# In The Matter Of:

*Haydn Zeis, Administrator of the Estate of Jordn Miller v. Springfield Township, Ohio, et al.*

---

*Officer Robert Scherer*

*Vol. 1*

*March 14, 2017*

---

*Layne & Associates*

*6723 Cooperstone Drive*

*Dublin, Ohio  43017*

*(614) 309-1669*

*WhitneyLayne@att.net*



## Layne & Associates

Reporters Without Borders

Original File 03-14-2017 Scherer Final.txt

Min-U-Script® with Word Index

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 1
March 14, 2017

---

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION

 3

 4   Haydn Zeis, Administrator of
     the Estate of Jordn Miller,
 5        Plaintiff,

 6        vs.              Case No. 5:16-CV-02331-JRA

 7   Springfield Township, Ohio,
     et al.,
 8        Defendants

 9

10                         - - -

11

12           VIDEO DEPOSITION OF ROBERT SCHERER
     the Defendant herein, called by the Plaintiff under the
13   applicable Rules of Civil Procedure, taken before me,
     Whitney Layne, a Notary Public for the State of Ohio, at
14   the Springfield Township Police Department, 2465 Canfield
     Road, Akron, Ohio  44312 on March 14, 2017 at 10:00 a.m.

15

16

17

18

19

20                   LAYNE & ASSOCIATES
                    6723 COOPERSTONE DRIVE
21                   DUBLIN, OHIO  43017

22

23

24
```

---

Page 2

```
 1   APPEARANCES

 2

 3        MICHAEL HILL, ESQUIRE
          EADIE HILL TRIAL LAWYERS
 4        3100 East 45th Street
          Suite 218
 5        Cleveland, Ohio  44127
               on behalf of the Plaintiff
 6

 7        GREGORY BECK, ESQUIRE
          MEL LUTE, ESQUIRE
 8        BAKER DUBLIKAR BECK WILEY & MATHEWS
          400 South Main Street
 9        North Canton, Ohio  44720
               on behalf of the Defendants
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

---

Page 3

```
 1                              March 14, 2017
                                Tuesday Session
 2                              10:00 a.m.

 3

 4                   - - -

 5                  STIPULATIONS

 6        It is stipulated by and among counsel for the
     respective parties that the deposition of ROBERT SCHERER,
 7   the Defendant herein, called by the Plaintiff under the
     applicable Rules of Civil Procedure, may be taken at this
 8   time by the notary Whitney Layne; that said deposition may
     be reduced to writing in stenotypy by the notary, whose
 9   notes thereafter may be transcribed out of the presence of
     the witness; and that the proof of the official character
10   and qualification of the notary is waived.

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

---

Page 4

```
 1                     EXAMINATION INDEX

 2

 3   ROBERT SCHERER
        CROSS BY MR. HILL  . . . . . . . . . .   Page 5

 4

 5                     EXHIBIT INDEX

 6   Deposition                                     Marked

 7    4   Springfield Township Use of Taser Policy  Page 140

 8    6   Springfield Township Use of Force Report   Page 155

 9   10   Springfield Township Use of Force Policy   Page 50

10   12   Investigative Notes                        Page 31

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 1
March 14, 2017

Page 5

1          ROBERT SCHERER,
2      Being first duly sworn, as hereinafter
3  certified, deposes and says as follows:
4           CROSS-EXAMINATION
5  BY MR. HILL:
6    Q    Officer, could you please --
7      MR. HILL: Actually, before we begin, since
8  we're on video, can everybody just go around the room and
9  introduce yourselves and who you represent?
10      MR. BECK: My name is Gregory Beck, and I
11  represent Officer Scherer and all of the Springfield
12  Township defendants.
13      MR. LUTE: Mel Lute.  I also represent the same
14  defendants.
15      MR. HILL: Michael Hill on behalf of the
16  plaintiffs.
17  BY MR. HILL:
18    Q    And, Officer, if you could, state your full
19  name.
20    A    Robert Scherer.
21    Q    Thank you, Officer.  Have you ever had your
22  deposition taken before?
23    A    I have.
24    Q    Can you give me an idea of just how many times

Page 6

1  you've had your deposition taken?
2    A    Three?
3    Q    And when you've had your deposition taken those
4  three times, what kind of cases were they?
5    A    One was a suit over a false arrest for a DUI.
6  The other was an incident here involving training with
7  Officer Albrecht, an in-custody death.  The third was also
8  a training incident involving Officer Sheila Church.
9    Q    All the times you've been deposed, it's been in
10  your capacity here as a law enforcement officer with
11  Springfield Township; is that right?
12    A    Yes, sir.
13    Q    Never in like a personal capacity?
14    A    No.
15    Q    Can you tell me a little bit about the first
16  time, this false arrest case where you had your deposition
17  taken -- I understand some is going to be approximations,
18  but give me an idea of some dates, time frames, who was
19  involved in that case.
20    A    I was actually with Brimfield Police Department
21  at the time.  It was early on in my career, so maybe 1992,
22  '93, somewhere around in there.  It was a -- I had pulled
23  a stop for obviously a suspected drunk driver.  The guy
24  did not speak any English, so we had a language barrier

Page 7

1  between us.  When we got him back to the office, it was
2  about basically trying to get him to understand what the
3  breathalyzer was.
4      That -- we ended up not being able to get a
5  good sample because he couldn't understand the directions
6  to that breathalyzer machine.
7      Later on, we ended up getting sued for false
8  arrest.
9      But I do not believe that case went anywhere
10  after the deposition.
11    Q    That was Brimfield PD?
12    A    Brimfield, B-R-I-M-F-I-E-L-D.
13    Q    How long had you been on the force at that
14  point?
15    A    Maybe two, three years.
16    Q    And were you named in that lawsuit?
17    A    I was.
18    Q    And as far as you know, that lawsuit was
19  dismissed without a settlement?
20    A    Yes.
21    Q    I want to talk about the second deposition you
22  were involved in.  I think you said this was a training
23  situation for an in-custody death involving Officer
24  Albrecht?

Page 8

1    A    Yes.
2    Q    Who is Officer Albrecht?
3    A    She was a former employee here that she had an
4  incident where she had tased somebody that was high on --
5  high on narcotics at the time.  He ended up dying.
6      At the time, I was the trainer for Taser and
7  Use of Force.
8    Q    Can you give me an approximation of dates,
9  either when the event happened or when you were deposed?
10    A    Was it in 2007?
11      MR. BECK: I can help you out there, Mike.  I
12  defended the township on that case, and we've got that.  I
13  can get you that information.
14      MR. HILL: Could you get me that information?
15      MR. BECK: I think it was like 2005, 2006.  I
16  know I defended that.  But we can get you that
17  information.  I think it was something like that.
18  BY MR. HILL:
19    Q    You said that Ms. Albrecht -- is it a female?
20    A    Yes.
21    Q    Ms. Albrecht was a former employee.  She was a
22  police officer?
23    A    Yes.
24    Q    And when was she dismissed from the force?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 9

1   A   She wasn't dismissed. She left to take a job
2 at some county sheriff's office.
3   Q   And you said the individual was intoxicated on
4 drugs and was tasered?
5   A   Yes.
6   Q   Was he known to be intoxicated on drugs at the
7 time he was tasered?
8   A   I believe so, yes. I was not on scene during
9 the incident.
10   Q   I understand.
11       And you were brought into the case because you
12 were the lead Taser trainer?
13   A   Yes.
14   Q   Were any policy violations found as a result to
15 Ms. Albrecht's actions?
16   A   Not that I can recall.
17   Q   Was there any retraining that was undertaken
18 regarding tasering individuals who are intoxicated on
19 drugs, after that incident?
20   A   No, not that I recall.
21   Q   Any additional -- and not only retraining for
22 Ms. Albrecht, but I mean department-wide?
23   A   Not at that time, no.
24   Q   Any change in policies or procedures regarding

Page 10

1 the use of electrical-conducted weapon?
2   A   Not at that time, no.
3   Q   What's your understanding of the result of that
4 lawsuit involving Ms. Albrecht?
5   A   The way I understood it was we just --
6 everybody agreed on a settlement to cover costs, if I'm
7 not mistaken.
8   Q   You didn't have to testify in court in that
9 case, just a deposition?
10   A   No.
11   Q   I want to talk about the third time.
12       Well, let me go back. I know you were the lead
13 Taser trainer; correct?
14   A   Yes.
15   Q   When was the time period where you were a Taser
16 trainer for Springfield Township?
17   A   I can get you exact dates, if you want.
18 However, everything right now is just going to be just a
19 guesstimate.
20       I believe we started with the tasers in maybe
21 2005, 2006, somewhere in that area. And then I went all
22 the way until about 2008, 2009.
23   Q   And was there a reason that you, at some point,
24 stopped being the lead Taser trainer for the department?

Page 11

1   A   More or less a conflict with our new chief at
2 the time.
3   Q   And that new chief was who?
4   A   Chief John Smith.
5   Q   And when you say "conflict," what was the
6 nature of the conflict?
7   A   There was a lot of internal issues within the
8 department with personnel, and it was just a very bad time
9 at the time.
10   Q   Around 2008 to 2009 or more recently?
11   A   Well, shortly after 2008.
12   Q   You said it was a lot of internal issues, it
13 was a bad time. Can you just explain that?
14   A   There was some incidents that occurred here
15 that created a large internal investigation that kind of
16 split the department up personnel-wise by sides, so to
17 speak. And that created a lot of animosity between just
18 officers in general and administration.
19   Q   What was the reason for the internal
20 investigation?
21   A   There was a sexual harassment claim.
22   Q   Do you know who made the claim?
23   A   I do.
24   Q   Who was that?

Page 12

1   A   It was Officer Mizer, M-I-Z-E-R.
2       MR. BECK: Let me just place an objection to --
3 you can answer these questions. I'm just going to voice a
4 blanket objection to any question on this, because I don't
5 know if there were any findings. Some of that is
6 confidential, but you can inquire.
7 BY MR. HILL:
8   Q   Officer Mizer, is that a female?
9   A   Yes.
10   Q   Is she still with the force?
11   A   Yes.
12   Q   What's her position with the force?
13   A   Patrol officer.
14   Q   Do you know who she alleged had sexually
15 harassed her?
16   A   Yes. Sergeant East.
17   Q   Is that Eric East?
18   A   Yes.
19   Q   He's still with the force; correct?
20   A   Yes.
21   Q   And you said there was a lot of -- well, tell
22 me about the internal investigation. Just describe it to
23 me, what kind of investigation you understood took place.
24   A   Basically, confirming the allegations.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 1
March 14, 2017

Page 13

1    Q   When you say "confirming," what were the
2  allegations that were confirmed as far as you understand
3  it?
4    A   Well, I don't know what was confirmed.  I just
5  know that that was the purpose of the -- the purpose of
6  the investigation was to -- basically, were these
7  allegations true or false.  So that's what I mean by
8  confirming.
9    Q   And do you know if they were confirmed to be
10  true or false?
11    A   I really don't know.
12    Q   Were you interviewed at all during this
13  investigation?
14    A   Yes, I was.
15    Q   Who interviewed you?
16    A   It was a detective from Summit County Sheriff's
17  Office and a detective from Akron Police Department, but I
18  do not recall their names.
19    Q   And do you know why you were interviewed?
20    A   Well, I was actually one of the witnesses at
21  the time.
22    Q   And a witness to what?
23    A   To the first incident that created the
24  allegations to come forward.

Page 14

1    Q   And what was the first incident that resulted
2  in the allegations coming forward?
3    A   Sergeant East showed up in the patrol room just
4  wearing his underwear.
5    Q   Walk me through how -- what you remember
6  happening.
7    A   We had -- Officer Ron Victor had just passed
8  away, and he had died -- well, obviously passed away, he
9  died.  We just got back from the calling hours.  I was a
10  member of the honor guard at the time.  So was Sergeant
11  East.
12      We had gotten back.  We were all in the patrol
13  office, and I believe Sergeant East was trying to just
14  lighten the mood of the incident.  And he walked into the
15  patrol office in front of two female officers wearing a
16  turtleneck and his underwear and, you know, said that he
17  thinks this should be our new -- our new uniforms.
18    Q   How many officers do you think were in the room
19  when this happened?
20    A   Myself, Officer Mizer, Officer Imhoff, Sergeant
21  Gaffney, Officer Brian Troyer, and then obviously Sergeant
22  East.
23    Q   And I apologize if you said this and I missed
24  it.  Were you in this building here?

Page 15

1    A   Yes.
2    Q   And where were you at within -- and we're at
3  2465 Canfield?
4    A   Yes.
5    Q   Is this the main police headquarters for
6  Springfield Township?
7    A   Yes.
8    Q   So where were you, this collection of officers,
9  at within the building when Officer East -- was he an
10  officer at the time or a sergeant?
11    A   He was a sergeant.
12    Q   He was a sergeant then as well?
13    A   Yes.
14    Q   He was a supervisor?
15    A   Yes.
16    Q   When Sergeant East walked into the room wearing
17  a turtleneck and only his underwear, where were you at in
18  the building?
19    A   We were in the patrol office.
20    Q   And this was right after someone close to the
21  department had died?
22    A   Yes.
23    Q   And I'm assuming that one of these female
24  officers who was present is the one who made the

Page 16

1  complaint?
2    A   Yes.
3    Q   Anything else happen during this set of events
4  where Supervisor Sergeant East was there with some of his
5  subordinates, I would take it, in his underwear?
6    A   What do you mean, anything else?
7    Q   Well, I guess just take a step back.
8      Sergeant East was a supervisor.  Some of the
9  individuals in his presence, when he was wearing only his
10  underwear, were his subordinates here at the police
11  department?
12    A   Yes.
13    Q   Was the female officer -- one of the female
14  officers who made the allegations also his subordinate?
15    A   Yes.
16    Q   As far as you know, was Sergeant East
17  disciplined in any way?
18    A   I really don't know the whole outcome of that
19  case.
20    Q   He is still with the department; correct?
21    A   Yes.
22    Q   He's still a sergeant; correct?
23    A   Yes.
24    Q   He actually does some public relations work as

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 1
March 14, 2017

---

Page 17

1  a spokesperson for the department; is that correct?
2      A    Yes.
3      Q    That was the first allegation made by this
4  woman.
5          And what was her name again?  I'm sorry.
6      A    Jamie Mizer.
7      Q    Jamie Mizer.
8          With respect to the second allegation by Jamie
9  Mizer, do you know what that involved?
10     A    What's the second allegation?
11     Q    I thought you said there were two allegations,
12  you testified or were interviewed as to the first.
13     A    Officer Mizer, and then -- I never got to
14  finish, but Officer Imhoff also made the same allegation
15  at that time.
16     Q    Is Officer Imhoff a male or female?
17     A    Female.
18     Q    So both female officers made that allegation?
19     A    Yes.
20     Q    And the allegation, at least with respect to
21  Sergeant East, their supervisor, standing there and
22  discussing whatever in his underwear with subordinates,
23  that part was just factually true; correct?
24     A    Yes.

---

Page 18

1      Q    Anything else that you're aware of in terms of
2  this internal investigation?
3      A    No.  That's what all I had to testify to.
4      Q    When you say "testified," that was a
5  deposition?
6      A    Well, interview.
7      Q    Interview.
8          So you said that there was a lot of conflict
9  and it divided the department; is that correct?
10     A    Yes.
11     Q    Tell me what you mean by it divided the
12  department.
13     A    Well, you had half the -- half the officers
14  were supportive of Officer Mizer and Officer Imhoff, and
15  then you had the other half of the officers that were
16  supportive of Sergeant East.
17     Q    Is Officer Imhoff still with the department?
18     A    No, she's not.
19     Q    And Officer Mizer is also not with the
20  department?
21     A    No.  She is.
22     Q    Oh, she is.  I'm sorry.
23          And you don't know the results of the
24  investigation?

---

Page 19

1      A    No, that was never made public to me.
2      Q    John Smith was the chief at that point?
3      A    Yes.
4      Q    He was -- how long had he been the chief?  I
5  mean, approximately.  Was he new to the job?
6      A    He was new.
7      Q    Was he with Springfield Township in some
8  capacity as a law enforcement officer before he became
9  chief?
10     A    Yes.
11     Q    Who interviewed you as part of that
12  investigation?
13     A    I don't remember their names, but it was a
14  detective from Summit County.
15     Q    That's right.
16     A    And Akron.
17     Q    That's right.
18          John Smith was still the chief when the events
19  involving Jordn Miller took place on September 8th, 2015;
20  correct?
21     A    Yes.
22     Q    So we've talked about the false arrest issue
23  where you were deposed; correct?
24     A    Yes.

---

Page 20

1      Q    We talked about the in-custody death following
2  a Taser application by Officer Albrecht; correct?
3      A    Yes.
4      Q    There was a third training situation that you
5  were deposed about; correct?
6      A    Yes.
7      Q    Can you tell me what you remember about that
8  set of events?
9      A    We were conducting a rapid deployment training
10  for rapid shooters inside the schools.  We were using
11  Simunition ammunition and weapons.
12          Officer Church was -- everybody was trained
13  specifically on what to do, how to enter rooms, and what
14  to do.
15          Officer Church didn't follow directions, which
16  caused her to actually get an injury during this training.
17  At that -- even though workers' comp covered the whole
18  incident, she -- she had tried to sue us for, I guess, the
19  pain and suffering of the injury.
20     Q    Can you tell me how -- how she was injured,
21  what you understand the injuries to be?  Was she shot?
22  Did she fall down?
23     A    Yeah.  She -- again, by not following what she
24  was instructed to do, she -- she lowered herself, almost

---

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

---

Page 21

1 diving to the ground. And the bad guy, or the officer
2 that was playing the bad guy, fired a Simunition round at
3 her. And he was always instructed to fire center mass to
4 the chest and stomach, abdomen area. But by her dropping
5 down, that caused her to actually drop into the path of
6 the bullet, you know, the Simunition round. It struck her
7 in the mouth and ended up, I guess, killing one of her
8 teeth.
9     Q   I guess for the record, what is a Simunition
10 round?
11    A   It's just a cotton -- cotton round that has --
12 dipped in paint.
13    Q   And do you know what happened with that, that
14 lawsuit?
15    A   Again, Mr. Beck would probably be able to --
16    Q   Okay.
17        MR. BECK: I can get you that. I know we
18 handled that, but --
19        THE WITNESS: Yeah. I don't remember
20 everything.
21 BY MR. HILL:
22    Q   That's quite all right. Quite all right.
23        Well, it looks like you've been deposed a
24 number of times, okay?

Page 22

1     A   Yes.
2     Q   And I'm sure you know how it goes.
3         But just so you and I are on the same page, I
4 kind of want to go over a few ground rules for both of us
5 to follow, okay?
6     A   Okay.
7     Q   Obviously, it's a question-and-answer session.
8         I'm going to ask you questions today. It's
9 your job to provide the answers; all right?
10    A   Yes, sir.
11    Q   One thing you have got to do is answer out
12 loud, yes, nos, explanations.
13        You've done a good job so far, but it's tough
14 for the court reporter to take down uh-huhs and huh-uhs
15 and try to interpret those things.
16    A   I understand.
17    Q   You're on video today, so that's going to help
18 us try to interpret things down the road. But I would ask
19 that you keep your voice up just to make sure the
20 microphone catches you.
21    A   Okay.
22    Q   And I'll do the same, okay?
23    A   Yes, sir.
24    Q   We'll try not to talk over each other, okay?

Page 23

1 So let me finish my question before you start to answer,
2 and vice versa, all right?
3     A   Yes.
4     Q   Do you have -- if I ask you a question today
5 that doesn't make a lot of sense or you want me to
6 rephrase it, please just speak up and say, "Michael, you
7 know, can you rephrase the question?" I'll be happy to
8 get you a question that you understand, okay?
9     A   Yes, sir.
10    Q   If you need a break for anything today -- I
11 don't know exactly how long we'll be here, but it could be
12 a little while -- just let me know you need a break. You
13 don't have to tell me why. And we'll accommodate you,
14 okay?
15    A   Okay.
16    Q   You were sworn in by the court reporter.
17    A   I was.
18    Q   Yes. So you understand you're under oath
19 today?
20    A   Yes.
21    Q   Your testimony today is the same as if you were
22 in front of a judge or a jury?
23    A   Yes.
24    Q   And you understand this is my only opportunity

Page 24

1 to ask you questions before trial in this case?
2     A   Yes.
3     Q   And you understand that I'm going to be relying
4 on the answers you give today in preparing this case for
5 trial; correct?
6     A   Yes.
7     Q   Now, Officer, I don't want to know any
8 discussions you had with your attorneys who are here
9 today. But other than speaking with your attorneys, can
10 you tell me what you did to prepare for your deposition
11 today?
12    A   I looked over my investigative notes that we
13 wrote the night of the incident.
14    Q   Anything else that you did to prepare for your
15 deposition today?
16    A   Just tried to remember everything.
17    Q   Did you listen to any audio recordings of
18 dispatch calls or 911 calls?
19    A   I have not.
20    Q   Have you ever listened to those since the
21 events that took place in this case?
22    A   I don't believe I ever heard them, no.
23    Q   You say you don't believe you ever heard them.
24 Do you mean you never heard them at any time or you

---

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

---

Page 25

1 haven't heard them since the events?
2    A   I don't believe I ever heard them at any time.
3    Q   How about dispatch? I'm assuming you would
4 have heard things come over the radio in terms of dispatch
5 to a location?
6    A   Yes, when the call came out.
7    Q   Anything else that you did to prepare for your
8 deposition today?
9    A   No, sir.
10   Q   Have you discussed your deposition with anyone
11 other than your attorneys?
12   A   Just the other officers involved.
13   Q   Tell me about those discussions.
14   A   Just trying to help each other recollect.
15   Q   When is the last time you spoke to either --
16 any of your colleagues about the events that took place?
17       And the events that took place, you're
18 referring to Jordn Miller; correct?
19   A   Yes.
20   Q   Okay.
21   A   It would have been yesterday with Officer
22 Holsopple.
23   Q   Where were you at when you spoke with Officer
24 Holsopple?

---

Page 26

1    A   Just in a parking lot, parked car. We were
2 both working.
3    Q   Was that -- what parking lot?
4    A   I believe it was a church off Canton Road.
5    Q   And how did it come to be that you and Officer
6 Holsopple were in the parking lot over on -- in the church
7 parking lot?
8    A   We just -- periodically, throughout the day, we
9 just hook up and talk about various things, if we don't
10 have any calls coming in or any activity going on.
11   Q   And how do you communicate with one another as
12 to a location to meet and speak? Is that by radio, by
13 cell phone?
14   A   Usually radio or over the in-car computers.
15   Q   Over the in-car computers -- I'm not a police
16 officer myself, so tell me a little bit about how you
17 communicate with one another through a computer system.
18   A   It's basically like sending a message, like a
19 text message. You would type in his unit number and then
20 write whatever you're going to write in the field and then
21 send it, and then he receives it and, you know, just
22 answers back.
23   Q   So this -- can I call it a -- can I just call
24 it a text messaging system; is that easier?

---

Page 27

1    A   Sure.
2    Q   This text messaging system, do you just -- do
3 you do it directly from -- from the -- is it a laptop in
4 your computer?
5    A   Basically, yes.
6    Q   And when you send a text message, how do you
7 know who it's coming from?
8    A   It has their -- when you send it, it has the
9 person's district number. Like we're assigned -- we're
10 day shift, so we're called Adam, and then we have
11 districts 1, 2 and 3. And so it would be Adam 901. That
12 would mean day shift, District 1 car.
13       And then when it receives, it would read, you know,
14 from -- it will actually say from Adam 902 to Adam 901.
15   Q   I see.
16   A   So --
17   Q   And what is your, I guess, name or what's your
18 designation on this text messaging system?
19   A   Yesterday it would have been Adam 901.
20   Q   So it changes from day-to-day?
21   A   Yes.
22   Q   Why does it change from day-to-day?
23   A   Everybody just works different districts
24 throughout the week.

---

Page 28

1    Q   And how would you match up, kind of going back
2 in time, the designation on the text messages that come
3 through versus the officers who are sending them? Do you
4 know what I mean?
5    A   No.
6    Q   Let's say we wanted to find out what Officer
7 Scherer sent two weeks ago.
8       Would you look at your schedule to see what
9 shift you were working that day or what district you were
10 in? Is that how you would do it?
11   A   Usually, that's never a thing. But everything
12 that's sent, dispatch would probably have a -- because
13 every -- we have to call into dispatch, and they keep a
14 log.
15   Q   So dispatch keeps a log of your district
16 numbers?
17   A   Yes, and which officers in each district.
18   Q   Dispatch, as far as you know, doesn't keep a
19 log of like text messages; do they?
20   A   I don't believe so.
21   Q   So tell me about, then -- and this text
22 messaging system, is part of this so you can kind of stay
23 off the airwaves and not get them all clogged up with
24 information like communication?

---

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 1
March 14, 2017

Page 29

1    A   Yes.
2    Q   So I'm assuming that this kind of inter --
3  car-to-car text messaging system is something that you
4  guys use pretty frequently; is that fair?
5    A   At times, yeah.
6    Q   Do you coordinate locations to meet using that
7  system?
8    A   Yeah.  If somebody asks to meet somewhere,
9  we'll just say where, and then they'll just say, "Meet me
10  at the church on Canton Road," or something like that.
11    Q   Can you tell me an idea, like yesterday,
12  what -- roughly, what time you and Officer Holsopple met?
13    A   It was morning time.  I can't -- I don't really
14  know the specific time.  We work 12-hour shifts.  The
15  whole day runs into each other but --
16    Q   Sure.
17    A   I don't know.  It was early morning,
18  mid-morning.
19    Q   And who asked who to meet?
20    A   He might have asked me to meet with him.  I
21  don't really --
22    Q   And when you met with him yesterday, had you
23  already reviewed your incident statements that you had
24  prepared back in September of 2015?

Page 30

1    A   Yeah, I had been looking at them on and off.
2    Q   So when you met with Officer Holsopple, just
3  tell me in as much detail as you can what you guys talked
4  about, how you talked about it, what was said, those types
5  of things.
6    A   It was more of he had never been deposed before
7  and was just more curious about what this setting would be
8  like.
9        Unfortunately, I have been deposed, so I was
10  able to kind of just tell him what the setting was like
11  and, you know, the basic question of "I wonder exactly
12  what he's going to ask."
13        So -- and, you know, that's the gist of the
14  conversation, and then we would just move on to a new
15  topic.
16    Q   What -- what did you tell him in terms of what
17  are they going to ask me?
18    A   I believe I said, "I have no freaking clue."
19    Q   Okay.  You said that you looked over -- I think
20  you said an incident report, or investigative notes maybe
21  was the term you used?
22    A   Yes, sir.
23    Q   And I have a copy of that here.  And I
24  premarked these.  So we're going to get to them all at

Page 31

1  some point over the next couple of days.
2        (Exhibit Number 12 was introduced.)
3  BY MR. HILL:
4    Q   But Officer, that's Exhibit 12 for this
5  deposition.
6        Can you take a look at that and tell me what it
7  is?
8    A   This is the investigative notes that I looked
9  at minus this page right here.
10    Q   It looks like page three of exhibit --
11    A   I guess it would be page three.  It doesn't
12  have a number.
13    Q   Of Exhibit 12?
14        Well, it's the third page of what I handed you
15  as Exhibit 12; correct?
16    A   Yes.
17    Q   Is that the document that you and -- is it
18  Sergeant Moore and Officer Holsopple created together?
19    A   Yes, sir.
20    Q   And that's a collective statement from all
21  three of you as to the events on September 8th, 2015;
22  correct?
23    A   Yes, sir.
24    Q   And before you submitted that investigative

Page 32

1  note, did you take a look at it to make sure it was
2  accurate?
3    A   Yes, sir.
4    Q   And who actually typed the information that's
5  on those pages, Exhibit 12?
6    A   I believe Sergeant Moore did the typing.
7    Q   And this was a collective effort; correct?
8    A   Yes, sir.
9    Q   My understanding is Chief John Smith was also
10  present when you created this investigative note?
11    A   He was in and out of the patrol office.  I
12  don't know if he was there the entire time.
13    Q   So tell me how -- just kind of the process
14  here.  We're going to get into the specifics of the note
15  later on.  But I just want to know the process as to how
16  this investigative note was created by the three of you
17  with Sergeant Moore typing it.
18    A   We all -- basically, we all sat in a row at the
19  computer desk or in the patrol office, and we just started
20  trying to recall each person's individual involvement.
21  And as we would, you know, recollect something, then we
22  would put it -- she would type it in the note.
23    Q   And probably likewise, I would assume there was
24  some editing that was happening as you created it, maybe

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 1
March 14, 2017

Page 33

1 some deletions and some additions as people recalled more
2 information?
3    A    And stuff added, yeah, probably.
4    Q    Is that the only draft that you're aware of, of
5 Exhibit 12?
6    A    Yes, sir.
7    Q    And each of you signed that report at the
8 bottom?
9    A    Yes, sir.
10   Q    And did each of you sign that report in each
11 other's presence?
12   A    Yes, sir.
13   Q    And in terms of -- we're going to get into
14 obviously your testimony today and the events.  But when
15 you looked over that incident report, was there anything
16 that jumped out at you as being inaccurate or you needed
17 to change?
18   A    I don't see anything that's inaccurate.
19   Q    You can hold on to that or set it aside.
20       Did you talk to Sergeant Moore at all about
21 your deposition today?
22   A    No, sir.
23   Q    Did you talk to Chief John Smith at all about
24 your deposition today?

Page 34

1    A    No, sir.
2    Q    Have you spoken to anyone else about your
3 deposition today?
4    A    My wife.
5    Q    Have you spoken to Sergeant Moore -- since
6 September 8th, 2015, have you spoken to her about the
7 events that took place with Jordn Miller?
8    A    Yes.
9    Q    Can you give me an idea of how many times
10 that's happened?  I know it's been a year and a half, so
11 --
12   A    Yeah.  Most of it was right after the incident
13 happened.
14       The three of us were really shook up over the
15 incident, and we were really trying to get a debriefing
16 scheduled and trying to decompress from what this incident
17 did to us.
18   Q    You said a debriefing scheduled.  Is this like
19 a post incident review type of situation?
20   A    Yes.
21   Q    Since the post incident review or the
22 debriefing was scheduled, have you talked to Sergeant
23 Moore at all about Jordn Miller?  Let's say in the last
24 six months.

Page 35

1    A    It would be sporadic here and there, and it was
2 no major conversations.  It was just -- you know, you kind
3 of -- we kind of got by it.  And then when things started
4 coming forward, like the court dates and things like that,
5 that would kind of refresh what's going on, and we might
6 hash things over, like just kind of bring it back up
7 again.  But nothing specific, nothing on a regular basis.
8    Q    You said that you have reviewed the incident
9 report, the investigative notes, Exhibit 12, from time to
10 time; correct?
11   A    Yes.
12   Q    Do you have a personal copy of that?
13   A    I do.
14   Q    Do you have that at your home?
15   A    No.  It was in my desk.
16   Q    Do you still have it?
17   A    Yes.
18   Q    Have you made any notes or handwritten notes or
19 anything like that on the investigative report itself?
20   A    No, sir.
21   Q    Any other notes or items that you've kept
22 regarding Jordn Miller?
23   A    No, sir.
24   Q    Could I ask you:  How many investigative notes

Page 36

1 total do you keep in your desk?  I mean, from other
2 occasions, other events.
3    A    It just varies.  If I have an important --
4 depending on the case.  If I have a folder or a file or
5 something, I might keep them in my desk so that I can --
6 especially if I know I'm going to have a big court case
7 over it, I'll keep them in my desk so that I can refresh
8 my memory without having to try to go through records to
9 repull everything up.
10   Q    Is the Jordn Miller case, in terms of an
11 investigation here at Springfield Township, considered
12 open or closed, as far as you know?
13   A    I would believe it's closed.
14   Q    And the reason that you have a copy of -- is it
15 just the investigative notes, or do you have more
16 information in your --
17   A    I just have Exhibit 12.
18   Q    So the reason you have the investigative notes
19 in your desk at the office is just from time to time so
20 you can look at it and make sure your memory is sharp
21 about the events?
22   A    Trying, yes.
23   Q    And that's basically for court purposes like
24 testifying today?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 37

1   A   Today.
2   Q   So if I ask you questions about Exhibit 12, you
3   should be pretty -- pretty okay to answer them; correct?
4   A   I've read it a lot.
5       MR. HILL: If you don't mind, what I'd like to
6   do is just take a short break.  I just want to make sure
7   that the audio is working and everything like that.  All
8   right?
9       MR. BECK: Yes.
10      (Recess taken.)
11  BY MR. HILL:
12  Q   Officer, we're back on the record after a short
13  break.  And I guess, just to make sure the record is
14  clear, the Albrecht case you were describing earlier, that
15  was the case -- the decedent in that case or the person
16  who died, was that Richard Holcomb?
17  A   Yes, sir.
18  Q   And was Richard Holcomb a case in any way
19  involving excited delirium as far as you know?
20  A   Yes.
21  Q   Can you explain what is your understanding of
22  excited delirium with respect to Richard Holcomb?
23  A   He had taken a bunch of -- a combination of
24  narcotics throughout the day.  That created an internal

Page 38

1   medical condition for him that he just couldn't control.
2   That's -- his violent outbreaks is what caused people to
3   call the police.  And Officer Albrecht was the first to
4   respond to that incident.
5   Q   And you said that it was an in-custody death.
6       Can you explain what you mean by Richard
7   Holcomb's death being in custody?  Was it at a jail?  Was
8   he being restrained?
9   A   He was being restrained, attempting to be
10  restrained at the time.
11  Q   Do you know which officers were restraining
12  him?
13  A   It was just Officer Albrecht.  She was alone
14  for the majority of that incident.
15  Q   And you said the -- your understanding is
16  either a combination of medications or some other factors
17  caused Mr. Holcomb, the decedent, to have a medical
18  condition that caused excited delirium?
19  A   Yes.
20  Q   And I want to take a step back, something we've
21  talked a little bit about earlier.
22      I think you mentioned that you were the Taser
23  -- the lead Taser instructor up until about the time that
24  Chief John Smith took over here as the chief; is that

Page 39

1   correct?
2   A   Correct.  Shortly after, I had resigned.
3   Q   And what was your relationship like with Chief
4   Smith?
5   A   He was my boss.
6   Q   You say that with a little hesitation.  You
7   kind of bite your tongue a little bit.
8       Tell me what you mean.
9   A   He was my boss.  It wasn't anything that we
10  were friends.  We weren't enemies.  We just -- he was my
11  boss, and I had to respect that he was my boss.
12  Q   Anything else?
13  A   That's about it.  I mean, he was -- there was
14  no relationship.  Just differences of opinions that -- he
15  was the boss, so --
16  Q   Is Chief Smith still with the department?
17  A   He is.
18  Q   He's no longer chief; is that correct?
19  A   Correct.
20  Q   Is his position school resource officer now?
21  A   Yes, sir.
22  Q   I'll have a chance to talk to Mr. Smith, but
23  what is a school resource officer?
24  A   I'm not exactly -- what his duties are, but

Page 40

1   he's assigned to work within the high school, and he just
2   pretty much deals with every incident that occurs up
3   there.
4   Q   Is that -- unless he's, you know, called to
5   report somewhere else, is that the limitations of his
6   jurisdiction now, the school, basically?
7   A   Basically, yes.
8   Q   Officer, I want to ask you kind of some general
9   questions, okay?
10  A   Sure.
11  Q   Let me know if you agree or disagree.
12      A police officer must never needlessly endanger
13  a member of the public; true?
14  A   True.
15  Q   Police officers should strive to uphold the
16  safety of the public; true?
17  A   True.
18  Q   When there's more than one way to handle or
19  deal with a member of the public, a police officer should
20  always select the way that's safest for that member of the
21  public; true?
22      MR. BECK: Objection.
23      Go ahead.
24  A   We always try.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

---

Page 41

1  BY MR. HILL:
2    Q    That's part of your job; correct?
3    A    Correct.
4    Q    To protect and serve; correct?
5    A    That is correct.
6    Q    And in terms of choosing the safest way, that
7  includes what force to use; correct?
8    A    Correct.
9    Q    That includes how to go about using that force;
10 correct?
11   A    Yes.
12   Q    That includes making decisions about how to
13 restrain a person; true?
14   A    True.
15   Q    That includes planning on how to address
16 members of the public when they're in a medical or mental
17 crisis; true?
18       MR. BECK: Objection.
19       Go ahead.
20   A    True.
21 BY MR. HILL:
22   Q    Police officers must use the least amount of
23 force needed under the circumstances; true?
24       MR. BECK: Objection.

---

Page 42

1        Go ahead.
2    A    I agree.
3  BY MR. HILL:
4    Q    Once a person is restrained, police are no
5  longer permitted to use force; true?
6        MR. BECK: Objection.
7        Go ahead.
8    A    False.
9  BY MR. HILL:
10   Q    Tell me why that's false.
11   A    Just because somebody is restrained does not
12 mean that they are under control.  They are still a danger
13 to themselves.  They can still be a danger to others,
14 including officers.  So just because somebody is in
15 handcuffs does not necessarily mean that they are in
16 control.
17   Q    Are officers here at the Springfield Township
18 police allowed to use force on a restrained individual?
19   A    If the incident calls for, yes.
20   Q    Are officers at Springfield Township permitted
21 to use a Taser or an electrical-conducted weapon on
22 restrained individuals?
23       MR. BECK: Objection.
24       Go ahead.

---

Page 43

1    A    If the incident calls for, yes.  If you're
2  still trying to gain compliance, you may exceed to
3  continue to use whatever force to get that person in that
4  control.
5  BY MR. HILL:
6    Q    And you understand the policies here, and
7  you've been trained on the policies of Springfield
8  Township; correct?
9    A    Yes, sir.
10   Q    Is using an electrical-conducted weapon or a
11 Taser on a restrained individual consistent or in line
12 with the policies, procedures, protocols here at
13 Springfield Township?
14       MR. BECK: Objection.
15       Go ahead.
16   A    Is using one?
17 BY MR. HILL:
18   Q    Yes.
19   A    In any circumstance?
20   Q    Yes.
21   A    Yes.
22   Q    Using more force than is needed to restrain an
23 individual is excessive; true?
24       MR. BECK: Objection.

---

Page 44

1        Go ahead.
2    A    That's not true.  I don't believe so.  I
3  believe you have to use the appropriate force to restrain
4  somebody.  I don't know what that force is.
5  BY MR. HILL:
6    Q    Part of a police officer's job is to help
7  people who are in trouble; true?
8    A    True.
9    Q    All members from our society depend on police
10 force for help; true?
11   A    Yes, sir.
12   Q    White members of society; yes?
13   A    Yes.
14   Q    Black?
15   A    Yes.
16   Q    Old?
17   A    Yes.
18   Q    Young?
19   A    Yes.
20   Q    Wealthy?
21   A    Yes.
22   Q    Poor?
23   A    Yes.
24   Q    Medically compromised?

---

Layne & Associates
(614) 309-1669

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 45

1    A    Yes.
2    Q    Mentally ill?
3    A    Yes.
4    Q    Basically, police officers in our society
5  really touch every person or every group of people who are
6  in a crisis situation at some point; true?
7    A    Yes, sir.
8    Q    Officer, you took an oath to uphold the
9  constitution; correct?
10   A    Yes, sir.
11   Q    It's your job to protect people's
12  constitutional rights; true?
13   A    Yes.
14   Q    It's your sworn obligation to serve and protect
15  the community; true?
16   A    Yes, sir.
17   Q    And the community should be able to trust you
18  as a law enforcement officer to uphold the constitution;
19  correct?
20   A    Yes.
21   Q    And why is that important, that the members of
22  our community should be able to trust you to uphold their
23  constitutional rights?
24   A    Without their trust, then who are were?

Page 46

1    Q    Tell me what you mean.  I think that's a good
2  answer, but tell me what you mean.
3    A    It's -- it's as simple as they're not going to
4  call us if they can't trust us.  They're not going to ask
5  for help if they can't trust us.
6    Q    And people should be able to trust police
7  officers like yourself and your colleagues when they're in
8  a moment of crisis; correct?
9    A    Yes.
10   Q    And that includes a medical crisis?
11   A    Yes.  Any crisis.
12   Q    That includes -- well, you said any crisis.  So
13  that includes people who are medically ill?
14   A    Yes.
15   Q    And I'm sure you've been involved in campaigns
16  or speaking engagements or just seen public service
17  announcements where -- and we encourage members of our
18  community to call police when they need help; correct?
19   A    Yes.
20   Q    It's your sworn responsibility to protect
21  people's Fourth Amendment rights to be free from
22  unreasonable searches and seizures; true?
23   A    Yes.
24   Q    It's your sworn obligation to protect people's

Page 47

1  constitutional rights when they need necessary medical
2  care; true?
3    A    True.
4         MR. BECK: Objection.
5         Go ahead.
6  BY MR. HILL:
7    Q    It was your sworn obligation on September 8th,
8  2015, to protect and not violate Jordn Miller's
9  constitutional rights; true?
10   A    I'm sorry, what?
11   Q    It was your sworn obligation on September 8th,
12  2015, to protect and not violate Jordn Miller's
13  constitutional rights; true?
14   A    True.
15   Q    That included Jordn Miller's rights to be free
16  from unreasonable searches and seizures; true?
17   A    If that pertained, yes.
18   Q    That included Jordn Miller's right to be free
19  from excessive force; true?
20   A    If that pertained, yes.
21   Q    That included Jordn Miller's right to get
22  access to necessary medical care; true?
23   A    Yes.
24   Q    Have you ever testified as an expert in the use

Page 48

1  of force or police procedures?
2    A    Never as an expert.
3    Q    Have you ever been retained as a consultant on
4  the use of force or police procedures for any department?
5    A    No.
6    Q    Do you consider yourself an expert in the use
7  of force for police procedures?
8    A    No.
9    Q    Have you ever been retained by anyone, could be
10  an attorney, anyone, to consult on training of police
11  procedures?
12   A    No.
13   Q    You've been talking a little bit about force,
14  use of force.
15        Force means any violence, compulsion or
16  constraint physically exerted by any means or against a
17  person or thing; true?
18   A    True.
19        MR. BECK: Objection.
20        Go ahead.
21   A    One definition.
22  BY MR. HILL:
23   Q    Is that the definition here at the Springfield
24  Township police department?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 49

1      MR. BECK: Objection.
2      A   I don't specifically know what the -- the
3   wording is, but it would -- force is just -- for us, is
4   any amount of -- any amount of exertion that we have to
5   use to gain compliance or control.
6   BY MR. HILL:
7      Q   That would include a police officer's decision
8   to physically grab and move a person from one location to
9   another; true?
10     A   Yes.
11     Q   That would include a police officer's decision
12  to physically restrain a person who is attempting to move;
13  true?
14     A   Yes.
15     Q   That would include holding a person down on the
16  ground; true?
17     A   Yes.
18     Q   That would include the use of a conductive
19  electrical weapon; true?
20     A   Yes.
21     Q   That's a Taser; correct?
22     A   Yes.
23     Q   That definition of force would include the
24  decision to strike with your fist a member of the public;

Page 50

1   true?
2      A   Yes.
3      Q   That would include the decision to hold a
4   person in one position on the ground as opposed to
5   another; true?
6      A   Yes.
7      Q   And since I have it out, I'm going to hand you
8   what we'll mark as Exhibit 10 for this deposition.
9          (Exhibit Number 10 was introduced.)
10         MR. HILL: And, Greg, I've handed you a copy
11  here.
12         MR. BECK: Thank you.
13  BY MR. HILL:
14     Q   Officer, I'm not going to ask you a lot of
15  questions about this, but if you will look at the bottom
16  of Exhibit 10 there, there's a -- well, Exhibit 10, is
17  that the -- a use of force policy from Springfield
18  Township as far as you know?
19     A   As far as I'm aware, yes.
20     Q   And under -- if you look at the bottom, there's
21  a definition section that says "1214.01," definitions?
22     A   Okay.
23     Q   Do you see where I'm --
24     A   Yes, I see.

Page 51

1      Q   And there's a definition of force that's
2   provided on the bottom of -- it would be page 1 of Exhibit
3   10. It carries over to the top of Page 2 of Exhibit 10;
4   correct?
5      A   Yes.
6      Q   And that definition states: "Force means any
7   violence, compulsion or constraint physically exerted by
8   any means upon or against a person or thing."
9          Correct?
10     A   Yes.
11     Q   And you gave me another definition, but it
12  sounds like they're pretty much in line; is that fair?
13     A   Yes.
14     Q   As far as you know, are there any other -- what
15  you have in front of you, this Exhibit 10, says, "Use of
16  deadly force and weapons requalifications." It would be
17  kind of on the cover sheet. Do you see that?
18     A   I see "the use of deadly force" --
19     Q   And then it says, "And Weapons
20  requalifications," directly underneath it?
21     A   Oh, at the top, yes.
22     Q   It's all part of the title.
23         If you look down on the -- kind of the middle
24  of the page, on the left-hand side, it says, "Revised

Page 52

1   2007." Correct?
2      A   Yes.
3      Q   As far as you know -- this is what my office
4   received as part of this lawsuit.
5          But as far as you know, is this the most
6   up-to-date use of deadly force policy?
7      A   I would have to assume so, yes.
8      Q   You've never seen any more recent one as far as
9   you know?
10     A   No.
11     Q   Are there any other use of force policies -- I
12  understand there's a Taser policy.
13         But with expect to use of force, are you aware
14  of any other written policies or protocols or guidelines
15  here at Springfield Township other than what you have in
16  front of you as Exhibit 10?
17     A   As far as the use of force and weapons, no.
18  This should be everything, other than the separate policy
19  for Taser.
20     Q   Officer, as part of your job as a police
21  officer who provides help to members of the public, from
22  time to time you encounter individuals who have a
23  diminished mental capacity; is that fair?
24     A   Yes.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 53

1   Q   And when deciding whether to use force on a
2  member of the public, a police officer should consider the
3  mental capacity of the subject at the time; true?
4   A   Depending on the situation.
5   Q   Give me -- tell me why, why mental capacity
6  would be one of the factors in determining whether to use
7  force and what force to use.
8   A   Basically, it depends on what their demeanor
9  is. Are they being violent with us or others?
10   Q   Is that the only consideration?
11   A   Usually, yes.
12   Q   Some individuals with diminished mental
13  capacity may not be able to follow a police officer's
14  commands; true?
15   A   Some.
16   Q   And that's something you have got to take into
17  consideration as a police officer; correct?
18   A   We try.
19   Q   And you have to take that into consideration as
20  a tactical measure; is that fair?
21   A   Yes.
22   Q   And you've also got to take that into
23  consideration in terms of how to approach a situation?
24   A   Yes.

Page 54

1   Q   And you've got to take that into consideration
2  in terms of using force or the amount of force when a
3  person with diminished mental capacity may not follow your
4  commands; true?
5   A   Yes.
6   Q   And that's because they may not be capable of
7  doing so; correct?
8   A   And we might not know that either.
9   Q   If you know that -- well, strike that.
10   Some individuals with diminished mental
11  capacity may act in ways inconsistent with police
12  officers' commands; true?
13   MR. BECK: Objection.
14   Go ahead.
15   A   They might -- if they're not listening, they're
16  not following the command, so yes.
17   BY MR. HILL:
18   Q   And it may actually just be not only are they
19  not listening, but they may not understand that they were
20  even interacting with the police at the time; true?
21   MR. BECK: Objection.
22   Go ahead.
23   A   I don't -- I can't speak on what he's
24  perceiving or not perceiving. I don't know that.

Page 55

1  BY MR. HILL:
2   Q   Do you try to take into consideration, when
3  using force on a member of the public, whether they seem
4  to perceive you and how they perceive you as a police
5  officer?
6   A   I try to use consideration any time I have to
7  use force. I'm not out there to beat people up. Like you
8  said, we are there to help the people and do what we can
9  do to help them. So every time I have to use force, I use
10  consideration of what I'm dealing with. But I have to
11  know all the facts to know what I'm dealing with.
12   Q   And to get those facts, you've got to sometimes
13  take some steps before you actually interact with the
14  person; true?
15   A   You try.
16   Q   Who am I dealing with?
17   A   Sometimes there's not time.
18   Q   Who am I dealing with?
19   A   Yes.
20   Q   What is their mental capacity?
21   A   Yes.
22   Q   What type of call was this?
23   A   Yes.
24   Q   Is this a medical call?

Page 56

1   A   Yes.
2   Q   Is this someone who needs help?
3   A   Yes.
4   Q   Those are all things that you'd like to know
5  before interacting with a person and potentially using
6  force; correct?
7   A   Yes.
8   Q   Some individuals with diminished mental
9  capacities may not understand the roles of police officers
10  at the time; true?
11   MR. BECK: Objection.
12   Go ahead.
13   A   It's possible, yes.
14  BY MR. HILL:
15   Q   I'm going to use some examples.
16   For example, a person with low cognitive
17  abilities or retardation, mental retardation, may not
18  understand the roles of the police; correct?
19   A   That all depends on their levels. I don't know
20  what their levels are. I don't know what they're capable
21  of understanding or not understanding. I'm not in their
22  situation.
23   Q   How about an individual with Alzheimer's or
24  dementia, members of our elderly community?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 57

1    Some of those people don't understand at the
2 moment that they're interacting with members of the
3 police; true?
4    A   It's possible.  Again, not understanding their
5 levels.
6    Q   Those individuals may not be able to follow
7 commands given by officers because of mental limitations;
8 true?
9    A   Again, it's true, but I don't know what their
10 levels are.  I don't know what they're capable of.
11    Q   How would you go about trying to find out what
12 a person's levels are or what their mental capabilities
13 are?
14    A   You can only rely on the information that's
15 given to us at the time of the calls, and family members.
16 They're the only ones that are going to be able to tell
17 us.
18    Q   Family members are good resources?
19    A   Yes.
20    Q   You also have your own firsthand observations,
21 correct?
22    A   Yes.
23    Q   What you've observed of this person; correct?
24    A   Yes.

Page 58

1    Q   So it's a combination of what information
2 you've been provided; true?
3    A   Yes.
4    Q   It's a combination of not only what information
5 you've been provided by dispatch but also what family
6 members have as resources; true?
7    A   Yes.
8    Q   And also your firsthand observations of is it
9 apparent that this person has diminished mental capacity;
10 true?
11    A   Sure.
12    Q   Very young children may have diminished mental
13 capacities; true?  Maybe they're fine for their age, but
14 given their --
15    A   Possible, yes.
16    Q   Individuals -- I'm sure you've been trained on
17 approaching people who are having a diabetic coma or other
18 diabetic issues?
19    A   True, yes.
20    Q   They can sometimes act like they're drunk or
21 delirious and not understand people around them; correct?
22    A   Some do.
23    Q   That would be the type of situation where a
24 member of our community might have a diminished mental

Page 59

1 capacity where you're asked to respond; true?
2    A   True.
3    Q   There might be problems with unintentional
4 medication overdoses or medication combinations; true?
5    A   True.
6    Q   Again, that's the type of situation where a
7 person may be delirious or out of control and you'd be
8 asked to help from a medical perspective; right?
9    A   I wouldn't say a medical perspective, but as
10 somebody trying to help with EMS.
11    Q   You'd be a first responder getting them in the
12 hands of medical professionals; true?
13    A   Yes.
14    Q   I'm sure sometimes you've been called for drug
15 overdoses; true?
16    A   Yes.
17    Q   Drug overdoses are also a medical -- would be
18 considered a medical call; correct?
19    A   Yes.
20    Q   And in those situations, individuals in a drug
21 overdose type situation may not be able to follow a police
22 officer's commands; true?
23    A   Some.
24    Q   And that may be because of a medical condition

Page 60

1 being caused by the interaction of these chemical
2 substances; true?
3    A   That's possible, yes.
4    Q   Something you have got to take into
5 consideration; correct?
6    A   Correct.
7    Q   And you take that into consideration in terms
8 of how you're interacting with this person; right?
9    A   Yes.
10    Q   And you do that because your job is to help;
11 right?
12    A   We try.
13    Q   And all your steps, when dealing with a person
14 with diminished mental capacity, and when it's a medical
15 call, should be to try to help that person; right?
16    A   We always try to help.
17    Q   That's your job; right?
18    A   That's our job.
19    Q   What are some of the ways that police officers
20 can address or respond to a person with a diminished
21 mental capacity in ways other than using force?
22        MR. BECK: Objection.
23        Go ahead.
24    A   Again, that depends on the whole call scenario,

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 61

1 the information we're receiving at the time, and what's
2 going on when we get to the scene.
3          Every scene, every situation, every call is
4 different.  There is no -- nothing that we do that is
5 routine.  So every incident is completely different from
6 the next incident.
7 BY MR. HILL:
8    Q   Do you receive any kind of training here at the
9 department as to how to approach and interact with members
10 of the community who have diminished mental capacities?
11    A   I have not.
12    Q   Who would be responsible for arranging that
13 training here at the department?  Would that be the chief?
14    A   I would imagine.
15    Q   And you said that everything we do -- and I'm
16 paraphrasing to some extent.  But I think that what you
17 said is nothing we do is routine, every circumstance is
18 different; correct?
19    A   Yes, sir.
20    Q   And that's why it's so important to get the
21 available information and have a plan; true?
22    A   True.
23    Q   A police officer must never punish a person for
24 being in a diminished mental state; true?

Page 62

1    A   Sure.
2    Q   We can agree with that?
3    A   Yes.
4    Q   A police officer must never use force as a
5 punitive measure; true?
6    A   That is true.
7    Q   So it should never be kind of a tit-for-tat
8 arrangement.  You did something to me; therefore, I'm
9 going to retaliate as a police officer.  That should never
10 happen; true?
11    A   Not under that type of definition, no.
12    Q   You agree with what I said; right?
13    A   Yeah.
14    Q   Okay.
15    A   We should never do a tit for tat.  But if they
16 escalate force, we have to escalate force.  And again, to
17 try to gain compliance.
18    Q   And if a person escalates force, you said you
19 can escalate force; correct?
20    A   Yes.
21    Q   And as force de-escalates, officers must
22 de-escalate their force; correct?
23    A   Yes.
24    Q   Law enforcement officers, like yourself, are

Page 63

1 often called upon to help mentally ill people; true?
2    A   From time to time, yes.
3    Q   That happens in lots of different scenarios;
4 correct?
5    A   Yes.
6    Q   Could happen in a public setting; correct?
7    A   Yes.
8    Q   Could happen in a private setting, like a home;
9 correct?
10    A   Yes.
11    Q   And officers need to be prepared to handle
12 those types of situations regardless of the setting;
13 correct?
14    A   We try.
15    Q   Should be trained on that; correct?
16        MR. BECK: Objection.
17        Go ahead.
18    A   We're not doctors, so we do what we can do and
19 how we do it.  It's just -- every -- again, every
20 situation is different.  There's no set scenario that we
21 can go to every day with every mental-impaired person
22 that's going to give us the same outcome.
23 BY MR. HILL:
24    Q   Now, I know you've never been trained on

Page 64

1 interacting with people with diminished mental capacity;
2 correct?  We talked about that?
3    A   Yes.
4    Q   If training was offered here at the department
5 on interacting with people who have a diminished mental
6 capacity, you would have gladly received that training;
7 correct?
8        MR. BECK: Objection.
9        Go ahead.
10    A   Yes.
11 BY MR. HILL:
12    Q   Mentally ill -- some of the scenarios involving
13 mentally ill individuals might be a call for a confused
14 person; true?
15    A   Could be.
16    Q   It might be that a person is acting strangely;
17 correct?
18    A   Could be, yes.
19    Q   It might be that a person is agitated; correct?
20    A   Yes.
21    Q   It may be that a person -- one of the scenarios
22 might be a mentally ill person who doesn't understand the
23 verbal commands or cannot follow the verbal commands of
24 police officers; true?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 65

1    A   Possibly, yes.
2    Q   Have you ever received -- I know I talked to
3 you kind of more broadly about diminished mental capacity.
4 But have you ever received any training regarding how to
5 interact with members of the community who are mentally
6 ill or in the throes of a mental crisis?
7    A   No.  Yes and no, to be honest with you.
8        The excited delirium training I have sometimes
9 can be construed as potentially one onset mentally that
10 could be, you know -- somebody could be thrown into an
11 onset of excited delirium just mentally.  But just that
12 little bit of training, nothing above and beyond that.
13    Q   I want to just unpack that. I think I
14 understand it.  But you've received some training on
15 excited delirium; true?
16    A   Yes.
17    Q   And one of the things that can cause excited
18 delirium in your understanding is an underlying mental
19 health issue?
20    A   Could be, yes.
21    Q   But other than excited delirium training,
22 you've never had -- let me back up again, too.
23        Were you also saying that people with excited
24 delirium behave in manners similar to people who are

Page 66

1 mentally ill, at times?
2    A   Everybody has different symptoms.  So it's not
3 necessarily the same symptoms as excited -- full-blown
4 excited delirium subjects or mentally ill people.  So no,
5 that's not --
6    Q   Okay.  That's fine.
7        The extent of your training, with respect to
8 how to interact with members of the public who may be
9 mentally ill, would simply be some overlap with your
10 excited delirium training; true?
11    A   Yes.
12    Q   There's never been any kind of specific course
13 here at Springfield Township or anywhere else where you've
14 gone through training about this is how a police officer
15 should approach a situation involving a mental health
16 crisis; true?
17    A   True.
18    Q   And again, the same question, but I think I
19 know the answer.
20        If training, specific training was offered here
21 at Springfield Township involving how do police officers
22 in our community approach and respond to members of the
23 public who are suffering a mental health crisis, you would
24 have undertaken that training if it was offered; true?

Page 67

1        MR. BECK: Objection.
2        Go ahead.
3    A   True.
4 BY MR. HILL:
5    Q   Do you believe that law enforcement officers
6 should do everything in their power to protect the safety
7 of mentally ill persons in need of help?
8        MR. BECK: Objection.
9        Go ahead.
10    A   We do what we can do.
11 BY MR. HILL:
12    Q   So is the answer the officers should do
13 everything in their power to protect the safety of
14 mentally ill persons in need of help?
15        MR. BECK: Objection.
16        Go ahead.
17    A   Yes.  I believe we should do everything we can
18 to protect everybody, not just the mentally ill.
19 BY MR. HILL:
20    Q   Because these are members of our community in
21 need of help; true?
22    A   Yes.
23    Q   When engaging members of the public who are
24 suffering a mental health crisis, police officers should

Page 68

1 attempt to engage in de-escalation tactics; true?
2    A   If -- if that's feasible, yes.
3    Q   The attempt should be made; correct?
4    A   Yes.
5    Q   What are some examples of de-escalation
6 tactics?
7    A   Really, all there is at this point that I'm
8 aware of is trying to talk to the subject.
9    Q   Anything else?
10    A   Not as far as de-escalating.
11    Q   Have you ever received any training on
12 de-escalation tactics as a police officer?
13    A   I don't believe so.
14    Q   Have you received any training on what signs or
15 symptoms to look for, to identify whether a person's
16 behavior is being caused by a mental illness?
17    A   No.
18    Q   Have you ever been engaged in a process where a
19 person is being involuntarily committed to a psychiatric
20 institution?
21        Sometimes they call it being pink slipped.
22 Other states may call it the Baker Act.  Do you know what
23 I'm referring to?
24    A   Yes, I know.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 69

1    Q   Have you ever been involved as an officer in
2  one of those situations, assisting a mentally ill person
3  to a hospital setting for an involuntary commitment?
4    A   Yes.
5    Q   Can you tell me -- have you received any
6  training on that?
7    A   No.
8    Q   Can you walk me through what you would do or
9  have done in the past when you were called to a home or
10  other setting for an involuntary commitment where you're
11  an officer on duty?
12    A   99 percent of those cases are suicidal cases.
13  It's somebody who is wanting to commit suicide and we get
14  called.
15       You know, we talk to them.  And if we can
16  verify that the allegations are true, either by family
17  members or text messaging sometimes or e-mails, whatever
18  the case may be, then we would do the pink slip.  But we
19  always -- usually, again, probably 95 percent of that
20  time, are in a cooperative setting.  The subject wants
21  help.  The subject is -- whether they are pink slipped or
22  not, they're still voluntarily willing to go, so they are
23  very easy to deal with and handle.
24    Q   So about 99 percent of the time -- and I'm not

Page 70

1  going to hold you to numbers, okay?  But most of the time,
2  it sounds like, these are suicidal situations; right?
3    A   Yes.
4    Q   One percent of the cases, then, or some smaller
5  amount, are not suicide cases; correct?
6    A   Correct.
7    Q   And likewise, you said about 95 percent of the
8  time or a big chunk of the time, people, even if they
9  don't want to go into a commitment situation, they go
10  willingly?
11    A   Yes.
12    Q   And then there's a smaller percentage, five
13  percent, ten percent, whatever it might be, of people who
14  don't want to go; correct?
15    A   Correct.
16    Q   I want you to walk me through -- what it --
17  when you get contacted as an officer, you and your
18  colleagues here, about pink slipping a person or an
19  involuntary commitment situation, what's the process, kind
20  of from A to Z, that you have to go through?
21    A   We get on scene, we know -- as soon as we get
22  there, everything is based off of their reaction.
23       If they're calm, we're calm.  If they're
24  agitated, we try to calm them.  And if we're in a setting

Page 71

1  that they're not creating any danger to themselves or
2  others or us, then we will try to talk to them as long as
3  we can try to talk to them.
4       Dispatch usually already has dispatched an EMS
5  there anyway.  So once they get there, then we usually
6  just stand by, allow EMS to assess them.  And if they
7  don't want -- if EMS says they don't want to go and we
8  have to involuntarily take them, then, again, we try to
9  get them onto the cot, get them to go willingly.  We talk
10  to them, tell them, "Look, if you don't go, we're going to
11  have to physically put you on that cot."  And then we
12  might get charged.  And, you know, you don't want to do
13  this, and we don't want to do that.  Just go get the help.
14  You know, we try to explain this to them and really get
15  them to go voluntarily.  And sometimes that doesn't work.
16  And sometimes we'll go to grab them just to put an arm --
17  a hand on their arm to try to walk them over to a cot and
18  they start using physical force.  At that point, we are --
19  we have no obligation.  We have to get that person help.
20  We have to physically put them on the cot.  So now we
21  might have to use force.
22       And if we only have to use enough force to pick
23  them up and put them on a cot until the paramedics can tie
24  them down, then that's all the force that we use.

Page 72

1       You know, if he starts fighting with us and
2  attacking us and attacking EMS personnel, then we might
3  have to use other force.  It just depends on what they're
4  displaying to us, so --
5    Q   Is the goal to -- if you have an agitated
6  person, to speak softly, quietly, and try to prevent that
7  agitation from growing?
8    A   We try.
9    Q   You said, "When EMS has been called, we usually
10  wait for EMS to arrive."  Is that right?
11    A   No.  EMS is already dispatched prior to us
12  getting dispatched, usually.  So we're already there, or
13  we're already going there and they're already going there.
14  We usually beat them there, so we'll go in and make the
15  initial contact.
16       But depending on the circumstances, even though
17  EMS is called by dispatch prior to us, a lot of times they
18  will not approach until the whole scene is secure.  So
19  they might be a block or two down the road anyway.
20    Q   So EMS in those situations would be in a
21  staging area?
22    A   Sometimes they are.  And sometimes they come up
23  to the house.  It just depends on -- again, it's based off
24  the information they receive.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 73

1    Q    You said you make the first contact; correct?
2    A    Usually, yes.
3    Q    And when you make the first contact, do you try
4  to get available information from family members about
5  what is going on with this person?
6    A    Yes.
7    Q    Because they're really the best resource in
8  terms of this person's mental health history; correct?
9    A    Correct.
10    Q    And they're the best resource in terms of how
11  this person is behaving; correct?
12    A    Correct.
13    Q    And they may be a good resource in terms of how
14  to interact with this person; correct?
15    A    Yes.
16    Q    Do you coordinate in any way with EMS to find
17  out when they're arriving or where they are arriving?
18    A    No.
19    Q    Have you ever undergone any training about
20  coordinating with EMS in terms of setting up a staging
21  area or anything along those lines when responding to a
22  mental health crisis?
23    A    Training, no.  But if we think it's something
24  that needs to be staged or something, or if we think the

Page 74

1  scene is not secure, we'll just let them know not to
2  approach yet.
3    Q    But I means, in terms of -- are there any kind
4  of guidelines that you have here at the department or
5  policies saying you stage and this is how you stage?
6    A    No.
7    Q    This is when you make contact with EMS?
8    A    Well, there's a -- there's a guideline put in
9  place for excited delirium cases about staging and EMS,
10  but it doesn't say, you know, where specifically they're
11  going to stage or how or when or anything like that.
12    Q    Uh-huh.  So what does that mean, then, staging?
13    A    Staging just means to try to be in an area that
14  we are at.  Not on scene, but maybe a few blocks away,
15  maybe a half mile away, depending on where we're located.
16    Q    And we'll get into excited delirium.  But does
17  it mean -- staging, does it mean a half a mile?  Does it
18  mean a block?  Does it mean --
19    A    It depends where they stop.
20    Q    What's the point of the staging area or the
21  staging -- what's the point of EMS staging anywhere?
22    A    Anywhere?
23    Q    Yeah.  What's the point of having that as part
24  of a policy, that they're staging?

Page 75

1    A    Just so that they are able to respond quicker.
2    Q    Right.  Because you have a person who may be
3  medically compromised; true?
4    A    Yes.
5    Q    You may have a person who needs immediate
6  medical attention; true?
7    A    True.
8    Q    It may be a person who needs the administration
9  of medications immediately; true?
10        MR. BECK: Objection.
11    A    Yeah, I don't know that one.  That's --
12  BY MR. HILL:
13    Q    That would be up to EMS?
14    A    That's up to them, yeah.
15    Q    Just so I understand it, when you're asked to
16  respond to a mental health crisis at a person's home --
17  because that's the example we've been using -- do you
18  formulate a plan with your fellow officers as to when
19  you're going to arrive, who's going to arrive, who is
20  going to take the lead, anything like that?
21    A    No.
22    Q    How do you approach the situation?  Is it just
23  you walk in and ask what's going on?
24    A    Well, usually the call is dispatched to the

Page 76

1  district car.  And then if it's a mental -- we call it a
2  53, is our code, which stands for a mental case.
3        If -- the district car will get dispatched.
4  Another car will just voluntarily pipe up and advise radio
5  that they're in route to back them up.  And then usually
6  whoever is dispatched, the call, whoever's call it is,
7  they do the initial talking to the person.  The backup
8  officer usually tries to gather some information from the
9  family members or whoever is on scene, if that's feasible
10  to do.
11        So there's really no set protocol in place for
12  that.  You just -- if it's my call, I'll take the lead on
13  it.  And then the backup officer usually gets -- helps get
14  information and then watches the other guy's back.
15    Q    So the custom that's developed here at the
16  department is -- when you have a mental health crisis
17  call, the officer whose car is dispatched goes there
18  immediately; true?
19    A    Yeah.  They're usually the primary responding
20  officer.
21    Q    And then there is a -- is there always a second
22  officer who arrives, or is there sometimes not a second
23  officer?
24    A    Again, it's based off of the information and

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 77

1  how the call comes out.  Sometimes we don't need a second
2  officer.
3      Q   My question is, though, in terms of custom.  Is
4  there -- it doesn't sound like there's always a two-person
5  response to a mental health crisis; correct?
6      A   Correct.
7      Q   Who is making the decision one car will show
8  up, two cars will show up?
9      A   Nobody makes the decision other than how
10  dispatch puts the call out to us.
11      Q   So when you say how dispatch puts the call out
12  to us, are they saying two officers need to respond?
13      A   No.
14      Q   Or they're giving information and then the
15  officers on the job are making the decision we need two
16  cars or we only need one car?
17      A   Yes.
18      Q   And how are you communicating that information,
19  over the radio?
20      A   Yeah, if -- if I get the call and it's
21  something that another officer might think that he needs
22  to come to, he'll just get on the radio and say, you know,
23  "I'll be in route to back."
24      Q   So in that type of situation -- let's use you

Page 78

1  as an example.  A call comes in from dispatch of a mental
2  health crisis.  It's your car.  You go directly to the
3  scene; true?
4      A   Yes.
5      Q   There would be no kind of rendezvous point
6  where you talk to another officer; correct?
7      A   No.
8      Q   And whatever officers are hearing this over the
9  radio, they would make an independent judgment to go to
10  the scene or not; correct?
11      A   Yes, usually.
12      Q   And then based from there, because you're the
13  first person in the door -- if you're the first person in
14  the door, you likely would be the initial contact with the
15  person in the mental health crisis; true?
16      A   Yes.
17      Q   And then if another officer comes in, he would
18  likely be talking to a family member or another
19  information-gathering situation?
20      A   Yes.
21      Q   And if that second officer doesn't arrive, you
22  would be on your own; correct?
23      A   Yes.
24      Q   And there is no set training here at

Page 79

1  Springfield Township where you guys have gone through some
2  kind of situational training or classroom training,
3  saying, in a mental health crisis situation, these are the
4  number of officers that need to be respond; true?
5      A   True.
6      Q   And likewise, there has never been any kind of
7  training here saying in a mental health crisis situation
8  this is the plan or protocol that officers must follow;
9  true?
10      A   True.
11      Q   Likewise, in terms of the decision to use force
12  when handling an individual in a mental health crisis,
13  that is just a matter of whatever happens at the scene;
14  correct?
15      A   Yes.
16      Q   Do you ever consult any mental health
17  professionals when dealing with a mental health call -- or
18  a mental call, as you call it?
19      A   No.
20      Q   And in terms of training, we were talking
21  earlier about a staging area.  You've never undergone any
22  specific training that says, "Here is how you coordinate
23  with EMS to identify an appropriate staging area."
24  Correct?

Page 80

1      A   No.
2      Q   You've never undergone any specific training by
3  the department here saying, "When you're undertaking a
4  staging, either excited delirium or mental health issues,
5  this is how far away the ambulance or EMS should be."
6  Correct?
7      A   No.  Now, for the excited delirium, since you
8  bring that up, with that protocol, whoever the officer is
9  that notifies them that they want them to stage, they
10  might say, just -- we'll tell dispatch to have them stage
11  at the corner of this street and this street.  But
12  usually, we allow that -- we allow the fire department to
13  make their decision on how far they want to stage, how far
14  they say they feel safe from the scene.
15      Q   And in the excited delirium situation, do you
16  communicate with the fire department as to how far they
17  are going to stage?
18      A   We might throw a recommendation out, but they
19  don't have to follow that -- that recommendation.
20      Q   But what I'm asking is not even a
21  recommendation.  Are you finding out where they are
22  staged?
23      A   No, we're not knowing where they're at.
24      Q   So you don't know necessarily how long it's

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 81

1 going to take for them to get to the scene from their
2 staging area?
3    A   No.
4    Q   I mean, that's -- it's something you would be
5 capable of finding out through radio traffic, I would
6 assume; correct?
7    A   If you have time to do that, depending on what
8 you've got going on at the moment.
9    Q   But you could -- and I understand if it's
10 possible. But do you have your radio on now?
11    A   No, I do not.
12    Q   Do you usually keep it kind of on your collar,
13 kind of lapel area?
14    A   Yeah, right here.
15    Q   Can you just kind of show me -- how many
16 buttons do you have to push to use the radio?
17    A   Just one.
18    Q   So can you show me what -- if you wanted to
19 find out the location of the fire department or EMS, what
20 would you say?
21    A   I would have to ask our dispatcher if they can
22 contact EMS and find out where they're at.
23    Q   Officers here at Springfield Township cannot
24 contact EMS directly?

Page 82

1    A   We can, but we have to change several channels.
2    Q   Okay. What do you mean?
3    A   On the radio, you have got a knob that switches
4 channels. We have -- I don't know how many channels we
5 have. It's several banks of different channels to
6 different agencies. So you would actually have to pull
7 the radio out of your mic -- or out of your holder. And
8 on the side of the radio it has a screen with the channel
9 display in it. You would have to switch the channel and
10 watch every channel until you hit the -- it says PDFD
11 channel. So that's the only way we can communicate
12 directly with our EMS.
13    Q   So if you were going to do that, you would
14 really need an officer who wasn't hands-on who was there
15 almost specifically to do that; correct?
16    A   Yes.
17    Q   When deciding to use force on a member of the
18 public, police officers should consider whether that
19 member of the public is suffering from any medical
20 conditions; true?
21       MR. BECK: Objection.
22    A   That's a loaded question. I mean, you -- we
23 don't know what they're experiencing, you know. I mean,
24 you should always -- we only use force when force is

Page 83

1 necessary. So if the force isn't necessary, we're not
2 going to use it. So it's really not a consideration of
3 who we're dealing with as much as what are we dealing with
4 and what are they doing that is forcing us to use that
5 force.
6 BY MR. HILL:
7    Q   Well, isn't it important to identify, before
8 you use force, whether a person is in a compromised
9 medical situation where force can be dangerous?
10       MR. BECK: Objection. We've been over this.
11       You can answer.
12    A   Yeah. I don't -- I don't believe it's going to
13 matter what that person is going through. If they're
14 using force on us, or they're using force on public, we
15 are obligated under law to use it, to use whatever
16 necessary force we have to get them in and under control
17 so we can get them that help.
18       If we can identify later, after they're under
19 control, that they need medical attention and medical
20 help, then we are a lot easier able to do that and get
21 them that help that they need to. But if they're coming
22 at us, we don't have time to sit and try to diagnose them
23 and find out what their problem is and to try to, you
24 know, stall the situation until everybody can get there.

Page 84

1 We have to act accordingly. And they -- we act off of
2 their reactions. And that's the only thing that I can --
3 I continuously say, is based off of what they're doing is
4 how we react. Based off of our level of force is based
5 off of what level of force they're using to us.
6 BY MR. HILL:
7    Q   I just want to -- something you said in the
8 middle of that answer, because it was kind of a long
9 answer.
10       You said, "We don't try to stall the situation
11 until everyone gets there." Is that correct?
12       MR. BECK: Objection.
13       Go ahead.
14    A   No, that's not what I said.
15       We don't try to stall the situation to try to
16 diagnose somebody. If he's coming at us and using a level
17 of force or he's a danger to himself immediately or he's a
18 danger to public or he's resisting us, then we don't have
19 time to sit and try to diagnose the situation of where
20 he's at and what he needs. You know, sometimes we have to
21 get him under control before we can diagnose a situation.
22 BY MR. HILL:
23    Q   Do you think it's important for police officers
24 to try to stall the situation and stall the use of force

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 1
March 14, 2017

Page 85

1 until you can understand what the medical situation is?
2    A   If that time is permitted.
3       MR. BECK: Objection.
4 BY MR. HILL:
5    Q   And how would you go about doing that?
6    A   Based off his actions.
7    Q   Anything else?
8    A   No.
9    Q   Any kind of planning before you confront the
10 person?
11    A   It's all based off of his actions.
12    Q   So you would approach the person and then
13 react?
14    A   Yes.
15    Q   Have you ever undergone any training at
16 Springfield Township in terms of how to respond to
17 individuals with medical crises?
18       We talked about mental health crises. Now I'm
19 talking about medical crises.
20    A   We've had some periodic first aid training.
21    Q   Other than first aid training, have you
22 received any formal or informal training here at the
23 department or from any other source?
24    A   Well, that -- that first aid training was given

Page 86

1 by our fire department, set up through our police
2 department.
3       I mean, if you're asking if I ever took an EMT
4 class or something, then no.
5    Q   How about with respect to using force on
6 members of the public?
7       Have you received any training with regard to
8 using force on individuals or members of the public who
9 may be in a medical crisis?
10       MR. BECK: Objection.
11       Go ahead.
12    A   No.
13 BY MR. HILL:
14    Q   And if I understand it, the response from
15 police officers here at Springfield Township, including
16 yourself, would be the same, in terms of using force,
17 regardless of whether a person was medically compromised
18 or mentally compromised because it would all -- or
19 absolutely normal, because it would all be based on
20 reacting to that individual's behavior; is that true?
21    A   That is --
22       MR. BECK: Objection.
23       Go ahead.
24    A   That is true.

Page 87

1 BY MR. HILL:
2    Q   When deciding whether to use force, should
3 officers -- should police officers consider whether the
4 person is under the influence of any drugs?
5    A   That's good information to have. But again,
6 what are they doing to us or somebody else or even to
7 themselves at the time?
8    Q   Why is it good information to have?
9    A   That lets us know maybe why he's acting in
10 certain behavior, or it may let us know that he might be a
11 lot stronger than the situation may be.
12       I mean, there's all kinds of different safety
13 factors. But it also let's us know if this is going to
14 end -- maybe eventually be a medical thing that we're
15 going to have to deal with.
16    Q   You said it's a -- there are a number of safety
17 factors.
18       You're referring to potentially the safety of
19 the officers involved; correct?
20    A   Yes.
21    Q   Potentially the safety of this member of the
22 public who is on drugs; correct?
23    A   Yes.
24    Q   Because you said it could lead to a medical

Page 88

1 situation down the road; correct?
2    A   It could be, yes.
3    Q   And you want to get medical attention to this
4 person in need as soon as possible; true?
5    A   If needed, yes.
6    Q   Well, after a person has ingested drugs, the
7 body may be under physiological stress; true?
8    A   Sure.
9    Q   And additional stress resulting from force can
10 be dangerous to that person; true?
11       MR. BECK: Objection.
12       Go ahead.
13    A   Yes.
14 BY MR. HILL:
15    Q   Because it puts additional stress on an already
16 physiologically-stressed body; true?
17    A   I would assume.
18    Q   And individuals under the influence of drugs
19 also may not be able to follow the commands of officers;
20 true?
21       MR. BECK: Objection.
22       Go ahead.
23    A   Again, it depends on their levels.
24 BY MR. HILL:

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

---

Page 89

1  Q   Sure.  But certainly you've seen situations --
2  A   It has happened, yes.
3  Q   And individuals under the influence of drugs
4  may have a diminished mental capacity; true?
5  A   True.
6  Q   Have you received any training here at the
7  Springfield Township police department or otherwise in
8  terms of how to use force or whether to use force on
9  individuals suspected of being on drugs?
10  A   General drugs, no.  It depends on, again, on
11  the situation.
12  Q   When you say depends on the situation, are you
13  referring to just a real-time, on-the-scene situation?
14  A   Yes.
15  Q   What I'm asking, though, is have you ever
16  undergone any training on how to use force on people
17  suspected of being on drugs?
18  A   Generalized drugs, no.  If it's an excited
19  delirium case, yes.  So I don't know exactly what -- you
20  know, we have a very high drug problem here.  We deal with
21  people on drugs every day, but it doesn't mean they're in
22  a case -- or a situation where they're experiencing some
23  excited delirium or that they're acting bizarre or
24  violent, you know, where -- we might not even have to use

---

Page 90

1  drugs.  They might just be all antsy and tweaking and just
2  hyper.  So I don't know.  I guess I don't understand
3  exactly what the question is that you're -- that you're
4  asking.
5  Q   I'll ask it again.
6      But every day here officers at Springfield
7  Township are responding to individuals in the community
8  who are on drugs or suspected of being on drugs; true?
9  A   That's true.
10  Q   This is a usually-recurring circumstance here
11  for the department, people being on drugs or interacting
12  with police; correct?
13  A   Yes.
14  Q   And my question was:  In terms of using force
15  on members of the public who are on drugs, have you
16  undergone any specific training as to:  This is how you
17  should use force.  These are the considerations you should
18  make before using force.  Things like that here at the
19  department.
20      MR. BECK: Objection.
21      Go ahead.
22  A   Again, it's based off of what they are
23  presenting to us, what way are they presenting to us.
24      It's going to fall under the general use-of-

---

Page 91

1  force guidelines no matter what the situation is with
2  anybody.
3      If they are using force or we have to use force
4  to get them help, that -- all those guidelines fall under
5  this policy of use of force.  There's no specific training
6  for this person being under this drug or this person being
7  under this drug or this person being under alcohol.  It's
8  just force in general.  What level of force are they
9  presenting?  What level of force do we have to use to get
10  them under control to get them the help or get them to
11  jail or get them to what we need to do?
12      So in general, there's nothing specific.  It
13  all falls right here under this use-of-force policy.
14      You know, you come at me one way, and I might
15  have to use a level of force.  But then once you're under
16  control, you're under control.
17      Now, are you under drugs?  Are you drunk?  I
18  don't know.  Or are you just mad at me?  You know, so --
19  but there's no specific training other than what the use
20  of force is.
21      I'm going to use the force only necessary that
22  I have to get you under control.  So there's no specific
23  training for each individual incident.
24  BY MR. HILL:

---

Page 92

1  Q   What training have you undergone regarding use
2  of force generally here at the department?
3  A   This policy --
4  Q   That's Exhibit 10?
5  A   Yes, I'm sorry, Exhibit 10.
6      This policy and when we do in-service
7  trainings, no matter what they are.
8  Q   What do you mean?
9  A   It could be rapid deployment training.  It
10  could be Taser training.  It could be some sort of
11  scenario-based training like traffic stops and procedures,
12  you know, whatever -- whatever we're training at the time,
13  there might be a situation or a scenario that is presented
14  in there that you would have to use a certain level of
15  force.
16  Q   So the use of force training you're describing
17  with Exhibit 10, again, just so I understand it, there's
18  not a separate section that comes out of it that says,
19  "This is how we deal with people suspected of being on
20  drugs."  Fair?
21  A   That's fair.  That's correct.
22  Q   Same thing, this is not -- there's nothing that
23  you pull out of there to say this is how we deal with
24  people who are acting a certain way because of a medical

---

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 93

1   condition; true?
2       A   True.
3       Q   Same thing, there's nothing in there that you
4   pull out that says this is how we react to people who are
5   acting this way because they have got mental health
6   problems?
7       A   That is correct.
8       Q   I think we've gone through this, and I think I
9   understand.
10          Springfield Township police officers, like
11  yourself, you're going to respond with the same amount of
12  force for the same reasons regardless of what is causing a
13  person to act a certain way; true?
14          MR. BECK: Objection.
15          Go ahead.
16      A   Yes.
17  BY MR. HILL:
18      Q   And when going to a call, there's no commanding
19  that's taking place with you and another officer, by radio
20  or otherwise, saying, hey, here's how we need to approach
21  this, I think he's on drugs, let's not use this type of
22  force, or something like that; fair?
23      A   Yeah, we don't know until we get there.
24      Q   Unless somebody tells you?

Page 94

1       A   Yes.
2       Q   But even if they tell you, it won't really
3   change how you react, because your actions are reactions
4   to the person there; true?
5           MR. BECK: Objection.
6           Go ahead.
7       A   Yes.
8   BY MR. HILL:
9       Q   That would go with the same explanation for
10  mental health, medical conditions and everything else we
11  discussed; true?
12      A   Yes.
13          MR. BECK: Let's take a break whenever you're
14  in a good spot.
15          MR. HILL: Why don't we pause right now?
16  That's fine. I think we've been going about an hour.
17          (Recess taken.)
18  BY MR. HILL:
19      Q   People with a low body mass index are
20  especially vulnerable to injury during uses of force;
21  true?
22      A   Yeah, I would say so.
23      Q   And that includes during the use of a
24  conducted-electrical weapon; true?

Page 95

1       A   Could be.
2       Q   Do you know why that is?
3       A   I would assume just less fat, less cushion.
4       Q   When you were a Taser instructor, was a
5   person's body mass index ever part of the instruction?
6       A   Yes.
7       Q   How so?
8       A   It had an effect on the use or the
9   effectiveness of the Taser.
10      Q   And what effect did it have?
11      A   Somebody that was more obese would not have --
12  may not have had the same effects that somebody that's
13  skinnier and healthier. That's why we always try to teach
14  to shoot into a muscle group.
15      Q   So the lower a person's body mass index, the
16  more effect the Taser would have?
17      A   It could, yes.
18      Q   Given the same connection?
19      A   Yes.
20      Q   And that also goes to -- people who are frail
21  are especially likely to be injured during uses of force,
22  including the use of a Taser; true?
23      A   Yes, anybody that is old.
24      Q   Or in a weakened condition?

Page 96

1       A   Yes.
2       Q   And they might not necessarily be old, but they
3   might be in a weakened medical condition for other
4   reasons; true?
5       A   That could be true, yes.
6       Q   When considering whether to use force on a
7   person, a reasonable officer should consider whether the
8   person is exhibiting signs of increasing physiological
9   stress; true?
10          MR. LUTE: Objection.
11          Go ahead.
12      A   Again, it's what we're dealing with at the
13  time.
14      Q   Right.
15      A   You know, in a perfect world, it would be great
16  to have all the information, be able to diagnose somebody
17  and do what we need to do at that time so that things like
18  this never happen. But we all know we're not in a perfect
19  world.
20  BY MR. HILL:
21      Q   Things like what? You said things like this
22  never happen.
23      A   Well, this incident here.
24      Q   You're talking an in-custody death?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 97

1   A   Yes.
2   Q   When considering whether to use force, officers
3  have to consider all the evidence they have in front of
4  them; correct?
5   A   Yes.
6   Q   And the evidence they have in front of them
7  includes signs that a person may be exhibiting that
8  they're under increased stress; true?
9       MR. LUTE: Objection.
10      Go ahead.
11  A   That could be any number of things, yes.  But
12 that could be one.
13 BY MR. HILL:
14  Q   And that's one of the things that an officer
15 should consider?
16  A   But again, if they're out of control or they're
17 coming at us or have harmed somebody else, you know, we
18 may not have time to consider that.
19  Q   Assuming that an officer has time to consider
20 that, whether a person is demonstrating signs of stress,
21 if those warning signs are present, it's something
22 officers should take into consideration; true?
23  A   Yes.
24  Q   And that's because when a body is already under

Page 98

1  stress, adding stress to that person can be dangerous for
2  that person; true?
3   A   It could, yes.
4   Q   It can cause that person to have heart rhythm
5  problems; true?
6   A   Yes.
7   Q   It can cause that person to have trouble
8  breathing; true?
9   A   Yes.
10  Q   It can cause that person to suffer from sudden
11 death; true?
12  A   Yes.
13  Q   Conditions that you're aware of that can
14 increase the body's physiological stress response can
15 include drug use, particularly stimulants; true?
16  A   Yes, sir.
17  Q   It can include mental illness; true?
18  A   Yes, sir.
19  Q   And specifically, I'm referring to a mental
20 health crisis, where is a person may be acting erratic or
21 under agitation?
22  A   Any number of reasons, yes.
23  Q   That's one of them?
24  A   It could be, yes.

Page 99

1   Q   Medical conditions, like excited delirium, can
2  put the body under extreme stress; true?
3   A   Yes, sir.
4   Q   A reasonable officer should attempt to decrease
5  the stress response of a person, not increase the amount
6  of stress; true?
7       MR. LUTE: Objection.
8       Go ahead.
9  BY MR. HILL:
10  Q   When a police officer uses force, this can
11 increase the physiological response of the person's body;
12 true?
13  A   It can, yes.
14  Q   It can increase that agitation level; true?
15  A   Yes.
16  Q   It can increase that body's fight or flight
17 response; true?
18  A   Yes.
19  Q   Positional restraint asphyxia occurs when a
20 person's body position interferes with breathing; true?
21  A   Yes.
22  Q   This can be caused by a restriction on the
23 person's ability to expand his or her chest; true?
24  A   Yes.

Page 100

1   Q   This can be caused when the person -- or the
2  position of a person's head obstructs the airway; correct?
3   A   It can, yes.
4   Q   This can be caused when anything is in the face
5  or mouth of the person and it obstructs their airway;
6  true?
7   A   Yes.
8   Q   Positional restraint asphyxia is a life-
9  threatening medical condition; true?
10  A   It can be, yes.
11  Q   Positional restraint asphyxia can cause death;
12 true?
13  A   Yes.
14  Q   When restraining an individual, police officers
15 must actively assess the person to make sure they're
16 restrained in a manner that allows them to breathe; true?
17  A   If it's feasible, yes, we try.
18  Q   When restraining an individual, officers must
19 make sure that nothing is obstructing the person's
20 breathing; true?
21  A   Again, we try.  It's not always possible, but
22 we do what we can do, you know, when we can.
23  Q   Because the result, if the breathing is
24 compromised, is the person can die; true?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 101

1    A   That's true.
2    Q   So it's not one of those things where you kind
3  of try a little bit.  You've got to try very hard;
4  correct?
5        MR. LUTE: Objection.
6        Go ahead.
7    A   Again, it depends on what type of fight that
8  we're involved in or level of force that's going on.  But
9  when we are able to, we try to make sure that they are
10  safe during this whole resisting, so to speak.
11  BY MR. HILL:
12    Q   Officers have to be aware of the risks of
13  positional restraint asphyxia whenever they're interacting
14  or restraining members of the public; true?
15    A   We try to be, yes.
16    Q   That's part of your job; correct?
17    A   Yes.
18    Q   Prone restraint is a risk factor for positional
19  asphyxia; true?
20    A   It can be.
21    Q   Have you received any training at Springfield
22  Township or otherwise on positioning a person to avoid
23  positional restraint asphyxia?
24    A   Yes.

Page 102

1    Q   How did you receive that training?
2    A   That was with the -- that was involved -- a
3  small segment was involved in the excited delirium
4  training that I attended.
5    Q   When did you attend that excited delirium
6  training?
7    A   Oh, again, I would have to look exactly.
8  Shortly after the Albrecht-Holcomb incident.  So 2006,
9  2007.
10    Q   The Albrecht-Holcomb incident or Mr. Holcomb's
11  death, was he in a prone position when he died?
12    A   I -- I don't know that.  I was not there for
13  that incident.  I can't -- I don't recall the situation up
14  there.
15    Q   Where were you sent for this excited delirium
16  training?
17    A   They actually had a class at Summit County
18  sheriff's office.
19    Q   And how many people attended from Springfield?
20    A   Myself and just Officer Holsopple.
21    Q   And was this class specifically put on for
22  Mr. -- because of Mr. Holcomb's case, or was this
23  something that was happening anyway and because you had
24  the Holcomb death --

Page 103

1    A   Yeah, this was something that was already
2  happening, and because we had an incident similar to this,
3  we had went.
4    Q   The officer actually involved in Mr. Holcomb's
5  death did not go to this training?
6    A   That is correct.
7    Q   Were you given any materials at this training
8  session?
9    A   Yes.
10    Q   Did you bring any of those materials back with
11  you to the department?
12    A   Yes.
13    Q   What happened to those materials?
14    A   Well, for the longest time, when I would teach
15  yearly classes on excited delirium, I just had them in my
16  desk.  And then I gave everybody a hand-out at one point
17  on the very first class, just like a cheat sheet.  But
18  since then, since I had resigned from all the training, I
19  honestly don't know where these materials have gone to.
20    Q   You would have last trained what year on
21  excited delirium?  Would this have been with the --
22    A   It's been at least eight to ten years.
23    Q   Would this have also been the time when Chief
24  Smith came on duty as chief?

Page 104

1    A   Yes, it was during his tenure.
2    Q   And after you stopped teaching excited delirium
3  training, was anybody else here at the department
4  providing training on that?
5    A   No.  There's a brief segment in the Taser
6  training that Taser puts in their manual that people
7  cover, that the current Taser instructors will cover.
8    Q   And who is that current Taser instructor?
9    A   John Lombardi and Brian Troyer.
10    Q   So when you underwent training at Summit County
11  maybe ten years ago or so, whenever it was, what do you
12  remember being taught concerning positioning a patient to
13  avoid positional restraint asphyxia?
14        MR. LUTE: Objection.
15        Go ahead.
16    A   The big thing then was the prone position with
17  use of pepper spray and taking their -- because of the
18  pepper spray, people are gasping for air.  And you already
19  have that inability to breathe, and then you combine that
20  with laying somebody on their stomach, was creating that
21  problem of expansion for the lungs.  And then they would
22  eventually pass out and go into some sort of cardiac
23  arrest if not caught quick enough.  So that was the big
24  thing at that time back then.  So --

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 1
March 14, 2017

Page 105

BY MR. HILL:
1
2 Q Anything else?
3 A No.
4 Q And that is the risk of positional restraint
5 asphyxia, is that you go into cardiac arrest?
6 A You could, yes.
7 Q We talked about prone, a prone restraint being
8 a risk factor for positional restraint asphyxia; correct?
9 A Yes.
10 Q Prone position meaning laying face down,
11 correct, on your stomach?
12 A Yes.
13 Q Are there any policies or protocols here at
14 Springfield Township regarding how to restrain a person?
15 A What do you mean?
16 Q We have a use of force policy there; correct?
17 A Yes.
18 Q Is there any policy that you're aware of that
19 addresses prone restraint or how to restrain a member of
20 the public?
21 A Not that I'm aware of.
22 Q And other than the excited delirium training,
23 you're not aware of any specific training regarding prone
24 restraint; correct?

Page 106

1 A Correct.
2 Q And the last time that training would have been
3 given, as far as you know, would have been you giving it
4 seven or eight years ago, give or take; correct?
5 A At least, yes.
6 Q Before it was discontinued by Chief Smith?
7 A Yes.
8 Q Is there anything in Springfield Township's
9 policies banning prone restraint?
10 A Not that I'm aware of.
11 Q Is restraining a person in a prone position
12 something that happens fairly regularly at Springfield
13 Township?
14 A That depends on every circumstance. We
15 never -- at least the people that I work with, if we have
16 to restrain somebody, we only leave them in that prone
17 position just long enough to get them in control and
18 custody. And as soon as that's done, we either roll them
19 over, sit them up or stand them straight up and then get
20 them to a car. We never leave anybody just laying --
21 laying around. And that's no policy. That's just
22 practice of conscious officers.
23 Q That's what everybody knows, basically; right?
24 A Yes.

Page 107

1 Q That prone restraint can result in positional
2 asphyxia?
3 A Yes.
4 Q And you said roll them on their side. That's
5 because when you roll them on their side, their diaphragm
6 and chest are no longer compressed, and it opens up the
7 airways; true?
8 A That is true.
9 Q Same thing when you said roll them on their
10 back; correct?
11 A Yes.
12 Q A struggle with officers or anybody is a risk
13 factor for positional asphyxia; correct?
14 MR. LUTE: Objection.
15 Go ahead if you understand the question.
16 A Yeah, I don't know what you're meaning by a
17 struggle with.
18 BY MR. HILL:
19 Q Well, a struggle where somebody is in a prone
20 position and they're trying to get up and the officers are
21 trying to keep them down, that type of struggle increases
22 the risk of positional asphyxia because the muscles
23 require additional oxygenation; true?
24 MR. LUTE: Objection.

Page 108

1 Go ahead if you know.
2 A It could. But again, you almost have to have
3 somebody specifically laying on top of that person to help
4 restrict that -- their breathing.
5 BY MR. HILL:
6 Q And where did you learn that information?
7 A That was -- that's just common sense.
8 Just because you're laying on your stomach -- I
9 sleep on my stomach every night, but I don't go into
10 positional asphyxia from it.
11 Q I'm asking you about a situation where a person
12 is struggling to get up and they're in a position --
13 they're in a prone restraint, okay, they're face down,
14 they're in a prone position, and they're struggling to get
15 up and officers are trying to keep that person down.
16 Does that struggle increase the risk of
17 positional asphyxia?
18 MR. LUTE: Objection.
19 Go ahead if you know.
20 A It might. But so could running. I mean, as
21 far as putting them in any type of medical condition.
22 BY MR. HILL:
23 Q Well, I'm talking about things that officers
24 are involved in, okay? And I'm talking about things that

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 109

1 officers have to be aware of when assessing people for
2 risk factors for positional asphyxia, okay?
3    A    Well, if they're struggling to get up -- I'm
4 sorry. Go ahead.
5    Q    So my question is: If a person is in a prone
6 position and they're struggling to get up or move, and
7 they're being held down by officers, that increases the
8 risk of positional restraint asphyxia; true?
9    A    It could.
10    Q    And the reason for that is because as a person
11 is struggling, muscles require additional oxygenation;
12 true?
13         MR. LUTE: Objection.
14         Go ahead if you know.
15    A    I don't know about oxygenation and muscles and
16 everything, so --
17 BY MR. HILL:
18    Q    It's because the stress on the body, in lay
19 terms, is getting more; correct?
20    A    Yeah. If he's fighting, there's going to be
21 stress.
22    Q    Any time when a person is becoming winded, that
23 increases the risk for positional restraint asphyxia;
24 true?

Page 110

1         MR. LUTE: Objection.
2         You can answer if you know.
3    A    I don't know. I mean, that's -- I don't know
4 what his situation is. I mean, that's hard. That's a
5 speculation like, I believe.
6 BY MR. HILL:
7    Q    So how do you assess -- when you have a person
8 in prone position, how are you assessing the risk for
9 positional restraint asphyxia short of a person sitting on
10 him?
11    A    I would have to say prolonged time and is
12 somebody specifically on him, and is that person trying to
13 get up? If he's trying to get up and pushing himself
14 halfway up, then he's not totally laying on his diaphragm
15 and his chest and his stomach, so he's able to pass air.
16 If he's yelling, he's passing air, you know.
17         So again, it depends on how bad the struggle is
18 and what they are doing to us that are forcing us to try
19 to hold him down. But if he's pushing himself up, he's
20 created distance between himself and the ground. So I
21 would -- under those circumstances, then, no, he would not
22 be a danger of positional asphyxia.
23    Q    You said if a person is yelling, they can pass
24 air; is that what you said?

Page 111

1    A    Yes.
2    Q    So if a person is yelling or making noise,
3 based on your training, do you think that that person is
4 not at risk of positional asphyxia?
5         MR. LUTE: Objection.
6         Go ahead.
7    A    And he's still passing air -- at that
8 particular time, he's passing air, so to me he's
9 breathing.
10 BY MR. HILL:
11    Q    And a person will be able to do that until they
12 stop breathing; correct?
13    A    Yes.
14    Q    And at that point, they're in positional
15 restraint asphyxia, correct, once they've stopped
16 breathing?
17         MR. LUTE: Objection.
18         Go ahead if you know.
19    A    I would assume, yes.
20 BY MR. HILL:
21    Q    That's the life-threatening thing you're trying
22 to avoid; correct?
23    A    Yes.
24    Q    Anything that causes the heart to race and

Page 112

1 increases stress increases the risk of positional
2 restraint asphyxia; true?
3         MR. BECK: Objection.
4         Go ahead.
5    A    Just not that thing, though, yeah. The heart
6 racing can cause -- he could have died or had a heart
7 attack sitting up, if the heart is racing, if he just got
8 done fighting. There's nothing that says that just
9 because the heart is racing and he's in that prone
10 position that that's why he had a heart attack.
11 BY MR. HILL:
12    Q    That's not my question.
13    A    Okay.
14    Q    My question is: When you as an officer are
15 assessing the risk factors or the risk that a person may
16 go into positional restraint asphyxia, you've got to
17 evaluate all the circumstances around you; true?
18    A    Yes.
19    Q    We talked about that.
20    A    Yes.
21    Q    One of the circumstances or the conditions that
22 you need to evaluate is whether or not that person is
23 under some amount of stress causing the heart to race.
24 That's obvious to you; true?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 113

1    A    That's true.  But we still have to get him
2  under control before we can assess all that stuff.
3    Q    And you keep saying you have to get him under
4  control.
5        Are you saying that you have to get a person
6  like that under control so that you can -- you said help
7  them; is that what you said?
8    A    Yes.
9    Q    People who are under the influence of drugs are
10  at a higher risk for positional restraint asphyxia; true?
11    A    I don't know that statistic.
12    Q    You've never been taught that?
13      MR. BECK: Objection.
14      Go ahead.  Go ahead and answer.
15    A    Again, you could be sober and just overweight.
16  And if we're fighting with you and you're on the ground in
17  a positional situation, have no drugs on board, but just a
18  bad heart, that person could have the same effects.
19  BY MR. HILL:
20    Q    Right.
21    A    So I don't know if drugs are going to
22  necessarily increase it or decrease it.  I'm not a medical
23  doctor, I guess.
24    Q    You bring up a good point.

Page 114

1        So basically, when you as a member of the
2  police department, going to help people, you may not know
3  a person's underlying medical condition; true?
4    A    That's true.
5    Q    And any member of the public that you deal with
6  may have heart issues or increased stress that could put
7  them into positional restraint asphyxia if they're in a
8  prone restraint with force; true?
9    A    That's true.
10    Q    So you have got to be on the lookout for that
11  no matter what; correct?
12    A    You try, yes.
13    Q    People who are experiencing a condition,
14  sometimes described as excited delirium, are at a high
15  risk for positional asphyxia; true?
16    A    If they're prone, yes.
17    Q    Anything that causes the muscles to contract
18  severely, including the application of an
19  electrical-conducted weapon, increases the risk of
20  positional restraint asphyxia; true?
21    A    I don't know.  I can't say for certain if
22  that's accurate or not.
23        Again, positional asphyxia is -- that person is
24  laying on their stomach and we're on top of the guy, we're

Page 115

1  pig pile, we're preventing his breathing, you know, so I
2  don't know -- I don't know at what level medical condition
3  he's at that -- is he close to dying?  Is he a health
4  risk?  Or what the deal is.  So can -- can muscle
5  contractions do that?  Maybe, I guess.
6        Again, I'm -- that's out of my realm of what --
7  what I know about.
8    Q    It's out of your realm of what you've been
9  taught?
10    A    Right.  That's -- to me, that's more for
11  doctors to understand.
12    Q    But doctors aren't the people restraining
13  members of the public usually, are they, in these type of
14  situations?
15    A    Not out there, they're not.
16    Q    It's usually you; right?
17    A    Yes.
18    Q    Some people you interact with in the public are
19  fragile medically; true?
20    A    Yes.
21    Q    And those people are at a higher risk of
22  positional restraint asphyxia.  I think we can agree to
23  that; true?
24    A    Again, if they're on their stomach and, you

Page 116

1  know, we're restricting their breathing.
2    Q    Have you ever read anywhere or been taught by
3  anyone here at the department that using a Taser or
4  electrical-conducted weapon on a person in prone position
5  increases the risk of positional restraint asphyxia?
6    A    No.
7    Q    Have you ever seen any documentation by any
8  groups of police officers or anyone else who puts together
9  guidelines for best practices that say that using a Taser
10  on a person in a prone restraint situation increases the
11  risk of positional restraint asphyxia?
12    A    I have read articles similar to stuff like
13  that, after prolonged excessive use of a Taser and then
14  leaving that person in a prone position for an excessive
15  amount of time.
16    Q    What did you read?
17    A    Just that.  Basically, if somebody uses a Taser
18  and they give them multiple cycles -- I'm talking five,
19  six, seven, eight five-second cycles -- and they're
20  leaving them in a prone position or they've got somebody
21  on top of them, then that might assist in the leading of a
22  prone positional asphyxiation death, under those specific
23  circumstances.
24    Q    You said a prolonged position.  What are you

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 117

1  referring to when you say prolonged?
2      A    It might be five, ten minutes.
3      Q    Is it ever okay -- I mean, five minutes in a
4  prone position would be prolonged; true?
5      A    If that subject is not -- if that subject is in
6  custody and in control, yes, that is way too long.
7      Q    Is there any time period that a person is
8  permitted -- well, let me back this up.
9          It sounds like that at -- that a police
10  officer, like yourself, should try to get a person out of
11  prone position as soon as is feasible; true?
12      A    That is true.
13      Q    Persons who are exposed to repeated
14  applications of an electrical-conducted weapon are at a
15  higher risk for positional restraint asphyxia; true?
16      A    That is true.
17      Q    And is the reason for that the extreme stress
18  caused by the muscle contractions from the weapon?
19          MR. BECK: Objection.
20          Go ahead.
21      A    Along with that person may be laying on his
22  stomach, yes.
23  BY MR. HILL:
24      Q    Excited delirium is a medical condition.  We

Page 118

1  talked about that; right?
2      A    I can't remember if we really touched on it
3  being a definition of medical condition or not.
4      Q    It is a medical condition; correct?
5      A    It is, yes.
6      Q    It's a life-threatening medical condition;
7  true?
8      A    Yes, it is.
9      Q    People in a state of what's called excited
10  delirium need emergency medical attention as soon as
11  possible; true?
12      A    Yes.
13      Q    People in the state of excited delirium need
14  medical attention as soon as possible because they need
15  medical treatment; true?
16      A    Yes.
17      Q    People are often -- police, like yourself, are
18  often the first responders contacted when a person is
19  having a medical emergency called excited delirium; true?
20      A    Usually, yes.
21      Q    Being in a state of excited delirium is not a
22  crime; true?
23          MR. BECK: Objection.
24          Go ahead.

Page 119

1      A    That -- no, that's not a crime.
2  BY MR. HILL:
3      Q    Because it's a medical condition; true?
4      A    Correct.
5      Q    And from a police officer's perspective, the
6  reason a person is in a state of excited delirium is
7  irrelevant; true?
8          MR. BECK: Objection.
9      A    Why they're in it?
10  BY MR. HILL:
11      Q    Uh-huh.
12      A    Yeah, that's irrelevant.
13      Q    Because from a police officer's perspective, a
14  person who is in a state of excited delirium needs medical
15  care and attention as soon as possible, regardless of what
16  caused the excited delirium; true?
17      A    Yes.
18      Q    And that's just like any other medical
19  condition.  The reason that they're in the medical
20  condition doesn't matter as much as the fact that they're
21  in a medical condition; true?
22      A    That's true.
23      Q    When a person is in a state of excited
24  delirium, the pulse can race; true?

Page 120

1      A    Yes.
2      Q    It can put extreme stress on the body; true?
3      A    Yes.
4      Q    It can increase the risk of positional
5  restraint asphyxia, like we talked about; true?
6      A    Yes.
7      Q    Using a Taser on such a person can increase the
8  stress response even more; true?
9          MR. BECK: Objection.
10          Go ahead.
11      A    It might.
12  BY MR. HILL:
13      Q    Repeated applications of a Taser compound the
14  stress on the body of a person with excited delirium;
15  true?
16          MR. BECK: Objection.
17          Go ahead.
18      A    If repeated tasings work, yes, it could.
19  BY MR. HILL:
20      Q    By repeated tasings, I mean more than once.
21  You understand that's what I mean by repeated; true?
22      A    Yes.
23      Q    You taught a class called Excited Delirium;
24  correct?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 121

1    A   Yes.
2    Q   What are some of the warning signs of excited
3  delirium?
4        Is psychomotor agitation a warning sign of
5  excited delirium?
6    A   There are several warning signs.  It can be a
7  mental disorder, it can be --
8    Q   I want to mark these a little bit slower.
9        When you say mental disorder, what do you mean
10  by that?
11   A   Just a chemical imbalance of the brain.
12   Q   That can cause a person to go into excited
13  delirium?
14   A   It could be a contributing factor.
15   Q   Knowledge that a person has an underlying
16  mental health condition is one of those things police
17  officers like yourself would want to know to see if maybe
18  this is an excited delirium case I'm dealing with?
19       MR. BECK: Objection.
20       Go ahead.
21   A   All the facts help when we get them.
22  BY MR. HILL:
23   Q   So you said mental disorder is a warning sign
24  of excited delirium; true?

Page 122

1    A   It might be, yes.
2    Q   What about disorientation, a person's
3  disorientation?
4    A   That's a possibility.  They usually are
5  extremely hot in temperature, over 100 degrees with
6  internal body temperature, which usually causes them to
7  disrobe and -- and try to find means to cool down.
8        They don't like glass.  They don't like
9  anything reflective.  They don't like any type of flashing
10  lights.
11   Q   What are warning signs of excited delirium?
12  What about bizarre behavior?
13   A   Those are all warning signs.  They're all
14  equally precursors and warning signs of the same thing, of
15  excited delirium.
16   Q   So evidence or a report that a person is
17  disrobed or taking off their clothes or running around
18  naked, that's a warning sign of excited delirium; true?
19   A   That could be one precursor to it, yes.
20   Q   Report that a person is mentally out of it and
21  acting bizarre, that's a potential warning sign of excited
22  delirium; true?
23   A   It might; it might not be.
24   Q   A report -- it's one of the things that factors

Page 123

1  towards excited delirium; correct?
2    A   Yes.
3    Q   A report that someone is mentally ill and
4  getting worse, that's a potential warning sign for excited
5  delirium; true?
6    A   It could be.
7    Q   Speech disturbances are warning signs of
8  excited delirium; correct?
9    A   It -- it could be, yes.
10   Q   Hallucinations are warning signs of excited
11  delirium; true?
12   A   Yes.
13   Q   Like people screaming out names of people who
14  aren't near them, as if they're talking to someone; true?
15   A   It could be, yes.
16   Q   Confusion is a potential warning sign of
17  excited delirium; true?
18   A   It could be.
19   Q   Diminished mental capacity, a failure to
20  understand what's going on around them, not understanding
21  your circumstances, looking dazed and confused, those are
22  also warning signs of excited delirium; true?
23   A   It could be, yes.
24   Q   You were aware of these warning signs of

Page 124

1  excited delirium as of September 8th, 2015; correct?
2    A   Yes.
3    Q   And that's because you taught a class on
4  excited delirium; true?
5    A   Yes.
6    Q   When you taught a class on excited delirium,
7  what were you teaching your -- I guess maybe your students
8  here at Springfield Township; right?
9    A   Yes.
10   Q   What were you teaching them to be on the
11  lookout?  These are the things -- in addition to what
12  we've talked about -- and if it's everything we've already
13  talked about, that's fine.  But if there was more than
14  what we talked about, what were the warning signs of
15  excited delirium?
16   A   There's really not too many more warning signs
17  that are very -- that are publicized.  Because at the time
18  we were doing this, excited delirium was still very
19  controversial with the medical field.  And there were
20  doctors that believed it, and then there were a lot of ER
21  doctors that didn't believe in it and didn't believe the
22  condition even existed.  So everything that we were --
23  that I would teach was just based off of things that I was
24  taught.  And these are, again, from I guess one side who

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 125

1 believed in it compared to the other side that didn't
2 believe in it medically, doctor-wise.
3   Q  Right, so --
4   A  So --
5   Q  I don't want to interrupt you.  I'm sorry.
6   A  So I would just teach what I was taught and
7 that these people that are in these conditions usually
8 exhibit superhuman strength and they cannot be controlled
9 with just one officer.  And then I would teach them -- but
10 we have an obligation to get them help, and we have to get
11 them under control before we can get them help.  And a lot
12 of times -- at that time the Taser was the best weapon to
13 help gain compliance the quickest to get these people
14 under control.
15      And the reason that was the best weapon was
16 because we could get somebody maybe a Taser deployment and
17 get somebody handcuffed within just a few minutes compared
18 to wrestling with somebody that might take five, ten
19 minutes.
20      And if -- by your own questions, wrestling with
21 somebody for five to ten minutes can definitely put them
22 into a cardiac arrest situation.
23      If we know for sure that we are experiencing or
24 dealing with somebody in that excited delirium state -- we

Page 126

1 have to have several of those warning factors for us to
2 believe that, and we have to have that knowledge when we
3 get those calls.  So I would teach our guys that we do
4 this and we do this and we have to get them under control.
5 We have to get them under control quickly.
6      Our guys also were taught that we would deploy
7 no more than three applications of Taser unless it was
8 absolutely necessary just because we did not want to put
9 that person in any additional harm.
10      But again, it depends on that person.  It
11 depends on that -- you know, a guy that weighs 50 pounds
12 and they are full of amphetamines and in a psychotic
13 state, they can be stronger than the biggest man in the
14 room.  And it might take five guys to get that guy under
15 control.  We don't know that.  You don't know any of this
16 until you actually have to start going hands-on with
17 somebody.
18      So my guys, again, knew we had to get this
19 person under control.  We had to use the least amount of
20 force necessary, and we had to -- the best weapon we had
21 to do this was using the Taser.
22      Pepper spray has no effect on anybody.  You
23 worry about cross contamination, officers getting sprayed,
24 and it just doesn't -- it's not effective.  And that

Page 127

1 actually creates more of a problem, because now that
2 person, who might not be able to breathe, definitely can't
3 breathe with pepper spray in them.
4      So my guys were taught to look for this
5 information and knowing that this is a crisis -- but we
6 have to deal with the crisis first and get that person
7 under control before we can get any type of medical
8 attention.  So that is what I taught our people.
9   Q  You were teaching your fellow officers here at
10 Springfield Township that if you -- here are the warning
11 signs for excited delirium; true?
12   A  Yes.
13   Q  And if these warning signs are present, you
14 have potentially a medical crisis; true?
15   A  Yes.
16   Q  And because this person is in this medical
17 crisis, you need to take control of that person; true?
18   A  Yes.
19   Q  And in order to gain compliance for a person in
20 excited delirium or suspected excited delirium, you were
21 instructing them the best tool you have is a Taser; true?
22   A  Yes, if it came down to a resistance level,
23 which, you know, again, it depends on what they're doing
24 to us, what level of force are they presenting to us.

Page 128

1      If it's something that we can talk to them and
2 get them under control and get them in cuffs and quickly
3 and assessed, then we can get them help right away.  But
4 sometimes they don't want to go that easy.  So at that
5 point, the best tool we have to help get that person under
6 control, if we can't do it verbally, is -- is going to be
7 the Taser.
8   Q  I just want to make sure I understand.
9      So it's consistent with the training and the
10 policy here at Springfield Township to use a Taser to gain
11 compliance on people suffering from the medical condition
12 excited delirium; true?
13   A  It is.
14   Q  And is that still the case?
15   A  Yes.
16   Q  And is it consistent with the training and the
17 policy here at Springfield Township to use a Taser on a
18 person in the throes of excited delirium who is in prone
19 position?
20   A  Again, we have to know that they're in excited
21 delirium; and, two, is that person under control yet.
22      So even if they're in a prone position, and
23 he's still out of control, if we're trying to gain that
24 compliance and that's the only tool that works, then, yes,

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 129

1 they are permitted to use that.
2    Q   I just want to make sure I understand it.
3        You're teaching your fellow officers that
4 you've got to look for the warning signs of excited
5 delirium; correct?
6    A   Yes.
7    Q   Because you're not going to get a diagnosis in
8 the field; correct?
9    A   Yes.
10   Q   Based on the warning signs that are apparent to
11 the officer, either by firsthand observation or
12 information provided, they have to determine is this a
13 warning sign of excited delirium; true?
14   A   Yes.
15   Q   And my question is: So when those warning
16 signs are present, a police officer at Springfield
17 Township may use a Taser on a person with excited delirium
18 who is in prone restraint in order to gain compliance?
19   A   Yes, they may.
20   Q   And that's also true if that same person is in
21 prone position, there are warning signs present of excited
22 delirium and they're handcuffed in prone position, true,
23 if you have to gain compliance?
24   A   Yes.

Page 130

1    Q   And a Taser can be used for that?
2    A   Yes.
3    Q   And repeated applications, up to three, can be
4 used for that in Springfield Township?
5    A   Yeah.
6    Q   That was a yes; right?
7    A   Yes.
8    Q   The qualifications that you had to teach the
9 class on excited delirium, was that based primarily on you
10 going to this class that was given at Summit County?
11   A   Yes. The class I attended was a
12 train-the-trainers, so it made me an instructor.
13   Q   And you talked about -- earlier about kind of
14 two -- two camps regarding excited delirium, those who
15 endorsed excited delirium and those who didn't; correct?
16   A   Yes.
17   Q   The group that endorsed excited delirium for
18 the longest period of time is police officers; correct?
19       Maybe I should state that, because that might
20 commit you to that. Maybe you don't know who did it
21 first.
22   A   Yeah.
23   Q   In terms of when you were doing research on
24 excited delirium and getting the warning signs, were those

Page 131

1 primarily coming from police officer, law enforcement type
2 journals, articles, studies, those types of things?
3    A   I believe they were coming from medical
4 journals, to be honest with you.
5    Q   Do you believe that excited delirium is a
6 medical condition?
7    A   I believe there is something out there that
8 exists. I don't know if it's excited delirium or all
9 psychotic or chemical imbalances or, you know, just
10 somebody extremely hyped up on a lot of amphetamines.
11       I'm nowhere near medically inclined enough to
12 believe if it exists or doesn't exist.
13   Q   Whatever we term it, there's this thing that
14 gets categorized as excited delirium, where people act in
15 a certain way or exhibit certain behaviors, including
16 those warning signs you discussed earlier that puts them
17 at risk of sudden death; true?
18   A   Yes.
19   Q   You were a Taser instructor; is that correct?
20   A   Yes.
21   Q   And you were a Taser instructor at the same
22 time you were the excited delirium instructor?
23   A   Yes.
24   Q   Did those stop at exactly the same time, when

Page 132

1 Chief Smith took over, or did they phase out at different
2 times?
3    A   I resigned all training at the same time.
4    Q   Why did you resign?
5        I know there were personality differences
6 between you and the chief, but what was your motivation in
7 not training your officers any longer?
8    A   Again, a lot of it -- just that internal beef
9 made me just want to step back and take a break from
10 things.
11   Q   What -- and I'm not trying to pry into much
12 here, but it sounds like this is something you were pretty
13 invested in, these types of trainings?
14   A   Yes.
15   Q   So it seems like it would take kind of a lot
16 for you to hit a boiling point to: "I'm done. I'm not
17 going to do these anymore."
18       Can you tell us a little bit more about what
19 happened, what was going on?
20       MR. BECK: Objection.
21       Go ahead.
22   A   Again, it all stemmed from this sexual
23 harassment incident in 2008. And just enough was enough
24 for me. You know? To put it into words -- I don't know.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 133

1 I just had enough, and I wanted to be kind of in my own
2 little corner for a while, so --
3 BY MR. HILL:
4    Q   The sexual harassment part of it, there were
5 two sides to this issue.
6        Can I ask you which side you were on?
7    A   Well, I was actually one of the witnesses that
8 saw him, so unfortunately I got thrown into the bad side.
9    Q   What's the bad side?
10   A   Well, that was the side of the girls.
11   Q   Okay.
12   A   So --
13   Q   So was there a little bit of kind of
14 inner department, you're not really with us, you're kind
15 of with them, making allegations?
16   A   That was the -- yeah, that was the general gist
17 of the separation of sides.  That's how that all happened,
18 was, you know, you guys told.
19        Well, no, I didn't tell.  I was interviewed and
20 read my Miranda rights.  I was told, you know -- I told
21 the truth.
22   Q   Right.
23   A   So --
24   Q   Did they look at you as a little bit of a

Page 134

1 traitor?
2    A   Oh, yeah.
3    Q   Because you were telling on another officer?
4    A   Yes.
5    Q   A Taser works by causing uncontrollable muscle
6 contractions; true?
7    A   It overrides the central nervous motor system.
8    Q   And that's the result, uncontrollable muscle
9 contractions; true?
10   A   It's not uncontrollable.  It just locks it up.
11   Q   Stepping up --
12   A   Yes.
13   Q   They fall down if they're standing up?
14   A   Yes.
15   Q   The body basically -- it's almost like a giant
16 cramp in a way?
17   A   Yes.
18   Q   Electrical-conducted weapons, that's what
19 Tasers are called; correct?
20   A   Yes.
21   Q   Electrical-conducted weapons have been cited by
22 medical authorities as a cause or a contributing factor in
23 some deaths.  You've heard that; true?
24   A   I have.

Page 135

1    Q   There are certain populations who are
2 considered to be at high risk for serious injuries or even
3 death from electrical-conducted weapons; true?
4    A   Again, that's one of those studies that are
5 back and forth with things.
6        Honestly, that -- those statistics change
7 yearly, it seems like.
8    Q   Does Taser put out any guidelines regarding who
9 to not use a Taser on?
10   A   Yes.
11   Q   Who?
12   A   They do not recommend on the elderly or frail,
13 pregnant women, and then they try to avoid any direct hits
14 into the front of the chest, right over the heart.
15   Q   Anything else?
16   A   Well, obviously, they don't want you to shoot
17 them in the face and --
18   Q   Does --
19   A   -- groin area, but --
20   Q   Are persons in medical crises a high-risk
21 population?
22   A   No.
23   Q   Are persons with a mental health crisis a
24 high-risk population for serious injury or death from a

Page 136

1 Taser?
2        MR. BECK: Objection.
3        Go ahead.
4    A   No, not from a Taser.
5 BY MR. HILL:
6    Q   Are persons under the influence of stimulant
7 drugs at a high risk of serious injury or death from a
8 Taser?
9    A   No.
10   Q   Are persons in the throes of excited delirium
11 at a high risk for serious injury or death from a
12 electrical-conducted weapon like a Taser?
13       MR. BECK: Objection.
14   A   No.
15 BY MR. HILL:
16   Q   And from the department's perspective here, as
17 you've been trained, there are no prohibitions on using a
18 Taser on those people that I've described that's any
19 different from somebody in the general population; right?
20   A   I mean, we don't do it on pregnant women or --
21 you mean just the mentally --
22   Q   Let me give you the list I talked about.
23       From a department policy perspective, there is
24 no greater limitation on using a Taser against people in a

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 1
March 14, 2017

Page 137

1  mental crisis, mental health crisis, under the influence
2  of stimulant drugs, or in the throes of excited delirium
3  any more than there is a member of the general population?
4  A  That is correct.
5      MR. BECK: Objection.
6      Go ahead.
7  BY MR. HILL:
8  Q  Do you believe that police personnel should be
9  aware that there's a higher risk of sudden death in
10  subjects under the influence of drugs and/or exhibiting
11  symptoms associated with excited delirium?
12      MR. BECK: Objection.
13      Go ahead.
14  A  I -- I don't know how we can judge when
15  somebody is going to die.
16  BY MR. HILL:
17  Q  So it's not something you're considering when
18  using a Taser; true?
19      MR. BECK: Objection.  That wasn't the answer
20  to his question.
21      You can answer.
22  A  Yeah, I'm using a Taser to gain compliance and
23  gain control, so that's why I use the force.
24  BY MR. HILL:

Page 138

1  Q  Repeated applications of a electrical-conducted
2  weapon increases the risk of serious injury and death;
3  true?
4  A  I'm sorry.  Repeated what?
5  Q  Repeated applications of an electrical-
6  conducted weapon increases the risk of serious injury and
7  death; true?
8      MR. BECK: Objection.
9  A  It's possible.
10  BY MR. HILL:
11  Q  You've been taught, or at least you've heard,
12  that it does; correct?
13  A  It's possible.  I don't think anybody has ever
14  linked Taser as a sole factor to somebody dying.
15  Q  I didn't say it was a sole factor.  I said it
16  increases the risk of serious injury or death?
17      MR. BECK: Objection.  You've asked this
18  repeatedly.
19      You can answer just one last time.
20  A  Again, it's possible.
21  BY MR. HILL:
22  Q  Positional asphyxia may exacerbate the
23  condition of any individual who has received an
24  electrical-conducted weapon application; true?

Page 139

1      MR. BECK: Objection.
2      Go ahead.
3  A  It's possible.
4  BY MR. HILL:
5  Q  Do you know?
6  A  I don't know.
7  Q  Police personnel should be trained on how to
8  use a restraint technique that does not impair a person's
9  respiration after being -- after an application of a
10  electrical-conducted weapon; true?
11      MR. BECK: Objection.
12  A  I think that's an impossible thing to be
13  taught.
14  BY MR. HILL:
15  Q  It's not something that's being taught here at
16  Springfield Township; fair?
17      MR. BECK: Objection.  That's not his answer.
18  BY MR. HILL:
19  Q  Is it?
20  A  No, we're not being taught that.  But I don't
21  believe that it can be taught.
22  Q  I know that you were an instructor before you
23  resigned that post or that position.
24      Were you ever -- you're a patrol officer today;

Page 140

1  correct?
2  A  Yes, sir.
3  Q  Were you ever anything other than a patrol
4  officer?  Have you been a detective, sergeant, captain?
5  A  I've been a detective.  And being a senior
6  officer, whenever a sergeant is off, I'm often the officer
7  in charge of the shift.
8  Q  So when -- a sergeant here is considered a
9  supervisor; is that fair?
10  A  Yes.
11  Q  Have you ever been involved in creating any of
12  the policies, written policies, other than the excited
13  delirium directive, any of the policies here at
14  Springfield Township?
15  A  Yes.
16  Q  Can you tell me when and how?
17  A  When we first developed the Taser, myself and
18  Chief Hoover wrote that policy together.
19  Q  Let me see if I have a copy here.  I'll hand
20  you what we've mark as Exhibit 4 for today.
21      (Exhibit Number 4 was introduced.)
22  A  (Reviewing document.)
23  BY MR. HILL:
24  Q  What I've handed you, Exhibit 4, can you state

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 141

1  for the record what that is?
2      A   It's the Springfield Township Police policy and
3  procedures for the use of the M26 and X26 advanced Tasers.
4      Q   And is this the policy you were saying you had
5  a hand in creating?
6      A   Yes, sir.
7      Q   Is this the current policy regarding M26 and
8  X26 advanced Tasers at Springfield Township?
9      A   Yes, sir.
10     Q   There's a -- on the front page there, Exhibit
11 4, on the bottom left-hand side, it says, "Approved
12 12-2003," or December of 2003; correct?
13     A   Yes, sir.
14     Q   Is that the time frame that you were describing
15 that you were involved in creating this policy?
16     A   Yes.
17     Q   I don't see any -- you know, if we looked at
18 the other policy -- I think it's Exhibit 10 we have in
19 front of us.  Do you see there's a revised date on there?
20     A   Uh-huh.
21     Q   Yes?
22     A   Yes.
23     Q   Sorry.  Just for the record, that's all.
24         I don't see any kind of revised date on Exhibit

Page 142

1  4; do you?
2      A   No, sir.
3      Q   So as somebody who actually created this
4  policy, can we agree that the last time Exhibit 4, the
5  advanced Taser policy section, 1214(b), was amended or
6  changed or created was back in December of 2003?
7      A   Yes.
8      Q   It hasn't been updated since?
9      A   Yes, as far as I know.
10     Q   Do you know if the police force here at
11 Springfield Township is accredited by any law enforcement
12 agencies; for example, CALEA, Commission on Accreditation
13 for Law Enforcement?
14     A   I don't believe we're accredited.
15     Q   As a senior officer, can you give me a rough
16 idea of how many officers work at the department?
17         I think I heard 34 at one point during the
18 proceedings in this case.  I don't know if that's
19 consistent with your memory.
20     A   Probably right around 28 now.
21     Q   Do you know how many -- has that gone up or
22 gone down since September of 2015?
23     A   That's gone down.
24     Q   Do you know what it was in terms of number of

Page 143

1  officers back in September of 2015?
2      A   I do not.  It might have been maybe 30, 32,
3  maybe, tops.  I don't know for sure.
4      Q   I'm just trying to get a general idea.  I'll
5  find out the exact information.
6      A   That would include part-time officers, too,
7  though.
8      Q   How many police officers are available -- I
9  think you said you worked the day shift; right?
10     A   Yes.
11     Q   And the day shift is a 12-hour shift?
12     A   Yes.
13     Q   What's the start and end time for a day shift?
14     A   Eight a.m. to eight p.m.
15     Q   How long have you worked the day shift?
16     A   Ever since we moved to this schedule.  Probably
17 at least the last four years I've been on days now.
18     Q   And like I said earlier, I mean, I'll find out
19 the exact numbers of who was working, but I would assume
20 that the day shift has more officers on duty than the
21 night shift?
22     A   Everybody is scheduled the same number of
23 officers.  We might have more here because of
24 administration and things, detectives.

Page 144

1      Q   So as far as you know, I guess there's a day
2  shift, which is 12 hours, and there's a night shift that's
3  12 hours?
4      A   Yes, sir.
5      Q   I'm assuming the day shift is the more
6  desirable shift?
7      A   Nobody wants to work eight P to eight A.
8      Q   But it sounds like there's the same amount of
9  officers on duty in the eight P to eight A as the eight A
10 to eight P?
11     A   Yes.
12     Q   And do you have your own car regularly, or do
13 you have a partner?
14     A   No.  We are by ourselves.
15     Q   And is that the same for all officers here?
16     A   Yes.
17     Q   So you have your car, Officer Holsopple has his
18 car, Sergeant Moore has her car?
19     A   Yes.
20     Q   And can you give me an idea of how many --
21 well, how large geographically is your jurisdiction of
22 Springfield Township, or is it kind of in a pod?
23     A   We are so broken up, but we are about 24 square
24 miles.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 1
March 14, 2017

---

Page 145

1    Q    And I don't really understand.  Is Springfield
2   Township part of Akron?  I mean, I know it's a different
3   police department, but there's Akron addresses out here.
4    A    No.  Because we're a township, we just use
5   Akron post offices.  Townships aren't required to hold a
6   post office in Ohio, so we use Akron's zip.  We use
7   Uniontown zip codes.  So we're not part of the city
8   whatsoever.
9    Q    But in terms of police work, Springfield
10  Township would be your exclusive jurisdiction?
11   A    Yes.  Well, except for the Village of Lakemore.
12   Q    And back in -- a day shift back in September of
13  2015 -- I know it's about 50/50 in terms of officers a.m.
14  versus p.m.; right?
15   A    Yes.
16   Q    So would there be something like, give or take,
17  15 officers on duty during the eight A to eight P back in
18  September of 2015?
19   A    Oh, no.  There would be like -- well, there was
20  four of us that were assigned to work the road, that were
21  patrol units.
22   Q    That's right, because you said some of these
23  would be part-time; right?  Out of the 30 total, some
24  would be part-time?

---

Page 146

1    A    Yeah, there would be part-time people in there.
2    Q    So how many officers would be assigned on the
3   road?
4    A    Just four of us.
5    Q    So it would have been you, Holsopple, Moore?
6    A    Yes.
7    Q    And who else?
8    A    Officer Linburg.
9    Q    Linburg?
10   A    Yes, L-I-N-B-U-R-G.
11   Q    And then if you needed additional resources,
12  what would you do?
13   A    Sometimes if the detectives aren't on anything,
14  then they would come out to help.
15   Q    And how would you -- and I guess for people --
16  for the jury's sake, detectives are law enforcement
17  officers; correct?
18   A    Yes.
19   Q    They've got all the same abilities to enforce
20  the laws that you do; right?
21   A    Correct.
22   Q    How would you go about summoning or contacting
23  a detective if you needed additional resources?
24   A    A supervisor would just usually contact him

---

Page 147

1   over the radio.
2    Q    And would this be as involved as the fire
3   department radio we talked about earlier, or would this be
4   just kind of a simple --
5    A    No, it's a lot --
6    Q    Simpler?
7    A    Yeah, less --
8    Q    And your supervisor was Sergeant Moore; is that
9   right?
10   A    Yes.
11   Q    Was she your day-to-day supervisor?
12   A    Yes, she is.
13   Q    Is she still your supervisor?
14   A    Yes, she is.
15   Q    And I think -- I want to make sure I
16  understand.  She's your supervisor, but you trained her in
17  the past; right?
18   A    Yes.
19   Q    You would have trained her on the excited
20  delirium?
21   A    Yes.
22   Q    And the use of a Taser?
23   A    Yes.
24       MR. HILL:  Greg, we've been going for another

---

Page 148

1   hour.
2        (Discussion held off the record.)
3        (Recess taken.)
4   BY MR. HILL:
5    Q    Officer, you're wearing your uniform today?
6    A    Yes.
7    Q    Is that the same uniform you would have been
8   wearing back in September of 2015, or at least looked the
9   same?
10   A    Yes.
11   Q    Can you tell me what kind of -- you don't have
12  your belt on today with all your gear; do you?
13   A    No.
14   Q    Can you tell me what gear you would have had on
15  your belt back on September 8th, 2015?
16   A    Firearm, magazines, my Taser, a set of
17  handcuffs, my radio.
18   Q    Anything else?
19   A    No.
20   Q    Pepper spray or anything?
21   A    No.
22   Q    Baton or anything, flashlight?
23   A    A flashlight, yes.  A small, mini flashlight
24  about this big.

---

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 149

1    Q    Do you have a bullet-proof vest on?
2    A    Yes.
3    Q    How much does all that gear weigh, bullet-proof
4   vest, you know, belt with all the equipment?
5    A    The belt is probably 15, 20 pounds, and another
6   eight to 10 pounds maybe for the body armor.
7    Q    So the body armor added something like 25 to 30
8   pounds total?
9    A    Could be, yes, close.
10   Q    And how much did you weigh back in September of
11  2015?
12   A    Pretty much the same, which is between 190,
13  200.
14   Q    So with all the gear and everything on, you're
15  talking, you know, 210 to 220, something like that?
16   A    I would suppose.  Thank you.
17   Q    Somewhere in that range?
18   A    Yeah.
19   Q    How tall are you?
20   A    5'5.
21   Q    Do you guys have -- at Springfield Township, do
22  you guys have any kind of dash cams or video-recording
23  equipment on the cars back in September of 2015?
24   A    Yes.

Page 150

1    Q    And how are those activated?
2    A    You can either turn them on manually by just
3   hitting a button in the car or they automatically turn on
4   when you activate your overhead lights.
5    Q    And when you received -- on September 8th,
6   2015, at some point in the day, about 3:12 or so, 3:15,
7   you were alerted to an incident involving Jordn Miller;
8   correct?
9    A    Yes.
10   Q    At that point, or at any point on September
11  8th, 2015, did you activate your lights?
12   A    No.
13   Q    Is there a reason why not?
14   A    Well, you mean for that call?
15   Q    Uh-huh.
16   A    No.
17   Q    Is there a reason why not?
18   A    That did not come out to a -- to us as an
19  emergency call that we would run that type of response.
20   Q    Okay.  What type of emergency response would
21  you put your lights on for?
22   A    Usually crimes in progress or, you know --
23  again, depending on what -- the radio tells us if somebody
24  is in danger, so --

Page 151

1    Q    And you did not activate your lights in your
2   cruiser on September 8th, 2015, because this was not a
3   call where someone was in danger or a crime was being
4   committed; true?
5    A    That is at that point true.
6    Q    And at no point did you activate your lights;
7   correct?
8    A    Correct.
9    Q    Do you know if any of the other officers
10  activated their lights on September 8th, 2015?
11   A    I have no way of knowing.
12   Q    You don't remember seeing any?
13   A    No.
14   Q    And because you did not activate your lights,
15  the dash cam would not automatically start recording;
16  correct?
17   A    Correct.
18   Q    You would have had to manually turn on the
19  recording device?
20   A    Yes.
21   Q    Which is a flip of the switch?
22   A    And you have to push a button.
23   Q    And you did not do that regarding Jordn Miller
24  on that call; correct?

Page 152

1    A    Correct.
2    Q    Is that for the same reasons that you didn't
3   activate your lights?
4    A    Yeah.  We don't usually turn our cameras on
5   manually in the cars for any reason.
6    Q    When you heard -- and I know that you've read
7   your statement several times.
8        When you heard or received information about
9   Jordn Miller, you were getting information about what you
10  would call a mental case or a mental health case; right?
11   A    Yes.
12   Q    Were you by yourself when you got the call?
13   A    Yes.
14   Q    Or it came over the radio?
15   A    Yes.
16   Q    Do you remember where you were?
17   A    I actually do.
18   Q    Where were you?
19   A    I was on -- I was in the Village of Lakemore.
20  That was my assigned district.  And I was right behind the
21  Scope school.
22   Q    How far is that from -- again, approximations,
23  but in your experience 909 Milo White Drive?
24   A    Maybe three miles, four miles, rough estimate.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 153

1    Q   You said the Scope school?
2    A   Yes.
3    Q   How do you spell that?
4    A   Just S-C-O-P-E.
5    Q   Like the mouthwash?
6    A   Yeah.
7    Q   And that distance of three to four miles,
8 that's about the same distance, then, to 1019 Abington;
9 right?
10    A   Yes, that's all the same neighborhood. Milo
11 White and Abington are all in the same neighborhood.
12    Q   Abington, basically, is like a street or so
13 over from Milo White Drive; right?
14    A   Yes.
15    Q   Before you encountered Jordn Miller, did you
16 have any knowledge about his criminal history?
17    A   No.
18    Q   Did you have any knowledge about him as a
19 person?
20    A   No.
21    Q   Had you ever heard his name before?
22    A   No.
23    Q   Did you know his family in any way?
24    A   No.

Page 154

1    Q   So those did not enter into your planning or
2 decision making as you went towards the location where
3 your presence was requested; correct?
4    A   Correct.
5    Q   When this came over the radio, that there was a
6 mental health call for this person, Jordn Miller, did you
7 speak at all with any of the other officers on duty?
8    A   Prior to getting there?
9    Q   Yes.
10    A   No.
11    Q   No communication over the radio?
12    A   Not that I recall, no.
13    Q   No texting or messaging?
14    A   Oh, no.
15    Q   No meeting to determine what a plan of action
16 would be?
17    A   No.
18    Q   And I'm going to -- and Jordn Miller is about
19 150 pounds, he was; correct?
20    A   I guess so.
21    Q   What I'm going to do is I'm going to hand you
22 what we're going to mark as Exhibit 6 today. It's a Use
23 of Force Report.
24    A   Okay.

Page 155

1    Q   But if I understand it, it's basically one page
2 -- a one-page use of force template, basically, that's
3 completed along with -- it looks like the investigative
4 note that you and Officer Holsopple and Sergeant Moore put
5 together.
6      (Exhibit Number 6 was introduced.)
7    A   (Reviewing document.) Yes.
8 BY MR. HILL:
9    Q   Is that correct?
10    A   Yes.
11    Q   So this document we have in front of us,
12 Exhibit 6, it appears to be -- do me a favor and count,
13 including the first page -- it looks like it's a six-page
14 document?
15    A   Yes.
16    Q   And did you create this document, Exhibit 6?
17 If you look at Page 2 and 3 -- and I'm looking at Page 2,
18 which says, "Springfield Township Police Department Use of
19 Force Report." Do you see that at the top?
20    A   Yes.
21    Q   That document, did you create that document?
22    A   No.
23    Q   Who did create this document?
24    A   That was made before I was -- ever got here or

Page 156

1 hired here, I should say.
2    Q   I don't mean who created the template. I mean
3 the information on the document itself.
4      See where it says, "Report number, date
5 occurred, date reported," all that type of information?
6    A   Oh, okay. Yes, I -- yeah. Who prepared it?
7    Q   Yes.
8    A   Yes, I prepared it.
9    Q   And how do you prepare a document like this?
10    A   Like you said, it's on a template on the
11 computer. And you just go in the template and start
12 filling in the boxes.
13    Q   So there's some software system that's used?
14    A   Yes.
15    Q   And where is this Exhibit 6? Where in the
16 department is this created?
17    A   That would be in the patrol office, I assume.
18    Q   And there's some information on here that's
19 typewritten. Did you type that?
20    A   Yes.
21    Q   There also appears to be some information
22 that's handwritten; correct?
23    A   Yes.
24    Q   Did you handwrite that information?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 1
March 14, 2017

Page 157

1    A    No, that is not my writing.
2    Q    Do you know whose handwriting that is?
3    A    Yeah.  That would be Sergeant Moore's.
4    Q    So tell me the process, then, for how you
5  created this document, Exhibit 6, Page 2.
6    A    What do you mean, the process?
7        I sat down and typed it and then turned it in
8  to Sergeant Moore.
9    Q    Well, you did this on September 8th, 2015;
10  correct?
11    A    Yes.
12    Q    And you completed the typewritten information
13  first; correct?
14    A    Yes.
15    Q    And then did you print it out and then hand it
16  to Sergeant Moore?
17    A    Yes.
18    Q    And then Sergeant Moore included all this
19  information, the handwritten information?
20    A    The social security number of Mr. Miller, yes.
21    Q    I have some questions here for you.
22        Under "suspect armed," do you see that?
23    A    Yes.
24    Q    And let me ask you:  Did you create this Use of

Page 158

1  Force Report before you created the investigative notes
2  along with Sergeant Moore and Officer Holsopple?
3    A    No, this would have been afterwards.
4    Q    So you had already created the -- what I'll
5  call investigative note.  Is that what you call it?
6    A    Yes.
7    Q    So that's your explanation or recounting of the
8  events of that day; correct?
9    A    Yes.
10    Q    And then after that, you went and created this
11  Use of Force Report; correct?
12    A    Yes.
13    Q    So there's -- where it says, "suspect armed,"
14  do you see that?
15    A    Yes.
16    Q    What is the definition -- the department
17  definition of being armed?
18    A    Any object -- well, common sense would be any
19  object that could cause or inflict harm to another.
20    Q    And those objects include what?
21    A    Could include a rock, a knife, a gun, pliers,
22  anything that could cause bodily injury to somebody.
23    Q    And when you're talking about the use of force
24  and the type of weapon the person had, you're talking

Page 159

1  about any weapon the person had at the time you used
2  force; correct?
3    A    That we used force?
4    Q    No.  When you fill out this document, Exhibit
5  6, and there's a question on here about types of weapon,
6  right, was he armed, you're referring to whether or not he
7  was armed at the time you used force; correct?
8    A    Yes.
9    Q    It's not whether he was armed sometime in the
10  past; right?
11    A    Correct.
12    Q    And you checked yes to the suspect being armed;
13  right?
14    A    Yes.
15    Q    And under type of weapon, you wrote "personal"?
16    A    Yes.
17    Q    What does that mean?
18    A    That means his -- basically his hands, his
19  feet.
20    Q    Is that a definition that's used for being
21  armed, having hands or feet?
22    A    Could be, yes.
23    Q    Okay.
24    A    They could cause injury.

Page 160

1    Q    So by that definition, isn't basically anyone
2  that you encounter armed?
3    A    If they're using it in an aggressive manner,
4  yes.
5    Q    So being armed, when you say is the suspect
6  armed, you're just meaning he has hands or feet; correct?
7        MR. BECK: Objection.  That's not what he said.
8    A    If they're using them in an aggressive manner
9  that could cause injury, yes, they are considered armed.
10    Q    Is that your personal definition, or is that
11  something that's used here at the police department?
12    A    It's a general rule.
13    Q    When you say a general rule, whose rule?
14    A    Just law enforcement in general, and society.
15    Q    So, for example, if you would ask over the
16  radio, "Is the suspect armed," you would expect that if he
17  was using his hands and feet aggressively, they would say
18  yes, his hands and feet?
19    A    Yes.
20    Q    Other than his hands or feet, was Jordn Miller
21  armed?
22    A    He was.
23    Q    How else?
24    A    He had a pair of needle-nose pliers.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 161

1   Q   I'm talking about at time you used force.
2   A   Yeah, he had a pair of needle-nose pliers.
3   Q   When you were using force?
4   A   Yes.
5   Q   Okay.  Alcohol detected.  There's a box for you
6   to select yes or no; correct?
7   A   Yes, sir.
8   Q   And you selected no; is that true?
9   A   Yes.
10  Q   There's a box for whether drugs are found or
11  suspected; correct?
12  A   Yes.
13  Q   And you checked no; correct?
14  A   Yes.
15  Q   So at the time that you were interacting with
16  Jordn Miller, and even after you created this incident
17  report, you did not suspect that he was on drugs; correct?
18  A   I had no idea he was on drugs.
19  Q   It's not even something that you suspected?
20  A   Yeah, I couldn't -- I had no knowledge.
21  Q   That's why I asked.  It says drugs found or
22  suspected; correct?
23  A   Yeah.  I didn't suspect it at the time.
24  Q   And it says, "Type of call or offense," at the

Page 162

1   bottom; correct?  Kind of halfway through the page?
2   A   Yes.
3   Q   And this is your description of why you were
4   there in the first place; right?
5   A   Yes.
6   Q   So the type of call or offense that you have
7   listed is mental, running around naked; correct?
8   A   Yes.
9   Q   So at no time during your interaction with
10  Jordn Miller on September 8th, 2015, did you suspect that
11  he was on drugs; correct?
12  A   Correct.  It was way after the fact.
13  Q   And when you were interacting with Jordn
14  Miller, your only suspicion was that he was having a
15  mental health crisis; true?
16  A   Yes.
17  Q   You knew that you were responding to a request
18  for help for a suspect or a person with a mental health
19  problem; true?
20  A   Yes.
21  Q   You were called to help that person; true?
22  A   Yes.
23  Q   You were not called because of any criminal act
24  or offense; true?

Page 163

1       MR. BECK: Objection.
2   A   We did receive information while still in route
3   to that call that he was committing criminal acts, but the
4   original call was just for the mental health.
5   BY MR. HILL:
6   Q   You understood that the person you would be
7   approaching was in the throes of a mental health crisis;
8   true?
9       MR. BECK: Objection.
10  A   We -- that's the information we received.  We
11  didn't know exactly for sure yet.
12  BY MR. HILL:
13  Q   Based on the information, all the information
14  you had was that this person that you were going to be
15  interacting with was in the throes of a mental health
16  crisis?
17  A   Yes.
18  Q   The term you have here, where it says mental,
19  running around naked, I have seen that term used in other
20  Use of Force Reports here at Springfield Township,
21  "mental."  What does that mean, mental?
22  A   Just somebody with a -- basically a mental
23  disability of some sort.
24      Like I said earlier, we have a code called 53

Page 164

1   in our codes and signals that we use for dispatch and
2   radio communications.  And the definition of the 53 just
3   says mental.
4   Q   So based on everything you knew regarding this
5   original call, you understood that Jordn Miller was
6   running around naked and had a mental disability of some
7   sort; true?
8       MR. BECK: Objection.
9       Go ahead.
10  A   That was some of the information, yes.
11  BY MR. HILL:
12  Q   In terms of timing, can you tell me when you
13  created this document, the Use of Force Report?
14  A   It was well after I had returned from the
15  hospital.  I can't give you an exact.
16  Q   Well, if you look at -- if you flip over the
17  pages a little bit here, there are some time stamps at the
18  bottom of Pages 4 and 5.
19  A   Okay.
20  Q   And 6 of the incident report; correct?
21  A   Yes.
22  Q   So on Page 4 at the bottom, it's got a time
23  stamp of 20:30?
24  A   Yes.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 165

1    Q    That would be, what, 8:30 p.m.
2    A    Yes.
3    Q    And on the bottom of Page 5, it's got a time
4  stamp of 21:30?
5    A    Yes.
6    Q    So that would be 9:30 p.m.?
7    A    Yes.
8    Q    And then on Page 6, it's got a time stamp of
9  22:00; correct?
10   A    Yes.
11   Q    So that would be 10:00 p.m.?
12   A    Yes.
13   Q    So the Use of Force Report, Page 2 of Exhibit 6
14  that you filled out, would have been after -- at least
15  after 10:00 p.m. on September 8th, 2015; correct?
16   A    Yes.
17   Q    Yes?
18   A    Yes.
19   Q    And this is after -- you completed this Use of
20  Force Report after you had spoken to EMS; correct?
21   A    Yes.
22   Q    You completed this Use of Force Report after
23  you had been to a hospital; correct?
24   A    Yes.

Page 166

1    Q    After you had spoken to your colleagues about
2  Jordn Miller; correct?
3    A    Yes.
4    Q    Including Sergeant Moore; correct?
5    A    Yes.
6    Q    Including Officer Holsopple; correct?
7    A    Yes.
8    Q    Including Chief Smith; correct?
9    A    Yes.
10   Q    And at that point, based on everything you
11  knew, you were still dealing with somebody who just had a
12  mental health crisis, not a drug -- you weren't suspecting
13  a drug issue; true?
14        MR. BECK: Objection.
15   A    Yeah, I -- his mom was not real cooperative
16  with letting us know what -- what he -- if he did have
17  drugs on board, so I don't -- I was still suspecting that
18  it wasn't an issue.
19  BY MR. HILL:
20   Q    That's my only question.
21        Based on everything you created, your
22  interactions with Jordn Miller, everything you did on the
23  Use of Force Report as of 10:00 p.m. on September 8th,
24  2015, the whole time you thought you had been dealing with

Page 167

1  somebody who was in the throes of a mental health crisis;
2  true?
3    A    Yes.
4    Q    So if you could -- and you can follow along
5  however you want.  Maybe you can confirm.
6        It looks like -- do you have Exhibit 12 in
7  front of you?
8    A    Yes.
9    Q    Is that your incident report?
10   A    It's the --
11   Q    Investigative note?
12   A    Yeah.
13   Q    If you look at -- compare the investigative
14  note, those three pages, with pages 4, 5 and 6 of the Use
15  of Force Report, it looks like they're identical.  The
16  only difference being the signature at the bottom.
17   A    You mean Exhibit 6?
18   Q    Yes.
19   A    Yes, I believe they are the same.
20   Q    It looks like the only difference is Exhibit 12
21  has your signatures at the bottom?
22   A    Yes.
23   Q    But other than that, they're the same?
24   A    Yes.

Page 168

1    Q    And when you were creating Exhibit 12 -- well,
2  let me make sure I understand.  It looks like Exhibit 12
3  you created, and then you just attached it as the --
4  basically the description of what happened to the Use of
5  Force Report; correct?
6    A    Yes.
7    Q    And when you and your officers, your fellow
8  officers, Sergeant Moore and Holsopple, created Exhibit
9  12, as we discussed earlier, you were careful to make sure
10  it was accurate; true?
11   A    Yes.
12   Q    You were careful to make sure it had all the
13  pertinent details; true?
14   A    Yes.
15   Q    And you have read that numerous times since and
16  felt no reason to amend it or change it; true?
17   A    True.
18   Q    So let's begin with Exhibit 6 that you have in
19  front of you, Page 4.  You can either follow along that
20  way or with Exhibit 12, since they're the same.
21  Completely up to you.
22        If we look at the first line here, it says, "On
23  this date officers received a call, a reference" -- a call
24  reference, a Jordn Miller, who was 24-years-old, having a

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 169

1  mental episode and that he was running around naked."
2  Correct?
3      A    Yes.
4      Q    The report you received demonstrated somebody
5  who potentially had a diminished mental capacity; true?
6      A    Yes.
7      Q    He's engaging in odd behavior; true?
8      A    Yes.
9      Q    He's engaging in what might be considered
10  irrational behavior; true?
11      A    Yes.
12      Q    Not a normal thing for people to do; right?
13      A    Yes.
14      Q    There was no report that he attempted to harm
15  anyone; correct?
16      A    Not at this moment.
17      Q    I mean, you had not received any information
18  that he had harmed anyone?
19      A    Not yet, no.
20      Q    There was no report that he was dangerous in
21  any way; correct?
22      A    No.
23      Q    There was no report that he attempted any
24  crime; correct?

Page 170

1      A    Not yet.
2      Q    And at the time you get this information, it
3  starts to frame your view of the event you're going to
4  respond to, everything indicated that this is a person in
5  mental distress; true?
6      A    Yes.
7      Q    Not a violent criminal running around
8  terrorizing the neighborhood; right?
9      A    Not yet.
10      Q    It says -- and I ask this because three
11  officers created this report.
12          It says, "On this date officers received a
13  call."
14          Is that referring to the three of you,
15  Holsopple, Sergeant Moore, and you?
16      A    Yes.
17      Q    So when it says in this investigative note
18  officers received or officers did this, is that meaning
19  all three of you, you've all endorsed that view?
20      A    Yes.
21      Q    Do you remember where you were at when you got
22  the call of this mental health issue you were being asked
23  to respond to?  Do you remember what the weather was like
24  that day?

Page 171

1      A    It was -- it was sunny, but it was -- I don't
2  remember the temperature, but it wasn't cold, but it
3  wasn't hot either.  It was just an in-between temperature.
4      Q    It was clear outside; right?  It wasn't raining
5  or anything like that?
6      A    Right.
7      Q    It was sunny?
8      A    Right.
9      Q    It was warm outside; correct?
10      A    It was cool.  It wasn't warm.  It wasn't cold.
11  Just that in-between temperature phase.  It wasn't -- like
12  I said, it wasn't overly hot and it wasn't overly cold.
13      Q    You have a clear memory of that?
14      A    Yeah.
15      Q    This person who is running around naked, this
16  gives you an impression of a person who might be highly
17  confused; correct?
18      A    Originally.
19      Q    Might be a person who actually could run into
20  traffic and get hit by a car, get themselves into trouble;
21  true?
22      A    Maybe.
23      Q    Might be somebody who is scared; correct?
24      A    Could be.

Page 172

1      Q    Could be somebody who, because of their mental
2  state, doesn't even understand who the police are; true?
3          MR. BECK: Objection.
4          Go ahead.
5      A    It's possible.
6  BY MR. HILL:
7      Q    Right?  It's something you have got to
8  consider; right?
9          MR. BECK: Objection.
10      A    Possible.
11  BY MR. HILL:
12      Q    Based on the information you have, you have got
13  to consider all these things; correct?
14      A    Correct.
15      Q    You've got to consider that this person might
16  not understand the role that the police are playing in the
17  situation in responding; true?
18      A    That's possible.
19      Q    You understood that this was someone who needed
20  medical help; true?
21          MR. BECK: Objection.
22      A    That's possible.
23  BY MR. HILL:
24      Q    That's the purpose of the call; correct?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 173

1     MR. BECK: Objection.
2   A   Yes.
3   BY MR. HILL:
4   Q   We know that you did not -- you did not
5   coordinate your response with any other officers; correct?
6   A   Yes.
7   Q   You agree?
8   A   Yes.
9   Q   You did not coordinate your response with EMS;
10  correct?
11  A   Correct.
12  Q   Who was the first person, police officer, to
13  arrive?
14  A   Actually, I believe myself and Officer
15  Holsopple kind of got in the area at the same time.
16  Q   Initially, based on the information you're
17  getting of this person in the throes of a mental health
18  crisis who needs medical help, what was your plan when you
19  approached?
20  A   We had to locate him first.
21  Q   What was your plan once you located him?
22  A   To evaluate him.
23  Q   How were you going to do that?
24  A   Just depends on when we got there and what was

Page 174

1   happening with him and what he was doing.
2   Q   You were just going to show up and see what
3   happens?
4     MR. BECK: Objection.
5   A   Yes. That's all we can do.
6   BY MR. HILL:
7   Q   Based on the information -- and you understood
8   that Jordn was running around the neighborhood naked,
9   initially; true? Based on the initial call?
10  A   The initial call. But then even before we got
11  there, he was already dressed again.
12  Q   But based on the initial call you got, Jordn,
13  on a warm day, had disrobed and was running around naked;
14  true?
15  A   Yes.
16  Q   Based on what you received, this sounded like a
17  call for somebody who was delusional; true?
18  A   Could be, yes.
19  Q   Could be hallucinating; true?
20    MR. BECK: Objection. We've been over this.
21  A   It's possible, yes.
22  BY MR. HILL:
23  Q   And once you get that initial information, your
24  plan is just to go there?

Page 175

1     MR. BECK: Objection. You've asked him that at
2   least three times.
3   A   Yes.
4   BY MR. HILL:
5   Q   Moving on in your statement, the next line that
6   says, "We were updated by dispatch that he put on clothes
7   and then took off outside in an unknown direction.
8   Officer Holsopple and Officer Scherer arrived in the area
9   and began looking for him."
10  A   That is correct.
11  Q   What area did you arrive at?
12  A   The Milo White-Abington Road neighborhood area,
13  the streets.
14  Q   Did you go to his -- I'm just trying to figure
15  out where did you go. I'm just talking about your car.
16  We'll talk about Holsopple. But where did you go
17  initially?
18  A   Well, I went to Delaware. And as I was at
19  Delaware and Abington, I got flagged down by some -- a
20  citizen.
21  Q   So let me ask you: Did you ever get to a point
22  where you had stopped your car and was actually looking
23  around for Jordn Miller before you were flagged down?
24  A   No, because as soon as I got to that area is

Page 176

1   when I got flagged down.
2   Q   So just to make sure I'm right, when it says
3   you arrived in the area and began looking for him, what
4   that means is you were driving down Delaware Avenue and
5   hadn't stopped your car yet; correct?
6   A   Correct.
7   Q   And Delaware Avenue is a few streets from Milo
8   White?
9   A   Yeah, it's a main -- it connects the entire --
10  all the streets together. It's a main thorough -- road.
11  Q   Do you know if Officer Holsopple ever stopped
12  his automobile?
13  A   I don't know.
14  Q   And when it says that you were looking for him,
15  had you gone -- were you driving up and down Delaware, or
16  was it the first pass through the neighborhood you get
17  flagged down?
18  A   As I enter that neighborhood, I immediately
19  start looking, because I don't know where he's going to
20  pop up and pop out from.
21    So as soon as you enter into the neighborhood,
22  you're instantly looking to see where he's going to be.
23    And as soon as I got up into more of the
24  prescribed areas where he might be, I immediately got

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 177

1 flagged down.
2    Q   I just want to make sure I understand the
3 statement, though.
4        When it says, "Officer Holsopple and Officer
5 Scherer arrived in the area," you don't know what Officer
6 Holsopple actually did?
7    A   I can't answer for him.  He was in the area
8 probably looking just like I was doing.
9    Q   I just want to know what you know.
10   A   Yeah, I don't know.
11   Q   It says, "While we were looking, dispatch
12 advised officers that they received a call from 1019
13 Abington that the suspect was there and was in their
14 vehicle in the driveway."  True?
15   A   Yes.
16   Q   So you get that information before you're
17 flagged down; correct?
18   A   No.  I'm already getting flagged down while
19 we're getting this call.
20   Q   I'm just trying to understand the order of the
21 --
22   A   Yeah.
23   Q   -- the statement.
24   A   Because that call is going out.  This lady that

Page 178

1 flagged me down just tried to tell me that she -- that
2 somebody tried to steal her car, too.  So it's all coming
3 out together at the same time.
4    Q   So you're driving down Delaware?
5    A   Uh-huh.
6    Q   Yes?
7    A   Yes.
8    Q   And as this information is coming over the
9 radio from dispatch, you're at the same time getting
10 flagged down by this person?
11   A   Yes.
12   Q   And the information you get from dispatch --
13 and we'll talk about what this woman said when she flagged
14 you down.  But the information you get from dispatch is
15 that you know now where Jordn is, he's at 1019 Abington;
16 right?
17   A   Yes.
18   Q   And you know that he's in a parked car in a
19 driveway; true?
20   A   Yes.
21   Q   How far is 1019 Abington from where you were
22 looking for Jordn?
23   A   Probably a few houses up.
24   Q   So as you're driving, do you have to turn

Page 179

1 around when you get this information?
2    A   No.
3    Q   So you're already headed in that direction?
4    A   Yes.
5    Q   So the distance, then, between this woman who
6 flags you down, that we'll talk about, and the location
7 where you're told Jordn is in a parked car in the
8 driveway, is just a few houses?
9    A   Yeah, five, six houses, maybe, tops.
10   Q   Have you -- I want to stop right here for a
11 moment.
12       Have you seen any of your fellow officers in
13 the area, their cruisers, them walking around, anything?
14   A   Well, at that point, as I'm talking to the
15 lady, I see -- and this information, new information comes
16 out about 1019, Officer Holsopple comes -- coming up the
17 street and passes me.
18   Q   So you know at this moment, when Officer
19 Holsopple passes you, Jordn is a few houses down and you
20 have multiple officers on the scene, or are going to?
21   A   You have me and Officer Holsopple, yes.
22   Q   And this woman who flags you down, can you show
23 me what she did?  How did she flag you down?
24   A   Just came running out to the street and

Page 180

1 started, you know, very excited telling me that somebody
2 was just in her car and tried to steal her car and then he
3 took off running up the street.
4    Q   Did she tell you what she saw him do?
5    A   Just that somebody was trying -- in her car and
6 trying to -- and she believed was trying to steal her car.
7    Q   And at that moment, when you're talking to this
8 woman, you're getting the information over dispatch;
9 right?
10   A   Uh-huh, yes.
11   Q   So you know at this point this is the same guy?
12   A   Yes.
13   Q   You know this is this mental health issue
14 you've been dealing with?
15   A   Yes.
16   Q   In the report, it says, "On the way to 1019
17 Abington, Officer Scherer was flagged down by another
18 resident on Abington that the suspect had also tried to
19 steal their vehicle.  This is still under investigation."
20       Was that investigation closed?
21   A   I believe so, by the detectives.
22   Q   And as you sit here, do you think Jordn was
23 trying to steal a car?
24       MR. BECK: Objection.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 181

1     A   I can't answer for his state of mind.
2   BY MR. HILL:
3     Q   Did Jordn start that vehicle?  Not the Jeep,
4   but the woman who flagged you down.  Did he start her
5   vehicle?
6     A   I don't know.
7     Q   Did he move the vehicle?
8     A   I don't believe so.
9     Q   And when you're talking to this woman who flags
10  you down, is she on the passenger side of the vehicle or
11  the driver's side?
12    A   She's on my side, driver's side.
13    Q   How long does that interaction --
14    A   It's just brief.  30 seconds, 45 seconds,
15  maybe.
16    Q   And from the time that you received the call of
17  this mental health crisis involving Jordn Miller, how long
18  did it take you to get from the Scope school to 1019
19  Abington where Jordn was?
20    A   Honestly, without looking at the dispatch
21  notes, I couldn't even tell you.  It was a few minutes,
22  maybe.
23    Q   So Officer Holsopple arrives first, correct, to
24  1019 Abington?

Page 182

1     A   Yes.
2     Q   Where does he park his cruiser?
3     A   On the street.
4     Q   This is a dirt road?
5     A   Concrete.
6     Q   Concrete road, gravel driveway?
7     A   Yes.
8     Q   And where do you park your cruiser?
9     A   Right behind his.
10    Q   Are you guys in the middle of the street?  Are
11  you --
12    A   We're off to the opposite side of the road.
13    Q   So the driveway is -- you're on the other side
14  of the street from the driveway?
15    A   No.  We're on the same side as the driveway.
16    Q   Okay.  And when you get out of your car, do you
17  speak with Officer Holsopple at all?
18    A   No.  We're actually -- as we approach the
19  driveway, we actually get rushed by several citizens.
20    Q   So is Office Holsopple out of his car when you
21  pull up?
22    A   I don't know if he was just getting out or
23  still getting out.  I can't recall.
24    Q   He hadn't gone up to the Jeep where Jordn was

Page 183

1   yet?
2     A   No.
3     Q   You said that you were rushed by several
4   citizens; is that correct?
5     A   Yes.
6     Q   In the statement you write, or you collectively
7   write, as the three officers there:  "Upon officer's
8   arrival" -- and that's you and Officer Holsopple; correct?
9     A   Yes, sir.
10    Q   "At 1019 Abington, Chester A. Clark, III, came
11  running to the end of the driveway yelling, 'he's trying
12  to steal our Jeep.'" Correct?
13    A   Yes.
14    Q   That's one citizen; correct?
15    A   That's one there, yes.
16    Q   You don't mention any other citizens in your
17  report; correct?
18    A   Well, there are some that are up at that Jeep
19  now, still.  They're surrounding the Jeep trying to --
20    Q   Which ones of them rushed you?
21    A   I guess it would have been Mr. Clark.
22    Q   So when you said Citizens rushed you, you meant
23  Mr. Clark?
24    A   Yes.

Page 184

1     Q   So Mr. Clark approaches you and Officer
2   Holsopple.  You're still together?
3     A   Yes.
4     Q   And he says, "He's trying to steal my Jeep."
5   Correct?
6     A   Yes.
7     Q   And you know this is Jordn Miller inside there;
8   right?
9     A   Yes.
10    Q   You said there were -- and dispatch, it is your
11  understanding that dispatch had already informed these
12  homeowners that Jordn was having a mental episode?
13    A   I don't know what they informed the homeowners.
14    Q   Now, Jordn had not moved that Jeep; correct?
15  You didn't see it driving around?
16    A   No.
17    Q   Were the keys inside?
18    A   I don't know.
19    Q   Did you ask?
20    A   No, I didn't ask.
21    Q   Is there a reason why not?
22        MR. BECK: Objection.
23        Go ahead.
24    A   Because the information we were getting, that

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 185

1  really wasn't a concern of mine.
2  BY MR. HILL:
3    Q   What was your concern?
4    A   My concern was somebody is going to get hurt.
5    Q   By what?
6    A   By his behavior and/or by those citizens,
7  because he's trying to steal their Jeep.
8    Q   But your concern was not whether he had keys
9  and the ability to drive it away?
10   A   No.  You don't need keys to steal a vehicle.
11   Q   That wasn't my question.
12       My question was:  Your concern was not whether
13 or not the keys were in the vehicle and he could drive it
14 away with the keys?
15   A   That was not a concern.
16       MR. BECK: That's not what he said, but that's
17 all right.
18 BY MR. HILL:
19   Q   You write: "When officers approached the Jeep,
20 there were four total people holding the door shut to keep
21 the suspect in the vehicle.  Officers moved them out of
22 the way.  The suspect was in the car, flailing around,
23 screaming, making no sense at all.  He attempted to climb
24 out the window, but then just grabbed onto the steering

Page 186

1  wheel, almost like he was trying to rip it off, still
2  screaming." Correct?
3    A   Correct.
4    Q   Did you and Officer Holsopple approach the Jeep
5  together?
6    A   Yes.
7    Q   Did you walk or did you run?
8    A   By this time, after we got everybody else, we
9  just walked.
10   Q   How far of a walk is it from the end of the
11 driveway to the Jeep?
12   A   25 feet, maybe.  I don't know.
13   Q   So you and Officer Holsopple walk up to the
14 Jeep.
15       What do you say to the people, the four people
16 holding the door shut?
17   A   We just tell them to get out of the way and let
18 us handle it.
19   Q   Where were these four -- these are four people
20 plus Chester?
21   A   Yes.
22   Q   And where are these four people positioned at
23 the Jeep?
24   A   If I recall, they were kind of just all around

Page 187

1  it, all around the front half of it.
2    Q   What do you mean?
3    A   From the driver's door to the front of the
4  Jeep, to the back of the Jeep -- or not the back of the
5  Jeep, but the passenger side door of the Jeep.
6    Q   Is there -- how many people are on the
7  passenger side?
8    A   I don't -- I don't know.
9    Q   How many people are on the driver's side?
10   A   At least -- at least the one, maybe two.
11   Q   And they're all on the outside of the Jeep?
12   A   Yes.
13   Q   Only Jordn is inside the Jeep?
14   A   Yes.
15   Q   So at this point you say Jordn is flailing
16 around and screaming, making no sense at all; right?
17   A   Yes.
18   Q   What is he doing to indicate to you that this
19 guy is making no sense at all?
20   A   He's just yelling and, you know, talking to
21 nobody, but just very combative.
22   Q   Let's take it step by step.
23       When he's talking to nobody, what's he doing?
24 What's he saying?

Page 188

1    A   I don't recall everything he was saying.  He
2  was just uttering spontaneous nonsense.
3    Q   Is he in the driver's side, passenger's side?
4  Where is he at in the car at this point?
5    A   Driver's side.
6    Q   He's incoherent; right?
7    A   He's acting bizarre, yes.
8    Q   Did you ask any questions to the four people
9  who are around the Jeep or Chester Clark?
10   A   I did not, but I know Officer Holsopple was
11 trying to get some information at that time, too.
12   Q   Did Officer Holsopple stay away -- let me ask
13 you this: As you approached, did you approach kind of
14 lockstep together the whole way, or did Officer Holsopple
15 kind of break apart to get information?
16   A   No.  We were pretty much side by side the whole
17 time.  I was -- I kept my focus more on Mr. Miller, and
18 that's why I wasn't really listening to what Officer
19 Holsopple was asking everybody else.
20   Q   And as you're listening to Jordn Miller, other
21 than him talking spontaneous nonsense to no one at all, is
22 there anything else you observed him say?
23   A   Say, no.
24   Q   And was this kind of a constant process where

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 1
March 14, 2017

Page 189

1  he's spontaneously uttering nonsense, or were there
2  moments where he wouldn't say anything and then would
3  blurt something out?
4      A   It was back and forth.
5      Q   Sometimes he would be quiet?
6      A   Sometimes he would be quiet; sometimes he would
7  be yelling.
8      Q   And when he was yelling, where was he yelling;
9  out the door?
10     A   Just wherever his head was pointing.  There was
11 no specific direction.
12     Q   So you've got your eye on Jordn.  The doors are
13 shut; correct?
14     A   Yes.
15     Q   He's in the car.
16         Where -- do you say anything to Jordn?
17     A   Yeah.  Myself and Officer Holsopple both tried
18 to calm him down, give him verbal commands to come out,
19 you know, but not too aggressively, you know, and try to
20 find out what's going on with him.  We want to try to get
21 him to come out on his own so we can try to help him out
22 and get him some medical attention, and he's just not
23 talking to us.
24     Q   I want to take it step by step.

Page 190

1          Are you at the driver -- by the driver's side?
2      A   Yes.
3      Q   What's exactly the first thing you say to
4  Jordn?
5      A   I -- I couldn't even begin to tell you.  I know
6  we're just trying to -- basically, it's like a
7  negotiation, so we're just trying to negotiate him out of
8  the truck and tell him we're there to help him.
9      Q   And as you're trying to negotiate, is he still
10 spontaneously uttering nonsense?
11     A   Yes.
12     Q   So you're -- when you say negotiating with him,
13 can you give me an example of the type of thing you would
14 have said?
15     A   We would ask him what's going on, how is he
16 feeling today, why is he doing this, you know, is there
17 something we can do for you, can we get you some help, you
18 know, are you on anything, have you eaten?  I mean, just
19 anything to try to start a dialogue.
20     Q   And what is he saying in response?
21     A   He's saying nothing to us.
22     Q   Nothing or nonsense?
23     A   Both.  He won't even answer us, but then he
24 would just yell nonsense.

Page 191

1      Q   So you knew at this point your negotiations
2  weren't going to get anywhere; correct?
3      A   Correct.
4      Q   Verbal commands are going to make no difference
5  with this person?
6      A   That is correct.
7      Q   You're not going to get any real information
8  out of this person because of whatever medical or mental
9  health episode he's in; right?
10     A   Yes.
11     Q   You say he was flailing around inside the Jeep.
12 Was he flailing around while he was uttering the
13 spontaneous nonsense?
14     A   It's all a combination, back and forth, yeah,
15 so --
16     Q   How was he -- when you say flailing, I image
17 someone --
18     A   Just flailing his arms.
19     Q   And is he in the driver's seat the whole time,
20 or is he moving around the Jeep?
21     A   He's in the driver's seat the whole time.
22     Q   And as you're -- at this point, where Jordn is
23 flailing his arms, kind of just blurting out nonsense and
24 not -- clearly, he doesn't know what's going on; right?

Page 192

1      A   Yes.
2      Q   You and both Officer Holsopple -- are you both
3  at the driver's side at this point?
4      A   Yes.
5      Q   Other than flailing around, kind of throwing
6  his arms up and down, does he do anything else before he
7  starts grabbing the steering wheel?
8      A   No.
9      Q   So you say he grabbed onto the steering wheel,
10 jerking like he was trying to rip it off.  Is that --
11     A   Yes.
12     Q   He's got both hands on the steering wheel?
13     A   Yes.
14     Q   Is he like shaking it?
15     A   Yeah.
16     Q   Show me.
17     A   (Indicating.)
18     Q   So the steering wheel is not moving.  His body
19 is probably moving; right?
20     A   Correct.
21     Q   Is he still kind of saying this nonsense?
22     A   On and off.
23     Q   Has he said anything coherent that you've heard
24 at this point?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 1
March 14, 2017

Page 193

1    A   No.
2    Q   At this point, you haven't seen him try to --
3  you haven't seen any keys in his hand; right?
4    A   No.
5    Q   You haven't seen any ability of him to be able
6  to drive away at this point; right?
7    A   No.
8    Q   So at this point, you understood that you've
9  got a mentally-troubled young man who is confused,
10  incoherent, making no sense at all, who had been
11  reportedly running around the neighborhood naked but now
12  was clothed, inside someone else's car yelling, flailing
13  and screaming; true?
14    A   Yes, but there's also more to that.
15    Q   Which is?
16    A   Officer Holsopple received this information,
17  that he related to me before we took him out of the car,
18  that he actually tried to stab one of the homeowners's son
19  in the head with a pair of the needle nose pliers, because
20  he was actually in the car trying to get Mr. Miller out of
21  the car.  So, you know, at that point they were more than
22  angry.  They were also demanding that we remove him from
23  their vehicle and their property.  And those were all
24  considerations that were taken into effect at this point.

Page 194

1  And we knew that he had tools in that truck.
2    Q   You had not seen him hold any tools since you
3  had been there?
4    A   No, but you could see them on the seats.
5    Q   I'm just asking you what you saw.
6        When you went back to the station that night
7  and created this Use of Force Report --
8    A   Uh-huh.
9    Q   Yes?
10    A   Yes.
11    Q   And you have listed weapons; right?
12    A   Uh-huh.
13    Q   Yes?
14    A   Yes.  I'm sorry.
15    Q   There's no mention of pliers or tools; correct?
16    A   I believe it says it in --
17    Q   Hold on.
18        MR. BECK: Let him answer.
19    A   Number 12.  I believe it says in Exhibit 12
20  that he tried to stab him with a pair of pliers.
21  BY MR. HILL:
22    Q   Where is that?
23    A   (Reviewing document.)
24        I thought it was in here, but obviously it's

Page 195

1  not, so -- but I know that is information that we had had.
2    Q   You just didn't put it in that report?
3    A   It might have not got put -- obviously, it
4  didn't get put in this report.
5    Q   All the times that you reviewed that report,
6  you never thought that was something missing that needed
7  to be added?
8    A   Well, I also know that the detectives did their
9  own individual investigation, so that's what -- you know,
10  that's the part that they would have added in there, too.
11    Q   That's not my question.
12    A   So --
13    Q   My question is:  In all the times that you've
14  reviewed this document that's in your desk drawer, in
15  anticipation of your testimony, you never thought this is
16  an omission that needs to be added?
17        MR. BECK: Objection.
18        Go ahead.
19    A   You can sit and try to write this report after
20  this incident, but you're not going to remember
21  everything.
22  BY MR. HILL:
23    Q   I didn't write it.
24    A   I understand that.  You know, we did.  But with

Page 196

1  the incident and the nature of the incident, you're not
2  going to recall every single fact when you're actually
3  sitting down to write this report.
4    Q   And also after you were done with that incident
5  investigative note and you created the Use of Force Report
6  that's on Exhibit 6, you did not include pliers or any
7  tools as a weapon that Jordn Miller used that resulted in
8  your using force against him; true?
9        MR. BECK: Objection.
10        Go ahead.
11    A   That's -- that's what it says, yes.
12  BY MR. HILL:
13    Q   From the tools you've described, they were
14  never in Jordn's hands at any time you saw Jordn; true?
15    A   That is true.
16    Q   Based on your interactions with Jordn, you
17  understood that once he was out of the vehicle he still
18  wasn't going to obey your verbal commands; correct?
19        MR. BECK: Objection.
20    A   He was not obeying, no.
21  BY MR. HILL:
22    Q   Any reason to believe that mentally he would
23  have changed from the time he was contained in the vehicle
24  to you removing him out of the vehicle?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 197

1    A   Yes.  In my experience, sometimes it only takes
2  a simple use of force of grabbing somebody out of the car,
3  when they start, "Okay, okay, okay.  I'm going to listen.
4  I'll listen.  I'll listen."
5        So at any given time, people have changed
6  through my experiences.  So I had no reason to believe at
7  that point that he couldn't refocus and start obeying our
8  commands.
9    Q   So that was your expectation as a police
10  officer?
11    A   My expectation, and I have seen it.
12    Q   Now, you understood that once you removed him
13  from the vehicle, if he didn't shape up and become
14  coherent all of a sudden but was still flailing around
15  uttering nonsense, you would have to use physical force
16  against him; right?
17    A   Yes.
18    Q   You would have to control him, or else, he
19  could just run away or something; right?
20    A   Yes.
21    Q   I mean, this is a guy who had been running
22  around the neighborhood; right?
23    A   Yes.
24    Q   So once you got him out, what was your plan if

Page 198

1  he didn't shape up?
2    A   Our plan was to get him in control.
3    Q   How?
4    A   Whatever we had to do to get him there.  It all
5  depended on how he was reacting to us.
6        The more he fought, the more he forced us to
7  fight.
8    Q   Had you spoken to EMS at this point?
9    A   Not yet.
10    Q   Why not?
11    A   There was no cause for EMS yet.
12    Q   In your mind -- and let me ask you:  Did you
13  discuss removing Jordn from the vehicle with Officer
14  Holsopple?
15    A   For a split second, yes.
16    Q   And for that split second, what was discussed?
17    A   We looked at each other and said, "We're going
18  to have to take him out of the car."
19    Q   Anything else?
20    A   No.
21    Q   And that's -- okay.
22        Now, up until now, Jordn has been in the car
23  the entire time; right?
24    A   Yes.

Page 199

1    Q   And you've had the ability, if you wanted to,
2  to pull out that radio and summons the fire department;
3  correct?
4    A   I could have.
5    Q   I mean, whether you thought you needed to is
6  one thing.  But you had the time and opportunity to do so;
7  correct?
8    A   I suppose so, possibly.
9    Q   Did you know at this point whether or not EMS
10  was in route?
11    A   No.
12    Q   Did you do anything to find out is a squad on
13  its way?
14    A   No.
15    Q   Did you talk to your supervisor, Sergeant
16  Moore, at any point?
17    A   No.
18    Q   Is there a reason you didn't contact your
19  supervisor to say, "Here's the situation.  Our plan is to
20  remove him from the vehicle"?
21    A   We had to get him out of that vehicle because I
22  was in fear that he could start that vehicle and leave, by
23  any means, whether it was -- if there were keys in there
24  or not, or with those tools.  If he got mobile, now he's

Page 200

1  in a weapon, and we'd never able to stop him from that.
2    Q   You're talking about if he's driving around in
3  the car?
4    A   Yes, if he left in that car.
5        We knew he had committed crimes, from what they
6  had told us, and we are the police.  And we have to react.
7  We have to get him out of that car, we have to get him
8  secured, and we have to get him whatever attention he
9  needs as soon as we can do that.
10        And sitting around isn't going to solve that
11  problem.  We have to get him under control.  We're the
12  police, and that's just our job.
13    Q   The whole time you've been outside the vehicle
14  and observed Jordn, you've been able to observe his hands,
15  whether they're on the steering wheel or he's flailing
16  around; right?
17    A   They do disappear time to time, but they are
18  either up here, around there or they're underneath, so --
19    Q   And this person who admittedly is in the throes
20  of some episode, where he's talking nonsense and flailing
21  and screaming and talking to people who apparently aren't
22  there, did you really expect that without keys he was
23  going to find a way to start this vehicle and drive away?
24        MR. BECK: Objection.  Go ahead.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

---

Page 201

1  A  First of all, you have to kind of understand
2  the demographics of where we're at.  And most of these
3  people over there are motor heads, which means -- that's
4  all they do, is work on cars.
5      Do they have the capability of peeling a column
6  and starting a car?  I don't know.  Can it happen?
7  Absolutely.
8      I don't know what his abilities are.  But I
9  have to prepare that if he does know how to do that and
10  he's capable of doing it and he has the tools in there to
11  do it, we can't let that vehicle get mobile.  So I don't
12  know what his abilities are.  I have never dealt with him.
13  I had never spoken to him.
14  BY MR. HILL:
15  Q  So I just want to make sure I understand.
16      From your perspective, one of the primary
17  reasons you felt you had to get Jordn out of the car is
18  because in his condition you thought he might be able to
19  start the car in some fashion and drive away with these
20  tools?
21  A  He could have, yes.  That was a concern.
22  Q  And while you had observed Jordn this entire
23  time, you never saw him get one of these tools and try to
24  start the car; true?

---

Page 202

1  A  That's true.
2  Q  And you never saw any keys in Jordn's hands at
3  any time?
4  A  No.
5  Q  And nobody ever told you, "Oh, the keys are
6  inside the car.  He can take off"?
7  A  No.
8  Q  Other than Officer Holsopple, at this point in
9  time, when you made the decision to remove Jordn from the
10  vehicle, have you spoken with any police officer at all
11  from Springfield Township?
12  A  No.
13  Q  And the chief is on duty at this point;
14  correct?
15  A  Yes.
16  Q  Is he a resource you can speak to, then Chief
17  John Smith?
18  A  I would assume, yes.
19  Q  Not something you've ever done?
20  A  No.
21  Q  So let's stop there.
22      Before you extract the vehicle, you and Officer
23  Holsopple are next to the driver's side door.  How far are
24  you from the vehicle?

---

Page 203

1  A  Two, three feet.
2  Q  So he can't -- if you're two or three feet --
3  is the window open?
4  A  I believe it is.
5  Q  Do you remember one way or another?
6  A  No.  I know the report says it was, but I don't
7  recall it up or down.
8  Q  Jordn never swings his hand outside the window
9  to try to hit you; right?
10  A  I don't believe so.  I don't recall that, but
11  --
12  Q  And then the four to five people who were
13  present in the driveway when you got there, where are they
14  standing at this point?
15  A  Honestly, after we just tried to get them back,
16  I didn't pay any attention to them.  My focus is on
17  Mr. Miller.
18  Q  When Jordn's hands are on the steering wheel,
19  is there any -- aside from driving away with the vehicle,
20  is there any threat that Jordn poses to you or Officer
21  Holsopple?
22  A  That's unknown.
23  Q  And is that the same answer for any threat
24  Jordn posed to anyone else at that moment?

---

Page 204

1  A  I would say yes.
2  Q  So moving on in the statement: "We opened the
3  door to extract him from the vehicle, and he immediately
4  started to fight and resist with both officers.  We were
5  able to get him out of the vehicle, onto the ground, onto
6  his stomach."  Okay?
7  A  Okay.
8  Q  And that's your writing; correct?
9  A  Yes.
10  Q  Jordn did not try to get out of the vehicle on
11  his own; correct?
12  A  No.
13  Q  Correct, right?
14  A  Correct.
15  Q  What I said is correct, okay.
16      You made the decision to open the driver's side
17  door and remove Jordn?
18  A  Yes.
19  Q  As you attempted to pull Jordn from the
20  vehicle, he tried to stay in the vehicle; true?
21  A  Yes.
22  Q  Was he grabbing the steering wheel?  Was he
23  still holding on?
24  A  With one arm.

---

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 1
March 14, 2017

Page 205

1   Q   And where did you grab Jordn to get him out of
2   the vehicle?
3   A   Well, actually, initially, just Officer
4   Holsopple reached in and grabbed the arm to try to more or
5   less escort him out.
6   Q   Grabbed his left arm?
7   A   I don't recall what arm it was, but he just --
8   the free arm that wasn't holding onto the wheel.  But he
9   tried to actually just kind of arm bar him and escort him
10  out gently to see if he could just get him to come out.
11  When he pulled back, he automatically started to resist
12  us.  And that's when we both reached in and grabbed him
13  with a lot more force, pulling him out so that, one, he
14  would let go of that wheel and that, two, we could get him
15  out of the car.
16  Q   How do you grab Jordn?
17  A   Just by the arm and -- basically, just by the
18  upper torso and like the shoulder of his coat.
19  Q   And that coat is a hooded sweatshirt; right?
20  A   Yes.
21  Q   So Officer Holsopple has one of Jordn's arms,
22  free arm; correct?
23  A   Yes.
24  Q   And he's pulling on that?

Page 206

1   A   Yes.
2   Q   And then you have Jordn by the coat, like the
3   collar area?
4   A   Yeah, like by the arm and the shoulder of the
5   coat.
6   Q   And you have got both hands on him and you're
7   pulling Jordn?
8   A   Yes.
9   Q   And Jordn has got his right hand still on the
10  steering wheel, trying to stay in the vehicle; right?
11  A   Yes.
12  Q   And at this point have you -- are you still
13  trying to negotiate with Jordn?
14  A   Yeah.  We're still trying to tell him, "Just
15  come out of the car.  Just come out of the car."
16  Q   But at this point -- that's the point where
17  you're trying to rip him out of the car and he's trying to
18  keep himself inside?
19  A   Yes.  When he exhibited force by pulling away
20  from Officer Holsopple, then we exhibited another level of
21  force to try to match and supersede his a little bit, just
22  enough to get him out of the car.  But he's still hanging
23  on.
24  Q   And the force you're talking about Jordn

Page 207

1   exhibiting is him holding onto that steering wheel and
2   trying to get his body in the car?
3   A   Yes.
4   Q   It states you're able to get Jordn out of the
5   vehicle.  So at some point you're able to break his grasp
6   where he's holding onto the steering wheel?
7   A   Yes.
8   Q   It says you get him onto the ground -- is this
9   that gravel drive?
10  A   Yes.
11  Q   You get him onto the ground and onto his
12  stomach; right?
13  A   Yes.
14  Q   When you get Jordn onto his stomach, where are
15  you in relation to the Jeep?
16      Where are the three people now?  It's you,
17  Holsopple and Jordn; right?
18  A   Yeah.  Just a few feet next to the Jeep.
19  Q   So you're off to the driver's side of the Jeep;
20  right?
21  A   Yes.
22  Q   Is Jordn's head facing the engine of the
23  vehicle or facing the rear tires?
24  A   No, he's facing actually away from the Jeep

Page 208

1   altogether.
2   Q   So when you say away from the Jeep, are his
3   feet closest to the driver's side?
4   A   His feet are closest to the driver's side.
5   Q   So he's like perpendicular to the Jeep?
6   A   Yes.
7   Q   And where are you located?
8   A   I am on his left side.
9   Q   So you're -- if I understand it, you're --
10  Jordn is on his stomach?
11  A   Uh-huh.
12  Q   Yes?
13  A   Yes.
14  Q   You're on Jordn's left side, which would be the
15  side closest to the street?
16  A   Yes.
17  Q   And then Officer Holsopple is where?
18  A   On his right side.
19  Q   When you have -- now, you've got Jordn.  He's
20  in a prone position at this point; correct?
21  A   Yes.
22  Q   Face down?
23  A   Yes.
24  Q   Stomach down?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 1
March 14, 2017

---

Page 209

1    A   Yes.
2    Q   Where are -- are you kneeling or standing?
3    A   I think I was actually kneeling on my right
4  knee. And Officer Holsopple was, I believe -- he might
5  have been on both his knees next to him. And we just had
6  our hands on his back, trying to calm him down, still
7  trying to talk to him. He's still not listening to us.
8  And Joe and I -- or Officer Holsopple and I make the
9  decision that we've to get him into some cuffs. So at
10  that point I --
11    Q   Can I stop you right there?
12    A   Yes.
13    Q   Kind of time-sequence-wise.
14        You're -- both of you have your hands on Jordn;
15  right?
16    A   Yes.
17    Q   You're holding on to Jordn's body?
18    A   Yes.
19    Q   Is he trying to -- and he's face down. Is he
20  trying to get up off the ground?
21    A   He is flailing around, kicking, yelling. He
22  keeps arching his back up and just yelling just loud
23  noises, not anything specific, just yelling, and trying to
24  roll side-to-side.

---

Page 210

1        So he -- to us, he is trying to get up.
2    Q   And in order to keep him from getting up, you
3  and Officer Holsopple have to put force down on Jordn to
4  keep him on the ground; right?
5    A   Yes.
6    Q   And your hands are where?
7    A   Like on his shoulder and lower back, almost
8  near his back. And I think Officer Holsopple is probably
9  around the same type of distance, just on the opposite
10  side of him.
11    Q   So four hands on Jordn's -- somewhere on
12  Jordn's back?
13    A   Yes.
14    Q   And he's trying to arch his back up to get up,
15  and you're keeping him down?
16    A   Yes.
17    Q   And you have to use some force to keep him
18  down, because he's really thrashing; right?
19    A   Correct.
20    Q   How long does that continue?
21    A   It seems forever, but the reality is it might
22  have been --
23    Q   I don't want you to guess.
24    A   Yeah. I don't know, then.

---

Page 211

1    Q   Going to the next section of the statement
2  here, it says, "One of his arms was completely underneath
3  his body while he continued to fight with officers. He
4  was fighting, kicking and yelling and not listening to any
5  verbal commands that were being given by both officers on
6  the scene." Correct?
7    A   Yes.
8    Q   When it states -- and I'm assuming here, where
9  it's talking about officers, this is limited now to you
10  and Officer Holsopple; right?
11    A   Yes.
12    Q   Sergeant Moore is not there yet; correct?
13    A   Correct.
14    Q   It says, "One of his arms was completely
15  underneath his body." That's Jordn?
16    A   Yes.
17    Q   Now, you -- do you have one of his arms? One
18  of his arms is not underneath his body?
19    A   Yes. At this point, we already have one arm
20  handcuffed.
21    Q   And do you have that arm?
22    A   No. Officer Holsopple had that arm.
23    Q   So Officer Holsopple has what would be Jordn's
24  right arm?

---

Page 212

1    A   Yes.
2    Q   And that's behind Jordn's back now?
3    A   Yes.
4    Q   Because you're ready to cuff him?
5    A   We're trying to cuff him.
6    Q   How is Jordn's arm -- left arm, then,
7  underneath his body?
8    A   He's just totally laying on it.
9    Q   He's laying on it?
10    A   Yeah.
11    Q   Like on his diaphragm area?
12    A   Yes.
13    Q   So at this process where he's -- you're holding
14  him down, trying to keep him from moving, he has got his
15  left handcuffed like you did underneath his diaphragm?
16    A   Yes.
17    Q   And he's still in a prone position?
18    A   Yes.
19    Q   And have you and Officer Holsopple moved
20  positions at all?
21    A   No.
22    Q   An eyewitness who gave a statement described
23  you as trying to keep Jordn down with one of your knees on
24  Jordn's body. Is that correct or not?

---

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 213

1    A   I did not have a knee on his body.
2    Q   Okay.
3    A   Like I said, my right knee was -- my left knee,
4  which would have been closer to him, was in the up
5  position anyway.
6    Q   So --
7    A   My right knee would have been down away from
8  Jordn.
9    Q   Yeah.  We're not going to be able to get it on
10  camera, but if I understand it, I mean, you're -- you've
11  got your right knee then -- your right knee is actually on
12  the ground like at a 90-degree angle?
13    A   Yes.
14    Q   And you've got your left knee, then, kind of
15  bent, foot on the ground, bent and at a 90-degree angle?
16    A   Yes.
17    Q   And you're holding Jordn then with both of your
18  hands?
19    A   Yes.
20    Q   Are you still trying to negotiate with Jordn at
21  this point?
22    A   Yes.  We're trying to get him to give up his
23  other hand so we can get him handcuffed.
24    Q   Has he said anything that has made any sense so

Page 214

1  far?
2    A   No.  Still just yelling.
3    Q   Anything even decipherable, or just yells?
4    A   Just yelling.
5    Q   Now, at this point have you contacted anyone to
6  summons for EMS?
7    A   Not yet.
8    Q   When you say that Jordn was fighting, kicking
9  and yelling, tell me what he was doing as far as kicking.
10    A   He was just flailing his feet.
11    Q   Like up and down?
12    A   Up and down and -- yeah, just --
13    Q   Almost like a swimmer, kind of?
14    A   Yeah.  He was just -- just his whole body was
15  out of control.
16    Q   We talked about kicking.  In terms of fighting,
17  we know one arm was actually behind his back; right?
18    A   Yes.
19    Q   So how is he fighting at this point?  He's got
20  the other -- the left arm --
21    A   He's still just flailing around and kicking and
22  trying to toss side-to-side.  He's still rearing his head
23  and shoulders up off the ground, yelling.  And just he
24  will not -- he's got superhuman strength at this point.

Page 215

1    This is when we're starting to develop that he
2  is super strong and we cannot, you know, break that arm
3  out from underneath of him.
4    Q   So if he's super strong at this point, it must
5  take a lot of force from you and Officer Holsopple to keep
6  him down?
7    A   We're not using that much force, honestly.  I
8  mean, we are -- we're using just enough force, but we're
9  not laying on him, we're not -- you know, we're not
10  putting our weight into him.  We are just trying to more
11  control his movements than laying on him.
12    Q   I want to be fair here.
13    If he has got superhuman strength, why doesn't
14  he just get up if you're not putting force on him?
15    MR. BECK: Objection.  That's not what he said.
16    A   I can't answer that.
17  BY MR. HILL:
18    Q   Put it this way:  You're using enough force,
19  you and Holsopple, on Jordn's back, to keep this person
20  who is developing superhuman strength in a prone position;
21  fair?
22    A   Yes.  We're trying to control him.
23    Q   Jordn never got up; true?
24    A   No.

Page 216

1    Q   When he becomes unresponsive, he's still in the
2  prone position; true?
3    A   Split second.  But yeah, he's still -- he was
4  in the prone position.
5    Q   So let me -- I think you kind of jumped ahead
6  in the statement, so let me try to catch up here.
7    A   Okay.
8    Q   You say, "Officer Holsopple said we should try
9  to get the cuffs on him."  That's a quote; correct?
10    A   Yes.
11    Q   So at this point, had you guys not -- was there
12  no plan to put handcuffs on him at this point?
13    A   We were just still trying to control him enough
14  to get him to calm down.  And then when we got him out of
15  that truck and we knew that we weren't going to be able to
16  control him anymore, we knew we had to get him secured.
17  That was the only way we were going to be able to get him
18  any type of help or get this situation ended.
19    Q   So everything you did this day was for Jordn's
20  help?
21    A   Yes.
22    Q   So it says, "At that time Officer Scherer was
23  able to get one cuff on his left hand."
24    A   Okay.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 1
March 14, 2017

Page 217

1    Q    Well, you --
2    A    Yeah, honestly, I don't remember which arm it
3  was that was cuffed.  But I knew at -- we got one cuff on
4  there.
5    Q    Well, do you remember what side of Jordn's body
6  you were on?
7    A    Yeah, absolutely.  I was on his left side.
8    Q    So you had the cuff on him?
9    A    Yeah, I put the first cuff on him.
10   Q    So Officer Scherer didn't have a cuff on him?
11   A    I am Officer Scherer.
12   Q    I'm sorry.  I'm sorry.  You're right.  You're
13  right.  My apologies.
14        But he was still resisting and fighting with
15  what seemed to be superhuman strength?
16   A    Yes.
17   Q    And you wrote:  "And power."  "Superhuman
18  strength and power, which was highly unusual in both
19  officers's experiences."
20   A    Yes.
21   Q    So you and Officer Scherer must have discussed
22  this after the fact?
23   A    I'm still Officer Scherer.
24   Q    I'm sorry.  You and Officer Holsopple must have

Page 218

1  discussed this after the fact?
2    A    Yeah, yeah.
3    Q    And throughout this point, Jordn's left hand is
4  still underneath him, under his diaphragm; right?
5    A    Yeah, one of his arms is underneath him.
6    Q    Have you and Officer -- so Officer -- do you
7  know who is holding Jordn's cuffed hand, you or Officer
8  Holsopple?
9    A    I believe Officer Holsopple was.
10   Q    Do you remember if Officer Holsopple has both
11  hands on Jordn, Jordn's wrist that's cuffed, or one?
12   A    Actually, if he had them, he probably just had
13  them by the chain of the cuff.
14   Q    Do you remember?
15   A    No, I don't remember.
16   Q    Do you remember when you and Officer Holsopple
17  discussed Jordn having superhuman strength and power?
18   A    That would have been later that night.
19   Q    Like when you guys were putting this note
20  together?
21   A    Yeah, after we kind of decompressed a little
22  bit.
23   Q    It says, "Officer Holsopple attempted to get
24  his right arm free."  That's Jordn; right?

Page 219

1    A    Yes.
2    Q    So it's his right arm that's underneath him.
3    A    Like I said, I don't remember, in the throes of
4  all the craziness you're battling -- you know, I know what
5  side I was on, but I don't remember which arm was cuffed
6  or which arm was underneath him.  I just knew one arm was
7  underneath him and we had one cuff on the other one.
8    Q    So the statement you wrote at the time is
9  better than your memory today; is that fair?
10   A    Yeah, absolutely.
11   Q    So you're on Jordn's left side as he's face
12  down?
13   A    Yes.
14   Q    The entire time?
15   A    Yes.
16   Q    Jordn's left hand, left arm, which is the one
17  on your side, is behind his back and cuffed; right?
18   A    Okay.  Yes.
19   Q    I mean, that's what it says; right?
20   A    Yes.
21   Q    And then Jordn's right arm, which would be the
22  one away from you, is underneath his body, crossed,
23  underneath his diaphragm; like you said earlier?
24   A    Yes.

Page 220

1    Q    It says, "Officer Holsopple tried to get his,
2  Jordn's, right arm free" -- because you were trying to
3  cuff it; right?
4    A    Yes.
5    Q    "The suspect lifted, arched up."
6        Can you tell me what he did, "arched up"?
7    A    So he's on his stomach, and he just -- again,
8  he lifted up his shoulder, arched his back, lifted up his
9  shoulders.  I mean, higher than anybody I've ever seen
10  before being capable of even doing something like that,
11  and just arched up, and his whole -- from the nipple line
12  up, just arched upward.  Right off the ground.
13   Q    So like at a 90-degree angle?
14   A    It looked like a shark coming out, to be honest
15  with you.  But yeah, he just arched his back and almost
16  doing like a backward sit-up.
17   Q    And it says he bit your left front calf?
18   A    Yes.
19   Q    That's the knee you had bent; right?
20   A    That's the knee that I had in the up position.
21   Q    Where he bit you, how high is that off the
22  ground?
23   A    Well, I'm pretty short.  Six, seven inches,
24  maybe.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 221

1  Q   So at the point he arched up and -- he must
2  have turned his head to bite your leg?
3  A   Yes.
4  Q   And it's about six inches off the ground?
5  A   Six, seven inches, yeah.
6  Q   But you remember him going --
7  A   Yeah, he's --
8  Q   How high did his head go?
9  A   High enough to get my calf.  I mean, he arched
10 up and turned his head right at me and just clamped onto
11 my calf.
12 Q   But I mean, he bit you, your calf, maybe six
13 inches off the ground.  He wouldn't have to arch up very
14 far to bite your calf; right?
15 A   No.
16 Q   So how high -- I'm trying to ask you.  How high
17 did he actually lift up?  Was his head at your chest?
18 A   No.  Just high enough to get to my -- the bite
19 mark on my calf --
20 Q   Like six inches?
21 A   Yeah.  The bite mark is about six inches from
22 the bottom of my foot, maybe seven, so just that high.
23 Q   It says, "Officer Scherer advised Holsopple
24 that the suspect was biting him.  Officer Scherer pulled

Page 222

1  his leg out of his mouth while he was still fighting.  He
2  turned sideways and then laid back down."
3          So I want to unpack this a little bit.
4          Jordn's left arm on your side at the time he
5  bites you is cuffed and behind his back?
6  A   Yes.
7  Q   And he bites you.  And at the time he's biting
8  you, you say, "Officer Holsopple, he's biting me"?
9  A   He's biting me.
10 Q   Then, you pull your leg out of his mouth?
11 A   Yes.
12 Q   How do you do that?  Rip it out?
13 A   I just rip it out.  Yep, I just rip it out and
14 end up standing up more.
15 Q   So you just rip your -- you don't grab your leg
16 with your hands; you just take a step backwards?
17 A   Right.
18 Q   And at that point he's not biting you any
19 longer?
20 A   Not after I rip my leg out of his mouth.
21 Q   And then it says, "He turned sideways."  So do
22 you mean he rolled over?  Is that what you mean, he turned
23 sideways?
24 A   No.  I don't know --

Page 223

1  Q   Or he turned his head sideways?
2  A   He just turned his head back sideways.
3  Q   And then it says, "He laid back down."  Right?
4  A   Yeah.  So he's just in one fluid motion laying
5  back down to where his face is flat down on the ground.
6  Q   So he lifts his head up off the ground, about
7  six inches, bites you.  You move your leg back.  He lays
8  his head face down back in the gravel?
9  A   Yes.
10 Q   And there's -- you have stood up, but do you go
11 back down to that kneeling position you had before?
12 A   Not initially.
13 Q   So the biting event has concluded at this
14 point?
15 A   Yes.
16 Q   And Officer Holsopple is still holding Jordn
17 down?
18 A   Yes.
19 Q   And from where you're at, at this point, Jordn
20 can't bite you; correct?
21 A   Correct.
22 Q   It says, "Officer Scherer then struck the
23 suspect in the left common peroneal to gain compliance."
24 Correct?

Page 224

1  A   Correct.
2  Q   So I want to -- this sequence of events -- the
3  biting event has ended.  He's face down.  You strike him
4  with -- can I say a fist?
5  A   My foot, actually.
6  Q   Your foot?
7  A   There was a strike, a kick strike to his common
8  peroneal.
9  Q   So you -- this is because you're standing up
10 now; right?
11 A   Yes.
12 Q   So the biting event has ended.  He's face down.
13 You've taken a step back; right?
14 A   I'm still next to him, yes.
15 Q   But you're standing --
16 A   I'm clear he's not going to bite me again.
17 Q   Right.  And then can I say -- kick and strike;
18 is there a difference?
19 A   I consider a kick a kick with a fist -- or a
20 foot, and a strike is more of a hand-punch motion.
21 Q   So you kick him?
22 A   I kick him.
23 Q   Where do you kick him?
24 A   In the left common peroneal.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 1
March 14, 2017

Page 225

1   Q   What is that?
2   A   That is the meaty part of the left thigh.
3   Q   And when you kick him in the meaty part of the
4   thigh, it's his left thigh; right?
5   A   Yes.
6   Q   He's at that point face down in the gravel;
7   right?
8   A   Yes.
9   Q   With Officer Holsopple on his side?
10  A   Yes.
11  Q   And the reason you kick him is to gain
12  compliance?
13  A   Trying to gain more compliance.  He's
14  escalating force.  We have to now escalate the force.  And
15  we're still in the process of trying to gain that
16  compliance and control to get him into control, to get him
17  cuffed, to get him the help that he needs.
18  Q   When you kicked Jordn in the leg, are you
19  wearing boots?  What kind of shoes do you wear?
20  A   Boots or tennis shoes.  It depends on the
21  weather.  I might have had tennis shoes on that day.
22  Q   And when you kick Jordn, when he's face down in
23  the gravel, what response is there?
24  A   Zero.

Page 226

1   Q   Is he still then -- because he was face down
2   when you kicked him.  Is he still face down after you kick
3   him?
4   A   He's still face down.  He's still kicking,
5   flailing, and yelling.
6   Q   Do you kick him with your right leg?
7   A   Yeah, I believe.  So I'm right handed, so
8   everything usually --
9   Q   That's your strong side?
10  A   Yes.
11  Q   At the moment you kicked Jordn, was just
12  Officer Holsopple able to hold him down?
13  A   No.  He was still having difficulties.
14  Q   But I mean, he was the only one holding him
15  down?
16  A   He was the only one holding him at that point.
17  Q   And he was able to hold him down?
18  A   He was having difficulties, but he was still
19  maintaining him on the ground, yes.
20  Q   At the moment you kicked Jordn and you're
21  standing there, do you try to find out whether or not EMS
22  is on its way?
23  A   Not yet.
24  Q   Have you attempted in any way to contact EMS or

Page 227

1   the fire department?
2   A   No.
3   Q   At the point that you kicked Jordn, have you
4   tried to speak with your supervisor at all?
5   A   No.
6   Q   Is there any plan in place now or, to use one
7   of your phrases earlier, are you still battling him?
8   A   We are still in the midst of a battle.  There
9   is no time to put anything into motion.
10  Q   Now, I guess I should back up a little bit.
11      Throughout this entire process, Jordn is
12  wearing a camouflaged hooded sweatshirt?
13  A   It was some kind of hooded -- heavy-hooded
14  sweatshirt, yes.
15  Q   And baggy -- kind of like maybe gym shorts?
16  A   Something like that, yes.
17  Q   And no shoes, no socks?
18  A   I don't recall the shoes or socks issue.
19  Q   After you kicked Jordn and there's no response
20  from him -- so I'm assuming that means he just continues
21  to lay face down; right?
22  A   He's continuing to fight, flail, yes.
23  Q   Face down, kind of mouth in the ground?
24  A   He's still rearing up and yelling, though, so

Page 228

1   he's not totally in the gravel.
2   Q   What do you do after you kick Jordn?
3   A   At that point, I realize that I have no other
4   option than to escalate the force to the Taser.  I tell
5   Officer Holsopple that I'm going to deploy the Taser.
6   Q   Let me -- can I stop you for a second?
7   A   Sure.
8   Q   Before you tell Officer Holsopple you're going
9   to deploy the Taser, have you said anything to Jordn at
10  all -- even about him biting you?  Are you saying
11  anything, speaking to Jordn at all at this point?
12  A   I believe Officer Holsopple is still trying to
13  tell him to settle down.
14  Q   But from your perspective --
15  A   Yeah.  I have not said anything else at this
16  point.
17  Q   And at this point, is Jordn saying anything?
18  Is he still making his nonsensical --
19  A   He's just -- I'm sorry.
20  Q   Go ahead.
21  A   Yeah.  No.  He's just yelling again.  Nothing
22  specific; just yelling.
23  Q   Just ahhh?
24  A   Yeah, just general yelling.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 229

1    Q    So moving on to this statement, it says,
2  "Officer Holsopple again tried to get his arm; however, it
3  was now right next to his face, and that would have been
4  impossible without also getting bit." Okay?
5    A    Okay.
6    Q    So we're talking about Jordn's right arm;
7  right?
8    A    Yes.
9    Q    And was Jordn's right arm -- how was it next to
10  Jordn's face?
11    A    Honestly, I don't know.
12    Q    It says, "Officer Scherer then informed Officer
13  Holsopple that he was going to deploy the Taser, at which
14  time Officer Holsopple moved a little bit to the side to
15  get a hold of his arm." That's what it says?
16    A    Okay, yes.
17    Q    What arm did Officer Holsopple get a hold of in
18  order for you to --
19    A    I'm assuming it was still the -- it was still
20  the cuff -- the arm that had the handcuff, because that
21  loose handcuff is a weapon. So if he flings that around,
22  we let that loose, you know, and he uses that, that arm
23  gets loose, he can use that loose cuff as a weapon. So he
24  was still holding on to that arm to maintain that we

Page 230

1  didn't get hurt from that.
2    Q    And I'm not trying to trick you or anything.  I
3  just want to -- I'm trying to understand which arm anybody
4  had a hold of.
5        When it says, "Officer Holsopple moved a little
6  bit to the side to get a hold of his arm" -- Jordn's arm,
7  do you know which arm you're talking about?
8    A    It's the arm with the cuff.
9    Q    Is that because you, then, were holding --
10  during this process, were you holding that arm?
11    A    No.  Officer Holsopple never let go of the arm.
12    Q    Okay.
13    A    He has maintained possession of that arm the
14  entire time, after that cuff got on there the first time.
15    Q    So that's what I'm trying to understand is --
16  "At which time Officer Holsopple moved a little bit to the
17  side to get a hold of his arm."
18        That sounds to me like an arm that he doesn't
19  currently have a hold of.  Is that fair?
20    A    It might sound that way, but I don't -- I don't
21  know exactly what that statement would mean.
22    Q    Okay.
23    A    Because he never let go of the arm.
24    Q    Okay.

Page 231

1    A    The one with the cuff, anyway.
2    Q    Okay.
3    A    So --
4    Q    Was Officer Holsopple -- was he holding Jordn's
5  right arm in any way when you used the electrical-
6  conducted weapon on Jordn?
7    A    I don't know.
8    Q    Okay.
9    A    I know he had a handcuff.  That's it.
10        MR. HILL: Let's take a quick break, because
11  we're going to run out of tape here on this one, okay?
12            (Recess taken.)
13  BY MR. HILL:
14    Q    We're back on the record after a short break.
15        And I don't want you to tell me anything you
16  discussed with your attorneys out there, okay?
17    A    Okay.
18    Q    We were just beginning to talk about you using
19  the electrical-conducted weapon on Jordn; correct?
20    A    Yes.
21    Q    The first application.
22    A    Yes.
23    Q    At the point -- how do you holster your weapon;
24  which side?

Page 232

1    A    On my left.
2    Q    And is that because your firearm, then, is on
3  your right?
4    A    Yes, it's a cross draw.
5    Q    So then tell me how you mechanically -- what
6  you do to draw your Taser.
7    A    I usually take my left arm and just flip the --
8  flip the lock back that holds the Taser in place, and with
9  my right arm I cross draw and pull it out of my holster.
10    Q    And at the time that you do this, are you back
11  kneeling down at this point?
12    A    Yeah, I believe I drop to a knee again.
13    Q    Same knee as before?
14    A    Yeah.  I don't know.
15    Q    And we were trying -- before we took a break,
16  we were trying to get an understanding of what arm was
17  being described that Officer Holsopple moved away to grab.
18  But it sounds like in terms of your recollection all you
19  can remember Holsopple grabbing was Jordn's left arm,
20  which has been cuffed behind his back pretty much the
21  entire time; true?
22    A    Yes.
23    Q    And at the time you decide to -- you make the
24  decision to use your electrical-conducted weapon, from

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 1
March 14, 2017

---

Page 233

1  everything you've seen, Jordn is still in the throes of
2  this mental health crisis; true?
3      A   Yes.
4      Q   And you've already recognized at this point
5  that he's not capable of following your commands; correct?
6      A   Yes.  He's still not listening.
7      Q   Right.  There's been no indication, though,
8  based on his behavior, his nonsensical speech, that he's
9  even capable of following your commands; true?
10         MR. BECK: Objection.
11     A   I don't know what he's capable of.  I just know
12  he's not doing it.
13  BY MR. HILL:
14     Q   And so far, from everything you've seen, your
15  understanding is that all of Jordn's behavior is due to
16  this -- well, let me strike that.
17         At this point, everything you've seen and
18  everything you've been engaging in with Jordn, you do not
19  and have not suspected drug use; true?
20     A   True.
21     Q   What you are suspecting at this point is still
22  mental health?
23     A   Yes.
24     Q   At the time you used the Taser, Jordn's head is

---

Page 234

1  facing -- you know, his face is facing the gravel
2  driveway; right?
3      A   Yes.
4      Q   As you grab the Taser, is it with your left
5  hand, the cross draw?
6      A   Right hand.
7      Q   Right hand.  I'm sorry.
8          Where is your left hand?  Is it still on
9  Jordn's back?
10     A   Yeah.  Officer Holsopple actually lifts up
11  Jordn's sweatshirt a little bit to expose his skin, and I
12  just kind of put my hand back on his back, my left hand
13  back on his back.
14     Q   Where on his back?
15     A   Just underneath the jacket line, just to make
16  sure the jacket doesn't slide back down.
17     Q   So your hand, if I understand it -- Officer
18  Holsopple has pulled Jordn's sweatshirt up towards his --
19  from his waist to his neck area?
20     A   No.  Only about mid back.
21     Q   But I mean, that's the direction he's pulling
22  it up?
23     A   Yes.
24     Q   So his pulling it from the waistband area

---

Page 235

1  towards his neck?
2      A   Yes.
3      Q   And he gets about halfway up?
4      A   Yes.
5      Q   And then you put your left hand -- it would be
6  in the center of Jordn's back, then, near where the
7  sweatshirt ends; right?
8      A   Yeah.  I'm just holding up the sweatshirt to
9  make sure it doesn't fall back down, just flat.
10     Q   Is he resisting at this point with a lot of
11  force to get up?
12     A   He's still flailing and yelling and rearing
13  back and still just very out of control, yes.
14     Q   So in order to prevent Jordn from getting up,
15  are you equaling or have to overpower his force of getting
16  up with your force of pushing down; right?
17     A   I don't have very much pressure applied to him
18  whatsoever with my left hand.
19     Q   What I'm saying is you are actively pushing
20  down on Jordn or else he would just get up; right?
21     A   Well, yes, we have to.
22     Q   That's my point.
23         So you're pushing down on Jordn in the center
24  of his back at this point?

---

Page 236

1      A   More on the side of his back, yeah.  It's not
2  so much in the center.
3      Q   Is it towards the left or towards his --
4  towards Jordn's left or towards his right?
5      A   His left.  It's closest to me.
6      Q   So you're pushing down.  And where is Officer
7  Holsopple's hands?  He's got one hand on the cuffed area;
8  right?
9      A   Yes.
10     Q   And from what you could tell, is he also
11  pushing down to prevent Jordn from getting up?
12     A   Honestly, I don't know.
13     Q   At this point, Jordn has not stood up; correct?
14     A   Correct.
15     Q   You've been able to keep him on the ground the
16  whole time?
17     A   Yes.
18     Q   And when you say you're going to deploy your
19  Taser, does Officer Holsopple say anything in response or
20  just pull up his shirt?
21     A   He just pulls up his shirt.
22     Q   So you fire the Taser, and the darts -- I'll
23  read it: "The darts struck him in the middle of the back
24  and were about three inches apart from each other.

---

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 237

1 Officer Scherer also put the Taser on his right thigh as a
2 dry stun maneuver to make a good connection." Correct?
3    A   Yes.
4    Q   So the darts that you fired -- about how far
5 were you from Jordn when you fired the Taser darts into
6 his back?
7    A   I don't know.  I was -- I remember going up
8 more like this to -- instead of standing up, because I
9 didn't want to stand up and leave Officer Holsopple trying
10 to hold him down by himself.  So I remember going up real
11 high this way, as high as I could reach, to help make a
12 spread of those darts.
13    Q   Okay.
14    A   So --
15    Q   Because the farther the spread, the more -- the
16 better the connection; right?
17    A   The better effectiveness it has.
18    Q   Because the better -- when you say better
19 effectiveness, what do you mean?
20    A   It means that the more compliance we are able
21 to gain with the -- the wider the spread.
22    Q   And that's because there's more neuromuscular
23 contraction; right?
24    A   Yes.

Page 238

1    Q   And when you actually fire the Taser dart into
2 Jordn's back, his face is still pointing forward; right?
3    A   Yes.
4    Q   He hasn't bitten you again; right?
5    A   Thank God, no.
6    Q   He hasn't even tried to bite you again; right?
7    A   No.
8    Q   And you have the darts now in the center of
9 Jordn's back; right?
10    A   Yes.
11    Q   How close are they -- you obviously moved your
12 hand away when you fired; right?
13    A   Oh, absolutely.
14    Q   So you pulled his shirt up and held it there
15 for a while, and then you got your hand out of the way so
16 you don't shoot yourself?
17    A   Yes.
18    Q   And then you have the darts then in Jordn's
19 bare skin.  And then you use -- can you show us how you
20 use the Taser to connect Jordn's thigh -- this is the same
21 thigh you kicked; right?
22    A   No, this is the opposite thigh.
23    Q   So you are actually going across your body?
24    A   Yeah, I went across his body.

Page 239

1    Q   So are you behind Jordn at this point or just
2 leaning over?
3    A   I'm just leaning.
4    Q   So can you kind of show us what you did, then?
5    A   The darts are deployed in his back.  He's still
6 got the wires, and the cartridge is still on the Taser
7 device itself.
8       So all you do is -- you can actually just take
9 that Taser and take -- and just push it down, you know,
10 just drive it into somebody's leg or whatever body part
11 you choose.  And then that acts as a connection, also.
12 It's almost like a third dart in the sense of -- without
13 any puncture wounds.
14    Q   Right.  It takes that three-inch spread that
15 you had to a very large spread; right?
16    A   Yes.
17    Q   Which is ideal for creating that neuromuscular
18 contraction; right?
19    A   Correct.
20    Q   And you apply the Taser itself to his bare
21 thigh; right?  Because he's got shorts on?
22    A   Yes.
23    Q   I'm trying to get an idea, because you're
24 standing -- you're on his opposite side.  You're on his

Page 240

1 right side of his body, and you Taser the left side of the
2 body.  So you do the inside of the thigh, the outside of
3 the thigh?
4    A   Just the back of the thigh.
5    Q   Kind of like the hamstring?
6    A   Yeah, just wherever was -- yeah, just whatever
7 was exposed, where I knew there would be a muscle group.
8    Q   Now, you did not attempt to use the Taser with
9 that three-inch spread where the darts were; correct?
10    A   I don't understand.
11    Q   The first application -- I know you fired the
12 darts into him.
13    A   Uh-huh.
14    Q   But the first actual application of the
15 electrical-conducted weapon was through that larger
16 connection you created into his thigh; correct?
17    A   Well, the application starts as soon as those
18 darts make contact.
19    Q   What do you mean?
20    A   The Taser is set on a five-second cycle.  So as
21 soon as that -- that trigger is pulled, you start a
22 five-second cycle.  So as soon as those -- that trigger is
23 pulled, you're starting your five seconds.
24       Now, if it takes another, you know, five

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 241

1 seconds to get down to the thigh, or ten seconds, now
2 you're only looking at, you know, a four-minute -- I'm
3 sorry. Four-minute. A four and a half second cycle that
4 he actually gets use from.
5    Q   Can you explain that to me again?
6    A   The cycle doesn't start until those darts -- or
7 probes, I should say, are in his skin.
8    Q   Right.
9    A   So that three seconds or that three inches, I
10 was already starting to use that -- that dart deployment
11 as part of the cycle. But by the time I get to his thigh,
12 that uses up more time, so he might -- that full large NMI
13 that I was looking for, wasn't even a full five-second
14 cycle.
15    Q   Let me take a step back.
16        How far was the Taser -- I know you said you
17 didn't stand up. So you're still -- you're kneeling down
18 when you fired the darts in his back; right?
19    A   Right.
20    Q   And then you know when you fire the darts --
21 you had already made up in your mind the spread was going
22 to be small so you're going to have to connect it; right?
23    A   Right.
24    Q   So I'm assuming, based on your police tactics,

Page 242

1 you fire the darts and then make the connection to the
2 thigh, like that; right?
3    A   Yeah, whatever the time is to go from here to
4 there.
5    Q   And that here to there was you moving your hand
6 three feet or so?
7    A   Correct.
8    Q   And you don't know what amount of time elapsed
9 in between; right?
10    A   No.
11    Q   It was one movement, right, boom, boom?
12    A   Yeah.
13    Q   How did Jordn's body -- now, let me ask you.
14 Let me take a step back.
15        You shoot the darts into his back, and you make
16 the connection. He's still in a prone position; right?
17    A   Yes.
18    Q   How does Jordn's body react to the application
19 of the electrical-conducted weapon?
20    A   He went into full NMI.
21    Q   What does that mean to a lay person?
22    A   Neuromuscular incapacitation.
23    Q   What does that mean to a lay person?
24    A   It means that it worked.

Page 243

1    Q   What we talked about earlier, that body seizing
2 up?
3    A   Yeah, he seized up. And that allowed us to get
4 him under control or get him in cuffs at that point.
5    Q   As soon as you do that, do you get him in cuffs
6 or do you call EMS first?
7    A   Officer Holsopple is getting him in cuffs. And
8 at the same time, then I get on my radio and advise that
9 we have a Taser deployment, that we need a 29, which is
10 our code for an ambulance.
11    Q   This is the first time anyone, as far as you
12 are aware, has contacted an ambulance or requested an
13 ambulance?
14    A   Yes.
15    Q   And when you requested the ambulance, you did
16 not call the fire department directly; right?
17    A   No.
18    Q   You went through dispatch?
19    A   Yes.
20    Q   And how long did that take to make that call?
21    A   I -- I don't know. I don't know what the
22 process is at dispatch.
23    Q   I mean, you -- like how long did it take you to
24 tell dispatch we need an ambulance?

Page 244

1    A   Just a few seconds. Just enough to be able to
2 get to my mic, key it, and say the words.
3    Q   And then you knew that -- through that dispatch
4 would make the arrangements to get the fire department and
5 ambulance there?
6    A   Yes.
7    Q   You write: "The suspect raised up. His arms
8 swung out, and Officer Holsopple was able to secure his
9 other wrist in the cuff."
10        That's his right wrist, then; right?
11    A   Yes.
12    Q   "Right after the Taser shut off, and he was
13 cuffed, he was still fighting, kicking and squirming
14 around. This was when Sergeant Denise Moore was also on
15 scene. He was still out of control, trying to turn on his
16 side."
17    A   Yes.
18    Q   Was Sergeant Moore on scene when you used the
19 Taser the first time?
20    A   No.
21    Q   You say, "Right after the Taser shut off and he
22 was cuffed, he was still fighting, kicking, and squirming
23 around."
24    A   Yes. Right after the cycle, he was still

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 245

1 combative. He continued right where he left off.
2   Q   And now both hands are handcuffed behind his
3 back?
4   A   That is correct.
5   Q   He's still in prone position; right?
6   A   Yes.
7   Q   Are you back down on your side, on your knees,
8 on Jordn's left side?
9   A   Yeah. I'm still in the same spot that I was.
10 I had never moved yet.
11   Q   And is Officer Holsopple still in the same
12 spot?
13   A   Yes.
14   Q   And you say he's fighting, kicking, and
15 squirming around. What's he doing?
16   A   Yeah, he's still doing the same thing. He's
17 still trying to rear up. He's kind of moving his head
18 back and forth, side-to-side, similar to the same
19 movements he did when he bit me.
20      And like I said, he was still kicking both his
21 feet and then just trying -- since now he was cuffed, he
22 was just trying to turn -- roll over side-to-side, and
23 then he was still yelling and just banging his head back
24 and forth.

Page 246

1      He had started banging his head more on the
2 ground at this point.
3   Q   Where are your hands -- let me ask you: Do you
4 put the Taser back?
5   A   No. I still have the Taser in my hand.
6   Q   So it's in your right hand?
7   A   Yes.
8   Q   What are you doing with the Taser in your right
9 hand at this point?
10   A   It's just -- I'm just holding it at this point.
11   Q   Is it, you know -- is the plastic material
12 touching Jordn's body anywhere?
13   A   No.
14   Q   How are you holding it?
15   A   Just up like this (indicating).
16   Q   And where is your left hand?
17   A   It's still just sitting on top -- or on his
18 back.
19   Q   By his handcuffs, or where at?
20   A   Yeah, just mid, lower back.
21   Q   Where are Officer Holsopple's hands?
22   A   I think he's more up towards his shoulders.
23   Q   You say more towards his shoulders. More in
24 the middle of his back, then, like between his shoulder

Page 247

1 blades?
2   A   Yeah, but still on the side. He was still on
3 the side. He was still on that right side of Jordn.
4   Q   You say Jordn is squirming around. He's trying
5 to get on his side, you say?
6   A   Yeah. He's just rolling back, side-to-side,
7 yelling.
8   Q   So he's trying to get himself out of prone
9 position?
10   A   I don't know what he's trying to do. He's
11 acting the same as he's been acting.
12   Q   Let me take that back.
13      His body movements are rocking side-to-side,
14 which would get him out of prone position; right? His
15 body is trying to roll over?
16   A   He's trying to do something, yes.
17   Q   What you're seeing is his body --
18   A   Yeah, rolling side-to-side.
19   Q   He's in prone position, and his body is moving
20 away from prone position; right?
21   A   He's going side-to-side.
22   Q   And you and Officer Holsopple are keeping him
23 in prone position; right?
24   A   Yeah. We are just trying to still gain

Page 248

1 compliance of him.
2   Q   But my question is: You guys are -- with the
3 pressure you're applying to him to keep him from moving --
4   A   Yes.
5   Q   -- you're keeping him in prone position?
6   A   Yes.
7   Q   And you have to press down with some force in
8 order to do that?
9   A   Yes.
10   Q   And it says, "This was when Sergeant Denise
11 Moore was also on scene."
12      Can you tell me how long between the first time
13 you used the electrical-conducted weapon on Jordn Miller,
14 while he was in prone position, did Sergeant Moore arrive?
15   A   I don't know. She came up from behind me, so I
16 really -- I was focused and tunnel-visioned right on
17 Jordn, and she came up behind me, so I don't know exactly
18 when she arrived on scene.
19   Q   Sergeant Moore is now the third officer on
20 scene?
21   A   Yes.
22   Q   When officer -- were there any other officers
23 on scene?
24   A   Not at that time.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

Page 249

1    Q   Until Jordn became unresponsive, were there any
2 other officers who came on scene aside from you,
3 Holsopple, and Moore?
4    A   No.
5    Q   And Sergeant Moore is the on-scene supervisor
6 at this point?
7    A   Yes.
8    Q   So when Jordn is fighting, kicking and
9 squirming during this period, he's in prone position,
10 hands restrained behind his back?
11    A   Yes, sir.
12    Q   He can't bite anyone at this point; true?
13    A   He still could if we got our leg up there.
14    Q   He was not -- based on where you were
15 positioned, Holsopple was positioned, Sergeant Moore was
16 positioned, he wasn't able to bite anybody?
17    A   That's hard to answer, because I don't know
18 what he's capable of. I already saw what he was capable
19 of. Could he still do it at that point? I don't know.
20    Q   Before you tasered him, I asked you about him
21 biting and him attempting to bite you again, before you
22 tasered him.
23       Had he attempted to bite you again before
24 Officer Moore comes back?

Page 250

1    A   No, I never put my leg back up in that area.
2    Q   And he hasn't attempted to bite Officer
3 Holsopple at all; right?
4    A   I don't believe so, but I don't know.
5    Q   It's not something you observed?
6    A   Yeah. I didn't observe anything.
7    Q   So when Jordn -- after Jordn was tasered in
8 prone position, he's now rolling around, squirming, and
9 now there's three officers trying to keep him in a prone
10 position; true?
11    A   Yes.
12    Q   And at some point all three of you -- how soon
13 after does Sergeant Moore come to Jordn after you use the
14 Taser the first time? Is it quick?
15    A   I don't even believe she actually made it all
16 the way up to us yet.
17    Q   So when you use the Taser the first time --
18    A   She was not on scene.
19    Q   Okay.
20    A   And like I said, she came up from behind me, so
21 I'm not for sure when she was exactly out there. But she
22 wasn't physically there, that I remember seeing her, until
23 after the second deployment.
24    Q   Now, at this point you've never attempted to

Page 251

1 roll Jordn over onto his side; correct?
2    A   No. He was still out of control.
3    Q   That wasn't my question.
4       At this point, neither you or Officer Holsopple
5 have attempted to roll Jordn onto his side; correct?
6    A   No.
7    Q   Jordn at this point, after you've used the
8 Taser, he's handcuffed, and he's in this gravel driveway,
9 what risk does he pose to anybody?
10    A   Well, he's a huge risk to himself. He's still
11 banging his head against the gravel, the driveway, and you
12 know, he's still fighting -- fighting with us. He's still
13 out of control. He's still not where we could even have
14 EMS treat this guy.
15    Q   Well, you've never -- until you've tasered him,
16 you never attempted to get EMS there to treat him; true?
17    A   That's true.
18    Q   You said he's a huge threat because he was
19 banging his head on the gravel; is that right?
20    A   Yes.
21    Q   So what do you do to prevent him from banging
22 his head on the gravel, if anything?
23    A   Well, after he bit us, there's not a lot we can
24 do. We're not going to put our face on him, you know, or

Page 252

1 get anywhere near his face.
2       So all we can do is just try to control him the
3 best that we can. And no matter what we do, he's -- he's
4 still fighting us. He's still banging his head. He's
5 still trying to kick us.
6       So until he can settle down enough that we can
7 get him in a full upright position, he's still a danger to
8 himself and us.
9    Q   You said the threat that he posed to himself
10 was banging his head on the gravel; correct?
11    A   Yes.
12    Q   And you don't do anything to stop that from
13 happening; true?
14    A   There's nothing we can do.
15    Q   So that's not one of the reasons that you used
16 the Taser, is it?
17       MR. BECK: Objection.
18    A   We tried to get him to get control. That's why
19 I used that Taser.
20 BY MR. HILL:
21    Q   Did you use the Taser to prevent Jordn from
22 banging his head on the gravel?
23    A   I used the Taser to get him under control.
24    Q   My question is: Did you use the Taser on --

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 1
March 14, 2017

Page 253

1    A   I can't stop him from banging his head on the
2 ground.  I used the Taser to get him under control.
3 That's the only method we had that was going to work for
4 this situation.  That was the best method.
5    Q   What was a safer position for Jordn to be in;
6 on his side or face down?
7    A   Ideally, if he could be sitting up, that would
8 be the best.
9    Q   Why?
10    A   Well, then there's no issues.  That means he's
11 calmed down.  It means we have control of him.  It means
12 that he would not be in a prone position.  But that's in
13 an ideal situation.
14    Q   I'm just asking you from a safety perspective,
15 as an officer whose job it is to help somebody, what's a
16 safer position for Jordn to be in; on his side or in a
17 prone position?
18        MR. BECK: Objection.
19        Go ahead.
20    A   Again, it depends on his manners.  The safest
21 position is sitting up.  That's my opinion.
22 BY MR. HILL:
23    Q   You talked earlier about the risks of
24 positional restraint asphyxia.  Those risks decrease when

Page 254

1 a person is on his side; true?  We agreed to that earlier?
2    A   Yes.
3    Q   Those risks of positional restraint asphyxia
4 decrease when a person is sitting up as opposed to prone
5 position; true?
6    A   That is true.
7    Q   In terms of positional restraint asphyxia, the
8 safer position would be for Jordn to be on his side or
9 sitting upright as opposed to in a prone position; true?
10        MR. BECK: Objection.
11        Go ahead.
12    A   In any case, yes.
13 BY MR. HILL:
14    Q   Now, at this point are the probes still in
15 Jordn's back?
16    A   Yes.
17    Q   The probe -- what do you call them, lines,
18 connectors?  What are the wires?
19    A   Just wires.
20    Q   The wires have not broken; correct?
21    A   No.
22    Q   And while Jordn is handcuffed in prone
23 position, and as a third officer is on scene, you use the
24 electrical-conducted weapon again; true?

Page 255

1    A   Yes.
2    Q   How do you use the electrical-conducted weapon
3 the second time?
4    A   Same as the first.  I just try to hit on his
5 calf to try to make a larger connection.
6        I left it on there for about two to three
7 seconds, and I saw that it then had zero effects.  And I
8 actually removed it from his calf at that point and just
9 held it up in the air, because my brain couldn't focus to
10 tell me just to shut the switch off.  So I actually let it
11 cycle out while it was up in the air because I knew this
12 was not working anymore.
13        And then once that five-second cycle was done,
14 you know, I actually took the Taser cartridge off, threw
15 it, and threw my Taser off to the side of the ground.  I
16 couldn't even get it into the --
17        MR. HILL: I'm going to pause for a quick
18 second, okay?
19        (Discussion held off the record.)
20        MR. HILL: Officer, we're going to adjourn for
21 the day.  So we'll see you back at ten a.m. in the
22 morning, okay?  It's about 3:30.
23        THE WITNESS: Yes, sir.
24             - - -

Page 256

1        (Signature not waived.)
2             - - -
3        And, thereupon, the deposition was adjourned at
4 3:30 p.m.
5             - - -
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

---

Page 257

```
                              March 21, 2017
 1

 2
     Dear Mr. Scherer,
 3
          You have chosen to read and sign your transcript.
 4   Please do not mark on the transcript.  Any
     corrections/changes you may desire to make in your
 5   testimony should be typewritten or printed on the errata
     sheet at the end of testimony, giving the page number,
 6   line number and desired correction/change.  After you have
     read the transcript, sign your name on the correction
 7   sheet and where indicated at the close of testimony before
     a notary public.
 8
          The rules of civil procedure allow thirty days for
 9   you to read and sign.  Please return the signature page
     and errata sheet to Whitney Layne, 6723 Cooperstone Drive,
10   Dublin, Ohio 43017 within that time.  Failure to do so in
     the allotted time will result in your transcript being
11   used as though read and signed by you.

12
                              Sincerely,
13                            _____
                              Whitney Layne
14                            Professional Reporter

15   Cc:
     Michael Hill
16   Gregory Beck

17

18

19

20

21

22

23

24
```

---

Page 259

```
 1   TO THE REPORTER:

 2   I have read the entire transcript of my deposition taken

 3   on the ____ day of _____, 20__, or the same has been

 4   read to me.  I request that the following changes be

 5   entered upon the record for the reasons indicated.

 6

 7   Page   Line   Correction and reason therefore

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   Date_____Signature_____

24
```

---

Page 258

```
 1   State of _____

 2   County of _____

 3        I, ROBERT SCHERER, do hereby certify that I have

 4   read the foregoing transcript of my deposition given on

 5   March 14, 2017; that together with the correction page

 6   attached hereto noting changes in form or substance, if

 7   any, it is true and correct.

 8                            _____

 9                            ROBERT SCHERER

10        I do hereby certify that the foregoing transcript

11   of the deposition of ROBERT SCHERER was submitted to the

12   witness for reading and signing; that after he had stated

13   to the undersigned Notary Public that he had read and

14   examined his deposition, he signed the same in my presence

15   on the ____ day of _____, 2017.

16

17                            Notary Public

18   My Commission Expires on _____

19                     - - -

20

21

22

23

24
```

---

Page 260

```
 1                    CERTIFICATE

 2   State of Ohio      :

 3   County of Franklin:

 4

 5        I, Whitney Layne, Notary Public in and for the

 6   State of Ohio, duly commissioned and qualified, certify

 7   that the within named ROBERT SCHERER was by me duly sworn

 8   to testify to the whole truth in the cause aforesaid; that

 9   the testimony was taken down by me in stenotype in the

10   presence of said witness; afterwards transcribed upon a

11   computer; that the foregoing is a true and correct

12   transcript of the testimony given by said witness taken at

13   the time and place in the foregoing caption specified.

14

15        IN WITNESS WHEREOF, I have set my hand and

16   affixed my seal of office at Dublin, Ohio, on this 21st

17   day of March, 2017.

18

19

20                    Whitney Layne, Notary Public

21                    In and for the State of Ohio

22   My Commission expires May 4, 2020

23

24
```

---

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 1
March 14, 2017

## A

**abdomen (1)**
21:4
**abilities (4)**
56:17;146:19;201:8,
12
**ability (4)**
99:23;185:9;193:5;
199:1
**Abington (12)**
153:8,11,12;175:19;
177:13;178:15,21;
180:17,18;181:19,24;
183:10
**able (36)**
7:4;21:15;30:10;
45:17,22;46:6;53:13;
57:6,16;59:21;75:1;
83:20;88:19;96:16;
101:9;110:15;111:11;
127:2;193:5;200:1,14;
201:18;204:5;207:4,5;
213:9;216:15,17,23;
226:12,17;236:15;
237:20;244:1,8;249:16
**above (1)**
65:12
**absolutely (6)**
86:19;126:8;201:7;
217:7;219:10;238:13
**access (1)**
47:22
**accommodate (1)**
23:13
**accordingly (1)**
84:1
**Accreditation (1)**
142:12
**accredited (2)**
142:11,14
**accurate (3)**
32:2;114:22;168:10
**across (2)**
238:23,24
**act (8)**
54:11;58:20;68:22;
84:1,1;93:13;131:14;
162:23
**acting (10)**
64:16;87:9;89:23;
92:24;93:5;98:20;
122:21;188:7;247:11,
11
**action (1)**
154:15
**actions (4)**
9:15;85:6,11;94:3
**activate (6)**
150:4,11;151:1,6,14;
152:3
**activated (2)**

150:1;151:10
**actively (2)**
100:15;235:19
**activity (1)**
26:10
**acts (2)**
163:3;239:11
**actual (1)**
240:14
**Actually (45)**
5:7;6:20;13:20;
16:24;20:16;21:5;
27:14;32:4;54:18;
55:13;82:6;102:17;
103:4;126:16;127:1;
133:7;142:3;152:17;
171:19;173:14;175:22;
177:6;182:18,19;
193:18,20;196:2;
205:3,9;207:24;209:3;
213:11;214:17;218:12;
221:17;224:5;234:10;
238:1,23;239:8;241:4;
250:15;255:8,10,14
**Adam (5)**
27:10,11,14,14,19
**added (5)**
33:3;149:7;195:7,10,
16
**adding (1)**
98:1
**addition (1)**
124:11
**additional (8)**
9:21;88:9,15;107:23;
109:11;126:9;146:11,
23
**additions (1)**
33:1
**address (2)**
41:15;60:20
**addresses (2)**
105:19;145:3
**adjourn (1)**
255:20
**adjourned (1)**
256:3
**administration (3)**
11:18;75:8;143:24
**admittedly (1)**
200:19
**advanced (3)**
141:3,8;142:5
**advise (2)**
76:4;243:8
**advised (2)**
177:12;221:23
**afterwards (1)**
158:3
**again (57)**
17:5;20:23;21:15;
35:7;57:4,9;59:6;
60:24;62:16;63:19;

65:22;66:18;69:19;
71:8;72:23;76:24;87:5;
88:23;89:10;90:5,22;
92:17;96:12;97:16;
100:21;101:7;102:7;
108:2;110:17;113:15;
114:23;115:6,24;
124:24;126:10,18;
127:23;128:20;132:8,
22;135:4;138:20;
150:23;152:22;174:11;
220:7;224:16;228:21;
229:2;232:12;238:4,6;
241:5;249:21,23;
253:20;254:24
**against (6)**
48:16;51:8;136:24;
196:8;197:16;251:11
**age (1)**
58:13
**agencies (2)**
82:6;142:12
**aggressive (2)**
160:3,8
**aggressively (2)**
160:17;189:19
**agitated (3)**
64:19;70:24;72:5
**agitation (4)**
72:7;98:21;99:14;
121:4
**ago (3)**
28:7;104:11;106:4
**agree (7)**
40:11;42:2;62:2,12;
115:22;142:4;173:7
**agreed (2)**
10:6;254:1
**ahead (61)**
40:23;41:19;42:1,7,
24;43:15;44:1;47:5;
48:20;54:14,22;56:12;
60:23;63:17;64:9;67:2,
9,16;84:13;86:11,23;
88:12,22;90:21;93:15;
94:6;96:11;97:10;99:8;
101:6;104:15;107:15;
108:1,19;109:4,14;
111:6,18;112:4;
113:14,14;117:20;
118:24;120:10,17;
121:20;132:21;136:3;
137:6,13;139:2;164:9;
172:4;184:23;195:18;
196:10;200:24;216:5;
228:20;253:19;254:11
**ahhh (1)**
228:23
**aid (3)**
85:20,21,24
**air (8)**
104:18;110:15,16,
24;111:7,8;255:9,11

**airwaves (1)**
28:23
**airway (2)**
100:2,5
**airways (1)**
107:7
**Akron (5)**
13:17;19:16;145:2,3,
5
**Akron's (1)**
145:6
**Albrecht (11)**
6:7;7:24;8:2,19,21;
9:22;10:4;20:2;37:14;
38:3,13
**Albrecht-Holcomb (2)**
102:8,10
**Albrecht's (1)**
9:15
**alcohol (2)**
91:7;161:5
**alerted (1)**
150:7
**allegation (6)**
17:3,8,10,14,18,20
**allegations (9)**
12:24;13:2,7,24;
14:2;16:14;17:11;
69:16;133:15
**alleged (1)**
12:14
**allow (3)**
71:6;80:12,12
**allowed (2)**
42:18;243:3
**allows (1)**
100:16
**almost (9)**
20:24;82:15;108:2;
134:15;186:1;210:7;
214:13;220:15;239:12
**alone (1)**
38:13
**along (6)**
73:21;117:21;155:3;
158:2;167:4;168:19
**altogether (1)**
208:1
**always (10)**
21:3;40:20,24;60:16;
69:19;76:21;77:4;
82:24;95:13;100:21
**Alzheimer's (1)**
56:23
**ambulance (6)**
80:5;243:10,12,13,
15,24;244:5
**amend (1)**
168:16
**amended (1)**
142:5
**Amendment (1)**
46:21

**ammunition (1)**
20:11
**amount (12)**
41:22;49:4,4;54:2;
70:5;93:11;99:5;
112:23;116:15;126:19;
144:8;242:8
**amphetamines (2)**
126:12;131:10
**and/or (2)**
137:10;185:6
**angle (2)**
213:12,15;220:13
**angry (1)**
193:22
**animosity (1)**
11:17
**announcements (1)**
46:17
**anticipation (1)**
195:15
**antsy (1)**
90:1
**anymore (3)**
132:17;216:16;
255:12
**apart (2)**
188:15;236:24
**apologies (1)**
217:13
**apologize (1)**
14:23
**apparent (2)**
58:9;129:10
**apparently (1)**
200:21
**appears (2)**
155:12;156:21
**application (9)**
20:2;114:18;138:24;
139:9;231:21;240:11,
14,17;242:18
**applications (6)**
117:14;120:13;
126:7;130:3;138:1,5
**applied (1)**
235:17
**apply (1)**
239:20
**applying (1)**
248:3
**approach (12)**
53:23;61:9;66:15,22;
72:18;74:2;75:22;
85:12;93:20;182:18;
186:4;188:13
**approached (3)**
173:19;185:19;
188:13
**approaches (1)**
184:1
**approaching (2)**
58:17;163:7

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

**appropriate (2)**
44:3;79:23
**Approved (1)**
141:11
**approximately (1)**
19:5
**approximation (1)**
8:8
**approximations (2)**
6:17;152:22
**arch (2)**
210:14;221:13
**arched (8)**
220:5,6,8,11,12,15;
221:1,9
**arching (1)**
209:22
**area (26)**
10:21;21:4;72:21;
73:21;74:13,20;79:21,
23;81:2,13;135:19;
173:15;175:8,11,12,24;
176:3;177:5,7;179:13;
206:3;212:11;234:19,
24;236:7;250:1
**areas (1)**
176:24
**arm (54)**
71:16,17;204:24;
205:4,6,7,8,9,17,22;
206:4;211:19,21,22,24;
212:6,6;214:17,20;
215:2;217:2;218:24;
219:2,5,6,6,16,21;
220:2;222:4;229:2,6,9,
15,17,20,22,24;230:3,
6,6,7,8,10,11,13,17,18,
23;231:5;232:7,9,16,19
**armed (14)**
157:22;158:13,17;
159:6,7,9,12,21;160:2,
5,6,9,16,21
**armor (2)**
149:6,7
**arms (10)**
191:18,23;192:6;
205:21;211:2,14,17,18;
218:5;244:7
**around (46)**
5:8;6:22;11:10;
58:21;106:21;112:17;
122:17;123:20;142:20;
162:7;163:19;164:6;
169:1;170:7;171:15;
174:8,13;175:23;
179:1,13;184:15;
185:22;186:24;187:1,
16;188:9;191:11,12,
20;192:5;193:11;
197:14,22;200:2,10,16,
18;209:21;210:9;
214:21;229:21;244:14,
23;245:15;247:4;250:8

**arrangement (1)**
62:8
**arrangements (1)**
244:4
**arranging (1)**
61:12
**arrest (7)**
6:5,16;7:8;19:22;
104:23;105:5;125:22
**arrival (1)**
183:8
**arrive (7)**
72:10;75:19,19;
78:21;173:13;175:11;
248:14
**arrived (4)**
175:8;176:3;177:5;
248:18
**arrives (2)**
76:22;181:23
**arriving (2)**
73:17,17
**articles (2)**
116:12;131:2
**aside (3)**
33:19;203:19;249:2
**asphyxia (37)**
99:19;100:8,11;
101:13,19,23;104:13;
105:5,8;107:2,13,22;
108:10,17;109:2,8,23;
110:9,22;111:4,15;
112:2,16;113:10;
114:7,15,20,23;115:22;
116:5,11;117:15;
120:5;138:22;253:24;
254:3,7
**asphyxiation (1)**
116:22
**assess (4)**
71:6;100:15;110:7;
113:2
**assessed (1)**
128:3
**assessing (3)**
109:1;110:8;112:15
**assigned (5)**
27:9;40:1;145:20;
146:2;152:20
**assist (1)**
116:21
**assisting (1)**
69:2
**associated (1)**
137:11
**assume (9)**
32:23;52:7;81:6;
88:17;95:3;111:19;
143:19;156:17;202:18
**assuming (9)**
15:23;25:3;29:2;
97:19;144:5;211:8;
227:20;229:19;241:24

**attached (1)**
168:3
**attack (2)**
112:7,10
**attacking (2)**
72:2,2
**attempt (4)**
68:1,3;99:4;240:8
**attempted (11)**
169:14,23;185:23;
204:19;218:23;226:24;
249:23;250:2,24;
251:5,16
**attempting (3)**
38:9;49:12;249:21
**attend (1)**
102:5
**attended (3)**
102:4,19;130:11
**attention (10)**
75:6;83:19;88:3;
118:10,14;119:15;
127:8;189:22;200:8;
203:16
**attorney (1)**
48:10
**attorneys (4)**
24:8,9;25:11;231:16
**audio (2)**
24:17;37:7
**authorities (1)**
134:22
**automatically (3)**
150:3;151:15;205:11
**automobile (1)**
176:12
**available (3)**
61:21;73:4;143:8
**Avenue (2)**
176:4,7
**avoid (4)**
101:22;104:13;
111:22;135:13
**aware (15)**
18:1;33:4;50:19;
52:13;68:8;98:13;
101:12;105:18,21,23;
106:10;109:1;123:24;
137:9;243:12
**away (22)**
14:8,8;74:14,15;
80:5;128:3;185:9,14;
188:12;193:6;197:19;
200:23;201:19;203:19;
206:19;207:24;208:2;
213:7;219:22;232:17;
238:12;247:20

**B**

**back (101)**
7:1;10:12;14:9,12;
16:7;26:22;28:1;29:24;

35:6;37:12;38:20;
65:22;76:5,14;77:23;
103:10;104:24;107:10;
117:8;132:9;135:5;
142:6;143:1;145:12,
12,17;148:8,15;149:10,
23;187:4,4;189:4;
191:14;194:6;203:15;
205:11;209:6,22;
210:7,8,12,14;212:2;
214:17;215:19;219:17;
220:8,15;222:2,5;
223:2,3,5,7,8,11;
224:13;227:10;231:14;
232:8,10,20;234:9,12,
12,13,13,14,16,20;
235:6,9,13,24;236:1,
23;237:6;238:2,9;
239:5;240:4;241:15,
18;242:14,15;245:3,7,
18,23;246:4,18,20,24;
247:6,12;249:10,24;
250:1;254:15;255:21
**backup (2)**
76:7,13
**backward (1)**
220:16
**backwards (1)**
222:16
**bad (8)**
11:8,13;21:1,2;
110:17;113:18;133:8,9
**baggy (1)**
227:15
**Baker (1)**
68:22
**banging (9)**
245:23;246:1;
251:11,19,21;252:4,10,
22;253:1
**banks (1)**
82:5
**banning (1)**
106:9
**bar (1)**
205:9
**bare (2)**
238:19;239:20
**barrier (1)**
6:24
**based (29)**
70:22;72:23;76:24;
78:12;84:3,4,4;85:6,
11;86:19;90:22;111:3;
124:23;129:10;130:9;
163:13;164:4;166:10,
21;172:12;173:16;
174:7,9,12,16;196:16;
233:8;241:24;249:14
**basic (1)**
30:11
**basically (24)**
7:2;12:24;13:6;

26:18;27:5;32:18;
36:23;40:6,7;45:4;
53:8;106:23;114:1;
116:17;134:15;153:12;
155:1,2;159:18;160:1;
163:22;168:4;190:6;
205:17
**basis (1)**
35:7
**Baton (1)**
148:22
**battle (1)**
227:8
**battling (2)**
219:4;227:7
**beat (2)**
55:7;72:14
**became (2)**
19:8;249:1
**BECK (85)**
5:10,10;8:11,15;
12:2;21:15,17;37:9;
40:22;41:18,24;42:6,
23;43:14,24;47:4;
48:19;49:1;50:12;
54:13,21;56:11;60:22;
63:16;64:8;67:1,8,15;
75:10;82:21;83:10;
84:12;85:3;86:10,22;
88:11,21;90:20;93:14;
94:5,13;112:3;113:13;
117:19;118:23;119:8;
120:9,16;121:19;
132:20;136:2,13;
137:5,12,19;138:8,17;
139:1,11,17;160:7;
163:1,9;164:8;166:14;
172:3,9,21;173:1;
174:4,20;175:1;
180:24;184:22;185:16;
194:18;195:17;196:9,
19;200:24;215:15;
233:10;252:17;253:18;
254:10
**become (1)**
197:13
**becomes (1)**
216:1
**becoming (1)**
109:22
**beef (1)**
132:8
**began (2)**
175:9;176:3
**begin (3)**
5:7;168:18;190:5
**beginning (1)**
231:18
**behalf (1)**
5:15
**behave (1)**
65:24
**behaving (1)**

Layne & Associates
(614) 309-1669

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

73:11
**behavior (9)**
68:16;86:20;87:10;
122:12;169:7,10;
185:6;233:8,15
**behaviors (1)**
131:15
**behind (13)**
152:20;182:9;212:2;
214:17;219:17;222:5;
232:20;239:1;245:2;
248:15,17;249:10;
250:20
**belt (4)**
148:12,15;149:4,5
**bent (3)**
213:15,15;220:19
**best (11)**
73:7,10;116:9;
125:12,15;126:20;
127:21;128:5;252:3;
253:4,8
**better (5)**
219:9;237:16,17,18,
18
**beyond (1)**
65:12
**big (5)**
36:6;70:8;104:16,23;
148:24
**biggest (1)**
126:13
**bit (26)**
6:15;26:16;38:21;
39:7;48:13;65:12;
101:3;121:8;132:18;
133:13,24;164:17;
206:21;218:22;220:17,
21;221:12;222:3;
227:10;229:4,14;
230:6,16;234:11;
245:19;251:23
**bite (13)**
39:7;221:2,14,18,21;
223:20;224:16;238:6;
249:12,16,21,23;250:2
**bites (3)**
222:5,7;223:7
**biting (10)**
221:24;222:7,8,9,18;
223:13;224:3,12;
228:10;249:21
**bitten (1)**
238:4
**bizarre (4)**
89:23;122:12,21;
188:7
**Black (1)**
44:14
**blades (1)**
247:1
**blanket (1)**
12:4

**block (2)**
72:19;74:18
**blocks (1)**
74:14
**blurt (1)**
189:3
**blurting (1)**
191:23
**board (2)**
113:17;166:17
**bodily (1)**
158:22
**body (41)**
88:7,16;94:19;95:5,
15;97:24;99:2,11,20;
109:18;120:2,14;
122:6;134:15;149:6,7;
192:18;207:2;209:17;
211:3,15,18;212:7,24;
213:1;214:14;217:5;
219:22;238:23,24;
239:10;240:1,2;
242:13,18;243:1;
246:12;247:13,15,17,
19
**body's (2)**
98:14;99:16
**boiling (1)**
132:16
**boom (2)**
242:11,11
**boots (2)**
225:19,20
**boss (5)**
39:5,9,11,11,15
**both (19)**
17:18;22:4;26:2;
189:17;190:23;192:2,
2,12;204:4;205:12;
206:6;209:5,14;211:5;
213:17;217:18;218:10;
245:2,20
**bottom (12)**
33:8;50:15,20;51:2;
141:11;162:1;164:18,
22;165:3;167:16,21;
221:22
**box (2)**
161:5,10
**boxes (1)**
156:12
**brain (2)**
121:11;255:9
**break (12)**
23:10,12;37:6,13;
94:13;132:9;188:15;
207:5;215:2;231:10,
14;232:15
**breathalyzer (2)**
7:3,6
**breathe (4)**
100:16;104:19;
127:2,3

**breathing (10)**
98:8;99:20;100:20,
23;108:4;111:9,12,16;
115:1;116:1
**Brian (2)**
14:21;104:9
**brief (2)**
104:5;181:14
**Brimfield (3)**
6:20;7:11,12
**B-R-I-M-F-I-E-L-D (1)**
7:12
**bring (4)**
35:6;80:8;103:10;
113:24
**broadly (1)**
65:3
**broken (2)**
144:23;254:20
**brought (1)**
9:11
**building (3)**
14:24;15:9,18
**bullet (1)**
21:6
**bullet-proof (2)**
149:1,3
**bunch (1)**
37:23
**button (2)**
150:3;151:22
**buttons (1)**
81:16

**C**

**CALEA (1)**
142:12
**calf (8)**
220:17;221:9,11,12,
14,19;255:5,8
**call (62)**
25:6;26:23,23;28:13;
38:3;46:4,18;55:22,24;
59:18;60:15,24;61:3;
64:13;68:21,22;75:24;
76:1,6,6,12,17;77:1,10,
11,20;78:1;79:17,18,
18;93:18;150:14,19;
151:3,24;152:10,12;
154:6;158:5,5;161:24;
162:6;163:3,4;164:5;
168:23,23;170:13,22;
172:24;174:9,10,12,17;
177:12,19,24;181:16;
243:6,16,20;254:17
**called (15)**
27:10;40:4;59:14;
63:1;69:9,14;72:9,17;
118:9,19;120:23;
134:19;162:21,23;
163:24
**calling (1)**

14:9
**calls (7)**
24:18,18;26:10;
42:19;43:1;57:15;
126:3
**calm (6)**
70:23,23,24;189:18;
209:6;216:14
**calmed (1)**
253:11
**cam (1)**
151:15
**came (11)**
25:6;103:24;127:22;
152:14;154:5;179:24;
183:10;248:15,17;
249:2;250:20
**camera (1)**
213:10
**cameras (1)**
152:4
**camouflaged (1)**
227:12
**campaigns (1)**
46:15
**camps (1)**
130:14
**cams (1)**
149:22
**can (156)**
5:8,24;6:15;8:8,11,
13,16;9:16;10:17;
11:13;12:3,6;20:7,20;
21:17;23:7;24:9;26:23,
23;28:22;29:11;30:3;
31:6;33:19;34:9;36:5,
7,20;37:21;38:6;42:13;
55:8;57:14;58:20;
60:20;62:2;19;63:18,
21;65:9,17;67:10,17;
69:5,8,15;71:3,23;
81:15,18,21;82:1,11;
83:9,11,17,18,24;84:2,
21;85:1;88:9;98:1,4,7,
10,13,14,17;99:1,10,
13,14,16,22;100:1,3,4,
10,11,22,22,24;101:20;
107:1;110:2,23;112:6;
113:2,6;115:4,4,22;
119:24;120:2,4,7;
121:6,7,12;125:11,21;
126:13;127:7;128:1,3;
130:1,3;132:18;133:6;
137:14,21;138:19;
139:21;140:16,24;
142:4,15;144:20;
148:11,14;150:2;
164:12;167:4,5;
168:19;174:5;179:22;
189:21;190:13,17,17;
195:19;200:9;201:6;
202:6,16;209:11;
213:23;220:6;224:4,

17;228:6;229:23;
232:19;238:19;239:4,
8;241:5;248:12;
251:23;252:2,3,6,6,14
**Canfield (1)**
15:3
**Canton (2)**
26:4;29:10
**capabilities (1)**
57:12
**capability (1)**
201:5
**capable (11)**
54:6;56:20;57:10;
81:5;201:10;220:10;
233:5,9,11;249:18,18
**capacities (3)**
56:9;58:13;61:10
**capacity (20)**
6:10,13;19:8;52:23;
53:3,5,13;54:3,11;
55:20;58:9;59:1;60:14,
21;64:1,6;65:3;89:4;
123:19;169:5
**captain (1)**
140:4
**car (53)**
26:1;27:12;76:1,3,4,
17;77:7,16;78:2;
106:20;144:12,17,18,
18;150:3;171:20;
175:15,22;176:5;
178:2,18;179:7;180:2,
2,5,6,23;182:16,20;
185:22;188:4;189:15;
193:12,17,20,21;197:2;
198:18,22;200:3,4,7;
201:6,17,19,24;202:6;
205:15;206:15,15,17,
22;207:2
**cardiac (3)**
104:22;105:5;125:22
**care (3)**
47:2,22;119:15
**career (1)**
6:21
**careful (2)**
168:9,12
**carries (1)**
51:3
**cars (3)**
77:8,16;149:23;
152:5;201:4
**car-to-car (1)**
29:3
**cartridge (2)**
239:6;255:14
**case (28)**
6:16,19;7:9;8:12;
9:11;10:9;16:19;24:1,
4,21;36:4,6,10;37:14,
15,15,18;69:18;76:2;
89:19,22;102:22;

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 1
March 14, 2017

121:18;128:14;142:18;
152:10,10;254:12
**cases (6)**
6:4;69:12,12;70:4,5;
74:9
**catch (1)**
216:6
**catches (1)**
22:20
**categorized (1)**
131:14
**caught (1)**
104:23
**cause (13)**
65:17;98:4,7,10;
100:11;112:6;121:12;
134:22;158:19,22;
159:24;160:9;198:11
**caused (12)**
20:16;21:5;38:2,17,
18;60:1;68:16;99:22;
100:1,4;117:18;119:16
**causes (3)**
111:24;114:17;122:6
**causing (3)**
93:12;112:23;134:5
**cell (1)**
26:13
**center (5)**
21:3;235:6,23;236:2;
238:8
**central (1)**
134:7
**certain (8)**
87:10;92:14,24;
93:13;114:21;131:15,
15;135:1
**certainly (1)**
89:1
**certified (1)**
5:3
**chain (1)**
218:13
**chance (1)**
39:22
**change (7)**
9:24;27:22;33:17;
82:1;94:3;135:6;
168:16
**changed (3)**
142:6;196:23;197:5
**changes (2)**
27:20;259:4
**channel (4)**
82:8,9,10,11
**channels (4)**
82:1,4,4,5
**charge (1)**
140:7
**charged (1)**
71:12
**cheat (1)**
103:17

**checked (2)**
159:12;161:13
**chemical (3)**
60:1;121:11;131:9
**chest (6)**
21:4;99:23;107:6;
110:15;135:14;221:17
**Chester (3)**
183:10;186:20;188:9
**chief (24)**
11:1,3,4;19:2,4,9,18;
32:9;33:23;38:24,24;
39:3,16,18;61:13;
103:23,24;106:6;
132:1,6;140:18;166:8;
202:13,16
**children (1)**
58:12
**choose (1)**
239:11
**choosing (1)**
41:6
**chunk (1)**
70:8
**Church (6)**
6:8;20:12,15;26:4,6;
29:10
**circumstance (4)**
43:19;61:17;90:10;
106:14
**circumstances (7)**
41:23;72:16;110:21;
112:17,21;116:23;
123:21
**cited (1)**
134:21
**citizen (1)**
175:20;183:14
**citizens (5)**
182:19;183:4,16,22;
185:6
**city (1)**
145:7
**claim (2)**
11:21,22
**clamped (1)**
221:10
**Clark (5)**
183:10,21,23;184:1;
188:9
**class (10)**
86:4;102:17,21;
103:17;120:23;124:3,
6;130:9,10,11
**classes (1)**
103:15
**classroom (1)**
79:2
**clear (4)**
37:14;171:4,13;
224:16
**clearly (1)**
191:24

**climb (1)**
185:23
**clogged (1)**
28:23
**close (4)**
15:20;115:3;149:9;
238:11
**closed (3)**
36:12,13;180:20
**closer (1)**
213:4
**closest (4)**
208:3,4,15;236:5
**clothed (1)**
193:12
**clothes (2)**
122:17;175:6
**clue (1)**
30:18
**coat (4)**
205:18,19;206:2,5
**code (3)**
76:2;163:24;243:10
**codes (2)**
145:7;164:1
**cognitive (1)**
56:16
**coherent (2)**
192:23;197:14
**cold (3)**
171:2,10,12
**collar (2)**
81:12;206:3
**colleagues (4)**
25:16;46:7;70:18;
166:1
**collection (1)**
15:8
**collective (2)**
31:20;32:7
**collectively (1)**
183:6
**column (1)**
201:5
**coma (1)**
58:17
**combative (2)**
187:21;245:1
**combination (5)**
37:23;38:16;58:1,4;
191:14
**combinations (1)**
59:4
**combine (1)**
104:19
**coming (13)**
14:2;26:10;27:7;
35:4;83:21;84:16;
97:17;131:1,3;178:2,8;
179:16;220:14
**command (1)**
54:16
**commanding (1)**

93:18
**commands (15)**
53:14;54:4,12;57:7;
59:22;64:23,23;88:19;
189:18;191:4;196:18;
197:8;211:5;233:5,9
**Commission (1)**
142:12
**commit (2)**
69:13;130:20
**commitment (4)**
69:3,10;70:9,19
**committed (3)**
68:19;151:4;200:5
**committing (1)**
163:3
**common (5)**
108:7;158:18;
223:23;224:7,24
**communicate (4)**
26:11,17;80:16;
82:11
**communicating (1)**
77:18
**communication (2)**
28:24;154:11
**communications (1)**
164:2
**community (11)**
45:15,17,22;46:18;
56:24;58:24;61:10;
65:5;66:22;67:20;90:7
**comp (1)**
20:17
**compare (1)**
167:13
**compared (2)**
125:1,17
**complaint (1)**
16:1
**completed (4)**
155:3;157:12;
165:19,22
**completely (4)**
61:5;168:21;211:2,
14
**compliance (16)**
43:2;49:5;62:17;
125:13;127:19;128:11,
24;129:18,23;137:22;
223:23;225:12,13,16;
237:20;248:1
**compound (1)**
120:13
**compressed (1)**
107:6
**compromised (6)**
44:24;75:3;83:8;
86:17,18;100:24
**compulsion (2)**
48:15;51:7
**computer (4)**
26:17;27:4;32:19;

156:11
**computers (2)**
26:14,15
**concern (7)**
185:1,3,4,8,12,15;
201:21
**concerning (1)**
104:12
**concluded (1)**
223:13
**Concrete (2)**
182:5,6
**condition (25)**
38:1,18;59:24;93:1;
95:24;96:3;100:9;
108:21;114:3,13;
115:2;117:24;118:3,4,
6;119:3,19,20,21;
121:16;124:22;128:11;
131:6;138:23;201:18
**conditions (6)**
82:20;94:10;98:13;
99:1;112:21;125:7
**conducted (2)**
138:6;231:6
**conducted-electrical (1)**
94:24
**conducting (1)**
20:9
**conductive (1)**
49:18
**confidential (1)**
12:6
**confirm (1)**
167:5
**confirmed (3)**
13:2,4,9
**confirming (3)**
12:24;13:1,8
**conflict (4)**
11:1,5,6;18:8
**confront (1)**
85:9
**confused (4)**
64:13;123:21;
171:17;193:9
**Confusion (1)**
123:16
**connect (2)**
238:20;241:22
**connection (8)**
95:18;237:2,16;
239:11;240:16;242:1,
16;255:5
**connectors (1)**
254:18
**connects (1)**
176:9
**conscious (1)**
106:22
**consider (13)**
48:6;53:2;82:18;
87:3;96:7;97:3,15,18,

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

19;172:8,13,15;224:19
**consideration (12)**
53:10,17,19,23;54:1;
55:2,6,10;60:5,7;83:2;
97:22
**considerations (2)**
90:17;193:24
**considered (6)**
36:11;59:18;135:2;
140:8;160:9;169:9
**considering (3)**
96:6;97:2;137:17
**consistent (3)**
43:11;128:9,16;
142:19
**constant (1)**
188:24
**constitution (2)**
45:9,18
**constitutional (5)**
45:12,23;47:1,9,13
**constraint (2)**
48:16;51:7
**construed (1)**
65:9
**consult (2)**
48:10;79:16
**consultant (1)**
48:3
**contact (11)**
72:15;73:1,3;74:7;
78:14;81:22,24;
146:24;199:18;226:24;
240:18
**contacted (4)**
70:17;118:18;214:5;
243:12
**contacting (1)**
146:22
**contained (1)**
196:23
**contamination (1)**
126:23
**continue (2)**
43:3;210:20
**continued (2)**
211:3;245:1
**continues (1)**
227:20
**continuing (1)**
227:22
**continuously (1)**
84:3
**contract (1)**
114:17
**contraction (2)**
237:23;239:18
**contractions (4)**
115:5;117:18;134:6,
9
**contributing (2)**
121:14;134:22
**control (52)**

38:1;42:12,16;43:4;
49:5;59:7;83:16,19;
84:21;91:10,16,16,22;
97:16;106:17;113:2,4,
6;117:6;125:11,14;
126:4,5,15,19;127:7,
17;128:2,6,21,23;
137:23;197:18;198:2;
200:11;214:15;215:11,
22;216:13,16;225:16,
16;235:13;243:4;
244:15;251:2,13;
252:2,18,23;253:2,11
**controlled (1)**
125:8
**controversial (1)**
124:19
**conversation (1)**
30:14
**conversations (1)**
35:2
**cool (2)**
122:7;171:10
**cooperative (2)**
69:20;166:15
**coordinate (5)**
29:6;73:16;79:22;
173:5,9
**coordinating (1)**
73:20
**copy (5)**
30:23;35:12;36:14;
50:10;140:19
**corner (2)**
80:11;133:2
**Correction (1)**
259:7
**costs (1)**
10:6
**cot (5)**
71:9,11,17,20,23
**cotton (2)**
21:11,11
**count (1)**
155:12
**county (6)**
9:2;13:16;19:14;
102:17;104:10;130:10
**couple (1)**
31:1
**course (1)**
66:12
**court (6)**
10:8;22:14;23:16;
35:4;36:6,23
**cover (4)**
10:6;51:17;104:7,7
**covered (1)**
20:17
**cramp (1)**
134:16
**craziness (1)**
219:4

**create (4)**
155:16,21,23;157:24
**created (26)**
11:15,17;13:23;
31:18;32:10,16,24;
37:24;110:20;142:3,6;
156:2,16;157:5;158:1,
4,10;161:16;164:13;
166:21;168:3,8;
170:11;194:7;196:5;
240:16
**creates (1)**
127:1
**creating (7)**
71:1;104:20;140:11;
141:5,15;168:1;239:17
**crime (4)**
118:22;119:1;151:3;
169:24
**crimes (2)**
150:22;200:5
**criminal (4)**
153:16;162:23;
163:3;170:7
**crises (4)**
85:17,18,19;135:20
**crisis (36)**
41:17;45:6;46:8,10,
11,12;65:6;66:16,23;
67:24;73:22;75:16;
76:16;77:5;78:2,15;
79:3,7,12;86:9;98:20;
127:5,6,14,17;135:23;
137:1,1;162:15;163:7,
16;166:12;167:1;
173:18;181:17;233:2
**cross (4)**
126:23;232:4,9;
234:5
**crossed (1)**
219:22
**CROSS-EXAMINATION (1)**
5:4
**cruiser (3)**
151:2;182:2,8
**cruisers (1)**
179:13
**cuff (16)**
212:4,5;216:23;
217:3,8,9,10;218:13;
219:7;220:3;229:20,
23;230:8,14;231:1;
244:9
**cuffed (12)**
217:3;218:7,11;
219:5,17;222:5;
225:17;232:20;236:7;
244:13,22;245:21
**cuffs (6)**
128:2;209:9;216:9;
243:4,5,7
**curious (1)**
30:7

**current (3)**
104:7,8;141:7
**currently (1)**
230:19
**cushion (1)**
95:3
**custody (3)**
38:7;106:18;117:6
**custom (2)**
76:15;77:3
**cycle (9)**
240:20,22;241:3,6,
11,14;244:24;255:11,
13
**cycles (2)**
116:18,19

**D**

**danger (9)**
42:12,13;71:1;84:17,
18;110:22;150:24;
151:3;252:7
**dangerous (4)**
83:9;88:10;98:1;
169:20
**dart (3)**
238:1;239:12;241:10
**darts (16)**
236:22,23;237:4,5,
12;238:8,18;239:5;
240:9,12,18;241:6,18,
20;242:1,15
**dash (2)**
149:22;151:15
**date (6)**
141:19,24;156:4,5;
168:23;170:12
**Date_Signature_ (1)**
259:23
**dates (4)**
6:18;8:8;10:17;35:4
**day (25)**
26:8;27:10,12;28:9;
29:15;37:24;63:21;
89:21;90:6;143:9,11,
13,15,20;144:1,5;
145:12;150:6;158:8;
170:24;174:13;216:19;
225:21;255:21;259:3
**days (2)**
31:1;143:17
**day-to-day (3)**
27:20,22;147:11
**dazed (1)**
123:21
**deadly (3)**
51:16,18;52:6
**deal (9)**
40:19;69:23;87:15;
89:20;92:19,23;144:5;
115:4;127:6
**dealing (14)**

55:10,11,16,18;
60:13;79:17;83:3,3;
96:12;121:18;125:24;
166:11,24;180:14
**deals (1)**
40:2
**dealt (1)**
201:12
**death (21)**
6:7;7:23;20:1;38:5,
7;96:24;98:11;100:11;
102:11,24;103:5;
116:22;131:17;135:3,
24;136:7,11;137:9;
138:2,7,16
**deaths (1)**
134:23
**debriefing (3)**
34:15,18,22
**decedent (2)**
37:15;38:17
**December (2)**
141:12;142:6
**decide (1)**
232:23
**deciding (3)**
53:1;82:17;87:2
**decipherable (1)**
214:3
**decision (14)**
49:7,11,24;50:3;
77:7,9,15;79:11;80:13;
154:2;202:9;204:16;
209:9;232:24
**decisions (1)**
41:12
**decompress (1)**
34:16
**decompressed (1)**
218:21
**decrease (4)**
99:4;113:22;253:24;
254:4
**de-escalate (1)**
62:22
**de-escalates (1)**
62:21
**de-escalating (1)**
68:10
**de-escalation (3)**
68:1,5,12
**defendants (2)**
5:12,14
**defended (2)**
8:12,16
**definitely (2)**
125:21;127:2
**definition (15)**
48:21,23;49:23;
50:21;51:1,6,11;62:11;
118:3;158:16,17;
159:20;160:1,10;164:2
**definitions (1)**

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

50:21
**degrees (1)**
  122:5
**Delaware (6)**
  175:18,19;176:4,7,
  15;178:4
**deletions (1)**
  33:1
**delirious (2)**
  58:21;59:7
**delirium (83)**
  37:19,22;38:18;65:8,
  11,15,18,21,24;66:4,
  10;74:9,16;80:4,7,15;
  89:19,23;99:1;102:3,5,
  15;103:15,21;104:2;
  105:22;114:14;117:24;
  118:10,13,19,21;119:6,
  14,16,24;120:14,23;
  121:3,5,13,18,24;
  122:11,15,18,22;123:1,
  5,8,11,17,22;124:1,4,6,
  15,18;125:24;127:11,
  20,20;128:12,18,21;
  129:5,13,17,22;130:9,
  14,15,17,24;131:5,8,
  14,22;136:10;137:2,
  11;140:13;147:20
**delusional (1)**
  174:17
**demanding (1)**
  193:22
**demeanor (1)**
  53:8
**dementia (1)**
  56:24
**demographics (1)**
  201:2
**demonstrated (1)**
  169:4
**demonstrating (1)**
  97:20
**Denise (2)**
  244:14;248:10
**Department (49)**
  6:20;10:24;11:8,16;
  13:17;15:21;16:11,20;
  17:1;18:9,12,17,20;
  39:16;48:4,24;61:9,13;
  64:4;74:4;76:16;80:3,
  12,16;81:19;85:23;
  86:1,2;89:7;90:11,19;
  92:2;103:11;104:3;
  114:2;116:3;133:14;
  136:23;142:16;145:3;
  147:3;155:18;156:16;
  158:16;160:11;199:2;
  227:1;243:16;244:4
**department's (1)**
  136:16
**department-wide (1)**
  9:22
**depend (1)**

44:9
**depended (1)**
  198:5
**depending (6)**
  36:4;53:4;72:16;
  74:15;81:7;150:23
**depends (18)**
  53:8;56:19;60:24;
  72:3,23;74:19;88:23;
  89:10,12;101:7;
  106:14;110:17;126:10,
  11;127:23;173:24;
  225:20;253:20
**deploy (5)**
  126:6;228:5,9;
  229:13;236:18
**deployed (1)**
  239:5
**deployment (6)**
  20:9;92:9;125:16;
  241:10;243:9;250:23
**deposed (7)**
  6:9;8:9;19:23;20:5;
  21:23;30:6,9
**deposes (1)**
  5:3
**deposition (19)**
  5:22;6:1,3,16;7:10,
  21;10:9;18:5;24:10,15;
  25:8,10;31:5;33:21,24;
  34:3;50:8;256:3;259:2
**describe (1)**
  12:22
**described (5)**
  114:14;136:18;
  196:13;212:22;232:17
**describing (3)**
  37:14;92:16;141:14
**description (2)**
  162:3;168:4
**designation (2)**
  27:18;28:2
**desirable (1)**
  144:6
**desk (8)**
  32:19;35:15;36:1,5,
  7,19;103:16;195:14
**detail (1)**
  30:3
**details (1)**
  168:13
**detected (1)**
  161:5
**detective (6)**
  13:16,17;19:14;
  140:4,5;146:23
**detectives (5)**
  143:24;146:13,16;
  180:21;195:8
**determine (2)**
  129:12;154:15
**determining (1)**
  53:6

**develop (1)**
  215:1
**developed (2)**
  76:15;140:17
**developing (1)**
  215:20
**device (2)**
  151:19;239:7
**diabetic (2)**
  58:17,18
**diagnose (5)**
  83:22;84:16,19,21;
  96:16
**diagnosis (1)**
  129:7
**dialogue (1)**
  190:19
**diaphragm (6)**
  107:5;110:14;
  212:11,15;218:4;
  219:23
**die (2)**
  100:24;137:15
**died (6)**
  14:8,9;15:21;37:16;
  102:11;112:6
**difference (4)**
  167:16,20;191:4;
  224:18
**differences (2)**
  39:14;132:5
**different (13)**
  27:23;61:4,5,18;
  63:3,20;66:2;82:5,6;
  87:12;132:1;136:19;
  145:2
**difficulties (2)**
  226:13,18
**diminished (18)**
  52:23;53:12;54:3,10;
  56:8;58:9,12,24;60:14,
  20;61:10,24;64:1,5;
  65:3;89:4;123:19;
  169:5
**dipped (1)**
  21:12
**direct (1)**
  135:13
**direction (4)**
  175:7;179:3;189:11;
  234:21
**directions (2)**
  7:5;20:15
**directive (1)**
  140:13
**directly (6)**
  27:3;51:20;78:2;
  81:24;82:12;243:16
**dirt (1)**
  182:4
**disability (2)**
  163:23;164:6
**disagree (1)**

40:11
**disappear (1)**
  200:17
**disciplined (1)**
  16:17
**discontinued (1)**
  106:6
**discuss (1)**
  198:13
**discussed (9)**
  25:10;94:11;131:16;
  168:9;198:16;217:21;
  218:1,17;231:16
**discussing (1)**
  17:22
**Discussion (2)**
  148:2;255:19
**discussions (2)**
  24:8;25:13
**dismissed (3)**
  7:19;8:24;9:1
**disorder (3)**
  121:7,9,23
**disorientation (2)**
  122:2,3
**dispatch (28)**
  24:18;25:3,4;28:12,
  13,15,18;58:5;71:4;
  72:17;77:10,11;78:1;
  80:10;164:1;175:6;
  177:11;178:9,12,14;
  180:8;181:20;184:10,
  11;243:18,22,24;244:3
**dispatched (7)**
  71:4;72:11,12;75:24;
  76:3,6,17
**dispatcher (1)**
  81:21
**display (1)**
  82:9
**displaying (1)**
  72:4
**disrobe (1)**
  122:7
**disrobed (2)**
  122:17;174:13
**distance (5)**
  110:20;153:7,8;
  179:5;210:9
**distress (1)**
  170:5
**district (8)**
  27:9,12;28:9,15,17;
  76:1,3;152:20
**districts (2)**
  27:11,23
**disturbances (1)**
  123:7
**divided (2)**
  18:9,11
**diving (1)**
  21:1
**doctor (1)**

113:23
**doctors (5)**
  63:18;115:11,12;
  124:20,21
**doctor-wise (1)**
  125:2
**document (16)**
  31:17;140:22;155:7,
  11,14,16,21,21,23;
  156:3,9;157:5;159:4;
  164:13;194:23;195:14
**documentation (1)**
  116:7
**done (8)**
  22:13;69:9;106:18;
  112:8;132:16;196:4;
  202:19;255:13
**door (10)**
  78:13,14;185:20;
  186:16;187:3,5;189:9;
  202:23;204:3,17
**doors (1)**
  189:12
**down (97)**
  20:22;21:5;22:14,18;
  49:15;51:23;71:24;
  72:19;88:1;105:10;
  107:21;108:13,15;
  109:7;110:19;122:7;
  127:22;134:13;142:22,
  23;157:7;175:19,23;
  176:1,4,15,17;177:1,
  17,18;178:1,4,10,14;
  179:6,19,22,23;180:17;
  181:4,10;189:18;
  192:6;196:3;203:7;
  208:22,24;209:6,19;
  210:3,15,18;212:14,23;
  213:7;214:11,12;
  215:6;216:14;219:12;
  222:2;223:3,5,5,8,11,
  17;224:3,12;225:6,22;
  226:1,2,4,12,15,17;
  227:21,23;228:13;
  232:11;234:16;235:9,
  16,20,23;236:6,11;
  237:10;239:9;241:1,
  17;245:7;248:7;252:6;
  253:6,11
**draft (1)**
  33:4
**draw (4)**
  232:4,6,9;234:5
**drawer (1)**
  195:14
**dressed (1)**
  174:11
**Drive (9)**
  152:23;153:13;
  185:9,13;193:6;
  200:23;201:19;207:9;
  239:10
**driver (2)**

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

6:23;190:1
**driver's (15)**
181:11,12;187:3,9;
188:3,5;190:1;191:19,
21;192:3;202:23;
204:16;207:19;208:3,4
**driveway (14)**
177:14;178:19;
179:8;182:6,13,14,15,
19;183:11;186:11;
203:13;234:2;251:8,11
**driving (7)**
176:4,15;178:4,24;
184:15;200:2;203:19
**drop (2)**
21:5;232:12
**dropping (1)**
21:4
**drug (10)**
59:14,17,20;89:20;
91:6,7;98:15;166:12,
13;233:19
**drugs (33)**
9:4,6,19;87:4,22;
88:6,18;89:3,9,10,17,
18,21;90:1,8,8,11,15;
91:17;92:20;93:21;
113:9,17,21;136:7;
137:2,10;161:10,17,18,
21;162:11;166:17
**drunk (3)**
6:23;58:20;91:17
**dry (1)**
237:2
**due (1)**
233:15
**DUI (1)**
6:5
**duly (1)**
5:2
**during (14)**
9:8;13:12;16:3;
20:16;94:20,23;95:21;
101:10;104:1;142:17;
145:17;162:9;230:10;
249:9
**duties (1)**
39:24
**duty (7)**
69:11;103:24;
143:20;144:9;145:17;
154:7;202:13
**dying (3)**
8:5;115:3;138:14

**E**

**earlier (14)**
37:14;38:21;79:21;
130:13;131:16;143:18;
147:3;163:24;168:9;
219:23;227:7;243:1;
253:23;254:1

**early (2)**
6:21;29:17
**easier (2)**
26:24;83:20
**East (13)**
12:16,17;14:3,11,13,
22;15:9,16;16:4,8,16;
17:21;18:16
**easy (2)**
69:23;128:4
**eaten (1)**
190:18
**editing (1)**
32:24
**effect (5)**
95:8,10,16;126:22;
193:24
**effective (1)**
126:24
**effectiveness (3)**
95:9;237:17,19
**effects (3)**
95:12;113:18;255:7
**effort (1)**
32:7
**eight (14)**
103:22;106:4;
116:19;143:14,14;
144:7,7,9,9,9,10;
145:17,17;149:6
**either (12)**
8:9;25:15;38:16;
54:8;69:16;80:4;
106:18;129:11;150:2;
168:19;171:3;200:18
**elapsed (1)**
242:8
**elderly (2)**
56:24;135:12
**electrical (1)**
49:19
**electrical- (2)**
138:5;231:5
**electrical-conducted (20)**
10:1;42:21;43:10;
114:19;116:4;117:14;
134:18,21;135:3;
136:12;138:1,24;
139:10;231:19;232:24;
240:15;242:19;248:13;
254:24;255:2
**else (30)**
16:3,6;18:1;24:14;
25:7;34:2;39:12;40:5;
66:13;68:9;85:7;87:6;
94:10;97:17;104:3;
105:2;116:8;135:15;
146:7;148:18;160:23;
186:8;188:19,22;
192:6;197:18;198:19;
203:24;228:15;235:20
**else's (1)**
193:12

**e-mails (1)**
69:17
**emergency (4)**
118:10,19;150:19,20
**employee (2)**
8:3,21
**EMS (33)**
59:10;71:4,6,7;72:2,
9,10,11,17,20;73:16,
20;74:7,9,21;75:13;
79:23;80:5;81:19,22,
24;82:12;165:20;
173:9;198:8,11;199:9;
214:6;226:21,24;
243:6;251:14,16
**EMT (1)**
86:3
**encounter (2)**
52:22;160:2
**encountered (1)**
153:15
**encourage (1)**
46:17
**end (5)**
87:14;143:13;
183:11;186:10;222:14
**endanger (1)**
40:12
**ended (7)**
7:4,7;8:5;21:7;
216:18;224:3,12
**endorsed (3)**
130:15,17;170:19
**ends (1)**
235:7
**enemies (1)**
39:10
**enforce (1)**
146:19
**enforcement (10)**
6:10;19:8;45:18;
62:24;67:5;131:1;
142:11,13;146:16;
160:14
**engage (1)**
68:1
**engaged (1)**
68:18
**engagements (1)**
46:16
**engaging (4)**
67:23;169:7,9;
233:18
**engine (1)**
207:22
**English (1)**
6:24
**enough (15)**
71:22;104:23;
106:17;131:11;132:23,
23;133:1;206:22;
215:8,18;216:13;
221:9,18;244:1;252:6

**enter (4)**
20:13;154:1;176:18,
21
**entered (1)**
259:5
**entire (9)**
32:12;176:9;198:23;
201:22;219:14;227:11;
230:14;232:21;259:2
**episode (4)**
169:1;184:12;191:9;
200:20
**equaling (1)**
235:15
**equally (1)**
122:14
**equipment (2)**
149:4,23
**ER (1)**
124:20
**Eric (1)**
12:17
**erratic (1)**
98:20
**escalate (5)**
62:16,16,19;225:14;
228:4
**escalates (1)**
62:18
**escalating (1)**
225:14
**escort (2)**
205:5,9
**especially (3)**
36:6;94:20;95:21
**estimate (1)**
152:24
**evaluate (3)**
112:17,22;173:22
**even (28)**
20:17;54:20;70:8;
72:16;80:20;87:6;
89:24;94:2;120:8;
124:22;128:22;135:2;
161:16,19;172:2;
174:10;181:21;190:5,
23;214:3;220:10;
228:10;233:9;238:6;
241:13;250:15;251:13;
255:16
**event (5)**
8:9;170:3;223:13;
224:3,12
**events (14)**
16:3;19:18;20:8;
24:21;25:1,16,17;
31:21;33:14;34:7;36:2,
21;158:8;224:2
**eventually (2)**
87:14;104:22
**everybody (12)**
5:8;10:6;20:12;
27:23;66:2;67:18;

83:24;103:16;106:23;
143:22;186:8;188:19
**everyone (1)**
84:11
**evidence (2)**
97:3,6;122:16
**exacerbate (1)**
138:22
**exact (4)**
10:17;143:5,19;
164:15
**exactly (12)**
23:11;30:11;39:24;
89:19;90:3;102:7;
131:24;163:11;190:3;
230:21;248:17;250:21
**example (6)**
56:16;75:17;78:1;
142:12;160:15;190:13
**examples (2)**
56:15;68:5
**exceed (1)**
43:2
**except (1)**
145:11
**excessive (4)**
43:23;47:19;116:13,
14
**excited (85)**
37:19,22;38:18;65:8,
11,15,17,21,23;66:3,4,
10;74:9,16;80:4,7,15;
89:18,23;99:1;102:3,5,
15;103:15,21;104:2;
105:22;114:14;117:24;
118:9,13,19,21;119:6,
14,16,23;120:14,23;
121:2,5,12,18,24;
122:11,15,18,21;123:1,
4,8,10,17,22;124:1,4,6,
15,18;125:24;127:11,
20,20;128:12,18,20;
129:4,13,17,21;130:9,
14,15,17,24;131:5,8,
14,22;136:10;137:2,
11;140:12;147:19;
180:1
**exclusive (1)**
145:10
**exerted (2)**
48:16;51:7
**exertion (1)**
49:4
**Exhibit (48)**
31:2,4,10,13,15;
32:5;33:5;35:9;36:17;
37:2;50:8,9,16,16;51:2,
3,15;52:16;92:4,5,17;
125:8;131:15;140:20,
21,24;141:10,18,24;
142:4;154:22;155:6,
12,16;156:15;157:5;
159:4;165:13;167:6,

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

17,20;168:1,2,8,18,20;
194:19;196:6
**exhibited (2)**
206:19,20
**exhibiting (4)**
96:8;97:7;137:10;
207:1
**exist (1)**
131:12
**existed (1)**
124:22
**exists (2)**
131:8,12
**expand (1)**
99:23
**expansion (1)**
104:21
**expect (3)**
52:13;160:16;200:22
**expectation (2)**
197:9,11
**experience (2)**
152:23;197:1
**experiences (2)**
197:6;217:19
**experiencing (4)**
82:23;89:22;114:13;
125:23
**expert (3)**
47:24;48:2,6
**explain (5)**
11:13;37:21;38:6;
71:14;241:5
**explanation (2)**
94:9;158:7
**explanations (1)**
22:12
**expose (1)**
234:11
**exposed (2)**
117:13;240:7
**extent (2)**
61:16;66:7
**extract (2)**
202:22;204:3
**extreme (3)**
99:2;117:17;120:2
**extremely (2)**
122:5;131:10
**eye (1)**
189:12
**eyewitness (1)**
212:22

**F**

**face (25)**
100:4;105:10;
108:13;135:17;208:22;
209:19;219:11;223:5,
8;224:3,12;225:6,22;
226:1,2,4;227:21,23;
229:3,10;234:1;238:2;

251:24;252:1;253:6
**facing (5)**
207:22,23,24;234:1,
1
**fact (5)**
119:20;162:12;
196:2;217:22;218:1
**factor (7)**
101:18;105:8;
107:13;121:14;134:22;
138:14,15
**factors (8)**
38:16;53:6;87:13,17;
109:2;112:15;122:24;
126:1
**facts (3)**
55:11,12;121:21
**factually (1)**
17:23
**failure (1)**
123:19
**fair (3)**
29:4;51:12;52:23;
53:20;92:20,21;93:22;
139:16;140:9;215:12,
21;219:9;230:19
**fairly (1)**
106:12
**fall (5)**
20:22;90:24;91:4;
134:13;235:9
**falls (1)**
91:13
**false (8)**
6:5,16;7:7;13:7,10;
19:22;42:8,10
**family (8)**
57:15,18;58:5;69:16;
73:4;76:9;78:18;
153:23
**far (34)**
7:18;13:2;16:16;
22:13;28:18;36:12;
37:19;50:18,19;51:14;
52:3,5,8,17;68:10;80:5,
13,13,16;106:3;
108:21;142:9;144:1;
152:22;178:21;186:10;
202:23;214:1,9;
221:14;233:14;237:4;
241:16;243:11
**farther (1)**
237:15
**fashion (1)**
201:19
**fat (1)**
95:3
**favor (1)**
155:12
**fear (14)**
199:22
**feasible (4)**
68:2;76:9;100:17;

117:11
**feel (1)**
80:14
**feeling (1)**
190:16
**feet (15)**
159:19,21;160:6,17,
18,20;186:12;203:1,2;
207:18;208:3,4;
214:10;242:6;245:21
**fellow (5)**
75:18;127:9;129:3;
168:7;179:12
**felt (2)**
168:16;201:17
**female (9)**
8:19;12:8;14:15;
15:23;16:13,13;17:16,
17,18
**few (10)**
22:4;74:14;125:17;
176:7;178:23;179:8,
19;181:21;207:18;
244:1
**field (3)**
26:20;124:19;129:8
**fight (6)**
99:16;101:7;198:7;
204:4;211:3;227:22
**fighting (17)**
72:1;109:20;112:8;
113:16;211:4;214:8,
16,19;217:14;222:1;
244:13,22;245:14;
249:8;251:12,12;252:4
**figure (1)**
175:14
**file (1)**
36:4
**fill (1)**
159:4
**filled (1)**
165:14
**filling (1)**
156:12
**find (13)**
28:6;57:11;73:16;
81:19,22;83:23;122:7;
143:5,18;189:20;
199:12;200:23;226:21
**finding (2)**
80:21;81:5
**findings (1)**
12:5
**fine (4)**
58:13;66:6;94:16;
124:13
**finish (2)**
17:14;23:1
**fire (14)**
21:3;80:12,16;81:19;
86:1;147:2;199:2;
227:1;236:22;238:1;

241:20;242:1;243:16;
244:4
**Firearm (2)**
148:16;232:2
**fired (6)**
21:2;237:4,5;238:12;
240:11;241:18
**first (42)**
5:2;6:15;13:23;14:1;
17:3,12;38:3;59:11;
73:1,3;78:13,13;85:20,
21,24;103:17;118:18;
127:6;130:21;140:17;
155:13;157:13;162:4;
168:22;173:12,20;
176:16;181:23;190:3;
201:1;217:9;230:14;
231:21;240:11,14;
243:6,11;244:19;
248:12;250:14,17;
255:4
**firsthand (3)**
57:20;58:8;129:11
**fist (3)**
49:24;224:4,19
**five (11)**
70:12;116:18;117:2,
3;125:18,21;126:14;
179:9;203:12;240:23,
24
**five-second (5)**
116:19;240:20,22;
241:13;255:13
**flag (1)**
179:23
**flagged (12)**
175:19,23;176:1,17;
177:1,17,18;178:1,10,
13;180:17;181:4
**flags (3)**
179:6,22;181:9
**flail (1)**
227:22
**flailing (17)**
185:22;187:15;
191:11,12,16,18,23;
192:5;193:12;197:14;
200:15,20;209:21;
214:10,21;226:5;
235:12
**flashing (1)**
122:9
**flashlight (3)**
148:22,23,23
**flat (2)**
223:5;235:9
**flight (1)**
99:16
**flings (1)**
229:21
**flip (4)**
151:21;164:16;
232:7,8

**fluid (1)**
223:4
**focus (3)**
188:17;203:16;255:9
**focused (1)**
248:16
**folder (1)**
36:4
**follow (12)**
20:15;22:5;53:13;
54:3;57:6;59:21;64:23;
79:8;80:19;88:19;
167:4;168:19
**following (6)**
20:1,23;54:16;233:5,
9;259:4
**follows (1)**
5:3
**foot (5)**
213:15;221:22;
224:5,6,20
**force (151)**
7:13;8:7,24;12:10,
12,19;41:7,9,23;42:5,
18;43:3,22;44:3,4,10;
47:19;48:1,4,7,13,14,
15;49:3,23;50:17;51:1,
6,16,18;52:6,11,13,17;
53:1,7,7;54:2,2;55:3,7,
9;56:6;60:21;62:4,16,
18,18,19,21,22;71:18,
21,22,24;72:3;79:11;
82:17,24,24;83:1,5,8,9,
14,14,16;84:4,5,17,24;
86:5,8,16;87:2;88:9;
89:8,8,16;90:14,17,18;
91:1,3,3,5,8,8,9,15,20,
21;92:2,15,16;93:12,
22;94:20;95:21;96:6;
97:2;99:10;101:8;
105:16;114:8;126:20;
127:24;137:23;142:10;
154:23;155:2,19;
158:1,11,23;159:2,3,7;
161:1,3;163:20;
164:13;165:13,20,22;
166:23;167:15;168:5;
194:7;196:5,8;197:12;
15;205:13;206:19,21,
24;210:3,17;215:5,7,8,
14,18;225:14,14;
228:4;235:11,15,16;
248:7
**forced (1)**
198:6
**forcing (2)**
83:4;110:18
**forever (1)**
210:21
**formal (1)**
85:22
**former (2)**
8:3,21

Layne & Associates
(614) 309-1669

(8) exhibited - former

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

formulate (1)
75:18
forth (5)
135:5;189:4;191:14;
245:18,24
forward (4)
13:24;14:2;35:4;
238:2
fought (1)
198:6
found (3)
9:14;161:10,21
four (14)
143:17;145:20;
146:4;152:24;153:7;
185:20;186:15,19,19,
22;188:8;203:12;
210:11;241:3
four-minute (2)
241:2,3
Fourth (1)
46:21
fragile (1)
115:19
frail (2)
95:20;135:12
frame (2)
141:14;170:3
frames (1)
6:18
freaking (1)
30:18
free (7)
46:21;47:15,18;
205:8,22;218:24;220:2
frequently (1)
29:4
friends (1)
39:10
front (15)
14:15;23:22;51:15;
52:16;97:3,6;135:14;
141:10,19;155:11;
167:7;168:19;187:1,3;
220:17
full (6)
5:18;126:12;241:12,
13;242:20;252:7
full-blown (1)
66:3

## G

Gaffney (1)
14:21
gain (17)
43:2;49:5;62:17;
125:13;127:19;128:10,
23;129:18,23;137:22,
23;223:23;225:11,13,
15;237:21;247:24
gasping (1)
104:18

gather (1)
76:8
gave (3)
51:11;103:16;212:22
gear (2)
148:12,14;149:3,14
general (14)
11:18;40:8;89:10;
90:24;91:8,12;133:16;
136:19;137:3;143:4;
160:12,13,14;228:24
Generalized (1)
89:18
generally (1)
92:2
gently (1)
205:10
geographically (1)
144:21
gets (6)
76:13;84:11;131:14;
229:23;235:3;241:4
giant (1)
134:15
girls (1)
133:10
gist (2)
30:13;133:16
given (10)
57:7,15;58:14;85:24;
95:18;103:7;106:3;
130:10;197:5;211:5
gives (1)
171:16
giving (2)
77:14;106:3
gladly (1)
64:6
glass (1)
122:8
goal (1)
72:5
God (1)
238:5
goes (3)
22:2;76:17;95:20
good (10)
7:5;22:13;46:1;
57:18;73:13;87:5,8;
94:14;113:24;237:2
grab (7)
49:8;71:16;205:1,16;
222:15;232:17;234:4
grabbed (5)
185:24;192:9;205:4,
6,12
grabbing (4)
192:7;197:2;204:22;
232:19
grasp (1)
207:5
gravel (13)
182:6;207:9;223:8;

225:6,23;228:1;234:1;
251:8,11,19,22;252:10,
22
great (1)
96:15
greater (1)
136:24
Greg (2)
50:10;147:24
Gregory (1)
5:10
groin (1)
135:19
ground (26)
21:1;22:4;49:16;
50:4;110:20;113:16;
204:5;207:8,11;
209:20;210:4;213:12,
15;214:23;220:12,22;
221:4,13;223:5,6;
226:19;227:23;236:15;
246:2;253:2;255:15
group (4)
45:5;95:14;130:17;
240:7
groups (1)
116:8
growing (1)
72:7
guard (1)
14:10
guess (18)
16:7;20:18;21:7,9;
27:17;31:11;37:13;
90:2;113:23;115:5;
124:7,24;144:1;
146:15;154:20;183:21;
210:23;227:10
guesstimate (1)
10:19
guideline (1)
74:8
guidelines (6)
52:14;74:4;91:1,4;
116:9;135:8
gun (1)
158:21
guy (10)
6:23;21:1,2;114:24;
126:11,14;180:11;
187:19;197:21;251:14
guys (15)
29:4;30:3;79:1;
126:3,6,14,18;127:4;
133:18;149:21,22;
182:10;216:11;218:19;
248:2
guy's (1)
76:14
gym (1)
227:15

## H

half (8)
18:13,13,15;34:10;
74:15,17;187:1;241:3
halfway (3)
110:14;162:1;235:3
hallucinating (1)
174:19
Hallucinations (1)
123:10
hamstring (1)
240:5
hand (31)
50:7;71:17;140:19;
141:5;154:21;157:15;
193:3;203:8;206:9;
213:23;216:23;218:3,
7;219:16;234:5,6,7,8,
12,12,17;235:5,18;
236:7;238:12,15;
242:5;246:5,6,9,16
handcuff (3)
229:20,21;231:9
handcuffed (8)
125:17;129:22;
211:20;212:15;213:23;
245:2;251:8;254:22
handcuffs (4)
42:15;148:17;
216:12;246:19
handed (4)
31:14;50:10;140:24;
226:7
handle (4)
40:18;63:11;69:23;
186:18
handled (1)
21:18
handling (1)
79:12
hand-out (1)
103:16
hand-punch (1)
224:20
hands (25)
59:12;159:18,21;
160:6,17,18,20;192:12;
196:14;200:14;202:2;
203:18;206:6;209:6,
14;210:6,11;213:18;
218:11;222:16;236:7;
245:2;246:3,21;249:10
hands-on (2)
82:14;126:16
handwrite (1)
156:24
handwriting (1)
157:2
handwritten (3)
35:18;156:22;157:19
hanging (1)

206:22
happen (7)
16:3;62:10;63:6,8;
96:18,22;201:6
happened (10)
8:9;14:19;21:13;
34:10,13;89:2;103:13;
132:19;133:17;168:4
happening (6)
14:6;32:24;102:23;
103:2;174:1;252:13
happens (6)
63:3;79:13;106:12;
174:3
happy (1)
23:7
harassed (1)
12:15
harassment (1)
11:21;132:23;133:4
hard (3)
101:3;110:4;249:17
harm (3)
126:9;158:19;169:14
harmed (2)
97:17;169:18
hash (1)
35:6
head (24)
100:2;189:10;
193:19;207:22;214:22;
221:2,8,10,17;223:1,2,
6,8;233:24;245:17,23;
246:1;251:11,19,22;
252:4,10,22;253:1
headed (2)
179:3
headquarters (1)
15:5
heads (1)
201:3
health (41)
65:19;66:15,23;
67:24;73:8,22;75:16;
76:16;77:5;78:2,15;
79:3,7,12,16,17;80:4;
85:18;93:5;94:10;
98:20;115:3;121:16;
135:23;137:1;152:10;
154:6;162:15,18;
163:4,7,15;166:12;
167:1;170:22;173:17;
180:13;181:17;191:9;
233:2,22
healthier (1)
95:13
heard (13)
24:22,23,24;25:1,2,
4;134:23;138:11;
142:17;152:6,8;
153:21;192:23
hearing (1)
78:8

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

**heart (11)**
98:4;111:24;112:5,6,
7,9,10,23;113:18;
114:6;135:14
**heavy-hooded (1)**
227:13
**held (5)**
109:7;148:2;238:14;
255:9,19
**help (50)**
8:11;22:17;25:14;
44:6,10;46:5,18;52:21;
55:8,9;56:2;59:8,10;
60:10,15,16;63:1;67:7,
14,21;69:21;71:13,19;
83:17,20,21;91:4,10;
108:3;113:6;114:2;
121:21;125:10,11,13;
128:3,5;146:14;
162:18,21;172:20;
173:18;189:21;190:8,
17;216:18,20;225:17;
237:11;253:15
**helps (1)**
76:13
**hereinafter (1)**
5:2
**here's (2)**
93:20;199:19
**herself (1)**
20:24
**hesitation (1)**
39:6
**hey (1)**
93:20
**high (17)**
8:4,5;40:1;89:20;
114:14;135:2;136:7,
11;220:21;221:8,9,16,
16,18,22;237:11,11
**higher (5)**
113:10;115:21;
117:15;137:9;220:9
**highly (2)**
171:16;217:18
**high-risk (2)**
135:20,24
**HILL (110)**
5:5,7,15,15,17;8:14,
18;12:7;21:21;31:3;
37:5,11;41:1,21;42:3,
9;43:5,17;44:5;47:6;
48:22;49:6;50:10,13;
54:17;55:1;56:14;61:7;
63:23;64:11;67:4,11,
19;75:12;83:6;84:6,22;
85:4;86:13;87:1;88:14,
24;91:24;93:17;94:8,
15,18;96:20;97:13;
99:9;101:11;105:1;
107:18;108:5,22;
109:17;110:6;111:10,
20;112:11;113:19;

117:23;119:2,10;
120:12,19;121:22;
133:3;136:5,15;137:7,
16,24;138:10,21;139:4,
14,18;140:23;147:24;
148:4;155:8;163:5,12;
164:11;166:19;172:6,
11,23;173:3;174:6,22;
175:4;181:2;185:2,18;
194:21;195:22;196:12,
21;201:14;215:17;
231:10,13;233:13;
252:20;253:22;254:13;
255:17,20
**himself (10)**
84:17;110:13,19,20;
206:18;237:10;247:8;
251:10;252:8,9
**hired (1)**
156:1
**history (2)**
73:8;153:16
**hit (5)**
82:10;132:16;
171:20;203:9;255:4
**hits (1)**
135:13
**hitting (1)**
150:3
**Holcomb (5)**
37:16,18,22;38:17;
102:24
**Holcomb's (4)**
38:7;102:10,22;
103:4
**hold (16)**
33:19;50:3;70:1;
110:19;145:5;194:2,
17;226:12,17;229:15,
17;230:4,6,17,19;
237:10
**holder (1)**
82:7
**holding (21)**
49:15;185:20;
186:16;204:23;205:8;
207:1,6;209:17;
212:13;213:17;218:7;
223:16;226:14,16;
229:24;230:9,10;
231:4;235:8;246:10,14
**holds (1)**
232:8
**Holsopple (94)**
25:22,24;26:6;29:12;
30:2;31:18;102:20;
144:17;146:5;155:4;
158:2;166:6;168:8;
170:15;173:15;175:8,
16;176:11;177:4,6;
179:16,19,21;181:23;
182:17,20;183:8;
184:2;186:4,13;

188:10,12,14,19;
189:17;192:2;193:16;
198:14;202:8,23;
203:21;205:4,21;
206:20;207:17;208:17;
209:4,8;210:3,8;
211:10,22,23;212:19;
215:5,19;216:8;
217:24;218:8,9,10,16,
23;220:1;221:23;
222:8;223:16;225:9;
226:12;228:5,8,12;
229:2,13,14,17;230:5,
11,16;231:4;232:17,
19;234:10,18;236:19;
237:9;243:7;244:8;
245:11;247:22;249:3,
15;250:3;251:4
**Holsopple's (2)**
236:7;246:21
**holster (2)**
231:23;232:9
**home (4)**
35:14;63:8;69:9;
75:16
**homeowners (2)**
184:12,13
**homeowners's (1)**
193:18
**honest (3)**
65:7;131:4;220:14
**honestly (8)**
103:19;135:6;
181:20;203:15;215:7;
217:2;229:11;236:12
**honor (1)**
14:10
**hooded (3)**
205:19;227:12,13
**hook (1)**
26:9
**Hoover (1)**
140:18
**hospital (3)**
69:3;164:15;165:23
**hot (3)**
122:5;171:3,12
**hour (2)**
94:16;148:1
**hours (3)**
14:9;144:2,3
**house (1)**
72:23
**houses (4)**
178:23;179:8,9,19
**huge (2)**
251:10,18
**huh-uhs (1)**
22:14
**hurt (2)**
185:4;230:1
**hyped (1)**
131:10

**hyper (1)**
90:2

## I

**idea (9)**
5:24;6:18;29:11;
34:9;142:16;143:4;
144:20;161:18;239:23
**ideal (2)**
239:17;253:13
**Ideally (1)**
253:7
**identical (1)**
167:15
**identify (4)**
68:15;79:23;83:7,18
**III (1)**
183:10
**ill (15)**
45:2;46:13;63:1;
64:12,13,22;65:6;66:1,
4,9;67:7,14,18;69:2;
123:3
**illness (2)**
68:16;98:17
**image (1)**
191:16
**imagine (1)**
61:14
**imbalance (1)**
121:11
**imbalances (1)**
131:9
**Imhoff (5)**
14:20;17:14,16;
18:14,17
**immediate (1)**
75:5
**immediately (6)**
75:9;76:18;84:17;
176:18,24;204:3
**impair (1)**
139:8
**important (5)**
36:3;45:21;61:20;
83:7;84:23
**impossible (2)**
139:12;229:4
**impression (1)**
171:16
**inability (1)**
104:19
**inaccurate (2)**
33:16,18
**in-between (2)**
171:3,11
**incapacitation (1)**
242:22
**in-car (2)**
26:14,15
**inches (9)**
220:23;221:4,5,13,

20,21;223:7;236:24;
241:9
**incident (41)**
6:6,8;8:4;9:9,19;
13:23;14:1,14;20:18;
24:13;29:23;30:20;
33:15;34:12,15,16,19,
21;35:8;38:4,14;40:2;
42:19;43:1;61:5,6;
91:23;96:23;102:8,10,
13;103:2;132:23;
150:7;161:16;164:20;
167:9;195:20;196:1,1,
4
**incidents (1)**
11:14
**inclined (1)**
131:11
**include (5)**
49:7,11,15,18,23;
50:3;98:15,17;143:6;
158:20,21;196:6
**included (4)**
47:15,18,21;157:18
**includes (9)**
41:7,9,12,15;46:10,
12,13;94:23;97:7
**including (9)**
42:14;86:15;95:22;
114:18;131:15;155:13;
166:4,6,8
**incoherent (2)**
188:6;193:10
**inconsistent (1)**
54:11
**increase (9)**
98:14;99:5,11,14,16;
108:16;113:22;120:4,7
**increased (2)**
97:8;114:6
**increases (11)**
107:21;109:7,23;
112:1,1;114:19;116:5,
10;138:2,6,16
**increasing (1)**
96:8
**in-custody (5)**
6:7;7:23;20:1;38:5;
96:24
**independent (1)**
78:9
**index (3)**
94:19;95:5,15
**indicate (1)**
187:18
**indicated (2)**
170:4;259:5
**Indicating (2)**
192:17;246:15
**indication (1)**
233:7
**individual (12)**
9:3;32:20;42:18;

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

43:11,23;56:23;79:12;
91:23;100:14,18;
138:23;195:9
**individuals (17)**
9:18;16:9;42:22;
52:22;53:12;54:10;
56:8;57:6;58:16;59:20;
64:13;85:17;86:8;
88:18;89:3,9;90:7
**individual's (1)**
86:20
**inflict (1)**
158:19
**influence (7)**
87:4;88:18;89:3;
113:9;136:6;137:1,10
**informal (1)**
85:22
**information (61)**
8:13,14,17;28:24;
32:4;33:2;36:16;57:14;
58:1,4;61:1,21;72:24;
73:4;76:8,14,24;77:14,
18;87:5,8;96:16;108:6;
127:5;129:12;143:5;
152:8,9;156:3,5,18,21,
24;157:12,19,19;163:2,
10,13,13;164:10;
169:17;170:2;172:12;
173:16;174:7,23;
177:16;178:8,12,14;
179:1,15,15;180:8;
184:24;188:11,15;
191:7;193:16;195:1
**information-gathering (1)**
78:19
**informed (3)**
184:11,13;229:12
**ingested (1)**
88:6
**initial (7)**
72:15;76:7;78:14;
174:9,10,12,23
**Initially (5)**
173:16;174:9;
175:17;205:3;223:12
**injured (2)**
20:20;95:21
**injuries (2)**
20:21;135:2
**injury (12)**
20:16,19;94:20;
135:24;136:7,11;
138:2,6,16;158:22;
159:24;160:9
**inner (1)**
133:14
**inquire (1)**
12:6
**in-service (1)**
92:6
**inside (9)**
20:10;184:7,17;

187:13;191:11;193:12;
202:6;206:18;240:2
**instantly (1)**
176:22
**instead (1)**
237:8
**institution (1)**
68:20
**instructed (2)**
20:24;21:3
**instructing (1)**
127:21
**instruction (1)**
95:5
**instructor (8)**
38:23;95:4;104:8;
130:12;131:19,21,22;
139:22
**instructors (1)**
104:7
**inter (1)**
29:2
**interact (6)**
55:13;61:9;65:5;
66:8;73:14;115:18
**interacting (11)**
54:20;56:5;57:2;
60:8;64:1,5;90:11;
101:13;161:15;162:13;
163:15
**interaction (3)**
60:1;162:9;181:13
**interactions (2)**
166:22;196:16
**interferes (1)**
99:20
**internal (9)**
11:7,12,15,19;12:22;
18:2;37:24;122:6;
132:8
**interpret (2)**
22:15,18
**interrupt (1)**
125:5
**interview (2)**
18:6,7
**interviewed (6)**
13:12,15,19;17:12;
19:11;133:19
**into (49)**
9:11;14:14;15:16;
21:5;28:13;29:15;
32:14;33:13;53:16,19,
22;54:1;55:2;60:4,7;
65:10;70:9;74:16;
95:14;97:22;104:22;
105:5;108:9;112:16;
114:7;121:12;125:22;
132:11,24;133:8;
135:14;154:1;171:19,
20;176:21,23;193:24;
209:9;215:10;225:16;
227:9;237:5;238:1;

239:10;240:12,16;
242:15,20;255:16
**intoxicated (3)**
9:3,6,18
**introduce (1)**
5:9
**introduced (4)**
31:2;50:9;140:21;
155:6
**invested (1)**
132:13
**investigation (13)**
11:15,20;12:22,23;
13:6,13;18:2,24;19:12;
36:11;180:19,20;195:9
**investigative (18)**
24:12;30:20;31:8,24;
32:10,16;35:9,19,24;
36:15,18;155:3;158:1,
5;167:11,13;170:17;
196:5
**involuntarily (1)**
68:19;71:8
**involuntary (3)**
69:3,10;70:19
**involved (15)**
6:19;7:22;17:9;
25:12;46:15;69:1;
87:19;101:8;102:2,3;
103:4;108:24;140:11;
141:15;147:2
**involvement (1)**
32:20
**involving (11)**
6:6,8;7:23;10:4;
19:19;37:19;64:12;
66:15,21;150:7;181:17
**irrational (1)**
169:10
**irrelevant (2)**
119:7,12
**issue (8)**
19:22;65:19;133:5;
166:13,18;170:22;
180:13;227:18
**issues (6)**
11:7,12;58:18;80:4;
114:6;253:10
**items (1)**
35:21

**J**

**jacket (2)**
234:15,16
**jail (2)**
38:7;91:11
**Jamie (3)**
17:6,7,8
**Jeep (27)**
181:3;182:24;
183:18,19;184:4,14;
185:7,19;186:4,11,14,

23;187:4,4,5,5,11,13;
188:9;191:11,20;
207:15,18,19,24;208:2,
5
**Jeep' (1)**
183:12
**jerking (1)**
192:10
**job (15)**
9:1;19:5;22:9,13;
41:2;44:6;45:11;52:20;
60:10,17,18;77:15;
101:16;200:12;253:15
**Joe (1)**
209:8
**John (8)**
11:4;19:2;18;32:9;
33:23;38:24;104:9;
202:17
**Jordn (127)**
19:19;25:18;34:7,23;
35:22;36:10;47:8,12,
15,18,21;150:7;
151:23;152:9;153:15;
154:6,18;160:20;
164:5;166:2,22;
168:24;174:8,12;
175:23;178:15,22;
179:7,19;180:22;
181:3,17,19;182:24;
184:7,12,14;187:13,15;
188:20;189:12,16;
190:4;191:22;196:7,
14,16;198:13,22;
200:14;201:17,22;
202:9;203:8,20,24;
204:10,17,19;205:1,16;
206:2,7,9,13,24;207:4,
14,17;208:10,19;
209:14;210:3;211:15;
212:23;213:8,17,20;
214:8;215:23;218:11,
17,24;223:16,19;
225:18,22;226:11,20;
227:3,11,19;228:2,9,
11,17;231:6,19;233:1,
18;235:14,20,23;
236:11,13;237:5;
239:1;247:3,4;248:13,
17;249:1,8;250:7,7,13;
251:1,5,7;252:21;
253:5,16;254:8,22
**Jordn's (46)**
196:14;202:2;
203:18;205:21;207:22;
208:14;209:17;210:11,
12;211:23;212:2,6,24;
215:19;216:19;217:5;
218:3,7,11;219:11,16,
21;220:2;222:4;229:6,
9,10;230:6;231:4;
232:19;233:15,24;

23;187:4,4,5,5,11,13;
188:9;191:11,20;
207:15,18,19,24;208:2,
5
**Jeep' (1)**
183:12
**jerking (1)**
192:10
**job (15)**
9:1;19:5;22:9,13;
41:2;44:6;45:11;52:20;
60:10,17,18;77:15;
101:16;200:12;253:15
**Joe (1)**
209:8
**John (8)**
11:4;19:2;18;32:9;
33:23;38:24;104:9;
202:17
**Jordn (127)**
234:9,11,18;235:6;
236:4;238:2,9,18,20;
242:13,18;245:8;
246:12;254:15
**journals (2)**
131:2,4
**judge (2)**
23:22;137:14
**judgment (1)**
78:9
**jumped (2)**
33:16;216:5
**jurisdiction (3)**
40:6;144:21;145:10
**jury (1)**
23:22
**jury's (1)**
146:16

**K**

**keep (22)**
22:19;28:13,18;36:1,
5,7;81:12;107:21;
108:15;113:3;185:20;
206:18;210:2,4,17;
212:14,23;215:5,19;
236:15;248:3;250:9
**keeping (3)**
210:15;247:22;248:5
**keeps (2)**
28:15;209:22
**kept (2)**
35:21;188:17
**key (1)**
244:2
**keys (10)**
184:17;185:8,10,13,
14;193:3;199:23;
200:22;202:2,5
**kick (14)**
224:7,17,19,19,21,
22,23;225:3,11,22;
226:2,6;228:2;252:5
**kicked (7)**
225:18;226:2,11,20;
227:3,19;238:21
**kicking (12)**
209:21;211:4;214:8,
9,16,21;226:4;244:13,
22;245:14,20;249:8
**killing (1)**
21:7
**kind (66)**
6:4;11:15;12:23;
22:4;28:1,22;29:2;
30:10;32:13;35:2,3,5,
6;39:7;40:8;51:17,23;
61:8;62:7;65:3;66:12;
70:19;74:3;78:5;79:2,
6;81:12,13,15;84:8;
85:9;101:2;130:13;
132:15;133:1,13,14;

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

141:24;144:22;147:4;
148:11;149:22;162:1;
173:15;186:24;188:13,
15,24;191:23;192:5,
21;201:1;205:9;
209:13;213:14;214:13;
216:5;218:21;225:19;
227:13,15,23;234:12;
239:4;240:5;245:17
**kinds (1)**
87:12
**knee (12)**
209:4;213:1,3,3,7,11,
11,14;220:19,20;
232:12,13
**kneeling (5)**
209:2,3;223:11;
232:11;241:17
**knees (3)**
209:5;212:23;245:7
**knew (14)**
126:18;162:17;
164:4;166:11;191:1;
194:1;200:5;216:15,
16;217:3;219:6;240:7;
244:3;255:11
**knife (1)**
158:21
**knob (1)**
82:3
**knowing (3)**
80:23;127:5;151:11
**Knowledge (5)**
121:15;126:2;
153:16,18;161:20
**known (1)**
9:6
**knows (1)**
106:23

## L

**lady (2)**
177:24;179:15
**laid (2)**
222:2;223:3
**Lakemore (2)**
145:11;152:19
**language (1)**
6:24
**lapel (1)**
81:13
**laptop (1)**
27:3
**large (4)**
11:15;144:21;
239:15;241:12
**larger (2)**
240:15;255:5
**last (7)**
25:15;34:23;103:20;
106:2;138:19;142:4;
143:17

**Later (4)**
7:7;32:15;83:18;
218:18
**law (11)**
6:10;19:8;45:18;
62:24;67:5;83:15;
131:1;142:11,13;
146:16;160:14
**laws (1)**
146:20
**lawsuit (5)**
7:16,18;10:4;21:14;
52:4
**lay (4)**
109:18;227:21;
242:21,23
**laying (1)**
104:20;105:10;
106:20,21;108:3,8;
110:14;114:24;117:21;
212:8,9;215:9,11;
223:4
**lays (1)**
223:7
**lead (7)**
9:12;10:12,24;38:23;
75:20;76:12;87:24
**leading (1)**
116:21
**leaning (2)**
239:2,3
**learn (1)**
108:6
**least (13)**
17:20;41:22;103:22;
106:5,15;126:19;
138:11;143:17;148:8;
165:14;175:2;187:10,
10
**leave (4)**
106:16,20;199:22;
237:9
**leaving (2)**
116:14,20
**left (38)**
9:1;200:4;205:6;
208:8,14;212:6,15;
213:3,14;214:20;
216:23;217:7;218:3;
219:11,16,16;220:17;
222:4;223:23;224:24;
225:2,4;232:1,7,19;
234:4,8,12;235:5,18;
236:3,4,5;240:1;245:1,
8;246:16;255:6
**left-hand (2)**
51:24;141:11
**leg (11)**
221:2;222:1,10,15,
20;223:7;225:18;
226:6;239:10;249:13;
250:1
**less (5)**

11:1;95:3,3;147:7;
205:5
**lets (1)**
87:9
**letting (1)**
166:16
**level (13)**
84:4,5,16;91:8,9,15;
92:14;99:14;101:8;
115:2;127:22,24;
206:20
**levels (6)**
56:19,20;57:5,10,12;
88:23
**life- (1)**
100:8
**life-threatening (2)**
111:21;118:6
**lift (1)**
221:17
**lifted (3)**
220:5,8,8
**lifts (2)**
223:6;234:10
**lighten (1)**
14:14
**lights (9)**
122:10;150:4,11,21;
151:1,6,10,14;152:3
**likely (3)**
78:14,18;95:21
**likewise (4)**
32:23;70:7;79:6,11
**limitation (1)**
136:24
**limitations (2)**
40:5;57:7
**limited (1)**
211:9
**Linburg (2)**
146:8,9
**L-I-N-B-U-R-G (1)**
146:10
**line (7)**
43:11;51:12;168:22;
175:5;220:11;234:15;
259:7
**lines (2)**
73:21;254:17
**linked (1)**
138:14
**list (1)**
136:22
**listed (2)**
162:7;194:11
**listen (4)**
24:17;197:3,4,4
**listened (1)**
24:20
**listening (7)**
54:15,19;188:18,20;
209:7;211:4;233:6
**little (23)**

6:15;23:12;26:16;
38:21;39:6,7;48:13;
65:12;101:3;121:8;
132:18;133:2,13,24;
164:17;206:21;218:21;
222:3;227:10;229:14;
230:5,16;234:11
**loaded (1)**
82:22
**locate (1)**
173:20
**located (3)**
74:15;173:21;208:7
**location (6)**
25:5;26:12;49:8;
81:19;154:2;179:6
**locations (1)**
29:6
**lock (1)**
232:8
**locks (1)**
134:10
**lockstep (1)**
188:14
**log (3)**
28:14,15,19
**Lombardi (1)**
104:9
**long (15)**
7:13;19:4;23:11;
71:2;80:24;84:8;
106:17;117:6;143:15;
181:13,17;210:20;
243:20,23;248:12
**longer (5)**
39:18;42:5;107:6;
132:7;222:19
**longest (2)**
103:14;130:18
**look (17)**
28:8;31:6;32:1;
36:20;50:15,20;51:23;
68:15;71:10;102:7;
127:4;129:4;133:24;
155:17;164:16;167:13;
168:22
**looked (8)**
24:12;30:19;31:8;
33:15;141:17;148:8;
198:17;220:14
**looking (15)**
30:1;123:21;155:17;
175:9,22;176:3,14,19,
22;177:8,11;178:22;
181:20;241:2,13
**lookout (2)**
114:10;124:11
**looks (8)**
21:23;31:10;155:3,
13;167:6,15,20;168:2
**loose (4)**
229:21,22,23,23
**lot (25)**

11:7,12,17;12:21;
18:8;23:5;26:1,3,6,7;
37:4;50:14;72:17;
83:20;87:11;124:20;
125:11;131:10;132:8,
15;147:5;205:13;
215:5;235:10;251:23
**lots (1)**
63:3
**loud (2)**
22:12;209:22
**low (2)**
56:16;94:19
**lower (2)**
95:15;210:7;246:20
**lowered (1)**
20:24
**lungs (1)**
104:21
**LUTE (14)**
5:13,13;96:10;97:9;
99:7;101:5;104:14;
107:14,24;108:18;
109:13;110:1;111:5,17

## M

**M26 (2)**
141:3,7
**machine (1)**
7:6
**mad (1)**
91:18
**magazines (1)**
148:16
**main (3)**
15:5;176:9,10
**maintain (1)**
229:24
**maintained (1)**
230:13
**maintaining (1)**
226:19
**major (1)**
35:2
**majority (1)**
38:14
**makes (1)**
77:9
**making (11)**
41:12;77:7,15;111:2;
133:15;154:2;185:23;
187:16,19;193:10;
228:18
**male (1)**
17:16
**man (2)**
126:13;193:9
**maneuver (1)**
237:2
**manner (3)**
100:16;160:3,8
**manners (2)**

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

65:24;253:20
**manual (1)**
104:6
**manually (3)**
150:2;151:18;152:5
**many (15)**
5:24;14:18;34:9;
35:24;81:15;82:4;
102:19;124:16;142:16,
21;143:8;144:20;
146:2;187:6,9
**mark (6)**
50:8;121:8;140:20;
154:22;221:19,21
**mass (4)**
21:3;94:19;95:5,15
**match (2)**
28:1;206:21
**material (1)**
246:11
**materials (4)**
103:7,10,13,19
**matter (7)**
79:13;83:13;91:1;
92:7;114:11;119:20;
252:3
**may (39)**
43:2;53:13;54:3,6,
11,18,19;56:9,17;57:6;
58:12;59:7,21,24;
64:21;66:8;68:22;
69:18;73:13;75:2,5,8;
86:9;87:10,11;88:7,19;
89:4;95:12;97:7,18;
98:20;112:15;114:2,6;
117:21;129:17,19;
138:22
**maybe (32)**
6:21;7:15;10:20;
30:20;32:24;58:13;
74:14,15;87:9,14;
104:11;115:5;121:17;
124:7;125:16;130:19,
20;143:2,3;149:6;
152:24;167:5;171:22;
179:9;181:15,22;
186:12;187:10;220:24;
221:12,22;227:15
**mean (69)**
9:22;13:7;16:6;
18:11;19:5;24:24;
27:12;28:4;36:1;38:6;
39:8,13;42:12,15;46:1,
2;74:12,17,17,18,18;
81:4;82:2,22,23;86:3;
87:12;89:21;92:8;
105:15;108:20;110:3,
4;117:3;120:20,21;
121:9;136:20,21;
143:18;145:2;150:14;
156:2,2;157:6;159:17;
163:21;167:17;169:17;
187:2;190:18;197:21;

199:5;213:10;215:8;
219:19;220:9;221:9,
12;222:22,22;226:14;
230:21;234:21;237:19;
240:19;242:21,23;
243:23
**meaning (4)**
105:10;107:16;
160:6;170:18
**means (17)**
48:15,16;51:6,8;
74:3,13;122:7;159:18;
176:4;199:23;201:3;
227:20;237:20;242:24;
253:10,11,11
**meant (1)**
183:22
**measure (2)**
53:20;62:5
**meaty (2)**
225:2,3
**mechanically (1)**
232:5
**medical (61)**
38:1,17;41:16;46:10;
47:1,22;55:24;59:8,9,
12,17,18,24;60:14;
75:6;82:19;83:9,19,19;
85:1,17,19;86:9;87:14,
24;88:3;92:24;94:10;
96:3;99:1;100:9;
108:21;113:22;114:3;
115:2;117:24;118:3,4,
6,10,14,15,19;119:3,
14,18,19,21;124:19;
127:7,14,16;128:11;
131:3,6;134:22;
135:20;172:20;173:18;
189:22;191:8
**Medically (7)**
44:24;46:13;75:3;
86:17;115:19;125:2;
131:11
**medication (2)**
59:4,4
**medications (2)**
38:16;75:9
**meet (6)**
26:12;29:6,8,9,19,20
**meeting (1)**
154:15
**Mel (1)**
5:13
**member (16)**
14:10;40:13,19,20;
49:24;53:2;55:3;58:24;
78:18;82:17,19;87:21;
105:19;114:1,5;137:3
**members (25)**
41:16;44:9,12;45:21;
46:17;52:21;56:24;
57:2,15,18;58:6;61:9;
65:5;66:8,22;67:20,23;

69:17;73:4;76:9;86:6,
8;90:15;101:14;115:13
**memory (5)**
36:8,20;142:19;
171:13;219:9
**mental (87)**
41:16;52:23;53:3,5,
12;54:3,10;55:20;56:8,
17;57:7,12;58:9,12,24;
60:14,21;61:10,24;
64:1,5;65:3,6,18;66:15,
23;67:24;68:16;73:8,
22;75:16;76:1,2,16;
77:5;78:1,15;79:3,7,12,
16,17,18;80:4;85:18;
89:4;93:5;94:10;98:17,
19;121:7,9,16,23;
123:19;135:23;137:1,
1;152:10,10;154:6;
162:7,15,18;163:4,7,
15,18,21,21,22;164:3,
6;166:12;167:1;169:1,
5;170:5,22;172:1;
173:17;180:13;181:17;
184:12;191:8;233:2,22
**mental-impaired (1)**
63:21
**Mentally (20)**
45:2;63:1;64:12,13,
22;65:5,9,11;66:1,4,9;
67:7,14,18;69:2;86:18;
122:20;123:3;136:21;
196:22
**mentally-troubled (1)**
193:9
**mention (2)**
183:16;194:15
**mentioned (1)**
38:22
**message (3)**
26:18,19;27:6
**messages (2)**
28:2,19
**messaging (7)**
26:24;27:2,18;28:22;
29:3;69:17;154:13
**met (3)**
29:12,22;30:2
**method (2)**
253:3,4
**mic (2)**
82:7;244:2
**Michael (2)**
5:15;23:6
**microphone (1)**
22:20
**mid (2)**
234:20;246:20
**middle (5)**
51:23;84:8;182:10;
236:23;246:24
**mid-morning (1)**
29:18

**midst (1)**
227:8
**might (52)**
29:20;35:5;36:5;
54:8,15;58:24;59:3;
64:13,16,19,22;70:13;
71:12,21;72:2,19;
77:21;80:10,18;87:10;
89:24;90:1;91:14;
92:13;96:2,3;108:20;
116:21;117:2;120:11;
122:1,23,23;125:18;
126:14;127:2;130:19;
143:2,23;169:9;
171:16,19,23;172:15;
176:24;195:3;201:18;
209:4;210:21;225:21;
230:20;241:12
**Mike (1)**
8:11
**mile (2)**
74:15,17
**miles (4)**
144:24;152:24,24;
153:7
**Miller (30)**
19:19;25:18;34:7,23;
35:22;36:10;150:7;
151:23;152:9;153:15;
154:6,18;157:20;
160:20;161:16;162:10,
14;164:5;166:2,22;
168:24;175:23;181:17;
184:7;188:17,20;
193:20;196:7;203:17;
248:13
**Miller's (5)**
47:8,12,15,18,21
**Milo (5)**
152:23;153:10,13;
175:12;176:7
**mind (4)**
37:5;181:1;198:12;
241:21
**mine (1)**
185:1
**mini (1)**
148:23
**minus (1)**
31:9
**minutes (6)**
117:2,3;125:17,19,
21;181:21
**Miranda (1)**
133:20
**missed (1)**
14:23
**missing (1)**
195:6
**mistaken (1)**
10:7
**Mizer (9)**
12:1,8;14:20;17:6,7,

9,13;18:14,19
**M-I-Z-E-R (1)**
12:1
**mobile (2)**
199:24;201:11
**mom (1)**
166:15
**moment (10)**
46:8;57:2;81:8;
169:16;179:11,18;
180:7;203:24;226:11,
20
**moments (1)**
189:2
**months (1)**
34:24
**mood (1)**
14:14
**Moore (29)**
31:18;32:6,17;33:20;
34:5,23;144:18;146:5;
147:8;155:4;157:8,16,
18;158:2;166:4;168:8;
170:15;199:16;211:12;
244:14,18;248:11,14,
19;249:3,5,15,24;
250:13
**Moore's (1)**
157:3
**More (47)**
11:1,10;30:6,7;33:1;
36:15;40:18;43:22;
52:8;65:3;95:11,16;
109:19;115:10;120:8,
20;124:13,16;126:7;
127:1;132:18;137:3;
143:20,23;144:5;
176:23;188:17;193:14,
21;198:6,6;205:4,13;
215:10;222:14;224:20;
225:13;236:1;237:8,
15,20,22;241:12;246:1,
22,23,23
**morning (3)**
29:13,17;255:22
**Most (4)**
34:12;52:5;70:1;
201:2
**motion (3)**
223:4;224:20;227:9
**motivation (1)**
132:6
**motor (2)**
134:7;201:3
**mouth (6)**
21:7;100:5;222:1,10,
20;227:23
**mouthwash (1)**
153:5
**move (6)**
30:14;49:8,12;109:6;
181:7;223:7
**moved (10)**

Layne & Associates
(614) 309-1669

Case: 5:16-cv-02331-JRA  Doc #: 16-4  Filed: 07/17/17  80 of 91.  PageID #: 228

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

143:16;184:14;
185:21;212:19;229:14;
230:5,16;232:17;
238:11;245:10

**movement (1)**
242:11

**movements (3)**
215:11;245:19;
247:13

**Moving (11)**
175:5;191:20;
192:18,19;204:2;
212:14;229:1;242:5;
245:17;247:19;248:3

**much (14)**
30:3;40:2;51:12;
83:3;119:20;132:11;
149:3,10,12;188:16;
215:7;232:20;235:17;
236:2

**multiple (2)**
116:18;179:20

**muscle (6)**
95:14;115:4;117:18;
134:5,8;240:7

**muscles (4)**
107:22;109:11,15;
114:17

**must (12)**
40:12;41:22;61:23;
62:4,21;79:8;100:15,
18;215:4;217:21,24;
221:1

**Myself (6)**
14:20;26:16;102:20;
140:17;173:14;189:17

### N

**naked (9)**
122:18;162:7;
163:19;164:6;169:1;
171:15;174:8,13;
193:11

**name (5)**
5:10,19;17:5;27:17;
153:21

**named (1)**
7:16

**names (3)**
13:18;19:13;123:13

**narcotics (2)**
8:5;37:24

**nature (2)**
11:6;196:1

**near (5)**
123:14;131:11;
210:8;235:6;252:1

**necessarily (5)**
42:15;66:3;80:24;
96:2;113:22

**necessary (8)**
47:1,22;83:1,1,16;

91:21;126:8,20

**neck (2)**
234:19;235:1

**need (28)**
23:10,12;46:18;47:1;
63:11;67:7,14,21;77:1,
12,15,16;79:4;82:14;
83:19,21;88:4;91:11;
93:20;96:17;112:22;
118:10,13,14;127:17;
185:10;243:9,24

**needed (9)**
33:16;41:23;43:22;
88:5;146:11,23;
172:19;195:6;199:5

**needle (1)**
193:19

**needle-nose (2)**
160:24;161:2

**needlessly (1)**
40:12

**needs (11)**
56:2;73:24;75:5,8;
77:21;84:20;119:14;
173:18;195:16;200:9;
225:17

**negotiate (4)**
190:7,9;206:13;
213:20

**negotiating (1)**
190:12

**negotiation (1)**
190:7

**negotiations (1)**
191:1

**neighborhood (10)**
153:10,11;170:8;
174:8;175:12;176:16,
18,21;193:11;197:22

**neither (1)**
251:4

**nervous (1)**
134:7

**neuromuscular (3)**
237:22;239:17;
242:22

**new (8)**
11:1,3;14:17,17;
19:5,6;30:14;179:15

**next (10)**
31:1;61:6;175:5;
202:23;207:18;209:5;
211:1;224:14;229:3,9

**night (6)**
24:13;108:9;143:21;
144:2;194:6;218:18

**nipple (1)**
220:11

**NMI (2)**
241:12;242:20

**Nobody (5)**
77:9;144:7;187:21,
23;202:5

**noise (1)**
111:2

**noises (1)**
209:23

**nonsense (11)**
188:2,21;189:1;
190:10,22,24;191:13,
23;192:21;197:15;
200:20

**nonsensical (2)**
228:18;233:8

**normal (1)**
86:19;169:12

**nos (1)**
22:12

**nose (1)**
193:19

**note (12)**
32:1,10,14,16,22;
155:4;158:5;167:11,
14;170:17;196:5;
218:19

**notes (12)**
24:12;30:20;31:8;
35:9,18,18,21,24;
36:15,18;158:1;181:21

**notifies (1)**
80:9

**nowhere (1)**
131:11

**number (17)**
21:24;26:19;27:9;
31:2,12;50:9;79:4;
87:16;97:11;98:22;
140:21;142:24;143:22;
155:6;156:4;157:20;
194:19

**numbers (3)**
28:16;70:1;143:19

**numerous (1)**
168:15

### O

**oath (2)**
23:18;45:8

**obese (1)**
95:11

**obey (1)**
196:18

**obeying (2)**
196:20;197:7

**object (2)**
158:18,19

**objection (87)**
12:2,4;40:22;41:18,
24;42:6,23;43:14,24;
47:4;48:19;49:1;54:13,
21;56:11;60:22;63:16;
64:8;67:1,8,15;75:10;
82:21;83:10;84:12;
85:3;86:10,22;88:11,
21;90:20;93:14;94:5;

96:10;97:9;99:7;101:5;
104:14;107:14,24;
108:18;109:13;110:1;
111:5,17;112:3;
113:13;117:19;118:23;
119:8;120:9,16;
121:19;132:20;136:2,
13;137:5,12,19;138:8,
17;139:1,11,17;160:7;
163:1,9;164:8;166:14;
172:3,9,21;173:1;
174:4,20;175:1;
180:24;184:22;195:17;
196:9,19;200:24;
215:15;233:10;252:17;
253:18;254:10

**objects (1)**
158:20

**obligated (1)**
83:15

**obligation (6)**
45:14;46:24;47:7,11;
71:19;125:10

**observation (1)**
129:11

**observations (2)**
57:20;58:8

**observe (2)**
200:14;250:6

**observed (5)**
57:23;188:22;
200:14;201:22;250:5

**obstructing (1)**
100:19

**obstructs (2)**
100:2,5

**obvious (1)**
112:24

**obviously (9)**
6:23;14:8,21;22:7;
33:14;135:16;194:24;
195:3;238:11

**occasions (1)**
36:2

**occurred (2)**
11:14;156:5

**occurs (2)**
40:2;99:19

**odd (1)**
169:7

**off (39)**
26:4;28:23;30:1;
70:22;72:23;76:24;
84:1,3,4,5;85:6,11;
90:22;122:17;124:23;
140:6;148:2;175:7;
180:3;182:12;186:1;
192:10,22;202:6;
207:19;209:20;214:23;
220:12,21;221:4,13;
223:6;244:12,21;
245:1;255:10,14,15,19

**offense (3)**

161:24;162:6,24

**offered (3)**
64:4;66:20,24

**office (14)**
7:1;9:2;13:17;14:13,
15;15:19;32:11,19;
36:19;52:3;102:18;
145:6;156:17;182:20

**Officer (203)**
5:6,11,18,21;6:7,8,
10;7:23;8:2,22;12:1,8,
13;14:7,20,20,21;15:9,
10;16:13;17:13,14,16;
18:14,14,17,19;19:8;
20:2,12,15;21:1;24:7;
25:21,23;26:5,16;28:6;
29:12;30:2;31:4,18;
37:12;38:3,13;39:20,
23;40:8,12,19;45:8,18;
50:14;52:20,21;53:2,
17;55:5;61:23;62:4,9;
66:14;68:12;69:1,11;
70:17;76:8,13,17,20,
22,23;77:2,21;78:6,17,
21;80:8;82:14;93:19;
96:7;97:14,19;99:4,10;
102:20;103:4;112:14;
117:10;125:9;129:11,
16;131:1;134:3;
139:24;140:4,6,6;
142:15;144:17;146:8;
148:5;155:4;158:2;
166:6;173:12,14;
175:8,8;176:11;177:4,
4,5;179:16,18,21;
180:17;181:23;182:17;
183:8;184:1;186:4,13;
188:10,12,14,18;
189:17;192:2;193:16;
197:10;198:13;202:8,
10,22;203:20;205:3,
21;206:20;208:17;
209:4,8;210:3,8;
211:10,22,23;212:19;
215:5;216:8,22;
217:10,11,21,23,24;
218:6,6,7,9,10,16,23;
220:1;221:23,24;
222:8;223:16,22;
225:9;226:12;228:5,8,
12;229:2,12,12,14,17;
230:5,11,16;231:4;
232:17;234:10,17;
236:6,19;237:1,9;
243:7;244:8;245:11;
246:21;247:22;248:19,
22;249:24;250:2;
251:4;253:15;254:23;
255:20

**officers (101)**
11:18;14:15,18;15:8,
24;16:14;17:18;18:13,
15;25:12;28:3,17;

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

38:11;40:15;41:22;
42:14,17,20;45:4;46:7;
56:9;57:7;60:19;62:21,
24;63:11;64:24;66:21;
67:5,12,24;75:18;
77:12,15;78:8;79:4,8;
81:23;82:18;84:23;
86:15;87:3,3,19;88:19;
90:6;93:10;97:2,22;
100:14,18;101:12;
106:22;107:12,20;
108:15,23;109:1,7;
116:8;121:17;126:23;
127:9;129:3;130:18;
132:7;142:16;143:1,6,
8,20,23;144:9,15;
145:13,17;146:2,17;
151:9;154:7;168:7,8,
23;170:11,12,18,18;
173:5;177:12;179:12,
20;183:7;185:19,21;
204:4;211:3,5,9;
248:22;249:2;250:9

**officer's (8)**
44:6;49:7,11;53:13;
59:22;119:5,13;183:7

**officers's (2)**
54:12;217:19

**offices (1)**
145:5

**often (4)**
63:1;118:17,18;
140:6

**Ohio (1)**
145:6

**Old (3)**
44:16;95:23;96:2

**omission (1)**
195:16

**Once (11)**
42:4;71:5;91:15;
111:15;120:20;173:21;
174:23;196:17;197:12,
24;255:13

**One (79)**
6:5;13:20;15:23,24;
16:13;21:7;22:11;
26:11,17;40:18;43:16;
48:21;49:8;50:4;52:8;
53:6;64:21;65:9,17;
69:2;70:4;75:11;77:7,
16;81:17;91:14;97:12,
14;98:23;101:2;
103:16;112:21;121:16;
122:19,24;124:24;
125:9;133:7;135:4;
138:19;142:17;155:1;
183:14,15;187:10;
188:21;193:18;199:6;
201:16,23;203:5;
204:24;205:13,21;
211:2,14,17,17,19;
212:23;214:17;216:23;

217:3;218:5,11;219:6,
7,7,16,22;223:4;
226:14,16;227:6;
231:1,11;236:7;
242:11;252:15

**one-page (1)**
155:2

**ones (2)**
57:16;183:20

**only (30)**
9:21;15:17;16:9;
23:24;33:4;53:10;
54:18;57:14,16;58:4;
71:22;77:16;82:11,24;
84:2;91:21;106:16;
128:24;162:14;166:20;
167:16,20;187:13;
197:1;216:17;226:14,
16;234:20;241:2;253:3

**on-scene (1)**
249:5

**onset (2)**
65:9,11

**on-the-scene (1)**
89:13

**onto (15)**
71:9;185:24;192:9;
204:5,5;205:8;207:1,6,
8,11,11,14;221:10;
251:1,5

**open (3)**
36:12;203:3;204:16

**opened (1)**
204:2

**opens (1)**
107:6

**opinion (1)**
253:21

**opinions (1)**
39:14

**opportunity (2)**
23:24;199:6

**opposed (3)**
50:4;254:4,9

**opposite (4)**
182:12;210:9;
238:22;239:24

**option (1)**
228:4

**order (7)**
127:19;129:18;
177:20;210:2;229:18;
235:14;248:8

**original (2)**
163:4;164:5

**Originally (1)**
171:18

**others (3)**
42:13;53:9;71:2

**other's (1)**
33:11

**otherwise (3)**
89:7;93:20;101:22

**ourselves (1)**
144:14

**out (117)**
8:11;22:11;25:6;
28:6;32:11;33:16;50:7;
55:7;57:11;59:7;73:17;
77:1,10,11;80:18,21;
81:5,19,22;82:7,7;
83:23;92:18,23;93:4;
97:16;104:22;115:6,8,
15;117:10;122:20;
123:13;128:23;131:7;
132:1;135:8;143:5,18;
145:3,23;146:14;
150:18;157:15;159:4;
165:14;175:15;176:20;
177:24;178:3;179:16,
24;182:16,20,22,23;
185:21,24;186:17;
189:3,9,18,20,21,21;
190:7;191:8,23;
193:17,20;196:17,24;
197:2,24;198:18;
199:2,12,21;200:7;
201:17;204:5,10;
205:1,5,10,10,13,15;
206:15,15,17,22;207:4;
214:15;215:3;216:14;
220:14;222:1,10,12,13,
13,20;226:21;231:11,
16;232:9;235:13;
238:15;244:8,15;
247:8,14;250:21;
251:2,13;255:11

**outbreaks (1)**
38:2

**outcome (2)**
16:18;63:22

**outside (7)**
171:4,9;175:7;
187:11;200:13;203:8;
240:2

**over (20)**
6:5;22:4,24;24:12;
25:4;26:6,14,15;30:19;
31:1;33:15;34:14;35:6;
36:7;38:24;51:3;71:17;
77:19;78:8;83:10;
106:19;122:5;132:1;
135:14;147:1;152:14;
153:13;154:5,11;
160:15;164:16;174:20;
178:8;180:8;201:3;
222:22;239:2;245:22;
247:15;251:1

**overdose (1)**
59:21

**overdoses (3)**
59:4,15,17

**overhead (1)**
150:4

**overlap (1)**
66:9

**overly (2)**
171:12,12

**overpower (1)**
235:15

**overrides (1)**
134:7

**overweight (1)**
113:15

**own (8)**
57:20;78:22;125:20;
133:1;144:12;189:21;
195:9;204:11

**oxygenation (3)**
107:23;109:11,15

---

## P

**page (21)**
22:3;31:9,10,11,14;
51:2,3,24;141:10;
155:1,13,17,17;157:5;
162:1;164:22;165:3,8,
13;168:19;259:7

**pages (5)**
32:5;164:17,18;
167:14,14

**pain (1)**
20:19

**paint (1)**
21:12

**pair (2)**
160:24;161:2;
193:19;194:20

**paramedics (1)**
71:23

**paraphrasing (1)**
61:16

**park (2)**
182:2,8

**parked (3)**
26:1;178:18;179:7

**parking (4)**
26:1,3,6,7

**part (19)**
17:23;19:11;28:22;
41:2;44:6;51:22;52:4,
20;74:23;95:5;101:16;
133:4;145:2,7;195:10;
225:2,3;239:10;241:11

**particular (1)**
111:8

**particularly (1)**
98:15

**partner (1)**
144:13

**part-time (4)**
143:6;145:23,24;
146:1

**pass (4)**
104:22;110:15,23;
176:16

**passed (2)**
14:7,8

**passenger (3)**
181:10;187:5,7

**passenger's (1)**
188:3

**passes (2)**
179:17,19

**passing (3)**
110:16;111:7,8

**past (3)**
69:9;147:17;159:10

**path (1)**
21:5

**patient (1)**
104:12

**Patrol (11)**
12:13;14:3,12,15;
15:19;32:11,19;
139:24;140:3;145:21;
156:17

**pause (2)**
94:15;255:17

**pay (1)**
203:16

**PD (1)**
7:11

**PDFD (1)**
82:10

**peeling (1)**
201:5

**people (66)**
33:13;38:2;44:7;45:5;
46:6,13;55:7,8;57:1;
58:17,21;63:1;64:1,5;
65:23,24;66:4;70:8,13;
89:16,21;90:11;92:19,
24;93:4;94:19;95:20;
102:19;104:6,18;
106:15;109:1;113:9;
114:2,13;115:12,18,21;
118:9,13,17;123:13,13;
125:7,13;127:8;
128:11;131:14;136:18,
24;146:1,15;169:12;
185:20;186:15,15,19,
22;187:6,9;188:8;
197:5;200:21;201:3;
203:12;207:16

**people's (3)**
45:11;46:21,24

**pepper (5)**
104:17,18;126:22;
127:3;148:20

**perceive (2)**
55:4,4

**perceiving (2)**
54:24,24

**percent (4)**
69:12,19,24;70:4,7,
13,13

**percentage (1)**
70:12

**perfect (2)**
96:15,18

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 1
March 14, 2017

**period (4)**
10:15;117:7;130:18;
249:9
**periodic (1)**
85:20
**periodically (1)**
26:8
**permitted (5)**
42:5,20;85:2;117:8;
129:1
**peroneal (3)**
223:23;224:8,24
**perpendicular (1)**
208:5
**person (148)**
37:15;41:13;42:4;
43:3;45:5;48:17;49:8,
12,15;50:4;51:8;54:3;
55:14;56:5,16;57:23;
58:9;59:7;60:8,13,15,
20;61:23;62:18;63:21;
64:14,16,19,21,22;
68:19;69:2;70:18;
71:19;72:6;73:5,11,14;
75:2,5,8;76:7;78:13,13,
15;83:8,13;85:10,12;
86:17;87:4;88:4,6,10;
91:6,6,7;93:13;94:4;
96:7,8;97:7,20;98:1,2,
4,7,10,20;99:5;100:1,5,
15,24;101:22;105:14;
106:11;108:3,11,15;
109:5,10,22;110:7,9,
12,23;111:2,3,11;
112:15,22;113:5,18;
114:23;116:4,10,14;
117:7,10,21;118:18;
119:6,14,23;120:7,14;
121:12,15;122:16,20;
126:9,10,19;127:2,6,
16,17,19;128:5,18,21;
129:17,20;153:19;
154:6;158:24;159:1;
162:18,21;163:6,14;
170:4;171:15,16,19;
172:15;173:12,17;
178:10;191:5,8;
200:19;215:19;242:21,
23;254:1,4
**personal (4)**
6:13;35:12;159:15;
160:10
**personality (1)**
132:5
**personnel (4)**
11:8;72:2;137:8;
139:7
**personnel-wise (1)**
11:16
**persons (7)**
67:7,14;117:13;
135:20,23;136:6,10
**person's (16)**

27:9;32:20;57:12;
68:15;73:8;75:16;95:5,
15;99:11,20,23;100:2,
19;114:3;122:2;139:8
**perspective (9)**
59:8;9;119:5,13;
136:16,23;201:16;
228:14;253:14
**pertained (2)**
47:17,20
**pertinent (1)**
168:13
**phase (2)**
132:1;171:11
**phone (1)**
26:13
**phrases (1)**
227:7
**physical (2)**
71:18;197:15
**physically (7)**
48:16;49:8,12;51:7;
71:11,20;250:22
**physiological (4)**
88:7;96:8;98:14;
99:11
**physiologically-stressed (1)**
88:16
**pick (1)**
71:22
**pig (1)**
115:1
**pile (1)**
115:1
**pink (4)**
68:21;69:18,21;
70:18
**pipe (1)**
76:4
**place (13)**
12:2,23;19:19;24:21;
25:16,17;34:7;74:9;
76:11;93:19;162:4;
227:6;232:8
**plaintiffs (1)**
5:16
**plan (12)**
61:21;75:18;79:8;
154:15;173:18,21;
174:24;197:24;198:2;
199:19;216:12;227:6
**planning (3)**
41:15;85:9;154:1
**plastic (1)**
246:11
**playing (2)**
21:2;172:16
**please (2)**
5:6;23:6
**pliers (7)**
158:21;160:24;
161:2;193:19;194:15,
20;196:6

plus (1)
186:20
**pm (8)**
143:14;145:14;
165:1,6,11,15;166:23;
256:4
**pod (1)**
144:22
**point (93)**
7:14;10:23;19:2;
31:1;45:6;68:7;71:18;
74:20,21,23;78:5;
103:16;111:14;113:24;
128:5;132:16;142:17;
150:6,10,10;151:5,6;
166:10;175:21;179:14;
180:11;187:15;188:4;
191:1,22;192:3,24;
193:2,6,8,21,24;197:7;
198:8;199:9,16;202:8,
13;203:14;206:12,16,
16;207:5;208:20;
209:10;211:19;213:21;
214:5,19,24;215:4;
216:11,12;218:3;
221:1;222:18;223:14,
19;225:6;226:16;
227:3;228:3,11,16,17;
231:23;232:11;233:4,
17,21;235:10,22,24;
236:13;239:1;243:4;
246:2,9,10;249:6,12,
19;250:12,24;251:4,7;
254:14;255:8
**pointing (2)**
189:10;238:2
**Police (82)**
6:20;8:22;13:17;
15:5;16:10;26:15;38:3;
40:12,15,19;41:22;
42:4,18;44:6,9;45:4;
46:6,18;48:1,4,7,10,24;
49:7,11;52:20;53:2,13,
17;54:11,20;55:4;56:9,
18;57:3;59:21;60:19;
61:23;62:4,9;64:24;
66:14,21;67:24;68:12;
82:18;84:23;86:1,15;
87:3;89:7;90:12;93:10;
99:10;100:14;114:2;
116:8;117:9;118:17;
119:5,13;121:16;
129:16;130:18;131:1;
137:8;139:7;141:2;
142:10;143:8;145:3,9;
155:18;160:11;172:2,
16;173:12;197:9;
200:6,12;202:10;
241:24
**policies (12)**
9:24;43:6,7,12;
52:11,14;74:5;105:13;
106:9;140:12,12,13

**policy (24)**
9:14;50:17;52:6,12,
18;74:24;91:5,13;92:3,
6;105:16,18;106:21;
128:10,17;136:23;
140:18;141:2,4,7,15,
18;142:4,5
**Poor (1)**
44:22
**pop (2)**
176:20,20
**population (4)**
135:21,24;136:19;
137:3
**populations (1)**
135:1
**pose (1)**
251:9
**posed (2)**
203:24;252:9
**poses (1)**
203:20
**position (57)**
12:12;39:20;50:4;
99:20;100:2;102:11;
104:16;105:10;106:11,
17;107:20;108:12,14;
109:6;110:8;112:10;
116:4,14,20,24;117:4,
11;128:19,22;129:21,
22;139:23;208:20;
212:17;213:5;215:20;
216:2,4;220:20;
223:11;242:16;245:5;
247:9,14,19,20,23;
248:5,14;249:9;250:8,
10;252:7;253:5,12,16,
17,21;254:5,8,9,23
**Positional (39)**
99:19;100:8,11;
101:13,18,23;104:13;
105:4,8;107:1,13,22;
108:10,17;109:2,8,23;
110:9,22;111:4,14;
112:1,16;113:10,17;
114:7,15,20,23;115:22;
116:5,11,22;117:15;
120:4;138:22;253:24;
254:3,7
**positioned (4)**
186:22;249:15,15,16
**positioning (2)**
101:22;104:12
**positions (1)**
212:20
**possession (1)**
230:13
**possibility (1)**
122:4
**possible (19)**
56:13;57:4;58:15;
60:3;81:10;88:4;
100:21;118:11,14;

119:15;138:9,13,20;
139:3;172:5,10,18,22;
174:21
**Possibly (2)**
65:1;199:8
**post (5)**
34:19,21;139:23;
145:5,6
**potential (3)**
122:21;123:4,16
**potentially (6)**
56:5;65:9;87:18,21;
127:14;169:5
**pounds (5)**
126:11;149:5,6,8;
154:19
**power (5)**
67:6,13;217:17,18;
218:17
**practice (1)**
106:22
**practices (1)**
116:9
**precursor (1)**
122:19
**precursors (1)**
122:14
**pregnant (2)**
135:13;136:20
**premarked (1)**
30:24
**prepare (5)**
24:10,14;25:7;156:9;
201:9
**prepared (4)**
29:24;63:11;156:6,8
**preparing (1)**
24:4
**prescribed (1)**
176:24
**presence (3)**
16:9;33:11;154:3
**present (7)**
15:24;32:10;97:21;
127:13;129:16,21;
203:13
**presented (1)**
92:13
**presenting (4)**
90:23,23;91:9;
127:24
**press (1)**
248:7
**pressure (2)**
235:17;248:3
**pretty (10)**
29:4;37:3,3;40:2;
51:12;132:12;149:12;
188:16;220:23;232:20
**prevent (5)**
72:6;235:14;236:11;
251:21;252:21
**preventing (1)**

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 1
March 14, 2017

115:1
**primarily (2)**
130:9;131:1
**primary (2)**
76:19;201:16
**print (1)**
157:15
**prior (3)**
72:11,17;154:8
**private (1)**
63:8
**probably (13)**
21:15;28:12;32:23;
33:3;69:19;142:20;
143:16;149:5;177:8;
178:23;192:19;210:8;
218:12
**probe (1)**
254:17
**probes (2)**
241:7;254:14
**problem (6)**
83:23;89:20;104:21;
127:1;162:19;200:11
**problems (3)**
59:3;93:6;98:5
**procedures (8)**
9:24;43:12;48:1,4,7,
11;92:11;141:3
**proceedings (1)**
142:18
**process (12)**
32:13,15;68:18;
70:19;157:4,6;188:24;
212:13;225:15;227:11;
230:10;243:22
**professionals (2)**
59:12;79:17
**progress (1)**
150:22
**prohibitions (1)**
136:17
**prolonged (5)**
110:11;116:13,24;
117:1,4
**Prone (54)**
101:18;102:11;
104:16;105:7,7,10,19,
23;106:9,11,16;107:1,
19;108:13,14;109:5;
110:8;112:9;114:8,16;
116:4,10,14,20,22;
117:4,11;128:18,22;
129:18,21,22;208:20;
212:17;215:20;216:2,
4;242:16;245:5;247:8,
14,19,20,23;248:5,14;
249:9;250:8,9;253:12,
17;254:4,9,22
**property (1)**
193:23
**protect (10)**
41:4;45:11,14;46:20,

24;47:8,12;67:6,13,18
**protocol (3)**
76:11;79:8;80:8
**protocols (3)**
43:12;52:14;105:13
**provide (1)**
22:9
**provided (4)**
51:2;58:2,5;129:12
**provides (1)**
52:21
**providing (1)**
104:4
**pry (1)**
132:11
**psychiatric (1)**
68:19
**psychomotor (1)**
121:4
**psychotic (2)**
126:12;131:9
**public (29)**
16:24;19:1;40:13,16,
19,21;41:16;46:16;
49:24;52:21;53:2;55:3;
63:6;66:8,23;67:23;
82:18,19;83:14;84:18;
86:6,8;87:22;90:15;
101:14;105:20;114:5;
115:13,18
**publicized (1)**
124:17
**pull (9)**
82:6;92:23;93:4;
182:21;199:2;204:19;
222:10;232:9;236:20
**pulled (7)**
6:22;205:11;221:24;
234:18;238:14;240:21,
23
**pulling (6)**
205:13,24;206:7,19;
234:21,24
**pulls (1)**
236:21
**pulse (1)**
119:24
**puncture (1)**
239:13
**punish (1)**
61:23
**punitive (1)**
62:5
**purpose (3)**
13:5,5;172:24
**purposes (1)**
36:23
**push (3)**
81:16;151:22;239:9
**pushing (7)**
110:13,19;235:16,
19,23;236:6,11
**put (31)**

32:22;71:11,16,20,
23;74:8;99:2;102:21;
114:6;120:2;125:21;
126:8;132:24;135:8;
150:21;155:4;175:6;
195:2,3,4;210:3;
215:18;216:12;217:9;
227:9;234:12;235:5;
237:1;246:4;250:1;
251:24
**puts (6)**
77:10,11;88:15;
104:6;116:8;131:16
**putting (4)**
108:21;215:10,14;
218:19

## Q

**qualifications (1)**
130:8
**question-and-answer (1)**
22:7
**quick (4)**
104:23;231:10;
250:14;255:17
**quicker (1)**
75:1
**quickest (1)**
125:13
**quickly (2)**
126:5;128:2
**quiet (2)**
189:5,6
**quietly (1)**
72:6
**quite (2)**
21:22,22
**quote (1)**
216:9

## R

**race (3)**
111:24;112:23;
119:24
**racing (3)**
112:6,7,9
**radio (26)**
25:4;26:12,14;76:4;
77:19,22;78:9;81:5,10,
16;82:3,7,8;93:19;
147:1,3;148:17;
150:23;152:14;154:5,
11;160:16;164:2;
178:9;199:2;243:8
**raining (1)**
171:4
**raised (1)**
244:7
**range (1)**
149:17
**rapid (1)**

20:9,10;92:9
**reach (1)**
237:11
**reached (2)**
205:4,12
**react (6)**
84:4;85:13;93:4;
94:3;200:6;242:18
**reacting (2)**
86:20;198:5
**reaction (1)**
70:22
**reactions (2)**
84:2;94:3
**read (11)**
27:13;37:4;116:2,12,
16;133:20;152:6;
168:15;236:23;259:2,4
**ready (1)**
212:4
**real (3)**
166:15;191:7;237:10
**reality (1)**
210:21
**realize (1)**
228:3
**really (23)**
13:11;16:18;29:13,
21;34:14,15;45:5;68:7;
71:14;73:7;76:11;
82:14;83:2;94:2;118:2;
124:16;133:14;145:1;
185:1;188:18;200:22;
210:18;248:16
**realm (2)**
115:6,8
**real-time (1)**
89:13
**rear (2)**
207:23;245:17
**rearing (3)**
214:22;227:24;
235:12
**reason (19)**
10:23;11:19;36:14,
18;109:10;117:17;
119:6,19;125:15;
150:13,17;152:5;
168:16;184:21;196:22;
197:6;199:18;225:11;
259:7
**reasonable (2)**
96:7;99:4
**reasons (7)**
93:12;96:4;98:22;
152:2;201:17;252:15;
259:5
**recall (14)**
9:16,20;13:18;32:20;
102:13;154:12;182:23;
186:24;188:1;196:2;
203:7,10;205:7;227:18
**recalled (1)**

33:1
**receive (4)**
61:8;72:24;102:1;
163:2
**received (25)**
52:4;64:6;65:2,4,14;
68:11,14;69:5;85:22;
86:7;89:6;101:21;
138:23;150:5;152:8;
163:10;168:23;169:4,
17;170:12,18;174:16;
177:12;181:16;193:16
**receives (2)**
26:21;27:13
**receiving (1)**
61:1
**recent (1)**
52:8
**recently (1)**
11:10
**Recess (4)**
37:10;94:17;148:3;
231:12
**recognized (1)**
233:4
**recollect (1)**
25:14;32:21
**recollection (1)**
232:18
**recommend (1)**
135:12
**recommendation (3)**
80:18,19,21
**record (9)**
21:9;37:12,13;141:1,
23;148:2;231:14;
255:19;259:5
**recording (2)**
151:15,19
**recordings (1)**
24:17
**records (1)**
36:8
**recounting (1)**
158:7
**reference (2)**
168:23,24
**referring (8)**
25:18;68:23;87:18;
89:13;98:19;117:1;
159:6;170:14
**reflective (1)**
122:9
**refocus (1)**
197:7
**refresh (2)**
35:5;36:7
**regard (1)**
86:7
**regarding (12)**
9:18,24;35:22;65:4;
92:1;105:14,23;
130:14;135:8;141:7;

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 1
March 14, 2017

151:23;164:4
**regardless (4)**
63:12;86:17;93:12;
119:15
**regular (1)**
35:7
**regularly (2)**
106:12;144:12
**related (1)**
193:17
**relation (1)**
207:15
**relations (1)**
16:24
**relationship (2)**
39:3,14
**rely (1)**
57:14
**relying (1)**
24:3
**remember (27)**
14:5;19:13;20:7;
21:19;24:16;104:12;
118:2;151:12;152:16;
170:21,23;171:2;
195:20;203:5;217:2,5;
218:10,14,15,16;219:3,
5;221:6;232:19;237:7,
10;250:22
**remove (4)**
193:22;199:20;
202:9;204:17
**removed (2)**
197:12;255:8
**removing (2)**
196:24;198:13
**rendezvous (1)**
78:5
**repeated (9)**
117:13;120:13,18,
20,21;130:3;138:1,4,5
**repeatedly (1)**
138:18
**rephrase (2)**
23:6,7
**report (41)**
30:20;33:7,10,15;
35:9,19;40:5;122:16,
20,24;123:3;154:23;
155:19;156:4;158:1,
11;161:17;164:13,20;
165:13,20,22;166:23;
167:9,15;168:5;169:4,
14,20,23;170:11;
180:16;183:17;194:7;
195:2,4,5,19;196:3,5;
203:6
**reported (1)**
156:5
**reportedly (1)**
193:11
**reporter (3)**
22:14;23:16;259:1

**Reports (1)**
163:20
**represent (3)**
5:9,11,13
**repull (1)**
36:9
**requalifications (2)**
51:16,20
**request (2)**
162:17;259:4
**requested (3)**
154:3;243:12,15
**require (2)**
107:23;109:11
**required (1)**
145:5
**research (1)**
130:23
**resident (1)**
180:18
**resign (1)**
132:4
**resigned (4)**
39:2;103:18;132:3;
139:23
**resist (2)**
204:4;205:11
**resistance (1)**
127:22
**resisting (4)**
84:18;101:10;
217:14;235:10
**resource (6)**
39:20,23;73:7,10,13;
202:16
**resources (4)**
57:18;58:6;146:11,
23
**respect (6)**
17:8,20;37:22;39:11;
66:7;86:5
**respiration (1)**
139:9
**respond (12)**
38:4;59:1;60:20;
66:22;75:1,16;77:12;
79:4;85:16;93:11;
170:4,23
**responder (1)**
59:11
**responders (1)**
118:18
**responding (5)**
73:21;76:19;90:7;
162:17;172:17
**response (15)**
77:5;86:14;98:14;
99:5,11,17;120:8;
150:19,20;173:5,9;
190:20;225:23;227:19;
236:19
**responsibility (1)**
46:20

**responsible (1)**
61:12
**restrain (7)**
41:13;43:22;44:3;
49:12;105:14,19;
106:16
**restrained (10)**
38:8,9,10;42:4,11,18,
22;43:11;100:16;
249:10
**restraining (6)**
38:11;100:14,18;
101:14;106:11;115:12
**restraint (36)**
99:19;100:8,11;
101:13,18,23;104:13;
105:4,7,8,19,24;106:9;
107:1;108:13;109:8,
23;110:9;111:15;
112:2,16;113:10;
114:7,8,20;115:22;
116:5,10,11;117:15;
120:5;129:18;139:8;
253:24;254:3,7
**restrict (1)**
108:4
**restricting (1)**
116:1
**restriction (1)**
99:22
**result (5)**
9:14;10:3;100:23;
107:1;134:8
**resulted (2)**
14:1;196:7
**resulting (1)**
88:9
**results (1)**
18:23
**retained (2)**
48:3,9
**retaliate (1)**
62:9
**retardation (2)**
56:17,17
**retraining (2)**
9:17,21
**returned (1)**
164:14
**review (2)**
34:19,21
**reviewed (4)**
29:23;35:8;195:5,14
**Reviewing (3)**
140:22;155:7;194:23
**Revised (3)**
51:24;141:19,24
**rhythm (1)**
98:4
**Richard (4)**
37:16,18,22;38:6
**right (184)**
6:11;10:18;15:20;

19:15,17;21:22,22;
22:9;23:2;31:9;34:12;
37:8;47:18,21;59:8;
60:8,11,15,17;62:12;
70:2;72:10;75:2;81:14;
91:13;94:15;96:14;
106:23;113:20;115:10,
16;118:1;124:8;125:3;
128:3;130:6;133:22;
135:14;136:19;142:20;
143:9;145:14,22,23;
146:20;147:9,17;
152:10,20;153:9,13;
159:6,10,13;162:4;
169:12;170:8;171:4,6,
8;172:7,8;176:2;
178:16;179:10;180:9;
182:9;184:8;185:17;
187:16;188:6;191:9,
24;192:19;193:3,6;
194:11;197:16,19,22;
198:23;200:16;203:9;
204:13;205:19;206:9,
10;207:12,17,20;
208:18;209:3,11,15;
210:4,18;211:10,24;
213:3,7,11,11;214:17;
217:12,13;218:4,24,24;
219:2,17,19,21;220:2,
3,12,19;221:10,14;
222:17;223:3;224:10,
13,17;225:4,7;226:6,7;
227:21;229:3,6,7,9;
231:5;232:3,9;233:7;
234:2,6,7;235:7,16,20;
236:4,8;237:1,16,23;
238:2,4,6,9,12,21;
239:14,15,18,21;240:1;
241:8,18,19,22,23;
242:2,9,11,16;243:16;
244:10,10,12,21,24;
245:1,5;246:6,8;247:3,
14,20,23;248:16;
250:3;251:19
**rights (8)**
45:12,23;46:21;47:1,
9,13,15;133:20
**rip (8)**
186:1;192:10;
206:17;222:12,13,13,
15,20
**risk (33)**
101:18;105:4,8;
107:12,22;108:16;
109:2,8,23;110:8;
111:4;112:1,15,15;
113:10;114:5,19;
115:4,21;116:5,11;
117:15;120:4;131:17;
135:2;136:11,17;137:9;
138:2,6,16;251:9,10
**risks (4)**
101:12;253:23,24;

254:3
**road (12)**
22:18;26:4;29:10;
72:19;88:1;145:20;
146:3;175:12;176:10;
182:4,6,12
**ROBERTS (2)**
5:1,20
**rock (1)**
158:21
**rocking (1)**
247:13
**role (1)**
172:16
**roles (2)**
56:9,18
**roll (9)**
106:18;107:4,5,9;
209:24;245:22;247:15;
251:1,5
**rolled (1)**
222:22
**rolling (3)**
247:6,18;250:8
**Ron (1)**
14:7
**room (5)**
5:8;14:3,18;15:16;
126:14
**rooms (1)**
20:13
**rough (2)**
142:15;152:24
**roughly (1)**
29:12
**round (4)**
21:2,6,10,11
**route (4)**
76:5;77:23;163:2;
199:10
**routine (2)**
61:5,17
**row (1)**
32:18
**rule (3)**
160:12,13,13
**rules (1)**
22:4
**run (5)**
150:19;171:19;
186:7;197:19;231:11
**running (15)**
108:20;122:17;
162:7;163:19;164:6;
169:1;170:7;171:15;
174:8,13;179:24;
180:3;183:11;193:11;
197:21
**runs (1)**
29:15
**rushed (4)**
182:19;183:3,20,22

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

## S

**safe (2)**
80:14;101:10
**safer (3)**
253:5,16;254:8
**safest (3)**
40:20;41:6;253:20
**safety (8)**
40:16;67:6,13;87:12,
16,18,21;253:14
**sake (1)**
146:16
**same (54)**
5:13;17:14;22:3,22;
23:21;63:22;66:3,18;
86:16;92:22;93:3,11,
12;94:9;95:12,18;
107:9;113:18;122:14;
129:20;131:21,24;
132:3;143:22;144:8,
15;146:19;148:7,9;
149:12;152:2;153:8,
10,11;167:19,23;
168:20;173:15;178:3,
9;180:11;182:15;
203:23;210:9;232:13;
238:20;243:8;245:9,
11,16,18;247:11;
255:4;259:3
**sample (1)**
7:5
**sat (2)**
32:18;157:7
**saw (8)**
133:8;180:4;194:5;
196:14;201:23;202:2;
249:18;255:7
**saying (18)**
65:23;74:5;77:12;
79:3,7;80:3;93:20;
113:3,5;141:4;187:24;
188:1;190:20,21;
192:21;228:10,17;
235:19
**scared (1)**
171:23
**scenario (3)**
60:24;63:20;92:13
**scenario-based (1)**
92:11
**scenarios (3)**
63:3;64:12,21
**scene (24)**
9:8;61:2,3;70:21;
72:18;74:1,14;76:9;
78:3,10;79:13;80:14;
81:1;179:20;211:6;
244:15,18;248:11,18,
20,23;249:2;250:18;
254:23
**schedule (2)**

28:8;143:16
**scheduled (4)**
34:16,18,22;143:22
**SCHERER (17)**
5:1,11,20;28:7;
175:8;177:5;180:17;
216:22;217:10,11,21,
23;221:23,24;223:22;
229:12;237:1
**school (7)**
39:20,23;40:1,6;
152:21;153:1;181:18
**schools (1)**
20:10
**Scope (3)**
152:21;153:1;181:18
**S-C-O-P-E (1)**
153:4
**screaming (6)**
123:13;185:23;
186:2;187:16;193:13;
200:21
**screen (1)**
82:8
**searches (2)**
46:22;47:16
**seat (2)**
191:19,21
**seats (1)**
194:4
**second (15)**
7:21;17:8,10;76:21,
22;77:1;78:21;198:15,
16;216:3;228:6;241:3;
250:23;255:3,18
**seconds (8)**
181:14,14;240:23;
241:1,1,9;244:1;255:7
**section (4)**
50:21;92:18;142:5;
211:1
**secure (3)**
72:18;74:1;244:8
**secured (2)**
200:8;216:16
**security (1)**
157:20
**seeing (3)**
151:12;247:17;
250:22
**seem (1)**
55:3
**seemed (1)**
217:15
**seems (3)**
132:15;135:7;210:21
**segment (2)**
102:3;104:5
**seized (1)**
243:3
**seizing (1)**
243:1
**seizures (2)**

46:22;47:16
**select (2)**
40:20;161:6
**selected (1)**
161:8
**send (3)**
26:21;27:6,8
**sending (2)**
26:18;28:3
**senior (2)**
140:5;142:15
**sense (9)**
23:5;108:7;158:18;
185:23;187:16,19;
193:10;213:24;239:12
**sent (3)**
28:7,12;102:15
**separate (2)**
52:18;92:18
**separation (1)**
133:17
**September (23)**
19:19;29:24;31:21;
34:6;47:7,11;124:1;
142:22;143:1;145:12,
18;148:8,15;149:10,
23;150:5,10;151:2,10;
157:9;162:10;165:15;
166:23
**sequence (1)**
224:2
**Sergeant (46)**
12:16;14:3,10,13,20,
21;15:10,11,12,16;
16:4,8,16,22;17:21;
18:16;31:18;32:6,17;
33:20;34:5,22;140:4,6,
8;144:18;147:8;155:4;
157:3,8,16,18;158:2;
166:4;168:8;170:15;
199:15;211:12;244:14,
18;248:10,14,19;249:5,
15;250:13
**serious (7)**
135:2,24;136:7,11;
138:2,6,16
**serve (2)**
41:4;45:14
**service (1)**
46:16
**session (2)**
22:7;103:8
**set (9)**
16:3;20:8;33:19;
63:20;76:11;78:24;
86:1;148:16;240:20
**setting (10)**
30:7,10;63:6,8,12;
69:3,10,20;70:24;
73:20
**settle (2)**
228:13;252:6
**settlement (1)**

46:22;47:16
**seven (5)**
106:4;116:19;
220:23;221:5,22
**several (7)**
82:1,5;121:6;126:1;
152:7;182:19;183:3
**severely (1)**
114:18
**sexual (3)**
11:21;132:22;133:4
**sexually (1)**
12:14
**shaking (1)**
192:14
**shape (2)**
197:13;198:1
**shark (1)**
220:14
**sharp (1)**
36:20
**sheet (2)**
51:17;103:17
**Sheila (1)**
6:8
**sheriff's (3)**
9:2;13:16;102:18
**shift (16)**
27:10,12;28:9;140:7;
143:9,11,11,13,15,20,
21;144:2,2,5,6;145:12
**shifts (1)**
29:14
**shirt (3)**
236:20,21;238:14
**shoes (3)**
225:19,20,21;
227:17,18
**shook (1)**
34:14
**shoot (4)**
95:14;135:16;
238:16;242:15
**shooters (1)**
20:10
**short (5)**
37:6,12;110:9;
220:23;231:14
**shortly (3)**
11:11;39:2;102:8
**shorts (2)**
227:15;239:21
**shot (1)**
20:21
**shoulder (5)**
205:18;206:4;210:7;
220:8;246:24
**shoulders (4)**
214:23;220:9;
246:22,23
**show (9)**
77:7,8;81:15,18;
174:2;179:22;192:16;

238:19;239:4
**showed (1)**
14:3
**shut (6)**
185:20;186:16;
189:13;244:12,21;
255:10
**side (68)**
51:24;82:8;107:4,5;
124:24;125:1;133:6,8,
9,10;141:11;181:10,11,
12,12;182:12,13,15;
187:5,7,9;188:3,3,5,16,
16;190:1;192:3;
202:23;204:16;207:19;
208:3,4,8,14,15,18;
210:10;217:5,7;219:5,
11,17;222:4;225:9;
226:9;229:14;230:6,
17;231:24;236:1;
239:24;240:1,1;
244:16;245:7,8;247:2,
3,3,5;251:1,5;253:6,16;
254:1,8;255:15
**sides (3)**
11:16;133:5,17
**side-to-side (8)**
209:24;214:22;
245:18,22;247:6,13,18,
21
**sideways (5)**
222:2,21,23;223:1,2
**sign (8)**
33:10;121:4,23;
122:18,21;123:4,16;
129:13
**signals (1)**
164:1
**signature (2)**
167:16;256:1
**signatures (1)**
167:21
**signed (1)**
33:7
**signs (24)**
68:14;96:8;97:7,20,
21;121:2,6;122:11,13,
14;123:7,10,22,24;
124:14,16;127:11,13;
129:4,10,16,21;130:24;
131:16
**similar (4)**
65:24;103:2;116:12;
245:18
**simple (3)**
46:3;147:4;197:2
**Simpler (1)**
147:6
**simply (1)**
66:9
**Simunition (4)**
20:11;21:2,6,9
**single (1)**

Layne & Associates
(614) 309-1669

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

196:2
**sit (5)**
83:22;84:19;106:19;
180:22;195:19
**sitting (9)**
110:9;112:7;196:3;
200:10;246:17;253:7,
21;254:4,9
**situation (48)**
7:23;20:4;34:19;
45:6;53:4,23;56:22;
58:23;59:6,21;61:3;
63:20;66:15;70:9,19;
75:22;77:24;78:19;
79:3,7;80:15;83:9,24;
84:10,15,19,21,24;
85:1;87:11;88:1;89:11,
12,13,22;91:1;92:13;
102:13;108:11;110:4;
113:17;116:10;125:22;
172:17;199:19;216:18;
253:4,13
**situational (1)**
79:2
**situations (7)**
59:20;63:12;69:2;
70:2;72:20;89:1;
115:14
**sit-up (1)**
220:16
**six (10)**
34:24;116:19;179:9;
220:23;221:4,5,12,20,
21;223:7
**six-page (1)**
155:13
**skin (3)**
234:11;238:19;241:7
**skinnier (1)**
95:13
**sleep (1)**
108:9
**slide (1)**
234:16
**slip (1)**
69:18
**slipped (2)**
68:21;69:21
**slipping (1)**
70:18
**slower (1)**
121:8
**small (3)**
102:3;148:23;241:22
**smaller (2)**
70:4,12
**Smith (14)**
11:4;19:2,18;32:9;
33:23;38:24;39:4,16,
22;103:24;106:6;
132:1;166:8;202:17
**sober (1)**
113:15

**social (1)**
157:20
**society (4)**
44:9,12;45:4;160:14
**socks (2)**
227:17,18
**softly (1)**
72:6
**software (1)**
156:13
**sole (2)**
138:14,15
**solve (1)**
200:10
**somebody (48)**
8:4;29:8;42:11,14;
44:4;59:10;65:10;
69:13;84:16;87:6;
93:24;95:11,12;96:16;
97:17;104:20;106:16;
107:19;108:3;110:12;
116:17,20;125:16,17,
18,21,24;126:17;
131:10;136:19;137:15;
138:14;142:3;150:23;
158:22;163:22;166:11;
167:1;169:4;171:23;
172:1;174:17;178:2;
180:1,5;185:4;197:2;
253:15
**somebody's (1)**
239:10
**someone (8)**
15:20;56:2;123:3,14;
151:3;172:19;191:17;
193:12
**sometime (1)**
159:9
**sometimes (21)**
55:12,17;58:20;
59:14;65:8;68:21;
69:17;71:15,16;72:22,
22;76:22;77:1;84:20;
114:14;128:4;146:13;
189:5,6,6;197:1
**somewhere (6)**
6:22;10:21;29:8;
40:5;149:17;210:11
**son (1)**
193:18
**soon (16)**
70:21;88:4;106:18;
117:11;118:10,14;
119:15;175:24;176:21,
23;200:9;240:17,21,
22;243:5;250:12
**sorry (15)**
17:5;18:22;47:10;
92:5;109:4;125:5;
138:4;141:23;194:14;
217:12,12,24;228:19;
234:7;241:3
**sort (4)**

92:10;104:22;
163:23;164:7
**sound (2)**
77:4;230:20
**sounded (1)**
174:16
**sounds (7)**
51:12;70:2;117:9;
132:12;144:8;230:18;
232:18
**source (1)**
85:23
**speak (11)**
6:24;11:17;23:6;
26:12;54:23;72:6;
101:10;154:7;182:17;
202:16;227:4
**speaking (3)**
24:9;46:16;228:11
**specific (16)**
29:14;35:7;66:12,20;
79:22;80:2;90:16;91:5,
12,19,22;105:23;
116:22;189:11;209:23;
228:22
**specifically (8)**
20:13;49:2;74:10;
82:15;98:19;102:21;
108:3;110:12
**specifics (1)**
32:14
**speculation (1)**
110:5
**Speech (2)**
123:7;233:8
**spell (1)**
153:3
**split (4)**
11:16;198:15,16;
216:3
**spoke (2)**
25:15,23
**spoken (8)**
34:2,5,6;165:20;
166:1;198:8;201:13;
202:10
**spokesperson (1)**
17:1
**spontaneous (3)**
188:2,21;191:13
**spontaneously (2)**
189:1;190:10
**sporadic (1)**
35:1
**spot (3)**
94:14;245:9,12
**spray (5)**
104:17,18;126:22;
127:3;148:20
**sprayed (1)**
126:23
**spread (7)**
237:12,15,21;

239:14,15;240:9;
241:21
**Springfield (45)**
5:11;6:11;10:16;
15:6;19:7;36:11;42:17,
20;43:7,13;48:23;
50:17;52:15;66:13,21;
79:1;81:23;85:16;
86:15;89:7;90:6;93:10;
101:21;102:19;105:14;
106:8,12;124:8;
127:10;128:10,17;
129:16;130:4;139:16;
140:14;141:2,8;
142:11;144:22;145:1,
9;149:21;155:18;
163:20;202:11
**squad (1)**
199:12
**square (1)**
144:23
**squirming (6)**
244:13,22;245:15;
247:4;249:9;250:8
**stab (2)**
193:18;194:20
**stage (7)**
74:5,5,11;80:9,10,13,
17
**staged (2)**
73:24;80:22
**staging (14)**
72:21;73:20;74:9,12,
13,17,20,21,21,24;
79:21,23;80:4;81:2
**stall (5)**
83:24;84:10,15,24,
24
**stamp (3)**
164:23;165:4,8
**stamps (1)**
164:17
**stand (4)**
71:6;106:19;237:9;
241:17
**standing (10)**
17:21;134:13;
203:14;209:2;222:14;
224:9,15;226:21;
237:8;239:24
**stands (1)**
76:2
**start (18)**
23:1;71:18;126:16;
143:13;151:15;156:11;
176:19;181:3,4;
190:19;197:3,7;
199:22;200:23;201:19,
24;240:21;241:6
**started (7)**
10:20;32:19;35:3;
180:1;204:4;205:11;
246:1

**starting (4)**
201:6;215:1;240:23;
241:10
**starts (4)**
72:1;170:3;192:7;
240:17
**state (14)**
5:18;61:24;118:9,13,
21;119:6,14,23;
125:24;126:13;130:19;
140:24;172:2;181:1
**statement (13)**
31:20;152:7;175:5;
177:3,23;183:6;204:2;
211:1;212:22;216:6;
219:8;229:1;230:21
**statements (1)**
29:23
**states (4)**
51:6;68:22;207:4;
211:8
**station (1)**
194:6
**statistic (1)**
113:11
**statistics (1)**
135:6
**stay (4)**
28:22;188:12;
204:20;206:10
**steal (9)**
178:2;180:2,6,19,23;
183:12;184:4;185:7,10
**steering (11)**
185:24;192:7,9,12,
18;200:15;203:18;
204:22;206:10;207:1,6
**stemmed (1)**
132:22
**step (11)**
16:7;38:20;132:9;
187:22,22;189:24,24;
222:16;224:13;241:15;
242:14
**Stepping (1)**
134:11
**steps (2)**
55:13;60:13
**still (106)**
12:10,19;16:20,22;
18:17;19:18;35:16;
39:16;42:12,13;43:2;
69:22;111:7;113:1;
124:18;128:14,23;
147:13;163:2;166:11,
17;180:19;182:23;
183:19;184:2;186:1;
190:9;192:21;196:17;
197:14;204:23;206:9,
12,14,22;209:6,7;
212:17;213:20;214:2,
21,22;216:1,3,13;
217:14,23;218:4;

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

222:1;223:16;224:14;
225:15;226:1,2,4,4,13,
18;227:7,8,24;228:12,
18;229:19,19,24;233:1,
6,21;234:8;235:12,13;
238:2;239:5,6;241:17;
242:16;244:13,15,22,
24;245:5,9,11,16,17,
20,23;246:5,17;247:2,
2,3,24;249:13,19;
251:2,10,12,12,13;
252:4,4,5,7;254:14
stimulant (2)
136:6;137:2
stimulants (1)
98:15
stomach (15)
21:4;104:20;105:11;
108:8,9;110:15;
114:24;115:24;117:22;
204:6;207:12,14;
208:10,24;220:7
stood (2)
223:10;236:13
stop (11)
6:23;74:19;111:12;
131:24;179:10;200:1;
202:21;209:11;228:6;
252:12;253:1
stopped (6)
10:24;104:2;111:15;
175:22;176:5,11
stops (1)
92:11
straight (1)
106:19
strangely (1)
64:16
street (10)
80:11,11;153:12;
179:17,24;180:3;
182:3,10,14;208:15
streets (3)
175:13;176:7,10
strength (7)
125:8;214:24;
215:13,20;217:15,18;
218:17
stress (21)
88:7,9,15;96:9;97:8,
20;98:1,1,14;99:2,5,6;
109:18,21;112:1,23;
114:6;117:17;120:2,8,
14
strike (8)
49:24;54:9;224:3,7,
7,17,20;233:16
strive (1)
40:15
strong (3)
215:2,4;226:9
stronger (2)
87:11;126:13

struck (3)
21:6;223:22;236:23
struggle (6)
107:12,17,19,21;
108:16;110:17
struggling (5)
108:12,14;109:3,6,
11
students (1)
124:7
studies (2)
131:2;135:4
stuff (3)
33:3;113:2;116:12
stun (1)
237:2
subject (6)
53:3;68:8;69:20,21;
117:5,5
subjects (2)
66:4;137:10
submitted (1)
31:24
subordinate (1)
16:14
subordinates (3)
16:5,10;17:22
substances (1)
60:2
sudden (4)
98:10;131:17;137:9;
197:14
sue (1)
20:18
sued (1)
7:7
suffer (1)
98:10
suffering (5)
20:19;66:23;67:24;
82:19;128:11
suicidal (2)
69:12;70:2
suicide (2)
69:13;70:5
suit (1)
6:5
Summit (5)
13:16;19:14;102:17;
104:10;130:10
summoning (1)
146:22
summons (2)
199:2;214:6
sunny (2)
171:1,7
super (2)
215:2,4
superhuman (7)
125:8;214:24;
215:13,20;217:15,17;
218:17
supersede (1)

206:21
supervisor (14)
15:14;16:4,8;17:21;
140:9;146:24;147:8,
11,13,16;199:15,19;
227:4;249:5
supportive (2)
18:14,16
suppose (2)
149:16;199:8
sure (35)
22:2,19;27:1;29:16;
32:1;36:20;37:6,13;
40:10;46:15;58:11,16;
59:14;62:1;88:8;89:1;
100:15,19;101:9;
125:23;128:8;129:2;
143:3;147:15;163:11;
168:2,9,12;176:2;
177:2;201:15;228:7;
234:16;235:9;250:21
surrounding (1)
183:19
suspect (17)
157:22;158:13;
159:12;160:5,16;
161:17,23;162:10,18;
177:13;180:18;185:21,
22;220:5;221:24;
223:23;244:7
suspected (10)
6:23;89:9,17;90:8;
92:19;127:20;161:11,
19,22;233:19
suspecting (3)
166:12,17;233:21
suspicion (1)
162:14
sweatshirt (7)
205:19;227:12,14;
234:11,18;235:7,8
swimmer (1)
214:13
swings (1)
203:8
switch (3)
82:9;151:21;255:10
switches (1)
82:3
sworn (7)
5:2;23:16;45:14;
46:20,24;47:7,11
swung (1)
244:8
symptoms (4)
66:2,3;68:15;137:11
system (9)
26:17,24;27:2,18;
28:22;29:3,7;134:7;
156:13

**T**

tactical (1)
53:20
tactics (4)
68:1,6,12;241:24
talk (20)
7:21;10:11;22:24;
26:9;33:20,23;39:22;
68:8;69:15;71:2,3,9;
78:6;128:1;175:16;
178:13;179:6;199:15;
209:7;231:18
talked (22)
19:22;20:1;30:3,4;
34:22;38:21;64:2;65:2;
85:18;105:7;112:19;
118:1;120:5;124:12,
13,14;130:13;136:22;
147:3;214:16;243:1;
253:23
talking (29)
48:13;76:7;78:18;
79:20;85:19;96:24;
108:23,24;116:18;
123:14;149:15;158:23,
24;161:1;175:15;
179:14;180:7;181:9;
187:20,23;188:21;
189:23;200:2,20,21;
206:24;211:9;229:6;
230:7
tall (1)
149:19
tape (1)
231:11
tased (1)
8:4
Taser (95)
8:6;9:12;10:13,15,
24;20:2;38:22,23;
42:21;43:11;49:21;
52:12,19;92:10;95:4,9,
16,22;104:5,6,7,8;
116:3,9,13,17;120:7,
13;125:12,16;126:7,
21;127:21;128:7,10,
17;129:17;130:1;
131:19,21;134:5;
135:8,9;136:1,4,8,12,
18,24;137:18,22;
138:14;140:17;142:5;
147:22;148:16;228:4,
5,9;229:13;232:6,8;
233:24;234:4;236:19,
22;237:1,5;238:1,20;
239:6,9,20;240:1,8,20;
241:16;243:9;244:12,
19,21;246:4,5,8;
250:14,17;251:8;
252:16,19,21,23,24;
253:2;255:14,15
tasered (6)
9:4,7;249:20,22;
250:7;251:15

tasering (1)
9:18
tasers (4)
10:20;134:19;141:3,
8
tasings (2)
120:18,20
tat (1)
62:15
taught (17)
104:12;113:12;
115:9;116:2;120:23;
124:3,6,24;125:6;
126:6;127:4,8;138:11;
139:13,15,20,21
teach (7)
95:13;103:14;
124:23;125:6,9;126:3;
130:8
teaching (5)
104:2;124:7,10;
127:9;129:3
technique (1)
139:8
teeth (1)
21:8
telling (2)
134:3;180:1
tells (2)
93:24;150:23
temperature (5)
122:5,6;171:2,3,11
template (4)
155:2;156:2,10,11
ten (8)
70:13;103:22;
104:11;117:2;125:18,
21;241:1;255:21
tennis (2)
225:20,21
tenure (1)
104:1
term (4)
30:21;131:13;
163:18,19
terms (30)
18:1;25:4;30:16;
33:13;36:10;41:6;
53:23;54:2;60:7;73:8,
10,13,20;74:3;77:3;
79:11,20;85:16;86:16;
89:8;90:14;109:19;
130:23;142:24;145:9,
13;164:12;214:16;
232:18;254:7
terrorizing (1)
170:8
testified (3)
17:12;18:4;47:24
testify (2)
10:8;18:3
testifying (1)
36:24

Layne & Associates
(614) 309-1669

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

testimony (3)
23:21;33:14;195:15
texting (1)
154:13
therefore (2)
62:8;259:7
thereupon (1)
256:3
thigh (15)
225:2,4,4;237:1;
238:20,21,22;239:21;
240:2,3,4,16;241:1,11;
242:2
third (7)
6:7;10:11;20:4;
31:14;239:12;248:19;
254:23
thorough (1)
176:10
though (9)
20:17;72:16;77:3;
89:15;112:5;143:7;
177:3;227:24;233:7
thought (7)
17:11;166:24;
194:24;195:6,15;
199:5;201:18
thrashing (1)
210:18
threat (4)
203:20,23;251:18;
252:9
threatening (1)
100:9
Three (28)
6:2,4,7;15:31:10,11,
21;32:16;34:14;126:7;
130:3;152:24;153:7;
167:14;170:10,14,19;
175:2;183:7;203:1,2;
207:16;236:24;241:9,
9;242:6;250:9,12;
255:6
three-inch (2)
239:14;240:9
threw (2)
255:14,15
throes (3)
65:6;128:18;136:10;
137:2;163:7,15;167:1;
173:17;200:19;219:3;
233:1
throughout (5)
26:8;27:24;37:24;
218:3;227:11
throw (1)
80:18
throwing (1)
192:5
thrown (2)
65:10;133:8
tie (1)
71:23

times (15)
5:24;6:4,9;21:24;
29:5;34:9;66:1;72:17;
125:12;132:2;152:7;
168:15;175:2;195:5,13
time-sequence-wise (1)
209:13
timing (1)
164:12
tires (1)
207:23
tit (1)
62:15
tit-for-tat (1)
62:7
title (1)
51:22
today (24)
22:8,17;23:4,10,19,
21;24:4,9,11,15;25:8;
33:14,21,24;34:3;
36:24;37:1;139:24;
140:20;148:5,12;
154:22;190:16;219:9
together (10)
31:18;116:8;140:18;
155:5;176:10;178:3;
184:2;186:5;188:14;
218:20
told (6)
133:18,20,20;179:7;
200:6;202:5
tongue (1)
39:7
took (15)
12:23;19:19;24:21;
25:16,17;34:7;38:24;
45:8;86:3;132:1;175:7;
180:3;193:17;232:15;
255:14
tool (3)
127:21;128:5,24
tools (9)
194:1,2,15;196:7,13;
199:24;201:10,20,23
top (7)
51:3,21;108:3;
114:24;116:21;155:19;
246:17
topic (1)
30:15
tops (2)
143:3;179:9
torso (1)
205:18
toss (1)
214:22
total (4)
36:1;145:23;149:8;
185:20
totally (3)
110:14;212:8;228:1
touch (1)

45:5
touched (1)
118:2
touching (1)
246:12
tough (1)
22:13
towards (10)
123:1;154:2;234:18;
235:1;236:3,3,4,4;
246:22,23
Township (45)
5:12;6:11;8:12;
10:16;15:6;19:7;36:11;
42:17,20;43:8,13;
48:24;50:18;52:15;
66:13,21;79:1;81:23;
85:16;86:15;89:7;90:7;
93:10;101:22;105:14;
106:13;124:8;127:10;
128:10,17;129:17;
130:4;139:16;140:14;
141:2,8;142:11;
144:22;145:2,4,10;
149:21;155:18;163:20;
202:11
Townships (1)
145:5
Township's (1)
106:8
traffic (3)
81:5;92:11;171:20
trained (10)
20:12;43:7;58:16;
63:15,24;103:20;
136:17;139:7;147:16,
19
trainer (5)
8:6;9:12;10:13,16,24
training (72)
6:6,8;7:22;20:4,9,16;
48:10;61:8,13;64:4,6;
65:4,8,12,14,21;66:7,
10,14,20,20,24;68:11,
14;69:6;73:19,23;
78:24;79:2,2,7,20,22;
80:2;85:15,20,21,22,
24;86:7;89:6,16;90:16;
91:5,19,23;92:1,9,10,
11,12,16;101:21;102:1,
4,6,16;103:5,7,18;
104:3,4,6,10;105:22,
23;106:2;111:3;128:9,
16;132:3,7
trainings (2)
92:7;132:13
train-the-trainers (1)
130:12
traitor (1)
134:1
transcript (1)
259:2
treat (2)

251:14,16
treatment (1)
118:15
trial (2)
24:1,5
trick (1)
230:2
tried (17)
20:18;24:16;178:1,2;
180:2,18;189:17;
193:18;194:20;203:15;
204:20;205:9;220:1;
227:4;229:2;238:6;
252:18
tries (1)
76:8
trigger (2)
240:21,22
trouble (3)
44:7;98:7;171:20
Troyer (2)
14:21;104:9
truck (3)
190:8;194:1;216:15
true (258)
13:7,10;17:23;40:13,
14,16,17,21;41:13,14,
17,20,23;42:5;43:23;
44:2,7,8,10;45:6,12,15;
46:22;47:2,3,9,13,14,
16,19,22;48:17,18;
49:9,13,16,19;50:1,5;
53:3,14;54:4,12,20;
55:14;56:10;57:3,8,9;
58:2,6,10,13,19;59:1,2,
4,5,12,15,22;60:2;
61:21,22,24;62:5,6,10;
63:1;64:14,24;65:15;
66:10,16,17,24;67:3,
21;68:1;69:16;75:3,6,
7,9;76:18;78:3,15;
79:4,5,9,10;82:20;
86:20,24;88:4,7,10,16,
20;89:4,5;90:8;93:1,
2,13;94:4,11,21,24;
95:22;96:4,5,9;97:8,
22;98:2,5,8,11,15,17;
99:2,6,12,14,17,20,23;
100:6,9,12,16,20,24;
101:1,14,19;107:7,8,
23;109:8,12,24;112:2,
17,24;113:1,10;114:3,
4,8,9,15,20;115:19,23;
117:4,11,12,15,16;
118:7,11,15,19,22;
119:3,7,16,21,22,24;
120:2,5,8,15,21;
121:24;122:18,22;
123:5,11,14,17,22;
124:4;127:11,14,17,21;
128:12;129:13,20,22;
131:17;134:6,9,23;
135:3;137:18;138:3,7,

24;139:10;151:4,5;
161:8;162:15,19,21,24;
163:8;164:7;166:13;
167:2;168:10,13,16,17;
169:5,7,10;170:5;
171:21;172:2,17,20;
174:9,14,17,19;177:14;
178:19;193:13;196:8,
14,15;201:24;202:1;
204:20;215:23;216:2;
232:21;233:2,9,19,20;
249:12;250:10;251:16,
17;252:13;254:1,5,6,9,
24
trust (6)
45:17,22,24;46:4,5,6
truth (1)
133:21
try (60)
22:15,18,24;36:8;
40:24;53:18;55:2,6,15;
60:12,15,16;62:17;
63:14;70:24;71:2,3,8,
14,17;72:6,8;73:3;
74:13;83:22,23;84:10,
15,15,19,24;95:13;
100:17,21;101:3,3,9,
15;110:18;114:12;
117:10;122:7;135:13;
189:19,20,21;190:19;
193:2;195:19;201:23;
203:9;204:10;205:4;
206:21;216:6,8;
221:21;252:2;255:4,5
trying (83)
7:2;14:13;25:14;
32:20;34:15,16;36:22;
43:2;57:11;59:10;68:8;
107:20,21;108:15;
110:12,13;111:21;
128:23;132:11;143:4;
175:14;177:20;180:5,
6,6,23;183:11,19;
184:4;185:7;186:1;
188:11;190:6,7,9;
192:10;193:20;206:10,
13,14,17,17;207:2;
209:6,7,19,20,23;
210:1,14;212:5,14,23;
213:20,22;214:22;
215:10,22;216:13;
220:2;221:16;225:13,
15;228:12;230:2,3,15;
232:15,16;237:9;
239:23;244:15;245:17,
21,22;247:4,8,10,15,
16,24;250:9;252:5
tunnel-visioned (1)
248:16
turn (7)
150:2,3;151:18;
152:4;178:24;244:15;
245:22

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

turned (8)
157:7;221:2,10;
222:2,21,22;223:1,2
turtleneck (2)
14:16;15:17
tweaking (1)
90:1
two (17)
7:15;14:15;17:11;
28:7;72:19;77:8,12,15;
128:21;130:14,14;
133:5;187:10;203:1,2;
205:14;255:6
two-person (1)
77:4
type (28)
26:19;32:22;34:19;
55:22;58:23;59:6,21;
62:11;77:24;93:21;
101:7;107:21;108:21;
115:13;122:9;127:7;
131:1;150:19,20;
156:5,19;158:24;
159:15;161:24;162:6;
190:13;210:9;216:18
typed (2)
32:4;157:7
types (5)
30:4;63:12;131:2;
132:13;159:5
typewritten (2)
156:19;157:12
typing (2)
32:6,17

U

uh-huhs (1)
22:14
uncontrollable (3)
134:5,8,10
under (56)
23:18;41:23;42:12;
50:20;62:11;83:15,16,
18;84:21;87:4;88:7,18;
89:3;90:24;91:4,6,7,7,
10,13,15,16,17,22;
97:8,24;98:21;99:2;
110:21;112:23;113:2,
3,6,9;116:22;125:11,
14;126:4,5,14,19;
127:7;128:2,5,21;
136:6;137:1,10;
157:22;159:15;180:19;
200:11;218:4;243:4;
252:23;253:2
undergone (7)
73:19;79:21;80:2;
85:15;89:16;90:16;
92:1
underlying (3)
65:18;114:3;121:15
underneath (16)

51:20;200:18;211:2,
15,18;212:7,15;215:3;
218:4,5;219:2,6,7,22,
23;234:15
understood (9)
10:5;12:23;163:6;
164:5;172:19;174:7;
193:8;196:17;197:12
undertaken (2)
9:17;66:24
undertaking (1)
80:3
underwear (6)
14:4,16;15:17;16:5,
10;17:22
underwent (1)
104:10
Unfortunately (2)
30:9;133:8
uniform (2)
148:5,7
uniforms (1)
14:17
unintentional (1)
59:3
Uniontown (1)
145:7
unit (1)
26:19
units (1)
145:21
unknown (2)
175:7;203:22
unless (3)
40:4;93:24;126:7
unpack (2)
65:13;222:3
unreasonable (2)
46:22;47:16
unresponsive (2)
216:1;249:1
unusual (1)
217:18
up (140)
7:4,7;8:5;11:16;
14:3;21:7;22:19;23:6;
26:9;28:1,23;34:14;
35:6;36:9;38:23;40:2;
55:7;65:22;71:23;
72:22;73:20;75:13,14;
76:4,5;77:8,8;80:8;
86:1;102:13;106:19,
19;107:6,20;108:12,
15;109:3,6;110:13,13,
14,19;112:7;113:24;
117:8;130:3;131:10;
134:10,11,13;142:21;
144:23;168:21;174:2;
176:15,20,23;178:23;
179:16;180:3;182:21,
24;183:18;186:13;
192:6;197:13;198:1,
22;200:18;203:7;

209:20,22;210:1,2,14,
14;213:4,22;214:11,12,
23;215:14,23;216:6;
220:5,6,8,8,11,12,20;
221:1,10,13,17;222:14,
14;223:6,10;224:9;
227:10,24;234:10,18,
22;235:3,8,11,14,16,
20;236:11,13,20,21;
237:7,8,9,10;238:14;
241:12,17,21;243:2,3;
244:7;245:17;246:15,
22;248:15,17;249:13;
250:1,16,20;253:7,21;
254:4;255:9,11
updated (2)
142:8;175:6
uphold (4)
40:15;45:8,18,22
upon (4)
51:8;63:1;183:7;
259:5
upper (1)
205:18
upright (2)
252:7;254:9
up-to-date (1)
52:6
upward (1)
220:12
Use (120)
8:7;10:1;29:4;41:7,
22;42:5,18,21;43:3;
44:3;47:24;48:4,6,14;
49:5,18;50:17;51:15,
18;52:6,11,13,17;53:1,
6,7;55:6,7,9,9;56:15;
62:4;71:21,22,24;72:3;
77:24;79:11;81:16;
82:17,24;83:2,4,8,15,
15;84:24;87:2;89:8,8,
16,24;90:17;91:3,5,9,
15,19,21;92:1,14,16;
93:21;94:23;95:8,22;
96:6;97:2;98:15;
104:17;105:16;116:13;
126:19;128:10,17;
129:1,17;135:9;
137:23;139:8;141:3;
145:4,6,6;147:22;
154:22;155:2,18;
157:24;158:11,23;
163:20;164:1,13;
165:13,19,22;166:23;
167:14;168:4;194:7;
196:5;197:2,15;
210:17;227:6;229:23;
232:24;233:19;238:19,
20;240:8;241:4,10;
250:13,17;252:21,24;
254:23;255:2
used (21)
30:21;130:1,4;

156:13;159:1,3,7,20;
160:11;161:1;163:19;
196:7;231:5;233:24;
244:18;248:13;251:7;
252:15,19,23;253:2
use-of- (1)
90:24
use-of-force (1)
91:13
uses (6)
94:20;95:21;99:10;
116:17;229:22;241:12
using (39)
20:10;29:6;41:9;
43:10,16,22;54:2;55:3;
56:5;60:21;71:18;
75:17;83:14,14;84:5,
16;86:5,8,16;90:14,18;
91:3;116:3,9;120:7;
126:21;136:17,24;
137:18,22;160:3,8,17;
161:3;196:8;215:7,8,
18;231:18
Usually (29)
26:14;28:11;53:11;
69:19;71:4,5;72:9,12,
14;73:2;75:24;76:5,8,
13,19;78:11;80:12;
81:12;115:13,16;
118:20;122:4,6;125:7;
146:24;150:22;152:4;
226:8;232:7
usually-recurring (1)
90:10
uttering (5)
188:2;189:1;190:10;
191:12;197:15

V

varies (1)
36:3
various (1)
26:9
vehicle (34)
177:14;180:19;
181:3,5,7,10;185:10,
13,21;193:23;196:17,
23,24;197:13;198:13;
199:20,21,22;200:13,
23;201:11;202:10,22,
24;203:19;204:3,5,10,
20,20;205:2;206:10;
207:5,23
verbal (6)
64:23,23;189:18;
191:4;196:18;211:5
verbally (1)
128:6
verify (1)
69:16
versa (1)
23:2

versus (2)
28:3;145:14
vest (2)
149:1,4
vice (1)
23:2
Victor (1)
14:7
video (2)
5:8;22:17
video-recording (1)
149:22
view (2)
170:3,19
Village (2)
145:11;152:19
violate (2)
47:8,12
violations (1)
9:14
violence (2)
48:15;51:7
violent (4)
38:2;53:9;89:24;
170:7
voice (2)
12:3;22:19
voluntarily (3)
69:22;71:15;76:4
vulnerable (1)
94:20

W

waist (1)
234:19
waistband (1)
234:24
wait (1)
72:10
waived (1)
256:1
Walk (8)
14:5;69:8;70:16;
71:17;75:23;186:7,10,
13
walked (3)
14:14;15:16;186:9
walking (1)
179:13
wants (2)
69:20;144:7
warm (3)
171:9,10;174:13
warning (28)
97:21;121:2,4,6,23;
122:11,13,14,18,21;
123:4,7,10,16,22,24;
124:14,16;126:1;
127:10,13;129:4,10,13,
15,21;130:24;131:16
watch (1)
82:10

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 1
March 14, 2017

**watches (1)**
76:14
**way (38)**
10:5,22;16:17;37:18;
40:18,20;41:6;73:16;
82:11;90:23;91:14;
92:24;93:5,13;117:6;
131:15;134:16;151:11;
153:23;162:12;168:20;
169:21;180:16;185:22;
186:17;188:14;199:13;
200:23;203:5;215:18;
216:17;226:22,24;
230:20;231:5;237:11;
238:15;250:16
**ways (3)**
54:11;60:19,21
**weakened (2)**
95:24;96:3
**Wealthy (1)**
44:20
**weapon (34)**
10:1;42:21;43:10;
49:19;94:24;114:19;
116:4;117:14,18;
125:12,15;126:20;
136:12;138:2,6,24;
139:10;158:24;159:1,
5,15;196:7;200:11;
229:21,23;231:6,19,23;
232:24;240:15;242:19;
248:13;254:24;255:2
**weapons (8)**
20:11;51:16,19;
52:17;134:18,21;
135:3;194:11
**wear (1)**
225:19
**wearing (8)**
14:4,15;15:16;16:9;
148:5,8;225:19;227:12
**weather (2)**
170:23;225:21
**week (1)**
27:24
**weeks (1)**
28:7
**weigh (2)**
149:3,10
**weighs (1)**
126:11
**weight (1)**
215:10
**weren't (4)**
39:10;166:12;191:2;
216:15
**What's (23)**
10:3;12:12;17:10;
27:17;35:5;61:1;70:19;
74:20,21,23;75:23;
118:9;123:20;133:9;
143:13;187:23,24;
189:20;190:3,15;

191:24;245:15;253:15
**whatsoever (2)**
145:8;235:18
**wheel (13)**
186:1;192:7,9,12,18;
200:15;203:18;204:22;
205:8,14;206:10;
207:1,6
**whenever (4)**
94:13;101:13;
104:11;140:6
**wherever (2)**
189:10;240:6
**White (5)**
44:12;152:23;
153:11,13;176:8
**White-Abington (1)**
175:12
**whoever's (1)**
76:6
**whole (15)**
16:18;20:17;29:15;
60:24;72:18;101:10;
166:24;188:14,16;
191:19,21;200:13;
214:14;220:11;236:16
**who's (1)**
75:19
**whose (4)**
76:17;157:2;160:13;
253:15
**wider (1)**
237:21
**wife (1)**
34:4
**willing (1)**
69:22
**willingly (2)**
70:10;71:9
**winded (1)**
109:22
**window (3)**
185:24;203:3,8
**wires (4)**
239:6;254:18,19,20
**within (5)**
11:7;15:2,9;40:1;
125:17
**without (7)**
7:19;36:8;45:24;
181:20;200:22;229:4;
239:12
**witness (3)**
13:22;21:19;255:23
**witnesses (2)**
13:20;133:7
**woman (7)**
17:4;178:13;179:5,
22;180:8;181:4,9
**women (2)**
135:13;136:20
**wonder (1)**
30:11

**wording (1)**
49:3
**words (2)**
132:24;244:2
**work (12)**
16:24;29:14;40:1;
71:15;106:15;120:18;
142:16;144:7;145:9,
20;201:4;253:3
**worked (3)**
143:9,15;242:24
**workers' (1)**
20:17
**working (5)**
26:2;28:9;37:7;
143:19;255:12
**works (3)**
27:23;128:24;134:5
**world (2)**
96:15,19
**worry (1)**
126:23
**worse (1)**
123:4
**wounds (1)**
239:13
**wrestling (2)**
125:18,20
**wrist (3)**
218:11;244:9,10
**write (9)**
26:20,20;183:6,7;
185:19;195:19,23;
196:3;244:7
**writing (2)**
157:1;204:8
**written (2)**
52:14;140:12
**wrote (5)**
24:13;140:18;
159:15;217:17;219:8

**X**

**X26 (2)**
141:3,8

**Y**

**year (2)**
34:10;103:20
**yearly (2)**
103:15;135:7
**years (5)**
7:15;103:22;104:11;
106:4;143:17
**yell (1)**
190:24
**yelling (25)**
110:16,23;111:2;
183:11;187:20;189:7,
8,8;193:12;209:21,22,
23;211:4;214:2,4,9,23;

226:5;227:24;228:21,
22,24;235:12;245:23;
247:7
**yells (1)**
214:3
**Yep (1)**
222:13
**yesterday (4)**
25:21;27:19;29:11,
22
**Young (3)**
44:18;58:12;193:9

**Z**

**Zero (2)**
225:24;255:7
**zip (1)**
145:6,7

**1**

**1 (3)**
27:11,12;51:2
**10 (13)**
50:8,9,16,16;51:3,3,
15;52:16;92:4,5,17;
141:18;149:6
**10:00 (3)**
165:11,15;166:23
**100 (1)**
122:5
**1019 (9)**
153:8;177:12;
178:15,21;179:16;
180:16;181:18,24;
183:10
**12 (19)**
31:2,4,13,15;32:5;
33:5;35:9;36:17;37:2;
144:2,3;167:6,20;
168:1,2,9,20;194:19,19
**1214.01 (1)**
50:21
**1214b (1)**
142:5
**12-2003 (1)**
141:12
**12-hour (2)**
29:14;143:11
**15 (2)**
145:17;149:5
**150 (1)**
154:19
**190 (1)**
149:12
**1992 (1)**
6:21

**2**

**2 (6)**
27:11;51:3;155:17,

17;157:5;165:13
**20 (1)**
149:5
**20:30 (1)**
164:23
**20_ (1)**
259:3
**200 (1)**
149:13
**2003 (2)**
141:12;142:6
**2005 (2)**
8:15;10:21
**2006 (3)**
8:15;10:21;102:8
**2007 (3)**
8:10;52:1;102:9
**2008 (4)**
10:22;11:10,11;
132:23
**2009 (2)**
10:22;11:10
**2015 (23)**
19:19;29:24;31:21;
34:6;47:8,12;124:1;
142:22;143:1;145:13,
18;148:8,15;149:11,
23;150:6,11;151:2,10;
157:9;162:10;165:15;
166:24
**21:30 (1)**
165:4
**210 (1)**
149:15
**22:00 (1)**
165:9
**220 (1)**
149:15
**24 (1)**
144:23
**2465 (1)**
15:3
**24-years-old (1)**
168:24
**25 (2)**
149:7;186:12
**28 (1)**
142:20
**29 (1)**
243:9

**3**

**3 (2)**
27:11;155:17
**3:12 (1)**
150:6
**3:15 (1)**
150:6
**3:30 (2)**
255:22;256:4
**30 (4)**
143:2;145:23;149:7;

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 1
March 14, 2017

181:14
**32 (1)**
143:2
**34 (1)**
142:17

**4**

**4 (10)**
140:20,21,24;
141:11;142:1,4;
164:18,22;167:14;
168:19
**45 (1)**
181:14

**5**

**5 (3)**
164:18;165:3;167:14
**50 (1)**
126:11
**50/50 (1)**
145:13
**53 (3)**
76:2;163:24;164:2
**5'5 (1)**
149:20

**6**

**6 (14)**
154:22;155:6,12,16;
156:15;157:5;159:5;
164:20;165:8,13;
167:14,17;168:18;
196:6

**8**

**8:30 (1)**
165:1
**8th (15)**
19:19;31:21;34:6;
47:7,11;124:1;148:15;
150:5,11;151:2,10;
157:9;162:10;165:15;
166:23

**9**

**9:30 (1)**
165:6
**901 (3)**
27:11,14,19
**902 (1)**
27:14
**909 (1)**
152:23
**90-degree (3)**
213:12,15;220:13
**911 (1)**
24:18

**93 (1)**
6:22
**95 (2)**
69:19;70:7
**99 (2)**
69:12,24