# In The Matter Of:

*Haydn Zeis, Administrator of the Estate of Jordn Miller v.*
*Springfield Township, Ohio, et al.*

---

*Officer Robert Scherer*
*Vol. 2*
*March 15, 2017*

---

*Layne & Associates*
*6723 Cooperstone Drive*
*Dublin, Ohio  43017*
*(614) 309-1669*
*WhitneyLayne@att.net*



*Layne & Associates*
Reporters Without Borders

Original File 03-15-2017 Scherer2 Final.txt
Min-U-Script® with Word Index

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 2
March 15, 2017

---

Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF OHIO
2                      EASTERN DIVISION

3

4   Haydn Zeis, Administrator of
    the Estate of Jordn Miller,
5        Plaintiff,

6        vs.              Case No. 5:16-CV-02331-JRA

7   Springfield Township, Ohio,
    et al.,
8        Defendants

9                        - - -

10

11
        PART 2 VIDEO DEPOSITION OF OFFICER ROBERT SCHERER
12   the Defendant herein, called by the Plaintiff under the
     applicable Rules of Civil Procedure, taken before me,
13   Whitney Layne, a Notary Public for the State of Ohio, at
     the Springfield Township Police Department, 2465 Canfield
14   Road, Akron, Ohio 44312 on March 15, 2017 at 10:00 a.m.

15

16

17

18

19

20                  LAYNE & ASSOCIATES
                    6723 COOPERSTONE DRIVE
21                    DUBLIN, OHIO  43017

22

23

24
```

---

Page 2

```
1   APPEARANCES

2

3         MICHAEL HILL, ESQUIRE
          EADIE HILL TRIAL LAWYERS
4         3100 East 45th Street
          Suite 218
5         Cleveland, Ohio  44127
              on behalf of the Plaintiff
6

7         GREGORY BECK, ESQUIRE
          MEL LUTE, ESQUIRE
8         BAKER DUBLIKAR BECK WILEY & MATHEWS
          400 South Main Street
9         North Canton, Ohio  44720
              on behalf of the Defendants
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

---

Page 3

```
1                              March 15, 2017
                               Wednesday Session
2                              10:00 a.m.

3
                                 - - -
4
                              STIPULATIONS
5
        It is stipulated by and among counsel for the
6   respective parties that the deposition of ROBERT SCHERER,
    the Defendant herein, called by the Plaintiff under the
7   applicable Rules of Civil Procedure, may be taken at this
    time by the notary Whitney Layne; that said deposition may
8   be reduced to writing in stenotypy by the notary, whose
    notes thereafter may be transcribed out of the presence of
9   the witness; and that the proof of the official character
    and qualification of the notary is waived.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

---

Page 4

```
1                        EXAMINATION INDEX

2
    ROBERT SCHERER
3     BY MR. HILL . . . . . . . . . . . . . .  Page 5
      DIRECT BY MR. BECK . . . . . . . . . . .  Page 86
4     FURTHER CROSS BY MR. HILL  . . . . . . .  Page 94

5

6                          EXHIBIT INDEX

7
    Exhibit                                        Marked
8   1   Advanced Taser Report                      Page 43

9   2   Chief Smith's Report                       Page 36

10  3   Excited Delirium Directive                 Page 57

11  7   M26 & X26 Advanced Taser Use Report        Page 63

12  8   M26 & X26 Advanced Taser Use Report        Page 71

13

14

15

16

17

18

19

20

21

22

23

24
```

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 2
March 15, 2017

Page 5

1        ROBERT SCHERER,
2     Being first duly sworn, as hereinafter
3 certified, deposes and says as follows:
4              EXAMINATION
5 BY MR. HILL:
6     Q   We're back after a break.  Are you ready to go?
7     A   I'm ready.
8     Q   Okay.  Great.  I appreciate it.
9         One of the things that we talked about
10 yesterday was the weather.  And I think, if you remember,
11 you said it was not warm, not cold.  It was kind of middle
12 of the road; is that right?
13    A   Yes.
14    Q   I'm just going to mark as an exhibit something
15 I pulled off the internet.  It's just a historical weather
16 report, but it's got Tuesday, September 8th of 2015.
17    Just, if you could, just flip through it.
18    (Exhibit Number 13 was marked for identification.)
19 BY MR. HILL:
20    Q   It looks like it says the weather was about 90
21 degrees that day at about three, four p.m., the time we're
22 talking about.
23    A   I don't recall it being that warm.
24    Q   Okay.  That's not consistent with your memory,

Page 6

1 at least?
2     A   No, sir.
3     Q   Your memory is it was not warm, not cold?
4     A   Yeah.  I know it was sunny, but it did not --
5 it was not that warm to me.
6     Q   I have a couple follow-up questions about the
7 time period where Jordn is in the Jeep before you and
8 Officer Holsopple pulled him from the Jeep, okay?
9     A   Okay.
10    Q   I just want to confirm a couple of things.
11        While Jordn was in the Jeep, he never tried to
12 kick you; correct?
13    A   Correct.
14    Q   While Jordn was in the Jeep, he never tried to
15 kick anyone as far as you're aware?
16    A   As far as I'm aware, yes.
17    Q   You never saw Jordn try to spit on anyone while
18 he was in the Jeep; true?
19    A   True.
20    Q   You never observed Jordn try to spit at you
21 while he was in the Jeep; true?
22    A   True.
23    Q   Jordn never tried to bite you while he was in
24 the Jeep; true?

Page 7

1     A   True.
2     Q   You never saw Jordn try to bite anyone while he
3 was in the Jeep; true?
4     A   True.
5     Q   At the time you were standing outside the Jeep,
6 you didn't believe that Jordn had tried to bite anyone;
7 true?
8     A   No.  Yeah, true.
9     Q   While Jordn was in the Jeep and the door was
10 closed, he couldn't reach anyone; true?
11    A   True.
12    Q   Jordn was contained in the Jeep; true?
13    A   Yes.
14    Q   Did Jordn ever acknowledge your presence while
15 he was in the Jeep?
16    A   I'm not sure what he acknowledged.
17    Q   I mean, did he ever look at you?
18    A   He looked at us, but I don't know if he
19 acknowledged us.  I don't know what he was thinking.
20    Q   I know he never -- he never responded in a way
21 that rationally consistent with your speech while he
22 was in the Jeep; true?
23    A   True.
24    Q   Yesterday we discussed what you consider to be

Page 8

1 some warning signs of a condition some people call excited
2 delirium; correct?
3     A   Yes.
4     Q   And some of those warning signs included
5 displays consistent with active mental illness; true?
6     A   True.
7     Q   Those warning signs include delusions or
8 hallucinations; true?
9     A   Yes.
10    Q   Those warning signs included disorientation;
11 true?
12    A   Yes.
13    Q   Those warning signs included disorganized or
14 incoherent speech; true?
15    A   Yes.
16    Q   Those warning signs included shouting or
17 yelling; true?
18    A   They can, yes.
19    Q   Those warning signs included strange or bizarre
20 behavior; true?
21    MR. BECK: I don't want to be going through all
22 of this again, but --
23 BY MR. HILL:
24    Q   Those warning signs included agitation; true?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 2
March 15, 2017

Page 9

1    A    It can, yes.
2    Q    Those warning signs included disrobing; true?
3    A    They can, yes.
4    Q    While Jordn was in the Jeep, all of these
5    warning signs I just described had either been reported to
6    you or you had directly observed them; true?
7    A    Some of them, they had, yes.
8    Q    There were also some signs of excited delirium
9    that you talked about yesterday that I want to make
10   sure -- I want to find out whether or not Jordn had these
11   or not.
12        You talked about a fear of glass as being a
13   sign or a warning sign of excited delirium; correct?
14   A    Yes.
15   Q    At any time did Jordn display any fear of glass
16   or anything that you saw?
17   A    No.
18   Q    You talked about an elevated internal
19   temperature as a sign of excited delirium; correct?
20   A    Yes.
21   Q    Did you request that anyone, either EMS or
22   physicians, take a rectal temperature of Jordn Miller to
23   identify what his internal temperature was?
24        MR. BECK: Objection.

Page 10

1    A    That wouldn't be my call to make.
2    BY MR. HILL:
3    Q    No one from the police department did, did
4    they?
5    A    Not that I'm aware of.
6        MR. BECK: What, asked for it or did it?
7        MR. HILL: Asked for it.
8    BY MR. HILL:
9    Q    No.  I'm asking if you asked for it, not
10   whether you did it.
11   A    Okay.  I definitely didn't do it.  I definitely
12   didn't ask for it, either.  That would not be my
13   responsibility.
14   Q    You talked yesterday about Jordn having
15   superhuman strength.
16        Can you tell me exactly what Jordn did that
17   demonstrated superhuman strength?
18   A    He was able to consistently resist two officers
19   fighting us, preventing us from getting him in handcuffs,
20   preventing us from getting him under control and into
21   custody.  He prevented -- or was able to, you know, still
22   escalate the level of force towards us by biting me or
23   trying to kick us or bite other officers or flailing
24   around or lifting himself up off the ground.  So that is

Page 11

1    extreme strength.
2    Q    You and Officer Holsopple were able to get
3    Jordn out of the car?
4    A    Yes.
5    Q    You were able to get him on the ground in a
6    prone position; correct?
7    A    Yes.
8    Q    He never got out of a prone position; correct?
9    A    No.
10   Q    Correct?
11   A    Correct.
12   Q    Jordn remained in a prone position until he
13   became unresponsive; correct?
14   A    He remained there until we got him into
15   control.
16   Q    He remained in a prone position until he became
17   unresponsive; true?
18   A    Which we believe he was in control of that,
19   yes.
20   Q    You answered, yes, he was in a prone position
21   from every point, from the time you put him on the ground,
22   out of the car, until he became unresponsive?
23   A    Yes.
24   Q    You kicked Jordn while he was in a prone

Page 12

1    position?
2    A    Yes.
3    Q    You used an electrical-conducted weapon on
4    Jordn while he was in a prone position?
5    A    Yes.
6    Q    You handcuffed Jordn while he was in a prone
7    position?
8    A    Yes.
9    Q    You used a electrical-conducted weapon a second
10   time while Jordn was in a prone position and handcuffed?
11   A    Yes.
12   Q    Jordn never lifted himself off the ground with
13   you on his back or anything like that?
14   A    No, we weren't laying on him.
15   Q    That's not my question.
16        He never stood up out of the prone position,
17   you were on his back or fighting him or anything like
18   that; right?
19   A    He attempted to lift up, but we would not let
20   him.
21   Q    Where we left off yesterday was you describing
22   the second application of the electrical-conducted weapon;
23   correct?  Is that what you remember?
24   A    I believe so.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 2
March 15, 2017

Page 13

1    Q    And I believe what you said -- I want to make
2  sure that I'm right about this.
3         The reason that you used the electrical-
4  conducted weapon the second time was because you wanted to
5  gain compliance; is that correct?
6    A    Control, yes.
7    Q    You say yesterday -- and I apologize if I asked
8  you this.
9         Between the first application of the
10  electrical-conducted weapon and the second application,
11  did you reholster your Taser or not?
12   A    No.
13   Q    And can you describe to me -- the second
14  application was to Jordn's calf?
15   A    Yes.
16   Q    Which side of his body, right or left?
17   A    I believe it was his left.
18   Q    So the one closest to you?
19   A    Yes.
20   Q    And can you tell me where on his calf?
21   A    Just mid calf area.
22   Q    And were you holding the Taser with your right
23  hand?
24   A    Yes.

Page 14

1    Q    And Officer Holsopple was still on the other
2  side of Jordn holding him when you used the Taser?
3    A    Yes.
4    Q    He was still kneeling?
5    A    Officer Holsopple?
6    Q    Yes.
7    A    Yes, he was on his knees.
8    Q    Sergeant Moore was approaching, but you don't
9  know how close she was?
10   A    Correct.
11   Q    You said yesterday -- you described that you
12  thought the Taser had no effect on Jordn?
13   A    I know it had no effect on him.
14   Q    When you say it had no effect on him, you're
15  not making any medical conclusions about how it actually
16  affected him internally; are you?
17   A    No, just that I did not gain compliance or
18  control of him or receive the NMI.
19   Q    And the wires were still attached at this
20  point; correct?
21   A    Yes, sir.
22   Q    When you used the Taser on Jordn while he was
23  in cuffs, in his calf, how long did you hold it to him?
24   A    Just two to three seconds.

Page 15

1    Q    When you say two to three seconds, were you
2  counting at the time?
3    A    No, just -- it's just a general observation at
4  the time, I guess.
5    Q    Because when you push the Taser, it cycles for
6  a five-cycle period; correct?
7    A    Yes.
8    Q    That's preset?
9    A    Yes.
10   Q    So how do you know -- well, let me ask you.
11        Was it making any kind of arcing noises or
12  anything like that?
13   A    It will make an arcing noise, yes.
14   Q    How loud?
15   A    I don't know how to answer that.
16   Q    So the two to three seconds, is that a guess?
17        MR. BECK: Objection.
18        Go ahead.
19   A    Yes.
20  BY MR. HILL:
21   Q    I'm going to keep going down your statement,
22  okay?
23   A    Okay.
24   Q    Do you have the exhibits in front of you from

Page 16

1  yesterday?
2    A    I do not.
3         MR. BECK: Did you take them with you
4  yesterday?
5         THE WITNESS: No.  I gave them to Mel, I
6  believe.
7         (Exhibit Number 12 was introduced.)
8  BY MR. HILL:
9    Q    So I'm just going to read a portion of it to
10  you.
11   A    Okay.
12   Q    You say: "The suspect would lay there now a
13  few seconds but then would continue to fight and struggle
14  to get up.  Officers were restraining him from hurting
15  himself and getting up by holding him down.  Officer
16  Scherer had his foot on his left leg to try to keep him
17  from kicking us.  Officer Holsopple was on his knees
18  beside him on the ground.  And the officer was holding one
19  hand that was cuffed, and his other hand was holding down
20  his right leg to also prevent him from kicking.  Sergeant
21  Moore had her right foot on his left shoulder blade to
22  keep him from arching up and turning his head to bite
23  anyone.  He continued to struggle and try to get up for
24  several minutes."

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 2
March 15, 2017

---

Page 17

1       How long -- go ahead and read along.
2    A    (Reviewing document.)
3    Q    How long after the application -- let me step
4  back a second.
5       When you used the Taser on Jordn the second
6  time, is Officer Holsopple holding -- hold on.
7       So you have your foot on Jordn's left leg;
8  correct?
9    A    Yes.
10    Q    What part of his leg?
11    A    It would have just been his -- probably his
12  calf.
13    Q    Do you remember?
14    A    No.
15    Q    Are you standing or kneeling?
16    A    I believe I was still stand -- or kneeling at
17  that point.
18    Q    So what leg would you have on Jordn's -- what
19  foot would you have on Jordn's left leg?
20    A    It would probably have been my right foot.
21    Q    So your left knee is on the ground, your right
22  foot is on Jordn's left leg, pushing him down on the
23  ground to keep him from moving his leg?
24    A    Yes.

---

Page 18

1    Q    And then Officer Holsopple was on his knees
2  beside Jordn, so he's still on Jordn's right side?
3    A    Yes.
4    Q    Across from you?
5    A    Yes.
6    Q    And Officer Holsopple was holding one hand that
7  was cuffed, so he's holding Jordn's hand that's behind
8  Jordn's back?
9    A    Well, he was completely handcuffed at this
10  point, so --
11    Q    Well, he's handcuffed behind his back?
12    A    Yes.
13    Q    So one of Officer Holsopple's hands is pushing
14  into -- on Jordn's back at the cuff area?
15    A    I would assume, yes.
16    Q    And his other hand was then holding down
17  Jordn's right leg, pushing -- holding -- pushing his right
18  leg into the ground to keep it from moving?
19    A    Yes.
20    Q    And then Sergeant Moore, when she approaches,
21  she puts her right foot into Jordn's left shoulder blade
22  to keep Jordn from arcing, from moving his head or neck
23  off the ground?
24    A    Correct.

---

Page 19

1    Q    So she's pushing down with some force on his
2  back?
3    A    I would assume.  I don't know how much force
4  she was using.
5    Q    But enough force to keep him from moving.
6  That's something he had been trying to do; correct?
7    A    Yes.
8    Q    She's keeping him from doing that, so she's
9  keeping his chest flush on the ground?
10       MR. BECK: Objection.
11    A    She's keeping -- trying to gain control of him
12  also, yes.
13  BY MR. HILL:
14    Q    But I mean what his body is doing, his face --
15    A    Yes, we are trying to prevent him from causing
16  harm to us or himself.
17    Q    And you're successful at keeping his chest and
18  diaphragm and everything on the ground in a prone
19  position; correct?
20    A    Yes.
21    Q    And he's not able to lift his head or neck;
22  correct?
23    A    Not at that point.
24    Q    And it says:  "That position of you three

---

Page 20

1  officers doing that lasts for several minutes."  Correct?
2    A    That's what it says, yes.
3    Q    That's what it says because the three of you
4  wrote it; right?
5    A    Yes.
6    Q    And this set of events where the three of you
7  are holding Jordn down in this prone position, where he's
8  handcuffed, this is the period after you tasered Jordn
9  while he was in handcuffs; correct?
10    A    This is after the second tasing.
11    Q    And while the three of you were holding Jordn
12  down like this for several minutes, was Jordn trying to
13  squirm around still and move?
14    A    Yes, he was still very, very combative and
15  actively fighting with us.
16    Q    When you say fighting, his hands were cuffed,
17  so he wasn't using his hands to fight; correct?
18    A    Correct.
19    Q    His legs were being held down by you and
20  Officer Holsopple; correct?
21    A    We were trying to hold him down, yes.
22    Q    And you were successful at holding him down?
23    A    To a point, yes.
24    Q    And his body, his chest area was held down.

---

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 2
March 15, 2017

Page 21

1    So was he -- when you say fighting, does that
2  mean he was squirming around like you demonstrated
3  yesterday?
4    A   Yes, he was still thrashing around.
5    Q   Are you aware that when the body -- you know,
6  the body has a fight-or-flight response; correct?
7    A   Yes.
8    Q   You're aware that the human body will fight to
9  survive when it's being deprived of oxygen; correct?
10    MR. BECK: Objection.
11    Go ahead.
12    A   It can.
13  BY MR. HILL:
14    Q   Similarly to you can't voluntarily drown
15  yourself.  Your body will fight to get up; right?
16    A   I suppose.
17    Q   You understand that when someone is having
18  trouble breathing, the body will naturally attempt to get
19  air and move around; correct?
20    MR. BECK: Objection.
21    A   Again, it could.  I'm not a medical doctor.
22  BY MR. HILL:
23    Q   But it's something that you understand in terms
24  of restraining someone; correct?

Page 22

1    A   I understand it's all possibilities that can
2  happen.
3    Q   And after several minutes of being in this
4  position with you on one side holding Jordn down, Officer
5  Holsopple holding Jordn down on the other side of you, and
6  Sergeant Moore holding Jordn down with her foot on his
7  upper back, he becomes unresponsive; correct?
8    A   Yes.
9    Q   You notice he's no longer breathing?
10    A   He's no longer fighting.
11    Q   You write: "When he stopped trying to get up,
12  officers started rubbing his back, asking if he's okay,
13  trying to get a response from him.  When he wasn't
14  responding, officers rolled him over on his back."
15  Correct?
16    A   Yes.
17    Q   So when you say he stopped trying to get up, in
18  your documentation, the report you wrote that night, is
19  that what you're saying now as fighting, trying to get up?
20    A   Yes.
21    Q   Are those the same things?
22    A   Yes, those are the same meanings.  We actually
23  believed that we had gained compliance at that point, he
24  had just given up and submitted that -- that the fight was

Page 23

1  over.
2    Q   And is that what had been going on, a fight or
3  a battle, until then?
4    A   Yes.
5    Q   You say:  "Officers started rubbing his back."
6    Who was rubbing Jordn's back?
7    A   It might have been Officer Holsopple.  I don't
8  recall specifically.
9    Q   It wasn't you?
10    A   No.
11    Q   Jordn is still in a prone position at this
12  point when you're rubbing his back?
13    A   Yes.
14    Q   How long do the officers continue to rub
15  Jordn's back?
16    A   It's minute seconds.  It's just enough -- as
17  soon as we didn't get -- he didn't answer us, that's when
18  we immediately rolled him over.
19    Q   Was his body limp at this point?
20    A   We rolled him on his side.  It was kind of --
21  it was hard to tell if he was limp.  I wouldn't say limp,
22  but --
23    Q   How about when he's still face down, but he's
24  -- you realize -- you realize something is wrong, right,

Page 24

1  when he's not responding?
2    A   Well, I realized -- we believed -- I believed
3  that he finally gave up the fight, is what I believed.  I
4  did not believe he was having any medical issues at that
5  point.
6    Q   Except for the ones you responded to that day?
7    MR. BECK: Objection.
8    Go ahead.
9    A   Those would be mental issues, yes.
10  BY MR. HILL:
11    Q   Do you remember anyone saying anything about we
12  need to check if he's okay or anything -- did any of your
13  officers, you or your fellow officers say, before you
14  started rubbing Jordn's back or Officer Holsopple started
15  rubbing Jordn's back --
16    A   Do we need to -- I don't understand the
17  question.
18    Q   Did Officer Holsopple just start rubbing his
19  back and saying, "Are you okay," or what precipitated
20  that?
21    A   It's more of -- yes, more of rubbing his back,
22  kind of tapping it, I guess, going to the point of going,
23  "Hey, man, are you all right now?  Are you good?  Are you
24  good?  Are you going to settle down for us?"  It's more of

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 2
March 15, 2017

Page 25

1  that type of nature.
2       It's not that we were recognizing that he was
3  under any type of medical duress.  It was:  "All right,
4  buddy.  Are we done now?  That was a fight.  Are we done?
5  Are you settled down?  Can we get you some help now?"
6  That type of thing.
7       Q    And there's no response from him at that point?
8       A    There's no response, yes.
9       Q    What's the next thing that happens?
10      A    We roll him on his side.
11      Q    And that's the first time that Jordn has been
12  moved out of the prone position; correct?
13      A    Correct.
14      Q    You write:  "Officers could tell that the
15  suspect had debris in his mouth, and in fear of choking
16  officers rolled him on his side."  Correct?
17      A    Where exactly do you see that?
18           MR. BECK: It's right down --
19           THE WITNESS: Oh, yeah.  Yes, sir.
20  BY MR. HILL:
21      Q    So before you rolled him over -- and I know
22  you're kind of hitting him on the back, saying, "Hey,
23  buddy," all that stuff.
24           Before you actually roll him over on his side,

Page 26

1  someone recognizes that there's debris in his mouth;
2  correct?
3       A    Yes.
4       Q    Who recognized that?
5       A    I think everybody did.
6       Q    And what was it?  What was the debris?
7       A    It was just the -- it was more -- it was a lot
8  on his face, some on his -- just on the inside of his lips
9  area.  It was the -- like the dirt -- it was a gravel,
10  rocky, dirty type of driveway, so it was just the debris
11  from the driveway.
12      Q    And he still -- when you realize this, he's
13  still in a prone position; right?
14      A    No.  He's on his side.
15      Q    It says you rolled him on his side in fear of
16  choking him because he had debris in his mouth.
17      A    Well, we couldn't see his face until we rolled
18  him on his side, so --
19      Q    So when he's in that prone position we've been
20  describing, you couldn't see his face?
21      A    Correct.
22      Q    Okay.
23      A    Only when he would rear up and try to come at
24  us or bite us.

Page 27

1       Q    But I mean during the time period where it's
2  you, Sergeant Moore and Holsopple, you can't see his face.
3  He's facing the ground?
4       A    Yes.
5       Q    Is it safe to assume that that's the time
6  period that the gravel and debris was getting in his
7  mouth?
8       A    I would say during that entire altercation,
9  yes.
10      Q    Did you remove that debris from his mouth?
11      A    No.
12      Q    Did anyone remove that debris from his mouth?
13      A    I can't speak on behalf of what the EMS did.
14      Q    No, no.  I'm sorry.  You're right.
15           Did you observe any of your fellow officers
16  remove debris from his mouth?
17      A    No.
18      Q    So at this point, before EMS gets there, he's
19  on his side, he's not responding, and he's got debris,
20  gravel debris from the gravel on his face and his mouth;
21  fair?
22      A    Yes.
23      Q    You first noticed the debris, then, after Jordn
24  stopped responding; correct?

Page 28

1       A    As soon as we rolled him over.
2       Q    Which was after he stopped responding?
3       A    Yes.
4       Q    I have a couple of questions about the timing
5  of this document, Exhibit 12.
6           If you'll look at page 1, do you see at the
7  bottom right-hand side -- see where it says "time"?
8       A    Yes.
9       Q    So there's that time stamp there of 20:30 or
10  8:30 p.m.?
11      A    Yes, sir.
12      Q    And then if you go to Page 2 of Exhibit 12, it
13  says 21:30, which would be an hour later; right?
14      A    Yes.
15      Q    And then if you go to Page 3, it's got 22:00?
16      A    Yes.
17      Q    Do you know how that -- that time stamp that's
18  on there, is that something that an officer writes, or is
19  that generated automatically by a computer?
20      A    No, that's just something whoever is writing
21  the document types in when they're completed.
22      Q    Okay.  So Page 1 was finished at 20:30, then;
23  is that right?
24      A    I would -- I would believe so, yes.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 2
March 15, 2017

Page 29

1    Q   And then it took an hour for the three of you
2  to complete Page 2?
3    A   Yes.
4    Q   And then it took a half an hour to complete
5  Page 3 of Exhibit 12?
6    A   Well, I don't remember Page 3 being anywhere on
7  anything that I wrote or that I had anything to do with,
8  so --
9    Q   In terms of your understanding of the timing of
10 these documents, how this time is put on there, it's
11 something that's manually put on by the officer writing it
12 after he completes that page; fair?
13   A   Yes.
14   Q   So on Page 3 of Exhibit 12, it describes the
15 only injuries he sustained, regarding Jordn, those types
16 of statements.  That's not something that you wrote; fair?
17   A   I don't recall having any dealing with that,
18 yes.
19   Q   And that's not -- I know you have a copy of
20 Exhibit 12.
21   A   Yes.
22   Q   It sounds like you only have Page 1 and 2?
23   A   That's correct.
24   Q   Between the time that you noticed Jordn was

Page 30

1  unresponsive and you rolled him over and EMS arriving, did
2  Jordn ever respond in any way?
3    A   No.
4    Q   Did Jordn just lay there limp at that point?
5    A   He was laying there.  We moved him on his back,
6  but he had a -- he was still breathing, and he had a good,
7  strong pulse.
8    Q   Who -- you were checking the pulse?
9    A   I was checking the pulse, yes.
10   Q   So describe how you were checking the pulse?
11   A   Through the carotid, which is at the neck.
12   Q   Show us how you were doing that.
13   A   Just right up underneath the jaw.
14   Q   You say a good, strong pulse.  Can you describe
15 that to us?
16   A   Fast and very strong.
17   Q   How fast?
18   A   I didn't take the pulse to measure an exact
19 number, but I could tell it was beating quickly.
20   Q   When you say beating quickly, what does that
21 mean to you as a first responder?
22       MR. BECK: Objection.  He's not a first
23 responder.
24       Go ahead.

Page 31

1    A   It means he had a strong pulse.
2  BY MR. HILL:
3    Q   And are you a first responder?
4    A   Oftentimes.
5        MR. BECK: That's a technical term.  It's
6  actually defined by the code.  So you have to describe
7  what you mean by first responder.
8  BY MR. HILL:
9    Q   Do you act as a first responder as a police
10 officer responding to like a health crisis or medical
11 crisis?
12       MR. LUTE: Objection.
13   A   Sometimes, yes.
14 BY MR. HILL:
15   Q   And you're trained in CPR?
16   A   Yes.
17   Q   So when you say a fast pulse, something about
18 the pulse made you think it was fast; right?  So what is
19 it?
20   A   It was beating quickly.
21   Q   I know.  But if we're trying to quantify this,
22 what does that mean?
23   A   It means it was a rapid pulse rate.  There's no
24 other way to explain it.

Page 32

1    Q   It was faster than a normal person?
2        MR. BECK: Objection.
3    A   I don't know what the normal person is.  That's
4  hard to speculate.
5    Q   So when you're saying it's a rapid pulse, rapid
6  compared to what?
7    A   Well, rapid as he just got done fighting with
8  us.  It was elevated, I would assume.  But I don't know
9  what his normal pulse rate is either.
10   Q   But all I'm asking is you're saying it's a good
11 strong pulse and a rapid pulse; right?
12   A   Uh-huh, yes.
13   Q   And I'm saying what are you comparing that to?
14 When you say rapid, faster than what --
15   A   I'm not comparing it to anything.
16       MR. BECK: Objection.  He's answered it a dozen
17 times.  Last time.
18 BY MR. HILL::
19   Q   You didn't measure his pulse?
20       MR. BECK: He's already told you that.  Ask
21 another question.
22 BY MR. HILL:
23   Q   You didn't measure his pulse?
24       MR. BECK: You've already answered that.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 2
March 15, 2017

Page 33

1          Ask another question.
2    BY MR. HILL:
3    Q    You said he was breathing at that point?
4    A    Yes.
5    Q    How far -- describe his breathing.  Did you
6    listen to it?
7    A    No.  You could see his chest rise and fall.
8    Q    Like a normal person?
9    A    Yes.
10   Q    How long after Jordn was unresponsive did it
11   take EMS to get there?  Was it quick?
12   A    Well, they were on scene.  I don't know how
13   long it took them to get on scene, but he was never
14   totally unresponsive.  He still had the heart -- he was
15   still breathing and had a pulse.
16   Q    When EMS was there?
17   A    Yes.
18   Q    So the EMS run report describes that when they
19   arrived Jordn had no signs of life.  Do you disagree with
20   that?
21   A    Yeah.  As they were actually walking up the
22   driveway is when we started losing the pulse.  And then we
23   yelled down to them that I can't feel his pulse anymore.
24   Q    Were Jordn's eyes open or shut?

Page 34

1    A    I believe they were rolled back into his head.
2    Q    And was that true from the time you rolled him
3    on his back or side?
4    A    I honestly don't remember when I first noticed
5    his eyes -- where his eyes were at.
6    Q    When you noticed that he had this gravel and
7    debris and things in his mouth, do you remember if his
8    eyes were open or shut at that point?
9    A    No.  It was just a quick glance at his face.
10   For me, anyways.
11   Q    So how far was -- how long did it take in your
12   mind from the time you noticed Jordn was unresponsive for
13   the EMS to arrive on scene?
14   A    That's hard to say under those mental and
15   stressful conditions.  Everything seemed longer than the
16   whole incident took anyways.  So maybe from the time that
17   we initially called for EMS --
18   Q    I'm talking from the time you noticed that
19   Jordn was unresponsive and you start to roll him over.
20   From that period, how long does it take for EMS to get
21   there?
22   A    Less than a minute.
23   Q    Could you hear sirens in the background at that
24   point?

Page 35

1    A    I don't believe they ran lights and sirens.
2    Q    Where did the -- this is a fire truck?
3    A    Ambulance.
4    Q    Where did the ambulance park?
5    A    Right at the end of the driveway.
6    Q    None of the officers gave any CPR; correct?
7    A    It wasn't needed until --
8    Q    My question --
9    A    No.
10   Q    So officer -- I'm sorry.  Your captain or chief
11   at the time, Chief Smith, created a report in this case
12   regarding the events that took place.  Are you aware of
13   that?
14   A    I am not aware of it.
15   Q    At the time, was Chief Smith the main policy
16   decision maker?
17   A    Yes.
18   Q    Here at the force?
19   A    Yes.
20   Q    I'm going to hand you what's been marked as
21   Exhibit 11 for today.
22        (Exhibit Number 11 was introduced.)
23   BY MR. HILL:
24   Q    And if you will look, if you go to page -- I'm

Page 36

1    sorry.  That's Exhibit 2.  I need to hand you Exhibit 2.
2    What did I hand you?
3    A    11.
4    Q    I'm going to hand you Exhibit 2, Page 11.
5        (Exhibit Number 2 was introduced.)
6    BY MR. HILL:
7    Q    You'll see that it says -- there's a date of
8    October 14th, 2015.
9    A    Okay.
10   Q    And it states at the top -- not at the very
11   top, kind of the heading area:  "Final report and status
12   of internal review of incident number 15-2772 involving
13   the use of force against Jordn L. Miller, September 8th,
14   2015."  Is that correct?
15   A    Yes, sir.
16   Q    And at the beginning here, there is a statement
17   concerning kind of the use of force.  Underneath that,
18   there are nine bullet points.
19   A    Okay.
20   Q    That says:  "Other considerations for officers
21   in use of force situations."  Do you see that?
22   A    Yes.
23   Q    The first bullet point is stating that officers
24   should consider, when using force, the physical condition

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 2
March 15, 2017

Page 37

1   of the officer or the subject; correct?
2       A   Yes.
3       Q   Do you agree with that, that that's one of the
4   considerations that officers should use when deciding what
5   amount of force to use?
6       A   We try to, if that -- if that allows, yes.
7       Q   That is one of the considerations?
8       A   Yes.
9       Q   There was nothing impairing your physical
10  condition in any way on September 8th, 2015; correct?
11      A   My physical?
12      Q   Correct.
13      A   No.
14      Q   There was nothing impairing Officer Holsopple's
15  physical condition in any way on September 8th, 2015, that
16  you're aware of?
17      A   Not that I'm aware of.
18      Q   And also for Sergeant Moore.  Was there
19  anything impairing her physical condition in any way that
20  you know of?
21      A   Not that I'm aware of.
22      Q   Number 2 states: "Are any weapons involved?
23  When officers are involved, the weapons are always
24  considered."

Page 38

1       Do you agree with that, that that's a
2   consideration that should be undertaken by police officers
3   when using force or deciding what amount of force to use,
4   whether weapons are involved?
5       A   Always.
6       Q   We've already discussed that Jordn never had
7   anything in his hands at any time that you dealt with him;
8   correct?
9       A   That is correct.
10      Q   Or any time you saw him?
11      A   Yes.
12      Q   Jordn was only partially clothed when you were
13  dealing with him; true?
14      A   Shorts and a shirt.  That's --
15      Q   No shoes, no socks?
16      A   I don't recall the shirt or the shoes or socks
17  so --
18      Q   You had weapons; correct?
19      A   Yes.
20      Q   Had body armor?
21      A   Yes.
22      Q   Had a gun, a Taser, a flashlight?
23      A   Yes.
24      Q   The third consideration in Chief Smith's report

Page 39

1   is the number of subjects and officers on scene; correct?
2       A   Yes.
3       Q   You agree that that's one of the factors that
4   reasonable officers should look to when deciding what
5   amount of force to use?
6       A   It depends on the subject we're dealing with.
7       Q   But is this one of the considerations?
8       A   Yes, he has it as a consideration.
9       Q   And you agree with it?
10      A   I agree with it, but it also doesn't mean it's
11  in bold print to me, either.
12      Q   What does that mean?
13      A   That means that one guy can take six officers,
14  so it doesn't necessarily mean that just because we have
15  one officer or two officers or three officers -- that
16  might not be enough officers to control one guy.  You
17  never know what we're dealing with.
18      Q   My question is:  In the totality of
19  circumstances, is that a factor that should be considered
20  by officers, the number of officers and the number of
21  subjects involved?
22          MR. BECK: Objection.
23          Go ahead.
24      A   We use the minimum that we have to use, and the

Page 40

1   same with the officers.
2   BY MR. HILL:
3       Q   Chief Smith is including this in his report.
4   I'm asking do you agree with that statement:  "A factor
5   that officers can consider" -- "should consider is the
6   number of subjects and officers on scene."
7           I'm asking do you agree with it or not?
8           MR. BECK: And again, you're not phrasing it
9   correctly.  It's may consider, not must consider.  So
10  that's been the source of my objection.  It says: "Force
11  may be.  Other considerations may be," not must be.
12          MR. HILL: I'll ask it.
13  BY MR. HILL:
14      Q   When you're approaching a subject, do you
15  consider the number of officers involved versus the number
16  of subjects involved when deciding what amount of force to
17  use?
18      A   Yes.
19      Q   At all times that you were engaged or seeing
20  Jordn Miller, there were at least two officers present;
21  correct?
22      A   Yes.
23      Q   When you used the Taser a second time on Jordn,
24  when he was in handcuffs, there was a third officer on

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 2
March 15, 2017

Page 41

1    scene approaching; correct?
2        A    Like I said, I believe she was approaching.  I
3    don't know where she was.  She was coming up behind me.
4        Q    She was on scene, though?
5        A    I believe she was on scene.
6        Q    For the remaining portion of any involvement
7    you had with Jordn on September 8th, 2015, there were no
8    fewer than three officers on scene after you tasered him
9    the second time?
10       A    Correct.
11       Q    The fourth consideration in Chief Smith's
12   report states:  "The possibility of the subject having a
13   diminished capacity from drug use or some type of medical,
14   mental condition."  Correct?
15       A    That's what it says, yes.
16       Q    And I think we've talked about this, and I
17   won't go through Jordn's medical or mental condition at
18   the time you were dealing with him.
19           But is that one of the factors that you
20   consider when engaging a person?
21       A    Yes.
22       Q    The fifth consideration regarding the use of
23   force that an officer can consider is information received
24   from dispatchers regarding the call; correct?

Page 42

1        A    Yes.
2        Q    Have we already discussed everything that you
3    understood to have taken place with respect to you being
4    informed information by dispatch?
5        A    I believe we have.
6        Q    The sixth consideration is any prior knowledge
7    of whether the subject has a violent history; correct?
8        A    Yes.
9        Q    We've discussed earlier you had no information
10   about Jordn having any kind of a violent history; correct?
11       A    Correct.
12       Q    The seventh consideration is prior knowledge of
13   criminal activity at the location; correct?
14       A    Yes.
15       Q    Is that another thing that reasonable officers
16   take into consideration, have you been called to this
17   place before for violent activities?
18       A    I -- yes.
19       Q    Did you have any understanding or information
20   that the location you were going to, 1019 Abington, was
21   somehow a dangerous location or there had been a history
22   of criminal activity there?
23       A    I had never been there.
24       Q    The eighth consideration is prior knowledge of

Page 43

1    mental impairment with subject or at location.
2        I think we've talked about this.
3        You didn't know who Jordn was, but you had
4    information from dispatch that you were responding to a
5    mental health call; fair?
6        A    Yes.
7        Q    The ninth consideration is environmental
8    conditions such as ice, rain or snow may change officer
9    tactics; correct?
10       A    Yes.
11       Q    And again, that's something you have to take
12   into consideration?
13       A    Yes.
14       Q    And here there was no ice, rain, snow or any
15   other environmental factors that made you change your
16   tactics; correct?
17       A    No.
18       Q    You were in a wide-open area?
19       A    Yes.
20       Q    I'll hand you what I've marked as Exhibit 1.
21           (Exhibit Number 1 was introduced.)
22   BY MR. HILL:
23       Q    There's a cover sheet that says "Advanced Taser
24   Report."

Page 44

1           Could you tell us for the record what is the
2    Advanced Taser Report, Exhibit 1, that I've handed you?
3        A    Just another Use of Force Report that
4    specifically is -- that we're required to fill out
5    specifically when we use the Taser.
6        Q    Does this have to be signed off on by a
7    supervisor?
8        A    Yes.
9        Q    And why is that?
10       A    It's just -- like every other report we have,
11   it's got to be approved by all -- a supervisor.
12       Q    And your supervisor is Sergeant Moore; correct?
13       A    Yes.
14       Q    You are not Sergeant Moore's supervisor;
15   correct?
16       A    No.
17       Q    Have you ever been Sergeant Moore's supervisor?
18       A    No.
19       Q    So on Exhibit 1, if you go to Page 2, it would
20   be the second page, third page and fourth page.
21           There is a combination of typewritten
22   information and handwritten information; correct?
23       A    Yes.
24       Q    Who -- let me ask you -- the handwritten

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 2
March 15, 2017

Page 45

1  information, is that yours?
2     A   Everything but the word "Trazodone."
3     Q   You're looking at the bottom of page two?
4     A   Yes.
5     Q   Who wrote that?
6     A   That looks like Sergeant Moore's writing.
7     Q   So let me back up a little bit, then.
8         Walk me through the process of how you complete
9  this -- this Taser Use of Force Report that's been marked
10  as Exhibit 1.
11     A   Again, it's just on the -- on the computer.
12     Q   In the patrol office?
13     A   In the patrol office, yes.
14     Q   And do you complete it the same day that you
15  use the Taser?
16     A   We try to, yes.
17     Q   And it looks like you completed -- well, does
18  it say what time you completed this document?
19     A   I don't believe this one says when it was
20  completed, other than on the -- it just has the date of
21  the incident.
22     Q   It doesn't have the date that it was signed;
23  correct?
24     A   No.

Page 46

1     Q   Now, you typed this information, some of it,
2  into a computer; correct?
3     A   Yes.
4     Q   And then did you print it out and handwrite
5  information on top of it?
6     A   Yes.
7     Q   And is that something that you customarily do?
8     A   Yeah, it's pretty normal.  If you forget a box
9  or you forget -- you skip over a box, it's -- and then you
10  notice it afterwards, then it's pretty common for us to
11  write it in to complete the report.
12     Q   So all of the information on the bottom of
13  Page 2 -- it says, "List substance, if known."  That's all
14  handwritten; correct?
15     A   Yes.
16     Q   So that's not information you had when you
17  completed this report?
18     A   No, that was later on.
19     Q   You agree that it's not information you had
20  when you completed the report and you added the
21  information later on?
22     A   This report -- we write these reports as we
23  know the information during the incident, so --
24     Q   So this goes back to what you said earlier,

Page 47

1  that during the incident you didn't suspect he was on
2  drugs?
3     A   That is correct.
4     Q   On Page 2, it says, "Location of each probe
5  contact."
6         Actually, it would be page 3.  I'm sorry.  Page
7  3 of Exhibit 1.  It says, "Location of each probe
8  contact."  Do you see that?
9     A   Yes.
10     Q   And that's your handwriting where it says, "Mid
11  to upper center of back"?
12     A   Yes.
13     Q   So that's not information that you had at the
14  time you completed this?
15     A   No, that is.  That's just something I might
16  have skipped over during -- when I was writing the report
17  and didn't notice it until I printed it out.
18     Q   And that's the same thing with respect to the
19  distance between probes?
20     A   Yes.
21     Q   Later on you went back and added approximately
22  three inches?
23     A   Yes.
24     Q   And that's also true for the cartridge serial

Page 48

1  numbers?
2     A   Yes.  But, however, that is Sergeant Moore's
3  writing.
4         The serial number is typed in there.  I'm
5  sorry.  The -- the Taser serial number is typed in there.
6  The cartridge serial number was tagged in there by 101,
7  and Sergeant Moore wrote that.
8     Q   There's a time and date listed on Page 2 at the
9  very top.  And the time is 15:14 hours; correct?
10     A   Yes.
11     Q   Where did you get that information when you put
12  that in?  That's pretty specific.
13     A   That would only come from the call, time of
14  call, is what that means.
15     Q   So that's not the time that you used the Taser?
16     A   No.
17     Q   Now, you also have a height and weight listed;
18  correct?
19     A   Yes.
20     Q   You have the weight of 151 pounds; right?
21     A   Yes.
22     Q   Where did you get that information?
23     A   That would just have been off his DMV, license
24  information.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 2
March 15, 2017

Page 49

1    Q    You have a type of force used or displayed by
2 the subject, and then you can check all that apply;
3 correct?
4    A    Yes.
5    Q    So the ones that are listed here are impact;
6 right?
7    A    Yes.
8    Q    What is impact?
9    A    It could be a rock, type bat, stick, anything
10 like that.
11    Q    Something he could strike you with his hands?
12    A    Yeah, something he could swing at you with.
13    Q    You have a cutting instrument.  What would be
14 included in that?
15    A    Basically, just a knife, box cutters,
16 razor blade.
17    Q    What about the screwdriver?  Where would that
18 fit?
19    A    Probably under "other."
20    Q    Pliers would probably go under "other" as well?
21    A    Yes.
22    Q    A firearm.  I think that's self-explanatory.
23    A    Yes.
24    Q    And when it says, "type of force used or

Page 50

1 displayed by suspect," these are all -- you're supposed to
2 list all the things that you saw the person do that would
3 give you reason to use force; correct?
4    A    Yes.
5    Q    For the Taser?  All right.
6        Now, on Page 3 of Exhibit 1, you describe the
7 cycling.  If you'll look, it says, "Length of time,
8 electrical current application."  Do you see that?
9    A    Yes.
10    Q    It says, "Programmed five seconds."  That's
11 what we've been talking about.  It's automatically
12 programmed; correct?
13    A    Right.
14    Q    Can you override that?
15    A    You can.
16    Q    How do you override it?
17    A    You just keep the trigger pulled in.
18    Q    Now, you state the second cycle.  That means
19 the second time you applied the Taser to Jordn?
20    A    Yes.
21    Q    "The second cycle might have went the five
22 seconds, or I might have shut it off in the middle of the
23 cycle, because I saw no compliance.  I cannot be certain
24 due to the stress of the incident."

Page 51

1    A    Yes.
2    Q    That's what you wrote relatively close to the
3 event; right?
4    A    Yes.
5    Q    So at the time you wrote this, you don't put in
6 there that it was two to three seconds; right?
7    A    That is correct.
8    Q    And your goal in using the Taser, you said, was
9 to gain compliance; correct?
10    A    Yes.
11    Q    Can you tell me why, if you're using a Taser to
12 gain compliance, why you would prematurely remove it when
13 you don't get compliance?
14    A    Because there's no reason to continue that
15 level of force if it's not working, so I will move on.
16    Q    Was the Taser sparking or anything when you
17 held it up?
18    A    Yes, it was still cycling.
19    Q    Now you remember that?
20    A    Well, I know it.  Yeah, I didn't ever shut it
21 off.  I know I just held it up this way.
22    Q    Okay.
23    A    But yeah, I do remember it now after time, yes.
24    Q    So at the time that you completed this form,

Page 52

1 you did not remember that?
2    A    I couldn't recall that at that time, no.
3    Q    But now, a year and a half later, you do?
4        MR. BECK: Objection.
5        Go ahead.
6    A    When you have time to reflect on things
7 throughout the year and a half, yes, there are certain
8 things that do come back to your memory.
9        This was written immediately after a very
10 stressful situation.  So trying to document and remember
11 every single incident immediately after that incident is
12 very difficult for the brain to process.
13        Also, during this report time is when I also
14 received a call from the hospital advising that Mr. Miller
15 was hepatitis C and that I was going to have to come in
16 for treatment, and that also distracted my brain quite a
17 bit.
18    BY MR. HILL:
19    Q    There's a note at the bottom of page 3 that you
20 wrote; correct?
21    A    Yes.
22    Q    And this would have been something you wrote
23 close to the time of the events; correct?
24    A    Yes.

**Haydn Zeis, Administrator of the Estate of Jordn Miller v.**
**Springfield Township, Ohio, et al.**

Officer Robert Scherer - Vol. 2
March 15, 2017

Page 53

1  Q   And when you say the suspect was believed,
2  that's what you believed at the time?
3  A   Yes.
4  Q   At the time you were interacting with him?
5  A   Yes.
6  Q   So you say, "The suspect was believed to be in
7  full excited delirium state."  Correct?
8     MR. BECK: Objection.
9     Go ahead.
10  A   Yes.
11  BY MR. HILL:
12  Q   Do you remember speaking to Chief Smith the
13  night or the day of September 8th, 2015, after you
14  returned to the station?
15  A   I -- yeah, I remember general conversation, not
16  specifics.
17  Q   I think you told me earlier that all -- the
18  force that you used, beginning from the time of pulling
19  Jordn out of the car until he became unresponsive, was to
20  help Jordn; is that fair?
21  A   I have to gain compliance and get him under
22  control before I can help him, yes.
23  Q   So your motivation in using the force that you
24  did was to help Jordn?

Page 54

1     MR. BECK: Objection.  You must have asked this
2  a dozen times.
3     This is the last time you're going to answer
4  that.
5  A   Yes.  When I can get him in control and I can
6  get him the help he needs.
7  BY MR. HILL:
8  Q   How did not calling an ambulance while Jordn
9  was contained in the Jeep help Jordn?
10     MR. BECK: Objection.
11  A   At that point, he was a general medical -- or
12  not medical, but mental call.  At that point, I did not
13  see that he needed immediate EMS.  So it wasn't a routine
14  call at that point with mental patients.
15  BY MR. HILL:
16  Q   In light of everything you've testified about
17  his behavior in the Jeep?
18  A   And that didn't come until later on, so yes.
19  Q   I mean, what I'm saying is when you're outside
20  the Jeep, before you extract him from the Jeep, how did
21  not calling an ambulance at that time help Jordn?
22     MR. BECK: Objection.
23     Go ahead.
24  A   Just because he is yelling at people or yelling

Page 55

1  and making no sense doesn't necessarily mean he's a
2  medical crisis at that point.  I did not see a need for an
3  ambulance at that specific point.
4  BY MR. HILL:
5  Q   How did forcefully removing Jordn from the Jeep
6  help Jordn?
7     MR. BECK: Objection.
8  A   That is the only way we're going to gain
9  control of him.
10  BY MR. HILL:
11  Q   How did holding Jordn in a prone position help
12  Jordn?
13     MR. BECK: Objection.
14  A   Again, that's the only way we can get control
15  of him because that's the only position he will allow us
16  to put him in.
17  BY MR. HILL:
18  Q   How did using a electrical-conducted weapon on
19  Jordn, while he was in a face-down prone position, help
20  Jordn?
21     MR. BECK: Objection.
22     Go ahead.
23  A   The best tool to try to gain that compliance
24  and control.

Page 56

1  BY MR. HILL:
2  Q   How did using a electrical-conducted weapon a
3  second time on Jordn, while he was in a face-down prone
4  position and in handcuffs, help Jordn?
5     MR. BECK: Objection.
6     Go ahead.
7  A   The best tool to continue to try to gain that
8  control.
9  BY MR. HILL:
10  Q   How did three officers holding Jordn down in a
11  prone position face down until he became unresponsive help
12  Jordn?
13     MR. BECK: Objection.
14  A   He was still combative.  We could not do
15  anything with him until we had control of him.  We had to
16  maintain the control and get him to calm down before we
17  could help him.
18     Three officers holding him down actually helped
19  prevent less injury to him than just one officer or two
20  officers, because he could not flail as much of his body
21  and hurt himself or bang his head off the rocks.
22  BY MR. HILL:
23  Q   I'm going to hand you what's marked as Exhibit
24  3.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 2
March 15, 2017

---

Page 57

1      (Exhibit Number 3 was introduced.)
2   BY MR. HILL:
3   Q   If you could take a look at that.
4   A   (Reviewing document.)
5   Q   Have you had a chance to review that?
6   A   Yeah.
7   Q   Is this a document you're familiar with?
8   A   Yes.
9   Q   What's marked as Exhibit 3 is an Excited
10  Delirium Directive; is that correct?
11  A   Yes, sir.
12  Q   And this is a directive here at the Springfield
13  Township police department?
14  A   Yes, sir.
15  Q   And the document is dated March 16th, 2009?
16  A   Yes.
17  Q   And this is the same directive that was in
18  place as of September 8th, 2015, here at Springfield
19  Township?
20  A   Yes.
21  Q   And is this directive still in place today?
22  A   I believe it is, yes.
23  Q   At least as of March 16th, 2009, Springfield
24  Township officers understood that excited delirium was a

---

Page 58

1   significant enough problem that officers need to be
2   trained on how to respond to it; true?
3   A   Yes.
4   Q   This is, excited delirium, a common enough
5   incident that it was likely enough to occur that officers
6   needed to be trained on it; fair?
7   A   We don't have many, but it is -- like I said
8   earlier, it's a worldwide problem that some believe, some
9   don't.
10  Q   You've taught on excited delirium; correct?
11  A   Yes.
12  Q   You believed in it enough to teach on it to
13  your fellow officers; fair?
14  A   Yes.
15  Q   Same with respect to the directive.  It was
16  understood here at the department; correct?
17  A   Yes.
18  Q   And my understanding is that you actually
19  participated in drafting some of the language in this
20  document?
21  A   Yes.
22  Q   Did you draft the entire document?
23  A   I don't know if I drafted the entire thing.  I
24  know we worked on it and then we gave it to the attorneys.

---

Page 59

1   So I don't know if they changed some language or anything
2   like that.
3   Q   You and Chief Smith worked on it together?
4   A   Yes.
5   Q   Do you approve of the language in it?
6   A   Yes.
7   Q   You gave it to the chief -- to the attorneys
8   for Springfield Township?
9       MR. BECK: Objection.
10  A   Yeah, the legal --
11  BY MR. HILL:
12  Q   I don't want to know the discussions.  But it
13  came back from the attorneys, and at that point it was the
14  directive here for Springfield Township?
15      MR. BECK: Wait a minute.  He's not going to
16  answer that question.
17      MR. HILL: Whether it went to him, I don't
18  think is privileged.
19      MR. BECK: Well, you can ask him if he knows
20  whether that happened or not.
21  BY MR. HILL:
22  Q   I don't want to put words in your mouth.  I
23  thought you just testified that you thought it went to the
24  attorneys?

---

Page 60

1   A   I believe it did go to the attorneys, but I
2   never took it to them personally.
3   Q   That's fine.
4       It comes back at some point and it becomes the
5   directive for how to respond to excited delirium here at
6   Springfield Township; correct?
7   A   Yes.
8   Q   After it came back, you still approved of the
9   language in it; correct?
10  A   I wouldn't have had a choice, but yes.
11  Q   You don't have a choice, because that's the
12  policy here; right?
13  A   Yes.
14  Q   It states at the top, under directive:  "Any
15  officer who encounters a person who exhibits any warning
16  signs of excited delirium shall immediately summon EMS and
17  have them respond to a nearby staging area."  Correct?
18  A   Yes.
19  Q   We've already discussed all the warning signs
20  for excited delirium; right?
21  A   Yes.
22  Q   Why is it important for an officer, who
23  encounters any warning signs of excited delirium, to call
24  for an ambulance immediately?

---

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 2
March 15, 2017

Page 61

1    A   You want to try to get EMS in the area so that
2 they can respond, just help the response, basically, try
3 to make sure that the -- you can get any medical treatment
4 there a little bit quicker.
5    Q   Because excited delirium is a life-threatening
6 medical condition?
7    A   It could be.
8    Q   In the second paragraph, it states:  "It will
9 be our directive not to leave the subject laying in a
10 face-down prone position."  Correct?
11    A   Yes.
12    Q   And that's what you taught your fellow officers
13 here at Springfield Township; true?
14    A   Yes.
15    Q   You talked earlier about a post incident review
16 or a debriefing; right?
17    A   Yes.
18    Q   Who conducted that post incident review?
19    A   It was a pastor who was trained to do police
20 debriefing and fire and EMS debriefings.  It's a
21 counseling center.
22    Q   So this post incident debriefing that we're
23 talking about right now, was this more of a counseling
24 session for the police officers in terms of what they were

Page 62

1 going through emotionally, because somebody had died, or
2 was this to debrief the incident and find out whether
3 everything happened according to protocol?
4    Do you see what I mean, the difference between
5 the two?
6    A   Yeah.  This is a total outside agency.  It's a
7 -- like I said, it's a pastor.  It's more for emotional
8 and not so much of protocols or policy guidelines.  It has
9 nothing to do with what happened within the agency.
10    Q   With respect to any internal investigation, as
11 to what happened, whether you -- this was consistent with
12 policies or protocols or anything else, did you sit down
13 and were you interviewed by someone?
14    A   No.
15    Q   Do you know if either Officer Holsopple or
16 Moore were ever interviewed about the events that took
17 place on September 8th, 2015, in order to investigate the
18 use of force or the in-custody death?
19    A   I don't know.
20    Q   Other than the investigative notes that you
21 created and the Use of Force Report and the things you
22 have in front of you, you didn't create any other
23 documentation, did you, regarding Jordn Miller?
24    A   No.

Page 63

1    Q   It's my understanding that a search warrant was
2 effected on September 9th for some photos of Jordn Miller
3 at the hospital.
4    Did you have anything to do with that?
5    A   I had nothing to do with that.
6    Q   Did you ever see Jordn at the hospital when he
7 was, you know, in a hospital bed or anything like that?
8    A   No.
9    Q   I'll try to get through this quickly.  I'll
10 hand you what's been marked as Exhibit 7.
11    (Exhibit Number 7 was introduced.)
12 BY MR. HILL:
13    Q   It's a collection of documents I received from
14 your attorneys regarding some historical uses of a Taser.
15    A   (Reviewing document.)
16    Q   Have you had a chance to glance at that?
17    A   Yes, sir.
18    Q   Some of these have probably been a few -- been
19 a little while since you saw them; right?
20    A   Yes, sir.
21    Q   So within Exhibit 7, if you could flip to the
22 fifth page.
23    You told me earlier that -- well, page 5 --
24 let's see -- 4, 5 and 6 of Exhibit 7 are a Use of Force

Page 64

1 Report that you completed for a Taser application; true?
2    A   Yes.
3    MR. BECK: What's the date on that?  Is that
4 10-25?
5    MR. HILL: This is 12-9-08.  It's report number
6 08-3246.
7    THE WITNESS: What was the date?
8 BY MR. HILL:
9    Q   The date and time of incident is December 9th,
10 2008, and it's at 22:49, is the time stamp.
11    A   Okay.
12    Q   And it's report number 08-3246?
13    A   Yes.
14    Q   Now, you said earlier, I believe, that all
15 Taser Use of Force reports have to be authorized and
16 signed off on by a supervisor; correct?
17    A   Yes.
18    Q   So if you look at -- and maybe I'm missing
19 something.  But if you look at this, the three pages that
20 make up this Use of Force Report, I don't see any
21 signature from a supervisor.
22    A   Yeah, if you look at the name of the supervisor
23 notified, it says I was the OIC.
24    Q   What does that mean?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 2
March 15, 2017

Page 65

1    A   That means that I was the officer in charge for
2  the day, which means I was the supervisor.
3    Q   So sometimes you supervise yourself?
4    A   Yes.
5    Q   And so you -- on this application of a Taser,
6  you wouldn't have gotten a supervisor's approval because
7  you're supervising yourself?
8    A   Yes.
9    Q   And on this occasion, where you sign off as
10  your own supervisor, it says you actually applied the
11  Taser three times to this person, is that correct, three
12  applications?
13        It would be on Page 5, under "length of time
14  for electrical current application."
15    A   Yes, that's what it says.
16    Q   If you go to Page 10.  This is report number
17  07-0853.
18    A   Okay.
19    Q   On the second page of this report -- was this a
20  person that you tasered who was in a holding cell at the
21  jail?
22    A   I will need to read what it's about, first.
23        (Reviewing document.)
24        Okay.  I'm sorry.  What was the question, now?

Page 66

1    Q   If I understand it, the Taser was used on a guy
2  who had passed out on drugs, he had earlier passed out on
3  drugs?
4    A   He had -- it shows he was passed out at one
5  point, according to the call -- or the witnesses, yes.
6    Q   So this is just a -- this is a Taser that was
7  applied to a guy who was in a holding cell after he was
8  known to be on drugs; correct?
9    A   Yes.
10    Q   If you go to Page 12, which is Page 3 of 3 of
11  that Taser report, there's an area for the officer
12  submitting the report and the supervisor's approval;
13  correct?
14    A   Yes.
15    Q   And both of those are blank; correct?
16    A   Yes.
17    Q   Why is that?
18    A   I couldn't even tell you why.
19    Q   Do these reports get reviewed by someone
20  internally going up the chain?
21    A   I -- I don't know if sometimes the chief or
22  captain would want to look at them, but I don't know if
23  they do every time.
24    Q   Do you know if there's any kind of a process

Page 67

1  here when a Use of Force Report is made or Taser use it
2  does go up the chain?
3        I don't mean a situation where maybe a chief
4  looks at it or maybe somebody else looks at it, but I'm
5  talking more on a systematic level.  Are you aware of any
6  kind of a process where, "Here's the report.  Here's who
7  reviews it"?
8    A   No.  I turn it in to my supervisor.  And what
9  he does with that, I don't know.
10    Q   What do you do when you're the supervisor?  How
11  do you turn it in?
12    A   I would usually just put a copy in the chief's
13  mailbox.
14    Q   So the chief is getting all of these documents?
15    A   I would assume so, yes.
16    Q   I mean, they're going --
17    A   At least when I would be the supervisor, he
18  did.
19    Q   And the person you're supervising is just
20  yourself?
21    A   Yes.  Or a shift underneath me.  I wouldn't
22  just supervise myself, but I also might supervise three or
23  four other people underneath me.  So --
24    Q   This would be when you're kind of like an

Page 68

1  acting sergeant?
2    A   Yes.
3    Q   Because the sergeant is gone?
4    A   Yes.
5    Q   And that would be Sergeant Moore usually?
6    A   Yes.
7    Q   If you could go to Page 19 in Exhibit 7.  It's
8  an accident report.
9    A   (Reviewing document.)
10        Okay.
11    Q   Did you complete this accident report?
12    A   Yes.
13    Q   And I have some questions about some of the
14  terminology.
15        There's a question where it states, about
16  halfway through the page, what duties were being performed
17  at the time of the accident.  Do you see that?
18    A   Yes.
19    Q   And when it says what duties are being
20  performed, that's a place for you to explain what your
21  responsibilities were as a public servant?
22    A   Yeah, what was I doing at the time, yes.
23    Q   And you select the language that you put in
24  here.  It's not a check box; correct?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 2
March 15, 2017

Page 69

1    A   Yes.
2    Q   Or a pull-down?
3        And the terminology you use is "fighting with a
4  mental."  Correct?
5    A   Yes.
6    Q   What does that mean, fighting with a mental?
7    A   Fighting with somebody who is just mentally not
8  on the same level as we are.
9    Q   Somebody whose capacity is diminished?
10   A   Yes.
11   Q   And underneath that there's a question that
12  says, "How did the accident happen?"  And you again
13  include "fighting with a mental."  Correct?
14   A   Yes.
15   Q   Is that a phrase that's used here in the
16  department, a mental?
17   A   Yes.  As a matter of fact, that's our code.  53
18  is a mental.  That's what -- we have codes and signals
19  that we are dispatched by.  When you get a number, our
20  dispatchers give us a number, code 53 or signal 53 -- next
21  to that, the definition is mental.
22   Q   If you go to the next page, Page 20, there's a
23  supervisor's evaluation of injury.  Do you see that?
24   A   Yes.

Page 70

1    Q   And who is your supervisor -- the date on this
2  is February 28th, 2013; correct?
3    A   Yes.
4    Q   And this captain who signed this, what is his
5  name?
6    A   Captain Kenny Ray.
7    Q   Is Kenny Ray still with the force here?
8    A   No, he retired.
9    Q   So there's a supervisor's evaluation of injury;
10  correct?
11   A   Yes.
12   Q   And there's a number of items predesignated
13  that can be checked, and then there's another that says,
14  "other, specified."  And is that the captain who writes --
15  or the supervisor who writes that information?
16   A   Yes.
17   Q   And what he says here, his description is,
18  quote, "No way to prevent fight with mental person," end
19  quote; correct?
20   A   Yes.
21   Q   And then it says, "What have you done to
22  eliminate this condition," and the answer is "nothing."
23  Correct?
24   A   Yes.

Page 71

1    Q   Actually, I saw that you used the phrase
2  "superhuman strength" on page 18 of this document, in
3  describing someone.
4        It's a typewritten form.  It's the page before
5  the accident report, and it's at the bottom -- the second
6  paragraph at the bottom, it says, "Nathan displayed
7  superhuman strength, which is consistent with a person who
8  has mental illness or excited delirium behaviors."
9    A   Yes.
10   Q   Is that you who wrote that?
11   A   Yes.
12   Q   So when you're approaching somebody who has got
13  a mental illness, one of the things you have to anticipate
14  is this superhuman strength?
15   A   Potentially.  Not everyone.
16   Q   I'm going to hand you what's marked as Exhibit
17  8.  It's another set of documents I have from your
18  attorneys.
19       (Exhibit Number 8 was introduced.)
20  BY MR. HILL:
21   Q   And this was provided to us.
22       We just looked at your Taser history, I think,
23  over the last five years.  This is something that we
24  received with respect to Sergeant Moore's Taser use over

Page 72

1  the last five years.
2        I guess before I get into this, can I ask you a
3  question?
4        When you were the Taser instructor, were you on
5  a consistent basis reviewing Use of Force Taser reports?
6    A   No.
7    Q   Other than your own, did you ever review them?
8    A   Most of it was just word of mouth.
9    Q   When you say that, do you mean just kind of
10  talk amongst the department, so and so had to use a Taser
11  for this reason?
12   A   Yes.
13   Q   So I want you to look at the first five pages
14  of Exhibit 8, so pages 1 through 5.
15       And it says it's report number 11-3142.
16       It looks like there are the typical three kind
17  of preprinted forms for the Use of Force Report, and then
18  attached -- or for the Taser report, and then attached to
19  that is a Use of Force Report and a typewritten
20  description; correct?
21   A   Is this all one incident, or no?
22   Q   Yes, as far as I can tell.  It all appears to
23  be incident 11-3142.
24   A   Oh, okay.  I see it.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 2
March 15, 2017

Page 73

1    Q    Make sure that's right, though.
2    A    Yeah, it separates --
3    Q    It is all the same incident, though; correct?
4    A    Yeah.
5    Q    So if you look at Page 2, there is a name of a
6  supervisor notified, and that's a Captain Ray?
7    A    Yes.
8    Q    I believe that's Kenny Ray we just talked
9  about?
10   A    Yes.
11   Q    If you look at Page 3, the officer submitting
12 this report, it says, "Sergeant Moore"?
13   A    Yes.
14   Q    And that's Denise Moore?
15   A    Yes.
16   Q    Who is your day-to-day supervisor?
17   A    Yes.
18   Q    And then below that, "supervisor's approval."
19 And whose signature is that?
20   A    That is mine.
21   Q    Why are you approving your supervisor's use of
22 force?
23   A    Well, it's not so much the use of force as much
24 as it's just the report.  And as an OIC, sometimes the

Page 74

1  sergeant will have them do that, especially if somebody is
2  going to jail or something or if we're trying to get
3  something done quickly.  They can have another OIC just
4  look at it and sign off on it.
5    Q    So the only time you're signing off as a
6  supervisor is for your own uses of the Taser; correct?
7        MR. BECK: Objection.
8  BY MR. HILL:
9    Q    Or Sergeant Moore's?
10       MR. BECK: Objection.
11       Go ahead.
12   A    Well, if any sergeant wanted me to sign off on
13 it as an OIC, then I can do that.
14  BY MR. HILL:
15   Q    So there are -- this is something you do on
16 occasion?
17   A    Yes.  And I might not even have been working
18 with her during this incident.  So I might have been
19 coming on at four to midnight at that point and been the
20 OIC for the four to midnight shift.  So then she would
21 have turned it in to me.  So I don't even know if I was
22 present.
23   Q    So are there other Taser uses where you have
24 signed off for your colleagues here?

Page 75

1    A    I believe so.
2    Q    Okay.
3    A    There could be.
4    Q    And does that continue to this day?
5    A    Yes.
6    Q    When is the last time that happened?
7    A    For a use of force, not -- not for a while.
8  But maybe just a general report, you know, the last few
9  months or so maybe.
10   Q    What do you mean a general report?
11   A    Just somebody broke into my car type of report
12 and it needs checked.
13   Q    How about with respect to use of force?
14   A    No, it hasn't been for a while.
15   Q    Can you give me a time frame, roughly?
16   A    Not even close.
17   Q    If we look at the description -- I guess maybe
18 just to make sure I'm clear.  I think I am, but -- you
19 signed off as the supervisor approving Sergeant Moore's
20 use of the Taser, but you were not her supervisor; is that
21 correct?
22   A    That is correct.
23   Q    And when you approve the use of the Taser, you
24 have to have an understanding of the reason why the Taser

Page 76

1  was used; correct?
2    A    Yes.
3    Q    So you would have reviewed the narrative and
4  the other information here that's included in report
5  number 11-3142; correct?
6    A    Yes, I would read it.
7    Q    And the description is the suspect was engaged
8  in turbulent behavior, trying to diffuse imaginary bombs;
9  correct?  On Page 5?  It's the first sentence.
10   A    Yes.
11   Q    A person trying to diffuse imaginary bombs
12 paints a picture of someone with some mental health
13 issues; correct?
14   A    Yes.
15   Q    That's not a normal thing that you're
16 encountering as a police officer, people trying to diffuse
17 imaginary bombs?
18   A    It wouldn't be the first time, but yes.
19   Q    And if I understand the narrative, Sergeant
20 Moore used the electrical-conducted weapon two times on
21 this individual after he was in handcuffs?
22   A    Yes, that's what she says.
23   Q    And you approved the use of the Taser on this
24 apparently mentally odd individual who was handcuffed;

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 2
March 15, 2017

Page 77

1  correct?
2     A  And extremely violent, yes.
3     Q  Was he in -- was he also in a police cruiser
4  and handcuffed when he was tasered twice?
5     A  Again, I -- I'm just reading what she wrote,
6  because I cannot recollect this incident.  And it -- I
7  would say that it probably appears that he was in a
8  cruiser.
9     Q  And handcuffed, correct, according to the
10 documentation that you approved?
11    A  I don't see anywhere where he's handcuffed yet.
12 I see it says in there that they -- well, we tried to
13 handcuff him, but he wouldn't allow us.  So I do not know
14 from a recollection standpoint if he was cuffed at this
15 point during the deployment or not.
16    Q  I think I handed you what was exhibit -- I
17 think it's Exhibit 11, which is the Taser data report.
18    A  Yes.
19    Q  On page -- it's 11 pages, correct, Exhibit 11?
20 There's page numbers at the top.
21    A  Yeah.  It says 9 of 11 -- or 11 of 11, so I'm
22 missing 10.
23    Q  This is what I received.
24       MR. HILL: So we might need another page filled

Page 78

1  in.
2     BY MR. HILL:
3     Q  But there's a serial number listed at the top
4  of Page 1 of 11; correct?
5     A  Yes.
6     Q  Is that your Taser?
7     A  I would assume.  I can't -- I don't know the
8  serial number off the top of my head.
9     Q  Do you use the same Taser day in and day out?
10    A  Yes.  It's assigned to me.
11    Q  And then if you look at -- on the left-hand --
12 and I'm assuming this is your download report.  This is
13 what I received in response.  But there's a report
14 generated on 9-8-15, at 7:09 p.m., it looks like.  So the
15 day that there was this incident with Jordn Miller, okay?
16       Do you see that on the Page 1 of 11, on the
17 right-hand side?  And I guess we can match up the serial
18 numbers, because you --
19    A  Okay, yeah.  I see what you're saying, yeah.
20    Q  I guess we can match up the serial numbers,
21 because you wrote the serial number down; right?
22    A  Yeah, that should be on the Use of Force, the
23 Taser report.
24    Q  So it's X00-445350, is what you wrote on the

Page 79

1  Taser Use of Force Report, Exhibit 1.  That's the same
2  Taser number that's listed on Exhibit 11?
3     A  Yes, sir.
4     Q  And on the left-hand side, there's a column
5  that says, "Recorded firing data."  Correct?
6     A  Yes.
7     Q  So those are all the times that you squeezed
8  the trigger and activated the Taser?
9     A  Yes.
10    Q  And it's very difficult to tell, but the
11 time -- the time stamp on all of these uses of the Taser
12 are -- are inaccurate; correct?
13    A  I don't understand.  What do you mean by
14 inaccurate?
15    Q  GMT time zone, so our time, eastern time, it
16 says 1-26-2009 through April 26th, 2001.
17    A  Okay.
18    Q  Okay.  So those aren't the time periods that
19 involve this event; right?
20    A  Oh, not this event, no.
21    Q  And there's a corrected time.  It says, "new
22 time," at the bottom of September 8th, 2015.  Do you see
23 that at the very last column?
24    A  On what page?

Page 80

1     Q  It's the very last page.  The very last entry.
2     A  Yes, I see that.
3     Q  So, but according to this document, it says
4  that you fired the Taser, at least since this one was
5  issued to you, about 290 times?
6     A  Probably, yes.
7     Q  And some of those times are the five-second
8  period, which is the pre-selected data; correct?
9     A  Yes.
10    Q  That's just when you hit it, that's where it
11 goes?
12    A  Yes.
13    Q  And then there are shorter durations at times;
14 correct?
15    A  Yes.
16    Q  And those are times where you squeezed the
17 trigger but let off of it?
18    A  Yes.
19    Q  And when that happens -- and that's something
20 you do sometimes; you squeeze it and then let off?
21    A  Yeah, we test it.  Most of these are just test
22 firings.
23    Q  How often do you test it?
24    A  We recommend at least once a week.  Sometimes

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 2
March 15, 2017

Page 81

1 we'll do it daily.  Sometimes we'll go a month.  But most
2 of these are just test firings.
3          So you might test it and let it ride the full
4 five seconds, and then other times you might just see if
5 it sparks up and then shut it right back off.
6     Q    Have you ever reviewed this Taser download
7 report before?
8     A    Not this, no.
9     Q    The last two entries, where there's actually a
10 time sequence being recorded, are both five-second
11 durations, so the full amount, correct, the full squeeze
12 of the Taser cycle?
13    A    Well, the last two, all it says is old time and
14 then new time.  There's no durations.
15    Q    I'm talking about the last two durations that
16 are listed.
17    A    So you're talking about 0292 and 0293?
18    Q    Yeah.  I don't know if those are the times with
19 Jordn Miller or not, since all the dates are inaccurate.
20    A    Yeah.  I don't -- I don't know what those
21 bottom -- the 0294 and 0295 is, where it says, "old time"
22 and "new time," so I don't know what that is.
23          The ones that you were asking me about, that
24 would be some sort of discharge or cycling of them,

Page 82

1 because it would indicate, you know, like you said, the
2 five-second cycle there, so --
3     Q    Right.  I mean, I ask because the dates don't
4 match up with any of the time that you were involved with
5 Jordn Miller; correct?
6     A    Yes.
7     Q    And the time stamp appears to put this, I
8 guess, at about 8:52 p.m.
9     A    Yeah, that's what it says.
10    Q    Which is also not consistent with Jordn Miller;
11 correct?
12    A    That is correct.
13    Q    So when you're -- when you're testing these
14 Tasers, are you testing whether they're downloading
15 accurately?
16    A    No.  I don't --
17    Q    Or the dates on them?
18    A    When I -- when I stopped being the instructor,
19 we don't -- the users don't download the data.  Only the
20 Taser instructors download the data.
21          So after I stopped being the instructor, I
22 never had any more issues with downloading them.
23    Q    Sure.  As the instructor, when you did download
24 the data, how often did you do that?

Page 83

1     A    I tried to do it monthly.
2     Q    For yours or for everyone's?
3     A    Everyone's.
4     Q    And did you try to make sure the time was -- I
5 mean, if you saw a time that was off by 14 years, would
6 that raise some red flags and you would have it reset?
7     A    Yes.
8     Q    Did that ever happen, when you were an
9 instructor, the time was off and it had to be reset, on
10 the Taser?
11    A    I can't recall.  But you can -- if you catch it
12 soon enough, you can just reset the clock yourself.
13    Q    And how do you -- and I don't know if it's
14 changed or not.  But while you were the instructor, how
15 did you download this information or data with this
16 information?
17    A    Taser actually had a DPM that was hooked up to
18 a USB port that you would just plug into a computer.  And
19 once you plugged it in, their program would open up, and
20 it would just automatically download.
21    Q    And I know you're not the instructor any
22 longer.
23          Do you have any idea whether or not anyone at
24 Springfield Township is testing or downloading this

Page 84

1 information to make sure it's being accurately recorded?
2     A    I have no idea.
3     Q    And as a former Taser instructor yourself, who
4 has downloaded this information and analyzed these
5 reports, can you identify with any amount of accuracy
6 whether the Taser applications that you used with Jordn
7 Miller are listed on that report?
8     A    Not that I can --
9     Q    Okay.  Thanks.
10    A    -- see.
11    Q    Did you ever go in Jordn Miller's home?
12    A    No.
13    Q    Have you ever spoken to any of his family
14 members?
15    A    No.
16    Q    Have we discussed all of the times you've
17 spoken to anyone here at the department about Jordn, Jordn
18 Miller?
19    A    You mean about our incident?
20    Q    Yes.  Well, any incident.
21    A    Just our incident, yeah.  We talked about that
22 very first thing yesterday.
23    Q    That's what I mean.  But we've covered all of
24 that?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 2
March 15, 2017

Page 85

1    A    Yes.
2    Q    And there's nothing else that you want to add?
3    A    Not that I can recall.
4    Q    I just want to make sure, you know, down the
5  road at trial there isn't some new revelation or a long
6  story of a conversation you had with somebody.
7         And I'm going to hand you a photograph. It's
8  only one photograph. I don't have a copy, so we'll just
9  mark it as an exhibit. I received these from your
10 attorney.
11   (Exhibit Number 14 was marked for identification.)
12 BY MR. HILL:
13   Q    Just for the record, that picture you have in
14 front of you, that we'll mark as Exhibit 14 for today, is
15 that Jordn Miller?
16   A    I would believe so.
17   Q    As far as you can tell, that is the same
18 individual?
19   A    As far as I can tell, yes.
20   Q    There are a number of scrapes and scratches and
21 things like that on Jordn's body. Do you know how those
22 got there?
23   A    Well, I can see with the knees. And again, I
24 can only assume from the gravel and him being in shorts

Page 86

1  and the way he was fighting and flailing around that he
2  caused those injuries.
3    Q    And I ask because when we described Jordn in
4  the vehicle you didn't say anything about his bleeding or
5  having any apparent wounds.
6    A    Not that I noticed at that point.
7         MR. HILL: Do you want to give me about two
8  minutes? I'm just going to look over my notes. But I'm
9  pretty sure we're done, okay?
10        THE WITNESS: Yes, sir.
11        MR. BECK: Let's step outside.
12        (Recess taken.)
13        MR. HILL: Officer Scherer, I don't have any
14 additional questions for you at this time, but it's my
15 understanding that your attorney might have some questions
16 for you.
17        THE WITNESS: Okay.
18        DIRECT-EXAMINATION
19 BY MR. BECK:
20   Q    Officer Scherer, for the record, as you know,
21 my name is Greg Beck, and I represent you and the Township
22 in this claim. And we've been on the record for maybe
23 close to six hours, so there are just a couple things that
24 I need to ask.

Page 87

1         First of all, on your training and the
2  department training on use of force, how often is that
3  training conducted?
4    A    It was yearly.
5    Q    Is it still yearly?
6    A    It is.
7    Q    What about Taser training?
8    A    Yearly.
9    Q    The old designation for the force continues, to
10 be the force continuum, what do you use now? How is it
11 actually described as far as the process an officer might
12 be called upon to use?
13        MR. HILL: Objection to form.
14   A    I don't believe we've -- we personally here
15 have renamed it to anything specific.
16 BY MR. BECK:
17   Q    Is response to resistance something that's used
18 in the police department?
19        MR. HILL: Objection to form.
20   A    To a point, yes.
21 BY MR. BECK:
22   Q    In this particular situation, you were asked
23 many questions with respect to your actions.
24        What -- why did you respond the way you did?

Page 88

1    A    I responded the way I did based on the facts
2  that I had received from the radio call. And that's the
3  only way I can respond until I know something different.
4    Q    You testified before about the number of cycles
5  that one might utilize using a Taser on a confrontation,
6  and you mentioned three cycles.
7         Did you mean three cycles total or three cycles
8  at a time? What did you mean?
9         MR. HILL: Objection to the form.
10   A    We try not to use any more than three cycles in
11 total.
12 BY MR. BECK:
13   Q    Well, the reason I ask that question is you
14 were asked a series of questions about the times a suspect
15 may be tased during compliance.
16        Your policy is how many cycles for any given
17 encounter?
18        MR. HILL: Objection to form.
19   A    Yes. We try to use the minimum cycles
20 required. We try not to exceed three.
21        However, at times we might have to use more
22 just to gain that compliance and control. It all depends
23 on the subject and how he is resisting us and fighting
24 with us.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 2
March 15, 2017

Page 89

1  BY MR. BECK:
2      Q   In your -- in the reports, the Use of Force
3  Report and the Taser Report, are these reports based upon
4  information that you accumulate later, or are they based
5  on what information you have at the time of the encounter?
6      A   At the time that we encounter.
7      Q   The reason I ask that question, with respect to
8  Exhibit 1, you were asked questions about the note that's
9  at the bottom of Page 3.  And you weren't asked the full
10 -- you weren't ask the question on the full statement.
11 You were asked only part of it.
12         The statement says:  "The suspect was believed
13 to be in full excited delirium state and full of unknown
14 narcotics, according to his mother," end quote.
15         Did you know at the time or believe at the time
16 that he had drugs on board?
17     A   We did not know at the time.
18     Q   So when you say the subject was believed, is
19 that based upon what you learned later from the mother?
20     A   Yes.
21     Q   All right.  There were many questions about the
22 efforts that you and Officer Holsopple used, along with
23 Sergeant Moore, to control Mr. Miller.
24         But when any suspect is resisting arrest, are

Page 90

1  the officers in danger?
2      A   Yes.
3      Q   And what's the nature of that danger?
4      A   It could be anything.  They could get our guns.
5  They could get our Tasers.  They could grab rocks from a
6  driveway or anything and use as a weapon against us.
7          Any time we fight with somebody, there is a
8  level of danger.
9      Q   Is one part of the -- what is this notion of
10 revolver retention?  In police parlance, what does that
11 mean?
12     A   I'm sorry, what?
13     Q   Revolver retention, what does that mean?
14     A   The way I read it as:  Keeping your firearm
15 safe.
16     Q   And in other words, when a suspect is resisting
17 arrest, that suspect could have access to your own weapon?
18     A   There is a weapon there, and he can easily get
19 that from us if we can not control him.
20     Q   Particularly a suspect that has a lot of
21 strength, a lot of resistance?
22     A   Yes.
23     Q   You were asked a lot of questions about what
24 you observed in the car of Mr. Miller before you chose to

Page 91

1  remove him, along with Officer Holsopple.
2          There's a mention in your summary that he tried
3  to exit the window.  Do you recall that?
4      A   I don't recall that.
5      Q   Do you even know whether the window was open or
6  shut?
7      A   The window was open.
8      Q   The driver's side window?
9      A   I believe the driver's side window was open.
10 That's where he was sitting.
11     Q   And the only reason I ask that, you were not
12 asked about that specific event.  But you have no specific
13 recollection about his attempt?
14     A   I can't recall that now.
15     Q   You were asked a lot of questions about the
16 position of Mr. Miller's arm that was underneath him.
17         Have you ever seen a situation where a suspect
18 refuses to comply to handcuffing procedure?
19     A   Hundreds of times.
20     Q   How is that done?
21     A   The most -- the most common method is somebody
22 will take their hands and just bring their elbows in right
23 underneath them.  And then once they're in this position,
24 it makes it -- they have very, very strong strength.  It

Page 92

1  makes it very difficult to pry an arm out from that area.
2  And this is a very common move and method that they use.
3  Or they'll come in and grab their clothing to help lock
4  their arms in underneath them or against their bodies.
5      Q   With respect to Mr. Miller -- and I think there
6  was a lot of testimony about perhaps his right arm was
7  underneath him.  Do you know exactly where it was
8  underneath his body?
9          MR. HILL: Objection to form.
10     A   It was under his body.  I can't tell you where
11 exactly.
12 BY MR. BECK:
13     Q   Well, I ask that question because counsel asked
14 repeatedly about whether or not the arm was up against his
15 diaphragm or beneath his diaphragm.
16         I'm asking you, based on your observations, do
17 you know where his arm was located?
18     A   I did not know.  I just knew it was underneath
19 him.
20     Q   So even someone -- so is it your testimony that
21 even someone who does not have what seems to be inordinate
22 strength, that man or woman could resist aggressively a
23 cuffing technique if they simply pull their arms in, as
24 you've described?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 2
March 15, 2017

Page 93

1          MR. HILL: Objection to form.
2     A   Yes, they can.  And even the weakest person,
3   when they do that, can make it very difficult to handcuff.
4   BY MR. BECK:
5     Q   When you prepared your summary and also your
6   Use of Force Report, did you look at the dispatch logs
7   that showed the exact times and so forth?
8     A   I did not.
9     Q   And would it be fair that the dispatch logs
10  might have the most accurate identification of when you
11  arrived on scene and the actions that may have occurred
12  later?
13         MR. HILL: Objection to form.
14    A   They would.
15  BY MR. BECK:
16    Q   And why is that?
17    A   Everything is transmitted and recorded and time
18  stamped.
19    Q   And would that include the time you arrived at
20  the scene?
21    A   The time I -- the time of call, the time we
22  arrived, the time we called for the Taser, the time we
23  cleared the scene or did anything specific.  Any time we
24  radioed in, that would stamp a time.

Page 94

1     Q   And I don't know if you were asked this
2   question.  But when you deployed the Taser the first time,
3   did you report that through dispatch?
4     A   Immediately.
5     Q   And finally, you were asked a number of
6   questions about the term "mental," which is code 53.
7     A   Yes.
8     Q   Is that just a general term that the department
9   uses to describe that category of person?
10    A   That's very general.
11    Q   And all the other codes have similar general
12  designations as well, don't they?
13    A   Yes.
14         MR. BECK: That's all I have.  Thank you.
15         MR. HILL: Really quick follow-up on Mr. Beck's
16  questions.
17         FURTHER CROSS-EXAMINATION
18  BY MR. HILL:
19    Q   During all your testimony, you never mentioned
20  that Jordn Miller made any reaches or grabs toward your
21  gun; correct?
22    A   No.
23    Q   You never saw him move his hands in a manner
24  like he was trying to grab your gun; correct?

Page 95

1     A   He did not.
2     Q   He asked some questions about revolver
3   retention.
4          When Mr. Miller was contained inside a vehicle,
5   revolver retention isn't a reason that you used force; is
6   it?
7     A   Not at that point, no.
8     Q   When Jordn was out of the car and in prone
9   position with one hand cuffed behind his back and the
10  other one underneath him, revolver retention is not a
11  reason that you used force; is it?
12    A   I have to be aware of that as always being a
13  possibility once we are hands-on with somebody.
14    Q   So when he had one hand locked underneath him,
15  like you described, and one hand handcuffed behind his
16  back, and there were two officers present holding Jordn
17  down, one of the reasons that you used force was because
18  he could grab your gun?
19    A   I'm always in fear of somebody grabbing my gun
20  when I'm hands-on with somebody.
21    Q   Is that a reason you used force?
22    A   It's always a reason I use force, yes.
23    Q   Is it one of the reasons here?
24    A   Yes.

Page 96

1     Q   When Jordn was handcuffed, with both hands
2   behind his back and in prone restraint, was revolver
3   retention one of the reasons that you used force in this
4   case?
5     A   Not at that point.
6     Q   When did revolver retention stop being an
7   issue?
8     A   When we were able to get the second handcuff on
9   him.
10    Q   So when you kicked him, was revolver retention
11  a reason?
12    A   It's still a reason, yes.
13    Q   So that's one of the factors -- one of the
14  reasons you kicked Jordn is because you were standing, he
15  was on the ground, but revolver retention was an issue?
16    A   One of the reasons of many.
17    Q   And when you tasered Jordn the second time and
18  he was in handcuffs, handcuffed behind his back, revolver
19  retention was no longer a consideration for you to use
20  force?
21    A   Not at that point.
22    Q   When the three officers, you, Sergeant Moore,
23  and Officer Holsopple, were restraining Jordn in the prone
24  position until he became unresponsive, during that entire

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 2
March 15, 2017

**Page 97**

1 time period, revolver retention was not a factor in you
2 using force; correct?
3    A  Not at that point.
4    Q  You were asked some questions about a note on
5 Exhibit 1, Page 3, where it says, "Full of unknown
6 narcotics, according to his mother."
7      Do you see that?
8    A  Yes.
9    Q  Do you remember being asked about that?
10    A  Yes.
11    Q  You never spoke to his mother?
12    A  No.
13    Q  So you got this information from someone else
14 at the department?
15    A  Sergeant Moore.
16    Q  When it says, "The suspect was" -- and this is
17 the same question and along the same lines with what
18 Mr. Beck was asking you.
19      "The suspect was believed to be in full excited
20 delirium state."
21      That's not something that you're attributing to
22 Jordn Miller's mother; are you?
23    A  I don't understand what -- how do you mean
24 that?

**Page 98**

1    Q  Well, you were asked a question. Mr. Beck
2 said, "The suspect was believed to be in a full excited
3 delirium state and full of unknown narcotics, according to
4 his mother," okay?
5    A  Okay.
6    Q  And Mr. Beck asked you: "Is that statement
7 attributed to his mother?" And you agreed yes.
8      And I'm asking you: Did Jordn Miller's mother
9 come in and tell someone at the police department my son
10 was in a full excited delirium state?
11    A  That part, no.
12    Q  Okay. So when it says what you believed at the
13 time that the force was used, the excited delirium state,
14 that's attributed to you, who completed this form?
15    A  At that time, yes.
16    Q  In terms of the three cycles of the Taser -- do
17 you remember Mr. Beck was asking you those questions?
18    A  Yes.
19    Q  You said, "At a minimum we don't want to use
20 any force." Fair?
21    A  Yes.
22    Q  You can use three cycles of the Taser and still
23 be in policy; correct?
24    A  Yes.

**Page 99**

1    Q  But sometimes here at the department you have
2 to cycle the Taser more than three times, depending on the
3 suspect?
4    A  That is true.
5    Q  All of which could be within policy here?
6    A  That is true.
7    Q  And all of that could be within policy
8 regardless of whether the person is handcuffed or not;
9 true?
10    A  That is true.
11    Q  And all of that can be within policy here
12 regardless of whether the person is mentally ill; true?
13    A  That is true.
14    Q  And all of that can be within policy here
15 regardless of whether or not the suspect is in the throes
16 of a mental health crisis; true?
17    MR. BECK: Objection.
18      Go ahead.
19    A  That's true.
20 BY MR. HILL:
21    Q  And all of that, the three cycles in handcuffs,
22 could be consistent with policy here if the person was in
23 the throes of a medical crisis; true?
24    MR. BECK: Objection. All of these questions

**Page 100**

1 are based on possibility.
2      Go ahead.
3    A  It's all true. It's all possible. Everything
4 -- it's all possible.
5 BY MR. HILL:
6    Q  I guess what I'm saying is there's no policy
7 banning that here, that type of force here at Springfield
8 Township?
9    A  No.
10    MR. HILL: No more questions.
11    MR. BECK: We'll read it. Thank you.
12      - - -
13      (Signature not waived.)
14      - - -
15      And, thereupon, the deposition was adjourned at
16 12:15 p.m.
17      - - -

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 2
March 15, 2017

---

Page 101

1                                  March 21, 2017

2
    Dear Mr. Scherer,

3
        You have chosen to read and sign your transcript.
4   Please do not mark on the transcript.  Any
    corrections/changes you may desire to make in your
5   testimony should be typewritten or printed on the errata
    sheet at the end of testimony, giving the page number,
6   line number and desired correction/change.  After you have
    read the transcript, sign your name on the correction
7   sheet and where indicated at the close of testimony before
    a notary public.

8
        The rules of civil procedure allow thirty days for
9   you to read and sign.  Please return the signature page
    and errata sheet to Whitney Layne, 6723 Cooperstone Drive,
10  Dublin, Ohio 43017 within that time.  Failure to do so in
    the allotted time will result in your transcript being
11  used as though read and signed by you.

12
                            Sincerely,
13
                            _____
14                          Whitney Layne
                            Professional Reporter
15  Cc:
    Michael Hill
16  Gregory Beck

17

18

19

20

21

22

23

24

---

Page 103

1   TO THE REPORTER:

2   I have read the entire transcript of my deposition taken

3   on the _____ day of _____, 20__, or the same has been

4   read to me.  I request that the following changes be

5   entered upon the record for the reasons indicated.

6

7   Page    Line    Correction and reason therefore

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  Date_____Signature_____

24

---

Page 102

1   State of _____

2   County of _____

3       I, ROBERT SCHERER, do hereby certify that I have

4   read the foregoing transcript of my deposition given on

5   March 15, 2017; that together with the correction page

6   attached hereto noting changes in form or substance, if

7   any, it is true and correct.

8                       _____

9                       ROBERT SCHERER

10      I do hereby certify that the foregoing transcript

11  of the deposition of ROBERT SCHERER was submitted to the

12  witness for reading and signing; that after he had stated

13  to the undersigned Notary Public that he had read and

14  examined his deposition, he signed the same in my presence

15  on the _____ day of _____, 2017.

16                       _____

17                       Notary Public

18  My Commission Expires on _____

19                          - - -

20

21

22

23

24

---

Page 104

1                       CERTIFICATE

2   State of Ohio        :

3   County of Franklin:

4

5       I, Whitney Layne, Notary Public in and for the

6   State of Ohio, duly commissioned and qualified, certify

7   that the within named ROBERT SCHERER was by me duly sworn

8   to testify to the whole truth in the cause aforesaid; that

9   the testimony was taken down by me in stenotype in the

10  presence of said witness; afterwards transcribed upon a

11  computer; that the foregoing is a true and correct

12  transcript of the testimony given by said witness taken at

13  the time and place in the foregoing caption specified.

14

15      IN WITNESS WHEREOF, I have set my hand and

16  affixed my seal of office at Dublin, Ohio, on this 21st

17  day of March, 2017.

18

19

20                      Whitney Layne, Notary Public

21                      In and for the State of Ohio

22  My Commission expires May 4, 2020

23

24

---

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 2
March 15, 2017

## A

**Abington (1)**
42:20
**able (6)**
10:18,21;11:2,5;
19:21;96:8
**access (1)**
90:17
**accident (5)**
68:8,11,17;69:12;
71:5
**according (7)**
62:3;66:5;77:9;80:3;
89:14;97:6;98:3
**accumulate (1)**
89:4
**accuracy (1)**
84:5
**accurate (1)**
93:10
**accurately (2)**
82:15;84:1
**acknowledge (1)**
7:14
**acknowledged (2)**
7:16,19
**Across (1)**
18:4
**act (1)**
31:9
**acting (1)**
68:1
**actions (2)**
87:23;93:11
**activated (1)**
79:8
**active (1)**
8:5
**actively (1)**
20:15
**activities (1)**
42:17
**activity (2)**
42:13,22
**actually (13)**
14:15;22:22;25:24;
31:6;33:21;47:6;56:18;
58:18;65:10;71:1;81:9;
83:17;87:11
**add (1)**
85:2
**added (2)**
46:20;47:21
**additional (1)**
86:14
**adjourned (1)**
100:15
**Advanced (2)**
43:23;44:2
**advising (1)**
52:14

**affected (1)**
14:16
**afterwards (1)**
46:10
**again (9)**
8:22;21:21;40:8;
43:11;45:11;55:14;
69:12;77:5;85:23
**against (4)**
36:13;90:6;92:4,14
**agency (2)**
62:6,9
**aggressively (1)**
92:22
**agitation (1)**
8:24
**agree (8)**
37:3;38:1;39:3,9,10;
40:4,7;46:19
**agreed (1)**
98:7
**ahead (14)**
15:18;17:1;21:11;
24:8;30:24;39:23;52:5;
53:9;54:23;55:22;56:6;
74:11;99:18;100:2
**air (1)**
21:19
**allow (2)**
55:15;77:13
**allows (1)**
37:6
**along (4)**
17:1;89:22;91:1;
97:17
**altercation (1)**
27:8
**always (5)**
37:23;38:5;95:12,19,
22
**Ambulance (6)**
35:3,4;54:8,21;55:3;
60:24
**amongst (1)**
72:10
**amount (6)**
37:5;38:3;39:5;
40:16;81:11;84:5
**analyzed (1)**
84:4
**answered (3)**
11:20;32:16,24
**anticipate (1)**
71:13
**anymore (1)**
33:23
**anyways (2)**
34:10,16
**apologize (1)**
13:7
**apparent (1)**
86:5
**apparently (1)**

76:24
**appears (3)**
72:22;77:7;82:7
**application (9)**
12:22;13:9,10,14;
17:3;50:8;64:1;65:5,14
**applications (2)**
65:12;84:6
**applied (3)**
50:19;65:10;66:7
**apply (1)**
49:2
**appreciate (1)**
5:8
**approaches (1)**
18:20
**approaching (5)**
14:8;40:14;41:1,2;
71:12
**approval (3)**
65:6;66:12;73:18
**approve (2)**
59:5;75:23
**approved (4)**
44:11;60:8;76:23;
77:10
**approving (2)**
73:21;75:19
**approximately (1)**
47:21
**April (1)**
79:16
**arching (1)**
16:22
**arcing (3)**
15:11,13;18:22
**area (10)**
13:21;18:14;20:24;
26:9;36:11;43:18;
60:17;61:1;66:11;92:1
**arm (5)**
91:16;92:1,6,14,17
**armor (1)**
38:20
**arms (2)**
92:4,23
**around (6)**
10:24;20:13;21:2,4,
19;86:1
**arrest (2)**
89:24;90:17
**arrive (1)**
34:13
**arrived (4)**
33:19;93:11,19,22
**arriving (1)**
30:1
**assigned (1)**
78:10
**assume (7)**
18:15;19:3;27:5;
32:8;67:15;78:7;85:24
**assuming (1)**

78:12
**attached (3)**
14:19;72:18,18
**attempt (2)**
21:18;91:13
**attempted (1)**
12:19
**attorney (2)**
85:10;86:15
**attorneys (7)**
58:24;59:7,13,24;
60:1;63:14;71:18
**attributed (2)**
98:7,14
**attributing (1)**
97:21
**authorized (1)**
64:15
**automatically (3)**
28:19;50:11;83:20
**aware (12)**
6:15,16;10:5;21:5,8;
35:12,14;37:16,17,21;
67:5;95:12

## B

**back (36)**
5:6;12:13,17;17:4;
18:8,11,14;19:2;22:7,
12,14;23:5,6,12,15;
24:14,15,19,21;25:22;
30:5;34:1,3;45:7;
46:24;47:11,21;52:8;
59:13;60:4,8;81:5;
95:9,16;96:2,18
**background (1)**
34:23
**bang (1)**
56:21
**banning (1)**
100:7
**based (6)**
88:1;89:3,4,19;
92:16;100:1
**Basically (2)**
49:15;61:2
**basis (1)**
72:5
**bat (1)**
49:9
**battle (1)**
23:3
**beating (3)**
30:19,20;31:20
**became (6)**
11:13,16,22;53:19;
56:11;96:24
**BECK (52)**
8:21;9:24;10:6;
15:17;16:3;19:10;
21:10,20;24:7;25:18;
30:22;31:5;32:2,16,20,

24;39:22;40:8;52:4;
53:8;54:1,10,22;55:7,
13,21;56:5,13;59:9,15,
19;64:3;74:7,10;86:11,
19,21;87:16,21;88:12;
89:1;92:12;93:4,15;
94:14;97:18;98:1,6,17;
99:17,24;100:11
**Beck's (1)**
94:15
**becomes (1)**
22:7;60:4
**bed (1)**
63:7
**beginning (2)**
36:16;53:18
**behalf (1)**
27:13
**behavior (3)**
8:20;54:17;76:8
**behaviors (1)**
71:8
**behind (7)**
18:7,11;41:3;95:9,
15;96:2,18
**below (1)**
73:18
**beneath (1)**
92:15
**beside (2)**
16:18;18:2
**best (2)**
55:23;56:7
**bit (3)**
45:7;52:17;61:4
**bite (6)**
6:23;7:2,6;10:23;
16:22;26:24
**biting (1)**
10:22
**bizarre (1)**
8:19
**blade (3)**
16:21;18:21;49:16
**blank (1)**
66:15
**bleeding (1)**
86:4
**board (1)**
89:16
**bodies (1)**
92:4
**body (14)**
13:16;19:14;20:24;
21:5,6,8,15,18;23:19;
38:20;56:20;85:21;
92:8,10
**bold (1)**
39:11
**bombs (3)**
76:8,11,17
**both (3)**
66:15;81:10;96:1

Layne & Associates
(614) 309-1669

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 2
March 15, 2017

**bottom (9)**
28:7;45:3;46:12;
52:19;71:5,6;79:22;
81:21;89:9
**box (4)**
46:8,9;49:15;68:24
**brain (2)**
52:12,16
**break (1)**
5:6
**breathing (6)**
21:18;22:9;30:6;
33:3,5,15
**bring (1)**
91:22
**broke (1)**
75:11
**buddy (2)**
25:4,23
**bullet (2)**
36:18,23

**C**

**calf (5)**
13:14,20,21;14:23;
17:12
**call (13)**
8:1;10:1;41:24;43:5;
48:13,14;52:14;54:12,
14;60:23;66:5;88:2;
93:21
**called (4)**
34:17;42:16;87:12;
93:22
**calling (2)**
54:8,21
**calm (1)**
56:16
**came (2)**
59:13;60:8
**can (49)**
8:18;9:1,3;10:16;
13:13,20;21:12;22:1;
25:5;30:14;39:13;40:5;
41:23;49:2;50:14,15;
51:11;53:22;54:5,5;
55:14;59:19;61:2,3;
70:13;72:2,22;74:3,13;
75:15;78:17,20;83:11,
12;84:5,8;85:3,17,19,
23,24;88:3;90:18,19;
93:2,3;98:22;99:11,14
**capacity (2)**
41:13;69:9
**captain (6)**
35:10;66:22;70:4,6,
14;73:6
**car (6)**
11:3,22;53:19;75:11;
90:24;95:8
**carotid (1)**
30:11

**cartridge (2)**
47:24;48:6
**case (2)**
35:11;96:4
**catch (1)**
83:11
**category (1)**
94:9
**caused (1)**
86:2
**causing (1)**
19:15
**cell (2)**
65:20;66:7
**center (2)**
47:11;61:21
**certain (1)**
50:23;52:7
**certified (1)**
5:3
**chain (2)**
66:20;67:2
**chance (2)**
57:5;63:16
**change (2)**
43:8,15
**changed (2)**
59:1;83:14
**changes (1)**
103:4
**charge (1)**
65:1
**check (3)**
24:12;49:2;68:24
**checked (2)**
70:13;75:12
**checking (3)**
30:8,9,10
**chest (4)**
19:9,17;20:24;33:7
**chief (12)**
35:10,11,15;38:24;
40:3;41:11;53:12;59:3,
7;66:21;67:3,14
**chief's (1)**
67:12
**choice (2)**
60:10,11
**choking (2)**
25:15;26:16
**chose (1)**
90:24
**circumstances (1)**
39:19
**claim (1)**
86:22
**clear (1)**
75:18
**cleared (1)**
93:23
**clock (1)**
83:12
**close (5)**

14:9;51:2;52:23;
75:16;86:23
**closed (1)**
7:10
**closest (1)**
13:18
**clothed (1)**
38:12
**clothing (1)**
92:3
**code (4)**
31:6;69:17,20;94:6
**codes (2)**
69:18;94:11
**cold (2)**
5:11;6:3
**colleagues (1)**
74:24
**collection (1)**
63:13
**column (2)**
79:4,23
**combative (2)**
20:14;56:14
**combination (1)**
44:21
**coming (2)**
41:3;74:19
**common (4)**
46:10;58:4;91:21;
92:2
**compared (1)**
32:6
**comparing (2)**
32:13,15
**complete (6)**
29:2,4;45:8,14;
46:11;68:11
**completed (10)**
28:21;45:17,18,20;
46:17,20;47:14;51:24;
64:1;98:14
**completely (1)**
18:9
**completes (1)**
29:12
**compliance (11)**
13:5;14:17;22:23;
50:23;51:9,12,13;
53:21;55:23;88:15,22
**comply (1)**
91:18
**computer (4)**
28:19;45:11;46:2;
83:18
**concerning (1)**
36:17
**conclusions (1)**
14:15
**condition (9)**
8:1;36:24;37:10,15,
19;41:14,17;61:6;
70:22

**conditions (2)**
34:15;43:8
**conducted (3)**
13:4;61:18;87:3
**confirm (1)**
6:10
**confrontation (1)**
88:5
**consider (9)**
7:24;36:24;40:5,5,9,
9,15;41:20,23
**consideration (12)**
38:2,24;39:8;41:11,
22;42:6,12,16,24;43:7,
12;96:19
**considerations (5)**
36:20;37:4,7;39:7;
40:11
**considered (2)**
37:24;39:19
**consistent (8)**
5:24;7:21;8:5;62:11;
71:7;72:5;82:10;99:22
**consistently (1)**
10:18
**contact (2)**
47:5,8
**contained (3)**
7:12;54:9;95:4
**continue (5)**
16:13;23:14;51:14;
56:7;75:4
**continued (1)**
16:23
**continues (1)**
87:9
**continuum (1)**
87:10
**control (18)**
10:20;11:15,18;13:6;
14:18;19:11;39:16;
53:22;54:5;55:9,14,24;
56:8,15,16;88:22;
89:23;90:19
**conversation (2)**
53:15;85:6
**copy (3)**
29:19;67:12;85:8
**corrected (1)**
79:21
**Correction (1)**
103:7
**correctly (1)**
40:9
**counsel (1)**
92:13
**counseling (2)**
61:21,23
**counting (1)**
15:2
**couple (4)**
6:6,10;28:4;86:23
**cover (1)**

43:23
**covered (1)**
84:23
**CPR (2)**
31:15;35:6
**create (1)**
62:22
**created (2)**
35:11;62:21
**criminal (2)**
42:13,22
**crisis (5)**
31:10,11;55:2;99:16,
23
**CROSS-EXAMINATION (1)**
94:17
**cruiser (2)**
77:3,8
**cuff (1)**
18:14
**cuffed (5)**
16:19;18:7;20:16;
77:14;95:9
**cuffing (1)**
92:23
**cuffs (1)**
14:23
**current (2)**
50:8;65:14
**custody (1)**
10:21
**customarily (1)**
46:7
**cutters (1)**
49:15
**cutting (1)**
49:13
**cycle (6)**
50:18,21,23;81:12;
82:2;99:2
**cycles (11)**
15:5;88:4,6,7,7,10,
16,19;98:16,22;99:21
**cycling (3)**
50:7;51:18;81:24

**D**

**daily (1)**
81:1
**danger (3)**
90:1,3,8
**dangerous (1)**
42:21
**data (7)**
77:17;79:5;80:8;
82:19,20,24;83:15
**date (8)**
36:7;45:20,22;48:8;
64:3,7,9;70:1
**Date_Signature_ (1)**
103:23
**dated (1)**

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 2
March 15, 2017

57:15
dates (3)
81:19;82:3,17
day (10)
5:21;24:6;45:14;
53:13;65:2;75:4;78:9,
9,15;103:3
day-to-day (1)
73:16
dealing (5)
29:17;38:13;39:6,17;
41:18
dealt (1)
38:7
death (1)
62:18
debrief (1)
62:2
debriefing (3)
61:16,20,22
debriefings (1)
61:20
debris (13)
25:15;26:1,6,10,16;
27:6,10,12,16,19,20,
23;34:7
December (1)
64:9
deciding (4)
37:4;38:3;39:4;
40:16
decision (1)
35:16
defined (1)
31:6
definitely (2)
10:11,11
definition (1)
69:21
degrees (1)
5:21
delirium (20)
8:2;9:8,13,19;53:7;
57:10,24;58:4,10;60:5,
16,20,23;61:5;71:8;
89:13;97:20;98:3,10,
13
delusions (1)
8:7
demonstrated (2)
10:17;21:2
Denise (1)
73:14
department (12)
10:3;57:13;58:16;
69:16;72:10;84:17;
87:2,18;94:8;97:14;
98:9;99:1
depending (1)
99:2
depends (2)
39:6;88:22
deployed (1)

94:2
deployment (1)
77:15
deposes (1)
5:3
deposition (2)
100:15;103:2
deprived (1)
21:9
describe (7)
13:13;30:10,14;31:6;
33:5;50:6;94:9
described (6)
9:5;14:11;86:3;
87:11;92:24;95:15
describes (2)
29:14;33:18
describing (3)
12:21;26:20;71:3
description (4)
70:17;72:20;75:17;
76:7
designation (1)
87:9
designations (1)
94:12
diaphragm (3)
19:18;92:15,15
died (1)
62:1
difference (1)
62:4
different (1)
88:3
difficult (4)
52:12;79:10;92:1;
93:3
diffuse (3)
76:8,11,16
diminished (2)
41:13;69:9
DIRECT-EXAMINATION (1)
86:18
Directive (9)
57:10,12,17,21;
58:15;59:14;60:5,14;
61:9
directly (1)
9:6
dirt (1)
26:9
dirty (1)
26:10
disagree (1)
33:19
discharge (1)
81:24
discussed (6)
7:24;38:6;42:2,9;
60:19;84:16
discussions (1)
59:12
disorganized (1)

8:13
disorientation (1)
8:10
dispatch (5)
42:4;43:4;93:6,9;
94:3
dispatched (1)
69:19
dispatchers (2)
41:24;69:20
display (1)
9:15
displayed (3)
49:1;50:1;71:6
displays (1)
8:5
disrobing (1)
9:2
distance (1)
47:19
distracted (1)
52:16
DMV (1)
48:23
doctor (1)
21:21
document (15)
17:2;28:5,21;45:18;
52:10;57:4,7,15;58:20,
22;63:15;65:23;68:9;
71:2;80:3
documentation (3)
22:18;62:23;77:10
documents (4)
29:10;63:13;67:14;
71:17
done (7)
25:4,4;32:7;70:21;
74:3;86:9;91:20
door (1)
7:9
down (28)
15:21;16:15,19;
17:22;18:16;19:1;20:7,
12,19,21,22,24;22:4,5,
6;23:23;24:24;25:5,18;
33:23;56:10,11,16,18;
62:12;78:21;85:4;
95:17
download (7)
78:12;81:6;82:19,20,
23;83:15,20
downloaded (1)
84:4
downloading (3)
82:14,22;83:24
dozen (2)
32:16;54:2
DPM (1)
83:17
draft (1)
58:22
drafted (1)

58:23
drafting (1)
58:19
driver's (2)
91:8,9
driveway (5)
26:10,11;33:22;35:5;
90:6
drown (1)
21:14
drug (1)
41:13
drugs (5)
47:2;66:2,3,8;89:16
due (1)
50:24
duly (1)
5:2
durations (4)
80:13;81:11,14,15
duress (1)
25:3
during (11)
27:1,8;46:23;47:1,
16;52:13;74:18;77:15;
88:15;94:19;96:24
duties (2)
68:16,19

E

earlier (8)
42:9;46:24;53:17;
58:8;61:15;63:23;
64:14;66:2
easily (1)
90:18
eastern (1)
79:15
effect (3)
14:12,13,14
effected (1)
63:2
efforts (1)
89:22
eighth (1)
42:24
either (6)
9:5,21;10:12;32:9;
39:11;62:15
elbows (1)
91:22
electrical (2)
50:8;65:14
electrical- (1)
13:3
electrical-conducted (7)
12:3,9,22;13:10;
55:18;56:2;76:20
elevated (2)
9:18;32:8
eliminate (1)
70:22

else (4)
62:12;67:4;85:2;
97:13
emotional (1)
62:7
emotionally (1)
62:1
EMS (14)
9:21;27:13,18;30:1;
33:11,16,18;34:13,17,
20;54:13;60:16;61:1,
20
encounter (3)
88:17;89:5,6
encountering (1)
76:16
encounters (2)
60:15,23
end (3)
35:5;70:18;89:14
engaged (2)
40:19;76:7
engaging (1)
41:20
enough (8)
19:5;23:16;39:16;
58:1,4,5,12;83:12
entered (1)
103:5
entire (5)
27:8;58:22,23;96:24;
103:2
entries (1)
81:9
entry (1)
80:1
environmental (2)
43:7,15
escalate (1)
10:22
especially (1)
74:1
evaluation (2)
69:23;70:9
even (8)
66:18;74:17,21;
75:16;91:5;92:20,21;
93:2
event (4)
51:3;79:19,20;91:12
events (4)
20:6;35:12;52:23;
62:16
everybody (1)
26:5
everyone (1)
71:15
everyone's (2)
83:2,3
exact (2)
30:18;93:7
exactly (4)
10:16;25:17;92:7,11

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 2
March 15, 2017

**EXAMINATION (1)**
5:4
**exceed (1)**
88:20
**Except (1)**
24:6
**excited (20)**
8:1;9:8,13,19;53:7;
57:9,24;58:4,10;60:5,
16,20,23;61:5;71:8;
89:13;97:19;98:2,10,
13
**exhibit (42)**
5:14,18;16:7;28:5,
12;29:5,14,20;35:21,
22;36:1,1,4,5;43:20,21;
44:2,19;45:10;47:7;
50:6;56:23;57:1,9;
63:10,11,21,24;68:7;
71:16,19;72:14;77:16,
17,19;79:1,2;85:9,11,
14;89:8;97:5
**exhibits (2)**
15:24;60:15
**exit (1)**
91:3
**explain (2)**
31:24;68:20
**extract (1)**
54:20
**extreme (1)**
11:1
**extremely (1)**
77:2
**eyes (4)**
33:24;34:5,5,8

**F**

**face (9)**
19:14;23:23;26:8,17,
20;27:2,20;34:9;56:11
**face-down (3)**
55:19;56:3;61:10
**facing (1)**
27:3
**fact (1)**
69:17
**factor (3)**
39:19;40:4;97:1
**factors (4)**
39:3;41:19;43:15;
96:13
**facts (1)**
88:1
**fair (9)**
27:21;29:12,16;43:5;
53:20;58:6,13;93:9;
98:20
**fall (1)**
33:7
**familiar (1)**
57:7

**family (1)**
84:13
**far (8)**
6:15,16;33:5;34:11;
72:22;85:17,19;87:11
**Fast (4)**
30:16,17;31:17,18
**faster (2)**
32:1,14
**fear (5)**
9:12,15;25:15;26:15;
95:19
**February (1)**
70:2
**feel (1)**
33:23
**fellow (4)**
24:13;27:15;58:13;
61:12
**few (3)**
16:13;63:18;75:8
**fewer (1)**
41:8
**fifth (2)**
41:22;63:22
**fight (10)**
16:13;20:17;21:8,15;
22:24;23:2;24:3;25:4;
70:18;90:7
**fighting (14)**
10:19;12:17;20:15,
16;21:1;22:10,19;32:7;
69:3,6,7,13;86:1;88:23
**fight-or-flight (1)**
21:6
**fill (1)**
44:4
**filled (1)**
77:24
**Final (1)**
36:11
**finally (2)**
24:3;94:5
**find (2)**
9:10;62:2
**fine (1)**
60:3
**finished (1)**
28:22
**fire (2)**
35:2;61:20
**firearm (2)**
49:22;90:14
**fired (1)**
80:4
**firing (1)**
79:5
**firings (2)**
80:22;81:2
**first (18)**
5:2;13:9;25:11;
27:23;30:21,22;31:3,7,
9;34:4;36:23;65:22;

72:13;76:9,18;84:22;
87:1;94:2
**fit (1)**
49:18
**five (6)**
50:10,21;71:23;72:1,
13;81:4
**five-cycle (1)**
15:6
**five-second (3)**
80:7;81:10;82:2
**flags (1)**
83:6
**flail (1)**
56:20
**flailing (2)**
10:23;86:1
**flashlight (1)**
38:22
**flip (2)**
5:17;63:21
**flush (1)**
19:9
**following (1)**
103:4
**follows (1)**
5:3
**follow-up (2)**
6:6;94:15
**foot (8)**
16:16,21;17:7,19,20,
22;18:21;22:6
**force (56)**
10:22;19:1,3,5;
35:18;36:13,17,21,24;
37:5;38:3,3;39:5;
40:10,16;41:23;44:3;
45:9;49:1,24;50:3;
51:15;53:18,23;62:18,
21;63:24;64:15,20;
67:1;70:7;72:5,17,19;
73:22,23;75:7,13;
78:22;79:1;87:2,9,10;
89:2;93:6;95:5,11,17,
21,22;96:3,20;97:2;
98:13,20;100:7
**forcefully (1)**
55:5
**forget (2)**
46:8,9
**form (10)**
51:24;71:4;87:13,19;
88:9,18;92:9;93:1,13;
98:14
**former (1)**
84:3
**forms (1)**
72:17
**forth (1)**
93:7
**four (4)**
5:21;67:23;74:19,20
**fourth (2)**

41:11;44:20
**frame (1)**
75:15
**front (3)**
15:24;62:22;85:14
**full (13)**
53:7;81:3,11,11;
89:9,10,13,19;97:5,19;
98:2,3,10
**FURTHER (1)**
94:17

**G**

**gain (10)**
13:5;14:17;19:11;
51:9,12;53:21;55:8,23;
56:7;88:22
**gained (1)**
22:23
**gave (5)**
16:5;24:3;35:6;
58:24;59:7
**general (8)**
15:3;53:15;54:11;
75:8,10;94:8,10,11
**generated (2)**
28:19;78:14
**gets (1)**
27:18
**given (2)**
22:24;88:16
**glance (2)**
34:9;63:16
**glass (2)**
9:12,15
**GMT (1)**
79:15
**goal (1)**
51:8
**goes (2)**
46:24;80:11
**good (5)**
24:23,24;30:6,14;
32:10
**grab (4)**
90:5;92:3;94:24;
95:18
**grabbing (1)**
95:19
**grabs (1)**
94:20
**gravel (6)**
26:9;27:6,20,20;
34:6;85:24
**Great (1)**
5:8
**Greg (1)**
86:21
**ground (13)**
10:24;11:5,21;12:12;
16:18;17:21,23;18:18,
23;19:9,18;27:3;96:15

**guess (9)**
15:4,16;24:22;72:2;
75:17;78:17,20;82:8;
100:6
**guidelines (1)**
62:8
**gun (5)**
38:22;94:21,24;
95:18,19
**guns (1)**
90:4
**guy (4)**
39:13,16;66:1,7

**H**

**half (3)**
29:4;52:3,7
**halfway (1)**
68:16
**hallucinations (1)**
8:8
**hand (18)**
13:23;16:19,19;18:6,
7,16;35:20;36:1,2,4;
43:20;56:23;63:10;
71:16;85:7;95:9,14,15
**handcuff (3)**
77:13;93:3;96:8
**handcuffed (13)**
12:6,10;18:9,11;
20:8;76:24;77:4,9,11;
95:15;96:1,18;99:8
**handcuffing (1)**
91:18
**handcuffs (7)**
10:19;20:9;40:24;
56:4;76:21;96:18;
99:21
**handed (1)**
44:2;77:16
**hands (8)**
18:13;20:16,17;38:7;
49:11;91:22;94:23;
96:1
**hands-on (2)**
95:13,20
**handwrite (1)**
46:4
**handwriting (1)**
47:10
**handwritten (3)**
44:22,24;46:14
**happen (3)**
22:2;69:12;83:8
**happened (5)**
59:20;62:3,9,11;75:6
**happens (2)**
25:9;80:19
**hard (3)**
23:21;32:4;34:14
**harm (1)**
19:16

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 2
March 15, 2017

head (6)
16:22;18:22;19:21;
34:1;56:21;78:8
heading (1)
36:11
health (4)
31:10;43:5;76:12;
99:16
hear (1)
34:23
heart (1)
33:14
height (1)
48:17
held (4)
20:19,24;51:17,21
help (15)
25:5;53:20,22,24;
54:6,9,21;55:6,11,19;
56:4,11,17;61:2;92:3
helped (1)
56:18
hepatitis (1)
52:15
hereinafter (1)
5:2
Here's (2)
67:6,6
Hey (2)
24:23;25:22
HILL (62)
5:5,19;8:23;10:2,7,8;
15:20;16:8;19:13;
21:13,22;24:10;25:20;
31:2,8,14;32:18,22;
33:2;35:23;36:6;40:2,
12,13;43:22;52:18;
53:11;54:7,15;55:4,10,
17;56:1,9,22;57:2;
59:11,17,21;63:12;
64:5,8;71:20;74:8,14;
77:24;78:2;85:12;86:7,
13;87:13,19;88:9,18;
92:9;93:1,13;94:15,18;
99:20;100:5,10
himself (5)
10:24;12:12;16:15;
19:16;56:21
historical (1)
5:15;63:14
history (4)
42:7,10,21;71:22
hit (1)
80:10
hitting (1)
25:22
hold (1)
14:23;17:6;20:21
holding (22)
13:22;14:2;16:15,18,
19;17:6;18:6,7,16,17;
20:7,11,22;22:4,5,6;
55:11;56:10,18;65:20;

66:7;95:16
Holsopple (18)
6:8;11:2;14:1,5;
16:17;17:6;18:1,6;
20:20;22:5;23:7;24:14,
18;27:2;62:15;89:22;
91:1;96:23
Holsopple's (2)
18:13;37:14
home (1)
84:11
honestly (1)
34:4
hooked (1)
83:17
hospital (4)
52:14;63:3,6,7
hour (3)
28:13;29:1,4
hours (2)
48:9;86:23
human (1)
21:8
Hundreds (1)
91:19
hurt (1)
56:21
hurting (1)
16:14

I

ice (2)
43:8,14
idea (2)
83:23;84:2
identification (3)
5:18;85:11;93:10
identify (2)
9:23;84:5
ill (1)
99:12
illness (3)
8:5;71:8,13
imaginary (3)
76:8,11,17
immediate (1)
54:13
immediately (6)
23:18;52:9,11;60:16,
24;94:4
impact (2)
49:5,8
impairing (3)
37:9,14,19
impairment (1)
43:1
important (1)
60:22
inaccurate (3)
79:12,14;81:19
inches (1)
47:22

incident (23)
34:16;36:12;45:21;
46:23;47:1;50:24;
52:11,11;58:5;61:15,
18,22;62:2;64:9;72:21,
23;73:3;74:18;77:6;
78:15;84:19,20,21
include (3)
8:7;69:13;93:19
included (9)
8:4,10,13,16,19,24;
9:2;49:14;76:4
including (1)
40:3
incoherent (1)
8:14
in-custody (1)
62:18
indicate (1)
82:1
indicated (1)
103:5
individual (3)
76:21,24;85:18
information (28)
41:23;42:4,9,19;
43:4;44:22,22;45:1;
46:1,5,12,16,19,21,23;
47:13;48:11,22,24;
70:15;76:4;83:15,16;
84:1,4;89:4,5;97:13
informed (1)
42:4
initially (1)
34:17
injuries (2)
29:15;86:2
injury (3)
56:19;69:23;70:9
inordinate (1)
92:21
inside (2)
26:8;95:4
instructor (8)
72:4;82:18,21,23;
83:9,14,21;84:3
instructors (1)
82:20
instrument (1)
49:13
interacting (1)
53:4
internal (4)
9:18,23;36:12;62:10
internally (1)
14:16;66:20
internet (1)
5:15
interviewed (2)
62:13,16
into (12)
10:20;11:14;18:14,
18,21;34:1;42:16;

43:12;46:2;72:2;75:11;
83:18
introduced (7)
16:7;35:22;36:5;
43:21;57:1;63:11;
71:19
investigate (1)
62:17
investigation (1)
62:10
investigative (1)
62:20
involve (1)
79:19
involved (7)
37:22,23;38:4;39:21;
40:15,16;82:4
involvement (1)
41:6
involving (1)
36:12
issue (2)
96:7,15
issued (1)
80:5
issues (4)
24:4,9;76:13;82:22
items (1)
70:12

J

jail (1)
65:21;74:2
jaw (1)
30:13
Jeep (19)
6:7,8,11,14,18,21,24;
7:3,5,9,12,15,22;9:4;
54:9,17,20,20;55:5
Jordn (95)
6:7,11,14,17,20,23;
7:2,6,9,12,14;9:4,10,
15,22;10:14,16;11:3,
12,24;12:4,6,10,12;
14:2,12,22;17:5;18:2,
22;20:7,8,11,12;22:4,5,
6;23:11;25:11;27:23;
29:15,24;30:2,4;33:10,
19;34:12,19;36:13;
38:6,12;40:20,23;41:7;
42:10;43:3;50:19;
53:19,20,24;54:8,9,21;
55:5,6,11,12,19,20;
56:3,4,10,12;62:23;
63:2,6;78:15;81:19;
82:5,10;84:6,11,17,17;
85:15;86:3;94:20;95:8,
16;96:1,14,17,23;
97:22;98:8
Jordn's (18)
13:14;17:7,18,19,22;
18:2,7,8,14,17,21;23:6,

15;24:14,15;33:24;
41:17;85:21

K

keep (8)
15:21;16:16,22;
17:23;18:18,22;19:5;
50:17
keeping (5)
19:8,9,11,17;90:14
Kenny (3)
70:6,7;73:8
kick (3)
6:12,15;10:23
kicked (3)
11:24;96:10,14
kicking (2)
16:17,20
kind (13)
5:11;15:11;23:20;
24:22;25:22;36:11,17;
42:10;66:24;67:6,24;
72:9,16
knee (1)
17:21
kneeling (3)
14:4;17:15,16
knees (4)
14:7;16:17;18:1;
85:23
knew (1)
92:18
knife (1)
49:15
knowledge (3)
42:6,12,24
known (2)
46:13;66:8
knows (1)
59:19

L

language (5)
58:19;59:1,5;60:9;
68:23
Last (12)
32:17;54:3;71:23;
72:1;75:6,8;79:23;
80:1,1;81:9,13,15
lasts (1)
20:1
later (3)
28:13;46:18,21;
47:21;52:3;54:18;89:4,
19;93:12
lay (1)
16:12;30:4
laying (3)
12:14;30:5;61:9
learned (1)
89:19

Layne & Associates
(614) 309-1669

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 2
March 15, 2017

least (6)
6:1;40:20;57:23;
67:17;80:4,24
leave (1)
61:9
left (10)
12:21;13:16,17;
16:16,21;17:7,19,21,
22;18:21
left-hand (2)
78:11;79:4
leg (10)
16:16,20;17:7,10,18,
19,22,23;18:17,18
legal (1)
59:10
legs (1)
20:19
Length (2)
50:7;65:13
Less (2)
34:22;56:19
level (5)
10:22;51:15;67:5;
69:8;90:8
license (1)
48:23
life (1)
33:19
life-threatening (1)
61:5
lift (2)
12:19;19:21
lifted (1)
12:12
lifting (1)
10:24
light (1)
54:16
lights (1)
35:1
likely (1)
58:5
limp (4)
23:19,21,21;30:4
Line (1)
103:7
lines (1)
97:17
lips (1)
26:8
List (2)
46:13;50:2
listed (7)
48:8,17;49:5;78:3;
79:2;81:16;84:7
listen (1)
33:6
little (3)
45:7;61:4;63:19
located (1)
92:17
location (6)

42:13,20,21;43:1;
47:4,7
lock (1)
92:3
locked (1)
95:14
logs (2)
93:6,9
long (9)
14:23;17:1,3;23:14;
33:10,13;34:11,20;
85:5
longer (5)
22:9,10;34:15;83:22;
96:19
look (18)
7:17;28:6;35:24;
39:4;50:7;57:3;64:18,
19,22;66:22;72:13;
73:5,11;74:4;75:17;
78:11;86:8;93:6
looked (2)
7:18;71:22
looking (1)
45:3
looks (7)
5:20;45:6,17;67:4,4;
72:16;78:14
losing (1)
33:22
lot (6)
26:7;90:20,21,23;
91:15;92:6
loud (1)
15:14
LUTE (1)
31:12

M

mailbox (1)
67:13
main (1)
35:15
maintain (1)
56:16
maker (1)
35:16
makes (2)
91:24;92:1
making (3)
14:15;15:11;55:1
man (2)
24:23;92:22
manner (1)
94:23
manually (1)
29:11
many (5)
58:7;87:23;88:16;
89:21;96:16
March (2)
57:15,23

mark (3)
5:14;85:9,14
marked (9)
5:18;35:20;43:20;
45:9;56:23;57:9;63:10;
71:16;85:11
match (3)
78:17,20;82:4
matter (1)
69:17
may (6)
40:9,11,11;43:8;
88:15;93:11
maybe (8)
34:16;64:18;67:3,4;
75:8,9,17;86:22
mean (29)
7:17;19:14;21:2;
27:1;30:21;31:7,22;
39:10,12,14;54:19;
55:1;62:4;64:24;67:3,
16;69:6;72:9;75:10;
79:13;82:3;83:5;84:19,
23;88:7,8;90:11,13;
97:23
meanings (1)
22:22
means (7)
31:1,23;39:13;48:14;
50:18;65:1,2
measure (3)
30:18;32:19,23
medical (13)
14:15;21:21;24:4;
25:3;31:10;41:13,17;
54:11,12;55:2;61:3,6;
99:23
Mel (1)
16:5
members (1)
84:14
memory (3)
5:24;6:3;52:8
mental (21)
8:5;24:9;34:14;
41:14,17;43:1,5;54:12,
14;69:4,6,13,16,18,21;
70:18;71:8,13;76:12;
94:6;99:16
mentally (3)
69:7;76:24;99:12
mention (1)
91:2
mentioned (2)
88:6;94:19
method (2)
91:21;92:2
mid (2)
13:21;47:10
middle (2)
5:11;50:22
midnight (2)
74:19,20

might (16)
23:7;39:16;47:15;
50:21,22;67:22;74:17,
18;77:24;81:3,4;86:15;
87:11;88:5,21;93:10
Miller (18)
9:22;36:13;40:20;
52:14;62:23;63:2;
78:15;81:19;82:5,10;
84:7,18;85:15;89:23;
90:24;92:5;94:20;95:4
Miller's (4)
84:11;91:16;97:22;
98:8
mind (1)
34:12
mine (1)
73:20
minimum (3)
39:24;88:19;98:19
minute (3)
23:16;34:22;59:15
minutes (5)
16:24;20:1,12;22:3;
86:8
missing (2)
64:18;77:22
month (1)
81:1
monthly (1)
83:1
months (1)
75:9
Moore (16)
14:8;16:21;18:20;
22:6;27:2;37:18;44:12;
48:7;62:16;68:5;73:12,
14;76:20;89:23;96:22;
97:15
Moore's (7)
44:14,17;45:6;48:2;
71:24;74:9;75:19
more (12)
24:21,21,24;26:7;
61:23;62:7;67:5;82:22;
88:10,21;99:2;100:10
Most (6)
72:8;80:21;81:1;
91:21,21;93:10
mother (8)
89:14,19;97:6,11,22;
98:4,7,8
motivation (1)
53:23
mouth (11)
25:15;26:1,16;27:7,
10,12,16,20;34:7;
59:22;72:8
move (5)
20:13;21:19;51:15;
92:2;94:23
moved (2)
25:12;30:5

moving (4)
17:23;18:18,22;19:5
much (5)
19:3;56:20;62:8;
73:23,23
must (3)
40:9,11;54:1
myself (1)
67:22

N

name (4)
64:22;70:5;73:5;
86:21
narcotics (3)
89:14;97:6;98:3
narrative (2)
76:3,19
Nathan (1)
71:6
naturally (1)
21:18
nature (2)
25:1;90:3
nearby (1)
60:17
necessarily (2)
39:14;55:1
neck (3)
18:22;19:21;30:11
need (8)
24:12,16;36:1;55:2;
58:1;65:22;77:24;
86:24
needed (3)
35:7;54:13;58:6
needs (2)
54:6;75:12
new (4)
79:21;81:14,22;85:5
next (3)
25:9;69:20,22
night (2)
22:18;53:13
nine (1)
36:18
ninth (1)
43:7
NMI (1)
14:18
noise (1)
15:13
noises (1)
15:11
None (1)
35:6
normal (6)
32:1,3,9;33:8;46:8;
76:15
note (3)
52:19;89:8;97:4
notes (2)

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 2
March 15, 2017

62:20;86:8
**notice (3)**
  22:9;46:10;47:17
**noticed (7)**
  27:23;29:24;34:4,6,
  12,18;86:6
**notified (7)**
  64:23;73:6
**notion (1)**
  90:9
**Number (36)**
  5:18;16:7;30:19;
  35:22;36:5,12;37:22;
  39:1,20,20;40:6,15,15;
  43:21;48:4,5,6;57:1;
  63:11;64:5,12;65:16;
  69:19,20;70:12;71:19;
  72:15;76:5;78:3,8,21;
  79:2;85:11,20;88:4;
  94:5
**numbers (4)**
  48:1;77:20;78:18,20

## O

**Objection (34)**
  9:24;15:17;19:10;
  21:10,20;24:7;30:22;
  31:12;32:2,16;39:22;
  40:10;52:4;53:8;54:1,
  10,22;55:7,13,21;56:5,
  13;59:9;74:7,10;87:13,
  19;88:9,18;92:9;93:1,
  13;99:17,24
**observation (1)**
  15:3
**observations (1)**
  92:16
**observe (1)**
  27:15
**observed (3)**
  6:20;9:6;90:24
**occasion (2)**
  65:9;74:16
**occur (1)**
  58:5
**occurred (1)**
  93:11
**October (1)**
  36:8
**odd (1)**
  76:24
**off (23)**
  5:15;10:24;12:12,21;
  18:23;44:6;48:23;
  50:22;51:21;56:21;
  64:16;65:9;74:4,5,12,
  24;75:19;78:8;80:17,
  20;81:5;83:5,9
**office (2)**
  45:12,13
**Officer (40)**
  6:8;11:2;14:1,5;

16:15,17,18;17:6;18:1,
6,13;20:20;22:4;23:7;
24:14,18;28:18;29:11;
31:10;35:10;37:1,14;
39:15;40:24;41:23;
43:8;56:19;60:15,22;
62:15;65:1;66:11;
73:11;76:16;86:13,20;
87:11;89:22;91:1;
96:23
**officers (46)**
  10:18,23;16:14;20:1;
  22:12,14;23:5,14;
  24:13,13;25:14,16;
  27:15;35:6;36:20,23;
  37:4,23;38:2;39:1,4,13,
  15,15,16,20,20;40:1,5,
  6,15,20;41:8;42:15;
  56:10,18,20;57:24;
  58:1,5,13;61:12,24;
  90:1;95:16;96:22
**often (3)**
  80:23;82:24;87:2
**Oftentimes (1)**
  31:4
**OIC (5)**
  64:23;73:24;74:3,13,
  20
**old (3)**
  81:13,21;87:9
**once (4)**
  80:24;83:19;91:23;
  95:13
**One (34)**
  5:9;10:3;13:18;
  16:18;18:6,13;22:4;
  37:3,7;39:3,7,13,15,16;
  41:19;45:19;56:19;
  66:4;71:13;72:21;80:4;
  85:8;88:5;90:9;95:9,
  10,14,15,17,23;96:3,
  13,13,16
**ones (3)**
  24:6;49:5;81:23
**Only (15)**
  26:23;29:15,22;
  38:12;48:13;55:8,14,
  15;74:5;82:19;85:8,24;
  88:3;89:11;91:11
**open (6)**
  33:24;34:8;83:19;
  91:5,7,9
**order (1)**
  62:17
**out (17)**
  9:10;11:3,8,22;
  12:16;25:12;44:4;46:4;
  47:17;53:19;62:2;66:2,
  2,4;78:9;92:1;95:8
**outside (4)**
  7:5;54:19;62:6;
  86:11
**over (13)**

22:14;23:1,18;25:21,
24;28:1;30:1;34:19;
46:9;47:16;71:23,24;
86:8
**override (2)**
  50:14,16
**own (4)**
  65:10;72:7;74:6;
  90:17
**oxygen (1)**
  21:9

## P

**page (50)**
  28:6,12,15,22;29:2,5,
  6,12,14,22;35:24;36:4;
  44:19,20,20,20;45:3;
  46:13;47:4,6,6;48:8;
  50:6;52:19;63:22,23;
  65:13,16,19;66:10,10;
  68:7,16;69:22;71:2,
  4;73:5,11;76:9;77:19,
  20,24;78:4,16;79:24;
  80:1;89:9;97:5;103:7
**pages (4)**
  64:19;72:13,14;
  77:19
**paints (1)**
  76:12
**paragraph (2)**
  61:8;71:6
**park (1)**
  35:4
**parlance (1)**
  90:10
**part (4)**
  17:10;89:11;90:9;
  98:11
**partially (1)**
  38:12
**participated (1)**
  58:19
**particular (1)**
  87:22
**Particularly (1)**
  90:20
**passed (3)**
  66:2,2,4
**pastor (2)**
  61:19;62:7
**patients (1)**
  54:14
**patrol (2)**
  45:12,13
**people (4)**
  8:1;54:24;67:23;
  76:16
**performed (2)**
  68:16,20
**perhaps (1)**
  92:6
**period (8)**

6:7;15:6;20:8;27:1,
6;34:20;80:8;97:1
**periods (1)**
  79:18
**person (17)**
  32:1,3;33:8;41:20;
  50:2;60:15;65:11,20;
  67:19;70:18;71:7;
  76:11;93:2;94:9;99:8,
  12,22
**personally (2)**
  60:2;87:14
**photograph (2)**
  85:7,8
**photos (1)**
  63:2
**phrase (2)**
  69:15;71:1
**phrasing (1)**
  40:8
**physical (5)**
  36:24;37:9,11,15,19
**physicians (1)**
  9:22
**picture (2)**
  76:12;85:13
**place (7)**
  35:12;42:3,17;57:18,
  21;62:17;68:20
**Pliers (1)**
  49:20
**plug (1)**
  83:18
**plugged (1)**
  83:19
**pm (5)**
  5:21;28:10;78:14;
  82:8;100:16
**point (34)**
  11:21;14:20;17:17;
  18:10;19:23;20:23;
  22:23;23:12,19;24:5,
  22;25:7;27:18;30:4;
  33:3;34:8,24;36:23;
  54:11,12,14;55:2,3;
  59:13;60:4;66:5;74:19;
  77:15;86:6;87:20;95:7;
  96:5,21;97:3
**points (1)**
  36:18
**police (11)**
  10:3;31:9;38:2;
  57:13;61:19,24;76:16;
  77:3;87:18;90:10;98:9
**policies (1)**
  62:12
**policy (11)**
  35:15;60:12;62:8;
  88:16;98:23;99:5,7,11,
  14,22;100:6
**port (1)**
  83:18
**portion (2)**

16:9;41:6
**position (28)**
  11:6,8,12,16,20;12:1,
  4,7,10,16,19:19,24;
  20:7;22:4;23:11;25:12;
  26:13,19;55:11,15,19;
  56:4,11;61:10;91:16,
  23;95:9;96:24
**possibilities (1)**
  22:1
**possibility (3)**
  41:12;95:13;100:1
**possible (2)**
  100:3,4
**post (3)**
  61:15,18,22
**Potentially (1)**
  71:15
**pounds (1)**
  48:20
**precipitated (1)**
  24:19
**predesignated (1)**
  70:12
**prematurely (1)**
  51:12
**prepared (1)**
  93:5
**preprinted (1)**
  72:17
**pre-selected (1)**
  80:8
**presence (1)**
  7:14
**present (3)**
  40:20;74:22;95:16
**preset (1)**
  15:8
**pretty (4)**
  46:8,10;48:12;86:9
**prevent (4)**
  16:20;19:15;56:19;
  70:18
**prevented (1)**
  10:21
**preventing (2)**
  10:19,20
**print (2)**
  39:11;46:4
**printed (1)**
  47:17
**prior (3)**
  42:6,12,24
**privileged (1)**
  59:18
**probably (7)**
  17:11,20;49:19,20;
  63:18;77:7;80:6
**probe (2)**
  47:4,7
**probes (1)**
  47:19
**problem (2)**

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 2
March 15, 2017

58:1,8
**procedure (1)**
91:18
**process (5)**
45:8;52:12;66:24;
67:6;87:11
**program (1)**
83:19
**Programmed (2)**
50:10,12
**prone (24)**
11:6,8,12,16,20,24;
12:4,6,10,16;19:18;
20:7;23:11;25:12;
26:13,19;55:11,19;
56:3,11;61:10;95:8;
96:2,23
**protocol (1)**
62:3
**protocols (2)**
62:8,12
**provided (1)**
71:21
**pry (1)**
92:1
**public (1)**
68:21
**pull (1)**
92:23
**pull-down (1)**
69:2
**pulled (3)**
5:15;6:8;50:17
**pulling (1)**
53:18
**pulse (19)**
30:7,8,9,10,14,18;
31:1,17,18,23;32:5,9,
11,11,19,23;33:15,22,
23
**push (1)**
15:5
**pushing (5)**
17:22;18:13,17,17;
19:1
**put (10)**
11:21;29:10,11;
48:11;51:5;55:16;
59:22;67:12;68:23;
82:7
**puts (1)**
18:21

## Q

**quantify (1)**
31:21
**quick (3)**
33:11;34:9;94:15
**quicker (1)**
61:4
**quickly (5)**
30:19,20;31:20;63:9;

74:3
**quite (1)**
52:16
**quote (3)**
70:18,19;89:14

## R

**radio (1)**
88:2
**radioed (1)**
93:24
**rain (2)**
43:8,14
**raise (1)**
83:6
**ran (1)**
35:1
**rapid (6)**
31:23;32:5,5,7,11,14
**rate (2)**
31:23;32:9
**rationally (1)**
7:21
**Ray (4)**
70:6,7;73:6,8
**razor (1)**
49:16
**reach (1)**
7:10
**reaches (1)**
94:20
**read (8)**
16:9;17:1;65:22;
76:6;90:14;100:11;
103:2,4
**reading (1)**
77:5
**ready (2)**
5:6,7
**realize (3)**
23:24,24;26:12
**realized (1)**
24:2
**Really (1)**
94:15
**rear (1)**
26:23
**reason (15)**
13:3;50:3;51:14;
72:11;75:24;88:13;
89:7;91:11;95:5,11,21,
22;96:11,12;103:7
**reasonable (2)**
39:4;42:15
**reasons (6)**
95:17,23;96:3,14,16;
103:5
**recall (10)**
5:23;23:8;29:17;
38:16;52:2;83:11;85:3;
91:3,4,14
**receive (1)**

14:18
**received (8)**
41:23;52:14;63:13;
71:24;77:23;78:13;
85:9;88:2
**Recess (1)**
86:12
**recognized (1)**
26:4
**recognizes (1)**
26:1
**recognizing (1)**
25:2
**recollect (1)**
77:6
**recollection (2)**
77:14;91:13
**recommend (1)**
80:24
**record (5)**
44:1;85:13;86:20,22;
103:5
**Recorded (4)**
79:5;81:10;84:1;
93:17
**rectal (1)**
9:22
**red (1)**
83:6
**reflect (1)**
52:6
**refuses (1)**
91:18
**regarding (6)**
29:15;35:12;41:22,
24;62:23;63:14
**regardless (3)**
99:8,12,15
**reholster (1)**
13:11
**relatively (1)**
51:2
**remained (3)**
11:12,14,16
**remaining (1)**
41:6
**remember (15)**
5:10;12:23;17:13;
24:11;29:6;34:4,7;
51:19,23;52:1,10;
53:12,15;97:9;98:17
**remove (5)**
27:10,12,16;51:12;
91:1
**removing (1)**
55:5
**renamed (1)**
87:15
**repeatedly (1)**
92:14
**report (54)**
5:16;22:18;33:18;
35:11;36:11;38:24;

40:3;41:12;43:24;44:2,
3,10;45:9;46:11,17,20,
22;47:16;52:13;62:21;
64:1,5,12,20;65:16,19;
66:11,12;67:1,6;68:8,
11;71:5;72:15,17,18,
19;73:12,24;75:8,10,
11;76:4;77:17;78:12,
13,23;79:1;81:7;84:7;
89:3,3;93:6;94:3
**reported (1)**
9:5
**REPORTER (1)**
103:1
**reports (7)**
46:22;64:15;66:19;
72:5;84:5;89:2,3
**represent (1)**
86:21
**request (2)**
9:21;103:4
**required (2)**
44:4;88:20
**reset (3)**
83:6,9,12
**resist (2)**
10:18;92:22
**resistance (2)**
87:17;90:21
**resisting (3)**
88:23;89:24;90:16
**respect (9)**
42:3;47:18;58:15;
62:10;71:24;75:13;
87:23;89:7;92:5
**respond (7)**
30:2;58:2;60:5,17;
61:2;87:24;88:3
**responded (3)**
7:20;24:6;88:1
**responder (5)**
30:21,23;31:3,7,9
**responding (7)**
22:14;24:1;27:19,24;
28:2;31:10;43:4
**response (7)**
21:6;22:13;25:7,8;
61:2;78:13;87:17
**responsibilities (1)**
68:21
**responsibility (1)**
10:13
**restraining (3)**
16:14;21:24;96:23
**restraint (1)**
96:2
**retention (11)**
90:10,13;95:3,5,10;
96:3,6,10,15,19;97:1
**retired (1)**
70:8
**returned (1)**
53:14

**revelation (1)**
85:5
**review (5)**
36:12;57:5;61:15,18;
72:7
**reviewed (1)**
66:19;76:3;81:6
**Reviewing (6)**
17:2;57:4;63:15;
65:23;68:9;72:5
**reviews (1)**
67:7
**revolver (11)**
90:10,13;95:2,5,10;
96:2,6,10,15,18;97:1
**ride (1)**
81:3
**right (46)**
5:12;12:18;13:2,16,
22;16:20,21;17:20,21;
18:2,17,17,21;20:4;
21:15;23:24;24:23;
25:3,18;26:13;27:14;
28:13,23;30:13;31:18;
32:11;35:5;48:20;49:6;
50:5,13;51:3,6;60:12,
20;61:16,23;63:19;
73:1;78:21;79:19;81:5;
82:3;89:21;91:22;92:6
**right-hand (2)**
28:7;78:17
**rise (1)**
33:7
**road (2)**
5:12;85:5
**ROBERT (1)**
5:1
**rock (1)**
49:9
**rocks (2)**
56:21;90:5
**rocky (1)**
26:10
**roll (3)**
25:10,24;34:19
**rolled (11)**
22:14;23:18,20;
25:16,21;26:15,17;
28:1;30:1;34:1,2
**roughly (1)**
75:15
**routine (1)**
54:13
**rub (1)**
23:14
**rubbing (8)**
22:12;23:5,6,12;
24:14,15,18,21
**run (1)**
33:18

## S

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 2
March 15, 2017

safe (2)
   27:5;90:15
same (15)
   22:21,22;40:1;45:14;
   47:18;57:17;58:15;
   69:8;73:3;78:9;79:1;
   85:17;97:17,17;103:3
saw (10)
   6:17;7:2;9:16;38:10;
   50:2,23;63:19;71:1;
   83:5;94:23
saying (10)
   22:19;24:11,19;
   25:22;32:5,10,13;
   54:19;78:19;100:6
scene (12)
   33:12,13;34:13;39:1;
   40:6;41:1,4,5,8;93:11,
   20,23
SCHERER (4)
   5:1;16:16;86:13,20
scrapes (1)
   85:20
scratches (1)
   85:20
screwdriver (1)
   49:17
search (1)
   63:1
second (20)
   12:9,22;13:4,10,13;
   17:4,5;20:10;40:23;
   41:9;44:20;50:18,19,
   21;56:3;61:8;65:19;
   71:5;96:8,17
seconds (9)
   14:24;15:1,16;16:13;
   23:16;50:10,22;51:6;
   81:4
seeing (1)
   40:19
seemed (1)
   34:15
seems (1)
   92:21
select (1)
   68:23
self-explanatory (1)
   49:22
sense (1)
   55:1
sentence (1)
   76:9
separates (1)
   73:2
September (10)
   5:16;36:13;37:10,15;
   41:7;53:13;57:18;
   62:17;63:2;79:22
sequence (1)
   81:10
Sergeant (25)
   14:8;16:20;18:20;

22:6;27:2;37:18;44:12,
   14,17;45:6;48:2,7;
   68:1,3,5;71:24;73:12;
   74:1,9,12;75:19;76:19;
   89:23;96:22;97:15
serial (9)
   47:24;48:4,5,6;78:3,
   8,17,20,21
series (1)
   88:14
servant (1)
   68:21
session (1)
   61:24
set (2)
   20:6;71:17
settle (1)
   24:24
settled (1)
   25:5
seventh (1)
   42:12
several (4)
   16:24;20:1,12;22:3
shall (1)
   60:16
sheet (1)
   43:23
shift (2)
   67:21;74:20
shirt (2)
   38:14,16
shoes (2)
   38:15,16
shorter (1)
   80:13
Shorts (2)
   38:14;85:24
shoulder (2)
   16:21;18:21
shouting (1)
   8:16
Show (1)
   30:12
showed (1)
   93:7
shows (1)
   66:4
shut (6)
   33:24;34:8;50:22;
   51:20;81:5;91:6
side (19)
   13:16;14:2;18:2;
   22:4,5;23:20;25:10,16,
   24;26:14,15,18;27:19;
   28:7;34:3;78:17;79:4;
   91:8,9
sign (6)
   9:13,13,19;65:9;
   74:4,12
signal (1)
   69:20
signals (1)

69:18
signature (3)
   64:21;73:19;100:13
signed (6)
   44:6;45:22;64:16;
   70:4;74:24;75:19
significant (1)
   58:1
signing (1)
   74:5
signs (15)
   8:1,4,7,10,13,16,19,
   24;9:2,5,8;33:19;
   60:16,19,23
similar (1)
   94:11
Similarly (1)
   21:14
simply (1)
   92:23
single (1)
   52:11
sirens (2)
   34:23;35:1
sit (1)
   62:12
sitting (1)
   91:10
situation (4)
   52:10;67:3;87:22;
   91:17
situations (1)
   36:21
six (2)
   39:13;86:23
sixth (1)
   42:6
skip (1)
   46:9
skipped (1)
   47:16
Smith (5)
   35:11,15;40:3;53:12;
   59:3
Smith's (2)
   38:24;41:11
snow (2)
   43:8,14
socks (2)
   38:15,16
somebody (13)
   62:1;67:4;69:7,9;
   71:12;74:1;75:11;85:6;
   90:7;91:21;95:13,19,
   20
somehow (1)
   42:21
someone (11)
   21:17,24;26:1;62:13;
   66:19;71:3;76:12;
   92:20,21;97:13;98:9
Sometimes (8)
   31:13;65:3;66:21;

73:24;80:20,24;81:1;
   99:1
son (1)
   98:9
soon (3)
   23:17;28:1;83:12
sorry (7)
   27:14;35:10;36:1;
   47:6;48:5;65:24;90:12
sort (7)
   81:24
sounds (1)
   29:22
source (1)
   40:10
sparking (1)
   51:16
sparks (1)
   81:5
speak (1)
   27:13
speaking (1)
   53:12
specific (6)
   48:12;55:3;87:15;
   91:12,12;93:23
specifically (3)
   23:8;44:4,5
specifics (1)
   53:16
specified (1)
   70:14
speculate (1)
   32:4
speech (1)
   7:21;8:14
spit (2)
   6:17,20
spoke (1)
   97:11
spoken (2)
   84:13,17
Springfield (9)
   57:12,18,23;59:8,14;
   60:6;61:13;83:24;
   100:7
squeeze (2)
   80:20;81:11
squeezed (2)
   79:7;80:16
squirm (1)
   20:13
squirming (1)
   21:2
staging (1)
   60:17
stamp (6)
   28:9,17;64:10;79:11;
   82:7;93:24
stamped (1)
   93:18
stand (1)
   17:16

standing (3)
   7:5;17:15;96:14
standpoint (1)
   77:14
start (2)
   24:18;34:19
started (5)
   22:12;23:5;24:14,14;
   33:22
state (7)
   50:18;53:7;89:13;
   97:20;98:3,10,13
statement (6)
   15:21;36:16;40:4;
   89:10,12;98:6
statements (1)
   29:16
states (6)
   36:10;37:22;41:12;
   60:14;61:8;68:15
stating (1)
   36:23
station (1)
   53:14
status (1)
   36:11
step (2)
   17:3;86:11
stick (1)
   49:9
still (24)
   10:21;14:1,4,19;
   17:16;18:2;20:13,14;
   21:4;23:11,23;26:12,
   13;30:6;33:14,15;
   51:18;56:14;57:21;
   60:8;70:7;87:5;96:12;
   98:22
stood (1)
   12:16
stop (1)
   96:6
stopped (5)
   22:11,17;27:24;28:2;
   82:18,21
story (1)
   85:6
strange (1)
   8:19
strength (9)
   10:15,17;11:1;71:2,
   7,14;90:21;91:24;
   92:22
stress (1)
   50:24
stressful (2)
   34:15;52:10
strike (1)
   49:11
strong (6)
   30:7,14,16;31:1;
   32:11;91:24
struggle (2)

Case: 5:16-cv-02331-JRA  Doc #: 16-5  Filed: 07/17/17  37 of 38.  PageID #: 276

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer -  Vol. 2
March 15, 2017

16:13,23
**stuff (1)**
25:23
**subject (10)**
37:1;39:6;40:14;
41:12;42:7;43:1;49:2;
61:9;88:23;89:18
**subjects (4)**
39:1,21;40:6,16
**submitted (1)**
22:24
**submitting (2)**
66:12;73:11
**substance (1)**
46:13
**successful (2)**
19:17;20:22
**summary (1)**
91:2;93:5
**summon (1)**
60:16
**sunny (1)**
6:4
**superhuman (5)**
10:15,17;71:2,7,14
**supervise (3)**
65:3;67:22,22
**supervising (2)**
65:7;67:19
**supervisor (20)**
44:7,11,12,14,17;
64:16,21,22;65:2,10;
67:8,10,17;70:1,15;
73:6,16;74:6;75:19,20
**supervisor's (6)**
65:6;66:12;69:23;
70:9;73:18,21
**suppose (1)**
21:16
**supposed (1)**
50:1
**sure (11)**
7:16;9:10;13:2;61:3;
73:1;75:18;82:23;83:4;
84:1;85:4;86:9
**survive (1)**
21:9
**suspect (19)**
16:12;25:15;47:1;
50:1;53:1,6;76:7;
88:14;89:12,24;90:16,
17,20;91:17;97:16,19;
98:2;99:3,15
**sustained (1)**
29:15
**swing (1)**
49:12
**sworn (1)**
5:2
**systematic (1)**
67:5

**T**

**tactics (2)**
43:9,16
**tagged (1)**
48:6
**talk (1)**
72:10
**talked (10)**
5:9;9:9,12,18;10:14;
41:16;43:2;61:15;73:8;
84:21
**talking (7)**
5:22;34:18;50:11;
61:23;67:5;81:15,17
**tapping (1)**
24:22
**tased (1)**
88:15
**Taser (66)**
13:11,22;14:2,12,22;
15:5;17:5;38:22;40:23;
43:23;44:2,5;45:9,15;
48:5,15;50:5,19;51:8,
11,16;63:14;64:1,15;
65:5,11;66:1,6,11;
67:1;71:22,24;72:4,5,
10,18;74:6,23;75:20,
23,24;76:23;77:17;
78:6,9,23;79:1,2,8,11;
80:4;81:6,12;82:20;
83:10,17;84:3,6;87:7;
88:5;89:3;93:22;94:2;
98:16,22;99:2
**tasered (5)**
20:8;41:8;65:20;
77:4;96:17
**Tasers (2)**
82:14;90:5
**tasing (1)**
20:10
**taught (2)**
58:10;61:12
**teach (1)**
58:12
**technical (1)**
31:5
**technique (1)**
92:23
**temperature (3)**
9:19,22,23
**term (3)**
31:5;94:6,8
**terminology (2)**
68:14;69:3
**terms (4)**
21:23;29:9;61:24;
98:16
**test (5)**
80:21,21,23;81:2,3
**testified (3)**
54:16;59:23;88:4

**testimony (3)**
92:6,20;94:19
**testing (3)**
82:13,14;83:24
**Thanks (1)**
84:9
**therefore (1)**
103:7
**thereupon (1)**
100:15
**thinking (1)**
7:19
**third (3)**
38:24;40:24;44:20
**though (3)**
41:4;73:1,3
**thought (3)**
14:12;59:23,23
**thrashing (1)**
21:4
**three (30)**
5:21;14:24;15:1,16;
19:24;20:3,6,11;29:1;
39:15;41:8;47:22;51:6;
56:10,18;64:19;65:11,
11;67:22;72:16;88:6,7,
7,10,20;96:22;98:16,
22;99:2,21
**throes (2)**
99:15,23
**throughout (1)**
52:7
**times (18)**
32:17;40:19;54:2;
65:11;76:20;79:7;80:5,
7,13,16;81:4,18;84:16;
88:14,21;91:19;93:7;
99:2
**timing (2)**
28:4;29:9
**today (3)**
35:21;57:21;85:14
**together (1)**
59:3
**told (3)**
32:20;53:17;63:23
**took (7)**
29:1,4;33:13;34:16;
35:12;60:2;62:16
**tool (2)**
55:23;56:7
**top (8)**
36:10,11;46:5;48:9;
60:14;77:20;78:3,8
**total (3)**
62:6;88:7,11
**totality (1)**
39:18
**totally (1)**
33:14
**toward (1)**
94:20
**towards (1)**

10:22
**Township (10)**
57:13,19,24;59:8,14;
60:6;61:13;83:24;
86:21;100:8
**trained (4)**
31:15;58:2,6;61:19
**training (4)**
87:1,2,3,7
**transcript (1)**
103:2
**transmitted (1)**
93:17
**Trazodone (1)**
45:2
**treatment (2)**
52:16;61:3
**trial (1)**
85:5
**tried (7)**
6:11,14,23;7:6;
77:12;83:1;91:2
**trigger (3)**
50:17;79:8;80:17
**trouble (1)**
21:18
**truck (1)**
35:2
**true (42)**
6:18,19,21,22,24;7:1,
3,4,7,8,10,11,12,22,23;
8:5,6,8,11,14,17,20,24;
9:2,6;11:17;34:2;
38:13;47:24;58:2;
61:13;64:1;99:4,6,9,10,
12,13,16,19,23;100:3
**try (17)**
6:17,20;7:2;16:16,
23;26:23;37:6;45:16;
55:23;56:7;61:1,2;
63:9;83:4;88:10,19,20
**trying (17)**
10:23;19:6,11,15;
20:12,21;22:11,13,17,
19;31:21;52:10;74:2;
76:8,11,16;94:24
**Tuesday (1)**
5:16
**turbulent (1)**
76:8
**turn (2)**
67:8,11
**turned (1)**
74:21
**turning (1)**
16:22
**twice (1)**
77:4
**two (16)**
10:18;14:24;15:1,16;
39:15;40:20;45:3;51:6;
56:19;62:5;76:20;81:9,
13,15;86:7;95:16

**type (10)**
25:1,3,6;26:10;
41:13;49:1,9,24;75:11;
100:7
**typed (3)**
46:1;48:4,5
**types (2)**
28:21;29:15
**typewritten (3)**
44:21;71:4;72:19
**typical (1)**
72:16

**U**

**under (9)**
10:20;25:3;34:14;
49:19,20;53:21;60:14;
65:13;92:10
**underneath (13)**
30:13;36:17;67:21,
23;69:11;91:16,23;
92:4,7,8,18;95:10,14
**understood (3)**
42:3;57:24;58:16
**undertaken (1)**
38:2
**unknown (3)**
89:13;97:5;98:3
**unresponsive (12)**
11:13,17,22;22:7;
30:1;33:10,14;34:12,
19;53:19;56:11;96:24
**up (30)**
10:24;12:16,19;
16:14,15,22,23;21:15;
22:11,17,19,24;24:3;
26:23;30:13;33:21;
41:3;45:7;51:17,21;
64:20;66:20;67:2;
78:17,20;81:5;82:4;
83:17,19;92:14
**upon (4)**
87:12;89:3,19;103:5
**upper (2)**
22:7;47:11
**USB (1)**
83:18
**use (54)**
36:13,17,21;37:4,5;
38:3;39:5,24,24;40:17;
41:13,22;44:3,5;45:9,
15;50:3;62:18,21;
63:24;64:15,20;67:1,1;
69:3;71:24;72:5,10,17,
19;73:21,23;75:7,13,
20,23;76:23;78:9,22;
79:1;87:2,10,12;88:10,
19,21;89:2;90:6;92:2;
93:6;95:22;96:19;
98:19,22
**used (25)**
12:3,9;13:3;14:2,22;

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Robert Scherer - Vol. 2
March 15, 2017

17:5;40:23;48:15;49:1,
24;53:18;66:1;69:15;
71:1;76:1,20;84:6;
87:17;89:22;95:5,11,
17,21;96:3;98:13
users (1)
82:19
uses (5)
63:14;74:6,23;79:11;
94:9
using (11)
19:4;20:17;36:24;
38:3;51:8,11;53:23;
55:18;56:2;88:5;97:2
usually (2)
67:12;68:5
utilize (1)
88:5

**V**

vehicle (2)
86:4;95:4
versus (1)
40:15
violent (4)
42:7,10,17;77:2
voluntarily (1)
21:14

**W**

Wait (1)
59:15
waived (1)
100:13
Walk (1)
45:8
walking (1)
33:21
warm (4)
5:11,23;6:3,5
warning (4)
8:1,4,7,10,13,16,19,
24;9:2,5,13;60:15,19,
23
warrant (1)
63:1
way (15)
7:20;30:2;31:24;
37:10,15,19;51:21;
55:8,14;70:18;86:1;
87:24;88:1,3;90:14
weakest (1)
93:2
weapon (11)
12:3,9,22;13:4,10;
55:18;56:2;76:20;90:6,
17,18
weapons (4)
37:22,23;38:4,18
weather (3)
5:10,15,20

week (1)
80:24
weight (2)
48:17,20
weren't (3)
12:14;89:9,10
What's (8)
25:9;35:20;56:23;
57:9;63:10;64:3;71:16;
90:3
whole (1)
34:16
whose (2)
69:9;73:19
wide-open (1)
43:18
window (5)
91:3,5,7,8,9
wires (1)
14:19
within (6)
62:9;63:21;99:5,7,
11,14
WITNESS (3)
16:5;25:19;64:7;
86:10,17
witnesses (1)
66:5
woman (1)
92:22
word (2)
45:2;72:8
words (2)
59:22;90:16
worked (2)
58:24;59:3
working (2)
51:15;74:17
worldwide (1)
58:8
wounds (1)
86:5
write (4)
22:11;25:14;46:11,
22
writes (3)
28:18;70:14,15
writing (5)
28:20;29:11;45:6;
47:16;48:3
written (1)
52:9
wrong (1)
23:24
wrote (14)
20:4;22:18;29:7,16;
45:5;48:7;51:2,5;
52:20,22;71:10;77:5;
78:21,24

**X**

X00-445350 (1)

78:24

**Y**

year (2)
52:3,7
yearly (3)
87:4,5,8
years (3)
71:23;72:1;83:5
yelled (1)
33:23
yelling (3)
8:17;54:24,24
yesterday (11)
5:10;7:24;9:9;10:14;
12:21;13:7;14:11;16:1,
4;21:3;84:22

**Z**

zone (1)
79:15

**0**

0292 (1)
81:17
0293 (1)
81:17
0294 (1)
81:21
0295 (1)
81:21
07-0853 (1)
65:17
08-3246 (2)
64:6,12

**1**

1 (16)
28:6,22;29:22;43:20,
21;44:2,19;45:10;47:7;
50:6;72:14;78:4,16;
79:1;89:8;97:5
10 (2)
65:16;77:22
101 (1)
48:6
1019 (1)
42:20
10-25 (1)
64:4
11 (13)
35:21,22;36:3,4;
77:17,19,19,21,21,21;
78:4,16;79:2
11-3142 (3)
72:15,23;76:5
12 (7)
16:7;28:5,12;29:5,
14,20;66:10

12:15 (1)
100:16
1-26-2009 (1)
79:16
12-9-08 (1)
64:5
13 (1)
5:18
14 (3)
83:5;85:11,14
14th (1)
36:8
15:14 (1)
48:9
151 (1)
48:20
15-2772 (1)
36:12
16th (2)
57:15,23
18 (1)
71:2
19 (1)
68:7

**2**

2 (13)
28:12;29:2,22;36:1,
1,4,5;37:22;44:19;
46:13;47:4;48:8;73:5
20 (1)
69:22
20:30 (2)
28:9,22
20_ (1)
103:3
2001 (1)
79:16
2008 (1)
64:10
2009 (2)
57:15,23
2013 (1)
70:2
2015 (10)
5:16;36:8,14;37:10,
15;41:7;53:13;57:18;
62:17;79:22
21:30 (1)
28:13
22:00 (1)
28:15
22:49 (1)
64:10
26th (1)
79:16
28th (1)
70:2
290 (1)
80:5

**3**

3 (16)
28:15;29:5,6,14;
47:6,7;50:6;52:19;
56:24;57:1,9;66:10,10;
73:11;89:9;97:5

**4**

4 (1)
63:24

**5**

5 (5)
63:23,24;65:13;
72:14;76:9
53 (4)
69:17,20,20;94:6

**6**

6 (1)
63:24

**7**

7 (5)
63:10,11,21,24;68:7
7:09 (1)
78:14

**8**

8 (3)
71:17,19;72:14
8:30 (1)
28:10
8:52 (1)
82:8
8th (9)
5:16;36:13;37:10,15;
41:7;53:13;57:18;
62:17;79:22

**9**

9 (1)
77:21
90 (1)
5:20
9-8-15 (1)
78:14
9th (2)
63:2;64:9