# In The Matter Of:

*Haydn Zeis, Administrator of the Estate of Jordn Miller v. Sprinfield Township, Ohio, et al.*

---

*Officer Joseph Holsopple*

*Vol. 2*

*March 17, 2017*

---

*Layne & Associates*

*6723 Cooperstone Drive*

*Dublin, Ohio  43017*

*(614) 309-1669*

*WhitneyLayne@att.net*



Layne & Associates

Reporters Without Borders

Original File 031717-Holsopple.txt

Min-U-Script® with Word Index

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Sprinfield Township, Ohio, et al.

Officer Joseph Holsopple -  Vol. 2
March 17, 2017

---

**Page 1**

1   IN THE UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF OHIO
2              EASTERN DIVISION

3                - - -

4   HAYDN ZEIS,              :
    ADMINISTRATOR OF THE     :
5   ESTATE OF JORDN MILLER,  :
                             :
6        PLAINTIFF,          :
                             :
7        vs.                 : CASE NO. 5:16-CV-02331-JRA
                             :
8   SPRINGFIELD TWP., OHIO,  :
    ET AL.,                  :
9                            :
         DEFENDANTS.         :
10

11               - - -

12    CONTINUED DEPOSITION OF JOSEPH HOLSOPPLE

13              VOLUME 2

14               - - -

15        Friday, March 17, 2017

16          at 10:12 a.m.

17               - - -

18  Taken at:  Springfield Township Police Department
                2465 Canfield Road
19              Akron, Ohio  44312

20               - - -

21

22

23  REPORTED BY:  CAROL A. KIRK, RPR/RMR/CSR

24

---

**Page 2**

1    CONTINUED DEPOSITION OF JOSEPH HOLSOPPLE

2              APPEARANCES

3                - - -

4   On behalf of the Plaintiffs:

5        MICHAEL A. HILL, ESQUIRE
         EADIE HILL TRIAL LAWYERS
6        3100 East 45th Street, Suite 218
         Cleveland, Ohio  44127
7        216-777-8856
         michael.hill@eadiehill.com
8

9   On behalf of the Defendants:

10       MEL L. LUTE, JR., ESQUIRE
         BAKER DUBLIKAR BECK WILEY & MATHEWS
11       400 South Main Street
         North Canton, Ohio  44720
12       330-499-6000
         lute@bakerfirm.com
13

14

15               - - -

16

17

18

19

20

21

22

23

24

---

**Page 3**

1           Friday Morning Session
                March 17, 2017
2               10:12 a.m.

3                - - -

4            STIPULATIONS

5        It is stipulated by and between counsel for

6   the respective parties that the deposition of JOSEPH

7   HOLSOPPLE, a Defendant herein, called by the Plaintiff

8   under the applicable Federal Rules of Civil Procedure,

9   may be taken at this time in stenotype by the Notary,

10  pursuant to notice; that said deposition may thereafter

11  be transcribed by the Notary out of the presence of the

12  witness; that proof of the official character and

13  qualification of the Notary is waived; that the witness

14  may sign the transcript of his deposition before a

15  Notary other than the Notary taking his deposition; said

16  deposition to have the same force and effect as though

17  signed before the Notary taking it.

18               - - -

19

20

21

22

23

24

---

**Page 4**

1    CONTINUED DEPOSITION OF JOSEPH HOLSAPPLE

2            INDEX TO EXAMINATION

3   WITNESS                               PAGE

4   JOSEPH HOLSOPPLE

5        CROSS-EXAMINATION BY MR. HILL:          5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Sprinfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 2
March 17, 2017

Page 5

1      JOSEPH HOLSOPPLE
2 being by me first duly sworn, as hereinafter certified,
3 deposes and says as follows:
4      CROSS-EXAMINATION
5 BY MR. HILL:
6    Q. Joe, we're back on the record after a pretty
7 hefty break here. Since Wednesday when your deposition
8 stopped or adjourned for the day, have you reviewed any
9 documents?
10   A. No.
11   Q. Done anything or talked to anybody about Jordn
12 Miller or these events?
13   A. No.
14   Q. Didn't talk to anybody about your deposition?
15   A. No. I mean, I told my girlfriend I had my
16 deposition, but I didn't go into any details about it.
17   Q. I want to follow up on the investigative note
18 we were discussing, which was Exhibit 12. I've got --
19 here are all the exhibits, Joe. Here's Exhibit 12. The
20 other ones should be in order. I'll just give those to
21 you now.
22   A. Thank you, sir.
23   Q. If you go to page 3, the final page of Exhibit
24 12, of that document.

Page 6

1    A. Yes, sir.
2    Q. There's some information listed on there.
3 Officer Scherer said that he did not include that
4 information, or what's written on page 3 is not his
5 information.
6    A. Okay.
7    Q. Do you know who wrote that?
8    A. Well, this is all three of us writing it.
9    Q. I mean, but do you know who --
10   A. But Denise --
11   Q. -- stated the information that's on page 3?
12   A. I thought it was a collective -- I mean, I
13 don't know if he put input into it. I know I put in --
14 I told Denise what I saw, observed on Jordn, but I don't
15 know if I would have said anything or not. I don't
16 know.
17   Q. On page 3 that you have there, those
18 descriptions, did you include the information that's
19 listed there? I mean, is that part of your statement?
20   A. Yeah, I believe so.
21   Q. When I spoke to -- we'll come back to that.
22      We were talking earlier about the way that you
23 would go about requesting EMS through dispatch, which
24 would just be to use the radio on your lapel, correct?

Page 7

1    A. Yes.
2    Q. And you were wearing one of those lapel radios
3 on September 8, 2015, right?
4    A. Yes, sir.
5    Q. Is that the same way that you would go about
6 requesting additional officers to a scene?
7    A. Yes.
8    Q. And, again, that would be the same procedure;
9 take a few seconds?
10   A. Yes.
11   Q. You also referenced a log that you reviewed
12 before your deposition that said -- it showed you how
13 your time was recorded.
14   A. Yes.
15   Q. And you said that each officer has a log, I
16 think.
17   A. I don't know at that time if the sergeants
18 were required to do a log. I think they're supposed to
19 do them now, but I don't -- there was a time where the
20 sergeants didn't have to do a log.
21   Q. But patrol officers did?
22   A. Yes.
23   Q. Just tell me a little bit about --
24   A. Supposed to.

Page 8

1    Q. -- this log. What is it? Is it on the
2 computer?
3    A. It's basically the same thing that's in the
4 CAD system, but it's easier, just a piece of paper that
5 we have here. You get a time call. You get a time of
6 your arrival, or when you're in the area, the address is
7 on there and what the nature of the call is.
8    Q. Who is logging the information?
9    A. Me, or the officer.
10   Q. So the information on your log, for example,
11 for September 8, 2015, is based on what you would have
12 been writing down at the time?
13   A. Well, the times you write down are what times
14 that the dispatch gives you. It's supposed to be.
15 Sometimes you kind of miss a time and you kind of
16 estimate. I don't think that was the case on this day.
17 I know there's sometimes you get really busy and you
18 forget to write down a time, so you kind of -- and I was
19 there about ten minutes, and you just write down that.
20   Q. But it sounds like on September 8, 2015, there
21 wasn't anything going on when you got the call?
22   A. I don't think so.
23   Q. How did you review the log?
24   A. It was in -- I don't even remember where I saw

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple -  Vol. 2
March 17, 2017

Page 9

1    it, but it was in one of the files.
2       Q.   One of the files here at the station?
3       A.   Yeah.
4       Q.   And within those documents -- so let me ask
5    you, then, if I'm looking for this log, would it have
6    your name and, what, badge number on it?
7       A.   Usually I write my name, what district -- I
8    mean, it has a spot for what district you're working,
9    the times you worked, the radio you used.  If you're not
10   assigned one, you've got to write that in there.  And
11   the mileage on your car and stuff like that at the top.
12      Q.   So this is a handwritten log?
13      A.   Yes.
14      Q.   And then there should -- at least there should
15   be one for Officer Scherer that day, correct?
16      A.   I would assume.
17      Q.   And Officer -- is it Linaburg?
18      A.   Yes.
19      Q.   And we then don't know whether or not Sergeant
20   Moore would have been required to fill out a log?
21      A.   Yes.
22      Q.   Sometimes in the past, she did, and maybe
23   sometimes in the past that changed.  We don't know.
24      A.   Right.

Page 10

1       Q.   Earlier in the deposition you said that in
2    reviewing the log, you realized it took you four minutes
3    to get --
4       A.   Yeah, I was wrong when I said that.  I wanted
5    to correct that.  It was five minutes.
6       Q.   Five minutes?
7       A.   Yes.  I was dispatched at 1514 and 1519 -- I
8    thought about that later.  I forgot to tell you that the
9    other day.
10      Q.   Okay.  Great.  Well, I'm glad we cleared it
11   up.  So that five minutes between dispatch and you
12   getting there, that's just basically --
13      A.   That was me getting in the area.
14      Q.   Right.  That's you -- but you're driving the
15   entire time?
16      A.   I was -- yeah.  I'm coming from somewhere, and
17   I was in the area five minutes later looking for him.
18      Q.   And as soon as dispatch made that initial call
19   regarding Jordn Miller's mental health crisis, you began
20   to drive directly to the area, right?
21      A.   Of course.
22      Q.   And your sole focus at that point was
23   considering responding to Jordn Miller and his mental
24   health crisis?

Page 11

1       A.   Yes.
2       Q.   How fast were you driving through this area?
3       A.   I have no idea.
4       Q.   It wasn't --
5       A.   Like I said, I don't even remember where I
6    came from.  I don't remember anything until getting to
7    the area.
8       Q.   You didn't have your lights on?
9       A.   No.
10      Q.   You didn't have your sirens on?
11      A.   No.
12      Q.   It wasn't what we would say a high urgency
13   response for you?
14      A.   Right.  I mean, we get three to five of mental
15   health calls a week that we respond to, in my opinion.
16   It's probably somewhere around there.
17      Q.   And within seconds of you actually arriving at
18   1019 Abington, you and Officer Scherer are able to walk
19   up the driveway and be by the Jeep, fair?
20      A.   Yeah.  It was actually a hurried walk, because
21   the guys -- they were saying it was such an urgent
22   situation.  This guy is trying to steal a car, so you're
23   walking up there trying to get a little bit of
24   information, but you're trying to get up there to figure

Page 12

1    out what the -- I have all these -- these four people
2    around this car that are in danger of being injured, and
3    plus Jordn is in the car.  I mean, I didn't know it was
4    Jordn at the time, but he's in some state, or he's
5    trying to steal a car.  So, yes, we're trying to walk up
6    there fast.
7       Q.   So it's a hurried -- it's a hurried walk, not
8    a run?
9       A.   Right.
10      Q.   And then from you exiting your cruiser -- I
11   mean, you're at the Jeep, though, within -- it's a short
12   driveway, right?  Relatively short?
13      A.   Yeah.  It's probably 40 feet, 30 feet.
14      Q.   So it takes you at a hurried walk, a couple
15   seconds, five seconds, ten seconds?
16      A.   Somewhere around there.
17      Q.   And how long are you and Bubba, Officer
18   Scherer, standing outside of the Jeep before you begin
19   to remove Jordn?
20      A.   I think there was kind of a delay in there.  I
21   mean, we were actually trying to talk to him.  So I
22   would say we arrived there at 21, 1521, get up the
23   driveway 15 seconds later and maybe --
24      Q.   Thirty seconds?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple -  Vol. 2
March 17, 2017

Page 13

1    A.  45 seconds, I would say.
2    Q.  And when you say "45 seconds," so we're clear
3  later, 45 seconds from the time you get to the Jeep --
4    A.  No.  45 seconds at the Jeep, 10 seconds to get
5  up the driveway -- or five seconds to get up -- however
6  many seconds it takes to walk up the driveway.  But I
7  would say I would estimate about 45 seconds we were at
8  the Jeep talking to him.  You know, he tried to get out
9  of the Jeep for a minute, but then he just sat back down
10  and grabbed the steering wheel, and we were talking to
11  him, and I would estimate 45 seconds at the window.
12    Q.  That's what I wanted to know.  Talking about
13  pink slipping a person -- we kind of went through what
14  pink slipping was.  And pink slipping occurs when an
15  individual is taken for a psychiatric commitment?
16    A.  Correct.
17    Q.  And how does someone initiate the process for
18  pink slipping a person?
19    A.  What do you mean?
20    Q.  Well, I think you said that you've been
21  involved in the process of pink slipping people.
22    A.  Yes.  Are you asking how I initiate it?  I
23  don't know of anybody else than police officers that can
24  do a pink slip.

Page 14

1    Q.  So are pink slips oftentimes then a response
2  of police officers when a family member, you know,
3  requests emergency help that maybe they need somebody in
4  the psych ward?
5    A.  Yeah.  But we've got to evaluate -- we've got
6  to go there and kind of evaluate the situation.  There
7  has to be -- either he's, you know, like delusional or
8  he's out -- you know, he has no control of himself, or
9  he said something along the lines that he was going to
10  harm himself or he's going to harm somebody else or
11  both.
12    Q.  Fair to say, then, oftentimes when you're pink
13  slipping a member of the public, it's in response to a
14  911 call for a mental health crisis?
15    A.  Yes.
16    Q.  And is that the same code that was used in
17  this case?  Is it 53?
18    A.  Yes.
19    Q.  Sometimes when you're asked -- so are you
20  asked to pink slip a person, or do you make that
21  decision?  How does that work?
22    A.  It depends on the situation.  I mean, if I get
23  a bunch of information that they -- you know, that they
24  said that they tried to kill themselves or they were

Page 15

1  going to -- they said they were -- if I got ten people
2  that have called in and said they were going to kill
3  someone or they were going to harm themself -- but it's
4  kind of one of those calls, if you don't have -- all you
5  have is that he's going through a mental illness
6  situation.  You kind of got to go there and assess
7  what's going on before you just say -- I can't just
8  justify pink slipping somebody as soon as someone says,
9  "Well, he's having a mental crisis."
10    I can call you on tomorrow and say, "Hey,
11  you're having a mental crisis," and that doesn't mean I
12  have to -- I don't want to have to go pink slip you just
13  because somebody made a call like that.  It's an
14  assessment when you get there sometimes.
15    Q.  Or sometimes you may get enough information
16  where in your mind you've already decided "I'm going to
17  have to do this if this is true"?
18    A.  Probably.
19    Q.  Okay.
20    A.  I'll say probably.  I never -- until I get
21  there -- you can't make that determination until you've
22  got all the information that you can get.
23    Q.  Sometimes either when you're asked to pink
24  slip a person or you decide to pink slip a person, it

Page 16

1  may be a circumstance where that individual is under the
2  influence of drugs or alcohol, true?
3    A.  That's not -- I don't necessarily agree with
4  that.  I mean, that would be more of a medical issue.  I
5  mean, unless they're in some -- if you go to the state
6  of excited delirium, then, yes, you might be looking at
7  that, but they would need medical treatment before they
8  went to wherever -- if I was to pink slip them.  And at
9  that point, I don't know even know if I would have to
10  pink slip them because of their medical issues.
11    Q.  Because you're going to be already calling
12  EMS, and they're going to take care of it?  Yes?
13    A.  Yes, yes.
14    Q.  So when you make that connection as a police
15  officer, a mental health crisis, and you also see signs
16  of suspected drug use, you contact EMS?  Yes?
17    A.  As soon as I get that evaluated, yes.
18    Q.  I mean, as soon as you make that connection,
19  though?
20    A.  Right.
21    Q.  That there's a connection -- that the health
22  crisis is the call, the person is suspected by you of
23  being on drugs?
24    A.  Yes.  Once I'm there.  Not necessarily by

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 2
March 17, 2017

Page 17

1  information on the radio.  I want to be clear about
2  that.  I mean, I can't go by everything that's said on
3  the radio until I -- I mean, there are situations where
4  you would do that, but at the same time, there's times
5  where you have to go there and see what's going on.
6      Q.  Yeah.  And I think we're talking about exactly
7  the same thing.  We're talking about something that's
8  happened to you before.  You get a call.  Here's a
9  report of a person in a mental health crisis.  You get
10  there.  The person is exhibiting signs of a mental
11  crisis, but also signs that are suspicious that the
12  person might be on drugs.  The next step for you would
13  be to contact EMS, fair?
14      MR. LUTE: Objection.
15      Go ahead.
16      A.  Yes.
17      Q.  Sometimes when an officer like yourself is
18  asked to pink slip a person, that person may be engaged
19  in behavior that's considered criminal, true?
20      A.  Yes.
21      Q.  They may be damaging property, true?
22      A.  Yes.
23      Q.  Smashing things, for example?
24      A.  Yes.

Page 18

1      Q.  Some of those things could be, you know,
2  damage to property, but they might -- strike that.
3      If you came across a situation where you
4  thought somebody needed to be pink slipped, but they
5  were also engaging in criminal behavior, would you ask
6  for backup?  How would that work?
7      A.  Well, I mean, it depends on the situation.  I
8  mean, if you're specifically asking about this
9  situation, there was two of us there.  There's only so
10  much room in the doorway of a Jeep to get him out of the
11  car.  So we were sufficient.  And we knew Denise was on
12  the way, Sergeant Moore.
13      Q.  And that's the reason that in this case you
14  did not ask for backup, because you knew you had two
15  officers present and a third was going to be there
16  shortly, true?
17      A.  Correct.
18      Q.  You had enough officers to handle the
19  situation?
20      A.  Yeah.  I believe so, yes.  In my opinion, yes.
21      Q.  We talked the other day -- I'll see if I have
22  a copy here -- of an incident report, and I got
23  something through a public records request I had made
24  that says "incident report," but I'm not completely

Page 19

1  certain this is what you were talking about, and we'll
2  mark this as Exhibit 9.  It's heavily redacted.  It's
3  got a lot of black marker on it, but that's the only
4  copy I've ever received in this case.
5      A.  Okay.
6      Q.  When you were describing an incident report
7  during your deposition earlier, is that what you were
8  referring to?
9      A.  Yes.  I didn't really review this part of it
10  that much when I did.
11      Q.  Well, in terms of pages, what pages did you
12  review?
13      A.  I don't even remember opening it.  All I
14  remember is it sitting there and I wanted to read this.
15  Actually, I really only wanted to read the first page of
16  this.
17      Q.  When you say "this," so we know what we're --
18      A.  Sorry.  I remember seeing the first page of
19  Exhibit 9, but I really didn't even review it.  I did
20  look to see that it's the same number as the note that
21  goes -- this is also part of the same thing.  Do you
22  know what I mean?  So Exhibit 12 was what I was wanting
23  to review, and I really only wanted to do the first page
24  of this that was mostly pertinent to me.  I didn't

Page 20

1  really go over this at all.  I just looked at it.
2      Q.  The incident report number on Exhibit 9, is
3  that 15-2772?
4      A.  Yes, sir.
5      Q.  And you created that document on September 8,
6  2015?
7      A.  I believe Denise actually put the information
8  in, and I kind of reviewed it and made sure -- or went
9  over it and said I was okay with how she wrote it.
10      Q.  I'm asking -- yeah, because you're listed as
11  the reporting officer.
12      A.  Right.
13      Q.  So you either wrote the information or agreed
14  with all the information that was written?
15      A.  At the time, yes.
16      Q.  Right.  September 8, 2015, the night this
17  happened?
18      A.  Yes.
19      Q.  I spoke to Chief Smith yesterday.
20      A.  Okay.
21      Q.  Or former Chief Smith, I should say.  And he
22  testified that after he returned to the station, there
23  was -- you and Sergeant Moore and perhaps Sergeant
24  Scherer were all at the station working on a report?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 2
March 17, 2017

Page 21

1    A.    That would be this (indicating).
2    Q.    That's that report?
3    A.    That would be Number 12.
4    Q.    Had Officer Scherer returned by the time you
5    and Sergeant Moore were completing Exhibit 9, the
6    incident report?
7    A.    I don't know when he returned, but he was
8    involved in this, so he had to have come either sometime
9    during or he was already there.
10   Q.    It sounds like you don't know which one was
11   completed first, the incident report or the
12   investigative --
13   A.    Generally we do this first, and then this
14   (indicating). Item 9 would have probably been done
15   first and then we -- because this -- like I said, this
16   is actually in a little section of this report. So you
17   would have to have this report started to even be able
18   to do this.
19   Q.    And you and Sergeant Moore identify a number
20   of potential offenses on the top -- well, throughout
21   this document, this incident report, correct?
22   A.    Yes.
23   Q.    How did you select the offenses that are
24   listed on the document?

Page 22

1    A.    Just by experience and what the situation was.
2    Q.    I mean, these are the ones that you thought
3    applied?
4    A.    Correct.
5    Q.    And both you and Sergeant Moore had to agree
6    to the offenses listed before you moved forward with the
7    incident report?
8    A.    Honestly, I don't remember even seeing what
9    she had put on there. I don't remember. I mean, I knew
10   the gist of the situation. She might have just put
11   those in there, and I don't know if I actually went over
12   each one of them before I said this was okay. I mean,
13   just because I'm listed as the reporting officer doesn't
14   mean that I'm the one that --
15   Q.    Reported it?
16   A.    Right.
17   Q.    So as the reporting officer, what's your
18   involvement in an incident report like this?
19   A.    Well, normally it's my responsibility to do
20   the report.
21   Q.    Okay.
22   A.    But that doesn't necessarily mean that I'm the
23   one that did it. You know what I mean?
24   Q.    No.

Page 23

1    A.    I'm usually responsible to do a report, but
2    someone else could just put -- they could do the report
3    if they were there or they have knowledge of it and just
4    list me as the reporting officer.
5    Q.    How often does that happen?
6    A.    It depends on -- I mean, it depends on the
7    situation. Like, she helps do our reports usually like
8    in felony cases just to get us through this and get us
9    back on the road -- you know what I mean? -- for time
10   reasons, because I've got -- I've got to fingerprint
11   somebody. I've got to do this. I've got to get all
12   this paperwork done.
13        So she actually comes in and does the report,
14   and then I look over it briefly to get the gist of it,
15   and then -- just for time purposes. So it's like two
16   people doing one person's job -- you know what I mean?
17   -- just to hurry things along to get the person in the
18   jail so I can get back on the road and get back to my
19   community. You know what I mean? You don't know?
20   Q.    I don't know. It's your precinct. It's
21   your -- I don't know --
22   A.    Well, I'm just trying to explain. It's
23   more -- it's just about getting back to the road.
24   Because we're a pretty busy police department. So

Page 24

1    you're saving time by having two people do paperwork
2    rather than one, because our process -- I mean, it takes
3    generally an hour and a half to do a felony arrest if
4    you've got to arrest somebody, bring them back here and
5    process them and get them to the jail. So if you're by
6    yourself, it might take you two hours. If there's two
7    people doing it, it might take you one hour.
8    Q.    I'm just asking who completed the uniform
9    incident report that's number 15-2722.
10   A.    I believe Denise Moore. Sergeant Moore
11   completed that.
12   Q.    And then she would have just written your name
13   on it, typed your name in?
14   A.    Well, it's not even -- sorry about that. It's
15   not even writing it. It's a selection that you put in
16   there. It's a drop-down bubble, and you pick whose name
17   it is.
18   Q.    Is that a pretty common practice here at
19   Springfield Township that the approving officer just
20   hits this pull-down and puts the reporting officer's
21   name in it?
22   A.    I have no idea. I mean, on our shift, we do
23   it to get the report done.
24   Q.    And by your shift, you mean you and Sergeant

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple -  Vol. 2
March 17, 2017

Page 25

1   Moore and Officer Scherer?
2       A.   Yes.
3       Q.   And Linaburg?
4       A.   Yes.
5       Q.   So with respect to this incident report
6   regarding Jordn Miller, do you know if you had any
7   involvement in selecting any of the listed criminal
8   charges on this document?
9       A.   I didn't -- no, I don't even recall --
10  honestly, I don't even recall looking at those.  I mean,
11  I looked at the report.  I knew what it was.  I might
12  have glanced over it and kind of said, "Yes, that kind
13  of seems like what happened," and it was good to me.
14      Q.   But as you sit here, you have no memory of
15  doing that?
16      A.   No.
17      Q.   Is there a way to identify within the computer
18  system here at Springfield Township what officer is
19  logged in the computer completing what document?
20      A.   I have no idea.
21      Q.   For example --
22      A.   You'll have to ask the IT guy.  I don't know
23  about computers like that, so ...
24      Q.   So, for example, when you go to a computer

Page 26

1   terminal here, do you have to log in with any kind of
2   identification code?
3       A.   Yes.
4       Q.   Okay.
5       A.   Well, if somebody else is already logged on,
6   it doesn't log off for a while.  So you could actually
7   be on somebody else's if you didn't pay attention.
8       Q.   So walk me then -- I've never been in the
9   patrol office, but I'm assuming that's where the
10  computers are.
11      A.   Yeah, there's two in the patrol office.
12      Q.   And there's some in some other locations as
13  well?
14      A.   Two in the detectives' -- two or three in the
15  detectives', one in the chief's, one in the data entry.
16      Q.   Which ones do you typically use to --
17      A.   Generally the ones in the patrol office.
18      Q.   And when you log into the patrol office
19  computer, you've got a unique ID number for Joe
20  Holsopple?
21      A.   Yes.  You have a user name, first initial,
22  last name, and then there's a password that goes with
23  it.
24      Q.   Let's say the uniform incident report here --

Page 27

1   you have filled these out before?
2       A.   Yes.
3       Q.   And you got, for example, administrative at
4   the top left.  There's time of day.  What does TOA stand
5   for?
6       A.   Time of arrival.
7       Q.   And then what's TOC?
8       A.   Time of clearing.
9       Q.   That's when the scene was cleared?
10      A.   It doesn't necessarily mean that.  That's the
11  time that the actual call was done.  You might still be
12  there for -- like in this case, I don't know -- you
13  know, I don't know when I cleared the scene, but the
14  call was cleared then.  You know, I might still be there
15  with the detectives.
16      Q.   Did you clear the scene?
17      A.   I was there until the detective was done and
18  gathering his evidence.  And, like I said, I had given
19  the people statements, but I don't remember -- I know I
20  signed them later, that I was the one that -- but I
21  don't remember if I did that there or if I did it back
22  at the office or where those went, or if I just gave
23  them to the detectives at the scene and I had already
24  signed them.  Do you know what I mean?

Page 28

1       Q.   You're talking about when you signed them as
2   the witness?
3       A.   Right.
4       Q.   Let's just stay on the incident report for a
5   moment.
6       A.   Okay.
7       Q.   In terms of where it says "time cleared," you
8   don't know who cleared the scene?
9       A.   Well, I was the last -- it was me and Blasdel
10  that were there, but I don't know if that -- I don't
11  know if that was when I cleared as in Jordn was gone.
12  You know what I mean?  Or if that was cleared the scene
13  with the detective.
14      Q.   When did you leave the scene?
15      A.   Well, this says 1621.  I don't know if that
16  was -- honestly, I don't know if that was when I was
17  done with all the statements and all that, or -- I mean,
18  it seems like it, because it would be an hour.  You know
19  what I mean?  I didn't arrive at this 1019 until -- or
20  this 1019 Abington until 1521 hours, I know that.
21           So I can't imagine that -- I would assume this
22  would be when the detective cleared the scene, you know,
23  because I called the detective as soon as they were
24  loading him in the bus to say we're going to need

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Sprinfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 2
March 17, 2017

Page 29

1 somebody to come process this scene.  And I would
2 imagine it would have taken more than an hour to do
3 that.  There really wasn't a lot, in my opinion, to
4 collect.  You know what I mean?  So I would assume
5 that's when the detectives cleared the scene and I
6 cleared the scene with them.
7    Q.  Did you leave with the detectives?
8    A.  I don't remember.
9    Q.  Do you remember if you were the last person to
10 leave that scene?
11   A.  No, I don't.  I mean, it could have been
12 either way.  It could have been me clearing the scene
13 because the detectives were there and they can clear
14 later, or it could have been that I stayed there the
15 whole time they were there, and then we all left
16 together, but I don't remember.
17   Q.  It sounds like you don't have a recollection
18 of what time you left.
19   A.  Right.
20   Q.  And it sounds like you don't have a
21 recollection of who left before you or after you?
22   A.  Well, I know Bubba left.  I know Denise left
23 to go over to Jordn's house.  I believe Blasdel went to
24 Jordn's house for a minute, and then -- but I don't know

Page 30

1 if he was at my scene first and went over there and then
2 came back, or if he was there and then he came over to
3 me.
4    Q.  Do you have a recollection of driving back to
5 the station?
6    A.  No.
7    Q.  Do you have a recollection of what time you
8 came back to the station at all that day?
9    A.  No.
10   Q.  The clearance time that's listed on this
11 uniform incident report, I mean, you don't know where
12 that time is coming from, is that fair, because you're
13 not sure if you wrote the document?
14   A.  Right.  Well, I'm not sure if -- like I told
15 you before, I'm not sure if it's when all the detectives
16 and me cleared or if it's just when I was there and the
17 detective was still on the -- I don't even remember if
18 there was a detective on scene when I left or if I left
19 with them.  It's either one of them.
20   Q.  So by "time cleared" on the incident report,
21 you don't know what that corresponds with; is that fair?
22   A.  No.  Like I said, it's either --
23   Q.  So what happened at 1621 then?
24   A.  I cleared -- I cleared the scene at 1621.

Page 31

1 Whether I was with everybody else or if the scene was
2 still being kept by a detective, I don't remember that
3 part.
4    Q.  In terms of who wrote 1621 on this sheet,
5 that -- you don't know if that was you or not?
6    A.  Well, it should correlate with my log.
7    Q.  Your handwritten log again?
8    A.  Yes.
9    Q.  So this handwritten log then is available to
10 whoever is completing this incident report?
11   A.  Yes.
12   Q.  And how would that work if someone other than
13 you is completing the incident report?  You hand it to
14 them?
15   A.  No.  They would ask me, or they could call
16 dispatch, or they could be actually using -- if somebody
17 else wrote this, they could be actually using their time
18 that they cleared.  If they wrote their own log and they
19 wrote this report and they were there, this could be
20 their time, so that they just look over it and go,
21 "okay, I was -- this is the time we were gone, this is
22 the time we cleared."
23   Q.  So do you know, when it says 1621, is that
24 your time or someone else's time?

Page 32

1    A.  I don't know.  If you have my log, we can
2 look, and I'll tell you what time mine was.
3    Q.  I don't have your log.
4    A.  Okay.
5    Q.  I never received it.
6        In terms of these times that are listed on the
7 incident report, are those manually entered by a person
8 at the computer?
9    A.  Yes.
10   Q.  And is that the same for all the times that
11 are listed?
12   A.  I believe so, yes.  I know on all the -- the
13 time of dispatch, time of arrival, time of clear, report
14 date and time, incident occurred from and to, yes.
15   Q.  How about with respect to where it says
16 reporting officer and it has a date there, and also for
17 the approving officer?
18   A.  Where is that at?
19   Q.  The bottom of page 2 of Exhibit 9.
20   A.  No, that's not manually.
21   Q.  So that's generated by the computer itself?
22   A.  Yes.
23   Q.  With respect to information like on page 3 of
24 Exhibit 9, there's values listed.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 2
March 17, 2017

Page 33

1    A.  Uh-huh.
2    Q.  Monetary values.  Do you see that?
3    A.  Yes.
4    Q.  Are those manually put into the computer by an
5    officer?
6    A.  Yeah, but it's basically our opinion on what
7    we think -- I have no idea.  I'm not an appraiser of
8    vehicles, so we just assume -- or we ask the person what
9    the vehicle is worth and they tell us.  So it's not like
10   we had somebody come out and estimate the value of the
11   vehicle.
12   Q.  Were any charges formally brought or actually
13   brought against Jordn Miller?
14   A.  No.
15   Q.  And there's four charges that are listed on
16   this incident report where you're at least listed as the
17   reporting officer, correct?
18   A.  Yes.
19   Q.  There is theft -- let me take a step back.  So
20   there's theft, criminal damaging/endangering, resisting
21   arrest, and felonious assault, correct?
22   A.  Yes.
23   Q.  And if you look -- there's also three victims
24   that are identified in this police report, correct?

Page 34

1    A.  Yes.
2    Q.  So the first victim is an individual named
3    Chester Clark?
4    A.  Yes.
5    Q.  He's the owner of the vehicle?
6    A.  Yes.
7    Q.  The second victim listed is Robert Scherer,
8    Officer Scherer?
9    A.  Yes.
10   Q.  And the third victim listed is the State of
11   Ohio?
12   A.  Yes.
13   Q.  And throughout the document, Exhibit 9, the
14   incident report, where you're the reporting officer,
15   there is a victim offense link, correct?
16   A.  Yes.
17   Q.  So all the charges that were being considered
18   for Jordn on September 8, 2015 are identified with
19   respect to who the victim is, correct?
20   A.  Supposed to be, yes.
21   Q.  And they are, correct?  They're all on there.
22   A.  Okay.
23   Q.  So with respect to Chester Clark, on the
24   bottom of page --

Page 35

1    A.  Actually, there's not a victim-suspect
2    relationship for the State of Ohio, so they're not all
3    on there.
4    Q.  Okay.
5    A.  But go ahead.
6    Q.  With respect to Chester Clark, the offense
7    codes for him are theft, which is Revised Code 2913.02,
8    right?
9    A.  Yes.
10   Q.  And criminal damaging, which is listed as
11   Revised Code 2909.06, correct?
12   A.  Yes.
13   Q.  Those are the only offenses or potential
14   criminal charges associated with Jordn and Mr. Chester
15   Clark, correct?
16       MR. HILL: Objection.
17       Go ahead.
18   A.  At any time you can go back and add more to
19   this, but at that time, those were the two that were
20   associated with them.
21   Q.  Right, as of September 8, 2015.
22   A.  Right.
23   Q.  And on page 3 of Exhibit 9, the incident
24   report, there's a description of this theft offense that

Page 36

1    was potentially going to be brought against Jordn; is
2    that fair?
3    A.  Yes.
4    Q.  I know there's no formal -- there were never
5    any formal charges pending, but in terms of the incident
6    report, the officers here --
7    A.  I don't see what you're talking about.  On
8    page 3, I have the reporting person and the vehicle
9    information and the property.  Am I on the wrong page?
10   Q.  I believe it's page 3 of Exhibit 9.  I think
11   you're there.
12   A.  It says Chester Clark right at the top as the
13   reporting party?
14   Q.  Yes.
15   A.  Okay.  What are you asking about?
16   Q.  So you've completed these before, correct?
17   A.  Yes.
18   Q.  The categories here include the victim's
19   vehicle, correct?
20   A.  Which section are you looking at?  What does
21   it say to the left of it?  Vehicle reporting property.
22   Q.  It says, Check Categories.  It says, Victim's
23   VEH.
24   A.  Over here, on the left side, there's a

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 2
March 17, 2017

Page 37

1   reporting section, vehicle section, property section.
2   Which section are you talking about?
3       Q.  It says Reported at the top, Victim's VEH, and
4   then underneath, it says, 2001 Jeep Grand Cherokee SUV
5   with blue -- are you following?
6       A.  Yes.  So you're in the vehicle section?
7       Q.  Uh-huh.
8       A.  Okay.
9       Q.  I'm just trying to understand how this
10  document works, all right?
11      A.  I'm just trying to figure out -- I want to
12  make sure we're on the same spot.
13      Q.  It says on the far right, it says Value.
14      A.  Uh-huh.
15      Q.  And it says zero, correct?
16      A.  Correct.
17      Q.  What does that mean?
18      A.  It might have been a typo.  Again, we're
19  not -- I'm not a professional estimator of a car, but
20  it's supposed to be the same thing as the value that you
21  said earlier in the report.  There are mistakes that are
22  made in reports.
23      Q.  So what is this box that says zero?  What's it
24  for?

Page 38

1       A.  The value of the vehicle, our judgment
2   estimate of the value of the vehicle, not the actual
3   estimate -- or the actual value of the vehicle.
4       Q.  So then going down the incident report, it
5   says, on the left side, still under the -- I guess where
6   it turns to Property.
7       A.  Yes.
8       Q.  Do you see that?
9       A.  Uh-huh.
10      Q.  It's kind of a large, I guess, page break
11  you'd call it?
12      A.  Yes.
13      Q.  So underneath that, it says Loss Code 4,
14  right?
15      A.  Yes.
16      Q.  What does that mean, Loss Code 4?
17      A.  Destroyed, damaged, or vandalized.
18      Q.  So that corresponds to that criminal damaging
19  issue?
20      A.  Well, yes.
21      Q.  And it says Description, Vehicle, SUV-Blue,
22  correct?
23      A.  Yes.
24      Q.  And then on the far right, it says Total

Page 39

1   Value.  It says $4,000.  Is that for the vehicle?
2       A.  Yes, our estimated value of the vehicle.
3       Q.  Not of the damage done but --
4       A.  Correct.
5       Q.  Underneath it, it says Victim Number and
6   there's a number 1.  That corresponds to Mr. Clark, the
7   owner of the vehicle, correct?
8       A.  Yes.
9       Q.  And under Loss Code 1, do you see that right
10  underneath?
11      A.  Uh-huh.
12      Q.  What is Loss Code 1?
13      A.  I have no idea.  Well, it says Property -- if
14  it's the same as what it is -- I'd have to look at
15  our -- I'd actually have to be doing a report to see if
16  it was a different -- I would assume that's this --
17  where it says Property Type up at the top and it says
18  number 1 is none, do you see that?
19      Q.  Uh-huh.
20      A.  Right after the break in the Property line, it
21  describes all those -- what the codes are.  Number 1 is
22  none, number 2 is counterfeit or forged, number 3 is --
23  or number 5 is stolen, et cetera.  Number 7 is
24  recovered.  Do you see that?

Page 40

1       Q.  Where are you?
2       A.  Remember where you said the property line
3   break was --
4       Q.  Uh-huh.
5       A.  -- the bold, right below that, type property,
6   the very next line.
7       Q.  Oh, okay.  So loss code, where it says type
8   property, is none, right?
9       A.  Yes.
10      Q.  So it means no property was taken?
11      A.  Yes.  It could mean that.
12      Q.  That makes sense then because it says
13  quantity.  That responds to how much stuff was taken,
14  right; the number of things, zero, correct?
15      A.  Yes.
16      Q.  And then next to that is the description and
17  then the incident report.  An officer here, either you
18  or Sergeant Moore, typed in "nothing taken," correct?
19      A.  Yes.  But for some reason in our report system
20  you have to put something like that in to make the
21  report valid.
22      Q.  Okay.
23      A.  There has to be some -- if you put criminal
24  damaging in, you have to have that property code and

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 2
March 17, 2017

Page 41

1  that -- you have to put some description in there for
2  that.  You'll have to ask the data entry lady how all
3  that works, but we have to do some of this stuff to make
4  the report valid.
5     Q.  So when you say "data entry," are you typing
6  this information on here?  Are you handwriting it and
7  somebody else is entering it?
8     A.  No.  I'm typing it.
9     Q.  Who's the data entry person?
10    A.  Deborah Grill.
11    Q.  And how would she be knowledgeable?
12    A.  She kind of-- well, before we started this
13  system, she was the one that entered everything, and
14  this system works basically the same as what she used to
15  have to enter all the time.  So we are still constantly
16  having to go to her to figure out how to make these
17  reports valid.
18    Q.  Does she review the report?
19    A.  I think she goes over most of them.
20    Q.  How long have you been using this system here
21  at Springfield Township?
22    A.  Well, we've been using this since I started
23  here.  The OHLEG system -- or the OHLEG reports, we used
24  to handwrite them, and now we are on RMS, which is on

Page 42

1  the OHLEG site, and it's all on the computer.
2     Q.  I mean, how long has the system been that the
3  officers are typing the information directly into the
4  computer?
5     A.  Maybe a year, two years, somewhere around
6  there.  I don't know.
7     Q.  So pretty close in time --
8     A.  Yeah.
9     Q.  -- to September 8, 2015?
10    A.  I think so.
11    Q.  But before you were typing the information
12  into the computer, you were writing the information,
13  handwriting it into forms that were the same?
14    A.  Yes, 'ish.  There's a few different changes in
15  it.  Basically, yes.
16    Q.  Then when you were -- is her name Deborah?
17  Was that her name, the data entry --
18    A.  Yes.
19    Q.  So when you would handwrite information, would
20  Deborah then change it before it would go into the
21  computer system occasionally for the reports?
22    A.  I don't think so, not without -- if she did,
23  she would tell us about it.
24    Q.  She'd come back to you and say --

Page 43

1     A.  "Hey, this is wrong.  I've got to do this."
2     Q.  So with respect to quantity, zero, because
3  nothing is taken, correct?
4     A.  Right.
5     Q.  And then description is nothing is taken,
6  correct?
7     A.  Yes.
8     Q.  So with respect to a potential theft offense
9  as of September 8, 2015, where you have a felony 5
10  listed, what was stolen?
11    A.  Well, it would have been the attempted theft
12  of the vehicle.
13    Q.  So it's not theft then?  Nothing was stolen?
14    A.  Correct.
15    Q.  Is there a description -- so under the
16  criminal damaging part --
17    A.  Actually, let's go back to that.
18    Q.  Yes.
19    A.  This says Noted.  If you go back to theft on
20  the very first page of that report, if you go over here,
21  2913.02, the next category is A and C.  Do you see it?
22    Q.  Uh-huh.
23    A.  Attempted is for A.  Completed is for C.
24    Q.  Gotcha.  So this was an attempt at theft he's

Page 44

1  been charged with --
2     A.  Right.
3     Q.  -- or considered being charged with?
4     A.  Right.
5     Q.  Criminal damaging, is that where it says zero
6  above, that was the value of the items damaged,
7  estimated?
8     A.  What do you mean?  Are we back to the property
9  again?
10    Q.  Yeah.  I'm trying to figure out, is there
11  anything listed in terms of the value of anything that
12  was damaged.
13    A.  No, we didn't estimate that.  That doesn't
14  necessarily mean that's for the criminal damaging.  I
15  mean, I don't know if that code needs -- if you have
16  criminal damaging, I don't know if you had to put
17  something in there to -- in the property section or
18  estimate how much the damage was on there for the report
19  to validate.
20    Q.  And in terms of criminal damaging, what you
21  were aware of at this point Jordn damaging was the
22  broken shifter knob, right?
23    A.  Correct.  Well, yeah, it was the turn signal
24  knob.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 2
March 17, 2017

Page 45

1    Q.   Turn signal.  You're right.
2    A.   And I don't know -- I don't know if there was
3  other reports filed later about the fence that he -- I
4  don't know what they -- but as far as what -- in my
5  incident, it was for that.
6    Q.   This is your incident report?
7    A.   Right.
8    Q.   In terms of resisting arrest, that is
9  categorized as -- the victim is the State of Ohio,
10  right?
11    A.   Let me double check.  Yes, sir.
12    Q.   And when did you or Officer Scherer first
13  attempt to place Jordn under arrest?
14    A.   What do you mean?  When did we announce it?
15    Q.   No, no.  When do you consider an arrest to
16  have taken place?
17        MR. LUTE: Objection.
18        Go ahead.
19    A.   As soon as we feel we have to detain him and
20  get him out of the car.
21    Q.   That's when he was arrested?
22    A.   Yes, in my opinion.  That's what I felt.  I
23  can't talk for Officer Scherer when he thought he was
24  arrested.

Page 46

1    Q.   I'm just asking when you arrested Jordan, when
2  you physically removed him from the car.
3    A.   When he refused to get out of the car, and
4  then as soon as we decided we're going to take him out
5  of the car, that's when he got arrested.
6    Q.   And at that point, he was being arrested for?
7    A.   Criminal damaging.  It was going to be
8  attempted theft of a motor vehicle.
9    Q.   I just want to make sure that we're able to
10  follow along here.
11    A.   Okay.
12    Q.   And at that point, when you were removing
13  Jordn from the car, you're considering him a criminal?
14    A.   Yes.
15        But like I told you before, it was also --
16  there's still the mental health issue that would have
17  been addressed as soon as we could.
18        MR. LUTE: How are you doing, Joe?
19        THE WITNESS: I need to get another cough
20  drop.  Can we take a break?
21        MR. HILL: Fine with me.
22        (Recess taken.)
23  BY MR. HILL:
24    Q.   The other possible offense you have listed for

Page 47

1  Jordn Miller as of September 8, 2015 on this incident
2  report is felonious assault.
3    A.   Yes, sir.
4    Q.   And the victim of that is tied to Officer
5  Scherer?
6    A.   Yes, sir.
7    Q.   And that's relative to the bite?
8    A.   Yes, sir.
9    Q.   And nothing else, correct?
10    A.   No.
11    Q.   You agree with what I said?  What's listed
12  here in terms of --
13    A.   It's for the bite.
14    Q.   It's for the bite.  Okay.
15        Then the injury described here is apparent
16  minor injury?
17    A.   Yes.
18    Q.   That's a fair description, isn't it, for
19  Officer Scherer's bite, as you saw it?
20        MR. LUTE: Objection.
21        Go ahead.
22    A.   Aside from the hepatitis part.
23    Q.   Well, he didn't get hepatitis, did he?
24    A.   No.  But he had to get -- Jordn had hepatitis,

Page 48

1  and we had to go through shots and medical stuff to make
2  sure we didn't have it.
3    Q.   But, I mean, in terms of physical injuries to
4  Officer Scherer --
5    A.   I mean, it was a bite mark.  I don't know
6  how -- I would describe it as an apparent minor injury,
7  but I don't know if Bubba felt it was an apparent minor
8  injury.  I don't know how deep it was or how bad it hurt
9  him.
10    Q.   When you were back at the station that night
11  and Officer Scherer came back, he was walking around?
12    A.   Yes.
13    Q.   And that's the extent of all the possible
14  charges being considered for Jordn as of September 8,
15  2015, what's listed on here?
16    A.   As far as my report, yes.  I don't know what
17  the detectives -- if they were going to do more reports
18  for the other car he tried to steal or the fence that he
19  damaged.  As far as mine goes, yes, that's what we were
20  going with at that time.
21    Q.   You've never seen any other ones, other
22  reports?
23    A.   I would assume, because he passed away, that
24  there was no reports generated.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Sprinfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 2
March 17, 2017

Page 49

1    Q.  Just so we're clear on the record, the only
2  incident report you've ever seen relative to any crimes
3  for Jordn regarding September 8, 2015 is the Ohio
4  uniform incident report, 15-2772, where you're listed as
5  the reporting officer, fair?
6    A.  That's the only one I've seen.
7    Q.  And that's marked as Exhibit 9 for today?
8    A.  Yes.
9    Q.  You said you were the witness for some witness
10  statements that were given on September 8, 2015?
11    A.  I signed them.  Basically that means I was
12  there when they wrote the thing, and I collected it.  I
13  don't even know if I read those.  They might have just
14  went to the detective.  I might have read them.  I don't
15  remember them now.
16    Q.  So what's the process?  You hand it to them
17  and just watch them complete it?
18    A.  Yes.  I mean, if I'm doing the investigation,
19  when I was the detective, I would sit there, watch them
20  write it, read it over, and then do a Q & A if I felt
21  necessary.  But it wasn't my crime scene.  It was the
22  detective's crime scene, so that's not really my job to
23  do that anymore.
24    Q.  Who's crime scene was it?

Page 50

1    A.  Well, I was securing it, but Blasdel was the
2  one that was out there.
3    Q.  When you say it was a detective's crime scene,
4  I just want to know which detective.
5    A.  Blasdel.
6    Q.  I've got a couple witness statements here.
7  Again, they're heavily redacted, the ones that I've
8  received, so they've got black marks on them.  I've
9  never received copies that don't have all these black
10  markers covering the people's address and things like
11  that.
12    A.  Okay.
13    Q.  Are those a few of the witness statements that
14  you signed off on as the witness even though you may not
15  have read them?
16    A.  Correct.
17    Q.  These witnesses statements describe features
18  of Jordn that these people saw, at least in part, while
19  he was in the Jeep?
20    A.  Like I said, I don't remember.  I would have
21  to read them.
22    Q.  Have you ever read them?
23    A.  I don't remember if I have or not.
24    Q.  I mean, you remember -- the people that you

Page 51

1  gave witness statements to to sign were limited to those
2  people who were at 1019 Abington, fair?
3    A.  I believe they were all the ones that were
4  there, the ones I gave the statements to.
5    Q.  Right.  I'm only talking about your
6  statements.
7    A.  Yeah.
8    Q.  And some of these statements contain a
9  description of Jordn while he was in the vehicle, okay?
10    A.  Okay.
11    Q.  And I don't know if this is before you got
12  there or while you were there, all right?  But I just
13  want to ask you whether or not some of the descriptions
14  are consistent with what you observed, okay?
15    A.  So you want me to read all these?
16    Q.  Well, if you look at Kelly White -- and I
17  don't know what number that is on there.
18    A.  It's the second one.
19    Q.  It states, "He was foaming at the mouth and
20  mumbling some words."
21    A.  Okay.
22    Q.  Did you ever see Jordn foaming at the mouth?
23    A.  I don't recall seeing that.
24    Q.  I mean, you remember seeing his face in the

Page 52

1  Jeep; you don't remember anything foaming?
2    A.  Right.
3    Q.  Correct?
4    A.  Yes, sir.
5    Q.  How about mumbling?  Do you remember him
6  mumbling words while he was in the Jeep?
7    A.  I remember -- like I told you, it seemed like
8  a language to me.  I wouldn't describe it as mumbling.
9  I would describe it as possessed.
10    Q.  Right.  That's kind of why I asked, because
11  mumbling sounds a little bit -- at least when I hear the
12  word mumbling, a little bit softer, right?  Is that how
13  it sounds to you, kind of like --
14    A.  Just not forming words, in my opinion.
15  Mumbling to me would be not having any language.  You
16  know what I mean?  To me, mumbling means you're not
17  forming any words.  You're just making sounds that
18  aren't words.
19         Well, this to me -- what I heard was more
20  of -- like I told you, it sounded like some demonic
21  historical language like -- I have no idea.  Like
22  something you would see in stigmata or something --
23    Q.  He was not forming
24    A.  -- which is possessed.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Sprinfield Township, Ohio, et al.

Officer Joseph Holsopple -  Vol. 2
March 17, 2017

Page 53

1   Q.  He was not forming any words that you
2   understood?
3   A.  Right.
4   Q.  At any time?
5   A.  No, but it seemed like words.
6   Q.  When you say no, though, you're saying yes.
7   You agree he was not ever at any time you encountered
8   Jordn forming words that you understood?
9   A.  Correct, no known language that I know of.
10  Q.  Again, there is a statement attributed to
11  Chester A. Clark, III.
12  A.  Yes.
13  Q.  And it states regarding Jordn, "He was foaming
14  at the mouth."  It says that again, correct?
15  A.  Yes.
16  Q.  Again, not something you remember seeing?
17  A.  No, but their accounts were happening before
18  me and Bubba got there, I would assume.  I don't know
19  what they --
20  Q.  There's another statement on there from
21  Chester Clark, Sr.
22  A.  Yes.  The III?
23  Q.  No.  I think -- is there another one in there?
24  A.  I don't have that one.  Oh, wait.  This is it.

Page 54

1   Yeah.  Yes, I have it.
2   Q.  And the statement he wrote -- now, Chester
3   Clark, as we saw, I think, from the incident report, was
4   the owner --
5   A.  Yes.
6   Q.  -- of the vehicle, right?
7   A.  Uh-huh, yes.
8   Q.  And he was outside by the Jeep when you were
9   there, correct?
10  A.  Yes.
11  Q.  He's kind of the older gentleman, I believe?
12  A.  Yes.
13  Q.  And he states, "I just got back from doctor's
14  office, got out of my Jeep, took keys with me into
15  house."
16      Correct?
17  A.  Yes.
18  Q.  I mean, there's some misspellings in there,
19  but that's what it's saying?
20  A.  Right.
21  Q.  So at least based on what Mr.-- it appears
22  Mr. Clark, the owner of the vehicle, the information he
23  had at the time is that the keys were not in the
24  vehicle, fair?

Page 55

1   A.  Well, he wrote this afterwards.  I mean, he
2   never told me that, but he knew that.
3   Q.  Right.  And then all of these, the three
4   witness statements I handed to you, you signed off on
5   all these, right?
6   A.  Yes.  I signed that I collected them.
7   Q.  When you saw Jordn Miller in the Jeep, did you
8   know him as a person?  Did you recognize him?
9   A.  No.
10  Q.  You didn't --
11  A.  Not at the time.
12  Q.  That's what I mean.  The time that you're
13  interacting with Jordn, you don't have any memory of
14  ever having dealt with this person before, correct?
15  A.  Correct.
16  Q.  Later on, you might have realized --
17  A.  -- that was the guy from Milo, and I
18  actually -- if I would have made it up to Milo to his
19  house, I would have realized who it was.  Remember I
20  told you I turned around on Milo, and it didn't click
21  that it was the same kid.
22  Q.  That's all I want to know, is what your belief
23  or understanding was at the time you were dealing with
24  Jordn Miller on September 8, 2015.

Page 56

1   A.  Okay.
2   Q.  And at that time, you didn't have any
3   knowledge of -- you didn't put two and two together,
4   "I've met this person before," fair?
5   A.  Correct, and he looked a lot different.
6   Q.  Because of his condition on September 8?
7   A.  I don't -- I mean, age -- I don't know.
8   Whatever.  It could be the condition.  It could have
9   been he was older.  It could have been --
10  Q.  When you say he looked a lot different, what
11  do you mean?  What looked different?
12  A.  He just looked different from what I remember
13  seeing him when I dealt with him before.
14  Q.  How so?
15  A.  Skinnier.
16  Q.  Skinnier the second time?
17  A.  Yeah.
18  Q.  I don't know if it was the second time.  He
19  looked skinnier on September 8 than he did previously?
20  A.  I mean, I really only had the side view of him
21  in the car.  You know what I mean?  So I didn't really
22  get the face look of him.  I don't know.  I couldn't
23  tell the difference between his profile and his
24  straight-on face.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Sprinfield Township, Ohio, et al.

Officer Joseph Holsopple -  Vol. 2
March 17, 2017

Page 57

1    Q.   When Jordn is in the car, you're standing
2  outside the driver's side window and you're only looking
3  at the left side of Jordn's face because Jordn is
4  looking forward past the steering wheel?
5    A.   Right.
6    Q.   Did you have any conversations with Wendy
7  Tomblin, Jordn Miller's mother, on September 8, 2015?
8    A.   No.
9    Q.   Did you ever see her on September 8, 2015?
10    A.   No.
11    Q.   Would you be able to recognize her if you saw
12  her?
13    A.   The only thing I remember is she's in a
14  wheelchair.  That's the only thing I remember.  That was
15  from the previous time I dealt with them.
16    Q.   Did you ever speak with a girl named Amanda --
17  well, let me take a step back.
18        Did you ever see Wendy Miller at any time on
19  September 8, 2015?
20    A.   Who is Wendy now?  Her mom?
21    Q.   Wendy Tomblin is Jordn Miller's mother.
22    A.   No, not that I recall.
23    Q.   Did you ever --
24    A.   Oh, wait.  She was at the office later.  I do

Page 58

1  remember that.
2    Q.   What do you remember about that?
3    A.   I remember -- I might have popped in.  There
4  was somebody talking to them, and I just said hi, and I
5  might have gave them a statement, too.  I might have
6  been instructed to give them a statement, and they took
7  the statement, and I don't know if I signed that
8  statement or if they just took over from there.
9    Q.   You have no --
10        MR. LUTE: Hold on a second.  Just so the
11  record is clear, when you say "a statement," you mean a
12  form on which the person will give a statement?
13        THE WITNESS: Correct.
14  BY MR. HILL:
15    Q.   You're not interviewing?
16    A.   No.
17    Q.   So just so we're clear, do you have a memory
18  of seeing Wendy Tomblin, Jordn's mother, on September 8,
19  2015 at the police station?
20    A.   I remember her being here.  I remember walking
21  past the office.  I think it might have been John Smith
22  that was in there with them.  And I don't know -- I
23  don't remember if -- I think I gave them a statement to
24  fill out, a statement form, but I don't know if I came

Page 59

1  back and got that or if someone else collected it, a
2  detective took it, or if I signed it, because I didn't
3  really review that at all.  I guess they were -- her and
4  his girlfriend were here, Amanda.
5    Q.   Okay.
6    A.   And I popped in there, and the chief said
7  something to me about them or something, and we talked
8  for a few seconds.  I don't even remember what it was
9  about, because I had so much other stuff to worry about,
10  and I left.
11    Q.   So you have no memory of anything they may
12  have said?
13    A.   No.
14    Q.   No memory of anything you may have said to
15  them?
16    A.   No.
17    Q.   The extent of your memory is you may have
18  handed them a form?
19    A.   Right, and I know I talked to them about
20  something, but I have no idea what the content of that
21  was.
22    Q.   Where would you have seen them at here at the
23  police station?
24    A.   Actually, it would have been in -- I think

Page 60

1  they were in here.
2    Q.   And you would have popped in from which way?
3    A.   This door (indicating).
4    Q.   Were Amanda and Wendy in the room together?
5    A.   Yes.
6    Q.   And it sounds like your recollection is that
7  then Chief John Smith was in the room with them?
8    A.   Yes.
9    Q.   Do you remember if anyone else was in the
10  room?
11    A.   No.
12    Q.   Have you ever spoken to -- since Jordn
13  Miller's death, have you ever spoken to Jordn's mother?
14    A.   Not that I remember.
15    Q.   Since Jordn's death, have you ever encountered
16  this Amanda person?
17    A.   I know she got in trouble for something.  I
18  don't remember ever being around her again, but I know
19  someone -- Officer Porter dealt with her again, and I
20  don't remember if he ever brought her here and I might
21  have talked to her, but I've never had a police
22  encounter with her since then.
23    Q.   Have you ever had any encounter with Jordn's
24  mother?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Sprinfield Township, Ohio, et al.

Officer Joseph Holsopple -  Vol. 2
March 17, 2017

---

Page 61

1    A.  Since the incident or ever?
2    Q.  Since the incident?
3    A.  Not that I remember.
4    Q.  How about with Amanda?  It just sounds like
5  maybe somebody -- you might have, but you don't really
6  remember?
7    A.  Correct.
8    Q.  How about with any of Jordn's other family
9  members?
10    A.  I don't even know of any other of Jordn's
11  family members.  I mean, Miller is a pretty common name,
12  so ...
13    Q.  Once Jordn was handcuffed behind his back, you
14  never attempted to transition him to a position out of
15  the prone position, did you?
16    A.  Once we realized he was suffering, we did.
17  During the time he was cuffed like that, he was still
18  actively resisting, so no.
19    Q.  So when you say "suffering" -- so let me just
20  make sure we're clear.  Between the time period where
21  Jordn was first in prone position and until the period
22  that you noticed that he was unresponsive, during that
23  entire period between those two points, there was no
24  attempt to transition him out of a prone position, fair?

---

Page 62

1        MR. LUTE: Objection.
2        Go ahead.
3    A.  Yes.
4    Q.  Once Sergeant Moore arrived, Jordn was already
5  handcuffed behind his back, true?
6    A.  I believe so, yes.  I'm not positive.  I don't
7  know exactly when she got there.
8    Q.  As you sit here, is that your recollection?
9    A.  Yes.
10    Q.  When we were talking earlier, you told me that
11  when you were interacting with Jordn Miller, you did not
12  believe this to be an excited delirium case, true?
13    A.  Yes.
14    Q.  Meaning you did not believe Jordn had excited
15  delirium?
16    A.  No.
17    Q.  You agree?
18    A.  Yes, I agree.  But like I told you before, at
19  the beginning when the call went out, I thought it could
20  be, but then when the call notes changed and he put his
21  clothes back on and now he's running around the
22  neighborhood, I didn't think he was.
23    Q.  We were looking at your statement, Exhibit 12.
24    A.  Yes.

---

Page 63

1    Q.  And there's a portion, it states -- and I'll
2  just read it to you, "Officer" -- and this is after the
3  time period -- well, you said that when you struck Jordn
4  in the back of the head with your forearm, your left
5  forearm, that was the same -- that was at the same time,
6  basically simultaneous, that Officer Scherer, Bubba,
7  kicked Jordn.  Those two events happened at the same
8  time?
9    A.  Back to back.  I was looking at Bubba, so I
10  know I wasn't on top of him yet, so he kicked him, and
11  then I went forward.
12    Q.  Then after that, after that time period, it
13  states, "Officer Holsopple again tried to get his arm;
14  however, it was now right next to his face, and that
15  would have been impossible without also getting bit."
16        Correct?
17    A.  Yeah.
18    Q.  And that's talking about the arm that was
19  previously underneath him?
20    A.  Yes.
21    Q.  Now it's out -- when you say by his face --
22    A.  No, it was up under his neck.
23    Q.  So it's like this (indicating)?
24    A.  Yeah.  I was still under him, but if I went to

---

Page 64

1  grab it, his face was right there.  So I -- I actually
2  went to reach, and I went, "I don't want to get bit
3  too."  So that's the extent of how long I was on top of
4  him.  I hit him with my forearm, laid down on top of
5  him.  I went to lie like that (indicating), and then I
6  got back up.
7    Q.  When you say "I laid down on top of him,"
8  that's when his arm is under his --
9    A.  Yes.
10    Q.  Under his neck?
11    A.  Uh-huh.
12    Q.  Yes?
13    A.  Yes.  Sorry.
14    Q.  It says, "Officer Scherer then informed
15  Officer Holsopple that he was going to deploy the Taser,
16  at which time Officer Holsopple moved away a little bit
17  to the side to get ahold of his arm."
18        Correct?
19    A.  Yes.
20    Q.  When it says "get ahold of his arm," I'm
21  assuming you mean Jordn's?
22    A.  Yes.
23    Q.  So what arm are you getting a hold of?  Where
24  were you at, number one?

---

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Sprinfield Township, Ohio, et al.

Officer Joseph Holsopple -  Vol. 2
March 17, 2017

---

Page 65

1     A.  I'm still on the right side.  I was back up on
2  my knees.
3     Q.  Where are your hands before Officer Scherer
4  says, "I'm going to Taser him"?
5     A.  I came off of him.  I tried to get that arm
6  up, and then I just stood up, and I didn't really know
7  what to do with that --
8     Q.  Did you stand up?
9     A.  No.  I was just on my knees kneeling right
10  beside him, and Bubba said he was going to Tase him.  I
11  pushed his shirt up.
12     Q.  Both hands?
13     A.  I don't -- I'm thinking it was both hands, but
14  it was enough to get -- so he would have a shot at bare
15  skin with the Taser so we didn't have to worry about the
16  clothing for the Taser.
17     Q.  So what is Jordn --
18     A.  And then --
19     Q.  Hold on.  So Jordn is down.  His arm is still
20  under the neck?
21     A.  Yes.
22     Q.  You lift up this hooded sweatshirt of Jordn's?
23     A.  Uh-huh.
24     Q.  Yes?

---

Page 66

1     A.  Yes.
2     Q.  You lift it up to the middle of Jordn's back
3  area, or at least --
4     A.  At least up -- yeah, I would say two-thirds of
5  the way up his back.
6     Q.  So he's got bare flesh?
7     A.  Uh-huh.
8     Q.  Yes?
9     A.  Yes.
10     Q.  And while you're doing that, where is Officer
11  Scherer?
12     A.  He's still -- I don't remember if he was on
13  his knees or if he was standing, you know, because he's
14  kind of a shorter guy.  I don't remember if he was
15  standing up next to him on the right -- on the left side
16  or if he was kneeling.  I think he had ahold of one of
17  his -- his left leg trying to hold that down, because he
18  kept kicking.  But I'm on the right side.  He's on the
19  left side.  I had just sat up, and he said he was going
20  to Tase him.  I just pushed his shirt up, and I kind of
21  moved a little bit around the side because I expected
22  when the Taser went off, that his arm would come out.
23     Q.  Is anybody holding Jordn at that point when
24  the Taser goes off?

---

Page 67

1     A.  When you asked earlier about the leg, you
2  know, I kept -- every time he'd kick, I'd kind of just
3  keep pushing his leg down.  You know what I mean?
4     Q.  When you say "kick," Officer Scherer kind of
5  described it like somebody who was kind of swimming?
6     A.  Yeah, that, and he was -- on my side he was --
7     Q.  From the knee?
8     A.  Yeah.  He was kicking into me.
9     Q.  So your elbow was like the knee --
10     A.  Right.
11     Q.  -- moving back and forth?
12     A.  Like this (indicating).
13     Q.  Okay.
14     A.  I mean, if you're laying flat on the ground,
15  say this is your leg, this is your leg, he was going
16  like this to me (indicating).  I don't know what Bubba's
17  side was doing, but I kept getting kicked, and that's
18  why I kept having to go and grab around his ankle and
19  push it down, because he kept kicking me.
20     Q.  So when you lift up the shirt -- when Officer
21  Scherer -- you're not sure if he stands up to fire the
22  Taser?
23     A.  I don't remember.
24     Q.  When he fires the Taser, are you still holding

---

Page 68

1  on to the shirt?
2     A.  No.
3     Q.  Are you holding --
4     A.  I kind of moved around the side.  I was still
5  trying to control that leg, but I'm waiting for this arm
6  to come out from underneath so I can grab it as it comes
7  out.
8     Q.  So is anyone holding Jordn other than you just
9  kind of holding on -- or touching his leg?
10     A.  Well, I'm holding his leg.
11     Q.  Uh-huh.
12     A.  You know, it's not like we weren't controlling
13  him, but I don't know -- there was nobody just
14  physically holding on to him.
15     Q.  I'm wondering -- okay.  Jordn doesn't get up,
16  right?
17     A.  No.
18     Q.  So I'm wondering how is he being kept down?
19     A.  Just because it's hard to get up when you keep
20  kicking your legs and I keep pushing them down.
21     Q.  But that's all it took to keep him down at
22  that moment?
23     A.  That's all I remember.
24     Q.  And that's the moment where the Taser is

---

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Sprinfield Township, Ohio, et al.

Officer Joseph Holsopple -  Vol. 2
March 17, 2017

Page 69

1  fired?
2     A.  Yes.
3     Q.  I should say the first Taser.
4     A.  No.  There was only one Taser fired.
5     Q.  The probe is fired in his back, correct?
6     A.  Yeah.
7     Q.  And at that moment, Officer Scherer stated
8  that he was far enough away that Jordn wasn't able to
9  bite anybody, you agree with that, at the time the Taser
10  is fired?
11     A.  He was far enough away from his head.
12     Q.  You, too, because you're at the back?
13     A.  Yeah, we're at the back.  We're not away from
14  him, but we were away from his mouth.
15     Q.  And his body is on the ground at that point,
16  his torso?
17     A.  Yes.
18     Q.  You say, "The darts shot him in the middle of
19  the back" -- I'm sorry.
20         "The darts struck him in the middle of the
21  back and were about three inches apart from each other.
22  Officer Scherer put the Taser on his right thigh as a
23  dry stun maneuver to make a good connection."
24         Is that consistent with your memory?

Page 70

1     A.  Yes.  I want to be clear.  I don't remember
2  what he did with the Taser.  I remember seeing the darts
3  go in and where they were.  And they were, yes, about
4  three inches apart, but I didn't know if he did -- I was
5  too busy worrying about his arm coming out or what else
6  I needed to worry about.  I don't know if he put the dry
7  stun thing in or not.  He told me later that he did, but
8  I don't remember seeing him do that.
9     Q.  And you're down by Jordn who's got no shoes,
10  no socks on, right?
11     A.  Yes.  I mean, I really -- at that time, I
12  didn't even -- I wasn't even thinking about his shoes or
13  his feet.  I don't even remember if he had -- all I
14  remember is I'm trying to control him.  I don't
15  remember -- later, of course, you find out or you see
16  later -- after he's secured or whatever, then you see he
17  don't have shoes on, but you don't see it while you're
18  fighting with somebody.  You know what I mean?
19     Q.  So Officer Scherer described that when he
20  fired the probes into Jordn's back, it was kind of a one
21  movement fire connection?
22     A.  Okay.
23     Q.  Are you by Jordn's legs at the time the
24  connection is made?

Page 71

1     A.  I was by his right leg.
2     Q.  So you would have been -- so his right thigh
3  is where the connection, the dry stun --
4     A.  Right.
5     Q.  -- is connected?
6         So it's right by you?
7     A.  Like I said, I had moved up a little bit
8  towards his waist, and I was still trying to hold his
9  leg.  So I didn't -- I saw the darts go in, but Officer
10  Scherer was off in my peripheral.  You know, I didn't
11  see everything he was doing.
12     Q.  Do you let go of Jordn's -- are you away from
13  Jordn's legs at the time the dry stun or that full
14  connection is made?
15     A.  Like I said, I don't even -- I can't even tell
16  you that Officer Scherer did that.  So I don't know
17  where I was.
18     Q.  It says, "The suspect raised up, swung his arm
19  out, and Officer Holsopple was able to secure his other
20  wrist in the cuff right after the Taser shut off, and he
21  was cuffed.  He was still fighting, kicking, and
22  squirming around.  This was when Sergeant Denise Moore
23  was also on scene.  He was still out of control trying
24  to turn onto his side."

Page 72

1         That's your statement?
2     A.  I don't know who wrote that.
3     Q.  You approved of it?
4     A.  What is that on?  I don't know --
5     Q.  It's on --
6     A.  Oh, this?
7     Q.  Your statement, yeah.
8     A.  Yeah.
9     Q.  When it says, "He raised up and his arm swung
10  out," do you remember that?
11     A.  Yes.
12     Q.  And that's when his body contracted?
13     A.  It was almost like a -- I describe it almost
14  like a fish raising up.  He arched up, and it was like a
15  reaction.  He might have been locking up, but it made
16  his arm come out like this (indicating), and it came
17  right to me, and I was able to grab it.
18     Q.  How long -- from the time the arm swings up,
19  you were able to handcuff him behind his back, right?
20     A.  It might have taken -- because it was kind of
21  awkward where I was.  I had to move my body to get his
22  arm to the cuff.  So I would say within five seconds,
23  ten seconds.
24     Q.  Five seconds after the Taser is fired or the

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Sprinfield Township, Ohio, et al.

Officer Joseph Holsopple -  Vol. 2
March 17, 2017

Page 73

1  dry stun five-second cycle is completed?
2     A.  Like I said, I don't know if he did the dry
3  stun, but after the Taser went off, it probably took a
4  second for his arm to come out, and then maybe ten
5  seconds until he was in the cuffs after that.
6     Q.  And you actually secured the cuffs behind
7  Jordn's back?
8     A.  Well, Bubba was holding one at that point, and
9  I got the other arm back there and zipped.
10    Q.  When you say -- was it a zip or a --
11    A.  No, cuff.  It was a regular cuff.
12    Q.  Metal cuffs?
13    A.  Yeah.  I just call them zipped when they
14  click, click, click.
15    Q.  So from that point forward, at all times
16  Jordn's cuffed behind his back?
17    A.  Yes.
18    Q.  It states that right after the Taser shut off,
19  it starts talking about how Jordn was squirming around.
20    A.  Yes.
21    Q.  Officer Scherer described this as kind of like
22  a rocking back and forth.  Is that what you remember?
23    A.  Yes.
24    Q.  So it was like his torso is down, and he's

Page 74

1  kind of going like that (indicating)?  I know the video
2  can't see me doing it.
3     A.  Right.
4     Q.  Can you kind of show us?
5     A.  He was doing that (indicating), but he was
6  also still kicking, because I remember I had to put my
7  hand back on his leg because I got kicked again.  And I
8  remember he would do that, but then he would raise up
9  like he was looking for somebody to bite again.
10    Q.  And it says here that he was trying to turn on
11  his side.
12    A.  Right.
13    Q.  Is that consistent with your memory?
14    A.  Yeah, it says that, but I take that as that's
15  how -- the way he was doing it was the same move that
16  he -- when he bit Bubba, that it looked like that.  He
17  was looking for another leg that was, you know, like
18  there for him to bite.
19    Q.  So he's trying to turn on his side, fair?  I
20  mean, that's what's written.
21    A.  I don't agree with that.  I don't think he was
22  trying to turn on his side.  I took it as he was looking
23  for someone to bite.
24    Q.  Was he physically trying to turn on his side

Page 75

1  out of prone position?
2     A.  Not in my opinion.
3     Q.  He was trying to turn on his side and stay in
4  prone position?
5     A.  No.  He was trying to raise up to find
6  somebody to bite.
7     Q.  So he was remaining in prone position?
8     A.  Well, I don't know if he would have rolled
9  over or -- I can't tell you what he was going to do at
10  that point.
11    Q.  Let me say this:  You and Officer Scherer
12  prevented him from turning over; is that fair?
13    A.  Yes.
14    Q.  It states in the statement -- well, as part of
15  the same couple sentences here, it states that he was
16  cuffed.  Right after he was cuffed, it says, "This was
17  when Sergeant Denise Moore was also on scene."
18       Do you remember when she came on scene?
19    A.  No.
20    Q.  Any reason to disagree with this statement
21  that was done that night that she was on scene right
22  about the time the Taser was used?
23    A.  No.
24    Q.  Do you remember anything between the period of

Page 76

1  the first Taser being used or the Taser being used --
2  deployed the first time and the second dry stun?
3     A.  No.
4     Q.  And in the narrative, it states, "Jordn would
5  lay there for a few seconds, but then would continue to
6  fight and struggle to get up."
7       Is that consistent with your memory?
8     A.  Yes.
9     Q.  And you say -- now, his hands are behind his
10  back, so when you say struggle to get up, what was he
11  doing?
12    A.  Still doing that arch thing, still trying
13  to --
14    Q.  Trying to get his chest off the ground?  Is
15  that what he's trying to do, it looks like?
16    A.  Like I told you, in my opinion, it was like he
17  was arching up looking for someone to bite, or he would
18  turn his head the same manner that he did when he bit
19  Bubba.
20    Q.  So where are you guys?  You guys are away from
21  his face?
22    A.  Yes.
23    Q.  I'm not asking what you think his motivation
24  is.  I'm asking you what his body is doing when you

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Sprinfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 2
March 17, 2017

Page 77

1 approved of the statement here saying "struggled to get
2 up."
3    A.   Well, he was kicking still, and he would arch
4 his back, and his head would turn to the side in the
5 same manner that he did when he bit Bubba.
6    Q.   It says, "Officers were restraining him from
7 hurting himself and getting up by holding him down."
8         Consistent with your memory?
9    A.   Yes.
10   Q.   "Officer Scherer had his foot on his, Jordn's,
11 left leg to try to keep him from kicking us."
12        Is that consistent with your memory?
13   A.   Yes.
14   Q.   Where it says Officer Holsopple, for example,
15 does that mean that you wrote it?
16   A.   No.
17   Q.   "Officer Holsopple was on his knees beside him
18 on the ground, and the officer was holding one hand that
19 was cuffed, and his other hand was holding down his
20 right leg to prevent him from kicking me."
21        Is that consistent with your memory?
22   A.   Yes.
23   Q.   It states, "Sergeant Moore had her right foot
24 on his left shoulder blade to keep him from arching up

Page 78

1 and turning his head to bite anyone."
2         Consistent with your memory?
3    A.   Yes.
4    Q.   "He continued to struggle and try to get up
5 for several minutes."
6         Consistent with your memory?
7    A.   I don't -- I don't think it was several
8 minutes.  I mean, we -- I don't know when the EMS
9 arrived, but it didn't seem like that he -- maybe two
10 minutes he was down there.
11   Q.   I don't know.  You guys wrote several minutes,
12 right?
13   A.   Sergeant Moore did, yes.
14   Q.   And you all selected the wording together,
15 correct?
16   A.   Yes.
17   Q.   Okay.  And where it says, "He continued to
18 struggle and try to get up for several minutes," it's
19 describing that position that we just said with you on
20 one side holding the leg, Officer Scherer on the other,
21 and Sergeant Moore with her foot on Jordn's shoulder
22 blade, true?
23   A.   Well, she wouldn't leave her foot on his
24 shoulder blade.  She would put it there when -- as soon

Page 79

1 as he started -- we would ease off of him, and as soon
2 as he -- he would stop, and the next move would have
3 been we were going to get him up.  But then as soon as
4 we did that, then he would start flailing around again
5 or kicking at me.
6         So then I, of course, had to grab -- I think I
7 had my hand on his hand the whole time holding the cuff
8 or holding his hand around the cuff.  And as soon as he
9 started kicking again, I'd have to push his leg back.
10        But in my recollection, Sergeant Moore
11 would -- she was standing there, and she really
12 wasn't -- her foot wasn't on him, but it was just like
13 hovering above him.  So as soon as he started to raise
14 up, then she would be able to stop him.
15   Q.   So is that a typo where it says, "Sergeant
16 Moore had her right foot on his left shoulder blade to
17 keep him from arching up and turning his head"?
18   A.   Well, it was on there when he did arch up, so
19 you'll have to ask her what she meant by that.
20   Q.   Okay.  Because I thought you were saying you
21 had some -- well, you signed off on this?
22   A.   Yes, but I don't know exactly what she meant
23 by that part of it.  That's her part that she would have
24 been talking about.

Page 80

1    Q.   Well, did you ask her afterwards "What do you
2 mean by this?"
3    A.   No.
4    Q.   Did you say, "Well, that's not consistent with
5 what I saw"?
6         MR. LUTE: Objection.
7         You may answer.
8    A.   It was on him, but I don't know that she
9 was -- I mean, it was holding him down, but it wasn't on
10 him continuously.
11   Q.   Do you remember -- I mean, how much was on?
12 How much was off?  Do you have any memory?
13   A.   You'll have to ask her.
14   Q.   I'm asking you.  You said it was on and it was
15 off.  Can you say one way or another?
16   A.   No.
17   Q.   I mean, as you sit here, do you actually have
18 a memory of it being off?
19   A.   I remember -- in my brain -- maybe it was when
20 I -- because things freeze in your head in a situation
21 like this.  So I don't know if I watched her as she was
22 putting it on him and then it stayed, or if I was -- the
23 part I saw was her foot being above him.  It was an inch
24 or two off of his shoulder.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 2
March 17, 2017

Page 81

1    Q.   Because the statement that you guys all agreed
2  to never says anything about her taking her foot off his
3  shoulder blade, fair?
4          MR. LUTE: Objection.
5          Go ahead.
6    A.   Correct, yes.
7    Q.   And, again, as we discussed, your memory was
8  better at the time when you wrote this than it is today,
9  correct?
10   A.   Yes.  But, again, that was her part of the
11 statement.
12   Q.   You say that he would lay there for a few
13 seconds.  Was he completely still at that point?
14   A.   I don't remember.  I remember he would make
15 more of the garbled noises like he was trying to talk,
16 you know, and that's when we were saying, "Jordn, calm
17 down."  I don't know if we knew his name at that point.
18 We were saying, "Calm down, calm down."  And then he
19 would just start the whole process again and try to
20 raise up and do his headbutt thing again and then start
21 kicking.
22   Q.   Did you ever try to set him up?
23   A.   No.
24   Q.   And you never tried to roll him on his side?

Page 82

1    A.   No.
2    Q.   And the whole time that you're describing this
3  where Sergeant Moore has her foot on Jordn's shoulder
4  blade and you're holding his legs and Sergeant Scherer
5  is in this position holding him down, when the three of
6  you are holding him down, he's the whole time handcuffed
7  and prone restrained at this point, true?
8    A.   Yes.  It's Officer Scherer, not Sergeant
9  Scherer.
10   Q.   It says, "When he stopped trying to get up,
11 officers started rubbing his back, asking if he's okay,
12 trying to get a response from him.  When he wasn't
13 responding, officers rolled him over on his back."
14       Correct?
15   A.   Yes.
16   Q.   So earlier it says, he would lay there for a
17 few seconds?
18   A.   Uh-huh.
19   Q.   Yes?
20   A.   Yes.
21   Q.   And here it says, "When he stopped trying to
22 get up," correct?
23   A.   Yes.
24   Q.   So when you're saying -- you know, when he's

Page 83

1  moving around, is that what he's trying to do, he's
2  trying to get up off the ground?
3          MR. LUTE: Objection.
4          You may answer if you know what he was trying
5  to do.
6    A.   I don't know what he was trying to do.
7    Q.   Well, you agree it says, "When he stopped
8  trying to get up"?  This is your language, not mine.
9    A.   Well, I would assume that he was trying to get
10 up.
11   Q.   That's what he appeared to be doing to you?
12 That's what you saw?
13   A.   Correct.  That would be the normal thing that
14 I would expect from a person that was laying there
15 fighting with me.
16   Q.   And when he stopped trying to get up, what do
17 you remember noticing?  First, let me ask you, where
18 were you when he stopped trying to get up?
19   A.   Same position, beside him, right side, on my
20 knees.  I don't remember if I had his foot at that time
21 or not, but I had his hand kneeling beside him on the
22 gravel.
23   Q.   And then after he's -- let me ask you.  At
24 this point, you've now had -- since the Taser was used,

Page 84

1  at least the second time, you've had three officers
2  present the whole time, right?
3    A.   Yes.
4    Q.   And he's been in cuffs the whole time?
5    A.   I don't know -- I think Denise got there --
6  Sergeant Moore got there as the second Taser was going
7  on; but since then, yes, there was two officers there.
8    Q.   And you're able to keep him on the ground the
9  entire time?
10   A.   Yes.
11   Q.   But did any of you ever say, "Let's roll him
12 over" before he became unresponsive?
13   A.   No, not that I remember.
14   Q.   Did anybody say, "Let's get him out of prone
15 restraint"?
16   A.   No.
17   Q.   How long was he completely still before
18 someone started rubbing his back, asking him if he's
19 okay?
20   A.   I would say less than five -- this one, it was
21 different.  His body just kind of went limp.  Even when
22 he would buck up and he would stop, he would still be --
23 you know, he was talking or whatever, but this time it
24 was just kind of like he just went limp.  I mean, it was

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple -  Vol. 2
March 17, 2017

Page 85

1  instantly, like something happened.  And it was
2  instantly Bubba was rubbing on his back, "Hey, are you
3  all right?"
4        I stood up at that point.  Denise and him --
5  Denise and Bubba were the ones that were kind of doing
6  the sternum rub.  And the only thing -- I went over
7  there and just held his head up to make sure there was
8  no -- that his neck wasn't buckled where he couldn't
9  breathe.
10    Q.  You got up off your knees and walked to his
11  head?
12    A.  Yes.
13    Q.  And was that before he was rolled over?
14    A.  As they were rolling him over is when I -- I
15  mean, it was kind of one of the things, they're doing
16  that, and I didn't know where to go, because there's two
17  people already working on him.  So I kind of worked my
18  way around Denise, and I got up by his head and I was
19  just holding it while they were rubbing on him and
20  making sure he was all right or checking to see if he
21  was all right.  And Bubba kept checking for a pulse.  I
22  think it was Bubba.  One of them kept checking for a
23  pulse while I was holding his head.
24    Q.  Who noticed -- let me take a step back.

Page 86

1        When you rolled him over, who was it who
2  realized the debris in his mouth?
3    A.  I saw that.
4    Q.  And that was gravel?
5    A.  Yeah.  It looked like -- I don't know for
6  sure.  It looked like he got a mouthful of gravel.  But
7  there was a point where right when he went limp, his
8  face went straight down in the gravel like (indicating).
9  And then that's when he was limping, and we were like --
10  and Bubba started doing the rub and "Hey, are you all
11  right?"
12        And when we rolled him over, that's -- I did
13  see -- there wasn't a lot of gravel.  It was just a
14  little bit of debris.  There might have been a rock or
15  two in his mouth.  It was more the dirt that I remember
16  seeing.
17    Q.  It was the driveway?
18    A.  Right.
19    Q.  It was enough, though, that you commented on
20  it?
21    A.  Yes.
22    Q.  Where you were located -- I mean, you're kind
23  of on Jordn's one side, and Officer Scherer's on another
24  side, and Sergeant Moore is standing -- is she standing

Page 87

1  facing -- I mean, is she -- Jordn's on his back, so is
2  she facing --
3    A.  She's right in front of him facing him with
4  her -- it would be her right foot was the one she was
5  using on his shoulder.
6    Q.  Okay.  So she's got her right foot on Jordn's
7  left shoulder.  She's kind of standing over his head?
8    A.  I wouldn't say over his head, but she was
9  probably -- she was cocked a little bit to the side of
10  him.
11    Q.  So when Jordn is laying face down and she's
12  got her left -- right foot on Jordn's left shoulder --
13    A.  Yes.
14    Q.  Okay.  And is she then -- so she's facing him
15  but a little bit to the side?
16    A.  Well, maybe a little cantered, not to the
17  side.  She's directly in front of him, but she's a
18  little bit angled away from him probably so if he was to
19  raise up, that he wouldn't be able to bite her calf.
20  You know what I mean?
21    Q.  Yeah, he's not able to bite her.
22    A.  No.
23    Q.  Correct?
24    A.  Yes, correct.

Page 88

1    Q.  Did you clear the debris from Jordn's mouth?
2    A.  No.
3    Q.  Officer Scherer remembers Jordn's eyes being
4  rolled back in his head at that time.  Do you remember
5  that?
6    A.  No.
7    Q.  Do you remember anything about Jordn's face
8  other than the driveway in his mouth?
9    A.  No.
10    Q.  Did he make any noises at all after he became
11  unresponsive in prone restraint?
12    A.  I don't recall.
13    Q.  After you rolled him over, you never remember
14  him -- he didn't open his eyes or anything like that?
15    A.  I don't remember.
16    Q.  Did you stay by his head that entire time?
17    A.  Yeah.  Yes.
18    Q.  Did you say anything to anyone at that point?
19    A.  Not that I recall.  I mean, I might have said,
20  "He's still breathing" or "I can see his chest" -- I
21  mean, we were all evaluating him, but I don't remember
22  what I said exactly.
23    Q.  All I want to know is what you said.
24    A.  I don't remember anything that I said

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Sprinfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 2
March 17, 2017

Page 89

1  directly.
2  Q. You were not checking for any kind of a pulse,
3  right?
4  A. No, sir.
5  Q. As you were remaining near Jordn's head, what
6  else did you observe regarding Jordn's body? You said
7  he went completely limp. So when they roll him over,
8  he's still cuffed behind his back, right?
9  A. Yes.
10  Q. What do you notice? Anything about him
11  physically?
12  A. I don't remember anything specific.
13  Q. It's described -- he's still got that hooded
14  sweatshirt on?
15  A. Yes.
16  Q. It's like 90 degrees out, right?
17  A. Yes.
18  Q. Which is an odd choice of clothing to begin
19  with on a 90-degree day, right?
20  A. Correct.
21  Q. It's described his breathing -- and let me
22  make sure I have this correct. It states that his
23  breathing -- is he still breathing, or is it shallowed?
24  What's going on?

Page 90

1  A. I know he was breathing. I was watching to
2  make sure his head was open for air. I wasn't really
3  concentrating on -- because I knew one of them was
4  checking for pulse, and one of them was checking for his
5  respiratory stuff. I was just making sure that his head
6  was up where he could breathe.
7  Q. Is he completely on his back at this point or
8  on his side?
9  A. He was actually kind of sitting up, because I
10  was holding his head up a little bit to try to help.
11  Q. Like cradled?
12  A. Yeah.
13  Q. Because he's limp?
14  A. Right.
15  Q. When you say that he was breathing, you're not
16  watching his chest?
17  A. No.
18  Q. Okay. So when you say that he's breathing,
19  you're just saying it looks like from the position of
20  his head, his airway might be open?
21  A. Right.
22  Q. Okay.
23  A. And they're saying that he's breathing.
24  Q. When you say "they" --

Page 91

1  A. Scherer and -- or one of them two was saying
2  they could still feel a pulse and he's still breathing.
3  Q. Do you remember anything else being said
4  during this period?
5  A. Oh, I remember Denise calling -- right when he
6  went limp, she told the ambulance to step it up, which
7  we had already called. But I don't specifically
8  remember anybody saying anything other than checking
9  for -- every couple seconds, "Does he still got a pulse?
10  Still feel a pulse. He's breathing." That's all I
11  remember.
12  Q. Was there a time where he stopped?
13  A. Stopped?
14  Q. Well, you're not checking his breathing, so
15  I'll ask somebody else, right, if he stopped breathing?
16  A. I did hear him say as the ambulance pulled up,
17  "I don't feel a pulse anymore."
18  Q. And that would have been Officer Scherer?
19  A. Yes. I don't remember about the breathing.
20  Q. Just so it's clear later on, when you were
21  saying earlier in a statement that he was lifting his
22  head up like he was trying to bite someone, what you're
23  saying is he was lifting his head up and moving it not
24  trying to bite somebody with his mouth, but in the way

Page 92

1  that he did when he bit Officer Scherer earlier?
2  A. Correct. It looked the same to me, the same
3  movement that he did when he reached up -- or arched up
4  and bit Officer Scherer.
5  Q. The same head and neck movement?
6  A. Right.
7  Q. You're not seeing him chomping?
8  A. No.
9  Q. Okay.
10  A. Well, he would turn his head that way, too.
11  But, no, I didn't see him open his mouth and try to bite
12  anybody or anything.
13  Q. That's what I mean.
14  Do you remember -- just so we're clear -- on
15  September 8, 2015, when you're at the location,
16  Abington, do you have any conversations with any of the
17  witnesses, people who lived there, those people who were
18  standing around the car earlier? Did you have any
19  actual conversations with those people about what
20  happened after that?
21  A. Of course, I was there while they were doing
22  their statements.
23  Q. When you say "statements," you're talking
24  about the form you gave them?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Sprinfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 2
March 17, 2017

Page 93

1    A.  The form I gave them.  Of course, I was there
2  then, and they might have been talking about it.  But at
3  that point, I wasn't actively interviewing them at all.
4  If the detective wasn't there and talking to them, then
5  they were just talking amongst themselves, or they might
6  have said something, but I wasn't really even paying
7  attention to it.
8         Really, all I wanted to do is get their
9  statement so the detective could have it when he got
10  there, or if he wanted to interview them, he could.
11  But, no, I didn't a lengthy conversation with them about
12  the incident at all.
13    Q.  All I want to know is do you remember after
14  Jordn -- let me say it this way:  You and Officer
15  Scherer initially moved those people out of the way who
16  were by the Jeep, correct?
17    A.  Correct.
18    Q.  After that and before you left the scene that
19  day, do you remember those people giving you any
20  additional information about Jordn or what he did?
21    A.  I remember them talking, but I don't remember
22  any specific information that they gave me.
23    Q.  Right.  That's all I want to know.  You don't
24  remember anything as you sit here?

Page 94

1    A.  Right.
2    Q.  Okay.  Do you remember having conversations
3  that day with then Chief John Smith?
4    A.  Other than when he was in this room -- and I
5  stopped -- with Mr. Miller's mother and his girlfriend,
6  whatever that conversation was, which I don't remember
7  the content of that, and John Smith came back -- while
8  we were doing this form (indicating) --
9    Q.  That's Exhibit 12?
10    A.  -- Number 1212, he came back to the patrol
11  office, and he kind of asked us about what happened, and
12  he was in there for part of the time while we were
13  preparing this.  I don't remember any other conversation
14  with John Smith.
15    Q.  Do you remember having any conversations with
16  him at all at 1019 Abington before you left that day?
17    A.  No.  I remember seeing him and the captain get
18  out of the car, but I don't remember talking to him at
19  all.
20    Q.  You didn't talk to either of them?
21    A.  I don't remember talking to them.
22    Q.  That's fine.  Between the time that you left
23  1019 Abington that day -- well, I guess let me ask you.
24  Do you remember any more conversations you haven't told

Page 95

1  me about between you and Officer Scherer at any time on
2  September 8, 2015?
3    A.  Just while we were doing this.  And then I
4  talked to him when the hospital called, and he said that
5  he needed to go for hepatitis stuff.  I did talk to him
6  about that a little bit, because he was pretty upset.
7  And then I started thinking that, you know, I was
8  wrestling with this guy and he had open cuts and stuff.
9  So I kind of wanted to know -- I didn't know -- I didn't
10  know anything about hepatitis at that time, so I didn't
11  know how it was transmitted, and if I had a little cut
12  and he had a cut, and I'm going to be hepatitis positive
13  for the rest of my life, or what was going on.  So it
14  scared me a little bit.  So we were talking about that.
15    Q.  Did you get tested?
16    A.  Yes.
17    Q.  Are you clear?
18    A.  Yes.
19    Q.  When I talked to Officer Scherer the other
20  day, he told me that when he was outside the Jeep and
21  looking in and saw Jordn, he couldn't notice any kind of
22  wounds or marks on Jordn.  Do you remember seeing
23  anything on Jordn while he was in the Jeep?
24    A.  I don't remember seeing anything, no.

Page 96

1    Q.  And when you're talking about the scrapes and
2  marks and things like that, open wounds on Jordn, is
3  that all stuff that you noticed after he became
4  unresponsive?
5    A.  I remember seeing -- I remember seeing blood
6  while we were doing -- while we were wrestling with him.
7  I can't tell you right now where it was.  I mean, it's
8  been a long time.  I remember seeing a scrape of some
9  kind.  I don't remember -- as I sit here now, it seems
10  to run in my mind like it was on his back somewhere
11  right where I -- the reason I got concerned with the
12  hepatitis is because I did lay on top of him.  I did hit
13  him with my forearm.  And I would have been exposed --
14  directly exposed to one of those scrapes.  That's why I
15  remember it, but I don't remember where it was for sure.
16    Q.  Do you remember any conversations with anybody
17  here at the department after September 8, 2015 -- after
18  that night is completed?  So beginning, I guess,
19  September 9, 2015, do you remember any conversations
20  with anyone about Jordn Miller moving forward that we
21  haven't already discussed?
22    A.  No.
23    Q.  In the process of creating your statement, the
24  mutual statement of you, Sergeant Moore, and Officer

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 2
March 17, 2017

Page 97

1    Scherer that you all agreed to --
2        A.   Exhibit 1?
3        Q.   Yes, the incident note or investigative note.
4        A.   Right.
5        Q.   Have you described all the conversations you
6    had with them while you were creating that?
7        A.   What do you mean?
8        Q.   Well, you told me that there was kind of an
9    ongoing conversation while you were creating the
10   investigative note, correct?
11       A.   Right.
12       Q.   That's how the investigative note gets
13   created?
14       A.   Right.
15       Q.   You guys are talking this out amongst each
16   other?  Yes?
17       A.   Yes.
18       Q.   Sergeant Moore is typing it up as you go?
19       A.   Yes.
20       Q.   You guys are making sure that the events are
21   consistent with all three of your memories?
22       A.   From what we could remember, yes.
23       Q.   Right.  Which is the best your memory has been
24   of this because it was that night?

Page 98

1        A.   Right.
2        Q.   And then Officer Scherer -- or you agree to
3    have Sergeant Moore sign off on it for you as if it was
4    your signature?
5        A.   Yes.
6        Q.   Have we discussed your conversations during
7    that period where you were creating the note?
8        A.   Have we discussed it?
9        Q.   Yeah.  Or is there more for you to say?
10       A.   No.
11       Q.   Okay.
12       A.   Not that I can recall.
13       Q.   Let me ask you one final question.  When I was
14   talking to Chief Smith yesterday, he was telling me
15   about the role of a school resource officer, and he was
16   kind of describing the school to me.  And I went home
17   and I looked it up on Mapquest to see how far it was
18   from -- from the Springfield Township school, high
19   school and middle school, over to 1019 Abington.  It
20   looked like it's about a four-minute drive.  Is that
21   consistent with your memory or with your knowledge of
22   the area?
23       A.   Probably three or four minutes.
24       Q.   Okay.  Do you know --

Page 99

1        A.   You said that was one final question.  I'm
2    just teasing.  Sorry.
3        Q.   You're killing me, Joe.
4            In terms of part-time officers here at the
5    force, how are they scheduled?
6        A.   I'm not familiar with the schedule.  My
7    knowledge is it depends on how many we have, first off,
8    because we run low.  Sometimes we only have one or two
9    up to 15.  Then you have part-time guys that are in the
10   evidence room.  They have a set schedule.  But as far as
11   working the road, they can be asked to fill in on
12   vacation days for other people, and I believe they have
13   like two set days a week that they work automatically.
14   So they could be working 16 hours, or they could be
15   working 30 hours.
16       Q.   There should be a schedule here somewhere at
17   the office I can get?
18       A.   Yes.
19       Q.   Historically, looking backwards?
20       A.   I don't know if that -- we do it on a dry
21   erase board in the back, and they change it every month.
22   So I don't know if they have a historical -- I mean,
23   other than calling our dispatch to find out who worked
24   that day.

Page 100

1        Q.   Somebody is paying them.
2        A.   Right.
3        Q.   I'm sure there's a record.
4        A.   Some kind of record.
5            MR. HILL:  Thanks, Joe.  I don't have any
6    other questions for you.
7            MR. LUTE:  He'll read.
8            (Signature not waived.)
9                    - - -
10           Thereupon, at 12:06 p.m., on Friday, March 17,
11   2017, the deposition was concluded.
12                   - - -
13
14
15
16
17
18
19
20
21
22
23
24

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Sprinfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 2
March 17, 2017

---

Page 101

1                                    March 30, 2017

2

3    Dear Holsopple,

4        You have chosen to read and sign your transcript.
     Please do not mark on the transcript.  Any
5    corrections/changes you may desire to make in your
     testimony should be typewritten or printed on the errata
6    sheet at the end of testimony, giving the page number,
     line number, and desired correction/change.  After you
7    have read the transcript, sign your name on the
     correction sheet and where indicated at the close of
8    testimony before a notary public.

9        The Rules of Civil Procedure allow 30 days for you
     to read and sign.  Please return the signature page and
10   errata sheet to Whitney Layne, 6723 Cooperstone Drive,
     Dublin, Ohio 43017 within that time.  Failure to do so
11   in the allotted time will result in your transcript
     being used as though read and signed by you.

12

13                                    Sincerely,

14

15                                    Whitney Layne
                                      Professional Reporter
16

17   cc:
     Michael Hill
18   Gregory Beck

19

20

21

22

23

24

---

Page 103

1    TO THE REPORTER:

2    I, JOSEPH HOLSOPPLE, have read the transcript of my
     continued deposition taken on the 17th day of March,
3    2017, or the same has been read to me.  I request that
     the following changes be entered upon the record for the
4    reasons so indicated.  I have signed the signature page
     and authorize you to attach the same to the original
5    transcript.

6    Page  Line  Correction or Change and Reason Therefor:

7    ____  ____  _____

8    ____  ____  _____

9    ____  ____  _____

10   ____  ____  _____

11   ____  ____  _____

12   ____  ____  _____

13   ____  ____  _____

14   ____  ____  _____

15   ____  ____  _____

16   ____  ____  _____

17   ____  ____  _____

18   ____  ____  _____

19   ____  ____  _____

20   ____  ____  _____

21   ____  ____  _____

22   ____  ____  _____

23   ____  ____  _____

24   Date _____  Signature _____

---

Page 102

1                    CERTIFICATE

2    STATE OF OHIO        :
                               SS:
3    COUNTY OF FRANKLIN   :

4

5        I, JOSEPH HOLSOPPLE, do hereby certify that I

6    have read the foregoing transcript of my

7    cross-examination given on March 17, 2017; that together

8    with the correction page attached hereto noting changes

9    in form or substance, if any, it is true and correct.

10   _____

11                    JOSEPH HOLSAPPLE

12       I do hereby certify that the foregoing

13   transcript of the cross-examination of JOSEPH HOLSOPPLE

14   was submitted to the witness for reading and signing;

15   that after he had stated to the undersigned Notary

16   Public that he had read and examined his

17   cross-examination, he signed the same in my presence on

18   the _____ day of _____, 2017.

19

20   _____
                     NOTARY PUBLIC - STATE OF OHIO
21

22   My Commission Expires:

23   _____, _____.

24

---

Page 104

1                    CERTIFICATE

2    STATE OF OHIO        :
                               SS:
3    COUNTY OF FRANKLIN   :

4        I, Carol A. Kirk, a Registered Merit Reporter
     and Notary Public in and for the State of Ohio, duly
5    commissioned and qualified, do hereby certify that the
     within-named JOSEPH HOLSOPPLE was by me first duly sworn
6    to testify to the truth, the whole truth, and nothing
     but the truth in the cause aforesaid; that the
7    deposition then given by him was by me reduced to
     stenotype in the presence of said witness; that the
8    foregoing is a true and correct transcript of the
     deposition so given by him; that the deposition was
9    taken at the time and place in the caption specified and
     was completed without adjournment; and that I am in no
10   way related to or employed by any attorney or party
     hereto or financially interested in the action; and I am
11   not, nor is the court reporting firm with which I am
     affiliated, under a contract as defined in Civil Rule
12   28(D).

13       IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my seal of office at Columbus, Ohio on
14   this 30th day of March 2017.

15

16

17                    *Carol A. Kirk*

18                    _____
                      CAROL A. KIRK, RMR
19                    NOTARY PUBLIC - STATE OF OHIO

20   My Commission Expires:  April 8, 2017.

21                    - - -

22

23

24

---

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 2
March 17, 2017

## $

**$4,000 (1)**
39:1

## A

**Abington (7)**
11:18;28:20;51:2;
92:16;94:16,23;98:19
**able (12)**
11:18;21:17;46:9;
57:11;69:8;71:19;
72:17,19;79:14;84:8;
87:19,21
**above (4)**
44:6;79:13;80:23
**accounts (1)**
53:17
**across (1)**
18:3
**actively (2)**
61:18;93:3
**actual (4)**
27:11;38:2,3;92:19
**actually (21)**
11:17,20;12:21;
19:15;20:7;21:16;
22:11;23:13;26:6;
31:16,17;33:12;35:1;
39:15;43:17;55:18;
59:24;64:1;73:6;80:17;
90:9
**add (1)**
35:18
**additional (2)**
7:6;93:20
**address (2)**
8:6;50:10
**addressed (1)**
46:17
**adjourned (1)**
5:8
**administrative (1)**
27:3
**afterwards (2)**
55:1;80:1
**again (19)**
7:8;31:7;37:18;44:9;
50:7;53:10,14,16;
60:18,19;63:13;74:7,9;
79:4,9;81:7,10,19,20
**against (2)**
33:13;36:1
**age (1)**
56:7
**agree (10)**
16:3;22:5;47:11;
53:7;62:17,18;69:9;
74:21;83:7;98:2
**agreed (3)**
20:13;81:1;97:1

**ahead (7)**
17:15;35:5,17;45:18;
47:21;62:2;81:5
**ahold (3)**
64:17,20;66:16
**air (1)**
90:2
**airway (1)**
90:20
**alcohol (1)**
16:2
**almost (2)**
72:13,13
**along (3)**
14:9;23:17;46:10
**Amanda (5)**
57:16;59:4;60:4,16;
61:4
**ambulance (2)**
91:6,16
**amongst (2)**
93:5;97:15
**angled (1)**
87:18
**ankle (1)**
67:18
**announce (1)**
45:14
**anymore (2)**
49:23;91:17
**apart (2)**
69:21;70:4
**apparent (3)**
47:15;48:6,7
**appeared (1)**
83:11
**appears (1)**
54:21
**applied (1)**
22:3
**appraiser (1)**
33:7
**approved (2)**
72:3;77:1
**approving (2)**
24:19;32:17
**arch (3)**
76:12;77:3;79:18
**arched (2)**
72:14;92:3
**arching (3)**
76:17;77:24;79:17
**area (8)**
8:6;10:13,17,20;
11:2,7;66:3;98:22
**arm (18)**
63:13,18;64:8,17,20,
23;65:5,19;66:22;68:5;
70:5;71:18;72:9,16,18,
22;73:4,9
**around (18)**
11:16;12:2,16;42:5;
48:11;55:20;60:18;

62:21;66:21;67:18;
68:4;71:22;73:19;79:4,
8;83:1;85:18;92:18
**arrest (6)**
24:3,4;33:21;45:8,
13,15
**arrested (5)**
45:21,24;46:1,5,6
**arrival (3)**
8:6;27:6;32:13
**arrive (1)**
28:19
**arrived (3)**
12:22;62:4;78:9
**arriving (1)**
11:17
**Aside (1)**
47:22
**assault (1)**
33:21;47:2
**assess (1)**
15:6
**assessment (1)**
15:14
**assigned (1)**
9:10
**associated (2)**
35:14,20
**assume (4)**
9:16;28:21;29:4;
33:8;39:16;48:23;
53:18;83:9
**assuming (2)**
26:9;64:21
**attempt (3)**
43:24;45:13;61:24
**attempted (4)**
43:11,23;46:8;61:14
**attention (2)**
26:7;93:7
**attributed (1)**
53:10
**automatically (1)**
99:13
**available (1)**
31:9
**aware (1)**
44:21
**away (9)**
48:23;64:16;69:8,11,
13,14;71:12;76:20;
87:18
**awkward (1)**
72:21

## B

**back (62)**
5:6;6:21;13:9;23:9,
18,18,23;24:4;27:21;
30:2,4,8;33:19;35:18;
42:24;43:17,19;44:8;
48:10,11;54:13;57:17;

59:1;61:13;62:5,21;
63:4,9,9;64:6;65:1;
66:2,5,6;7:11;69:5,12,
13,19,21;70:20;72:19;
73:7,9,16,22;74:7;
76:10;77:4;79:9;82:11,
13;84:18;85:2,24;87:1;
88:4;89:8;90:7;94:7,
10;96:10;99:21
**backup (2)**
18:6,14
**backwards (1)**
99:19
**bad (1)**
48:8
**badge (1)**
9:6
**bare (2)**
65:14;66:6
**based (2)**
8:11;54:21
**basically (7)**
8:3;10:12;33:6;
41:14;42:15;49:11;
63:6
**became (3)**
84:12;88:10;96:3
**began (1)**
10:19
**begin (2)**
12:18;89:18
**beginning (2)**
62:19;96:18
**behavior (2)**
17:19;18:5
**behind (7)**
61:13;62:5;72:19;
73:6,16;76:9;89:8
**belief (1)**
55:22
**below (1)**
40:5
**beside (4)**
65:10;77:17;83:19,
21
**best (1)**
97:23
**better (1)**
81:8
**bit (21)**
7:23;11:23;52:11,12;
63:15;64:2,16;66:21;
71:7;74:16;76:18;77:5;
86:14;87:9,15,18;
90:10;92:1,4;95:6,14
**bite (17)**
47:7,13,14,19;48:5;
69:9;74:9,18,23;75:6;
76:17;78:1;87:19,21;
91:22,24;92:11
**black (3)**
19:3;50:8,9
**blade (6)**

59:1;61:13;62:5,21;
63:4,9,9;64:6;65:1;
66:2,5,6;7:11;69:5,12,
13,19,21;70:20;72:19;
73:7,9,16,22;74:7;
76:10;77:4;79:9;82:11,
13;84:18;85:2,24;87:1;
88:4;89:8;90:7;94:7,
10;96:10;99:21

**77:24;78:22,24;
79:16;81:3;82:4
**Blasdel (4)**
28:9;29:23;50:1,5
**blood (1)**
96:5
**blue (1)**
37:5
**board (1)**
99:21
**body (6)**
69:15;72:12,21;
76:24;84:21;89:6
**bold (1)**
40:5
**both (4)**
14:11;22:5;65:12,13
**bottom (2)**
32:19;34:24
**box (1)**
37:23
**brain (1)**
80:19
**break (5)**
5:7;38:10;39:20;
40:3;46:20
**breathe (1)**
85:9;90:6
**breathing (13)**
88:20;89:21,23,23;
90:1,15,18,23;91:2,10,
14,15,19
**briefly (1)**
23:14
**bring (1)**
24:4
**broken (1)**
44:22
**brought (4)**
33:12,13;36:1;60:20
**Bubba (16)**
12:17;29:22;48:7;
53:18;63:6,9;65:10;
73:8;74:16;76:19;77:5;
85:2,5,21,22;86:10
**Bubba's (1)**
67:16
**bubble (1)**
24:16
**buck (1)**
84:22
**buckled (1)**
85:8
**bunch (1)**
14:23
**bus (1)**
28:24
**busy (2)**
8:17;23:24;70:5

## C

**CAD (1)**

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Sprinfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 2
March 17, 2017

8:4

**calf (1)**
87:19

**call (16)**
8:5,7,21;10:18;
14:14;15:10,13;16:22;
17:8;27:11,14;31:15;
38:11;62:19,20;73:13

**called (4)**
15:2;28:23;91:7;
95:4

**calling (3)**
16:11;91:5;99:23

**calls (2)**
11:15;15:4

**calm (3)**
81:16,18,18

**came (12)**
11:6;18:3;30:2,2,8;
48:11;58:24;65:5;
72:16;75:18;94:7,10

**can (15)**
13:23;15:10,22;
23:18;29:13;32:1;
35:18;46:20;68:6;74:4;
80:15;88:20;98:12;
99:11,17

**cantered (1)**
87:16

**captain (1)**
94:17

**car (17)**
9:11;11:22;12:2,3,5;
18:11;37:19;45:20;
46:2,3,5,13;48:18;
56:21;57:1;92:18;
94:18

**care (1)**
16:12

**case (6)**
8:16;14:17;18:13;
19:4;27:12;62:12

**cases (1)**
23:8

**categories (2)**
36:18,22

**categorized (1)**
45:9

**category (1)**
43:21

**certain (1)**
19:1

**certified (1)**
5:2

**cetera (1)**
39:23

**change (2)**
42:20;99:21

**changed (2)**
9:23;62:20

**changes (1)**
42:14

**charged (2)**

44:1,3

**charges (7)**
25:8;33:12,15;34:17;
35:14;36:5;48:14

**Check (2)**
36:22;45:11

**checking (8)**
85:20,21,22;89:2;
90:4,4;91:8,14

**Cherokee (1)**
37:4

**chest (3)**
76:14;88:20;90:16

**Chester (8)**
34:3,23;35:6,14;
36:12;53:11,21;54:2

**Chief (6)**
20:19,21;59:6;60:7;
94:3;98:14

**chief's (1)**
26:15

**choice (1)**
89:18

**chomping (1)**
92:7

**circumstance (1)**
16:1

**Clark (10)**
34:3,23;35:6,15;
36:12;39:6;53:11,21;
54:3,22

**clear (14)**
13:2;17:1;27:16;
29:13;32:13;49:1;
58:11,17;61:20;70:1;
88:1;91:20;92:14;
95:17

**clearance (1)**
30:10

**cleared (17)**
10:10;27:9,13,14;
28:7,8,11,12,22;29:5,6;
30:16,20,24,24;31:18,
22

**clearing (1)**
27:8;29:12

**click (4)**
55:20;73:14,14,14

**close (1)**
42:7

**clothes (1)**
62:21

**clothing (2)**
65:16;89:18

**cocked (1)**
87:9

**code (11)**
14:16;26:2;35:7,11;
38:13,16;39:9,12;40:7,
24;44:15

**codes (2)**
35:7;39:21

**collect (1)**

29:4

**collected (3)**
49:12;55:6;59:1

**collective (1)**
6:12

**coming (3)**
10:16;30:12;70:5

**commented (1)**
86:19

**commitment (1)**
13:15

**common (2)**
24:18;61:11

**community (1)**
23:19

**complete (1)**
49:17

**completed (7)**
21:11;24:8,11;36:16;
43:23;73:1;96:18

**completely (5)**
18:24;81:13;84:17;
89:7;90:7

**completing (4)**
21:5;25:19;31:10,13

**computer (12)**
8:2;25:17,19,24;
26:19;32:8,21;33:4;
42:1,4,12,21

**computers (2)**
25:23;26:10

**concentrating (1)**
90:3

**concerned (1)**
96:11

**concluded (1)**
100:11

**condition (2)**
56:6,8

**connected (1)**
71:5

**connection (8)**
16:14,18,21;69:23;
70:21,24;71:3,14

**consider (1)**
45:15

**considered (4)**
17:19;34:17;44:3;
48:14

**considering (2)**
10:23;46:13

**consistent (12)**
51:14;69:24;74:13;
76:7;77:8,12,21;78:2,
6;80:4;97:21;98:21

**constantly (1)**
41:15

**contact (2)**
16:16;17:13

**contain (1)**
51:8

**content (2)**
59:20;94:7

**continue (1)**
76:5

**continued (2)**
78:4,17

**continuously (1)**
80:10

**contracted (1)**
72:12

**control (4)**
14:8;68:5;70:14;
71:23

**controlling (1)**
68:12

**conversation (4)**
93:11;94:6,13;97:9

**conversations (10)**
57:6;92:16,19;94:2,
15,24;96:16,19;97:5;
98:6

**copies (1)**
50:9

**copy (2)**
18:22;19:4

**correlate (1)**
31:6

**corresponds (3)**
30:21;38:18;39:6

**cough (1)**
46:19

**counterfeit (1)**
39:22

**couple (4)**
12:14;50:6;75:15;
91:9

**course (5)**
10:21;70:15;79:6;
92:21;93:1

**covering (1)**
50:10

**cradled (1)**
90:11

**created (2)**
20:5;97:13

**creating (4)**
96:23;97:6,9;98:7

**crime (4)**
49:21,22,24;50:3

**crimes (1)**
49:2

**criminal (15)**
17:19;18:5;25:7;
33:20;35:10,14;38:18;
40:23;43:16;44:5,14,
16,20;46:7,13

**crisis (9)**
10:19,24;14:14;15:9,
11;16:15,22;17:9,11

**CROSS-EXAMINATION (1)**
5:4

**cruiser (1)**
12:10

**cuff (6)**
71:20;72:22;73:11,

11;79:7,8

**cuffed (7)**
61:17;71:21;73:16;
75:16,16;77:19;89:8

**cuffs (4)**
73:5,6,12;84:4

**cut (2)**
95:11,12

**cuts (1)**
95:8

**cycle (1)**
73:1

---

**D**

**damage (3)**
18:2;39:3;44:18

**damaged (4)**
38:17;44:6,12;48:19

**damaging (11)**
17:21;35:10;38:18;
40:24;43:16;44:5,14,
16,20,21;46:7

**damaging/endangering (1)**
33:20

**danger (1)**
12:2

**darts (4)**
69:18,20;70:2;71:9

**data (5)**
26:15;41:2,5,9;42:17

**date (2)**
32:14,16

**day (14)**
5:8;8:16;9:15;10:9;
18:21;27:4;30:8;89:19;
93:19;94:3,16,23;
95:20;99:24

**days (2)**
99:12,13

**dealing (1)**
55:23

**dealt (4)**
55:14;56:13;57:15;
60:19

**death (2)**
60:13,15

**Deborah (1)**
41:10;42:16,20

**debris (3)**
86:2,14;88:1

**decide (1)**
15:24

**decided (2)**
15:16;46:4

**decision (1)**
14:21

**deep (1)**
48:8

**degrees (1)**
89:16

**delay (1)**
12:20

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 2
March 17, 2017

delirium (3)
  16:6;62:12,15
delusional (1)
  14:7
demonic (1)
  52:20
Denise (13)
  6:10,14;18:11;20:7;
  24:10;29:22;71:22;
  75:17;84:5;85:4,5,18;
  91:5
department (2)
  23:24;96:17
depends (5)
  14:22;18:7;23:6,6;
  99:7
deploy (1)
  64:15
deployed (1)
  76:2
deposes (1)
  5:3
deposition (7)
  5:7,14,16;7:12;10:1;
  19:7;100:11
describe (5)
  48:6;50:17;52:8,9;
  72:13
described (7)
  47:15;67:5;70:19;
  73:21;89:13,21;97:5
describes (1)
  39:21
describing (4)
  19:6;78:19;82:2;
  98:16
description (8)
  35:24;38:21;40:16;
  41:1;43:5,15;47:18;
  51:9
descriptions (2)
  6:18;51:13
Destroyed (1)
  38:17
details (1)
  5:16
detain (1)
  45:19
detective (13)
  27:17;28:13,22,23;
  30:17,18;31:2;49:14,
  19;50:4;59:2;93:4,9
detectives (7)
  27:15,23;29:5,7,13;
  30:15;48:17
detectives' (2)
  26:14,15
detective's (2)
  49:22;50:3
determination (1)
  15:21
difference (1)
  56:23

different (7)
  39:16;42:14;56:5,10,
  11,12;84:21
directly (5)
  10:20;42:3;87:17;
  89:1;96:14
dirt (1)
  86:15
disagree (1)
  75:20
discussed (4)
  81:7;96:21;98:6,8
discussing (1)
  5:18
dispatch (7)
  6:23;8:14;10:11,18;
  31:16;32:13;99:23
dispatched (1)
  10:7
district (2)
  9:7,8
doctor's (1)
  54:13
document (9)
  5:24;20:5;21:21,24;
  25:8,19;30:13;34:13;
  37:10
documents (2)
  5:9;9:4
Done (9)
  5:11;21:14;23:12;
  24:23;27:11,17;28:17;
  39:3;75:21
door (1)
  60:3
doorway (1)
  18:10
double (1)
  45:11
down (28)
  8:12,13,18,19;13:9;
  38:4;64:4,7;65:19;
  66:17;67:3,19;68:18,
  20,21;70:9;73:24;77:7,
  19;78:10;80:9;81:17,
  18,18;82:5,6;86:8;
  87:11
drive (2)
  10:20;98:20
driver's (1)
  57:2
driveway (7)
  11:19;12:12,23;13:5,
  6;86:17;88:8
driving (3)
  10:14;11:2;30:4
drop (1)
  46:20
drop-down (1)
  24:16
drug (1)
  16:16
drugs (3)

16:2,23;17:12
dry (8)
  69:23;70:6;71:3,13;
  73:1,2;76:2;99:20
duly (1)
  5:2
during (6)
  19:7;21:9;61:17,22;
  91:4;98:6

### E

earlier (10)
  6:22;10:1;19:7;
  37:21;62:10;67:1;
  82:16;91:21;92:1,18
ease (1)
  79:1
easier (1)
  8:4
either (9)
  14:7;15:23;20:13;
  21:8;29:12;30:19,22;
  40:17;94:20
elbow (1)
  67:9
else (14)
  13:23;14:10;23:2;
  26:5;31:1,17;41:7;
  47:9;59:1;60:9;70:5;
  89:6;91:3,15
else's (2)
  26:7;31:24
emergency (1)
  14:3
EMS (5)
  6:23;16:12,16;17:13;
  78:8
encounter (2)
  60:22,23
encountered (2)
  53:7;60:15
engaged (1)
  17:18
engaging (1)
  18:5
enough (6)
  15:15;18:18;65:14;
  69:8,11;86:19
enter (1)
  41:15
entered (2)
  32:7;41:13
entering (1)
  41:7
entire (4)
  10:15;61:23;84:9;
  88:16
entry (5)
  26:15;41:2,5,9;42:17
erase (1)
  99:21
estimate (8)

8:16;13:7,11;33:10;
  38:2,3;44:13,18
estimated (2)
  39:2;44:7
estimator (1)
  37:19
et (1)
  39:23
evaluate (2)
  14:5,6
evaluated (1)
  16:17
evaluating (1)
  88:21
even (23)
  8:24;11:5;16:9;
  19:13,19;21:17;22:8;
  24:14,15;25:9,10;
  30:17;49:13;50:14;
  59:8;61:10;70:12,12,
  13;71:15,15;84:21;
  93:6
events (3)
  5:12;63:7;97:20
everybody (1)
  31:1
evidence (2)
  27:18;99:10
exactly (4)
  17:6;62:7;79:22;
  88:22
example (6)
  8:10;17:23;25:21,24;
  27:3;77:14
excited (3)
  16:6;62:12,14
Exhibit (17)
  5:18,19,23;19:2,19,
  22;20:2;21:5;32:19,24;
  34:13;35:23;36:10;
  49:7;62:23;94:9;97:2
exhibiting (1)
  17:10
exhibits (1)
  5:19
exiting (1)
  12:10
expect (1)
  83:14
expected (1)
  66:21
experience (1)
  22:1
explain (1)
  23:22
exposed (2)
  96:13,14
extent (3)
  48:13;59:17;64:3
eyes (2)
  88:3,14

### F

face (11)
  51:24;56:22,24;57:3;
  63:14,21;64:1;76:21;
  86:8;87:11;88:7
facing (4)
  87:1,2,3,14
fair (15)
  11:19;14:12;17:13;
  30:12,21;36:2;47:18;
  49:5;51:2;54:24;56:4;
  61:24;74:19;75:12;
  81:3
familiar (1)
  99:6
family (3)
  14:2;61:8,11
far (9)
  37:13;38:24;45:4;
  48:16,19;69:8,11;
  98:17;99:10
fast (2)
  11:2;12:6
features (1)
  50:17
feel (4)
  45:19;91:2,10,17
feet (3)
  12:13,13;70:13
felonious (2)
  33:21;47:2
felony (3)
  23:8;24:3;43:9
felt (3)
  45:22;48:7;49:20
fence (2)
  45:3;48:18
few (7)
  7:9;42:14;50:13;
  59:8;76:5;81:12;82:17
fight (1)
  76:6
fighting (3)
  70:18;71:21;83:15
figure (4)
  11:24;37:11;41:16;
  44:10
filed (1)
  45:3
files (2)
  9:1,2
fill (3)
  9:20;58:24;99:11
filled (1)
  27:1
final (3)
  5:23;98:13;99:1
find (3)
  70:15;75:5;99:23
Fine (2)
  46:21;94:22

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Sprinfield Township, Ohio, et al.

Officer Joseph Holsopple -  Vol. 2
March 17, 2017

**fingerprint (1)**
23:10
**fire (2)**
67:21;70:21
**fired (6)**
69:1,4,5,10;70:20;
72:24
**fires (1)**
67:24
**first (18)**
5:2;19:15,18,23;
21:11,13,15;26:21;
30:1;34:2;43:20;45:12;
61:21;69:3;76:1,2;
83:17;99:7
**fish (1)**
72:14
**five (10)**
10:5,6,11,17;11:14;
12:15;13:5;72:22,24;
84:20
**five-second (1)**
73:1
**flailing (1)**
79:4
**flat (1)**
67:14
**flesh (1)**
66:6
**foaming (4)**
51:19,22;52:1;53:13
**focus (1)**
10:22
**follow (2)**
5:17;46:10
**following (1)**
37:5
**follows (1)**
5:3
**foot (13)**
77:10,23;78:21,23;
79:12,16;80:23;81:2;
82:3;83:20;87:4,6,12
**force (1)**
99:5
**forearm (4)**
63:4,5;64:4;96:13
**forged (1)**
39:22
**forget (1)**
8:18
**forgot (1)**
10:8
**form (6)**
58:12,24;59:18;
92:24;93:1;94:8
**formal (2)**
36:4,5
**formally (1)**
33:12
**former (1)**
20:21
**forming (5)**

52:14,17,23;53:1,8
**forms (1)**
42:13
**forth (2)**
67:11;73:22
**forward (5)**
22:6;57:4;63:11;
73:15;96:20
**four (4)**
10:2;12:1;33:15;
98:23
**four-minute (1)**
98:20
**freeze (1)**
80:20
**Friday (1)**
100:10
**front (2)**
87:3,17
**full (1)**
71:13

**G**

**garbled (1)**
81:15
**gathering (1)**
27:18
**gave (8)**
27:22;51:1,4;58:5,
23;92:24;93:1,22
**Generally (3)**
21:13;24:3;26:17
**generated (2)**
32:21;48:24
**gentleman (1)**
54:11
**gets (1)**
97:12
**girl (1)**
57:16
**girlfriend (3)**
5:15;59:4;94:5
**gist (2)**
22:10;23:14
**given (2)**
27:18;49:10
**gives (1)**
8:14
**giving (1)**
93:19
**glad (1)**
10:10
**glanced (1)**
25:12
**goes (5)**
19:21;26:22;41:19;
48:19;66:24
**good (2)**
25:13;69:23
**Gotcha (1)**
43:24
**grab (5)**

64:1;67:18;68:6;
72:17;79:6
**grabbed (1)**
13:10
**Grand (1)**
37:4
**gravel (5)**
83:22;86:4,6,8,13
**Great (1)**
10:10
**Grill (1)**
41:10
**ground (6)**
67:14;69:15;76:14;
77:18;83:2;84:8
**guess (5)**
38:5,10;59:3;94:23;
96:18
**guy (5)**
11:22;25:22;55:17;
66:14;95:8
**guys (8)**
11:21;76:20,20;
78:11;81:1;97:15,20;
99:9

**H**

**half (1)**
24:3
**hand (9)**
31:13;49:16;74:7;
77:18,19;79:7,7,8;
83:21
**handcuff (1)**
72:19
**handcuffed (3)**
61:13;62:5;82:6
**handed (2)**
55:4;59:18
**handle (1)**
18:18
**hands (3)**
65:3,12,13;76:9
**handwrite (2)**
41:24;42:19
**handwriting (2)**
41:6;42:13
**handwritten (3)**
9:12;31:7,9
**happen (1)**
23:5
**happened (8)**
17:8;20:17;25:13;
30:23;63:7;85:1;92:20;
94:11
**happening (1)**
53:17
**hard (1)**
68:19
**harm (3)**
14:10,10;15:3
**head (24)**

63:4;69:11;76:18;
77:4;78:1;79:17;80:20;
85:7,11,18,23;87:7,8;
88:4,16;89:5;90:2,5,10,
20;91:22,23;92:5,10
**headbutt (1)**
81:20
**health (8)**
10:19,24;11:15;
14:14;16:15,21;17:9;
46:16
**hear (2)**
52:11;91:16
**heard (1)**
52:19
**heavily (2)**
19:2;50:7
**hefty (1)**
5:7
**held (1)**
85:7
**help (2)**
14:3;90:10
**helps (1)**
23:7
**hepatitis (7)**
47:22,23,24;95:5,10,
12;96:12
**hereinafter (1)**
5:2
**Here's (2)**
5:19;17:8
**Hey (4)**
15:10;43:1;85:2;
86:10
**hi (1)**
58:4
**high (2)**
11:12;98:18
**HILL (6)**
5:5;35:16;46:21,23;
58:14;100:5
**himself (3)**
14:8,10;77:7
**historical (2)**
52:21;99:22
**Historically (1)**
99:19
**hit (2)**
64:4;96:12
**hits (1)**
24:20
**Hold (5)**
58:10;64:23;65:19;
66:17;71:8
**holding (21)**
66:23;67:24;68:3,8,
9,10,14;73:8;77:7,18,
19;78:20;79:7,8;80:9;
82:4,5,6;85:19,23;
90:10
**HOLSOPPLE (8)**
5:1;26:20;63:13;

64:15,16;71:19;77:14,
17
**home (1)**
98:16
**Honestly (3)**
22:8;25:10;28:16
**hooded (2)**
65:22;89:13
**hospital (1)**
95:4
**hour (4)**
24:3,7;28:18;29:2
**hours (4)**
24:6;28:20;99:14,15
**house (4)**
29:23,24;54:15;
55:19
**hovering (1)**
79:13
**hurried (4)**
11:20;12:7,7,14
**hurry (1)**
23:17
**hurt (1)**
48:8
**hurting (1)**
77:7

**I**

**ID (1)**
26:19
**idea (7)**
11:3;24:22;25:20;
33:7;39:13;52:21;
59:20
**identification (1)**
26:2
**identified (2)**
33:24;34:18
**identify (2)**
21:19;25:17
**III (2)**
53:11,22
**illness (1)**
15:5
**imagine (2)**
28:21;29:2
**impossible (1)**
63:15
**inch (1)**
80:23
**inches (2)**
69:21;70:4
**incident (35)**
18:22,24;19:6;20:2;
21:6,11,21;22:7,18;
24:9;25:5;26:24;28:4;
30:11,20;31:10,13;
32:7,14;33:16;34:14;
35:23;36:5;38:4;40:17;
45:5,6;47:1;49:2,4;
54:3;61:1,2;93:12;97:3

Layne & Associates
(614) 309-1669

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Sprinfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 2
March 17, 2017

**include (3)**
6:3,18;36:18
**indicating (12)**
21:1,14;60:3;63:23;
64:5;67:12,16;72:16;
74:1,5;86:8;94:8
**individual (3)**
13:15;16:1;34:2
**influence (1)**
16:2
**information (25)**
6:2,4,5,11,18;8:8,10;
11:24;14:23;15:15,22;
17:1;20:7,13,14;32:23;
36:9;41:6;42:3,11,12,
19;54:22;93:20,22
**informed (1)**
64:14
**initial (2)**
10:18;26:21
**initially (1)**
93:15
**initiate (2)**
13:17,22
**injured (1)**
12:2
**injuries (1)**
48:3
**injury (4)**
47:15,16;48:6,8
**input (1)**
6:13
**instantly (2)**
85:1,2
**instructed (1)**
58:6
**interacting (2)**
55:13;62:11
**interview (1)**
93:10
**interviewing (2)**
58:15;93:3
**into (11)**
5:16;6:13;26:18;
33:4;42:3,12,13,20;
54:14;67:8;70:20
**investigation (1)**
49:18
**investigative (5)**
5:17;21:12;97:3,10,
12
**involved (2)**
13:21;21:8
**involvement (2)**
22:18;25:7
**ish (1)**
42:14
**issue (3)**
16:4;38:19;46:16
**issues (1)**
16:10
**Item (1)**
21:14

**items (1)**
44:6

## J

**jail (2)**
23:18;24:5
**Jeep (18)**
11:19;12:11,18;13:3,
4,8,9;18:10;37:4;
50:19;52:1,6;54:8,14;
55:7;93:16;95:20,23
**job (2)**
23:16;49:22
**Joe (6)**
5:6,19;26:19;46:18;
99:3;100:5
**John (5)**
58:21;60:7;94:3,7,14
**Jordan (1)**
46:1
**Jordn (58)**
5:11;6:14;10:19,23;
12:3,4,19;25:6;28:11;
33:13;34:18;35:14;
36:1;44:21;45:13;
46:13;47:1,24;48:14;
49:3;50:18;51:9,22;
53:8,13;55:7,13,24;
57:1,3,7,21;60:12;
61:13,21;62:4,11,14;
63:3,7;65:17,19;66:23;
68:8,15;69:8;70:9;
73:19;76:4;81:16;
87:11;93:14,20;95:21,
22,23;96:2,20
**Jordn's (30)**
29:23,24;57:3;58:18;
60:13,15,23;61:8,10;
64:21;65:22;66:2;
70:20,23;71:12,13;
73:7,16;77:10;78:21;
82:3;86:23;87:1,6,12;
88:1,3,7;89:5,6
**JOSEPH (1)**
5:1
**judgment (1)**
38:1
**justify (1)**
15:8

## K

**keep (8)**
67:3;68:19,20,21;
77:11,24;79:17;84:8
**Kelly (1)**
51:16
**kept (9)**
31:2;66:18;67:2,17,
18,19;68:18;85:21,22
**keys (2)**
54:14,23

**kick (2)**
67:2,4
**kicked (4)**
63:7,10;67:17;74:7
**kicking (12)**
66:18;67:8,19;68:20;
71:21;74:6;77:3,11,20;
79:5,9;81:21
**kid (1)**
55:21
**kill (2)**
14:24;15:2
**killing (1)**
99:3
**kind (45)**
8:15,15,18;12:20;
13:13;14:6;15:4,6;
20:8;25:12,12;26:1;
38:10;41:12;52:10,13;
54:11;66:14,20;67:2,4,
5;68:4,9;70:20;72:20;
73:21;74:1,4;84:21,24;
85:5,15,17;86:22;87:7;
89:2;90:9;94:11;95:9,
21;96:9;97:8;98:16;
100:4
**knee (2)**
67:7,9
**kneeling (3)**
65:9;66:16;83:21
**knees (6)**
65:2,9;66:13;77:17;
83:20;85:10
**knew (7)**
18:11,14;22:9;25:11;
55:2;81:17;90:3
**knob (2)**
44:22,24
**knowledge (4)**
23:3;56:3;98:21;
99:7
**knowledgeable (1)**
41:11
**known (1)**
53:9

## L

**lady (1)**
41:2
**laid (2)**
64:4,7
**language (5)**
52:8,15,21;53:9;83:8
**lapel (2)**
6:24;7:2
**large (1)**
38:10
**last (3)**
26:22;28:9;29:9
**later (13)**
10:8,17;12:23;13:3;
27:20;29:14;45:3;

55:16;57:24;70:7,15,
16;91:20
**lay (4)**
76:5;81:12;82:16;
96:12
**laying (3)**
67:14;83:14;87:11
**least (8)**
9:14;33:16;50:18;
52:11;54:21;66:3,4;
84:1
**leave (4)**
28:14;29:7,10;78:23
**left (26)**
27:4;29:15,18,21,22,
22;30:18,18;36:21,24;
38:5;57:3;59:10;63:4;
66:15,17,19;77:11,24;
79:16;87:7,12,12;
93:18;94:16,22
**leg (16)**
66:17;67:1,3,15,15;
68:5,9,10;71:1,9;74:7,
17;77:11,20;78:20;
79:9
**legs (4)**
68:20;70:23;71:13;
82:4
**lengthy (1)**
93:11
**less (1)**
84:20
**life (1)**
95:13
**lift (3)**
65:22;66:2;67:20
**lifting (2)**
91:21,23
**lights (1)**
11:8
**limited (1)**
51:1
**limp (6)**
84:21,24;86:7;89:7;
90:13;91:6
**limping (1)**
86:9
**Linaburg (2)**
9:17;25:3
**line (3)**
39:20;40:2,6
**lines (1)**
14:9
**link (1)**
34:15
**list (1)**
23:4
**listed (22)**
6:2,19;20:10;21:24;
22:6,13;25:7;30:10;
32:6,11,24;33:15,16;
34:7,10;35:10;43:10;
44:11;46:24;47:11;

48:15;49:4
**little (17)**
7:23;11:23;21:16;
52:11,12;64:16;66:21;
71:7;86:14;87:9,15,16,
18;90:10;95:6,11,14
**lived (1)**
92:17
**loading (1)**
28:24
**located (1)**
86:22
**location (1)**
92:15
**locations (1)**
26:12
**locking (1)**
72:15
**log (20)**
7:11,15,18,20;8:1,10,
23;9:5,12,20;10:2;
26:1,6,18;31:6,7,9,18;
32:1,3
**logged (2)**
25:19;26:5
**logging (1)**
8:8
**long (7)**
12:17;41:20;42:2;
64:3;72:18;84:17;96:8
**look (8)**
19:20;23:14;31:20;
32:2;33:23;39:14;
51:16;56:22
**looked (13)**
20:1;25:11;56:5,10,
11,12,19;74:16;86:5,6;
92:2;98:17,20
**looking (15)**
9:5;10:17;16:6;
25:10;36:20;57:2,4;
62:23;63:9;74:9,17,22;
76:17;95:21;99:19
**looks (2)**
76:15;90:19
**Loss (5)**
38:13,16;39:9,12;
40:7
**lot (5)**
19:3;29:3;56:5,10;
86:13
**low (1)**
99:8
**LUTE (10)**
17:14;45:17;46:18;
47:20;58:10;62:1;80:6;
81:4;83:3;100:7

## M

**makes (1)**
40:12
**making (4)**

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 2
March 17, 2017

52:17;85:20;90:5;
97:20
**maneuver (1)**
69:23
**manner (2)**
76:18;77:5
**manually (3)**
32:7,20;33:4
**many (2)**
13:6;99:7
**Mapquest (1)**
98:17
**March (1)**
100:10
**mark (2)**
19:2;48:5
**marked (1)**
49:7
**marker (1)**
19:3
**markers (1)**
50:10
**marks (3)**
50:8;95:22;96:2
**may (10)**
15:15;16:1;17:18,21;
50:14;59:11,14,17;
80:7;83:4
**maybe (9)**
9:22;12:23;14:3;
42:5;61:5;73:4;78:9;
80:19;87:16
**mean (88)**
5:15;6:9,12,19;9:8;
11:14;12:3,11,21;
13:19;14:22;15:11;
16:4,5,18;17:2,3;18:7,
8;19:22;22:2,9,12,14,
22,23;23:6,9,16,19;
24:2,22,24;25:10;
27:10,24;28:12,17,19;
29:4,11;30:11;37:17;
38:16;40:11;42:2;44:8,
14,15;45:14;48:3,5;
49:18;50:24;51:24;
52:16;54:18;55:1,12;
56:7,11,20,21;58:11;
61:11;64:21;67:3,14;
70:11,18;74:20;77:15;
78:8;80:2,9,11,17;
84:24;85:15;86:22;
87:1,20;88:19,21;
92:13;96:7;97:7;99:22
**Meaning (1)**
62:14
**means (3)**
40:10;49:11;52:16
**meant (2)**
79:19,22
**medical (5)**
16:4,7,10;48:1
**member (2)**
14:2,13

**members (2)**
61:9,11
**memories (1)**
97:21
**memory (19)**
25:14;55:13;58:17;
59:11,14,17;69:24;
74:13;76:7;77:8,12,21;
78:2,6;80:12,18;81:7;
97:23;98:21
**mental (11)**
10:19,23;11:14;
14:14;15:5,9,11;16:15;
17:9,10;46:16
**met (1)**
56:4
**Metal (1)**
73:12
**middle (4)**
66:2;69:18,20;98:19
**might (26)**
16:6;17:12;18:2;
22:10;24:6,7;25:11;
27:11,14;37:18;49:13,
14;55:16;58:3,5,5,21;
60:20;61:5;72:15,20;
86:14;88:19;90:20;
93:2,5
**mileage (1)**
9:11
**Miller (11)**
5:12;10:23;25:6;
33:13;47:1;55:7,24;
57:18;61:11;62:11;
96:20
**Miller's (5)**
10:19;57:7,21;60:13;
94:5
**Milo (3)**
55:17,18,20
**mind (2)**
15:16;96:10
**mine (3)**
32:2;48:19;83:8
**minor (3)**
47:16;48:6,7
**minute (2)**
13:9;29:24
**minutes (12)**
8:19;10:2,5,6,11,17;
78:5,8,10,11,18;98:23
**miss (1)**
8:15
**misspellings (1)**
54:18
**mistakes (1)**
37:21
**mom (1)**
57:20
**moment (4)**
28:5;68:22,24;69:7
**Monetary (1)**
33:2

**month (1)**
99:21
**Moore (24)**
9:20;18:12;20:23;
21:5,19;22:5;24:10,10;
25:1;40:18;62:4;71:22;
75:17;77:23;78:13,21;
79:10,16;82:3;84:6;
86:24;96:24;97:18;
98:3
**more (10)**
16:4;23:23;29:2;
35:18;48:17;52:19;
81:15;86:15;94:24;
98:9
**most (1)**
41:19
**mostly (1)**
19:24
**mother (6)**
57:7,21;58:18;60:13,
24;94:5
**motivation (1)**
76:23
**motor (1)**
46:8
**mouth (10)**
51:19,22;53:14;
69:14;86:2,15;88:1,8;
91:24;92:11
**mouthful (1)**
86:6
**move (3)**
72:21;74:15;79:2
**moved (6)**
22:6;64:16;66:21;
68:4;71:7;93:15
**movement (3)**
70:21;92:3,5
**moving (4)**
67:11;83:1;91:23;
96:20
**Mr- (1)**
54:21
**much (7)**
18:10;19:10;40:13;
44:18;59:9;80:11,12
**mumbling (8)**
51:20;52:5,6,8,11,12,
15,16
**mutual (1)**
96:24

## N

**name (12)**
9:6,7;24:12,13,16,
21;26:21,22;42:16,17;
61:11;81:17
**named (2)**
34:2;57:16
**narrative (1)**
76:4

**nature (1)**
8:7
**near (1)**
89:5
**necessarily (5)**
16:3,24;22:22;27:10;
44:14
**necessary (1)**
49:21
**neck (5)**
63:22;64:10;65:20;
85:8;92:5
**need (4)**
14:3;16:7;28:24;
46:19
**needed (3)**
18:4;70:6;95:5
**needs (1)**
44:15
**neighborhood (1)**
62:22
**next (7)**
17:12;40:6,16;43:21;
63:14;66:15;79:2
**night (5)**
20:16;48:10;75:21;
96:18;97:24
**nobody (1)**
68:13
**noises (2)**
81:15;88:10
**none (3)**
39:18,22;40:8
**normal (1)**
83:13
**normally (1)**
22:19
**note (7)**
5:17;19:20;97:3,3,
10,12;98:7
**Noted (1)**
43:19
**notes (1)**
62:20
**notice (2)**
89:10;95:21
**noticed (3)**
61:22;85:24;96:3
**noticing (1)**
83:17
**number (19)**
9:6;19:20;20:2;21:3,
19;24:9;26:19;39:5,6,
18,21,22,22,23,23;
40:14;51:17;64:24;
94:10

## O

**Objection (8)**
17:14;35:16;45:17;
47:20;62:1;80:6;81:4;
83:3

**observe (1)**
89:6
**observed (2)**
6:14;51:14
**occasionally (1)**
42:21
**occurred (1)**
32:14
**occurs (1)**
13:14
**odd (1)**
89:18
**of- (1)**
41:12
**off (22)**
26:6;50:14;55:4;
65:5;66:22,24;71:10,
20;73:3,18;76:14;79:1,
21;80:12,15,18,24;
81:2;83:2;85:10;98:3;
99:7
**offense (5)**
34:15;35:6,24;43:8;
44:14
**offenses (4)**
21:20,23;22:6;35:13
**office (10)**
26:9,11,17,18;27:22;
54:14;57:24;58:21;
94:11;99:17
**Officer (67)**
6:3;7:15;8:9;9:15,
17;11:18;12:17;16:15;
17:17;20:11;21:4;
22:13,17;23:4;24:19;
25:1,18;32:16,17;33:5,
17;34:8,14;40:17;
45:12,23;47:4,19;48:4,
11;49:5;60:19;63:2,6,
13;64:14,15,16;65:3;
66:10;67:4,20;69:7,22;
70:19;71:9,16,19;
73:21;75:11;77:10,14,
17,18;78:20;82:8;
86:23;88:3;91:18;92:1,
4;93:14;95:1,19;96:24;
98:2,15
**officers (14)**
7:6,21;13:23;14:2;
18:15,18;36:6;42:3;
77:6;82:11,13;84:1,7;
99:4
**officer's (1)**
24:20
**often (1)**
23:5
**oftentimes (2)**
14:1,12
**Ohio (4)**
34:11;35:2;45:9;
49:3
**OHLEG (3)**
41:23,23;42:1

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 2
March 17, 2017

older (2)
  54:11;56:9
Once (4)
  16:24;61:13,16;62:4
one (43)
  7:2;9:1,2,10,15;15:4;
  21:10;22:12,14,23;
  23:16;24:2,7;26:15,15;
  27:20;30:19;41:13;
  49:6;50:2;51:18;53:23,
  24;64:24;66:16;69:4;
  70:20;73:8;77:18;
  78:20;80:15;84:20;
  85:15,22;86:23;87:4;
  90:3,4;91:1;96:14;
  98:13;99:1,8
ones (9)
  5:20;22:2;26:16,17;
  48:21;50:7;51:3,4;85:5
ongoing (1)
  97:9
only (15)
  18:9;19:3,15,23;
  35:13;49:1,6;51:5;
  56:20;57:2,13,14;69:4;
  85:6;99:8
onto (1)
  71:24
open (6)
  88:14;90:2,20;92:11;
  95:8;96:2
opening (1)
  19:13
opinion (8)
  11:15;18:20;29:3;
  33:6;45:22;52:14;75:2;
  76:16
order (1)
  5:20
out (37)
  9:20;12:1;13:8;14:8;
  18:10;27:1;33:10;
  37:11;41:16;44:10;
  45:20;46:3,4;50:2;
  54:14;58:24;61:14,24;
  62:19;63:21;66:22;
  68:6,7;70:5,15;71:19,
  23;72:10,16;73:4;75:1;
  84:14;89:16;93:15;
  94:18;97:15;99:23
outside (4)
  12:18;54:8;57:2;
  95:20
over (28)
  20:1,9;22:11;23:14;
  25:12;29:23;30:1,2;
  31:20;36:24;41:19;
  43:20;49:20;58:8;75:9,
  12;82:13;84:12;85:6,
  13,14;86:1,12;87:7,8;
  88:13;89:7;98:19
own (1)
  31:18

owner (4)
  34:5;39:7;54:4,22

## P

page (17)
  5:23,23;6:4,11,17;
  19:15,18,23;32:19,23;
  34:24;35:23;36:8,9,10;
  38:10;43:20
pages (2)
  19:11,11
paper (1)
  8:4
paperwork (2)
  23:12;24:1
part (13)
  6:19;19:9,21;31:3;
  43:16;47:22;50:18;
  75:14;79:23,23;80:23;
  81:10;94:12
part-time (2)
  99:4,9
party (1)
  36:13
passed (1)
  48:23
password (1)
  26:22
past (4)
  9:22,23;57:4;58:21
patrol (6)
  7:21;26:9,11,17,18;
  94:10
pay (1)
  26:7
paying (2)
  93:6;100:1
pending (1)
  36:5
people (17)
  12:1;13:21;15:1;
  23:16;24:1,7;27:19;
  50:18,24;51:2;85:17;
  92:17,17,19;93:15,19;
  99:12
people's (1)
  50:10
perhaps (1)
  20:23
period (8)
  61:20,21,23;63:3,12;
  75:24;91:4;98:7
peripheral (1)
  71:10
person (23)
  13:13,18;14:20;
  15:24,24;16:22;17:9,
  10,12,18,18;23:17;
  29:9;32:7;33:8;36:8;
  41:9;55:8,14;56:4;
  58:12;60:16;83:14
person's (1)

23:16
pertinent (1)
  19:24
physical (1)
  48:3
physically (4)
  46:2;68:14;74:24;
  89:11
pick (1)
  24:16
piece (1)
  8:4
pink (17)
  13:13,14,14,18,21,
  24;14:1,12,20;15:8,12,
  23,24;16:8,10;17:18;
  18:4
place (2)
  45:13,16
plus (1)
  12:3
pm (1)
  100:10
point (19)
  10:22;16:9;44:21;
  46:6,12;66:23;69:15;
  73:8,15;75:10;81:13,
  17;82:7;83:24;85:4;
  86:7;88:18;90:7;93:3
points (1)
  61:23
police (8)
  13:23;14:2;16:14;
  23:24;33:24;58:19;
  59:23;60:21
popped (1)
  58:3;59:6;60:2
Porter (1)
  60:19
portion (1)
  63:1
position (11)
  61:14,15,21,24;75:1,
  4,7;78:19;82:5;83:19;
  90:19
positive (2)
  62:6;95:12
possessed (2)
  52:9,24
possible (2)
  46:24;48:13
potential (3)
  21:20;35:13;43:8
potentially (1)
  36:1
practice (1)
  24:18
precinct (1)
  23:20
preparing (1)
  94:13
present (2)
  18:15;84:2

pretty (6)
  5:6;23:24;24:18;
  42:7;61:11;95:6
prevent (1)
  77:20
prevented (1)
  75:12
previous (1)
  57:15
previously (2)
  56:19;63:19
probably (9)
  11:16;12:13;15:18,
  20;21:14;73:3;87:9,18;
  98:23
probe (1)
  69:5
probes (1)
  70:20
procedure (1)
  7:8
process (8)
  13:17,21;24:2,5;
  29:1;49:16;81:19;
  96:23
professional (1)
  37:19
profile (1)
  56:23
prone (9)
  61:15,21,24;75:1,4,
  7;82:7;84:14;88:11
property (16)
  17:21;18:2;36:9,21;
  37:1;38:6;39:13,17,20;
  40:2,5,8,10,24;44:8,17
psych (1)
  14:4
psychiatric (1)
  13:15
public (2)
  14:13;18:23
pull-down (1)
  24:20
pulled (1)
  91:16
pulse (8)
  85:21,23;89:2;90:4;
  91:2,9,10,17
purposes (1)
  23:15
push (2)
  67:19;79:9
pushed (2)
  65:11;66:20
pushing (2)
  67:3;68:20
put (18)
  6:13,13;20:7;22:9,
  10;23:2;24:15;33:4;
  40:20,23;41:1;44:16;
  56:3;62:20;69:22;70:6;
  74:6;78:24

puts (1)
  24:20
putting (1)
  80:22

## Q

quantity (2)
  40:13;43:2

## R

radio (4)
  6:24;9:9;17:1,3
radios (1)
  7:2
raise (5)
  74:8;75:5;79:13;
  81:20;87:19
raised (2)
  71:18;72:9
raising (1)
  72:14
rather (1)
  24:2
reach (1)
  64:2
reached (1)
  92:3
reaction (1)
  72:15
read (11)
  19:14,15;49:13,14,
  20;50:15,21,22;51:15;
  63:2;100:7
realized (5)
  10:2;55:16,19;61:16;
  86:2
really (18)
  8:17;19:9,15,19,23;
  20:1;29:3;49:22;56:20,
  21;59:3;61:5;65:6;
  70:11;79:11;90:2;93:6,
  8
reason (4)
  18:13;40:19;75:20;
  96:11
reasons (1)
  23:10
recall (7)
  25:9,10;51:23;57:22;
  88:12,19;98:12
received (1)
  19:4;32:5;50:8,9
Recess (1)
  46:22
recognize (2)
  55:8;57:11
recollection (7)
  29:17,21;30:4,7;
  60:6;62:8;79:10
record (5)
  5:6;49:1;58:11;

Layne & Associates
(614) 309-1669

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Sprinfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 2
March 17, 2017

100:3,4
recorded (1)
    7:13
records (1)
    18:23
recovered (1)
    39:24
redacted (2)
    19:2;50:7
referenced (1)
    7:11
referring (1)
    19:8
refused (1)
    46:3
regarding (5)
    10:19;25:6;49:3;
    53:13;89:6
regular (1)
    73:11
relationship (1)
    35:2
relative (2)
    47:7;49:2
Relatively (1)
    12:12
remaining (2)
    75:7;89:5
remember (103)
    8:24;11:5,6;19:13,
    14,18;22:8;9;27:19,21;
    29:8,9,16;30:17;31:2;
    40:2;49:15;50:20,23,
    24;51:24;52:1,5,7;
    53:16;55:19;56:12;
    57:13,14;58:1,2,3,20,
    20,23;59:8;60:9,14,18,
    20;61:3,6;66:12,14;
    67:23;68:23;70:1,2,8,
    13,14,15;72:10;73:22;
    74:6,8;75:18,24;80:11,
    19;81:14,14;83:17,20;
    84:13;86:15;88:4,7,13,
    15,21,24;89:12;91:3,5,
    8,11,19;92:14;93:13,
    19,21,21,24;94:2,6,13,
    15,17,18,21,24;95:22,
    24;96:5,5,8,9,15,15,16,
    19;97:22
remembers (1)
    88:3
remove (1)
    12:19
removed (1)
    46:2
removing (1)
    46:12
report (52)
    17:9;18:22,24;19:6;
    20:2,24;21:2,6,11,16,
    17,21;22:7,18,20;23:1,
    2,13;24:9,23;25:5,11;
    26:24;28:4;30:11,20;

31:10,13,19;32:7,13;
33:16,24;34:14;35:24;
36:6;37:21;38:4;39:15;
40:17,19,21;41:4,18;
43:20;44:18;45:6;47:2;
48:16;49:2,4;54:3
Reported (2)
    22:15;37:3
reporting (13)
    20:11;22:13,17;23:4;
    24:20;32:16;33:17;
    34:14;36:8,13,21;37:1;
    49:5
reports (9)
    23:7;37:22;41:17,23;
    42:21;45:3;48:17,22,
    24
request (1)
    18:23
requesting (2)
    6:23;7:6
requests (1)
    14:3
required (2)
    7:18;9:20
resisting (3)
    33:20;45:8;61:18
resource (1)
    98:15
respect (8)
    25:5;32:15,23;34:19,
    23;35:6;43:2,8
respiratory (1)
    90:5
respond (1)
    11:15
responding (2)
    10:23;82:13
responds (1)
    40:13
response (4)
    11:13;14:1,13;82:12
responsibility (1)
    22:19
responsible (1)
    23:1
rest (1)
    95:13
restrained (1)
    82:7
restraining (1)
    77:6
restraint (2)
    84:15;88:11
returned (3)
    20:22;21:4,7
review (7)
    8:23;19:9,12,19,23;
    41:18;59:3
reviewed (3)
    5:8;7:11;20:8
reviewing (1)
    10:2

Revised (2)
    35:7,11
right (103)
    7:3;9:24;10:14,20;
    11:14;12:9,12;16:20;
    20:12,16;22:16;28:3;
    29:19;30:14;35:8,21,
    22;36:12;37:10,13;
    38:14,24;39:9,20;40:5,
    8,14;43:4;44:2,4,22;
    45:1,7,10;51:5,12;52:2,
    10,12;53:3;54:6,20;
    55:3,5;57:5;59:19;
    63:14;64:1;65:1,9;
    66:15,18;67:10;68:16;
    69:22;70:10;71:1,2,4,6,
    20;72:17,19;73:18;
    74:3,12;75:16,21;
    77:20,23;78:12;79:16;
    83:19;84:2;85:3,20,21;
    86:7,11,18;87:3,4,6,12;
    89:3,8,16,19;90:14,21;
    91:5,15;92:6;93:23;
    94:1;96:7,11;97:4,11,
    14,23;98:1;100:2
RMS (1)
    41:24
road (4)
    23:9,18,23;99:11
Robert (1)
    34:7
rock (1)
    86:14
rocking (1)
    73:22
role (1)
    98:15
roll (3)
    81:24;84:11;89:7
rolled (7)
    75:8;82:13;85:13;
    86:1,12;88:4,13
rolling (1)
    85:14
room (6)
    18:10;60:4,7,10;
    94:4;99:10
rub (2)
    85:6;86:10
rubbing (4)
    82:11;84:18;85:2,19
run (3)
    12:8;96:10;99:8
running (1)
    62:21

S

same (26)
    7:5,8;8:3;14:16;17:4,
    7;19:20,21;32:10;
    37:12,20;39:14;41:14;
    42:13;55:21;63:5,5,7;

74:15;75:15;76:18;
77:5;83:19;92:2,2,5
sat (2)
    13:9;66:19
saving (1)
    24:1
saw (13)
    6:14;8:24;47:19;
    50:18;54:3;55:7;57:11;
    71:9;80:5,23;83:12;
    86:3;95:21
saying (14)
    11:21;53:6;54:19;
    77:1;79:20;81:16,18;
    82:24;90:19,23;91:1,8,
    21,23
scared (1)
    95:14
scene (27)
    7:6;27:9,13,16,23;
    28:8,12,14,22;29:1,5,6,
    10,12;30:1,18,24;31:1;
    49:21,22,24;50:3;
    71:23;75:17,18,21;
    93:18
schedule (3)
    99:6,10,16
scheduled (1)
    99:5
Scherer (42)
    6:3;9:15;11:18;
    12:18;20:24;21:4;25:1;
    34:7,8;45:12,23;47:5;
    48:4,11;63:6;64:14;
    65:3;66:11;67:4,21;
    69:7,22;70:19;71:10,
    16;73:21;75:11;77:10;
    78:20;82:4,8,9;88:3;
    91:1,18;92:1,4;93:15;
    95:1,19;97:1;98:2
Scherer's (2)
    47:19;86:23
school (5)
    98:15,16,18,19,19
scrape (1)
    96:8
scrapes (2)
    96:1,14
second (9)
    34:7;51:18;56:16,18;
    58:10;73:4;76:2;84:1,6
seconds (25)
    7:9;11:17;12:15,15,
    15,23,24;13:1,2,3,4,4,5,
    6,7,11;59:8;72:22,23,
    24;73:5;76:5;81:13;
    82:17;91:9
section (8)
    21:16;36:20;37:1,1,
    1,2,6;44:17
secure (1)
    71:19
secured (2)

70:16;73:6
securing (1)
    50:1
seeing (17)
    19:18;22:8;51:23,24;
    53:16;56:13;58:18;
    70:2,8;86:16;92:7;
    94:17;95:22,24;96:5,5,
    8
seem (1)
    78:9
seemed (2)
    52:7;53:5
seems (3)
    25:13;28:18;96:9
select (1)
    21:23
selected (1)
    78:14
selecting (1)
    25:7
selection (1)
    24:15
sense (1)
    40:12
sentences (1)
    75:15
September (24)
    7:3;8:11,20;20:5,16;
    34:18;35:21;42:9;43:9;
    47:1;48:14;49:3,10;
    55:24;56:6,19;57:7,9,
    19;58:18;92:15;95:2;
    96:17,19
Sergeant (26)
    9:19;18:12;20:23,23;
    21:5,19;22:5;24:10,24;
    40:18;62:4;71:22;
    75:17;77:23;78:13,21;
    79:10,15;82:3,4,8;
    84:6;86:24;96:24;
    97:18;98:3
sergeants (2)
    7:17,20
set (3)
    81:22;99:10,13
several (4)
    78:5,7,11,18
shallowed (1)
    89:23
sheet (1)
    31:4
shift (2)
    24:22,24
shifter (1)
    44:22
shirt (4)
    65:11;66:20;67:20;
    68:1
shoes (3)
    70:9,12,17
short (2)
    12:11,12

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 2
March 17, 2017

**shorter (1)**
66:14
**shortly (1)**
18:16
**shot (2)**
65:14;69:18
**shots (1)**
48:1
**shoulder (10)**
77:24;78:21,24;
79:16;80:24;81:3;82:3;
87:5,7,12
**show (1)**
74:4
**showed (1)**
7:12
**shut (2)**
71:20;73:18
**side (30)**
36:24;38:5;56:20;
57:2,3;64:17;65:1;
66:15,18,19,21;67:6,
17;68:4;71:24;74:11,
19,22,24;75:3;77:4;
78:20;81:24;83:19;
86:23,24;87:9,15,17;
90:8
**sign (2)**
51:1;98:3
**signal (2)**
44:23;45:1
**signature (2)**
98:4;100:8
**signed (10)**
27:20,24;28:1;49:11;
50:14;55:4,6;58:7;
59:2;79:21
**signs (3)**
16:15;17:10,11
**simultaneous (1)**
63:6
**sirens (1)**
11:10
**sit (6)**
25:14;49:19;62:8;
80:17;93:24;96:9
**site (1)**
42:1
**sitting (2)**
19:14;90:9
**situation (12)**
11:22;14:6,22;15:6;
18:3,7,9,19;22:1,10;
23:7;80:20
**situations (1)**
17:3
**skin (1)**
65:15
**Skinnier (3)**
56:15,16,19
**slip (8)**
13:24;14:20;15:12,
24,24;16:8,10;17:18

**slipped (1)**
18:4
**slipping (7)**
13:13,14,14,18,21;
14:13;15:8
**slips (1)**
14:1
**Smashing (1)**
17:23
**Smith (8)**
20:19,21;58:21;60:7;
94:3,7,14;98:14
**socks (1)**
70:10
**softer (1)**
52:12
**sole (1)**
10:22
**somebody (22)**
14:3,10;15:8,13;
18:4;23:11;24:4;26:5,
7;29:1;31:16;33:10;
41:7;58:4;61:5;67:5;
70:18;74:9;75:6;91:15,
24;100:1
**someone (12)**
13:17;15:3,8;23:2;
31:12,24;59:1;60:19;
74:23;76:17;84:18;
91:22
**sometime (1)**
21:8
**Sometimes (10)**
8:15,17;9:22,23;
14:19;15:14,15,23;
17:17;99:8
**somewhere (6)**
10:16;11:16;12:16;
42:5;96:10;99:16
**soon (13)**
10:18;15:8;16:17,18;
28:23;45:19;46:4,17;
78:24;79:1,3,8,13
**Sorry (5)**
19:18;24:14;64:13;
69:19;99:2
**sounded (1)**
52:20
**sounds (9)**
8:20;21:10;29:17,20;
52:11,13,17;60:6;61:4
**speak (1)**
57:16
**specific (2)**
89:12;93:22
**specifically (2)**
18:8;91:7
**spoke (2)**
6:21;20:19
**spoken (2)**
60:12,13
**spot (2)**
9:8;37:12

**Springfield (4)**
24:19;25:18;41:21;
98:18
**squirming (2)**
71:22;73:19
**Sr (1)**
53:21
**stand (2)**
27:4;65:8
**standing (9)**
12:18;57:1;66:13,15;
79:11;86:24,24;87:7;
92:18
**stands (1)**
67:21
**start (3)**
79:4;81:19,20
**started (10)**
21:17;41:12,22;79:1,
9,13;82:11;84:18;
86:10;95:7
**starts (1)**
73:19
**state (5)**
12:4;16:5;34:10;
35:2;45:9
**stated (2)**
6:11;69:7
**statement (24)**
6:19;53:10,20;54:2;
58:5,6,7,8,11,12,23,24;
62:23;72:1,7;75:14,20;
77:1;81:1,11;91:21;
93:9;96:23,24
**statements (13)**
27:19;28:17;49:10;
50:6,13,17;51:1,4,6,8;
55:4;92:22,23
**states (11)**
51:19;53:13;54:13;
63:1,13;73:18;75:14,
15;76:4;77:23;89:22
**station (8)**
9:2;20:22,24;30:5,8;
48:10;58:19;59:23
**stay (3)**
28:4;75:3;88:16
**stayed (2)**
29:14;80:22
**steal (3)**
11:22;12:5;48:18
**steering (2)**
13:10;57:4
**step (5)**
17:12;33:19;57:17;
85:24;91:6
**sternum (1)**
85:6
**stigmata (1)**
52:22
**still (32)**
27:11,14;30:17;31:2;
38:5;41:15;46:16;

61:17;63:24;65:1,19;
66:12;67:24;68:4;71:8,
21,23;74:6;76:12,12;
77:3;81:13;84:17,22;
88:20;89:8,13,23;91:2,
2,9,10
**stolen (1)**
39:23;43:10,13
**stood (2)**
65:6;85:4
**stop (3)**
79:2,14;84:22
**stopped (10)**
5:8;82:10,21;83:7,
16,18;91:12,13,15;94:5
**straight (1)**
86:8
**straight-on (1)**
56:24
**strike (1)**
18:2
**struck (2)**
63:3;69:20
**struggle (4)**
76:6,10;78:4,18
**struggled (1)**
77:1
**stuff (9)**
9:11;40:13;41:3;
48:1;59:9;90:5;95:5,8;
96:3
**stun (7)**
69:23;70:7;71:3,13;
73:1,3;76:2
**suffering (2)**
61:16,19
**sufficient (1)**
18:11
**supposed (5)**
7:18,24;8:14;34:20;
37:20
**sure (18)**
20:8;30:13,14,15;
37:12;46:9;48:2;61:20;
67:21;85:7,20;86:6;
89:22;90:2,5;96:15;
97:20;100:3
**suspect (1)**
71:18
**suspected (2)**
16:16,22
**suspicious (1)**
17:11
**SUV (1)**
37:4
**SUV-Blue (1)**
38:21
**sweatshirt (2)**
65:22;89:14
**swimming (1)**
67:5
**swings (1)**
72:18

**sworn (1)**
5:2
**swung (2)**
71:18;72:9
**system (9)**
8:4;25:18;40:19;
41:13,14,20,23;42:2,21

**T**

**talk (6)**
5:14;12:21;45:23;
81:15;94:20;95:5
**talked (7)**
5:11;18:21;59:7,19;
60:21;95:4,19
**talking (28)**
6:22;13:8,10,12;
17:6,7;19:1;28:1;36:7;
37:2;51:5;58:4;62:10;
63:18;73:19;79:24;
84:23;92:23;93:2,4,5,
21;94:18,21;95:14;
96:1;97:15;98:14
**Tase (2)**
65:10;66:20
**Taser (8)**
64:15;65:4,15,16;
66:22,24;67:22,24;
68:24;69:3,4,9,22;
70:2;71:20;72:24;73:3,
18;75:22;76:1,1;83:24;
84:6
**teasing (1)**
99:2
**telling (1)**
98:14
**ten (5)**
8:19;12:15;15:1;
72:23;73:4
**terminal (1)**
26:1
**terms (11)**
19:11;28:7;31:4;
32:6;36:5;44:11,20;
45:8;47:12;48:3;99:4
**tested (1)**
95:15
**testified (1)**
20:22
**Thanks (1)**
100:5
**theft (10)**
33:19,20;35:7,24;
43:8,11,13,19,24;46:8
**Thereupon (1)**
100:10
**thigh (2)**
69:22;71:2
**thinking (3)**
65:13;70:12;95:7
**third (2)**
18:15;34:10

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Sprinfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 2
March 17, 2017

Thirty (1)
  12:24
though (5)
  12:11;16:19;50:14;
  53:6;86:19
thought (7)
  6:12;10:8;18:4;22:2;
  45:23;62:19;79:20
three (11)
  6:8;11:14;26:14;
  33:23;55:3;69:21;70:4;
  82:5;84:1;97:21;98:23
throughout (2)
  21:20;34:13
tied (1)
  47:4
times (7)
  8:13;13:9;9;17:4;
  32:6,10;73:15
TOA (1)
  27:4
TOC (1)
  27:7
today (2)
  49:7;81:8
together (4)
  29:16;56:3;60:4;
  78:14
told (16)
  5:15;6:14;30:14;
  46:15;52:7,20;55:2,20;
  62:10,18;70:7;76:16;
  91:6;94:24;95:20;97:8
Tomblin (3)
  57:7,21;58:18
tomorrow (1)
  15:10
took (8)
  10:2;54:14;58:6,8;
  59:2;68:21;73:3;74:22
top (11)
  9:11;21:20;27:4;
  36:12;37:3;39:17;
  63:10;64:3,4,7;96:12
torso (2)
  69:16;73:24
Total (1)
  38:24
touching (1)
  68:9
towards (1)
  71:8
Township (4)
  24:19;25:18;41:21;
  98:18
transition (2)
  61:14,24
transmitted (1)
  95:11
treatment (1)
  16:7
tried (6)
  13:8;14:24;48:18;

63:13;65:5;81:24
trouble (1)
  60:17
true (9)
  15:17;16:2;17:19,21;
  18:16;62:5,12;78:22;
  82:7
try (7)
  77:11;78:4,18;81:19,
  22;90:10;92:11
trying (38)
  11:22,23,24;12:5,5,
  21;23:22;37:9,11;
  44:10;66:17;68:5;
  70:14;71:8,23;74:10,
  19,22,24;75:3,5;76:12,
  14,15;81:15;82:10,12,
  21;83:1,2,4,6,8,9,16,
  18;91:22,24
turn (11)
  44:23;45:1;71:24;
  74:10,19,22,24;75:3;
  76:18;77:4;92:10
turned (1)
  55:20
turning (3)
  75:12;78:1;79:17
turns (1)
  38:6
two (23)
  18:9,14;23:15;24:1,
  6,6;26:11,14,14;35:19;
  42:5;56:3,3;61:23;
  63:7;78:9;80:24;84:7;
  85:16;86:15;91:1;99:8,
  13
two-thirds (1)
  66:4
Type (3)
  39:17;40:5,7
typed (2)
  24:13;40:18
typically (1)
  26:16
typing (5)
  41:5,8;42:3,11;97:18
typo (2)
  37:18;79:15

U

under (10)
  16:1;38:5;39:9;
  43:15;45:13;63:22,24;
  64:8,10;65:20
underneath (6)
  37:4;38:13;39:5,10;
  63:19;68:6
understood (2)
  53:2,8
uniform (4)
  24:8;26:24;30:11;
  49:4

unique (1)
  26:19
unless (1)
  16:5
unresponsive (4)
  61:22;84:12;88:11;
  96:4
up (78)
  5:17;10:11;11:19,23,
  24;12:5,22;13:5,5,6;
  39:17;55:18;63:22;
  64:6;65:1,6,6,8,11,22;
  66:2,4,5,15,19,20;
  67:20,21;68:15,19;
  71:7,18;72:9,14,14,15,
  18;74:8;75:5;76:6,10,
  17;77:2,7,24;78:4,18;
  79:3,14,17,18;81:20,
  22;82:10,22;83:2,8,10,
  16,18;84:22;85:4,7,10,
  18;87:19;90:6,9,10;
  91:6,16,22;92:3,3,3;
  97:18;98:17;99:9
upset (1)
  95:6
urgency (1)
  11:12
urgent (1)
  11:21
use (3)
  6:24;16:16;26:16
used (8)
  9:9;14:16;41:14,23;
  75:22;76:1,1;83:24
user (1)
  26:21
using (5)
  31:16,17;41:20,22;
  87:5
Usually (1)
  9:7;23:1,7

V

vacation (1)
  99:12
valid (3)
  40:21;41:4,17
validate (1)
  44:19
value (10)
  33:10;37:13,20;38:1,
  2,3;39:1,2;44:6,11
values (2)
  32:24;33:2
vandalized (1)
  38:17
VEH (2)
  36:23;37:3
vehicle (21)
  33:9,11;34:5;36:8,
  19,21;37:1,6;38:1,2,3,
  21;39:1,2,7;43:12;

46:8;51:9;54:6,22,24
vehicles (1)
  33:8
victim (8)
  34:2,7,10,15,19;
  39:5;45:9;47:4
victims (1)
  33:23
victim's (3)
  36:18,22;37:3
victim-suspect (1)
  35:1
video (1)
  74:1
view (1)
  56:20

W

waist (1)
  71:8
wait (2)
  53:24;57:24
waiting (1)
  68:5
waived (1)
  100:8
walk (7)
  11:18,20;12:5,7,14;
  13:6;26:8
walked (1)
  85:10
walking (3)
  11:23;48:11;58:20
ward (1)
  14:4
watch (2)
  49:17,19
watched (1)
  80:21
watching (2)
  90:1,16
way (14)
  6:22;7:5;18:12;
  25:17;29:12;60:2;66:5;
  74:15;80:15;85:18;
  91:24;92:10;93:14,15
wearing (1)
  7:2
Wednesday (1)
  5:7
week (2)
  11:15;99:13
Wendy (6)
  57:6,18,20,21;58:18;
  60:4
weren't (1)
  68:12
what's (11)
  6:4;15:7;17:5;22:17;
  27:7;37:23;47:11;
  48:15;49:16;74:20;
  89:24

wheel (2)
  13:10;57:4
wheelchair (1)
  57:14
wherever (1)
  16:8
White (1)
  51:16
whole (7)
  29:15;79:7;81:19;
  82:2,6;84:2,4
Who's (3)
  41:9;49:24;70:9
whose (1)
  24:16
window (2)
  13:11;57:2
within (5)
  9:4;11:17;12:11;
  25:17;72:22
without (2)
  42:22;63:15
witness (10)
  28:2;46:19;49:9,9;
  50:6,13,14;51:1;55:4;
  58:13
witnesses (2)
  50:17;92:17
wondering (2)
  68:15,18
word (1)
  52:12
wording (1)
  78:14
words (8)
  51:20;52:6,14,17,18;
  53:1,5,8
work (4)
  14:21;18:6;31:12;
  99:13
worked (3)
  9:9;85:17;99:23
working (6)
  9:8;20:24;85:17;
  99:11,14,15
works (3)
  37:10;41:3,14
worry (3)
  59:9;65:15;70:6
worrying (1)
  70:5
worth (1)
  33:9
wounds (2)
  95:22;96:2
wrestling (2)
  95:8;96:6
wrist (1)
  71:20
write (6)
  8:13,18,19;9:7,10;
  49:20
writing (1)

Layne & Associates
(614) 309-1669

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Sprinfield Township, Ohio, et al.

Officer Joseph Holsopple -  Vol. 2
March 17, 2017

6:8:8:12;24:15;
42:12
**written (4)**
6:4;20:14;24:12;
74:20
**wrong (3)**
10:4;36:9;43:1
**wrote (15)**
6:7;20:9,13;30:13;
31:4,17,18,19;49:12;
54:2;55:1;72:2;77:15;
78:11;81:8

**Y**

**year (1)**
42:5
**years (1)**
42:5
**yesterday (2)**
20:19;98:14

**Z**

**zero (5)**
37:15,23;40:14;43:2;
44:5
**zip (1)**
73:10
**zipped (2)**
73:9,13

**1**

**1 (6)**
39:6,9,12,18,21;97:2
**10 (1)**
13:4
**1019 (7)**
11:18;28:19,20;51:2;
94:16,23;98:19
**12 (7)**
5:18,19,24;19:22;
21:3;62:23;94:9
**12:06 (1)**
100:10
**1212 (1)**
94:10
**15 (2)**
12:23;99:9
**1514 (1)**
10:7
**1519 (1)**
10:7
**1521 (2)**
12:22;28:20
**15-2722 (1)**
24:9
**15-2772 (2)**
20:3;49:4
**16 (1)**
99:14
**1621 (5)**

28:15;30:23,24;31:4,
23
**17 (1)**
100:10

**2**

**2 (2)**
32:19;39:22
**2001 (1)**
37:4
**2015 (22)**
7:3;8:11,20;20:6,16;
34:18;35:21;42:9;43:9;
47:1;48:15;49:3,10;
55:24;57:7,9,19;58:19;
92:15;95:2;96:17,19
**2017 (1)**
100:11
**21 (1)**
12:22
**2909.06 (1)**
35:11
**2913.02 (2)**
35:7;43:21

**3**

**3 (9)**
5:23;6:4,11,17;
32:23;35:23;36:8,10;
39:22
**30 (2)**
12:13;99:15

**4**

**4 (2)**
38:13,16
**40 (1)**
12:13
**45 (6)**
13:1,2,3,4,7,11

**5**

**5 (2)**
39:23;43:9
**53 (1)**
14:17

**7**

**7 (1)**
39:23

**8**

**8 (23)**
7:3;8:11,20;20:5,16;
34:18;35:21;42:9;43:9;
47:1;48:14;49:3,10;
55:24;56:6,19;57:7,9,

19;58:18;92:15;95:2;
96:17

**9**

**9 (12)**
19:2,19;20:2;21:5,
14;32:19,24;34:13;
35:23;36:10;49:7;
96:19
**90 (1)**
89:16
**90-degree (1)**
89:19
**911 (1)**
14:14