# In The Matter Of:

*Haydn Zeis, Administrator of the Estate of Jordn Miller v.*
*Springfield Township, Ohio, et al.*

---

*Sergeant Tera Denise Moore*
*March 20, 2017*

---

*Layne & Associates*
*6723 Cooperstone Drive*
*Dublin, Ohio  43017*
*(614) 309-1669*
*WhitneyLayne@att.net*



Layne & Associates
Reporters Without Borders

Original File 03-20-2017 TMoore Final.txt
Min-U-Script® with Word Index

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

---

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF OHIO
 2                  EASTERN DIVISION

 3

 4   Haydn Zeis, Administrator of
     the Estate of Jordn Miller,
 5        Plaintiff,

 6
          vs.
 7                      Case No. 5:16-CV-02331-JRA

 8   Springfield Township, Ohio,
     et al.,
 9        Defendants

10                      - - -

11

12       VIDEO DEPOSITION OF SERGEANT TERA DENISE MOORE
13   the Defendant herein, called by the Plaintiff
     under the applicable Rules of Civil Procedure,
14   taken before me, Whitney Layne, a Notary Public
     for the State of Ohio, at the Springfield Township
15   Police Department, 2465 Canfield Road, Akron, Ohio
     44312 on March 20, 2017 at 1:00 p.m.
16

17

18

19

20

21                LAYNE & ASSOCIATES
22              6723 COOPERSTONE DRIVE
                 DUBLIN, OHIO  43017
23

24
```

**Page 2**

```
 1   APPEARANCES

 2

 3        MICHAEL HILL, ESQUIRE
          EADIE HILL TRIAL LAWYERS
 4        3100 East 45th Street
          Suite 218
 5        Cleveland, Ohio  44127
               on behalf of the Plaintiff
 6

 7        MEL LUTE, ESQUIRE
          BAKER DUBLIKAR BECK WILEY & MATHEWS
 8        400 South Main Street
          North Canton, Ohio  44720
 9             on behalf of the Defendants

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

**Page 3**

```
 1                          March 20, 2017
                            Monday Session
 2                          1:00 p.m.

 3

 4                          - - -

 5                      STIPULATIONS

 6        It is stipulated by and among counsel for the
     respective parties that the deposition of TERA
 7   DENISE MOORE, the Defendant herein, called by the
     Plaintiff under the applicable Rules of Civil
 8   Procedure, may be taken at this time by the notary
     Whitney Layne; that said deposition may be reduced
 9   to writing in stenotypy by the notary, whose notes
     thereafter may be transcribed out of the presence
10   of the witness; and that the proof of the official
     character and qualification of the notary is
11   waived.

12

13

14

15

16

17

18

19

20

21

22

23

24
```

**Page 4**

```
 1                  EXAMINATION INDEX

 2

 3   TERA DENISE MOORE

 4        BY MR. HILL . . . . . . . . . . . .  Page 5

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 5

1      TERA DENISE MOORE,
2      Being first duly sworn, as hereinafter
3 certified, deposes and says as follows:
4           EXAMINATION
5 BY MR. HILL:
6    Q   Could you please state your full name
7 for the record?
8    A   Sergeant Tera Denise Moore.
9    Q   And in going through some documents I
10 saw, was your last name formerly Johnston?
11   A   It was Johnston Baugh.  I had it legally
12 changed.
13   Q   And how do you spell your former name?
14   A   My former name?
15   Q   Yes.
16   A   J-O-H-N-S-T-O-N B-A-U-G-H.
17   Q   I just wanted to make sure going through
18 your personnel file that was you.
19   A   Right, that's me.
20   Q   And you go by Denise?
21   A   Yes.
22   Q   Today for your deposition, do you want
23 me to call you Denise or Sergeant Moore?
24   A   Denise is fine.

Page 6

1    Q   Denise?  Okay, great.
2        Denise, you understand that I'm here to
3 take your deposition today?
4    A   Yep.
5    Q   I know we've been kind of trying to get
6 this scheduled.  You've been hanging out for about
7 a week or so, so I appreciate your patience.
8 Okay?
9    A   Okay.
10   Q   And we've had a chance to kind of, I
11 guess, talk a little bit off the record with your
12 attorneys present.  But just so it's formal, my
13 name is Michael Hill.  And you understand I
14 represent the Estate of Jordn Miller in this
15 lawsuit?
16   A   Yes.
17   Q   And the Springfield Township, as well as
18 yourself, have been named in a lawsuit brought by
19 the estate.  Do you understand that?
20   A   Yes.
21   Q   Have you ever given a deposition before?
22   A   No.
23   Q   Well, today is going to be a
24 question-and-answer session.  I'm going to ask you

Page 7

1 a series of questions.  It's your job to answer
2 truthfully.  That's it, okay?
3    A   Uh-huh.
4    Q   If you don't understand one of my
5 questions today, it's probably my fault, okay?
6        So just speak up, and say, "Michael, I
7 don't understand the question."  I'm happy to
8 rephrase it, all right?
9    A   Yes.
10   Q   If you need a break for any reason, you
11 don't need to tell me why.  Just ask for a break,
12 and we'll accommodate you, okay?
13   A   Okay.
14   Q   And I say that, because it might be a
15 little bit of a lengthy exercise because this is
16 my only time to ask you questions before trial.
17   A   Uh-huh.
18   Q   Please, do me a favor -- really, the
19 court reporter a favor -- and wait until I'm done
20 asking the question before you start to answer.
21 And I'll do the same and wait until you're done
22 answering before I ask you a question, okay?
23   A   Uh-huh.
24   Q   The reason is because you and I will

Page 8

1 understand each other.  The court reporter is
2 going to have some difficulty typing both people
3 at the same time if we talk over each other.  All
4 right?
5    A   I understand.
6    Q   The other thing is, because we are going
7 to try to get a - we have got the video, which
8 helps, but we're also going to try to get a
9 written record today.  So try to answer out loud
10 with yeses or nos.
11       Naturally, you're going to say uh-huh
12 and huh-uh sometimes.  Try to say yes or no, okay?
13   A   Okay.
14   Q   If you say uh-huh or huh-uh, it's not a
15 big deal, but I'm going to look at you and say,
16 "Is that a yes, or is that a no"?  It's not meant
17 to be rude.  It's just so six months down the
18 road, when we look at this, we're not confused by
19 what you were saying, okay?
20   A   I understand.
21   Q   If at any time today, up until the very
22 last question, you know, you want to go back and
23 talk about something we discussed earlier, you're
24 free to do that, okay?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 9

1    A   Okay.
2    Q   So if we're on topic A and now we're on
3  topic R, you can just speak up and say, "Michael,
4  I remembered something we were talking about
5  earlier.  Can we go back and talk about that?"
6  Happy to do so, okay?
7    A   Okay.
8    Q   And you were just sworn in by the court
9  reporter, so you understand you're under oath?
10   A   Yes.
11   Q   Your testimony today is the same as if
12 you're in front of a judge or jury?
13   A   Yes.
14   Q   You understand that I'm going to be
15 relying on the answers you give today to prepare
16 this case for trial?
17   A   Yes.
18   Q   And you understand this is my only
19 opportunity to speak with you before trial?
20   A   Yes.
21   Q   Prior to your deposition, what have you
22 done to prepare for this deposition?
23       And I don't want to know, you know, the
24 contents of any conversations you had with your

Page 10

1  attorneys, okay?
2    A   Okay.  I read my invest notes and the
3  incident report.
4    Q   When you say the invest notes, we've got
5  -- I think maybe it's in front of you in this
6  collection of documents somewhere.  It's marked as
7  Exhibit 12.  I think what you have in front of
8  you, that you're looking through right now, is
9  actually one of the detective's notes.
10   A   Right.
11   Q   All the exhibits are in this pile right
12 here.  And it should be Exhibit 12, I believe?
13   A   They're in order, then?
14   Q   Yeah.
15   A   Okay.
16   Q   You said invest note.  Is that what
17 you're referring to?
18   A   Investigative notes.
19   Q   And you, along with your two colleagues,
20 Officer Holsopple and Officer Scherer, created
21 that document; is that correct?
22   A   Yes.
23   Q   And when is the last time you reviewed
24 that document?

Page 11

1    A   This morning.
2    Q   Do you have a copy of that yourself?
3    A   Yes.
4    Q   Is that -- how long have you had a copy
5  of that document?
6    A   Since last week.
7    Q   Have you made any notes on that
8  document?
9    A   Not that I'm aware of.
10   Q   I mean, have you written anything on it
11 as you're looking at it?
12   A   No.
13   Q   And that is your statement, Exhibit 12;
14 correct?
15   A   Yes.
16   Q   That's your statement of the events that
17 took place on September 8th, 2015, involving Jordn
18 Miller?
19   A   Mine, as well as Officer Scherer and
20 Officer Holsopple, yes.
21   Q   And before signing that document, you
22 agreed to the words included in that document;
23 correct?
24   A   Yes.

Page 12

1    Q   And before you signed it, you agreed
2  that the entire document was accurate; is that
3  fair?
4    A   Yes.
5    Q   And you adopt Exhibit 12 as your
6  statement of the events; is that fair?
7    A   Yes.
8        MR. LUTE: Objection.
9        Go ahead.
10 BY MR. HILL:
11   Q   You also said that you looked at an
12 incident report; is that correct?
13   A   Yes.
14   Q   Let's see if I have this here.  There
15 should be an incident report in front of you.  I
16 believe it's marked as Exhibit 9.
17   A   Okay.
18   Q   Do you have Exhibit 9 in front of you?
19   A   Yes.
20   Q   Is that the incident report you were
21 referring to?
22   A   Yes.
23   Q   And did you create that incident report
24 along with Officer Holsopple?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 13

1    A   Officer Holsopple wrote the incident
2 report.  I approved the incident report.
3    Q   And when you say that you approved the
4 incident report, just very quickly, if you could
5 tell me, what's the process for you receiving an
6 incident report like Exhibit 9 and approving of
7 it.
8    A   They fill out the incident report and
9 give it to me because I'm their sergeant.  I look
10 it over and make sure there's no clerical errors.
11    Q   Is that -- I don't say this like in a
12 snarky way, but in terms of you as the sergeant
13 looking at the incident report and approving it,
14 is that kind of what you're looking for, is it
15 filled out correctly?
16    A   Yes.
17    Q   There's no obvious typos or clerical
18 errors?
19    A   Yes, for the most part.
20    Q   Like the document, where it says
21 "victim," it's properly linked between victim and
22 offense, things like that?
23    A   Yes.
24    Q   Is that because the reporting officer

Page 14

1 oftentimes has more information about the events
2 themselves that are being reported than you do as
3 their supervisor?
4    A   Not necessarily.
5    Q   Okay.  In terms of Exhibit 9, was your
6 role limited to approving the document?
7       MR. LUTE: Objection.
8       You may answer.
9    A   No.
10  BY MR. HILL:
11    Q   Did you type any of the information on
12 Exhibit 9?
13    A   Not that I'm aware of.
14    Q   Were you present with Officer Holsopple
15 when he was creating the document?
16    A   I may have been in the room, but I
17 didn't have any action as far as assisting him
18 write the document, to my knowledge.
19    Q   I mean, with respect to the offenses or
20 charges that are listed, did Officer Holsopple
21 select those?
22       MR. LUTE: Objection.
23       You may answer.
24    A   Repeat the question again?

Page 15

1  BY MR. HILL:
2    Q   Sure.  There's a couple of -- four
3 offenses that are listed on Exhibit 9; correct?
4    A   Right.
5    Q   Did Officer Holsopple select the
6 offenses to be included on that document?
7    A   Well, at the time I would assume --
8 these are the offenses that occurred that day, so
9 yes, I approved the report as it was written.
10    Q   All I'm asking is:  Whose role was what
11 on the incident report?
12    A   I think as police officers, we all know
13 what offenses were committed that day.  It
14 wasn't -- any police officer would agree with the
15 offenses, so --
16    Q   We'll come back to that, then.
17       Other than your attorney, did you
18 discuss your deposition with anyone?
19    A   No.
20    Q   Other than exhibits 9 and 12, did you
21 review anything in preparing for your deposition
22 today?
23    A   Yes.
24    Q   What?

Page 16

1    A   I did review the body camera video from
2 Detective Lombardi.
3    Q   And that would have been body camera
4 video that was recorded on September 9th, 2015?
5    A   I don't know what date that it was, that
6 he recorded that on body camera.
7    Q   When did you review that?
8    A   Last week prior -- when I was supposed
9 to have my original deposition.  And actually, it
10 only started playing because I was trying to find
11 the DVD for the dispatch audio from that day.
12    Q   Had you reviewed that body camera
13 interview at any time before last week?
14    A   No.
15    Q   The body camera interview -- and I just
16 had the opportunity to speak with Detective
17 Lombardi, and he testified that that interview on
18 the body -- all of the body camera interviews were
19 done on September 9th, 2015, okay?
20    A   Okay.
21    Q   So with respect to the body camera
22 interview on September 9th, 2015, that's not
23 something that you would have had available prior
24 to your interaction with Jordn Miller; fair?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 17

1     A   I wouldn't have had the body camera
2  interview?
3     Q   Correct.
4     A   No.
5     Q   The information on the body camera
6  interview or what's being stated by those
7  witnesses wasn't one of the factors that you were
8  relying on in using force in this case; correct?
9     A   No.  Yeah.  No, not at all.
10    Q   Anything else that you reviewed in
11 preparing for your deposition?
12    A   Not that I'm aware of.
13    Q   Your colleagues were deposed in this
14 case last week.  Did you speak with them at all
15 about their depositions?
16    A   No.  "How long were you in there,"
17 maybe, because I was trying to figure out when I
18 was going to get in.
19    Q   I understand.  But in terms of substance
20 of the depositions, did you discuss anything with
21 them?
22    A   No substance.
23    Q   Chief Smith the other day stated that he
24 believed you went through some CIT or crisis

Page 18

1  intervention training.  Is that true?
2     A   Yes.
3     Q   When did you undergo CIT training?
4         MR. LUTE: Objection.  I want to make
5  sure we're using the proper -- you might want to
6  ask her what CIT means to her as opposed to that
7  terminology.
8   BY MR. HILL:
9     Q   Did you undergo crisis intervention
10 training?
11    A   Yes.
12    Q   When?
13    A   I have no idea.  You would have to look
14 at my training file.
15    Q   Where did you undergo crisis
16 intervention training?
17    A   I believe it was the Akron Police
18 Department.
19    Q   Do you remember how long that training
20 was?
21    A   No.
22    Q   Did you receive any documents as part of
23 that training?  Not a certificate of going through
24 it, but any kind of materials, PowerPoints,

Page 19

1  printouts, anything?
2     A   I would never remember that.
3     Q   Do you remember how long this training
4  was, this crisis intervention training?
5     A   To my knowledge, it was probably several
6  days.  But again, it's been a long time.
7     Q   So as you sit here, do you know how long
8  it was?
9     A   No.
10    Q   Do you know who the instructor for this
11 crisis intervention training was?
12    A   Not the instructor.
13    Q   Did any of your colleagues here at
14 Springfield Township undergo that training with
15 you?
16    A   I don't remember.
17    Q   Do you remember any of the topics or
18 subjects that were discussed during this crisis
19 intervention training?
20    A   It was in dealing with crisis situations
21 with the mentally ill, topics involving that.
22    Q   Do you remember anything that you were
23 taught about handling or dealing with the mentally
24 ill in a crisis situation?

Page 20

1     A   Yes.
2     Q   What do you remember?
3         MR. LUTE: Objection.
4         Go ahead.
5     A   Basically, it's how you approach the
6  mentally ill, or if you believe it's somebody
7  that's mentally ill, and try and negotiate with
8  them to settle them down, different behaviors that
9  they exhibit, and how to recognize that.
10   BY MR. HILL:
11    Q   The first thing you mentioned was how to
12 approach people in a mental health crisis; is that
13 fair?
14    A   Yes.
15    Q   What were you taught or what did you
16 learn during this crisis intervention training
17 about how to approach a member of the public in a
18 mental health crisis?
19    A   I think it's important to understand,
20 too, it's been such a long time since I went to
21 CIT training.  I also have a bachelor's degree in
22 psychology.  So I don't remember if it was from
23 the CIT training or my psychology degree -- I have
24 an associate's in psychology -- from where I know

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 21

1  information about the mentally ill.  But I have
2  been dealing with the mentally ill for years, and
3  I was a hostage negotiator.
4      So when they portray the signs of
5  psychosis, you try to -- first, you can try to
6  assist them in saving face so that they come out
7  or settle down or give them some kind of reason to
8  settle down.
9      You call the ambulance.  You try to get
10 them evaluated.
11     There's a lot of things that go into
12 being mentally ill and how to try to deal with
13 them.  But everybody is different, every
14 situation.
15   Q   So you said whenever there are signs of
16 psychosis.
17     When you say "signs of psychosis," as an
18 attorney, not somebody with a psychology
19 background, what are you referring to?
20   A   Well, there's any number of mentally ill
21 illnesses you can have, whether it's psychosis or
22 bipolar disorder or depression or a mania or
23 schizophrenia.  There's many.  And I am not a
24 doctor, so I can't diagnose.  You can only do the

Page 22

1  best you can do in a situation.
2    Q   I understand that.  But when you're
3  saying "signs of psychosis," I took that to mean
4  that as a police officer responding to a potential
5  mental health crisis one thing you have got to
6  look for are signs of psychosis; is that fair?
7        MR. LUTE: Objection.
8        Go ahead.
9    A   Signs of being mentally ill, so yes.
10 BY MR. HILL:
11   Q   And "psychosis" may be a medical term.
12 But what you're looking for as a police officer,
13 are there signs that this is in fact a mental
14 health crisis; is that fair?
15   A   Yes.
16   Q   And whether or not the person is
17 actually acutely psychotic or has some other
18 mental illness, is that -- that's not really your
19 role as a police officer?
20   A   Correct.
21   Q   Your role as a police officer is to
22 identify is this in fact or does this appear to be
23 a mental health crisis?
24   A   We do try to see if it's a mental health

Page 23

1  crisis or if the person could be on drugs.  You
2  never know, and you try to do the best that you
3  can.
4    Q   When you said -- you gave me some
5  options for a police officer in dealing with a
6  person who has signs of a mental health crisis.
7  And one of those was -- I think you said save
8  face?
9    A   Uh-huh.
10   Q   Approach them in a way that they can
11 save face?
12   A   Uh-huh.
13   Q   What did you mean by that?
14   A   If they've already exhibited signs of
15 being aggressive with us in front of their
16 family -- and we might have the family leave the
17 house or leave the room so that he can cooperate
18 with us and save face in front of his family
19 because he wanted to be the tough guy, maybe, and
20 had to continue that behavior until they weren't
21 around to not see it.
22   Q   So it sounds like one of the things that
23 you're trying to do as a police officer in this
24 circumstance is understand a little bit of the

Page 24

1  motivation behind the behavior?
2    A   Yes.
3    Q   And that's what you mean by saving face,
4  perhaps this person, if we change their
5  environment, slightly, it's likely they may act
6  differently?
7    A   Among other things, yeah.
8    Q   One of the other things you said is give
9  them a reason to settle down; correct?
10   A   Yes, try to.
11   Q   And when you say as a police officer try
12 to give the person in a mental health crisis a
13 reason to settle down, what do you mean?
14   A   If they're upset because their
15 girlfriend broke up with them, maybe they're
16 depressed or anxious, so we try to talk it out
17 with them; you know, there's other people out
18 there and she's not the one for you.  You know,
19 there's things that we can talk about once you
20 cooperate with us, and we'll help you the best
21 that we can, and what is it that you need from us,
22 those kinds of things, just to try to help get
23 them to cooperate with us.
24   Q   So that's another option that police

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 25

1 officers have when confronting a person with a
2 mental health crisis; fair?
3     A   Yes.
4     Q   You also brought up contacting an
5 ambulance; correct?
6     A   In some circumstances.
7     Q   Tell me what -- in what circumstances,
8 to your understanding, or you've been taught to
9 contact an ambulance when responding to a mental
10 health crisis.
11     A   Well, a mental health crisis, our fire
12 department does not always and usually doesn't
13 transport for us in a mental health evaluation
14 crisis.
15         For the most part, we have to put them
16 in handcuffs and take them to City Hospital just
17 because -- ourselves, because they wouldn't take
18 them unless they were handcuffed behind their
19 back.  Our fire department doesn't like to
20 transport.
21     Q   So is that the policy -- well, tell me.
22 You brought up calling an ambulance.
23         So what were you referring to when you
24 said one of the options is to call an ambulance?

Page 26

1     A   The only time that I have to call an
2 ambulance is if I suspect highly that somebody is
3 under excited delirium.
4     Q   And you said that's the only time you
5 have to?
6     A   Uh-huh.
7     Q   Yes?
8     A   Yes.  Sorry.
9     Q   When you say "the only time you have
10 to," according to whom?  What do you mean the only
11 time you have to?
12     A   According to policy directive of the
13 Springfield Police Department.
14     Q   So according to the policy here at
15 Springfield Township, you as a police officer are
16 not required to contact emergency medical
17 professionals for anything other than excited
18 delirium --
19         MR. LUTE: Objection.
20 BY MR. HILL:
21     Q   -- in a mental health situation?
22         MR. LUTE: Objection.
23         You may answer.
24     A   No.  There's many reasons we have to

Page 27

1 call the ambulance.  If there is -- if they took
2 too many of their antidepressant pills or if they
3 have taken pills that don't belong to them, then
4 of course if they're in a mental health crisis we
5 would call the ambulance for that, because that's
6 medically necessary.
7 BY MR. HILL:
8     Q   Well, I asked about contacting -- you
9 brought up contacting an ambulance in response to
10 a mental health crisis.  Then you said the only
11 time, according to your policy directive, is when
12 it's a situation of excited delirium; correct?
13     A   I said the excited delirium policy
14 requires us to call the ambulance, have them
15 stage, and that is a must.  That, if I'm on my way
16 to a call, I already suspect that.  If I know who
17 the person is, and if they do drugs, then I would
18 have reason to believe that.  A lot of times you
19 don't know that.  Most of the time, you don't.
20     Q   So I just want to understand.  We'll get
21 into excited delirium, but I want to understand.
22         In terms of responding to a mental
23 health crisis, have you ever been taught or told
24 by anyone here at Springfield Township not to call

Page 28

1 an ambulance in circumstances other than when a
2 person has taken too many medications or excited
3 delirium?
4         MR. LUTE: Objection.
5         You may answer if you know.
6     A   It's under the discretion of the
7 supervisor, the way that the call is put out, the
8 details that were given.  There's never a definite
9 answer for that question.
10 BY MR. HILL:
11     Q   So there's nothing here in terms of
12 training at Springfield Township to give you a
13 clear directive as to when to contact EMS for
14 signs and symptoms of mental illness, not other
15 than excited delirium?  Do you understand the
16 question?
17         MR. LUTE: Objection.
18         You may answer if you know.
19     A   I believe the excited delirium directive
20 does say mental illness.  But a doctor didn't
21 write that directive.  We can only go by what it
22 says.
23 BY MR. HILL:
24     Q   I'm asking how you've been trained.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 29

1     A   There's a directive --
2         MR. LUTE: Wait, wait. Wait for the
3   question.
4         Go ahead.
5   BY MR. HILL:
6     Q   I'm asking how you've been trained.
7   Other than the excited delirium directive --
8     A   Other than the excited delirium
9   directive.
10    Q   -- have you received any training as to
11  when to contact emergency medical professionals or
12  EMS for a mental health crisis?
13        MR. LUTE: Objection.
14        Go ahead.
15    A   Over the years, we've had meetings with
16  the fire department and discussed things. I
17  couldn't give you the dates or times of those.
18  But it would be in situations where you would want
19  the squad there, like I said before, with
20  medications and such, and the injuries.
21    BY MR. HILL:
22    Q   The medications, though, that's not
23  specific to mental illness in any way; is it?
24    A   Not necessarily.

Page 30

1     Q   Any person who has taken too many of
2   their medication may need EMS; correct?
3     A   Yes.
4     Q   In terms of other injuries a person
5   might have, bleeding or something else, you
6   contact EMS regardless of whether they were
7   mentally ill; correct?
8     A   Yes.
9     Q   But in terms of contacting EMS for a
10  mental health crisis, have you received any
11  training outside of the excited delirium
12  directive?
13        MR. LUTE: Objection.
14        Go ahead.
15    A   We may have brought it up with the fire
16  department.
17    BY MR. HILL:
18    Q   So when you --
19    A   As far as a policy, I would have to look
20  it over, if you have one.
21    Q   I don't.
22    A   Okay.
23    Q   Are you aware of one?
24    A   Not that I know of.

Page 31

1     Q   Are you aware, as you sit here, of any
2   training that you've received from Springfield
3   Township about responding to a mental health
4   crisis and contacting an ambulance outside of the
5   excited delirium directive?
6     A   Yes. Like I said, the fire department
7   training.
8     Q   When was the fire department training?
9     A   First aid, CPR training we've had.
10    Q   When was the fire department training on
11  mental illness?
12    A   Remember --
13        MR. LUTE: Objection.
14        Go ahead.
15    A   Remember, I just told you, I don't
16  remember the dates and times.
17    BY MR. HILL:
18    Q   Can you give me a year?
19    A   No.
20    Q   Can you give me a decade?
21    A   I've been a cop for almost 23 years, so
22  there's been several times. There's no way to
23  give you an idea. You would have to look that up
24  in the training.

Page 32

1     Q   I have. I haven't been able to find it.
2     A   The fire department might have
3   something.
4     Q   Okay. Where was the training provided?
5   What building?
6     A   This building down at the fire
7   department.
8     Q   And you don't know who gave the
9   training?
10    A   The fire department.
11    Q   But who at the fire department?
12    A   It's been several people over the years.
13    Q   Name them.
14    A   I can't tell you the names of the
15  firemen right now when I see them. They just show
16  up. They don't wear name tags, that I know of.
17    Q   Did they give you any documents?
18    A   Yes, there were documents over the
19  years. I wouldn't have them now.
20    Q   What would you have done with them?
21    A   What would I have done with them?
22    Q   What did you do with them?
23    A   I would have reviewed them, like we're
24  supposed to review them, and it would have been my

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 33

1 knowledge then and I would have disposed of them.
2     Q   So in terms of responding to a mental
3 health crisis and summoning an ambulance, do you
4 remember what your training was?
5     A   At the fire department, you're talking
6 about now?
7     Q   Any training you received here at
8 Springfield Township, whether by the fire
9 department or the police department.
10     A   Well, we have excited delirium training
11 that's every year with the Taser training. We
12 have talked about mental illness excited delirium
13 at the fire department, when the fire department
14 has put on training.
15     Q   I know. I'm asking you. You're talking
16 about the training. I'm asking you what training
17 did they provide about responding to a mental
18 health crisis?
19     MR. LUTE: Objection.
20     Go ahead.
21     A   They provided training about the
22 circumstances and examples of when you would call
23 a squad in a possible mental illness crisis.
24 BY MR. HILL:

Page 34

1     Q   Okay.
2     A   That's my answer.
3     Q   So what were the examples when you
4 would?
5     A   I told you earlier. I can repeat them,
6 if you'd like.
7     Q   I believe you said medication overdose?
8     A   Not necessarily overdose. Medication,
9 too much. Medication that's not theirs. Any
10 injuries they may have.
11     Q   When you say "injuries," are you
12 referring to physical injuries?
13     A   Yeah. You said that, even, if they're
14 bleeding or cut.
15     Q   Anything else? Any other examples?
16     A   There's probably more examples, but
17 right now that's all I have got for you.
18     Q   What would you need to review to
19 identify additional examples that you were
20 provided?
21     A   If you want to give me time, I can
22 probably write down a whole page full.
23     Q   Well, I just want to know how you were
24 trained. Can you remember any other examples as

Page 35

1 you sit here?
2     A   Every call that you go to, I can tell
3 you, is different. If they put out a call that
4 somebody possibly even was -- maybe somebody
5 drugged up somebody, then we would call them.
6 Could it be mental illness? They could both be
7 mentally ill. You never know. It depends on how
8 the call comes out.
9     If the dispatchers give me information
10 and I may think that they have a mental illness or
11 that they were drugged by somebody, I would call
12 an ambulance then.
13     It would have to be a medical emergency,
14 not just a mental illness crisis.
15     As a matter of fact, the fire department
16 doesn't even come onto the scene if we don't have
17 it under control yet.
18     Q   When you said it would have to be a
19 medical emergency, not just a mental health
20 crisis -- that's what you said; correct?
21     A   One of the reasons, yes. I've talked to
22 the fire department about this millions of times,
23 trying to get them to respond to all mental health
24 crises.

Page 36

1     Q   You've tried to?
2     A   Uh-huh.
3     Q   So have you gone to the department here
4 and said, "We need a policy where the fire
5 department needs to respond to all mental health
6 crises"?
7     A   No.
8     MR. LUTE: Objection.
9     You may answer.
10     A   No. Because every situation is
11 different. You could never come up with a policy
12 that would incorporate every situation that you
13 come across. It's judgement and subjective.
14 BY MR. HILL:
15     Q   You just said, "I've gone to them a
16 million times to get them to respond to every
17 mental health crisis."
18     A   Just on the transport to the hospital.
19 That's different. Not just because they're
20 mentally ill. I wanted them to transport, because
21 in my mind it's more medical than police related.
22     Q   Mental health crises are?
23     A   Yes.
24     Q   And a police officer responds to them;

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 37

1 is that what you're saying?
2    A   Yes.
3    Q   So just so I understand it, a police
4 officer's response to a mental health crisis is
5 more medical than investigative police work; fair?
6       MR. LUTE: Objection.
7  BY MR. HILL:
8    Q   From your perspective.
9    A   Mental health crises are diseases of the
10 brain.  That's medical.  Whether or not they need
11 EMS in an emergency, that is not necessarily the
12 case.
13    Q   You said it's -- I just want to
14 understand what the policy is here.  Can you
15 identify any policy as to when a police officer
16 needs to contact EMS for a mental health crisis
17 outside of a physical injury or a medication
18 overdose or someone else's medication?
19       MR. LUTE: Objection.
20       Go ahead.
21    A   Other than the excited delirium, no
22 policy, because it's subjective.
23  BY MR. HILL:
24    Q   Subjective to whom?

Page 38

1    A   To the information we're given and the
2 officer responding, the supervisor working.
3 There's many situations that -- every single call
4 you get is different.  There's no way to have a
5 policy.
6    Q   Are you aware of whether any other
7 policy -- are you aware of whether any other
8 department in the country has a policy?
9    A   I don't know.
10       MR. LUTE: Wait.
11       THE WITNESS: Sorry.
12       MR. LUTE: Are you done with your
13 question?
14       MR. HILL: I am.
15  BY MR. HILL:
16    Q   So when you say that there would be no
17 way to have a policy, what are you referring to?
18       MR. LUTE: Objection.
19       You may answer if you understand his
20 question.
21    A   I'm not a medical doctor.  In my
22 opinion, I don't think you could have a policy for
23 every situation that comes out, because every
24 situation is different.  I'm not aware of what

Page 39

1 other departments in this country have, as far as
2 policy for it.
3  BY MR. HILL:
4    Q   Have you ever looked to see whether or
5 not these types of policies in responding to a
6 mental health crisis exist?
7       MR. LUTE: Objection.
8       Go ahead.
9    A   It's not my job, so no.
10  BY MR. HILL:
11    Q   So when you said that there's no way to
12 have a policy, that's just your -- that's just
13 your opinion as you sit here today?
14    A   Like I said, yes.
15    Q   And that's not based on any kind of
16 research you've done?
17    A   No.
18    Q   And I think we can agree you haven't
19 done any research as to what policies may be
20 available in responding to a mental health crisis
21 for law enforcement; true?
22    A   Yes.  That's not my job.
23    Q   Has anyone here at the department ever
24 come to you to discuss creating a policy

Page 40

1 potentially for how to respond to people in a
2 mental health crisis?
3       MR. LUTE: Objection.
4       Go ahead.
5    A   Not that I recall.
6  BY MR. HILL:
7    Q   Have -- I know you talked about some
8 training provided by the fire department about
9 responding to a mental health crisis; correct?
10    A   To a mental health crisis that they
11 consider is medical, yes.
12    Q   Has anyone from Springfield Township,
13 who is a law enforcement officer, ever provided
14 you with any training about how to respond to a
15 mental health crisis?
16    A   Like I said earlier, the excited
17 delirium training we get, yes.
18    Q   Do you consider excited delirium to be a
19 mental illness?
20       MR. LUTE: Objection.
21       You may answer.
22    A   In combination with drugs and overdose,
23 yes.  But that's even subjective in the medical
24 community.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 41

1  BY MR. HILL:
2    Q   When you say "subjective," what do you
3  mean, "in the medical community"?
4        MR. LUTE: Objection, qualification.
5        You may answer.
6    A   Doctors are different and have different
7  opinions, and so have coroners over the years.
8  BY MR. HILL:
9    Q   So do you -- and I'm not trying to
10  really parse words here.
11       When you say "subjective," do you mean
12  controversial?
13   A   Yes.
14   Q   So whether or not excited delirium as a
15  disease exists is a medical -- or something that's
16  been controversial in the medical field; correct?
17   A   Yes. I don't consider it a disease. I
18  believe it exacerbates a mental illness.
19   Q   Do you believe that excited delirium is
20  a medical condition?
21       MR. LUTE: Objection, qualification.
22       You may answer.
23   A   In combination with the drugs that they
24  take, yes, absolutely.

Page 42

1  BY MR. HILL:
2    Q   My question was, though: Do you believe
3  that the thing you were describing as excited
4  delirium, is that a medical condition?
5        MR. LUTE: Objection, qualification.
6        You may answer.
7    A   Only with drugs involved. Not on its
8  own.
9  BY MR. HILL:
10   Q   So I just want to understand your
11  thinking pattern.
12       Are you saying that a person can have
13  excited delirium without drugs and it's not a
14  medical condition, or are you saying that a person
15  can only have excited delirium if they've used
16  drugs?
17       MR. LUTE: Objection. She's not
18  qualified. It's a medical issue.
19       You can answer.
20  BY MR. HILL:
21   Q   I'm asking you --
22   A   That would have been my answer.
23   Q   So as a police officer responding to a
24  scene, since you're not -- we can agree, as a

Page 43

1  police officer responding to a scene, you're not
2  capable of making any kind of a medical diagnosis?
3    A   No.
4    Q   So in terms of a police officer
5  responding to the scene, and a person exhibits
6  behavior consistent with excited delirium, is it
7  your job to get that person to a medical
8  professional as soon as possible?
9        MR. LUTE: Objection.
10       You may answer.
11   A   Once we get there, if we believe that
12  it's an excited delirium situation with drugs
13  involved, yes.
14  BY MR. HILL:
15   Q   You keep saying "with drugs involved."
16   A   Right.
17   Q   Excited delirium is an emergency;
18  correct?
19   A   Yes.
20       MR. LUTE: Objection.
21       You may answer.
22   A   Yes.
23  BY MR. HILL:
24   Q   So what's safest for the person

Page 44

1  experiencing this -- signs and symptoms of this
2  condition of excited delirium, to get them to an
3  emergency medical professional immediately or to
4  wait until you identify whether or not they've
5  taken any drugs?
6        MR. LUTE: Objection.
7        You may answer. It's a hypothetical,
8  but you may answer.
9    A   I would have to say that many, if not
10  most, mental illnesses display at least one
11  qualification that you would have for excited
12  delirium. You don't know for sure or can't be
13  sure that it's excited delirium until you have
14  additional information on whether or not they're a
15  drug addict, if they've taken drugs, and if that
16  could be an added situation. That would be a
17  medical emergency.
18       A lot of things present as mental
19  illness that also could present as excited
20  delirium, so you would have to take every
21  situation separate.
22  BY MR. HILL:
23   Q   So you have to get, as a police officer
24  responding to a complaint of a mental illness,

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 45

1 where a person exhibits at least one sign of
2 excited delirium, it could be excited delirium, or
3 it could just be a mental health issue?
4     A    Yes, you have to determine what you
5 believe, yeah.
6     Q    And what -- in order to determine or
7 make these determinations as a police officer,
8 you've got to identify the available information;
9 correct?
10     A    Yes.
11     Q    And you've got to utilize the available
12 resources; correct?
13     A    Yes, when necessary.
14     Q    And in a situation where a person may
15 have excited delirium, it is necessary; correct?
16     A    Yes.
17     Q    And in terms of the available
18 information, it could include people who know this
19 person; correct?
20     A    Yes.
21     Q    It could be calling dispatch to get
22 additional information; correct?
23     A    Yes.
24     Q    It could be contacting family members if

Page 46

1 you know where they are; correct?
2     A    Yes.
3     Q    It could be contacting other witnesses
4 who may have information about this person's
5 behavior; true?
6     A    If you have time.
7     Q    It could be making firsthand
8 observations about this individual in front of
9 you; correct?
10     A    Yes.
11     Q    Certain individuals who may be on drugs
12 exhibit signs that are pretty apparent that
13 they're on drugs; correct?
14     A    Sometimes.  But like I said, it's a fine
15 line.  Mental illness presents as excited delirium
16 and vice versa.
17     Q    So as a police officer, do you wait --
18 let's take a step back.
19         If you have a person who exhibits signs
20 of excited delirium, do you, Sergeant Moore, as a
21 police officer, wait to contact EMS or other
22 medical providers until you have information that
23 confirms that this person has used drugs recently?
24     MR. LUTE: Objection.

Page 47

1     You may answer.
2     A    That's kind of contradictive.  But if I
3 get to a call where I believe somebody has excited
4 delirium, of course I'm immediately calling EMS.
5 BY MR. HILL:
6     Q    Even if you don't know if they've taken
7 drugs?
8     A    If I believe it's excited delirium, I
9 believe they've taken drugs.
10     Q    How would -- have there ever been any
11 circumstances where you've arrived on a scene
12 where you believe a person had excited delirium
13 but weren't given information about drug use?
14     MR. LUTE: Objection.
15     You may answer.
16     A    We can suspect that they've taken drugs,
17 but you never really know for sure.  But if you
18 can get the medical emergency there and close and
19 get them settled down enough, then they can be
20 evaluated.  But if I believe something is excited
21 delirium and they possibly have taken drugs
22 because it's no behavior I've ever known before or
23 seen before, then yeah, I would have EMS come
24 right away.

Page 48

1 BY MR. HILL:
2     Q    Like what kind of behavior?
3     A    For one instance -- you know, excited
4 delirium doesn't happen much anymore.  It used to
5 happen a lot more back when methamphetamine was
6 the drug of choice, and it's not now.  It's
7 heroin.
8         Back in the day, we had a guy completely
9 nude on a street, running down the street, tearing
10 stuff apart and talking nonsense and trying to
11 fight us, and we couldn't get EMS even close.  But
12 of course, I had them staged down the street.  And
13 I thought, this is probably a little bit more than
14 psychosis, and it could be drug related.  And he
15 was naked, which means he could be overheating, so
16 we had EMS staged.
17     Q    So are you saying that's an example of a
18 situation where you thought somebody had excited
19 delirium?
20     A    Yes, because it looked drug related to
21 me from my experience.
22     Q    And when did this occur?
23     A    Years ago.  I don't know.  I would have
24 to say maybe between five and ten.  Meth was a lot

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 49

1 bigger back then.
2     Q   So this event you're referring to
3 occurred between five and ten years ago?
4     A   Yes.  Excited delirium doesn't exhibit
5 much anymore.
6     Q   I'm just asking about the dates.
7         And in that situation, just based on the
8 individual's behavior, it was pretty obvious to
9 you that he had been using drugs?
10     A   I suspected that he had been using
11 drugs.
12     Q   And when you suspected he was using
13 drugs, did you contact EMS?
14     A   Yes.
15     Q   And is that because, based on his
16 behavior, that triggered the excited delirium
17 policy that you have here at the station?
18     A   Yes.
19     Q   What happened with that individual?  Did
20 he survive?  Did he die?
21         MR. LUTE: Objection.
22         Go ahead.
23     A   We finally got him cuffed, but I can't
24 remember if we took him down or if the squad took

Page 50

1 him down.  And if the squad did, I'm sure we rode
2 with him, but I can't remember.  It was on
3 Edwards.  I'm sure you could look it up.
4 BY MR. HILL:
5     Q   On Edwards?
6     A   Uh-huh.
7     Q   And that's a street?
8     A   Yes.
9     Q   What other officers were involved other
10 than you?
11     A   I don't remember.  We've been through
12 many shift changes since then.
13     Q   Do you know if there was a death
14 involved with that individual?
15     A   There was not.
16     Q   So I'm assuming he was taken to a
17 hospital?
18     A   Yeah.  Yes, that day he was.
19     Q   Do you know what happened to that
20 individual?
21     A   We still have problems with that
22 individual.
23     Q   So he's alive?
24     A   Yes.

Page 51

1     Q   Any other situations where you have been
2 asked to respond to something that you consider to
3 be excited delirium where you weren't given
4 specific information about the history of drug
5 use?
6     A   Definitely nothing recent.  Nothing
7 sticks out in my memory.
8     Q   And this event that occurred on Edwards,
9 it sounds like you don't remember who actually
10 restrained the individual, whether it was you or
11 the fire department; is that fair?
12     A   Oh, the fire department did not restrain
13 them.
14     Q   Okay.  Because you said the squad, so I
15 wasn't sure.
16     A   Yeah, they staged.  And once we had him
17 under control, then -- I know that they talked to
18 him.  I just don't know who transported him.
19     Q   Do you know where, in terms of this
20 individual being on Edwards, how far away EMS was
21 staged?  Was it like a block over?
22     A   It was off of Krumroy.  Edwards was off
23 of Krumroy.  They were staging at the corner of
24 Krumroy and Edwards.  The male ended up about

Page 52

1 halfway from his house to Krumroy, in the street.
2     Q   So how far -- I'm not familiar with the
3 area, so I apologize.
4         How far was this individual when you
5 were encountering him to the staging area?
6     A   We started at his house, and he charged
7 us out of his yard, was charging us in the street
8 and probably chased us around for 300 yards all
9 together.  It was us trying to take cover and
10 trying to see if we could control him in some way
11 that day.
12     Q   So just in terms of where he was
13 restrained, how far is that from the staging area?
14     A   EMS was pretty far away there, but not
15 -- I'm sure what you're looking for, maybe 200
16 feet.
17     Q   And they're within -- you can see them?
18     A   You can see them.
19     Q   Any other occasions where you've been
20 asked to respond to a scene that you believed was
21 excited delirium?
22         And I'm not -- I know earlier I prefaced
23 the question by saying where no one had told you
24 about drug use.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 53

1 I want to know about kind of all
2 circumstances where you responded to a scene where
3 you thought that this person exhibits what some
4 people call excited delirium.
5 A I think there was another incident on
6 Albrecht, and that wasn't that long ago.
7 Q Is that a street, Albrecht?
8 A Yes. Albrecht Avenue. I'm trying to
9 think if I remember the officers that were there.
10 I don't think that I do.
11 It wasn't until the very end that I
12 suspected the excited delirium, though, when he
13 started trying to take off his clothes and
14 charging us. He was just on the street. We
15 didn't have any additional information.
16 Q You said this was fairly recent?
17 A Yeah, it was pretty recent. Within the
18 last couple years, I think.
19 Q And how were you involved?
20 A I was one of the responding officers. I
21 arrived after at least the initial officer. I
22 think there might have been three of us there at
23 the time.
24 Q Do you know who the other officers were?

Page 54

1 A I don't remember.
2 Q Do you remember this -- well, let's take
3 a step back.
4 The first, we were talking about this
5 situation on Edwards, where this person had signs
6 of excited delirium. You said that he is still
7 somebody that you encounter, okay?
8 A Yes.
9 Q Do you know his name?
10 A Craig Currington.
11 Q Do you know how you spell Craig
12 Currington?
13 A C-R-A-I-G C-U-R-R-I-N-G-T-O-N.
14 Q And this next individual that was just
15 within the past few years, do you know who this
16 individual was?
17 A No.
18 Q You contacted EMS in this more recent
19 case on Albrecht because of excited delirium; is
20 that correct?
21 A I suspected it, but not until the very
22 end.
23 Q Okay.
24 A And then we called EMS.

Page 55

1 Q But my question is: The reason you
2 called EMS, was that because you suspected excited
3 delirium?
4 A It was a possibility, yeah.
5 Q And what happened to this individual?
6 A They always -- any time a situation like
7 that happens, they get transported, one way or the
8 other, to the hospital. And again, I don't
9 remember if it was the squad with an officer
10 inside or us with him handcuffed.
11 Q Did this individual on Albrecht, did he
12 survive?
13 A Yes.
14 Q Do you still see him occasionally?
15 A No.
16 Q And you don't know what treatment he got
17 at the hospital, do you?
18 A No.
19 Q Do you need to take your phone for any
20 reason --
21 A No. I'm sorry. Actually, I had it on
22 silent. I don't know how it even rang.
23 Q Any other occasions where you've
24 responded to a scene and you were dealing with a

Page 56

1 person you thought possibly had excited delirium?
2 MR. LUTE: Objection.
3 Go ahead.
4 A Not that I can recall offhand.
5 BY MR. HILL:
6 Q The individual that you encountered on
7 Albrecht, do you remember the nature of the call
8 originally?
9 A I know it was a man in the middle of the
10 street, walking down the street towards traffic.
11 That's all really I remember.
12 Q Do you know who was making the initial
13 call?
14 A No.
15 Q In terms of drug use, did anybody tell
16 you this individual has been using drugs?
17 A No.
18 Q Just based on his behavior itself, there
19 was enough there that it raised the possibility of
20 excited delirium?
21 A At the end, it did.
22 Q There was an individual that's been
23 mentioned throughout the depositions over the last
24 week or so named Richard Holcomb, who died.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 57

1  A  Yes.
2  Q  Do you know who I'm referring to?
3  A  Yes.
4  Q  You have a lot of devices making a lot
5  of noise.
6  A  It's the same person, voice mail.
7  Q  Were you at all involved in responding
8  to Richard Holcomb?
9  A  No.
10  Q  Were you already a sergeant when Richard
11  Holcomb died?  And I believe that was in 2005?
12  A  Yes.
13  Q  Were you supervising the officers
14  involved in responding to Mr. Holcomb?
15  A  No.
16  Q  My understanding is that Mr. Holcomb was
17  -- a Taser was used against Mr. Holcomb by an
18  officer named Officer Albrecht?
19  A  Yes.
20  Q  But that's a different situation than
21  what happened on Albrecht Road?
22  A  Avenue, yes.
23  Q  Were you involved in any way in the
24  internal investigation into Mr. Holcomb's death?

Page 58

1  A  No.
2  Q  Were you interviewed by anyone?
3  A  Nope.
4  Q  I know you -- you weren't deposed in
5  that case; right?
6  A  No.
7  Q  And I know that Officer Scherer was
8  deposed in that case because he was a trainer at
9  the time.
10  Was Officer Scherer your trainer on
11  excited delirium?
12  A  At one time, he was.
13  Q  And that -- would that have been -- at
14  the time of September 8th, 2015, when this
15  incident took place with Jordn Miller, was Officer
16  Scherer your trainer on excited delirium?
17  A  I don't believe so.
18  Q  Do you know when is the last time he
19  provided any training to you on excited delirium?
20  A  I don't know.  You'll have to ask him.
21  Q  He told me his memory was that he
22  stopped providing training on excited delirium
23  about the time that Chief Smith took control,
24  maybe a year or two later.  I think that would

Page 59

1  have been about 2008 or 2009.  Is that consistent
2  with your memory?
3  MR. LUTE: Objection.
4  Go ahead.
5  A  Yes, probably within a five-year period
6  of that time.  Probably sooner.
7  BY MR. HILL:
8  Q  Five years, give or take?
9  A  Uh-huh.
10  Q  You can't be any more specific?
11  A  I know that it was after John Smith
12  became chief.  I do know that.
13  Q  After Officer Scherer stopped providing
14  training on excited delirium, and up until your
15  involvement with Jordn Miller on September 8th,
16  2015, did you receive training on excited delirium
17  from anyone at the department?
18  A  Yes.
19  Q  Who?
20  A  Well, Brian Troyer teaches Taser and
21  John Lombardi teaches Taser, and they both go over
22  excited delirium in training.
23  Q  Anything else?
24  A  No.

Page 60

1  Q  So your excited delirium training that
2  you're receiving on the policy here at Springfield
3  Township would be included within any Taser
4  training; fair?
5  A  Yes, usually.
6  Q  There's no separate class or course on
7  how to respond to excited delirium that's being
8  offered in Springfield Township?
9  MR. LUTE: Objection.
10  You may answer.
11  A  Currently?
12  BY MR. HILL:
13  Q  As of September 8th, 2015.
14  A  Not that I'm aware of.
15  Q  How about currently?
16  A  No.
17  Q  A police officer must never needlessly
18  endanger a member of the public; true?
19  A  Yes.
20  Q  A police officer should strive to uphold
21  the safety of the public; true?
22  A  Yes.
23  Q  When there's more than one way to handle
24  or restrain a member of the public, a police

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 61

1  officer should always select the way that's safest
2  for the member of the public; true?
3       MR. LUTE: Objection.
4       Go ahead.
5    A   And the officer and the public around
6  that and that person.
7  BY MR. HILL:
8    Q   And this includes the decision about
9  what force an officer is to use?
10   A   Yes.
11   Q   And this includes making decisions about
12 how to restrain a person in a specific position;
13 true?
14   A   Yes.
15   Q   And that's because some positions are
16 more dangerous to members of the public than other
17 positions?
18   A   Yes.
19   Q   This includes planning how to address
20 members of the public who may be in a medical or
21 mental crisis; true?
22      MR. LUTE: Objection.
23      Go ahead.
24   A   It applies to anybody.

Page 62

1  BY MR. HILL:
2    Q   I mean in terms of selecting the safest
3  way to handle a member of the public, that
4  includes making decisions or plans about how to
5  address a person in a mental health crisis; true?
6    A   If they're posing a threat to people
7  around, I believe we have to do what we have to do
8  so that those people don't get injured as well,
9  yes.
10   Q   And in terms of selecting the way that
11 is safest for either the person in a mental health
12 crisis or members of the public around that person
13 in a mental health crisis, officers need to
14 formulate a plan on how to act; true?
15      MR. LUTE: Objection.
16      Go ahead.
17   A   Most of the time, there's not time to
18 formulate a plan if you're in a serious medical
19 emergency or mental emergency or if there's a
20 commission of a felony going on.  You don't have
21 time to formulate a plan.
22 BY MR. HILL:
23   Q   Do you attempt to formulate a plan?
24   A   We work together as officers.  And in my

Page 63

1  case, I'm a pretty seasoned officer, and you know,
2  you know who you're working with and what needs to
3  be done.  But there is usually no time to go, hey,
4  let's do A, B and C, and then do it.  You do what
5  is safest for everybody and to the best of your
6  ability.
7    Q   If there is time to identify let's do A,
8  B and C, officers should make an attempt to do so;
9  correct?
10      MR. LUTE: Objection.
11      Go ahead.
12   A   There have been times for that.
13 BY MR. HILL:
14   Q   And those are occasions where an
15 individual is not demonstrating any overt threat
16 to anybody and there's time for the officers to
17 deliberate and make decisions; true?
18   A   I mean, there's been people with knives
19 holding the knives to their chest, and we could
20 whisper for a second, "hey, okay, on three we're
21 going to go and try to grab the knife from him,"
22 you know.  You can whisper sometimes.  But
23 usually, they hear you and call you out.  So no,
24 not usually.

Page 64

1    Q   You said that you're a hostage
2  negotiator; correct?
3    A   I'm trained in it.  I'm not anymore.
4    Q   When were you trained on how to be a
5  hostage negotiator?
6    A   I believe I was on Metro SWAT from -- I
7  think I started in '98, and I was on for five or
8  six years.  I would have gotten trained sometime
9  within that time at the beginning of my career
10 with the SWAT team.
11   Q   You said Metro SWAT.  Is that Akron?
12   A   It's the SWAT team that involves all of
13 the jurisdictions basically around here.  It's a
14 metro area.  So I believe Brimfield used to be in
15 it, Streetsboro, Springfield, Lakemore, when they
16 were separate.  Tallmadge used to be in it.  I
17 don't know if Aurora is still in it or not.  I'm
18 not involved with Metro SWAT anymore.  But
19 everybody pays their fair share, and then they
20 train together and respond to each jurisdiction.
21   Q   Metro SWAT still exists?
22   A   Yes.
23   Q   And it sounds like the last time you
24 would have been at Metro SWAT would have been

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 65

1  something like 2003, 2004?
2      A   Yeah, '04 or '05, maybe.
3      Q   So during your five to six years --
4  well, let me ask you: Why did you want to be a
5  member of Metro SWAT?
6      A   Well, I was a pretty young officer. I
7  don't know that I was highly confident of myself
8  at that time. And the sergeant at the time, who
9  ended up being captain and then chief, Garry
10  Moneypenny, pretty much talked me into it.
11     Q   What do you mean?
12     A   He said, "I think that you would do a
13  good job, and I'd like you to think about being a
14  hostage negotiator on Metro SWAT." And I agreed
15  to do it, to be perfectly honest.
16     Q   And you underwent some training, I would
17  think, in how to be a hostage negotiator?
18     A   It was hostage negotiator training, yes.
19     Q   Where did you receive that training?
20     A   I don't remember.
21     Q   Do you remember who provided any
22  training on being a hostage negotiator?
23     A   I think there was an advanced class and
24  the regular class, and I think Garry Moneypenny

Page 66

1  trained one of those two. And I couldn't tell
2  you. But I'm sure it's in my personnel file.
3      Q   Do you remember what year you underwent
4  any training to be a hostage negotiator?
5      A   It could be anywhere from '97, '98, '99.
6      Q   Do you remember anything about what that
7  training consisted of?
8      A   Classroom, scenario-based. That was
9  basically it. It was pretty lengthy.
10     Q   Have you ever had to put your hostage
11  negotiating skills into practice?
12     A   Yes.
13     Q   When?
14     A   We've had -- we had many call-outs when
15  I was a negotiator. You would have to get the
16  records. But I was the primary negotiator on a
17  few of those.
18     Q   Can you give me -- were these with
19  Springfield Township or for Metro SWAT?
20     A   Always through Metro SWAT. It depends
21  on where the call-out is. The call-out could have
22  be in Brimfield. It could be have been in
23  Springfield. It could have been in Lakemore. It
24  could have been in Streetsboro.

Page 67

1      Q   Do you remember where any of these
2  call-outs were?
3          And the reason I ask is because if I try
4  to get the records, it could be difficult.
5      A   I get it. I'm trying to figure it out.
6          It seems like there was an incident
7  that -- I don't know if it's considered Copley or
8  Fairlawn. It was in an apartment complex behind
9  the Home Depot in Fairlawn, so I don't know where
10  that would be considered, if it was Copley. I
11  believe it was Copley. It could have been
12  Fairlawn. I don't know. There was one there.
13          There was one in Streetsboro. I don't
14  know that I was a primary negotiator on any in
15  Springfield that I'm aware of. But there's been
16  times where I've negotiated people out of the
17  house where they haven't called Metro SWAT, but
18  you would have to get the records of Metro SWAT.
19     Q   In terms of the incident that happened
20  at either Copley or Fairlawn, what was the nature
21  of the incident where you were a primary
22  negotiator?
23     A   I'm sorry. It's been so long, I can't
24  remember the details. It was a barricade for

Page 68

1  sure.
2      Q   Did it involve weapons?
3      A   I don't know if there were hostages. I
4  think there was one that involved a weapon.
5      Q   It doesn't sound like you're in a
6  position to describe what happened.
7      A   I don't remember them. That was very --
8  20 years ago.
9      Q   So just before we move on, as we sit
10  here, can you remember the details or even the
11  general substance of any occasions where you were
12  acting as a hostage negotiator?
13     A   Other than being called out to a
14  barricade and possible hostage, no, no details.
15     Q   Police officers must use the least
16  amount of force needed under the circumstances;
17  true?
18     A   Yes.
19     Q   Once a person is restrained, police
20  officers are no longer permitted to use force on
21  that individual; true?
22     A   No.
23         MR. LUTE: Objection.
24         Go ahead.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 69

1     THE WITNESS: I'm sorry.
2   BY MR. HILL:
3     Q    Have you been trained here at
4   Springfield Township that once a person is
5   restrained police officers are permitted to use
6   force?
7     A    In my police training and experience,
8   you can use the amount of force necessary to keep
9   them from injuring themselves, the police
10  officers, or the public, whether they're
11  restrained or not.
12    Q    And based on your understanding of the
13  policies here at Springfield Township, are
14  officers allowed to use an electrical conducted
15  weapon on a person who is restrained in handcuffs?
16    MR. LUTE: Objection.
17    Go ahead.
18    A    If anybody is in danger for their
19  physical well-being, you can use whatever use of
20  force necessary to get them under control.
21  BY MR. HILL:
22    Q    When you say danger for their
23  well-being, in terms of danger, what type of
24  danger are you referring to?

Page 70

1     A    If they are trying to kick officers, if
2   they're trying to get away from you, if they're
3   trying to hurt the public, if they're banging
4   their head on the ground and hurting themselves.
5   Those are examples.
6     Q    Can an officer then use a Taser on a
7   restrained person because he's banging his head on
8   the ground?
9     A    If he's hurting himself and we need to
10  immobilize him, yes.
11    Q    And then what would be the purpose of
12  tasering a restrained individual who is -- who has
13  banged his head on the ground?
14    A    I wouldn't want him to get a concussion
15  or knock himself out or kill himself.  And people
16  have the force to do that.
17    Q    So under that circumstance, the Taser of
18  a restrained person, who is handcuffed, would be
19  to help that person?  Is that your understanding?
20    A    And be a way to control him so he
21  wouldn't hurt himself anymore.
22    Q    In your experience here at Springfield
23  Township, on how many occasions have you seen
24  officers use a Taser on a person who is restrained

Page 71

1   in handcuffs?
2     MR. LUTE: Objection.
3     You may answer.
4     A    Multiple times.
5   BY MR. HILL:
6     Q    Can you give me -- when you say
7   "multiple," is it more than five, more than ten,
8   more than 20?
9     MR. LUTE: Objection.
10    You may answer if you know.
11    A    I don't know exactly.  I would say
12  around ten.  Maybe more.
13  BY MR. HILL:
14    Q    Have you, during the course of your
15  employment here at Springfield Township, used an
16  electrical conducted weapon or a Taser on a person
17  who was restrained in handcuffs?
18    MR. LUTE: Objection.
19    Go ahead.
20    A    I don't remember.  I would have to look
21  at the use of force reports.
22  BY MR. HILL:
23    Q    As a supervisor here at Springfield
24  Township, sometimes you sign off on the uses of

Page 72

1   force of other officers?
2     A    No.  The use of force reports go
3   directly to the chief.  They may or may not give
4   them to me to look them over, make sure the
5   typos -- there's no typos or, you know, anything
6   that I can think of more that we need to put in
7   there.  But other than that, they go straight to
8   the chief of police.
9     Q    Here at Springfield Township, do
10  sergeants sign use of force reports?
11    A    They go to the chief.
12    Q    How about with respect -- go ahead.  I'm
13  sorry.
14    A    And the chief may give them to the Taser
15  instructors.  I don't know.
16    Q    Here at Springfield Township, do
17  sergeants, like yourself, sign off as a supervisor
18  on Taser use of force reports?
19    A    Not that I'm aware of.  I mean, they go
20  to the chief of police unless there's something --
21  you know, a new form that they've created this
22  week.
23    Q    I'm not worried about anything this
24  week.  But in your experience here, it's your

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 73

1 understanding that Taser use of force reports go
2 directly to the chief of police?
3    A   All use of force reports do.
4    Q   And in so doing -- well, let me ask you,
5 then: How do they go from the person who used the
6 force to the chief? Are they just put in the
7 chief's box?
8    A   Uh-huh.
9    Q   Yes?
10   A   Yes.
11   Q   He's got a mailbox here?
12   A   Several.
13   Q   And then these mailboxes, one of them,
14 I'm assuming, says "use of force" or something
15 like that?
16   A   No.
17   Q   Then how -- you say they have several.
18 What are the different mailboxes?
19   A   There's one on the outside of his office
20 and one in the mailbox room.
21   Q   So there's two?
22   A   Two.
23   Q   And if a patrol officer or someone who
24 uses a Taser on somebody -- how do they get their

Page 74

1 use of force report to the chief?
2    A   They walk it to the mailbox or hand it
3 to the chief.
4    Q   And what does the chief do with it; do
5 you know?
6    A   You'll have to ask him.
7    Q   Sergeants aren't making decisions about
8 whether or not the use of force was appropriate
9 under the circumstances?
10   A   Nope.
11   Q   Okay.
12   A   No.
13   Q   And that goes for a Taser as well, the
14 use of a Taser?
15   A   Yes.
16   Q   Do you consider yourself -- well, has
17 that always been the case here?
18   A   Yes.
19      MR. LUTE: We've been going for about an
20 hour. Do you want to take a break?
21      THE WITNESS: It's up to you guys. I'm
22 all right.
23      MR. HILL: It's fine with me, if you
24 want to.

Page 75

1      MR. LUTE: Want to take five?
2      MR. HILL: Yeah, sure.
3      MR. LUTE: We'll take five.
4         (Recess taken.)
5 BY MR. HILL:
6    Q   Using more force than is needed is
7 excessive; true?
8      MR. LUTE: Objection.
9      Go ahead.
10   A   Yes.
11 BY MR. HILL:
12   Q   Part of a police officer's job is to
13 help people who are in trouble; true?
14   A   Yes.
15   Q   And that includes people from all
16 different types of society; correct?
17   A   Yes.
18   Q   As a police officer, it's your job to
19 help people in trouble from all different aspects
20 of our community; correct?
21   A   Yes.
22   Q   It's your job to protect people
23 regardless of race; correct?
24   A   Yes.

Page 76

1    Q   Regardless of age?
2    A   Yes.
3    Q   Regardless of socioeconomic status?
4    A   Yes.
5    Q   Regardless of whether they have prior
6 criminal convictions or not?
7    A   Yes.
8    Q   As part of your job, you undertook or
9 gave an oath to protect people's constitutional
10 rights; correct?
11   A   Yes.
12   Q   And it's your sworn obligation to
13 protect the constitutional rights of members of
14 our community; correct?
15   A   Yes.
16   Q   And that includes people in Springfield
17 Township?
18   A   Yes.
19   Q   That includes people traveling through
20 Springfield Township?
21   A   Yes.
22   Q   And as part of your role in Metro SWAT,
23 that included people from all over the Akron
24 community; correct?

Layne & Associates
(614) 309-1669

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 77

1    A    Yeah.  More than the Akron community,
2 Summit, Portage County.
3    Q    And the community should be able to
4 trust law enforcement to uphold their
5 constitutional rights; true?
6    A    Yes.
7    Q    And the members of our community should
8 expect or should trust law enforcement officers
9 not to violate their constitutional rights; true?
10    A    Yes.
11    Q    And why is that kind of community trust
12 important?
13    A    You would have chaos if the community
14 did not trust law enforcement and just went off
15 and did whatever they wanted to do.  You have to
16 have some kind of organized policing.  And they
17 have to trust you, or it would be chaos.
18    Q    Any other reasons?
19    A    You have to have law.  There has to be
20 structure.  Everybody needs structure and rules in
21 society and parenting and all aspects of life.
22 People would rather have rules than no rules at
23 all.
24    Q    And in terms of rules, are you saying

Page 78

1 that -- rules that police officers should follow?
2    A    Yes, and rules for children and every
3 aspect of life.
4    Q    It's your sworn responsibility to
5 protect people's Fourth Amendment right to be free
6 from unreasonable searches and seizures; true?
7    A    Yes.
8    Q    It's your sworn obligation to protect
9 people's constitutional rights to get necessary
10 medical care; correct?
11    A    Yes.
12    Q    It was your sworn obligation to protect
13 Jordn Miller's constitutional rights on September
14 8th, 2015; true?
15    A    As much as possible.
16    Q    That included Jordn Miller's right to be
17 free from any unreasonable searches and seizures;
18 true?
19    A    Yes.
20    Q    That included Jordn Miller's right to be
21 free from any excessive force; true?
22    A    Yes.
23    Q    That included Jordn Miller's right to
24 necessary medical care; correct?

Page 79

1    A    Yes.
2    Q    Have you ever testified as an expert in
3 the use of force or police procedures?
4    A    No.
5    Q    Have you ever been retained as a
6 consultant on the use of force or police
7 procedures?
8    A    No.
9    Q    Do you consider yourself to be an expert
10 in the use of force or police procedures?
11    A    No.
12    Q    Have you ever been asked by any
13 department to provide training or consulting to
14 police officers on the use of force?
15    A    No.
16    Q    Have you ever been retained or asked to
17 train officers from any police department on
18 police procedures or tactics?
19    A    No.
20    Q    Do you consider yourself, as part of
21 your job here as a supervisor, to be familiar or
22 well versed in the policies, practices and customs
23 of Springfield Township Police Department?
24    A    Yes.

Page 80

1    Q    Force means any violence, compulsion or
2 constraints physically exerted by any means upon
3 or against a person or thing; true?
4    A    I would say.  I don't know what the
5 Webster's dictionary says, but that sounds about
6 right.
7    Q    That's the definition in Springfield
8 Township's use of force policy, okay?
9    A    Okay.
10    Q    You don't disagree with that definition?
11    A    No.
12    Q    Force, then, would include a police
13 officer's decision to physically grab and move a
14 person from one location to another; true?
15    A    That would be force.
16    Q    Force includes a police officer's
17 decision to physically restrain a person; true?
18    A    Yes.
19    Q    That includes a police officer's
20 decision to restrain a person and prevent them
21 from moving from one area to another; correct?
22    A    Yes.
23    Q    That includes restraining a person and
24 holding them in a specific position; true?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 81

1    A   Yes.
2    Q   That includes an officer's decision to
3  restrain a person and prevent them from rolling
4  over or turning; true?
5    A   Yes.
6    Q   Force would include holding a person on
7  the ground; true?
8    A   Yes.
9    Q   Force would include kicking a person;
10 true?
11   A   Yes.
12   Q   Force would include striking a person
13 with your forearm; true?
14   A   Yes.
15   Q   Force would include using an electrical
16 conducted weapon; true?
17   A   Yes.
18   Q   When deciding whether to use force on a
19 member of the public, police officers should
20 consider the mental capacity of the subject at the
21 time; true?
22       MR. LUTE: Objection.
23       You may answer.
24   A   Everything is -- every situation, like I

Page 82

1  said before, is different.
2       If it's an electrical device that's
3  what's necessary to control them, then we have to
4  use it, whether they have a medical problem or a
5  mental problem or whatever the case may be.
6  BY MR. HILL:
7    Q   You said every situation is different.
8    A   For the most part.
9    Q   And one of the things that can be
10 different from one situation to another is the
11 person's mental capacity; fair?
12   A   It's possible.
13   Q   But in terms of the decision to use an
14 electrical conducted weapon, it sounds like
15 there's no distinction being made here at
16 Springfield Township in terms of whether to use an
17 electrical conducted weapon on a person with a
18 diminished mental capacity or a person of a normal
19 mental capacity; is that fair?
20       MR. LUTE: Wait a minute.  Your question
21 is:  It seems there's no distinction here between
22 the use of an electrical conducted weapon against
23 a person with diminished mental capacity versus --
24 what was the second part?

Page 83

1       MR. HILL: I'll rephrase it.
2  BY MR. HILL:
3    Q   In terms of your decision-making as to
4  whether to use an electrical conducted weapon on a
5  member of the public, does a person's mental
6  capacity factor in in any way?
7       MR. LUTE: Objection.
8       Go ahead.
9    A   I use whatever force necessary, and we
10 use any force necessary that we can to put them
11 under control.
12      If it's grabbing them by the arm, then
13 that's the force we use.  If it's putting them to
14 the ground, then that's the force we use.  If
15 it's, you know, running after them and tackling
16 them, then that's the use of force.  If nothing is
17 working, we escalate, and eventually it might get
18 to an electrical device.  So every situation is
19 different.
20 BY MR. HILL:
21   Q   And my question, though, is:  Is there a
22 difference in your approach or response in the
23 amount of force you use or whether to use force
24 based on whether that person has a diminished

Page 84

1  mental capacity or not?
2    A   It's not my job to determine whether
3  they do or not.  And even if it's my opinion that
4  they may or may not, I still have to do whatever
5  force is necessary to keep them under control.
6    Q   That's all I'm asking.
7    A   Okay.
8    Q   Is whether or not your decision to use
9  force is not influenced by whether they have a
10 diminished mental capacity or not.  That's my only
11 question.
12   A   Yes.
13   Q   When you say yes, you're agreeing that
14 the person's mental capacity is not a factor in
15 your decision to use force; fair?
16   A   If I have to use the force, then yes, I
17 will use it, if it's necessary.
18   Q   And I just want to make sure I'm getting
19 an answer to my question.
20   A   I mean, you know, you're going a couple
21 different ways.  I mean, if you want to rephrase,
22 you can.  I'm not sure exactly what you're looking
23 for, I guess.
24   Q   As a police officer here at Springfield

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 85

1  Township, do you use the same amount of force
2  regardless of whether the person is suffering from
3  a diminished mental capacity?
4  　　A　If I have to use the force, then I'll
5  use the force, yes.
6  　　Q　Does your decision to escalate force, is
7  that the same regardless of whether the person has
8  a diminished mental capacity and/or a normal
9  mental capacity?
10  　　　MR. LUTE: Objection.
11  　　　Go ahead.
12  　　A　If it's necessary, yes.  It doesn't
13  matter what they have.
14  BY MR. HILL:
15  　　Q　In terms of your decision to use force,
16  you would use the same amount of force under the
17  same circumstances regardless of whether the
18  person has a diminished mental capacity; true?
19  　　A　If I believe that they do, yes.
20  　　　Oh, my goodness.  Sorry.
21  　　Q　Do you need to get that?
22  　　A　No.
23  　　Q　Some individuals with diminished mental
24  capacity may not be able to follow a police

Page 86

1  officer's commands; true?
2  　　A　Yes.
3  　　Q　Some individuals with a diminished
4  mental capacity may act in ways inconsistent with
5  police officers's commands; true?
6  　　A　That and injured people and -- a lot of
7  people have a problem with our commands.
8  　　Q　And for a drunk person, that actually
9  may be they're so intoxicated they actually have,
10  temporarily, diminished mental capacity; true?
11  　　A　At the time, you could say.
12  　　Q　Some individuals with diminished mental
13  capacities may not understand that they're
14  interacting with the police; true?
15  　　A　It's not for me to say.  I suppose it's
16  possible.
17  　　Q　Is it anything you've ever considered as
18  a police officer?
19  　　A　I think everybody considers that
20  possibility.
21  　　Q　Including reasonable police officers?
22  　　A　Yes.
23  　　Q　Some individuals with diminished mental
24  capacity --

Page 87

1  　　A　I am sorry.
2  　　Q　Let me know when you're ready.
3  　　A　I'm going to turn this thing off,
4  because I think it's just the Apple watch that's
5  the problem.  And it won't bug me.  I'm sorry
6  about that.  I've never turned it off before so --
7  I'm good.
8  　　Q　Some individuals with diminished mental
9  capacity may not understand the roles that police
10  officers play in a particular situation; true?
11  　　A　I don't know what they think.
12  　　Q　Is that something that you have to
13  consider when re --
14  　　A　It's possible, yes.
15  　　Q　So it's something that a reasonable
16  officer should consider when responding to members
17  of the public; true?
18  　　A　Yes.
19  　　Q　And for example, there are members of
20  our community who may have diminished mental
21  capacities; true?
22  　　A　Yes.
23  　　Q　And those could include individuals with
24  cognitive deficits or mental retardation?

Page 88

1  　　A　Yes.
2  　　Q　They could include members of our
3  elderly community who may have dementia or
4  Alzheimer's?
5  　　A　Yes.
6  　　Q　It may include very young children, for
7  example?
8  　　A　Yes.
9  　　Q　It may include individuals with certain
10  medical conditions like diabetes or other
11  conditions that can cause mental changes?
12  　　A　Yes.
13  　　Q　It may be individuals who have problems
14  with medication; correct?
15  　　A　Yes, but they're not mental illnesses.
16  They're situational.  Somebody with diabetes
17  doesn't have a mental illness.
18  　　Q　Sure.  But temporarily, they may have a
19  diminished mental capacity --
20  　　A　Cognitive difficulties.
21  　　Q　-- because of high or low sugar?
22  　　A　Well, that's what causes, yeah, for them
23  to act out, would be aggressive, sometimes.
24  　　Q　And that's -- so that's a great example.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 89

1    So some people who have issues with
2  their glucose levels, because of diabetes, may be
3  delirious or aggressive under the circumstances
4  from no fault of their own; true?
5    A   Correct.  And they're not mentally ill,
6  yeah.  They have diabetes.
7    Q   Sure.  And at that moment, when they're
8  acting or behaving in that way, they may not
9  understand that they are acting in that way;
10  correct?
11    A   Yes.
12    Q   And in that situation, where officers
13  find themselves, they have to take into
14  consideration that this person's behavior may be
15  the result of a medical condition; true?
16    A   Yes.
17    Q   Because using force against that person
18  may not get them to change their behavior, because
19  they don't understand why they're doing it; true?
20      MR. LUTE: Objection.
21      You may answer if you know.
22    A   You have to use force no matter what
23  cognitive or mental status they're in, if you have
24  to get them medical attention.

Page 90

1  BY MR. HILL:
2    Q   So in terms of responding to an
3  individual who has -- who is in the throes of a
4  medical crisis because of diabetes, glucose
5  irregularities, would you alter your response in
6  any way?
7    A   No, if I need to control them.  It
8  happens a lot.
9    Q   And that would include using force
10  against that individual?
11    A   Yes.
12    Q   That would include using a Taser against
13  that individual?
14    A   Yes, if necessary.
15    Q   Would that include using strikes of the
16  forearm against that individual?
17    A   It depends.
18    Q   It's one of the options you consider?
19    A   Uh-huh.
20    Q   Yes?
21    A   Yes.
22    Q   There would be no restriction on that
23  just because the person's behavior is caused by
24  their diabetes?

Page 91

1    A   No.
2    Q   That would go really for any use of
3  force; correct?
4    A   Yes.
5    Q   Would that be true of other conditions
6  I've described as well, like Alzheimer's or
7  dementia?
8    A   If you have to get them medical
9  attention, you have to control them, so yes.
10    Q   And for an individual whose behavior is
11  being caused by Alzheimer's or dementia, will you
12  also use a Taser against such a person?
13    A   If you have to.
14    Q   Would you also use a forearm strike
15  against such a person?
16      MR. LUTE: Objection.
17    A   If you have to.
18  BY MR. HILL:
19    Q   Would you also kick such a person?
20      MR. LUTE: Objection.
21      Go ahead.
22    A   If you have to.
23  BY MR. HILL:
24    Q   And those are things that you would do,

Page 92

1  kicking, striking or tasering, in an effort to get
2  that person medical attention potentially?
3    A   To put them under control to get them
4  medical attention, yes, and keep them from hurting
5  people and themselves.
6    Q   And nothing about your response and the
7  use of force would be influenced by that person's
8  actions being caused by Alzheimer's or dementia;
9  true?
10    A   I would take into consideration if I
11  believed that was the case or if a wife told me,
12  "oh, my husband is suffering from dementia."  But
13  it would not make a difference in the way that I
14  have to control them or the use of force I use.
15    Q   And I just want to make sure I'm clear.
16      In terms of training here at Springfield
17  Township, you've never received any training
18  instructing you to change your response or the
19  amount of force you use based on the fact that a
20  person's actions are being caused by a medical
21  condition; is that true?
22    A   Use of force is use of force.  You have
23  to do that regardless of, like you said, whether
24  you're white, black, Asian, economic status,

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 93

1  whatever it is and whatever the situation.  If you
2  have to put them under control, you have to do
3  what you have to do.
4     Q    Should officers attempt to refrain from
5  using force when a person's actions are likely
6  being caused by a diminished mental capacity?
7          MR. LUTE: Objection.
8          Go ahead.
9     A    My answer is still the same.  If they
10  have to use force, they have to whether they want
11  to or not.
12  BY MR. HILL:
13     Q    In terms of interacting with a member of
14  the public who has a diminished mental capacity,
15  is the approach by officers and when to use force
16  the same regardless of their mental capacity?
17          MR. LUTE: Objection.
18          Go ahead.
19     A    Yes, it's the same.  These are all the
20  same questions.
21  BY MR. HILL:
22     Q    Police officers must never punish a
23  person for being in a diminished mental state;
24  true?

Page 94

1     A    True.
2     Q    Police officers must never use force as
3  a punitive measure; true?
4     A    True.
5     Q    When addressing a member of the public
6  with a diminished mental capacity, a police
7  officer must never make that person less safe;
8  true?
9          MR. LUTE: Objection.
10          You may answer if you know.
11     A    You never want to hurt anybody or them
12  to hurt anybody.
13  BY MR. HILL:
14     Q    And when addressing a member of the
15  public with a diminished mental capacity, police
16  officers must take every step possible to avoid
17  making them less safe; true?
18     A    Yes.
19     Q    Law enforcement officers are often
20  called upon to help mentally ill people; true?
21     A    Yes.
22     Q    In lots of different scenarios; true?
23     A    Yes.
24     Q    And some of those scenarios may be

Page 95

1  people in a public setting; true?
2     A    Yes.
3     Q    Or a person running around naked in the
4  street, like an example you gave me earlier; true?
5     A    Yes.
6     Q    It may be a person who is in their home;
7  true?
8     A    Yes.
9     Q    May be a person who is in a car; true?
10     A    Yes.
11     Q    And people who are mentally ill may be
12  experiencing confusion; correct?
13     A    Yes.
14     Q    They may act strangely; correct?
15     A    Yes.
16     Q    They may be agitated; correct?
17     A    Yes.
18     Q    They may not understand the role of
19  police officers; true?
20     A    Yes.
21     Q    They may not be able to follow verbal
22  commands of police officers; true?
23     A    Yes.
24     Q    Do you believe that law enforcement

Page 96

1  officers should do everything in their power to
2  protect the safety of mentally ill people in need
3  of help?
4          MR. LUTE: Objection.
5          You may answer.
6     A    Yes.
7  BY MR. HILL:
8     Q    Because these are members of our
9  community and in need of help, like any others?
10     A    Yes.
11     Q    When engaging members of the public who
12  are suffering a mental health crisis, police
13  officers should attempt to engage in de-escalation
14  tactics; true?
15          MR. LUTE: Objection.
16          Go ahead.
17     A    Yes.
18  BY MR. HILL:
19     Q    And what are some examples of
20  de-escalation tactics that police officers can use
21  when engaging a member of our community in the
22  throes of a mental health crisis?
23          MR. LUTE: Objection.
24          Go ahead.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 97

1    A   Well, if you know it's a mental health
2  crisis -- really, in any crisis where they're
3  agitated or combative or barricading themselves,
4  you are going to use the same tactic, whether
5  they're mentally ill or not.  You need to do what
6  you can to de-escalate them and get them to calm
7  down.  So of course everybody tries to talk to
8  them first and try to negotiate with them and,
9  hey, what can we do to make this better, what can
10  we do for you, you know, if you corporate with us,
11  we'll, you know, try to do what you want us to do
12  or what you need us to do, but we can't leave
13  here, you know, with you like this kind of thing.
14       If that doesn't work and, you know,
15  they're still running around or charging people or
16  damaging things, then we have to do what we have
17  to do to control them as well.
18  BY MR. HILL:
19    Q   When can an officer escalate
20  de-escalation to using force?
21    A   If somebody -- if you try to put your
22  hands on them to cuff them, tell them they're
23  under arrest and they pull away from you, if they
24  run from you, if they try to fight you.

Page 98

1    Q   Putting cuffs on a person, would that be
2  a use of force?
3    A   No.
4    Q   How about if officers go to grab
5  somebody?  That's a use of force?
6    A   If they're trying --
7       MR. LUTE: Objection.
8       Go ahead.
9    A   If they're trying to get away from you
10  and they're evading you.
11  BY MR. HILL:
12    Q   It's not a use of force if the person is
13  being -- is not trying to evade the officers?
14    A   If I go, hey, buddy, you know, like,
15  let's do this, let's do that, you know, I might
16  have my hand on their shoulder or on their arm.
17  It doesn't mean I'm grabbing on.  So I guess it
18  depends on exactly what you're talking about.  If
19  I grab them to arrest them and say you're under
20  arrest, then that's use of force, if they try to
21  break away and then I have to go at them with more
22  strength to get them handcuffed, so yes.
23    Q   When an officer physically grabs
24  somebody and pulls them towards the officer,

Page 99

1  that's a use of force; correct?
2    A   No.  I mean, if you have to arrest
3  somebody, you can -- you have to grab their arm
4  and put their hands behind their back.  That's not
5  use of force.  That's handcuffing somebody.
6    Q   If an officer physically grabs somebody
7  and pulls them to the ground, is that a use of
8  force?
9    A   Yes.
10    Q   Officers should always attempt to
11  de-escalate situations, not escalate them; true?
12    A   Yes.
13    Q   Officers should never be the first
14  aggressor; true?
15    A   Yes.
16    Q   Should an officer's use of force only be
17  in response to a member of the public's
18  threatening behavior?
19    A   Yeah, that would be the point of
20  excessive force.
21    Q   Did you ever go to any training on any
22  de-escalation tactics here at Springfield
23  Township?
24    A   De-escalating training was covered in

Page 100

1  the CIT training.  It was covered in the hostage
2  negotiating training.
3    Q   Have we already discussed all the types
4  of de-escalating tactics you're aware of?
5    A   Yes.  I mean, while I'm sitting here.
6    Q   Well, this is my only opportunity to ask
7  you questions.
8    A   Well, you can ask me if something is a
9  de-escalating tactic, and I'll tell you yes or no,
10  what my opinion is, if you want.  But when I'm put
11  on the spot, I mean, there's only so many things I
12  can come up with.  But if I had examples, sure,
13  I'd be able to tell you yes or no.
14    Q   And I just want to know as you sit here.
15       For example, if you're out in the field,
16  you may have to use de-escalation tactics;
17  correct?
18    A   Yes.
19    Q   And you have to use them on the spot
20  based on what you know at the time; correct?
21    A   Uh-huh.
22    Q   Correct?
23    A   Yes.
24    Q   So in terms of today, all I want to know

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 101

1 is have you told me all the de-escalation tactics
2 that you can think of as you sit here?
3 A As I sit here. But if you want to play
4 out a scenario, I could answer something
5 different. I would be glad to tell you more.
6 Q When deciding whether to use force on
7 members of the public, should police officers
8 consider whether the person may be under the
9 influence of drugs?
10 A Yes.
11 Q Why?
12 A Well, like I said before, if you're
13 under the influence of drugs and you're in a manic
14 state, it could lead to excited delirium, as we
15 talked earlier.
16 Q When you say "a manic state," you're
17 referring to bipolar disorder?
18 A Not necessarily. You could have mania
19 without bipolar disorder.
20 Q Where did you learn that?
21 A Kent State University.
22 Q When you say, then, "mania," just give
23 me your definition of what would be considered
24 mania or manic behavior.

Page 102

1 MR. LUTE: Objection.
2 Go ahead.
3 A There's a lot of different things that
4 are mania. You could be, you know, aggressive,
5 not aggressive, you could be yelling, you could be
6 having the thoughts in your head and acting out in
7 a different way. You could have delusions of
8 grandiose and exhibit those behaviors, think
9 you're invincible. Those are some examples.
10 BY MR. HILL:
11 Q A sign of mania, then, might be yelling?
12 A Yes.
13 Q And it might be yelling for no apparent
14 reason?
15 A Sometimes.
16 Q It might be a sign that a person has
17 hyperactive thoughts or behavior?
18 A Or anxiety, or it could be anything,
19 yeah.
20 Q A person under the effects of mania or a
21 manic episode may be agitated or appear agitated
22 for no apparent reason?
23 A Yes.
24 Q You said one of the signs of mania as a

Page 103

1 police officer, as you understand it, is a person
2 may be experiencing delusions?
3 A That could be a sign of mania or
4 schizophrenia.
5 Q And what about hallucinations?
6 A It's possible. Things present
7 themselves the same way in different mental cases.
8 Q In terms of trying to identify as a
9 police officer whether a person may be in a manic
10 episode or expressing signs of mania, what else
11 would you be looking for other than aggression,
12 agitation, racing thoughts, yelling for no
13 apparent reason, delusions or hallucinations?
14 A I probably don't think that most police
15 officers even label anything as mania.
16 Q I'm asking about you.
17 A Me? Then what's the question again?
18 Q The original question was -- was in
19 responding to a person who may be under the
20 influence of drugs. And your response was they
21 may be in a manic episode, may be experiencing
22 mania, and that's why it's important to determine
23 if they're on drugs in terms of using force; fair?
24 MR. LUTE: Objection.

Page 104

1 Go ahead.
2 A I'm going to use whatever is necessary I
3 need to, to put them under control still, whether
4 they're using drugs or not. I would prefer people
5 not to be on drugs.
6 BY MR. HILL:
7 Q After a person has ingested drugs, you
8 would agree the body may be under extreme
9 physiological stress; true?
10 A Yes.
11 Q Additional stress resulting from force
12 can be dangerous; true?
13 A After being exacerbated by the drugs,
14 yes.
15 Q When you say "exacerbated by the drugs,"
16 how about exacerbated by the force?
17 A It could be any number of things.
18 Q And that's because the force puts
19 additional stress on the body; true?
20 A It would. They could have also ran two
21 miles before we got there.
22 Q Which would put even more stress on the
23 body; correct?
24 A If we knew about it, yes.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 105

1    Q   So another thing that you have to be
2  aware of as a police officer, trying to find out;
3  true?
4    A   A lot of different things, yeah.
5    Q   Had the person been running all over the
6  neighborhood; correct?
7    A   It's possible.
8    Q   Because running around the neighborhood
9  before encountering police could put additional
10 stress on the body; true?
11   A   Yeah, but you might not know.
12   Q   But if you do know, it's something you
13 have got to consider; correct?
14   A   You have to consider everything.
15   Q   And you have to consider it because this
16 person may have more stress already on the body
17 than a normal person; true?
18     MR. LUTE: Objection.
19     Go ahead.
20   A   That's not really my concern.  My
21 concern is their safety, our safety, and the
22 public's safety.
23  BY MR. HILL:
24   Q   So when you said that there may be

Page 106

1  additional stress on the body because they have
2  been running around, what did you mean?
3    A   It may be excessive stress on their
4  body, but I still have to do what's necessary to
5  protect everybody.
6    Q   Individuals under the influence of drugs
7  may not be able to follow verbal commands; true?
8    A   Yes.
9    Q   They may not be able to follow police
10 orders; true?
11   A   Yes.
12   Q   They may not understand the roles of
13 police; true?
14   A   Yes.
15   Q   And in terms of the -- in terms of
16 training, have you received any training about how
17 to respond to members of our community who may be
18 under the influence of drugs other than the
19 excited delirium policy?
20   A   Not that I'm aware of.
21   Q   Other than the excited delirium policy,
22 have you received any training in terms of how to
23 use force on members of the public who may be
24 under the influence of drugs?

Page 107

1    A   You still have to use whatever force
2  necessary, whether they're on drugs or not.
3    Q   So what's the answer to my question?
4    A   Which specific question?
5    Q   So other than the excited delirium
6  directive, have you received any training on what
7  amount of force or how to use force on members of
8  the public who may be under the influence of
9  drugs?
10   A   You mean other than the training that I
11 talked about earlier?
12   Q   (Nods head.)
13   A   Yes?
14   Q   Yes.
15   A   Not that I'm aware of.
16   Q   In deciding what amount of force to use
17 on a member of the public, should officers
18 consider the size of the person?
19   A   Yes.
20   Q   Why?
21   A   You would use more force to arrest
22 somebody that's fighting with you if they were 300
23 pounds.
24   Q   How about with respect to the decision

Page 108

1  to use an electrical conducted weapon or a Taser?
2  Does the size of the person make any difference in
3  your mind?
4    A   No.
5    Q   When considering whether to use force on
6  a person, a reasonable officer should consider
7  whether the person is exhibiting signs of
8  increased physiological stress; true?
9      MR. LUTE: Objection.
10     Go ahead.
11   A   We still have to do what is necessary as
12 far as excessive use of force or use of force at
13 all.
14  BY MR. HILL:
15   Q   So is the answer no, it's not a
16 consideration that should factor into an officer's
17 decision to use force?
18   A   All factors are considered in how much
19 force you use.
20   Q   So how does a person's exhibiting signs
21 or showing signs of increasing physiological
22 stress factor into an officer's decision as to
23 whether to use force?
24   A   There's no way for me to judge how much

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

---

Page 109

1 stress their body is under.
2 Q So you said it's a factor. How is it a
3 factor?
4 A It's a factor that if they're fighting
5 with us, then I'm going to use more force than if
6 they weren't fighting with.
7 Q Is that the only way it's a factor in
8 your mind?
9 A In my mind.
10 Q Conditions that can increase
11 physiological stress on the body include drug use;
12 true?
13 A Yes.
14 Q They include exacerbations of mental
15 illness; true?
16 A Yes.
17 Q They can include medical conditions like
18 excited delirium; true?
19 A Yes.
20 Q They can include other medical crises as
21 well; true?
22 A Yes.
23 Q For example, seizures and heart attacks
24 and things like put stress on the body; true?

---

Page 110

1 A Yes.
2 Q A reasonable officer should attempt to
3 decrease the stress response of such a person, not
4 increase the amount of stress; true?
5 A If possible.
6 Q You would agree that when a police
7 officer uses force, it can increase the stress
8 response in the body; true?
9 A I would assume it does.
10 Q And increasing stress upon a person's
11 body can cause serious injury or death; true?
12 MR. LUTE: Objection.
13 Go ahead if you know.
14 A It's possible.
15 BY MR. HILL:
16 Q You're aware of it as a police officer;
17 correct?
18 A As to what would cause the death? Are
19 you talking about more serious physical injury?
20 Q I mean, you're aware as a police officer
21 that increasing stress on a person's body can
22 cause serious injury or death; true?
23 A If I believe that they have serious
24 stress to their body, if I have information to

---

Page 111

1 that effect, yes.
2 Q And information to that effect would
3 include has the person been running around. We
4 talked about that; correct?
5 MR. LUTE: Objection.
6 Go ahead.
7 A Whether they ran from their front door
8 to the street or 14 miles, if we knew, then that
9 might be a factor. But I'm still going to use
10 whatever force necessary.
11 BY MR. HILL:
12 Q Is the person in a mental health crisis,
13 that's something that can increase stress;
14 correct?
15 A Physiologically, yes, I suppose.
16 Q And also is this person exhibiting signs
17 of drug use; correct?
18 A If I believe so, yes.
19 Q And is this -- you said if you believe
20 so.
21 When you say "believe," you're talking
22 about does this person exhibit signs or do you
23 have information that would make you suspect this
24 person is under the influence of drugs; true?

---

Page 112

1 A Well, of course I would want someone to
2 tell me if they have been under drugs or for it to
3 say methamphetamine across their forehead or
4 something to that effect. But if I have no idea,
5 but I suspect, I'm still going to use the same
6 amount of force as necessary.
7 Q Positional restraint asphyxia occurs
8 when a person's body interferes with breathing;
9 true?
10 A Yes.
11 Q This can be caused by a restriction of
12 the chest's ability to expand; true?
13 A Yes.
14 Q It can be caused by any kind of pressure
15 on the diaphragm; true?
16 A Yes.
17 Q It can be caused when a person's -- the
18 position of a person's head obstructs the airway
19 or breathing; true?
20 A Yes.
21 Q It can be caused when anything is in the
22 mouth and it obstructs the airway; true?
23 A I don't know.
24 MR. LUTE: Objection.

---

Layne & Associates
(614) 309-1669

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 113

1          Go ahead.
2     A   I don't know.
3   BY MR. HILL:
4     Q   Ever been taught that?
5     A   Positional asphyxia is, you know, a
6   breathing issue.  I guess if they were choking on
7   something -- I don't think that's positional, so I
8   don't know exactly where that question is going.
9     Q   Positional restraint asphyxia is a
10  life-threatening medical condition; true?
11    A   It could be.
12    Q   It is; isn't it?
13    A   Well, there's positional asphyxia and
14  some people don't die, so it could be.
15    Q   Asphyxia is the inability to breathe;
16  true?
17    A   Yes, for a second or for five minutes.
18    Q   Any time a person's breathing is
19  restricted, that's life threatening; correct?
20        MR. LUTE: Objection.
21        You can answer if you know.
22    A   It could be.
23  BY MR. HILL:
24    Q   Positional restraint asphyxia can cause

Page 114

1   death; true?
2     A   It can.
3     Q   That's something that's well known by
4   police officers; true?
5     A   Yes.
6     Q   You knew about that before September
7   8th, 2015?
8     A   Of course.
9     Q   Positional restraint asphyxia can cause
10  the heart to beat improperly; true?
11    A   That, I don't know.
12    Q   When restraining an individual, police
13  officers must actively assess the person to make
14  sure they're restrained in a safe manner; true?
15    A   As much as possible.
16    Q   When restraining an individual, officers
17  must be sure to make -- be sure to assess the
18  person to make sure -- strike that.
19        Officers have to be aware of the risk of
20  positional restraint asphyxia any time they
21  restrain a member of the public; true?
22    A   Repeat that question.
23    Q   Sure.  Police officers have to be aware
24  of the risk of positional restraint asphyxia

Page 115

1   whenever they restrain a member of the public;
2   true?
3     A   Yes.
4     Q   There are risk factors for positional
5   restraint asphyxia; true?
6     A   Yep.  Yes.
7     Q   Being in a prone position is a risk
8   factor for positional restraint asphyxia; true?
9     A   It's possible.
10    Q   Anything that causes a struggle while in
11  a prone position increases the risk of positional
12  restraint asphyxia; true?
13    A   It could.
14    Q   And that's because when a person
15  struggles, it causes the muscles to need more
16  oxygen devoted to them?
17    A   Yes.
18    Q   And you knew that as of September 8th,
19  2015; correct?
20    A   Yes.
21    Q   Anything that causes the heart to race
22  can increase the risk of positional restraint
23  asphyxia; true?
24    A   I would assume.

Page 116

1     Q   People who are suffering an acute mental
2   health crisis are at a higher risk for positional
3   restraint asphyxia; true?
4         MR. LUTE: Objection.
5         You may answer if you know.
6     A   That, I don't know.
7   BY MR. HILL:
8     Q   People whose bodies are under increased
9   physiological stress for any reason are at a
10  heightened risk for positional restraint asphyxia;
11  true?
12        MR. LUTE: Objection.
13        Go ahead.
14    A   That, I don't know.
15  BY MR. HILL:
16    Q   You were never taught that here at
17  Springfield Township?
18    A   Just, you know, if they're fighting you,
19  you have to do -- they have to be in whatever
20  position you need them to be in to control them.
21  So I guess maybe I confused what you were looking
22  for.
23    Q   I'm talking about risk factors for
24  positional restraint asphyxia.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

---

Page 117

1        Anything that causes increased
2  physiological stress on the body increases the
3  risk of positional restraint asphyxia; true?
4      A   Yes.
5      Q   People who are suffering from a mental
6  health crisis are at an increased risk for
7  positional restraint asphyxia; true?
8      A   I don't know if there's a
9  differentiation between a mental health person and
10 not, in that position.
11     Q   People who are experiencing a condition
12 sometimes described as excited delirium are at a
13 higher risk for positional restraint asphyxia;
14 true?
15         MR. LUTE: Objection.
16         You may answer if you know.
17     A   Same answer.
18 BY MR. HILL:
19     Q   You don't know that?
20     A   Nope.
21     Q   You've never been taught that here at
22 Springfield Township?
23     A   Not the different.  Every person is
24 treated the same, remember?  I treat everybody the

---

Page 118

1  same, whether they're mental health, not mental
2  health.  We have to -- we have to get them under
3  control no matter what.
4      Q   All I'm asking is you've never been
5  taught here at Springfield Township that people
6  who are experiencing a condition sometimes
7  described as excited delirium are at a high risk
8  of positional restraint asphyxia?
9      A   You just now said excited delirium, so
10 that's different.
11     Q   I said that in the last question as
12 well.
13     A   That's different.
14         Excited delirium, they're already at
15 risk for serious physical injury, if they're
16 already in that state, not necessarily just mental
17 health issues.
18     Q   So they were different questions asked.
19     A   Okay.
20     Q   Earlier I asked you whether people
21 suffering from a mental health crisis or an acute
22 psychotic breakdown are at a higher risk for
23 positional restraint asphyxia, and you told me you
24 didn't know; fair?

---

Page 119

1      A   You just now added excited delirium,
2  though, so I don't know which question you're
3  asking.
4      Q   So listen to my question, okay?
5      A   I'm trying.
6      Q   People who are suffering from an acute
7  psychotic breakdown, or a mental health crisis,
8  are at a high risk for positional restraint
9  asphyxia; do you agree with that or not?
10         MR. LUTE: Objection.
11         You may answer if you know.
12     A   As much as any other person.
13 BY MR. HILL:
14     Q   There's nothing about being in the
15 throes of a mental health crisis that in your mind
16 increases the risk for positional restraint
17 asphyxia?
18         MR. LUTE: Objection.
19         You may answer if you know.
20     A   I'm not a medical expert, so I can't
21 answer that.
22 BY MR. HILL:
23     Q   So it wouldn't influence anything about
24 your decision as to how to restrain a person in

---

Page 120

1  the field?
2          MR. LUTE: Objection.  That's a
3  different question.
4          You may answer if you know.
5      A   I'm still going to do whatever is
6  necessary to put them under control.
7  BY MR. HILL:
8      Q   People who are experiencing a condition
9  sometimes called excited delirium are at a high
10 risk for positional restraint asphyxia; true?
11         MR. LUTE: Objection.
12         You may answer if you know.
13     A   As far as I know, as much as anybody
14 else.
15 BY MR. HILL:
16     Q   Anything that causes the muscles to
17 contract severely increases the risk of positional
18 restraint asphyxia; true?
19         MR. LUTE: Objection.
20         You may answer.
21     A   That's a medical thing and very
22 specific, and I don't know that.
23 BY MR. HILL:
24     Q   Nothing you've been trained about as a

---

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 121

1  police officer here at Springfield Township?
2  　　A   Not in that depth.
3  　　Q   The use of an electrical conducted
4  weapon increases the risk of positional restraint
5  asphyxia; true?
6  　　　　MR. LUTE: Objection.
7  　　　　Go ahead.
8  　　A   In who? Anyone?
9  BY MR. HILL:
10 　　Q   Well, does it?
11 　　A   It cycles for five seconds to immobilize
12 somebody, and then they can breathe just fine.
13 　　Q   So does the application of an electrical
14 conducted weapon increase the risk of positional
15 restraint asphyxia?
16 　　　　MR. LUTE: Objection.
17 　　　　You may answer if you know.
18 　　A   Not if you have control of the
19 situation.
20 BY MR. HILL:
21 　　Q   So does it or not?
22 　　　　MR. LUTE: Objection.
23 　　　　You may answer.
24 　　A   Like I said, not necessarily. It

Page 122

1  depends on if you have control of the situation or
2  not.
3  BY MR. HILL:
4  　　Q   So I'm just asking you. Does --
5  　　　　MR. LUTE: You're asking an absolute
6  question, and she's giving you an answer based on
7  her experience. That's her answer.
8  BY MR. HILL:
9  　　Q   Based on your training here at
10 Springfield Township, does the application of an
11 electrical conducted weapon increase a person's
12 risk of positional restraint asphyxia?
13 　　　　MR. LUTE: Objection.
14 　　　　You may answer.
15 　　A   In what situation?
16 BY MR. HILL:
17 　　Q   A person --
18 　　A   Are they standing? Are they in a car?
19 Are they on a bed?
20 　　　　MR. LUTE: She's telling you there's no
21 absolute answer.
22 　　　　MR. HILL: Well, she can answer, Mel.
23 　　　　MR. LUTE: She's answered the question
24 three times. You've asked it three times. She's

Page 123

1  given you her answer. That's it. Move on.
2  BY MR. HILL:
3  　　Q   So as you sit here, based on your
4  training, you can't say whether or not the
5  application of a Taser or an electrical conducted
6  weapon increases a person's risk of positional
7  asphyxia?
8  　　　　MR. LUTE: Objection.
9  　　A   Oh, my goodness. If you want to give me
10 an example, I'll try to answer your question.
11 　　　　Are they on a bed? Are they on the
12 floor? Are they in a trailer on a couch? Are
13 they reclining in a vehicle back in their seat?
14 Are they sitting at this table?
15 　　　　If you want to give me an example, I'll
16 try to answer your question.
17 BY MR. HILL:
18 　　Q   Earlier you said a police officer should
19 assess the risk of positional restraint asphyxia
20 whenever they restrain a member of the public.
21 　　　　Do you remember agreeing to that?
22 　　A   Repeat it.
23 　　Q   Earlier you stated that a police officer
24 should be aware of the risk of positional

Page 124

1  restraint asphyxia whenever they restrain a member
2  of the public.
3  　　　　Do you remember saying that?
4  　　A   Yes.
5  　　Q   So in terms of risk factors, how does
6  the use of an electrical conducted weapon factor?
7  　　A   It only immobilizes them for five
8  seconds. So are they stuck between a couch and a
9  wall after the five-second cycle, or are they
10 laying on the bed and they can sit right up?
11 　　Q   So would it make a difference if they're
12 being restrained at the time?
13 　　A   Restrained how? Cuffs? Throwing them
14 down on the ground to try to -- because they're
15 fighting us or pushing them up against a wall?
16 　　　　There could be a million different
17 circumstances. And in most circumstances, no, it
18 runs for five seconds and it's -- we can get them
19 under control in most circumstances.
20 　　Q   I'm not saying if there's a direct cause
21 between being tasered and positional restraint
22 asphyxia.
23 　　　　I'm asking you, when restraining a
24 person, is one of the considerations whether a

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 125

1 Taser has been used on them?
2     A   Every situation is considered in whether
3 or not we believe that they can't breathe or not
4 or whether we should use a Taser or not.
5     Q   So why -- in restraining a person, why
6 is a Taser one of the things that you consider in
7 terms of assessing their risk for positional
8 restraint asphyxia?
9         MR. LUTE: Objection.
10     A   I have never had a situation where
11 tasing somebody kept them from breathing. That's
12 all I can tell you.
13 BY MR. HILL:
14     Q   A person --
15     A   I've been tased. I could breathe.
16     Q   Persons who are exposed to repeated
17 applications of electrical conducted weapons are
18 at a higher risk for positional restraint
19 asphyxia; true?
20         MR. LUTE: Objection.
21         You may answer if you know.
22     A   There is different cases. How many
23 times? Two cycles? Ten cycles? 30 cycles?
24 BY MR. HILL:

Page 126

1     Q   At what point does it make a difference
2 in your mind?
3         MR. LUTE: Objection.
4         You may answer if you know.
5     A   If it doesn't work the first time, I
6 usually try a second time. If it doesn't work
7 that time, I have to move on.
8 BY MR. HILL:
9     Q   When you say "it doesn't work," are you
10 saying the Taser malfunctions?
11     A   Not necessarily. It could be any number
12 of things. The probes might not be connected. It
13 may not have an effect on them because they have
14 got this superhuman strength and they're
15 impervious to the pain. One dart could have
16 missed.
17     Q   So my question was: People who are
18 exposed to repeated applications, meaning more
19 than one, from an electrical conducted weapon are
20 at a higher risk for positional restraint
21 asphyxia; true?
22         MR. LUTE: Objection.
23         You may answer.
24     A   In my opinion?

Page 127

1 BY MR. HILL:
2     Q   In your training.
3     A   If they were tased 30 times, 15 times, I
4 would say that that would be a high risk.
5     Q   Anything less than 15 where the number
6 of tasing would make a difference?
7         MR. LUTE: Objection.
8         You may answer. It's hypothetical.  You
9 may answer if you know.
10     A   It is. It's hypothetical.
11         If I had somebody that, you know, had a
12 knife in their hand and they were trying to stab
13 themselves and the only way that I could get them
14 to drop the knife or try to get them to drop the
15 knife or to not charge somebody with a knife, if I
16 had to tase them five times, but not in a row,
17 giving them a couple of seconds of tasing to see
18 if they're going to drop the knife, then I don't
19 think that's excessive.
20         Do I think ten is excessive? Maybe.
21 But it's hypothetical. Depends on the situation.
22 BY MR. HILL:
23     Q   Just so we're clear, I didn't ask you
24 about at what point the number of times a person

Page 128

1 has been tasered is excessive. My question was --
2     A   My opinion.
3     Q   -- are people who have been exposed to
4 repeated applications of a Taser or an electrical
5 conducted weapon at a higher risk for positional
6 restraint asphyxia?
7         MR. LUTE: Objection.
8         You may answer if you know the answer to
9 that question.
10     A   I do not know the answer to that
11 question. I told you 30 times might be excessive.
12 BY MR. HILL:
13     Q   Excited delirium is a life-threatening
14 medical condition; true?
15         MR. LUTE: Objection.
16         Go ahead.
17     A   Yes.
18 BY MR. HILL:
19     Q   People in a state of excited delirium
20 need emergency medical attention as soon as
21 possible; true?
22     A   When we know, yes.
23     Q   Pardon?
24     A   When you know, yes.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

---

Page 129

1    Q    Well, they need the attention
2  regardless?
3    A    If we know they're in it.
4    Q    So people in a state of excited delirium
5  only need medical attention when officers know
6  they are in excited delirium?
7    A    Well, how would we know they're in
8  excited delirium?  That's the question you're
9  asking.  Is it excited delirium?  How do we know
10 for sure?
11   Q    Listen to my question, okay?  I
12 understand you're getting frustrated.  Just listen
13 to my question.
14        The question was:  People in a state of
15 excited delirium need emergency medical attention
16 as soon as possible; true?
17        MR. LUTE: Objection.
18        Go ahead.
19   A    If you say it exactly like that, yes,
20 they should get medical attention.
21 BY MR. HILL:
22   Q    And you understood that as of September
23 8th, 2015; true?
24   A    I know people in a state of excited

---

Page 130

1  delirium need medical attention, yes.
2    Q    People in a state of excited delirium or
3  what people call excited delirium need medical
4  attention as soon as possible because they need
5  medical treatment; true?
6    A    Yes.
7    Q    Police are often the first individuals
8  contacted when a person is having a medical
9  emergency that some people call excited delirium;
10 true?
11   A    Based on we get calls for it, yes.
12   Q    Police officers may be the first person
13 to arrive on a scene for a person who may be
14 demonstrating signs of excited delirium; true?
15   A    Yes.
16   Q    Being in a state of excited delirium is
17 not a crime; true?
18   A    True.
19   Q    And that's because it's a medical
20 condition; true?
21        MR. LUTE: Objection.
22        Go ahead.
23   A    If we know that's the case, yes.  I
24 mean, we could mistake it for disorderly conduct

---

Page 131

1  if we didn't know.
2  BY MR. HILL:
3    Q    And it's important, then, for police
4  officers to use all the available information to
5  identify is this a crime or is this a medical
6  condition; fair?
7        MR. LUTE: Objection, in that the
8  question assumes it is either a crime or a medical
9  condition, excluding the option of it being both.
10       You may answer.
11       MR. HILL: Enough with the speaking
12 objections.
13       MR. LUTE: Do you understand the
14 question?
15       THE WITNESS: Yes.
16       MR. HILL: Can we refrain from the
17 speaking objections moving forward?
18       MR. LUTE: If the questions are clear,
19 yes.
20       MR. HILL: Make your objections.  If
21 they are not, just make your objections.  You
22 understand you're not permitted to make speaking
23 objections, Mel.
24       MR. LUTE: I understand.

---

Page 132

1        MR. HILL: I don't want you making the
2  record.
3  BY MR. HILL:
4    Q    Do you need the question read back?
5    A    No.
6        MR. HILL: Was there an answer?
7        THE REPORTER: No.
8  BY MR. HILL:
9    Q    Then go ahead and answer.
10   A    Repeat it.
11   Q    You said that officers may mistake signs
12 of excited delirium as disorderly conduct; true?
13   A    It's possible, yes.
14   Q    And that's because some of the signs of
15 excited delirium may be behavior that's considered
16 even criminal?
17   A    Yes.
18   Q    People in a state of excited delirium
19 may engage in activity that looks like a crime,
20 true, like disorderly conduct?
21   A    Usually it originates from a crime
22 before we figure out what it is.
23   Q    When you say it usually originates from
24 a crime, what's your basis for saying that?

---

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 133

1    A   I mean, unless the only call we get is
2  they're running down the street naked and they've
3  run a mile down the road or something, then I
4  would think right away, oh, I've got to get a
5  squad there.
6    Q   Because running down the street naked is
7  a big sign of either a severe mental health crisis
8  or excited delirium?
9    A   Yeah, I don't know anybody that does
10  that.
11    Q   I don't either.
12      When a person is in a state of excited
13  delirium, their pulse can race; true?
14    A   Yes.
15    Q   When a person is in a state of excited
16  delirium, the person's body is in the state of
17  extreme physical stress; true?
18    A   Yes.
19    Q   When a person is in a state of excited
20  delirium, it's important that responders,
21  including police officers, do everything they can
22  to reduce the amount of stress on the body; true?
23      MR. LUTE: Objection.
24      You can answer.

Page 134

1    A   Like I said before, I don't know how
2  much stress is on the body.
3  BY MR. HILL:
4    Q   So in such a circumstance, where a
5  person is in a state of excited delirium, should
6  police officers do everything they can to reduce
7  the amount of stress on the body?
8      MR. LUTE: Objection.
9      Go ahead.
10    A   If I believe they're in a state of
11  excited delirium, I'm going to get the medical
12  experts there as soon as possible.
13  BY MR. HILL:
14    Q   Warning signs of excited delirium
15  include psychomotor agitation; true?
16    A   Yes.
17    Q   They include disorientation?
18    A   Yes.
19    Q   They include bizarre behavior?
20    A   Yes.
21    Q   They include speech disturbances, like
22  incoherent speech?
23    A   Yes.
24    Q   Hallucinations can be a warning sign of

Page 135

1  excited delirium?
2    A   Yes.
3    Q   Confusion can be a warning sign of
4  excited delirium?
5    A   Yes.
6    Q   Sometimes the removal of clothing --
7  well, we already talked about that, didn't we?
8    A   Yeah.
9    Q   We don't need to go back over that.
10      You were aware of these warning signs of
11  excited delirium we just discussed as of September
12  2015; true?
13      MR. LUTE: Objection.
14      Go ahead.
15    A   Yes, I've been trained on that for many
16  years.
17  BY MR. HILL:
18    Q   Are there certain populations who are
19  considered to be at high risk for -- or higher
20  risk for serious injuries or even death from
21  electrical conducted weapons?
22    A   Not to my knowledge.
23    Q   Positional restraint asphyxia may
24  exacerbate the condition of an individual who has

Page 136

1  received an electrical conducted weapon
2  application; is that true?
3    A   Yes.
4    Q   And why is that?
5    A   Well, if they fall face first and
6  they're on their belly for an extended period of
7  time, that could be a problem, if, you know,
8  they're not still trying to fight you.
9    Q   People can -- well, take a step back.
10      Is it your understanding that just
11  because a person can still struggle or move
12  they're not at risk for positional restraint
13  asphyxia?
14    A   It's my understanding that I still have
15  to do what is necessary so that they don't hurt
16  themselves or other people or us.
17    Q   No.  My question is:  A person can be
18  able to struggle or squirm around but be at risk
19  for positional restraint asphyxia; true?
20      MR. LUTE: Objection.
21      You may answer.
22    A   I would feel like if they're struggling
23  they can still breathe or they wouldn't be moving.
24  BY MR. HILL:

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 137

1    Q   At some point, they stop breathing;
2  true?
3    A   If they're in positional asphyxia?  Not
4  always.  They might be in that position for a few
5  minutes and then you might realize what's going on
6  and you turn them over and they start breathing
7  again.
8    Q   Once a person stops breathing,
9  positional restraint asphyxia has occurred; true?
10       MR. LUTE: Objection.
11       You may answer if you know.
12    A   Something has occurred that was
13  detrimental to their well-being.
14  BY MR. HILL:
15    Q   But I mean in terms of preventing
16  positional restraint asphyxia, you need to do that
17  before the person stops breathing; true?
18    A   You don't know when they're going to
19  stop breathing.  There's no way to know that.  You
20  don't know what's going on in their brain or their
21  body.
22    Q   So positional asphyxia may exacerbate
23  the condition of any individual who has received
24  an electrical conducted weapon application.  Do

Page 138

1  you agree with that?
2       MR. LUTE: Objection.
3       Go ahead.
4    A   Repeat that.
5  BY MR. HILL:
6    Q   Positional asphyxia or a prone
7  position -- let's take that back.
8       Restraining a person in a prone position
9  may exacerbate the condition of any individual who
10  has received an electrical conducted weapon
11  application; true?
12       MR. LUTE: Objection.
13       You may answer if you know.
14    A   Not necessarily.
15  BY MR. HILL:
16    Q   I said may.
17    A   It's possible.
18    Q   It's a risk factor; right?
19    A   A lot of things are.
20    Q   It's something officers have to be
21  trained on; true?
22       MR. LUTE: Objection.
23       You may answer if you know.
24    A   We have been trained on that.

Page 139

1  BY MR. HILL:
2    Q   So how have you been trained on how to
3  use a restraint technique following the
4  application of an electrical conducted weapon?
5    A   As soon as we fire a Taser, any time, we
6  are trained that as soon as that five-second cycle
7  is over, and even if you can before, if you can
8  stay away from the wires, that you need to try to
9  get them in handcuffs to control them before that
10  five seconds is over or right after the five
11  seconds so you don't get shocked and then put
12  yourself in danger.  Then, of course, you would
13  try to get them into a cruiser and get them
14  contained some way.
15    Q   Anything else?
16    A   In regards to?
17    Q   A restraint technique following the
18  application of an electrical conducted weapon.
19    A   After you discharge a Taser, you put
20  them in handcuffs because you will be then
21  arresting them, of course, because they resisted
22  you in some way, and then you try to get them into
23  the cruiser so you can take them to jail.  So
24  you're going to either -- if they're still

Page 140

1  fighting you, you're going to have to wait until
2  you can control them.  If they're not fighting
3  you, they'll stand up and cooperate, then you put
4  them in a cruiser.
5    Q   Any other training?
6       MR. LUTE: Objection.
7       You may answer.
8    A   If they're cooperating, you will get
9  them out of the scene, so they're not causing a
10  disturbance anymore.
11  BY MR. HILL:
12    Q   Anything else?
13    A   That's basically it.
14    Q   And you're getting -- after you've used
15  a Taser on a person, you're getting them into a
16  cruiser to take them to jail?
17    A   Well, after they have the probes taken
18  out.
19    Q   There's a use of force policy that you
20  have.  It's Exhibit 10 in that collection of
21  documents.
22    A   That we call the squad after we tase?
23  That one?
24    Q   No.  Just wait until you pick up the

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

---

Page 141

1 actual document.
2     A    Got it.
3     Q    I've taken a number of depositions over
4 the last week, I think as you know.
5     A    I'm sure you have.
6     Q    Everybody has stated that Exhibit 10,
7 that you have there in front of you, is the use of
8 force policy that was in effect as of September
9 8th, 2015.
10        Do you have any reason to disagree with
11 that testimony?
12     A    Not that I know of.  This is use of
13 deadly force, weapons requalification.
14     Q    Are you aware of any --
15     A    There's the use of force -- well, 1214
16 is use of force, but it doesn't say it's deadly.
17 I guess what's the question?
18     Q    Well, what are you looking at?
19     A    It says, "Use of Deadly Force and
20 Weapons Requalifications."
21     Q    When's the last time you saw that
22 document, Exhibit 10, before today?
23     A    I couldn't tell you exactly when.  We've
24 been trained on policies my whole career,

---

Page 142

1 obviously.
2     Q    So can you give me an idea of the last
3 time you saw that document, Exhibit 10?
4     A    We're given the Taser use of force every
5 Taser training we have.  This is deadly force.  I
6 probably haven't reviewed it for the deadly force
7 one for a couple of years.
8     Q    And is it your understanding that
9 Exhibit 10 that you have in front of you applies
10 only to deadly force?
11        MR. LUTE: Objection.
12        You may answer.
13     A    It says, "Use of Deadly Force and
14 Weapons Requalifications."
15 BY MR. HILL:
16     Q    So is your answer yes?
17     A    It's just the deadly force.
18     Q    So is your answer yes, that's just the
19 deadly force policy?
20     A    That's what it appears to be.
21     Q    On September 8th, 2015, were you working
22 the eight a.m. to eight p.m. shift?
23     A    Yes.
24     Q    And do you remember where you were at

---

Page 143

1 when information came in over dispatch regarding
2 Jordn Miller?
3     A    I was on an arrest, but I don't know
4 where I was.  I had somebody under arrest.
5     Q    Did you have somebody in your cruiser?
6     A    Yeah, I believe so.  I think it was a
7 summons.  It may have been for disorderly conduct,
8 but I can't remember for sure.
9     Q    So were you serving a warrant?  Is that
10 what it was?
11     A    I don't believe it was a warrant, but
12 I'm not sure exactly.  I'd have to go back and
13 look.  I never have looked to see what I was, you
14 know, arresting somebody for.  I just know that I
15 was clearing an arrest to back them up.
16     Q    I just wanted to know what you were
17 doing.
18     A    I wish I knew exactly.  I was arresting
19 somebody.  That's all I know.
20     Q    And were you arresting somebody because
21 you saw them do something, or were you serving a
22 warrant or --
23     A    I don't remember.  It's been a few
24 months ago.

---

Page 144

1     Q    Do you remember where you were, like
2 what part of town?
3     A    I was probably centrally located in the
4 middle of the township somewhere.  I know I wasn't
5 out a real long distance away, like in Arlington
6 or anything.  But I don't remember exactly now.
7     Q    So had you completed this arrest when
8 the call came through?
9     A    When the call came out, I remember
10 trying to wrap it up quickly, because my brain was
11 then with them in trying to back them up, because
12 I didn't know how far away backup was.
13     Q    When you say "with them," are you
14 talking about Officers Scherer and Holsopple?
15     A    Yes.
16     Q    So when you say, "wrap it up quickly,"
17 what did you do?
18     A    If I was summoning the person -- I
19 didn't take them to jail, obviously, because I
20 would have been coming from the Summit County
21 Jail.  So I had to have given them a summons for
22 something, released them where I was at, and I
23 went on my way to the call, which originally went
24 out on Milo White.

---

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 145

1    Q    So do you know how far you were from
2  Milo White when this call came through?
3    A    No, I don't know where I was.
4    Q    And when the call came through, were you
5  in your car or standing outside of your car?
6    A    I don't remember that either.
7    Q    Were you with this individual that you
8  were arresting?
9    A    All I remember from that arrest, because
10  that's not where my focus was that day, was
11  clearing with a 21, and then I was 25 to them.  So
12  I was releasing a prisoner and on my way to them
13  to back them up.  That's all I remember from that
14  day prior to this event.
15    Q    I'm just saying, when you say "releasing
16  a prisoner," did you have your prisoner with you?
17    A    Yes.
18    Q    Okay.  So when the call came through,
19  did you have him in your car?
20    A    I don't remember that.  I was with him
21  one way or the other.
22    Q    You just -- there's no way for you to be
23  able to tell right now?
24    A    No.

Page 146

1    Q    And there's no way for you to be able to
2  identify with any degree of accuracy where you
3  actually were in the community when this call came
4  through regarding Jordn Miller?
5    A    No, unless you have the arrest report
6  and refresh my memory.  But other than that, no.
7    Q    Do you mean the arrest report of this
8  other individual?
9    A    Right.
10    Q    Do you remember this other individual's
11  name?
12    A    No.
13    Q    So my understanding is there are logs
14  that officers here at Springfield Township use
15  during the course of the day to hand write
16  information?
17    A    Yes.
18    Q    And these are -- they just lined
19  paper, basically?
20    A    Yes.
21    Q    Would you have been keeping a log on
22  September 8th, 2015?
23    A    Oh, it just depends.
24    Q    On what?

Page 147

1    A    On just different factors.
2    Q    Well, are you supposed to maintain a
3  log?
4    A    The chief -- yes, at the time, the chief
5  was kind of lax on having sergeants do logs.  So
6  if my patrolmen were doing logs, some days I
7  didn't do them or if I didn't go to any calls.  If
8  they'd go to one call, I might not have even done
9  it.  If I went to ten calls, I would do a log
10  normally.
11         It's been enforced now with the new
12  chief, and we do them all the time.
13    Q    And the new chief is David Hoover?
14    A    Yes.
15    Q    So David Hoover is enforcing the
16  requirement that patrol officers and sergeants
17  complete a daily log?
18    A    Yes.
19    Q    And when Chief Smith was the chief, you
20  said there was lax enforcement?
21    A    Uh-huh, yes.
22    Q    Was there any enforcement?  Meaning were
23  you ever taken aside and said, "Sergeant Moore,
24  you don't have a log for today"?

Page 148

1    A    No, not like that.  I mean, he may have
2  mentioned it in passing to the sergeant, like,
3  "Hey, I want you guys to do a log," or, "I
4  couldn't find your log for this day," or something
5  to that effect.
6    Q    What did you do with your logs when they
7  were completed?
8    A    When we complete the logs, we put them
9  in the data entree office in a bin.
10    Q    And then what happens to them?
11    A    Data entry is supposed to file them by
12  date.
13    Q    Have you ever seen a log for your
14  activities on September 8th, 2015?
15    A    I don't remember if I did a log that
16  day.
17    Q    But my question is:  Have you ever seen
18  from anyone a copy of the log?
19    A    Not to my knowledge.
20    Q    And if I wanted to find out -- so if you
21  had created a log, though, it would have gone to
22  data entry?
23    A    Yes.
24    Q    There would be a record of it?

Layne & Associates
(614) 309-1669

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 149

1    A   Right.  Well, can I qualify that?
2    Q   Sure.
3    A   Things come up missing in the police
4  department all the time.  So I don't know.  They
5  get misplaced.  It happens with reports, too.
6        So, yes, generally, it should be there.
7  But people do take things, look at them, and then
8  they get thrown away if they're left on a table
9  somewhere.
10   Q   When you said "reports," are you talking
11 about police reports?
12   A   All kinds of reports.
13   Q   Tell me what you mean by reports going
14 missing.  I'm not in law enforcement, so --
15   A   I might fill out just like a probable
16 cause form and accidentally set it on a desk in
17 patrol or put it in a box, or they might set it
18 down on a desk somewhere and someone says, oh, why
19 is someone leaving all this paper here, and then
20 they shred it.  So --
21   Q   Is that anything that anybody -- the new
22 chief here has addressed?
23   A   I mean, they don't necessarily know.  I
24 mean, it's just someone going, oh, I can't find my

Page 150

1  personal identifiers form, I put it on this table,
2  where did it go?  I don't know, I don't know.  And
3  then somebody shredded but is surely not going to
4  go, oh, I shredded that five minutes ago.
5    Q   Any other kind of incidents of reports
6  or documents just kind of going missing here?
7    A   No.
8    Q   So there should be at least
9  documentation from -- from whatever was going on
10 with this arrest or prison release?
11   A   Through dispatch, yes.
12   Q   But I mean, there should also be -- do
13 you complete any documentation?
14   A   Whether I did a log that day, is what
15 I'm assuming you're asking, I don't remember
16 specifically.  If I didn't, all of my information
17 would be at dispatch, if they recorded it.
18   Q   When you release a prisoner, do you have
19 to -- is there a form here to demonstrate that the
20 prisoner is not in your custody any longer?
21   A   I would have done an arrest report.  And
22 at the end of it, if it was a summons, even for a
23 warrant, it would say such and such had a warrant,
24 they were summonsed and released.

Page 151

1    Q   And then you would file that?
2    A   Yes.
3    Q   So there would be a copy?
4    A   Yes.
5    Q   When you got -- when you heard this call
6  come through dispatch, did you communicate at all
7  with any of your fellow officers, Officer
8  Holsopple or Scherer?
9    A   I went 2510, which means I was on my way
10 to assist them, to the Milo White call.  So at
11 time it was just on Milo White still, and I was
12 heading towards that direction.
13   Q   Did you give your location?
14   A   Probably not.
15   Q   Did you know the location at that time
16 of either officers Holsopple or Scherer when you
17 gave the 2510?
18   A   Where they were coming from, you mean?
19 No.
20   Q   There was no communication -- well, take
21 a step back.
22        Before you got to 1019 Abington, where
23 Jordn Miller eventually was, there was no plan
24 being communicated between either you, Officer

Page 152

1  Scherer and Officer Holsopple over the radio in
2  terms of how to approach the scene; is that fair?
3    A   That's fair, yes.
4    Q   Did you activate your lights at any time
5  when responding to either 909 Milo White Drive or
6  1019 Abington?
7    A   I don't remember if I had my lights
8  activated or not.
9    Q   If you did, it would have activated the
10 dash cam; correct?
11   A   It would have.
12   Q   And have you ever -- and are you
13 required to save dash cam information?
14   A   I'm sure the Sunshine Laws say how long
15 you're required to keep it, but I don't know what
16 those laws are.  I don't deal with the dash cam
17 video.
18   Q   How about in an event like this, where
19 Jordn Miller is eventually hospitalized after
20 interacting with the police?
21        Would you have saved any dash cam video?
22        MR. LUTE: Objection.
23        You may answer.
24   A   I don't know if there was any dash cam

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 153

1 video on the supervisor's vehicle. There's four
2 -- it's one, two, three and four, on the lights.
3      I could have even, if you use the
4 first -- the number one, you know, your flashers
5 go on. Number two, the rotators go on. Number
6 three, additional lights go on. And if you hit it
7 all the way, it automatically turns on the sirens.
8      A lot of times the supervisors don't go
9 all the way over to four where the siren comes on
10 because it scares the death out of people that are
11 right there next to you. So if you want to get a
12 block or two away, you know, you might turn it all
13 the way on to four.
14      If I was close, I may have only turned
15 it on to three because I didn't need the sirens,
16 there was nobody in front of me.
17      I don't remember having my lights on at
18 all that day, actually, and I wasn't pointing in
19 that direction. I was actually, from Delaware,
20 pointing up towards Sadler and on Abington and
21 towards Crestline. So more in a south position,
22 southeast. So I wasn't facing here. I was facing
23 this way.
24 BY MR. HILL:

Page 154

1    Q   You're pointing to a photograph of the
2 scene?
3    A   Yes.
4    Q   Can you just hold that up for a second?
5      You said I wasn't pointing here, I was
6 pointing there. Just so it's clear later on.
7    A   Well, if that was a house --
8    Q   Actually, hold it up for the camera.
9    A   Oh, I'm sorry.
10      The street is up here, and I'm facing
11 this direction. I'm facing south. Southeast even
12 a little bit. But I'm facing this direction,
13 parked on the street. You know, where this is the
14 driveway, I would be facing the opposite
15 direction.
16      So if I had my lights on, I would be
17 recording this way, anyhow. It would never have
18 been up in the driveway where any of the events
19 happened.
20    Q   My question was just did you turn on
21 your lights?
22    A   Like I said, I don't remember. I don't
23 believe so, but I'm not one hundred percent sure.
24    Q   Were you ever --

Page 155

1    A   I definitely probably didn't have them
2 on when I got there.
3    Q   Do you remember how fast you were
4 driving when going to 1019 Abington?
5    A   No.
6    Q   Is that -- the speed of your response,
7 is that something that would have been captured by
8 the dash cam?
9    A   It depends. We have several different
10 dash cameras. And I don't deal with the dash
11 cameras or the recordings at all, so -- that's my
12 understanding, but I don't know for sure. I've
13 never had to -- I've never been involved with that
14 download or anything.
15    Q   Were you ever asked by anyone
16 investigating the events involving Jordn Miller
17 whether your dash camera captured anything that
18 day, on September 8th, 2015?
19    A   That would be the investigators going
20 back to look if that camera was operating at that
21 time or not. Back then, the cameras would get
22 full, and they'd have to change out. At the time
23 I think they were even DVDs -- not DVDs. VHS
24 tapes even. So we've changed dash cameras. I

Page 156

1 don't know which one we have. But I wasn't in
2 charge of the dash cameras at all. The
3 investigators would have requested all that. I
4 wasn't involved in that at all. But if there was
5 dash camera, they would have it.
6    Q   I'm just asking: Did anybody ever come
7 to you and ask you?
8    A   I can't remember specifically.
9    Q   Do you have any memory of that
10 happening?
11    A   No. Of anybody asking me?
12    Q   That's my only question.
13    A   Huh-uh.
14    Q   Did anybody ever ask you -- so no? You
15 said huh-uh. So no?
16    A   No, no.
17    Q   Did anyone ever ask you whether your
18 sirens or lights were on in your cruiser as you
19 responded?
20    A   I don't remember.
21    Q   Are you, not at the moment as we sit
22 here, but are your officers here wearing body
23 cameras now currently at Springfield Township?
24    A   Yes.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 157

1  Q   And when did that begin?
2  A   I don't know the date.  Detective
3  Lombardi was in -- put that on.  He would know.
4  Q   Can you show us -- because you've got
5  your uniform on today; correct?
6  A   Yes.
7  Q   This is the same uniform you wear in the
8  field?
9  A   Yes.
10  Q   You would be on duty today?
11  A   Yes.
12  Q   Can you show us where the body camera
13  that you wear is located?
14  A   It's right here.
15  Q   Is that actually the body camera?
16  A   No, this is a clip for the body camera.
17  Q   Okay.
18  A   Detective Lombardi was downloading it
19  this morning.
20  Q   Do you still have a radio that you use?
21  A   Uh-huh, yes.
22  Q   And as of September 8th, 2015, did you
23  have the lapel radio?
24  A   Yes.

Page 158

1  Q   Have you had any Taser uses or
2  electrical conducted weapon uses?
3  A   Yes.
4  Q   Since you've had the body camera?
5  A   Since the body camera?  I don't remember
6  if it's since the body camera.  I don't believe
7  so.
8  Q   And I'm going to ask you a question that
9  I've asked everybody, okay, as police officers.
10  How tall are you?
11  A   Oh, five four and a half.
12  Q   How much do you weigh?
13  A   Oh, no, you didn't.
14     MR. LUTE: That's why he prefaced it the
15  way he did.
16  BY MR. HILL:
17  Q   That's right.  I have got to be careful.
18  A   Do you know what?  When I go to the
19  doctor -- and I just went last week, as I told
20  you -- I turn around, and I literally face the
21  opposite direction.  So the last time I checked --
22  Q   Let's do it this way.  Nothing about how
23  much you weigh now.  How much did you weigh back
24  on September 8th, 2015?

Page 159

1  A   Oh, my gosh.  I don't know.  Like maybe
2  175.
3  Q   Okay.
4  A   I'm going to guess.
5  Q   Okay.  And were you wearing body armor
6  on September 8th, 2015?
7  A   No.
8  Q   Were you wearing a belt with all your
9  gear?
10  A   Yes.
11  Q   And Officer Scherer told me those can be
12  pretty heavy, like 15 pounds?
13  A   Maybe.
14  Q   Is that about how much you expect them
15  to weigh?
16  A   I wouldn't have thought -- yeah, between
17  ten and 15 maybe.  I never find it heavy like
18  everybody else, so I don't know.
19  Q   Do you work out?
20  A   Yeah, I do.
21  Q   What do you do to work out?
22  A   I actually just started working out
23  again, I just want to say.  I do now.  I didn't
24  back then.  Since I had twins, I didn't work out

Page 160

1  for years.  So I felt it was necessary, so I got a
2  membership so that I can bring that weight down.
3  Q   Do you have Exhibit 6 in front of you?
4  A   Yep.
5  Q   If you look at Exhibit 6, there's like a
6  cover page that says use of force report?
7  A   Yes.
8  Q   And then if you go to page -- it would
9  be page 3.  It's the one mostly blank.
10  A   Uh-huh, yes.
11  Q   And at the bottom it says, "Officer
12  Scherer," number 152?
13  A   Yes.
14  Q   And then it says, "Sergeant Moore, 134"?
15  A   Yes.
16  Q   And then it's got a time of 22:15?
17  A   Yes.
18  Q   So that would be 10:15 p.m.
19  A   Yes.
20  Q   Officer Scherer testified that that's
21  the time he believed this was completed, finished.
22  Is that consistent with your memory?
23  A   This time here?
24  Q   Yes, the 22:15.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

---

Page 161

1    A    That's probably the time that I checked
2  the use of force.  But I didn't check the Taser.
3    Q    No, that's what I mean.  The time the
4  use of force report was completed?
5    A    Well, that's the time I checked it.  So
6  I don't think that there's a time where he writes
7  when he's actually writing it.
8    Q    Right, he doesn't.
9    A    That's the time I checked it.
10   Q    Okay.  And when you checked it, do you
11 check it to make sure it's accurate?
12   A    Yeah, apparently.
13   Q    Okay.  It's not a trick question.  I
14 just want to make sure that you --
15   A    No.  I'm just -- I'm surprised that I
16 checked it, because some of them -- usually it's
17 this, front and back.  It's not a separate page
18 with this checked by, unless that's the Taser form
19 I'm confusing it with that I don't check.
20   Q    Well --
21   A    This isn't like normally how it is.
22 It's a double-sided page, so this is just throwing
23 me off how this is, but --
24   Q    Well, you signed the use of force report

---

Page 162

1  that was completed by Officer Scherer; correct?
2    A    That day, I guess.  My signature is
3  there.
4    Q    And when you sign the use of force
5  report, you check it to make sure that it's
6  accurate; right?
7    A    Where are the originals of these?
8    Q    I get what I get.  So when you say,
9  "Where are the originals," what do you mean?
10   A    The chief's -- I guess the chief's --
11 the chief keeps a file, I'm sure, of use of force
12 reports.
13   Q    And why do you want to know where the
14 original is?
15   A    Well, I just don't -- I don't know if
16 they were just copied this way.  I would assume
17 that's why they're not double-sided.  But I don't
18 want to swear to something that looks different
19 than what I actually checked.  But if you want to,
20 in general -- you know, I agreed with his
21 information for the tasing for that day, so.
22   Q    So I don't have access to other files
23 here at the department.  I ask for documents, and
24 I get what they give me.

---

Page 163

1    A    Right.  I mean, I'm sure they're copied
2  in different ways, but --
3    Q    And this is what I received.
4         In terms of your signature on page 3 of
5  Exhibit 6 at the bottom, that is your signature;
6  correct?
7    A    Yes, uh-huh.
8    Q    And at the top, it says, "Explain reason
9  for use of force, type of force and areas of the
10 body on which force was used."  Correct?
11   A    Yes.
12   Q    So when you say about it being
13 double-sided, are you saying that -- so page 1 of
14 Exhibit 6 has kind of like a cover sheet that
15 somebody created.
16   A    Well, yes.
17   Q    Okay?  So are you saying that usually
18 page 2 and page 3 are one double-sided document?
19   A    I guess this one and this one are a
20 double-sided document.  But what I was wondering
21 is were these notes attached at the time.
22   Q    And just so we're clear on the record,
23 when you said "this" and "this," just describe
24 what you're looking at.

---

Page 164

1    A    This is usually the front.  This is
2  usually the back.  Normally, with our new system,
3  we can't type on this.  It didn't let us type on
4  that before.
5         So you can see my signature on those
6  pages, and I just wanted to see the original to
7  see if these invest notes were on there, because I
8  didn't have time to read these invest notes, so I
9  have no idea, because my name is not on them.  So
10 I'd have to -- are these the -- our original
11 invest notes, then?  Are they the detective's
12 invest notes?  Are they Bubba's invest notes -- or
13 Officer Scherer's invest notes?
14   Q    I don't know.  Can you tell?
15   A    I would have to see the original.  I
16 mean, this is not the original.  These are copies.
17 But that's my signature.  And like I said before,
18 I agree with the tasing, so --
19   Q    But here's my question:  When it says,
20 "Checked by Sergeant Moore," what are you checking
21 as the supervisor?
22   A    Well, these are our invest notes.  These
23 must have been printed out before we had OHLEG.
24 So I'm checking the entire use of force report.

---

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 165

1    Q    Attached to that is information that
2  Officer Scherer provided that -- under a document
3  that says, "Use of Force Report."  Correct?  It's
4  page 2 of Exhibit 6.
5    A    Yes, that's the use of force report.
6    Q    And when it says "checked by," that's
7  part of what you were checking; correct?
8    A    Yes.
9    Q    And in fact, under social security
10  number for Jordn Miller, that's your handwriting;
11  correct?
12    A    That is my handwriting.
13    Q    So you would have reviewed this document
14  before you signed off on it as the supervisor;
15  true?
16    A    Yes.
17    Q    And you wouldn't have signed off on it
18  unless you agreed with it; true?
19    A    Correct.
20    Q    That was it.
21    A    Okay.
22    Q    The invest -- you call them the invest
23  notes?
24    A    Yes.

Page 166

1    Q    That are -- those are the investigative
2  notes that were created by you, Officer Holsopple
3  and Officer Scherer; correct?
4    A    I see that now, yes.
5    Q    And these are not -- at the bottom, they
6  would be page 4, 5 and 6 of Exhibit 6, correct,
7  would be the investigation notes?
8    A    4, 5 and 6, yes.
9    Q    They don't have any kind of signature at
10  the bottom?
11    A    These don't.  These were probably our
12  originals before they were entered by data entry
13  into the computer.
14    Q    So they look like they're typed to me.
15    A    They are.
16    Q    So when you say these were the originals
17  before they were input by data entry, what does
18  that mean?
19    A    We used to duplicate the work before we
20  had OHLEG.  We would type them, and then they
21  would type the exact same thing.  It was double
22  the work.  But it was word for word.
23    Q    So in terms of the investigative notes,
24  you would have created Exhibit 6, page 4, 5 and 6,

Page 167

1  the three of you, on a computer?
2    A    Yes.
3    Q    And then you would have, what, printed
4  it?
5    A    We would have printed it off and had it
6  checked and then sent it to data entry, to that
7  supervisor who checked those notes.
8    Q    So there was another supervisor who
9  checked investigative notes?
10    A    Well, if it was my investigator note or
11  I was involved in it, somebody else would check
12  it.  I couldn't check my own, if I was involved in
13  it.
14    Q    So if you look at Exhibit 12 --
15    A    Yes.
16    Q    -- at the bottom it states, "Checked by
17  Smith."  Right?
18    A    Yes.
19    Q    So that's Chief John Smith?
20    A    Yes, it is.
21    Q    So Chief John Smith was the person
22  checking the investigative notes that the three of
23  you created?
24    A    Yes.

Page 168

1    Q    Which is Exhibit 12?
2    A    Yes.
3    Q    And in terms of your understanding of
4  the timing of the creation of what is attached to
5  Exhibit 6 here, you would have typed this out,
6  printed it out, handed it to Chief Smith, he would
7  have checked it and then given it to data entry to
8  retype it?
9    A    Yes.
10    Q    So the times -- there are times listed
11  at the bottom of each page; correct?
12    A    Yes.
13    Q    And my understanding through the
14  depositions in this case, and perhaps I'm wrong,
15  but is that the timing at the bottom of each page
16  reflects the time that that page was completed; is
17  that your memory?
18    A    It's sometime during the time we were
19  completing the report.  Sometimes an officer might
20  type the first page and then look at the time real
21  quick and -- because I don't know why there's even
22  a time there, and then put that time.  And then at
23  the bottom of the next page -- because you have to
24  clear it off.  The way our computers work, you

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 169

1   can't continue it on for some reason, and before
2   it was even worse than it is now.  And then they
3   might forget what time they put on the first one
4   and just put whatever time it is now on the watch.
5         So there's no telling what time period
6   during typing that, you know, it's being typed.
7   It's some point between that time and that time.
8         It may have started at that time.  It
9   may have ended at that time.  That could have been
10   the time that page was completed, you know.
11   Q   No way to know?
12   A   No way to know.  There's no policy for
13   that specifically.
14   Q   And there are three different times, one
15   for each page of Exhibit 6, page 4, 5 and 6.
16         So the time on page 4 is 20:30.  The
17   time on page 5 is 21:30.  The time on page 6 is
18   22:00; correct?
19   A   Yes.
20   Q   So at least we know this document was
21   being worked on for an hour and a half?
22   A   Basically.
23   Q   But we don't know anything else?
24   A   No.  And this is, you know -- I mean, we

Page 170

1   had to go to the bathroom, you know, and that kind
2   of thing.  So I mean, it would be about that time.
3   There's no way to know exactly.
4   Q   On page 2 -- I'm sorry.  On page 3 of
5   Exhibit 6, the time that you signed this document
6   is 22:15?
7   A   Which one?
8   Q   Page 3 of Exhibit 6.  It's the Use of
9   Force report you had.
10   A   Oh, six.  I signed it at 22:15, yes.
11   Q   Right.  So you would have completed the
12   investigative notes, and then Officer Scherer --
13   and then you signed off on Officer Scherer's use
14   of force report?
15   A   It was all being worked on at the same
16   time, so --
17   Q   On different computers?
18   A   Yeah, we had two computers back there,
19   so I know I was on one for sure, and he must have
20   been on another one.
21   Q   And my understanding is you guys were
22   all -- the officers were discussing the
23   information out loud and you were actually typing
24   it for everyone?

Page 171

1   A   Yes.
2   Q   And Chief Smith testified that he was
3   back there while this was happening?
4   A   For part of it.
5   Q   And did Chief Smith have questions for
6   you while you were creating this, or was he just
7   listening?
8   A   He was only back there briefly to ask us
9   what happened and was everybody okay, and, you
10   know, Officer Scherer had gotten bitten, went to
11   the hospital, came back, is he okay.  Then there
12   was the hepatitis incident, so he was there for
13   that.  So he's kind of in and out throughout the
14   night.  I can't tell you if he was there the
15   entire time -- you know, when I was doing the
16   invest notes, because I know he wasn't.  He
17   couldn't have been back there for much of that at
18   all.  It was just a basic like, hey, what
19   happened.  Then he would go out and do his thing
20   and then maybe come back and check on us and make
21   sure we were doing okay.
22   Q   Were you ever -- well, let's take a step
23   back.
24         In terms of your discussions with Chief

Page 172

1   Smith on September 8th, 2015, the day of the event
2   --
3   A   Uh-huh, yes.
4   Q   -- what you just described is kind of
5   Chief Smith checking in, saying, hey, is everybody
6   okay, those types of conversations.
7         Is that the extent of your
8   communications with him that day, for the most
9   part?
10   A   Once we were back at the office, I mean,
11   we obviously told him the whole situation, what
12   happened.  And you know, he asked us if we were
13   okay.  We said that we were.  What did Jordn do,
14   you know?  And we explained to him.  And you know,
15   he's the chief.  He was just asking general
16   questions, make sure everything was, you know, on
17   the up-and-up kind of thing.  And then he checked
18   our invest notes and --
19   Q   And when he asked you questions, my
20   understanding is the three of you were together?
21   A   Yeah.  I mean, we walked in and out.  I
22   mean, I don't know if somebody went to the
23   bathroom or ate or got something to drink.
24         But, you know, in general, he did talk

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 173

1  to us when we all three were in the office.  He
2  probably talked to us when it was just me in the
3  office, you know.
4        There was a time when Bubba was out by
5  the -- Officer Scherer was out by the lake and,
6  you know, I was out there, so the chief was in
7  with Officer Holsopple.  I mean, this was -- went
8  on for hours, so --
9     Q   Do you remember what the discussions
10  were when it was just you and Chief Smith as
11  opposed to when the three of you -- when the four
12  of you were all together?
13     A   No, I don't remember anything specific.
14     Q   Were you ever interviewed by any
15  detectives in this case?
16     A   I don't know about interviewed.  I was
17  at 909 Milo White with Detective Blasdel, at the
18  time, for a brief period of time.  I think even
19  Chief Smith was at that location, outside for a
20  moment.  And Blasdel asked me some questions, a
21  few brief questions inside of the house, but
22  nothing major.
23     Q   And that's kind of what I'm getting at,
24  is there was no point where, you know, on

Page 174

1  September 8th, 2015, or later, where you were
2  asked to sit down with the detective and kind of
3  go piece-by-piece what happened that day; is that
4  fair?
5     A   Yes, that's fair.
6     Q   And you were never interviewed on camera
7  before today; correct?
8     A   No.
9     Q   And as far as you know, Officer
10  Holsopple and Officer Scherer were also not
11  separately interviewed by a detective; is that
12  correct?
13     A   I don't know if they were or not.
14     Q   Any reason to believe that they were?
15        MR. LUTE: Objection.
16        You may answer.
17     A   Not that I'm aware of.
18  BY MR. HILL:
19     Q   Were you ever sat down and presented
20  with any evidence that had been collected
21  regarding Jordn Miller after September 8th, 2015?
22     A   No.
23     Q   In terms of Exhibit 12, the other
24  officers, Officer Scherer and Officer Holsopple,

Page 175

1  consented to you signing for them; correct?
2     A   Yes.
3     Q   And with respect to -- and did you sign
4  this document?
5     A   Yes.
6     Q   So all the writing, where it says
7  Sergeant Moore, Officer Scherer, Officer
8  Holsopple, that's all your handwriting?
9     A   Yes.
10     Q   How about with the date, where it says
11  "9-8-15" handwritten.  Is that you or Smith?
12     A   That's Smith.
13     Q   And did you write Smith's name, too, or
14  did he write that?
15     A   That's his handwriting.
16     Q   After you arrived at 1019 Abington, had
17  you developed in your mind a plan as to what to do
18  when you got there?
19     A   Well, it was all evolving on my way, so
20  there was no way to -- to initiate any kind of
21  plan.  He was on the move, so --
22     Q   Even with respect to initiating a plan,
23  had you formulated one in your mind?
24     A   Well, I was going to where the call was,

Page 176

1  where he was last seen.  So I was on my way to 909
2  Milo White initially.
3     Q   And did you have a plan as to what to do
4  when you got there?
5     A   Put him under control.  He was having a
6  psychiatric break.
7        MR. LUTE: This is probably a good time
8  to stop.
9        (Recess taken.)
10  BY MR. HILL:
11     Q   Before we went on a break a moment ago,
12  I asked you whether or not you had formulated any
13  plan in terms of your response to 909 Milo White.
14  And your answer was you understood that he was
15  having a psychiatric break.  Is that fair?
16     A   Yes.
17     Q   In terms of responding to Jordn Miller's
18  psychiatric break at 909 Milo White, did you have
19  in your mind a plan as to what to do when you got
20  there?
21     A   I mean, I always -- any call that would
22  come out like that, if that's all the information
23  that we have, I mean, in my head I'm thinking,
24  okay, we just need to help this guy and we need to

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 177

1  contain him so he's not dangerous, he's not
2  hurting himself.  So those things are always going
3  through my mind.
4      Q   When you say "contain him," what do you
5  mean?
6      A   So he's not running around and out of
7  control.
8      Q   When you were responding or initially
9  responding, you didn't coordinate in any way with
10  your colleagues, Officer Holsopple or Officer
11  Scherer; is that fair?
12      A   Yes.
13      Q   Did you understand that Officer
14  Holsopple and Officer Scherer were also going to
15  the scene?
16      A   Yes.
17      Q   So you knew that there would be three
18  officers arriving at some point?
19      A   Yes.
20      Q   But in terms of who would do what or --
21  I'm sorry.  That wasn't clear.
22          In terms of what officers would be
23  responsible for doing what at the scene, you guys
24  hadn't had a -- hadn't discussed that?

Page 178

1      A   There was no way to know where he was.
2  We were just looking for him.
3      Q   I mean, in terms of --
4      A   That was the plan, in my head, at least,
5  is we need to find this guy.  So it was just
6  whoever came upon him first.
7      Q   And was there any thought in your mind
8  about, over the radio, discussing with Officer
9  Scherer or Officer Holsopple what to do when you
10  found him?
11      A   No.
12      Q   How long of a drive -- I know you don't
13  know exactly where you were at.  But in looking at
14  any documents, do you know how long it took
15  between the initial call for Jordn Miller's
16  psychiatric break and your arriving at 1019
17  Abington?
18      A   Not without the dispatch records.  A
19  couple minutes.
20      Q   And during that entire time period, did
21  you communicate by phone or by radio with Officer
22  Holsopple in any way?
23      A   I don't remember.
24      Q   There's no memory of you doing so as you

Page 179

1  sit here?
2      A   It's possible, but I don't recall.  A
3  phone call would have been at least in my
4  thoughts, probably, that day.
5      Q   Why do you say that?
6      A   Because we had a serious situation
7  happen.  If there was a phone call, I don't know
8  what importance it would be other than I needed
9  him to do something or, hey, can you run over here
10  or can you call a detective or -- I mean, I don't
11  know.
12      Q   In terms of Officer Scherer, did you
13  have any -- you heard that he had deployed the
14  Taser at some point?
15      A   Yes.
16      Q   Other than hearing him over the radio
17  say that he had used a Taser, did you have any
18  communication at all with Officer Scherer between
19  the time of the original call regarding Jordn
20  Miller and your arriving at 1019 Abington?
21      A   That's -- no.  That's the first I heard
22  of him tasing, was over the radio, yes.
23      Q   And there were no other communications
24  between either you or Officer Scherer?

Page 180

1      A   There was with dispatching them, of
2  course, you know, where he was, and there were
3  other people calling in dispatch.  And I knew
4  where they were.  I knew the address, so, you
5  know, I changed course, of course.
6      Q   When you say you knew where they were,
7  is that because Officer Holsopple or Officer
8  Scherer marked at the scene?
9      A   Yes.  I mean, we had residents calling,
10  giving an address where he was, and I heard them
11  go out there.
12      Q   I mean, you heard over the radio when
13  Officer Scherer had marked on the scene?
14      A   Yes.
15      Q   So you knew at that point that Officer
16  Scherer and Officer Holsopple were there?
17      A   Yes.
18      Q   And Jordn Miller had been located?
19      A   Yes.  Well, who we thought was the
20  mental patient, yeah.
21      Q   Sure.  That's a good qualification.  I
22  don't know that the name Jordn Miller had been
23  used over dispatch.
24      A   No, it was not.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 181

1    Q    But fair to say that the person at 1019
2 Abington, who had been located, was the same guy?
3    A    It was, yes.
4    Q    When Officer Scherer and Officer
5 Holsopple marked on the scene, do you know how far
6 away you were from 1019 Abington?
7    A    Me?
8    Q    Yes.
9    A    No.  And I don't know my route there.
10 But I was a couple minutes away, so I mean, I have
11 no idea what the route was.  I never made it to
12 Milo White, I know that.
13    Q    Did you have to change your route at any
14 point based on the information from dispatch?
15    A    Like I said, I don't remember my route,
16 but I do know I was on my way to 909 until they
17 called back in and said he was on Abington, and
18 then I changed my route.
19    Q    And when you say you changed your route,
20 I understand Abington and Milo White are pretty
21 much right next to each other?
22    A    Yes.
23    Q    So when you say you had to change your
24 route, did you change your destination?

Page 182

1    A    Yes.  Like I'm not focusing on finding
2 909 Milo White.  I'm trying to get to Abington
3 now.
4    Q    And in terms of when you say you changed
5 your route, did you actually have to turn around
6 and change your direction, or do you just have a
7 different destination now?
8    A    I just -- a different destination.
9    Q    And you don't have, you know, a memory
10 of where you were when Officer Scherer marked on
11 the scene?
12    A    No.
13    Q    During the few minutes that you were
14 driving, did you get on your radio and speak to
15 anyone?
16    A    Speak to anybody?  You mean other than
17 dispatch?
18    Q    Did you speak directly to dispatch while
19 you were driving in the direction of either 909
20 Milo White or 1019 Abington?
21    A    Yes.  I told them I was on my way to 909
22 Milo White.  And once they called out on Abington,
23 if I even had time to call out that I was there, I
24 would have been calling out that I was there, not

Page 183

1 on Milo White.
2    Q    During this few-minute drive, from the
3 time that the initial call comes in and you're
4 heading originally to 909 and then to 1019
5 Abington, did you request any additional
6 information from dispatch; for example, anymore
7 information about this person you were responding
8 to?
9    A    There was quite a bit of information
10 that already came in from his mother, what ended
11 up being his mother, about the psychiatric break
12 and that he needed hospitalized and, you know,
13 those kinds of things.  And it was a constant
14 barrage of radio traffic.  And I can't even
15 remember if I called 99, which was emergency
16 traffic, or not.
17    Q    What was emergency traffic?
18    A    99.  And I don't know if there would
19 have even been time, because it just happened so
20 fast.
21         So by the time they were out on
22 Abington, a couple minutes later I was able to get
23 there.  So there was a lot of traffic.  There was
24 the dispatch traffic, and then, you know, more

Page 184

1 people were calling in saying he was trying to
2 steal the Jeep on Abington.  And then there was
3 somebody down the road from 1019 Abington that
4 also said he tried to get in that vehicle.  So
5 there was a lot of traffic coming from dispatch.
6         By the time there was a break in
7 traffic, they were already calling out that there
8 was a Taser deployment and start the FD.  And then
9 I got there after that.
10    Q    The information -- you said there was a
11 lot of information already provided by Jordn's
12 mother about him, including his psychotic break
13 and the need for hospitalization?
14    A    Yes.
15    Q    That's all the information you had while
16 you were driving there?
17    A    Yes.
18    Q    So you didn't need to follow up to get
19 additional information about that?
20    A    Yes.  As far as I'm concerned, that's
21 the truth.
22    Q    And that was, you know -- so you
23 understood that you were responding to somebody
24 with a psychiatric break whose family thought

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 185

1  needed hospitalization?
2     A   Yes.
3     Q   And during this few-minute drive,
4  however long it was -- but we know it was a couple
5  of minutes; correct?
6     A   Yes.
7     Q   While you were in the car?
8     A   Yes.
9     Q   You said when there was a break in
10  traffic.  You meant radio traffic?
11    A   Yes.
12    Q   When there was a break in radio traffic,
13  that's when Officer Scherer aired that there was a
14  Taser deployment?
15    A   Yes.
16    Q   You didn't -- I understand that you came
17  to the scene of 1019 Abington after a fairly
18  significant portion of the event actually took
19  place; correct?
20    A   Yes.
21    Q   So in terms of Jordn's behavior before
22  he got in the Jeep, you did not see Jordn; is that
23  fair?
24    A   No.  Yes, I did not.

Page 186

1     Q   In terms of anything Jordn did before he
2  got in the Jeep, your information was limited to
3  anything that was aired over dispatch?
4     A   Yes.
5     Q   You did not see Jordn at any time he was
6  in the Jeep; correct?
7     A   No.
8     Q   You didn't know, when you arrived at
9  1019 Abington, what Jordn's condition was while he
10  was in the Jeep, other than a guy in a psychiatric
11  break who needs hospitalization?
12    A   Well, when the second call had came in,
13  about he's trying to steal a Jeep, that
14  information, that radio traffic.
15    Q   But in terms of what Jordn looked like
16  in the Jeep, you didn't see him?
17    A   No, I didn't see him in the Jeep.
18    Q   How he was moving his arms in the Jeep,
19  you didn't see that?
20    A   I was not there.
21    Q   What he was actually doing in the Jeep,
22  you didn't see any of that?
23    A   I didn't see it.
24    Q   You did not hear Jordn say anything

Page 187

1  before you arrived at 1019 Abington?
2     A   Before I arrived?
3     Q   Uh-huh.
4     A   No.
5     Q   Before you arrived, you didn't know
6  anything about whether Jordn had bitten anybody;
7  true?
8     A   No.
9     Q   True?  Do you agree with what I said?
10    A   Yes.
11    Q   You did not observe Officer Scherer or
12  Officer Holsopple remove Jordn from the Jeep at
13  any point?
14    A   No.
15    Q   You did not see Officer Scherer kick
16  Jordn; correct?
17    A   No.
18    Q   You did not see Officer Holsopple strike
19  Jordn with his forearm; correct?
20    A   No.
21    Q   You did not observe Officer Holsopple or
22  Officer Scherer's efforts to restrain Jordn at any
23  time before handcuffs were used or applied?
24    A   No.

Page 188

1     Q   Correct?
2     A   Yes, that's correct.
3     Q   You did not observe any kind of
4  interaction between Jordn and any homeowner or
5  other person at 1019 Abington before you arrived?
6     A   No.
7     Q   You were not -- before you arrived, you
8  were not given any information about Officer
9  Scherer's interactions with Jordn other than the
10  fact that Officer Scherer had used a Taser;
11  correct?
12    A   Correct.
13    Q   And with respect to Officer Holsopple,
14  at the time you arrived at 1019 Abington, you had
15  not received any information about Officer
16  Holsopple's interaction with Jordn; correct?
17    A   No.
18    Q   Correct?
19    A   Correct.
20    Q   Between the time Officer Scherer arrived
21  at 1019 Abington and his first use of the
22  electrical conducted weapon, had you received any
23  information from any source about what Jordn was
24  doing while the officers were on scene?

Layne & Associates
(614) 309-1669

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 189

1    A   I know that there was something about
2  some kind of screwdriver or trying to stab
3  somebody, they were trying to hold him in the
4  Jeep, you know, the residents that were calling.
5  This is -- would be the only information, other
6  than that.  Nothing from the officers.  Just
7  dispatch information.
8    Q   And the dispatch information speaks for
9  itself; right?
10   A   Yes.
11   Q   So if anything about a screwdriver or a
12 stabbing or anything like that is not in the
13 dispatch records, it didn't happen; correct?
14       MR. LUTE: Objection.  When you say "it
15 didn't happen," do you mean it factually didn't
16 happen?
17 BY MR. HILL:
18   Q   Are you suggesting that there are
19 communications that were made over dispatch that
20 weren't recorded?
21   A   We have a private channel, so I don't
22 know if there were any communications over the
23 private channel about it.  If it's not on the main
24 channel dispatch tape, which I didn't listen to

Page 190

1  the whole thing, then it's possible that
2  information came over the private channel.  But
3  when we're on 99, we're supposed to use the main
4  channel.  So it could be that it was on private.
5  I don't know.  But I knew that there was other
6  people calling in.  We also have MDTs.
7    Q   What are MDTs?
8    A   Mobile data terminals.
9    Q   And those are kind of like the text
10 messaging?  Is that what that is?
11   A   They're for the calls, the dispatch
12 calls.  They give us information.
13   Q   So you are -- I just want to make sure I
14 understand your testimony today under oath.
15       You received from dispatch on September
16 8th, 2015, information that one of -- that Jordn
17 Miller tried to stab a homeowner?
18   A   I knew that day.  When I found that
19 out, I can't tell you exactly.  These are --
20 you're talking about communications.  I don't know
21 if they were before the call -- the second call
22 from the homeowner came out, after the second call
23 from the homeowner came out.  I don't recall --
24 it's been too long -- which channels were used,

Page 191

1  whether it was on the MDT, that kind of thing.
2    Q   You're confident that you had that
3  information on September 8th, 2015?
4    A   To my recollection, I had it.
5    Q   And what was the source of that
6  information?
7    A   Like I said, I got the information one
8  way or the other.  So it was either on the private
9  channel or on my MDT.  A lot of times there would
10 be more information on the computer terminal than
11 they would give out over the air, too.
12   Q   So before you arrived at 1019 Abington,
13 it's your testimony today that you received either
14 through the MDT, the private channel or over
15 dispatch information that Jordn had tried to stab
16 someone?
17   A   Maybe I was -- didn't say it right.  I
18 knew that day.  I knew at some point when I was on
19 that call.  So whether it was from the MDT, when I
20 pulled up, or whether it was on the private
21 channel or whether it was aired, somehow I knew
22 that information.
23       When I found it out, I couldn't tell
24 you.  I don't even know what time I got there, so

Page 192

1  --
2    Q   But the way you found out was through
3  one of those three sources you just discussed;
4  correct?
5    A   It would have to be.
6    Q   That's all I want to know.
7    A   I mean, if I knew, I would tell you, if
8  I knew exactly.
9    Q   And who is able to put information out
10 over the MDT?
11   A   Anybody.  Sheriff's office, us,
12 dispatch.
13   Q   And then how do you receive this
14 information through MDT?
15   A   It's sent electronically, like an
16 e-mail, for the most part.  When they add notes,
17 you have to refresh the notes, though, which I
18 would have had the opportunity to do, but they
19 probably wouldn't have.  They got there pretty
20 quick.
21   Q   When you say "they," you're talking
22 about officers Scherer and Holsopple?
23   A   Yes.
24   Q   So you would have had the opportunity to

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 193

1 refresh the notes?
2　　A　Yes, on the drive.
3　　Q　So is there a refresh button?
4　　A　Yes.
5　　Q　Nothing -- and you said it could have
6 been sent by the sheriff's office?
7　　A　Yes, who is our dispatchers. But also,
8 sheriff's deputies can also send things over the
9 MDT, so -- you said who can send who what. And we
10 can all talk and communicate.
11　　Q　I want to make sure. It's MDB?
12　　A　Well, they used to be called MDTs, and
13 they're MDBs. They're all the same thing. It's
14 just a way to transmit information from dispatch
15 to us, from us to the sheriff's office.
16　　Q　What's does -- what's it called here at
17 the department? Is it MDB or MDT?
18　　A　We call it both. If you're an older
19 officer, we say MDB -- or MDT. If you're a newer
20 officer, it's MDB, so.
21　　Q　And is this information -- how do you
22 receive the MDB or MDT?
23　　A　It just comes like an e-mail. And it
24 will have a location, and then it will have a

Page 194

1 bunch of notes in the body of the e-mail, you
2 could say. And at the bottom, it will say what
3 officers are on their way, what time they got
4 there, when they clear, who the caller was, if
5 they know, any details the caller mentioned.
6　　Q　When you say it's like an e-mail, do you
7 have your own distinct e-mail address, or is this
8 to every officer?
9　　A　It goes by car number. So I'm the
10 supervisor, and I work during the day. So it
11 would be A905.
12　　Q　That would have been your car that day?
13　　A　That would have been my car that day.
14　　Q　And you said it goes -- so how would you
15 have -- so it's directed then to A905, or A905 is
16 one of the recipients of this?
17　　A　Anybody could see that call. So the
18 sheriff's office could even read the call notes if
19 they wanted to.
20　　Q　And when would you have -- this is one
21 of the -- I know it's one of the possibilities,
22 that it was through this MDT or MDB.
23　　A　Uh-huh.
24　　Q　Would you had to have hit a refresh

Page 195

1 button, or would this have auto-populated?
2　　A　It depends on what time I got there,
3 because it will refresh and then -- you know, it
4 will send me the refresh notes once I go there,
5 once I call out. So I could have refreshed. I
6 didn't have to. You know, there's no way to know
7 if I did or not, to check that.
8　　Q　And these notes, these electronic notes
9 that come through, are they visible on -- you
10 basically have a laptop on the computer; is that
11 right?
12　　A　Yes.
13　　Q　So these notes, are they visible on the
14 laptop just as you're driving?
15　　A　Yes.
16　　Q　And then do you download those notes
17 afterwards?
18　　A　No, not unless we request them.
19　　Q　Have you requested them in this case?
20　　A　I never did.
21　　Q　Did anyone ask you to request them?
22　　A　I wouldn't be in charge of requesting
23 them, but no.
24　　Q　When would you have read this MDB or MDT

Page 196

1 note regarding a caller saying that Jordn tried to
2 stab someone?
3　　A　At any time between the time the
4 original call came out until the time I got out of
5 my car to the time that I went to Milo White. I
6 mean, any time I'm in the car, I can see the
7 notes.
8　　Q　Okay. But I want to -- I'm just trying
9 to figure out when you got the information. And
10 it's your testimony that you had that information
11 when you arrived at 1019 Abington?
12　　A　I said I had it at some point in time
13 when I was there. I don't know if it was right
14 before I got there. I don't know if it was the
15 MDT. I don't know if it was the officers on the
16 private channel. I don't know exactly, but I had
17 that information.
18　　Q　We're talking about the source of the
19 information?
20　　A　Right. I wish I could tell you the
21 source of the information.
22　　Q　Hold on. Hold on. I'm just trying to
23 figure out the timing.
24　　A　Right. And I don't know the timing.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 197

1   Q   Okay.
2   A   It happened so fast, I couldn't tell
3   you.
4   Q   And again, I hate to do it, but this is
5   my only chance under oath, so I really have got to
6   dig in a little bit.
7       This information that was provided to
8   you at some point when you were at 1019 Abington
9   was from a call from a homeowner or a resident?
10  A   I said it could have been in the call
11  notes from the homeowner calling.  It could have
12  been on the private channel.  It could have been
13  on the services channel.  It could have been on
14  the main channel.  It could have been the MDB.
15  Q   Have you ever gone back and looked for
16  that information?
17  A   No.
18  Q   When is the last time you ever saw --
19  this information, if it was through the MDB, when
20  was the last time you would have seen it?
21  A   I don't -- that day.  I mean, it
22  disappears, you know.  It doesn't come back, so --
23  Q   What do you mean, it disappears?
24  A   Once you log off for that day, it's not

Page 198

1   in your messages that you have that day.  And
2   every time you log off the MDT and you delete the
3   messages from that computer, then they're not on
4   that computer anymore.  They would be stored at
5   the sheriff's office communications center, but
6   not on that particular MDB anymore.
7   Q   But in terms of the MDB or MDT, the
8   sheriff's department would have that information?
9   A   Yes.
10  Q   And how do you know that?  Have you seen
11  these printouts in the past?
12  A   Yes.
13  Q   So with respect to any information you
14  had regarding messages coming through the MDT or
15  MDB, the sheriff's office would be able to confirm
16  that?
17  A   Yes, if that's where they were from,
18  yeah.
19  Q   In terms of information from callers to
20  911, those calls are recorded; correct?
21  A   911s are recorded, yes.  Services is
22  recorded.  The main channel is recorded.
23  Q   So in terms of any person calling and
24  reporting any behavior of Jordn Miller by a 911

Page 199

1   call, that would be recorded; correct?
2   A   Yeah, unless they were having
3   communication problems or recording problems.
4   Q   There's no reason for you -- there's no
5   reason for you to believe there were any recording
6   --
7   A   Not that I know of, no.
8   Q   On September 8th, 2015?
9   A   Yeah.
10  Q   Just let me finish.
11      In terms of -- you said communications
12  over the main channel?
13  A   Yes.
14  Q   When you say the main channel, is that
15  the main channel that officers here at Springfield
16  Township are using?
17  A   To get dispatch calls, we use the main
18  channel, which is PDOPs.
19  Q   PDOPs?
20  A   PDOPs, yes.
21  Q   What does that stand for?
22  A   Just Police Department Operations
23  channel.  That's the main channel.
24      Then we have a private channel that we

Page 200

1   use that a lot of times -- our secondary radios
2   are on automatically.  So if we're out at a call
3   and we're trying to say something, if you don't
4   switch it back to A-1, which is OPs, you're on the
5   private channel and you're talking.  And once I
6   recognize that you're on the wrong channel and I
7   can't tell you to go to the main channel, now
8   you're talking on the private channel, where we
9   give more detailed information, because they don't
10  want it going over the main channel because it's
11  too much traffic for all the jurisdictions that
12  are policing the area.
13      And then there's the services channel,
14  which I believe is recorded.  That's A-3.  And
15  that's services.  And I believe that's recorded.
16  And those are the main -- the main channels we
17  would have used that day.
18  Q   The services channel, is that dispatch
19  -- that's not private citizens using the services
20  channel; correct?
21  A   It's dispatch, but it can be, you know,
22  heard over scanners.
23  Q   But I mean, in terms of services
24  channel, that's not a direct line for people in

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 201

1 the community to contact police officers at
2 Springfield Township; correct?
3     A    Not to call us, no.  They would be
4 calling in to whoever sits at the services
5 terminal.
6     Q    But I mean over the radio.  Those
7 aren't --
8     A    No.
9     Q    You're not hearing directly citizens on
10 there making complaints?
11    A    No.
12    Q    So they would be calling some number,
13 and then a dispatch person would be airing the
14 information out over the services channel?
15    A    Not necessarily.  They could be airing
16 it out over the services channel or the main
17 channel.
18    Q    And that is channel A-3?
19    A    A-3 and A-1.
20    Q    Those are both services channels, A-3
21 and A-1?
22    A    No.  A-1 is OPs.  A-3 is services.  A-2
23 is our private channel.
24    Q    Okay.  And then the other one -- the

Page 202

1 other possible channel is the private channel;
2 correct?
3     A    Yes.
4     Q    And the private channel, again, that's
5 not something that members of the community are on
6 speaking; correct?
7     A    No.
8     Q    That's just between officers?
9     A    Yes.
10    Q    So that would have been an officer -- if
11 that information about Jordn Miller trying to stab
12 somebody came over on the private channel, that
13 would have been information being relayed by
14 another officer?
15    A    Yes.
16    Q    Do you know which officer -- well, you
17 have no -- you don't know how you got the
18 information?
19    A    I don't remember.
20    Q    Do you know if Officer Scherer or
21 Officer Holsopple used that private channel?
22    A    I don't know, because unless you're
23 looking at the screen -- you can see my screen is
24 all the way in here.  Unless I take it out and

Page 203

1 look right when it's coming across, I don't know
2 what channel they're on.
3     Q    If I wanted to find this information
4 that you had while you were at 1019 Abington, that
5 Jordn had tried to stab somebody, where should I
6 look?
7     A    Like I said, I don't know where the
8 information came from, so you could look wherever
9 you want.  Those avenues.
10    Q    But I mean, as a law enforcement officer
11 here, if you wanted to find that information,
12 where would you look?
13    A    Probably the same place you would look,
14 because I'm telling you the avenues that I would
15 find out that information, either an officer told
16 me on a private channel, it came through dispatch,
17 or it was on the MDT.  It could have been on the
18 services channel.  Somebody could have yelled it
19 when I was getting out of the car.  Something
20 happened when I got there.  I knew that happened.
21    Q    Okay.  Anything else?  Any other ways
22 you would have had this information?
23    A    Not that I know of.
24    Q    You said somebody could have yelled it;

Page 204

1 correct?
2     A    It's possible.  I knew it there, so --
3     Q    Who would have yelled it?  Do you know
4 the person?
5     A    There was a lot of people around.
6     Q    And what specifically would they have
7 yelled?
8         MR. LUTE: Objection.
9         You may answer if you know.
10    A    Yeah.  I knew something about a
11 screwdriver and wailing it out of the window.
12 That's all I know.  Trying to stab somebody.  He's
13 got a screwdriver, something to that effect.
14 BY MR. HILL:
15    Q    Did you hear that from -- well, you
16 don't know where you would have heard it?
17    A    (Shakes head.)
18    Q    When you created Exhibit 12, did you
19 make a point of including all the important
20 information?
21    A    I mean, there was probably information
22 there that we could have put in that's not in
23 there.  It was a pretty traumatic event, so you
24 try to put in as much as you can to tell what

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 205

1 happened in the scenario, and it's pretty
2 accurate. There could be things that we could
3 have put in there, I suppose. Hindsight is 20/20,
4 but it was pretty traumatic for everybody
5 involved.
6 Q Including Jordn?
7 A Yes.
8 Q How many times have you reviewed Exhibit
9 12 before today, before your testimony right now?
10 A I read it probably once.
11 Q You read it this morning?
12 A Yes.
13 Q Anything stand out as being inaccurate
14 that you wanted to add?
15 A I mean, if there's something specific,
16 you can ask me. But this is basic what happened.
17 I mean, it's all truthful.
18 Q Well, I'm asking you.
19 A Well --
20 Q You said there are things that in
21 hindsight we could add?
22 A Well, probably --
23 MR. LUTE: Objection.
24 You may answer.

Page 206

1 A Okay. It could be ten pages long. I
2 mean, I tend to get long-winded, but I put the
3 basics. It might have been ten pages if it was
4 just all my information. But I was typing it
5 because I type the fastest. And they told me what
6 happened when they got there. And then I wrote
7 what happened when I got there. And it was just a
8 basic scenario of what happened.
9 BY MR. HILL:
10 Q So do you have any idea with any degree
11 of accuracy when you would have learned from an
12 unknown source that Jordn tried to stab somebody?
13 A I don't know the times of anything. It
14 all went by and quickly.
15 Q Did you tell Chief Smith at any time
16 that you had knowledge that Jordn tried to stab
17 anybody?
18 MR. LUTE: Objection.
19 You may answer.
20 A No, we never had that conversation.
21 BY MR. HILL:
22 Q Why not?
23 MR. LUTE: Objection.
24 Go ahead.

Page 207

1 A There would be no reason. He wanted to
2 know the basics of what happened, you know. The
3 main points were he didn't stab anybody, so the
4 main points were he was trying to steal a Jeep in
5 this driveway. And the officers got there, and
6 they told their side. And I told my side of what
7 I did when I got there and what happened when I
8 went over to 909 Milo White, and then I went to
9 the hospital. So he just wanted to make sure
10 Bubba was -- or Officer Scherer was okay, because
11 he was bit. And I had open wounds and Joe had
12 open wounds. So, you know, we were talking about
13 that and is everything all right.
14 BY MR. HILL:
15 Q Where were your open wounds?
16 A I had one on my finger somewhere. I
17 can't remember which finger it was, but we were
18 tested for hepatitis for months after that so I'm
19 sure they would have it.
20 Q Did you get any medical treatment for
21 the wound itself?
22 A No. It was just an exposure, so we had
23 blood drawn, if that's medical attention.
24 Q Did you photograph the wounds on your

Page 208

1 hands?
2 A I don't remember.
3 Q What finger was it on?
4 A I don't remember that either.
5 Q Did you tell anyone at the department
6 that you had a wound on your finger?
7 A When they called us to tell us that he
8 had hepatitis C, we looked to see if we had any
9 open wounds. And when there were some open
10 wounds, you know, we were all concerned. And I
11 can't remember if I went to the hospital then and
12 had blood drawn or exactly what happened. But I
13 know that it was an exposure after the fact, and
14 then we had to continue to go up to Cuyahoga Falls
15 for blood draws to make sure we didn't have
16 hepatitis C.
17 Q In terms of any wounds that you
18 experienced as a result of your interaction with
19 Jordn --
20 A That wasn't as a result. I had a wound.
21 Q Before you got there?
22 A Yeah. I had an open cut, yes, and I was
23 exposed to his hepatitis.
24 Q So when you said that "we had wounds,"

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 209

1  you meant that you came to the scene with wounds?
2    A   Yes.  I did, at least.
3    Q   That's not Jordn's fault that you had a
4  wound?
5    A   No.
6    Q   Not anything he did to you?
7    A   No.
8    Q   How about with respect to Officer
9  Holsopple?
10   A   That, I don't know.
11   Q   Do you know if Officer Holsopple had any
12 injuries as a result of his interaction with
13 Jordn?
14   A   Not to my knowledge.  Nothing important
15 where it would have to be seen, medical attention.
16   Q   Did you see Officer Holsopple get
17 checked out by EMS at the scene?
18   A   I don't remember anything.  EMS was
19 there when they took Jordn and Officer Scherer to
20 the hospital.  Right as soon as they were leaving,
21 as soon as I could, I jumped in my car and went to
22 his mom's house.
23       So what happened after that, you would
24 have to ask Officer Holsopple.

Page 210

1    Q   So I'm trying to make sure I understand
2  this.
3        You did not ever have any conversations
4  with Chief Holsopple about the fact --
5    A   Officer Holsopple.
6    Q   I'm sorry.  You did not have any
7  conversations at any time with Chief Smith about
8  the fact that you remember getting information
9  before you interacted with Jordn that he had
10 attempted to stab someone with a screwdriver?
11   A   I don't recall any details with Chief
12 Smith, other than the basics of the situation.
13   Q   Before today -- well, strike that.
14       Have you ever written in any documents
15 that you created at any time that Jordn ever tried
16 to stab someone?
17       MR. LUTE: Objection.
18       You may answer.
19   A   Not to my knowledge.
20 BY MR. HILL:
21   Q   Before today, had you ever discussed
22 with anyone that you claimed to have known at the
23 time you got to 1019 Abington or while you were at
24 1019 Abington that Jordn had attempted to stab

Page 211

1  someone with a screwdriver?
2    A   I wasn't --
3        MR. LUTE: Objection.
4        You may answer.
5    A   I wasn't there when this alleged trying
6  to stab happened.  And he didn't stab anybody.  So
7  I went with the offense that he was committing,
8  and I wasn't concerned about that because he
9  didn't make contact with anybody.  That wouldn't
10 have been a priority of mine.
11 BY MR. HILL:
12   Q   Did you use force at any time against
13 Jordn because you thought he had tried to stab
14 someone?
15   A   I was not there during that situation.
16   Q   But my question is:  At any time that
17 you engaged in Jordn, did you use force because
18 you thought he had tried to stab someone?
19   A   No.
20   Q   That was not one of the things factoring
21 into your decision to use force?
22   A   No.
23   Q   Okay.  Did you ever speak to anyone at
24 1019 Abington to find -- on September 8th, 2015,

Page 212

1  to find out had they been stabbed by Jordn?
2    A   No.  If that was a situation, they would
3  have made it known.
4        It was more important for me to find out
5  what was going on at his mother's house, and
6  that's why I raced there.
7    Q   I'm just wondering kind of from the
8  perspective of if you're at a scene and you hear
9  somebody may have been stabbed or somebody tried
10 to stab someone, did you go around and ask is
11 everybody okay?
12   A   They were there first.  If there were
13 any stabbings, somebody would have been running
14 around screaming like they always are when they're
15 stabbed, oh, my God, you know.  And that was not
16 happening.  The situation with the people were all
17 under control at that time.
18   Q   Where were the people when you got
19 there?
20   A   They were just around.  And I don't
21 remember exactly where they were standing, but I
22 just remember kind of jogging up the driveway and
23 there were people everywhere.
24   Q   They were a ways back from the vehicle

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 213

1   -- they were a ways back from Jordn at that point?
2      A    They were far enough back where they
3   weren't interfering with the officers, I just know
4   that much.
5      Q    And they didn't appear to you to be in
6   any kind of physical injury running around?
7      A    No.
8      Q    So anything you might have heard about
9   somebody being stabbed, by the time you got there
10  and you saw these people, you realized that
11  couldn't be the case?
12     A    It was a tried --
13          MR. LUTE: Objection.
14          Go ahead.
15          THE WITNESS: I'm sorry.
16     A    It was a tried.  It wasn't he stabbed
17  somebody, so that was not on the forefront of my
18  brain, no.
19  BY MR. HILL:
20     Q    And when you saw these people, I think
21  you said they seemed to be -- their behavior
22  seemed to be controlled?
23     A    They were controlled.
24     Q    They weren't within -- you said they

Page 214

1   weren't interfering with the scene.  And by that,
2   you mean they're not like on top of Jordn;
3   correct?
4      A    Yeah.  They're not hovering over the
5   officers or trying to yell like he did this or he
6   did that, you know, not in their face, not
7   interfering with them.
8      Q    They're basically -- there's this event
9   happening with Jordn and Officer Holsopple, and
10  then there's kind of a separate kind of group of
11  people who are in the yard; fair?
12     A    There's people everywhere.  I don't know
13  if they're in the yard, in the driveway.  I
14  briefly looked at the people, but I was focused on
15  my officers and Jordn.
16     Q    How close do you estimate these people
17  were to Jordn and the officers?
18     A    There's no way for me to know.  I mean,
19  that neighborhood is tiny.  The yards are tiny.
20  So they were just variously around the house,
21  garage, vehicles kind of thing.  They weren't more
22  than 100 feet away.
23     Q    Okay.  But I mean, as you came up, up
24  the driveway -- and you have some exhibits here?

Page 215

1      A    Uh-huh.
2      Q    Feel free to flip through them, but just
3   try to keep them in order, okay?
4      A    Uh-huh.
5      Q    Is that -- those exhibits you have, I
6   believe they're marked as Exhibit 19; is that
7   right?
8      A    18.
9      Q    Exhibit 18, is that the location where
10  you responded on September 8th, 2015?
11     A    Yes.
12     Q    And in looking at those photographs,
13  does it refresh your recollection at all in terms
14  of where any homeowners or other citizens may have
15  been when you arrived?
16     A    I don't know exactly where they were.  I
17  just know there were people around, but they
18  weren't posing any threat to what we were doing.
19     Q    You said they were no more than 100 feet
20  away.
21     A    Right.
22     Q    Can you narrow that at all to try to
23  tell me where they were at?
24     A    I have no idea where they were at.  I

Page 216

1   just know there were people.  That wasn't where my
2   focus was.
3      Q    Did they seem to be in any immediate
4   harm or jeopardy when you got there?
5      A    No.
6      Q    You and I are probably -- I guess,
7   probably like six and a half feet away, something
8   like that?
9      A    Uh-huh.
10     Q    Is that fair?
11     A    Yes.
12     Q    Were they at least that far away from
13  Jordn and the officers?
14     A    There's no way to know.  I mean,
15  maybe -- it would take probably just a couple
16  seconds for them to get close to us.
17     Q    Sure.
18     A    Or interfere, if they wanted to.
19     Q    No.  I understand that.  I'm just trying
20  to figure out where they actually were.
21     A    There's no way for me to know where they
22  were.
23     Q    They were just far enough away that they
24  didn't seem to be posing a problem?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 217

1    A   They weren't hovering over us, and that
2  was all I was concerned about.
3    Q   And they didn't seem to be in any
4  immediate jeopardy when you got there; fair?
5        MR. LUTE: Objection.
6        You may answer.
7    A   They were around.  There's always that
8  possibility, but they weren't getting injured when
9  I got there.
10  BY MR. HILL:
11   Q   And I know it's always a possibility.
12  Everything is a possibility.  But as you're coming
13  up to the scene and you're processing this
14  information, you were not under the impression
15  that they're in any immediate danger; is that
16  fair?
17   A   Just my officers; not them, yes.
18   Q   Now, at the time that you get there, you
19  know that Jordn has already been tasered once;
20  correct?
21   A   Yes.
22   Q   Do you know at the time you get there
23  why he's been tasered?
24   A   No.

Page 218

1    Q   When you get there, to the scene, at
2  1019 Abington, do you know why Jordn is out of the
3  vehicle, meaning who decided to get out of the
4  vehicle, Jordn or the officers?
5    A   No, not to my knowledge.  I don't know
6  how he is now out of the vehicle, yeah.  I can
7  assume, but, you know, I wasn't there for it.
8    Q   I don't want you to assume.  I just want
9  to know what was going on in your mind when you
10  got there, okay?
11   A   Uh-huh.
12   Q   Is that fair?
13   A   I can tell you what I was thinking when
14  I got there.  Is that what you want me to do,
15  about how he was out of the vehicle?
16   Q   Sure.
17   A   I figured that my officers extracted him
18  from the vehicle.
19   Q   Why did you figure that?
20   A   Because the door was open and he wasn't
21  in the vehicle any longer.  He was on the ground.
22   Q   And you have -- the documents you have
23  in front of you, Exhibit 18, those photographs,
24  when you arrived on the scene, can you show me

Page 219

1  where Jordn was on the ground?
2    A   I mean, I know he was in the driveway,
3  but I don't know.  I couldn't tell you exactly
4  where he was at in the driveway.
5    Q   Can you tell me generally?
6    A   He would have had to have been next to
7  the vehicle they got him out of, but I don't know
8  how far away from it that he was at that point.
9    Q   All right.  But I just want to know your
10  memory here, as you sit here.
11   A   Well, we cut his hoodie off, so I would
12  assume that's where he was at, in that various
13  location.
14   Q   So you're looking where the hoodie --
15  the camouflaged hoodie is located in those
16  photographs?
17   A   Right.  The only place I knew where he
18  was in that driveway, and what I was focusing on,
19  was where we had cut off his hoodie and it was
20  laying there before he was extracted into the
21  ambulance to be taken to the hospital.
22   Q   So --
23   A   So where at in the driveway, I don't
24  know exactly.  But wherever the general location

Page 220

1  of the hoodie was.
2    Q   And can you hold up that photograph?
3    A   You can see the hoodie in this one.
4    Q   I'm going to zoom in.  Can you move it a
5  little bit?  And is the hoodie behind the Jeep?
6    A   There's a part behind the Jeep and a
7  part to the side of the Jeep.
8    Q   Which part of the hoodie is where Jordn
9  was located?
10   A   He was in that general vicinity.
11   Q   But you said there's two different parts
12  of the hoodie.  One is behind the Jeep, and one is
13  to the side of the Jeep; correct?
14   A   Yes.
15   Q   So he wasn't in two places; right?
16   A   I just said he's in that general
17  vicinity.  Whether he was in the back of the Jeep
18  or the side of the Jeep, I can't tell you.  He was
19  near the Jeep, and I remember cutting the hoodie
20  -- the hoodie being cut off.
21   Q   Did you cut the hoodie off?
22   A   I don't remember who cut the hoodie off.
23  I think it may have been scissors from the EMS
24  squad.  You would have to ask them.  I was too

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 221

1  busy trying to arouse him, so --
2    Q   Where was Jordn's head with respect to
3  the location of the Jeep?  Does that make sense?
4  That might have been very unclear.
5    A   I still don't know which direction he
6  was facing, so --
7    Q   Was Jordn's head closer to the Jeep or
8  were his feet closer to the Jeep?
9    A   Like I said, I do not know.  He was
10  bucking around, and he was all over the place.  I
11  don't know which direction at what time he was
12  located.
13    Q   So you saw Jordn moving around the
14  driveway?
15    A   He was bucking up and kicking and moving
16  around.  He was all over the place.
17    Q   How far did Jordn's body travel while
18  you were in the driveway?
19    A   He was -- at that time, he was just able
20  to buck up and kick and try to bite.
21    Q   But my question is:  You said he was
22  moving all over the driveway.  From the time you
23  got there until the time he became unresponsive,
24  how far did Jordn's body move across the driveway?

Page 222

1    A   I do not know.  I was too concerned with
2  getting him under control.
3    Q   When you said that he was moving all
4  across the driveway, what did you mean?
5    A   He's bucking around, so I don't know
6  which direction his head is pointing, which is
7  what you're asking.  I do not know.
8        Did he move a quarter?  Did he move a
9  half?  180?  I don't know.
10    Q   As you sit here, can you say whether his
11  body moved at all while he was in the driveway?
12    A   Well, I'm sure it did.
13    Q   That's not my question.  My question is:
14  As you sit here, can you testify under oath as to
15  whether Jordn's body moved at all on the driveway
16  while you were there?
17    A   Well, his body moved the whole time
18  until the very end.
19    Q   In terms of the location on the
20  driveway, can you say under oath as you sit here
21  where his body moved in the driveway?
22    A   I told you, I do not know which
23  direction his head was and how far his head
24  portion moved to the location he was at.

Page 223

1    Q   And I know you said you can't tell how
2  far it moved.
3        Are you able to say under oath that it
4  did move, his head -- the closeness of his head to
5  the Jeep moved while you were in the -- while you
6  were on scene?
7    A   Under oath, I'm telling you his head was
8  off the ground and against the driveway on his own
9  volition and his legs were kicking and he was
10  reaching around and trying to bite everybody that
11  was around, so his head was moving.  I don't know
12  how much, how many inches, how many feet.  I do
13  not know.
14    Q   When you arrived on the scene, what side
15  of Jordn's body was Officer Scherer?
16    A   I don't know who was in which location.
17  I think that Holsopple had just gotten his right
18  arm out from underneath of him, so he had to have
19  been towards the right.  Officer Scherer was up
20  towards his head, because he had just gotten
21  bitten right before I got up to them.
22    Q   How did you know that?  I thought you
23  didn't know.
24    A   They told me that.

Page 224

1    Q   So when you got there, he said, "I was
2  bitten"?
3    A   No.  Holsopple said, "He just bit Bubba
4  in the leg."
5    Q   So how much earlier did that happen?
6    A   How much earlier did what happen?
7    Q   The bite.
8    A   It happened before I got out of the car
9  and was coming up the driveway.
10    Q   So as you pull in, did you see the bite
11  take place?
12    A   No.
13    Q   As you pull in, did you see Officer
14  Scherer kick Jordn?
15    A   No.
16    Q   As you pull in, did you see Officer
17  Holsopple strike Jordn in the back of the head?
18    A   I already told you no.
19    Q   So at what point -- so let me say.
20        When you pull in and you start jogging
21  up the driveway, are you looking at Officer
22  Scherer's back or his side?
23    A   I have no idea what I'm looking at, at
24  that point.  I'm looking at Jordn Miller to see

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 225

1  what I can do to help them control him.
2     Q     Same question with Officer Holsopple.
3  As you're coming up the driveway, are you looking
4  at Officer Holsopple's back or his side or his
5  front?
6     A     I cannot tell you. I don't think I'm
7  looking at anybody's butt, but I mean, you know,
8  they were there and trying to control him, and I
9  wasn't paying attention to my officers and their
10  fronts or sides or which side they're on. I'm
11  paying attention to what I can do to get control
12  and help them get control of Jordn Miller, which
13  was on the left side towards his shoulder area, is
14  where I was standing. So wherever they tell you
15  where they were standing is where they were
16  standing.
17     Q     Where were their hands?
18     A     I wasn't paying attention to where their
19  hands were. We were -- had hands on him, trying
20  to keep him from kicking, trying to keep him from
21  biting.
22     Q     I'm asking about their hands.
23     A     I cannot testify to where their hands
24  were.

Page 226

1     Q     Can you testify to where their hands
2  were at any point?
3     A     No. I mean, I just know that somebody
4  was trying to control his legs. Somebody was
5  trying to control the middle section of his body.
6  I was trying to control his head and not get
7  bitten at the same time and shoulder area so he
8  couldn't buck up to try and reach to bite us
9  anymore. But I don't know what they were doing
10  exactly.
11     Q     That was my only question, is: Do you
12  know where their hands were at any point when you
13  were at 1019 Abington?
14     A     We were all hands-on, trying to keep him
15  down from getting injured and from injuring us.
16  That's all I know. I know what I did. I don't
17  have a specific idea of, oh, well, Officer
18  Holsopple was holding his right calf or anything
19  like that.
20     Q     But you remember Officer Scherer and
21  Officer Holsopple at least trying to keep Jordn on
22  the ground?
23     A     We were all trying to.
24     Q     So you're using force to keep Jordn on

Page 227

1  the ground?
2     A     We're trying to hold him down so that he
3  can't hurt himself and us, yes.
4     Q     But my question is just, simply: You
5  were using force to keep Jordn on the ground?
6         MR. LUTE: Objection.
7         You may answer.
8     A     Like continuous force or -- I don't
9  understand what force you're talking about.
10  BY MR. HILL:
11     Q     Well, how were you keeping Jordn on the
12  ground?
13     A     Well, when he would buck up, we would
14  try and hold him down, you know. And then he
15  would buck up again and then go back down. So of
16  course we weren't holding him down at all when he
17  was back down on the ground and not trying to bite
18  or kick us.
19     Q     And how were you -- when you say "buck
20  up," what do you mean?
21     A     Like that. I mean, he has his back --
22         MR. LUTE: Wait, wait. There's a
23  record, so you kind of have to describe -- even
24  though the video is showing --

Page 228

1         THE WITNESS: Yeah.
2         MR. LUTE: You sort of have to describe
3  what you're physically doing.
4         THE WITNESS: Oh, I have to like get up
5  and describe it?
6         MR. LUTE: No. I'm saying when you say
7  "like that," she can only type the words "like
8  that."
9         THE WITNESS: Oh, I see what you're
10  saying.
11         MR. LUTE: So you have to be more
12  descriptive.
13         THE WITNESS: Okay.
14     A     So he has his hands -- Jordn Miller is
15  cuffed behind his back at this point. And when I
16  get on the scene, I can see him from a distance.
17  And even when I got up to his body and he -- his
18  head and shoulders are coming up off the ground,
19  and they'd go down, and his legs would come up off
20  the ground, and they'd go down, and he'd be trying
21  to turn on his side and kick us that way, and he
22  was trying to bite us by turning his head, and,
23  you know, trying to like latch on to something.
24         I don't know if that describes it good

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 229

1  enough, but it was just trying to injure us, get
2  away altogether kind of thing.
3  BY MR. HILL:
4    Q   I want to take it step by step, because
5  my question was:  When you said he was bucking up
6  and you were -- it looked like you were describing
7  your shoulders.
8    A   Yes.
9    Q   Just along those lines of him bucking up
10  with his shoulders, his hands are behind his back;
11  correct?
12    A   Yes.
13    Q   They're secured; correct?
14    A   Yes.
15    Q   He's in a prone position; correct?
16    A   Well, he's moving.
17    Q   He's in a prone position; correct?
18    A   Initially, when he's not moving.
19    Q   Does he ever get up off the ground?
20    A   He does not stand up.  We tried to get
21  him to stand up, and he wouldn't.
22    Q   You tried to transition Jordn out of a
23  prone position; is that what you're saying?
24    A   We were trying to give him orders, and

Page 230

1  he wasn't paying attention to anything.  So no, he
2  was not listening to us.
3    Q   My question is:  You said we tried to
4  stand him up.
5    A   Tried to get him up.  Tried to order him
6  up.
7    Q   So --
8    A   And I even called for another officer,
9  because I realized he wasn't going to get up, and
10  we may need you to carry him to the cruiser and we
11  might need more help.
12    Q   What officer did you call?
13    A   902, which was Officer Linaburg.
14    Q   And did you do that over your radio?
15    A   I believe so.
16    Q   And what did you say to Officer Linaburg
17  over the radio?
18    A   Something to the effect of:  "Can you 25
19  this way?  We might need help getting him into the
20  cruiser."
21    Q   And at what point in time did you make
22  that call?
23    A   I have no idea what time it was.
24    Q   So was it your expectation at this point

Page 231

1  that you're going to put Jordn directly in a
2  cruiser, police cruiser?
3    A   Yes.
4    Q   And 25 -- when you say, "Can you 25,"
5  what does that mean?
6    A   Head this way in route.
7    Q   Is that the first time you requested
8  anyone else to head to the area?
9    A   Other than the FD to step it up and the
10  EMS.
11    Q   So I only want to discuss his shoulders,
12  okay?
13        Let me take that back.  You said you
14  tried to get him up.
15        Did the three officers, you, Holsopple
16  and Scherer, ever attempt to lift or move Jordn
17  physically out of the prone position?
18    A   I don't know what they tried to do, but
19  I know when I got there I wanted to try to talk to
20  Jordn to see if he would listen to any commands.
21        So it's:  "Jordn, we need you to get up.
22  We need you to stand up.  We need you to sit up,"
23  that kind of thing.  And he was fighting the whole
24  time.

Page 232

1    Q   But that's not my question.  Do you
2  remember my question?
3    A   What is it you're looking for?
4    Q   Did you ever -- you, Officer Scherer,
5  Officer Holsopple try to physically get Jordn --
6    A   I never tried --
7    Q   Let me finish the question.
8    A   You already asked it.
9        MR. LUTE: Just wait for the question.
10        Go ahead.  Probably start it again.
11  BY MR. HILL:
12    Q   Did you, Officer Scherer, Officer
13  Holsopple, ever try to transition physically Jordn
14  out of a prone position?
15    A   Not once I got there.  I did not do
16  that.
17    Q   That's all I want you --
18    A   That's all I'm trying to say, yes.  I
19  was trying to explain what I meant by him getting
20  up.
21    Q   Okay.
22    A   Okay.
23    Q   You don't know what was happening in
24  terms of Jordn's position before you got there;

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 233

1 correct?
2    A   His position?
3    Q   How he was being restrained?
4    A   I could see when I was coming up the
5 driveway.  Before I got there, of course I would
6 not know.
7    Q   So I only want to ask -- I only want you
8 to talk about what you know, okay?  All right?
9    A   Okay.  What do you want to know?
10    Q   So when I'm asking you questions about
11 did you or Officer Holsopple or Officer Scherer
12 ever try to transition Jordn out of a prone
13 position, I'm asking about while you were there,
14 okay?  Just so we're clear.
15    A   Okay.
16    Q   While you were there, did you see
17 Officer Scherer or Officer Holsopple ever try to
18 transition Jordn out of a prone position?
19    A   Not to my knowledge.
20    Q   You never physically tried to assist
21 Jordn out of a prone position; fair?
22    A   I don't recall trying to pull him up off
23 the ground.  We were trying not to get close like
24 that.

Page 234

1    Q   And I don't even mean -- and
2 transitioning him out of a prone position could
3 mean sitting him up; correct?
4    A   Yes, it could.
5    Q   It could mean rolling him on his side;
6 correct?
7    A   It could.
8    Q   It could mean standing him up; correct?
9    A   Yes.
10    Q   And at least while you were present,
11 none of those were attempted; correct?
12    A   No, they were not.
13    Q   When you said earlier you tried to get
14 Jordn to stand up, those were verbal commands you
15 were giving to Jordn?
16    A   Yes.
17    Q   This is after Jordn had been tasered?
18    A   Yes.
19    Q   What verbal commands were you giving
20 Jordn?
21    A   I can't tell you word for word, but my
22 common thing is, "Come on, buddy.  We need you to
23 stand up.  We need you to get up.  You need to
24 just roll on over onto your side and get on your

Page 235

1 butt.  Come on.  We need to talk to you.  Just
2 stand up."  And you're trying to talk to somebody,
3 trying to get them to do what you want and what
4 you need them to do, and he just wasn't
5 responding.
6    Q   And then when he would go to move, what
7 would you do?
8    A   Well, when he -- move in what way?  If
9 he was just wriggling around, we didn't do
10 anything.  We were just waiting for the squad.
11       If he was trying to bite somebody, then
12 we put him back down on the ground, so --
13    Q   Well, you said put him back on the
14 ground?
15    A   Right.
16    Q   He never got off the ground; fair?
17    A   From the bucking that we talked about
18 earlier.
19    Q   I just want to make sure we're clear on
20 the record.
21       When you say, "Put him back on the
22 ground," from all the testimony I've heard in this
23 case from all the officers, their testimony has
24 been he never got off the ground?

Page 236

1    A   I never said he got off the ground.  But
2 he's bucking and he's coming -- parts of his body
3 are coming off the ground.  These are semantics.
4    Q   Well, I just want to make sure we're
5 clear so when we can look back at this and know
6 what we talked about.
7    A   Well, you even buck like --
8       MR. LUTE: Just wait for the question.
9       THE WITNESS: Okay.
10 BY MR. HILL:
11    Q   So you said there would be periods where
12 Jordn would lay on the ground and not move at all;
13 correct?
14    A   Very short in between the bucking, yes.
15    Q   How long did those periods last?
16    A   Not long.  Maybe a couple seconds.
17    Q   Is there a reason why during those
18 periods of a couple seconds where Jordn is lying,
19 not doing anything, but in a prone position, no
20 one attempted to transition him to a different
21 position?
22       MR. LUTE: Objection.
23       Go ahead.
24    A   Because when he was moving, he was

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 237

1 making further actions towards us to harm us, so
2 we didn't want bit again.
3 BY MR. HILL:
4    Q   So I'm just trying to understand.
5        When he's laying on the ground not doing
6 anything, you're not trying to get him out of a
7 prone position. But at the same time, or during
8 the same period, you're asking him to stand up?
9    A   I'm trying to get him to cooperate, to
10 understand what I'm saying, to talk to him, to
11 communicate, so that he would understand that
12 we're not there to hurt him.
13       "We're not here to hurt you, man. We
14 just need to talk to you, figure out what's going
15 on."
16       Whenever we got close to his head area,
17 he would try to bite. And when you stand somebody
18 up, you take them by the arm and try to turn them
19 over onto their butt, and that was too dangerous.
20    Q   Did he appear to understand what you
21 were saying?
22       MR. LUTE: Objection.
23       Go ahead.
24    A   He was screaming and, you know, talking

Page 238

1 nonsense. I couldn't even tell you what he was
2 saying or trying to say. But he was able to make
3 noise. That's all I can tell you.
4 BY MR. HILL:
5    Q   What kind of noise?
6    A   That's all I can tell you. I heard
7 noise. Just nonsense.
8    Q   What kind of noise? Can you describe
9 it?
10    A   I do not know. Just loud noises, you
11 know, maybe even a "get off" here and there or
12 whatever, but nothing that made any sense
13 whatsoever.
14    Q   "Get off" makes sense, doesn't it?
15    A   Well, he didn't want arrested. And at
16 that time, that's what he thought, he was under
17 arrest, in our minds, like everybody else.
18    Q   Is that what you were thinking at the
19 time?
20    A   Yes. After he was trying to steal a
21 Jeep, I automatically thought he didn't want to
22 get arrested for that.
23    Q   Is that what you thought you were
24 dealing with at the time, a guy who was actively

Page 239

1 resisting because he didn't want to go to jail?
2    A   Well, I didn't know if it was mental and
3 then he was trying to steal a Jeep on top of that.
4 I didn't know if it was just mental and he was
5 just in the Jeep. I didn't know what was going on
6 in his head. I could only tell you what I was
7 there for, and he was trying to steal a Jeep.
8    Q   You said -- I'm just trying to follow
9 up.
10       You said he maybe said "get off," and
11 then you said he didn't want to go to jail.
12    A   That's generally when people tell us,
13 "Get off me, man," you know, "get off me. Get
14 away from me." They say that all the time.
15    Q   And was he saying those things?
16    A   He may have said something like "off,"
17 or "get off" or he was verbally trying to
18 communicate. Some things didn't make sense. I
19 don't remember exactly what he said at all, but he
20 was making noise.
21    Q   As you sit here today, do you think you
22 remember Jordn saying something like "get off"?
23       MR. LUTE: Objection.
24       You may answer.

Page 240

1    A   It's -- it's in my head that he did, but
2 I don't know exactly what he was saying. I don't
3 think he knew what he was saying. So I can't tell
4 you for sure. It was something to that effect,
5 but I can't tell you exactly what he said.
6 BY MR. HILL:
7    Q   Do you remember hearing any -- any
8 statements or words from Jordn that you could
9 understand?
10    A   Other than whatever it was that he said
11 to that effect, no, I didn't understand anything
12 he was saying or trying to say when I was there.
13    Q   So it was a lot of -- a lot of
14 incomprehensible noise, fair, coming from Jordn?
15    A   It was yelling noise, mostly.
16    Q   And then you heard him say something
17 like "get off," "get off me"?
18    A   Something to that effect.
19    Q   And when during your interaction with
20 Jordn did you hear him say "get off me"?
21    A   When he was trying to bite us.
22    Q   So where were you at when he was saying
23 "get off me"?
24    A   I never moved from his left shoulder

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 241

1  area.
2    Q    And you're talking about where your foot
3  was?
4    A    Yes, where my body was.
5    Q    And my understanding is Jordn was in
6  a -- handcuffed behind his back, on his stomach,
7  and you were standing towards where like the crown
8  of his head would be?
9    A    Yeah, like shoulder area.
10   Q    Were you straddling Jordn?
11   A    No.
12   Q    You have one foot on Jordn's shoulder
13  blade?
14   A    On his left shoulder blade when he bucks
15  up only.  When he would go back down, I didn't
16  have anything on him.
17   Q    So you would put your foot on him when
18  he started to buck up?
19   A    Yes.
20   Q    And you would use that foot to push him
21  back down?
22   A    Yes.  Well, to make sure that he didn't
23  get his head turned enough to bite anybody.
24   Q    Right.  But physically, you would be

Page 242

1  pushing his body down?
2    A    It was pushing it down, yes.
3    Q    And that would continue until he fell
4  into these periods where he wasn't re -- where he
5  was kind of limp for a moment, for a few seconds?
6    A    It only happened a couple times by the
7  time I got there and by the time he went
8  unresponsive.
9    Q    So your left foot would be on, is it
10  Jordn's right shoulder?
11   A    It would have been my right foot on his
12  left shoulder.
13   Q    Your right foot on his left shoulder.
14  And you describe it in your report as his shoulder
15  blade?
16   A    General area, yeah.
17   Q    And is that like your scapula area?
18  Where would that be?
19   A    Well, right here (indicating), I guess.
20   Q    Like upper back?
21   A    Yeah.  I mean, your shoulder.
22   Q    I just want to make sure that -- can you
23  -- we're on video, so we can actually see.
24   A    I just pointed to it.  Right here

Page 243

1  (indicating).
2    Q    Okay.
3    A    That's where you come up.  So if you
4  want somebody to go back down so they can't turn
5  their head, you push down right here (indicating).
6    Q    And where was your heel?
7    A    I could draw it, if you want, but --
8    Q    Was your heel on his back?
9    A    No.  Like my toes were on -- right here
10  (indicating).  And so I'm sideways, so that I can
11  move out of the way if he makes affirmative action
12  towards me to bite me.  So if this is his shoulder
13  blade, my toes are right here.  The rest of my
14  foot is right here.  And I wear a size seven shoe,
15  so --
16   Q    So when Jordn would go to raise his
17  shoulders off the ground, you would pick your foot
18  up, put it on his shoulder, and push him back
19  down?
20   A    Right.  And then take my foot back off.
21   Q    And how long would this struggle
22  continue before you took your foot off?
23   A    Oh, well, as soon as his shoulder was
24  back down on the ground, I took my foot off.  And

Page 244

1  that happened a couple of times.
2    Q    So how long -- were you able to push him
3  down right away?
4    A    Yes.
5    Q    So when he lifted his shoulders up, when
6  you put your foot on him, you were able to push
7  his shoulders down easily?
8    A    His shoulder down.
9    Q    Easily?
10   A    I wouldn't say easily.  He was trying to
11  bite at us so --
12   Q    I know that.  But I'm talking about the
13  amount of force that you had to use, because you
14  described him in your report as having superhuman
15  strength; correct?
16   A    Yeah, he was very strong.  It took three
17  of us to control him.  So was the shoulder his
18  strongest?  I mean, probably that -- he was
19  kicking pretty hard, too.
20   Q    I'm asking what you did.
21       In terms of superhuman strength, how
22  much force did you have to use to keep this person
23  on the ground?
24   A    The superhuman strength was Officer

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 245

1  Holsopple and Officer Scherer.  My part of it was
2  at the very end.  And although he was kicking and
3  trying to bite and bucking up, it wasn't anything
4  that I couldn't control as far as one shoulder
5  when there were three of us there.  So I don't
6  know what you want me to say.
7      Q   I don't want you to say anything.  I
8  want to know what happened.
9      A   And I'm trying to describe it the best
10  that I can.
11          MR. LUTE: I think --
12  BY MR. HILL:
13      Q   In terms of superhuman strength, you did
14  not observe Jordn doing anything in terms of his
15  back or shoulder that demonstrated some superhuman
16  strength?
17      A   He was trying to bite us, that's all.
18      Q   That's not my question.
19      A   He didn't have a cape and fly around or
20  anything.
21      Q   Then what did you mean?  You agreed to
22  this language in the report of superhuman
23  strength?
24      A   That was their -- it was all three of us

Page 246

1  comprised in this investigator's note.  They told
2  me what they experienced when they were there.  I
3  discussed in there what I experienced when I was
4  there.  They said he had superhuman strength when
5  they had to extract him and they had to get him on
6  the ground and get him handcuffed and control him.
7  So if you want to talk about the superhuman
8  strength, you can talk to them.
9      Q   I did.
10      A   Okay.
11      Q   But you signed off on their report, so I
12  want to talk to you about it, okay?
13      A   I believe my officers, so it was the
14  three of us.
15      Q   My question is:  The phrase that you
16  used, superhuman strength, does that apply to the
17  period that you were on scene?
18      A   Not any more than anybody else he was
19  trying to bite.
20      Q   That's not my question.  The terminology
21  the three of you agreed to, superhuman strength,
22  did that apply to the period that you were on the
23  scene and interacting with Jordn where your foot
24  was on his shoulder?

Page 247

1      A   Not that time.  Not when I was there.
2      Q   So is it your understanding that the
3  reference "superhuman strength" that's in Exhibit
4  12 applies to the time period before it was all
5  three officers restraining Jordn?
6      A   That's applied, yes, before I was there.
7      Q   I spoke to Officer Scherer about Jordn
8  moving his head while you were there.  I'm sorry.
9  I spoke to Officer Holsopple about that.
10          Officer Holsopple saw Jordn move his
11  head -- try to move his head from side-to-side but
12  never saw Jordn move his teeth to try to bite
13  somebody.
14          Is your testimony different than that?
15      A   Yes.
16      Q   Okay.  So I want you to tell me what --
17  you're telling me that Jordn was actively trying
18  to bite someone?
19      A   He had his mouth open.  I knew he
20  already bit somebody.  In my mind, he was trying
21  to bite somebody else again.
22      Q   I want to ask, though, what you saw.
23      A   I can't say --
24      Q   I'm asking what you saw Jordn do.

Page 248

1      A   I'm explaining to you.  In my opinion,
2  he was trying to bite again.  He had his mouth
3  open and was coming towards where our legs were.
4  And to me, that would be him trying to bite again.
5          What I was trying to do in his head, I
6  don't know.  But that was my fear, and that's what
7  I was trying to prevent from happening.
8      Q   You said he was coming to where our legs
9  were; correct?
10      A   Yes.
11      Q   Whose legs?
12      A   Like I said, I don't know which position
13  we're in.  We're looking at him.  I'm focusing on
14  Jordn Miller.  I'm not focusing on which body is
15  where.  I just see legs, and there are officer's
16  legs in polyester pants, and his mouth is next to
17  them.  And I'm just making sure his mouth isn't
18  going to connect to a leg again.
19      Q   When you say he was coming to where
20  their legs are, what did you mean just now, if you
21  don't know where their legs were at?
22      A   I know where my legs are, and I can see
23  polyester pants.
24          Do I know which position the officers

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 249

1  are in at that time?  I'm focusing on Jordn
2  Miller.  I think I was pretty specific with that.
3  I see polyester pants, I see his mouth, I see it
4  open, and I see it by a police leg.  And I'm going
5  to make sure he doesn't bite it.  That's all I
6  know.
7      Q   How close was Jordn's mouth to any
8  police officer's leg, not including your own?
9      A   Inches from where we were trying to keep
10  him from getting up and getting away from us.
11     Q   So whose leg, Officer Scherer or Officer
12  Holsopple?
13         MR. LUTE: Objection.  I think she's
14  already said she doesn't know.  She said it like
15  three times.
16  BY MR. HILL:
17     Q   Well, I just want to know, because you
18  said --
19     A   I know you want to know.
20     Q   It's within inches, but you don't know
21  where their legs are, you're telling me.
22         MR. LUTE: She says she sees where legs
23  are, but she doesn't know who they belong to.
24     A   Yeah.  We all have black boots on.  We

Page 250

1  all have the same polyester pants on.  I know
2  where my legs are.  I see other legs, and they're
3  police legs.  They're not people legs, you know.
4  They're not jeans legs or shorts legs.  They're
5  polyester pants legs.  Do I look up to see whose
6  legs they are?  I don't care whose legs they are.
7  I know they're cops' legs.  That's all I know.
8  BY MR. HILL:
9      Q   I'm just asking you.
10     A   And I've been answering you.  And I will
11  answer anything you want, but I don't want to
12  answer it five times.  You wouldn't want to
13  either.
14     Q   Well, my only question is that you're
15  saying he's within inches of biting a police
16  officer's leg.  But you're also at the same time
17  saying you don't know where either the police
18  officers were at with respect to Jordn and their
19  positions.  So you understand why there's a
20  disconnect?
21     A   If you laid down right here and there's
22  three officers around you, how far can anybody be
23  from you when we're trying to keep you on the
24  ground?  There's legs everywhere.  There's six

Page 251

1  police legs within inches trying to keep this
2  person on the ground, away from biting people.
3  You see blue polyester pants, I -- there's not a
4  face on their calf or on their ankle or on their
5  boot.  I can't say.  I'm not paying attention to
6  that.  I'm paying attention to Jordn and making
7  sure he can't injure my officers.
8      Q   As you arrived on scene, you saw Officer
9  Scherer use the electrical-conducted weapon on
10  Jordn a second time; correct?
11     A   I heard it when I was getting out of my
12  car.
13     Q   What did you hear?
14     A   The t-t-t-t-t of a Taser.
15     Q   Did you see anything about where Jordn
16  was at when you heard the Taser?
17     A   I don't remember the location he was at.
18  I just heard the noise.
19     Q   Did you see Jordn's body while the Taser
20  was being activated?
21     A   From where I was, I could tell that it
22  had no electro-muscular incapacitation at all,
23  like something wasn't connected or something
24  wasn't working.

Page 252

1      Q   Or the probe is not connected?
2      A   I don't know.  I don't know if it just
3  had no effect on him.  I don't know if there was a
4  probe that wasn't all the way attached.  At that
5  point I just didn't know at all.
6      Q   Well, the probes were in Jordn's back;
7  correct?
8      A   Well, at least one.  But sometimes it
9  can be, if you have clothing on, it's not
10  completely into your skin.  If it's touching your
11  skin a little bit, it's not going to incapacitate
12  you muscularly.
13     Q   Was it in his clothing?
14     A   I don't remember where the probes were.
15     Q   So what are you talking about?
16     A   He was tased, and he had clothing on.
17     Q   So do you know whether the probes were
18  connected or not?
19     A   The other officers wrote in here where
20  the probes were:  In his back, three inches a
21  part.  I read that.
22         That's not my statement.  That's theirs.
23  They tased him.
24         When I came up, I saw wires, and I knew

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 253

1  it didn't incapacitate him.
2      Q   So you started going along the lines,
3  saying sometimes they're not effective because the
4  probes aren't connected.
5          Do you know one way or another whether
6  the probes were in Jordn's body when you arrived?
7      A   I don't know if one was disconnected or
8  not.  They could have been there the first time
9  and then one might have fallen out.  There's no
10  way for me to have known.  And all I was concerned
11  about was he didn't hurt anybody or himself.
12         So where the probes were and whether
13  they were in the skin or just in the clothing or
14  barely touching the skin, at that point I didn't
15  know.  He was moving around so much they could
16  have come out.
17     Q   So is that your question as to whether
18  or not you knew or didn't know where the probes
19  were at?
20     A   I knew he was tased.  When I saw that it
21  didn't incapacitate him like a Taser normally
22  does, because I know what it feels like, I knew
23  something was wrong.
24     Q   How --

Page 254

1      A   What it was, whether it was him --
2          Well, let me answer.  I asked -- you
3  asked your question.
4          I don't know if one came disconnected or
5  not, but it didn't incapacitate him.  That's all I
6  can tell you.
7      Q   When Jordn became unresponsive, did you
8  ever look to see if the probes were still
9  attached?
10     A   No.
11     Q   Why not?
12     A   Because I was too concerned with him
13  injuring himself and other people.
14     Q   When he was unresponsive?
15     A   Oh, unresponsive?
16     Q   That was my question.
17     A   No.  When he was unresponsive, I was
18  trying to get him to come to, as you can read.  I
19  was doing sternum rubs.  I was rubbing his back.
20  We unhandcuffed him.  We were checking his pulse.
21  We were doing everything we could when he became
22  unresponsive.
23     Q   My only question was --
24     A   Maybe it will save you from further

Page 255

1  questions.
2      Q   So as you approached and you hear the
3  Taser cycling, you're the supervisor on the scene
4  at that point; correct?
5      A   Yeah, I'm getting up there.
6      Q   I mean, you are Officer Scherer and
7  Officer Holsopple's supervisor; true?
8      A   Yes.
9      Q   And at that point, when you hear the
10  Taser going off, do you implicitly authorize the
11  use of the Taser?
12         MR. LUTE: Objection.
13         You may answer.
14     A   No.
15  BY MR. HILL:
16     Q   Are you comfortable with the Taser being
17  used at that point?
18     A   If they felt that it was necessary, yes.
19     Q   Did you ask anyone why the Taser was
20  being used a second time?
21     A   I wasn't even around anybody.  I was
22  coming up.  I wasn't even next to anybody when it
23  was going off.
24     Q   My question is:  You get out of the car.

Page 256

1  You start to jog towards where Mr. Miller is at;
2  correct?
3      A   (Nods head.)
4      Q   Correct?
5      A   Yes.
6      Q   You hear the Taser cycling; correct?
7      A   Correct.
8      Q   You know that Jordn has been tasered
9  once already; correct?
10     A   Correct.
11     Q   You understand at this point that he's
12  in handcuffs; correct?
13     A   Not until I get completely up to him,
14  no.  I didn't know if he was fully in handcuffs or
15  not until I was right up there next to him, and
16  then I saw.
17     Q   At any point did you question the use of
18  the Taser the second time?
19     A   No.
20     Q   Was any discussion had about that a
21  Taser shouldn't be used a third time?
22     A   No.
23     Q   As the supervisor on scene, would you
24  have been comfortable with a Taser being used a

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 257

1 third time?
2      MR. LUTE: Objection.  It's
3 hypothetical.
4      You may answer.
5   A   At that point it didn't work, and he did
6 what I would have done.
7 BY MR. HILL:
8   Q   That's not my question.  My question --
9   A   Well, there would have been no point in
10 cycling a third time, when it doesn't work.  When
11 it doesn't work, you go to something else.
12   Q   You were close enough that you could
13 hear the Taser cycling?
14   A   They're loud.  I could hear it from the
15 car, yes.
16   Q   So you said you could hear it from the
17 car.  Are you still in the car when you hear it?
18   A   I'm probably getting out, on my way up.
19   Q   Do you remember one way or another?
20   A   No.  I mean, I was -- from the street,
21 coming up the driveway, I could hear it.
22   Q   As soon as you got onto the scene and
23 got to Jordn, did you ever put your hands on
24 Jordn?

Page 258

1   A   When I got to the scene and got up to
2 Jordn?
3   Q   Yes.
4   A   Did I put my hands on him?
5   Q   Correct.
6   A   No.
7   Q   Was it the first position you took to
8 put your foot on Jordn's shoulder blade?
9   A   They said, "Be careful, he just bit
10 Bubba," and he was going crazy on the ground, and
11 I never put my hands down there to get close to
12 his face.
13   Q   So my question was:  Before Jordn became
14 unresponsive, did you ever put your hands on
15 Jordn?
16   A   No.
17   Q   So with respect to the statement that
18 you signed -- I'm just -- it's your language;
19 correct?
20   A   I typed it.
21   Q   Well, you agreed to the language in it;
22 correct?
23      MR. LUTE: Objection.
24      Go ahead.

Page 259

1   A   It's their language and my language, so
2 yes.
3 BY MR. HILL:
4   Q   In terms of the language that is used
5 after you were on scene, it's your language, too;
6 correct?
7   A   Once I'm on scene, it's my language.
8   Q   It states -- and let me ask you:  Before
9 the Taser was cycled the second time, did you see
10 anything that Jordn did?
11   A   I couldn't see -- I wasn't really even
12 knowing where to focus when I got out.  I heard
13 it, and then I started to focus.  And by the time
14 the Taser cycle was over, I could see all three of
15 them there.
16   Q   My question is:  When you hear the Taser
17 cycling, you know that the Taser has already been
18 used; correct?
19   A   The first time.  The first time?
20   Q   No.  When you're either in the car or
21 getting out of the car.
22   A   Yes.
23   Q   And you hear the Taser cycling, you know
24 that the Taser is being used at that point;

Page 260

1 correct?
2   A   Yes.
3   Q   Prior to hearing that noise, the Taser
4 cycling already, when you're either in the car or
5 getting out of the car, had you seen Jordn do
6 anything?
7   A   No.
8   Q   Your statement reads:  "The suspect
9 would lay there for a few seconds but then would
10 continue to fight and struggle to get up."
11 Correct?
12   A   Yes.
13   Q   When Jordn would lay there -- it says,
14 "Lay there for a few seconds," where was his face?
15      MR. LUTE: Objection.
16      Go ahead.
17   A   On the ground, sideways, in the front of
18 him, to the other side.
19 BY MR. HILL:
20   Q   What do you mean in the front of him?
21   A   Like straight down, to the side on the
22 right, to the side on the left.
23   Q   And you have a clear memory of that?
24   A   He was all over the place.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 261

1    Q   That's not my question.  My question is:
2  Do you have a clear memory of where his face was
3  at during these periods where you would lay there
4  for a few seconds?
5    A   He was on the ground.
6    Q   My question is with respect to --
7      If you don't remember --
8    A   I don't understand what the question is.
9  I told you earlier I can't remember which
10  direction he was in.  I do know that he turned his
11  head to the left and right and had it straight
12  when I was there.
13    Q   When --
14    A   How many times, I don't know.
15    Q   So when you wrote, "He would lay there
16  for a few seconds," do you know on how many
17  occasions he laid there for a few seconds without
18  moving?
19    A   Yes.  I told you a couple times he would
20  lay there.
21    Q   Is that three, is that four, is that
22  five, is that six?
23    A   I told you earlier approximately two.
24    Q   And when he laid there, my question was:

Page 262

1  Do you have a memory of the direction of his face
2  on both times he laid there without moving?
3    A   Each time?  I couldn't tell you if it
4  was to the right or to the left, no.
5    Q   Do you know if it was face down, face
6  up?  What do you remember?
7    A   Each time, I could not tell you which
8  direction it was in each time.
9    Q   And you're confident where it says, "he
10  would lay there for a few seconds," that happened
11  twice?
12    A   Approximately twice.
13    Q   Do you remember it happening more than
14  twice?
15    A   No, I don't remember more than twice or
16  I would have told you more than twice.
17    Q   It says: "Officers were restraining him
18  from hurting himself and getting up by holding him
19  down."  Correct?
20    A   Yes.
21    Q   So is that the reason that Jordn was
22  being -- I mean, you selected this language.  So
23  is that why you believe Jordn was being held down,
24  to keep him from hurting himself?

Page 263

1    A   There were times he was going to hurt
2  himself, and there were times when I thought he
3  was going to hurt our officers.
4    Q   I'm just reading what you wrote, okay?
5      It says:  "Officers were restraining him
6  from hurting himself and getting up by holding him
7  down."  Correct?
8      MR. LUTE: Objection.
9      Go ahead.
10    A   I certainly didn't want him to cut
11  himself on the gravel driveway.  We were trying to
12  keep him from hurting himself and hurting us.
13  BY MR. HILL:
14    Q   When you say cutting himself on the
15  gravel driveway, is that why you were holding him
16  down on the gravel driveway?
17      MR. LUTE: Objection.
18      Go ahead.
19    A   He was trying to bite us, he was moving
20  -- he was banging his headed around.  I didn't
21  want him to hurt himself.  I didn't want him to
22  cut himself.  He was on a driveway.  He was trying
23  to lunge towards us with his head.
24  BY MR. HILL:

Page 264

1    Q   How did he lunge at you with his head?
2    A   He had his mouth open, like I told you
3  earlier, and he was going towards the legs that
4  were down towards his head.
5    Q   So can you just show us on the video?  I
6  mean, he's hands down --
7    A   I showed you earlier, but I can do it
8  again, if you want.
9      So his hands are back here, and he's
10  bucking up like this, and he's coming towards this
11  officer and coming towards this officer and going
12  like this and wherever we're putting our legs.
13    Q   How high did his chest get off the
14  ground?
15    A   As high as he could possibly get it.  As
16  far as inches, I couldn't tell you.  Enough to
17  where he could reach us if he wasn't put back
18  down.
19    Q   Did he ever reach you?
20    A   He never bit me.
21    Q   High enough he could reach you.  That
22  doesn't describe how high it was.  So how high was
23  it?
24    A   I told you already --

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

---

Page 265

1    MR. LUTE: Objection.
2    Go ahead.
3    A    I told you already I don't know how many
4  inches away we were from him.  But it wasn't far,
5  because we didn't want him to get up and go
6  running around and create more damage to himself
7  or anybody else.  He was close.  Close enough to
8  bite.
9  BY MR. HILL:
10    Q    You feel comfortable putting your -- it
11  sounds like your foot on his shoulder blade,
12  pretty close to his head; correct?
13    A    Well, yeah, because I can move my leg
14  out of the way if he's trying to bite me, and then
15  he might turn his head the other way.  But I'm not
16  going to put my hand down towards his mouth.
17    Q    So you put your leg and foot on Jordn's
18  shoulder blade, and he was not in a position to
19  bite you from that angle; correct?
20    A    Yes, he was in a position to bite
21  everybody from where he was at.  The legs that
22  were in front of me, he was in a position to bite
23  every time he bucked up.  When he bucked up, I put
24  his shoulder back down on the ground so that he

---

Page 266

1  couldn't move his head.
2    Q    So where were you keeping your foot in
3  between him bucking up?
4    A    On the ground to stand.
5    Q    So you're telling me that you put the
6  foot on him, and then you put it on the ground
7  next to him?
8    A    That's correct.
9    Q    And then when he would buck up, how high
10  would you have to pick your foot up to put it on
11  Jordn's back?
12    A    A couple inches.  He is laying on the
13  ground. Like this, like this, like this, like
14  this. (Indicating.)
15    Q    So you were putting it up about that far
16  (indicating)?
17    A    Well, that's about shoulder height.
18  Whatever shoulder height is on the ground and him
19  bucking up and then me putting his shoulder back
20  down on the ground.
21    Q    What I'm asking you is:  You said he
22  bucked up, and you had to put your shoulder on his
23  back.  How high did you have to put your foot to
24  get it on his back?

---

Page 267

1    A    I don't know how high he bucked up.  I
2  told you I don't know how many inches he would
3  come up off the ground.  I lifted up my foot high
4  enough to put his shoulder back down to the ground
5  so he couldn't reach anybody with his mouth.
6    Q    And what you just demonstrated for the
7  camera with your foot, is that about how high --
8  or with your hands, is that about how high?
9    A    His shoulder length is this.  So he
10  bucks up from there.  I don't know how many inches
11  he bucks up, but his head is also moving to the
12  left and right where our legs are.  So how many
13  inches that is, I don't know.  His head is turning
14  towards legs.  That's all I know.  So as soon as
15  he would buck up and I could put his shoulder back
16  down on the ground, then his head would go back
17  down and he wouldn't be able to bite anybody
18  anymore.
19    Q    If his head is continuously going
20  side-to-side like you demonstrated, how is he not
21  coming in contact with your leg as you're standing
22  right in front of him but slightly to the side?
23    MR. LUTE: Objection.
24    Go ahead.

---

Page 268

1    A    Because everybody is moving out of his
2  way but trying to restrain him at the same time.
3  If it was easy, we wouldn't have had to do any of
4  that.
5  BY MR. HILL:
6    Q    You said everybody is moving.  Who?
7    A    If he moves and makes affirmative action
8  towards one of my officers or me, we would move
9  out of the way, restrain him to put him back down
10  so that he couldn't reach us again, and then he
11  would lay down.  Then a couple seconds later, he
12  would come back up, and then he'd get close to one
13  of us. We'd move.  We'd be able to put whatever
14  they were using and my foot to put his shoulder
15  back down until he was back down on the ground and
16  couldn't reach to bite us anymore.
17    Q    So you would all get up and move away
18  from Jordn?
19    A    No, not get up and move away.  I told
20  you we were all right next to him.
21    So if his face came towards my leg, I
22  would move my leg a second so he couldn't get at
23  me, and then I would put them back down so that he
24  couldn't make any further movements to bite us

---

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 269

1  anymore.
2      Q    Hold on.  You said we would all move out
3  of the way.  I'm talking about Officer Holsopple
4  and Officer Scherer.  Where did they go?
5      A    I'm talking about myself.  I'm assuming
6  they've moved, too, because his head went towards
7  those legs.  So if they didn't move, they would
8  have gotten bitten.
9      Q    So when you said, "We all moved out of
10  the way," you're talking about you?
11      A    Me and whoever's legs were there that we
12  discussed earlier that were in polyester pants.
13      Q    So their testimony should be that they
14  were moving out of the way?
15      A    I don't know what their testimony is.
16      Q    Well, if you're right, that's what their
17  testimony should be; correct?
18          MR. LUTE: Objection.
19          Go ahead.
20      A    I'm not in their head.  I don't know
21  what they were thinking.  In my head, that's what
22  I was thinking.
23  BY MR. HILL:
24      Q    Have you ever asked them what they were

Page 270

1  thinking?
2      A    No.  As far as the biting?
3      Q    Yeah.
4      A    Is concerned?  After the first bite?
5      I mean, we didn't sit down and discuss
6  this.  Nobody is happy to have had this situation.
7      Q    Well, you did sit down and discuss this;
8  didn't you?
9      A    We typed this up that night.
10      Q    Together?
11      A    And it took an hour and such, yes.
12      So does it say in here how many times he
13  tried to bite them?  No.  You would have to ask
14  them that.
15      Q    So where it says, "Sergeant Moore had
16  her right foot on his left shoulder blade to keep
17  him from arching up and turning his head to bite
18  anyone," did you write that?
19      A    Yeah, that's my words.
20      Q    And it says:  "He continued to struggle
21  and tried to get up for several minutes."
22  Correct?
23      A    Yes.  It happened a couple times.
24      Q    Well, for several minutes; correct?

Page 271

1      A    It only lasted several minutes.  So if
2  that's what I have, that's what it has.
3      Q    So where it says, "He continued to
4  struggle and tried to get up for several minutes,"
5  that's your wording; correct?
6          MR. LUTE: Objection.
7          Go ahead.
8      A    It's the wording of the three of us.  At
9  some point, I know that it lasted a couple
10  minutes, they know it lasted a couple of minutes.
11  What their couple minutes is comparatively what
12  mine is, I don't know.
13  BY MR. HILL:
14      Q    Well, I'll read the entire two
15  sentences.
16          It says:  "Sergeant Moore had her right
17  foot on his" -- referring to Jordn -- "left
18  shoulder blade to keep him from arching up and
19  turning his head to bite anyone.  He continued to
20  struggle and tried to get up for several minutes."
21          Okay.  That's what it says.
22      A    Right.
23      Q    So in terms of trying to get up for
24  several minutes, you agreed to that language;

Page 272

1  correct?
2          MR. LUTE: Objection.
3          Go ahead.
4      A    Yes.  To me, it was several minutes.
5  BY MR. HILL:
6      Q    And when you say to you regarding
7  several minutes, you're talking about this
8  situation where you've got your right foot --
9  you're using that to keep Jordn from arching up;
10  correct?
11          MR. LUTE: Objection.
12          Go ahead.
13      A    The struggle was a couple minutes.  Of
14  course I did not have my foot on his shoulder
15  blade for a couple minutes.  It was only a few
16  seconds one time, a few seconds another time.
17  BY MR. HILL:
18      Q    Well, based on what I'm reading here,
19  was he continued to struggle and get up for
20  several minutes, we're talking about a couple
21  minutes; right?
22      A    Right.
23      Q    And there were only two instances where
24  Jordn was lying down flat; correct?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 273

1    A   Two instances?
2    Q   Sure.
3    A   There were times where he was bucking
4  up, times when he was turning his head, times when
5  he was kicking.
6        Could I tell you how many times he
7  kicked and struggled and bucked up and struggled?
8  I pushed his shoulder down a couple times.  But he
9  was struggling to get up for several minutes.
10  That includes his legs.
11    Q   Okay.
12    A   It's the whole situation.
13    Q   So were there long stretches, then,
14  where he wasn't doing anything with his head or
15  trying to bite anyone?
16    A   No.  Long stretches?  No.
17    Q   Every time he arched up, you pushed his
18  body down with your foot; correct?
19    A   That happened to me twice.  He was also
20  kicking.  To me, that's struggling and trying to
21  get away from us.  It was the entire comprehensive
22  situation.
23        My incident happened a couple times.  He
24  was kicking towards whatever officer was back

Page 274

1  there and trying to roll around, and they were
2  containing that part of him, I would assume,
3  because I wasn't.  I was handling the head
4  movements.  To me, that was a couple minutes all
5  together, the struggle.
6    Q   So for everything except during this
7  couple minutes where you're involved, there's only
8  two occasions that last a couple seconds where
9  he's lying still; correct?
10    A   Where I have to push his shoulder down.
11    Q   We talked earlier -- it says:  "The
12  suspect would lay there for a few seconds but then
13  would continue to fight and struggle to get up."
14  Correct?
15    A   That's exactly right.
16    Q   You said that happened twice?
17    A   To me, my incident.
18        Are you asking me about the continuous
19  struggle that was a couple minutes or my incident
20  with the shoulder?  I don't understand.  You just
21  need to clarify that.  Am I being confusing?  I
22  don't know if I'm being confusing.
23    Q   There were only two occasions, then,
24  where Jordn lifted his shoulders off the ground

Page 275

1  while you were there; correct?
2    A   Yes.
3    Q   And that only lasted a second or two
4  before you pushed Jordn's shoulders down on the
5  ground; correct?
6    A   Yes.
7    Q   Aside from that, Jordn's shoulders and
8  torso area were on the ground; correct?
9    A   His head moved, his feet were moving,
10  but his shoulders were down.
11        MR. HILL: Let's change the tape, okay?
12        THE WITNESS: Okay.
13        (Discussion held off the record.)
14  BY MR. HILL:
15    Q   Ready?
16    A   Yes.
17    Q   Okay.  We lost the tape.  The tape ended
18  as you were giving -- giving your last answer.
19  But I think we agreed that for the entire --
20  entire few minutes that you were there were Jordn,
21  there were only a few seconds where Jordn's chest
22  or torso were not on the ground; true?
23    A   Yes, a couple of times.
24    Q   And those few occasions where Jordn's

Page 276

1  chest or shoulders lifted off the ground, you were
2  able to use your foot to push him back on the
3  ground relatively quickly?
4    A   Yes.
5    Q   And as you sit here, it's your
6  understanding or memory that that happened only
7  two or three times?
8    A   Yes.
9    Q   In terms of you moving around the area,
10  were you able to stand relatively in the same
11  position?
12    A   Yeah.  I just moved my closest leg.
13    Q   And your closest leg, is that the one
14  you were using to push Jordn down?
15    A   Yes.
16    Q   You didn't have to skirt your body
17  around Jordn one way or another?
18    A   No.
19    Q   And when Jordn lifted his shoulders up
20  off the ground, you were able to subdue him with
21  your foot pretty quickly?
22    A   Yes.
23    Q   And then at some point during this
24  process, Jordn stopped moving at all; correct?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 277

1    A   Yes.
2    Q   And it says -- just tell me where you
3 were at, where you were located.  Was it still in
4 the same position?
5    A   Yes.
6    Q   When Jordn stopped responding at all?
7    A   Yes.
8    Q   So how long was it that Jordn went back
9 to the ground and stopped moving at all before one
10 of the officers, or perhaps you, recognized that
11 there was a problem with Jordn?
12   A   I'm so sorry.  It's been a long day.
13        This entire struggle, like I said
14 earlier, it lasted a couple minutes.  And then
15 when he wasn't -- you know, I had to do that a
16 couple times myself.  Then when I noticed his legs
17 weren't moving, too, when I didn't have to push
18 down his shoulder blade, then I started getting
19 worried when he wasn't making any more noise.
20 So right away, I'm like, "Hey, are you okay,"
21 rubbing his back kind of thing, and he then wasn't
22 moving anymore.
23        So then we rolled him over, and I could
24 see his chest rising and falling.  I think Bubba

Page 278

1 probably told you he was feeling for the pulse,
2 and then eventually he became unresponsive.
3    Q   Well, he wasn't responsive while he was
4 still in the prone position?
5    A   Well, we eventually -- yeah.  What I
6 mean is --
7    Q   I mean, you tried to get him to respond
8 and he couldn't?
9    A   Right.  He wasn't talking or making any
10 noise.
11   Q   Or making any movements?
12   A   Right.
13   Q   And you said that you started to rub his
14 back?
15   A   Yes.
16   Q   Did you have to lean down to rub his
17 back?
18   A   Yes.
19   Q   And where were you rubbing his back?
20   A   Middle of the back, between his
21 shoulders, you know, "Hey, buddy, are you all
22 right," you know, kind of thing.
23   Q   Did he still have the sweatshirt on?
24   A   Yes.

Page 279

1    Q   Was the shirt lifted up at any point to
2 expose the probes?
3    A   I don't remember.
4    Q   And how long did you remain behind Jordn
5 where you were rubbing his back, asking are you
6 okay?
7    A   Just for a second.  When I realized he
8 wasn't moving or saying anything, we rolled him
9 over.
10   Q   Did his body appear lifeless at that
11 point?
12   A   Yes.
13   Q   Limp?
14   A   Limp.
15   Q   You said he stopped making any noise.
16 What noise was he making before he stopped?
17   A   All those noises that I explained
18 earlier.  When he no longer moved and no longer
19 was making those noises is when I said, "Hey,
20 buddy, are you okay," and rubbed his shoulders.
21   Q   And then do you remember which side
22 Jordn was rolled onto, his right or his left?
23   A   I don't remember.
24   Q   And this is the first time that any

Page 280

1 Springfield officer attempted to roll Jordn out of
2 a prone position; correct?
3    A   When I was there.
4    Q   First time -- from the time that you
5 arrived, the first attempt to transition Jordn out
6 of a prone position was after you recognized he
7 was unresponsive; fair?
8    A   Yes.
9    Q   It states: "Officers could tell the
10 suspect had debris in his mouth and in fear of
11 choking rolled him on his side."  Correct?
12   A   Yes.
13   Q   Now, Officer Holsopple testified that he
14 was the individual that recognized the debris in
15 Jordn's mouth.  Is that consistent with your
16 memory?
17   A   From what I can remember.
18   Q   From where you were standing, could you
19 see any debris or see Jordn's mouth?
20   A   I could see his mouth.  I couldn't see
21 the debris, because -- until we rolled him over.
22 And then there was just kind of dirt on his lips.
23   Q   While you were -- when Jordn became
24 unresponsive, where was your foot?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 281

1    A    Same spot on the ground.
2    Q    Not on Jordn's back?
3    A    No.
4    Q    When it says, "Officers could tell that
5    the suspect had debris in his mouth," did you
6    actually get down and look at his mouth to check
7    for debris, or was that Officer Holsopple?
8    A    Officer Holsopple did that.
9    Q    Officer Holsopple already testified
10   about the debris that he saw in Jordn's mouth.
11       Based on your memory of the positions of
12   the officers, of the three of you, who do you
13   think would know best as to what was in Jordn's
14   mouth?
15   A    Officer Holsopple.  I remember him
16   saying that.
17   Q    Do you remember what he said about the
18   debris in his mouth?
19   A    Not exactly.
20   Q    Do you remember him saying anything
21   about any substance in his mouth, rocks or
22   anything like that?
23   A    No.
24   Q    Officer Holsopple said that no one

Page 282

1    attempted to remove any debris from Jordn's mouth.
2    Is that consistent with your memory?
3    A    Yes.
4    Q    The first time anyone noticed or voiced
5    any concern -- well, let's take a step back.
6        Was it Officer Holsopple who said
7    something first about Jordn having debris in his
8    mouth?
9    A    I don't remember.
10   Q    You did not sustain any physical
11   injuries from your encounter with Jordn Miller;
12   correct?
13   A    No.
14   Q    Correct?
15   A    Correct.
16   Q    Jordn never scratched you or anything?
17   A    No.
18   Q    Because you didn't see Jordn until there
19   was already -- or until he was already in prone
20   restraint and had been tasered and things of that
21   nature, you can't say what injuries he had while
22   he was in the automobile; is that fair?
23   A    Yes.
24   Q    And you're not going to be able to state

Page 283

1    whether Jordn -- the scrapes and bruising and
2    things like that, that might have been on Jordn's
3    body, you can't state whether that happened while
4    Jordn was on the ground with the officers; is that
5    fair?
6        MR. LUTE: Objection.
7        Go ahead.
8    A    No, I'm -- nobody knows, I don't think,
9    where those injuries came from.
10   BY MR. HILL:
11   Q    Right.  In order for you to know, you
12   would have had to have seen him before he was on
13   the ground; correct?
14   A    Right.
15   Q    When you and Officer Holsopple and
16   Officer Scherer created what's Exhibit 12, the
17   investigative notes, you already knew at that
18   point that Jordn was in bad medical condition;
19   correct?
20       MR. LUTE: Objection.
21       Go ahead.
22   A    That's why I asked the squad to step it
23   up when I was there, yes.
24   BY MR. HILL:

Page 284

1    Q    And I mean, even though by the time
2    you're back at the station that night creating the
3    investigative note, which has some time stamps --
4    it looks like the last time stamp is ten p.m. --
5    you knew at that point that Jordn was in the ICU;
6    correct?
7    A    Yes.
8    Q    You knew that Officer Scherer had
9    ordered -- reported back that he was in critical
10   condition?
11   A    I knew he was in -- on life support of
12   some kind.
13   Q    At the time that you guys, you, Officer
14   Holsopple and Officer Scherer, were creating
15   Exhibit 12, the investigative note, you knew that
16   because Jordn was on life support there was a fair
17   chance he might not pull through.  Is that safe to
18   say?
19   A    When we did the notes, I didn't think
20   for a second he was going to pass away.  We got
21   worried more the next day and then more the next
22   day.  But during these notes, I had no idea he was
23   going to die.
24   Q    What did you think about him being on

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 285

1  life support?
2      A   I thought that they had gotten this
3  faint pulse back at the hospital and they were
4  just helping him breathe with the machines.  I
5  didn't think that -- I didn't know he was brain
6  dead.  I didn't know any details.
7      Q   Did you ever go to the hospital where
8  Jordn was at?
9      A   Yes.
10     Q   Did you go the first day, September 8th,
11 2015?
12     A   Yes.
13     Q   And when did you go to the hospital?
14     A   After I left Jordn's mother's house.
15     Q   Do you remember -- well, let me ask you:
16 On September 8th, 2015, you went directly from
17 1019 Abington to 909 Milo White Drive; correct?
18     A   Yes.
19     Q   And that drive, I'm assuming, only took
20 a few -- 23 seconds?
21     A   Yes.
22     Q   Is that the first time that you spoke at
23 all with Wendy Tomblin, Jordn's mother, that day?
24     A   That day?

Page 286

1      Q   Yes.
2      A   Yes.
3      Q   And can you walk me through any
4  discussions or conversations you had with Wendy
5  Tomblin on September 8th, 2015?
6          And to begin, when you went to Wendy
7  Tomblin's home, Jordn had not yet left in an
8  ambulance; is that correct?
9      A   I don't know if they had already taken
10 off or not, because I wanted to get the medical
11 information as fast as I could to give to the
12 squad.  So I don't know if they had pulled away or
13 not.  I can't remember.
14     Q   When you say, "medical information,"
15 what medical information were you trying to get?
16     A   What kind of mental, you know, status he
17 had, was he schizophrenic, bipolar, what the
18 mental psychotic breakdown she was talking about
19 was.
20     Q   And what did she tell you about the
21 mental psychotic breakdown?
22     A   Can I talk to discuss this?  I don't
23 know what I'm supposed to say.  Can I tell you
24 from the time I got there?  Is that okay?

Page 287

1      Q   Yeah.  I'm talking -- yeah, when you got
2  to Wendy Tomblin's home, or Jordn Miller's home,
3  one of the things you wanted to find out is what's
4  the nature of this mental psychotic break;
5  correct?
6      A   Right.
7      Q   Why did you want to know that
8  information?
9      A   Okay.  I pulled up to the house and --
10     Q   My question is:  Why did you want to
11 know that information?
12     A   Because I then knew who he was.  I put
13 two and two together.  And knowing that he had
14 prior drug -- illicit drug use.  And I wanted to
15 then, as soon as I saw the house and put two and
16 two together, get the information from his mother
17 to the squad as fast as possible so they could
18 administer what medical attention they needed to,
19 to counteract whatever drugs he could possibly be
20 on in addition to maybe mental psychosis state as
21 well.
22     Q   And did you recognize who Jordn was
23 until you pulled into that driveway and saw the
24 home?

Page 288

1      A   I had no idea until I pulled into his
2  mother's house.
3      Q   So you wanted -- you needed or wanted
4  that information about the nature of his mental or
5  psychotic break before you put together who Jordn
6  was?
7      A   Yes.
8      Q   So that was important information that
9  you thought you needed as an officer before
10 recognizing who Jordn was?
11     A   Right.
12     Q   Based on, one, the report that was
13 initially provided by Wendy Tomblin; correct?
14     A   Yes.
15     Q   Based on the information you had about
16 the psychotic break; correct?
17     A   Yes.
18     Q   And based on your own observations of
19 Jordn at the scene; correct?
20     A   Yes.
21     Q   So when you went to Wendy Tomblin's
22 home, what's the first -- where did you park?
23     A   I don't remember where I parked.
24     Q   Did you walk into the home?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 289

1     A   Of course, I was in the house, yes.
2     Q   Okay.
3     A   I'm trying to think of where I was
4  parked.  I don't know.  But like I said, the
5  driveway is short, like they all are in that
6  neighborhood.  I can't remember if I was on the
7  street, though, or in the driveway.
8     Q   And what door did you enter?
9     A   The front door.
10    Q   Where was -- did you knock or just open
11  the door?
12    A   There were other officers -- I had
13  Officer Linaburg there by then, but he had just
14  gotten there.  So it was more like I just walked
15  into the house.  He was already in there.
16    Q   How long in terms of time sequence, from
17  the moment Jordn became unresponsive, were you
18  able to get to Wendy Tomblin's home?
19    A   A couple minutes to five minutes, maybe.
20  It was fairly quick.
21    Q   And when you got there, Officer Linaburg
22  was already in the home?
23    A   Yes.  He had just gotten there to my
24  recollection.

Page 290

1     Q   And was he there based on that earlier
2  request you made over the radio?
3     A   I don't remember how I got him over to
4  the house, if I asked him to go over there and see
5  if you can figure out what's going on or what the
6  case may be or to just secure the house until I
7  could get there.  But he was there briefly,
8  obtained no information of any value, and I
9  started asking questions when I got in the house.
10    Q   Have you ever discussed with Officer
11  Linaburg how long he had been at the home before
12  you got there?
13    A   No.
14    Q   And you said you got no information of
15  any value?
16    A   Yes.
17    Q   What do you mean by that?
18    A   He was asking her questions, and the
19  value at this point was that the psychotic break
20  was also drug related, and he had no information
21  on any drugs.  She was telling him, no, he hadn't
22  done any drugs and things like that, so he had no
23  information like that.
24    Q   When is the first time that you as a

Page 291

1  police officer suspected that Jordn, based on his
2  behavior or anything else, might have used drugs
3  prior to your encounter with him?
4        MR. LUTE: Objection.
5        Go ahead.
6     A   As soon as I pulled up to his mother's
7  house, I realized who he was.
8  BY MR. HILL:
9     Q   Before that, had it ever crossed your
10  mind that Jordn Miller, based on his behavior or
11  the reports about his behavior, may have used
12  drugs?
13    A   I didn't know.  All I knew is that it
14  was a psychotic break, like his mother said.
15    Q   But my question is just:  As a police
16  officer, you told me earlier people don't often
17  come to you and have meth written on their
18  forehead; correct?
19    A   Right.
20    Q   You've got to make some on-the-scene
21  observations and determinations; right?
22    A   Yes.
23    Q   You have got to make some inferences
24  based on what am I seeing; correct?

Page 292

1     A   Yes.
2     Q   So in terms of whether or not Jordn,
3  this individual, may have used drugs, is the first
4  time that ever really came into your mind when you
5  pulled into the driveway of his mother's home?
6     A   Yes.
7     Q   Had you ever discussed with any of your
8  other -- your colleagues, Officer Holsopple or
9  Officer Scherer, whether they ever suspected
10  Jordn, based on his behavior or anything else, may
11  have used drugs?
12    A   Other than typing this report, no.  It
13  was a mental call.  I think we all just knew that.
14    Q   So when you first entered Jordn's home,
15  where was his mother, Wendy Tomblin?
16    A   The house is kind of an open floor plan.
17  The living room is in the front.  She's in a
18  wheelchair.  And I can't remember if she was in
19  the front area.  It's a tiny house.  Towards the
20  living room or in the dining room, middle area,
21  but she's in that vicinity.
22    Q   Was anyone else in the home other than
23  officers?
24    A   I can't remember if the girlfriend was

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 293

1  in that -- in the house at the time or not.  I was
2  talking to Ms. Tomblin.
3     Q    Some of the other reports of witnesses
4  tend to go back to the scene where Jordn was.
5  Some of the other witnesses stated that Jordn was,
6  quote, foaming at the mouth.  Did you ever notice
7  anything like that?
8     A    No.
9     Q    Have you ever seen a person who was
10  conscious foaming at the mouth?
11    A    Conscious?
12    Q    Uh-huh.
13    A    I've seen a lot of things.  I mean,
14  there's -- you know, people get the white stringy
15  stuff and the stuff in the corners of their mouth.
16  That could be considered foaming.  I've seen them
17  drool.  So foaming?  It just depends on what they
18  were talking about.  I don't know.
19    Q    One of the officers testified that when
20  Jordn was rolled over to his side, on his side
21  after he became unresponsive, his eyes were rolled
22  back into his head.  Is that consistent with your
23  memory?
24    A    I do remember that in the investigative

Page 294

1  report, yes, that someone said something about his
2  eyes being rolled back into his head.
3     Q    Is that consistent with your memory when
4  Jordn was rolled over?
5     A    Yes.
6     Q    You said that Jordn -- when you radio --
7  well, how long after you rolled Jordn over do you
8  radio the fire department to step it up?
9        MR. LUTE: Objection.
10       Go ahead.
11    A    Right away.  As soon as I noticed he
12  wasn't responding, in fact, I told them to step it
13  up.
14  BY MR. HILL:
15    Q    And the reason you gave for EMS or the
16  fire department to step it up is because, quote,
17  "Jordn was barely breathing"?
18    A    His chest was still rising and falling,
19  but he wasn't responding to anything we were
20  saying.
21    Q    Do you remember saying anything about
22  Jordn barely breathing to EMS?
23    A    Yes.  By the time they got there, then,
24  his pulse had slowed and he was barely breathing,

Page 295

1  by the time then the squad got there.
2     Q    Do you remember saying anything over the
3  radio to EMS to step it up because Jordn was
4  barely breathing?
5     A    Yes, unresponsive, something of that
6  nature.
7     Q    And when you said "barely breathing,"
8  what did you mean?
9     A    That he's not responding.  And in my
10  experience, when somebody goes limp, I mean,
11  they're on a downhill slide.
12    Q    And I'm just --
13    A    He wasn't agitated and breathing heavy
14  like he was before and mad or aggravated.  He went
15  limp.
16    Q    When you say he was breathing heavy
17  before, you're talking about the time period where
18  you were observing Jordn while he was handcuffed,
19  but still conscious?
20    A    Yeah, the fighting part.
21    Q    How was he breathing heavy during this
22  interaction with the police while you were there?
23    A    Just like anybody would if they were
24  struggling with somebody else.  They're, you know,

Page 296

1  breathing heavy and trying to get away, and you
2  can hear them breathing.
3     Q    How could you hear him breathing?
4     A    With my ears.
5     Q    What did it sound like?
6     A    Breathing.  Fast breathing.  Agitated
7  breathing.  Breathing when we have to physically
8  control somebody.
9     Q    You could hear his breathing while you
10  were standing up straight?
11    A    When he would be struggling, I could
12  hear him.
13    Q    You said it was fast breathing.
14    A    It was out-of-breath breathing where
15  you're fighting.
16    Q    Like huffing?
17    A    Not Huffing, just fast breathing.  Mad.
18    Q    Well, I just want to know what it
19  sounded like, not his motivation.  But can you --
20    A    Well, it wasn't like he was struggling
21  for breath.  He was just breathing fast because of
22  the struggling and the kicking and the movements.
23    Q    I'm just trying to find out -- later on,
24  when we look back at the transcript or watch the

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 297

1   video -- what those sounds were that he was
2   making.
3          When you say he was breathing fast, you
4   are telling me things about him being agitated or
5   angry.  I just want to know what the breathing
6   sounded like that made you realize he was
7   breathing -- as you said, breathing heavy?
8      A   Do you run?  Do you jog?
9      Q   Not as much as I should.
10     A   It would be breathing like fast
11  breathing like you're exercising.  Not struggling
12  for breath, not gasping for air, just you're
13  wrestling with somebody and you know how you're
14  breathing heavy.  I think everything can attest to
15  wrestling, at some point, for fun with somebody.
16     Q   And you were able to hear his breathing
17  while you were standing up above him; correct?
18     A   When he was struggling.
19     Q   Well, did his breathing immediately go
20  back to normal when he wasn't struggling?
21     A   Well, when he tried to get up, he was
22  making more sounds than when he would lay back
23  down.  And his head was up, so I could hear him
24  more.

Page 298

1      Q   And that was just those two or so
2   occasions where you just pushed his body down?
3      A   Right.
4      Q   So when you said "barely breathing," was
5   anybody doing anything to check Jordn's
6   respirations?
7          MR. LUTE: Objection.
8          You may answer.
9      A   Officer Scherer was checking his pulse.
10  I was watching his belly rise and fall, his chest
11  rise and fall.  And Holsopple made sure that his
12  head was in a position where he could breathe and,
13  you know, just like you would when you would
14  perform CPR.
15  BY MR. HILL:
16     Q   No one performed CPR on Jordn; correct?
17     A   He was still breathing and had a pulse
18  when the squad was coming up.  It was barely, but
19  then they started CPR when they got there.
20     Q   So in terms of checking Jordn's
21  respiration, was it just watching -- watching his
22  chest or stomach area?
23     A   I didn't put my head down next to his
24  mouth.  I watched his chest rise and fall.  And

Page 299

1   Officer Scherer checked his pulse.
2      Q   Did anyone check to actually try to
3   determine whether there was air coming out of his
4   mouth or nose?
5      A   You mean by putting your hand down there
6   or something or your face?  No.
7      Q   Anything.
8          By the time EMS got to the scene and
9   approached Jordn, he had stopped breathing all
10  together; correct?
11     A   I had saw -- as soon as the EMS was
12  getting out of the squad, I wasn't noticing his
13  chest rise anymore.  It's like it was stopping
14  right then, and I even yelled to the EMS
15  personnel, "Hurry up, hurry up, he's not
16  breathing," so that they would rush up faster than
17  they were coming.
18     Q   And how much time was there between you
19  telling the fire department to step it up and EMS
20  arriving on scene?
21     A   I could hear the sirens when I said
22  "step it up."  They were across the street.
23     Q   So it sounds like they were there within
24  a few seconds?

Page 300

1      A   From then, yes.
2      Q   And from then, I mean, when you say
3   "step it up"?
4      A   When I say "step it up," I can hear the
5   sirens.
6      Q   So realistically, EMS got to the scene
7   only really within seconds, then, of Jordn
8   becoming unresponsive, because you contacted the
9   EMS right away; correct?
10     A   Yes.
11     Q   When EMS got there, did you have any
12  conversations with EMS before you left to go to
13  Milo White Drive?
14     A   Just yelling at them to hurry.
15     Q   Anything else?
16     A   Just yelling at them.
17     Q   But I mean, when you were yelling at
18  them, was it just to hurry?
19     A   Yeah.  "Hurry up.  He's not breathing.
20  Hurry up.  He's not breathing.  Get up here."
21     Q   Nothing along the lines of here's what
22  we saw Jordn doing, here's how he was acting,
23  here's what we think it might be, nothing like
24  that?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 301

1 　A　I didn't.
2 　Q　Did you overhear any of your fellow
3 officers do that?
4 　A　At that time, it was life-saving
5 measures. We weren't really talking about what
6 happened after that point.
7 　Q　When you say "life-saving measures," do
8 you mean EMS started doing CPR?
9 　A　Yes. And trying to get him unhandcuffed
10 and trying to cut his shirt off and stuff like
11 that.
12 　Q　When EMS got there, was Jordn then now
13 rolled over all the way onto his back?
14 　A　We had already unhandcuffed him, and he
15 was laying on his back.
16 　Q　Your portion of the interaction with
17 Jordn sounds like it was limited to you looking at
18 his head and torso, correct, basically?
19 　A　Well, I could see his body.
20 　Q　I mean, I know you said you could see
21 polyester legs, but you didn't know whose legs
22 they were, because you were focused on Jordn?
23 　A　Up front, yeah. I could see him
24 kicking, of course. I could see his whole body.

Page 302

1 　Q　And when you say "kicking," are you
2 talking about his knee being on the ground and his
3 calf and foot coming up?
4 　A　Yeah, and trying to turn sideways and
5 kick sideways, too.
6 　Q　And was he still making these same
7 noises while he was struggling on the ground
8 throughout this period?
9 　A　Yes.
10 　Q　And it was during this period that you
11 think you heard Jordn say something like "get
12 off"?
13 　A　Something to that effect.
14 　Q　And that's the only intelligible word
15 you heard Jordn say; correct?
16 　A　Pretty much, yeah.
17 　Q　When you say "pretty much," there's
18 nothing else that you --
19 　A　Not that I can remember, no.
20 　Q　Have we discussed all of your
21 conversations with Chief John Smith regarding the
22 events on September 8th, 2015?
23 　　　MR. LUTE: Objection.
24 　　　Go ahead.

Page 303

1 　A　I mean, he had confidence in us that we
2 did the right thing. Other than that, no.
3 Nothing important.
4 BY MR. HILL:
5 　Q　But I mean, whether he had confidence in
6 you that you did the right thing, that's his state
7 of mind. I mean in terms of any conversations
8 that you had with Chief John Smith about the
9 events on September 8th, 2015, have we discussed
10 those conversations?
11 　　　MR. LUTE: Objection.
12 　　　Go ahead.
13 　A　Other than him saying that the detective
14 bureau was going to investigate it, we knew
15 nothing until the very end. Even after the
16 coroner's report, we didn't know what anything
17 said in the investigative case.
18 BY MR. HILL:
19 　Q　And in terms of the detective bureau's
20 investigation, you're talking about Detectives
21 Lombardi or Troyer?
22 　A　I'm only just now knowing that. When it
23 was going on, I didn't know everybody that was
24 involved.

Page 304

1 　Q　But in terms of -- when you say
2 detectives bureau, did you mean detectives here at
3 Springfield Township?
4 　A　Yes.
5 　Q　You didn't think there was some outside
6 agency coming in?
7 　A　No, no, no.
8 　Q　Do you still have Exhibit 9 there, that
9 incident report?
10 　A　Yeah.
11 　Q　Just so I understand the process,
12 Officer Holsopple actually completed all the
13 information that's contained on Exhibit 9; is that
14 correct?
15 　A　He got the information for the report.
16 As far as who wrote it or if it was handwritten or
17 typed, I can't remember.
18 　Q　When you got -- when you signed off on
19 the report -- and you did sign off on the report;
20 correct?
21 　A　Yes.
22 　Q　Or the incident report.
23 　　　Was it already completed when you would
24 have gotten it?

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 305

1    A   I mean, there would be times where if
2  there's something missing I might write it in or
3  correct something or do part of it for him,
4  because we're all working together to finish the
5  paperwork.  So I don't know exactly if I -- if it
6  was handwritten or typed or if I wrote anything on
7  it or not.
8    Q   Is there any way for you to be able to
9  identify whether or not you completed all of the
10  information on Exhibit 9 or what information
11  Officer Holsopple completed?
12    A   Not that I'm aware of.  Not at this
13  point.  I don't remember.
14    Q   So in terms of the approving officer,
15  then, sometimes you just write the report?
16    A   I sometimes -- well, I'm pretty fast
17  with paperwork.  So a lot of times when there's an
18  arrest or any other kind of case, I'll type it for
19  them or write it out for them if they give me the
20  information.  So it's their information.  I might
21  write it.  So I don't know if that happened in
22  this case or not.  I can't remember.  I do that
23  all the time, though.
24    Q   This incident report was created on

Page 306

1  September 8th, 2015?
2    A   Yes.
3    Q   So this would have been created after
4  you had returned back to the station at some
5  point?
6    A   Yes.
7    Q   And we've talked about everything you
8  did at 1019 Abington; correct?
9    A   Yes.
10    Q   You didn't go up and look inside the
11  car; right?
12    A   No.
13    Q   You didn't try to find out what if
14  anything Jordn damaged in the car; correct?
15    A   No.
16    Q   Did you -- before this incident report
17  was created, did you sit down with Officer
18  Holsopple and ask Officer Holsopple what he
19  observed Jordn doing in the car in terms of
20  attempts at stealing it?
21    A   I think that they were just talking
22  about it when we got back to the office.  It was
23  clear, like I said, at the scene what had
24  happened.  So as far as back at the office, they

Page 307

1  were just being -- reiterating what we already
2  knew about the Jeep and such.
3    Q   So you said it was clear at the scene
4  what had happened?
5    A   Right.
6    Q   So what had -- I mean, Officer Holsopple
7  and Officer Scherer actually had the opportunity
8  to observe Jordn while he was in the car and how
9  he acted in the car; correct?
10    A   Yes.
11    Q   You did not?
12    A   Correct.
13    Q   So in terms of it was clear what
14  happened at the scene, what did Jordn do in
15  furtherance of attempting to steal a car other
16  than being in it?
17    A   What I told you was at the scene.  I
18  knew the information had come in from the
19  residents that he was trying to steal their Jeep.
20  That's all I know.  I don't know how I got the
21  information.  I don't know which avenue it was,
22  but I knew.  So back at the office, everybody
23  knew.  It wasn't anything new that I was learning.
24        I looked at Bubba's -- or Officer

Page 308

1  Scherer's leg down at the hospital.  I went down
2  there to check on him, to check on Jordn, and then
3  didn't get back to the office until a while later,
4  so --
5    Q   But in terms of determining what Jordn
6  did in furtherance of stealing a car, you didn't
7  speak to any of the witnesses at the scene -- and
8  I mean like the homeowners; correct?
9    A   I did not interview anybody.  I left as
10  soon as I could.
11    Q   So when you say that they had reported a
12  car stolen, you're referring to information that
13  you would have gotten over dispatch?
14    A   Or those other avenues I told you
15  earlier.
16    Q   Did you discuss with Officer Holsopple
17  what charges to bring -- or I guess you didn't
18  bring charges, but what charges to list on Exhibit
19  9?
20    A   Like I said earlier, that's just common.
21  There's things that we do when we tase somebody
22  that we automatically charge, which is the
23  resisting.  He had bit Officer Scherer, so that's
24  obviously felonious assault on a police officer.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 309

```
 1   He had damaged parts of the car.  That was the
 2   criminal damaging.  And the attempted theft on the
 3   car.  That was all common knowledge for the three
 4   of us, so there wouldn't be a discussion.  It
 5   would just be on the report.
 6       Q   You said you always -- whenever -- some
 7   things are standard.  Whenever somebody is
 8   tasered, they're charged with resisting; is that
 9   fair?
10       A   Yes.
11       Q   What do you mean by that?
12       A   Whenever somebody resists arrest and we
13   have to tase them, we have to charge them.
14       Q   Is it the case, as far as you've been
15   here, that every time a person was tasered, they
16   were charged with resisting?
17       A   Once they got tasered.
18       Q   That's what I mean.  You guys weren't
19   tasering people before you got Tasers; right?
20       A   Correct.
21       Q   So has it always been your experience
22   here that when a person has -- an electrical
23   conducted weapon has been used against a person,
24   it's basically automatically been that they get
```

Page 310

```
 1   charged with resisting?
 2       A   Whenever the policy or directive came
 3   out is when that started, and I can't remember
 4   when that happened.
 5       Q   What policy or directive?
 6       A   The Taser policy and/or directives that
 7   may have been put up.  At one point, I remember
 8   specifically being given something that said if
 9   you tase somebody, they need to be charged with
10   resisting or obstructing.
11       Q   And that's still the directive here as
12   far as you know?
13       A   Yes.
14       Q   And my understanding is that no charges
15   were ever actually brought against Jordn?
16       A   Correct.
17       Q   Did you ever attempt to have charges
18   officially brought against Jordn?
19       A   No, I didn't do any of the
20   investigation.
21       Q   What did you do with this incident
22   report after it was concluded?
23       A   After I checked it?
24       Q   Uh-huh.
```

Page 311

```
 1       A   I would have turned it into data.
 2       Q   And where is data?
 3       A   That office that's up front.
 4       Q   So do you print it out and then hand it
 5   in?
 6       A   Yes.
 7       Q   And this is the same process where they
 8   retype it?
 9       A   It's always duplicate.
10       Q   There are four potential offenses that
11   are listed in the incident report; correct?
12       A   Yes.
13       Q   Did you include all of the potentially
14   relevant offenses you thought could have been
15   charged against Jordn?
16       A   Yes.
17       Q   I want to talk just a little bit about
18   the struggle, okay?
19           You're aware that the body has a fight
20   or flight response; correct?
21       A   I'm aware of it.
22       Q   And you're aware that the human body
23   will attempt to fight to survive; correct?
24       A   I would assume so.
```

Page 312

```
 1       Q   And it's just as the body can't
 2   voluntarily drown itself; right?  It will fight to
 3   get air; correct?
 4       A   Yes.
 5       Q   If you hold a person's body down, a
 6   person will naturally fight to move and get air;
 7   correct?
 8       A   Everyone fights.
 9       Q   And that's one of the things that can
10   cause a person to struggle, though, is just the
11   fight to get air; correct?
12       A   In some circumstances.
13       Q   And that's something you have to be
14   cognizant of -- or you've got to be aware of as an
15   officer; correct?
16       A   Yes.
17       Q   That's essentially a fight to stay
18   alive; correct?
19           MR. LUTE: Objection.
20           You can answer if you know.
21       A   I mean, that's redundant, I think.  I
22   think that's a human body response.
23   BY MR. HILL:
24       Q   I guess you're right.  A fight to
```

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

---

Page 313

1  breathe is a fight to stay alive; is that fair?
2    A   Right.
3    Q   And if a person is being held down in
4  prone restraint and has trouble breathing, you
5  understand the body will automatically kick and
6  fight to get air; correct?
7        MR. LUTE: Objection.
8    A   No, I don't know that.
9  BY MR. HILL:
10   Q   We stopped earlier.
11       When you left to go to Akron City
12  Hospital, was Wendy Tomblin still at her home?
13   A   I can't remember if I went to the office
14  -- I think I went to the office real quick first
15  to get a Workers' Comp packet for Officer Scherer
16  at the hospital.  So I think I came down here and
17  then went straight to the hospital.
18       As far as when I left Ms. Tomblin's
19  house, I know that she was going to be escorted
20  down to the office, but I don't know where she was
21  when I got here.  I was here.  I never saw her.  I
22  grabbed the packet and ran to the hospital.
23   Q   I mean when you left Wendy Tomblin's
24  home --

---

Page 314

1    A   Yeah.
2    Q   -- was she still at her home when you
3  left?
4    A   Yes, when I left.
5    Q   And at that point, it was your intention
6  to go to the hospital; right?
7    A   Yes.  I mean, I was going to get there.
8    Q   And you stopped here to get Workers'
9  Comp forms?
10   A   Right.  Once they got to the hospital, I
11  left to come down and get a Workers' Comp packet.
12   Q   And was that for you or for Officer
13  Scherer?
14   A   Officer Scherer.
15   Q   And did you bring that Workers' Comp
16  packet to the hospital?
17   A   I would assume that I did.  That's what
18  I came here for.
19   Q   Now, Wendy Tomblin, you said, is in a
20  wheelchair?
21   A   When I've seen her, she's sitting in a
22  wheelchair.
23   Q   I mean, that day, she was in a
24  wheelchair?

---

Page 315

1    A   To my knowledge, yes.
2    Q   Do you know if Wendy can drive?
3    A   I do not know.
4    Q   At the time you decided to go to the
5  hospital to see Officer Scherer, you understood
6  that Jordn Miller was at the hospital; correct?
7    A   Yes.
8    Q   Did you ever discuss with Wendy, while
9  you were at her home, her going to the hospital to
10  see Jordn?
11   A   I discussed what drugs he was taking to
12  save his life and trying to get that out of her.
13   Q   My question was:  Did you ever discuss
14  with her, Wendy, going to the hospital to see
15  Jordn?
16   A   Not to my knowledge.  The detective was
17  there, so --
18   Q   And you said that you were getting this
19  information to save Jordn's life?
20   A   To try to save his life, yes.
21   Q   So at this point, while you were in her
22  home, you understood that there was a chance that
23  Jordn was going to die?
24   A   I knew that there was a chance.

---

Page 316

1    Q   You knew that his circumstances were
2  poor?
3    A   I've seen other people unresponsive,
4  though, and live, so I didn't know.  And it was a
5  precautionary measure.
6    Q   So after you discussed this information
7  with Jordn -- with Jordn's mother -- I'm sorry --
8  about any drug use or anything else that may have
9  happened, do you immediately call the hospital?
10   A   Well, I was in Jordn's bedroom for a
11  minute, and I was talking to Officer Scherer over
12  the radio the entire time -- he was in the
13  squad -- to relay what Ms. Tomblin was saying.
14   Q   And was the information you were getting
15  regarding any drug use coming from Jordn's mother
16  or a girlfriend?
17   A   My answers that I got, I was talking
18  directly to mother.  I was -- I went back and
19  forth to Jordn's room for a minute and would come
20  back out and -- because at one point I saw a razor
21  blade and powder, and I said what is that in
22  there, because she didn't tell me anything like
23  that.  And she goes, "Well, I think he did meth
24  two or three days ago."  So that's when she

---

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 317

1  started telling me about the drugs, because I
2  said, "He may die if you don't tell me what he
3  took," because she didn't tell me at first. I
4  said, "Look, we're not looking so that we can
5  charge him. I just need to know what he's taking
6  so we can save him. He's not breathing in the
7  ambulance. You have to cooperate."
8      Q   So this powder that you're describing,
9  was anything ever tested?
10     A   That, you would have to talk to the
11 detectives.
12     Q   He didn't know. Blasdel didn't know.
13     A   I didn't do anything in that
14 investigation.
15     Q   So you just don't know?
16     A   No.
17     Q   And when you go -- you get the Workers'
18 Comp forms here, and then you go to Akron City
19 Hospital?
20     A   Yes.
21     Q   And what do you do when you get to Akron
22 city?
23     A   I find Officer Scherer, asked him what's
24 going on. He says all I know at that time was

Page 318

1  that he wasn't breathing, they had no shockable
2  rhythm in the ambulance, and he didn't know the
3  status at that point. And he was getting checked
4  out for the bite wound. I stayed there for a
5  brief period of time, and then I came back here.
6      Q   Did you see Jordn at all at the
7  hospital?
8      A   I saw the room he was in, but I couldn't
9  really see anything that was going on.
10     Q   What were -- were you able to see into
11 the room at all?
12     A   I was just kind of adjacent to the room.
13 It was kind of like a glass wall, from what I can
14 remember, and there were people in gowns. And I
15 saw a couple people around them, but I was only
16 there for a second, because it was almost like,
17 oops, you know, I don't want to get in the way,
18 and then I left.
19     Q   Was this in the ER or ICU or --
20     A   ER.
21     Q   Did you talk to any of Jordn's doctors?
22     A   No.
23     Q   Did you ever talk to the medical
24 examiner in this case?

Page 319

1      A   No.
2      Q   Did you ever talk to anyone about what
3  information was going to be provided to the
4  medical examiner?
5      A   No.
6      Q   In terms of that day, September 8th,
7  2015, my understanding is it was clear and nice
8  out, it was just very, very hot. Is that
9  consistent with your memory?
10     A   I remember it being excessively hot,
11 yes.
12     Q   There are a number of statements in
13 Chief Smith's report regarding discussions with
14 officers after -- at the station on the night of
15 September 8th, 2015, that reference discussions
16 about excited delirium and the officers thinking
17 that Jordn was suffering at some point from
18 excited delirium.
19         At any time that you were interacting
20 with Jordn Miller, did you believe that he was
21 experiencing or suffering from excited delirium?
22     A   No.
23     Q   As far as you know, has anyone ever
24 diagnosed Jordn with excited delirium?

Page 320

1          MR. LUTE: Objection.
2          You may answer.
3      A   I have no idea what the investigation
4  provided.
5  BY MR. HILL:
6      Q   You've encountered other individuals
7  with excited delirium in the past, you said;
8  correct?
9      A   Yes.
10     Q   What was different about Jordn that made
11 you think he didn't have excited delirium when you
12 were interacting with him?
13         MR. LUTE: Objection.
14         Go ahead.
15     A   Because his mother said it was only a
16 psychotic break. She mentioned no drugs. There
17 was no reason to believe he was on drugs at that
18 time.
19 BY MR. HILL:
20     Q   So if there was some reason, based on
21 Jordn's behavior, to suspect he was on drugs,
22 would that have been -- pushed you towards
23 believing he had excited delirium?
24         MR. LUTE: Objection.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 321

1        Go ahead.
2        A    If I knew on the scene or saw
3    paraphernalia or something, I would have obviously
4    put two and two together like I did when I pulled
5    into his house.
6    BY MR. HILL:
7        Q    But with respect to those people we
8    talked about earlier, where you thought that they
9    had excited delirium and you called EMS, your
10    suspicions of them being on drugs was based on
11    your own observations of them; correct?
12        A    Yes.
13        Q    Anything else that was discussed between
14    you and Wendy Tomblin while you were at her home
15    on September 8th, 2015 that we haven't already
16    talked about?
17        A    The only thing I can recall talking to
18    her about is: "Don't worry about him getting into
19    trouble. I need to know what drugs he's been on."
20        Q    When you went into Jordn Miller's
21    bedroom, did Wendy follow you in there?
22        A    No.
23        Q    She remained out in the common area, I
24    think you called it, or open area?

Page 322

1        A    Yes.
2        Q    That's out in the family room, by the
3    kitchen, I think you said?
4        A    Yeah, living room.
5        Q    Is it like one room, kind of?
6        A    I think there was a bed kind of there.
7        Q    Was it a hospital bed?
8        A    I don't know what it is exactly, if it's
9    a futon or --
10        Q    Have we discussed all of your
11    conversations with anyone here at Springfield
12    Township regarding your involvement in the uses of
13    force with Jordn Miller?
14        MR. LUTE: Objection.
15        You may answer.
16        A    No, not to my knowledge.
17    BY MR. HILL:
18        Q    No, we haven't?
19        A    The interaction only? Like no effects
20    afterward or anything; right?
21        Q    What do you mean "effects afterward"?
22        A    Like how the officers were doing and
23    talked to the chief about that or anything like
24    that?

Page 323

1        Q    I know that there was -- let's just talk
2    about the uses of force or your interaction with
3    Jordn Miller only, not how it's affected you. But
4    in terms of your uses of force --
5        A    Other than that night?
6        Q    Right.
7        A    No. And other than, you know, the three
8    of us -- we're confident in what we did wasn't
9    excessive and that, you know, it's a shame what
10    happened, and everybody feels bad, obviously, but
11    no, nothing other than that. We did everything
12    that we could.
13        Q    So have we discussed all of your
14    conversations with Chief Smith about the events?
15        A    That I can recall.
16        Q    You said that there may have been some
17    discussions about how this has affected you.
18        A    Yes.
19        Q    Are you referring to emotionally how
20    it's affected you?
21        A    Well, not necessarily me. I got there
22    after the fact, for the most part. But my other
23    two officers, yes.
24        Q    How has this affected you emotionally?

Page 324

1        A    I feel bad for everybody involved,
2    obviously. I feel super bad that those two and
3    myself had to continually get tested and blood
4    drawn for hepatitis. And that scare and -- you
5    know, Officer Scherer's married and has children.
6    He had to worry about hepatitis C. And he was
7    very upset about that. And Jordn passed away.
8    And it obviously was never intentional, and we did
9    everything that we possibly could. It's a bad
10    situation all the way around.
11        Q    Fortunately, none of the three of you
12    ever got hepatitis C; correct?
13        A    Not to my knowledge, not yet. It's a
14    continual testing, from what I understand.
15        Q    Are you still getting tested?
16        A    I'm not. I think Officer Scherer might
17    be. It was longer for him.
18        Q    When was the last time you were tested?
19        A    Mine might have been three or four blood
20    draws every three to four months maybe.
21        Q    And where were you getting these?
22        A    Cuyahoga Falls. There's a Workers' Comp
23    place in Cuyahoga Falls. You would have to ask
24    John Smith.

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 325

1    Q   Did you file a Workers' Comp claim in
2  this case?
3    A   I think you have to when you're exposed
4  like that to infectious disease.
5    Q   My question, though, is --
6    A   I think that's automatic.  I'm not sure.
7  I don't have paperwork on my desk about it.  But
8  if you're exposed to it, infectious disease, I
9  would assume that's an automatic Workers' Comp
10  claim.
11    Q   I'm just --
12    A   That's a department thing.
13    Q   I'm just asking based on what you
14  understand as you sit here.
15        Do you believe that a Workers' Comp
16  claim was filed on your behalf?
17    A   I don't know on my behalf.  I know there
18  was on Officer Scherer's behalf because of the
19  direct exposure.
20    Q   And when you went -- my understanding,
21  based on the timeline, is the first time Officer
22  Scherer heard anything about hepatitis C was after
23  he had returned to the station on September 8th?
24    A   Yes.

Page 326

1    Q   You took the Workers' Comp forms to
2  Officer Scherer before that event; correct?
3    A   Before he come back to the office?
4    Q   Yes.
5    A   Yes.
6    Q   So when you took the Workers' Comp forms
7  to Officer Scherer, it was relative to the bite;
8  correct?
9    A   Yes.
10    Q   It was not about any kind of issue with
11  hepatitis?
12    A   Not at that point, no.
13    Q   And had Officer Scherer asked you for
14  those forms or indicated that he was going to file
15  a Workers' Comp claim?
16    A   Any time an officer is injured and has
17  to go to the hospital, one has to be filed.
18    Q   So my question is:  Did Officer Scherer
19  tell you that he was going or intending to file a
20  Workers' Comp claim?
21    A   I'm the one that advised him to go to
22  the hospital.  One, to report back with Jordn's
23  health; and two, to get checked out for the bite.
24  I sent him there.

Page 327

1    Q   Okay.  So my question was just:  Did
2  Officer Scherer indicate to you or say to you that
3  he was going to file a Workers' Comp claim?
4    A   No, because I had made him go there, and
5  I brought him the Workers' Comp forms.  I said,
6  "Does the hospital have them there?  Do you need
7  me to bring them to you?"  And he said, "Just
8  bring them.  I don't know if they have them here,"
9  or "they don't have them here," something to that
10  effect.
11    Q   And as far as you know, did Officer
12  Scherer make a Worker's Comp claim in this case?
13    A   You have to.
14    Q   So yes?
15    A   Yes.
16    Q   In terms of -- my understanding is that
17  sergeant -- or I'm sorry -- Officer Scherer
18  returned that night, was walking around fine at
19  the office?
20    A   He wasn't fine, no.
21    Q   He wasn't able to walk?
22    A   He could walk.  Mentally, he wasn't
23  fine.
24    Q   I'm talking about physically.

Page 328

1    A   Physically, he would walk.
2    Q   In terms of any physical injury, is it
3  your understanding it was a minor physical injury
4  that's healed?
5        MR. LUTE: Objection.
6        Go ahead.
7    A   As far as -- I don't know what his
8  medical record is.
9  BY MR. HILL:
10    Q   As far as what you've observed?
11    A   He works.
12    Q   Does he appear to have been limited in
13  any way?
14    A   Not that I know of.
15    Q   So at this point have we discussed all
16  of your discussions or conversations with anyone
17  here at Springfield Township about the incidents
18  involving Jordn Miller?
19        MR. LUTE: Objection.
20        Go ahead.
21    A   As far as I can recall right now.
22  BY MR. HILL:
23    Q   Are you aware of completing any
24  documentation that we haven't reviewed during your

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

---

Page 329

1  deposition?
2      MR. LUTE: Objection.
3      Go ahead.
4  BY MR. HILL:
5    Q   Other than the possible log?
6    A   Not that I'm aware of or that I can
7  think of right now.
8    Q   Is there anything else you would like to say
9  before we terminate the deposition?
10   A   No.
11   Q   I don't have any other questions for you, okay?
12      MR. LUTE: She'll read.
13            - - -
14      (Signature not waived.)
15            - - -
16      And, thereupon, the deposition was adjourned at
17  6:36 p.m.
18            - - -
19
20
21
22
23
24

---

Page 330

1                              April 3, 2017
2
3  Dear Ms. Moore,
4      You have chosen to read and sign your transcript.
   Please do not mark on the transcript.  Any
5  corrections/changes you may desire to make in your
   testimony should be typewritten or printed on the errata
6  sheet at the end of testimony, giving the page number,
   line number and desired correction/change.  After you have
7  read the transcript, sign your name on the correction
   sheet and where indicated at the close of testimony before
   a notary public.
8
9      The rules of civil procedure allow thirty days for
   you to read and sign.  Please return the signature page
10 and errata sheet to Whitney Layne, 6723 Cooperstone Drive,
   Dublin, Ohio 43017 within that time.  Failure to do so in
11 the allotted time will result in your transcript being
   used as though read and signed by you.
12
13                       Sincerely,
14                       _____
                         Whitney Layne
15                       Professional Reporter
   Cc:
16 Michael Hill
   Gregory Beck
17
18
19
20
21
22
23
24

---

Page 331

1  State of _____
2  County of _____
3      I, TERA DENISE MOORE, do hereby certify that I
4  have read the foregoing transcript of my deposition given
5  on March 20, 2017; that together with the correction page
6  attached hereto noting changes in form or substance, if
7  any, it is true and correct.
8
9                       _____
                        TERA DENISE MOORE
10     I do hereby certify that the foregoing transcript
11 of the deposition of TERA DENISE MOORE was submitted to
12 the witness for reading and signing; that after he had
13 stated to the undersigned Notary Public that he had read
14 and examined his deposition, he signed the same in my
15 presence on the _____ day of _____, 2017.
16
17
18 _____
19 Notary Public
20 My Commission Expires on:
21                       - - -
22
23
24

---

Page 332

1  TO THE REPORTER:
2  I have read the entire transcript of my deposition taken
3  on the _____ day of _____, 20___, or the same has been
4  read to me.  I request that the following changes be
5  entered upon the record for the reasons indicated.
6  Page    Line    Correction and reason therefore
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 Date_____Signature_____
22
23
24

---

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

Page 333

```
 1                    CERTIFICATE
 2   State of Ohio        :
 3   County of Franklin:
 4        I, Whitney Layne, Notary Public in and for the
 5   State of Ohio, duly commissioned and qualified, certify
 6   that the within-named TERA DENISE MOORE was by me duly
 7   sworn to testify to the whole truth in the cause
 8   aforesaid; that the testimony was taken down by me in
 9   stenotype in the presence of said witness; afterwards
10   transcribed upon a computer; that the foregoing is a true
11   and correct transcript of the testimony given by said
12   witness taken at the time and place in the foregoing
13   caption specified.
14        IN WITNESS WHEREOF, I have set my hand and
15   affixed my seal of office at Dublin, Ohio, on this 3rd day
16   of April, 2017.
17
18
19
20             Whitney Layne
21             Notary Public - State of Ohio
22   My Commission Expires:  May 4, 2020.
23               - - -
24
```

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

## A

**A-1 (4)**
200:4;201:19,21,22
**A-2 (1)**
201:22
**A-3 (5)**
200:14;201:18,19,
20,22
**A905 (3)**
194:11,15,15
**ability (2)**
63:6;112:12
**Abington (35)**
151:22;152:6;
153:20;155:4;175:16;
178:17;179:20;181:2,
6,17,20;182:2,20,22;
183:5,22;184:2,3;
185:17;186:9;187:1;
188:5,14,21;191:12;
196:11;197:8;203:4;
210:23,24;211:24;
218:2;226:13;285:17;
306:8
**able (29)**
32:1;77:3;85:24;
95:21;100:13;106:7,9;
136:18;145:23;146:1;
183:22;192:9;198:15;
221:19;223:3;238:2;
244:2,6;267:17;
268:13;276:2,10,20;
282:24;289:18;297:16;
305:8;318:10;327:21
**above (1)**
297:17
**absolute (2)**
122:5,21
**absolutely (1)**
41:24
**access (1)**
162:22
**accidentally (1)**
149:16
**accommodate (1)**
7:12
**according (4)**
26:10,12,14;27:11
**accuracy (2)**
146:2;206:11
**accurate (4)**
12:2;161:11;162:6;
205:2
**across (6)**
36:13;112:3;203:1;
221:24;222:4;299:22
**act (5)**
24:5;62:14;86:4;
88:23;95:14
**acted (1)**
307:9

**acting (5)**
68:12;89:8,9;102:6;
300:22
**action (3)**
14:17;243:11;268:7
**actions (4)**
92:8,20;93:5;237:1
**activate (1)**
152:4
**activated (3)**
152:8,9;251:20
**actively (3)**
114:13;238:24;
247:17
**activities (1)**
148:14
**activity (1)**
132:19
**actual (1)**
141:1
**actually (26)**
10:9;16:9;22:17;
51:9;55:21;86:8,9;
146:3;153:18,19;
154:8;157:15;159:22;
161:7;162:19;170:23;
182:5;185:18;186:21;
216:20;242:23;281:6;
299:2;304:12;307:7;
310:15
**acute (3)**
116:1;118:21;119:6
**acutely (1)**
22:17
**add (3)**
192:16;205:14,21
**added (2)**
44:16;119:1
**addict (1)**
44:15
**addition (1)**
287:20
**additional (11)**
34:19;44:14;45:22;
53:15;104:11,19;
105:9;106:1;153:6;
183:5;184:19
**address (5)**
61:19;62:5;180:4,10;
194:7
**addressed (1)**
149:22
**addressing (2)**
94:5,14
**adjacent (1)**
318:12
**adjourned (1)**
329:16
**administer (1)**
287:18
**adopt (1)**
12:5
**advanced (1)**

65:23
**advised (1)**
326:21
**affected (4)**
323:3,17,20,24
**affirmative (2)**
243:11;268:7
**afterward (2)**
322:20,21
**afterwards (1)**
195:17
**again (17)**
14:24;19:6;55:8;
103:17;137:7;159:23;
197:4;202:4;227:15;
232:10;237:2;247:21;
248:2,4,18;264:8;
268:10
**against (16)**
57:17;80:3;82:22;
89:17;90:10,12,16;
91:12,15;124:15;
211:12;223:8;309:23;
310:15,18;311:15
**age (1)**
76:1
**agency (1)**
304:6
**aggravated (1)**
295:14
**aggression (1)**
103:11
**aggressive (5)**
23:15;88:23;89:3;
102:4,5
**aggressor (1)**
99:14
**agitated (7)**
95:16;97:3;102:21,
21;295:13;296:6;297:4
**agitation (2)**
103:12;134:15
**ago (8)**
48:23;49:3;53:6;
68:8;143:24;150:4;
176:11;316:24
**agree (9)**
15:14;39:18;42:24;
104:8;110:6;119:9;
138:1;164:18;187:9
**agreed (10)**
11:22;12:1;65:14;
162:20;165:18;245:21;
246:21;258:21;271:24;
275:19
**agreeing (2)**
84:13;123:21
**ahead (73)**
12:9;20:4;22:8;29:4,
14;30:14;31:14;33:20;
37:20;39:8;40:4;49:22;
56:3;59:4;61:4,23;
62:16;63:11;68:24;

69:17;71:19;72:12;
75:9;83:8;85:11;91:21;
93:8,18;96:16,24;98:8;
102:2;104:1;105:19;
108:10;110:13;111:6;
113:1;116:13;121:7;
128:16;129:18;130:22;
132:9;134:9;135:14;
138:3;206:24;213:14;
232:10;236:23;237:23;
258:24;260:16;263:9,
18;265:2;267:24;
269:19;271:7;272:3,
12;283:7,21;291:5;
294:10;302:24;303:12;
320:14;321:1;328:6,
20;329:3
**aid (1)**
31:9
**air (7)**
191:11;297:12;
299:3;312:3,6,11;
313:6
**aired (3)**
185:13;186:3;191:21
**airing (2)**
201:13,15
**airway (2)**
112:18,22
**Akron (7)**
18:17;64:11;76:23;
77:1;313:11;317:18,21
**Albrecht (8)**
53:6,7,8;54:19;
55:11;56:7;57:18,21
**alive (7)**
50:23;312:18;313:1
**alleged (1)**
211:5
**allowed (1)**
69:14
**almost (2)**
31:21;318:16
**along (5)**
10:19;12:24;229:9;
253:2;300:21
**alter (1)**
90:5
**although (1)**
245:2
**altogether (1)**
229:2
**always (15)**
25:12;55:6;61:1;
66:20;74:17;99:10;
137:4;176:21;177:2;
212:14;217:7,11;
309:6,21;311:9
**Alzheimer's (4)**
88:4;91:6,11;92:8
**ambulance (18)**
21:9;25:5,9,22,24;
26:2;27:1,5,9,14;28:1;

31:4;33:3;35:12;
219:21;286:8;317:7;
318:2
**Amendment (1)**
78:5
**Among (2)**
24:7
**amount (13)**
68:16;69:8;83:23;
85:1,16;92:19;107:7,
16;110:4;112:6;
133:22;134:7;244:13
**and/or (2)**
85:8;310:6
**angle (1)**
265:19
**angry (1)**
297:5
**ankle (1)**
251:4
**answered (1)**
122:23
**antidepressant (1)**
27:2
**anxiety (1)**
102:18
**anxious (1)**
24:16
**anymore (15)**
48:4;49:5;64:3,18;
70:21;140:10;183:6;
198:4,6;226:9;267:18;
268:16;269:1;277:22;
299:13
**apart (1)**
48:10
**apartment (1)**
67:8
**apologize (1)**
52:3
**apparent (4)**
46:12;102:13,22;
103:13
**apparently (1)**
161:12
**appear (6)**
22:22;102:21;213:5;
237:20;279:10;328:12
**appears (1)**
142:20
**Apple (1)**
87:4
**application (8)**
121:13;122:10;
123:5;136:2;137:24;
138:11;139:4,18
**applications (3)**
125:17;126:18;128:4
**applied (2)**
187:23;247:6
**applies (3)**
61:24;142:9;247:4
**apply (2)**

Layne & Associates
(614) 309-1669

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

246:16,22
**appreciate (1)**
　6:7
**approach (7)**
　20:5,12,17;23:10;
　83:22;93:15;152:2
**approached (2)**
　255:2;299:9
**appropriate (1)**
　74:8
**approved (3)**
　13:2,3;15:9
**approving (4)**
　13:6,13;14:6;305:14
**approximately (2)**
　261:23;262:12
**arched (1)**
　273:17
**arching (3)**
　270:17;271:18;272:9
**area (21)**
　52:3,5,13;64:14;
　80:21;200:12;225:13;
　226:7;231:8;237:16;
　241:1,9;242:16,17;
　275:8;276:9;292:19,
　20;298:22;321:23,24
**areas (1)**
　163:9
**Arlington (1)**
　144:5
**arm (5)**
　83:12;98:16;99:3;
　223:18;237:18
**armor (1)**
　159:5
**arms (1)**
　186:18
**around (43)**
　23:21;52:8;61:5;
　62:7,12;64:13;71:12;
　95:3;97:15;105:8;
　106:2;111:3;136:18;
　158:20;177:6;182:5;
　204:5;212:10,14,20;
　213:6;214:20;215:17;
　217:7;221:10,13,16;
　222:5;223:10,11;
　235:9;245:19;250:22;
　253:15;255:21;263:20;
　265:6;274:1;276:9,17;
　318:15;324:10;327:18
**arouse (1)**
　221:1
**arrest (17)**
　97:23;98:19,20;99:2;
　107:21;143:3,4,15;
　144:7;145:9;146:5,7;
　150:10,21;238:17;
　305:18;309:12
**arrested (2)**
　238:15,22
**arresting (5)**

139:21;143:14,18,
　20;145:8
**arrive (1)**
　130:13
**arrived (19)**
　47:11;53:21;175:16;
　186:8;187:1,2,5;188:5,
　7,14,20;191:12;
　196:11;215:15;218:24;
　223:14;251:8;253:6;
　280:5
**arriving (4)**
　177:18;178:16;
　179:20;299:20
**Asian (1)**
　92:24
**aside (1)**
　147:23;275:7
**aspect (1)**
　78:3
**aspects (2)**
　75:19;77:21
**asphyxia (44)**
　112:7;113:5,9,13,15,
　24;114:9,20,24;115:5,
　8,12,23;116:3,10,24;
　117:3,7,13;118:8,23;
　119:9,17;120:10,18;
　121:5,15;122:12;
　123:7,19;124:1,22;
　125:8,19;126:21;
　128:6;135:23;136:13,
　19;137:3,9,16,22;138:6
**assault (1)**
　308:24
**assess (3)**
　114:13,17;123:19
**assessing (1)**
　125:7
**assist (3)**
　21:6;151:10;233:20
**assisting (1)**
　14:17
**associate's (1)**
　20:24
**assume (11)**
　15:7;110:9;115:24;
　162:16;218:7,8;
　219:12;274:2;311:24;
　314:17;325:9
**assumes (1)**
　131:8
**assuming (5)**
　50:16;73:14;150:15;
　269:5;285:19
**ate (1)**
　172:23
**attached (5)**
　163:21;165:1;168:4;
　252:4;254:9
**attacks (1)**
　109:23
**attempt (10)**

62:23;63:8;93:4;
　96:13;99:10;110:2;
　231:16;280:5;310:17;
　311:23
**attempted (7)**
　210:10,24;234:11;
　236:20;280:1;282:1;
　309:2
**attempting (1)**
　307:15
**attempts (1)**
　306:20
**attention (20)**
　89:24;91:9;92:2,4;
　128:20;129:1,5,15,20;
　130:1,4;207:23;
　209:15;225:9,11,18;
　230:1;251:5,6;287:18
**attest (1)**
　297:14
**attorney (2)**
　15:17;21:18
**attorneys (2)**
　6:12;10:1
**audio (1)**
　16:11
**Aurora (1)**
　64:17
**authorize (1)**
　255:10
**automatic (2)**
　325:6,9
**automatically (6)**
　153:7;200:2;238:21;
　308:22;309:24;313:5
**automobile (1)**
　282:22
**auto-populated (1)**
　195:1
**available (6)**
　16:23;39:20;45:8,11,
　17;131:4
**Avenue (3)**
　53:8;57:22;307:21
**avenues (3)**
　203:9;14;308:14
**avoid (1)**
　94:16
**aware (30)**
　11:9;14:13;17:12;
　30:23;31:1;38:6,7,24;
　60:14;67:15;72:19;
　100:4;105:2;106:20;
　107:15;110:16,20;
　114:19,23;123:24;
　135:10;141:14;174:17;
　305:12;311:19,21,22;
　312:14;328:23;329:6
**away (37)**
　47:24;51:20;52:14;
　70:2;97:23;98:9,21;
　133:4;139:8;144:5,12;
　149:8;153:12;181:6,

10;214:22;215:20;
　216:7,12,23;219:8;
　229:2;239:14;244:3;
　249:10;251:2;265:4;
　268:17,19;273:21;
　277:20;284:20;286:12;
　294:11;296:1;300:9;
　324:7

## B

**bachelor's (1)**
　20:21
**back (115)**
　8:22;9:5;15:16;
　25:19;46:18;48:5,8;
　49:1;54:3;99:4;123:13;
　132:4;135:9;136:9;
　138:7;143:12,15;
　144:11;145:13;151:21;
　155:20,21;158:23;
　159:24;161:17;164:2;
　170:18;171:3,8,11,17,
　20,23;172:10;181:17;
　197:15,22;200:4;
　212:24;213:1,2;
　220:17;224:17,22;
　225:4;227:15,17,21;
　228:15;229:10;231:13;
　235:12,13,21;236:5;
　241:6,15,21;242:20;
　243:4,8,18,20,24;
　245:15;252:6,20;
　254:19;264:9,17;
　265:24;266:11,19,23,
　24;267:4,15,16;268:9,
　12,15,15,23;273:24;
　276:2;277:8,21;
　278:14,17,19,20;279:5;
　281:2;282:5;284:2,9;
　285:3;293:4,22;294:2;
　296:24;297:20,22;
　301:13,15;306:4,22,24;
　307:22;308:3;316:18,
　20;318:5;326:3,22
**background (1)**
　21:19
**backup (1)**
　144:12
**bad (5)**
　283:18;323:10;
　324:1,2,9
**banged (1)**
　70:13
**banging (5)**
　70:3,7;263:20
**barely (8)**
　253:14;294:17,22,
　24;295:4,7;298:4,18
**barrage (1)**
　183:14
**barricade (2)**
　67:24;68:14

**barricading (1)**
　97:3
**based (27)**
　39:15;49:7,15;56:18;
　69:12;83:24;92:19;
　100:20;122:6,9;123:3;
　130:11;181:14;272:18;
　281:11;288:12,15,18;
　290:1;291:1,10,24;
　292:10;320:20;321:10;
　325:13,21
**basic (3)**
　171:18;205:16;206:8
**Basically (10)**
　20:5;64:13;66:9;
　140:13;146:19;169:22;
　195:10;214:8;301:18;
　309:24
**basics (3)**
　206:3;207:2;210:12
**basis (1)**
　132:24
**bathroom (2)**
　170:1;172:23
**Baugh (1)**
　5:11
**B-A-U-G-H (1)**
　5:16
**beat (2)**
　114:10
**became (9)**
　59:12;221:23;254:7,
　21;258:13;278:2;
　280:23;289:17;293:21
**becoming (1)**
　300:8
**bed (5)**
　122:19;123:11;
　124:10;322:6,7
**bedroom (2)**
　316:10;321:21
**begin (2)**
　157:1;286:6
**beginning (1)**
　64:9
**behalf (3)**
　325:16,17,18
**behaving (1)**
　89:8
**behavior (26)**
　23:20;24:1;43:6;
　46:5;47:22;48:2;49:8,
　16;56:18;89:14,18;
　90:23;91:10;99:18;
　101:24;102:17;132:15;
　134:19;185:21;198:24;
　213:21;291:2,10,11;
　292:10;320:21
**behaviors (2)**
　20:8;102:8
**behind (11)**
　24:1;25:18;67:8;
　99:4;220:5,6,12;

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

228:15;229:10;241:6;
279:4
**believing (1)**
320:23
**belly (2)**
136:6;298:10
**belong (2)**
27:3;249:23
**belt (1)**
159:8
**best (6)**
22:1;23:2;24:20;
63:5;245:9;281:13
**better (1)**
97:9
**big (2)**
8:15;133:7
**bigger (1)**
49:1
**bin (1)**
148:9
**bipolar (4)**
21:22;101:17,19;
286:17
**bit (17)**
6:11;7:15;23:24;
48:13;154:12;183:9;
197:6;207:11;220:5;
224:3;237:2;247:20;
252:11;258:9;264:20;
308:23;311:17
**bite (39)**
221:20;223:10;
224:7,10;226:8;
227:17;228:22;235:11;
237:17;240:21;241:23;
243:12;244:11;245:3,
17;246:19;247:12,18,
21;248:2,4;249:5;
263:19;265:8,14,19,20,
22;267:17;268:16,24;
270:4,13,17;271:19;
273:15;318:4;326:7,23
**biting (4)**
225:21;250:15;
251:2;270:2
**bitten (6)**
171:10;187:6;
223:21;224:2;226:7;
269:8
**bizarre (1)**
134:19
**black (2)**
92:24;249:24
**blade (12)**
241:13,14;242:15;
243:13;258:8;265:11,
18;270:16;271:18;
272:15;277:18;316:21
**blank (1)**
160:9
**Blasdel (3)**
173:17,20;317:12

**bleeding (2)**
30:5;34:14
**block (2)**
51:21;153:12
**blood (5)**
207:23;208:12,15;
324:3,19
**blue (1)**
251:3
**bodies (1)**
116:8
**body (69)**
16:1,3,6,12,15,18,18,
21;17:1,5;104:8,19,23;
105:10,16;106:1,4;
109:1,11,24;110:8,11,
21,24;112:8;117:2;
133:16,22;134:2,7;
137:21;156:22;157:12,
15,16;158:4,5,6;159:5;
163:10;194:1;221:17,
24;222:11,15,17,21;
223:15;226:5;228:17;
236:2;241:4;242:1;
248:14;251:19;253:6;
273:18;276:16;279:10;
283:3;298:2;301:19,
24;311:19,22;312:1,5,
22;313:5
**boot (1)**
251:5
**boots (1)**
249:24
**both (7)**
8:2;35:6;59:21;
131:9;193:18;201:20;
262:2
**bottom (9)**
160:11;163:5;166:5,
10;167:16;168:11,15,
23;194:2
**box (2)**
73:7;149:17
**brain (5)**
37:10;137:20;
144:10;213:18;285:5
**break (22)**
7:10,11;74:20;98:21;
176:6,11,15,18;178:16;
183:11;184:6,12,24;
185:9,12;186:11;
287:4;288:5,16;
290:19;291:14;320:16
**breakdown (4)**
118:22;119:7;
286:18,21
**breath (2)**
296:21;297:12
**breathe (8)**
113:15;121:12;
125:3,15;136:23;
285:4;298:12;313:1
**breathing (48)**

112:8,19;113:6,18;
125:11;137:1,6,8,17,
19;294:17,22,24;295:4,
7,13,16,21;296:1,2,3,6,
6,7,7,9,13,14,17,21;
297:3,5,7,7,10,11,14,
16,19;298:4,17;299:9,
16;300:19,20;313:4;
317:6;318:1
**Brian (1)**
59:20
**brief (3)**
173:18,21;318:5
**briefly (3)**
171:8;214:14;290:7
**Brimfield (2)**
64:14;66:22
**bring (6)**
160:2;308:17,18;
314:15;327:7,8
**broke (1)**
24:15
**brought (8)**
6:18;25:4,22;27:9;
30:15;310:15,18;327:5
**bruising (1)**
283:1
**Bubba (5)**
173:4;207:10;224:3;
258:10;277:24
**Bubba's (2)**
164:12;307:24
**buck (9)**
221:20;226:8;
227:13,15,19;236:7;
241:18;266:9;267:15
**bucked (5)**
265:23,23;266:22;
267:1;273:7
**bucking (13)**
221:10,15;222:5;
229:5,9;235:17;236:2,
14;245:3;264:10;
266:3,19;273:3
**bucks (3)**
241:14;267:10,11
**buddy (4)**
98:14;234:22;
278:21;279:20
**bug (1)**
87:5
**building (2)**
32:5,6
**bunch (1)**
194:1
**bureau (2)**
303:14;304:2
**bureau's (1)**
303:19
**busy (1)**
221:1
**butt (2)**
225:7;235:1;237:19

**button (2)**
193:3;195:1

## C

**calf (3)**
226:18;251:4;302:3
**call (65)**
5:23;21:9;25:24;
26:1;27:1,5,14,16,24;
28:7;33:22;35:2,3,5,8,
11;38:3;47:3;53:4;
56:7,13;63:23;130:3,9;
133:1;140:22;144:8,9,
23;145:2,4,18;146:3;
147:8;151:5,10;
165:22;175:24;176:21;
178:15;179:3,7,10,19;
182:23;183:3;186:12;
190:21,21,22;191:19;
193:18;194:17,18;
195:5;196:4;197:9,10;
199:1;200:2;201:3;
230:12,22;292:13;
316:9
**called (15)**
54:24;55:2;67:17;
68:13;94:20;120:9;
181:17;182:22;183:15;
193:12,16;208:7;
230:8;321:9,24
**caller (3)**
194:4,5;196:1
**callers (1)**
198:19
**calling (14)**
25:22;45:21;47:4;
180:3,9;182:24;184:1,
7;189:4;190:6;197:11;
198:23;201:4,12
**call-out (2)**
66:21,21
**call-outs (2)**
66:14;67:2
**calls (7)**
130:11;147:7,9;
190:11,12;198:20;
199:17
**calm (1)**
97:6
**cam (6)**
152:10,13,16,21,24;
155:8
**came (30)**
143:1;144:8,9;145:2,
4,18;146:3;171:11;
178:6;183:10;185:16;
186:12;190:2,22,23;
196:4;202:12;203:8,
16;209:1;214:23;
252:24;254:4;268:21;
283:9;292:4;310:2;
313:16;314:18;318:5

**camera (21)**
16:1,3,6,12,15,18,21;
17:1,5;154:8;155:17,
20;156:5;157:12,15,
16;158:4,5,6;174:6;
267:7
**cameras (6)**
155:10,11,21,24;
156:2,23
**camouflaged (1)**
219:15
**can (162)**
9:3,5;21:5,21,24;
22:1;23:3,10,17;24:19,
21;28:21;31:18,20;
34:5,21,24;35:2;37:14;
39:18;42:12,15,19,24;
47:16,18,19;52:17,18;
56:4;63:22;66:18;
68:10;69:8,19;70:6;
71:6;72:6;82:9;83:10;
84:22;88:11;96:20;
97:6,9,9,19;99:3;100:8,
12;101:2;104:12;
109:10,17,20;110:7,11,
21;111:13;112:11,14,
17,21;113:21,24;114:2,
9;115:22;121:12;
122:22;124:10,18;
125:12;131:16;133:13,
21,24;134:6,24;135:3;
136:9,11,17,23;139:7,
7,23;140:2;142:2;
149:1;154:4;157:4,12;
159:11;160:2;164:5,
14;179:9,10;193:8,9,
10;196:6;200:21;
202:23;204:24;205:16;
215:22;218:6,13,24;
219:5;220:2,3,4;
222:10,14,20;225:1,11;
226:1;228:7,16;
230:18;231:4;236:5;
238:3,6,8;242:22,23;
243:10;245:10;246:8;
248:22;250:22;252:9;
254:6,18;264:5,7;
265:13;280:17;286:3,
22,23;290:5;296:2,19;
297:14;300:4;302:19;
312:9,20;315:2;317:4,
6;318:13;321:17;
323:15;328:21;329:6
**capable (1)**
43:2
**capacities (2)**
86:13;87:21
**capacity (24)**
81:20;82:11,18,19,
23;83:6;84:1,10,14;
85:3,8,9,18,24;86:4,10,
24;87:9;88:19;93:6,14,
16;94:6,15

Case: 5:16-cv-02331-JRA  Doc #: 16-8  Filed: 07/17/17  89 of 111.  PageID #: 461

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

cape (1)
   245:19
captain (1)
   65:9
captured (2)
   155:7,17
car (33)
   95:9;122:18;145:5,5,
   19;185:7;194:9,12,13;
   196:5,6;203:19;
   209:21;224:8;251:12;
   255:24;257:15,17,17;
   259:20,21;260:4,5;
   306:11,14,19;307:8,9,
   15;308:6,12;309:1,3
care (3)
   78:10,24;250:6
career (2)
   64:9;141:24
careful (2)
   158:17;258:9
carry (1)
   230:10
case (25)
   9:16;17:8,14;37:12;
   54:19;58:5,8;63:1;
   74:17;82:5;92:11;
   130:23;168:14;173:15;
   195:19;213:11;235:23;
   290:6;303:17;305:18,
   22;309:14;318:24;
   325:2;327:12
cases (2)
   103:7;125:22
cause (9)
   88:11;110:11,18,22;
   113:24;114:9;124:20;
   149:16;312:10
caused (9)
   90:23;91:11;92:8,20;
   93:6;112:11,14,17,21
causes (6)
   88:22;115:10,15,21;
   117:1;120:16
causing (1)
   140:9
center (1)
   198:5
centrally (1)
   144:3
Certain (3)
   46:11;88:9;135:18
certainly (1)
   263:10
certificate (1)
   18:23
certified (1)
   5:3
chance (3)
   6:10;197:5;284:17;
   315:22,24
change (9)
   24:4;89:18;92:18;

155:22;181:13,23,24;
182:6;275:11
changed (6)
   5:12;155:24;180:5;
   181:18,19;182:4
changes (3)
   50:12;88:11;332:4
channel (42)
   189:21,23,24;190:2,
   4;191:9,14,21;196:16;
   197:12,13,14;198:22;
   199:12,14,15,18,23,23,
   24;200:5,6,7,8,10,13,
   18,20,24;201:14,16,17,
   18,23;202:1,1,4,12,21;
   203:2,16,18
channels (3)
   190:24;200:16;
   201:20
chaos (2)
   77:13,17
charge (6)
   127:15;156:2;
   195:22;308:22;309:13;
   317:5
charged (6)
   52:6;309:8,16;310:1,
   9;311:15
charges (6)
   14:20;308:17,18,18;
   310:14,17
charging (1)
   52:7;53:14;97:15
chased (1)
   52:8
check (13)
   161:2,11,19;162:5;
   167:11,12;171:20;
   195:7;281:6;298:5;
   299:2;308:2,2
checked (21)
   158:21;161:1,5,9,10,
   16,18;162:19;164:20;
   165:6;167:6,7,9,16;
   168:7;172:17;209:17;
   299:1;310:23;318:3;
   326:23
checking (8)
   164:20,24;165:7;
   167:22;172:5;254:20;
   298:9,20
chest (10)
   63:19;264:13;
   275:21;276:1;277:24;
   294:18;298:10,22,24;
   299:13
chest's (1)
   112:12
Chief (42)
   17:23;58:23;59:12;
   65:9;72:3,8,11,14,20;
   73:2,6;74:1,3,4;147:4,
   4,12,13,19,19;149:22;

162:11;167:19,21;
168:6;171:2,5,24;
172:5,15;173:6,10,19;
206:15;210:4,7,11;
302:21;303:8;319:13;
322:23;323:14
chief's (3)
   73:7;162:10,10
children (3)
   78:2;88:6;324:5
choice (1)
   48:6
choking (2)
   113:6;280:11
circumstance (3)
   23:24;70:17;134:4
circumstances (15)
   25:6,7;28:1;33:22;
   47:11;53:2;68:16;74:9;
   85:17;89:3;124:17,17,
   19;312:12;316:1
CIT (6)
   17:24;18:3,6;20:21,
   23;100:1
citizens (3)
   200:19;201:9;215:14
City (4)
   25:16;313:11;
   317:18,22
claim (7)
   325:1,10,16;326:15,
   20;327:3,12
claimed (1)
   210:22
clarify (1)
   274:21
class (3)
   60:6;65:23,24
Classroom (1)
   66:8
clear (18)
   28:13;92:15;127:23;
   131:18;154:6;163:22;
   168:24;177:21;194:4;
   233:14;235:19;236:5;
   260:23;261:2;306:23;
   307:3,13;319:7
clearing (2)
   143:15;145:11
clerical (2)
   13:10,17
clip (1)
   157:16
close (14)
   47:18;48:11;153:14;
   214:16;216:16;233:23;
   237:16;249:7;257:12;
   258:11;265:7,7,12;
   268:12
closeness (1)
   223:4
closer (2)
   221:7,8

closest (2)
   276:12,13
clothes (1)
   53:13
clothing (5)
   135:6;252:9,13,16;
   253:13
cognitive (3)
   87:24;88:20;89:23
cognizant (1)
   312:14
colleagues (5)
   10:19;17:13;19:13;
   177:10;292:8
collected (1)
   174:20
collection (2)
   10:6;140:20
combative (1)
   97:3
combination (2)
   40:22;41:23
comfortable (3)
   255:16;256:24;
   265:10
coming (27)
   144:20;151:18;
   184:5;198:14;203:1;
   217:12;224:9;225:3;
   228:18;233:4;236:2,3;
   240:14;248:3,8,19;
   255:22;257:21;264:10,
   11;267:21;298:18;
   299:3,17;302:3;304:6;
   316:15
commands (8)
   86:1,5,7;95:22;
   106:7;231:20;234:14,
   19
commission (1)
   62:20
committed (1)
   15:13
committing (1)
   211:7
common (4)
   234:22;308:20;
   309:3;321:23
communicate (5)
   151:6;178:21;
   193:10;237:11;239:18
communicated (1)
   151:24
communication (3)
   151:20;179:18;199:3
communications (7)
   172:8;179:23;
   189:19,22;190:20;
   198:5;199:11
community (18)
   40:24;41:3;75:20;
   76:14,24;77:1,3,7,11,
   13;87:20;88:3;96:9,21;

106:17;146:3;201:1;
202:5
Comp (28)
   313:15;314:9,11,15;
   317:18;324:22;325:1,
   9,15;326:1,6,15,20;
   327:3,5,12
comparatively (1)
   271:11
complaint (1)
   44:24
complaints (1)
   201:10
complete (3)
   147:17;148:8;150:13
completed (12)
   144:7;148:7;160:21;
   161:4;162:1;168:16;
   169:10;170:11;304:12,
   23;305:9,11
completely (3)
   48:8;252:10;256:13
completing (2)
   168:19;328:23
complex (1)
   67:8
comprehensive (1)
   273:21
comprised (1)
   246:1
compulsion (1)
   80:1
computer (4)
   166:13;167:1;
   191:10;195:10;198:3,4
computers (3)
   168:24;170:17,18
concern (3)
   105:20,21;282:5
concerned (8)
   184:20;208:10;
   211:8;217:2;222:1;
   253:10;254:12;270:4
concluded (1)
   310:22
concussion (1)
   70:14
condition (20)
   41:20;42:4,14;44:2;
   89:15;92:21;113:10;
   117:11;118:6;120:8;
   128:14;130:20;131:6,
   9;135:24;137:23;
   138:9;186:9;283:18;
   284:10
conditions (5)
   88:10,11;91:5;
   109:10,17
conduct (4)
   130:24;132:12,20;
   143:7
conducted (25)
   69:14;71:16;81:16;

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

82:14,17,22;83:4;
108:1;121:3,14;
122:11;123:5;124:6;
125:17;126:19;128:5;
135:21;136:1;137:24;
138:10;139:4,18;
158:2;188:22;309:23
**confidence (2)**
303:1,5
**confident (4)**
65:7;191:2;262:9;
323:8
**confirm (1)**
198:15
**confirms (1)**
46:23
**confronting (1)**
25:1
**confused (2)**
8:18;116:21
**confusing (3)**
161:19;274:21,22
**confusion (2)**
95:12;135:3
**connect (1)**
248:18
**connected (5)**
126:12;251:23;
252:1,18;253:4
**conscious (3)**
293:10,11;295:19
**consented (1)**
175:1
**consider (18)**
40:11,18;41:17;51:2;
74:16;79:9,20;81:20;
87:13,16;90:18;101:8;
105:13,14,15;107:18;
108:6;125:6
**consideration (3)**
89:14;92:10;108:16
**considerations (1)**
124:24
**considered (9)**
67:7,10;86:17;
101:23;108:18;125:2;
132:15;135:19;293:16
**considering (1)**
108:5
**considers (1)**
86:19
**consisted (1)**
66:7
**consistent (8)**
43:6;59:1;160:22;
280:15;282:2;293:22;
294:3;319:9
**constant (1)**
183:13
**constitutional (6)**
76:9,13;77:5,9;78:9,
13
**constraints (1)**

80:2
**consultant (1)**
79:6
**consulting (1)**
79:13
**contact (11)**
25:9;26:16;28:13;
29:11;30:6;37:16;
46:21;49:13;201:1;
211:9;267:21
**contacted (3)**
54:18;130:8;300:8
**contacting (7)**
25:4;27:8,9;30:9;
31:4;45:24;46:3
**contain (2)**
177:1,4
**contained (2)**
139:14;304:13
**containing (1)**
274:2
**contents (1)**
9:24
**continual (1)**
324:14
**continually (1)**
324:3
**continue (7)**
23:20;169:1;208:14;
242:3;243:22;260:10;
274:13
**continued (4)**
270:20;271:3,19;
272:19
**continuous (2)**
227:8;274:18
**continuously (1)**
267:19
**contract (1)**
120:17
**contradictive (1)**
47:2
**control (39)**
35:17;51:17;52:10;
58:23;69:20;70:20;
82:3;83:11;84:5;90:7;
91:9;92:3,14;93:2;
97:17;104:3;116:20;
118:3;120:6;121:18;
122:1;124:19;139:9;
140:2;176:5;177:7;
212:17;222:2;225:1,8,
11,12;226:4,5,6;
244:17;245:4;246:6;
296:8
**controlled (2)**
213:22,23
**controversial (2)**
41:12,16
**conversation (1)**
206:20
**conversations (12)**
9:24;172:6;210:3,7;

286:4;300:12;302:21;
303:7,10;322:11;
323:14;328:16
**convictions (1)**
76:6
**cooperate (6)**
23:17;24:20,23;
140:3;237:9;317:7
**cooperating (1)**
140:8
**coordinate (1)**
177:9
**cop (1)**
31:21
**copied (2)**
162:16;163:1
**copies (1)**
164:16
**Copley (4)**
67:7,10,11,20
**cops's (1)**
250:7
**copy (4)**
11:2,4;148:18;151:3
**corner (1)**
51:23
**corners (1)**
293:15
**coroners (1)**
41:7
**coroner's (1)**
303:16
**corporate (1)**
97:10
**Correction (1)**
332:6
**correctly (1)**
13:15
**couch (2)**
123:12;124:8
**counteract (1)**
287:19
**country (2)**
38:8;39:1
**County (2)**
77:2;144:20
**couple (35)**
15:2;53:18;84:20;
127:17;142:7;178:19;
181:10;183:22;185:4;
216:15;236:16,18;
242:6;244:1;261:19;
266:12;268:11;270:23;
271:9,10,11;272:13,15,
20;273:8,23;274:4,7,8,
19;275:23;277:14,16;
289:19;318:15
**course (19)**
27:4;47:4;48:12;
60:6;71:14;97:7;112:1;
114:8;139:12,21;
146:15;180:2,5,5;
227:16;233:5;272:14;

289:1;301:24
**court (3)**
7:19;8:1;9:8
**cover (3)**
52:9;160:6;163:14
**covered (1)**
99:24;100:1
**CPR (5)**
31:9;298:14,16,19;
301:8
**Craig (2)**
54:10,11
**C-R-A-I-G (1)**
54:13
**crazy (1)**
258:10
**create (2)**
12:23;265:6
**created (13)**
10:20;72:21;148:21;
163:15;166:2,24;
167:23;204:18;210:15;
283:16;305:24;306:3,
17
**creating (5)**
14:15;39:24;171:6;
284:2,14
**creation (1)**
168:4
**Crestline (1)**
153:21
**crime (6)**
130:17;131:5,8;
132:19,21,24
**criminal (3)**
76:6;132:16;309:2
**crises (5)**
35:24;36:6,22;37:9;
109:20
**crisis (57)**
17:24;18:9,15;19:4,
11,18,20,24;20:12,16,
18;22:5,14,23;23:1,6;
24:12;25:2,10,11,14;
27:4,10,23;29:12;
30:10;31:4;33:3,18,23;
35:14,20;36:17;37:4,
16;39:6,20;40:2,9,10,
15;61:21;62:5,12,13;
90:4;96:12,22;97:2,2;
111:12;116:2;117:6;
118:21;119:7,15;133:7
**critical (1)**
284:9
**crossed (1)**
291:9
**crown (1)**
241:7
**cruiser (10)**
139:13,23;140:4,16;
143:5;156:18;230:10,
20;231:2,2
**cuff (1)**

97:22
**cuffed (2)**
49:23;228:15
**cuffs (2)**
98:1;124:13
**Currently (3)**
60:11,15;156:23
**Currington (2)**
54:10,12
**C-U-R-R-I-N-G-T-O-N (1)**
54:13
**custody (1)**
150:20
**customs (1)**
79:22
**cut (10)**
34:14;208:22;
219:11,19;220:20,21,
22;263:10,22;301:10
**cutting (2)**
220:19;263:14
**Cuyahoga (3)**
208:14;324:22,23
**cycle (3)**
124:9;139:6;259:14
**cycled (1)**
259:9
**cycles (4)**
121:11;125:23,23,23
**cycling (7)**
255:3;256:6;257:10,
13;259:17,23;260:4

**D**

**daily (1)**
147:17
**damage (1)**
265:6
**damaged (2)**
306:14;309:1
**damaging (2)**
97:16;309:2
**danger (6)**
69:18,22,23,24;
139:12;217:15
**dangerous (4)**
61:16;104:12;177:1;
237:19
**dart (1)**
126:15
**dash (12)**
152:10,13,16,21,24;
155:8,10,10,17,24;
156:2,5
**data (10)**
148:9,11,22;166:12,
17;167:6;168:7;190:8;
311:1,2
**date (4)**
16:5;148:12;157:2;
175:10
**Date_Signature_ (1)**

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

332:21

**dates (3)**
29:17;31:16;49:6

**David (2)**
147:13,15

**day (39)**
15:8,13;16:11;17:23;
48:8;50:18;52:11;
145:10,14;146:15;
148:4,16;150:14;
153:18;155:18;162:2,
21;172:1,8;174:3;
179:4;190:18;191:18;
194:10,12,13;197:21,
24;198:1;200:17;
277:12;284:21,22;
285:10,23,24;314:23;
319:6;332:3

**days (3)**
19:6;147:6;316:24

**dead (1)**
285:6

**deadly (9)**
141:13,16,19;142:5,
6,10,13,17,19

**deal (4)**
8:15;21:12;152:16;
155:10

**dealing (6)**
19:20,23;21:2;23:5;
55:24;238:24

**death (8)**
50:13;57:24;110:11,
18,22;114:1;135:20;
153:10

**debris (10)**
280:10,14,19,21;
281:5,7,10,18;282:1,7

**decade (1)**
31:20

**decided (2)**
218:3;315:4

**deciding (3)**
81:18;101:6;107:16

**decision (15)**
61:8;80:13,17,20;
81:2;82:13;84:8,15;
85:6,15;107:24;
108:17,22;119:24;
211:21

**decision-making (1)**
83:3

**decisions (4)**
61:11;62:4;63:17;
74:7

**decrease (1)**
110:3

**de-escalate (2)**
97:6;99:11

**De-escalating (3)**
99:24;100:4,9

**de-escalation (6)**
96:13,20;97:20;

99:22;100:16;101:1

**deficits (1)**
87:24

**definite (1)**
28:8

**Definitely (2)**
51:6;155:1

**definition (3)**
80:7,10;101:23

**degree (4)**
20:21,23;146:2;
206:10

**Delaware (1)**
153:19

**delete (1)**
198:2

**deliberate (1)**
63:17

**delirious (1)**
89:3

**delirium (105)**
26:3,18;27:12,13,21;
28:3,15,19;29:7,8;
30:11;31:5;33:10,12;
37:21;40:17,18;41:14,
19;42:4,13,15;43:6,12,
17;44:2,12,13,20;45:2,
2,15;46:15,20;47:4,8,
12,21;48:4,19;49:4,16;
51:3;52:21;53:4,12;
54:6,19;55:3;56:1,20;
58:11,16,19,22;59:14,
16,22;60:1,7;101:14;
106:19,21;107:5;
109:18;117:12;118:7,
9,14;119:1;120:9;
128:13,19;129:4,6,8,9,
15;130:1,2,3,9,14,16;
132:12,15,18;133:8,13,
16,20;134:5,11,14;
135:1,4,11;319:16,18,
21,24;320:7,11,23;
321:9

**delusions (3)**
102:7;103:2,13

**dementia (5)**
88:3;91:7,11;92:8,12

**demonstrate (1)**
150:19

**demonstrated (3)**
245:15;267:6,20

**demonstrating (2)**
63:15;130:14

**DENISE (7)**
5:1,8,20,23,24;6:1,2

**Department (41)**
18:18;25:12,19;
26:13;29:16;30:16;
31:6,8,10;32:2,7,10,11;
33:5,9,9,13,13;35:15,
22;36:3,5;38:8;39:23;
40:8;51:11,12;59:17;
79:13,17,23;149:4;

162:23;193:17;198:8;
199:22;208:5;294:8,
16;299:19;325:12

**departments (1)**
39:1

**depends (10)**
35:7;66:20;90:17;
98:18;122:1;127:21;
146:23;155:9;195:2;
293:17

**deployed (1)**
179:13

**deployment (2)**
184:8;185:14

**deposed (3)**
17:13;58:4,8

**deposes (1)**
5:3

**deposition (13)**
5:22;6:3,21;9:21,22;
15:18,21;16:9;17:11;
329:1,9,16;332:2

**depositions (5)**
17:15,20;56:23;
141:3;168:14

**Depot (1)**
67:9

**depressed (1)**
24:16

**depression (1)**
21:22

**depth (1)**
121:2

**deputies (1)**
193:8

**describe (9)**
68:6;163:23;227:23;
228:2,5;238:8;242:14;
245:9;264:22

**described (5)**
91:6;117:12;118:7;
172:4;244:14

**describes (1)**
228:24

**describing (3)**
42:3;229:6;317:8

**descriptive (1)**
228:12

**desk (3)**
149:16,18;325:7

**destination (3)**
181:24;182:7,8

**detailed (1)**
200:9

**details (7)**
28:8;67:24;68:10,14;
194:5;210:11;285:6

**Detective (11)**
16:2,16;157:2,18;
173:17;174:2,11;
179:10;303:13,19;
315:16

**detectives (5)**

173:15;303:20;
304:2,2;317:11

**detective's (2)**
10:9;164:11

**determinations (2)**
45:7;291:21

**determine (5)**
45:4,6;84:2;103:22;
299:3

**determining (1)**
308:5

**detrimental (1)**
137:13

**developed (1)**
175:17

**device (2)**
82:2;83:18

**devices (1)**
57:4

**devoted (1)**
115:16

**diabetes (6)**
88:10,16;89:2,6;
90:4,24

**diagnose (1)**
21:24

**diagnosed (1)**
319:24

**diagnosis (1)**
43:2

**diaphragm (1)**
112:15

**dictionary (1)**
80:5

**die (5)**
49:20;113:14;
284:23;315:23;317:2

**died (2)**
56:24;57:11

**difference (6)**
83:22;92:13;108:2;
124:11;126:1;127:6

**different (43)**
20:8;21:13;35:3;
36:11,19;38:4,24;41:6,
6;57:20;73:18;75:16,
19;82:1,7,10;83:19;
84:21;94:22;101:5;
102:3,7;103:7;105:4;
117:23;118:10,13,18;
120:3;124:16;125:22;
147:1;155:9;162:18;
163:2;169:14;170:17;
182:7,8;220:11;
236:20;247:14;320:10

**differentiation (1)**
117:9

**differently (1)**
24:6

**difficult (1)**
67:4

**difficulties (1)**
88:20

**difficulty (1)**
8:2

**dig (1)**
197:6

**diminished (20)**
82:18,23;83:24;
84:10;85:3,8,18,23;
86:3,10,12,23;87:8,20;
88:19;93:6,14,23;94:6,
15

**dining (1)**
292:20

**direct (3)**
124:20;200:24;
325:19

**directed (1)**
194:15

**direction (15)**
151:12;153:19;
154:11,12,15;158:21;
182:6,19;221:5,11;
222:6,23;261:10;
262:1,8

**directive (14)**
26:12;27:11;28:13,
19,21;29:1,7,9;30:12;
31:5;107:6;310:2,5,11

**directives (1)**
310:6

**directly (7)**
72:3;73:2;182:18;
201:9;231:1;285:16;
316:18

**dirt (1)**
280:22

**disagree (2)**
80:10;141:10

**disappears (2)**
197:22,23

**discharge (1)**
139:19

**disconnect (1)**
250:20

**disconnected (2)**
253:7;254:4

**discretion (1)**
28:6

**discuss (10)**
15:18;17:20;39:24;
231:11;270:5,7;
286:22;308:16;315:8,
13

**discussed (20)**
8:23;19:18;29:16;
100:3;135:11;177:24;
192:3;210:21;246:3;
269:12;290:10;292:7;
302:20;303:9;315:11;
316:6;321:13;322:10;
323:13;328:15

**discussing (2)**
170:22;178:8

**discussion (3)**

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

256:20;275:15;309:4
discussions (7)
  171:24;173:9;286:4;
  319:13,15;323:17;
  328:16
disease (4)
  41:15,17;325:4,8
diseases (1)
  37:9
disorder (3)
  21:22;101:17,19
disorderly (4)
  130:24;132:12,20;
  143:7
disorientation (1)
  134:17
dispatch (32)
  16:11;45:21;143:1;
  150:11,17;151:6;
  178:18;180:3,23;
  181:14;182:17,18;
  183:6,24;184:5;186:3;
  189:7,8,13,19,24;
  190:11,15;191:15;
  192:12;193:14;199:17;
  200:18,21;201:13;
  203:16;308:13
dispatchers (2)
  35:9;193:7
dispatching (1)
  180:1
display (1)
  44:10
disposed (1)
  33:1
distance (2)
  144:5;228:16
distinct (1)
  194:7
distinction (2)
  82:15,21
disturbance (1)
  140:10
disturbances (1)
  134:21
doctor (4)
  21:24;28:20;38:21;
  158:19
Doctors (2)
  41:6;318:21
document (22)
  10:21,24;11:5,8,21,
  22;12:2;13:20;14:6,15,
  18;15:6;141:1,22;
  142:3;163:18,20;
  165:2,13;169:20;
  170:5;175:4
documentation (3)
  150:9,13;328:24
documents (11)
  5:9;10:6;18:22;
  32:17,18;140:21;
  150:6;162:23;178:14;

210:14;218:22
done (14)
  7:19,21;9:22;16:19;
  32:20,21;38:12;39:16,
  19;63:3;147:8;150:21;
  257:6;290:22
door (5)
  111:7;218:20;289:8,
  9,11
double (1)
  166:21
double-sided (5)
  161:22;162:17;
  163:13,18,20
down (90)
  8:17;20:8;21:7,8;
  24:9,13;32:6;34:22;
  47:19;48:9,12;49:24;
  50:1;56:10;97:7;
  124:14;133:2,3,6;
  149:18;160:2;174:2,
  19;184:3;226:15;
  227:2,14,15,16,17;
  228:19,20;235:12;
  241:15,21;242:1,2;
  243:4,5,19,24;244:3,7,
  8;250:21;258:11;
  260:21;262:5,19,23;
  263:7,16;264:4,6,18;
  265:16,24;266:20;
  267:4,16,17;268:9,11,
  15,15,23;270:5,7;
  272:24;273:8,18;
  274:10;275:4,10;
  276:14;277:18;278:16;
  281:6;297:23;298:2,
  23;299:5;306:17;
  308:1,1;312:5;313:3,
  16,20;314:11
downhill (1)
  295:11
download (2)
  155:14;195:16
downloading (1)
  157:18
draw (1)
  243:7
drawn (3)
  207:23;208:12;324:4
draws (2)
  208:15;324:20
drink (1)
  172:23
Drive (9)
  152:5;178:12;183:2;
  185:3;193:2;285:17,
  19;300:13;315:2
driveway (33)
  154:14,18;207:5;
  212:22;214:13,24;
  219:2,4,18,23;221:14,
  18,22,24;222:4,11,15,
  20,21;223:8;224:9,21;

225:3;233:5;257:21;
  263:11,15,16,22;
  287:23;289:5,7;292:5
driving (5)
  155:4;182:14,19;
  184:16;195:14
drool (1)
  293:17
drop (3)
  127:14,14,18
drown (1)
  312:2
drug (15)
  44:15;47:13;48:6,14,
  20;51:4;52:24;56:15;
  109:11;111:17;287:14,
  14;290:20;316:8,15
drugged (2)
  35:5,11
drugs (52)
  23:1;27:17;40:22;
  41:23;42:7,13,16;
  43:12,15;44:5,15;
  46:11,13,23;47:7,9,16,
  21;49:9,11,13;56:16;
  101:9,13;103:20,23;
  104:4,5,7,13,15;106:6,
  18,24;107:2,9;111:24;
  112:2;287:19;290:21,
  22;291:2,12;292:3,11;
  315:11;317:1;320:16,
  17,21;321:10,19
drunk (1)
  86:8
duly (1)
  5:2
duplicate (2)
  166:19;311:9
during (23)
  19:18;20:16;65:3;
  71:14;146:15;168:18;
  169:6;178:20;182:13;
  183:2;185:3;194:10;
  211:15;236:17;237:7;
  240:19;261:3;274:6;
  276:23;284:22;295:21;
  302:10;328:24
duty (1)
  157:10
DVD (1)
  16:11
DVDs (2)
  155:23,23

E

earlier (29)
  8:23;9:5;34:5;40:16;
  52:22;95:4;101:15;
  107:11;118:20;123:18,
  23;224:5,6;234:13;
  235:18;261:9,23;
  264:3,7;269:12;

274:11;277:14;279:18;
  290:1;291:16;308:15,
  20;313:10;321:8
ears (1)
  296:4
easily (3)
  244:7,9,10
easy (1)
  268:3
economic (1)
  92:24
Edwards (7)
  50:3,5;51:8,20,22,
  24;54:5
effect (14)
  111:1,2;112:4;
  126:13;141:8;148:5;
  204:13;230:18;240:4,
  11,18;252:3;302:13;
  327:10
effective (1)
  253:3
effects (3)
  102:20;322:19,21
effort (1)
  92:1
efforts (1)
  187:22
eight (2)
  142:22,22
either (20)
  62:11;67:20;131:8;
  133:7,11;139:24;
  145:6;151:16,24;
  152:5;179:24;182:19;
  191:8,13;203:15;
  208:4;250:13,17;
  259:20;260:4
elderly (1)
  88:3
electrical (27)
  69:14;71:16;81:15;
  82:2,14,17,22;83:4,18;
  108:1;121:3,13;
  122:11;123:5;124:6;
  125:17;126:19;128:4;
  135:21;136:1;137:24;
  138:10;139:4,18;
  158:2;188:22;309:22
electrical-conducted (1)
  251:9
electro-muscular (1)
  251:22
electronic (1)
  195:8
electronically (1)
  192:15
else (27)
  17:10;30:5;34:15;
  59:23;103:10;120:14;
  139:15;140:12;159:18;
  167:11;169:23;203:21;
  231:8;238:17;246:18;

247:21;257:11;265:7;
  291:2;292:10,22;
  295:24;300:15;302:18;
  316:8;321:13;329:8
else's (1)
  37:18
e-mail (5)
  192:16;193:23;
  194:1,6,7
emergency (16)
  26:16;29:11;35:13,
  19;37:11;43:17;44:3,
  17;47:18;62:19,19;
  128:20;129:15;130:9;
  183:15,17
emotionally (2)
  323:19,24
employment (1)
  71:15
EMS (36)
  28:13;29:12;30:2,6,
  9;37:11,16;46:21;47:4,
  23;48:11,16;49:13;
  51:20;52:14;54:18,24;
  55:2;209:17,18;
  220:23;231:10;294:15,
  22;295:3;299:8,11,14,
  19;300:6,9,11,12;
  301:8,12;321:9
encounter (3)
  54:7;282:11;291:3
encountered (2)
  56:6;320:6
encountering (2)
  52:5;105:9
end (7)
  53:11;54:22;56:21;
  150:22;222:18;245:2;
  303:15
endanger (1)
  60:18
ended (5)
  51:24;65:9;169:9;
  183:10;275:17
enforced (1)
  147:11
enforcement (11)
  39:21;40:13;77:4,8,
  14;94:19;95:24;
  147:20,22;149:14;
  203:10
enforcing (1)
  147:15
engage (2)
  96:13;132:19
engaged (1)
  211:17
engaging (2)
  96:11,21
enough (12)
  47:19;56:19;131:11;
  213:2;216:23;229:1;
  241:23;257:12;264:16,

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

21;265:7;267:4

**enter (1)**
289:8

**entered (3)**
166:12;292:14;332:5

**entire (11)**
12:2;164:24;171:15;
178:20;271:14;273:21;
275:19,20;277:13;
316:12;332:2

**entree (1)**
148:9

**entry (6)**
148:11,22;166:12,
17;167:6;168:7

**environment (1)**
24:5

**episode (3)**
102:21;103:10,21

**ER (2)**
318:19,20

**errors (2)**
13:10,18

**escalate (4)**
83:17;85:6;97:19;
99:11

**escorted (1)**
313:19

**essentially (1)**
312:17

**Estate (2)**
6:14,19

**estimate (1)**
214:16

**evade (1)**
98:13

**evading (1)**
98:10

**evaluated (2)**
21:10;47:20

**evaluation (1)**
25:13

**even (42)**
34:13;35:4,16;40:23;
47:6;48:11;55:22;
68:10;84:3;103:15;
104:22;132:16;135:20;
139:7;147:8;152:22;
153:3;154:11;155:23,
24;168:21;169:2;
173:18;175:22;182:23;
183:14,19;191:24;
194:18;227:23;228:17;
230:8;234:1;236:7;
238:1,11;255:21,22;
259:11;284:1;299:14;
303:15

**event (9)**
49:2;51:8;145:14;
152:18;172:1;185:18;
204:23;214:8;326:2

**events (8)**
11:16;12:6;14:1;

**excited (105)**
26:3,17;27:12,13,21;
28:2,15,19;29:7,8;
30:11;31:5;33:10,12;
37:21;40:16,18;41:14,
19;42:3,13,15;43:6,12,
17;44:2,11,13,19;45:2,
2,15;46:15,20;47:3,8,
12,20;48:3,18;49:4,16;
51:3;52:21;53:4,12;
54:6,19;55:2;56:1,20;
58:11,16,19,22;59:14,
16,22;60:1,7;101:14;
106:19,21;107:5;
109:18;117:12;118:7,
9,14;119:1;120:9;
128:13,19;129:4,6,8,9,
15,24;130:2,3,9,14,16;
132:12,15,18;133:8,12,
15,19;134:5,11,14;
135:1,4,11;319:16,18,
21,24;320:7,11,23;
321:9

**excluding (1)**
131:9

**exercise (1)**
7:15

**exercising (1)**
297:11

**exerted (1)**
80:2

**Exhibit (46)**
10:7,12;11:13;12:5,
16,18;13:6;14:5,12;
15:3;20:9;46:12;49:4;
102:8;111:22;140:20;
141:6,22;142:3,9;
160:3,5;163:5,14;
165:4;166:6,24;
167:14;168:1,5;
169:15;170:5,8;
174:23;204:18;205:8;
215:6,9;218:23;247:3;
283:16;284:15;304:8,
13;305:10;308:18

**exhibited (1)**
23:14

**exhibiting (3)**
108:7,20;111:16

**exhibits (8)**
10:11;15:20;43:5;
45:1;46:19;53:3;
214:24;215:5

**exist (1)**
39:6

**exists (2)**
41:15;64:21

**expand (1)**
112:12

**expect (2)**
77:8;159:14

**expectation (1)**
230:24

**experience (7)**
48:21;69:7;70:22;
72:24;122:7;295:10;
309:21

**experienced (3)**
208:18;246:2,3

**experiencing (8)**
44:1;95:12;103:2,21;
117:11;118:6;120:8;
319:21

**expert (3)**
79:2,9;119:20

**experts (1)**
134:12

**Explain (2)**
163:8;232:19

**explained (2)**
172:14;279:17

**explaining (1)**
248:1

**expose (1)**
279:2

**exposed (6)**
125:16;126:18;
128:3;208:23;325:3,8

**exposure (3)**
207:22;208:13;
325:19

**expressing (1)**
103:10

**extended (1)**
136:6

**extent (1)**
172:7

**extract (1)**
246:5

**extracted (2)**
218:17;219:20

**extreme (2)**
104:8;133:17

**eyes (2)**
293:21;294:2

**F**

**face (17)**
21:6;23:8,11,18;
24:3;136:5;158:20;
214:6;251:4;258:12;
260:14;261:2;262:1,5,
5;268:21;299:6

**facing (7)**
153:22,22;154:10,
11,12,14;221:6

**fact (11)**
22:13,22;35:15;
92:19;165:9;188:10;
208:13;210:4,8;
294:12;323:22

**factor (2)**
83:6;84:14;108:16,
22;109:2,3,4,7;111:9;
115:8;124:6;138:18

**factoring (1)**
211:20

**factors (6)**
17:7;108:18;115:4;
116:23;124:5;147:1

**factually (1)**
189:15

**faint (1)**
285:3

**fair (39)**
12:3;6,16:24;20:13;
22:6,14;25:2;37:5;
51:11;60:4;64:19;
82:11,19;84:15;
103:23;118:24;131:6;
152:2,3;174:4,5;
176:15;177:11;181:1;
185:23;214:11;216:10;
217:4,16;218:12;
233:21;235:16;240:14;
280:7;282:22;283:5;
284:16;309:9;313:1

**Fairlawn (4)**
67:8,9,12,20

**fairly (2)**
53:16;185:17;289:20

**fall (4)**
136:5;298:10,11,24

**fallen (1)**
253:9

**falling (2)**
277:24;294:18

**Falls (3)**
208:14;324:22,23

**familiar (2)**
52:2;79:21

**family (6)**
23:16,16,18;45:24;
184:24;322:2

**far (39)**
14:17;30:19;39:1;
51:20;52:2,4,13,14;
108:12;120:13;144:12;
145:1;174:9;181:5;
184:20;213:2;216:12,
23;219:8;221:17,24;
222:23;223:2;245:4;
250:22;264:16;265:4;
266:15;270:2;304:16;
306:24;309:14;310:12;
313:18;319:23;327:11;
328:7,10,21

**fast (2)**
155:3;183:20;197:2;
286:11;287:17;296:6,
13,17,21;297:3,10;
305:16

**faster (1)**
299:16

**fastest (1)**
206:5

**fault (3)**
7:5;89:4;209:3

---

21;265:7;267:4

**eventually (5)**
83:17;151:23;
152:19;278:2,5

**everybody (24)**
21:13;63:5;64:19;
77:20;86:19;97:7;
106:5;117:24;141:6;
158:9;159:18;171:9;
172:5;205:4;212:11;
223:10;238:17;265:21;
268:1,6;303:23;
307:22;323:10;324:1

**everyone (2)**
170:24;312:8

**everywhere (3)**
212:23;214:12;
250:24

**evidence (1)**
174:20

**evolving (1)**
175:19

**exacerbate (3)**
135:24;137:22;138:9

**exacerbated (3)**
104:13,15,16

**exacerbates (1)**
41:18

**exacerbations (1)**
109:14

**exact (1)**
166:21

**exactly (27)**
71:11;84:22;98:18;
113:8;129:19;141:23;
143:12,18;144:6;
170:3;178:13;190:19;
192:8;196:16;208:12;
212:21;215:16;219:3,
24;226:10;239:19;
240:2,5;274:15;
281:19;305:5;322:8

**EXAMINATION (1)**
5:4

**examiner (2)**
318:24;319:4

**example (10)**
48:17;87:19;88:7,24;
95:4;100:15;109:23;
123:10,15;183:6

**examples (10)**
33:22;34:3,15,16,19,
24;70:5;96:19;100:12;
102:9

**except (1)**
274:6

**excessive (10)**
75:7;78:21;99:20;
106:3;108:12;127:19,
20;128:1,11;323:9

**excessively (1)**
319:10

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

favor (2)
7:18,19
FD (2)
184:8;231:9
fear (2)
248:6;280:10
feel (5)
136:22;215:2;
265:10;324:1,2
feeling (1)
278:1
feels (2)
253:22;323:10
feet (7)
52:16;214:22;
215:19;216:7;221:8;
223:12;275:9
fell (1)
242:3
fellow (2)
151:7;301:2
felonious (1)
308:24
felony (1)
62:20
felt (2)
160:1;255:18
few (21)
54:15;66:17;137:4;
143:23;173:21;182:13;
242:5;260:9,14;261:4,
16,17;262:10;272:15,
16;274:12;275:20,21,
24;285:20;299:24
few-minute (2)
183:2;185:3
field (4)
41:16;100:15;120:1;
157:8
fight (14)
48:11;97:24;136:8;
260:10;274:13;311:19,
23;312:2,6,11,17,24;
313:1,6
fighting (10)
107:22;109:4,6;
116:18;124:15;140:1,
2;231:23;295:20;
296:15
fights (1)
312:8
figure (9)
17:17;67:5;132:22;
196:9,23;216:20;
218:19;237:14;290:5
figured (1)
218:17
file (10)
5:18;18:14;66:2;
148:11;151:1;162:11;
325:1;326:14,19;327:3
filed (2)
325:16;326:17

files (1)
162:22
fill (2)
13:8;149:15
filled (1)
13:15
finally (1)
49:23
find (19)
16:10;32:1;89:13;
105:2;148:4,20;
149:24;159:17;178:5;
203:3,11,15;211:24;
212:1,4;287:3;296:23;
306:13;317:23
finding (1)
182:1
fine (7)
5:24;46:14;74:23;
121:12;327:18,20,23
finger (4)
207:16,17;208:3,6
finish (3)
199:10;232:7;305:4
finished (1)
160:21
fire (25)
25:11,19;29:16;
30:15;31:6,8,10;32:2,6,
10,11;33:5,8,13,13;
35:15,22;36:4;40:8;
51:11,12;139:5;294:8,
16;299:19
firemen (1)
32:15
first (38)
5:2;20:11;21:5;31:9;
54:4;97:8;99:13;26:5;
130:7,12;136:5;153:4;
168:20;169:3;178:6;
179:21;188:21;212:12;
231:7;253:8;258:7;
259:19,19;270:4;
279:24;280:4,5;282:4,
7;285:10,22;288:22;
290:24;292:3,14;
313:14;317:3;325:21
firsthand (1)
46:7
five (20)
48:24;49:3;59:8;
64:7;65:3;71:7;75:1,3;
113:17;121:11;124:7,
18;127:16;139:10,10;
150:4;158:11;250:12;
261:22;289:19
five-second (2)
124:9;139:6
five-year (1)
59:5
flashers (1)
153:4
flat (1)

272:24
flight (1)
311:20
flip (1)
215:2
floor (2)
123:12;292:16
fly (1)
245:19
foaming (4)
293:6,10,16,17
focus (4)
145:10;216:2;
259:12,13
focused (2)
214:14;301:22
focusing (5)
182:1;219:18;
248:13,14;249:1
follow (8)
78:1;85:24;95:21;
106:7,9;184:18;239:8;
321:21
following (3)
139:3,17;332:4
follows (1)
5:3
foot (33)
241:2,12,17,20;
242:9,11,13;243:14,17,
20,22,24;244:6;
246:23;258:8;265:11,
17;266:2,6,10,23;
267:3,7;268:14;
270:16;271:17;272:8,
14;273:18;276:2,2,21;
280:24;302:3
force (135)
17:8;61:9;68:16,20;
69:6,8,20;70:16;71:21;
72:1,2,10,18;73:1,3,6,
14;74:1,8;75:6;78:21;
79:3,6,10,14;80:1,8,12,
15,16;81:6,9,12,15,18;
83:9,10,13,14,16,23,
23;84:5,9,15,16;85:1,4,
5,6,15,16;89:17,22;
90:9;91:3;92:7,14,19,
22,22;93:5,10,15;94:2;
97:20;98:2,5,12,20;
99:1,5,8,16,20;101:6;
103:23;104:11,16,18;
106:23;107:1,7,7,16,
21;108:5,12,12,17,19,
23;109:5;110:7;
111:10;112:6;140:19;
141:8,13,15,16,19;
142:4,5,6,10,13,17,19;
160:6;161:2,4,24;
162:4,11;163:9,9,10;
164:24;165:3,5;170:9,
14;211:12,17,21;
226:24;227:5,8,9;

244:13,22;322:13;
323:2,4
forearm (4)
81:13;90:16;91:14;
187:19
forefront (1)
213:17
forehead (2)
112:3;291:18
forget (1)
169:3
form (5)
72:21;149:16;150:1,
19;161:18
formal (1)
6:12
former (2)
5:13,14
formerly (1)
5:10
forms (6)
314:9;317:18;326:1,
6,14;327:5
formulate (4)
62:14,18,21,23
formulated (2)
175:23;176:12
forth (1)
316:19
Fortunately (1)
324:11
forward (1)
131:17
found (4)
178:10;190:18;
191:23;192:2
four (11)
15:2;153:1,2,9,13;
158:11;173:11;261:21;
311:10;324:19,20
Fourth (1)
78:5
free (5)
8:24;78:5,17,21;
215:2
front (26)
9:12;10:5,7;12:15,
18;23:15,18;46:8;
111:7;141:7;142:9;
153:16;160:3;161:17;
164:1;218:23;225:5;
260:17,20;265:22;
267:22;289:9;292:17,
19;301:23;311:3
fronts (1)
225:10
frustrated (1)
129:12
full (5)
5:6;34:22;155:22
fully (1)
256:14
fun (1)

297:15
further (3)
237:1;254:24;268:24
furtherance (2)
307:15;308:6
futon (1)
322:9

G

garage (1)
214:21
Garry (2)
65:9,24
gasping (1)
297:12
gave (4)
23:4;32:8;76:9;95:4;
151:17;294:15
gear (1)
159:9
general (8)
68:11;162:20;
172:15,24;219:24;
220:10,16;242:16
generally (3)
149:6;219:5;239:12
girlfriend (3)
24:15;292:24;316:16
given (11)
6:21;28:8;38:1;
47:13;51:3;123:1;
142:4;144:21;168:7;
188:8;310:8
giving (7)
122:6;127:17;
180:10;234:15,19;
275:18,18
glad (1)
101:5
glass (1)
318:13
glucose (2)
89:2;90:4
God (1)
212:15
goes (5)
74:13;194:9,14;
295:10;316:23
good (5)
65:13;87:7;176:7;
180:21;228:24
goodness (2)
85:20;123:9
gosh (1)
159:1
gowns (1)
318:14
grab (5)
63:21;80:13;98:4,19;
99:3
grabbed (1)
313:22

Layne & Associates
(614) 309-1669

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

**grabbing (2)**
83:12;98:17
**grabs (2)**
98:23;99:6
**grandiose (1)**
102:8
**gravel (3)**
263:11,15,16
**great (2)**
6:1;88:24
**ground (61)**
70:4,8,13;81:7;
83:14;99:7;124:14;
218:21;219:1;223:8;
226:22;227:1,5,12,17;
228:18,20;229:19;
233:23;235:12,14,16,
22,24;236:1,3,12;
237:5;243:17,24;
244:23;246:6;250:24;
251:2;258:10;260:17;
261:5;264:14;265:24;
266:4,6,13,18,20;
267:3,4,16;268:15;
274:24;275:5,8,22;
276:1,3,20;277:9;
281:1;283:4,13;302:2,
7
**group (1)**
214:10
**guess (14)**
6:11;84:23;98:17;
113:6;116:21;141:17;
159:4;162:2,10;
163:19;216:6;242:19;
308:17;312:24
**guy (7)**
23:19;48:8;176:24;
178:5;181:2;186:10;
238:24
**guys (6)**
74:21;148:3;170:21;
177:23;284:13;309:18

**H**

**half (4)**
158:11;169:21;
216:7;222:9
**halfway (1)**
52:1
**hallucinations (3)**
103:5,13;134:24
**hand (7)**
74:2;98:16;127:12;
146:15;265:16;299:5;
311:4
**handcuffed (7)**
25:18;55:10;70:18;
98:22;241:6;246:6;
295:18
**handcuffing (1)**
99:5

**handcuffs (9)**
25:16;69:15;71:1,17;
139:9,20;187:23;
256:12,14
**handed (1)**
168:6
**handle (2)**
60:23;62:3
**handling (2)**
19:23;274:3
**hands (19)**
97:22;99:4;208:1;
225:17,19,19,22,23;
226:1,12;228:14;
229:10;257:23;258:4,
11,14;264:6,9;267:8
**hands-on (1)**
226:14
**handwriting (4)**
165:10,12;175:8,15
**handwritten (3)**
175:11;304:16;305:6
**hanging (1)**
6:6
**happen (8)**
48:4,5;179:7;189:13,
15,16;224:5,6
**happened (44)**
49:19;50:19;55:5;
57:21;67:19;68:6;
154:19;171:9,19;
172:12;174:3;183:19;
197:2;203:20,20;
205:1,16;206:6,7,8;
207:2,7;208:12;
209:23;211:6;224:8;
242:6;244:1;245:8;
262:10;270:23;273:19,
23;274:16;276:6;
283:3;301:6;305:21;
306:24;307:4,14;
310:4;316:9;323:10
**happening (7)**
156:10;171:3;
212:16;214:9;232:23;
248:7;262:13
**happens (4)**
55:7;90:8;148:10;
149:5
**happy (3)**
7:7;9:6;270:6
**hard (1)**
244:19
**harm (2)**
216:4;237:1
**hate (1)**
197:4
**head (62)**
70:4,7,13;102:6;
107:12;112:18;176:23;
178:4;204:17;221:2,7;
222:6,23,23;223:4,4,7,
11,20;224:17;226:6;

228:18,22;231:6,8;
237:16;239:6;240:1;
241:8,23;243:5;247:8,
11,11;248:5;256:3;
261:11;263:23;264:1,
4;265:12,15;266:1;
267:11,13,16,19;269:6,
20,21;270:17;271:19;
273:4,14;274:3;275:9;
293:22;294:2;297:23;
298:12,23;301:18
**headed (1)**
263:20
**heading (2)**
151:12;183:4
**healed (1)**
328:4
**health (54)**
20:12,18;22:5,14,23,
24;23:6;24:12;25:2,10,
11,13;26:21;27:4,10,
23;29:12;30:10;31:3;
33:3,18;35:19,23;36:5,
17,22;37:4,9,16;39:6,
20;40:2,9,10,15;45:3;
62:5,11,13;96:12,22;
97:1;111:12;116:2;
117:6,9;118:1,2,17,21;
119:7,15;133:7;326:23
**hear (24)**
63:23;186:24;
204:15;212:8;240:20;
251:13;255:2,9;256:6;
257:13,14,16,17,21;
259:16,23;296:2,3,9,
12;297:16,23;299:21;
300:4
**heard (18)**
151:5;179:13,21;
180:10,12;200:22;
204:16;213:8;235:22;
238:6;240:16;251:11,
16,18;259:12;302:11,
15;325:22
**hearing (4)**
179:16;201:9;240:7;
260:3
**heart (3)**
109:23;114:10;
115:21
**heavy (8)**
159:12,17;295:13,
16,21;296:1;297:7,14
**heel (2)**
243:6,8
**height (2)**
266:17,18
**heightened (1)**
116:10
**held (3)**
262:23;275:13;313:3
**help (13)**
24:20,22;70:19;

75:13,19;94:20;96:3,9;
176:24;225:1,12;
230:11,19
**helping (1)**
285:4
**helps (1)**
8:8
**hepatitis (10)**
171:12;207:18;
208:8,16,23;324:4,6,
12;325:22;326:11
**hereinafter (1)**
5:2
**here's (4)**
164:19;300:21,22,23
**heroin (1)**
43:20
**hey (11)**
63:3,20;97:9;98:14;
148:3;171:18;172:5;
179:9;277:20;278:21;
279:19
**high (17)**
88:21;118:7;119:8;
120:9;127:4;135:19;
264:13,15,21,22,22;
266:9,23;267:1,3,7,8
**higher (7)**
116:2;117:13;
118:22;125:18;126:20;
128:5;135:19
**highly (2)**
26:2;65:7
**HILL (170)**
5:5;6:13;12:10;
14:10;15:1;18:8;20:10;
22:10;26:20;27:7;
28:10,23;29:5,21;
30:17;31:17;33:24;
36:14;37:7,23;38:14,
15;39:3,10;40:6;41:1,
8;42:1,9,20;43:14,23;
44:22;47:5;48:1;50:4;
56:5;59:7;60:12;61:7;
62:1,22;63:13;69:2,21;
71:5,13,22;74:23;75:2,
5,11;82:6;83:1,2,20;
85:14;90:1;91:18,23;
93:12,21;94:13;96:7,
18;97:18;98:11;
102:10;104:6;105:23;
108:14;110:15;111:11;
113:3,23;116:7,15;
117:18;119:13,22;
120:7,15,23;121:9,20;
122:3,8,16,22;123:2,
17;125:13,24;126:8;
127:1,22;128:12,18;
129:21;131:2,11,16,20;
132:1,3,6,8;134:3,13;
135:17;136:24;137:14;
138:5,15;139:1;
140:11;142:15;153:24;

158:16;174:18;176:10;
189:17;204:14;206:9,
21;207:14;210:20;
211:11;213:19;217:10;
227:10;229:3;232:11;
236:10;237:3;238:4;
240:6;245:12;249:16;
250:8;255:15;257:7;
259:3;260:19;263:13,
24;265:9;268:5;
269:23;271:13;272:5,
17;275:11,14;283:10,
24;291:8;294:14;
298:15;303:4,18;
312:23;313:9;320:5,
19;321:6;322:17;
323:2,22;329:4
**himself (18)**
70:9,15,15,21;177:2;
227:3;253:11;254:13;
262:18,24;263:2,6,11,
18,24;264:2,12;265:6
**Hindsight (2)**
205:3,21
**history (1)**
51:4
**hit (2)**
153:6;194:24
**Holcomb (6)**
56:24;57:8,11,14,16,
17
**Holcomb's (1)**
57:24
**hold (10)**
154:4,8;189:3;
196:22,22;202:2;
227:2,14;269:2;312:5
**holding (8)**
63:19;80:24;81:6;
226:18;227:16;262:18;
263:6,15
**Holsopple (69)**
10:20;11:20;12:24;
13:1;14:14,20;15:5;
144:14;151:8,16;
152:1;166:2;173:7;
174:10,24;175:8;
177:10,14;178:9,22;
180:7,16;181:5;
187:12,18,21;188:13;
192:22;202:21;209:9,
11,16,24;210:4,5;
214:9;223:17;224:3,
17;225:2;226:18,21;
231:15;232:5,13;
233:11,17;245:1;
247:9,10;249:12;
269:3;280:13;281:7,8,
9,15,24;282:6;283:15;
284:14;292:8;298:11;
304:12;305:11;306:18,
18;307:6;308:16
**Holsopple's (3)**

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

188:16;225:4;255:7
**Home (20)**
  67:9;95:6;286:7;
  287:2,2,24;288:22,24;
  289:18,22;290:11;
  292:5,14,22;313:12,24;
  314:2;315:9,22;321:14
**homeowner (6)**
  188:4;190:17,22,23;
  197:9,11
**homeowners (2)**
  215:14;308:8
**honest (1)**
  65:15
**hoodie (13)**
  219:11,14,15,19;
  220:1,3,5,8,12,19,20,
  21,22
**Hoover (2)**
  147:13,15
**Hospital (32)**
  25:16;36:18;50:17;
  55:8,17;171:11;207:9;
  208:11;209:20;219:21;
  285:3,7,13;308:1;
  313:12,16,17,22;314:6,
  10,16;315:5,6,9,14;
  316:9;317:19;318:7;
  322:7;326:17,22;327:6
**hospitalization (3)**
  184:13;185:1;186:11
**hospitalized (2)**
  152:19;183:12
**hostage (12)**
  21:3;64:1,5;65:14,
  17,18,22;66:4,10;
  68:12,14;100:1
**hostages (1)**
  68:3
**hot (2)**
  319:8,10
**hour (3)**
  74:20;169:21;270:11
**hours (1)**
  173:8
**house (24)**
  23:17;52:1,6;67:17;
  154:7;173:21;209:22;
  212:5;214:20;285:14;
  287:9,15;288:2;289:1,
  15;290:4,6,9;291:7;
  292:16,19;293:1;
  313:19;321:5
**hovering (2)**
  214:4;217:1
**huffing (2)**
  296:16,17
**huh-uh (4)**
  8:12,14;156:13,15
**human (2)**
  311:22;312:22
**hundred (1)**
  154:23

**Hurry (6)**
  299:15,15;300:14,
  18,19,20
**hurt (12)**
  70:3,21;94:11,12;
  136:15;227:3;237:12,
  13;253:11;263:1,3,21
**hurting (9)**
  70:4,9;92:4;177:2;
  262:18,24;263:6,12,12
**husband (1)**
  92:12
**hyperactive (1)**
  102:17
**hypothetical (5)**
  44:7;127:8,10,21;
  257:3

**I**

**ICU (2)**
  284:5;318:19
**idea (14)**
  18:13;31:23;112:4;
  142:2;164:9;181:11;
  206:10;215:24;224:23;
  226:17;230:23;284:22;
  288:1;320:3
**identifiers (1)**
  150:1
**identify (10)**
  22:22;34:19;37:15;
  44:4;45:8;63:7;103:8;
  131:5;146:2;305:9
**ill (17)**
  19:21,24;20:6,7;
  21:1,2,12,20;22:9;
  30:7;35:7;36:20;89:5;
  94:20;95:11;96:2;97:5
**illicit (1)**
  287:14
**illness (17)**
  22:18;28:14,20;
  29:23;31:11;33:12,23;
  35:6,10,14;40:19;
  41:18;44:19,24;46:15;
  88:17;109:15
**illnesses (3)**
  21:21;44:10;88:15
**immediate (3)**
  216:3;217:4,15
**immediately (4)**
  44:3;47:4;297:19;
  316:9
**immobilize (2)**
  70:10;121:11
**immobilizes (1)**
  124:7
**impervious (1)**
  126:15
**implicitly (1)**
  255:10
**importance (1)**

179:8
**important (10)**
  20:19;77:12;103:22;
  131:3;133:20;204:19;
  209:14;212:4;288:8;
  303:3
**impression (1)**
  217:14
**improperly (1)**
  114:10
**inability (1)**
  113:15
**inaccurate (1)**
  205:13
**incapacitate (4)**
  252:11;253:1,21;
  254:5
**incapacitation (1)**
  251:22
**inches (12)**
  223:12;249:9,20;
  250:15;251:1;252:20;
  264:16;265:4;266:12;
  267:2,10,13
**incident (27)**
  10:3;12:12,15,20,23;
  13:1,2,4,6,8,13;15:11;
  53:5;58:15;67:6,19,21;
  171:12;273:23;274:17,
  19;304:9,22;305:24;
  306:16;310:21;311:11
**incidents (2)**
  150:5;328:17
**include (23)**
  45:18;80:12;81:6,9,
  12,15;87:23;88:2,6,9;
  90:9,12,15;109:11,14,
  17,20;111:3;134:15,17,
  19,21;311:13
**included (7)**
  11:22;15:6;60:3;
  76:23;78:16,20,23
**includes (12)**
  61:8,11,19;62:4;
  75:15;76:16,19;80:16,
  19,23;81:2;273:10
**Including (6)**
  86:21;133:21;
  184:12;204:19;205:6;
  249:8
**incoherent (1)**
  134:22
**incomprehensible (1)**
  240:14
**inconsistent (1)**
  86:4
**incorporate (1)**
  36:12
**increase (7)**
  109:10;110:4,7;
  111:13;115:22;121:14;
  122:11
**increased (4)**

108:8;116:8;117:1,6
**increases (6)**
  115:11;117:2;
  119:16;120:17;121:4;
  123:6
**increasing (3)**
  108:21;110:10,21
**indicate (1)**
  327:2
**indicated (2)**
  326:14;332:5
**indicating (6)**
  242:19;243:1,5,10;
  266:14,16
**individual (32)**
  46:8;49:19;50:14,20,
  22;51:10,20;52:4;
  54:14,16;55:5,11;56:6,
  16,22;63:15;68:21;
  70:12;90:3,10,13,16;
  91:10;114:12,16;
  135:24;137:23;138:9;
  145:7;146:8;280:14;
  292:3
**individuals (12)**
  46:11;85:23;86:3,12,
  23;87:8,23;88:9,13;
  106:6;130:7;320:6
**individual's (2)**
  49:8;146:10
**infectious (2)**
  325:4,8
**inferences (1)**
  291:23
**influence (9)**
  101:9,13;103:20;
  106:6,18,24;107:8;
  111:24;119:23
**influenced (2)**
  84:9;92:7
**information (108)**
  14:1,11;17:5;21:1;
  35:9;38:1;44:14;45:8,
  18,22;46:4,22;47:13;
  51:4;53:15;110:24;
  111:2,23;131:4;143:1;
  146:16;150:16;152:13;
  162:21;165:1;170:23;
  176:22;181:14;183:6,
  7,9;184:10,11,15,19;
  186:2,14;188:8,15,23;
  189:5,7,8;190:2,12,16;
  191:3,6,7,10,15,22;
  192:9,14;193:14,21;
  196:9,10,17,19,21;
  197:7,16,19;198:8,13,
  19;200:9;201:14;
  202:11,13,18;203:3,8,
  11,15,22;204:20,21;
  206:4;210:8;217:14;
  286:11,14,15;287:8,11,
  16;288:4,8,15;290:8,
  14,20,23;304:13,15;

305:10,10,20,20;
  307:18,21;308:12;
  315:19;316:6,14;319:3
**ingested (1)**
  104:7
**initial (4)**
  53:21;56:12;178:15;
  183:3
**initially (4)**
  176:2;177:8;229:18;
  288:13
**initiate (1)**
  175:20
**initiating (1)**
  175:22
**injure (2)**
  229:1;251:7
**injured (5)**
  62:8;86:6;217:8;
  226:15;326:16
**injuries (10)**
  29:20;30:4;34:10,11,
  12;135:20;209:12;
  282:11,21;283:9
**injuring (3)**
  69:9;226:15;254:13
**injury (8)**
  37:17;110:11,19,22;
  118:15;213:6;328:2,3
**input (1)**
  166:17
**inside (3)**
  55:10;173:21;306:10
**instance (1)**
  48:3
**instances (2)**
  272:23;273:1
**instructing (1)**
  92:18
**instructor (2)**
  19:10,12
**instructors (1)**
  72:15
**intelligible (1)**
  302:14
**intending (1)**
  326:19
**intention (1)**
  314:5
**intentional (1)**
  324:8
**interacted (1)**
  210:9
**interacting (6)**
  86:14;93:13;152:20;
  246:23;319:19;320:12
**interaction (10)**
  16:24;188:4,16;
  208:18;209:12;240:19;
  295:22;301:16;322:19;
  323:2
**interactions (1)**
  188:9

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

**interfere (1)**
216:18
**interferes (1)**
112:8
**interfering (3)**
213:3;214:1,7
**internal (1)**
57:24
**intervention (7)**
18:1,9,16;19:4,11,
19;20:16
**interview (7)**
16:13,15,17,22;17:2,
6;308:9
**interviewed (5)**
58:2;173:14,16;
174:6,11
**interviews (1)**
16:18
**into (31)**
21:11;27:21;57:24;
65:10;66:11;89:13;
92:10;108:16,22;
139:13,22;140:15;
166:13;211:21;219:20;
230:19;242:4;252:10;
287:23;288:1,24;
289:15;292:4,5;
293:22;294:2;311:1;
318:10;321:5,18,20
**intoxicated (1)**
86:9
**invest (14)**
10:2,4,16;164:7,8,11,
12,12,13,22;165:22,22;
171:16;172:18
**investigate (1)**
303:14
**investigating (1)**
155:16
**investigation (6)**
57:24;166:7;303:20;
310:20;317:14;320:3
**Investigative (12)**
10:18;37:5;166:1,23;
167:9,22;170:12;
283:17;284:3,15;
293:24;303:17
**investigator (1)**
167:10
**investigators (2)**
155:19;156:3
**investigator's (1)**
246:1
**invincible (1)**
102:9
**involve (1)**
68:2
**involved (19)**
42:7;43:13,15;50:9,
14;53:19;57:7,14,23;
64:18;68:4;155:13;
156:4;167:11,12;

205:5;274:7;303:24;
324:1
**involvement (2)**
59:15;322:12
**involves (1)**
64:12
**involving (4)**
11:17;19:21;155:16;
328:18
**irregularities (1)**
90:5
**issue (4)**
42:18;45:3;113:6;
326:10
**issues (2)**
89:1;118:17

**J**

**jail (6)**
139:23;140:16;
144:19,21;239:1,11
**jeans (1)**
250:4
**Jeep (31)**
184:2;185:22;186:2,
6,10,13,16,17,18,21;
187:12;189:4;207:4;
220:5,6,7,12,13,17,18,
19;221:3,7,8;223:5;
238:21;239:3,5,7;
307:2,19
**jeopardy (2)**
216:4;217:4
**job (11)**
7:1;39:9,22;43:7;
65:13;75:12,18,22;
76:8;79:21;84:2
**Joe (1)**
207:11
**jog (2)**
256:1;297:8
**jogging (2)**
212:22;224:20
**John (7)**
59:11,21;167:19,21;
302:21;303:8;324:24
**Johnston (2)**
5:10,11
**J-O-H-N-S-T-O-N (1)**
5:16
**Jordn (206)**
6:14;11:17;16:24;
58:15;59:15;78:13,16,
20,23;143:2;146:4;
151:23;152:19;155:16;
165:10;172:13;174:21;
176:17;178:15;179:19;
180:18,22;185:22;
186:1,5,15,24;187:6,
12,16,19,22;188:4,9,
16,23;190:16;191:15;
196:1;198:24;202:11;

203:5;205:6;206:12,
16;208:19;209:13,19;
210:9,15,24;211:13,17;
212:1;213:1;214:2,9,
15,17;216:13;217:19;
218:2,4;219:1;220:8;
221:13;224:14,17,24;
225:12;226:21,24;
227:5,11;228:14;
229:22;231:1,16,20,21;
232:5,13;233:12,18,21;
234:14,15,17,20;
236:12,18;239:22;
240:8,14,20;241:5,10;
243:16;245:14;246:23;
247:5,7,10,12,17,24;
248:14;249:1;250:18;
251:6,10,15;254:7;
256:8;257:23,24;
258:2,13,15;259:10;
260:5,13;262:21,23;
268:18;271:17;272:9,
24;274:24;275:20;
276:14,17,19,24;277:6,
8,11;279:4,22;280:1,5,
23;282:7,11,16,18;
283:1,4,18;284:5,16;
285:8;286:7;287:2,22;
288:5,10,19;289:17;
291:1,10;292:2,10;
293:4,5,20;294:4,6,7,
17,22;295:3,18;
298:16;299:9;300:7,
22;301:12,17,22;
302:11,15;306:14,19;
307:8,14;308:2,5;
310:15,18;311:15;
315:6,10,15,23;316:7;
318:6;319:17,20,24;
320:10;321:20;322:13;
323:3;324:7;328:18
**Jordn's (44)**
184:11;185:21;
186:9;209:3;221:2,7,
17,24;222:15;223:15;
232:24;241:12;242:10;
249:7;251:19;252:6;
253:6;258:8;265:17;
266:11;275:4,7,21,24;
280:15,19;281:2,10,13;
282:1;283:2;285:14,
23;292:14;298:5,20;
315:19;316:7,10,15,19;
318:21;320:21;326:22
**judge (2)**
9:12;108:24
**judgement (1)**
36:13
**jumped (1)**
209:21
**jurisdiction (1)**
64:20
**jurisdictions (2)**

64:13;200:11
**jury (1)**
9:12

**K**

**keep (21)**
43:15;69:8;84:5;
92:4;152:15;215:3;
225:20,20;256:14,21,
24;227:5;244:22;
249:9;250:23;251:1;
262:24;263:12;270:16;
271:18;272:9
**keeping (3)**
146:21;227:11;266:2
**keeps (1)**
162:11
**Kent (1)**
101:21
**kept (1)**
125:11
**kick (9)**
70:1;91:19;187:15;
221:20;224:14;227:18;
228:21;302:5;313:5
**kicked (1)**
273:7
**kicking (13)**
81:9;92:1;221:15;
223:9;225:20;244:19;
245:2;273:5,20,24;
296:22;301:24;302:1
**kill (1)**
70:15
**kind (54)**
6:5,10;13:14;18:24;
21:7;39:15;43:2;47:2;
48:2;53:1;77:11,16;
97:13;112:14;147:5;
150:5,6;163:14;166:9;
170:1;171:13;172:4,
17;173:23;174:2;
175:20;188:3;189:2;
190:9;191:1;212:7,22;
213:6;214:10,10,21;
227:23;229:2;231:23;
238:5,8;242:5;277:21;
278:22;280:22;284:12;
286:16;292:16;305:18;
318:12,13;322:5,6;
326:10
**kinds (3)**
24:22;149:12;183:13
**kitchen (1)**
322:3
**knee (1)**
302:2
**knew (43)**
104:24;111:8;114:6;
115:18;143:18;177:17;
180:3,4,6,15;190:5,18;
191:18,18,21;192:7,8,

203:20;204:2,10;
219:17;240:3;247:19;
252:24;253:18,20,22;
283:17;284:5,8,11,15;
287:12;291:13;292:13;
303:14;307:2,18,22,23;
315:24;316:1;321:2
**knife (1)**
63:21;127:12,14,15,
15,18
**knives (2)**
63:18,19
**knock (2)**
70:15;289:10
**knowing (3)**
259:12;287:13;
303:22
**knowledge (15)**
14:18;19:5;33:1;
135:22;148:19;206:16;
209:14;210:19;218:5;
233:19;309:3;315:1,
16;322:16;324:13
**known (5)**
47:22;114:3;210:22;
212:3;253:10
**knows (1)**
283:8
**Krumroy (4)**
51:22,23,24;52:1

**L**

**label (1)**
103:15
**laid (4)**
250:21;261:17,24;
262:2
**lake (1)**
173:5
**Lakemore (2)**
64:15;66:23
**language (10)**
245:22;258:18,21;
259:1,1,4,5,7;262:22;
271:24
**lapel (1)**
157:23
**laptop (2)**
195:10,14
**last (25)**
5:10;8:22;10:23;
11:6;16:8,13;17:14;
53:18;56:23;58:18;
64:23;118:11;141:4,
21;142:2;158:19,21;
176:1;197:18,20;
236:15;274:8;275:18;
284:4;324:18
**lasted (5)**
271:1,9,10;275:3;
277:14
**latch (1)**

Layne & Associates
(614) 309-1669

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

228:23
**later (7)**
58:24;154:6;174:1;
183:22;268:11;296:23;
308:3
**law (10)**
39:21;40:13;77:4,8,
14,19;94:19;95:24;
149:14;203:10
**Laws (2)**
152:14,16
**lawsuit (2)**
6:15,18
**lax (2)**
147:5,20
**lay (11)**
236:12;260:9,13,14;
261:3,15,20;262:10;
268:11;274:12;297:22
**laying (5)**
124:10;219:20;
237:5;266:12;301:15
**lead (1)**
101:14
**lean (1)**
278:16
**learn (2)**
20:16;101:20
**learned (1)**
206:11
**learning (1)**
307:23
**least (13)**
44:10;45:1;53:21;
68:15;150:8;169:20;
178:4;179:3;209:2;
216:12;226:21;234:10;
252:8
**leave (3)**
23:16,17;97:12
**leaving (2)**
149:19;209:20
**left (25)**
149:8;225:13;
240:24;241:14;242:9,
12,13;260:22;261:11;
262:4;267:12;270:16;
271:17;279:22;285:14;
286:7;300:12;308:9;
313:11,18,23;314:3,4,
11;318:18
**leg (14)**
224:4;248:18;249:4,
8,11;250:16;265:13,
17;267:21;268:21,22;
276:12,13;308:1
**legally (1)**
5:11
**legs (36)**
223:9;226:4;228:19;
248:3,8,11,15,16,20,21,
22;249:21,22;250:2,2,
3,3,4,4,5,6,6,7,24;

251:1;264:3,12;
265:21;267:12,14;
269:7,11;273:10;
277:16;301:21,21
**length (1)**
267:9
**lengthy (2)**
7:15;66:9
**less (3)**
94:7,17;127:5
**levels (1)**
89:2
**life (9)**
77:21;78:3;113:19;
284:11,16;285:1;
315:12,19,20
**lifeless (1)**
279:10
**life-saving (2)**
301:4,7
**life-threatening (2)**
113:10;128:13
**lift (1)**
231:16
**lifted (6)**
244:5;267:3;274:24;
276:1,19;279:1
**lights (8)**
152:4,7;153:2,6,17;
154:16,21;156:18
**likely (2)**
24:5;93:5
**limited (4)**
14:6;186:2;301:17;
328:12
**limp (5)**
242:5;279:13,14;
295:10,15
**Linaburg (5)**
230:13,16;289:13,
21;290:11
**line (3)**
46:15;200:24;332:6
**lined (1)**
146:18
**lines (3)**
229:9;253:2;300:21
**linked (1)**
13:21
**lips (1)**
280:22
**list (1)**
308:18
**listed (4)**
14:20;15:3;168:10;
311:11
**listen (5)**
119:4;129:11,12;
189:24;231:20
**listening (2)**
171:7;230:2
**literally (1)**
158:20

**little (9)**
6:11;7:15;23:24;
48:13;154:12;197:6;
220:5;252:11;311:17
**live (1)**
316:4
**living (3)**
292:17,20;322:4
**located (8)**
144:3;157:13;
180:18;181:2;219:15;
220:9;221:12;277:3
**location (13)**
80:14;151:13,15;
173:19;193:24;215:9;
219:13,24;221:3;
222:19,24;223:16;
251:17
**log (15)**
146:21;147:3,9,17,
24;148:3,4,13,15,18,
21;150:14;197:24;
198:2;329:5
**logs (5)**
146:13;147:5,6;
148:6,8
**Lombardi (6)**
16:2,17;59:21;157:3,
18;303:21
**long (28)**
11:4;17:16;18:19;
19:3,6,7;20:20;53:6;
67:23;144:5;152:14;
178:12,14;185:4;
190:24;206:1;236:15,
16;243:21;244:2;
273:13,16;277:8,12;
279:4;289:16;290:11;
294:7
**longer (6)**
68:20;150:20;
218:21;279:18,18;
324:17
**long-winded (1)**
206:2
**look (29)**
8:15,18;13:9;18:13;
22:6;30:19;31:23;50:3;
71:20;72:4;143:13;
149:7;155:20;160:5;
166:14;167:14;168:20;
203:1,6,8,12,13;236:5;
250:5;254:8;281:6;
296:24;306:10;317:4
**looked (10)**
12:11;39:4;48:20;
143:13;186:15;197:15;
208:8;214:14;229:6;
307:24
**looking (25)**
10:8;11:11;13:13,14;
22:12;52:15;84:22;
103:11;116:21;141:18;

163:24;178:2,13;
202:23;215:12;219:14;
224:21,23,24;225:3,7;
232:3;248:13;301:17;
317:4
**looks (3)**
132:19;162:18;284:4
**lost (1)**
275:17
**lot (23)**
21:11;27:18;44:18;
48:5,24;57:4,4;86:6;
90:8;102:3;105:4;
138:19;153:8;183:23;
184:5,11;191:9;200:1;
204:5;240:13,13;
293:13;305:17
**lots (1)**
94:22
**loud (4)**
8:9;170:23;238:10;
257:14
**low (1)**
88:21
**lunge (2)**
263:23;264:1
**LUTE (166)**
12:8;14:7,22;18:4;
20:3;22:7;26:19,22;
28:4,17;29:2,13;30:13;
31:13;33:19;36:8;37:6,
19;38:10,12,18;39:7;
40:3,20;41:4,21;42:5,
17;43:9,20;44:6;46:24;
47:14;49:21;56:2;59:3;
60:9;61:3,22;62:15;
63:10;68:23;69:16;
71:2,9,18;74:19;75:1,3,
8;81:22;82:20;83:7;
85:10;89:20;91:16,20;
93:7,17;94:9;96:4,15,
23;98:7;102:1;103:24;
105:18;108:9;110:12;
111:5;112:24;113:20;
116:4,12;117:15;
119:10,18;120:2,11,19;
121:6,16,22;122:5,13,
20,23;123:8;125:9,20;
126:3,22;127:7;128:7,
15;129:17;130:21;
131:7,13,18,24;133:23;
134:8;135:13;136:20;
137:10;138:2,12,22;
140:6;142:11;152:22;
158:14;174:15;176:7;
189:14;204:8;205:23;
206:18,23;210:17;
211:3;213:13;217:5;
227:6,22;228:2,6,11;
232:9;236:8,22;
237:22;239:23;245:11;
249:13,22;255:12;
257:2;258:23;260:15;

263:8,17;265:1;
267:23;269:18;271:6;
272:2,11;283:6,20;
291:4;294:9;298:7;
302:23;303:11;312:19;
313:7;320:1,13,24;
322:14;328:5,19;
329:2,12
**lying (3)**
236:18;272:24;274:9

## M

**machines (1)**
285:4
**mad (2)**
295:14;296:17
**mail (1)**
57:6
**mailbox (3)**
73:11,20;74:2
**mailboxes (2)**
73:13,18
**main (5)**
189:23;190:3;
197:14;198:22;199:12,
14,15,17,23;200:7,10,
16,16;201:16;207:3,4
**maintain (1)**
147:2
**major (1)**
173:22
**makes (3)**
238:14;243:11;268:7
**making (23)**
43:2;46:7;56:12;
57:4;61:11;62:4;74:7;
94:17;132:1;201:10;
237:1;239:20;248:17;
251:6;277:19;278:9,
11;279:15,16,19;297:2,
22;302:6
**male (1)**
51:24
**malfunctions (1)**
126:10
**man (3)**
56:9;237:13;239:13
**mania (12)**
21:22;101:18,22,24;
102:4,11,20,24;103:3,
10,15,22
**manic (6)**
101:13,16,24;
102:21;103:9,21
**manner (1)**
114:14
**many (24)**
21:23;26:24;27:2;
28:2;30:1;38:3;44:9;
50:12;66:14;70:23;
100:11;125:22;135:15;
205:8;223:12,12;

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

261:14,16;265:3;
267:2,10,12;270:12;
273:6
**marked (7)**
10:6;12:16;180:8,13;
181:5;182:10;215:6
**married (1)**
324:5
**materials (1)**
18:24
**matter (4)**
35:15;85:13;89:22;
118:3
**may (149)**
14:8,16,23;22:11;
24:5;26:23;28:5,18;
30:2,15;34:10;35:10;
36:9;38:19;39:19;
40:21;41:5,22;42:6;
43:10,21;44:7,8;45:14;
46:4,11;47:1,15;60:10;
61:20;71:3,10;72:3,3,
14;81:23;82:5;84:4,4;
85:24;86:4,9,13;87:9,
20;88:3,6,9,13,18;89:2,
8,14,18,21;94:10,24;
95:6,9,11,14,16,18,21;
96:5;100:16;101:8;
102:21;103:2,9,19,21,
21;104:8;105:16,24;
106:3,7,9,12,17,23;
107:8;116:5;117:16;
119:11,19;120:4,12,20;
121:17,23;122:14;
125:21;126:4,13,23;
127:8,9;128:8;130:12,
13;131:10;132:11,15,
19;135:23;136:21;
137:11,22;138:9,13,16,
23;140:7;142:12;
143:7;148:1;152:23;
153:14;169:8,9;
174:16;204:9;205:24;
206:19;210:18;211:4;
212:9;215:14;217:6;
220:23;227:7;230:10;
239:16,24;255:13;
257:4;290:6;291:11;
292:3,10;298:8;310:7;
316:8;317:2;320:2;
322:15;323:16
**maybe (25)**
10:5;17:17;23:19;
24:15;35:4;48:24;
52:15;58:24;65:2;
71:12;116:21;127:20;
159:1,13,17;171:20;
191:17;216:15;236:16;
238:11;239:10;254:24;
287:20;289:19;324:20
**MDB (12)**
193:11,17,19,20,22;
194:22;195:24;197:14,

19;198:6,7,15
**MDBs (1)**
193:13
**MDT (17)**
191:1,9,14,19;
192:10,14;193:9,17,19,
22;194:22;195:24;
196:15;198:2,7,14;
203:17
**MDTs (3)**
190:6;7;193:12
**mean (115)**
11:10;14:19;22:3;
23:13;24:3,13;26:10;
41:3,11;62:2;63:18;
65:11;72:19;84:20,21;
98:17;99:2;100:5,11;
106:2;107:10;110:20;
130:24;133:1;137:15;
146:7;148:1;149:13,
23,24;150:12;151:18;
161:3;162:9;163:1;
164:16;166:18;169:24;
170:2;172:10,21,22;
173:7;176:21,23;
177:5;178:3;179:10;
180:9,12;181:10;
182:16;189:15;192:7;
196:6;197:21,23;
200:23;201:6;203:10;
204:21;205:15,17;
206:2;214:2,18,23;
216:14;219:2;222:4;
225:7;226:3;227:20,
21;231:5;234:1,3,5,8;
242:21;244:18;245:21;
248:20;255:6;257:20;
260:20;262:22;264:6;
270:5;278:6,7;284:1;
290:17;293:13;295:8,
10;299:5;300:2,17;
301:8,20;303:1,5,7;
304:2;305:1;307:6;
308:8;309:11,18;
312:21;313:23;314:7,
23;322:21
**meaning (3)**
126:18;147:22;218:3
**means (5)**
18:6;48:15;80:1,2;
151:9
**meant (4)**
8:16;185:10;209:1;
232:19
**measure (2)**
94:3;316:5
**measures (2)**
301:5,7
**medical (66)**
22:11;26:16;29:11;
35:13,19;36:21;37:5,
10;38:21;40:11,23;
41:3,15,16,20;42:4,14,

18;43:2,7;44:3,17;
46:22;47:18;61:20;
62:18;78:10,24;82:4;
88:10;89:15,24;90:4;
91:8;92:2,4,20;109:17,
20;113:10;119:20;
120:21;128:14,20;
129:5,15,20;130:1,3,5,
8,19;131:5,8;134:11;
207:20,23;209:15;
283:18;286:10,14,15;
287:18;318:23;319:4;
328:8
**medically (1)**
27:6
**medication (7)**
30:2;34:7,8,9;37:17,
18;88:14
**medications (3)**
28:2;29:20,22
**meetings (1)**
29:15
**Mel (2)**
122:22;131:23
**member (18)**
20:17;60:18,24;61:2;
62:3;65:5;81:19;83:5;
93:13;94:5,14;96:21;
99:17;107:17;114:21;
115:1;123:20;124:1
**members (16)**
45:24;61:16,20;
62:12;76:13;77:7;
87:16,19;88:2;96:8,11;
101:7;106:17,23;
107:7;202:5
**membership (1)**
160:2
**memory (20)**
51:7;58:21;59:2;
146:6;156:9;160:22;
168:17;178:24;182:9;
219:10;260:23;261:2;
262:1;276:6;280:16;
281:11;282:2;293:23;
294:3;319:9
**mental (116)**
20:12,18;22:5,13,18,
23,24;23:6;24:12;25:2,
9,11,13;26:21;27:4,10,
22;28:14,20;29:12,23;
30:10;31:3,11;33:2,12,
17,23;35:6,10,14,19,
23;36:5,17,22;37:4,9,
16;39:6,20;40:2,9,10,
15,19;41:18;44:10,18,
24;45:3;46:15;61:21;
62:5,11,13,19;81:20;
82:5,11,18,19,23;83:5;
84:1,10,14;85:3,8,9,18,
23;86:4,10,12,23;87:8,
20,24;88:11,15,17,19;
89:23;93:6,14,16,23;

94:6,15;96:12,22;97:1;
103:7;109:14;111:12;
116:1;117:5,9;118:1,1,
16,21;119:7,15;133:7;
180:20;239:2,4;
286:16,18,21;287:4,20;
288:4;292:13
**mentally (18)**
19:21,23;20:6,7;
21:1,2,12,20;22:9;
30:7;35:7;36:20;89:5;
94:20;95:11;96:2;97:5;
327:22
**mentioned (5)**
20:11;56:23;148:2;
194:5;320:16
**messages (3)**
198:1,3,14
**messaging (1)**
190:10
**Meth (3)**
48:24;291:17;316:23
**methamphetamine (2)**
48:5;112:3
**Metro (13)**
64:6,11,14,18,21,24;
65:5,14;66:19,20;
67:17,18;76:22
**Michael (2)**
6:13;7:6;9:3
**middle (5)**
56:9;144:4;226:5;
278:20;292:20
**might (38)**
7:14;18:5;23:16;
30:5;32:2;53:22;83:17;
98:15;102:11,13,16;
105:11;111:9;126:12;
128:11;137:4,5;147:8;
149:15,17;153:12;
168:19;169:3;206:3;
213:8;221:4;230:11,
19;253:9;265:15;
283:2;284:17;291:2;
300:23;305:2,20;
324:16,19
**mile (1)**
133:3
**miles (2)**
104:21;111:8
**Miller (31)**
6:14;11:18;16:24;
58:15;59:15;143:2;
146:4;151:23;152:19;
155:16;165:10;174:21;
179:20;180:18,22;
190:17;198:24;202:11;
224:24;225:12;228:14;
248:14;249:2;256:1;
282:11;291:10;315:6;
319:20;322:13;323:3;
328:18
**Miller's (8)**

78:13,16,20,23;
176:17;178:15;287:2;
321:20
**million (2)**
36:16;124:16
**millions (1)**
35:22
**Milo (19)**
144:24;145:2;
151:10,11;152:5;
173:17;176:2,13,18;
181:12,20;182:2,20,22;
183:1;196:5;207:8;
285:17;300:13
**mind (16)**
36:21;108:3;109:8,9;
119:15;126:2;175:17,
23;176:19;177:3;
178:7;218:9;247:20;
291:10;292:4;303:7
**minds (1)**
238:17
**Mine (4)**
11:19;211:10;
271:12;324:19
**minor (1)**
328:3
**minute (3)**
82:20;316:11,19
**minutes (31)**
113:17;137:5;150:4;
178:19;181:10;182:13;
183:22;185:5;270:21,
24;271:1,4,10,10,11,
20,24;272:4,7,13,15,
20,21;273:9;274:4,7,
19;275:20;277:14;
289:19,19
**misplaced (1)**
149:5
**missed (1)**
126:16
**missing (4)**
149:3,14;150:6;
305:2
**mistake (2)**
130:24;132:11
**Mobile (1)**
190:8
**moment (6)**
89:7;156:21;173:20;
176:11;242:5;289:17
**mom's (1)**
209:22
**Moneypenny (2)**
65:10,24
**months (4)**
8:17;143:24;207:18;
324:20
**MOORE (10)**
5:1,8,23;46:20;
147:23;160:14;164:20;
175:7;270:15;271:16

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

**more (46)**
14:1;34:16;36:21;
37:5;48:5,13;54:18;
59:10;60:23;61:16;
71:7,7,8,12;72:6;75:6;
77:1;98:21;101:5;
104:22;105:16;107:21;
109:5;110:19;115:15;
126:18;153:21;183:24;
191:10;200:9;212:4;
214:21;215:19;228:11;
230:11;246:18;262:13,
15,16;265:6;277:19;
284:21,21;289:14;
297:22,24

**morning (3)**
11:1;157:19;205:11

**most (12)**
13:19;25:15;27:19;
44:10;62:17;82:8;
103:14;124:17,19;
172:8;192:16;323:22

**mostly (2)**
160:9;240:15

**mother (11)**
183:10,11;184:12;
285:23;287:16;291:14;
292:15;316:7,15,18;
320:15

**mother's (5)**
212:5;285:14;288:2;
291:6;292:5

**motivation (2)**
24:1;296:19

**mouth (27)**
112:22;247:19;
248:2,16,17;249:3,7;
264:2;265:16;267:5;
280:10,15,19,20;281:5,
6,10,14,18,21;282:1,8;
293:6,10,15;298:24;
299:4

**move (29)**
68:9;80:13;123:1;
126:7;136:11;175:21;
220:4;221:24;222:8,8;
223:4;231:16;235:6,8;
236:12;243:11;247:10,
11,12;265:13;266:1;
268:8,13,17,19,22;
269:2,7;312:6

**moved (13)**
222:11,15,17,21,24;
223:2,5;240:24;269:6,
9;275:9;276:12;279:18

**movements (4)**
268:24;274:4;
278:11;296:22

**moves (1)**
268:7

**moving (28)**
80:21;131:17;
136:23;186:18;221:13,

15,22;222:3;223:11;
229:16,18;236:24;
247:8;253:15;261:18;
262:2;263:19;267:11;
268:1,6;269:14;275:9;
276:9,24;277:9,17,22;
279:8

**much (29)**
34:9;48:4;49:5;
65:10;78:15;108:18,
24;114:15;119:12;
120:13;134:2;158:12,
23;159:14;171:17;
181:21;200:11;204:24;
213:4;223:12;224:5,6;
244:22;253:15;297:9;
299:18;302:16,17

**Multiple (2)**
71:4,7

**muscles (2)**
115:15;120:16

**muscularly (1)**
252:12

**must (11)**
27:15;60:17;68:15;
93:22;94:2,7,16;
114:13,17;164:23;
170:19

**myself (4)**
65:7;269:5;277:16;
324:3

---

## N

**naked (4)**
48:15;95:3;133:2,6

**name (12)**
5:6,10,13,14;6:13;
32:13,16;54:9;146:11;
164:9;175:13;180:22

**named (3)**
6:18;56:24;57:18

**names (1)**
32:14

**narrow (1)**
215:22

**Naturally (2)**
8:11;312:6

**nature (6)**
56:7;67:20;282:21;
287:4;288:4;295:6

**near (1)**
220:19

**necessarily (12)**
14:4;29:24;34:8;
37:11;101:18;118:16;
121:24;126:11;138:14;
149:23;201:15;323:21

**necessary (24)**
27:6;45:13,15;69:8,
20;78:9,24;82:3;83:9,
10;84:5,17;85:12;
90:14;104:2;106:4;

107:2;108:11;111:10;
112:6;120:6;136:15;
160:1;255:18

**need (54)**
7:10,11;24:21;30:2;
34:18;36:4;37:10;
55:19;62:13;70:9;72:6;
85:21;90:7;96:2,9;
97:5,12;104:3;115:15;
116:20;128:20;129:1,
5,15;130:1,3,4;132:4;
135:9;137:16;139:8;
153:15;176:24,24;
178:5;184:13,18;
230:10,11,19;231:21,
22,22;234:22,23,23;
235:1,4;237:14;
274:21;310:9;317:5;
321:19;327:6

**needed (8)**
68:16;75:6;179:8;
183:12;185:1;287:18;
288:3,9

**needlessly (1)**
60:17

**needs (5)**
36:5;37:16;63:2;
77:20;186:11

**negotiate (2)**
20:7;97:8

**negotiated (1)**
67:16

**negotiating (2)**
66:11;100:2

**negotiator (13)**
21:3;64:2,5;65:14,
17,18,22;66:4,15,16;
67:14,22;68:12

**neighborhood (4)**
105:6,8;214:19;
289:6

**new (6)**
72:21;147:11,13;
149:21;164:2;307:23

**newer (1)**
193:19

**next (13)**
54:14;153:11;
168:23;181:21;219:6;
248:16;255:22;256:15;
266:7;268:20;284:21,
21;298:23

**nice (1)**
319:7

**night (6)**
171:14;270:9;284:2;
319:14;323:5;327:18

**nobody (3)**
153:16;270:6;283:8

**Nods (2)**
107:12;256:3

**noise (14)**
57:5;238:3,5,7,8;

239:20;240:14,15;
251:18;260:3;277:19;
278:10;279:15,16

**noises (4)**
238:10;279:17,19;
302:7

**none (2)**
234:11;324:11

**nonsense (3)**
48:10;238:1,7

**Nope (3)**
58:3;74:10;117:20

**normal (4)**
82:18;85:8;105:17;
297:20

**normally (4)**
147:10;161:21;
164:2;253:21

**nos (1)**
8:10

**nose (1)**
299:4

**note (6)**
10:16;167:10;196:1;
246:1;284:3,15

**notes (38)**
10:2,4,9,18;11:7;
163:21;164:7,8,11,12,
12,13,22;165:23;166:2,
7,23;167:7,9,22;
170:12;171:16;172:18;
192:16,17;193:1;
194:1,18;195:4,8,8,13,
16;196:7;197:11;
283:17;284:19,22

**notice (1)**
293:6

**noticed (3)**
277:16;282:4;294:11

**noticing (1)**
299:12

**nude (1)**
48:9

**number (14)**
21:20;104:17;
126:11;127:5,24;
141:3;153:4,5,5;
160:12;165:10;194:9;
201:12;319:12

---

## O

**oath (8)**
9:9;76:9;190:14;
197:5;222:14,20;
223:3,7

**Objection (142)**
12:8;14:7,22;18:4;
20:3;22:7;26:19,22;
28:4,17;29:13;30:13;
31:13;33:19;36:8;37:6,
19;38:18;39:7;40:3,20;
41:4,21;42:5,17;43:9,

20;44:6;46:24;47:14;
49:21;56:2;59:3;60:9;
61:3,22;62:15;63:10;
68:23;69:16;71:2,9,18;
75:8;81:22;83:7;85:10;
89:20;91:16,20;93:7,
17;94:9;96:4,15,23;
98:7;102:1;103:24;
105:18;108:9;110:12;
111:5;112:24;113:20;
116:4,12;117:15;
119:10,18;120:2,11,19;
121:6,16,22;122:13;
123:8;125:9,20;126:3,
22;127:7;128:7,15;
129:17;130:21;131:7;
133:23;134:8;135:13;
136:20;137:10;138:2,
12,22;140:6;142:11;
152:22;174:15;189:14;
204:8;205:23;206:18,
23;210:17;211:3;
213:13;217:5;227:6;
236:22;237:22;239:23;
249:13;255:12;257:2;
258:23;260:15;263:8,
17;265:1;267:23;
269:18;271:6;272:2,
11;283:6,20;291:4;
294:9;298:7;302:23;
303:11;312:19;313:7;
320:1,13,24;322:14;
328:5,19;329:2

**objections (2)**
131:12,17,20,21,23

**obligation (3)**
76:12;78:8,12

**observations (4)**
46:8;288:18;291:21;
321:11

**observe (5)**
187:11,21;188:3;
245:14;307:8

**observed (2)**
306:19;328:10

**observing (1)**
295:18

**obstructing (1)**
310:10

**obstructs (2)**
112:18,22

**obtained (1)**
290:8

**obvious (2)**
13:17;49:8

**obviously (8)**
142:1;144:19;
172:11;308:24;321:3;
323:10;324:2,8

**occasionally (1)**
55:14

**occasions (10)**
52:19;55:23;63:14;

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

68:11;70:23;261:17;
274:8,23;275:24;298:2
**occur (1)**
    48:22
**occurred (5)**
    15:8;49:3;51:8;
    137:9,12
**occurs (1)**
    112:7
**off (61)**
    6:11;51:22,22;53:13;
    71:24;72:17;77:14;
    87:3,6;161:23;165:14,
    17;167:5;168:24;
    170:13;197:24;198:2;
    219:11,19;220:20,21,
    22;223:8;228:18,19;
    229:19;233:22;235:16,
    24;236:1,3;238:11,14;
    239:10,13,13,16,17,22;
    240:17,17,20,23;
    243:17,20,22,24;
    246:11;255:10,23;
    264:13;267:3;274:24;
    275:13;276:1,20;
    286:10;301:10;302:12;
    304:18,19
**offense (2)**
    13:22;211:7
**offenses (8)**
    14:19;15:3,6,8,13,
    15;311:10,14
**offered (1)**
    60:8
**offhand (1)**
    56:4
**office (21)**
    73:19;148:9;172:10;
    173:1,3;192:11;193:6,
    15;194:18;198:5,15;
    306:22,24;307:22;
    308:3;311:3;313:13,
    14,20;326:3;327:19
**Officer (228)**
    10:20,20;11:19,20;
    12:24;13:1,24;14:14,
    20;15:5,14;22:4,12,19,
    21;23:5,23;24:11;
    26:15;36:24;37:15;
    38:2;40:13;42:23;43:1,
    4;44:23;45:7;46:17,21;
    53:21;55:9;57:18,18;
    58:7,10,15;59:13;
    60:17,20;61:1,5,9;
    63:1;65:6;70:6;73:23;
    75:18;84:24;86:18;
    87:16;94:7;97:19;
    98:23,24;99:6;103:1,9;
    105:2;108:6;110:2,7,
    16,20;121:1;123:18,
    23;151:7,24;152:1;
    159:11;160:11,20;
    162:1;164:13;165:2;

166:2,3;168:19;
170:12,13;171:10;
173:5,7;174:9,10,24,
24;175:7,7;177:10,10,
13,14;178:8,9,21;
179:12,18,24;180:7,7,
13,15,16;181:4,4;
182:10;185:13;187:11,
12,15,18,21,22;188:8,
10,13,15,20;193:19,20;
194:8;202:10,14,16,20,
21;203:10,15;207:10;
209:8,11,16,19,24;
210:5;214:9;223:15,
19;224:13,16,21;225:2,
4;226:17,20,21;230:8,
12,13,16;232:4,5,12,
12;233:11,11,17,17;
244:24;245:1;247:7,9,
10;249:11,11;251:8;
255:6,7;264:11,11;
269:3,4;273:24;280:1,
13;281:7,8,9,15,24;
282:6;283:15,16;
284:8,13,14;288:9;
289:13,21;290:10;
291:1,16;292:8,9;
298:9;299:1;304:12;
305:11,14;306:17,18;
307:6,7,24;308:16,23,
24;312:15;313:15;
314:12,14;315:5;
316:11;317:23;324:5,
16;325:18,21;326:2,7,
13,16,18;327:2,11,17
**officers (112)**
    15:12;25:1;50:9;
    53:9,20,24;57:13;
    62:13,24;63:8,16;
    68:15,20;69:5,10,14;
    70:1,24;72:1;77:8;
    78:1;79:14,17;81:19;
    86:21;87:10;89:12;
    93:4,15,22;94:2,16,19;
    95:19,22;96:1,13,20;
    98:4,13;99:10,13;
    101:7;103:15;107:17;
    114:4,13,16,19,23;
    129:5;130:12;131:4;
    132:11;133:21;134:6;
    138:20;144:14;146:14;
    147:16;151:7,16;
    156:22;158:9;170:22;
    174:24;177:18,22;
    188:24;189:6;192:22;
    194:3;196:15;199:15;
    201:1;202:8;207:5;
    213:3;214:5,15,17;
    216:13;217:17;218:4,
    17;225:9;231:15;
    235:23;246:13;247:5;
    248:24;250:18,22;
    251:7;252:19;262:17;

263:3,5;268:8;277:10;
280:9;281:4,12;283:4;
289:12;292:23;293:19;
301:3;319:14,16;
322:22;323:23
**officer's (12)**
    37:4;75:12;80:13,16,
    19;81:2;86:1;99:16;
    108:16,22;249:8;
    250:16
**officers's (2)**
    86:5;248:15
**officially (1)**
    310:18
**often (3)**
    94:19;130:7;291:16
**oftentimes (1)**
    14:1
**OHLEG (2)**
    164:23;166:20
**older (1)**
    193:18
**once (19)**
    24:19;43:11;51:16;
    68:19;69:4;137:8;
    172:10;182:22;195:4,
    5;197:24;200:5;
    205:10;217:19;232:15;
    256:9;259:7;309:17;
    314:10
**one (94)**
    7:4;10:9;17:7;22:5;
    23:7,22;24:8,18;25:24;
    30:20,23;35:21;44:10;
    45:1;48:3;52:23;53:20;
    55:7;58:12;60:23;66:1;
    67:12,13;68:4;73:13,
    19,20;80:14,21;82:9,
    10;90:18;102:24;
    124:24;125:6;126:15,
    19;140:23;142:7;
    145:21;147:8;153:2,4;
    154:23;156:1;160:9;
    163:18,19,19;169:3,14;
    170:7,19,20;175:23;
    190:16;191:7;192:3;
    194:16,20,21;201:24;
    207:16;211:20;220:3,
    12,12;236:20;241:12;
    245:4;252:8;253:5,7,9;
    254:4;257:19;268:8,
    12;272:16;276:13,17;
    277:9;281:24;287:3;
    288:12;293:19;298:16;
    310:7;312:9;316:20;
    322:5;326:17,21,22
**only (55)**
    7:16;9:18;16:10;
    21:24;26:1,4,9,10;
    27:10;28:21;42:7,15;
    84:10;99:16;100:6,11;
    109:7;124:7;127:13;
    129:5;133:1;142:10;

153:14;156:12;171:8;
189:5;197:5;219:17;
226:11;228:7;231:11;
233:7,7;239:6;241:15;
242:6;250:14;254:23;
271:1;272:15,23;
274:7,23;275:3,21;
276:6;285:19;300:7;
302:14;303:22;318:15;
320:15;321:17;322:19;
323:3
**on-the-scene (1)**
    291:20
**onto (6)**
    35:16;234:24;
    237:19;257:22;279:22;
    301:13
**oops (1)**
    318:17
**open (14)**
    207:11,12,15;208:9,
    9,22;218:20;247:19;
    248:3;249:4;264:2;
    289:10;292:16;321:24
**operating (1)**
    155:20
**Operations (1)**
    199:22
**opinion (7)**
    38:22;39:13;84:3;
    100:10;126:24;128:2;
    248:1
**opinions (1)**
    41:7
**opportunity (6)**
    9:19;16:16;100:6;
    192:18,24;307:7
**opposed (2)**
    18:6;173:11
**opposite (2)**
    154:14;158:21
**OPs (2)**
    200:4;201:22
**option (2)**
    24:24;131:9
**options (3)**
    23:5;25:24;90:18
**order (5)**
    10:13;45:6;215:3;
    230:5;283:11
**ordered (1)**
    284:9
**orders (2)**
    106:10;229:24
**organized (1)**
    77:16
**original (9)**
    16:9;103:18;162:14;
    164:6,10,15,16;179:19;
    196:4
**originally (3)**
    56:8;144:23;183:4
**originals (4)**

162:7,9;166:12,16
**originates (2)**
    132:21,23
**others (1)**
    96:9
**ourselves (1)**
    25:17
**out (129)**
    6:6;8:9;13:8,15;
    17:17;21:6;24:16,17;
    28:7;35:3,8;38:23;
    51:7;52:7;63:23;67:5,
    16;68:13;70:15;88:23;
    100:15;101:4;102:6;
    105:2;132:22;140:9,
    18;144:5,9,24;148:20;
    149:15;153:10;155:22;
    159:19,21,22,24;
    164:23;168:5,6;
    170:23;171:13,19;
    172:21;173:4,5,6;
    176:22;177:6;180:11;
    182:22,23,24;183:21;
    184:7;190:19,22,23;
    191:11,23;192:2,9;
    195:5;196:4,4,9,23;
    200:2;201:14,16;
    204:11;205:13;209:17;
    212:1,4;216:20;218:2,
    3,6,15;219:7;223:18;
    224:8;229:22;231:17;
    232:14;233:12,18,21;
    234:2;237:6,14;
    243:11;251:11;253:9,
    16;255:24;257:18;
    259:12,21;260:5;
    265:14;268:1,9;269:2,
    9,14;280:1,5;287:3;
    290:5;296:23;299:3,
    12;305:19;306:13;
    310:3;311:4;315:12;
    316:20;318:4;319:8;
    321:23;322:2;326:23
**out-of-breath (1)**
    296:14
**outside (7)**
    30:11;31:4;37:17;
    73:19;145:5;173:19;
    304:5
**over (68)**
    8:3;13:10;29:15;
    30:20;32:12,18;41:7;
    51:21;56:23;59:21;
    72:4;76:23;81:4;105:5;
    135:9;137:6;139:7,10;
    141:3;143:1;152:1;
    153:9;178:8;179:9,16,
    22;180:12,23;186:3;
    189:19,22;190:2;
    191:11,14;192:10;
    193:8;199:12;200:10,
    22;201:6,14,16;

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

202:12;207:8;214:4;
217:1;221:10,16,22;
230:14,17;234:24;
237:19;259:14;260:24;
277:23;279:9;280:21;
290:2,3,4;293:20;
294:4,7;295:2;301:13;
308:13;316:11
**overdose (4)**
34:7,8;37:18;40:22
**overhear (1)**
301:2
**overheating (1)**
48:15
**overt (1)**
63:15
**own (8)**
42:8;89:4;167:12;
194:7;223:8;249:8;
288:18;321:11
**oxygen (1)**
115:16

**P**

**packet (4)**
313:15,22;314:11,16
**page (28)**
34:22;160:6,8,9;
161:17,22;163:4,13,18,
18;165:4;166:6,24;
168:11,15,16,20,23;
169:10,15,15,16,17,17;
170:4,4,8;332:6
**pages (3)**
164:6;206:1,3
**pain (1)**
126:15
**pants (7)**
248:16,23;249:3;
250:1,5;251:3;269:12
**paper (2)**
146:19;149:19
**paperwork (3)**
305:5,17;325:7
**paraphernalia (1)**
321:3
**Pardon (1)**
128:23
**parenting (1)**
77:21
**park (1)**
288:22
**parked (3)**
154:13;288:23;289:4
**parse (1)**
41:10
**part (23)**
13:19;18:22;25:15;
75:12;76:8,22;79:20;
82:8,24;144:2;165:7;
171:4;172:9;192:16;
220:6,7,8;245:1;

252:21;274:2;295:20;
305:3;323:22
**particular (1)**
87:10;198:6
**parts (3)**
220:11;236:2;309:1
**pass (1)**
284:20
**passed (1)**
324:7
**passing (1)**
148:2
**past (3)**
54:15;198:11;320:7
**patience (1)**
6:7
**patient (1)**
180:20
**patrol (3)**
73:23;147:16;149:17
**patrolmen (1)**
147:6
**pattern (1)**
42:11
**paying (6)**
225:9,11,18;230:1;
251:5,6
**pays (1)**
64:19
**PDOPs (3)**
199:18,19,20
**people (80)**
8:2;20:12;24:17;
32:12;40:1;45:18;53:4;
62:6,8;63:18;67:16;
70:15;75:13,15,19,22;
76:16,19,23;77:22;
86:6,7;89:1;92:5;
94:20;95:1,11;96:2;
97:15;104:4;113:14;
116:1,8;117:5,11;
118:5,20;119:6;120:8;
126:17;128:3,19;
129:4,14,24;130:2,3,9;
132:18;136:9,16;
149:7;153:10;180:3;
184:1;190:6;200:24;
204:5;212:16,18,23;
213:10,20;214:11,12,
14,16;215:17;216:1;
239:12;250:3;251:2;
254:13;291:16;293:14;
309:19;316:3;318:14,
15;321:7
**people's (3)**
76:9;78:5,9
**percent (1)**
154:23
**perfectly (1)**
65:15
**perform (1)**
298:14
**performed (1)**

298:16
**perhaps (3)**
24:4;168:14;277:10
**period (13)**
59:5;136:6;169:5;
173:18;178:20;237:8;
246:17,22;247:4;
295:17;302:8,10;318:5
**periods (5)**
236:11,15,18;242:4;
261:3
**permitted (3)**
68:20;69:5;131:22
**person (130)**
22:16;23:1,6;24:4,
12;25:1;27:17;28:2;
30:1,4;42:12,14;43:5,7,
24;45:1,14,19;46:19,
23;47:12;53:3;54:5;
56:1;57:6;61:6,12;
62:5,11,12;68:19;69:4,
15;70:7,18,19,24;
71:16;73:5;80:3,14,17,
20,23;81:3,6,9,12;
82:17,18,23;83:24;
85:2,7,18;86:8;89:17;
91:12,15,19;92:2;
93:23;94:7;95:3,6,9;
98:1,12;101:8;102:16,
20;103:1,9,19;104:7;
105:5,16,17;107:18;
108:2,6,7;110:3;111:3,
12,16,22,24;114:13,18;
115:14;117:9,23;
119:12,24;122:17;
124:24;125:5,14;
127:24;130:8,12,13;
133:12,15,19;134:5;
136:11,17;137:8,17;
138:8;140:15;144:18;
167:21;181:1;183:7;
188:5;198:23;201:13;
204:4;244:22;251:2;
293:9;309:15,22,23;
312:6,10;313:3
**personal (1)**
150:1
**personnel (3)**
5:18;66:2;299:15
**Persons (1)**
125:16
**person's (20)**
46:4;82:11;83:5;
84:14;89:14;90:23;
92:7;20;93:5;108:20;
110:10,21;112:8,17,18;
113:18;122:11;123:6;
133:16;312:5
**perspective (2)**
37:8;212:8
**phone (4)**
55:19;178:21;179:3,
7

**photograph (3)**
154:1;207:24;220:2
**photographs (3)**
215:12;218:23;
219:16
**phrase (1)**
246:15
**physical (10)**
34:12;37:17;69:19;
110:19;118:15;133:17;
213:6;282:10;328:2,3
**physically (14)**
80:2,13,17;98:23;
99:6;228:3;231:17;
232:5,13;233:20;
241:24;296:7;327:24;
328:1
**physiological (6)**
104:9;108:8,21;
109:11;116:9;117:2
**Physiologically (1)**
111:15
**pick (3)**
140:24;243:17;
266:10
**piece-by-piece (1)**
174:3
**pile (1)**
10:11
**pills (2)**
27:2,3
**place (10)**
11:17;58:15;185:19;
203:13;219:17;221:10,
16;224:11;260:24;
324:23
**places (1)**
220:15
**plan (13)**
62:14,18,21,23;
151:23;175:17,21,22;
176:3,13,19;178:4;
292:16
**planning (1)**
61:19
**plans (1)**
62:4
**play (2)**
87:10;101:3
**playing (1)**
16:10
**please (2)**
5:6;7:18
**pm (4)**
142:22;160:18;
284:4;329:17
**point (53)**
99:19;126:1;127:24;
137:1;169:7;173:24;
177:18;179:14;180:15;
181:14;187:13;191:18;
196:12;197:8;204:19;
213:1;219:8;224:19,

24;226:2,12;228:15;
230:21,24;252:5;
253:14;255:4,9,17;
256:11,17;257:5,9;
259:24;271:9;276:23;
279:1,11;283:18;
284:5;290:19;297:15;
301:6;305:13;306:5;
310:7;314:5;315:21;
316:20;318:3;319:17;
326:12;328:15
**pointed (1)**
242:24
**pointing (6)**
153:18,20;154:1,5,6;
222:6
**points (2)**
207:3,4
**police (105)**
15:12,14;18:17;22:4,
12,19,21;23:5,23;
24:11,24;26:13,15;
33:9;36:21,24;37:3,5,
15;42:23;43:1,4;44:23;
45:7;46:17,21;60:17,
20,24;68:15,19;69:5,7,
9;72:8,20;73:2;75:12,
18;78:1;79:3,6,10,14,
17,18,23;80:12,16,19;
81:19;84:24;85:24;
86:5,14,18,21;87:9;
93:22;94:2,6,15;95:19,
22;96:12,20;101:7;
103:1,9,14;105:2,9;
106:9,13;110:6,16,20;
114:4,12,23;121:1;
123:18,23;130:7,12;
131:3;133:21;134:6;
149:3,11;152:20;
158:9;199:22;201:1;
231:2;249:4,8;250:3,
15,17;251:1;291:1,15;
295:22;308:24
**policies (5)**
39:5,19;69:13;79:22;
141:24
**policing (2)**
77:16;200:12
**policy (31)**
25:21;26:12,14;
27:11,13;30:19;36:4,
11;37:14,15,22;38:5,7,
8,17,22;39:2,12,24;
49:17;60:2;80:8;
106:19,21;140:19;
141:8;142:19;169:12;
310:2,5,6
**polyester (8)**
248:16,23;249:3;
250:1,5;251:3;269:12;
301:21
**poor (1)**
316:2

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

**populations (1)**
135:18

Portage (1)
77:2

portion (3)
185:18;222:24;
301:16

portray (1)
21:4

posing (3)
62:6;215:18;216:24

position (38)
61:12;68:6;80:24;
112:18;115:7,11;
116:20;117:10;137:4;
138:7,8;153:21;
229:15,17,23;231:17;
232:14,24;233:2,13,18,
21;234:2;236:19,21;
237:7;248:12,24;
258:7;265:18,20,22;
276:11;277:4;278:4;
280:2,6;298:12

Positional (44)
112:7;113:5,7,9,13,
24;114:9,20,24;115:4,
8,11,22;116:2,10,24;
117:3,7,13;118:8,23;
119:8,16;120:10,17;
121:4,14;122:12;
123:6,19,24;124:21;
125:7,18;126:20;
128:5;135:23;136:12,
19;137:3,9,16,22;138:6

positions (4)
61:15,17;250:19;
281:11

possibilities (1)
194:21

possibility (6)
55:4;56:19;86:20;
217:8,11,12

possible (26)
33:23;43:8;68:14;
78:15;82:12;86:16;
87:14;94:16;103:6;
105:7;110:5,14;
114:15;115:9;128:21;
129:16;130:4;132:13;
134:12;138:17;179:2;
190:1;202:1;204:2;
287:17;329:5

possibly (6)
35:4;47:21;56:1;
264:15;287:19;324:9

potential (2)
22:4;311:10

potentially (3)
40:1;92:2;311:13

pounds (2)
107:23;159:12

powder (2)
316:21;317:8

power (1)
96:1

PowerPoints (1)
18:24

practice (1)
66:11

practices (1)
79:22

precautionary (1)
316:5

prefaced (2)
52:22;158:14

prefer (1)
104:4

prepare (2)
9:15,22

preparing (2)
15:21;17:11

present (6)
6:12;14:14;44:18,19;
103:6;234:10

presented (1)
174:19

presents (1)
46:15

pressure (1)
112:14

pretty (21)
46:12;49:8;52:14;
53:17;63:1;65:6,10;
66:9;159:12;181:20;
192:19;204:23;205:1,
4;244:19;249:2;
265:12;276:21;302:16,
17;305:16

prevent (3)
80:20;81:3;248:7

preventing (1)
137:15

primary (3)
66:16;67:14,21

print (1)
311:4

printed (4)
164:23;167:3,5;
168:6

printouts (2)
19:1;198:11

Prior (8)
9:21;16:8,23;76:5;
145:14;260:3;287:14;
291:3

priority (1)
211:10

prison (1)
150:10

prisoner (5)
145:12,16,16;
150:18,20

private (19)
189:21,23;190:2,4;
191:8,14,20;196:16;
197:12;199:24;200:5,

8,19;201:23;202:1,4,
12,21;203:16

probable (1)
149:15

probably (30)
7:5;19:5;34:16,22;
48:13;52:8;59:5,6;
103:14;142:6;144:3;
151:14;155:1;161:1;
166:11;173:2;176:7;
179:4;192:19;203:13;
204:21;205:10,22;
216:6,7,15;232:10;
244:18;257:18;278:1

probe (2)
252:1,4

probes (2)
126:12;140:17;
252:6,14,17,20;253:4,
6,12,18;254:8;279:2

problem (7)
82:4,5;86:7;87:5;
136:7;216:24;277:11

problems (4)
50:21;88:13;199:3,3

procedures (4)
79:3,7,10,18

process (4)
13:5;276:24;304:11;
311:7

processing (1)
217:13

professional (2)
43:8;44:3

professionals (2)
26:17;29:11

prone (20)
115:7,11;138:6,8;
229:15,17,23;231:17;
232:14;233:12,18,21;
234:2;236:19;237:7;
278:4;280:2,6;282:19;
313:4

proper (1)
18:5

properly (1)
13:21

protect (8)
75:22;76:9,13;78:5,
8,12;96:2;106:5

provide (2)
33:17;79:13

provided (13)
32:4;33:21;34:20;
40:8,13;58:19;65:21;
165:2;184:11;197:7;
288:13;319:3;320:4

providers (1)
46:22

providing (2)
58:22;59:13

psychiatric (7)
176:6,15,18;178:16;

183:11;184:24;186:10

psychology (4)
20:22,23,24;21:18

psychomotor (1)
134:15

psychosis (9)
21:5,16,17,21;22:3,6,
11;48:14;287:20

psychotic (12)
22:17;118:22;119:7;
184:12;286:18,21;
287:4;288:5,16;
290:19;291:14;320:16

public (28)
20:17;60:18,21,24;
61:2,5,16,20;62:3,12;
69:10;70:3;81:19;83:5;
87:17;93:14;94:5,15;
95:1;96:11;101:7;
106:23;107:8,17;
114:21;115:1;123:20;
124:2

public's (2)
99:17;105:22

pull (7)
97:23;224:10,13,16,
20;233:22;284:17

pulled (8)
191:20;286:12;
287:9,23;288:1;291:6;
292:5;321:4

pulls (2)
98:24;99:7

pulse (8)
133:13;254:20;
278:1;285:3;294:24;
298:9,17;299:1

punish (1)
93:22

punitive (1)
94:3

purpose (1)
70:11

push (9)
241:20;243:5,18;
244:2,6;274:10;276:2,
14;277:17

pushed (5)
273:8,17;275:4;
298:2;320:22

pushing (3)
124:15;242:1,2

put (67)
25:15;28:7;33:14;
35:3;66:10;72:6;73:6;
83:10;92:3;93:2;97:21;
99:4;100:10;104:3,22;
105:9;109:24;120:6;
139:11,19;140:3;
148:8;149:17;150:1;
157:3;168:22;169:3,4;
176:5;192:9;204:22,
24;205:3;206:2;231:1;

235:12,13,21;241:17;
243:18;244:6;257:23;
258:4,8,11,14;264:17;
265:16,17,23;266:5,6,
10,22,23;267:4,15;
268:9,13,14,23;287:12,
15;288:5;298:23;
310:7;321:4

puts (1)
104:18

putting (7)
83:13;98:1;264:12;
265:10;266:15,19;
299:5

**Q**

qualification (5)
41:4,21;42:5;44:11;
180:21

qualified (1)
42:18

qualify (1)
149:1

quarter (1)
222:8

question-and-answer (1)
6:24

quick (4)
168:21;192:20;
289:20;313:14

quickly (6)
13:4;144:10,16;
206:14;276:3,21

quite (1)
183:9

quote (1)
293:6;294:16

**R**

race (3)
75:23;115:21;133:13

raced (1)
212:6

racing (1)
103:12

radio (21)
152:1;157:20,23;
178:8,21;179:16,22;
180:12;182:14;183:14;
185:10,12;186:14;
201:6;230:14,17;
290:2;294:6,8;295:3;
316:12

radios (1)
200:1

raise (1)
243:16

raised (1)
56:19

ran (3)
104:20;111:7;313:22

Layne & Associates
(614) 309-1669

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

rang (1)
55:22
rather (1)
77:22
razor (1)
316:20
re (2)
87:13;242:4
reach (7)
226:8;264:17,19,21;
267:5;268:10,16
reaching (1)
223:10
read (13)
10:2;132:4;164:8;
194:18;195:24;205:10,
11;252:21;254:18;
271:14;329:12;332:2,4
reading (2)
263:4;272:18
reads (1)
260:8
ready (2)
87:2;275:15
real (3)
144:5;168:20;313:14
realistically (1)
300:6
realize (2)
137:5;297:6
realized (4)
213:10;230:9;279:7;
291:7
really (14)
7:18;22:18;41:10;
47:17;56:11;91:2;97:2;
105:20;197:5;259:11;
292:4;300:7;301:5;
318:9
reason (26)
7:10,24;21:7;24:9,
13;27:18;55:1,20;67:3;
102:14,22;103:13;
116:9;141:10;163:8;
169:1;174:14;199:4,5;
207:1;236:17;262:21;
294:15;320:17,20;
332:6
reasonable (4)
86:21;87:15;108:6;
110:2
reasons (4)
26:24;35:21;77:18;
332:5
recall (9)
40:5;56:4;179:2;
190:23;210:11;233:22;
321:17;323:15;328:21
receive (5)
18:22;59:16;65:19;
192:13;193:22
received (16)
29:10;30:10;31:2;

33:7;92:17;106:16,22;
107:6;136:1;137:23;
138:10;163:3;188:15,
22;190:15;191:13
receiving (2)
13:5;60:2
recent (4)
51:6;53:16,17;54:18
recently (1)
46:23
Recess (2)
75:4;176:9
recipients (1)
194:16
reclining (1)
123:13
recognize (2)
20:9;200:6;287:22
recognized (3)
277:10;280:6,14
recognizing (1)
288:10
recollection (3)
191:4;215:13;289:24
record (11)
5:7;6:11;8:9;132:2;
148:24;163:22;227:23;
235:20;275:13;328:8;
332:5
recorded (11)
16:4,6;150:17;
189:20;198:20,21,22,
22;199:1;200:14,15
recording (3)
154:17;199:3,5
recordings (1)
155:11
records (5)
66:16;67:4,18;
178:18;189:13
reduce (2)
133:22;134:6
redundant (1)
312:21
reference (2)
247:3;319:15
referring (13)
10:17;12:21;21:19;
25:23;34:12;38:17;
49:2;57:2;69:24;
101:17;271:17;308:12;
323:19
reflects (1)
168:16
refrain (2)
93:4;131:16
refresh (8)
146:6;192:17;193:1,
3;194:24;195:3,4;
215:13
refreshed (1)
195:5
regarding (11)

143:1;146:4;174:21;
179:19;196:1;198:14;
272:6;302:21;316:15;
319:13;322:12
regardless (11)
30:6;75:23;76:1,3,5;
85:2,7,17;92:23;93:16;
129:2
regards (1)
139:16
regular (1)
65:24
reiterating (1)
307:1
related (4)
36:21;48:14,20;
290:20
relative (1)
326:7
relatively (2)
276:3,10
relay (1)
316:13
relayed (1)
202:13
release (2)
150:10,18
released (2)
144:22;150:24
releasing (2)
145:12,15
relevant (1)
311:14
relying (2)
9:15;17:8
remain (1)
279:4
remained (1)
321:23
remember (111)
18:19;19:2,3,16,17,
22;20:2,22;31:12,15,
16;33:4;34:24;49:24;
50:2,11;51:9;53:9;
54:1,2;55:9;56:7,11;
65:20,21;66:3,6;67:1,
24;68:7,10;71:20;
117:24;123:21;124:3;
142:24;143:8,23;
144:1,6,9;145:6,9,13,
20;146:10;148:15;
150:15;152:7;153:17;
154:22;155:3;156:8,
20;158:5;173:9,13;
178:23;181:15;183:15;
202:19;207:17;208:2,
4,11;209:18;210:8;
212:21,22;220:19,22;
226:20;232:2;239:19,
22;240:7;251:17;
252:14;257:19;261:7,
9;262:6,13,15;279:3,
21,23;280:17;281:15,

17,20;282:9;285:15;
286:13;288:23;289:6;
290:3;292:18,24;
293:24;294:21;295:2;
302:19;304:17;305:13,
22;310:3,7;313:13;
318:14;319:10
remembered (1)
9:4
removal (1)
135:6
remove (2)
187:12;282:1
Repeat (6)
14:24;34:5;114:22;
123:22;132:10;138:4
repeated (3)
125:16;126:18;128:4
rephrase (5)
7:8;83:1;84:21
report (48)
10:3;12:12,15,20,23;
13:2,2,4,6,8,13;15:9,
11;74:1;146:5,7;
150:21;160:6;161:4,
24;162:5;164:24;
165:3,5;168:19;170:9,
14;242:14;244:14;
245:22;246:11;288:12;
292:12;294:1;303:16;
304:9,15,19,19,22;
305:15,24;306:16;
309:5;310:22;311:11;
319:13;326:22
reported (3)
14:2;284:9;308:11
reporter (5)
7:19;8:1;9:9;132:7;
332:1
reporting (2)
13:24;198:24
reports (15)
71:21;72:2,10,18;
73:1,3;149:5,10,11,12,
13;150:5;162:12;
291:11;293:3
represent (1)
6:14
requalification (1)
141:13
Requalifications (2)
141:20;142:14
request (5)
183:5;195:18,21;
290:2;332:4
requested (3)
156:3;195:19;231:7
requesting (1)
195:22
required (3)
26:16;152:13,15
requirement (1)
147:16

requires (1)
27:14
research (2)
39:16,19
resident (1)
197:9
residents (3)
180:9;189:4;307:19
resisted (1)
139:21
resisting (6)
239:1;308:23;309:8,
16;310:1,10
resists (1)
309:12
resources (1)
45:12
respect (14)
14:19;16:21;72:12;
107:24;175:3,22;
188:13;198:13;209:8;
221:2;250:18;258:17;
261:6;321:7
respiration (1)
298:21
respirations (1)
298:6
respond (11)
35:23;36:5,16;40:1,
14;51:2;52:20;60:7;
64:20;106:17;278:7
responded (4)
53:2;55:24;156:19;
215:10
responders (1)
133:20
responding (31)
22:4;25:9;27:22;
31:3;33:2,17;38:2;
39:5,20;40:9;42:23;
43:1,5;44:24;53:20;
57:7,14;87:16;90:2;
103:19;152:5;176:17;
177:8,9;183:7;184:23;
235:5;277:6;294:12,
19;295:9
responds (1)
36:24
response (14)
27:9;37:4;83:22;
90:5;92:6,18;99:17;
103:20;110:3,8;155:6;
176:13;311:20;312:22
responsibility (1)
78:4
responsible (1)
177:23
responsive (1)
278:3
rest (1)
243:13
restrain (14)
51:12;60:24;61:12;

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

80:17,20;81:3;114:21;
115:1;119:24;123:20;
124:1;187:22;268:2,9
**restrained (15)**
51:10;52:13;68:19;
69:5,11,15;70:7,12,18,
24;71:17;114:14;
124:12,13;233:3
**restraining (9)**
80:23;114:12,16;
124:23;125:5;138:8;
247:5;262:17;263:5
**restraint (41)**
112:7;113:9,24;
114:9,20,24;115:5,8,
12,22;116:3,10,24;
117:3,7,13;118:8,23;
119:8,16;120:10,18;
121:4,15;122:12;
123:19;124:1,21;
125:8,18;126:20;
128:6;135:23;136:12,
19;137:9,16;139:3,17;
282:20;313:4
**restricted (1)**
113:19
**restriction (2)**
90:22;112:11
**result (4)**
89:15;208:18,20;
209:12
**resulting (1)**
104:11
**retained (2)**
79:5,16
**retardation (1)**
87:24
**returned (3)**
306:4;325:23;327:18
**retype (2)**
168:8;311:8
**review (5)**
15:21;16:1,7;32:24;
34:18
**reviewed (8)**
10:23;16:12;17:10;
32:23;142:6;165:13;
205:8;328:24
**rhythm (1)**
318:2
**Richard (3)**
56:24;57:8,10
**Right (112)**
5:19;7:8;8:4;10:8,10,
11;15:4;32:15;34:17;
43:16;47:24;58:5;
74:22;78:5,16,20,23;
80:6;124:10;133:4;
138:18;139:10;145:23;
146:9;149:1;153:11;
157:14;158:17;161:8;
162:6;163:1;167:17;
170:11;181:21;189:9;

191:17;195:11;196:13,
20,24;203:1;205:9;
207:13;209:20;215:7,
21;219:9;17;220:15;
223:17,19,21;226:18;
233:8;235:15;241:24;
242:10,11,13,19,24;
243:5,9,13,14,20;
244:3;250:21;256:15;
260:22;261:11;262:4;
267:12,22;268:20;
269:16;270:16;271:16,
22;272:8,21,22;
274:15;277:20;278:9,
12,22;279:22;283:11,
14;287:6;288:11;
291:19,21;294:11;
298:3;299:14;300:9;
303:2,6;306:11;307:5;
309:19;312:2,24;
313:2;314:6,10;
322:20;323:6;328:21;
329:7
**rights (6)**
76:10,13;77:5,9;
78:9,13
**rise (4)**
298:10,11,24;299:13
**rising (2)**
277:24;294:18
**risk (36)**
114:19,24;115:4,7,
11,22;116:2,10,23;
117:3,6,13;118:7,15,
22;119:8,16;120:10,
17;121:4,14;122:12;
123:6,19,24;124:5;
125:7,18;126:20;
127:4;128:5;135:19,
20;136:12,18;138:18
**road (4)**
8:18;57:21;133:3;
184:3
**rocks (1)**
281:21
**rode (1)**
50:1
**role (6)**
14:6;15:10;22:19,21;
76:22;95:18
**roles (2)**
87:9;106:12
**roll (3)**
234:24;274:1;280:1
**rolled (1)**
277:23;279:8,22;
280:11,21;293:20,21;
294:2,4,7;301:13
**rolling (2)**
81:3;234:5
**room (13)**
14:16;23:17;73:20;
292:17,20,20;316:19;

318:8,11,12;322:2,4,5
**rotators (1)**
153:5
**route (9)**
181:9,11,13,15,18,
19,24;182:5;231:6
**row (1)**
127:16
**rub (2)**
278:13,16
**rubbed (1)**
279:20
**rubbing (4)**
254:19;277:21;
278:19;279:5
**rubs (1)**
254:19
**rude (1)**
8:17
**rules (6)**
77:20,22,22,24;78:1,
2
**run (4)**
97:24;133:3;179:9;
297:8
**running (14)**
48:9;83:15;95:3;
97:15;105:5,8;106:2;
111:3;133:2,6;177:6;
212:13;213:6;265:6
**runs (1)**
124:18
**rush (1)**
299:16

---

**S**

**Sadler (1)**
153:20
**safe (4)**
94:7,17;114:14;
284:17
**safest (5)**
43:24;61:1;62:2,11;
63:5
**safety (5)**
60:21;96:2;105:21,
21,22
**same (37)**
7:21;8:3;9:11;57:6;
85:1,7,16,17;93:9,16,
19,20;97:4;103:7;
112:5;117:17,24;
118:1;157:7;166:21;
170:15;181:2;193:13;
203:13;225:2;226:7;
237:7,8;250:1,16;
268:2;276:10;277:4;
281:1;302:6;311:7;
332:3
**sat (1)**
174:19
**save (9)**

23:7,11,18;152:13;
254:24;315:12,19,20;
317:6
**saved (1)**
152:21
**saving (2)**
21:6;24:3
**saw (26)**
5:10;141:21;142:3;
143:21;197:18;213:10,
20;221:13;247:10,12,
22,24;251:8;252:24;
253:20;256:16;281:10;
287:15,23;299:11;
300:22;313:21;316:20;
318:8,15;321:2
**saying (42)**
8:19;22:3;37:1;
42:12,14;43:15;48:17;
52:23;77:24;124:3,20;
126:10;132:24;145:15;
163:13,17;175:2;
184:1;196:1;228:6,10;
229:23;237:10,21;
238:2;239:15,22;
240:2,3,12,22;250:15,
17;253:3;279:8;
281:16,20;294:20,21;
295:2;303:13;316:13
**scanners (1)**
200:22
**scapula (1)**
242:17
**scare (1)**
324:4
**scares (1)**
153:10
**scenario (3)**
101:4;205:1;206:8
**scenario-based (1)**
66:8
**scenarios (2)**
94:22,24
**scene (50)**
35:16;42:24;43:1,5;
47:11;52:20;53:2;
55:24;130:13;140:9;
152:2;154:2;177:15,
23;180:8,13;181:5;
182:11;185:17;188:24;
209:1,17;212:8;214:1;
217:13;218:1,24;
223:6,14;228:16;
246:17,23;251:8;
255:3;256:23;257:22;
258:1;259:5,7;288:19;
293:4;299:8,20;300:6;
306:23;307:3,14,17;
308:7;321:2
**scheduled (1)**
6:6
**Scherer (80)**
10:20;11:19;58:7,10,

16;59:13;144:14;
151:8,16;152:1;
159:11;160:12,20;
162:1;165:2;166:3;
170:12;171:10;173:5;
174:10,24;175:7;
177:11,14;178:9;
179:12,18,24;180:8,13,
16;181:4;182:10;
185:13;187:11,15;
188:10,20;192:22;
202:20;207:10;209:19;
223:15,19;224:14;
226:20;231:16;232:4,
12;233:11,17;245:1;
247:7;249:11;251:9;
255:6;269:4;283:16;
284:8,14;292:9;298:9;
299:1;307:7;308:23;
313:15;314:13,14;
315:5;316:11;317:23;
324:16;325:22;326:2,
7,13,18;327:2,12,17
**Scherer's (8)**
164:13;170:13;
187:22;188:9;224:22;
308:1;324:5;325:18
**schizophrenia (2)**
21:23;103:4
**schizophrenic (1)**
286:17
**scissors (1)**
220:23
**scrapes (1)**
283:1
**scratched (1)**
282:16
**screaming (2)**
212:14;237:24
**screen (2)**
202:23,23
**screwdriver (6)**
189:2,11;204:11,13;
210:10;211:1
**searches (2)**
78:6,17
**seasoned (1)**
63:1
**seat (1)**
123:13
**second (17)**
63:20;82:24;113:17;
126:6;154:4;186:12;
190:21,22;251:10;
255:20;256:18;259:9;
268:22;275:3;279:7;
284:20;318:16
**secondary (1)**
200:1
**seconds (25)**
121:11;124:8,18;
127:17;139:10,11;
216:16;236:16,18;

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

242:5;260:9,14;261:4,
16,17;262:10;268:11;
272:16,16;274:8,12;
275:21;285:20;299:24;
300:7
**section (1)**
226:5
**secure (1)**
290:6
**secured (1)**
229:13
**security (1)**
165:9
**seeing (1)**
291:24
**seem (3)**
216:3,24;217:3
**seemed (2)**
213:21,22
**seems (2)**
67:6;82:21
**sees (1)**
249:22
**seizures (3)**
78:6,17;109:23
**select (3)**
14:21;15:5;61:1
**selected (1)**
262:22
**selecting (2)**
62:2,10
**semantics (1)**
236:3
**send (3)**
193:8,9;195:4
**sense (4)**
221:3;238:12,14;
239:18
**sent (4)**
167:6;192:15;193:6;
326:24
**sentences (1)**
271:15
**separate (5)**
44:21;60:6;64:16;
161:17;214:10
**separately (1)**
174:11
**September (38)**
11:17;16:4,19,22;
58:14;59:15;60:13;
78:13;114:6;115:18;
129:22;135:11;141:8;
142:21;146:22;148:14;
155:18;157:22;158:24;
159:6;172:1;174:1,21;
190:15;191:3;199:8;
211:24;215:10;285:10,
16;286:5;302:22;
303:9;306:1;319:6,15;
321:15;325:23
**sequence (1)**
289:16

**Sergeant (15)**
5:8,23;13:9,12;
46:20;57:10;65:8;
147:23;148:2;160:14;
164:20;175:7;270:15;
271:16;327:17
**sergeants (5)**
72:10,17;74:7;147:5,
16
**series (1)**
7:1
**serious (8)**
62:18;110:11,19,22,
23;118:15;135:20;
179:6
**services (13)**
197:13;198:21;
200:13,15,18,19,23;
201:4,14,16,20,22;
203:18
**serving (2)**
143:9,21
**session (1)**
6:24
**set (2)**
149:16,17
**setting (1)**
95:1
**settle (5)**
20:8;21:7,8;24:9,13
**settled (1)**
47:19
**seven (1)**
243:14
**several (16)**
19:5;31:22;32:12;
73:12,17;155:9;
270:21,24;271:1,4,20,
24;272:4,7,20;273:9
**severe (1)**
133:7
**severely (1)**
120:17
**Shakes (1)**
204:17
**shame (1)**
323:9
**share (1)**
64:19
**sheet (1)**
163:14
**Sheriff's (8)**
192:11;193:6,8,15;
194:18;198:5,8,15
**shift (2)**
50:12;142:22
**shirt (2)**
279:1;301:10
**shockable (1)**
318:1
**shocked (1)**
139:11
**shoe (1)**

243:14
**short (2)**
236:14;289:5
**shorts (1)**
250:4
**shoulder (39)**
98:16;225:13;226:7;
240:24;241:9,12,14;
242:10,12,13,14,21;
243:12,18,23;244:8,17;
245:4,15;246:24;
258:8;265:11,18,24;
266:17,18,19,22;267:4,
9,15;268:14;270:16;
271:18;272:14;273:8;
274:10,20;277:18
**shoulders (15)**
228:18;229:7,10;
231:11;243:17;244:5,
7;274:24;275:4,7,10;
276:1,19;278:21;
279:20
**show (5)**
32:15;157:4,12;
218:24;264:5
**showed (1)**
264:7
**showing (2)**
108:21;227:24
**shred (1)**
149:20
**shredded (2)**
150:3,4
**side (21)**
207:6,6;220:7,13,18;
223:14;224:22;225:4,
10,13;228:21;234:5,
24;260:18,21,22;
267:22;279:21;280:11;
293:20,20
**sides (1)**
225:10
**side-to-side (2)**
247:11;267:20
**sideways (4)**
243:10;260:17;
302:4,5
**sign (13)**
45:1;71:24;72:10,17;
102:11,16;103:3;
133:7;134:24;135:3;
162:4;175:3;304:19
**signature (7)**
162:2;163:4,5;164:5,
17;166:9;329:14
**signed (10)**
12:1;161:24;165:14,
17;170:5,10,13;
246:11;258:18;304:18
**significant (1)**
185:18
**signing (2)**
11:21;175:1

**signs (26)**
21:4,15,17;22:3,6,9,
13;23:6,14;28:14;44:1;
46:12,19;54:5;102:24;
103:10;108:7,20,21;
111:16,22;130:14;
132:11,14;134:14;
135:10
**silent (1)**
55:22
**simply (1)**
227:4
**single (1)**
38:3
**siren (1)**
153:9
**sirens (5)**
153:7,15;156:18;
299:21;300:5
**sit (24)**
19:7;31:1;35:1;
39:13;68:9;100:14;
101:2,3;123:3;124:10;
156:21;174:2;179:1;
219:10;222:10,14,20;
231:22;239:21;270:5,
7;276:5;306:17;325:14
**sits (1)**
201:4
**sitting (4)**
100:5;123:14;234:3;
314:21
**situation (42)**
19:24;21:14;22:1;
26:21;27:12;36:10,12;
38:23,24;43:12;44:16,
21;45:14;48:18;49:7;
54:5;55:6;57:20;81:24;
82:7,10;83:18;87:10;
89:12;93:1;121:19;
122:1,15;125:2,10;
127:21;172:11;179:6;
210:12;211:15;212:2,
16;270:6;272:8;
273:12,22;324:10
**situational (1)**
88:16
**situations (5)**
19:20;29:18;38:3;
51:1;99:11
**six (7)**
8:17;64:8;65:3;
170:10;216:7;250:24;
261:22
**size (3)**
107:18;108:2;243:14
**skills (1)**
66:11
**skin (4)**
252:10,11;253:13,14
**skirt (1)**
276:16
**slide (1)**

295:11
**slightly (2)**
24:5;267:22
**slowed (1)**
294:24
**Smith (23)**
17:23;58:23;59:11;
147:19;167:17,19,21;
168:6;171:2,5;172:1,5;
173:10,19;175:11,12;
206:15;210:7,12;
302:21;303:8;323:14;
324:24
**Smith's (2)**
175:13;319:13
**snarky (1)**
13:12
**social (1)**
165:9
**society (2)**
75:16;77:21
**socioeconomic (1)**
76:3
**somebody (64)**
20:6;21:18;26:2;
35:4,4,5,11;47:3;
48:18;54:7;73:24;
88:16;97:21;98:5,24;
99:3,5,6;107:22;
121:12;125:11;127:11,
15;143:4,5,14,19,20;
150:3;163:15;167:11;
172:22;184:3,23;
189:3;202:12;203:5,
18,24;204:12;206:12;
212:9,9,13;213:9,17;
226:3,4;235:2,11;
237:17;243:4;247:13,
20,21;295:10,24;
296:8;297:13,15;
308:21;309:7,12;310:9
**somehow (1)**
191:21
**someone (16)**
37:18;73:23;112:1;
149:18,19,24;191:16;
196:2;210:10,16;
211:1,14,18;212:10;
247:18;294:1
**sometime (2)**
64:8;168:18
**sometimes (15)**
8:12;46:14;63:22;
71:24;88:23;102:15;
117:12;118:6;120:9;
135:6;168:19;252:8;
253:3;305:15,16
**somewhere (5)**
10:6;144:4;149:9,18;
207:16
**soon (17)**
43:8;128:20;129:16;
130:4;134:12;139:5,6;

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

209:20,21;243:23;
257:22;267:14;287:15;
291:6;294:11;299:11;
308:10
**sooner (1)**
59:6
**Sorry (18)**
26:8;38:11;55:21;
67:23;69:1;72:13;
85:20;87:1,5;154:9;
170:4;177:21;210:6;
213:15;247:8;277:12;
316:7;327:17
**sort (1)**
228:2
**sound (2)**
68:5;296:5
**sounded (2)**
296:19;297:6
**sounds (10)**
23:22;51:9;64:23;
80:5;82:14;265:11;
297:1,22;299:23;
301:17
**source (5)**
188:23;191:5;
196:18,21;206:12
**sources (1)**
192:3
**south (2)**
153:21;154:11
**southeast (2)**
153:22;154:11
**speak (10)**
7:6;9:3,19;16:16;
17:14;182:14,16,18;
211:23;308:7
**speaking (4)**
131:11,17,22;202:6
**speaks (1)**
189:8
**specific (11)**
29:23;51:4;59:10;
61:12;80:24;107:4;
120:22;173:13;205:15;
226:17;249:2
**specifically (5)**
150:16;156:8;
169:13;204:6;310:8
**speech (2)**
134:21,22
**speed (1)**
155:6
**spell (2)**
5:13;54:11
**spoke (3)**
247:7,9;285:22
**spot (3)**
100:11,19;281:1
**Springfield (43)**
6:17;19:14;26:13,15;
27:24;28:12;31:2;33:8;
40:12;60:2,8;64:15;

66:19,23;67:15;69:4,
13;70:22;71:15,23;
72:9,16;76:16,20;
79:23;80:7;82:16;
84:24;92:16;99:22;
116:17;117:22;118:5;
121:1;122:10;146:14;
156:23;199:15;201:2;
280:1;304:3;322:11;
328:17
**squad (17)**
29:19;33:23;49:24;
50:1;51:14;55:9;133:5;
140:22;220:24;235:10;
283:22;286:12;287:17;
295:1;298:18;299:12;
316:13
**squirm (1)**
136:18
**stab (19)**
127:12;189:2;
190:17;191:15;196:2;
202:11;203:5;204:12;
206:12,16;207:3;
210:10,16,24;211:6,6,
13,18;212:10
**stabbed (5)**
212:1,9,15;213:9,16
**stabbing (1)**
189:12
**stabbings (1)**
212:13
**stage (1)**
27:15
**staged (4)**
48:12,16;51:16,21
**staging (3)**
51:23;52:5,13
**stamp (1)**
284:4
**stamps (1)**
284:3
**stand (14)**
140:3;199:21;
205:13;229:20,21;
230:4;231:22;234:14,
23;235:2;237:8,17;
266:4;276:10
**standard (1)**
309:7
**standing (12)**
122:18;145:5;
212:21;225:14,15,16;
234:8;241:7;267:21;
280:18;296:10;297:17
**start (6)**
7:20;137:6;184:8;
224:20;232:10;256:1
**started (16)**
16:10;52:6;53:13;
64:7;159:22;169:8;
241:18;253:2;259:13;
277:18;278:13;290:9;

298:19;301:8;310:3;
317:1
**state (23)**
5:6;93:23;101:14,16,
21;118:16;128:19;
129:4,14,24;130:2,16;
132:18;133:12,15,16,
19;134:5,10;282:24;
283:3;287:20;303:6
**stated (5)**
17:6,23;123:23;
141:6;293:5
**statement (6)**
11:13,16;12:6;
252:22;258:17;260:8
**statements (2)**
240:8;319:12
**states (3)**
167:16;259:8;280:9
**station (5)**
49:17;284:2;306:4;
319:14;325:23
**status (5)**
76:3;89:23;92:24;
286:16;318:3
**stay (3)**
139:8;312:17;313:1
**stayed (1)**
318:4
**steal (8)**
184:2;186:13;207:4;
238:20;239:3,7;
307:15,19
**stealing (2)**
306:20;308:6
**step (19)**
46:18;54:3;94:16;
136:9;151:21;171:22;
229:4,4;231:9;282:5;
283:22;294:8,12,16;
295:3;299:19,22;
300:3,4
**sternum (1)**
254:19
**sticks (1)**
51:7
**still (38)**
50:21;54:6;55:14;
64:17,21;84:4;93:9;
97:15;104:3;106:4;
107:1;108:11;111:9;
112:5;120:5;136:8,11,
14,23;139:24;151:11;
157:20;221:5;254:8;
257:17;274:9;277:3;
278:4,23;294:18;
295:19;298:17;302:6;
304:8;310:11;313:12;
314:2;324:15
**stolen (1)**
308:12
**stomach (2)**
241:6;298:22

**stop (3)**
137:1,19;176:8
**stopped (10)**
58:22;59:13;276:24;
277:6,9;279:15,16;
299:9;313:10;314:8
**stopping (1)**
299:13
**stops (2)**
137:8,17
**stored (1)**
198:4
**straddling (1)**
241:10
**straight (5)**
72:7;260:21;261:11;
296:10;313:17
**strangely (1)**
95:14
**street (19)**
48:9,9,12;50:7;52:1,
7;53:7,14;56:10,10;
95:4;111:8;133:2,6;
154:10,13;257:20;
289:7;299:22
**Streetsboro (3)**
64:15;66:24;67:13
**strength (13)**
98:22;126:14;
244:15,21,24;245:13,
16,23;246:4,8,16,21;
247:3
**stress (26)**
104:9,11,19,22;
105:10,16;106:1,3;
108:8,22;109:1,11,24;
110:3,4,7,10,21,24;
111:13;116:9;117:2;
133:17,22;134:2,7
**stretches (2)**
273:13,16
**strike (5)**
91:14;114:18;
187:18;210:13;224:17
**strikes (1)**
90:15
**striking (2)**
81:12;92:1
**stringy (1)**
293:14
**strive (1)**
60:20
**strong (1)**
244:16
**strongest (1)**
244:18
**structure (1)**
77:20,20
**struggle (16)**
115:10;136:11,18;
243:21;260:10;270:20;
271:4,20;272:13,19;
274:5,13,19;277:13;

311:18;312:10
**struggled (2)**
273:7,7
**struggles (1)**
115:15
**struggling (11)**
136:22;273:9,20;
295:24;296:11,20,22;
297:11,18,20;302:7
**stuck (1)**
124:8
**stuff (4)**
48:10;293:15,15;
301:10
**subdue (1)**
276:20
**subject (1)**
81:20
**subjective (6)**
36:13;37:22,24;
40:23;41:2,11
**subjects (1)**
19:18
**substance (4)**
17:19,22;68:11;
281:21
**suffering (9)**
85:2;92:12;96:12;
116:1;117:5;118:21;
119:6;319:17,21
**sugar (1)**
88:21
**suggesting (1)**
189:18
**Summit (2)**
77:2;144:20
**summoning (2)**
33:3;144:18
**summons (3)**
143:7;144:21;150:22
**summonsed (1)**
150:24
**Sunshine (1)**
152:14
**super (1)**
324:2
**superhuman (12)**
126:14;244:14,21,
24;245:13,15,22;246:4,
7,16,21;247:3
**supervising (1)**
57:13
**supervisor (14)**
14:3;28:7;38:2;
71:23;72:17;79:21;
164:21;165:14;167:7,
8;194:10;255:3,7;
256:23
**supervisors (1)**
153:8
**supervisor's (1)**
153:1
**support (3)**

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

284:11,16;285:1
suppose (3)
86:15;111:15;205:3
supposed (6)
16:8;32:24;147:2;
148:11;190:3;286:23
sure (63)
5:17;13:10;15:2;
18:5;44:12,13;47:17;
50:1,3;51:15;52:15;
66:2;68:1;72:4;75:2;
84:18,22;88:18;89:7;
92:15;100:12;114:14,
17,17,18,23;129:10;
141:5;143:8,12;149:2;
152:14;154:23;155:12;
161:11,14;162:5,11;
163:1;170:19;171:21;
172:16;180:21;190:13;
193:11;207:9,19;
208:15;210:1;216:17;
218:16;222:12;235:19;
236:4;240:4;241:22;
242:22;248:17;249:5;
251:7;273:2;298:11;
325:6
surely (1)
150:3
surprised (1)
161:15
survive (3)
49:20;55:12;311:23
suspect (10)
26:2;27:16;47:16;
111:23;112:5;260:8;
274:12;280:10;281:5;
320:21
suspected (7)
49:10,12;53:12;
54:21;55:2;291:1;
292:9
suspicions (1)
321:10
sustain (1)
282:10
SWAT (14)
64:6,10,11,12,18,21,
24;65:5,14;66:19,20;
67:17,18;76:22
swear (1)
162:18
sweatshirt (1)
278:23
switch (1)
200:4
sworn (6)
5:2;9:8;76:12;78:4,8,
12
symptoms (2)
28:14;44:1
system (1)
164:2

T

table (3)
123:14;149:8;150:1
tackling (1)
83:15
tactic (2)
97:4;100:9
tactics (7)
79:18;96:14,20;
99:22;100:4,16;101:1
tags (1)
32:16
talk (25)
6:11;8:3,23;9:5;
24:16,19;97:7;172:24;
193:10;231:19;233:8;
235:1,2;237:10,14;
246:7,8,12;286:22;
311:17;317:10;318:21,
23;319:2;323:1
talked (17)
33:12;35:21;40:7;
51:17;65:10;101:15;
107:11;111:4;135:7;
173:2;235:17;236:6;
274:11;306:7;321:8,
16;322:23
talking (41)
9:4;33:5,15;48:10;
54:4;98:18;110:19;
111:21;116:23;144:14;
149:10;190:20;192:21;
196:18;200:5,8;
207:12;227:9;237:24;
241:2;244:12;252:15;
269:3,5,10;272:7,20;
278:9;286:18;287:1;
293:2,18;295:17;
301:5;302:2;303:20;
306:21;316:11,17;
321:17;327:24
tall (1)
158:10
Tallmadge (1)
64:16
tape (4)
189:24;275:11,17,17
tapes (1)
155:24
tase (5)
127:16;140:22;
308:21;309:13;310:9
tased (5)
125:15;127:3;
252:16,23;253:20
Taser (59)
33:11;57:17;59:20,
21;60:3;70:6,17,24;
71:16;72:14,18;73:1,
24;74:13,14;90:12;
91:12;108:1;123:5;

125:1,4,6;126:10;
128:4;139:5,19;
140:15;142:4,5;158:1;
161:2,18;179:14,17;
184:8;185:14;188:10;
251:14,16,19;253:21;
255:3,10,11,16,19;
256:6,18,21,24;257:13;
259:9,14,16,17,23,24;
260:3;310:6
tasered (10)
124:21;128:1;
217:19,23;234:17;
256:8;282:20;309:8,
15,17
tasering (3)
70:12;92:1;309:19
Tasers (1)
309:19
tasing (6)
125:11;127:6,17;
162:21;164:18;179:22
taught (8)
19:23;20:15;25:8;
27:23;113:4;116:16;
117:21;118:5
teaches (2)
59:20,21
team (2)
64:10,12
tearing (1)
48:9
technique (2)
139:3,17
teeth (1)
247:12
telling (11)
122:20;169:5;
203:14;223:7;247:17;
249:21;266:5;290:21;
297:4;299:19;317:1
temporarily (2)
86:10;88:18
ten (11)
48:24;49:3;71:7,12;
125:23;127:20;147:9;
159:17;206:1,3;284:4
tend (2)
206:2;293:4
TERA (2)
5:1,8
term (1)
22:11
terminal (2)
191:10;201:5
terminals (1)
190:8
terminate (1)
329:9
terminology (2)
18:7;246:20
terms (79)
13:12;14:5;17:19;

27:22;28:11;30:4,9;
33:2;43:4;45:17;51:19;
52:12;56:15;62:2,10;
67:19;69:23;77:24;
82:13,16;83:3;85:15;
90:2;92:16;93:13;
100:24;103:8,23;
106:15,15,22;124:5;
125:7;137:15;152:2;
163:4;166:23;168:3;
171:24;174:23;176:13,
17;177:20,22;178:3;
179:12;182:4;185:21;
186:1,15;198:7,19,23;
199:11;200:23;208:17;
215:13;222:19;232:24;
244:21;245:13,14;
259:4;271:23;276:9;
289:16;292:2;298:20;
303:7,19;304:1;
305:14;306:19;307:13;
308:5;319:6;323:4;
327:16;328:2
tested (5)
207:18;317:9;324:3,
15,18
testified (7)
16:17;79:2;160:20;
171:2;280:13;281:9;
293:19
testify (3)
222:14;225:23;226:1
testimony (12)
9:11;141:11;190:14;
191:13;196:10;205:9;
235:22,23;247:14;
269:13,15,17
testing (1)
324:14
theft (1)
309:2
theirs (2)
34:9;252:22
therefore (1)
332:6
thereupon (1)
329:16
thinking (8)
42:11;176:23;
218:13;238:18;269:21,
22;270:1;319:16
third (3)
256:21;257:1,10
though (15)
29:22;42:2;53:12;
83:21;119:2;148:21;
192:17;227:24;247:22;
284:1;289:7;305:23;
312:10;316:4;325:5
thought (19)
48:13,18;53:3;56:1;
159:16;178:7;180:19;
184:24;211:13,18;

223:22;238:16,21,23;
263:2;285:2;288:9;
311:14;321:8
thoughts (4)
102:6,17;103:12;
179:4
threat (3)
62:6;63:15;215:18
threatening (2)
99:18;113:19
three (36)
53:22;63:20;122:24,
24;153:2,6,15;167:1,
22;169:14;172:20;
173:1,11;177:17;
192:3;231:15;244:16;
245:5,24;246:14,21;
247:5;249:15;250:22;
252:20;259:14;261:21;
271:8;276:7;281:12;
309:3;316:24;323:7;
324:11,19,20
throes (3)
90:3;96:22;119:15
throughout (3)
56:23;171:13;302:8
Throwing (2)
124:13;161:22
thrown (1)
149:8
timeline (1)
325:21
times (47)
27:18;29:17;31:16,
22;35:22;36:16;63:12;
67:16;71:4;122:24,24;
125:23;127:3,3,16,24;
128:11;153:8;168:10,
10;169:14;191:9;
200:1;205:8;206:13;
242:6;244:1;249:15;
250:12;261:14,19;
262:2;263:1,2;270:12,
23;273:3,4,4,6,8,23;
275:23;276:7;277:16;
305:1,17
timing (4)
168:4,15;196:23,24
tiny (3)
214:19,19;292:19
Today (22)
5:22;6:3,23;7:5;8:9,
21;9:11,15;15:22;
39:13;100:24;141:22;
147:24;157:5,10;
174:7;190:14;191:13;
205:9;210:13,21;
239:21
toes (2)
243:9,13
together (13)
52:9;62:24;64:20;
172:20;173:12;270:10;

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

274:5;287:13,16;
288:5;299:10;305:4;
321:4
**told (35)**
27:23;31:15;34:5;
52:23;58:21;92:11;
101:1;118:23;128:11;
158:19;159:11;172:11;
182:21;203:15;206:5;
207:6,6;222:22;
223:24;224:18;246:1;
261:9,19,23;262:16;
264:2,24;265:3;267:2;
268:19;278:1;291:16;
294:12;307:17;308:14
**Tomblin (9)**
285:23;286:5;
288:13;292:15;293:2;
313:12;314:19;316:13;
321:14
**Tomblin's (6)**
286:7;287:2;288:21;
289:18;313:18,23
**took (19)**
11:17;22:3;27:1;
49:24,24;58:15,23;
178:14;185:18;209:19;
243:22,24;244:16;
258:7;270:11;285:19;
317:3;326:1,6
**top (3)**
163:8;214:2;239:3
**topic (2)**
9:2,3
**topics (2)**
19:17,21
**torso (3)**
275:8,22;301:18
**touching (2)**
252:10;253:14
**tough (1)**
23:19
**towards (26)**
56:10;98:24;151:12;
153:20,21;223:19,20;
225:13;237:1;241:7;
243:12;248:3;256:1;
263:23;264:3,4,10,11;
265:16;267:14;268:8,
21;269:6;273:24;
292:19;320:22
**town (1)**
144:2
**Township (38)**
6:17;19:14;26:15;
27:24;28:12;31:3;33:8;
40:12;60:3,8;66:19;
69:4,13;70:23;71:15,
24;72:9,16;76:17,20;
79:23;82:16;85:1;
92:17;99:23;116:17;
117:22;118:5;121:1;
122:10;144:4;146:14;

156:23;199:16;201:2;
304:3;322:12;328:17
**Township's (1)**
80:8
**traffic (13)**
56:10;183:14,16,17,
23,24;184:5,7;185:10,
10,12;186:14;200:11
**trailer (1)**
123:12
**train (2)**
64:20;79:17
**trained (15)**
28:24;29:6;34:24;
64:3,4,8;66:1;69:3;
120:24;135:15;138:21,
24;139:2,6;141:24
**trainer (3)**
58:8,10,16
**training (68)**
18:1,3,10,14,16,19,
23;19:3,4,11,14,19;
20:16,21,23;28:12;
29:10;30:11;31:2,7,8,9,
10,24;32:4,9;33:4,7,10,
11,14,16,16,21;40:8,
14,17;58:19,22;59:14,
16,22;60:1,4;65:16,18,
19,22;66:4,7;69:7;
79:13;92:16,17;99:21,
24;100:1,2;106:16,16,
22;107:6,10;122:9;
123:4;127:2;140:5;
142:5
**transcript (2)**
296:24;332:2
**transition (6)**
229:22;232:13;
233:12,18;236:20;
280:5
**transitioning (1)**
234:2
**transmit (1)**
193:14
**transport (4)**
25:13,20;36:18,20
**transported (2)**
51:18;55:7
**traumatic (1)**
204:23;205:4
**travel (1)**
221:17
**traveling (1)**
76:19
**treat (1)**
117:24
**treated (1)**
117:24
**treatment (3)**
55:16;130:5;207:20
**trial (3)**
7:16;9:16,19
**trick (1)**

161:13
**tried (30)**
36:1;184:4;190:17;
191:15;196:1;203:5;
206:12,16;210:15;
211:13,18;212:9;
213:12,16;229:20,22;
230:3,5,5;231:14,18;
232:6;233:20;234:13;
270:13,21;271:4,20;
278:7;297:21
**tries (1)**
97:7
**triggered (1)**
49:16
**trouble (4)**
75:13,19;313:4;
321:19
**Troyer (2)**
59:20;303:21
**true (139)**
18:1;39:21;46:5;
60:18,21;61:2,13,21;
62:5,14;63:17;68:17,
21;75:7,13;77:5,9;
78:6,14,18,21;80:3,14,
17,24;81:4,7,10,13,16,
21;85:18;86:1,5,10,14;
87:10,17,21;89:4,15,
19;91:5;92:9,21;93:24;
94:1,3,4,8,17,20,22;
95:1,4,7,9,19,22;96:14;
99:11,14;104:9,12,19;
105:3,10,17;106:7,10,
13;108:8;109:12,15,18,
21,24;110:4,8,11,22;
111:24;112:9,12,15,19,
22;113:10,16;114:1,4,
10,14,21;115:2,5,8,12,
23;116:3,11;117:3,7,
14;120:10,18;121:5;
125:19;126:21;128:14,
21;129:16,23;130:5,10,
14,17,18,20;132:12,20;
133:13,17,22;134:15;
135:12;136:2,19;
137:2,9,17;138:11,21;
165:15,18;187:7,9;
255:7;275:22
**trust (5)**
77:4,8,11,14,17
**truth (1)**
184:21
**truthful (1)**
205:17
**truthfully (1)**
7:2
**try (48)**
8:7,8,9,12;20:7;21:5,
5,9,12;22:24;23:2;
24:10,11,16,22;63:21;
67:3;97:8,11,21,24;
98:20;123:10,16;

124:14;126:6;127:14;
139:8,13,22;204:24;
215:3,22;221:20;
226:8;227:14;231:19;
232:5,13;233:12,17;
237:17,18;247:11,12;
299:2;306:13;315:20
**trying (109)**
6:5;16:10;17:17;
23:23;35:23;41:9;
48:10;52:9,10;53:8,13;
67:5;70:1,2,3;98:6,9,
13;103:8;105:2;119:5;
127:12;136:8;144:10,
11;182:2;184:1;
186:13;189:2,3;196:8,
22;200:3;202:11;
204:12;207:4;210:1;
211:5;214:5;216:19;
221:1;223:10;225:8,
19,20;226:4,5,6,14,21,
23;227:2,17;228:20,22,
23;229:1,24;232:18,
19;233:22,23;235:2,3,
11;237:4,6,9;238:2,20;
239:3,7,8,17;240:12,
21;244:10;245:3,9,17;
246:19;247:17,20;
248:2,4,5,7;249:9;
250:23;251:1;254:18;
263:11,19,22;265:14;
268:2;271:23;273:15,
20;274:1;286:15;
289:3;296:1,23;301:9,
10;302:4;307:19;
315:12
**t-t-t-t-t (1)**
251:14
**turn (11)**
87:3;137:6;153:12;
154:20;158:20;182:5;
228:21;237:18;243:4;
265:15;302:4
**turned (5)**
87:6;153:14;241:23;
261:10;311:1
**turning (6)**
81:4;228:22;267:13;
270:17;271:19;273:4
**turns (1)**
153:7
**twice (7)**
262:11,12,14,15,16;
273:19;274:16
**twins (1)**
159:24
**two (32)**
10:19;58:24;66:1;
73:21,22;104:20;
125:23;153:2,5,12;
170:18;220:11,15;
261:23;271:14;272:23;
273:1;274:8,23;275:3;

276:7;287:13,13,15,16;
298:1;316:24;321:4,4;
323:23;324:2;326:23
**type (11)**
14:11;69:23;163:9;
164:3,3;166:20,21;
168:20;206:5;228:7;
305:18
**typed (7)**
166:14;168:5;169:6;
258:20;270:9;304:17;
305:6
**types (4)**
39:5;75:16;100:3;
172:6
**typing (5)**
8:2;169:6;170:23;
206:4;292:12
**typos (3)**
13:17;72:5,5

---

## U

**unclear (1)**
221:4
**under (48)**
9:9;26:3;28:6;35:17;
51:17;68:16;69:20;
70:17;74:9;83:11;84:5;
85:16;89:3;92:3;93:2;
97:23;98:19;101:8,13;
102:20;103:19;104:3,
8;106:6,18,24;107:8;
109:1;111:24;112:2;
116:8;118:2;120:6;
124:19;143:4;165:2,9;
176:5;190:14;197:5;
212:17;217:14;222:2,
14,20;223:3,7;238:16
**undergo (4)**
18:3,9,15;19:14
**underneath (1)**
223:18
**understood (5)**
129:22;176:14;
184:23;315:5,22
**undertook (1)**
76:8
**underwent (2)**
65:16;66:3
**unhandcuffed (3)**
254:20;301:9,14
**uniform (2)**
157:5,7
**University (1)**
101:21
**unknown (1)**
206:12
**unless (10)**
25:18;72:20;133:1;
146:5;161:18;165:18;
195:18;199:2;202:22,
24

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

**unreasonable (2)**
78:6,17
**unresponsive (16)**
221:23;242:8;254:7,
14,15,17,22;258:14;
278:2;280:7,24;
289:17;293:21;295:5;
300:8;316:3
**up (165)**
7:6;8:21;9:3;24:15;
25:4,22;27:9;30:15;
31:23;32:16;35:5;
36:11;50:3;51:24;
59:14;65:9;74:21;
100:12;124:10,15;
140:3,24;143:15;
144:10,11,16;145:13;
149:3;153:20;154:4,8,
10,18;183:11;184:18;
191:20;208:14;212:22;
214:23,23;217:13;
220:2;221:15,20;
223:19,21;224:9,21;
225:3;226:8;227:13,
15,20;228:4,17,18,19;
229:5,9,19,20,21;
230:4,5,6,9;231:9,14,
21,22,22;232:20;233:4,
22;234:3,8,14,23,23;
235:2;237:8,18;239:9;
241:15,18;243:3,18;
244:5;245:3;249:10;
250:5;252:24;255:5,
22;256:13,15;257:18,
21;258:1;260:10;
262:6,18;263:6;
264:10;265:5,23,23;
266:3,9,10,15,19,22;
267:1,3,3,10,11,15;
268:12,17,19;270:9,17,
21;271:4,18,20,23;
272:9,19;273:4,7,9,17;
274:13;276:19;279:1;
283:23;287:9;291:6;
294:8,13,16;295:3;
296:10;297:17,21,23;
298:18;299:15,15,16,
19,22;300:3,4,19,20,
20;301:23;302:3;
306:10;310:7;311:3
**up-and-up (1)**
172:17
**uphold (2)**
60:20;77:4
**upon (5)**
80:2;94:20;110:10;
178:6;332:5
**upper (1)**
242:20
**upset (2)**
24:14;324:7
**use (140)**
47:13;51:5;52:24;

56:15;61:9;68:15,20;
69:5,8,14,19,19;70:6,
24;71:21;72:2,10,18;
73:1,3,14;74:1,8,14;
79:3,6,10,14;80:8;
81:18;82:4,13,16,22;
83:4,9,10,13,14,16,23,
23;84:8,15,16,17;85:1,
4,5,15,16;89:22;91:2,
12,14;92:7,14,14,19,
22,22;93:10,15;94:2;
96:20;97:4;98:2,5,12,
20;99:1,5,7,16;100:16,
19;101:6;104:2;
106:23;107:1,7,16,21;
108:1,5,12,12,17,19,
23;109:5,11;111:9,17;
112:5;121:3;124:6;
125:4;131:4;139:3;
140:19;141:7,12,15,16,
19;142:4,13;146:14;
153:3;157:20;160:6;
161:2,4,24;162:4,11;
163:9;164:24;165:3,5;
170:8,13;188:21;
190:3;199:17;200:1;
211:12,17,21;241:20;
244:13,22;251:9;
255:11;256:17;276:2;
287:14;316:8,15
**used (33)**
42:15;46:23;48:4;
57:17;64:14,16;71:15;
73:5;125:1;140:14;
163:10;166:19;179:17;
180:23;187:23;188:10;
190:24;193:12;200:17;
202:21;246:16;255:17,
20;256:21,24;259:4,18,
24;291:2,11;292:3,11;
309:23
**uses (8)**
71:24;73:24;110:7;
158:1,2;322:12;323:2,
4
**using (23)**
17:8;18:5;49:9,10,
12;56:16;75:6;81:15;
89:17;90:9,12,15;93:5;
97:20;103:23;104:4;
199:16;200:19;226:24;
227:5;268:14;272:9;
276:14
**usually (12)**
25:12;60:5;63:3,23,
24;126:6;132:21,23;
161:16;163:17;164:1,2
**utilize (1)**
45:11

---

## V

**value (3)**

290:8,15,19
**various (1)**
219:12
**variously (1)**
214:20
**vehicle (11)**
123:13;153:1;184:4;
212:24;218:3,4,6,15,
18,21;219:7
**vehicles (1)**
214:21
**verbal (4)**
95:21;106:7;234:14,
19
**verbally (1)**
239:17
**versa (1)**
46:16
**versed (1)**
79:22
**versus (1)**
82:23
**VHS (1)**
155:23
**vice (1)**
46:16
**vicinity (3)**
220:10,17;292:21
**victim (2)**
13:21,21
**video (10)**
8:7;16:1,4;152:17,
21;153:1;227:24;
242:23;264:5;297:1
**violate (1)**
77:9
**violence (1)**
80:1
**visible (2)**
195:9,13
**voice (1)**
57:6
**voiced (1)**
282:4
**volition (1)**
223:9
**voluntarily (1)**
312:2

---

## W

**wailing (1)**
204:11
**wait (16)**
7:19,21;29:2,2,2;
38:10;44:4;46:17,21;
82:20;140:1,24;
227:22,22;232:9;236:8
**waiting (1)**
235:10
**waived (1)**
329:14
**walk (6)**

74:2;286:3;288:24;
327:21,22;328:1
**walked (2)**
172:21;289:14
**walking (2)**
56:10;327:18
**wall (3)**
124:9,15;318:13
**Warning (4)**
134:14,24;135:3,10
**warrant (5)**
143:9,11,22;150:23,
23
**watch (3)**
87:4;169:4;296:24
**watched (1)**
298:24
**watching (3)**
298:10,21,21
**way (88)**
13:12;23:10;27:15;
28:7;29:23;31:22;38:4,
17;39:11;52:10;55:7;
57:23;60:23;61:1;62:3,
10;70:20;83:6;89:8,9;
90:6;92:13;102:7;
103:7;108:24;109:7;
127:13;137:19;139:14,
22;144:23;145:12,21,
22;146:1;151:9;153:7,
9,13,23;154:17;158:15,
22;162:16;168:24;
169:11,12;170:3;
175:19,20;176:1;
177:9;178:1,22;
181:16;182:21;191:8;
192:2;193:14;194:3;
195:6;202:24;214:18;
216:14,21;228:21;
230:19;231:6;235:8;
243:11;252:4;253:5,
10;257:18,19;265:14,
15;268:2,9;269:3,10,
14;276:17;301:13;
305:8;318:17;324:10;
328:13
**ways (6)**
84:21;86:4;163:2;
203:21;212:24;213:1
**weapon (25)**
68:4;69:15;71:16;
81:16;82:14,17,22;
83:4;108:1;121:4,14;
122:11;123:6;124:6;
126:19;128:5;136:1;
137:24;138:10;139:4,
18;158:2;188:22;
251:9;309:23
**weapons (6)**
68:2;125:17;135:21;
141:13,20;142:14
**wear (4)**
32:16;157:7,13;

243:14
**wearing (3)**
156:22;159:5,8
**Webster's (1)**
80:5
**week (10)**
6:7;11:6;16:8,13;
17:14;56:24;72:22,24;
141:4;158:19
**weigh (4)**
158:12,23,23;159:15
**weight (1)**
160:2
**well-being (3)**
69:19,23;137:13
**Wendy (16)**
285:23;286:4,6;
287:2;288:13,21;
289:18;292:15;313:12,
23;314:19;315:2,8,14;
321:14,21
**weren't (17)**
23:20;47:13;51:3;
58:4;109:6;189:20;
213:3,24;214:1,21;
215:18;217:1,8;
227:16;277:17;301:5;
309:18
**what's (19)**
13:5;17:6;43:24;
82:3;103:17;106:4;
107:3;132:24;137:5,
20;141:17;193:16,16;
237:14;283:16;283:7;
288:22;290:5;317:23
**whatsoever (1)**
238:13
**wheelchair (4)**
292:18;314:20,22,24
**whenever (9)**
21:15;115:1;123:20;
124:1;237:16;309:6,7,
12;310:2
**When's (1)**
141:21
**wherever (4)**
203:8;219:24;
225:14;264:12
**whisper (2)**
63:20,22
**white (21)**
92:24;144:24;145:2;
151:10,11;152:5;
173:17;176:2,13,18;
181:12,20;182:2,20,22;
183:1;196:5;207:8;
285:17;293:14;300:13
**whoever's (1)**
269:11
**whole (8)**
34:22;141:24;
172:11;190:1;222:17;
231:23;273:12;301:24

Layne & Associates
(614) 309-1669

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Sergeant Tera Denise Moore
March 20, 2017

**Whose (9)**
15:10;91:10;116:8;
184:24;248:11;249:11;
250:5,6;301:21
**wife (1)**
92:11
**window (1)**
204:11
**wires (2)**
139:8;252:24
**wish (2)**
143:18;196:20
**within (12)**
52:17;53:17;54:15;
59:5;60:3;64:9;213:24;
249:20;250:15;251:1;
299:23;300:7
**without (5)**
42:13;101:19;
178:18;261:17;262:2
**WITNESS (11)**
38:11;69:1;74:21;
131:15;213:15;228:1,
4,9,13;236:9;275:12
**witnesses (5)**
17:7;46:3;293:3,5;
308:7
**wondering (2)**
163:20;212:7
**word (5)**
166:22,22;234:21,
21;302:14
**wording (2)**
271:5,8
**words (5)**
11:22;41:10;228:7;
240:8;270:19
**work (16)**
37:5;62:24;97:14;
126:5,6,9;159:19,21,
24;166:19,22;168:24;
194:10;257:5,10,11
**worked (2)**
169:21;170:15
**Workers' (15)**
313:15;314:8,11,15;
317:17;324:22;325:1,
9,15;326:1,6,15,20;
327:3,5
**Worker's (1)**
327:12
**working (7)**
38:2;63:2;83:17;
142:21;159:22;251:24;
305:4
**works (1)**
328:11
**worried (3)**
72:23;277:19;284:21
**worry (2)**
321:18;324:6
**worse (1)**
169:2

**wound (5)**
207:21;208:6,20;
209:4;318:4
**wounds (9)**
207:11,12,15,24;
208:9,10,17,24;209:1
**wrap (2)**
144:10,16
**wrestling (2)**
297:13,15
**wriggling (1)**
235:9
**write (11)**
14:18;28:21;34:22;
146:15;175:13,14;
270:18;305:2,15,19,21
**writes (1)**
161:6
**writing (2)**
161:7;175:6
**written (5)**
8:9;11:10;15:9;
210:14;291:17
**wrong (3)**
168:14;200:6;253:23
**wrote (7)**
13:1;206:6;252:19;
261:15;263:4;304:16;
305:6

**Y**

**yard (3)**
52:7;214:11,13
**yards (2)**
52:8;214:19
**year (4)**
31:18;33:11;58:24;
66:3
**years (17)**
21:2;29:15;31:21;
32:12,19;41:7;48:23;
49:3;53:18;54:15;59:8;
64:8;65:3;68:8;135:16;
142:7;160:1
**yell (1)**
214:5
**yelled (5)**
203:18,24;204:3,7;
299:14
**yelling (8)**
102:5,11,13;103:12;
240:15;300:14,16,17
**Yep (3)**
6:4;115:6;160:4
**yeses (1)**
8:10
**young (2)**
65:6;88:6

**Z**

**zoom (1)**

220:4

**0**

**04 (1)**
65:2
**05 (1)**
65:2

**1**

**1 (1)**
163:13
**10 (5)**
140:20;141:6,22;
142:3,9
**10:15 (1)**
160:18
**100 (2)**
214:22;215:19
**1019 (28)**
151:22;152:6;155:4;
175:16;178:16;179:20;
181:1,6;182:20;183:4;
184:3;185:17;186:9;
187:1;188:5,14,21;
191:12;196:11;197:8;
203:4;210:23,24;
211:24;218:2;226:13;
285:17;306:8
**12 (13)**
10:7,12;11:13;12:5;
15:20;167:14;168:1;
174:23;204:18;205:9;
247:4;283:16;284:15
**1214 (1)**
141:15
**134 (1)**
160:14
**14 (1)**
111:8
**15 (4)**
127:3,5;159:12,17
**152 (1)**
160:12
**175 (1)**
159:2
**18 (3)**
215:8,9;218:23
**180 (1)**
222:9
**19 (1)**
215:6

**2**

**2 (3)**
163:18;165:4;170:4
**20 (2)**
68:8;71:8
**20/20 (1)**
205:3
**20:30 (1)**

169:16
**20_ (1)**
332:3
**200 (1)**
52:15
**2003 (1)**
65:1
**2004 (1)**
65:1
**2005 (1)**
57:11
**2008 (1)**
59:1
**2009 (1)**
59:1
**2015 (37)**
11:17;16:4,19,22;
58:14;59:16;60:13;
78:14;114:7;115:19;
129:23;135:12;141:9;
142:21;146:22;148:14;
155:18;157:22;158:24;
159:6;172:1;174:1,21;
190:16;191:3;199:8;
211:24;215:10;285:11,
16;286:5;302:22;
303:9;306:1;319:7,15;
321:15
**21 (1)**
145:11
**21:30 (1)**
169:17
**22:00 (1)**
169:18
**22:15 (4)**
160:16,24;170:6,10
**23 (2)**
31:21;285:20
**25 (4)**
145:11;230:18;
231:4,4
**2510 (2)**
151:9,17

**3**

**3 (5)**
160:9;163:4,18;
170:4,8
**30 (3)**
125:23;127:3;128:11
**300 (2)**
52:8;107:22

**4**

**4 (5)**
166:6,8,24;169:15,
16

**5**

**5 (5)**

166:6,8,24;169:15,
17

**6**

**6 (16)**
160:3,5;163:5,14;
165:4;166:6,6,8,24,24;
168:5;169:15,15,17;
170:5,8
**6:36 (1)**
329:17

**8**

**8th (34)**
11:17;58:14;59:15;
60:13;78:14;114:7;
115:18;129:23;141:9;
142:21;146:22;148:14;
155:18;157:22;158:24;
159:6;172:1;174:1,21;
190:16;191:3;199:8;
211:24;215:10;285:10,
16;286:5;302:22;
303:9;306:1;319:6,15;
321:15;325:23

**9**

**9 (11)**
12:16,18;13:6;14:5,
12;15:3,20;304:8,13;
305:10;308:19
**902 (1)**
230:13
**909 (12)**
152:5;173:17;176:1,
13,18;181:16;182:2,19,
21;183:4;207:8;285:17
**911 (2)**
198:20,24
**911s (1)**
198:21
**97 (1)**
66:5
**98 (2)**
64:7;66:5
**9-8-15 (1)**
175:11
**99 (4)**
66:5;183:15,18;
190:3
**9th (3)**
16:4,19,22