# In The Matter Of:

*Haydn Zeis, Administrator of the Estate of Jordn Miller v.*
*Springfield Township, Ohio, et al.*

---

*Officer Joseph Holsopple*
*Vol. 1*
*March 15, 2017*

---

*Layne & Associates*
*6723 Cooperstone Drive*
*Dublin, Ohio  43017*
*(614) 309-1669*
*WhitneyLayne@att.net*



Original File 03-15-2017 Holsopple Final.txt

**Min-U-Script® with Word Index**

1

1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF OHIO
2                       EASTERN DIVISION


3


4    Haydn Zeis, Administrator of
     the Estate of Jordn Miller,
5         Plaintiff,

6         vs.                      Case No. 5:16-CV-02331-JRA

7    Springfield Township, Ohio,
     et al.,
8         Defendants

9
                              - - -
10


11

      PART 1 VIDEO DEPOSITION OF OFFICER JOSEPH HOLSOPPLE
12   the Defendant herein, called by the Plaintiff under the
     applicable Rules of Civil Procedure, taken before me,
13   Whitney Layne, a Notary Public for the State of Ohio, at
     the Springfield Township Police Department, 2465 Canfield
14   Road, Akron, Ohio 44312 on March 15, 2017 at 12:30 p.m.

15

16

17

18

19

20                      LAYNE & ASSOCIATES
                       6723 COOPERSTONE DRIVE
21                      DUBLIN, OHIO  43017

22

23

24

2

1   APPEARANCES

2

3       MICHAEL HILL, ESQUIRE
        EADIE HILL TRIAL LAWYERS
4       3100 East 45th Street
        Suite 218
5       Cleveland, Ohio  44127
                on behalf of the Plaintiff
6

7       GREGORY BECK, ESQUIRE
        MEL LUTE, ESQUIRE
8       BAKER DUBLIKAR BECK WILEY & MATHEWS
        400 South Main Street
9       North Canton, Ohio  44720
                on behalf of the Defendants
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

3

1                                    March 15,2017
                                     Wednesday Session
2                                    12:30 p.m.

3
                                  - - -
4
                              STIPULATIONS
5
          It is stipulated by and among counsel for the
6    respective parties that the deposition of JOSEPH
     HOLSOPPLE, the Defendant herein, called by the Plaintiff
7    under the applicable Rules of Civil Procedure, may be
     taken at this time by the notary Whitney Layne; that said
8    deposition may be reduced to writing in stenotypy by the
     notary, whose notes thereafter may be transcribed out of
9    the presence of the witness; and that the proof of the
     official character and qualification of the notary is
10   waived.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

4

EXAMINATION INDEX

JOSEPH HOLSOPPLE

CROSS BY MR. HILL . . . . . . . . . . . . . .   Page 5

1                     JOSEPH HOLSOPPLE,

2          Being first duly sworn, as hereinafter

3  certified, deposes and says as follows:

4                     CROSS-EXAMINATION

5   BY MR. HILL:

6      Q    My name is Michael Hill, okay?  I'm an

7  attorney.  I represent the estate of Jordn Miller, his

8  family.  And you understand you're here today to have your

9  deposition taken?

10     A    Correct.

11     Q    Could you please state your full name for the

12  record?

13     A    First name is Joseph, William Holsopple,

14  H-O-L-S-O-P-P-L-E.

15     Q    What would you like to go by today?  Do you

16  want to go by Joe?

17     A    Joe.

18     Q    Joe?  Okay.

19          As you know, we just finished the deposition of

20  one of your colleagues, Officer Scherer.

21     A    Uh-huh.

22     Q    Do you guys call him Bubba?  Is that right?

23     A    Yeah, his friends do.

24     Q    His friends on the force call him Bubba?  Do

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

6

1    you call him Bubba?

2        A    Yeah.

3        Q    Do you call him Bubba when you're out in the

4    field, when you're talking to each other?

5        A    Occasionally, yes.  I mean, if we're just

6    talking usually on the radio, we try not to -- we try to

7    use people's names or unit numbers, so --

8        Q    Have you ever had your deposition taken before

9    today?

10       A    No.

11       Q    Well, today is going to be a question-and-

12   answer session.

13            I don't think it's going to be as long as

14   Officer Scherer's, okay?

15            I'm going to ask you questions.  It's your job

16   to provide the answers, okay?

17       A    Uh-huh.

18       Q    Make sure that you answer out loud, okay?

19       A    Uh-huh.

20       Q    Uh-huh, huh-uh, they all sound the same.  So

21   yes, no, explanations, all right?

22       A    Yes.

23       Q    You might hear me throughout this kind of

24   follow up and say, "Is that a yes?  Is that a no?"

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

1          It's not meant to be rude.  It's just to make

2    sure we actually are getting what we want on the record;

3    all right?

4          A     Okay.

5          Q     If for some reason I ask a question and you

6    don't understand it -- and that might happen from time to

7    time -- just say, "Hey, Michael, can you rephrase the

8    question, or can you ask me it in a different way?"  I'm

9    happy to do so, okay?

10         A     Okay.

11         Q     If you want a break for any reason, feel free.

12   You don't have to give me a reason why.  Just say, "Hey,

13   Michael, I would like a break," and we will accommodate

14   you, okay?

15         A     Just to let you know up front, I am sick, so I

16   might have to blow my nose.  I've been sick for the last

17   couple of days.

18         Q     I don't have a problem with you blowing your

19   nose.  The only thing I would want to know is, you know,

20   are you taking any kind of medications or things like that

21   that might make you kind of tired and you have trouble

22   remembering things today?

23         A     Right.  I'm on Dayquil.  That shouldn't be a

24   problem.  I'll be eating some -- some cough drops as we go

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

8

1    through this.

2        Q    As long as you feel comfortable, your memory is

3    going to be good, and you're going to have the endurance

4    to get through today, I'm fine with it, okay?

5        A    I'm perfectly fine.

6        Q    If that becomes a problem at any point, let me

7    know, okay?

8        A    Uh-huh, yes, sir.

9        Q    If you want to revisit a line of questioning

10   throughout the deposition, let me know.  So if we've --

11   you know, we've talked about subject A and now we're on

12   subject R, just say, "Hey, Michael, I remember something,

13   something we talked about earlier.  Can we go back and

14   talk about that?"  I'm happy to do so up until the very

15   last question today, okay?

16       A    Yes, sir.

17       Q    We've got the camera here, so you're being

18   videoed, you're being recorded by audio.

19            Please try to keep your voice up.  It sounds

20   like you're going to be okay doing that, anyway.  But this

21   little microphone up here has to catch everything, okay?

22       A    Yes, sir.

23       Q    You understand this is my only opportunity to

24   ask you questions before trial?

**Officer Joseph Holsopple - Vol. 1 - March 15, 2017**

9

1        A     Yes, sir.

2        Q     So I'm going to be relying on the answers you

3    give today in preparing this case for trial?

4        A     Okay.

5        Q     And you're under oath today, just as you would

6    be in front of a judge or jury, okay?

7        A     I understand.

8        Q     And your testimony today is just as if you were

9    in front of a judge or jury, okay?

10       A     I understand.

11       Q     I don't want to know anything you did in terms

12   of speaking to your attorneys who are here, okay?

13       A     Yes, sir.

14       Q     And both of your attorneys are here today?

15       A     Yes, sir.

16       Q     But other than speaking to your attorneys, what

17   did you do to prepare for your deposition?

18       A     Honestly, the only thing I really -- I went

19   over the report a little bit to refresh the dates and

20   times a little bit, and I read the first page of the

21   invest note that we prepared after the case.  I mean, that

22   was my -- my relevance to the case, in my opinion.

23       Q     You said the first page of the invest note; is

24   that right?

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

1       A    Yes.

2       Q    You've got a bunch of documents here in front

3  of you.

4       A    Yes.

5       Q    If you look at the one that says Exhibit 12, I

6  think, at the top -- okay.

7            Is that what you were talking about, when you

8  said the invest note?

9       A    Yes.

10      Q    So you've reviewed the first page of that?

11      A    Yes, sir.

12      Q    And I think you referenced maybe another

13 document you looked at.  What was that?

14      A    Our incident report.

15      Q    What is the -- I understand -- okay.

16           When you reviewed the incident report, is there

17 anything additional that you think is important on the

18 incident report that is not included in your investigation

19 notes?

20      A    I -- you're going to have to narrow the scope

21 for me on that.  I mean, that's --

22      Q    When is the last time you reviewed it?

23      A    Last week for that.  I read this again today.

24 The incident report was last week when I read it.

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

1      Q    I'm just wondering in terms of the incident

2   report whether there was anything that stood out to you

3   that you thought is not included in the investigation

4   notes that's relative to the use of force or anything?

5      A    Not that I can recall.

6      Q    Did you have a conversation recently with

7   Officer Scherer about the deposition today?

8      A    Yeah, we talked.  I don't remember what day it

9   was.  I mean, it was -- I was just kind of -- since I've

10  never been through this before -- you know, I've testified

11  in court, and I was a detective for a long time and all

12  that, and I've done big cases, but I've never been

13  deposed.  So I was just kind of asking him what should I

14  be expecting in here and how this thing all goes; do you

15  know what I mean?  So --

16     Q    When is the last time you spoke to anyone other

17  than your attorneys about the deposition today?

18     A    I talked to my girlfriend a little bit about

19  it.

20     Q    When was that?

21     A    This morning.

22     Q    Anything in particular about the case or just

23  the fact that you had a deposition?

24     A    Just the fact that I had a deposition.

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

1      Q      When you spoke with Officer Scherer, did you go

2   through the events a little bit to try to, you know, make

3   sure your stories lined up?

4      A      We went over the events, but it wasn't to line

5   anything up.  It was just -- this is what I did, this is

6   what I recall happening.  I don't know, you know -- this

7   is -- basically, the timeline.  There was a couple

8   questions where I didn't remember if he told me to get up

9   at one point when he was going to tase him again or not.

10  I honestly don't remember.  That's all that was said.

11     Q      This is a conversation the two of you had in

12  the parking lot of a church?

13     A      Yes.

14     Q      You guys were in your cruisers?

15     A      Uh-huh.

16     Q      Did you get out of your cruisers to have the

17  conversation?

18     A      I don't think so.

19     Q      Did you have your windows open?

20     A      Yeah.  I mean, I might have got out.  I get out

21  and smoke every once in a while because we're not allowed

22  to smoke in the cruisers, so I might have gotten back in

23  and out.  I don't know.

24     Q      So you wanted to ask -- or Officer Scherer

13

1    asked you a few questions about is your memory of the

2    events similar to his?

3        A    Correct.

4        Q    And you did the same with Officer Scherer?

5        A    Correct.

6        Q    Was there any -- there were some things that

7    Officer Scherer asked you, like did you stand up before

8    Officer Scherer tased him the second time and you couldn't

9    remember if you stood up?

10       A    He didn't ask me that.  I brought that up to

11   him.  I said, "I don't remember if I stood up or if you

12   told me to" -- "said move," or if I just was out of the

13   way of the wires and we weren't worried about it or what.

14   But I don't remember -- and then I said something about my

15   one hand was on -- I wanted to make sure he remembered it

16   the same as me, because if I thought it was on his right

17   hand when it was cuffed, and he -- and I wanted to make

18   sure it wasn't on the left hand.  So I asked him if it was

19   the right hand that I had, and he said that's how he

20   remembered it as well.

21       Q    What else did you guys talk about?  Any other

22   questions you guys had?

23       A    About this case?

24       Q    Yeah.  Yeah, about memory issues.  What else

1    did you ask him?

2         A    I don't remember anything else.

3         Q    So he asked you -- there was a question about

4    whether you stood up when Officer Scherer tased him the

5    second time; right?

6         A    Yes, sir.

7         Q    You don't remember one way or the other?

8         A    No, I don't.

9         Q    And the other question was which hand were you

10   holding?

11        A    Right.

12        Q    Or pushing down, I guess?

13        A    No, just holding.

14        Q    And do you remember?

15        A    To my knowledge, it was the right -- he was

16   laying on his stomach, and it was the one closest to me,

17   so it would have been this one, the right hand.

18        Q    You were holding Jordn's right hand?

19        A    It was in a cuff -- I was basically kind of

20   holding the cuff around his hand, do you know what I mean,

21   while I was kneeling next to him on the ground.

22        Q    Anything else that you guys discussed?

23        A    Not that I remember, sir.

24        Q    This would have been Monday?

**Officer Joseph Holsopple - Vol. 1 - March 15, 2017**

1      A    I think so.

2      Q    Have you talked to -- so that would have been

3  Monday, September -- I'm sorry.  I have September on my

4  mind.  Monday, March 13th, 2017?

5      A    I'm not sure.

6      Q    Have you talked to Sergeant Moore at all about,

7  you know, the events involving Jordn Miller?

8      A    We might have brought it up about the

9  deposition coming up or something, but we haven't gone

10  over -- we haven't talked about -- like this.

11     Q    Not like you did with Officer Scherer?

12     A    Correct.

13     Q    How about since September of 2015, after this

14  happened with Jordn Miller?

15          Have you sat down at any point -- other than

16  when you guys put together your investigative note

17  together, outside of that, have you sat down with Sergeant

18  Moore at all to talk to her about what happened?

19     A    I'm sure I have.

20     Q    Do you have any idea --

21     A    There was one day that they both came over to

22  my house and we went over everything because we were -- we

23  were kind of heartbroken.  We wanted -- it was kind of

24  like a thing that we shared together.  I don't even know

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

16

 1   if we were talking about the case itself, but just being

 2   together, because we were all going through this together.

 3        Q    And they came over to your house?

 4        A    Yes, sir.

 5        Q    How long after Jordn's death do you think this

 6   was?

 7        A    I don't know.  A week, maybe.

 8        Q    And you said you guys went over everything.

 9   What do you mean by that?

10        A    Just the sequence of events and how -- how big

11   this is to an officer.

12             You know, I've never been through anything like

13   this before.  So I mean, I was actually tearing up when I

14   was sitting there with them talking and going over it.

15   It's just something that -- it's a big thing for everybody

16   to go through.

17        Q    And you said you guys -- had you already

18   completed all of your documentation?

19        A    Yes.

20        Q    At that point?  Okay.

21             And did you have any documentation with you --

22        A    No.

23        Q    -- when you were going over the sequence of

24   events?

1      A     No.

2      Q     And when you say the sequence of events, are

3  you walking through, you know, from the time you get --

4  here's dispatch, here's the information you get, you're

5  responding, the uses of force, that type of thing?

6      A     No.  It was more of a can you believe this

7  happened the way this did?  I can't believe this -- you

8  know, this happened to us; do you know what I mean?

9  Especially since, you know, I've never been through

10 something like that.

11          So, I mean, I -- as a detective, I have worked

12 on some things like that, but I've never been through it.

13     Q     As a detective -- and were you a detective at

14 Springfield Township?

15     A     Yes.

16     Q     As a detective at Springfield Township, did you

17 ever investigate any in-custody deaths?

18     A     I was the investigator on the Holcomb case.

19     Q     How long had you been a detective at that

20 point?

21     A     What year was that?

22     Q     I don't know.  Do you remember?

23     A     I would have been a detective probably at least

24 four or five years at that point, I believe.

18

1       Q     What was your role as a detective in that case?

2       A     I went to the scene, secured the scene.

3             I was actually working a side job at IHOP when

4    the call went out, and I drove to the scene.  And then

5    basically processed the whole crime -- the scene of the

6    incident.  I don't want to say crime.

7       Q     When you say you were working a side job at

8    IHOP when the call goes out, is that a call regarding that

9    Mr. Holcomb is dead or the initial call --

10      A     The initial call.

11      Q     And do you remember -- so you left your job at

12   IHOP to respond to the initial call?

13      A     Correct.

14      Q     And I know it's been some time, but what do you

15   just remember generally about what that initial call was?

16      A     It was a man in a field.  He was disrobing -- I

17   believe they said disrobing.  I'm not positive.  It's been

18   a long time.  And Officer Albrecht said she deployed her

19   Taser as he ran, I think, at her or was going to try and

20   get past her.  We don't know if he was running past her or

21   her gun.  And she deployed the Taser, said she had him on

22   the ground.  Officer Moore showed up.  And that's right

23   when I got -- I was already getting ready to leave in case

24   something happened where I could go help.  And then

1    Officer Moore said that he's lost signs of life or

2    something.  They called out for a ambulance, and I'm a

3    detective, so I decided just to go.

4         Q    The side job at IHOP, were you working

5    security?

6         A    Yes.

7         Q    So you're in uniform; right?

8         A    Yes, sir.

9         Q    And by the time you get there, there's already

10   now a report that there's no signs of life?

11        A    Correct.

12        Q    And did you interview witnesses?

13        A    I don't remember.

14        Q    Do you remember if you --

15        A    I don't think I did.  I didn't get deposed on

16   that, so --

17        Q    As a detective, what was your role in terms of

18   what you were doing?

19             You know, are you investigating wrongdoing?

20   Are you just cataloging evidence?  What's your role?

21        A    At that point, I think they kind of turned it

22   into an internal investigation.  So I did process the

23   scene that night and then maybe -- I don't remember if it

24   was a captain or a sergeant or somebody maybe took over

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

1   part of the investigation.  I think I went to the autopsy

2   on that, but that was it.

3        Q    Did you go to the autopsy in this case, Jordn

4   Miller?

5        A    No, sir.

6        Q    Did you ever speak to anyone from the medical

7   examiner's office in this case?

8        A    I think I might have -- no, no, that wasn't the

9   medical examiner.  I asked somebody if they had heard if

10  he passed away.  I think it was Jason Grom from the

11  medical examiner's office.  He was out on the scene for

12  something else, and I said, "Did you hear if Mr. Miller

13  had passed," and he told me yes.  That was the extent of

14  it.

15       Q    Did you ever speak to anyone from the Summit

16  County prosecutor's office about Jordn Miller?

17       A    No.

18       Q    Or this incident?

19       A    Not that I'm aware of.

20       Q    The Holcomb matter, this report of a man

21  disrobing, was he in a field?  Is that what you said?

22       A    In a field or in a shed or near a shed, in a

23  horse -- I know there was a horse barn close by.

24       Q    And that report of disrobing, that's a sign or

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

1    a warning sign of a condition -- some people call it

2    excited delirium?

3         A    Yes.

4         Q    Have you heard that?

5         A    Yes.

6         Q    Do you agree with that?

7         A    Yes, sir.

8         Q    On September 8th, 2015, were you wearing body

9    armor?

10        A    No, sir.

11        Q    How tall are you?

12        A    5'11.

13        Q    How much do you weigh?

14        A    260, 265, depending on what I had for lunch.

15        Q    Do you work out at all, lift weights?

16        A    I really haven't been in the gym in a long

17   time.  I do some pushup and situps at home.

18        Q    How about back in 2014, 2015?  Were you working

19   out?

20        A    Same.

21        Q    Did you have a Taser --

22        A    Yes.

23        Q    -- in September of 2015?

24        A    Uh-huh, yes.

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

22

1       Q     Did you have a gun?

2       A     Yes, sir.

3       Q     At any point when you were interacting with

4    Jordn Miller, did you remove the Taser from its holster?

5       A     No, sir.

6       Q     At any point when you were interacting with

7    Jordn Miller on September 8th, 2015, did you direct or

8    tell Officer Scherer to use the Taser?

9       A     No, sir.

10      Q     At any point on September 8th, 2015, did you

11   punch or kick Jordn Miller?

12      A     I gave him a forehand -- I hit him with my

13   forearm right there to the base of his neck.

14      Q     And we'll talk a little bit more about this

15   later, but it was your right arm?

16      A     Left.

17      Q     Left arm.  Because were you on Jordn's right

18   side?

19      A     Uh-huh.

20      Q     So he's -- and the reason you hit him in the

21   base of his neck is because he's prone?

22      A     Right.

23      Q     So does he lift his head up, or is his head

24   down when you hit him with the forearm?

23

1      A    He had just got done biting Bubba on the leg,

2    and Bubba said, "Ow, he bit me."  And my reaction was to

3    get him down.  He was still arched up.  And I hit him with

4    my forearm, so he -- and then I kind of laid on top of him

5    until he stopped.

6      Q    And Officer Scherer -- or Bubba's testimony was

7    that after Jordn bit him, he stood up, took a step back,

8    stood up -- first, he told you he's biting me?

9      A    Right.

10      Q    Stood up, and then he kicked?

11      A    Uh-huh.

12      Q    Jordn Miller; correct?

13      A    Yes.

14      Q    And he kicked him with his right leg?

15      A    Uh-huh.

16      Q    Onto what would be Jordn's left side because

17    Jordn was prone?

18      A    Yes, sir.

19      Q    And at the time Officer Scherer kicked Jordn

20    Miller, you had already struck Jordn in the back of the

21    head with your forearm and was kind of laying on him?

22      A    It was kind of about the same time.  As I'm

23    going down with him, I see Bubba kick him.  It was at

24    about the same time.

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

1      Q    How long did you stay on top of Jordn with kind

2    of your full body weight like that?

3      A    It wasn't my full body weight, first; and maybe

4    five, ten seconds.

5      Q    Other than that strike with the forearm, did

6    you punch or strike Jordn?

7      A    No.

8      Q    Did you ever kick Jordn?

9      A    No.

10     Q    Based on everything you observed in interacting

11   with Jordn, you didn't feel the need to kick him; fair?

12     A    Not for me to kick him.

13     Q    Right.  And based on everything in your

14   interactions with Jordn, you didn't feel the need to pull

15   your Taser; correct?

16     A    I hadn't -- one of us was going to do it.  If

17   he wouldn't have done it, I would have done it.

18     Q    And why is that?

19     A    Because he was out of control and our hands-on

20   wasn't working.

21     Q    I'm going to ask you some general rules or

22   principles, okay?

23     A    Rules as to what?

24     Q    What you believe as a police officer.

25

1      A     Oh, okay.

2      Q     And I've already gone through these with

3  Officer Scherer.

4      A     Uh-huh.

5      Q     A police officer must never needlessly endanger

6  a member of the public; true?

7      A     A member of the public or a suspect?

8      Q     Are they two different things?

9      A     They could be.

10     Q     Tell me about that.

11     A     Well, if he's a member of the public, and he's

12  not -- say he's the one standing by the car, not the one

13  in the car, then I wouldn't needlessly ever have to -- I

14  would move these people first and then have to deal with

15  Jordn Miller, in that case.

16          So he would be the suspect that I would be

17  dealing with.

18          The public at that point to me is the people

19  that are -- the bystanders.

20     Q     In terms of your interactions with Jordn

21  Miller, did you view him as a member of the public that it

22  was your job to help?

23     A     Yes.

24     Q     And is that because based on the information

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

1   you received this was a man in the throes of a mental

2   health crisis?

3       A    Correct.

4       Q    So let me ask you, then:  A police officer must

5   never needlessly endanger a member of the public; true?

6       A    True.

7       Q    A police officer should strive to uphold the

8   safety of the public; true?

9       A    True.

10      Q    When there's more than one way to handle or

11  restrain a member of the public, a police officer should

12  always select the way that's safest for that member of the

13  public; true?

14           MR. LUTE:  Objection.

15           Go ahead.

16      A    True.

17   BY MR. HILL:

18      Q    This includes deciding what force to use; true?

19      A    True.

20      Q    This includes making decisions about how to

21  restrain a person; true?

22      A    True.

23      Q    This includes planning how to address members

24  of the public in a medical or mental crisis; true?

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

1          MR. LUTE:  Objection.

2          Go ahead.

3     A    True.

4   BY MR. HILL:

5     Q    Police officers must use the least amount of

6   force needed under the circumstances; true?

7     A    True.

8     Q    Unnecessary force is excessive force; true?

9          MR. LUTE:  Objection.

10         Go ahead.

11    A    Can you read that again, please?

12  BY MR. HILL:

13    Q    Yes.  Unnecessary force is excessive force;

14  true?

15         MR. LUTE:  Objection.

16         Go ahead.

17    A    True.

18  BY MR. HILL:

19    Q    Once a person is restrained, police are no

20  longer permitted to use force; true?

21    A    False.

22         MR. LUTE:  Objection.

23         THE WITNESS:  I'm sorry.

24         MR. LUTE:  Go ahead.

28

1       A    False.

2    BY MR. HILL:

3       Q    Why do you say it's false that a police officer

4    is permitted to use force once a person is restrained?

5       A    Because he can still be a threat to himself or

6    another member of society or he could be trying to injure

7    me.

8       Q    In terms of policies here at Springfield

9    Township, are you familiar with the policies on the use of

10   force?

11      A    Yes.  I haven't reviewed them, but --

12      Q    But you need to be versed in them in order to

13   do your job; right?

14      A    Correct.

15      Q    And maybe even if they're not the written

16   policies, at least the informal customs and practices of

17   the department; true?

18      A    True.

19      Q    Is it one of the informal customs or practices

20   of the department that police officers are allowed to use

21   force on a person who has been restrained?

22      A    If necessary.

23      Q    And what types of force are police officers

24   here at Springfield Township allowed to use on a

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

1    restrained person?

2        A    Up to the force that's necessary to get them in

3    control.

4        Q    What kind of force have you seen officers at

5    Springfield Township use within policy or practice on a

6    restrained person?

7            MR. LUTE:  Objection.

8            You may answer.

9        A    Hands-on.

10   BY MR. HILL:

11       Q    What kind of hands-on?

12       A    Use your hands to try to control them.

13       Q    You mean like striking someone with a fist?

14       A    If -- no, I don't think I have ever seen

15   anybody that was in cuffs get punched.  But holding them

16   down physically or doing whatever you need to get them in

17   the cell so they -- they're somewhere where they're not

18   going to hurt -- be a danger to anyone.

19       Q    Can a police officer use a electrical-conducted

20   weapon on a restrained person?

21       A    Yes.

22       Q    And that's something you've seen happen here?

23       A    In this case, yes.

24       Q    In this case, do you mean Jordn Miller's case?

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

1      A     That's the only time I've ever seen it.

2      Q     Is a police officer -- how long have you been a

3    police officer here?

4      A     17 years.  This is my 17th year.

5      Q     And have all 17 years been at Springfield

6    Township?

7      A     Yes, sir.

8      Q     Any other types of force?

9            And let me say something.  You said holding a

10   person down physically; correct?

11     A     Uh-huh, yes, sir.

12     Q     Holding a person down physically against their

13   will, that's considered a use of force; correct?

14     A     Correct.

15     Q     Part of a police officer's job is to help

16   members of the public who are in trouble; true?

17     A     True.

18     Q     And that includes all members of society; true?

19     A     True.

20     Q     It includes -- regardless of race; correct?

21     A     Yes, sir.

22     Q     Regardless of age?

23     A     Yes, sir.

24     Q     Regardless of socioeconomic status?

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

31

1       A     Correct.

2       Q     It includes people who are on drugs?

3       A     True.

4       Q     It includes people who are mentally ill?

5       A     Yes, sir.

6       Q     It includes people who are medically

7    compromised?

8       A     Yes, sir.

9       Q     It includes people who have a diminished mental

10   capacity?

11      A     Yes.

12      Q     The job of a police officer is to serve and

13   protect those people; true?

14      A     Correct.

15      Q     It's your job as a police officer to protect

16   people's constitutional rights; true?

17      A     True.

18      Q     You took an oath to protect the constitutional

19   rights of the people in this community; true?

20      A     Yes.

21      Q     What constitutional rights did you swear to

22   uphold?

23            MR. LUTE:  Objection.

24            Go ahead.

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

 1        A     All of them.

 2     BY MR. HILL:

 3        Q     Give me some.  Name some.

 4              MR. LUTE:  Objection.

 5              Go ahead.

 6        A     The right to search and seizure, to bear arms.

 7   I mean, every right that they have.  I don't know all the

 8   rights off the top of my head.  But to protect them.

 9     BY MR. HILL:

10        Q     You said search and seizure; right?

11        A     Yes, sir.

12        Q     You're talking about the Fourth Amendment?

13        A     Yes.

14        Q     It's your sworn responsibility to protect

15   people's Fourth Amendment rights to be free from

16   unreasonable searches and seizures; right?

17        A     Yes.

18        Q     And a seizure means to -- well, how do you

19   describe a seizure?  Is that to hold somebody against

20   their will?

21        A     Unlawfully.

22        Q     Pardon?

23        A     Unlawfully.

24        Q     I mean, just the definition of a seizure,

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

1   though, to seize someone, what is that?

2        A    Oh, yes.

3             MR. LUTE:  Objection.

4             Go ahead.

5    BY MR. HILL:

6        Q    It's to restrain someone?

7        A    Yes.

8        Q    It's to use force against someone to stop them

9    from doing something?

10       A    Yes.

11       Q    Tasering a person can be considered a seizure;

12   correct?

13            MR. LUTE:  Objection.

14            Go ahead.

15       A    Yes.

16   BY MR. HILL:

17       Q    Can kicking somebody be considered a seizure to

18   stop them from doing something?

19            MR. LUTE:  Objection.

20            Go ahead.

21       A    Yes.

22   BY MR. HILL:

23       Q    It was your sworn obligation on September 8th,

24   2015, to protect Jordn Miller's constitutional rights;

34

1   true?

2      A    How much can I answer that?  I mean, yes, I am,

3   but I also have the duty, if he's a suspect in a crime, to

4   investigate and detain him.

5      Q    When you were interacting with Jordn Miller,

6   were you treating him as a suspect in a crime?

7      A    Yes.

8      Q    And was that your primary view of Jordn Miller

9   when you were interacting with him, is a suspect in a

10   crime?

11      A    Well, initially, when the call came out, it

12   came out as I was going to help him.  But when I got to

13   the scene, that changed.

14      Q    So in your mind, initially your view was this

15   is a guy with a mental health problem that I am going to

16   help; correct?

17      A    Right.

18      Q    And then when you get to the scene, your mind

19   changes from police officer helping a person in a crisis

20   to, what, stopping a criminal?

21      A    No, it didn't change.  I added it.

22      Q    So when you were using force against Jordn

23   Miller, was it because he was a suspect in a crime?

24      A    Both.

35

1      Q     That was one of your motivations?

2      A     Yes.

3      Q     When you say that was one of your motivations,

4  can you tell me what that means?

5            MR. LUTE:  Objection.

6            Go ahead.

7      A     When I walked up to the window of the car where

8  these people said he was trying to steal their car, which

9  was a felony, and I heard him -- some person say he tried

10 to stab me -- I don't know who said it or where it came

11 from, but it was right outside of the window, of course

12 now he becomes a suspect in a felony trying to steal a

13 vehicle and possibly some kind of assault or felonious

14 assault.

15   BY MR. HILL:

16     Q     Anything else?

17     A     As far as what?

18     Q     Criminal activity.

19     A     Oh, I guess criminal damaging, too.  He had

20 broken one of the turn signals things off the car that

21 they said.

22     Q     They said that to you?

23     A     Yes.

24     Q     Did you have a conversation with these people?

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

36

1      A    No.  This is -- well, as I was walking up the

2   driveway, the one guy said he's trying to steal our car,

3   and they were holding him in the car.  So there wasn't a

4   whole lot of time just to stand there and talk with the

5   gentleman.

6      Q    Well, right.  When I spoke to Officer Scherer,

7   the impression I got is the two of you were parked on the

8   street.  You parked first and him right behind you.

9      A    I backed up.  Because I had actually driven

10  down the road past -- the call went out on Milo White, and

11  then I was almost to Milo White, and then they called out

12  that he was now on -- in the car on Abington.

13         When I was coming down Abington, I really

14  wasn't paying attention to the numbers, because I saw

15  Officer Scherer down here talking to somebody, so I

16  assumed that's where the house was.

17         So I drove down the road.  And I had passed the

18  house now.  And he said, no, that was just somebody else

19  trying to say something about this guy tried to steal

20  their car, too.

21         So I backed up the road, and he pulled up in

22  front of me.  So my car was one way.  His was the other

23  way.

24      Q    You guys were facing each other?

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

1      A    Correct.  And that's when we got out and met

2  Mr. -- I don't remember his name.  The gentleman that came

3  down the driveway.

4      Q    Mr. Clark?

5      A    Yes.  Chester, maybe.

6      Q    And the impression I got from Officer Scherer

7  is the two of you -- you and Officer Scherer, or Bubba,

8  walked kind of lockstep, step-by-step up to the vehicle?

9      A    Yes, sir.

10      Q    And there's no time where the two of you are

11  speaking directly to any of these people around the Jeep

12  except for basically telling them to get out of the way?

13      A    Correct.

14      Q    You're not -- because your focus is on Jordn

15  Miller; correct?

16      A    Correct.

17      Q    Your focus at that point is not on getting

18  investigatory information from these individuals; correct?

19      A    Correct.

20      Q    So you're not interviewing them at that point?

21      A    No.  But they had volunteered some information.

22  Those things I heard, they were saying as we were walking

23  up and what Mr. -- Mr. Clark had told us on the way up the

24  driveway, or at the end of the driveway.

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

38

1     Q    You've never testified at all; right?

2     A    I've testified in court.

3     Q    Have you ever testified as an expert on the use

4  of force or police procedures?

5     A    No, sir.

6     Q    Have you ever been retained as a consultant on

7  the use of force or police procedures?

8     A    No, sir.

9     Q    Do you consider yourself to be an expert on the

10  use of force or police procedures?

11     A    No, sir.

12     Q    Have you ever been retained by anyone to

13  consult on the training of police officers?

14     A    No.

15     Q    Do you train police officers here at

16  Springfield Township?

17     A    I am -- I was the certified ASP instructor.

18     Q    What is that?

19     A    The metal baton, collapsible baton.  But I've

20  never trained anybody.

21     Q    Do you carry a collapsible baton?

22     A    I have one in my police bag.  But we have since

23  -- since I'm not -- I'm certified to do it, or there's a

24  thing in our policy that everybody has to recertify every

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

1   year in our police policy.  And I was trying to get the

2   chief to change a little bit of that wording, because ASP

3   only requires once-in-a-lifetime training, and ours says

4   you have to certify in it every year.  So I would have to

5   put everybody through the whole class every year rather

6   than just show that they still know how to -- you know,

7   like a -- I don't know.  They can show me that they still

8   know all the strikes and how to use the ASP.  They've now

9   removed the ASP from the training curriculum, so --

10          Q    Other than ASP, do you train anyone else here

11  at Springfield Township on any kind of uses of force?

12          A    No.

13          Q    How about on any kind of police practices?

14          A    I'm a field training officer.

15          Q    When did you become a field training officer?

16          A    Oh, actually before I went into the detective

17  bureau.  So I was in there for -- 14 years ago, but I've

18  only trained one person before I became a detective, and

19  I've only trained one since I came out.

20          Q    So two people in your lifetime?

21          A    Yes.

22          Q    Who are those people?

23          A    Matt Heinball and Szuhay, no 207.  I don't know

24  his first name.

**Officer Joseph Holsopple - Vol. 1 - March 15, 2017**

1      Q    The person that was before, 14 years ago, which

2  one was that?

3      A    Heinball.

4      Q    Is he on the force?

5      A    Nope.

6      Q    And Szuhay?

7      A    Uh-huh.

8      Q    How do you spell that; do you know?

9      A    S-Z-U-H-A-Y.

10     Q    When did you train Szuhay?

11     A    Just recently, a couple months ago.

12     Q    So after the incident?

13     A    In one phase of the training.

14     Q    What phase?

15     A    Phase II.

16     Q    Which is what?

17     A    Where they actually -- the first phase -- well,

18  they go through 40 hours of reading stuff in the office.

19  And the first phase is I think 80 hours of them just

20  sitting there observing.  They're not allowed to do

21  anything.  I mean, they might be able to do some paperwork

22  and start learning that.  But Phase II is when they

23  actually -- I start evaluating them on -- they can start

24  handling small calls, and I can tell what they're -- you

1  know, and I can interject if they get stumped on something

2  or don't know what to do.

3      Q    So the first person you trained in 14 years or

4  so was after the events involving Jordn Miller?

5      A    Yes, sir.

6      Q    And you said Phase II, which are kind of

7  small -- smaller calls?

8      A    I mean, he goes on every call with me, but I

9  can handle the bigger ones if I need to, and I can let him

10  kind of work into --

11      Q    I understand.

12      A    -- handling bigger calls.

13      Q    And as a field training officer, do you train

14  him in any way on uses of force?

15      A    No.

16      Q    You're not training anyone here in the

17  department on uses of force?

18      A    No, sir.

19      Q    Force means any violence, compulsion, or

20  constraint physically exerted by any means upon or against

21  a person or thing; true?

22      A    True.

23      Q    Do you agree with that?

24          That includes an officer's decision to

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

42

1    physically grab and move a person; true?

2         A    Yes.

3         Q    It includes an officer's decision to restrain

4    somebody; true?

5         A    Yes.

6         Q    It includes an officer's decision to hold a

7    person on the ground; true?

8         A    Yes, sir.

9         Q    It includes the decision to use a conducted

10   electrical weapon; true?

11        A    Yes.

12        Q    It includes the decision to strike somebody

13   with a forearm; true?

14        A    Correct.

15        Q    It includes the decision to kick somebody;

16   true?

17        A    Yes.

18        Q    It includes the decision to place your foot on

19   someone's back to keep them in a prone position; true?

20        A    Yes.

21        Q    When deciding whether to use force on a member

22   of the public, police officers should consider the mental

23   capacity of the subject at the time; true?

24             MR. LUTE:  Objection.

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

43

1          Go ahead.

2     A     True.

3   BY MR. HILL:

4     Q     And why is that?

5     A     Read the question again, please.

6     Q     When deciding whether to use force on a member

7   of the public, police officers should consider the mental

8   capacity of the subject at the time?

9          MR. LUTE:  Objection.

10         Go ahead.

11    A     For the safety of themselves, the police

12  officers, for the safety of the subject or suspect, and

13  the other public.

14  BY MR. HILL:

15    Q     You say the safety of the subject.  What do you

16  mean?

17    A     Well, if I'm only viewing him as a

18  mentally-handicapped person, having some kind of

19  experience, then he's not a suspect, but I still have to

20  help him.

21    Q     You mean -- and you're describing possibly

22  somebody who is having a mental health crisis?

23    A     Correct.

24    Q     And that would be a type of situation where

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

1   you're being called because a person is having a mental

2   health crisis?

3        A    Correct.

4        Q    You would want to consider that person's

5   potentially diminished mental capacity?

6        A    Correct.

7        Q    And part of that is because that person, one,

8   may not be able to control his behavior?

9        A    Correct.

10       Q    That person might not be able to follow police

11  commands?

12       A    Correct.

13       Q    That person might not understand what they're

14  doing at the time?

15            MR. LUTE:  Objection.

16            Go ahead if you know.

17       A    Say that again.

18   BY MR. HILL:

19       Q    That person with the diminished mental capacity

20  or in the throes of a mental health crisis might not be

21  able to understand what they're doing at the time?

22            MR. LUTE:  Objection.

23            Go ahead if you know.

24       A    I wouldn't know.  I've never -- I mean, I would

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

45

1    assume that, but I don't know that for a fact.

2         Q    I mean, that's one of the reasons, though, that

3    you're considering, a person's mental state, when you're

4    approaching them?

5         A    Correct.

6         Q    And what force to use?

7         A    Correct.

8         Q    Some individuals with a diminished mental

9    capacity may act in ways that are inconsistent with the

10   police officer's commands; true?

11        A    Correct.

12        Q    Some individuals with diminished mental

13   capacity may not even understand that they're interacting

14   with the police; true?

15        A    True.

16        Q    Some individuals with diminished mental

17   capacities might not understand the roles of police

18   officers in a given situation?

19        A    True.

20        Q    And some examples of people who police officers

21   might encounter with a diminished mental capacity could be

22   people with mental retardation?

23        A    Yes, sir.

24        Q    It could be elderly people with Alzheimer's or

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

46

1    dementia?

2         A    Yes, sir.

3         Q    It could be even very young children?

4         A    Yes.

5         Q    It could be somebody who is in shock or in a

6    coma from diabetes?

7         A    Yes.

8         Q    That's something that officers are trained on;

9    right?

10        A    Yes.

11        Q    It could be somebody who has had an intentional

12   or unintentional overdose of medication?

13        A    Yes.

14        Q    It could be somebody on drugs?

15        A    Yes.

16        Q    It could be somebody who is having a mental

17   health crisis?

18        A    Yes.

19        Q    What are some of the ways that police officers

20   can address a person with a diminished mental capacity to

21   try to avoid force?

22             MR. LUTE:  Objection.

23             Go ahead.

24        A    That's a pretty broad question to answer, and

47

1    every situation is different.

2     BY MR. HILL:

3         Q    Give me some examples of how you've been

4    trained to approach people with a diminished mental

5    capacity.

6         A    Talk -- talk slow, talk clear, talk low, don't

7    be aggressive towards them until you have to be

8    aggressive.  Of course, you can try to talk to them.  If

9    they don't comply, then you have to take measures to get

10   them the help that they need.

11        Q    I think you said talk slow; correct?

12        A    (Nods head.)

13        Q    Yes?

14        A    Yes, sir.  Sorry.

15        Q    When you say talk slow, that's kind of

16   measuring your delivery of voice, being very calm?

17        A    Correct.

18        Q    Not doing anything to act erratically or

19   agitate this person?

20        A    To start, yes.

21        Q    Same thing.  You said talk low.  So lower your

22   voice, be calm?

23        A    Yes.

24        Q    Is that for the same reason, you don't want to

48

1    do anything to needlessly agitate this person?

2        A    Correct.

3        Q    You said don't get aggressive unless you have

4    to; is that right?

5        A    Correct.

6        Q    So when you're approaching somebody who might

7    have a diminished mental capacity, you want to use

8    restraint in going hands-on; fair?

9            MR. LUTE:  Objection.

10            Go ahead.

11       A    Depends on the situation.

12    BY MR. HILL:

13       Q    You don't want to use -- you don't want to get

14    aggressive unless that person presents a threat of injury

15    or danger to you or a member of the public; true?

16            MR. LUTE:  Objection.

17            Go ahead.

18       A    Depends on the situation.

19    BY MR. HILL:

20       Q    What do you mean?

21       A    If he's in a mental capacity where he's also a

22    suspect, then it might be go right to it.  It depends on

23    what is going on in the whole totality of the

24    circumstances that we're considering or what's going on.

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

49

1    You can't just lump it into every time you walk up to a

2    suspect and -- there's no set way that this is going to go

3    in police work.

4         Q    When you're approaching somebody with a

5    diminished mental capacity who has been implicated in some

6    kind of property damage or other crime, do you still use

7    this approach of talk slow, talk low, don't get

8    aggressive, or do you move directly to force?

9         A    We usually try to talk to them, if we can.

10        Q    Are you allowed to use force against a person

11   with a diminished mental capacity if they don't pose a

12   threat of injury to you or a member of the public?

13             MR. LUTE:  Objection.

14             Go ahead.

15        A    To get them the help they need, yes.

16    BY MR. HILL:

17        Q    You're allowed to use force on a person with a

18   diminished mental capacity if they don't -- if they're not

19   posing any threat to you or a member of the public in

20   order to get them help?  Is that --

21        A    What kind of -- I guess you've got to break it

22   down into every mental problem that they could have.

23             Did they tell somebody they're going to kill

24   themselves and they don't want to go to the hospital?

50

1    Then yes, I have to pink slip them and get them into the

2    hospital.

3        Q    What force are you allowed to use?

4        A    As much as it takes to get them secure.

5        Q    Is it your understanding as a police officer

6    that you're able to use as much force as is needed to

7    secure somebody if they're in a diminished mental

8    capacity?

9        A    We follow our, you know -- first you go hands-

10   on.  If that doesn't work, you can go up the ladder until

11   he's secured.

12           I mean, there's a limit to the situation; do

13   you know what I mean?  Every situation is going to be

14   different.

15           If I walk into a house and a guy just told --

16   he's having a medical or a mental breakdown and he's

17   holding a gun and he's pointing it at me or someone else,

18   then of course I'm not going to go walk over there and

19   talk low to him.

20       Q    Suppose it's a situation where a person is

21   contained in a closed space and is not using any weapons

22   or holding anything in his hands?  What amount of force

23   are you allowed to use?

24           MR. LUTE:  Objection.

51

1           Go ahead.

2       A     What has he said?  What has he told you?  Why

3   was I called there?

4    BY MR. HILL:

5       Q     Based on that example, you can't --

6       A     I would evaluate him.

7       Q     How would you evaluate him?

8       A     In that situation, if I didn't know anything

9   more, then I would start talking to him.

10      Q     When would you escalate that to hands-on force?

11            MR. LUTE:  Objection.

12      A     Depends on --

13            MR. LUTE:  You may answer.

14            THE WITNESS:  Sorry.

15      A     Depends on what his needs are at that point.

16  If he doesn't know what he's doing and I have to pink slip

17  him, I use enough force to get him to the ambulance or get

18  him to the hospital myself.

19   BY MR. HILL:

20      Q     Would you ever Taser that person in order to

21  get them to the hospital?

22            MR. LUTE:  Objection.

23            Go ahead.

24      A     Depends.  In that situation?  What more did I

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

52

1    learn from the time I got there?

2            I mean, this is an infinite possibility.

3            Did I learn something more about his situation

4    when I got there, or is it the same?  Is he going to walk

5    out of the building with me or not?

6     BY MR. HILL:

7        Q    You said it's an infinite possibility.

8            Do you have any kind of a policy or manual here

9    at Springfield Township to guide you in that

10   decision-making?

11       A    Not that I'm aware of.

12       Q    Do you have any -- have you received any

13   specific training here at Springfield Township in terms of

14   how to approach and handle a person in a mental health

15   crisis?

16           MR. LUTE:  Objection.

17           Go ahead.

18       A    Just experience.

19    BY MR. HILL:

20       Q    I mean, but training?

21       A    No, sir.

22       Q    Is any training offered at Springfield Township

23   on how to interact or approach a person in the throes of a

24   mental health crisis?

53

1              MR. LUTE:  Objection.

2              Go ahead.

3       A    Not that I'm aware of.

4    BY MR. HILL:

5       Q    How about with respect to a person who may be

6    under the influence of drugs?

7              Is there any training that is offered by

8    Springfield Township in terms of how to interact with a

9    person who may be acting strangely or bizarrely because

10   they're on drugs?

11             MR. LUTE:  Objection.

12             Go ahead.

13      A    No, sir, not that I'm aware of.

14   BY MR. HILL:

15      Q    And have you received any training on how to

16   interact with members of the public who may be under the

17   influence of drugs?

18      A    Not that I recall.

19      Q    Have you received any training by Springfield

20   Township as to how to interact with a member of the public

21   who may be in the throes of a medical crisis?

22      A    I have a CIT officer.

23      Q    Crisis intervention?

24      A    Uh-huh.

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

54

1      Q     When did you undergo crisis intervention

2   training?

3      A     Oh, I don't remember.  It was probably before I

4   went into the detective bureau.  So 14 years ago.

5      Q     That was here at Springfield Township?

6      A     No.  It was through Akron.

7      Q     Where were you employed?  You were employed at

8   Springfield Township?

9      A     Yes.

10     Q     What did you have to do to get CIT training?

11     A     It was a long time ago.  I remember we -- we

12  had classroom stuff.  I don't remember how many days it

13  was; maybe three or four days.  We had classroom stuff,

14  and then they took us to mentally-handicapped places where

15  people aren't well.  And we had to sit and interact with

16  them.  And then they did some scenarios at the end so you

17  could see the different ways people could come.  And they

18  teach you safety about it, how to deal with them safely

19  and how to -- how to safely deal with -- not get hurt; do

20  you know what I mean?  And the things that you could see.

21  Some things you could see.

22     Q     And this course that you took at Akron was

23  based on a crisis intervention model?

24     A     I would assume, yes.

55

1      Q    When you took that course at Akron, was there a

2  crisis intervention team here in place at Springfield

3  Township?

4      A    There were other people that were CIT trained.

5  I don't know if we have -- we don't have an actual crisis

6  intervention team.

7      Q    Who else on the force is trained in crisis

8  intervention?

9      A    The only one I know for sure is Sergeant East.

10     Q    So when you went through this crisis

11  intervention training at Akron, do you remember anything

12  that they taught you in terms of how mental illness or

13  mental health crises can change people's behavior?

14     A    I can't tell you the bullets in the notebook or

15  anything, but basically the same thing we were discussing

16  earlier, that you lower your voice, you know, you don't --

17  talk slow to them.  You don't -- if they need space, you

18  give them space.  And you try to figure out what the

19  problem is, what the best method is to get them help.

20     Q    What did they teach you in terms of how you try

21  to find out what's going on with them?

22     A    Well, you first would interact with them

23  verbally to see if they can answer your questions.  Of

24  course, if there's another person on scene, you can ask --

56

1    one person can be asking them questions to figure out

2    what's going on while the other person is trying to calm

3    the person down.  Of course, you have got to call the EMS,

4    have them evaluated, and figure out what needs to be done.

5          Q     Who else can you access or try to get a hold of

6    to try to find out what's going on with the person?

7          A     What do you mean?

8          Q     You said one of the first things to do when

9    you're responding to a mental health crisis is try to find

10   out what's going on with this person; correct?

11         A     Correct.

12         Q     And the first thing is to try to interact with

13   them; correct?

14         A     Correct.

15         Q     But they may not be able to interact with you

16   because of whatever is going on with them; yes?

17         A     Yes.

18         Q     The next thing you can do or the next thing

19   that you should do is contact EMS, correct, because they

20   need medical help?

21               MR. LUTE:  Objection.

22               Go ahead.

23         A     Depends on the situation.  I don't know that --

24   I have to evaluate to find out if they're even in a crisis

57

1    before I can do that.

2     BY MR. HILL:

3          Q     I'm talking about a situation where you're

4    responding to a mental health crisis.

5          A     Okay.

6          Q     You just said find out what's going on with

7    this guy and contact EMS.  That was your testimony;

8    correct?

9          A     Contact EMS if I determine that he is in a

10   mental state.

11         Q     Yes, correct.  That's what you should do?

12         A     Correct.

13         Q     And in terms of finding out what's going on

14   with that person, can you speak to family members about

15   this person if they've -- if it's the family who has

16   reported the mental health crisis?

17              MR. LUTE:  Objection.

18              Go ahead.

19         A     Depends on the situation.

20    BY MR. HILL:

21         Q     Is it something that officers should try to do

22   if it's available?

23         A     Something they could do if they have time.

24         Q     When you say, "if they have time," you mean

58

1    it's not a situation where a person is charging at them or

2    has a gun or a knife or something like that?

3         A    Correct.

4              MR. LUTE:   Objection.

5              Go ahead.

6     BY MR. HILL:

7         Q    You're talking about a situation where the

8    person is maybe acting strangely or bizarre but he's

9    contained and you've got time to deliberate and make

10   decisions?

11             MR. LUTE:   Objection.

12             Go ahead.

13        A    Yes.   But that could change at any moment.

14    BY MR. HILL:

15        Q    I understand.   But assuming --

16        A    Yes.

17        Q    Assuming you have that kind of time, accessing

18   information from family members is a reasonable option;

19   true?

20        A    True.

21        Q    And asking -- can you also ask -- let's say

22   it's a situation where there's been a dispatch for a

23   mental health crisis and the family members are not

24   around.   Can you ask dispatch to get -- you know, can

59

 1   somebody get additional information or send somebody to

 2   the house --

 3         A    I'm sorry.  Can you ask me that again?

 4         Q    Sure.  It was not a very clear question.

 5              Suppose you've got a situation where you've got

 6   a person who is acting very strangely and not in a

 7   position to respond meaningfully to police, okay?

 8              So the police officers aren't going to get

 9   information from that individual; correct?

10         A    Correct.

11         Q    But the family members have reported that this

12   person is having a mental health crisis.

13              You as a police officer, can you contact

14   dispatch and say, "Can you send somebody to the family

15   member's house?"  Can you get additional information?

16              MR. LUTE:  Objection.

17              Go ahead.

18         A    Yeah, we can.

19    BY MR. HILL:

20         Q    Is that something that you think is reasonable

21   to do?

22         A    If there's time.  If nothing has changed.

23         Q    I understand.  When you're approaching someone

24   -- let me take a step back.

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

60

1           When you have somebody that you believe has

2   committed a crime or is suspected in committing a crime,

3   do you change your approach based on whether or not the

4   person you're dealing with is likely in a mental health

5   crisis?

6        A    If they're in the commission of a felony?

7        Q    Any crime.

8        A    My job is to detain them.

9        Q    Okay.

10        A    And figure out what's going on.

11        Q    And I think you've answered my question, is

12   that your approach to a suspected criminal act and

13   detaining or restraining that person is going to be the

14   same regardless of whether they're in the throes of a

15   mental health crisis or not; is that a fair

16   characterization of your testimony?

17        A    Correct.

18        Q    A police officer must never use force as a

19   punitive measure; correct?

20        A    Absolutely.

21        Q    A police officer must never punish a person for

22   being in a diminished mental state; true?

23        A    Correct.

24        Q    When addressing a member of the public with a

61

1  diminished mental capacity, a police officer must never

2  make that person less safe; true?

3          MR. LUTE:  Objection.

4          You may answer if you understand the question.

5      A    Read it again, please.

6   BY MR. HILL:

7      Q    When addressing a member of the public with a

8  diminished mental capacity, a police officer must never

9  make the person less safe; true?

10          MR. LUTE:  Objection.

11          Go ahead.

12      A    I don't know.  I -- it could be either way.

13  That depends on the situation as well.

14   BY MR. HILL:

15      Q    Let me rephrase it.  When addressing a member

16  of the public with a diminished mental capacity, a police

17  officer must do everything in his power to make that

18  person safe; true?

19          MR. LUTE:  Objection.

20      A    Unless it -- unless he's making someone unsafe;

21  right?

22          My job is to protect all people.  If he's

23  trying to hurt somebody else, I have to protect that

24  person.

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

62

1    BY MR. HILL:

2         Q    That's the only way you could make that person

3    in a diminished mental capacity less safe; true?

4              MR. LUTE:   Objection.

5              Go ahead.

6         A    That I can think of, yes.

7    BY MR. HILL:

8         Q    Law enforcement officers like yourself are

9    called upon to help mentally ill people; true?

10        A    Yes.

11        Q    It happens in lots of different scenarios;

12   right?

13        A    Yes.

14        Q    As a police officer, you might be asked to

15   address a person in the throes of a mental health crisis

16   who is locked in a bedroom at his home; right?

17        A    Yes.

18        Q    You might be asked to respond to a grocery

19   store where a person is in the throes of a mental health

20   crisis; correct?

21        A    Yes, sir.

22        Q    It can -- police officers may be asked to help

23   people who are acting confused; correct?

24        A    Yes, sir.

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

63

 1        Q     May be acting strangely; correct?

 2        A     Yes.

 3        Q     May be agitated; correct?

 4        A     Yes.

 5        Q     They may not understand the role of police;

 6   correct?

 7        A     I'm sorry.  What?

 8        Q     They may not understand the role of police;

 9   correct?

10        A     Yes.

11              MR. HILL:  Let me give you a second to have

12   your cough drop.

13              THE WITNESS:  Get that thing to kick in.

14              MR. HILL:  Do you have enough water?

15              THE WITNESS:  I'm good.  Thank you.

16    BY MR. HILL:

17        Q     When engaging members of the public who are

18   suffering a mental health crisis, police officers should

19   attempt to engage in de-escalation tactics; true?

20              MR. LUTE:  Objection.

21              You may answer.

22        A     Read it again, please.

23    BY MR. HILL:

24        Q     When engaging members of the public who are

64

1    suffering a mental health crisis, police officers should

2    attempt to engage in de-escalation tactics; true?

3            MR. LUTE:  Objection.

4            You may answer.

5       A    If they can, yes.

6    BY MR. HILL:

7       Q    They should attempt to; right?

8       A    Yes.

9       Q    And I think you may have already given me some,

10   but what are some examples of de-escalation tactics that

11   police can employ?

12      A    Just talking to the person, trying to get them

13   to calm down.  Of course, if we determine they're in a

14   mental state, call the EMS, try to get them in the

15   ambulance where they can calm down so nobody gets hurt,

16   get the EMS guys in there without anybody getting hurt.

17      Q    Have you undergone -- I understand the crisis

18   intervention training.  I guess I should have asked you

19   earlier.

20           Do you still have any documents from that

21   crisis intervention training?

22      A    Not personally.  I mean, they might have a

23   certificate for me from years ago.

24      Q    When is the last time you looked at any of the

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

65

1    PowerPoints or other documents from that training?

2         A    Not since that training.

3         Q    Have they offered that training since 14 years

4    ago, as far as you know, here at Springfield Township?

5              MR. LUTE:  Objection.

6         A    Not that I know of.  Not to me personally.

7     BY MR. HILL:

8         Q    I know Officer East went -- or Sergeant East, I

9    guess.

10             Did he go with you to the same event?

11        A    I believe he was in my class.

12        Q    And he's the only person that you know of who

13   has undergone that training?

14        A    Correct.

15        Q    How long was that training at Akron?

16        A    It was three or four or five days.  I think it

17   was four.

18        Q    Do you know who put on that training?  Like was

19   it OPOTA?  Was it University of Akron?

20        A    I don't honestly remember.  It was sergeant

21   Yogi from -- Yoho or Yogi from Akron.

22        Q    From Akron PD?

23        A    Yes, sir.

24        Q    Have you been trained to look for any signs or

66

1    symptoms of mental illness in dealing with the public,

2    when you're asked to respond to an event, not just walking

3    down the street?

4        A    Trained by who?

5        Q    I don't know.  Anyone.  That's my question.

6        A    Not that -- I mean, they might touch on that a

7    little bit in some of the trainings that you get, but not

8    a specific one on that, no.

9        Q    I mean, you were never trained on -- at least

10   by here at Springfield Township, these are the signs and

11   symptoms of somebody in the throes of a mental health

12   crisis?  You never got that kind of training here?

13       A    Well, we go over the excited delirium.  Is that

14   included in that?

15       Q    I don't know.  Do you think it's included?

16            MR. LUTE:  Objection.

17            You may answer.

18       A    Yes.

19    BY MR. HILL:

20       Q    And when you say yes, that the signs and

21   symptoms of excited delirium overlap with the signs and

22   symptoms of mental illness, what do you mean?

23            MR. LUTE:  Objection.  I don't think he said

24   that.  But go ahead.

67

1    BY MR. HILL:

2        Q    Let me ask you.  What did you mean when you

3    said that the excited -- the training on the signs and

4    symptoms of excited delirium are also somehow training on

5    the signs and symptoms of mental illness?

6            MR. LUTE:  Objection.

7            Go ahead if you understand the question.

8        A    What I meant was excited delirium is part of

9    one of the things that they teach you when -- that you

10   could be involved in an interaction with a person in an

11   event.

12           I don't think it's at all the same as being in

13   a mental breakdown kind of thing.  It's a different --

14   it's a horse by a different name; do you know what I mean?

15       Q    What do you mean by that?

16       A    Like -- I mean, there's excited delirium, and

17   then there's mental health.

18       Q    The training that you received on excited

19   delirium, was that given to you by Officer Scherer?

20       A    Yes, that was the last one.

21       Q    That would have been like -- were you getting

22   that annually when Officer Scherer was running the

23   program?

24       A    Yes.

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

68

1      Q     And is it your recollection that that training
2  ended like 2008, 2009, something along those lines?
3      A     I don't recall.
4      Q     Did it seem to end about the time that Chief
5  Smith, John Smith, became the chief here?
6      A     I would -- I think so, yes.
7      Q     I want to -- I'm going to read you some signs,
8  some warning signs -- strike that.
9            I spoke with Officer Scherer at length about
10  the warning signs, some of the warning signs of excited
11  delirium.  Okay?
12      A     Yes, sir.
13      Q     And I'm going to read some that he agreed to as
14  being warning signs of excited delirium.  I want to ask if
15  you agree to that, okay?
16      A     Yes.
17      Q     He agreed mentally ill symptoms or symptoms of
18  a mental illness are warning signs of excited delirium.
19  Do you agree?
20            MR. LUTE:  Objection.
21            Go ahead.
22      A     I guess they could be.
23   BY MR. HILL:
24      Q     Delusions or hallucinations are signs -- strike

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

69

1   that.

2           Delusions or hallucinations are signs that

3   police officers should consider, potentially, due to

4   excited delirium; true?

5           MR. LUTE:  Objection.

6           You may answer if you know.

7       A   Yes.

8    BY MR. HILL:

9       Q   Disorientation is a sign or symptom that police

10  officers should consider might be due to excited delirium;

11  true?

12      A   Yes, sir.

13      Q   Disorganized or incoherent speech are symptoms

14  or characteristics that police officers should consider

15  might be warning signs of excited delirium?

16      A   Yes.

17      Q   Shouting or yelling for no apparent reason are

18  activities that police officers should consider warning

19  signs of excited delirium; true?

20      A   Yes, sir.

21      Q   Agitation for no apparent reason is a warning

22  sign of excited delirium; true?

23          MR. LUTE:  Objection.

24          Go ahead.

70

1        A    Yes, sir.

2     BY MR. HILL:

3        Q    A report that a person has disrobed or is

4     disrobing for no apparent reason is a warning sign of

5     excited delirium; true?

6        A    Yes.

7        Q    A person's flailing their body parts and moving

8     for no apparent reason is a warning sign of excited

9     delirium; true?

10        A    Yes.

11             MR. LUTE:  Objection.

12             Go ahead.

13             THE WITNESS:  Oh.

14        A    Yes.

15     BY MR. HILL:

16        Q    Any other warning signs of excited delirium

17     that you're aware of that I didn't touch on?

18        A    It sounds like you got all the ones that are

19     pertinent.

20        Q    The big ones; right?

21        A    The ones I can think of.

22        Q    When deciding whether to use force on a member

23     of the public, police officers should consider the medical

24     condition of that person; correct?

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

71

 1          MR. LUTE:  Objection.

 2          Go ahead.

 3     A    Correct.

 4   BY MR. HILL:

 5     Q    For example, there are some people who are

 6  considered especially vulnerable to injuries from uses of

 7  force; correct?  Like pregnant women, for example?

 8     A    Yes.

 9     Q    Frail people?

10     A    Correct.

11     Q    People with a low body mass index?

12     A    Okay.

13     Q    Do you agree with that?

14     A    Yes.

15     Q    People who may be under the influence of drugs

16  may be at high risk of injury or death from uses of force;

17  correct?

18          MR. LUTE:  Objection.

19          Go ahead.

20     A    Yes.

21   BY MR. HILL:

22     Q    People who are in the throes of a mental health

23  crisis may be especially vulnerable to serious injury or

24   death from uses of force; correct?

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

72

1              MR. LUTE:  Objection.

2              Go ahead.

3       A    Yes.

4    BY MR. HILL:

5       Q    People suffering from warning signs of excited

6    delirium may be especially vulnerable to serious injury or

7    death from uses of force; true?

8              MR. LUTE:  Objection.

9              Go ahead.

10      A    Yes.

11   BY MR. HILL:

12      Q    When deciding whether to use force on members

13   of the public, police officers should consider whether the

14   person's acting a way that's consistent with that person

15   being under the influence of drugs; true?

16      A    I'm sorry.  Could you read it again?

17      Q    Yeah.  When deciding whether to use force on

18   members of the public, police officers should try to

19   consider whether the person might be under the influence

20   of drugs; true?

21              MR. LUTE:  Objection.

22              Go ahead.

23      A    Yes.

24   BY MR. HILL:

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

1      Q    And that's because of what we just talked

2   about, people under the influence of drugs can be

3   especially vulnerable to injury or death from uses of

4   force?

5      A    Yes.

6      Q    After a person has ingested drugs, the body may

7   be under extreme physiological stress already; correct?

8           MR. LUTE:  Objection.

9           Go ahead.

10     A    Yes.

11   BY MR. HILL:

12     Q    The heart may be racing, they may be sweating?

13     A    Yes.

14     Q    Additional stress resulting from the use of

15   force can be dangerous to that person because it adds

16   additional stress to them; correct?

17           MR. LUTE:  Objection.

18           Go ahead.

19     A    Yes.

20   BY MR. HILL:

21     Q    Individuals under the influence of drugs may

22   not be able to follow verbal commands of police officers;

23   true?

24           MR. LUTE:  Objection.

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

74

1            Go ahead.

2       A    Yes.

3   BY MR. HILL:

4       Q    Individuals under the influence of drugs may

5   have diminished mental capacities; true?  At least

6   temporarily?

7       A    Yes.

8       Q    When deciding whether to use force, police

9   officers should consider the size of the subject; true?

10           MR. LUTE:  Objection.

11           You may answer if you know.

12      A    Read it again, please.

13   BY MR. HILL:

14      Q    And this goes along the lines of what we just

15   talked about, a person being frail or low body mass index.

16           But when deciding whether to use force, police

17   officers should consider the size of the subject; true?

18           MR. LUTE:  Objection.

19           You may answer.

20      A    The low body mass index, I don't know what that

21   -- that necessarily has to do with -- you said it makes

22   them frail.  I don't know why that -- what all the time --

23   if they have a low body mass index, that that would make

24   them frail, so I can't speak to that one.  But yes, a

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

1    frail person, yes.

2     BY MR. HILL:

3         Q    Have you ever received -- you underwent

4    training, I'm sure, for electrical-conducted weapons?

5         A    Yes.

6         Q    During that training, did you ever hear that

7    you should try to avoid using a Taser on a person with a

8    low body mass index?

9         A    Yes.

10        Q    And is the reason for that that the electrical

11   current is greater within that person?

12        A    I don't know what the reason was.

13        Q    It's just that it's more dangerous for that

14   type of person?

15             MR. LUTE:  Objection.

16             You may answer if you know.

17        A    I believe.

18    BY MR. HILL:

19        Q    When considering whether to use force on a

20   person, a reasonable police officer should consider

21   whether the person is demonstrating signs that their body

22   is already under increased physiological stress; true?

23             MR. LUTE:  Objection.

24             You may answer.

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

1        A    Yes.

2     BY MR. HILL:

3        Q    Conditions that can increase the body's

4    physiological stress response include drug use?

5        A    Yes.

6        Q    Includes mental illness?

7        A    Yes.

8        Q    Includes medical conditions like something

9    called excited delirium?

10       A    Yes.

11       Q    A police officer should take all steps possible

12   to decrease the stress response of such a person, not

13   increase the amount of stress; true?

14            MR. LUTE:  Objection.

15            You may answer.

16       A    Read it again, please.

17    BY MR. HILL:

18       Q    Yeah.  A police officer should attempt to take

19   all steps possible to decrease the stress response of such

20   a person, not increase the stress?

21            MR. LUTE:  Objection.

22            You may answer.

23       A    Again, that can depend on the situation.

24    BY MR. HILL:

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

1       Q     So a police officer should take all steps

2   possible to decrease the stress of such a person; true?

3            MR. LUTE:  Objection.

4            You may answer.

5       A     Yes.

6    BY MR. HILL:

7       Q     When a police officer uses force, that can

8   increase the physiological stress response of such a

9   person; true?

10      A     Yes.

11      Q     Increased stress, physiological stress, can

12  cause serious injury or even death; true?

13      A     Yes.

14      Q     Cause the heart to fail?

15           MR. LUTE:  Objection.

16           You may answer if you know.

17      A     I would assume.  It can stop the breathing.

18   BY MR. HILL:

19      Q     Stop breathing, right.

20           Positional restraint asphyxia occurs when a

21  person's body position interferes with breathing; true?

22      A     Yes.

23      Q     This can be caused by a restriction on the

24  chest's ability to expand; true?

**Officer Joseph Holsopple - Vol. 1 - March 15, 2017**

1      A     I assume, yes.

2      Q     It can be caused when the position of the head

3  obstructs the airway; true?

4      A     Yes.

5      Q     It can be caused when anything is in the face

6  or near the face or mouth obstructs the airway; true?

7           MR. LUTE:  Objection.

8           You may answer.

9      A     Yes.

10   BY MR. HILL:

11      Q     Positional restraint asphyxia is a life-

12  threatening medical condition; true?

13      A     Say that again.

14      Q     Positional restraint asphyxia is a life-

15  threatening medical condition; true?

16      A     Yes.

17      Q     Positional restraint asphyxia can cause death;

18  true?

19      A     Yes.

20      Q     When a person asphyxiates, they've stopped

21  breathing; true?

22      A     Yes.

23      Q     When restraining an individual, officers must

24  be sure to -- must make sure that nothing is obstructing

1    the person's breathing or airway; true?

2              MR. LUTE:  Objection.

3              Go ahead.

4         A    Say it again.

5      BY MR. HILL:

6         Q    When restraining an individual, police officers

7    must be sure that nothing is obstructing the person's

8    breathing; true?

9              MR. LUTE:  Objection.

10             Go ahead.

11        A    Yes.

12     BY MR. HILL:

13        Q    And police officers have to be aware of the

14   risk of positional restraint asphyxia whenever they're

15   restraining a member of the public or a suspect; true?

16        A    Yes.

17        Q    Risk factors for positional restraint asphyxia

18   include having the person in a face-down prone position;

19   true?

20        A    Yes.

21        Q    When a person is engaged in a struggle, it

22   increases the risk of positional restraint asphyxia; true?

23        A    Yes.

24        Q    And that's because more oxygen is being devoted

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

1   to muscle tissue?

2           MR. LUTE:  Objection.

3       A   Correct.  If I know -- I would believe so, yes.

4    BY MR. HILL:

5       Q   Anything that causes the heart to race

6   increases the risk of positional restraint asphyxia; true?

7           MR. LUTE:  Objection.

8           If you know.

9       A   I don't know.

10   BY MR. HILL:

11      Q   People who are suffering from an acute

12  psychotic breakdown are at a higher risk of positional

13  restraint asphyxia; true?

14          MR. LUTE:  Objection.

15          If you know.

16      A   I don't know.

17   BY MR. HILL:

18      Q   You've never been taught that here at

19  Springfield Township?

20      A   They might have went over it, but I might not

21  remember every detail from every class.

22      Q   As you sit here as a police officer, is it your

23  understanding that people in the throes of a mental health

24  crisis are at a greater risk of positional restraint

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

81

1   asphyxia than members of the general public?

2           MR. LUTE:  Objection.

3           You may answer if you know.

4       A   Yes.

5    BY MR. HILL:

6       Q   People who are under the influence of drugs are

7    at a higher risk of positional restraint asphyxia; true?

8       A   Yes.

9       Q   People who are experiencing a condition

10   sometimes described or called excited delirium are at a

11   higher risk for positional restraint asphyxia; true?

12      A   Yes.

13      Q   Persons in a medical crisis are at a higher

14   risk of positional restraint asphyxia; true?

15          MR. LUTE:  Objection.

16          You may answer if you know.

17      A   Yes.

18   BY MR. HILL:

19      Q   Anything that causes the muscles in the body to

20   contract rapidly or hard increases the risk of positional

21   restraint asphyxia; true?

22          MR. LUTE:  Objection.

23          You may answer if you know.

24      A   I don't know.

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

82

1    BY MR. HILL:

2        Q    The application of a conducted electrical

3    weapon increases the risk of positional restraint

4    asphyxia; true?

5              MR. LUTE:  Objection.

6              You may answer.

7        A    True.

8    BY MR. HILL:

9        Q    People exposed to repeated applications of a

10   electrical-conducted weapon are at an even higher risk for

11   positional restraint asphyxia; true?

12             MR. LUTE:  Objection.

13             You may answer.

14       A    Yes.

15   BY MR. HILL:

16       Q    Those are all risk factors that compound upon

17   one another; true?

18             MR. LUTE:  Objection.

19             You may answer if you know that.

20       A    I don't know if one heightens the other one,

21   no, but they are things to look for.

22   BY MR. HILL:

23       Q    Excited delirium is a life-threatening medical

24   condition?

1       A    Yes.

2       Q    People in a state of excited delirium need

3   emergency medical attention as soon as possible; true?

4            MR. LUTE:  Objection.

5            You may answer.

6       A    Yes.

7   BY MR. HILL:

8       Q    Police officers are often the first responders

9   or first contact for people who may be in a state of

10  something called excited delirium; true?

11      A    Yes.

12      Q    Being in a state of excited delirium is not a

13  crime; true?

14      A    Not just that, no.

15      Q    From a police officer's perspective, the reason

16  that a person is in a state of excited delirium is

17  irrelevant; true?

18      A    True.

19      Q    Because from a police officer's perspective, a

20  person in the state of excited delirium needs medical care

21  and attention as soon as possible regardless of what

22  caused the condition; true?

23      A    True.

24      Q    And a police officer's job is to try to get

84

1 that person the medical care and attention they need;

2 true?

3   MR. LUTE:  Objection.

4   You may answer.

5  A True.

6 BY MR. HILL:

7  Q When a person is in a state of excited

8 delirium, it's important that police officers and other

9 first responders do everything they can to reduce the

10 amount of stress on the body; true?

11   MR. LUTE:  Objection.

12   You may answer.

13  A True.

14 BY MR. HILL:

15  Q Earlier we talked about the warning signs of

16 excited delirium.

17  A Yes.

18  Q You were aware of all those warning signs I

19 discussed as of September 8th, 2015; true?

20  A Yes, sir.

21  Q The class -- can you describe to us the class

22 on excited delirium that Officer Scherer taught?

23  A What do you mean, describe it?

24  Q How long it was, what type of setting it was.

85

1    Was it a classroom setting?  Was it situational-based,

2    scenario-based training?  Was it a week?  Was it two

3    hours?

4         A    I think the Taser training was six or seven

5    hours at that time, and I think the excited delirium was

6    probably an hour of that.  And I don't remember

7    specifically -- I know we did Taser scenarios and we shot

8    the Tasers, but I don't remember if there was a mental

9    scenario in there somewhere that we had to deal with.  I

10   don't remember.  It's been a little while.

11        Q    Do you remember anything specific that was

12   taught about excited delirium during those sessions?

13        A    Just with what -- you went over the signs to

14   look for, of course, and that you've got to get the

15   brain -- the slice of the brain cut out.  I remember that.

16        Q    And you request that from the pathologist?

17        A    Yeah.

18        Q    That's what they told you?

19        A    Uh-huh.

20        Q    And then you can have that sent somewhere to be

21   tested?

22        A    Yes.

23        Q    And you have it sent somewhere down in Miami to

24   have it tested?

1      A    Yes.  And then your basics -- of course, signs

2    you look for and things you can reduce, turn your lights

3    off, don't run hot air, no flashing lights in their face

4    and stuff like that.

5      Q    Still that talk low, talk slow?

6      A    Right.

7      Q    Do you remember any materials being given out

8    during those -- that training session?

9      A    No.  I think there was a directive that got put

10   out or something.  I don't --

11     Q    You have got a packet of documents there.

12     A    This?

13     Q    Yeah.  There is one in there that's going to be

14   Exhibit 3.

15     A    Okay.

16          MR. LUTE:  There it is.

17          MR. HILL:  Yeah, you got it.

18    BY MR. HILL:

19     Q    Exhibit 3, I've already gone through this with

20   Officer Scherer, but is this the directive you were

21   describing?

22     A    Yes.

23     Q    This is the excited delirium policy at

24   Springfield Township?

87

1      A    Yes, it's a directive that turns into policy

2   once it's put out.

3      Q    So was this ever put into policy?

4      A    I would believe so, yes.

5      Q    Do you -- looking at Exhibit 3, do you take

6   this to be a policy?

7           MR. LUTE:  Objection.

8           Go ahead.

9      A    Yes.

10   BY MR. HILL:

11     Q    And my understanding, after speaking with

12  Officer Scherer, is that this -- what is here a directive,

13  Exhibit 3, was the policy at Springfield Township

14  concerning how to respond to excited delirium as of

15  September 8th, 2015.  Do you agree with that?

16     A    Yes.

17     Q    You've been trained in how to use an

18  electrical-conducted weapon; correct?

19     A    Yes.

20     Q    An electrical-conducted weapon works by

21  overriding the neurological system and causing

22  uncontrollable muscle contractions; true?

23     A    Yes.

24     Q    It causes the entire body to seize; correct?

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

88

1      A     It could, yes.

2      Q     Sometimes you'll see people just freeze up and

3   kind of fall over even?

4      A     Yes.

5      Q     The use of a Taser is highly stressful to the

6   body; true?

7      A     Yes.

8      Q     Did you -- when you went through your training,

9   were you tasered?

10     A     Yes.

11     Q     Did you go through any medical testing or

12   anything beforehand?

13     A     No.

14     Q     When was that?

15     A     As soon as we got the Tasers.  I don't remember

16   what year it was.

17     Q     Like 15 years ago?

18     A     Yes.

19     Q     Electrical-conducted weapons have been cited by

20   medical authorities as a cause or a contributing factor in

21   some deaths; true?

22             MR. LUTE:  Objection.

23             You may answer if you know.

24     A     I don't know.  I mean, I would say yes, but I

89

1    don't know for sure.

2     BY MR. HILL:

3        Q    Through your training, you've learned that

4    electrical-conducted weapons have been a cause or a

5    contributing factor in causing people's deaths; true?

6              MR. LUTE:  Objection.

7              You may answer if you know.

8        A    Yes.

9     BY MR. HILL:

10       Q    And there are -- just as there are certain

11   populations or groups of people that may be at high risk

12   for positional restraint asphyxia, there's persons at high

13   risk for injury from a Taser as well; true?

14       A    Yes.

15       Q    And those persons -- some of those people at

16   high risk from serious injury or death from an electrical-

17   conducted weapon include people in a medical crisis; true?

18             MR. LUTE:  Objection.

19             Go ahead.

20       A    Yes.

21    BY MR. HILL:

22       Q    It includes people in a mental health crisis;

23   true?

24       A    Yes.

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

90

1      Q    Persons under the influence of drugs are at a

2  high risk for serious injuries or even death from

3  electrical-conducted weapons; true?

4            MR. LUTE:  Objection.

5            You may answer.

6      A    Yes.

7   BY MR. HILL:

8      Q    Persons with excited delirium are at a high

9  risk of serious injury or death from electrical-conducted

10  weapons; true?

11            MR. LUTE:  Objection.  You may answer.

12      A    Yes.

13   BY MR. HILL:

14      Q    And this is all based on training you've

15  received as a police officer in using a Taser; true?

16            MR. LUTE:  Objection.

17      A    Yes, sir.

18            MR. LUTE:  How are you doing, Joe?  Do you want

19  to take a break?

20            THE WITNESS:  Yeah.

21            MR. LUTE:  Yeah, let's take a break.

22            MR. HILL:  Fine with me.

23            (Recess taken.)

24   BY MR. HILL:

1      Q     We're back on the record after a short break

2   here.

3             I want you to take a look at those documents

4   you have in front of you.  Should be this pile.

5      A     Right here?

6      Q     Right there.  There should be a sticker where

7   it says Exhibit 10.

8      A     Yes, sir.

9      Q     And I went through this document kind of at

10  length with Officer Scherer, so I don't think I'll have to

11  go through much detail with you.

12            But I just want to confirm:  Is that the only

13  use of force -- let me take a step back.

14            There's a Taser use of force policy; right?

15  Are you aware?

16     A     Yes.

17     Q     Outside of the Taser use of force policy,

18  what's in front of you, Exhibit 10, is that the only other

19  use of force policy that you're aware of here at

20  Springfield Township?

21     A     I believe so, yes.

22     Q     Who do you think here at the force is the

23  person most knowledgeable about the use of force policy?

24            I mean, who would you ask if you wanted

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

92

1    guidance on what -- certain things on that mean?

2         A    Probably Bubba.  Is it okay if I call him Bubba

3    in here?

4         Q    It's fine with me.  If you call Officer Scherer

5    Bubba, call him Bubba, okay?

6              On September 8th, 2015, that's the day

7    involving Jordn Miller; correct?

8         A    Yes.

9         Q    Were you working the 8 A to 8 P shift?

10        A    Yes.

11        Q    Was that your normal shift?

12        A    Yes.

13        Q    And it was -- the officers on the shift

14   included you, Sergeant Moore, and Officer Scherer; is that

15   correct?

16        A    And Officer Linburg.

17        Q    Linburg.  That's right.

18             And then as well as the chief and maybe some

19   detectives?

20        A    Right.

21        Q    One of the things I requested in this case is

22   all of the times a person had completed a use of force

23   report for a Taser, okay?

24        A    Yes.

93

1       Q    I received documents for Sergeant Moore?

2       A    Okay.

3       Q    And Officer Scherer.  I did not receive any use

4  of force reports regarding your use of a Taser

5  historically.  Are there any?

6       A    No.

7       Q    You've never used one?

8       A    I have --

9       Q    On a person?

10      A    I just had an accidental discharge when I was

11  apprehending somebody last week.  That's the only time

12  I've deployed a Taser in the field.

13      Q    What was the accidental discharge?  What

14  happened?

15      A    A girl with a felony warrant was hiding in an

16  abandoned trailer.  We went in.  She was hiding behind a

17  mattress.  It was just me and Detective Lombardi.  And she

18  came around.  And I went to grab her arm like this, and my

19  finger slid right into the thing, and it just shot into

20  the floor.

21      Q    It didn't hit her, though?

22      A    No.  It didn't hit anybody.

23      Q    Fortunately, it didn't go through your foot or

24  anything?

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

94

1      A    Right.  That would be my luck.

2      Q    In terms of -- we talked a little bit earlier

3  about contacting EMS.

4          It's my understanding that there's two ways to

5  do that here at Springfield Township.  One would be just

6  to radio -- use the radio on your lapel, just tell

7  dispatch we need an ambulance?

8      A    Yes.

9      Q    And that takes a few seconds?

10     A    Yes.

11     Q    And the other way would be to change the

12  station on your radio and contact the fire department

13  directly?

14     A    Correct.

15     Q    That may take a few more seconds?

16     A    Correct.

17     Q    You had Exhibit 12 there, the investigative

18  note.  If you will pull that back out.

19     A    This, sir?

20     Q    Yeah.

21          That's a -- Exhibit 12 is a statement of the

22  events on June 8th, 2015, that was prepared by you,

23  Sergeant Moore, and Officer Scherer; correct?

24     A    Yes.

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

95

1      Q      And the three of you wrote that together?

2      A      Yes.

3      Q      And Sergeant Moore was typing the document?

4      A      Yes.

5      Q      And you and Officer Scherer were giving

6  Sergeant Moore information?

7      A      Correct.

8      Q      And she was also adding her own information?

9      A      When she got to her part, yes.

10      Q      And the three of you made sure that it was

11  accurate before you signed off on that document; correct?

12      A      Yes.

13      Q      You made sure to include major details that you

14  knew at the time; true?

15      A      Yes.

16      Q      Since you wrote that statement -- well, let me

17  take a step back.

18           At the time, you only signed that document

19  because you believed what was in it; correct?

20      A      I didn't sign the document, first of all.  But

21  yes.

22      Q      You didn't sign it?

23      A      That's not my signature.

24      Q      Who signed it?

96

1      A    That's sergeant Moore wrote whose names it was.

2      Q    Did you give her permission to write your name

3   there?

4      A    Yes.

5      Q    Before you gave her permission to write your

6   name, you made sure it was accurate; right?

7      A    Yes.

8      Q    My understanding from talking with Officer

9   Scherer, as you were creating it, there was a little bit

10  of, naturally, editing that went on back and forth?

11     A    Yes.

12     Q    And so what I'm saying by that is you had the

13  opportunity at the time to make additions, changes, make

14  sure it said what you wanted it to say; right?

15     A    At the time.

16     Q    And since that statement was created, you have

17  never gone back and made any additions; correct?

18     A    No.

19     Q    You never told anybody it was inaccurate or

20  anything like that; correct?

21     A    No.

22     Q    Have you ever noticed -- you've read it before;

23  right?

24     A    I mean, you always go back -- there's little

97

1    details that you recall differently or -- not differently,

2    but that didn't get put in here, and in any report that

3    you do.

4            It's just like reading a book.  If you read it

5    again, you pick up something you didn't put in there

6    before.

7        Q    Sure.  Little details; right?

8        A    Yes.

9        Q    There's nothing -- there's no major details

10   missing from Exhibit 12 that you've ever noticed; correct?

11       A    Correct.

12       Q    And that includes you having read it several

13   times?

14       A    Yeah.

15       Q    And you've adopted the entirety of that

16   statement as your summary of the events that happened;

17   correct?

18       A    Yes.

19       Q    Did you -- if you look at Exhibit 1 --

20       A    I'm sure it will be the last one in here.

21       Q    It's the advanced Taser report.

22            MR. LUTE:  There you go.  It's right on top.

23    BY MR. HILL:

24       Q    This advanced Taser report, if you flip it over

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

98

1   to the back page, it's signed by Officer Scherer and

2   Sergeant Moore; right?

3      A   Yes.

4      Q   Did you have any -- anything to do with the

5   creation of this document?

6      A   No.

7      Q   You didn't tell them what to add or give them

8   any kind of information to put into the document?

9      A   No.

10      Q   I just want to make sure.

11      A   Huh-uh.

12      Q   So I want to go through in a little bit of

13   detail Exhibit 12, which is your statement.

14      A   Okay.

15      Q   And if you'll look at the -- I believe it's the

16   very beginning.  It says, "On this date officers received

17   the call reference of Jordn Miller, who was 24 years old,

18   was having a mental episode and that he was running around

19   naked"?

20      A   Yes.

21      Q   So that's the information that you had when you

22   responded; correct?

23      A   That was the initial part.

24      Q   Sure.  We're going to take it step by step.

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

1      A     Okay.

2      Q     But where are you when you get this information

3  that there's this guy having -- who is having a mental

4  episode -- when you say "mental episode," that refers to a

5  mental health crisis; right?

6      A     Yes.

7      Q     This is somebody who is going to need to get

8  some kind of psychiatric treatment; correct?

9      A     Yes.

10      Q     So when you get this information that this

11  24-year-old man is having a mental health crisis and that

12  he's running around naked, where are you at?

13      A     I don't remember where I came from.  It took me

14  four minutes to get there, so not far.

15      Q     How do you know it took four minutes to get

16  there?  Have you reviewed some timelines?

17      A     Yeah, just on my log.

18      Q     When did you look at that?

19      A     The same day that I looked at that report.  I

20  forgot to tell you that one.

21      Q     Okay.

22      A     I consider that looking at the report, I guess.

23      Q     Other than the -- and when you say report,

24  you're talking about Exhibit 12?

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

100

1      A     No.  This is -- well, I read this and the

2   actual report.

3      Q     I gotcha.

4      A     And I looked at my log -- or times.

5      Q     Anything else that has kind of come to mind

6   that you might have reviewed?

7      A     No.

8      Q     And when you hear that this is a guy running

9   around naked, you know, a guy in a mental health crisis

10  who is running around naked, could be naked because of the

11  mental health episode; correct?

12     A     Correct.

13     Q     He could be running around naked and having

14  this mental health episode because he's in a state of

15  excited delirium; correct?

16     A     At that moment, yes.

17     Q     Because those are both signs, potentially, of

18  excited delirium; right?

19     A     Right.

20     Q     And you knew that at the time; correct?

21     A     Yes.

22     Q     And this could also be a guy running naked

23  having a mental health crisis because of drug

24  interactions; correct?

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

101

1      A    Yes.

2      Q    Those are all three possibilities that went

3  through your mind?

4      A    Yes.

5      Q    So at this time, you have a report of a person

6  with a diminished mental capacity; correct?

7      A    Yes.

8      Q    You have a report -- the report you receive is

9  not of a criminal nature; correct?

10     A    Correct.

11     Q    There was no report that he was dangerous at

12  this point; correct?

13     A    Nothing stuck out that they said it was

14  dangerous.

15     Q    Did you in your mind think that --

16     A    I always think that it could be dangerous.

17     Q    Could be dangerous for you; could be dangerous

18  for him?

19     A    For everyone.

20     Q    There was no report that he attempted to harm

21  anyone; correct?

22     A    Correct.

23     Q    There was no report that he had any weapons;

24  true?

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

102

1      A    Correct.

2      Q    This report that you received, this is all
3  coming over the radio through dispatch?

4      A    Yes.

5      Q    So you, Officer Scherer, Officer Linburg,
6  Sergeant Moore, all would have received this information
7  at the same time?

8      A    Yes.  I think Perry Linburg was on a call or
9  something, so he might not have been paying that much
10  attention.

11      Q    And since you reviewed the logs pretty
12  recently, the 911 call came in from Jordn's mom about
13  3:12 p.m. on Tuesday, September 8th, 2015; right?

14      A    I would have to see my log to see what time --
15  I don't know what time it came into dispatch.  I think I
16  got dispatched at 15:14.

17      Q    Yeah, two minutes later; right?

18      A    Well, yeah.  But I don't know if the time in my
19  cruiser is off or -- it could be a minute or two off of
20  variance in there, too.  But yes.

21      Q    But it's about three p.m. on a Tuesday; right?

22      A    Right.

23      Q    You're not wrapped up at that time in any other
24  kind of a call at the moment; right?

103

1     A     Not that I recall.

2     Q     You're not -- you know, there's not like an

3     armed robbery --

4     A     No.

5     Q     -- you have to attend to?  Okay.

6           So once you get this information, you're able

7     to start driving towards that location?

8     A     Yes.

9     Q     And the location you have is -- if I understand

10    it, it's kind of like this Milo White Drive, Abington,

11    Delaware Avenue; right?

12    A     Well, they said 909 Milo White, I think.

13    Q     Is that where you went?

14    A     That's where I started towards.

15    Q     And the weather is nice outside; right?

16    A     Yes.

17    Q     There's a report here -- it's the old weather

18    report.  Exhibit 13; is that what that says at the top?

19    A     Yeah.

20    Q     If you look on the left, it says it was about

21    high 80s, 90 degrees that day.

22          Is that consistent with your memory?

23    A     Yes.

24    Q     So this report you have of this guy running

1   around naked, having a mental health crisis, this

2   demonstrates to you you've got a guy who is likely to be

3   highly confused; right?

4       A    Could be.

5       Q    He might be scared of police; right?

6       A    Could be.

7       Q    He might not understand who police are; right?

8       A    Could be -- could.

9       Q    Right.  It's one of the considerations; right?

10      A    Uh-huh.

11      Q    This is the scene you're responding to?

12      A    Yes.

13      Q    He might not understand the circumstances

14  around him?

15      A    Correct.

16      Q    He might not understand the role that police

17  play when they approach him?

18      A    Correct.

19      Q    He might not be capable of responding to verbal

20  commands of police; correct?

21      A    Yes.

22      Q    These are all things that were going through

23  your mind as you get this information as a police officer;

24  right?

105

1        A     Yes.

2        Q     And you understood when you got this initial

3    report that, you know, this is a 24-year-old young man who

4    needs help.

5        A     Yes.

6        Q     And that's why you're being called as a police

7    officer.

8        A     Right.

9        Q     When you got this information -- and let me --

10   so I don't have to belabor kind of the point all along,

11   the first time anyone calls EMS is after Jordn becomes

12   unresponsive; true?

13       A     No.

14       Q     Officer Scherer's testimony was the first time

15   anyone called EMS was after he became unresponsive.

16            MR. LUTE:  Objection.

17       A     No.  He said as soon as he tased him.

18    BY MR. HILL:

19       Q     I'm sorry.  I'm sorry.  I'm sorry.  You're

20   right.

21            The first time anyone called EMS from

22   Springfield Township police department was Officer

23   Scherer, after he had tased -- used the Taser the first

24   time against Jordn; correct?

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

1      A     Right.

2      Q     So as you're driving towards the area of 909

3  White Drive, have you formulated in your mind a plan as to

4  how to approach the scene?

5      A     No.  I mean, you have to try and get there and

6  assess the whole thing as you're going there, you know,

7  because you're going to get more information, usually.

8      Q     So as you're driving, you have got all these

9  considerations that we talked about; right?

10     A     Right, yes.

11     Q     Do you try to coordinate any kind of a plan

12  with your fellow officers while you're on route?

13     A     No.

14     Q     Is that something that you've ever done in the

15  past when responding to any type of a scene, you know, get

16  on the radio and discuss with other officers a plan?

17     A     Yes.

18     Q     What are some occasions where you've done that,

19  discussed a plan over the radio?

20     A     Well, just to stage somewhere if you're going

21  to serve a warrant, or if you're going to kick in a door

22  or something, who is going where and how to -- how to

23  execute what we want to get done.

24     Q     And is there a reason why, when you're

107

1  responding to this mental health crisis, that there isn't

2  that type of communication over the radio?

3      A    In this one?

4      Q    Yeah.

5      A    This particular one?

6      Q    (Nods head.)

7      A    I mean, I don't remember any traffic -- or any

8  radio traffic on the way.  They might have been talking.

9  I don't know.  There could have been --

10     Q    I'm asking what you remember.

11     A    I don't remember any radio traffic on that day

12  about this.

13     Q    Okay.

14     A    Because there was more information that was

15  coming in and given to dispatch.

16     Q    So have you ever, when responding to a mental

17  health crisis or some kind of medical crisis, communicated

18  over the radio about a plan as to how the officers would

19  respond?

20     A    I mean, we have, but it would depend on the

21  situation, of course.

22     Q    Can you give me some examples where you have

23  coordinated that type of a plan for a mental health or a

24  medical crisis?

1      A    I mean, just basically telling them, you know,

2  if a guy is, you know, in a house, who is going to the

3  front door, who is going to go to the back door.  I mean,

4  I don't know that there's a -- there's not a specific plan

5  that you put into effect, if that's what you're asking.  I

6  don't know what you're asking, I guess.

7      Q    Yeah, I think there's two parts here.

8           Number one, there's no specific protocol here

9  at Springfield Township stating when you're responding to

10  a mental health crisis or something along those lines,

11  here's the steps you need to follow; correct?

12      A    Except for if we believe it's excited delirium.

13      Q    Yes.  If there's any warning signs of excited

14  delirium, then there's the directive; right?

15      A    Right.

16      Q    And that directive requires you to contact an

17  ambulance for a staging area as soon as possible; right?

18           MR. LUTE:  Objection.

19           Go ahead.

20      A    Yes.

21   BY MR. HILL:

22      Q    And the directive also requires that if there's

23  any warning signs of excited delirium you can't have a

24  person in prone restraint; true?

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

109

1          MR. LUTE:  Objection.

2          Go ahead.

3      A    Yes.

4    BY MR. HILL:

5      Q    And that's for the safety of the individual who

6  might have excited delirium?

7      A    Yes.

8      Q    So the next part of Exhibit 12 states:  "We

9  were updated" -- let me take a step back.

10         Anything you want to add to that first

11  statement we've been discussing of Exhibit 12?

12     A    No.

13     Q    It says:  "We were updated by dispatch that he

14  put on clothes and then took off outside in an unknown

15  direction.  Officer Holsopple and Officer Scherer arrived

16  in the area and began looking for him."  Right?

17     A    Yes.

18     Q    When you say, "Arrived in the area" -- I asked

19  Officer Scherer about this, and his car never stopped.

20         Did your car ever come to a stop on Milo White

21  Drive or somewhere else?

22     A    Yeah, I turned around.  I didn't make it all

23  the way up to 909, because I turned around and went back

24  the other way, because I knew Bubba had gone through there

**Officer Joseph Holsopple - Vol. 1 - March 15, 2017**

110

1    already.

2            When they said he was out running around, I of

3    course turned around to cover more of the neighborhood.

4        Q    So just explain to me, so I can map it out

5    later on, what's your route of travel.

6        A    I don't remember exactly how I got in this

7    area, but I probably came down Shadybrook and then

8    straight to Milo White.  And then the call went out --

9        Q    How do you get from Shadybrook to Milo White?

10       A    Turn left onto it.

11           I went partially up Milo White -- is when they

12   called out that he was -- now put his clothes back on and

13   had left.  So that's when I -- you know, the idea would be

14   then to spread the cars out to cover more ground.  So

15   that's why I turned around, and I went back towards

16   Abington.

17       Q    Now, at this point do you know which, if any,

18   officers, other than you, are responding to this call?

19       A    Yeah.  Bubba had called out that he was in the

20   area, I believe.

21       Q    Is that -- would that be in the log, that type

22   of information?

23       A    On my log?

24       Q    Any log.

**Officer Joseph Holsopple - Vol. 1 - March 15, 2017**

111

1      A    His log.  I mean, his should be on his log.

2  Mine should be on my log, what time we got there.  And it

3  should be on dispatch records.

4      Q    So you knew at all times that there were at

5  least going to be two officers there?

6      A    Yes.

7      Q    And you make it a little bit up 909 -- or Milo

8  White Drive.  You don't make it to 909; correct?

9      A    Correct.

10      Q    And then you turn around and head back the

11  opposite direction on Milo White?

12      A    Yep.

13      Q    And then where do you turn from there?

14      A    I go over to Abington.

15      Q    Which is --

16      A    Shadybrook Avenue.

17      Q    Which is very close; right?

18      A    Right.

19      Q    We're talking about an eighth of a mile or

20  something like that?

21      A    Right.

22      Q    So when you're on Abington, what happens?

23      A    That's when we get down farther into this where

24  -- when I got on Abington --

1        Q     Let me stop you real quick.

2        A     Okay.

3        Q     Where it says, "Officer Holsopple and Officer

4    Scherer arrived in the area and began looking for him,"

5    have we covered everything you did that's encapsulated in

6    that portion of the statement?

7        A     Correct.

8        Q     So it says, "While we were looking, dispatch

9    advised officers that they received a call from 1019

10   Abington that the suspect was there and was in their

11   vehicle in the driveway."  Correct?

12       A     Yes.

13       Q     So while you're driving, you're already on

14   Abington when you get that information?

15       A     I had just got on Abington, yes.

16       Q     So can you tell me, like, are you five houses

17   away, ten houses away?

18       A     Probably -- well, I can't really answer that

19   that easily, because I drove past the house because I saw

20   Bubba stopped and talking -- down there talking to

21   somebody; remember?  So I was probably five or six houses

22   in front of it, but I passed it by five or six houses and

23   then had to back up to the house.

24       Q     So you passed 1019 Abington.  Would that have

113

1    been on your right or left?

2        A    It would have been on my right.

3        Q    And you see Bubba's car.  Do you make it all

4    the way to Bubba's car?

5        A    Right up -- right up next to it -- or right up

6    behind it.  And I was getting ready to get out because I

7    thought that was where we were supposed to be going.  And

8    he said, "No, this isn't the right address.  It's up that

9    way somewhere."  So then we had to drive back up that way.

10       Q    So did you have to turn your car around at that

11   point?

12       A    I didn't turn around.  I just backed up.

13       Q    You backed up?  So you're backing down

14   Abington?

15       A    Yeah.

16       Q    And does Officer Scherer give you any

17   information about what he has spoken to this person about

18   that flagged him down?

19       A    That's when he said -- someone said something

20   about -- it might have been on the radio or it might have

21   been on the private channel or he might have told me, that

22   that person tried to steal their car.

23            The lady -- the person he was talking to -- I

24   don't even know if it was a woman or a man.  But that

114

1    person said someone just tried to steal her car and they

2    took off running.

3        Q    You did not get out of your car?

4        A    No.

5        Q    So you didn't have any face-to-face discussion

6    with Officer Scherer at that point?

7        A    No.

8        Q    And you said it might have been over the

9    private channel?

10       A    Yeah.

11       Q    The private channel, does that get logged by

12   dispatch?

13       A    No.

14       Q    Do you know one way or another whether Bubba

15   was talking over the private channel?

16       A    I don't remember.

17       Q    Okay.

18       A    I don't remember if he came walking over to my

19   car or if he yelled it out the window or if it was on the

20   private channel.  I don't remember.

21       Q    Because it's my only chance that I have you

22   under oath here.

23       A    That's okay.

24       Q    Do you remember one way or another whether you

1  got that information that somebody was saying he tried to

2  steal a car then or later?

3       A    I thought it was then, or we wouldn't have been

4  -- yeah, it had to be then when Bubba said that, or

5  someone said that.

6       Q    So you have the car in reverse and you make it

7  to 1019 Abington?

8       A    Yes.

9       Q    And it says, "While we were looking, dispatch

10 advised officers that they received a call from 1019

11 Abington that the suspect was there and was in their

12 vehicle in the driveway."  Right?

13      A    Can you read it again?

14      Q    Yeah.  You can follow along, too.

15      A    Uh-huh.

16      Q    "While we were looking, dispatch advised

17 officers that they received a call from 1019 Abington that

18 the suspect was there and was in their vehicle."  Correct?

19      A    Yes.

20      Q    So at this point, the -- where it says,

21 "suspect," you knew that this was this same 24-year-old

22 man who was earlier running around naked in the throes of

23 a mental health crisis; true?

24           MR. LUTE:  Objection.

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

116

1              Go ahead.

2         A    No.

3     BY MR. HILL:

4         Q    You thought it might be somebody different?

5         A    I have no idea.  I mean, it could be.

6              Most likely, you would -- you would think that

7     way.  But at first -- I don't call him a suspect yet.

8         Q    Somebody did.  It's written down there.

9         A    Well, that's because we wrote this paper later,

10    after more information came out.

11             And if you look at the report, it says he's a

12    suspect there.  At this time he's just someone in a mental

13    state I'm going to find.

14        Q    What I'm saying, though, is the person in the

15    -- when you get a report from dispatch that there's a

16    person in the car, you made the connection it's the same

17    guy?

18        A    I would assume it is, yes.

19        Q    Right.

20        A    Assume it was the same person.

21        Q    And this same person is this 24-year-old who

22    has been reported in a mental health crisis who is naked?

23        A    Right.

24        Q    And then you then learned he put on clothes and

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

1    he's running around the neighborhood?

2         A    Yes.

3         Q    That's all I wanted to know.

4         A    Okay.

5         Q    Is you knew it was the same guy?

6         A    Yes.

7         Q    Yes?

8         A    Yes.

9         Q    So you know where Jordn is at this point;

10   right?

11        A    Yes.

12        Q    So when you pull up, you and Officer Scherer

13   are together right outside -- right in the road, right

14   outside the driveway; right?

15        A    Yes.

16        Q    And you just walk up the driveway together;

17   correct?

18        A    The dude came down the driveway and met us at

19   the end of the driveway.

20        Q    That's Chester Clark?

21        A    Yeah, I think so.

22        Q    Older guy?

23        A    No.  I think it might have been one of the

24   other witnesses.  Younger one.

**Officer Joseph Holsopple - Vol. 1 - March 15, 2017**

118

1      Q    Do you know what he looked like?

2      A    Younger white male, maybe balding.

3      Q    Can you describe him to me?

4      A    That's all I remember.

5      Q    Younger, white male, bald?

6      A    He might have been bald.  I think it was the

7  gentleman -- I left a statement there later for him and

8  his -- his girlfriend wrote a statement because he

9  couldn't write or something.  It's that guy.

10     Q    The guy who couldn't write his own statement?

11     A    Yeah.

12     Q    Okay.

13     A    And she signed the bottom of it that it was

14  prepared by somebody else.  So you should be able to

15  figure out which one it is.

16     Q    Do you know why that guy couldn't write his

17  statement?

18     A    I don't think he knew how to write.

19     Q    So this guy tells you he's in the Jeep; right?

20     A    Yes.

21     Q    What else did this guy tell you?

22     A    That he was trying to steal the Jeep.

23     Q    That's all it says, he's trying to steal the

24  Jeep, in the report.

1            Anything else he told you?

2     A    No.  As we were walking up there, that's all we

3  had.

4     Q    Did you find out any information about whether

5  the keys were inside?

6     A    No.

7     Q    And as you walk up, there are a few homeowners

8  or other citizens outside the Jeep; right?

9     A    Yes.

10     Q    Doors are closed?

11     A    Yes.

12     Q    No one is in the Jeep except Jordn?

13     A    Correct.

14     Q    Jordn hadn't driven anywhere with the Jeep as

15  far as you know?

16     A    No.

17     Q    Do you know if dispatch had already informed

18  these homeowners that this guy is having a mental episode?

19     A    I have no idea.

20     Q    Did you say anything to these citizens -- let

21  me take it back.

22            As you walk up the driveway and this Chester

23  Clark says he's trying to steal our Jeep, do you say

24  anything in response to him?

1      A    To Chester?

2      Q    Yes.

3      A    Or whoever the person is walking up the

4  driveway?  It might not be Chester.  But I don't recall.

5      Q    Nothing stands out to you?

6      A    No.

7      Q    The statement says:  "When officers approached

8  the Jeep, there were four total people holding the door

9  shut to keep the suspect in the vehicle.  Officers moved

10  them out of the way.  The suspect was in the car flailing

11  around, screaming, making no sense at all."

12          Is that consistent with your memory?

13      A    Yes.

14      Q    Officer Scherer or Bubba --

15      A    There was at some point -- you asked what we

16  did with the people.

17      Q    Yes.

18      A    Did we get that far yet?  Do you want --

19      Q    Yeah.  I read the statement, and it says, "When

20  officers approached the Jeep, there were four total people

21  holding the door shut to keep the suspect inside the

22  vehicle."

23      A    Right.

24      Q    "Officers moved them out of the way."

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

121

 1        A    Correct.

 2        Q    That's all it says --

 3        A    During that time frame, one of them, I don't

 4    know who said, "He tried to stab me."

 5        Q    Who?  You don't know who said that?

 6        A    I don't know who said it.

 7        Q    Were you looking at him at the time?

 8        A    No.

 9        Q    Do you remember what he looked like?

10        A    No idea.

11        Q    Is there a reason you didn't include that in

12    the statement that you wrote?

13        A    No.  I just didn't recall it at the time.

14        Q    So you don't know who said it?

15        A    No.

16        Q    What did you say in response to that?

17        A    I don't think I said anything.  We went --

18    we're now focused on Jordn.

19        Q    Do you know -- did he tell you where he tried

20    to stab him?

21        A    I think he said in the neck.

22        Q    Did he tell you how he tried to stab him?

23        A    No.

24        Q    Did he tell you anything else about that?

122

1      A    That's all I knew.

2      Q    So the suspect was in the car flailing around,

3   screaming, making no sense at all.

4           Officer Scherer described and demonstrated on

5   the video how Jordn was flailing.  It was kind of like his

6   arms were moving up and down.

7           Is that how you remember it?

8      A    Yes.

9      Q    Officer Scherer said that at all times he was

10  looking at Jordn Miller.  Jordn Miller never had anything

11  in his hands except when he grabbed the steering wheel.

12          Is that consistent with your memory?

13     A    Yes.

14     Q    You never saw Jordn try to start the vehicle or

15  anything like that?

16     A    I don't -- I remember -- I remember seeing the

17  broken-off turn signal thing, but I don't remember if it

18  was just on the floor or if I saw him break it or -- I

19  don't know how it got there.  I don't remember that part.

20  But I knew -- I knew at that time he had broke the turn

21  signal off the -- off the driver's side.  But he didn't

22  have anything in his hands.

23     Q    So you didn't see him break it off?

24     A    Right.

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

123

1        Q    Fair?

2        A    I don't remember right when I got up there if

3    he had it in his hands and he dropped it on the floor or

4    if I just saw it on the floor.

5        Q    When it says, "The suspect, Jordn, was

6    screaming, making no sense at all," what do you remember

7    about him screaming and making no sense?

8        A    It just what he -- he was just talking in

9    gibberish, and it sounded like something out of a movie

10   where there's a demon possessing somebody.

11       Q    Can you show me?

12       A    Just (indicating).  I can't even make the words

13   that he was saying.  I don't even -- it sounded like a

14   language, do you know what I mean, like some ancient devil

15   language.

16       Q    Nonsense?

17       A    Yeah.  And I'm like wow.

18       Q    At that point you knew something was medically

19   wrong with this person?

20            MR. LUTE:  Objection.

21            Go ahead.

22       A    Probably.

23    BY MR. HILL:

24       Q    Did you understand at that point that based on

124

1   his behavior we're not going to -- he's probably not going

2   to respond to my commands or speech?

3        A    Yeah.  I mean, I think we even gave the

4   preliminary, "Jordn" -- or "Get out of the car."  I don't

5   think we knew his name at the time, or I didn't remember

6   his name at the time.  You know, tried to get him out.

7        Q    Tell me what you said to him.

8        A    We both just -- Bubba and I both said, "Hey,

9   you're going to have to get out of the car.  Come on."

10           I mean, once you realize that they're not --

11   it's not going to happen, you just -- I mean, you might

12   keep going and saying it over and over again.  I don't

13   know how many times we said it, but we attempted to

14   verbally get him to come out of the car.

15        Q    At that point, he was exhibiting strange or

16   bizarre behavior; true?

17        A    Yes.

18        Q    At that point he was shouting or yelling; true?

19        A    Yes.

20        Q    At that point he seemed to be agitated for no

21   apparent reason; true?

22        A    Yes.

23        Q    At that point you had already learned -- or it

24   had been reported to you that he had disrobed for no

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

125

1    apparent reason?

2         A    Yes, but then he put his clothes back on.

3         Q    At that point it had been reported to you that

4    he had mentally ill symptoms; true?

5         A    Yes.

6         Q    They were also pretty apparent just by looking

7    at the guy; right?

8         A    Yes.

9         Q    It appeared that he had some kind of delusions

10   or hallucinations going on; true?

11        A    Yes.

12        Q    He appeared disoriented; true?

13        A    Yes.

14        Q    He appeared to have disorganized or incoherent

15   speech; true?

16        A    Yes.

17        Q    When he was flailing around in the Jeep, his

18   arm never came out of the Jeep window; true?

19        A    Not that I recall.

20        Q    He was yelling and garbling nonsense, but you

21   never saw him spit at you or anybody else; true?

22        A    True.

23        Q    You never saw him take a punch or swing at you

24   or anybody else; true?

126

1      A      True.

2      Q      You never saw him kick or try to kick you or

3  somebody else while he was in the Jeep; true?

4      A      True.

5      Q      You never saw him with anything in his hands

6  other than when he was grabbing the steering wheel on the

7  Jeep; true?

8      A      True.

9      Q      And at all times that you were there and he was

10  in the Jeep, he was contained in the Jeep; true?

11      A      Yes.

12      Q      Given his mental state and what you observed,

13  you didn't -- you weren't thinking that he was going to

14  grab a tool and hot-wire the car and drive away or

15  something, were you?

16      A      Yeah.

17      Q      You were?

18      A      I was concerned of that.

19      Q      Okay.

20      A      That's why we got called there.  He's trying to

21  steal my car; right?

22      Q      When you were looking at Jordn Miller and he's

23  in the Jeep, based on everything you've described of his

24  behavior, did you think that he was capable of hot-wiring

**Officer Joseph Holsopple - Vol. 1 - March 15, 2017**

1    or using a tool to mechanically start a Jeep and drive

2    away?

3              MR. LUTE:  Objection.

4              Go ahead.

5         A    He was capable enough to run around the

6    neighborhood and get in that Jeep.  He could be capable of

7    doing anything.

8     BY MR. HILL:

9         Q    Is there a reason you didn't leave Jordn in the

10   Jeep?

11        A    Why would I?

12        Q    I'm asking you.

13        A    No.  Wait.  Can we go back to that?

14        Q    Uh-huh.

15        A    Can you say that question again?

16        Q    Is there a reason that, given the signs and

17   symptoms that Jordn was exhibiting, you didn't keep him

18   contained in the Jeep?

19        A    Because he was in the commission of a felony.

20   He's in a mental state.  I needed to take care of him.  I

21   needed to take care of the other people around him.

22        Q    In terms of taking care of the other people

23   around him, what do you mean?

24        A    Well, if he does get the Jeep started, he can

1    run them over.  If he doesn't get the Jeep started and he

2    gets out of the other side of the car or busts out or

3    kicks out the windshield and comes out, he can hurt

4    people; right?

5         Q    I'm trying to find out what your decision-

6    making was.

7         A    That's my job, is to make sure he can't hurt

8    somebody else, he can't hurt himself, and he can't hurt me

9    or Bubba.

10        Q    No one told you that he had keys in the car;

11   correct?

12        A    No.

13        Q    So the way that he would have been able to

14   operate the vehicle would have been to somehow hot-wire it

15   or use a tool to start it; right?

16             MR. LUTE:  Objection.

17             You may answer if you know.

18        A    Well, that's infinite possibilities, too.  The

19   people could have left the keys in there and they didn't

20   know it.  There might have been a spare key in there.  He

21   supposedly had a knife, and he could have already been

22   working on the hot-wire.  I don't know what he was doing.

23        Q    Did you ask anybody, "Are the keys in the

24   Jeep"?

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

1      A     We didn't have time.

2      Q     While you were walking up there, you didn't

3  have time?

4      A     No.

5      Q     While you were standing outside the vehicle,

6  you didn't have time?

7      A     You don't think of every question that you can

8  ask somebody.  When you say that -- when you're trying to

9  get up there and find out what this guy is doing, you're

10  not going to stand around and ask 25 questions when you

11  have an active felony being committed right now.

12      Q     Like, "Where are the keys"?

13      A     Yes.

14      Q     That never crossed your mind to ask that?

15      A     No.  I don't remember ever asking that.

16      Q     Have you told me -- so did you try to remove

17  Jordn from the Jeep to take care of the other people in

18  the neighborhood?

19      A     That's not the only reason.

20      Q     Is that one of the reasons?

21      A     Yes.

22      Q     Have you told me all -- all the ways?

23      A     To take care of him?

24      Q     To take care of the people in the neighborhood.

130

1    A    To take care of the people in the neighborhood,

2  take care of him, and take care of me and Bubba.

3    Q    Understood.  I'm asking you:  In terms of take

4  care of people in the neighborhood --

5    A    Uh-huh.

6    Q    -- have you told me all the reasons?

7    A    I think so.

8    Q    And that would include him smashing through a

9  window and running around the neighborhood?

10   A    What do you mean?

11   Q    I thought you just said that was one of the

12  things you had to protect the people from?

13   A    There's an infinite number of possibilities

14  that he could do.

15   Q    I want to know what you were thinking and why

16  you did it.  So when you say take care of people --

17   A    Because he's stealing this car and he could

18  possibly run somebody over, if he gets it started.  He can

19  kick out any window and jump out and, one, I have got to

20  chase him down again; and, two, he might hurt somebody.

21   Q    Jordn's body was contained in the car at all

22  times until you removed him; true?

23   A    Yes, sir.

24   Q    He was flailing around, he grabbed the steering

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

131

```
 1   wheel, but you never saw him try to break a window and get
 2   out?
 3        A    No.
 4        Q    You never saw him try to open a door and run
 5   out of the Jeep?
 6        A    No.
 7        Q    Right?
 8        A    I don't know what his intentions were with the
 9   flailing of the arms.  I didn't see him physically try to
10   grab a handle or -- no, I didn't see that.
11        Q    That's all I'm asking.
12        A    Okay.
13        Q    What you saw.
14             You never saw him try to open a door or exit
15   the vehicle; true?
16        A    True.
17        Q    You and Officer Scherer had to open the door
18   and physically grab Jordn together and pull him out of the
19   vehicle; true?
20        A    Correct.
21        Q    And when you did that, Jordn actually held on
22   to the steering wheel with one arm to try to stay in the
23   vehicle; true?
24        A    Yes.
```

132

1    Q    You understood that once you removed Jordn from

2    the vehicle, then you would have to use more force to

3    restrain him; true?

4    A    Yes.

5    Q    Okay.

6    A    I wouldn't say I would -- I guarantee I would

7    have to.  Maybe as soon as we got him out, he would stand

8    up and he wouldn't be fighting anymore.

9    Q    If one of your fears was you had to get him out

10   of the vehicle so he didn't exit and run around the

11   neighborhood, once you pulled him out of the vehicle, that

12   became a real possibility; didn't it?

13            MR. LUTE:  Objection.

14            You may answer.

15   A    I considered it.  But like I asked, there's an

16   infinite number of things he could have done when he got

17   out of the car.  He could have just put his hands behind

18   his back, and it would have been over.  Or it could have

19   been the way it was; right?

20   Q    One of the reasons you say that you took Jordn

21   out of the car is because he could have, on his own,

22   gotten out of the car and run around the neighborhood;

23   true?

24   A    Correct.

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

133

1      Q    By removing Jordn from the car, you made that

2   now a situation where you had to restrain him to prevent

3   him from doing that; true?

4              MR. LUTE:  Objection.

5              You may answer.

6      A    He would have been cuffed.  You asked -- that's

7   the restraint we would have went to.  You're saying I

8   would have had to use more force; right?

9    BY MR. HILL:

10     Q    My question is:  One of your fears was that he

11  would get out of the car; true?

12     A    Correct.

13     Q    So you removed him from the car?

14     A    Correct.

15     Q    When you got Jordn out of the car --

16     A    Uh-huh.

17     Q    -- you got him on the ground, and he was

18  restrained in a prone position; true?

19     A    Yes.

20     Q    He remained in a prone position until he became

21  unresponsive; true?

22     A    Yes.

23     Q    With respect to where Jordn was when he was out

24  of the car, he was in the gravel driveway perpendicular to

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

134

1    the Jeep; true?

2         A    Yes.

3         Q    His feet were closest to the Jeep?

4         A    Yes.

5         Q    You were on Jordn's right side?

6         A    Yes, sir.

7         Q    And Officer Scherer, or Bubba, was on Jordn's

8    left side?

9         A    Correct.

10        Q    Witness statements describe one of the officers

11   having a knee in Jordn's back early on.

12             Do you know who that was?

13             MR. LUTE:  Objection.

14        A    I don't know.  I didn't put my knee on him at

15   all.

16    BY MR. HILL:

17        Q    It would be improper to put your knee on Jordn;

18   true?

19        A    There are situations where you can do that, but

20   I didn't do that in this case.

21        Q    Okay.

22        A    I don't put my knee on people when I'm next to

23   them.

24        Q    Was there ever a reason in this case for you to

135

1    restrain Jordn with your knee or your foot?

2              MR. LUTE:  Objection.

3        A    I might have put one of my knees over one of

4    his legs to keep him from kicking me again.

5     BY MR. HILL:

6        Q    You might have or you did?

7        A    I know I used my hand to hold his leg down.  I

8    don't know if I lifted my knee up and put it on top of his

9    leg -- the bottom part of his leg or not.  I only remember

10   both my knees being on the ground beside him.  And I was

11   conscious about that.  Conscious.

12       Q    Because putting pressure on Jordn's body would

13   increase the risk of positional restraint asphyxia; true?

14       A    True.

15       Q    And that's why it needed to be avoided; true?

16       A    Yes.

17       Q    The entire time that Jordn was on the ground,

18   you never saw anything in his hands; correct?

19       A    No.

20       Q    Jordn was not armed; correct?

21       A    In the end we found out he was not armed.  But

22   at the time I don't know if he's got something -- if one

23   of his arms is underneath him.  He could have anything in

24   his belt.  I don't know.  There's already a saying that

136

1   they said -- he thought -- or he tried to stab me.  What

2   would you think?  You would think there would be a knife

3   in there or could be a knife in there.

4        Q    Did you believe Jordn was armed?

5        A    When someone said --

6        Q    My question is:  Did you believe that Jordn was

7   armed when you were using force?

8        A    Possibly.

9        Q    And is there a reason you don't write that in

10  any statement?

11       A    I don't know.

12       Q    That's kind of a major detail; isn't it?

13       A    I didn't even remember that they said it until

14  months later.

15       Q    So at the time you wrote your statement on

16  September 8th, 2015, you had no memory of those people

17  saying that Jordn tried to stab someone?

18       A    Right.  Well, I mean -- yeah, I didn't remember

19  at the time, when we wrote this.

20       Q    So my question:  When Jordn was being

21  restrained --

22       A    Yes, sir.

23       Q    -- and you were using force on him, as was

24  Officer Scherer, did you believe that he was armed?

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

137

1      A      Possibly.

2      Q      So did you or not?

3             MR. LUTE:  He's answered the question.  He said

4  his belief is that he was possibly armed.  That's his

5  belief.  You're asking him his belief.

6   BY MR. HILL:

7      Q      Isn't everyone possibly armed?

8      A      But the situation -- I don't believe -- yes, I

9  believe anybody could possibly be armed.  But I don't know

10  what he tried to stab him with at the time.  I later found

11  out it was a pair of pliers.

12     Q      When did you find that out?

13     A      The next week or something.  I don't know.

14     Q      How did you find that out?

15     A      Just from hearing it around the office.

16     Q      Well, how?

17     A      I think Detective Lombardi told me.

18     Q      How did Detective Lombardi find that out?

19     A      You'll have to ask him.  I don't know.  It

20  might have been Frank Blasdel who told me.  I don't know.

21     Q      Did you ever tell the chief?

22     A      Chief?

23     Q      That you thought that Jordn had tried to stab

24  somebody, in any of your debriefings?

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

138

1        A     I don't recall.

2        Q     You talked to the chief that night after the

3    event; correct?

4        A     Yes.

5        Q     You described to him what happened?

6        A     Yes.

7        Q     Did you ever mention to him, hey, this guy

8    tried to stab someone?

9        A     Like I said, I don't recall.  I don't remember.

10       Q     In all the times that you reviewed that

11   statement that you created, the three of you, you, Officer

12   Scherer and Sergeant Moore, you never thought there's a

13   pretty major detail missing, and that is I believe that

14   Jordn Miller had tried to stab someone?

15       A     I thought -- I thought that that will come out,

16   because they collected the pliers, and that will be

17   somebody else's job and somebody else to collect a

18   statement from the people.

19             MR. HILL:  We're out of memory here.

20             MR. LUTE:  You have to change?

21             MR. HILL:  Let's go off the record.

22                    (Recess taken.)

23           (Record read back as requested.)

24     BY MR. HILL:

139

1      Q    So when you created this statement, Exhibit 12,

2  and you checked it for accuracy and you told Sergeant

3  Moore she could sign off on it, you had forgotten that

4  Jordn -- that you learned that Jordn had tried to stab

5  someone?

6      A    I mean, it was probably in my head, but I just

7  didn't relay it to put it down, because I figured that

8  would come out through someone else's job.

9      Q    Whose job?

10     A    The detective or whoever is doing the

11 investigation.

12     Q    Isn't this investigative note that you created

13 a description of the events and why you used force that

14 day?

15     A    Yes.

16     Q    And you're telling me that one of the reasons

17 that you used force is because you suspected that Jordn

18 Miller had a knife or tried to stab someone?

19     A    No.  He tried to stab someone.  He didn't say

20 he had a knife.

21          All I heard them say, as they were walking

22 away -- they might not even have been talking to me.  Me

23 and Bubba were paying attention to him, and someone said,

24 "He tried to stab me."  I didn't even know who it was.

1    And I later learned that they collected a pair of pliers,

2    and I assumed the detective would be interviewing those

3    people to try to figure out who he tried to stab.

4         Q     What I am asking you, though, is when you put

5    together this very lengthy investigative note with your

6    colleagues --

7         A     Okay.

8         Q     -- and you included all of the major details

9    for why you and your officers did what you did, you didn't

10   include this major detail, which was I suspect that he was

11   possibly armed; is that correct?

12        A     I thought that in my head.  I don't include

13   every thought I have.  You can't -- you physically can't

14   put all the thoughts -- there are possibilities in your

15   head that change every three seconds on a scene.  Every

16   time you go to a scene, there's a million things that

17   could change.

18             Like I said, he could have gotten out of the

19   car, stood up, put his hands behind his back, or he could

20   have fought and punched Bubba in the face.

21             Since I missed the arm coming out of the car,

22   he could have punched Bubba.  There's a million things

23   that could have happened.

24        Q     At the time you wrote that investigative note,

141

1    you and your colleagues, you understood that Jordn was in

2    the hospital on life support; correct?

3         A    Yes.

4         Q    You understood at that time to include all the

5    reasons for why you used force; true?

6              MR. LUTE:  Objection.

7              You may answer, if that was your understanding.

8         A    I just explained to you that is impossible to

9    include all the possible reasons when you come up to a

10   scene.

11             I don't know how many clouds there were in the

12   sky.  I don't know what color -- I don't even remember

13   what color the house was, because you're focused on this,

14   trying to handle the problem.

15    BY MR. HILL:

16        Q    You didn't do what you did that day because of

17   clouds in the sky; correct?

18        A    I told you there were three reasons why I did

19   what I did.

20        Q    You're talking about clouds in the sky and the

21   color of a house.

22        A    Correct.

23        Q    Those do not equate in any way to whether or

24   not Jordn was possibly armed; do they?

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

142

1      A      No.

2      Q      Whether or not you believed at the time Jordn

3   was armed is a much more major detail than clouds in the

4   sky; correct?

5      A      Well, pretty much anybody that's going to steal

6   a car, I would believe they might have a weapon on them.

7   And that would be common sense to think that; right?

8            If you're committing a felony by stealing a

9   car, it's very possible you have a gun or a knife or any

10  other kind of weapon or at least a screwdriver that you're

11  trying to start the car with.

12     Q      So did you believe that Jordn did have a

13  weapon; or is that because people who steal cars sometimes

14  have weapons, Jordn might have one?

15     A      I believe it because of all of it.

16     Q      So did you believe at the time, even though

17  it's not included in anything you've apparently ever

18  written -- did you believe at the time that you needed to

19  use force because Jordn was armed?

20     A      No.

21     Q      Okay.

22     A      Possibly armed.

23     Q      And you said it would be someone else's job to

24  collect that information; right?

143

1        A      Correct.

2        Q      About a weapon?

3        A      Correct.

4        Q      But it wouldn't be someone else's job to write

5    down in that investigative note why you chose to do what

6    you did; correct?

7        A      Yes.

8        Q      That's your job?

9        A      Yes.

10       Q      Okay.

11       A      As detailed as you can get.  Nobody is going to

12   get every detail out.

13       Q      Have you -- outside of your testimony today,

14   have you ever recorded in any writing that Jordn -- that

15   you knew Jordn had tried to stab someone?

16       A      No.  I might have -- I would have to review the

17   witness statements that were collected that day to see if

18   it was in there.  Then I would assume that they would find

19   it; do you know what I mean?

20       Q      Did you review the witness statements before

21   you wrote that report?

22       A      I don't believe I did.

23       Q      What information, documents did you, Sergeant

24   Moore and Officer Scherer have available to you when you

144

1    created Exhibit 12?

2         A    Just the report that we wrote, or part of this.

3         Q    What's that?

4         A    The incident report.

5         Q    You didn't have witness statements?

6         A    Not -- no.

7         Q    You didn't have --

8         A    I don't know where they went.  Oh, I collected

9    them, and they -- Frank Blasdel came out and got them, I

10   think.  But they were gone to the detective bureau by

11   then.

12        Q    So at the time that you had created this

13   witness statement, you had already interviewed people?

14        A    I didn't interview anybody.  All I did was hand

15   them a piece of paper that said the detective was coming

16   out, so they could get started on the statement.

17        Q    At the time you and Officer Scherer pulled

18   Jordn from the car, had he said anything coherent to you?

19        A    Not that I recall.

20        Q    Once you pulled Jordn out of the car, you got

21   him on the ground in a prone position quickly; true?

22        A    Like I said, I was trying to -- that's what

23   happened.

24        Q    Yeah.

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

145

1     A     But we were trying to pull him out of the car.
2   If he would have stood up, then he would have stood up.
3          I think it was more in his momentum, when he
4   came out, finally, that took him to the ground like that.
5   And then I'm now reaching to try to get a hold of his arm
6   again.
7     Q     My understanding is you and Officer Scherer
8   have a hold of Jordn's upper body.  You're trying to pull
9   him out of the driver's side of the door that the two of
10  you have opened, and Jordn is holding on to the steering
11  wheel; correct?
12    A     Yes.
13    Q     And you're ripping him out of the car; correct?
14    A     Yes.
15    Q     And you're able to break his grasp on the
16  steering wheel; correct?
17    A     Yes.
18    Q     And as that happens, he's thrown to the ground
19  in a prone position?
20    A     He wasn't thrown to the ground.  Like I said,
21  just explained to you, it's my understanding that when he
22  came out of the car he was going down, because of the way
23  he came out.
24    Q     Because you're pulling him?

146

1        A    Well, I am -- I don't have any arms -- I have

2    no -- Bubba had one -- one of his arms.  He now has his

3    other arm come straight out, and it's now free.  And I

4    think the way his momentum -- of course, Bubba followed

5    him to the ground because he was going to the ground.  And

6    now he's on the ground and I have got to try to get his

7    other arm.

8        Q    Yeah.  He's in a prone position on the ground?

9        A    Yes.  But he wasn't thrown to the ground.

10       Q    My point is there's no period between him being

11   in the car, where he's standing upright, and you guys are

12   wrestling with him; right?

13       A    Yes.  I'm just correcting when you say

14   "thrown."  He wasn't thrown to the ground.  That's all I'm

15   saying.

16       Q    So as he is pulled out of the car in one

17   motion, he is on the ground in a prone position with Bubba

18   on top of him?

19       A    Correct.

20       Q    Where are you at?

21       A    I then go over to his right side, kneel on the

22   ground beside of him.  He's kicking at me, and I'm trying

23   to get his arm out from underneath him.

24       Q    And can you show us how his right arm was

1   underneath him?

2        A    Just like -- well, after he bit Bubba, it was

3   up more by his face.  But at first it was more laying down

4   and hitting, like under the chest part of his body.

5        Q    Almost -- the way you're demonstrating is like

6   if you were going to give yourself the Heimlich maneuver?

7        A    Yeah, close to that.

8        Q    And when you say Bubba was on top of him,

9   that's at the beginning of the -- Jordn being on the

10  ground?

11       A    Yeah.  I don't even know if he laid down on top

12  of -- I don't think he did.  I think he was just -- I

13  don't think he -- I don't remember him laying, because --

14  I don't remember Bubba being -- laying down on top of him

15  at all.  I only remember him on his -- standing or

16  kneeling beside, you know -- beside him, or on his knees

17  with him.  But I don't remember him on top of him.

18       Q    I only say -- you said that Bubba landed on top

19  of him earlier, okay?

20       A    I said Bubba went down after him, I think.  But

21  I don't --

22       Q    I don't want to put words in your mouth.

23       A    Right.

24       Q    And we have a statement we can rely on.

148

1      A     Uh-huh.

2      Q     Is your statement that you created at the time

3  of the events --

4      A     Yes.

5      Q     September 8th, 2015.

6      A     Right.

7      Q     Is that better than your memory today, a year

8  and a half later?

9      A     Absolutely.

10     Q     If there's a discrepancy between your testimony

11  today and the statement you have in front of you, Exhibit

12  12, should we rely on the statement?

13     A     Yes.

14     Q     And I don't say this to be critical in any way.

15  People's memories are different.

16     A     Right.

17     Q     How good do you think your memory is today, as

18  you sit here, of the events back on September 8th, 2015?

19           I mean that in no kind of critical way.

20     A     I'm sure the details are crisp; do you know

21  what I mean?  So I wouldn't say that it's as good as it

22  was at this time.  Where are you at in this?

23     Q     It states, "Officer Holsopple" -- is it

24  Holsopple or Holsopple?  How do you pronounce it?

149

1      A      Either way.  Holsopple.

2      Q      "Officer Holsopple said we should try to get

3  cuffs on him.  At that time, Officer Scherer" -- let me --

4  I want to stop there.  I want to back up before Jordn is

5  out of the car.

6              The last description of Jordn being in the car

7  that I see is where he is -- both hands are on the

8  steering wheel, he's jerking the steering wheel as if he's

9  trying to rip it off, and he's screaming and yelling

10 incoherently.

11     A      Okay.

12     Q      That's what I see in the statement.  Is that

13 your last memory of Jordn before the door is opened?

14     A      Yes.

15     Q      So once you have Jordn on the ground, you state

16 we should try to get cuffs on him?

17     A      Yes.

18     Q      Prior to saying that, you and Officer Scherer

19 still have not discussed any kind of plan; correct?

20     A      You don't really discuss it in the middle of

21 that.  You just try to get -- get the cuffs on him.

22     Q      I mean --

23     A      The way it works, one cop works on one arm and

24 the other one works on the other one.

1      Q     But before opening the door to extract Jordn

2   from the car, you and Officer Scherer had not --

3      A     -- I think we looked at each other and said we

4   have got to get him out of the car.

5      Q     Nothing more detailed as far as a plan?

6      A     No.

7      Q     No call back to the station to identify and

8   what should we do with this guy?

9      A     No.

10     Q     No attempt to contact family members or anybody

11  else to find out what is this guy's history?

12     A     No.

13     Q     Did you consider contacting EMS at that point,

14  before you pulled Jordn from the car?

15     A     No.

16     Q     Is there a reason why not?

17     A     Because I thought it was just a mental case,

18  that I was going to have to write a pink slip and get him

19  -- I guess I thought as soon as we get him detained, so

20  he's not going to harm anybody, then we'll get the

21  ambulance started, because I didn't believe this to be an

22  excited delirium case.

23     Q     Were you going to -- once you got him, as you

24  say it, under control, were you going to contact an

151

1    ambulance at that point to get him to a mental health

2    facility?

3         A    I would have him evaluated, and then either

4    they take him or I take him.  Usually they take him.

5         Q    You said, "I did not consider this to be an

6    excited delirium case."

7         A    Not at that time.

8         Q    We've talked about some warning signs of

9    excited delirium.

10        A    Uh-huh.

11        Q    Did you consider excited delirium and then make

12   a decision this is not excited delirium?

13        A    When the first call came out and they said,

14   "mental issues," I didn't -- well, they said he was naked,

15   so I -- apparently -- I mean, I always go -- as soon as

16   the person is naked, then I go to excited delirium.  But

17   then he put his clothes back on, and I've never heard in

18   any case -- in any excited delirium case where a guy puts

19   his clothes back on and then he walks up.

20             So I just thought it was just going to be an

21   evaluation, a pink slip, and then I'm going to have to

22   work on the car theft.  That's what I was thinking at the

23   time.

24        Q    Because having clothes on when it's 90 degrees

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

152

1    out, that's not consistent with excited delirium?

2         A    No.

3         Q    All the other things we described, yelling,

4    disorganized speech, flailing his arms, all those other

5    things he was doing in the car, those are all warning

6    signs of excited delirium; right?

7         A    Could be.

8         Q    They are; right?

9              MR. LUTE:  Objection.

10             You may answer.

11        A    Could be, yes.

12     BY MR. HILL:

13        Q    They are?

14             MR. LUTE:  You've asked him like 15 times.

15   He's given you his answer, and that's it.

16     BY MR. HILL:

17        Q    Your answer is yes?

18             MR. LUTE:  Objection.

19        A    It could be.

20             MR. LUTE:  And that's his answer, could be.

21     BY MR. HILL:

22        Q    And you knew that at the time, September 8th,

23   2015; right?

24        A    Yes.

153

1     Q     Anything else in your mind that pointed away
2    from this being an excited delirium case on September 8th,
3    2015, while Jordn was in the Jeep?
4         A     That he's trying to steal a car.  He's
5    committing felonies, in the commission of felonies.
6         Q     When you say he was trying to steal a car,
7    other than him being in a car, what acts did you see him
8    undertake in furtherance of stealing a car?
9         A     I didn't see anything.  But the information I
10   had was that he's trying to steal the car, is what they
11   said.  So I would think he's trying to steal the car.
12        Q     When you saw him, he was just flailing around
13   incoherently in the car?
14        A     Correct.  But he found his way to the car and
15   he got in the car.  So he could be possibly trying to
16   steal his car.  The same as he could possibly have a
17   knife.  The same as he could possibly kick out the window.
18            Everything that we do, there's a possibility
19   anything could happen.
20            This possibly could not have even been the same
21   guy.  It could have been somebody else trying to steal a
22   car.  It's an infinite possibility thing.
23        Q     Anything that you actually observed Jordn do,
24   other than being in a car, that was an act in furtherance

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

154

1    of stealing a car?

2         A     No.

3         Q     Anything -- other than someone saying he's

4    trying to steal a car, is there any information that you

5    received other than Jordn being in the car that you

6    considered an act in furtherance of stealing a car?

7              MR. LUTE:  Objection.

8              Go ahead.

9         A     At that point, no.

10    BY MR. HILL:

11        Q     At any point?

12        A     Well, he tried to -- he broke the -- we found

13   out later he had a pair of pliers.  He could have been

14   working on the thing.  I don't know what he was doing

15   before.  But there was evidence that he broke the turn

16   signal thing off and he had a pair of pliers in the car.

17        Q     You said you found out later about the pliers?

18        A     Right.

19        Q     After the event?

20        A     Correct.

21        Q     And when I say the event, I mean your entire

22   encounter with Jordn Miller?

23        A     Right.

24        Q     So that, the pliers, was not part of your

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

155

```
 1   thinking when you were interacting with Jordn; true?

 2        A    Correct.

 3        Q    When you have Jordn on the ground, you and

 4   Officer Scherer were able to keep him on the ground at all

 5   times; true?

 6        A    Yes.

 7        Q    You state:  "Jordn was resisting and fighting

 8   with what seemed to be superhuman strength and power,

 9   which was highly unusual to both officers."  Right?

10        A    Yes.

11        Q    Did you at some point, either while you're

12   creating this document -- well, was it at the time you

13   were creating this document that you were discussing with

14   the other officers that Jordn had superhuman strength?

15        A    Yes.

16        Q    Exactly what did Jordn do that demonstrated

17   superhuman strength?

18        A    You couldn't move his arm.  You couldn't move

19   his body.  You couldn't -- he was kicking like crazy,

20   flailing up, almost -- I mean, it was almost like you

21   couldn't hold him down.  Not that I was -- if you wanted

22   to hold him down, you couldn't hold him down.  And I could

23   not budge his arm out from underneath him.

24        Q    So you were trying to hold him down?
```

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

156

1        A     Well, my job was to detain him.

2        Q     But, I mean, you were trying to hold him down.

3   Because, otherwise, if he had superhuman strength, he

4   would just get up; right?

5        A     I was trying to get his arm out.

6        Q     Somebody must have been holding him on the

7   ground in a prone position; true?

8        A     I can't answer what Bubba was doing.  I was

9   kneeling beside him, trying to wrench his arm out from

10  underneath him.

11       Q     I mean, was he trying to get up?

12       A     I don't know what he was trying to do.

13       Q     Do you remember Jordn trying to get up?

14       A     I remember him arching up, and I don't know

15  what that means.  He could try to get up at any time.

16       Q     I'm asking you what -- Jordn was in a prone

17  position the entire time until he became unresponsive.

18  We've discussed that; right?

19       A     Right.

20       Q     Did he stay in a prone position voluntarily?

21  Is that what you're saying?

22       A     I don't know.  I didn't -- no, we were holding

23  him down.  We were keeping him from getting up.

24       Q     How?

157

1     A     I had my arm underneath him trying to wrench

2   his arm out, and -- and I'm doing this (indicating).

3     Q     What is this you're doing?  Where is his body

4   when you're saying that?

5     A     Over here.  I'm under here, trying to wrench

6   his arm out so we can get the hand out so we can get a

7   cuff on it.  So I'm holding his shoulder.

8     Q     Where at?

9     A     Shoulder blade-ish.

10    Q     Like?

11    A     And he's doing this (indicating).  And then I

12  finally gave up and said, "Bubba, let's try to get one

13  cuff on."  And I went back to his feet.  And that's when I

14  was holding his knee -- or his calf down right above his

15  knee -- right below his knee.

16    Q     What are you doing with your hands at that

17  point?

18    A     Trying -- then is when I moved to try to help

19  Bubba get the other cuff on, the one cuff on.

20    Q     All right.

21    A     So --

22    Q     And that's -- all I'm trying to get at is you

23  used the term "superhuman strength."  And this is a guy

24  who is face down in prone position the entire time that

1    you're with him.  And I'm wondering how he's remaining in

2    that face-down prone position.

3              Is it voluntarily, or are you and the other

4    officer keeping him in that position?

5        A    We're trying to keep him in that -- I was

6    trying to get the cuffs on him, is what I was trying to

7    do.

8        Q    You're trying to keep him face down?

9        A    Until he gets his cuffs.

10       Q    And you can't say where Officer Scherer's hands

11   were; correct?

12       A    No.

13       Q    And you say Jordn was trying to arch his back?

14       A    Yes.

15       Q    You mean he's trying to lift his chest up off

16   the ground?

17       A    Correct.

18       Q    And what are you doing to prevent that from

19   happening?

20       A    I was still working on the arm.

21       Q    What is Officer Scherer doing to prevent that

22   from happening?

23       A    I don't know.

24       Q    Did it appear that Jordn wanted to get up off

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

1    the ground?

2         A    No.

3         Q    So when you say superhuman strength, it didn't

4    involve him trying to stand up at any point?

5         A    No.

6         Q    You agree with what I said?

7         A    Well, I don't know what he was going to do.

8         Q    I said what he was trying to do.

9         A    I can't tell you what he was trying to do.  I

10   don't know.  I don't know if we weren't holding him down

11   if he would have gotten up and took off running.  I don't

12   know.  Or if he would have laid there.

13        Q    Is it fair to say, then, that you never saw

14   Jordn try to get up and run away?

15        A    True.

16             MR. BECK:  What time is it?

17             THE WITNESS:  Yeah, I have got to leave in two

18   minutes.

19             MR. HILL:  Let's go off the record.

20             (Discussion held off the record.)

21

22                        - - -

23             (Signature not waived.)

24                        - - -

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

160

1          And, thereupon, the deposition was adjourned at

2    3:30 p.m.

3                          - - -

161

1                                           March 23, 2017

2

   Dear Mr. Holsopple,

3
        You have chosen to read and sign your transcript.
4  Please do not mark on the transcript.  Any
   corrections/changes you may desire to make in your
5  testimony should be typewritten or printed on the errata
   sheet at the end of testimony, giving the page number,
6  line number and desired correction/change.  After you have
   read the transcript, sign your name on the correction
7  sheet and where indicated at the close of testimony before
   a notary public.
8
        The rules of civil procedure allow thirty days for
9  you to read and sign.  Please return the signature page
   and errata sheet to Whitney Layne, 6723 Cooperstone Drive,
10 Dublin, Ohio 43017 within that time.  Failure to do so in
   the allotted time will result in your transcript being
11 used as though read and signed by you.

12
                                        Sincerely,
13
                                        _____
                                        Whitney Layne
14                                      Professional Reporter

15 Cc:
   Michael Hill
16 Gregory Beck

17

18

19

20

21

22

23

24

162

1  State of _____

2  County of _____

3      I, JOSEPH HOLSOPPLE, do hereby certify that I

4  have read the foregoing transcript of my deposition given

5  on March 15, 2017; that together with the correction page

6  attached hereto noting changes in form or substance, if

7  any, it is true and correct.

8                          _____

9                          JOSEPH HOLSOPPLE

10      I do hereby certify that the foregoing transcript

11  of the deposition of JOSEPH HOLSOPPLE was submitted to the

12  witness for reading and signing; that after he had stated

13  to the undersigned Notary Public that he had read and

14  examined his deposition, he signed the same in my presence

15  on the _____ day of _____, 2017.

16                          _____

17                          Notary Public

18  My Commission Expires on _____

19                      - - -

20

21

22

23

24

163

1    TO THE  REPORTER:

2    I have read the entire transcript of my deposition taken

3    on the _____ day of _____, 20__, or the same has been

4    read to me.  I request that the following changes be

5    entered upon the record for the reasons indicated.

6

7    Page    Line    Correction and reason therefore

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   Date_____Signature_____

24

164

```
 1                       CERTIFICATE

 2   State of Ohio      :

 3   County of Franklin:

 4

 5           I, Whitney Layne, Notary Public in and for the

 6   State of Ohio, duly commissioned and qualified, certify

 7   that the within named JOSEPH HOLSOPPLE was by me duly

 8   sworn to testify to the whole truth in the cause

 9   aforesaid; that the testimony was taken down by me in

10   stenotype in the presence of said witness; afterwards

11   transcribed upon a computer; that the foregoing is a true

12   and correct transcript of the testimony given by said

13   witness taken at the time and place in the foregoing

14   caption specified.

15

16           IN WITNESS WHEREOF, I have set my hand and

17   affixed my seal of office at Dublin, Ohio, on this 23rd

18   day of March, 2017.

19

20

21                       Whitney Layne, Notary Public

22                       In and for the State of Ohio

23   My Commission expires May 4, 2020

24
```

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 1
March 15, 2017

## A

**abandoned (1)**
93:16
**ability (1)**
77:24
**Abington (15)**
36:12,13;103:10;
110:16;111:14,22,24;
112:10,14,15,24;
113:14;115:7,11,17
**able (12)**
40:21;44:8,10,21;
50:6;56:15;73:22;
103:6;118:14;128:13;
145:15;155:4
**above (1)**
157:14
**Absolutely (2)**
60:20;148:9
**access (1)**
56:5
**accessing (1)**
58:17
**accidental (2)**
93:10,13
**accommodate (1)**
7:13
**accuracy (1)**
139:2
**accurate (2)**
95:11;96:6
**act (5)**
45:9;47:18;60:12;
153:24;154:6
**acting (6)**
53:9;58:8;59:6;
62:23;63:1;72:14
**active (1)**
129:11
**activities (1)**
69:18
**activity (1)**
35:18
**acts (1)**
153:7
**actual (2)**
55:5;100:2
**actually (9)**
7:2;16:13;18:3;
36:9;39:16;40:17,23;
131:21;153:23
**acute (1)**
80:11
**add (2)**
98:7;109:10
**added (1)**
34:21
**adding (1)**
95:8
**additional (5)**
10:17;59:1,15;

73:14,16
**additions (2)**
96:13,17
**address (4)**
26:23;46:20;62:15;
113:8
**addressing (3)**
60:24;61:7,15
**adds (1)**
73:15
**adjourned (1)**
160:1
**adopted (1)**
97:15
**advanced (2)**
97:21,24
**advised (3)**
112:9;115:10,16
**again (21)**
10:23;12:9;27:11;
43:5;44:17;59:3;61:5;
63:22;72:16;74:12;
76:16,23;78:13;79:4;
97:5;115:13;124:12;
127:15;130:20;135:4;
145:6
**against (7)**
30:12;32:19;33:8;
34:22;41:20;49:10;
105:24
**age (1)**
30:22
**aggressive (5)**
47:7,8;48:3,14;49:8
**agitate (2)**
47:19;48:1
**agitated (2)**
63:3;124:20
**Agitation (1)**
69:21
**ago (8)**
39:17;40:1,11;54:4,
11;64:23;65:4;88:17
**agree (7)**
21:6;41:23;68:15,
19;71:13;87:15;159:6
**agreed (2)**
68:13,17
**ahead (54)**
26:15;27:2,10,16,
24;31:24;32:5;33:4,
14,20;35:6;43:1,10;
44:16,23;46:23;
48:10,17;49:14;51:1,
23;52:17;53:2,12;
56:22;57:18;58:5;12;
59:17;61:11;62:5;
66:24;67:7;68:21;
69:24;70:12;71:2,19;
72:2,9,22;73:9,18;
74:1;79:3,10;87:8;
89:19;108:19;109:2;
116:1;123:21;127:4;

154:8
**air (1)**
86:3
**airway (3)**
78:3,6;79:1
**Akron (8)**
54:6,22;55:1,11;
65:15,19,21,22
**Albrecht (1)**
18:18
**allowed (8)**
12:21;28:20,24;
40:20;49:10,17;50:3,
23
**almost (4)**
36:11;147:5;
155:20,20
**along (5)**
68:2;74:14;105:10;
108:10;115:14
**always (4)**
26:12;96:24;
101:16;151:15
**Alzheimer's (1)**
45:24
**ambulance (7)**
19:2;51:17;64:15;
94:7;108:17;150:21;
151:1
**Amendment (2)**
32:12,15
**amount (4)**
27:5;50:22;76:13;
84:10
**ancient (1)**
123:14
**annually (1)**
67:22
**answered (2)**
60:11;137:3
**anymore (1)**
132:8
**apparent (7)**
69:17,21;70:4,8;
124:21;125:1,6
**apparently (2)**
142:17;151:15
**appear (1)**
158:24
**appeared (3)**
125:9,12,14
**application (1)**
82:2
**applications (1)**
82:9
**apprehending (1)**
93:11
**approach (8)**
47:4;49:7;52:14,23;
60:3,12;104:17;106:4
**approached (2)**
120:7,20
**approaching (4)**

45:4;48:6;49:4;
59:23
**arch (1)**
158:13
**arched (1)**
23:3
**arching (1)**
156:14
**area (7)**
106:2;108:17;
109:16,18;110:7,20;
112:4
**arm (20)**
22:15,17;93:18;
125:18;131:22;
140:21;145:5;146:3,
7,23,24;149:23;
155:18,23;156:5,9;
157:1,2,6;158:20
**armed (14)**
103:3;135:20,21;
136:4,7,24;137:4,7,9;
140:11;141:24;142:3,
19,22
**armor (1)**
21:9
**arms (7)**
32:6;122:6;131:9;
135:23;146:1,2;152:4
**around (34)**
14:20;37:11;58:24;
93:18;98:18;99:12;
100:9,10,13;104:1,14;
109:22,23;110:2,3,15;
111:10;113:10,12;
115:22;117:1;120:11;
122:2;125:17;127:5,
21,23;129:10;130:9,
24;132:10,22;137:15;
153:12
**arrived (3)**
109:15,18;112:4
**ASP (5)**
38:17;39:2,8,9,10
**asphyxia (18)**
77:20;78:11,14,17;
79:14,17,22;80:6,13;
81:1,7,11,14,21;82:4,
11;89:12;135:13
**asphyxiates (1)**
78:20
**assault (2)**
35:13,14
**assess (1)**
106:6
**assume (7)**
45:1;54:24;77:17;
78:1;116:18,20;
143:18
**assumed (2)**
36:16;140:2
**assuming (2)**
58:15,17

**attempt (5)**
63:19;64:2,7;76:18;
150:10
**attempted (2)**
101:20;124:13
**attend (1)**
103:5
**attention (6)**
36:14;83:3,21;84:1;
102:10;139:23
**attorney (1)**
5:7
**attorneys (4)**
9:12,14,16;11:17
**audio (1)**
8:18
**authorities (1)**
88:20
**autopsy (2)**
20:1,3
**available (2)**
57:22;143:24
**Avenue (2)**
103:11;111:16
**avoid (2)**
46:21;75:7
**avoided (1)**
135:15
**aware (9)**
20:19;52:11;53:3,
13;70:17;79:13;
84:18;91:15,19
**away (8)**
20:10;112:17,17;
126:14;127:2;139:22;
153:1;159:14

## B

**back (37)**
8:13;12:22;21:18;
23:7,20;42:19;59:24;
91:1,13;94:18;95:17;
96:10,17,24;98:1;
108:3;109:9,23;
110:12,15;111:10;
112:23;113:9;119:21;
125:2;127:13;132:18;
134:11;138:23;
140:19;148:18;149:4;
150:7;151:17,19;
157:13;158:13
**backed (4)**
36:9;21;113:12,13
**backing (1)**
113:13
**bag (1)**
38:22
**bald (2)**
118:5,6
**balding (1)**
118:2
**barn (1)**

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 1
March 15, 2017

20:23
**base (2)**
22:13,21
**Based (9)**
24:10,13;25:24;
51:5;54:23;60:3;
90:14;123:24;126:23
**basically (6)**
12:7;14:19;18:5;
37:12;55:15;108:1
**basics (1)**
86:1
**baton (3)**
38:19,19,21
**bear (1)**
32:6
**became (6)**
39:18;68:5;105:15;
132:12;133:20;
156:17
**BECK (1)**
159:16
**become (1)**
39:15
**becomes (3)**
8:6;35:12;105:11
**bedroom (1)**
62:16
**beforehand (1)**
88:12
**began (2)**
109:16;112:4
**beginning (2)**
98:16;147:9
**behavior (5)**
44:8;55:13;124:1,
16;126:24
**behind (5)**
36:8;93:16;113:6;
132:17;140:19
**belabor (1)**
105:10
**belief (3)**
137:4,5,5
**below (1)**
157:15
**belt (1)**
135:24
**beside (5)**
135:10;146:22;
147:16,16;156:9
**best (1)**
55:19
**better (1)**
148:7
**big (4)**
11:12;16:10,15;
70:20
**bigger (2)**
41:9,12
**bit (14)**
9:19,20;11:18;12:2;
22:14;23:2,7;39:2;

66:7;94:2;96:9;98:12;
111:7;147:2
**biting (2)**
23:1,8
**bizarre (2)**
58:8;124:16
**bizarrely (1)**
53:9
**blade-ish (1)**
157:9
**Blasdel (2)**
137:20;144:9
**blow (1)**
7:16
**blowing (1)**
7:18
**body (22)**
21:8;24:2,3;70:7;
71:11;73:6;74:15,20,
23;75:8,21;77:21;
81:19;84:10;87:24;
88:6;130:21;135:12;
145:8;147:4;155:19;
157:3
**body's (1)**
76:3
**book (1)**
97:4
**both (9)**
9:14;15:21;34:24;
100:17;124:8,8;
135:10;149:7;155:9
**bottom (2)**
118:13;135:9
**brain (2)**
85:15,15
**break (10)**
7:11,13;49:21;
90:19,21;91:1;
122:18,23;131:1;
145:15
**breakdown (3)**
50:16;67:13;80:12
**breathing (6)**
77:17,19,21;78:21;
79:1,8
**broad (1)**
46:24
**broke (3)**
122:20;154:12,15
**broken (1)**
35:20
**broken-off (1)**
122:17
**brought (2)**
13:10;15:8
**Bubba (36)**
5:22,24;6:1,3;23:1,
2,23;37:7;92:2,2,5,5;
109:24;110:19;
112:20;114:14;115:4;
120:14;124:8;128:9;
130:2;134:7;139:23;

140:20,22;146:2,4,17;
147:2,8,14,18,20;
156:8;157:12,19
**Bubba's (3)**
23:6;113:3,4
**budge (1)**
155:23
**building (1)**
52:5
**bullets (1)**
55:14
**bunch (1)**
10:2
**bureau (3)**
39:17;54:4;144:10
**busts (1)**
128:2
**bystanders (1)**
25:19

## C

**calf (1)**
157:14
**call (32)**
5:22,24;6:1,3;18:4,
8,8,9,10,12,15;21:1;
34:11;36:10;41:8;
56:3;64:14;92:2,4,5;
98:17;102:8,12,24;
110:8,18;112:9;
115:10,17;116:7;
150:7;151:13
**called (14)**
19:2;36:11;44:1;
51:3;62:9;76:9;81:10;
83:10;105:6,15,21;
110:12,19;126:20
**calls (4)**
40:24;41:7,12;
105:11
**calm (5)**
47:16,22;56:2;
64:13,15
**came (21)**
15:21;16:3;34:11,
12;35:10;37:2;39:19;
93:18;99:13;102:12,
15;110:7;114:18;
116:10;117:18;
125:18;144:9;145:4,
22,23;151:13
**camera (1)**
8:17
**can (78)**
7:7,8;8:13;11:5;
17:6;27:11;28:5;
29:19;33:11,17;34:2;
35:4;39:7;40:23,24;
41:1,9,9;46:20;47:8;
49:9;50:10;55:13,23,
24;56:1,5,18;57:1,14;
58:21,24,24;59:3,13,

14,15,18;62:6,22;
64:5,11,15;70:21;
73:2,15;76:3,23;77:7,
11,17,23;78:2,5,17;
84:9,21;85:20;86:2;
107:22;110:4;112:16;
115:13,14;118:3;
123:11;127:13,15,24;
128:3;129:7;130:18;
134:19;143:11;
146:24;147:24;157:6,
6
**capable (4)**
104:19;126:24;
127:5,6
**capacities (2)**
45:17;74:5
**capacity (21)**
31:10;42:23;43:8;
44:5,19;45:9,13,21;
46:20;47:5;48:7,21;
49:5,11,18;50:8;61:1,
8,16;62:3;101:6
**captain (1)**
19:24
**car (77)**
25:12,13;35:7,8,20;
36:2,3,12,20,22;
109:19,20;113:3,4,10,
22;114:1,3,19;115:2,
6;116:16;120:10;
122:2;124:4,9,14;
126:14,21;128:2,10;
130:17,21;132:17,21,
22;133:1,11,13,15,24;
140:19,21;142:6,9,11;
144:18,20;145:1,13,
22;146:11,16;149:5,
6;150:2,4,14;151:22;
152:5;153:4,6,7,8,10,
11,13,14,15,16,22,24;
154:1,4,5,6,16
**care (13)**
83:20;84:1;127:20,
21,22;129:17,23,24;
130:1,2,2,4,16
**carry (1)**
38:21
**cars (2)**
110:14;142:13
**case (24)**
9:3,21,22;11:22;
13:23;16:1;17:18;
18:1,23;20:3,7;25:15;
29:23,24,24;92:21;
134:20,24;150:17,22;
151:6,18,18;153:2
**cases (1)**
11:12
**cataloging (1)**
19:20
**catch (1)**
8:21

14,15,18;62:6,22;
64:5,11,15;70:21;
73:2,15;76:23;77:7,
11,17,23;78:2,5,17;
84:9,21;85:20;86:2;
107:22;110:4;112:16;
115:13,14;118:3;
123:11;127:13,15,24;
128:3;129:7;130:18;
134:19;143:11;
146:24;147:24;157:6,
6
**cause (4)**
77:12,14;78:17;
88:20;89:4
**caused (4)**
77:23;78:2,5;83:22
**causes (3)**
80:5;81:19;87:24
**causing (2)**
87:21;89:5
**cell (1)**
29:17
**certain (2)**
89:10;92:1
**certificate (1)**
64:23
**certified (3)**
5:3;38:17,23
**certify (1)**
39:4
**chance (1)**
114:21
**change (9)**
34:21;39:2;55:13;
58:13;60:3;94:11;
138:20;140:15,17
**changed (2)**
34:13;59:22
**changes (3)**
34:19;96:13;163:4
**channel (5)**
113:21;114:9,11,
15,20
**characteristics (1)**
69:14
**characterization (1)**
60:16
**charging (1)**
58:1
**chase (1)**
130:20
**checked (1)**
139:2
**chest (2)**
147:4;158:15
**Chester (5)**
37:5;117:20;
119:22;120:1,4
**chest's (1)**
77:24
**chief (7)**
39:2;68:4,5;92:18;
137:21,22;138:2
**children (1)**
46:3
**chose (1)**
143:5
**church (1)**
12:12
**circumstances (3)**
27:6;48:24;104:13
**CIT (3)**
53:22;54:10;55:4
**cited (1)**

Case: 5:16-cv-02331-JRA  Doc #: 21  Filed: 07/17/17  168 of 181.  PageID #: 916
Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 1
March 15, 2017

88:19

**citizens (2)**
119:8,20

**Clark (4)**
37:4,23;117:20;
119:23

**class (5)**
39:5;65:11;80:21;
84:21,21

**classroom (3)**
54:12,13;85:1

**clear (2)**
47:6;59:4

**close (3)**
20:23;111:17;147:7

**closed (2)**
50:21;119:10

**closest (2)**
14:16;134:3

**clothes (7)**
109:14;110:12;
116:24;125:2;151:17,
19,24

**clouds (4)**
141:11,17,20;142:3

**coherent (1)**
144:18

**collapsible (2)**
38:19,21

**colleagues (3)**
5:20;140:6;141:1

**collect (2)**
138:17;142:24

**collected (4)**
138:16;140:1;
143:17;144:8

**color (3)**
141:12,13,21

**coma (1)**
46:6

**comfortable (1)**
8:2

**coming (6)**
15:9;36:13;102:3;
107:15;140:21;
144:15

**commands (5)**
44:11;45:10;73:22;
104:20;124:2

**commission (3)**
60:6;127:19;153:5

**committed (2)**
60:2;129:11

**committing (3)**
60:2;142:8;153:5

**common (1)**
142:7

**communicated (1)**
107:17

**communication (1)**
107:2

**community (1)**
31:19

**completed (2)**
16:18;92:22

**comply (1)**
47:9

**compound (1)**
82:16

**compromised (1)**
31:7

**compulsion (1)**
41:19

**concerned (1)**
126:18

**concerning (1)**
87:14

**condition (7)**
21:1;70:24;78:12,
15;81:9;82:24;83:22

**Conditions (2)**
76:3,8

**conducted (3)**
42:9;82:2;89:17

**confirm (1)**
91:12

**confused (7)**
62:23;104:3

**connection (1)**
116:16

**Conscious (2)**
135:11,11

**consider (18)**
38:9;42:22;43:7;
44:4;69:3,10,14,18;
70:23;72:13,19;74:9,
17;75:20;99:22;
150:13;151:5,11

**considerations (2)**
104:9;106:9

**considered (6)**
30:13;33:11,17;
71:6;132:15;154:6

**considering (3)**
45:3;48:24;75:19

**consistent (5)**
72:14;103:22;
120:12;122:12;152:1

**constitutional (4)**
31:16,18,21;33:24

**constraint (1)**
41:20

**consult (1)**
38:13

**consultant (1)**
38:6

**contact (9)**
56:19;57:7,9;59:13;
83:9;94:12;108:16;
150:10,24

**contacting (2)**
94:3;150:13

**contained (5)**
50:21;58:9;126:10;
127:18;130:21

**contract (1)**

81:20

**contractions (1)**
87:22

**contributing (2)**
88:20;89:5

**control (5)**
24:19;29:3,12;44:8;
150:24

**conversation (4)**
11:6;12:11,17;
35:24

**coordinate (1)**
106:11

**coordinated (1)**
107:23

**cop (1)**
149:23

**correcting (1)**
146:13

**Correction (1)**
163:7

**cough (2)**
7:24;63:12

**County (1)**
20:16

**couple (3)**
7:17;12:7;40:11

**course (13)**
35:11;47:8;50:18;
54:22;55:1,24;56:3;
64:13;85:14;86:1;
107:21;110:3;146:4

**court (2)**
11:11;38:2

**cover (2)**
110:3,14

**covered (1)**
112:5

**crazy (1)**
155:19

**created (7)**
96:16;138:11;
139:1,12;144:1,12;
148:2

**creating (3)**
96:9;155:12,13

**creation (1)**
98:5

**crime (11)**
18:5,6;34:3,6,10,
23;49:6;60:2,2,7;
83:13

**criminal (5)**
34:20;35:18,19;
60:12;101:9

**crises (1)**
55:13

**crisis (49)**
26:2,24;34:19;
43:22;44:2,20;46:17;
52:15,24;53:21,23;
54:1,23;55:2,5,7,10;
56:9,24;57:4,16;

58:23;59:12;60:5,15;
62:15,20;63:18;64:1,
17,21;66:12;71:23;
80:24;81:13;89:17,
22;99:5,11;100:9,23;
104:1;107:1,17,17,24;
108:10;115:23;
116:22

**crisp (1)**
148:20

**critical (2)**
148:14,19

**crossed (1)**
129:14

**CROSS-EXAMINATION (1)**
5:4

**cruiser (1)**
102:19

**cruisers (3)**
12:14,16,22

**cuff (5)**
14:19,20;157:7,13,
19,19

**cuffed (2)**
13:17;133:6

**cuffs (6)**
29:15;149:3,16,21;
158:6,9

**current (1)**
75:11

**curriculum (1)**
39:9

**customs (2)**
28:16,19

**cut (1)**
85:15

## D

**damage (1)**
49:6

**damaging (1)**
35:19

**danger (2)**
29:18;48:15

**dangerous (7)**
73:15;75:13;
101:11,14,16,17,17

**date (1)**
98:16

**Date_Signature_ (1)**
163:23

**dates (1)**
9:19

**day (10)**
11:8;15:21;92:6;
99:19;103:21;107:11;
139:14;141:16;
143:17;163:3

**Dayquil (1)**
7:23

**days (4)**
7:17;54:12,13;

65:16

**dead (1)**
18:9

**deal (4)**
25:14;54:18,19;
85:9

**dealing (3)**
25:17;60:4;66:1

**death (10)**
16:5;71:16,24;72:7;
73:3;77:12;78:17;
89:16;90:2,9

**deaths (3)**
17:17;88:21;89:5

**debriefings (1)**
137:24

**decided (1)**
19:3

**deciding (8)**
26:18;42:21;43:6;
70:22;72:12,17;74:8,
16

**decision (8)**
41:24;42:3,6,9,12,
15,18;151:12

**decision- (1)**
128:5

**decision-making (1)**
52:10

**decisions (2)**
26:20;58:10

**decrease (1)**
76:12,19;77:2

**de-escalation (3)**
63:19;64:2,10

**definition (1)**
32:24

**degrees (2)**
103:21;151:24

**Delaware (1)**
103:11

**deliberate (1)**
58:9

**delirium (51)**
21:2;66:13,21;67:4,
8,16,19;68:11,14,18;
69:4,10,15,19,22;
70:5,9,16;72:6;76:9;
81:10;82:23;83:2,10,
12,16,20;84:8,16,22;
85:5,12;86:23;87:14;
90:8;100:15,18;
108:12,14,23;109:6;
150:22;151:6,9,11,12,
16,18;152:1,6;153:2

**delivery (1)**
47:16

**Delusions (3)**
68:24;69:2;125:9

**dementia (1)**
46:1

**demon (1)**
123:10

Case: 5:16-cv-02331-JRA  Doc #: 21  Filed: 07/17/17  169 of 181.  PageID #: 917
Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 1
March 15, 2017

**demonstrated (2)**
122:4;155:16
**demonstrates (1)**
104:2
**demonstrating (2)**
75:21;147:5
**department (5)**
28:17,20;41:17;
94:12;105:22
**depend (2)**
76:23;107:20
**depending (1)**
21:14
**Depends (9)**
48:11,18,22;51:12,
15,24;56:23;57:19;
61:13
**deployed (3)**
18:18,21;93:12
**deposed (2)**
11:13;19:15
**deposes (1)**
5:3
**deposition (12)**
5:9,19;6:8;8:10;
9:17;11:7,17,23,24;
15:9;160:1;163:2
**describe (5)**
32:19;84:21,23;
118:3;134:10
**described (5)**
81:10;122:4;
126:23;138:5;152:3
**describing (2)**
43:21;86:21
**description (2)**
139:13;149:6
**detail (8)**
80:21;91:11;98:13;
136:12;138:13;
140:10;142:3;143:12
**detailed (2)**
143:11;150:5
**details (6)**
95:13;97:1,7,9;
140:8;148:20
**detain (3)**
34:4;60:8;156:1
**detained (1)**
150:19
**detaining (1)**
60:13
**detective (20)**
11:11;17:11,13,13,
16,19,23;18:1;19:3,
17;39:16,18;54:4;
93:17;137:17,18;
139:10;140:2;144:10,
15
**detectives (1)**
92:19
**determine (2)**
57:9;64:13

**devil (1)**
123:14
**devoted (1)**
79:24
**diabetes (1)**
46:6
**different (10)**
7:8;25:8;47:1;
50:14;54:17;62:11;
67:13,14;116:4;
148:15
**differently (2)**
97:1,1
**diminished (21)**
31:9;44:5,19;45:8,
12,16,21;46:20;47:4;
48:7;49:5,11,18;50:7;
60:22;61:1,8,16;62:3;
74:5;101:6
**direct (1)**
22:7
**direction (2)**
109:15;111:11
**directive (7)**
86:9,20;87:1,12;
108:14,16,22
**directly (3)**
37:11;49:8;94:13
**discharge (2)**
93:10,13
**discrepancy (1)**
148:10
**discuss (2)**
106:16;149:20
**discussed (5)**
14:22;84:19;
106:19;149:19;
156:18
**discussing (3)**
55:15;109:11;
155:13
**discussion (2)**
114:5;159:20
**Disorganized (3)**
69:13;125:14;152:4
**Disorientation (1)**
69:9
**disoriented (1)**
125:12
**dispatch (16)**
17:4;58:22,24;
59:14;94:7;102:3,15;
107:15;109:13;111:3;
112:8;114:12;115:9,
16;116:15;119:17
**dispatched (1)**
102:16
**disrobed (2)**
70:3;124:24
**disrobing (5)**
18:16,17;20:21,24;
70:4
**document (10)**

10:13;91:9;95:3,11,
18,20;98:5,8;155:12,
13
**documentation (2)**
16:18,21
**documents (7)**
10:2;64:20;65:1;
86:11;91:3;93:1;
143:23
**done (9)**
11:12;23:1;24:17,
17;56:4;106:14,18,
23;132:16
**door (11)**
106:21;108:3,3;
120:8,21;131:4,14,17;
145:9;149:13;150:1
**Doors (1)**
119:10
**down (47)**
14:12;15:15,17;
22:24;23:3,23;29:16;
30:10,12;36:10,13,15,
17;37:3;49:22;56:3;
64:13,15;66:3;85:23;
110:7;111:23;112:20;
113:13,18;116:8;
117:18;122:6;130:20;
135:7;139:7;143:5;
145:22;147:3,11,14,
20;155:21,22,22,24;
156:2,23;157:14,24;
158:8;159:10
**Drive (7)**
103:10;106:3;
109:21;111:8;113:9;
126:14;127:1
**driven (2)**
36:9;119:14
**driver's (2)**
122:21;145:9
**driveway (13)**
36:2;37:3,24,24;
112:11;115:12;
117:14,16,18,19;
119:22;120:4;133:24
**driving (4)**
103:7;106:2,8;
112:13
**drop (1)**
63:12
**dropped (1)**
123:3
**drops (1)**
7:24
**drove (3)**
18:4;36:17;112:19
**drug (2)**
76:4;100:23
**drugs (14)**
31:2;46:14;53:6,10,
17;71:15;72:15,20;
73:2,6,21;74:4;81:6;

90:1
**dude (1)**
117:18
**due (2)**
69:3,10
**duly (1)**
5:2
**During (4)**
75:6;85:12;86:8;
121:3
**duty (1)**
34:3

**E**

**earlier (7)**
8:13;55:16;64:19;
84:15;94:2;115:22;
147:19
**early (1)**
134:11
**easily (1)**
112:19
**East (3)**
55:9;65:8,8
**eating (1)**
7:24
**editing (1)**
96:10
**effect (1)**
108:5
**eighth (1)**
111:19
**either (4)**
61:12;149:1;151:3;
155:11
**elderly (1)**
45:24
**electrical (3)**
42:10;75:10;82:2
**electrical- (1)**
89:16
**electrical-conducted (9)**
29:19;75:4;82:10;
87:18,20;88:19;89:4;
90:3,9
**else (26)**
13:21,24;14:2,22;
20:12;35:16;36:18;
39:10;50:17;55:7;
56:5;61:23;100:5;
109:21;118:14,21;
119:1;121:24;125:21,
24;126:3;128:8;
138:17;150:11;153:1,
21
**else's (4)**
138:17;139:8;
142:23;143:4
**emergency (1)**
83:3
**employ (1)**
64:11

**employed (2)**
54:7,7
**EMS (11)**
56:3,19;57:7,9;
64:14,16;94:3;
105:11,15,21;150:13
**encapsulated (1)**
112:5
**encounter (2)**
45:21;154:22
**end (5)**
37:24;54:16;68:4;
117:19;135:21
**endanger (2)**
25:5;26:5
**ended (1)**
68:2
**endurance (1)**
8:3
**enforcement (1)**
62:8
**engage (2)**
63:19;64:2
**engaged (1)**
79:21
**engaging (2)**
63:17,24
**enough (5)**
51:17;63:14;127:5
**entered (1)**
163:5
**entire (6)**
87:24;135:17;
154:21;156:17;
157:24;163:2
**entirety (1)**
97:15
**episode (6)**
98:18;99:4,4;
100:11,14;119:18
**equate (1)**
141:23
**erratically (1)**
47:18
**escalate (1)**
51:10
**Especially (5)**
17:9;71:6,23;72:6;
78:3
**estate (1)**
5:7
**evaluate (3)**
51:6,7;56:24
**evaluated (2)**
56:4;151:3
**evaluating (1)**
40:23
**evaluation (1)**
151:21
**even (20)**
15:24;28:15;45:13;
46:3;56:24;77:12;
82:10;88:3;90:2;

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 1
March 15, 2017

113:24;123:12,13;
124:3;136:13;139:22,
24;141:12;142:16;
147:11;153:20
**event (6)**
65:10;66:2;67:11;
138:3;154:19,21
**events (13)**
12:2,4;13:2;15:7;
16:10,24;17:2;41:4;
94:22;97:16;139:13;
148:3,18
**everybody (3)**
16:15;38:24;39:5
**everyone (2)**
101:19;137:7
**evidence (2)**
19:20;154:15
**exactly (2)**
110:6;155:16
**examiner (1)**
20:9
**examiner's (2)**
20:7,11
**example (3)**
51:5;71:5,7
**examples (4)**
45:20;47:3;64:10;
107:22
**except (4)**
37:12;108:12;
119:12;122:11
**excessive (2)**
27:8,13
**excited (52)**
21:2;66:13,21;67:3,
4,8,16,18,68:10,14,
18;69:4,10,15,19,22;
70:5,8,16;72:5;76:9;
81:10;82:23;83:2,10,
12,16,20;84:7,16,22;
85:5,12;86:23;87:14;
90:8;100:15,18;
108:12,13,23;109:6;
150:22;151:6,9,11,12,
16,18;152:1,6;153:2
**execute (1)**
106:23
**exerted (1)**
41:20
**Exhibit (19)**
10:5;86:14,19;87:5,
13;91:7,18;94:17,21;
97:10,19;98:13;
99:24;103:18;109:8,
11;139:1;144:1;
148:11
**exhibiting (2)**
124:15;127:17
**exit (2)**
131:14;132:10
**expand (1)**
77:24

**expecting (1)**
11:14
**experience (2)**
43:19;52:18
**experiencing (1)**
81:9
**expert (2)**
38:3,9
**explain (1)**
110:4
**explained (2)**
141:8;145:21
**explanations (1)**
6:21
**exposed (1)**
82:9
**extent (1)**
20:13
**extract (1)**
150:1
**extreme (1)**
73:7

**F**

**face (7)**
78:5,6;86:3;140:20;
147:3;157:24;158:8
**face-down (2)**
79:18;158:2
**face-to-face (1)**
114:5
**facility (1)**
151:2
**facing (1)**
36:24
**fact (3)**
11:23,24;45:1
**factor (2)**
88:20;89:5
**factors (2)**
79:17;82:16
**fail (1)**
77:14
**fair (5)**
24:11;48:8;60:15;
123:1;159:13
**fall (1)**
88:3
**False (3)**
27:21;28:1,3
**familiar (1)**
28:9
**family (8)**
5:8;57:14,15;58:18,
23;59:11,14;150:10
**far (6)**
35:17;65:4;99:14;
119:15;120:18;150:5
**farther (1)**
111:23
**fears (2)**
132:9;133:10

**feel (4)**
7:11;8:2;24:11,14
**feet (2)**
134:3;157:13
**fellow (1)**
106:12
**felonies (2)**
153:5,5
**felonious (1)**
35:13
**felony (7)**
35:9,12;60:6;93:15;
127:19;129:11;142:8
**few (4)**
13:1;94:9,15;119:7
**field (8)**
6:4;18:16;20:21,22;
39:14,15;41:13;93:12
**fighting (2)**
132:8;155:7
**figure (6)**
55:18;56:1,4;60:10;
118:15;140:3
**figured (1)**
139:7
**finally (2)**
145:4;157:12
**find (14)**
55:21;56:6,9,24;
57:6;116:13;119:4;
128:5;129:9;137:12,
14,18;143:18;150:11
**finding (1)**
57:13
**fine (4)**
8:4,5;90:22;92:4
**finger (1)**
93:19
**finished (1)**
5:19
**fire (1)**
94:12
**first (29)**
5:2,13;9:20,23;
10:10;23:8;24:3;
25:14;36:8;39:24;
40:17,19;41:3;50:9;
55:22;56:8,12;83:8,9;
84:9;95:20;105:11,
14,21,23;109:10;
116:7;147:3;151:13
**fist (1)**
29:13
**five (6)**
17:24;24:4;65:16;
112:16,21,22
**flagged (1)**
113:18
**flailing (10)**
70:7;120:10;122:2,
5;125:17;130:24;
131:9;152:4;153:12;
155:20

**flashing (1)**
86:3
**flip (1)**
97:24
**floor (4)**
93:20;122:18;
123:3,4
**focus (2)**
37:14,17
**focused (2)**
121:18;141:13
**follow (6)**
6:24;44:10;50:9;
73:22;108:11;115:14
**followed (1)**
146:4
**following (1)**
163:4
**follows (1)**
5:3
**foot (3)**
42:18;93:23;135:1
**force (71)**
5:24;11:4;17:5;
26:18;27:6,8,8,13,13,
20;28:4,10,21,23;
29:2,4;30:8,13;33:8;
34:22;38:4,7,10;
39:11;40:4;41:14,17,
19;42:21;43:6;45:6;
46:21;49:8,10,17;
50:3,6,22;51:10,17;
55:7;60:18;70:22;
71:7,16,24;72:7,12,
17;73:4,15;74:8,16;
75:19;77:7;91:13,14,
17,19,22,23;92:22;
93:4;132:2;133:8;
136:7,23;139:13,17;
141:5;142:19
**forearm (6)**
22:13,24;23:4,21;
24:5;42:13
**forehand (1)**
22:12
**forgot (1)**
99:20
**forgotten (1)**
139:3
**formulated (1)**
106:3
**forth (1)**
96:10
**Fortunately (1)**
93:23
**fought (1)**
140:20
**found (5)**
135:21;137:10;
153:14;154:12,17
**four (8)**
17:24;54:13;65:16,
17;99:14,15;120:8,20

**Fourth (2)**
32:12,15
**Frail (2)**
71:9;74:15,22,24;
75:1
**frame (1)**
121:3
**Frank (2)**
137:20;144:9
**free (3)**
7:11;32:15;146:3
**freeze (1)**
88:2
**friends (2)**
5:23,24
**front (10)**
7:15;9:6,9;10:2;
36:22;91:4,18;108:3;
112:22;148:11
**full (3)**
5:11;24:2,3
**furtherance (3)**
153:8,24;154:6

**G**

**garbling (1)**
125:20
**gave (4)**
22:12;96:5;124:3;
157:12
**general (2)**
24:21;81:1
**generally (1)**
18:15
**gentleman (3)**
36:5;37:2;118:7
**gets (4)**
64:15;128:2;
130:18;158:9
**gibberish (1)**
123:9
**girl (1)**
93:15
**girlfriend (2)**
11:18;118:8
**given (8)**
45:18;64:9;67:19;
86:7;107:15;126:12;
127:16;152:15
**giving (1)**
95:5
**goes (4)**
11:14;18:8;41:8;
74:14
**good (4)**
8:3;63:15;148:17,
21
**gotcha (1)**
100:3
**grab (5)**
42:1;93:18;126:14;
131:10,18

Case: 5:16-cv-02331-JRA  Doc #: 21  Filed: 07/17/17  171 of 181.  PageID #: 919
Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 1
March 15, 2017

grabbed (2)
  122:11;130:24
grabbing (1)
  126:6
grasp (1)
  145:15
gravel (1)
  133:24
greater (2)
  75:11;80:24
grocery (1)
  62:18
Grom (1)
  20:10
ground (26)
  14:21;18:22;42:7;
  110:14;133:17;
  135:10,17;144:21;
  145:4,18,20;146:5,5,
  6,8,9,14,17,22;
  147:10;149:15;155:3,
  4;156:7;158:16;159:1
groups (1)
  89:11
guarantee (1)
  132:6
guess (9)
  14:12;35:19;49:21;
  64:18;65:9;68:22;
  99:22;108:6;150:19
guidance (1)
  92:1
guide (1)
  52:9
gun (5)
  18:21;22:1;50:17;
  58:2;142:9
guy (28)
  34:15;36:2,19;
  50:15;57:7;99:3;
  100:8,9,22;103:24;
  104:2;108:2;116:17;
  117:5,22;118:9,10,16,
  19,21;119:18;125:7;
  129:9;138:7;150:8;
  151:18;153:21;
  157:23
guys (11)
  5:22;12:14;13:21,
  22;14:22;15:16;16:8,
  17;36:24;64:16;
  146:11
guy's (1)
  150:11
gym (1)
  21:16

## H

half (1)
  148:8
hallucinations (3)
  68:24;69:2;125:10

hand (11)
  13:15,17,18,19;
  14:9,17,18,20;135:7;
  144:14;157:6
handle (5)
  26:10;41:9;52:14;
  131:10;141:14
handling (2)
  40:24;41:12
hands (12)
  29:12;50:22;
  122:11,22;123:3;
  126:5;132:17;135:18;
  140:19;149:7;157:16;
  158:10
hands- (1)
  50:9
hands-on (5)
  24:19;29:9,11;48:8;
  51:10
happen (4)
  7:6;29:22;124:11;
  153:19
happened (10)
  15:14,18;17:7,8;
  18:24;93:14;97:16;
  138:5;140:23;144:23
happening (3)
  12:6;158:19,22
happens (3)
  62:11;111:22;
  145:18
happy (2)
  7:9;8:14
hard (1)
  81:20
harm (2)
  101:20;150:20
head (11)
  22:23,23;23:21;
  32:8;47:12;78:2;
  107:6;111:10;139:6;
  140:12,15
health (39)
  26:2;34:15;43:22;
  44:2,20;46:17;52:14,
  24;55:13;56:9;57:4,
  16;58:23;59:12;60:4,
  15;62:15,19;63:18;
  64:1;66:11;67:17;
  71:22;80:23;89:22;
  99:5,11;100:9,11,14,
  23;104:1;107:1,17,
  23;108:10;115:23;
  116:22;151:1
hear (4)
  6:23;20:12;75:6;
  100:8
heard (6)
  20:9;21:4;35:9;
  37:22;139:21;151:17
hearing (1)
  137:15

heart (3)
  73:12;77:14;80:5
heartbroken (1)
  15:23
heightens (1)
  82:20
Heimlich (1)
  147:6
Heinball (2)
  39:23;40:3
held (2)
  131:21;159:20
help (15)
  18:24;25:22;30:15;
  34:12,16;43:20;
  47:10;49:15,20;
  55:19;56:20;62:9,22;
  105:4;157:18
helping (1)
  34:19
hereinafter (1)
  5:2
here's (3)
  17:4,4;108:11
Hey (5)
  7:7,12;8:12;124:8;
  138:7
hiding (2)
  93:15,16
high (7)
  71:16;89:11,12,16;
  90:2,8;103:21
higher (5)
  80:12;81:7,11,13;
  82:10
highly (3)
  88:5;104:3;155:9
HILL (109)
  5:5,6;26:17;27:4,
  12,18;28:2;29:10;
  32:2,9;33:5,16,22;
  35:15;43:3,14;44:18;
  47:2;48:12,19;49:16;
  51:4,19;52:6,19;53:4,
  14;57:2,20;58:6,14;
  59:19;61:6,14;62:1,7;
  63:11,14,16,23;64:6;
  65:7;66:19;67:1;
  68:23;69:8;70:2,15;
  71:4,21;72:4,11,24;
  73:11,20;74:3,13;
  75:2,18;76:2,17,24;
  77:6,18;78:10;79:5,
  12;80:4,10,17;81:5,
  18;82:1,8,15,22;83:7;
  84:6,14;86:17,18;
  87:10;89:2,9,21;90:7,
  13,22,24;97:23;
  105:18;108:21;109:4;
  116:3;123:23;127:8;
  133:9;134:16;135:5;
  137:6;138:19,21,24;
  141:15;152:12,16,21;

154:10;159:19
himself (2)
  28:5;128:8
historically (1)
  93:5
history (1)
  150:11
hit (6)
  22:12,20,24;23:3;
  93:21,22
hitting (1)
  147:4
Holcomb (3)
  17:18;18:9;20:20
hold (11)
  32:19;42:6;56:5;
  135:7;145:5,8;
  155:21,22,22,24;
  156:2
holding (18)
  14:10,13,18,20;
  29:15;30:9,12;36:3;
  50:17,22;120:8,21;
  145:10;156:6,22;
  157:7,14;159:10
HOLSOPPLE (9)
  5:1,13;109:15;
  112:3;148:23,24,24;
  149:1,2
H-O-L-S-O-P-P-L-E (1)
  5:14
holster (1)
  22:4
home (2)
  21:17;62:16
homeowners (2)
  119:7,18
Honestly (3)
  9:18;12:10;65:20
horse (3)
  20:23,23;67:14
hospital (5)
  49:24;50:2;51:18,
  21;141:2
hot (1)
  86:3
hot-wire (3)
  126:14;128:14,22
hot-wiring (1)
  126:24
hour (1)
  85:6
hours (4)
  40:18,19;85:3,5
house (12)
  15:22;16:3;36:16,
  18;50:15;59:2,15;
  108:2;112:19,23;
  141:13,21
houses (4)
  112:16,17,21,22
huh-uh (2)
  6:20;98:11

hurt (10)
  29:18;54:19;61:23;
  64:15,16;128:3,7,8,8;
  130:20

## I

idea (5)
  15:20;110:13;
  116:5;119:19;121:10
identify (1)
  150:7
IHOP (4)
  18:3,8,12;19:4
II (3)
  40:15,22;41:6
ill (4)
  31:4;62:9;68:17;
  125:4
illness (6)
  55:12;66:1,22;67:5;
  68:18;76:6
implicated (1)
  49:5
important (2)
  10:17;84:8
impossible (1)
  141:8
impression (2)
  36:7;37:6
improper (1)
  134:17
inaccurate (1)
  96:19
incident (9)
  10:14,16,18,24;
  11:1;18:6;20:18;
  40:12;144:4
include (10)
  76:4;79:18;89:17;
  95:13;121:11;130:8;
  140:10,12;141:4,9
included (7)
  10:18;11:3;66:14,
  15;92:14;140:8;
  142:17
includes (20)
  26:18,20,23;30:18,
  20;31:2,4,6,9;41:24;
  42:3,6,9,12,15,18;
  76:6,8;89:22;97:12
incoherent (2)
  69:13;125:14
incoherently (2)
  149:10;153:13
inconsistent (1)
  45:9
increase (5)
  76:3,13,20;77:8;
  135:13
increased (2)
  75:22;77:11
increases (4)

Case: 5:16-cv-02331-JRA  Doc #: 21  Filed: 07/17/17  172 of 181.  PageID #: 920
Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 1
March 15, 2017

79:22;80:6;81:20;
82:3
**in-custody (1)**
17:17
**index (5)**
71:11;74:15,20,23;
75:8
**indicated (1)**
163:5
**indicating (3)**
123:12;157:2,11
**individual (4)**
59:9;78:23;79:6;
109:5
**individuals (6)**
37:18;45:8,12,16;
73:21;74:4
**infinite (6)**
52:2,7;128:18;
130:13;132:16;
153:22
**influence (10)**
53:6,17;71:15;
72:15,19;73:2,21;
74:4;81:6;90:1
**informal (2)**
28:16,19
**information (30)**
17:4;25:24;37:18,
21;58:18;59:1,9,15;
95:6,8;98:8,21;99:2,
10;102:6;103:6;
104:23;105:9;106:7;
107:14;110:22;
112:14;113:17;115:1;
116:10;119:4;142:24;
143:23;153:9;154:4
**informed (1)**
119:17
**ingested (1)**
73:6
**initial (6)**
18:9,10,12,15;
98:23;105:2
**initially (2)**
34:11,14
**injure (1)**
28:6
**injuries (2)**
71:6;90:2
**injury (9)**
48:14;49:12;71:16,
23;72:6;73:3;77:12;
89:13,16;90:9
**inside (2)**
119:5;120:21
**instructor (1)**
38:17
**intentional (1)**
46:11
**intentions (1)**
131:8
**interact (8)**

52:23;53:8,16,20;
54:15;55:22;56:12,15
**interacting (7)**
22:3,6;24:10;34:5,
9;45:13;155:1
**interaction (1)**
67:10
**interactions (3)**
24:14;25:20;100:24
**interferes (1)**
77:21
**interject (1)**
41:1
**internal (1)**
19:22
**intervention (9)**
53:23;54:1,23;55:2,
6,8,11;64:18,21
**interview (2)**
19:12;144:14
**interviewed (1)**
144:13
**interviewing (2)**
37:20;140:2
**into (16)**
19:22;39:16;41:10;
49:1,22;50:1,15;54:4;
87:1,3;93:19,19;98:8;
102:15;108:5;111:23
**invest (3)**
9:21,23;10:8
**investigate (2)**
17:17;34:4
**investigating (1)**
19:19
**investigation (5)**
10:18;11:3;19:22;
20:1;139:11
**investigative (6)**
15:16;94:17;
139:12;140:5,24;
143:5
**investigator (1)**
17:18
**investigatory (1)**
37:18
**involve (1)**
159:4
**involved (1)**
67:10
**involving (3)**
15:7;41:4;92:7
**irrelevant (1)**
83:17
**issues (2)**
13:24;151:14

**J**

**Jason (1)**
20:10
**Jeep (29)**
37:11;118:19,22,

24;119:8,12,14,23;
120:8,20;125:17,18;
126:3,7,10,10,23;
127:1,6,10,18,24;
128:1,24;129:17;
131:5;134:1,3;153:3
**jerking (1)**
149:8
**job (21)**
6:15;18:3,7,11;
19:4;25:22;28:13;
30:15;31:12,15;60:8;
61:22;83:24;128:7;
138:17;139:8,9;
142:23;143:4,8;156:1
**Joe (4)**
5:16,17,18;90:18
**John (1)**
68:5
**Jordn (97)**
5:7;15:7,14;20:3,
16;22:4,7,11;23:7,12,
17,19,20;24:1,6,8,11,
14;25:15,20;29:24;
33:24;34:5,8,22;
37:14;41:4;92:7;
98:17;105:11,24;
117:9;119:12,14;
121:18;122:5,10,10,
14;123:5;124:4;
126:22;127:9,17;
129:17;131:18,21;
132:1,20;133:1,15,23;
134:17;135:1,17,20;
136:4,6,17,20;137:23;
138:14;139:4,4,17;
141:1,24;142:2,12,14,
19;143:14,15;144:18,
20;145:10;147:9;
149:4,6,13,15;150:1,
14;153:3,23;154:5,
22;155:1,3,7,14,16;
156:13,16;158:13,24;
159:14
**Jordn's (11)**
14:18;16:5;22:17;
23:16;102:12;130:21;
134:5,7,11;135:12;
145:8
**JOSEPH (2)**
5:1,13
**judge (2)**
9:6,9
**jump (1)**
130:19
**June (1)**
94:22
**jury (2)**
9:6,9

**K**

**keep (10)**

8:19;42:19;120:9,
21;124:12;127:17;
135:4;155:4;158:5,8
**keeping (2)**
156:23;158:4
**key (1)**
128:20
**keys (5)**
119:5;128:10,19,
23;129:12
**kick (12)**
22:11;23:23;24:8,
11,12;42:15;63:13;
106:21;126:2,2;
130:19;153:17
**kicked (3)**
23:10,14,19
**kicking (4)**
33:17;135:4;
146:22;155:19
**kicks (1)**
128:3
**kill (1)**
49:23
**kind (45)**
6:23;7:20,21;11:9,
13;14:19;15:23,23;
19:21;23:4,21,22;
24:1;29:4,11;35:13;
37:8;39:11,13;41:6,
10;43:18;47:15;49:6,
21;52:8;58:17;66:12;
67:13;88:3;91:9;98:8;
99:8;100:5;102:24;
103:10;105:10;
106:11;107:17;122:5;
125:9;136:12;142:10;
148:19;149:19
**knee (9)**
134:11,14,17,22;
135:1,8;157:14,15,15
**kneel (1)**
146:21
**kneeling (3)**
14:21;147:16;156:9
**knees (3)**
135:3,10;147:16
**knew (14)**
95:14;100:20;
109:24;111:4;115:21;
117:5;118:18;122:1,
20,20;123:18;124:5;
143:15;152:22
**knife (8)**
58:2;128:21;136:2,
3;139:18,20;142:9;
153:17
**knowledge (1)**
14:15
**knowledgeable (1)**
91:23

**L**

**ladder (1)**
50:10
**lady (1)**
113:23
**laid (3)**
23:4;147:11;159:12
**landed (1)**
147:18
**language (2)**
123:14,15
**lapel (1)**
94:6
**last (12)**
7:16;8:15;10:22,23,
24;11:16;64:24;
67:20;93:11;97:20;
149:6,13
**later (12)**
22:15;102:17;
110:5;115:2;116:9;
118:7;136:14;137:10;
140:1;148:8;154:13,
17
**Law (1)**
62:8
**laying (5)**
14:16;23:21;147:3,
13,14
**learn (2)**
52:1,3
**learned (5)**
89:3;116:24;
124:23;139:4;140:1
**learning (1)**
40:22
**least (7)**
17:23;27:5;28:16;
66:9;74:5;111:5;
142:10
**leave (3)**
18:23;127:9;159:17
**left (12)**
13:18;18:11;22:16,
17;23:16;103:20;
110:10,13;113:1;
118:7;128:19;134:8
**leg (5)**
23:1,14;135:7,9,9
**legs (1)**
135:4
**length (2)**
68:9;91:10
**lengthy (1)**
140:5
**less (3)**
61:2,9;62:3
**life (3)**
19:1,10;141:2
**life- (2)**
78:11,14

Case: 5:16-cv-02331-JRA  Doc #: 21  Filed: 07/17/17  173 of 181.  PageID #: 921
Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 1
March 15, 2017

life-threatening (1)
82:23
lifetime (1)
39:20
lift (3)
21:15;22:23;158:15
lifted (1)
135:8
lights (2)
86:2,3
likely (3)
60:4;104:2;116:6
limit (1)
50:12
Linburg (4)
92:16,17;102:5,8
line (3)
8:9;12:4;163:7
lined (1)
12:3
lines (3)
68:2;74:14;108:10
little (15)
8:21;9:19,20;11:18;
12:2;22:14;39:2;66:7;
85:10;94:2;96:9,24;
97:7;98:12;111:7
location (2)
103:7,9
locked (1)
62:16
lockstep (1)
37:8
log (9)
99:17;100:4;
102:14;110:21,23,24;
111:1,1,2
logged (1)
114:11
logs (1)
102:11
Lombardi (3)
93:17;137:17,18
long (12)
6:13;8:2;11:11;
16:5;17:19;18:18;
21:16;24:1;30:2;
54:11;65:15;84:24
longer (1)
27:20
look (11)
10:5;65:24;82:21;
85:14;86:2;91:3;
97:19;98:15;99:18;
103:20;116:11
looked (7)
10:13;64:24;99:19;
100:4;118:1;121:9;
150:3
looking (11)
87:5;99:22;109:16;
112:4,8;115:9,16;
121:7;122:10;125:6;

126:22
lost (1)
19:1
lot (2)
12:12;36:4
lots (1)
62:11
loud (1)
6:18
low (10)
47:6,21;49:7;50:19;
71:11;74:15,20,23;
75:8;86:5
lower (2)
47:21;55:16
luck (1)
94:1
lump (1)
49:1
lunch (1)
21:14
LUTE (108)
26:14;27:1,9,15,22,
24;29:7;31:23;32:4;
33:3,13,19;35:5;
42:24;43:9;44:15,22;
46:22;48:9,16;49:13;
50:24;51:11,13,22;
52:16;53:1,11;56:21;
57:17;58:4,11;59:16;
61:3,10,19;62:4;
63:20;64:3;65:5;
66:16,23;67:6;68:20;
69:5,23;70:11;71:1,
18;72:1,8,21;73:8,17,
24;74:10,18;75:15,
23;76:14,21;77:3,15;
78:7;79:2,9;80:2,7,
14;81:2,15,22;82:5,
12,18;83:4;84:3,11;
86:16;87:7;88:22;
89:6,18;90:4,11,16,
18,21;97:22;105:16;
108:18;109:1;115:24;
123:20;127:3;128:16;
132:13;133:4;134:13;
135:2;137:3;138:20;
141:6;152:9,14,18,20;
154:7

## M

major (7)
95:13;97:9;136:12;
138:13;140:8,10;
142:3
makes (1)
74:21
making (7)
26:20;61:20;
120:11;122:3;123:6,
7;128:6
male (2)

118:2,5
man (7)
18:16;20:20;26:1;
99:11;105:3;113:24;
115:22
maneuver (1)
147:6
manual (1)
52:8
many (3)
54:12;124:13;
141:11
map (1)
110:4
March (1)
15:4
mass (5)
71:11;74:15,20,23;
75:8
materials (1)
86:7
Matt (1)
39:23
matter (1)
20:20
mattress (1)
93:17
may (60)
29:8;44:8;45:9,13;
51:13;53:5,9,16,21;
56:15;61:4;62:22;
63:1,3,5,8,21;64:4,9;
66:17;69:6;71:15,16,
23;72:6;73:6,12,12,
21;74:4,11,19;75:16,
24;76:15,22;77:4,16;
78:8;81:3,16,23;82:6,
13,19;83:5,9;84:4,12;
88:23;89:7,11;90:5,
11;94:15;128:17;
132:14;133:5;141:7;
152:10
maybe (12)
10:12;16:7;19:23,
24;24:3;28:15;37:5;
54:13;58:8;92:18;
118:2;132:7
mean (68)
6:5;9:21;10:21;
11:9,15;12:20;14:20;
16:9,13;17:8,11;
29:13,24;32:7,24;
34:2;40:21;41:8;
43:16,21;44:24;45:2;
48:20;50:12,13;52:2,
20;54:20;56:7;57:24;
64:22;66:6,9,22;67:2,
14,15,16;84:23;
88:24;91:24;92:1;
96:24;106:5;107:7,
20;108:1,3;111:1;
116:5;123:14;124:3,
10,11;127:23;130:10;

136:18;139:6;143:19;
148:19,21;149:22;
151:15;154:21;
155:20;156:2,11;
158:15
meaningfully (1)
59:7
means (5)
32:18;35:4;41:19,
20;156:15
meant (2)
7:1;67:8
measure (1)
60:19
measures (1)
47:9
measuring (1)
47:16
mechanically (1)
127:1
medical (21)
20:6,9,11;26:24;
50:16;53:21;56:20;
70:23;76:8;78:12,15;
81:13;82:23;83:3,20;
84:1;88:11,20;89:17;
107:17,24
medically (2)
31:6;123:18
medication (1)
46:12
medications (1)
7:20
member (19)
25:6,7,11,21;26:5,
11,12;28:6;42:21;
43:6;48:15;49:12,19;
53:20;60:24;61:7,15;
70:22;79:15
members (14)
26:23;30:16,18;
53:16;57:14;58:18,
23;59:11;63:17,24;
72:12,18;81:1;150:10
member's (1)
59:15
memories (1)
148:15
memory (11)
8:2;13:1,24;103:22;
120:12;122:12;
136:16;138:19;148:7,
17;149:13
mental (87)
26:1,24;31:9;34:15;
42:22;43:7,22;44:1,5,
19,20;45:3,8,12,16,
21,22;46:16,20;47:4;
48:7,21;49:5,11,18,
22;50:7,16;52:14,24;
55:12,13;56:9;57:4,
10,16;58:23;59:12;
60:4,15,22;61:1,8,16;

62:3,15,19;63:18;
64:1,14;66:1,11,22;
67:5,13,17;68:18;
71:22;74:5;76:6;
80:23;85:8;89:22;
98:18;99:3,4,5,11;
100:9,11,14,23;101:6;
104:1;107:1,16,23;
108:10;115:23;
116:12,22;119:18;
126:12;127:20;
150:17;151:1,14
mentally (4)
31:4;62:9;68:17;
125:4
mentally-handicapped (2)
43:18;54:14
mention (1)
138:7
met (2)
37:1;117:18
metal (1)
38:19
method (1)
55:19
Miami (1)
85:23
Michael (4)
5:6;7:7,13;8:12
microphone (1)
8:21
middle (1)
149:20
might (52)
6:23;7:6,16,21;
12:20,22;15:8;20:8;
40:21;44:10,13,20;
45:17,21;48:6,22;
62:14,18;64:22;66:6;
69:10,15;72:19;
80:20,20;100:6;
102:9;104:5,7,13,16,
19;107:8;109:6;
113:20,20,21;114:8;
116:4;117:23;118:6;
120:4;124:11;128:20;
130:20;135:3,6;
137:20;139:22;142:6,
14;143:16
mile (1)
111:19
Miller (26)
5:7;15:7,14;20:4,
12,16;22:4,7,11;
23:12,20;25:15,21;
34:5,8,23;37:15;41:4;
92:7;98:17;122:10,
10;126:22;138:14;
139:18;154:22
Miller's (2)
29:24;33:24
million (2)
140:16,22

Case: 5:16-cv-02331-JRA  Doc #: 21  Filed: 07/17/17  174 of 181.  PageID #: 922
Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 1
March 15, 2017

**Milo (10)**
36:10,11;103:10,
12;109:20;110:8,9,
11;111:7,11
**mind (10)**
15:4;34:14,18;
100:5;101:3,15;
104:23;106:3;129:14;
153:1
**Mine (1)**
111:2
**minute (1)**
102:19
**minutes (4)**
99:14,15;102:17;
159:18
**missed (1)**
140:21
**missing (2)**
97:10;138:13
**model (1)**
54:23
**mom (1)**
102:12
**moment (3)**
58:13;100:16;
102:24
**momentum (2)**
145:3;146:4
**Monday (3)**
14:24;15:3,4
**months (2)**
40:11;136:14
**Moore (15)**
15:6,18;18:22;19:1;
92:14;93:1;94:23;
95:3,6;96:1;98:2;
102:6;138:12;139:3;
143:24
**more (21)**
17:6;22:14;26:10;
51:9,24;52:3;75:13;
79:24;94:15;106:7;
107:14;110:3,14;
116:10;132:2;133:8;
142:3;145:3;147:3,3;
150:5
**morning (1)**
11:21
**most (2)**
91:23;116:6
**motion (1)**
146:17
**motivations (2)**
35:1,3
**mouth (2)**
78:6;147:22
**move (6)**
13:12;25:14;42:1;
49:8;155:18,18
**moved (3)**
120:9,24;157:18
**movie (1)**

123:9
**moving (2)**
70:7;122:6
**much (8)**
21:13;34:2;50:4,6;
91:11;102:9;142:3,5
**muscle (2)**
80:1;87:22
**muscles (1)**
81:19
**must (12)**
25:5;26:4;27:5;
60:18,21;61:1,8,17;
78:23,24;79:7;156:6
**myself (1)**
51:18

## N

**naked (12)**
98:19;99:12;100:9,
10,10,13,22;104:1;
115:22;116:22;
151:14,16
**name (11)**
5:6,11,13;32:3;
37:2;39:24;67:14;
96:2,6;124:5,6
**names (2)**
6:7;96:1
**narrow (1)**
10:20
**naturally (1)**
96:10
**nature (1)**
101:9
**near (2)**
20:22;78:6
**necessarily (1)**
74:21
**necessary (2)**
28:22;29:2
**neck (3)**
22:13,21;121:21
**need (14)**
24:11,14;28:12;
29:16;41:9;47:10;
49:15;55:17;56:20;
83:2;84:1;94:7;99:7;
108:11
**needed (6)**
27:6;50:6;127:20,
21;135:15;142:18
**needlessly (1)**
25:5,13;26:5;48:1
**needs (4)**
51:15;56:4;83:20;
105:4
**neighborhood (10)**
110:3;117:1;127:6;
129:18,24;130:1,4,9;
132:11,22
**neurological (1)**

87:21
**next (7)**
14:21;56:18,18;
109:8;113:5;134:22;
137:13
**nice (1)**
103:15
**night (2)**
19:23;138:2
**nobody (2)**
64:15;143:11
**Nods (2)**
47:12;107:6
**Nonsense (1)**
123:16;125:20
**Nope (1)**
40:5
**normal (1)**
92:11
**nose (2)**
7:16,19
**note (9)**
9:21,23;10:8;15:16;
94:18;139:12;140:5,
24;143:5
**notebook (1)**
55:14
**notes (2)**
10:19;11:4
**noticed (2)**
96:22;97:10
**Number (3)**
108:8;130:13;
132:16
**numbers (2)**
6:7;36:14

## O

**oath (3)**
9:5;31:18;114:22
**Objection (98)**
26:14;27:1,9,15,22;
29:7;31:23;32:4;33:3,
13,19;35:5;42:24;
43:9;44:15,22;46:22;
48:9,16;49:13;50:24;
51:11,22;52:16;53:1,
11;56:21;57:17;58:4,
11;59:16;61:3,10,19;
62:4;63:20;64:3;65:5;
66:16,23;67:6;68:20;
69:5,23;70:11;71:1,
18;72:1,8,21;73:8,17,
24;74:10,18;75:15,
23;76:14,21;77:3,15;
78:7;79:2,9;80:2,7,
14;81:2,15,22;82:5,
12,18;83:4;84:3,11;
87:7;88:22;89:6,18;
90:4,11,16;105:16;
108:18;109:1;115:24;
123:20;127:3;128:16;

132:13;133:4;134:13;
135:2;141:6;152:9,
18;154:7
**obligation (1)**
33:23
**observed (3)**
24:10;126:12;
153:23
**observing (1)**
40:20
**obstructing (2)**
78:24;79:7
**obstructs (2)**
78:3,6
**Occasionally (1)**
6:5
**occasions (1)**
106:18
**occurs (1)**
77:20
**off (20)**
32:8;35:20;86:3;
95:11;102:19,19;
109:14;114:2;122:21,
21,23;138:21;139:3;
149:9;154:16;158:15,
24;159:11,19,20
**offered (3)**
52:22;53:7;65:3
**office (5)**
20:7,11,16;40:18;
137:15
**Officer (102)**
5:20;6:14;11:7;
12:1,24;13:4,7,8;
14:4;15:11;16:11;
18:18,22;19:1;22:8;
23:6,19;24:24;25:3,5;
26:4,7,11;28:3;29:19;
30:2,3;31:12,15;
34:19;36:6,15;37:6,7;
39:14,15;41:13;50:5;
53:22;59:13;60:18,
21;61:1,8,17;62:14;
65:8;67:19,22;68:9;
75:20;76:11,18;77:1,
7;80:22;84:22;86:20;
87:12;90:15;91:10;
92:4,14,16;93:3;
94:23;95:5;96:8;98:1;
102:5,5;104:23;
105:7,14,22;109:15,
15,19;112:3,3;
113:16;114:6;117:12;
120:14;122:4,9;
131:17;134:7;136:24;
138:11;143:24;
144:17;145:7;148:23;
149:2,3,18;150:2;
155:4;158:4,10,21
**officers (52)**
27:5;28:20,23;29:4;
38:13,15;42:22;43:7,

12;45:18,20;46:8,19;
57:21;59:8;62:8,22;
63:18;64:1;69:3,10,
14,18;70:23;72:13,
18;73:22;74:9,17;
78:23;79:6,13;83:8;
84:8;92:13;98:16;
106:12,16;107:18;
110:18;111:5;112:9;
115:10,17;120:7,9,20,
24;134:10;140:9;
155:9,14
**officer's (8)**
30:15;41:24;42:3,6;
45:10;83:15,19,24
**often (1)**
83:8
**old (2)**
98:17;103:17
**Older (1)**
117:22
**once (11)**
12:21;27:19;28:4;
87:2;103:6;124:10;
132:1,11;144:20;
149:15;150:23
**once-in-a-lifetime (1)**
39:3
**one (75)**
5:20;10:5;12:9;
13:15;14:7,16,17;
15:21;24:16;25:12,
12;26:10;28:19;35:1,
3,20;36:2,22;38:22;
39:18,19;40:2,13;
44:7;45:2;55:9;56:1,
8;66:8;67:9,20;74:24;
82:17,20,20;86:13;
92:21;93:7;94:5;
97:20;99:20;104:9;
107:3,5;108:8;
114:14,24;117:23,24;
118:15;119:12;121:3;
128:10;129:20;
130:11,19;131:22;
132:9,20;133:10;
134:10;135:3,3,22;
139:16;142:14;146:2,
2,16;149:23,23,24,24;
157:12,19
**ones (4)**
41:9;70:18,20,21
**only (20)**
7:19;8:23;9:18;
30:1;39:3,18,19;
43:17;55:9;62:2;
65:12;91:12,18;
93:11;95:18;114:21;
129:19;135:9;147:15,
18
**Onto (2)**
23:16;110:10
**open (4)**

Case: 5:16-cv-02331-JRA  Doc #: 21  Filed: 07/17/17  175 of 181.  PageID #: 923

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 1
March 15, 2017

12:19;131:4,14,17
**opened (2)**
145:10;149:13
**opening (1)**
150:1
**operate (1)**
128:14
**opinion (1)**
9:22
**OPOTA (1)**
65:19
**opportunity (2)**
8:23;96:13
**opposite (1)**
111:11
**option (1)**
58:18
**order (3)**
28:12;49:20;51:20
**otherwise (1)**
156:3
**ours (1)**
39:3
**out (118)**
6:3;18;11:2;12:16,
20,20,23;13:12;18:4,
8;19:2;20:11;21:15,
19;24:19;34:11,12;
36:10,11;37:1,12;
39:19;52:5;55:18,21;
56:1,4,6,10,24;57:6,
13;60:10;85:15;86:7,
10;87:2;94:18;
101:13;110:2,4,8,12,
14,19;113:6;114:3,
19;116:10;118:15;
119:4;120:5,10,24;
123:9;124:4,6,9,14;
125:18;128:2,2,3,3,5;
129:9;130:19,19;
131:2,5,18;132:7,9,
11,17,21,22;133:11,
15,23;135:21;137:11,
12,14,18;138:15,19;
139:8;140:3,18,21;
143:12;144:9,16,20;
145:1,4,9,13,22,23;
146:3,16,23;149:5;
150:4,11;151:13;
152:1;153:17;154:13,
17;155:23;156:5,9;
157:2,6,6
**outside (10)**
15:17;35:11;91:17;
103:15;109:14;
117:13,14;119:8;
129:5;143:13
**over (32)**
9:19;12:4;15:10,21,
22;16:3,8,14,23;
19:24;50:18;66:13;
80:20;85:13;88:3;
97:24;102:3;106:19;

107:2,18;111:14;
114:8,15,18;124:12,
12;128:1;130:18;
132:18;135:3;146:21;
157:5
**overdose (1)**
46:12
**overlap (1)**
66:21
**overriding (1)**
87:21
**Ow (1)**
23:2
**own (3)**
95:8;118:10;132:21
**oxygen (1)**
79:24

## P

**packet (1)**
86:11
**page (5)**
9:20,23;10:10;98:1;
163:7
**pair (4)**
137:11;140:1;
154:13,16
**paper (2)**
116:9;144:15
**paperwork (1)**
40:21
**Pardon (1)**
32:22
**parked (2)**
36:7,8
**parking (1)**
12:12
**part (12)**
20:1;30:15;44:7;
67:8;95:9;98:23;
109:8;122:19;135:9;
144:2;147:4;154:24
**partially (1)**
110:11
**particular (2)**
11:22;107:5
**parts (2)**
70:7;108:7
**passed (5)**
20:10,13;36:17;
112:22,24
**past (5)**
18:20,20;36:10;
106:15;112:19
**pathologist (1)**
85:16
**paying (3)**
36:14;102:9;139:23
**PD (1)**
65:22
**people (62)**
21:1;25:14,18;31:2,

4,6,9,13,19;35:8,24;
37:11;39:20,22;
45:20,22,24;47:4;
54:15,17;55:4;61:22;
62:9,23;71:5,9,11,15,
22;72:5;73:2;80:11,
23;81:6,9;82:9;83:2,
9;88:2;89:11,15,17,
22;120:8,16,20;
127:21,22;128:4,19;
129:17,24;130:1,4,12,
16;134:22;136:16;
138:18;140:3;142:13;
144:13
**people's (6)**
6:7;31:16;32:15;
55:13;89:5;148:15
**perfectly (1)**
8:5
**period (1)**
146:10
**permission (2)**
96:2,5
**permitted (2)**
27:20;28:4
**perpendicular (1)**
133:24
**Perry (1)**
102:8
**person (101)**
26:21;27:19;28:4,
21;29:1,6,20;30:10,
12;33:11;34:19;35:9;
39:18;40:1;41:3,21;
42:1,7;43:18;44:1,7,
10,13,19;46:20;
47:19;48:1,14;49:10,
17;50:20;51:20;
52:14,23;53:5,9;
55:24;56:1,2,3,6,10;
57:14,15;58:1,8;59:6,
12;60:4,13,21;61:2,9,
18,24;62:2,15,19;
64:12;65:12;67:10;
70:3,24;72:14,19;
73:6,15;74:15;75:1,7,
11,14,20,21;76:12,20;
77:2,9;78:20;79:18,
21;83:16,20;84:1,7;
91:23;92:22;93:9;
101:5;108:24;113:17,
22,23;114:1;116:14,
16,20,21;120:3;
123:19;151:16
**personally (2)**
64:22;65:6
**Persons (5)**
81:13;89:12,15;
90:1,8
**person's (7)**
44:4;45:3;70:7;
72:14;77:21;79:1,7
**perspective (2)**

83:15,19
**pertinent (1)**
70:19
**phase (7)**
40:13,14,15,17,19,
22;41:6
**physically (8)**
29:16;30:10,12;
41:20;42:1;131:9,18;
140:13
**physiological (5)**
73:7;75:22;76:4;
77:8,11
**pick (1)**
97:5
**piece (1)**
144:15
**pile (1)**
91:4
**pink (4)**
50:1;51:16;150:18;
151:21
**place (2)**
42:18;55:2
**places (1)**
54:14
**plan (9)**
106:3,11,16,19;
107:18,23;108:4;
149:19;150:5
**planning (1)**
26:23
**play (1)**
104:17
**please (8)**
5:11;8:19;27:11;
43:5;61:5;63:22;
74:12;76:16
**pliers (7)**
137:11;138:16;
140:1;154:13,16,17,
24
**pm (3)**
102:13,21;160:2
**point (37)**
8:6;12:9;15:15;
16:20;17:20,24;
19:21;22:3,6,10;
25:18;37:17,20;
51:15;101:12;105:10;
110:17;113:11;114:6;
115:20;117:9;120:15;
123:18,24;124:15,18,
20,23;125:3;146:10;
150:13;151:1;154:9,
11;155:11;157:17;
159:4
**pointed (1)**
153:1
**pointing (1)**
50:17
**police (82)**
24:24;25:5;26:4,7,

11;27:5,19;28:3,20,
23;29:19;30:2,3,15;
31:12,15;34:19;38:4,
7,10,13,15,22;39:1,
13;42:22;43:7,11;
44:10;45:10,14,17,20;
46:19;49:3;50:5;59:7,
8,13;60:18,21;61:1,8,
16;62:14,22;63:5,8,
18;64:1,11;69:3,9,14,
18;70:23;72:13,18;
73:22;74:8,16;75:20;
76:11,18;77:1,7;79:6,
13;80:22;83:8,15,19,
24;84:8;90:15;104:5,
7,16,20,23;105:6,22
**policies (3)**
28:8,9,16
**policy (13)**
29:5;38:24;39:1;
52:8;86:23;87:1,3,6,
13;91:14,17,19,23
**populations (1)**
89:11
**portion (1)**
112:6
**pose (1)**
49:11
**posing (1)**
49:19
**position (17)**
42:19;59:7;77:21;
78:2;79:18;133:18,
20;144:21;145:19;
146:8,17;156:7,17,20;
157:24;158:2,4
**Positional (18)**
77:20;78:11,14,17;
79:14,17,22;80:6,12,
24;81:7,11,14,20;
82:3,11;89:12;135:13
**positive (1)**
18:17
**possessing (1)**
123:10
**possibilities (4)**
101:2;128:18;
130:13;140:14
**possibility (5)**
52:2,7;132:12;
153:18,22
**possible (8)**
76:11,19;77:2;83:3,
21;108:17;141:9;
142:9
**possibly (15)**
35:13;43:21;
130:18;136:8;137:1,
4,7,9;140:11;141:24;
142:22;153:15,16,17,
20
**potentially (3)**
44:5;69:3;100:17

Case: 5:16-cv-02331-JRA  Doc #: 21  Filed: 07/17/17  176 of 181.  PageID #: 924
Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 1
March 15, 2017

**power (2)**
61:17;155:8
**PowerPoints (1)**
65:1
**practice (1)**
29:5
**practices (3)**
28:16,19;39:13
**pregnant (1)**
71:7
**preliminary (1)**
124:4
**prepare (1)**
9:17
**prepared (3)**
9:21;94:22;118:14
**preparing (1)**
9:3
**presents (1)**
48:14
**pressure (1)**
135:12
**pretty (5)**
46:24;102:11;
125:6;138:13;142:5
**prevent (1)**
133:2;158:18,21
**primary (1)**
34:8
**principles (1)**
24:22
**Prior (1)**
149:18
**private (5)**
113:21;114:9,11,
15,20
**probably (10)**
17:23;54:3;85:6;
92:2;110:7;112:18,
21;123:22;124:1;
139:6
**problem (7)**
7:18,24;8:6;34:15;
49:22;55:19;141:14
**procedures (3)**
38:4,7,10
**process (1)**
19:22
**processed (1)**
18:5
**program (1)**
67:23
**prone (16)**
22:21;23:17;42:19;
79:18;108:24;133:18,
20;144:21;145:19;
146:8,17;156:7,16,20;
157:24;158:2
**pronounce (1)**
148:24
**property (1)**
49:6
**prosecutor's (1)**

20:16
**protect (9)**
31:13,15,18;32:8,
14;33:24;61:22,23;
130:12
**protocol (1)**
108:8
**provide (1)**
6:16
**psychiatric (1)**
99:8
**psychotic (1)**
80:12
**public (30)**
25:6,7,11,18,21;
26:5,8,11,13,24;
30:16;42:22;43:7,13;
48:15;49:12,19;
53:16,20;60:24;61:7,
16;63:17,24;66:1;
70:23;72:13,18;
79:15;81:1
**pull (6)**
24:14;94:18;
117:12;131:18;145:1,
8
**pulled (6)**
36:21;132:11;
144:17,20;146:16;
150:14
**pulling (1)**
145:24
**punch (3)**
22:11;24:6;125:23
**punched (3)**
29:15;140:20,22
**punish (1)**
60:21
**punitive (1)**
60:19
**pushing (1)**
14:12
**pushup (1)**
21:17
**put (26)**
15:16;39:5;65:18;
86:9;87:2,3;97:2,5;
98:8;108:5;109:14;
110:12;116:24;125:2;
132:17;134:14,17,22;
135:3,8;139:7;140:4,
14,19;147:22;151:17
**puts (1)**
151:18
**putting (1)**
135:12

**Q**

**question-and- (1)**
6:11
**quick (1)**
112:1

**quickly (1)**
144:21

**R**

**race (2)**
30:20;80:5
**racing (1)**
73:12
**radio (12)**
6:6;94:6,6,12;
102:3;106:16,19;
107:2,8,11,18;113:20
**ran (1)**
18:19
**rapidly (1)**
81:20
**rather (1)**
39:5
**reaching (1)**
145:5
**reaction (1)**
23:2
**read (21)**
9:20;10:23,24;
27:11;43:5;61:5;
63:22;68:7,13;72:16;
74:12;76:16;96:22;
97:4,12;100:1;
115:13;120:19;
138:23;163:2,4
**reading (2)**
40:18;97:4
**ready (2)**
18:23;113:6
**real (2)**
112:1;132:12
**realize (1)**
124:10
**really (5)**
9:18;21:16;36:13;
112:18;149:20
**reason (23)**
7:5,11,12;22:20;
47:24;69:17,21;70:4,
8;75:10,12;83:15;
106:24;121:11;
124:21;125:1;127:9,
16;129:19;134:24;
136:9;150:16;163:7
**reasonable (3)**
58:18;59:20;75:20
**reasons (9)**
45:2;129:20;130:6;
132:20;139:16;141:5,
9,18;163:5
**recall (12)**
11:5;12:6;53:18;
68:3;97:1;103:1;
120:4;121:13;125:19;
138:1,9;144:19
**receive (2)**
93:3;101:8

**received (15)**
26:1;52:12;53:15,
19;67:18;75:3;90:15;
93:1;98:16;102:2,6;
112:9;115:10,17;
154:5
**recently (3)**
11:6;40:11;102:12
**recertify (1)**
38:24
**Recess (2)**
90:23;138:22
**recollection (1)**
68:1
**record (8)**
5:12;7:2;91:1;
138:21,23;159:19,20;
163:5
**recorded (2)**
8:18;143:14
**records (1)**
111:3
**reduce (2)**
84:9;86:2
**reference (1)**
98:17
**referenced (1)**
10:12
**refers (1)**
99:4
**refresh (1)**
9:19
**regarding (2)**
18:8;93:4
**regardless (5)**
30:20,22,24;60:14;
83:21
**relative (1)**
11:4
**relay (1)**
139:7
**relevance (1)**
9:22
**rely (2)**
147:24;148:12
**relying (1)**
9:2
**remained (1)**
133:20
**remaining (1)**
158:1
**remember (63)**
8:12;11:8;12:8,10;
13:9,11,14;14:2,7,14,
23;17:22;18:11,15;
19:13,14,23;37:2;
54:3,11,12;55:11;
65:20;80:21;85:6,8,
10,11,15;86:7;88:15;
99:13;107:7,10,11;
110:6;112:21;114:16,
18,20,24;118:4;
121:9;122:7,16,16,17,

19;123:2,6;124:5;
129:15;135:9;136:13,
18;138:9;141:12;
147:13,14,15,17;
156:13,14
**remembered (2)**
13:15,20
**remembering (1)**
7:22
**remove (2)**
22:4;129:16
**removed (4)**
39:9;130:22;132:1;
133:13
**removing (1)**
133:1
**repeated (1)**
82:9
**rephrase (2)**
7:7;61:15
**report (35)**
9:19;10:14,16,18,
24;11:2;19:10;20:20,
24;70:3;92:23;97:2,
21,24;99:19,22,23;
100:2;101:5,8,8,11,
20,23;102:2;103:17,
18,24;105:3;116:11,
15;118:24;143:21;
144:2,4
**reported (5)**
57:16;59:11;
116:22;124:24;125:3
**REPORTER (1)**
163:1
**reports (1)**
93:4
**represent (1)**
5:7
**request (2)**
85:16;163:4
**requested (2)**
92:21;138:23
**requires (3)**
39:3;108:16,22
**resisting (1)**
155:7
**respect (2)**
53:5;133:23
**respond (7)**
18:12;59:7;62:18;
66:2;87:14;107:19;
124:2
**responded (1)**
98:22
**responders (2)**
83:8;84:9
**responding (10)**
17:5;56:9;57:4;
104:11,19;106:15;
107:1,16;108:9;
110:18
**response (6)**

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 1
March 15, 2017

76:4,12,19;77:8;
119:24;121:16
**responsibility (1)**
32:14
**restrain (7)**
26:11,21;33:6;42:3;
132:3;133:2;135:1
**restrained (8)**
27:19;28:4,21;29:1,
6,20;133:18;136:21
**restraining (4)**
60:13;78:23;79:6,
15
**restraint (21)**
48:8;77:20;78:11,
14,17;79:14,17,22;
80:6,13,24;81:7,11,
14,21;82:3,11;89:12;
108:24;133:7;135:13
**restriction (1)**
77:23
**resulting (1)**
73:14
**retained (2)**
38:6,12
**retardation (1)**
45:22
**reverse (1)**
115:6
**review (2)**
143:16,20
**reviewed (8)**
10:10,16,22;28:11;
99:16;100:6;102:11;
138:10
**revisit (1)**
8:9
**right (131)**
5:22;6:21;7:3,23;
9:24;13:16,19;14:5,
11,15,17,18;18:22;
19:7;22:13,15,17,22;
23:9,14;24:13;28:13;
32:6,7,10,16;34:17;
35:11;36:6,8;38:1;
46:9;48:4,22;61:21;
62:12,16;64:7;70:20;
77:19;86:6;91:5,6,14;
92:17,20;93:19;94:1;
96:6,14,23;97:7,22;
98:2;99:5;100:18,19;
102:13,17,21,22,24;
103:11,15;104:3,5,7,
9,9,24;105:8,20;
106:1,9,10;108:14,15,
17;109:16;111:17,18,
21;113:1,2,5,5,5,8;
115:12;116:19,23;
117:10,13,13,13,14;
118:19;119:8;120:23;
122:24;123:2;125:7;
126:21;128:4,15;
129:11;131:7;132:19;

133:8;134:5;136:18;
142:7,24;146:12,21,
24;147:23;148:6,16;
152:6,8,23;154:18,23;
155:9;156:4,18,19;
157:14,15,20
**rights (6)**
31:16,19,21;32:8,
15;33:24
**rip (1)**
149:9
**ripping (1)**
145:13
**risk (20)**
71:16;79:14,17,22;
80:6,12,24;81:7,11,
14,20;82:3,10,16;
89:11,13,16;90:2,9;
135:13
**road (4)**
36:10,17,21;117:13
**robbery (1)**
103:3
**role (6)**
18:1;19:17,20;63:5,
8;104:16
**roles (1)**
45:17
**route (2)**
106:12;110:5
**rude (1)**
7:1
**rules (2)**
24:21,23
**run (8)**
86:3;127:5;128:1;
130:18;131:4;132:10,
22;159:14
**running (15)**
18:20;67:22;98:18;
99:12;100:8,10,13,22;
103:24;110:2;114:2;
115:22;117:1;130:9;
159:11

**S**

**safe (4)**
61:2,9,18;62:3
**safely (2)**
54:18,19
**safest (1)**
26:12
**safety (6)**
26:8;43:11,12,15;
54:18;109:5
**same (24)**
6:20;13:4,16;21:20;
23:22,24;47:21,24;
52:4;55:15;60:14;
65:10;67:12;99:19;
102:7;115:21;116:16,
20,21;117:5;153:16,

17,20;163:3
**sat (2)**
15:15,17
**saw (16)**
36:14;112:19;
122:14,18;123:4;
125:21,23;126:2,5;
131:1,4,13,14;135:18;
153:12;159:13
**saying (14)**
37:22;96:12;115:1;
116:14;123:13;
124:12;133:7;135:24;
136:17;146:15;
149:18;154:3;156:21;
157:4
**scared (1)**
104:5
**scenario (1)**
85:9
**scenario-based (1)**
85:2
**scenarios (3)**
54:16;62:11;85:7
**scene (15)**
18:2,2,4,5;19:23;
20:11;34:13,18;
55:24;104:11;106:4,
15;140:15,16;141:10
**Scherer (54)**
5:20;11:7;12:1,24;
13:4,7,8;14:4;15:11;
22:8;23:6,19;25:3;
36:6,15;37:6,7;67:19,
22;68:9;84:22;86:20;
87:12;91:10;92:4,14;
93:3;94:23;95:5;96:9;
98:1;102:5;105:23;
109:15,19;112:4;
113:16;114:6;117:12;
120:14;122:4,9;
131:17;134:7;136:24;
138:12;143:24;
144:17;145:7;149:3,
18;150:2;155:4;
158:21
**Scherer's (3)**
6:14;105:14;158:10
**scope (1)**
10:20
**screaming (5)**
120:11;122:3;
123:6,7;149:9
**screwdriver (1)**
142:10
**search (2)**
32:6,10
**searches (1)**
32:16
**second (3)**
13:8;14:5;63:11
**seconds (4)**
24:4;94:9,15;

140:15
**secure (2)**
50:4,7
**secured (2)**
18:2;50:11
**security (1)**
19:5
**seeing (1)**
122:16
**seem (1)**
68:4
**seemed (2)**
124:20;155:8
**seize (2)**
33:1;87:24
**seizure (7)**
32:6,10,18,19,24;
33:11,17
**seizures (1)**
32:16
**select (1)**
26:12
**send (2)**
59:1,14
**sense (5)**
120:11;122:3;
123:6,7;142:7
**sent (2)**
85:20,23
**September (17)**
15:3,3,13;21:8,23;
22:7,10;33:23;84:19;
87:15;92:6;102:13;
136:16;148:5,18;
152:22;153:2
**sequence (3)**
16:10,23;17:2
**Sergeant (17)**
15:6,17;19:24;55:9;
65:8,20;92:14;93:1;
94:23;95:3,6;96:1;
98:2;102:6;138:12;
139:2;143:23
**serious (6)**
71:23;72:6;77:12;
89:16;90:2,9
**serve (2)**
31:12;106:21
**session (2)**
6:12;86:8
**sessions (1)**
85:12
**set (1)**
49:2
**setting (2)**
84:24;85:1
**seven (1)**
85:4
**several (1)**
97:12
**Shadybrook (3)**
110:7,9;111:16
**shared (1)**

15:24
**shed (2)**
20:22,22
**shift (3)**
92:9,11,13
**shock (1)**
46:5
**short (1)**
91:1
**shot (2)**
85:7;93:19
**shoulder (2)**
157:7,9
**Shouting (2)**
69:17;124:18
**show (4)**
39:6,7;123:11;
146:24
**showed (1)**
18:22
**shut (2)**
120:9,21
**sick (2)**
7:15,16
**side (11)**
18:3,7;19:4;22:18;
23:16;122:21;128:2;
134:5,8;145:9;146:21
**sign (9)**
20:24;21:1;69:9,22;
70:4,8;95:20,22;
139:3
**signal (3)**
122:17,21;154:16
**signals (1)**
35:20
**signature (2)**
95:23;159:23
**signed (5)**
95:11,18,24;98:1;
118:13
**signs (31)**
19:1,10;65:24;
66:10,20,21;67:3,5;
68:7,8,10,10,14,18,
24;69:2,15,19;70:16;
72:5;75:21;84:15,18;
85:13;86:1;100:17;
108:13,23;127:16;
151:8;152:6
**similar (1)**
13:2
**sit (3)**
54:15;80:22;148:18
**sitting (2)**
16:14;40:20
**situation (23)**
43:24;45:18;47:1;
48:11,18;50:12,13,20;
51:8,24;52:3;56:23;
57:3,19;58:1,7,22;
59:5;61:13;76:23;
107:21;133:2;137:8

Case: 5:16-cv-02331-JRA Doc #: 21 Filed: 07/17/17 178 of 181. PageID #: 926
Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 1
March 15, 2017

**situational-based (1)**
  85:1
**situations (1)**
  134:19
**situps (1)**
  21:17
**six (3)**
  85:4;112:21,22
**size (2)**
  74:9,17
**sky (4)**
  141:12,17,20;142:4
**slice (1)**
  85:15
**slid (1)**
  93:19
**slip (4)**
  50:1;51:16;150:18;
  151:21
**slow (6)**
  47:6,11,15;49:7;
  55:17;86:5
**small (2)**
  40:24;41:7
**smaller (1)**
  41:7
**smashing (1)**
  130:8
**Smith (2)**
  68:5,5
**smoke (2)**
  12:21,22
**society (2)**
  28:6;30:18
**socioeconomic (1)**
  30:24
**somebody (42)**
  19:24;20:9;32:19;
  33:17;36:15,18;42:4,
  12,15;43:22;46:5,11,
  14,16;48:6;49:4,23;
  50:7;59:1,1,14;60:1;
  61:23;66:11;93:11;
  99:7;112:21;115:1;
  116:4,8;118:14;
  123:10;126:3;128:8;
  129:8;130:18,20;
  137:24;138:17,17;
  153:21;156:6
**somehow (2)**
  67:4;128:14
**someone (24)**
  29:13;33:1,6,8;
  50:17;59:23;61:20;
  113:19;114:1;115:5;
  116:12;136:5,17;
  138:8,14;139:5,8,18,
  19,23;142:23;143:4,
  15;154:3
**someone's (1)**
  42:19
**sometimes (3)**
  81:10;88:2;142:13

**somewhere (7)**
  29:17;85:9,20,23;
  106:20;109:21;113:9
**soon (8)**
  83:3,21;88:15;
  105:17;108:17;132:7;
  150:19;151:15
**sorry (10)**
  15:3;27:23;47:14;
  51:14;59:3;63:7;
  72:16;105:19,19,19
**sound (1)**
  6:20
**sounded (2)**
  123:9,13
**sounds (2)**
  8:19;70:18
**space (3)**
  50:21;55:17,18
**spare (1)**
  128:20
**speak (4)**
  20:6,15;57:14;
  74:24
**speaking (4)**
  9:12,16;37:11;
  87:11
**specific (5)**
  52:13;66:8;85:11;
  108:4,8
**specifically (1)**
  85:7
**speech (4)**
  69:13;124:2;
  125:15;152:4
**spell (1)**
  40:8
**spit (1)**
  125:21
**spoke (4)**
  11:16;12:1;36:6;
  68:9
**spoken (1)**
  113:17
**spread (1)**
  110:14
**Springfield (25)**
  17:14,16;28:8,24;
  29:5;30:5;38:16;
  39:11;52:9,13,22;
  53:8,19;54:5,8;55:2;
  65:4;66:10;80:19;
  86:24;87:13;91:20;
  94:5;105:22;108:9
**stab (16)**
  35:10;121:4,20,22;
  136:1,17;137:10,23;
  138:8,14;139:4,18,19,
  24;140:3;143:15
**stage (1)**
  106:20
**staging (1)**
  108:17

**stand (5)**
  13:7;36:4;129:10;
  132:7;159:4
**standing (4)**
  25:12;129:5;
  146:11;147:15
**stands (1)**
  120:5
**start (10)**
  40:22,23,23;47:20;
  51:9;103:7;122:14;
  127:1;128:15;142:11
**started (6)**
  103:14;127:24;
  128:1;130:18;144:16;
  150:21
**state (17)**
  5:11;45:3;57:10;
  60:22;64:14;83:2,9,
  12,16,20;84:7;
  100:14;116:13;
  126:12;127:20;
  149:15;155:7
**statement (26)**
  94:21;95:16;96:16;
  97:16;98:13;109:11;
  112:6;118:7,8,10,17;
  120:7,19;121:12;
  136:10,15;138:11,18;
  139:1;144:13,16;
  147:24;148:2,11,12;
  149:12
**statements (4)**
  134:10;143:17,20;
  144:5
**states (2)**
  109:8;148:23
**stating (1)**
  108:9
**station (2)**
  94:12;150:7
**status (1)**
  30:24
**stay (3)**
  24:1;131:22;156:20
**steal (20)**
  35:8,12;36:2,19;
  113:22;114:1;115:2;
  118:22,23;119:23;
  126:21;142:5,13;
  153:4,6,10,11,16,21;
  154:4
**stealing (5)**
  130:17;142:8;
  153:8;154:1,6
**steering (8)**
  122:11;126:6;
  130:24;131:22;
  145:10,16;149:8,8
**step (7)**
  23:7;59:24;91:13;
  95:17;98:24,24;109:9
**step-by-step (1)**

**37:8**
**steps (4)**
  76:11,19;77:1;
  108:11
**sticker (1)**
  91:6
**still (10)**
  23:3;28:5;39:6,7;
  43:19;49:6;64:20;
  86:5;149:19;158:20
**stomach (1)**
  14:16
**stood (10)**
  11:2;13:9,11;14:4;
  23:7,8,10;140:19;
  145:2,2
**stop (7)**
  33:8,18;77:17,19;
  109:20;112:1;149:4
**stopped (4)**
  23:5;78:20;109:19;
  112:20
**stopping (1)**
  34:20
**store (1)**
  62:19
**stories (1)**
  12:3
**straight (2)**
  110:8;146:3
**strange (1)**
  124:15
**strangely (4)**
  53:9;58:8;59:6;
  63:1
**street (2)**
  36:8;66:3
**strength (6)**
  155:8,14,17;156:3;
  157:23;159:3
**stress (14)**
  73:7,14,16;75:22;
  76:4,12,13,19,20;
  77:2,8,11,11;84:10
**stressful (1)**
  88:5
**strike (5)**
  24:5,6;42:12;68:8,
  24
**strikes (1)**
  39:8
**striking (1)**
  29:13
**strive (1)**
  26:7
**struck (1)**
  23:20
**struggle (1)**
  79:21
**stuck (1)**
  101:13
**stuff (4)**
  40:18;54:12,13;

**86:4**
**stumped (1)**
  41:1
**subject (8)**
  8:11,12;42:23;43:8,
  12,15;74:9,17
**suffering (4)**
  63:18;64:1;72:5;
  80:11
**summary (1)**
  97:16
**Summit (1)**
  20:15
**superhuman (6)**
  155:8,14,17;156:3;
  157:23;159:3
**support (1)**
  141:2
**Suppose (2)**
  50:20;59:5
**supposed (1)**
  113:7
**supposedly (1)**
  128:21
**sure (24)**
  6:18;7:2;12:3;
  13:15,18;15:5,19;
  55:9;59:4;75:4;78:24,
  24;79:7;89:1;95:10,
  13;96:6,14;97:7,20;
  98:10,24;128:7;
  148:20
**suspect (24)**
  25:7,16;34:3,6,9,
  23;35:12;43:12,19;
  48:22;49:2;79:15;
  112:10;115:11,18,21;
  116:7,12;120:9,10,21;
  122:2;123:5;140:10
**suspected (3)**
  60:2,12;139:17
**swear (1)**
  31:21
**sweating (1)**
  73:12
**swing (1)**
  125:23
**sworn (3)**
  5:2;32:14;33:23
**symptom (1)**
  69:9
**symptoms (11)**
  66:1,11,21,22;67:4,
  5;68:17,17;69:13;
  125:4;127:17
**system (1)**
  87:21
**Szuhay (3)**
  39:23;40:6,10
**S-Z-U-H-A-Y (1)**
  40:9

Case: 5:16-cv-02331-JRA  Doc #: 21  Filed: 07/17/17  179 of 181.  PageID #: 927
Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 1
March 15, 2017

## T

**tactics (3)**
63:19;64:2,10
**talk (20)**
8:14;13:21;15:18;
22:14;36:4;47:6,6,6,6,
8,11,15,21;49:7,7,9;
50:19;55:17;86:5,5
**talked (14)**
8:11,13;11:8,18;
15:2,6,10;73:1;74:15;
84:15;94:2;106:9;
138:2;151:8
**talking (22)**
6:4,6;10:7;16:1,14;
32:12;36:15;51:9;
57:3;58:7;64:12;96:8;
99:24;107:8;111:19;
112:20,20;113:23;
114:15;123:8;139:22;
141:20
**tall (1)**
21:11
**tase (1)**
12:9
**tased (4)**
13:8;14:4;105:17,
23
**Taser (21)**
18:19,21;21:21;
22:4,8;24:15;51:20;
75:7;85:4,7;88:5;
89:13;90:15;91:14,
17;92:23;93:4,12;
97:21,24;105:23
**tasered (1)**
88:9
**Tasering (1)**
33:11
**Tasers (2)**
85:8;88:15
**taught (4)**
55:12;80:18;84:22;
85:12
**teach (3)**
54:18;55:20;67:9
**team (2)**
55:2,6
**tearing (1)**
16:13
**telling (3)**
37:12;108:1;139:16
**tells (1)**
118:19
**temporarily (1)**
74:6
**ten (2)**
24:4;112:17
**term (1)**
157:23
**terms (13)**

9:11;11:1;19:17;
25:20;28:8;52:13;
53:8;55:12,20;57:13;
94:2;127:22;130:3
**tested (2)**
85:21,24
**testified (4)**
11:10;38:1,2,3
**testimony (7)**
9:8;23:6;57:7;
60:16;105:14;143:13;
148:10
**testing (1)**
88:11
**theft (1)**
151:22
**therefore (1)**
163:7
**thereupon (1)**
160:1
**thinking (4)**
126:13;130:15;
151:22;155:1
**though (6)**
33:1;45:2;93:21;
116:14;140:4;142:16
**thought (16)**
11:3;13:16;113:7;
115:3;116:4;130:11;
136:1;137:23;138:12,
15,15;140:12,13;
150:17,19;151:20
**thoughts (1)**
140:14
**threat (3)**
28:5;48:14;49:12,
19
**threatening (2)**
78:12,15
**three (9)**
54:13;65:16;95:1,
10;101:2;102:21;
138:11;140:15;
141:18
**throes (11)**
26:1;44:20;52:23;
53:21;60:14;62:15,
19;66:11;71:22;
80:23;115:22
**throughout (2)**
6:23;8:10
**thrown (5)**
145:18,20;146:9,
14,14
**timeline (1)**
12:7
**timelines (1)**
99:16
**times (12)**
9:20;92:22;97:13;
100:4;111:4;122:9;
124:13;126:9;130:22;
138:10;152:14;155:5

**tired (1)**
7:21
**tissue (1)**
80:1
**today (18)**
5:8,15;6:9,11;7:22;
8:4,15;9:3,5,8,14;
10:23;11:7,17;
143:13;148:7,11,17
**together (10)**
15:16,17,24;16:2,2;
95:1;117:13,16;
131:18;140:5
**told (19)**
12:8;13:12;20:13;
23:8;37:23;50:15;
51:2;85:18;96:19;
113:21;119:1;128:10;
129:16,22;130:6;
137:17,20;139:2;
141:18
**took (13)**
19:24;23:7;31:18;
54:14,22;55:1;99:13,
15;109:14;114:2;
132:20;145:4;159:11
**tool (3)**
126:14;127:1;
128:15
**top (13)**
10:6;23:4;24:1;
32:8;97:22;103:18;
135:8;146:18;147:8,
11,14,17,18
**total (2)**
120:8,20
**totality (1)**
48:23
**touch (2)**
66:6;70:17
**towards (5)**
47:7;103:7,14;
106:2;110:15
**Township (25)**
17:14,16;28:9,24;
29:5;30:6;38:16;
39:11;52:9,13,22;
53:8,20;54:5,8;55:3;
65:4;66:10;80:19;
86:24;87:13;91:20;
94:5;105:22;108:9
**traffic (3)**
107:7,8,11
**trailer (1)**
93:16
**train (4)**
38:15;39:10;40:10;
41:13
**trained (12)**
38:20;39:18,19;
41:3;46:8;47:4;55:4,
7;65:24;66:4,9;87:17
**training (38)**

38:13;39:3,9,14,15;
40:13;41:13,16;
52:13,20,22;53:7,15,
19;54:2,10;55:11;
64:18,21;65:1,2,3,13,
15,18;66:12;67:3,4,
18;68:1;75:4,6;85:2,
4;86:8;88:8;89:3;
90:14
**trainings (1)**
66:7
**transcript (1)**
163:2
**travel (1)**
110:5
**treating (1)**
34:6
**treatment (1)**
99:8
**trial (2)**
8:24;9:3
**tried (22)**
35:9;36:19;113:22;
114:1;115:1;121:4,
19,22;124:6;136:1,
17;137:10,23;138:8,
14;139:4,18,19,24;
140:3;143:15;154:12
**trouble (2)**
7:21;30:16
**true (164)**
25:6;26:5,6,8,9,13,
16,18,19,21,22,24;
27:3,6,7,8,14,17,20;
28:17,18;30:16,17,18,
19;31:3,13,16,17,19;
34:1;41:21,22;42:1,4,
7,10,13,16,19,23;
43:2;45:10,14,15,19;
48:15;58:19,20;
60:22;61:2,9,18;62:3,
9;63:19;64:2;69:4,11,
19,22;70:5,9;72:7,15,
20;73:23;74:5,9,17;
75:22;76:13;77:2,9,
12,21,24;78:3,6,12,
15,18,21;79:1,8,15,
19,22;80:6,13;81:7,
11,14,21;82:4,7,11,
17;83:3,10,13,17,18,
22,23;84:2,5,10,13,
19;87:22;88:6,21;
89:5,13,17,23;90:3,
10,15;95:14;101:24;
105:12;108:24;
115:23;124:16,18,21;
125:4,10,12,15,18,21,
22,24;126:1,3,4,7,8,
10;130:22;131:15,16,
19,23;132:3,23;133:3,
11,18,21;134:1,18;
135:13,14,15;141:5;
144:21;155:1,5;

156:7;159:15
**try (40)**
6:6,6;8:19;12:2;
18:19;29:12;46:21;
47:8;49:9;55:18,20;
56:5,6,9,12;57:21;
64:14;72:18;75:7;
83:24;106:5,11;
122:14;126:2;129:16;
131:1,4,9,14,22;
140:3;145:5;146:6;
149:2,16,21;156:15;
157:12,18;159:14
**trying (49)**
28:6;35:8,12;36:2,
19;39:1;56:2;61:23;
64:12;118:22,23;
119:23;126:20;128:5;
129:8;141:14;142:11;
144:22;145:1,8;
146:22;149:9;153:4,
6,10,11,15,21;154:4;
155:24;156:2,5,9,11,
12,13;157:1,5,18,22;
158:5,6,6,8,13,15;
159:4,8,9
**Tuesday (2)**
102:13,21
**turn (10)**
35:20;86:2;110:10;
111:10,13;113:10,12;
122:17,20;154:15
**turned (5)**
19:21;109:22,23;
110:3,15
**turns (1)**
87:1
**two (15)**
12:11;25:8;36:7;
37:7,10;39:20;85:2;
94:4;102:17,19;
108:7;111:5;130:20;
145:9;159:17
**type (8)**
17:5;43:24;75:14;
84:24;106:15;107:2,
23;110:21
**types (2)**
28:23;30:8
**typing (1)**
95:3

## U

**uncontrollable (1)**
87:22
**under (18)**
9:5;27:6;53:6,16;
71:15;72:15,19;73:2,
7,21;74:4;75:22;81:6;
90:1;114:22;147:4;
150:24;157:5
**undergo (1)**

Case: 5:16-cv-02331-JRA  Doc #: 21  Filed: 07/17/17  180 of 181.  PageID #: 928

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 1
March 15, 2017

54:1
**undergone (2)**
  64:17;65:13
**underneath (6)**
  135:23;146:23;
  147:1;155:23;156:10;
  157:1
**understood (5)**
  105:2;130:3;132:1;
  141:1,4
**undertake (1)**
  153:8
**underwent (1)**
  75:3
**uniform (1)**
  19:7
**unintentional (1)**
  46:12
**unit (1)**
  6:7
**University (1)**
  65:19
**unknown (1)**
  109:14
**Unlawfully (2)**
  32:21,23
**unless (4)**
  48:3,14;61:20,20
**Unnecessary (2)**
  27:8,13
**unreasonable (1)**
  32:16
**unresponsive (4)**
  105:12,15;133:21;
  156:17
**unsafe (1)**
  61:20
**unusual (1)**
  155:9
**up (79)**
  6:24;7:15;8:14,19,
  21;12:3,5,8;13:7,9,10,
  11;14:4;15:8,9;16:13;
  18:22;22:23;23:3,7,8,
  10;29:2;35:7;36:1,9,
  21,21;37:8,23,23;
  49:1;50:10;88:2;97:5;
  102:23;109:23;
  110:11;111:7;112:23;
  113:5,5,5,8,9,12,13;
  117:12,16;119:2,7,22;
  120:3;122:6;123:2;
  129:2,9;132:8;135:8;
  140:19;141:9;145:2,
  2;147:3;149:4;
  151:19;155:20;156:4,
  11,13,14,15,23;
  157:12;158:15,24;
  159:4,11,14
**updated (2)**
  109:9,13
**uphold (2)**
  26:7;31:22

**upon (4)**
  41:20;62:9;82:16;
  163:5
**upper (1)**
  145:8
**upright (1)**
  146:11
**use (56)**
  6:7;11:4;22:8;
  26:18;27:5,20;28:4,9,
  20,24;29:5,12,19;
  30:13;33:8;38:3,7,10;
  39:8;42:9,21;43:6;
  45:6;48:7,13;49:6,10,
  17;50:3,6,23;51:17;
  60:18;70:22;72:12,
  17;73:14;74:8,16;
  75:19;76:4;87:17;
  88:5;91:13,14,17,19,
  23;92:22;93:3,4;94:6;
  128:15;132:2;133:8;
  142:19
**used (7)**
  93:7;105:23;135:7;
  139:13,17;141:5;
  157:23
**uses (10)**
  17:5;39:11;41:14,
  17;71:6,16,24;72:7;
  73:3;77:7
**using (7)**
  34:22;50:21;75:7;
  90:15;127:1;136:7,23
**usually (4)**
  6:6;49:9;106:7;
  151:4

---

**V**

**variance (1)**
  102:20
**vehicle (16)**
  35:13;37:8;112:11;
  115:12,18;120:9,22;
  122:14;128:14;129:5;
  131:15,19,23;132:2,
  10,11
**verbal (2)**
  73:22;104:19
**verbally (2)**
  55:23;124:14
**versed (1)**
  28:12
**video (1)**
  122:5
**videoed (1)**
  8:18
**view (3)**
  25:21;34:8,14
**viewing (1)**
  43:17
**violence (1)**
  41:19

**voice (4)**
  8:19;47:16,22;
  55:16
**voluntarily (2)**
  156:20;158:3
**volunteered (1)**
  37:21
**vulnerable (1)**
  71:6,23;72:6;73:3

---

**W**

**Wait (1)**
  127:13
**waived (1)**
  159:23
**walk (7)**
  49:1;50:15,18;52:4;
  117:16;119:7,22
**walked (2)**
  35:7;37:8
**walking (9)**
  17:3;36:1;37:22;
  66:2;114:18;119:2;
  120:3;129:2;139:21
**walks (1)**
  151:19
**warning (19)**
  21:1;68:8,10,10,14,
  18;69:15,18,21;70:4,
  8,16;72:5;84:15,18;
  108:13,23;151:8;
  152:5
**warrant (2)**
  93:15;106:21
**water (1)**
  63:14
**way (38)**
  7:8;13:13;14:7;
  17:7;26:10,12;36:22,
  23;37:12,23;41:14;
  49:2;61:12;62:2;
  72:14;94:11;107:8;
  109:23,24;113:4,9,9;
  114:14,24;116:7;
  120:10,24;128:13;
  132:19;141:23;
  145:22;146:4;147:5;
  148:14,19;149:1,23;
  153:14
**ways (5)**
  45:9;46:19;54:17;
  94:4;129:22
**weapon (11)**
  29:20;42:10;82:3,
  10;87:18,20;89:17;
  142:6,10,13;143:2
**weapons (8)**
  50:21;75:4;88:19;
  89:4;90:3,10;101:23;
  142:14
**wearing (1)**
  21:8

**weather (2)**
  103:15,17
**week (6)**
  10:23,24;16:7;85:2;
  93:11;137:13
**weigh (1)**
  21:13
**weight (2)**
  24:2,3
**weights (1)**
  21:15
**weren't (3)**
  13:13;126:13;
  159:10
**What's (12)**
  19:20;48:24;55:21;
  56:2,6,10;57:6,13;
  60:10;91:18;110:5;
  144:3
**wheel (8)**
  122:11;126:6;
  131:1,22;145:11,16;
  149:8,8
**whenever (1)**
  79:14
**White (13)**
  36:10,11;103:10,
  12;106:3;109:20;
  110:8,9,11;111:8,11;
  118:2,5
**whole (5)**
  18:5;36:4;39:5;
  48:23;106:6
**whose (2)**
  96:1;139:9
**William (1)**
  5:13
**window (8)**
  35:7,11;114:19;
  125:18;130:9,19;
  131:1;153:17
**windows (1)**
  12:19
**windshield (1)**
  128:3
**wires (1)**
  13:13
**within (2)**
  29:5;75:11
**without (1)**
  64:16
**WITNESS (12)**
  27:23;51:14;63:13,
  15;70:13;90:20;
  134:10;143:17,20;
  144:5,13;159:17
**witnesses (2)**
  19:12;117:24
**woman (1)**
  113:24
**women (1)**
  71:7
**wondering (2)**

**11:1;158:1**
**wording (1)**
  39:2
**words (2)**
  123:12;147:22
**work (9)**
  21:15;41:10;49:3;
  50:10;151:22
**worked (1)**
  17:11
**working (9)**
  18:3;7;19:4;21:18;
  24:20;92:9;128:22;
  154:14;158:20
**works (4)**
  87:20;149:23,23,24
**worried (1)**
  13:13
**wow (1)**
  123:17
**wrapped (1)**
  102:23
**wrench (3)**
  156:9;157:1,5
**wrestling (1)**
  146:12
**write (9)**
  96:2,5;118:9,10,16,
  18;136:9;143:4;
  150:18
**writing (1)**
  143:14
**written (3)**
  28:15;116:8;142:18
**wrong (1)**
  123:19
**wrongdoing (1)**
  19:19
**wrote (11)**
  95:1,16;96:1;116:9;
  118:8;121:12;136:15,
  19;140:24;143:21;
  144:2

---

**Y**

**year (7)**
  17:21;30:4;39:1,4,
  5;88:16;148:7
**years (11)**
  17:24;30:4,5;39:17;
  40:1;41:3;54:4;64:23;
  65:3;88:17;98:17
**yelled (1)**
  114:19
**yelling (5)**
  69:17;124:18;
  125:20;149:9;152:3
**Yep (1)**
  111:12
**Yogi (2)**
  65:21,21
**Yoho (1)**

Haydn Zeis, Administrator of the Estate of Jordn Miller v.
Springfield Township, Ohio, et al.

Officer Joseph Holsopple - Vol. 1
March 15, 2017

65:21
**young (2)**
  46:3;105:3
**Younger (3)**
  117:24;118:2,5

---

### 1

**1 (1)**
  97:19
**10 (2)**
  91:7,18
**1019 (5)**
  112:9,24;115:7,10,
  17
**12 (11)**
  10:5;94:17,21;
  97:10;98:13;99:24;
  109:8,11;139:1;
  144:1;148:12
**13 (1)**
  103:18
**13th (1)**
  15:4
**14 (5)**
  39:17;40:1;41:3;
  54:4;65:3
**15 (2)**
  88:17;152:14
**15:14 (1)**
  102:16
**17 (2)**
  30:4,5
**17th (1)**
  30:4

---

### 2

**20_ (1)**
  163:3
**2008 (1)**
  68:2
**2009 (1)**
  68:2
**2014 (1)**
  21:18
**2015 (17)**
  15:13;21:8,18,23;
  22:7,10;33:24;84:19;
  87:15;92:6;94:22;
  102:13;136:16;148:5,
  18;152:23;153:3
**2017 (1)**
  15:4
**207 (1)**
  39:23
**24 (1)**
  98:17
**24-year-old (4)**
  99:11;105:3;
  115:21;116:21
**25 (1)**
  129:10

**260 (1)**
  21:14
**265 (1)**
  21:14

---

### 3

**3 (4)**
  86:14,19;87:5,13
**3:12 (1)**
  102:13
**3:30 (1)**
  160:2

---

### 4

**40 (1)**
  40:18

---

### 5

**5'11 (1)**
  21:12

---

### 8

**8 (2)**
  92:9,9
**80 (1)**
  40:19
**80s (1)**
  103:21
**8th (14)**
  21:8;22:7,10;33:23;
  84:19;87:15;92:6;
  94:22;102:13;136:16;
  148:5,18;152:22;
  153:2

---

### 9

**90 (2)**
  103:21;151:24
**909 (5)**
  103:12;106:2;
  109:23;111:7,8
**911 (1)**
  102:12