UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| HAYDN ZEIS, Administrator of the Estate of Jordn Lukas Miller, Deceased | ) | CASE NO. 5:16CV2331 |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| vs. | ) | |
| SPRINGFIELD TOWNSHIP, OHIO, et al. | ) | **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON HIS EXCESSIVE FORCE CLAIM AGAINST DEFENDANTS ROBERT SCHERER, JOSEPH HOLSOPPLE, AND DENISE MOORE** |
| Defendants. | ) | |

Plaintiff, Haydn Zeis, Administrator of the Estate of Jordn Miller, pursuant to Federal Rule of Civil Procedure 56, submits his Motion for Partial Summary Judgment on his Excessive Force Claim against Defendants Robert Scherer, Joseph Holsopple, and Denise Moore.

Respectfully submitted,

/S *Michael A. Hill*

MICHAEL A. HILL (0088130)
**EADIE HILL TRIAL LAWYERS**
3100 East 45th Street, Suite 218
Cleveland, Ohio 44127
(216) 777-8856 (o) | (216) 716-2507 (f)
michael.hill@eadiehill.com

***Counsel for Plaintiff***

# TABLE OF CONTENTS


Table of Contents ..... ii

Table of Authorities ..... iii

Statement of Issues ..... iv

Summary of the Arguments ..... v

Facts Statement ..... 1

A. Springfield Township's Policy Prohibited Prone Restraint and Required Defendants to Contact EMS for Signs of "Excited Delirium." ..... 1

B. Defendants Knew the Dangers of Prone Restraint and Positional Restraint Asphyxia. ..... 1

C. Anything that Increases the Body's Stress Response Increases the Risk of Positional Restraint Asphyxia. ..... 2

D. "Excited Delirium" is a Medical Emergency. ..... 3

E. Officers Must Be on the Lookout for Warning Signs of Excited Delirium. ..... 3

F. Springfield Township Officer's Actions on September 8, 2015 ..... 4

i. The Report to 911 and Dispatch ..... 4

ii. Jordn Miller was Contained Inside the Jeep ..... 5

iii. Prone Positioning Outside of the Jeep and the Multiple Taser Applications ..... 8

G. EMS Had the Ability to Treat Jordn if Defendants' Followed Policy. ..... 13

I. Legal Standard For Summary Judgment ..... 14

II. Defendants' Actions Constituted Excessive Force ..... 15

III. Jordn Miller's Rights were Clearly Established. ..... 19

Conclusion ..... 20

Certification of Track ..... 20

Certificate of Service ..... 21

# TABLE OF AUTHORITIES

**Cases**

*Abston v. City of Merced*, 506 Fed.Appx. 650 (9th Cir. 2013) ..... vi, 17
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..... 14
*Champion v. Outlook Nashville, Inc.*, 380 F.3d 893 (6th Cir. 2004) ..... vi, 15
*Cruz v. City of Laramie*, 239 F. 3d 1183 (10th Cir. 2001) ..... vi, 16
*Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003) ..... 17
*Feliciano v. City of Cleveland*, 988 F.2d 649 (6th Cir. 1993) ..... 14
*Gutierrez v. City of San Antonio*, 139 F.3d 441 (5th Cir. 1998) ..... 17
*Howe v. Town of North Andover*, 854 F.Supp.2d 131 (D. Mass. 2012) ..... vi, 17
*Johnson v. City of Cincinnati*, 39 F.Supp.2d 1013 (S.D. Ohio 1999) ..... vi, 16
*Kendall v. Hoover Co.*, 751 F.2d 171 (6th Cir. 1984) ..... 14
*Krecham v. County of Riverside*, 723 F.3d 1104 (9th Cir. 2013) ..... vi, 16
*Martin v. City of Broadview Heights*, 712 F.3d 951 (6th Cir. 2013) ..... vi, 15, 19
*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ..... 14
*May v. Township of* Bloomfield, 2013 U.S. Dist. LEXIS 74437 ..... 16
*McCue v. City of Bangor*, 2016 WL 5349730 (1st Cir. 2016) ..... 16
*Pirolozzi v. Stanbro*, 2008 U.S. Dist. LEXIS 36054 (N.D. Ohio 2008) ..... vi, 16
*Richman v. Sheahan*, 512 F.3d 876 (7th Cir. 2008) ..... vi, 17
*Simpson v. Hines*, 903 F.2d 400 (5th Cir. 1990) ..... vi, 17
*Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008) ..... vi, 17

**Rules**

Fed.R. Civ.P. 56 ..... 14

## STATEMENT OF ISSUES

I. Did Defendants Robert Scherer, Joseph, Holsopple, and Denise Moore violate Jordn Miller's federal constitutional right to be free from excessive force?

II. Was Jordn Miller's right to be free from excessive force under the circumstances of September 8, 2015 clearly established?

## SUMMARY OF THE ARGUMENTS

On September 8, 2015, Jordn Miller's mother, Wendy Tomblin, called 911 and requested medical and psychiatric help for her son who was experiencing a mental breakdown. She confirmed with 911 that that her son was non-violent, not dangerous, and had no weapons.

Defendants Robert Scherer, Joseph Holsopple, and Denise Moore were law enforcement officers employed by Springfield Township. They responded to the call knowing that this was a mental health crisis concerning someone in need of medical and psychiatric treatment. Shortly after Ms. Tomblin's 911 call, dispatch informed Defendants that Jordn was in a parked car in a driveway one street from his home.

Defendants knew that Jordn was in the throes of a mental health crisis. They observed Jordn exhibit warning signs of a medical condition sometimes referred to as "excited delirium." Springfield Township has a policy mandating officers to immediately contact EMS whenever they encounter any person exhibiting any warning signs of excited delirium. That policy also forbids officers from placing such a person in a face down prone (on stomach) position.

Defendants knew on September 8, 2015 that restraining someone in a face down prone position can cause positional asphyxia, a life-threatening condition where the body's position interferes with breathing leading to cardiac arrest. Defendants knew that individuals exhibiting signs of "excited delirium" or experiencing an acute mental health crisis are at an increased risk of suffering positional asphyxia. Defendants knew that using an electrical conducted weapon (Taser) on a person in a face down prone position increases the risk of positional asphyxia.

While Jordn was seated in the parked automobile and *before* any officers touched Jordn, he admittedly displayed numerous warning signs of "excited delirium," which mandated that Defendants contact EMS and avoid placing Jordn in a face down prone position. Defendants did

not contact EMS. Defendants forcibly removed Jordn from the parked automobile and threw him to the ground. They immediately placed Jordn in face down prone restraint, and Jordn remained in a face down prone position until *after* became unresponsive. At no point did Defendants ever attempt to transition Jordn out of prone restraint to a safer position. While Jordn was in a face down prone position, Defendants kicked Jordn, struck Jordn in the back of his head with their forearm, Taser-ed Jordn, Taser-ed Jordn a second time while he was facedown with his hands cuffed behind his back, and three officers placed pressure on Jordn's back. Jordn became unresponsive. Jordn never regained consciousness. He died on September 10, 2015.

Defendants' actions were in violation of the Springfield Township directive concerning excited delirium and prone restraint. The Defendants agree that the purpose of the directive is to provide prompt medical attention and avoid the life-threatening condition of excited delirium. Not only did Defendants' actions violate their own policy, but they were in violation of clearly established law concerning the use of prone restraint, positional asphyxia, and excessively using force on a restrained individual. *See, e.g., Champion v. Outlook Nashville, Inc.*, 380 F.3d 893 (6th Cir. 2004); *Martin v. City of Broadview Heights*, 712 F.3d 951 (6th Cir. 2013); *Johnson v. City of Cincinnati*, 39 F.Supp.2d 1013 (S.D. Ohio 1999); *Pirolozzi v. Stanbro*, 2008 U.S. Dist. LEXIS 36054, *20 (N.D. Ohio 2008); *Krecham v. County of Riverside*, 723 F.3d 1104 (9th Cir. 2013); *Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008); *Cruz v. City of Laramie*, 239 F. 3d 1183 (10th Cir. 2001); *Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003); *Abston v. City of Merced*, 506 Fed.Appx. 650 (9th Cir. 2013); *Richman v. Sheahan*, 512 F.3d 876 (7th Cir. 2008); *Simpson v. Hines*, 903 F.2d 400 (5th Cir. 1990).

Defendants' admitted actions violated Jordn's constitutional rights and clearly established law. Summary judgment in Plaintiff's favor is appropriate.

## FACTS STATEMENT

### A. *Springfield Township's Policy Prohibited Prone Restraint and Required Defendants to Contact EMS for Signs of "Excited Delirium."*

In 2009, Springfield Township Police Department enacted a policy regarding a medical emergency condition called "excited delirium." See Springfield Township Excited Delirium Policy, attached as Ex.6. The policy states:

> ANY OFFICER WHO ENCOUNTERS A PERSON WHO EXHIBITS **ANY WARNING SIGNS** OF "EXCITED DELIRIUM", **SHALL IMMEDIATELY SUMMON EMS** AND HAVE THEM RESPOND TO A NEARBY STAGING AREA, **SUMMON FOR ADDITIONAL POLICE BACKUP**, MAKE ANY AND ALL ATTEMPTS TO TAKE CONTROL OF THE SUBJECT FOR MEDICAL ASSESSMENT.
>
> WE UNDERSTAND THAT THE SUBJECT MAY HAVE EXTREME STRENGTH AND ENDURANCE AND WILL NEED TO BE RESTRAINED. **IT WILL BE OUR DIRECTIVE NOT TO LEAVE THE SUBJECT LAYING IN A "FACE DOWN PRONE POSITION**"

See Ex. 6.

This directive has the force of policy. (See David Hoover Dep. (May 17, 2017) 25:5-13), Ex.7; Robert Scherer Dep. (May 15, 2017) "Vol.II" 60:4-13, attached as Ex.10) According to Chief David Hoover, the officers are to carry out this policy to the letter of the policy. (Scherer Vol.II at 60:4-13.) Officer Scherer taught other officers about excited delirium, trained on this directive, and drafted the policy. (Id. 58:10-59:6) This policy was in place on September 8, 2015. (Id. 57:17-22)

### B. *Defendants Knew the Dangers of Prone Restraint and Positional Restraint Asphyxia.*

Defendants Scherer, Holsopple, and Moore were aware of the life-threatening dangers of restraining someone in a prone position as of September 8, 2015. Prone position means lying face down on your stomach. (Robert Scherer Dep. (May 14, 2017) "Vol.I" 105:4-12, attached as Ex.9) Restraining a person in a face-down prone position can cause positional restraint asphyxia. (Scherer Dep. Vol.I 107:1-11; Joseph Holsopple Dep. (Mar. 15, 2017) "Vol.I" 79:17-20, attached as Ex.11) Positional asphyxia is a life threatening medical condition that can cause cardiac arrest

and death. (Scherer Vol.I 100:1-101:1; Holsopple Vol.I 78:14-22) Positional restraint asphyxia occurs when a person's body position interferes with breathing either by compressing the chest, obstructing the airway, or causing difficulty breathing. (Scherer Vol.I 100:1-101:1; Holsopple Vol.I 77:20-78:9)

Admittedly, officers must be aware of the risks of positional asphyxia when restraining members of the public. (Scherer Vol.I 101:12-24) Because prone restraint is a risk factor for positional asphyxia, officers must get people out of prone restraint and onto their side or back as soon as possible. (Id. 101:12-24; 107:1-11) Moving a person to his side or back can avoid positional asphyxia because it takes pressure off his chest or diaphragm allowing the person to breathe. (Id. 107:1-11) Knowing that improper restraint can cause death, police officers must choose the safest means to restrain a person which means avoiding prone restraint and getting the person off is stomach as soon as possible. (Id. 41:6-20; 101:12-24; 107:1-11)

### C. *Anything that Increases the Body's Stress Response Increases the Risk of Positional Restraint Asphyxia.*

In deciding whether to use force or what amount of force to use, officers must consider whether the body is showing signs of physiologic stress. (Scherer Vol.I 97:2-12) This is important because adding stress to an already compromised individual is dangerous and can cause heart rhythm, difficulty breathing, and sudden death. (Scherer Vol.I 97:19-98:12)

Defendants knew that being under the influence of drugs, in an acute mental health crisis, suffering from "excited delirium," or being exposed to an electrical conducted weapon (Taser) all increase the likelihood that a person will suffer positional asphyxia if placed in prone restraint. (Holsopple Vol.I 81:6-17; 82:2-14; Scherer Vol.I 117:9-22; 65:17-20; 99:1-3; 98:17-24) Moreover, engaging a person in a struggle increases the physiological stress level by increasing agitation and triggering the body's fight or flight mechanism. (Scherer Vol.I 99:10-18) If a person

is in a prone position and they're struggling to get up or move, and they're being held down by officers, that increases the risk of positional restraint asphyxia. (Holsopple Vol.I 79:21-23)

***D. "Excited Delirium" is a Medical Emergency.***

The dangers of prone restraint become even more serious when a person is suffering from an agitated state caused by an acute mental health crisis or "excited delirium." (Scherer Vol.I 114:13-16). Everyone agrees that excited delirium is a life threatening medical condition. (Id. at 117:24-120:22) People in excited delirium need medical attention as soon as possible. (Id.)

Excited delirium causes the pulse to race placing extreme stress on the body. (Scherer Vol.I 117:24-120:22) A person already in a heightened stressful state like excited delirium is at increased risk for positional asphyxia. (Id.) Using a Taser on such a person further increases the stress response. (Id.) Repeated applications—meaning more than one—of a Taser compound the stress on the body of a person with excited delirium. (Scherer Vol.I 117:24-120:22)

Usually, police officers are the first individuals to respond to a person in excited delirium. (Id.) It is critical for an officer who encounters any warning signs of excited delirium to call for an ambulance immediately. (Scherer Vol II. 60:22-61:7) Defendants' understanding is consistent with the Springfield Township excited delirium policy. (See Ex.6) The policy mandates that if an officer "encounters a person who exhibits ***any warning signs*** of 'excited delirium', [they] ***shall immediately summon EMS***" and not leave the person "in a ***face down prone position***." (Id.) The purpose of this mandate is so that EMS can respond quicker because a person in such an agitated condition needs immediate medical attention. (Scherer Vol.I 74:23-75:7)

***E. Officers Must Be on the Lookout for Warning Signs of Excited Delirium.***

When responding to calls of mental health crises, Springfield Township Police Officers usually make the first contact. (Scherer Vol.I 72:20-73:2) Defendants testified that the following are warning signs of "excited delirium": (1) "a mental disorder" or "active mental illness," (2)

disorientation, (3) increased body temperature causing a person to disrobe or "a report that a person is disrobed or taking off their clothes or running around naked," (4) "bizarre behavior," (5) a "[r]eport that a person is mentally out of it" and "[a] report that someone is mentally ill and getting worse" (6) "speech disturbances," (7) "hallucinations" including "screaming out names of people who are not there," (8) "delusions" (9) "[c]onfusion," (10) "[d]iminished mental capacity, a failure to understand what's going on around them, not understanding your circumstances, looking dazed and confused," (11) "delusions or hallucination," (12) disorganized or incoherent speech, (13) "shouting or yelling," and (14) "agitation." (Scherer Vol.I 121:6-122:1, 122:2-4, 122:11-124:9; Scherer Vol.II 7:24-9:3; Holsopple Vol.I 20:24-21:3; 68:7-70:21) Defendants were aware of these warning signs on September 8, 2015. (Scherer Vol.I 123:24-124:2) In fact, Scherer trained officers at Springfield Township about excited delirium. (Scherer Vol.I 124:3-9)

### *F. Springfield Township Officer's Actions on September 8, 2015*

#### *i. The Report to 911 and Dispatch*

On September 8, 2015, Wendy Tomblin called 911 to report that her son Jordn Miler needed medical attention for a psychiatric breakdown. (See 911 Audio Recordings of September 8, 2015, attached as Ex.1[1]; Transcript of 911 Call, attached as Ex.2; Declaration of Wendy Tomblin, attached as Ex.3.) Wendy told a 911 dispatcher the following:

> My son's had a psychotic break. He's running around in the driveway naked. Please get somebody here. …He's 24. He's mentally ill. …He's got bipolar disorder, ADD, OCD. He's had a break….He's talking crazy out of his head. I've noticed for a couple of days he's had a couple of breaks but this is the worst. I've been trying to calm him down thinking that would help, but there's nothing working. I don't want them to hurt him. …He's outside now, I don't know. He don't know anything. He's talking out of his head. …He needs to be in a psych ward really bad. I've been trying to get him to go. It's like his mental illness is getting worse with age.

[1] The audio file for Wendy Tomblin's 911 call on September 8, 2015 is available here

See Ex.1; Ex.2. Wendy confirmed during the 911 call that Jordn was not dangerous and no one had been injured. Id.

Within moments, individuals near Wendy Tomblin's home reported an individual who was acting delirious and was seated in an automobile. (See Transcript of Audio Recording, attached as Ex.4.) The automobile where Jordn was located was at 1019 Abington Drive, which is one street from Jordn's home. (Scherer Vol.I 177:11-15, 178:12-17; 153:12-14[2] Dispatch recognized that the person seated in the car was Jordn Miller and instructed the homeowner to leave him alone as police were on their way. See Ex.4.

***ii. Jordn Miller was Contained Inside the Jeep***

Dispatch notified Defendants about Jordn Miller. At no point did the officers activate their lights because they were not responding to a crime in progress. (Scherer Vol.I 150:10-151:8; Rather than a crime in progress, Defendants knew this was a call for a mental health crisis. (Scherer Vol.I 152:8-11) Indeed, Officer Scherer testified that when he was interacting with Jordn Miller the only suspicion he had was that Jordn was having a mental health crisis and needed help. (Scherer Vol.I 162:13-22) Based on the information they had, the officers knew ***before*** they arrived that the person they would be interacting with—Jordn Miller—was in the "throes of a mental health crisis," "was running around naked," and "had a mental disability of some sort." (Scherer Vol.I 163:13-17, 164:4-10, 166:21-167:3; Signed Joint Statement of Robert Scherer, Joseph Holsopple, and Denise Moore, September 8, 2015, attached as Ex.5, at p.1)

It is undisputed that the report Defendants received about Jordn revealed someone with a diminished mental capacity, was engaging in odd and irrational behavior, was in mental distress, and there was no evidence that Jordn was dangerous in any way. (Scherer Vol.I 169:4-170:6)

[2] All depositions cited in this Motion have been filed with the Court. For the Court's convenience deposition pages cited in this Motion are also attached as exhibits.

Based on this available information, the officers had to consider that Jordn might be scared and confused, might not understand the police's role, needed medical help, had disrobed and was running around the neighborhood naked, and was somebody who might be delusional and hallucinating (Id. at 171:15-173:2; 174:7-21)

At this point, based on the officers own understanding of "excited delirium," the officers were aware that Jordn had demonstrated numerous warning signs of excited delirium. (Scherer Vol.I 121:6-122:4, 122:11-13, 122:16-19, 122:20-123:23; Scherer Vol.II 7:24-9:3; Holsopple Vol.I 20:24-21:3; 68:7-70:21) The officers, however, did not contact EMS. (Scherer Vol.I 173:9-11) The plan was simply "to show up and see what happens." (Scherer Vol.I 174:2-5)

Scherer and Holsopple were driving separate cruisers toward Jordn's home when dispatch radioed that Jordn was now in a parked vehicle at 1019 Abington Drive, one street from his home where his mother called 911. (Scherer Vol.I 177:11-15, 178:12-17; 153:12-14) Holsopple parked his cruiser in the road directly in front of 1019 Abington, and Scherer parked his cruiser directly behind Holsopple's. (Scherer Vol.I 181:23-182:15) There were several individuals standing by the Jeep, and Jordn was inside the Jeep.

After parking their cruisers, Scherer and Holsopple were approached by a male who said that a person was in the Jeep in the driveway. (Scherer Vol.I 184:1-6) Defendants understood that the person in the Jeep was Jordn. (Scherer Vol.I 178:12-23; 184:4-9) The Jeep was parked and not running. (Id. at 184:14-16.) Holsopple and Scherer walked approximately 25 feet from their cruisers to the parked Jeep where Jordn was seated. (Scherer Vol.I 186:4-12) The officers told the four people who were standing next to the vehicle to step aside, which they did. (Scherer Vol.I 186:15-187:12)

Scherer and Holsopple stood about two or three feet from the driver's side of the vehicle, (Scherer Vol.I 202:22-203:1) Jordn was inside the Jeep by himself. (Scherer Vol.I 187:13-14)[3] Jordn was seated in the driver's seat of the Jeep, was flailing around, screaming, making no sense at all, "was just uttering spontaneous nonsense," was "acting bizarre," and was "talking to nobody." (Scherer Vol.I 187:15-188:7) The entire time that Holsopple and Scherer stood side-by-side at the driver's side door, Jordn did not say anything that made any sense. (Scherer Vol.I 188:12-23) Jordn would go from silence to yelling nonsense. (Scherer Vol.I 188:24-189:7) Although Jordn would at times yell or speak loudly, he did not direct his speech at anyone but simply yelled in whatever direction his head was facing. (Scherer Vol.I 189:8-11)

At all times Scherer and Holsopple were standing by the Jeep, Jordn was seated in the driver's seat, the doors were shut, Jordn was flailing his arms while uttering spontaneous nonsense; Jordn clearly "doesn't know what's going on"; Jordn never had keys in his hands and there were no keys in the vehicle; Jordn never attempted to start the vehicle; Jordn never demonstrated that he had the means or ability to start or drive the vehicle; Jordn never had any tools in his hands while the officers were present; Jordn never swung his hands outside the vehicle; Jordn never tried to strike, kick, bite, or spit on anyone; Jordn could not strike, kick, bite, or spit on anyone if he tried because they were not in striking distance; Jordn never tried to get out of the vehicle; and Jordn was contained in the vehicle. (Scherer Vol.I 189:12-14; 190:15-24, 191:19-193-7; 196:13-15; 201:22-202:4; 203:8-11; 204:10-15; Scherer Vol.II 6:11-7:13) Other than simply being in a car, Jordn had not undertaken any act that was in furtherance of stealing a car. (Holsopple Vol.I

[3] With his bullet proof vest on, which he was wearing on September 8, 2015 Officer Scherer weighed between 210 and 220 pounds. (Scherer Vol.I 149:1-16) Holsopple weighed between 260 and 265 pounds. (Holsopple Vol.I 21:13-14). Denise Moore weighed approximately 185-190 pounds with her gear on September 8, 2015 (Moore Dep. (Mar. 20, 2017) 158:22-159:13, Exhibit. 14) Jordn weighed a little more than 150 pounds. (Scherer Vol. II 48:17-21)

153:23-2) At deposition, Scherer admitted that he is unable to identify any threat posed by Jordn to any officer or member of the public while Jordn was in the Jeep. (Scherer Vol.I 203:18-204:1)

Admittedly, Jordn displayed many warning signs of excited delirium while he was in the Jeep ***before*** the decision was made to remove Jordn from the Jeep. (Scherer Vol.II 9:4-7) During the entire time the officers had been on scene, Jordn was contained in the Jeep, and the officers had the time and opportunity to contact EMS (as required by policy). (Scherer Vol.I 199:1-8). Not only did Defendants not contact EMS, they did not know where EMS was located, did not do anything to find out, and did not contact a supervisor. (Scherer Vol.I 199:9-17)

Even though Jordn was not presenting an identifiable threat to anyone while he was in the Jeep, Scherer and Holsopple chose to forcefully remove Jordn from the vehicle. (Scherer Vol.I 204:16-18) The officers made this decision knowing that they would then have to use additional physical force against Jordn once he was outside of the vehicle. (Id. at 197:12-17) The officers opened the door and both officers reached into the Jeep, grabbed Jordn by the torso and upper body, and began pulling him out of the vehicle. (Scherer Vol.I 205:16-206:8) Jordn continued to have his hand on the steering wheel to remain in the vehicle. (Scherer Vol.I 206:9-11) Defendants broke Jordn's grasp and threw him on his stomach in a facedown prone position on the gravel driveway. (Scherer Vol.I 207:4-208:13)

***iii. Prone Positioning Outside of the Jeep and the Multiple Taser Applications***

Once Jordn was ripped from the vehicle, Holsopple was positioned on Jordn's right side; Scherer was on Jordn's left side; and Jordn was in a face down prone position. (Scherer Vol.I 208:9-209:1) Jordn attempted to roll from side-to-side to get out of face down prone position, but Scherer and Holsopple put their hands on Jordn's back and compressed his body to the ground to

keep him from arching his back or moving. (Scherer Vol.I 209:14-210:16) The officers admit that they were using force to keep Jordn in a face-down prone position. (Id. at 210:17-19; 215:18-22)

Jordn never got out of prone position. (Scherer Vol.I 215:23-24) When Jordn became unresponsive he was still in prone position. (Scherer Vol.I 216:1-4) While the officers were pressing down and using force on Jordn, his right arm was underneath his diaphragm, like the position one would use to give someone the Heimlich maneuver. (Scherer Vol.I 218:3-5; Holsopple Vol.I 147:5-7) This of course, when coupled with the force being used to press on Jordn's back, was forcing oxygen from his body. Jordn's left arm was behind his back and cuffed. (Scherer Vol.I 219:16-18)

While the officers were compressing Jordn's body into the ground to keep him in prone position, Jordn moved his head to the left, raised it no more than 6-7 inches, and bit the front of Scherer's shin. (Scherer Vol.I 221:1-22)

As soon as Jordn bit Scherer, Scherer removed his leg from Jordn's mouth, stood, took a step back, and Jordn's face fell back into the gravel. (Scherer Vol.I 222:4-17; 223:2-9). Scherer testified that once he stood and took a step back, *the biting event had concluded*, and Holsopple was still holding Jordn's body on the ground. (Scherer Vol.I 223:13-21) Jordn could not bite Scherer at this point. (Scherer Vol.I 223:19-21) Even though the biting event had concluded, Jordn was restrained in a face down prone position by Holsopple with one arm cuffed behind his back, Jordn's face was in the gravel, Jordn was not attempting to bite anyone, and Jordn could not bite anyone if he tried, Scherer kicked Jordn. (Scherer Vol.I 224:2-225:10) Scherer kicked Jordn with his right leg, which is Scherer's strong side. (Scherer Vol.I 226:6-10)

Scherer testified that when he kicked Jordn, it was "clear he's not going to bite me again." (Scherer Vol.I 224:12-16) At the same time Scherer kicked Jordn while he was in a face down

prone position, Holsopple lifted his forearm and drove it into the back of Jordn's head at the base of his neck smashing Jordn's face into the gravel and then laid on him. (Holsopple Dep. (Mar. 15, 2017) "Vol.I" 22:10-23:24)

Immediately after Scherer kicked Jordn and Holsopple drove his forearm into the back of Jordn's head and neck and laid on Jordn, Scherer chose to use his Taser. (Scherer Vol.I 228:2-5) When Scherer decided to use his Taser, it was apparent to Scherer that Jordn was still in the throes of a mental health crisis, was not mentally capable of following officer commands, and Scherer believed that all of Jordn's actions were because of his mental health condition. (Scherer Vol.I 232:23-233:23)

Scherer drew his Taser with his right hand; Holsopple lifted Jordn's sweatshirt to expose his bare flesh; Scherer grabbed Jordn's shirt with his left hand to keep it from falling; Scherer fired the Taser darts into Jordn's back; and with the darts in Jordn's back moved the Taser to Jordn's leg to increase the electrical current and effect of the Taser. (Scherer Vol.I 234:4-235:9; 236:18-237:24) Placing the Taser on Jordn's bare thigh acted "like a third dart" and created a very large spread increasing the electrical current and causing complete neuromuscular contraction and seizure. (Scherer Vol.I 239:8-22; 242:18-243:4)

When Scherer fired the Taser into Jordn's back, the officers were actively pushing down on Jordn's back while Jordn was in a face down prone position. (Scherer Vol.I 233:24-234:3; 235:19-236:19; 242:15-17) When Scherer fired the Taser, Jordn had not attempted to bite Scherer again. (Scherer Vol.I 238:1-7) Holsopple handcuffed both of Jordn's hands behind his back. (Scherer Vol.I 244:7-11) It was only after Scherer used the Taser that any officer from Springfield Township called EMS. (Scherer Vol.I 243:5-11)

Jordn remained in a face down prone position with his hands cuffed behind his back. (Scherer Vol.I 245:2-6) The officers remained in the same position with Scherer's left hand on Jordn's back and both of Holsopple's hands in the middle of Jordn's back between his shoulders. (Scherer Vol.I 245:7-13; 246:16-248:1) Jordn's body was attempting to rock side-to-side but Scherer and Holsopple were using their hands to press down with force to keep Jordn in a face down prone position. (Scherer Vol.I 247:19-248:9)

Sgt. Denise Moore was the on-shift and on-scene supervisor on September 8, 2015. (Scherer Vol.I 147:8-14; 249:5-7) While Jordn was handcuffed in prone position and as a third officer (Moore) was now on scene, Scherer used the Taser a second time on Jordn's calf. (Scherer Vol.I 254:22-255:1) While Jordn was in prone position and the Taser was used a second time, Scherer also had his foot on Jordn's leg and was pushing it into the ground to keep Jordn from moving. (Scherer Vol.II 17:5-24) One of Holsopple's hands was pushing into the middle of Jordn's back where Jordn's hands were cuffed and Holsopple's other hand was pushing Jordn's right leg into the ground to keep it from moving. (Scherer Vol II. 18:6-19) Moore placed her foot into Jordn's upper back and pushed down with force to prevent Jordn's head and neck from rising off the ground as Scherer and Holsopple continued to use force. (Scherer Vol. II 18:20-19:7)

Together, after the second Taser was deployed, Scherer, Holsopple, and Moore were successful at forcefully keeping every part of Jordn's body, including his diaphragm, torso, head, neck, and legs on the ground. (Scherer Vol.II 19:17-20:10; 20:19-23.) After several minutes of being in this position, with Scherer on one side holding Jordn down, Holsopple holding Jordn down, and Moore holding Jordn down Jordn with her foot on his upper back, Jordn become unresponsive. (Scherer Vol. II. 22:3-20)

Defendants' testimony is consistent with the signed statement Defendants Scherer, Holsopple, and Moore jointly created, reviewed, and signed on the night of the encounter. While he was in a facedown prone position, "Sgt. Moore had her right foot on his left shoulder blade to keep him from arching up. . .He continued to struggle and try to get up ***<u>for several minutes</u>***. When he stopped trying to get up, Officers started rubbing his back asking if he's okay trying to get a response from him. Sgt. Moore did a sternum rub with no response." (See <u>Ex.5</u> at p.1-2) Jordn was still in a prone position when the officers began rubbing his sternum. (Scherer Vol. II. 23:11-13)

Defendants knew that the risks of positional asphyxia decrease when a person is transitioned out of prone position. (Scherer Vol.I 253:23-254:6) There is no dispute that the safer position for Jordn to be in was sitting up and not in a prone position. (Scherer Vol.I 254:7-12) Despite the known risks of positional asphyxia, no one ever attempted to transition Jordn out of prone position. (Joseph Holsopple Dep. (Mar. 17, 2017) "Vol.II" 61:20-62:3, attached as <u>Ex.12</u>.) After Scherer and Holsopple removed Jordn from the Jeep, he never got out of prone position and remained in a prone position until he became unresponsive. (Scherer Vol.II 11:2-23) While Jordn was in a prone position, Scherer kicked Jordn, Holsopple drove his forearm into the back of Jordn's head, Scherer used a Taser, Jordn never stood or got out of prone position; the officers used force to hold Jordn in a prone position; Scherer used a Taser a second time while Jordn was in prone position and handcuffed; and the three officers forcefully pushed on Jordn's back and until he became unresponsive. (Scherer Vol. II.11:24-12:11)

Officer Holsopple admitted that he knew that Jordn Miller had debris, "a mouthful of gravel," and a "rock or two" from the driveway in his mouth but chose not to remove it, even after Jordn became unresponsive. (Holsopple Vol.II 86:1-21) None of the officers removed the debris from Jordn's mouth. (Scherer Vol.II 27:10-17; Holsopple Vol.II 88:1-2) None of the officers gave

CPR to Jordn. (Scherer Vol.II 35:5-9) Jordn Miller was still handcuffed behind his back in a face down prone position when paramedics arrived. (See Shawn DeWolfe Dep. (May 31, 2017) 53:8-17, Ex.13.) Paramedics rolled Jordn onto his back. (Id.)

That evening, the officers created a use of force report. In the contemporaneous use of force report, Scherer wrote, "[t]he suspect was believed to be in full excited delirium state." During his deposition, Scherer confirmed that was the officer's belief at the time he was interacting with Jordn. (Scherer Vol. II. 52:19-53:10)

### *G. EMS Had the Ability to Treat Jordn if Defendants' Followed Policy.*

Had the officers followed the excited delirium policy, Springfield Township paramedics on duty on September 8, 2015 testified that they can administer the medication ketamine, which is the "gold standard drug" for quickly treating excited delirium, mental crises, and other agitated states. (See DeWolfe 20:9-21:2; 39:2-40:23) "The goal of sedation is to not prolong restraint." (Id. 31:13-14) The paramedics testified that ketamine achieves rapid calming of the subject to eliminate physiologic stress, which is why it is important to sedate the person as soon as possible. (Id. 46:10-16) Ketamine has a "very limited risk" and is "quick acting." (Id. 33:23-34:10) Indeed, the paramedics testified that if a person is acting erratic and won't calm down with reasonable attempts, ketamine is the safest option for everybody involved. (Id. 40:2-5)

Ketamine is given via an intramuscular injection into any muscle. (Id. 21:9-17) The Springfield Township paramedics who responded had ketamine in their ambulance on September 8, 2015. (Id. 29:14-19; 31:25-32:16) Springfield Township paramedics testified that they have successfully administered ketamine to agitated individuals displaying signs and symptoms nearly identical to what Jordn Miller exhibited on September 8, 2015, including "[f]lailing his arms," cannot be calmed down by bystanders, saying things that don't make sense, and to individuals with a diminished mental capacity. (Id. 26:8-14; 26:25-29:2) In that instance, EMS coordinated with

the people who were present and immediately converged to give the injection without any struggle. (Id. 30:14-31:14) The ketamine worked by almost immediately subduing the person who was safely transported to the hospital. (Id. 112:15-113:1).

## I. LEGAL STANDARD FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed.R. Civ.P. 56. Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue of material fact regarding the existence of an essential element of the nonmoving party's case. *Id.*

A fact is "material" for purposes of summary judgment if proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Accordingly, when a reasonable jury could not find that the nonmoving party is entitled to a verdict, there is no genuine issue for trial and summary judgment is appropriate. *Id.; Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993).

Once the moving party carries the initial burden of demonstrating that there are no genuine issues of material fact in dispute, the burden shifts to the nonmoving party to present specific facts to prove that there is a genuine issue for trial. *Anderson*, 477 U.S. at 256. To create a genuine issue of material fact, the nonmoving party must present more than just some evidence of a disputed issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

## II. DEFENDANTS' ACTIONS CONSTITUTED EXCESSIVE FORCE

Plaintiff is entitled to judgment as a matter of law on her excessive force claim against Defendants Scherer, Holsopple, and Moore. The issue is whether Defendants' uses of force were objectively unreasonable under the circumstances of September 8, 2015 when analyzed from the perspective of an ordinary law enforcement officer. They were not. The law was clearly established long before September 8, 2015 that Defendants' conduct of forcibly restraining Jordn in the manner they chose was exceedingly dangerous.

The following cases demonstrate that use of force at issue was at least objectively unreasonable, and that Jordn's right to be free from the force at issue was clearly established. In *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004), the court confirmed that "[c]reating asphyxiating conditions by putting substantial pressure, such as body weight, on the back of an incapacitated and bound suspect constitutes objectively unreasonable force." It was clearly established that putting substantial or significant pressure on a suspect's back while he is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force.

In *Martin v. City of Broadview Heights*, 712 F.3d 951, 960, 961, 962 (6th Cir. 2013) (emphasis added) the court found:

> The officers' failure to adhere to departmental policy that explained the grave dangers of positional asphyxia verifies the unreasonableness of their actions . . . The prohibition against placing weight on Martin's body *after* he was handcuffed was clearly established in the Sixth Circuit as of 2007 . . . Zimmerman and Tieber crossed the line *Champion* drew when they placed their arms on Martin's back to restrain him after he was handcuffed and prone. . . *Champion* proscribes the use of substantial or significant pressure that creates asphyxiating conditions in order to restrain a subject who does not pose a material danger to the officers or others. ***<u>That Champion himself was handcuffed is incidental to the rule</u>*** . . . *Champion's* reliance on *Simpson* shows that creating asphyxiating conditions by applying "substantial or significant pressure" to restrain a suspect who presents a minimal safety risk amounts to excessive force. . . The officers violated clearly established law that required them to take into account the diminished capacity of an unarmed detainee when assessing the amount of force exerted.

> To summarize: Our precedents and BHPD's own policies clearly established in August 2007 that the force the officers used to restrain Martin was excessive. A reasonable officer should have known that subduing an unarmed, minimally dangerous, and mentally unstable individual with compressive body weight, head and body strikes, neck or chin restraints, and torso locks would violate that person's clearly established right to be free from excessive force.

Likewise, in *Pirolozzi v. Stanbro*, 2008 U.S. Dist. LEXIS 36054, *20 (N.D. Ohio 2008) the court explained that Pirolozzi, who was unarmed, was handcuffed behind his back and placed belly-down on the street, and this did not pose a threat to anyone. Creating asphyxiating conditions by putting substantial or significant pressure, such as body weight, on his back constituted objectively unreasonable excessive force. In *May v. Township of* Bloomfield, 2013 U.S. Dist. LEXIS 74437 (E.D. Mich. May 28, 2013), the court reiterated that placing pressure on the back of a suspect lying face down constitutes excessive force as of November 2009 because it restricts the suspect's breathing and creates a risk of asphyxiation. Plaintiff alleged defendant kneeled on deceased's shoulder/back area while deceased was cuffed in a prone position and that his resistance was an attempt to get off the ground to breathe. *See also, e.g., Johnson v. City of Cincinnati*, 39 F.Supp.2d 1013 (S.D. Ohio 1999) (Information existed in the law enforcement community, which put officers on notice of the dangers of positional asphyxia during prone restraint after a seizure. A reasonable jury could infer that a violation of civil rights was a predictable result from inadequate training and find that information existed that put law enforcement on notice of the risks of positional asphyxia.); *McCue v. City of Bangor*, 2016 WL 5349730 (1st Cir. 2016) (Arrestee in 2012 had a clearly established right not to be placed face-down in a prone position while two officers exerted weight on his back and shoulders.); *Krecham v. County of Riverside*, 723 F.3d 1104 (9th Cir. 2013) (Officers who restrained a delusional man in prone position by using their knees to hold decedent's shoulder blades down were not entitled to qualified immunity.); *Cruz v. City of Laramie*, 239 F. 3d 1183 (10th Cir. 2001) (Agitated state constituted clue to trained

officer that pressure on the chest was likely to cause positional asphyxia); *Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003) (Officers' alleged act of continuing to press their weight onto detainee's neck and torso as he lay on the ground and begged for air constituted excessive force. The degree of force used posed a risk of compression asphyxia and was thus severe, no underlying crime was at issue, and detainee likely posed only minimal threat to anyone's safety after being handcuffed. In what has come to be known as compression asphyxia, prone and handcuffed individuals in an agitated state have suffocated under the weight of restraining); *Gutierrez v. City of San Antonio*, 139 F.3d 441 (5th Cir. 1998) (Putting substantial weight on a suspect's back while that suspect is in a prone position after being subdued and/or incapacitated constitutes excessive force); *Abston v. City of Merced*, 506 Fed.Appx. 650 (9th Cir. 2013) (It was clearly established as of 2008 that use of body compression to restrain a prone and bound suspect, who was in no position to offer any meaningful resistance, would constitute unreasonable force.); *Simpson v. Hines*, 903 F.2d 400 (5th Cir. 1990) (Sitting on detainee in jail who was bound in prone restraint caused asphyxiation death and constituted excessive force.); *Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008) (A reasonable officer would have known that pressure placed on Mr. Weigel's upper back as he lay on his stomach created a significant risk of asphyxiation and death. His apparent intoxication, bizarre behavior, and vigorous struggle made him a strong candidate for positional asphyxia. Officers' application of substantial or significant pressure on a suspect's back for 3 minutes while suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force.); *Richman v. Sheahan*, 512 F.3d 876 (7th Cir. 2008) (Sitting on the back of a person in face down prone restraint constituted excessive force); *Howe v. Town of North Andover*, 854 F.Supp.2d 131 (D. Mass. 2012) (Applying pressure to a suspect's

upper back, once he is handcuffed and his legs restrained, is constitutionally unreasonable due to the significant risk of positional asphyxiation associated with such actions.)

In this case, Defendants were not responding to a crime.[4] Everyone admits that Defendants were responding to a mental health call for a person in a mental health crisis who needed medication and psychiatric treatment. Based on the information they received, Defendants knew that Jordn Miller was agitated, acting bizarrely, uttering nonsensical statements, yelling in the direction of nonexistent people, was in the throes of a mental health crisis, and was of a diminished mental capacity. Defendants knew *before* Jordn was removed from the Jeep that he displayed numerous warning signs that he would be at risk of positional asphyxia, including signs of an acute mental health crisis and "excited delirium." Springfield Township's policy mandated that they call EMS immediately and avoid the use of prone restraint. (See. Ex.6) Defendants disregarded this policy despite knowing that the purpose of the policy and the risks in disregarding it.

Defendants knew that Jordn's behaviors were red flags that he was at risk of suffering positional asphyxia if they placed him in prone restraint or engaged in a struggle with him. Defendants knew that using a Taser—especially repeated applications of the Taser—exacerbated that risk. Moreover, Defendants knew that placing pressure on Jordn increased the risk of positional asphyxia.

> Q Because putting pressure on Jordn's body would increase the risk of positional restraint asphyxia; true?
>
> A True.
>
> Q And that's why it needed to be avoided; true?
>
> A Yes.

[4] Jordn Miller was never charged with a crime. (See Holsopple Vol.II 33:12-14)

(Holsopple Vol.I 135:12-16) But Defendants chose to do so anyway. In fact, at the time Jordn became unresponsive he in a face down prone position, with hands cuffed behind his back, Scherer and Holsopple were pressing Jordn's body into the ground, and Moore was standing with her foot on his upper back for "several minutes." (Scherer Vol. II. 22:3-20; Ex.5 at p.1-2) Jordn was cuffed, restrained, unarmed, and posed a minimal (if any) threat. This force was excessive.

Scherer and Holsopple's decision to kick and strike Jordn after the biting incident had concluded, "it was clear he's not going to bite [anyone]," while he was in prone restraint, his face was already in the gravel, and he could not bite anyone even if he tried because of the distance, was gratuitous. Jordn was unarmed and posed no threat to anyone at that point, and Defendants' acknowledge that they knew all of his actions were being driven by his mental health crisis and he was unable to comply with their commands because of his mental state. Scherer's subsequent decision to use his Taser multiple times on Jordn while he was restrained in a face down prone position, both before and after he was handcuffed behind his back, was decidedly unreasonable.

## III. JORDN MILLER'S RIGHTS WERE CLEARLY ESTABLISHED.

It was clearly established by September 8, 2015, that Jordn Miller, a person of admittedly diminished capacity, had the right to be free from being ripped from the Jeep when he posed no articulable threat to anyone, to be free from having pressure placed on his back while in a prone position, to be kicked and struck while having pressure exerted on him in a prone position, and to be Taser-ed while in a prone position with his hands cuffed behind his back, all of which is proscribed by Springfield Township's policies and settled law. *See, e.g., Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004); *Martin v. City of Broadview Heights*, 712 F.3d 951, 960, 961, 962 (6th Cir. 2013).

## CONCLUSION

For the foregoing reasons, Plaintiff is entitled to judgment as a matter of law concerning her federal and state claims for excessive force against Defendants Robert Scherer, Joseph Holsopple, and Denise Moore.

## CERTIFICATION OF TRACK

Plaintiff certifies that this case has been set for a standard track, and this Motion complies with that track.

Respectfully submitted,

/S *Michael A. Hill*

MICHAEL A. HILL (0088130)
**EADIE HILL TRIAL LAWYERS**
3100 East 45th Street, Suite 218
Cleveland, Ohio 44127
(216) 777-8856 (o) | (216) 716-2507 (f)
michael.hill@eadiehill.com

***Counsel for Plaintiff***

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 17th day of July 2017, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF System. Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF Systems.

s/ *Michael A. Hill*
MICHAEL A. HILL (0088130)