**EXHIBIT**

**9**

exhibitsticker.com

# In The Matter Of:

*Haydn Zeis, Administrator of the Estate of Jordn Miller v. Springfield Township, Ohio, et al.*

---

*Officer Robert Scherer*

*Vol. 1*

*March 14, 2017*

---

*Layne & Associates*

*6723 Cooperstone Drive*

*Dublin, Ohio  43017*

*(614) 309-1669*

*WhitneyLayne@att.net*



Original File 03-14-2017 Scherer Final.txt

**Min-U-Script® with Word Index**

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


Haydn Zeis, Administrator of
the Estate of Jordn Miller,
    Plaintiff,

    vs.                    Case No. 5:16-CV-02331-JRA

Springfield Township, Ohio,
et al.,
    Defendants


- - -


        VIDEO DEPOSITION OF ROBERT SCHERER
the Defendant herein, called by the Plaintiff under the
applicable Rules of Civil Procedure, taken before me,
Whitney Layne, a Notary Public for the State of Ohio, at
the Springfield Township Police Department, 2465 Canfield
Road, Akron, Ohio  44312 on March 14, 2017 at 10:00 a.m.


              LAYNE & ASSOCIATES
            6723 COOPERSTONE DRIVE
             DUBLIN, OHIO  43017

2

1   APPEARANCES

2

3        MICHAEL HILL, ESQUIRE
         EADIE HILL TRIAL LAWYERS
4        3100 East 45th Street
         Suite 218
5        Cleveland, Ohio  44127
               on behalf of the Plaintiff
6

7        GREGORY BECK, ESQUIRE
         MEL LUTE, ESQUIRE
8        BAKER DUBLIKAR BECK WILEY & MATHEWS
         400 South Main Street
9        North Canton, Ohio  44720
               on behalf of the Defendants
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

3

1          March 14, 2017
           Tuesday Session
2          10:00 a.m.

3
                    - - -
4
                STIPULATIONS
5
        It is stipulated by and among counsel for the
6   respective parties that the deposition of ROBERT SCHERER,
    the Defendant herein, called by the Plaintiff under the
7   applicable Rules of Civil Procedure, may be taken at this
    time by the notary Whitney Layne; that said deposition may
8   be reduced to writing in stenotypy by the notary, whose
    notes thereafter may be transcribed out of the presence of
9   the witness; and that the proof of the official character
    and qualification of the notary is waived.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

41

1   BY MR. HILL:

2          Q      That's part of your job; correct?

3          A      Correct.

4          Q      To protect and serve; correct?

5          A      That is correct.

6          Q      And in terms of choosing the safest way, that

7   includes what force to use; correct?

8          A      Correct.

9          Q      That includes how to go about using that force;

10  correct?

11         A      Yes.

12         Q      That includes making decisions about how to

13  restrain a person; true?

14         A      True.

15         Q      That includes planning on how to address

16  members of the public when they're in a medical or mental

17  crisis; true?

18                MR. BECK:  Objection.

19                Go ahead.

20         A      True.

21  BY MR. HILL:

22         Q      Police officers must use the least amount of

23  force needed under the circumstances; true?

24                MR. BECK:  Objection.

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

1    A    Possibly, yes.

2    Q    Have you ever received -- I know I talked to

3 you kind of more broadly about diminished mental capacity.

4 But have you ever received any training regarding how to

5 interact with members of the community who are mentally

6 ill or in the throes of a mental crisis?

7    A    No.  Yes and no, to be honest with you.

8         The excited delirium training I have sometimes

9 can be construed as potentially one onset mentally that

10 could be, you know -- somebody could be thrown into an

11 onset of excited delirium just mentally.  But just that

12 little bit of training, nothing above and beyond that.

13    Q    I want to just unpack that. I think I

14 understand it.  But you've received some training on

15 excited delirium; true?

16    A    Yes.

17    Q    And one of the things that can cause excited

18 delirium in your understanding is an underlying mental

19 health issue?

20    A    Could be, yes.

21    Q    But other than excited delirium training,

22 you've never had -- let me back up again, too.

23         Were you also saying that people with excited

24 delirium behave in manners similar to people who are

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

1          You know, if he starts fighting with us and

2   attacking us and attacking EMS personnel, then we might

3   have to use other force.  It just depends on what they're

4   displaying to us, so --

5          Q    Is the goal to -- if you have an agitated

6   person, to speak softly, quietly, and try to prevent that

7   agitation from growing?

8          A    We try.

9          Q    You said, "When EMS has been called, we usually

10  wait for EMS to arrive."  Is that right?

11         A    No.  EMS is already dispatched prior to us

12  getting dispatched, usually.  So we're already there, or

13  we're already going there and they're already going there.

14  We usually beat them there, so we'll go in and make the

15  initial contact.

16          But depending on the circumstances, even though

17  EMS is called by dispatch prior to us, a lot of times they

18  will not approach until the whole scene is secure.  So

19  they might be a block or two down the road anyway.

20         Q    So EMS in those situations would be in a

21  staging area?

22         A    Sometimes they are.  And sometimes they come up

23  to the house.  It just depends on -- again, it's based off

24  the information they receive.

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

1      Q     You said you make the first contact; correct?

2      A     Usually, yes.

3      Q     And when you make the first contact, do you try

4   to get available information from family members about

5   what is going on with this person?

6      A     Yes.

7      Q     Because they're really the best resource in

8   terms of this person's mental health history; correct?

9      A     Correct.

10      Q     And they're the best resource in terms of how

11   this person is behaving; correct?

12      A     Correct.

13      Q     And they may be a good resource in terms of how

14   to interact with this person; correct?

15      A     Yes.

16      Q     Do you coordinate in any way with EMS to find

17   out when they're arriving or where they are arriving?

18      A     No.

19      Q     Have you ever undergone any training about

20   coordinating with EMS in terms of setting up a staging

21   area or anything along those lines when responding to a

22   mental health crisis?

23      A     Training, no.  But if we think it's something

24   that needs to be staged or something, or if we think the

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

74

1   scene is not secure, we'll just let them know not to

2   approach yet.

3       Q   But I means, in terms of -- are there any kind

4   of guidelines that you have here at the department or

5   policies saying you stage and this is how you stage?

6       A   No.

7       Q   This is when you make contact with EMS?

8       A   Well, there's a -- there's a guideline put in

9   place for excited delirium cases about staging and EMS,

10  but it doesn't say, you know, where specifically they're

11  going to stage or how or when or anything like that.

12      Q   Uh-huh.  So what does that mean, then, staging?

13      A   Staging just means to try to be in an area that

14  we are at.  Not on scene, but maybe a few blocks away,

15  maybe a half mile away, depending on where we're located.

16      Q   And we'll get into excited delirium.  But does

17  it mean -- staging, does it mean a half a mile?  Does it

18  mean a block?  Does it mean --

19      A   It depends where they stop.

20      Q   What's the point of the staging area or the

21  staging -- what's the point of EMS staging anywhere?

22      A   Anywhere?

23      Q   Yeah.  What's the point of having that as part

24  of a policy, that they're staging?

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

1      A      Just so that they are able to respond quicker.

2      Q      Right.  Because you have a person who may be

3   medically compromised; true?

4      A      Yes.

5      Q      You may have a person who needs immediate

6   medical attention; true?

7      A      True.

8      Q      It may be a person who needs the administration

9   of medications immediately; true?

10           MR. BECK:  Objection.

11      A      Yeah, I don't know that one.  That's --

12   BY MR. HILL:

13      Q      That would be up to EMS?

14      A      That's up to them, yeah.

15      Q      Just so I understand it, when you're asked to

16   respond to a mental health crisis at a person's home --

17   because that's the example we've been using -- do you

18   formulate a plan with your fellow officers as to when

19   you're going to arrive, who's going to arrive, who is

20   going to take the lead, anything like that?

21      A      No.

22      Q      How do you approach the situation?  Is it just

23   you walk in and ask what's going on?

24      A      Well, usually the call is dispatched to the

Officer Robert Scherer - Vol. 1 - March 14, 2017

1      A     Yes.

2      Q     When considering whether to use force, officers

3  have to consider all the evidence they have in front of

4  them; correct?

5      A     Yes.

6      Q     And the evidence they have in front of them

7  includes signs that a person may be exhibiting that

8  they're under increased stress; true?

9           MR. LUTE:  Objection.

10          Go ahead.

11     A     That could be any number of things, yes.  But

12  that could be one.

13   BY MR. HILL:

14     Q     And that's one of the things that an officer

15  should consider?

16     A     But again, if they're out of control or they're

17  coming at us or have harmed somebody else, you know, we

18  may not have time to consider that.

19     Q     Assuming that an officer has time to consider

20  that, whether a person is demonstrating signs of stress,

21  if those warning signs are present, it's something

22  officers should take into consideration; true?

23     A     Yes.

24     Q     And that's because when a body is already under

Officer Robert Scherer - Vol. 1 - March 14, 2017

98

1    stress, adding stress to that person can be dangerous for
2    that person; true?
3         A    It could, yes.
4         Q    It can cause that person to have heart rhythm
5    problems; true?
6         A    Yes.
7         Q    It can cause that person to have trouble
8    breathing; true?
9         A    Yes.
10        Q    It can cause that person to suffer from sudden
11   death; true?
12        A    Yes.
13        Q    Conditions that you're aware of that can
14   increase the body's physiological stress response can
15   include drug use, particularly stimulants; true?
16        A    Yes, sir.
17        Q    It can include mental illness; true?
18        A    Yes, sir.
19        Q    And specifically, I'm referring to a mental
20   health crisis, where is a person may be acting erratic or
21   under agitation?
22        A    Any number of reasons, yes.
23        Q    That's one of them?
24        A    It could be, yes.

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

1      Q      Medical conditions, like excited delirium, can

2  put the body under extreme stress; true?

3      A      Yes, sir.

4      Q      A reasonable officer should attempt to decrease

5  the stress response of a person, not increase the amount

6  of stress; true?

7           MR. LUTE:   Objection.

8           Go ahead.

9   BY MR. HILL:

10      Q      When a police officer uses force, this can

11  increase the physiological response of the person's body;

12  true?

13      A      It can, yes.

14      Q      It can increase that agitation level; true?

15      A      Yes.

16      Q      It can increase that body's fight or flight

17  response; true?

18      A      Yes.

19      Q      Positional restraint asphyxia occurs when a

20  person's body position interferes with breathing; true?

21      A      Yes.

22      Q      This can be caused by a restriction on the

23  person's ability to expand his or her chest; true?

24      A      Yes.

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

100

1        Q      This can be caused when the person -- or the

2   position of a person's head obstructs the airway; correct?

3        A      It can, yes.

4        Q      This can be caused when anything is in the face

5   or mouth of the person and it obstructs their airway;

6   true?

7        A      Yes.

8        Q      Positional restraint asphyxia is a life-

9   threatening medical condition; true?

10       A      It can be, yes.

11       Q      Positional restraint asphyxia can cause death;

12  true?

13       A      Yes.

14       Q      When restraining an individual, police officers

15  must actively assess the person to make sure they're

16  restrained in a manner that allows them to breathe; true?

17       A      If it's feasible, yes, we try.

18       Q      When restraining an individual, officers must

19  make sure that nothing is obstructing the person's

20  breathing; true?

21       A      Again, we try.  It's not always possible, but

22  we do what we can do, you know, when we can.

23       Q      Because the result, if the breathing is

24  compromised, is the person can die; true?

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

101

1          A     That's true.

2          Q     So it's not one of those things where you kind

3     of try a little bit.  You've got to try very hard;

4     correct?

5               MR. LUTE:  Objection.

6               Go ahead.

7          A     Again, it depends on what type of fight that

8     we're involved in or level of force that's going on.  But

9     when we are able to, we try to make sure that they are

10    safe during this whole resisting, so to speak.

11     BY MR. HILL:

12         Q     Officers have to be aware of the risks of

13    positional restraint asphyxia whenever they're interacting

14    or restraining members of the public; true?

15         A     We try to be, yes.

16         Q     That's part of your job; correct?

17         A     Yes.

18         Q     Prone restraint is a risk factor for positional

19    asphyxia; true?

20         A     It can be.

21         Q     Have you received any training at Springfield

22    Township or otherwise on positioning a person to avoid

23    positional restraint asphyxia?

24         A     Yes.

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

1    BY MR. HILL:

2         Q    Anything else?

3         A    No.

4         Q    And that is the risk of positional restraint

5    asphyxia, is that you go into cardiac arrest?

6         A    You could, yes.

7         Q    We talked about prone, a prone restraint being

8    a risk factor for positional restraint asphyxia; correct?

9         A    Yes.

10        Q    Prone position meaning laying face down,

11   correct, on your stomach?

12        A    Yes.

13        Q    Are there any policies or protocols here at

14   Springfield Township regarding how to restrain a person?

15        A    What do you mean?

16        Q    We have a use of force policy there; correct?

17        A    Yes.

18        Q    Is there any policy that you're aware of that

19   addresses prone restraint or how to restrain a member of

20   the public?

21        A    Not that I'm aware of.

22        Q    And other than the excited delirium training,

23   you're not aware of any specific training regarding prone

24   restraint; correct?

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

1      Q      That prone restraint can result in positional

2  asphyxia?

3         A      Yes.

4         Q      And you said roll them on their side.  That's

5  because when you roll them on their side, their diaphragm

6  and chest are no longer compressed, and it opens up the

7  airways; true?

8         A      That is true.

9         Q      Same thing when you said roll them on their

10  back; correct?

11         A      Yes.

12         Q      A struggle with officers or anybody is a risk

13  factor for positional asphyxia; correct?

14              MR. LUTE:  Objection.

15              Go ahead if you understand the question.

16         A      Yeah, I don't know what you're meaning by a

17  struggle with.

18   BY MR. HILL:

19         Q      Well, a struggle where somebody is in a prone

20  position and they're trying to get up and the officers are

21  trying to keep them down, that type of struggle increases

22  the risk of positional asphyxia because the muscles

23  require additional oxygenation; true?

24              MR. LUTE:  Objection.

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

1            So basically, when you as a member of the

2     police department, going to help people, you may not know

3     a person's underlying medical condition; true?

4          A     That's true.

5          Q     And any member of the public that you deal with

6     may have heart issues or increased stress that could put

7     them into positional restraint asphyxia if they're in a

8     prone restraint with force; true?

9          A     That's true.

10         Q     So you have got to be on the lookout for that

11    no matter what; correct?

12         A     You try, yes.

13         Q     People who are experiencing a condition,

14    sometimes described as excited delirium, are at a high

15    risk for positional asphyxia; true?

16         A     If they're prone, yes.

17         Q     Anything that causes the muscles to contract

18    severely, including the application of an

19    electrical-conducted weapon, increases the risk of

20    positional restraint asphyxia; true?

21         A     I don't know.  I can't say for certain if

22    that's accurate or not.

23              Again, positional asphyxia is -- that person is

24    laying on their stomach and we're on top of the guy, we're

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

117

1    referring to when you say prolonged?

2         A    It might be five, ten minutes.

3         Q    Is it ever okay -- I mean, five minutes in a

4    prone position would be prolonged; true?

5         A    If that subject is not -- if that subject is in

6    custody and in control, yes, that is way too long.

7         Q    Is there any time period that a person is

8    permitted -- well, let me back this up.

9              It sounds like that at -- that a police

10   officer, like yourself, should try to get a person out of

11   prone position as soon as is feasible; true?

12        A    That is true.

13        Q    Persons who are exposed to repeated

14   applications of an electrical-conducted weapon are at a

15   higher risk for positional restraint asphyxia; true?

16        A    That is true.

17        Q    And is the reason for that the extreme stress

18   caused by the muscle contractions from the weapon?

19             MR. BECK:  Objection.

20             Go ahead.

21        A    Along with that person may be laying on his

22   stomach, yes.

23     BY MR. HILL:

24        Q    Excited delirium is a medical condition.  We

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

118

1    talked about that; right?

2         A    I can't remember if we really touched on it

3    being a definition of medical condition or not.

4         Q    It is a medical condition; correct?

5         A    It is, yes.

6         Q    It's a life-threatening medical condition;

7    true?

8         A    Yes, it is.

9         Q    People in a state of what's called excited

10   delirium need emergency medical attention as soon as

11   possible; true?

12        A    Yes.

13        Q    People in the state of excited delirium need

14   medical attention as soon as possible because they need

15   medical treatment; true?

16        A    Yes.

17        Q    People are often -- police, like yourself, are

18   often the first responders contacted when a person is

19   having a medical emergency called excited delirium; true?

20        A    Usually, yes.

21        Q    Being in a state of excited delirium is not a

22   crime; true?

23             MR. BECK:  Objection.

24             Go ahead.

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

119

1        A      That -- no, that's not a crime.

2    BY MR. HILL:

3        Q      Because it's a medical condition; true?

4        A      Correct.

5        Q      And from a police officer's perspective, the

6    reason a person is in a state of excited delirium is

7    irrelevant; true?

8            MR. BECK:  Objection.

9        A      Why they're in it?

10   BY MR. HILL:

11       Q      Uh-huh.

12       A      Yeah, that's irrelevant.

13       Q      Because from a police officer's perspective, a

14   person who is in a state of excited delirium needs medical

15   care and attention as soon as possible, regardless of what

16   caused the excited delirium; true?

17       A      Yes.

18       Q      And that's just like any other medical

19   condition.  The reason that they're in the medical

20   condition doesn't matter as much as the fact that they're

21   in a medical condition; true?

22       A      That's true.

23       Q      When a person is in a state of excited

24   delirium, the pulse can race; true?

Officer Robert Scherer - Vol. 1 - March 14, 2017

120

1       A       Yes.

2       Q       It can put extreme stress on the body; true?

3       A       Yes.

4       Q       It can increase the risk of positional

5   restraint asphyxia, like we talked about; true?

6       A       Yes.

7       Q       Using a Taser on such a person can increase the

8   stress response even more; true?

9               MR. BECK:  Objection.

10              Go ahead.

11      A       It might.

12   BY MR. HILL:

13      Q       Repeated applications of a Taser compound the

14   stress on the body of a person with excited delirium;

15   true?

16              MR. BECK:  Objection.

17              Go ahead.

18      A       If repeated tasings work, yes, it could.

19   BY MR. HILL:

20      Q       By repeated tasings, I mean more than once.

21   You understand that's what I mean by repeated; true?

22      A       Yes.

23      Q       You taught a class called Excited Delirium;

24   correct?

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

1          A      Yes.

2          Q      What are some of the warning signs of excited

3    delirium?

4                 Is psychomotor agitation a warning sign of

5    excited delirium?

6          A      There are several warning signs.  It can be a

7    mental disorder, it can be --

8          Q      I want to mark these a little bit slower.

9                 When you say mental disorder, what do you mean

10   by that?

11         A      Just a chemical imbalance of the brain.

12         Q      That can cause a person to go into excited

13   delirium?

14         A      It could be a contributing factor.

15         Q      Knowledge that a person has an underlying

16   mental health condition is one of those things police

17   officers like yourself would want to know to see if maybe

18   this is an excited delirium case I'm dealing with?

19                MR. BECK:  Objection.

20                Go ahead.

21         A      All the facts help when we get them.

22     BY MR. HILL:

23         Q      So you said mental disorder is a warning sign

24   of excited delirium; true?

122

1       A       It might be, yes.

2       Q       What about disorientation, a person's

3   disorientation?

4       A       That's a possibility.  They usually are

5   extremely hot in temperature, over 100 degrees with

6   internal body temperature, which usually causes them to

7   disrobe and -- and try to find means to cool down.

8               They don't like glass.  They don't like

9   anything reflective.  They don't like any type of flashing

10  lights.

11      Q       What are warning signs of excited delirium?

12  What about bizarre behavior?

13      A       Those are all warning signs.  They're all

14  equally precursors and warning signs of the same thing, of

15  excited delirium.

16      Q       So evidence or a report that a person is

17  disrobed or taking off their clothes or running around

18  naked, that's a warning sign of excited delirium; true?

19      A       That could be one precursor to it, yes.

20      Q       Report that a person is mentally out of it and

21  acting bizarre, that's a potential warning sign of excited

22  delirium; true?

23      A       It might; it might not be.

24      Q       A report -- it's one of the things that factors

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

123

1    towards excited delirium; correct?

2         A    Yes.

3         Q    A report that someone is mentally ill and

4    getting worse, that's a potential warning sign for excited

5    delirium; true?

6         A    It could be.

7         Q    Speech disturbances are warning signs of

8    excited delirium; correct?

9         A    It -- it could be, yes.

10        Q    Hallucinations are warning signs of excited

11   delirium; true?

12        A    Yes.

13        Q    Like people screaming out names of people who

14   aren't near them, as if they're talking to someone; true?

15        A    It could be, yes.

16        Q    Confusion is a potential warning sign of

17   excited delirium; true?

18        A    It could be.

19        Q    Diminished mental capacity, a failure to

20   understand what's going on around them, not understanding

21   your circumstances, looking dazed and confused, those are

22   also warning signs of excited delirium; true?

23        A    It could be, yes.

24        Q    You were aware of these warning signs of

124

1    excited delirium as of September 8th, 2015; correct?

2         A    Yes.

3         Q    And that's because you taught a class on

4    excited delirium; true?

5         A    Yes.

6         Q    When you taught a class on excited delirium,

7    what were you teaching your -- I guess maybe your students

8    here at Springfield Township; right?

9         A    Yes.

10        Q    What were you teaching them to be on the

11   lookout?  These are the things -- in addition to what

12   we've talked about -- and if it's everything we've already

13   talked about, that's fine.  But if there was more than

14   what we talked about, what were the warning signs of

15   excited delirium?

16        A    There's really not too many more warning signs

17   that are very -- that are publicized.  Because at the time

18   we were doing this, excited delirium was still very

19   controversial with the medical field.  And there were

20   doctors that believed it, and then there were a lot of ER

21   doctors that didn't believe in it and didn't believe the

22   condition even existed.  So everything that we were --

23   that I would teach was just based off of things that I was

24   taught.  And these are, again, from I guess one side who

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

147

1    over the radio.

2         Q    And would this be as involved as the fire

3    department radio we talked about earlier, or would this be

4    just kind of a simple --

5         A    No, it's a lot --

6         Q    Simpler?

7         A    Yeah, less --

8         Q    And your supervisor was Sergeant Moore; is that

9    right?

10        A    Yes.

11        Q    Was she your day-to-day supervisor?

12        A    Yes, she is.

13        Q    Is she still your supervisor?

14        A    Yes, she is.

15        Q    And I think -- I want to make sure I

16   understand.  She's your supervisor, but you trained her in

17   the past; right?

18        A    Yes.

19        Q    You would have trained her on the excited

20   delirium?

21        A    Yes.

22        Q    And the use of a Taser?

23        A    Yes.

24             MR. HILL:  Greg, we've been going for another

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

149

1     Q     Do you have a bullet-proof vest on?

2     A     Yes.

3     Q     How much does all that gear weigh, bullet-proof

4   vest, you know, belt with all the equipment?

5     A     The belt is probably 15, 20 pounds, and another

6   eight to 10 pounds maybe for the body armor.

7     Q     So the body armor added something like 25 to 30

8   pounds total?

9     A     Could be, yes, close.

10     Q     And how much did you weigh back in September of

11   2015?

12     A     Pretty much the same, which is between 190,

13   200.

14     Q     So with all the gear and everything on, you're

15   talking, you know, 210 to 220, something like that?

16     A     I would suppose.  Thank you.

17     Q     Somewhere in that range?

18     A     Yeah.

19     Q     How tall are you?

20     A     5'5.

21     Q     Do you guys have -- at Springfield Township, do

22   you guys have any kind of dash cams or video-recording

23   equipment on the cars back in September of 2015?

24     A     Yes.

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

150

1      Q      And how are those activated?

2      A      You can either turn them on manually by just

3  hitting a button in the car or they automatically turn on

4  when you activate your overhead lights.

5      Q      And when you received -- on September 8th,

6  2015, at some point in the day, about 3:12 or so, 3:15,

7  you were alerted to an incident involving Jordn Miller;

8  correct?

9      A      Yes.

10     Q      At that point, or at any point on September

11  8th, 2015, did you activate your lights?

12     A      No.

13     Q      Is there a reason why not?

14     A      Well, you mean for that call?

15     Q      Uh-huh.

16     A      No.

17     Q      Is there a reason why not?

18     A      That did not come out to a -- to us as an

19  emergency call that we would run that type of response.

20     Q      Okay.  What type of emergency response would

21  you put your lights on for?

22     A      Usually crimes in progress or, you know --

23  again, depending on what -- the radio tells us if somebody

24  is in danger, so --

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

151

1      Q      And you did not activate your lights in your

2   cruiser on September 8th, 2015, because this was not a

3   call where someone was in danger or a crime was being

4   committed; true?

5      A      That is at that point true.

6      Q      And at no point did you activate your lights;

7   correct?

8      A      Correct.

9      Q      Do you know if any of the other officers

10  activated their lights on September 8th, 2015?

11     A      I have no way of knowing.

12     Q      You don't remember seeing any?

13     A      No.

14     Q      And because you did not activate your lights,

15  the dash cam would not automatically start recording;

16  correct?

17     A      Correct.

18     Q      You would have had to manually turn on the

19  recording device?

20     A      Yes.

21     Q      Which is a flip of the switch?

22     A      And you have to push a button.

23     Q      And you did not do that regarding Jordn Miller

24  on that call; correct?

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

152

1     A     Correct.

2     Q     Is that for the same reasons that you didn't

3  activate your lights?

4     A     Yeah.  We don't usually turn our cameras on

5  manually in the cars for any reason.

6     Q     When you heard -- and I know that you've read

7  your statement several times.

8           When you heard or received information about

9  Jordn Miller, you were getting information about what you

10  would call a mental case or a mental health case; right?

11     A     Yes.

12     Q     Were you by yourself when you got the call?

13     A     Yes.

14     Q     Or it came over the radio?

15     A     Yes.

16     Q     Do you remember where you were?

17     A     I actually do.

18     Q     Where were you?

19     A     I was on -- I was in the Village of Lakemore.

20  That was my assigned district.  And I was right behind the

21  Scope school.

22     Q     How far is that from -- again, approximations,

23  but in your experience 909 Milo White Drive?

24     A     Maybe three miles, four miles, rough estimate.

153

1      Q    You said the Scope school?

2      A    Yes.

3      Q    How do you spell that?

4      A    Just S-C-O-P-E.

5      Q    Like the mouthwash?

6      A    Yeah.

7      Q    And that distance of three to four miles,

8   that's about the same distance, then, to 1019 Abington;

9   right?

10      A    Yes, that's all the same neighborhood.  Milo

11   White and Abington are all in the same neighborhood.

12      Q    Abington, basically, is like a street or so

13   over from Milo White Drive; right?

14      A    Yes.

15      Q    Before you encountered Jordn Miller, did you

16   have any knowledge about his criminal history?

17      A    No.

18      Q    Did you have any knowledge about him as a

19   person?

20      A    No.

21      Q    Had you ever heard his name before?

22      A    No.

23      Q    Did you know his family in any way?

24      A    No.

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

162

1   bottom; correct?  Kind of halfway through the page?

2        A    Yes.

3        Q    And this is your description of why you were

4   there in the first place; right?

5        A    Yes.

6        Q    So the type of call or offense that you have

7   listed is mental, running around naked; correct?

8        A    Yes.

9        Q    So at no time during your interaction with

10  Jordn Miller on September 8th, 2015, did you suspect that

11  he was on drugs; correct?

12       A    Correct.  It was way after the fact.

13       Q    And when you were interacting with Jordn

14  Miller, your only suspicion was that he was having a

15  mental health crisis; true?

16       A    Yes.

17       Q    You knew that you were responding to a request

18  for help for a suspect or a person with a mental health

19  problem; true?

20       A    Yes.

21       Q    You were called to help that person; true?

22       A    Yes.

23       Q    You were not called because of any criminal act

24  or offense; true?

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

163

1          MR. BECK:  Objection.

2      A    We did receive information while still in route

3  to that call that he was committing criminal acts, but the

4  original call was just for the mental health.

5   BY MR. HILL:

6      Q    You understood that the person you would be

7  approaching was in the throes of a mental health crisis;

8  true?

9          MR. BECK:  Objection.

10     A    We -- that's the information we received.  We

11  didn't know exactly for sure yet.

12   BY MR. HILL:

13     Q    Based on the information, all the information

14  you had was that this person that you were going to be

15  interacting with was in the throes of a mental health

16  crisis?

17     A    Yes.

18     Q    The term you have here, where it says mental,

19  running around naked, I have seen that term used in other

20  Use of Force Reports here at Springfield Township,

21  "mental."  What does that mean, mental?

22     A    Just somebody with a -- basically a mental

23  disability of some sort.

24          Like I said earlier, we have a code called 53

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

164

1    in our codes and signals that we use for dispatch and

2    radio communications.  And the definition of the 53 just

3    says mental.

4         Q    So based on everything you knew regarding this

5    original call, you understood that Jordn Miller was

6    running around naked and had a mental disability of some

7    sort; true?

8              MR. BECK:  Objection.

9              Go ahead.

10        A    That was some of the information, yes.

11   BY MR. HILL:

12        Q    In terms of timing, can you tell me when you

13   created this document, the Use of Force Report?

14        A    It was well after I had returned from the

15   hospital.  I can't give you an exact.

16        Q    Well, if you look at -- if you flip over the

17   pages a little bit here, there are some time stamps at the

18   bottom of Pages 4 and 5.

19        A    Okay.

20        Q    And 6 of the incident report; correct?

21        A    Yes.

22        Q    So on Page 4 at the bottom, it's got a time

23   stamp of 20:30?

24        A    Yes.

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

1     Q    After you had spoken to your colleagues about

2  Jordn Miller; correct?

3     A    Yes.

4     Q    Including Sergeant Moore; correct?

5     A    Yes.

6     Q    Including Officer Holsopple; correct?

7     A    Yes.

8     Q    Including Chief Smith; correct?

9     A    Yes.

10     Q    And at that point, based on everything you

11  knew, you were still dealing with somebody who just had a

12  mental health crisis, not a drug -- you weren't suspecting

13  a drug issue; true?

14         MR. BECK:  Objection.

15     A    Yeah, I -- his mom was not real cooperative

16  with letting us know what -- what he -- if he did have

17  drugs on board, so I don't -- I was still suspecting that

18  it wasn't an issue.

19  BY MR. HILL:

20     Q    That's my only question.

21         Based on everything you created, your

22  interactions with Jordn Miller, everything you did on the

23  Use of Force Report as of 10:00 p.m. on September 8th,

24  2015, the whole time you thought you had been dealing with

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

167

1  somebody who was in the throes of a mental health crisis;

2  true?

3      A    Yes.

4      Q    So if you could -- and you can follow along

5  however you want.  Maybe you can confirm.

6          It looks like -- do you have Exhibit 12 in

7  front of you?

8      A    Yes.

9      Q    Is that your incident report?

10     A    It's the --

11     Q    Investigative note?

12     A    Yeah.

13     Q    If you look at -- compare the investigative

14  note, those three pages, with pages 4, 5 and 6 of the Use

15  of Force Report, it looks like they're identical.  The

16  only difference being the signature at the bottom.

17     A    You mean Exhibit 6?

18     Q    Yes.

19     A    Yes, I believe they are the same.

20     Q    It looks like the only difference is Exhibit 12

21  has your signatures at the bottom?

22     A    Yes.

23     Q    But other than that, they're the same?

24     A    Yes.

```
 1    mental episode and that he was running around naked."

 2    Correct?

 3         A    Yes.

 4         Q    The report you received demonstrated somebody

 5    who potentially had a diminished mental capacity; true?

 6         A    Yes.

 7         Q    He's engaging in odd behavior; true?

 8         A    Yes.

 9         Q    He's engaging in what might be considered

10    irrational behavior; true?

11         A    Yes.

12         Q    Not a normal thing for people to do; right?

13         A    Yes.

14         Q    There was no report that he attempted to harm

15    anyone; correct?

16         A    Not at this moment.

17         Q    I mean, you had not received any information

18    that he had harmed anyone?

19         A    Not yet, no.

20         Q    There was no report that he was dangerous in

21    any way; correct?

22         A    No.

23         Q    There was no report that he attempted any

24    crime; correct?
```

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

170

1      A      Not yet.

2      Q      And at the time you get this information, it

3  starts to frame your view of the event you're going to

4  respond to, everything indicated that this is a person in

5  mental distress; true?

6      A      Yes.

7      Q      Not a violent criminal running around

8  terrorizing the neighborhood; right?

9      A      Not yet.

10      Q      It says -- and I ask this because three

11  officers created this report.

12            It says, "On this date officers received a

13  call."

14            Is that referring to the three of you,

15  Holsopple, Sergeant Moore, and you?

16      A      Yes.

17      Q      So when it says in this investigative note

18  officers received or officers did this, is that meaning

19  all three of you, you've all endorsed that view?

20      A      Yes.

21      Q      Do you remember where you were at when you got

22  the call of this mental health issue you were being asked

23  to respond to?  Do you remember what the weather was like

24  that day?

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

1      A    It was -- it was sunny, but it was -- I don't

2   remember the temperature, but it wasn't cold, but it

3   wasn't hot either.  It was just an in-between temperature.

4      Q    It was clear outside; right?  It wasn't raining

5   or anything like that?

6      A    Right.

7      Q    It was sunny?

8      A    Right.

9      Q    It was warm outside; correct?

10      A    It was cool.  It wasn't warm.  It wasn't cold.

11   Just that in-between temperature phase.  It wasn't -- like

12   I said, it wasn't overly hot and it wasn't overly cold.

13      Q    You have a clear memory of that?

14      A    Yeah.

15      Q    This person who is running around naked, this

16   gives you an impression of a person who might be highly

17   confused; correct?

18      A    Originally.

19      Q    Might be a person who actually could run into

20   traffic and get hit by a car, get themselves into trouble;

21   true?

22      A    Maybe.

23      Q    Might be somebody who is scared; correct?

24      A    Could be.

**Layne & Associates**
**(614) 309-1669**

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

172

1      Q      Could be somebody who, because of their mental

2  state, doesn't even understand who the police are; true?

3            MR. BECK:  Objection.

4            Go ahead.

5      A      It's possible.

6  BY MR. HILL:

7      Q      Right?  It's something you have got to

8  consider; right?

9            MR. BECK:  Objection.

10     A      Possible.

11  BY MR. HILL:

12     Q      Based on the information you have, you have got

13  to consider all these things; correct?

14     A      Correct.

15     Q      You've got to consider that this person might

16  not understand the role that the police are playing in the

17  situation in responding; true?

18     A      That's possible.

19     Q      You understood that this was someone who needed

20  medical help; true?

21            MR. BECK:  Objection.

22     A      That's possible.

23  BY MR. HILL:

24     Q      That's the purpose of the call; correct?

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

173

1          MR. BECK:   Objection.

2     A     Yes.

3   BY MR. HILL:

4     Q     We know that you did not -- you did not

5  coordinate your response with any other officers; correct?

6     A     Yes.

7     Q     You agree?

8     A     Yes.

9     Q     You did not coordinate your response with EMS;

10  correct?

11     A     Correct.

12     Q     Who was the first person, police officer, to

13  arrive?

14     A     Actually, I believe myself and Officer

15  Holsopple kind of got in the area at the same time.

16     Q     Initially, based on the information you're

17  getting of this person in the throes of a mental health

18  crisis who needs medical help, what was your plan when you

19  approached?

20     A     We had to locate him first.

21     Q     What was your plan once you located him?

22     A     To evaluate him.

23     Q     How were you going to do that?

24     A     Just depends on when we got there and what was

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

174

1    happening with him and what he was doing.

2         Q    You were just going to show up and see what

3    happens?

4              MR. BECK:  Objection.

5         A    Yes.  That's all we can do.

6     BY MR. HILL:

7         Q    Based on the information -- and you understood

8    that Jordn was running around the neighborhood naked,

9    initially; true?  Based on the initial call?

10        A    The initial call.  But then even before we got

11   there, he was already dressed again.

12        Q    But based on the initial call you got, Jordn,

13   on a warm day, had disrobed and was running around naked;

14   true?

15        A    Yes.

16        Q    Based on what you received, this sounded like a

17   call for somebody who was delusional; true?

18        A    Could be, yes.

19        Q    Could be hallucinating; true?

20             MR. BECK:  Objection.  We've been over this.

21        A    It's possible, yes.

22    BY MR. HILL:

23        Q    And once you get that initial information, your

24   plan is just to go there?

**Layne & Associates**
**(614) 309-1669**

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

1    flagged down.

2         Q    I just want to make sure I understand the

3    statement, though.

4              When it says, "Officer Holsopple and Officer

5    Scherer arrived in the area," you don't know what Officer

6    Holsopple actually did?

7         A    I can't answer for him.  He was in the area

8    probably looking just like I was doing.

9         Q    I just want to know what you know.

10        A    Yeah, I don't know.

11        Q    It says, "While we were looking, dispatch

12   advised officers that they received a call from 1019

13   Abington that the suspect was there and was in their

14   vehicle in the driveway."  True?

15        A    Yes.

16        Q    So you get that information before you're

17   flagged down; correct?

18        A    No.  I'm already getting flagged down while

19   we're getting this call.

20        Q    I'm just trying to understand the order of the

21   --

22        A    Yeah.

23        Q    -- the statement.

24        A    Because that call is going out.  This lady that

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

178

1   flagged me down just tried to tell me that she -- that

2   somebody tried to steal her car, too.  So it's all coming

3   out together at the same time.

4        Q    So you're driving down Delaware?

5        A    Uh-huh.

6        Q    Yes?

7        A    Yes.

8        Q    And as this information is coming over the

9   radio from dispatch, you're at the same time getting

10   flagged down by this person?

11        A    Yes.

12        Q    And the information you get from dispatch --

13   and we'll talk about what this woman said when she flagged

14   you down.  But the information you get from dispatch is

15   that you know now where Jordn is, he's at 1019 Abington;

16   right?

17        A    Yes.

18        Q    And you know that he's in a parked car in a

19   driveway; true?

20        A    Yes.

21        Q    How far is 1019 Abington from where you were

22   looking for Jordn?

23        A    Probably a few houses up.

24        Q    So as you're driving, do you have to turn

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

1      A    I can't answer for his state of mind.

2   BY MR. HILL:

3      Q    Did Jordn start that vehicle?  Not the Jeep,

4   but the woman who flagged you down.  Did he start her

5   vehicle?

6      A    I don't know.

7      Q    Did he move the vehicle?

8      A    I don't believe so.

9      Q    And when you're talking to this woman who flags

10  you down, is she on the passenger side of the vehicle or

11  the driver's side?

12     A    She's on my side, driver's side.

13     Q    How long does that interaction --

14     A    It's just brief.  30 seconds, 45 seconds,

15  maybe.

16     Q    And from the time that you received the call of

17  this mental health crisis involving Jordn Miller, how long

18  did it take you to get from the Scope school to 1019

19  Abington where Jordn was?

20     A    Honestly, without looking at the dispatch

21  notes, I couldn't even tell you.  It was a few minutes,

22  maybe.

23     Q    So Officer Holsopple arrives first, correct, to

24  1019 Abington?

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

182

1     A    Yes.

2     Q    Where does he park his cruiser?

3     A    On the street.

4     Q    This is a dirt road?

5     A    Concrete.

6     Q    Concrete road, gravel driveway?

7     A    Yes.

8     Q    And where do you park your cruiser?

9     A    Right behind his.

10    Q    Are you guys in the middle of the street?  Are

11    you --

12    A    We're off to the opposite side of the road.

13    Q    So the driveway is -- you're on the other side

14    of the street from the driveway?

15    A    No.  We're on the same side as the driveway.

16    Q    Okay.  And when you get out of your car, do you

17    speak with Officer Holsopple at all?

18    A    No.  We're actually -- as we approach the

19    driveway, we actually get rushed by several citizens.

20    Q    So is Office Holsopple out of his car when you

21    pull up?

22    A    I don't know if he was just getting out or

23    still getting out.  I can't recall.

24    Q    He hadn't gone up to the Jeep where Jordn was

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

1    Q    So Mr. Clark approaches you and Officer

2    Holsopple.  You're still together?

3    A    Yes.

4    Q    And he says, "He's trying to steal my Jeep."

5    Correct?

6    A    Yes.

7    Q    And you know this is Jordn Miller inside there;

8    right?

9    A    Yes.

10   Q    You said there were -- and dispatch, it is your

11   understanding that dispatch had already informed these

12   homeowners that Jordn was having a mental episode?

13   A    I don't know what they informed the homeowners.

14   Q    Now, Jordn had not moved that Jeep; correct?

15   You didn't see it driving around?

16   A    No.

17   Q    Were the keys inside?

18   A    I don't know.

19   Q    Did you ask?

20   A    No, I didn't ask.

21   Q    Is there a reason why not?

22        MR. BECK:  Objection.

23        Go ahead.

24   A    Because the information we were getting, that

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

186

1   wheel, almost like he was trying to rip it off, still

2   screaming."  Correct?

3        A    Correct.

4        Q    Did you and Officer Holsopple approach the Jeep

5   together?

6        A    Yes.

7        Q    Did you walk or did you run?

8        A    By this time, after we got everybody else, we

9   just walked.

10       Q    How far of a walk is it from the end of the

11  driveway to the Jeep?

12       A    25 feet, maybe.  I don't know.

13       Q    So you and Officer Holsopple walk up to the

14  Jeep.

15            What do you say to the people, the four people

16  holding the door shut?

17       A    We just tell them to get out of the way and let

18  us handle it.

19       Q    Where were these four -- these are four people

20  plus Chester?

21       A    Yes.

22       Q    And where are these four people positioned at

23  the Jeep?

24       A    If I recall, they were kind of just all around

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

187

1     it, all around the front half of it.

2          Q     What do you mean?

3          A     From the driver's door to the front of the

4     Jeep, to the back of the Jeep -- or not the back of the

5     Jeep, but the passenger side door of the Jeep.

6          Q     Is there -- how many people are on the

7     passenger side?

8          A     I don't -- I don't know.

9          Q     How many people are on the driver's side?

10         A     At least -- at least the one, maybe two.

11         Q     And they're all on the outside of the Jeep?

12         A     Yes.

13         Q     Only Jordn is inside the Jeep?

14         A     Yes.

15         Q     So at this point you say Jordn is flailing

16    around and screaming, making no sense at all; right?

17         A     Yes.

18         Q     What is he doing to indicate to you that this

19    guy is making no sense at all?

20         A     He's just yelling and, you know, talking to

21    nobody, but just very combative.

22         Q     Let's take it step by step.

23               When he's talking to nobody, what's he doing?

24    What's he saying?

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

188

1      A      I don't recall everything he was saying.  He

2    was just uttering spontaneous nonsense.

3      Q      Is he in the driver's side, passenger's side?

4    Where is he at in the car at this point?

5      A      Driver's side.

6      Q      He's incoherent; right?

7      A      He's acting bizarre, yes.

8      Q      Did you ask any questions to the four people

9    who are around the Jeep or Chester Clark?

10     A      I did not, but I know Officer Holsopple was

11   trying to get some information at that time, too.

12     Q      Did Officer Holsopple stay away -- let me ask

13   you this:  As you approached, did you approach kind of

14   lockstep together the whole way, or did Officer Holsopple

15   kind of break apart to get information?

16     A      No.  We were pretty much side by side the whole

17   time.  I was -- I kept my focus more on Mr. Miller, and

18   that's why I wasn't really listening to what Officer

19   Holsopple was asking everybody else.

20     Q      And as you're listening to Jordn Miller, other

21   than him talking spontaneous nonsense to no one at all, is

22   there anything else you observed him say?

23     A      Say, no.

24     Q      And was this kind of a constant process where

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

1    he's spontaneously uttering nonsense, or were there

2    moments where he wouldn't say anything and then would

3    blurt something out?

4          A     It was back and forth.

5          Q     Sometimes he would be quiet?

6          A     Sometimes he would be quiet; sometimes he would

7    be yelling.

8          Q     And when he was yelling, where was he yelling;

9    out the door?

10         A     Just wherever his head was pointing.  There was

11   no specific direction.

12         Q     So you've got your eye on Jordn.  The doors are

13   shut; correct?

14         A     Yes.

15         Q     He's in the car.

16               Where -- do you say anything to Jordn?

17         A     Yeah.  Myself and Officer Holsopple both tried

18   to calm him down, give him verbal commands to come out,

19   you know, but not too aggressively, you know, and try to

20   find out what's going on with him.  We want to try to get

21   him to come out on his own so we can try to help him out

22   and get him some medical attention, and he's just not

23   talking to us.

24         Q     I want to take it step by step.

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

1    Are you at the driver -- by the driver's side?

2    A    Yes.

3    Q    What's exactly the first thing you say to

4    Jordn?

5    A    I -- I couldn't even begin to tell you.  I know

6    we're just trying to -- basically, it's like a

7    negotiation, so we're just trying to negotiate him out of

8    the truck and tell him we're there to help him.

9    Q    And as you're trying to negotiate, is he still

10   spontaneously uttering nonsense?

11   A    Yes.

12   Q    So you're -- when you say negotiating with him,

13   can you give me an example of the type of thing you would

14   have said?

15   A    We would ask him what's going on, how is he

16   feeling today, why is he doing this, you know, is there

17   something we can do for you, can we get you some help, you

18   know, are you on anything, have you eaten?  I mean, just

19   anything to try to start a dialogue.

20   Q    And what is he saying in response?

21   A    He's saying nothing to us.

22   Q    Nothing or nonsense?

23   A    Both.  He won't even answer us, but then he

24   would just yell nonsense.

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

191

1      Q     So you knew at this point your negotiations

2  weren't going to get anywhere; correct?

3      A     Correct.

4      Q     Verbal commands are going to make no difference

5  with this person?

6      A     That is correct.

7      Q     You're not going to get any real information

8  out of this person because of whatever medical or mental

9  health episode he's in; right?

10     A     Yes.

11     Q     You say he was flailing around inside the Jeep.

12 Was he flailing around while he was uttering the

13 spontaneous nonsense?

14     A     It's all a combination, back and forth, yeah,

15 so --

16     Q     How was he -- when you say flailing, I image

17 someone --

18     A     Just flailing his arms.

19     Q     And is he in the driver's seat the whole time,

20 or is he moving around the Jeep?

21     A     He's in the driver's seat the whole time.

22     Q     And as you're -- at this point, where Jordn is

23 flailing his arms, kind of just blurting out nonsense and

24 not -- clearly, he doesn't know what's going on; right?

192

1      A      Yes.

2      Q      You and both Officer Holsopple -- are you both

3  at the driver's side at this point?

4      A      Yes.

5      Q      Other than flailing around, kind of throwing

6  his arms up and down, does he do anything else before he

7  starts grabbing the steering wheel?

8      A      No.

9      Q      So you say he grabbed onto the steering wheel,

10  jerking like he was trying to rip it off.  Is that --

11      A      Yes.

12      Q      He's got both hands on the steering wheel?

13      A      Yes.

14      Q      Is he like shaking it?

15      A      Yeah.

16      Q      Show me.

17      A      (Indicating.)

18      Q      So the steering wheel is not moving.  His body

19  is probably moving; right?

20      A      Correct.

21      Q      Is he still kind of saying this nonsense?

22      A      On and off.

23      Q      Has he said anything coherent that you've heard

24  at this point?

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

193

1      A    No.

2      Q    At this point, you haven't seen him try to --

3  you haven't seen any keys in his hand; right?

4      A    No.

5      Q    You haven't seen any ability of him to be able

6  to drive away at this point; right?

7      A    No.

8      Q    So at this point, you understood that you've

9  got a mentally-troubled young man who is confused,

10  incoherent, making no sense at all, who had been

11  reportedly running around the neighborhood naked but now

12  was clothed, inside someone else's car yelling, flailing

13  and screaming; true?

14      A    Yes, but there's also more to that.

15      Q    Which is?

16      A    Officer Holsopple received this information,

17  that he related to me before we took him out of the car,

18  that he actually tried to stab one of the homeowners's son

19  in the head with a pair of the needle nose pliers, because

20  he was actually in the car trying to get Mr. Miller out of

21  the car. So, you know, at that point they were more than

22  angry.  They were also demanding that we remove him from

23  their vehicle and their property. And those were all

24  considerations that were taken into effect at this point.

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

196

1   the incident and the nature of the incident, you're not

2   going to recall every single fact when you're actually

3   sitting down to write this report.

4        Q    And also after you were done with that incident

5   investigative note and you created the Use of Force Report

6   that's on Exhibit 6, you did not include pliers or any

7   tools as a weapon that Jordn Miller used that resulted in

8   your using force against him; true?

9             MR. BECK:  Objection.

10            Go ahead.

11       A    That's -- that's what it says, yes.

12   BY MR. HILL:

13       Q    From the tools you've described, they were

14   never in Jordn's hands at any time you saw Jordn; true?

15       A    That is true.

16       Q    Based on your interactions with Jordn, you

17   understood that once he was out of the vehicle he still

18   wasn't going to obey your verbal commands; correct?

19            MR. BECK:  Objection.

20       A    He was not obeying, no.

21   BY MR. HILL:

22       Q    Any reason to believe that mentally he would

23   have changed from the time he was contained in the vehicle

24   to you removing him out of the vehicle?

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

197

1      A    Yes.  In my experience, sometimes it only takes

2  a simple use of force of grabbing somebody out of the car,

3  when they start, "Okay, okay, okay.  I'm going to listen.

4  I'll listen.  I'll listen."

5           So at any given time, people have changed

6  through my experiences.  So I had no reason to believe at

7  that point that he couldn't refocus and start obeying our

8  commands.

9      Q    So that was your expectation as a police

10  officer?

11      A    My expectation, and I have seen it.

12      Q    Now, you understood that once you removed him

13  from the vehicle, if he didn't shape up and become

14  coherent all of a sudden but was still flailing around

15  uttering nonsense, you would have to use physical force

16  against him; right?

17      A    Yes.

18      Q    You would have to control him, or else, he

19  could just run away or something; right?

20      A    Yes.

21      Q    I mean, this is a guy who had been running

22  around the neighborhood; right?

23      A    Yes.

24      Q    So once you got him out, what was your plan if

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

1      Q    And you've had the ability, if you wanted to,

2  to pull out that radio and summons the fire department;

3  correct?

4      A    I could have.

5      Q    I mean, whether you thought you needed to is

6  one thing.  But you had the time and opportunity to do so;

7  correct?

8      A    I suppose so, possibly.

9      Q    Did you know at this point whether or not EMS

10  was in route?

11      A    No.

12      Q    Did you do anything to find out is a squad on

13  its way?

14      A    No.

15      Q    Did you talk to your supervisor, Sergeant

16  Moore, at any point?

17      A    No.

18      Q    Is there a reason you didn't contact your

19  supervisor to say, "Here's the situation.  Our plan is to

20  remove him from the vehicle"?

21      A    We had to get him out of that vehicle because I

22  was in fear that he could start that vehicle and leave, by

23  any means, whether it was -- if there were keys in there

24  or not, or with those tools.  If he got mobile, now he's

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

1     A     First of all, you have to kind of understand

2   the demographics of where we're at.  And most of these

3   people over there are motor heads, which means -- that's

4   all they do, is work on cars.

5            Do they have the capability of peeling a column

6   and starting a car?  I don't know.  Can it happen?

7   Absolutely.

8            I don't know what his abilities are.  But I

9   have to prepare that if he does know how to do that and

10  he's capable of doing it and he has the tools in there to

11  do it, we can't let that vehicle get mobile.  So I don't

12  know what his abilities are.  I have never dealt with him.

13  I had never spoken to him.

14   BY MR. HILL:

15     Q     So I just want to make sure I understand.

16            From your perspective, one of the primary

17  reasons you felt you had to get Jordn out of the car is

18  because in his condition you thought he might be able to

19  start the car in some fashion and drive away with these

20  tools?

21     A     He could have, yes.  That was a concern.

22     Q     And while you had observed Jordn this entire

23  time, you never saw him get one of these tools and try to

24  start the car; true?

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

202

1      A      That's true.

2      Q      And you never saw any keys in Jordn's hands at

3  any time?

4      A      No.

5      Q      And nobody ever told you, "Oh, the keys are

6  inside the car.  He can take off"?

7      A      No.

8      Q      Other than Officer Holsopple, at this point in

9  time, when you made the decision to remove Jordn from the

10  vehicle, have you spoken with any police officer at all

11  from Springfield Township?

12      A      No.

13      Q      And the chief is on duty at this point;

14  correct?

15      A      Yes.

16      Q      Is he a resource you can speak to, then Chief

17  John Smith?

18      A      I would assume, yes.

19      Q      Not something you've ever done?

20      A      No.

21      Q      So let's stop there.

22          Before you extract the vehicle, you and Officer

23  Holsopple are next to the driver's side door.  How far are

24  you from the vehicle?

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

1      A    Two, three feet.

2      Q    So he can't -- if you're two or three feet --

3   is the window open?

4      A    I believe it is.

5      Q    Do you remember one way or another?

6      A    No.  I know the report says it was, but I don't

7   recall it up or down.

8      Q    Jordn never swings his hand outside the window

9   to try to hit you; right?

10     A    I don't believe so.  I don't recall that, but

11  --

12     Q    And then the four to five people who were

13  present in the driveway when you got there, where are they

14  standing at this point?

15     A    Honestly, after we just tried to get them back,

16  I didn't pay any attention to them.  My focus is on

17  Mr. Miller.

18     Q    When Jordn's hands are on the steering wheel,

19  is there any -- aside from driving away with the vehicle,

20  is there any threat that Jordn poses to you or Officer

21  Holsopple?

22     A    That's unknown.

23     Q    And is that the same answer for any threat

24  Jordn posed to anyone else at that moment?

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

204

1      A      I would say yes.

2      Q      So moving on in the statement:  "We opened the

3  door to extract him from the vehicle, and he immediately

4  started to fight and resist with both officers.  We were

5  able to get him out of the vehicle, onto the ground, onto

6  his stomach."  Okay?

7      A      Okay.

8      Q      And that's your writing; correct?

9      A      Yes.

10      Q      Jordn did not try to get out of the vehicle on

11  his own; correct?

12      A      No.

13      Q      Correct, right?

14      A      Correct.

15      Q      What I said is correct, okay.

16             You made the decision to open the driver's side

17  door and remove Jordn?

18      A      Yes.

19      Q      As you attempted to pull Jordn from the

20  vehicle, he tried to stay in the vehicle; true?

21      A      Yes.

22      Q      Was he grabbing the steering wheel?  Was he

23  still holding on?

24      A      With one arm.

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

1     Q    And where did you grab Jordn to get him out of

2   the vehicle?

3     A    Well, actually, initially, just Officer

4   Holsopple reached in and grabbed the arm to try to more or

5   less escort him out.

6     Q    Grabbed his left arm?

7     A    I don't recall what arm it was, but he just --

8   the free arm that wasn't holding onto the wheel.  But he

9   tried to actually just kind of arm bar him and escort him

10  out gently to see if he could just get him to come out.

11  When he pulled back, he automatically started to resist

12  us.  And that's when we both reached in and grabbed him

13  with a lot more force, pulling him out so that, one, he

14  would let go of that wheel and that, two, we could get him

15  out of the car.

16    Q    How do you grab Jordn?

17    A    Just by the arm and -- basically, just by the

18  upper torso and like the shoulder of his coat.

19    Q    And that coat is a hooded sweatshirt; right?

20    A    Yes.

21    Q    So Officer Holsopple has one of Jordn's arms,

22  free arm; correct?

23    A    Yes.

24    Q    And he's pulling on that?

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

206

1    A    Yes.

2    Q    And then you have Jordn by the coat, like the

3 collar area?

4    A    Yeah, like by the arm and the shoulder of the

5 coat.

6    Q    And you have got both hands on him and you're

7 pulling Jordn?

8    A    Yes.

9    Q    And Jordn has got his right hand still on the

10 steering wheel, trying to stay in the vehicle; right?

11    A    Yes.

12    Q    And at this point have you -- are you still

13 trying to negotiate with Jordn?

14    A    Yeah.  We're still trying to tell him, "Just

15 come out of the car.  Just come out of the car."

16    Q    But at this point -- that's the point where

17 you're trying to rip him out of the car and he's trying to

18 keep himself inside?

19    A    Yes.  When he exhibited force by pulling away

20 from Officer Holsopple, then we exhibited another level of

21 force to try to match and supersede his a little bit, just

22 enough to get him out of the car.  But he's still hanging

23 on.

24    Q    And the force you're talking about Jordn

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

207

1    exhibiting is him holding onto that steering wheel and

2    trying to get his body in the car?

3         A    Yes.

4         Q    It states you're able to get Jordn out of the

5    vehicle.  So at some point you're able to break his grasp

6    where he's holding onto the steering wheel?

7         A    Yes.

8         Q    It says you get him onto the ground -- is this

9    that gravel drive?

10        A    Yes.

11        Q    You get him onto the ground and onto his

12   stomach; right?

13        A    Yes.

14        Q    When you get Jordn onto his stomach, where are

15   you in relation to the Jeep?

16             Where are the three people now?  It's you,

17   Holsopple and Jordn; right?

18        A    Yeah.  Just a few feet next to the Jeep.

19        Q    So you're off to the driver's side of the Jeep;

20   right?

21        A    Yes.

22        Q    Is Jordn's head facing the engine of the

23   vehicle or facing the rear tires?

24        A    No, he's facing actually away from the Jeep

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

1      A     Yes.

2      Q     Where are -- are you kneeling or standing?

3      A     I think I was actually kneeling on my right

4   knee.  And Officer Holsopple was, I believe -- he might

5   have been on both his knees next to him.  And we just had

6   our hands on his back, trying to calm him down, still

7   trying to talk to him.  He's still not listening to us.

8   And Joe and I -- or Officer Holsopple and I make the

9   decision that we've to get him into some cuffs.  So at

10  that point I --

11     Q     Can I stop you right there?

12     A     Yes.

13     Q     Kind of time-sequence-wise.

14           You're -- both of you have your hands on Jordn;

15  right?

16     A     Yes.

17     Q     You're holding on to Jordn's body?

18     A     Yes.

19     Q     Is he trying to -- and he's face down.  Is he

20  trying to get up off the ground?

21     A     He is flailing around, kicking, yelling.  He

22  keeps arching his back up and just yelling just loud

23  noises, not anything specific, just yelling, and trying to

24  roll side-to-side.

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

210

1          So he -- to us, he is trying to get up.

2      Q     And in order to keep him from getting up, you

3   and Officer Holsopple have to put force down on Jordn to

4   keep him on the ground; right?

5      A     Yes.

6      Q     And your hands are where?

7      A     Like on his shoulder and lower back, almost

8   near his back.  And I think Officer Holsopple is probably

9   around the same type of distance, just on the opposite

10  side of him.

11     Q     So four hands on Jordn's -- somewhere on

12  Jordn's back?

13     A     Yes.

14     Q     And he's trying to arch his back up to get up,

15  and you're keeping him down?

16     A     Yes.

17     Q     And you have to use some force to keep him

18  down, because he's really thrashing; right?

19     A     Correct.

20     Q     How long does that continue?

21     A     It seems forever, but the reality is it might

22  have been --

23     Q     I don't want you to guess.

24     A     Yeah.  I don't know, then.

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

215

1      This is when we're starting to develop that he

2  is super strong and we cannot, you know, break that arm

3  out from underneath of him.

4      Q    So if he's super strong at this point, it must

5  take a lot of force from you and Officer Holsopple to keep

6  him down?

7      A    We're not using that much force, honestly.  I

8  mean, we are -- we're using just enough force, but we're

9  not laying on him, we're not -- you know, we're not

10  putting our weight into him.  We are just trying to more

11  control his movements than laying on him.

12      Q    I want to be fair here.

13          If he has got superhuman strength, why doesn't

14  he just get up if you're not putting force on him?

15          MR. BECK:  Objection.  That's not what he said.

16      A    I can't answer that.

17  BY MR. HILL:

18      Q    Put it this way:  You're using enough force,

19  you and Holsopple, on Jordn's back, to keep this person

20  who is developing superhuman strength in a prone position;

21  fair?

22      A    Yes.  We're trying to control him.

23      Q    Jordn never got up; true?

24      A    No.

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

216

1      Q      When he becomes unresponsive, he's still in the
2  prone position; true?
3      A      Split second.  But yeah, he's still -- he was
4  in the prone position.
5      Q      So let me -- I think you kind of jumped ahead
6  in the statement, so let me try to catch up here.
7      A      Okay.
8      Q      You say, "Officer Holsopple said we should try
9  to get the cuffs on him."  That's a quote; correct?
10     A      Yes.
11     Q      So at this point, had you guys not -- was there
12  no plan to put handcuffs on him at this point?
13     A      We were just still trying to control him enough
14  to get him to calm down.  And then when we got him out of
15  that truck and we knew that we weren't going to be able to
16  control him anymore, we knew we had to get him secured.
17  That was the only way we were going to be able to get him
18  any type of help or get this situation ended.
19     Q      So everything you did this day was for Jordn's
20  help?
21     A      Yes.
22     Q      So it says, "At that time Officer Scherer was
23  able to get one cuff on his left hand."
24     A      Okay.

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

218

1    discussed this after the fact?

2         A    Yeah, yeah.

3         Q    And throughout this point, Jordn's left hand is

4    still underneath him, under his diaphragm; right?

5         A    Yeah, one of his arms is underneath him.

6         Q    Have you and Officer -- so Officer -- do you

7    know who is holding Jordn's cuffed hand, you or Officer

8    Holsopple?

9         A    I believe Officer Holsopple was.

10        Q    Do you remember if Officer Holsopple has both

11   hands on Jordn, Jordn's wrist that's cuffed, or one?

12        A    Actually, if he had them, he probably just had

13   them by the chain of the cuff.

14        Q    Do you remember?

15        A    No, I don't remember.

16        Q    Do you remember when you and Officer Holsopple

17   discussed Jordn having superhuman strength and power?

18        A    That would have been later that night.

19        Q    Like when you guys were putting this note

20   together?

21        A    Yeah, after we kind of decompressed a little

22   bit.

23        Q    It says, "Officer Holsopple attempted to get

24   his right arm free."  That's Jordn; right?

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

219

1     A    Yes.

2     Q    So it's his right arm that's underneath him.

3     A    Like I said, I don't remember, in the throes of

4  all the craziness you're battling -- you know, I know what

5  side I was on, but I don't remember which arm was cuffed

6  or which arm was underneath him.  I just knew one arm was

7  underneath him and we had one cuff on the other one.

8     Q    So the statement you wrote at the time is

9  better than your memory today; is that fair?

10     A    Yeah, absolutely.

11     Q    So you're on Jordn's left side as he's face

12  down?

13     A    Yes.

14     Q    The entire time?

15     A    Yes.

16     Q    Jordn's left hand, left arm, which is the one

17  on your side, is behind his back and cuffed; right?

18     A    Okay.  Yes.

19     Q    I mean, that's what it says; right?

20     A    Yes.

21     Q    And then Jordn's right arm, which would be the

22  one away from you, is underneath his body, crossed,

23  underneath his diaphragm; like you said earlier?

24     A    Yes.

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

221

1      Q      So at the point he arched up and -- he must

2   have turned his head to bite your leg?

3         A      Yes.

4         Q      And it's about six inches off the ground?

5         A      Six, seven inches, yeah.

6         Q      But you remember him going --

7         A      Yeah, he's --

8         Q      How high did his head go?

9         A      High enough to get my calf.  I mean, he arched

10  up and turned his head right at me and just clamped onto

11  my calf.

12        Q      But I mean, he bit you, your calf, maybe six

13  inches off the ground.  He wouldn't have to arch up very

14  far to bite your calf; right?

15        A      No.

16        Q      So how high -- I'm trying to ask you.  How high

17  did he actually lift up?  Was his head at your chest?

18        A      No.  Just high enough to get to my -- the bite

19  mark on my calf --

20        Q      Like six inches?

21        A      Yeah.  The bite mark is about six inches from

22  the bottom of my foot, maybe seven, so just that high.

23        Q      It says, "Officer Scherer advised Holsopple

24  that the suspect was biting him.  Officer Scherer pulled

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

222

1    his leg out of his mouth while he was still fighting.  He

2    turned sideways and then laid back down."

3              So I want to unpack this a little bit.

4              Jordn's left arm on your side at the time he

5    bites you is cuffed and behind his back?

6        A    Yes.

7        Q    And he bites you.  And at the time he's biting

8    you, you say, "Officer Holsopple, he's biting me"?

9        A    He's biting me.

10       Q    Then, you pull your leg out of his mouth?

11       A    Yes.

12       Q    How do you do that?  Rip it out?

13       A    I just rip it out.  Yep, I just rip it out and

14   end up standing up more.

15       Q    So you just rip your -- you don't grab your leg

16   with your hands; you just take a step backwards?

17       A    Right.

18       Q    And at that point he's not biting you any

19   longer?

20       A    Not after I rip my leg out of his mouth.

21       Q    And then it says, "He turned sideways." So do

22   you mean he rolled over?  Is that what you mean, he turned

23   sideways?

24       A    No.  I don't know --

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

223

```
 1        Q    Or he turned his head sideways?
 2        A    He just turned his head back sideways.
 3        Q    And then it says, "He laid back down."  Right?
 4        A    Yeah.  So he's just in one fluid motion laying
 5   back down to where his face is flat down on the ground.
 6        Q    So he lifts his head up off the ground, about
 7   six inches, bites you.  You move your leg back.  He lays
 8   his head face down back in the gravel?
 9        A    Yes.
10        Q    And there's -- you have stood up, but do you go
11   back down to that kneeling position you had before?
12        A    Not initially.
13        Q    So the biting event has concluded at this
14   point?
15        A    Yes.
16        Q    And Officer Holsopple is still holding Jordn
17   down?
18        A    Yes.
19        Q    And from where you're at, at this point, Jordn
20   can't bite you; correct?
21        A    Correct.
22        Q    It says, "Officer Scherer then struck the
23   suspect in the left common peroneal to gain compliance."
24   Correct?
```

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

224

1      A      Correct.

2          Q      So I want to -- this sequence of events -- the

3      biting event has ended.  He's face down.  You strike him

4      with -- can I say a fist?

5          A      My foot, actually.

6          Q      Your foot?

7          A      There was a strike, a kick strike to his common

8      peroneal.

9          Q      So you -- this is because you're standing up

10     now; right?

11         A      Yes.

12         Q      So the biting event has ended.  He's face down.

13     You've taken a step back; right?

14         A      I'm still next to him, yes.

15         Q      But you're standing --

16         A      I'm clear he's not going to bite me again.

17         Q      Right.  And then can I say -- kick and strike;

18     is there a difference?

19         A      I consider a kick a kick with a fist -- or a

20     foot, and a strike is more of a hand-punch motion.

21         Q      So you kick him?

22         A      I kick him.

23         Q      Where do you kick him?

24         A      In the left common peroneal.

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

225

1      Q      What is that?

2      A      That is the meaty part of the left thigh.

3      Q      And when you kick him in the meaty part of the

4    thigh, it's his left thigh; right?

5      A      Yes.

6      Q      He's at that point face down in the gravel;

7    right?

8      A      Yes.

9      Q      With Officer Holsopple on his side?

10      A      Yes.

11      Q      And the reason you kick him is to gain

12    compliance?

13      A      Trying to gain more compliance.  He's

14    escalating force.  We have to now escalate the force.  And

15    we're still in the process of trying to gain that

16    compliance and control to get him into control, to get him

17    cuffed, to get him the help that he needs.

18      Q      When you kicked Jordn in the leg, are you

19    wearing boots?  What kind of shoes do you wear?

20      A      Boots or tennis shoes.  It depends on the

21    weather.  I might have had tennis shoes on that day.

22      Q      And when you kick Jordn, when he's face down in

23    the gravel, what response is there?

24      A      Zero.

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

226

```
 1        Q    Is he still then -- because he was face down
 2   when you kicked him.  Is he still face down after you kick
 3   him?
 4        A    He's still face down.  He's still kicking,
 5   flailing, and yelling.
 6        Q    Do you kick him with your right leg?
 7        A    Yeah, I believe.  So I'm right handed, so
 8   everything usually --
 9        Q    That's your strong side?
10        A    Yes.
11        Q    At the moment you kicked Jordn, was just
12   Officer Holsopple able to hold him down?
13        A    No.  He was still having difficulties.
14        Q    But I mean, he was the only one holding him
15   down?
16        A    He was the only one holding him at that point.
17        Q    And he was able to hold him down?
18        A    He was having difficulties, but he was still
19   maintaining him on the ground, yes.
20        Q    At the moment you kicked Jordn and you're
21   standing there, do you try to find out whether or not EMS
22   is on its way?
23        A    Not yet.
24        Q    Have you attempted in any way to contact EMS or
```

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

228

 1   he's not totally in the gravel.

 2        Q    What do you do after you kick Jordn?

 3        A    At that point, I realize that I have no other

 4   option than to escalate the force to the Taser.  I tell

 5   Officer Holsopple that I'm going to deploy the Taser.

 6        Q    Let me -- can I stop you for a second?

 7        A    Sure.

 8        Q    Before you tell Officer Holsopple you're going

 9   to deploy the Taser, have you said anything to Jordn at

10   all -- even about him biting you?  Are you saying

11   anything, speaking to Jordn at all at this point?

12        A    I believe Officer Holsopple is still trying to

13   tell him to settle down.

14        Q    But from your perspective --

15        A    Yeah.  I have not said anything else at this

16   point.

17        Q    And at this point, is Jordn saying anything?

18   Is he still making his nonsensical --

19        A    He's just -- I'm sorry.

20        Q    Go ahead.

21        A    Yeah.  No.  He's just yelling again.  Nothing

22   specific; just yelling.

23        Q    Just ahhh?

24        A    Yeah, just general yelling.

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

232

1      A     On my left.

2      Q     And is that because your firearm, then, is on

3  your right?

4      A     Yes, it's a cross draw.

5      Q     So then tell me how you mechanically -- what

6  you do to draw your Taser.

7      A     I usually take my left arm and just flip the --

8  flip the lock back that holds the Taser in place, and with

9  my right arm I cross draw and pull it out of my holster.

10     Q     And at the time that you do this, are you back

11  kneeling down at this point?

12     A     Yeah, I believe I drop to a knee again.

13     Q     Same knee as before?

14     A     Yeah.  I don't know.

15     Q     And we were trying -- before we took a break,

16  we were trying to get an understanding of what arm was

17  being described that Officer Holsopple moved away to grab.

18  But it sounds like in terms of your recollection all you

19  can remember Holsopple grabbing was Jordn's left arm,

20  which has been cuffed behind his back pretty much the

21  entire time; true?

22     A     Yes.

23     Q     And at the time you decide to -- you make the

24  decision to use your electrical-conducted weapon, from

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

233

1  everything you've seen, Jordn is still in the throes of

2  this mental health crisis; true?

3        A    Yes.

4        Q    And you've already recognized at this point

5  that he's not capable of following your commands; correct?

6        A    Yes.  He's still not listening.

7        Q    Right.  There's been no indication, though,

8  based on his behavior, his nonsensical speech, that he's

9  even capable of following your commands; true?

10            MR. BECK:  Objection.

11       A    I don't know what he's capable of.  I just know

12  he's not doing it.

13   BY MR. HILL:

14       Q    And so far, from everything you've seen, your

15  understanding is that all of Jordn's behavior is due to

16  this -- well, let me strike that.

17            At this point, everything you've seen and

18  everything you've been engaging in with Jordn, you do not

19  and have not suspected drug use; true?

20       A    True.

21       Q    What you are suspecting at this point is still

22  mental health?

23       A    Yes.

24       Q    At the time you used the Taser, Jordn's head is

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

234

1  facing -- you know, his face is facing the gravel

2  driveway; right?

3       A    Yes.

4       Q    As you grab the Taser, is it with your left

5  hand, the cross draw?

6       A    Right hand.

7       Q    Right hand.  I'm sorry.

8            Where is your left hand?  Is it still on

9  Jordn's back?

10       A    Yeah.  Officer Holsopple actually lifts up

11  Jordn's sweatshirt a little bit to expose his skin, and I

12  just kind of put my hand back on his back, my left hand

13  back on his back.

14       Q    Where on his back?

15       A    Just underneath the jacket line, just to make

16  sure the jacket doesn't slide back down.

17       Q    So your hand, if I understand it -- Officer

18  Holsopple has pulled Jordn's sweatshirt up towards his --

19  from his waist to his neck area?

20       A    No.  Only about mid back.

21       Q    But I mean, that's the direction he's pulling

22  it up?

23       A    Yes.

24       Q    So his pulling it from the waistband area

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

235

1    towards his neck?

2        A    Yes.

3        Q    And he gets about halfway up?

4        A    Yes.

5        Q    And then you put your left hand -- it would be

6    in the center of Jordn's back, then, near where the

7    sweatshirt ends; right?

8        A    Yeah.  I'm just holding up the sweatshirt to

9    make sure it doesn't fall back down, just flat.

10       Q    Is he resisting at this point with a lot of

11   force to get up?

12       A    He's still flailing and yelling and rearing

13   back and still just very out of control, yes.

14       Q    So in order to prevent Jordn from getting up,

15   are you equaling or have to overpower his force of getting

16   up with your force of pushing down; right?

17       A    I don't have very much pressure applied to him

18   whatsoever with my left hand.

19       Q    What I'm saying is you are actively pushing

20   down on Jordn or else he would just get up; right?

21       A    Well, yes, we have to.

22       Q    That's my point.

23            So you're pushing down on Jordn in the center

24   of his back at this point?

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

236

1        A      More on the side of his back, yeah.  It's not

2    so much in the center.

3        Q      Is it towards the left or towards his --

4    towards Jordn's left or towards his right?

5        A      His left.  It's closest to me.

6        Q      So you're pushing down.  And where is Officer

7    Holsopple's hands?  He's got one hand on the cuffed area;

8    right?

9        A      Yes.

10        Q      And from what you could tell, is he also

11    pushing down to prevent Jordn from getting up?

12        A      Honestly, I don't know.

13        Q      At this point, Jordn has not stood up; correct?

14        A      Correct.

15        Q      You've been able to keep him on the ground the

16    whole time?

17        A      Yes.

18        Q      And when you say you're going to deploy your

19    Taser, does Officer Holsopple say anything in response or

20    just pull up his shirt?

21        A      He just pulls up his shirt.

22        Q      So you fire the Taser, and the darts -- I'll

23    read it:  "The darts struck him in the middle of the back

24    and were about three inches apart from each other.

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

1   Officer Scherer also put the Taser on his right thigh as a

2   dry stun maneuver to make a good connection."  Correct?

3        A    Yes.

4        Q    So the darts that you fired -- about how far

5   were you from Jordn when you fired the Taser darts into

6   his back?

7        A    I don't know.  I was -- I remember going up

8   more like this to -- instead of standing up, because I

9   didn't want to stand up and leave Officer Holsopple trying

10  to hold him down by himself.  So I remember going up real

11  high this way, as high as I could reach, to help make a

12  spread of those darts.

13       Q    Okay.

14       A    So --

15       Q    Because the farther the spread, the more -- the

16  better the connection; right?

17       A    The better effectiveness it has.

18       Q    Because the better -- when you say better

19  effectiveness, what do you mean?

20       A    It means that the more compliance we are able

21  to gain with the -- the wider the spread.

22       Q    And that's because there's more neuromuscular

23  contraction; right?

24       A    Yes.

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

238

1      Q      And when you actually fire the Taser dart into

2  Jordn's back, his face is still pointing forward; right?

3      A      Yes.

4      Q      He hasn't bitten you again; right?

5      A      Thank God, no.

6      Q      He hasn't even tried to bite you again; right?

7      A      No.

8      Q      And you have the darts now in the center of

9  Jordn's back; right?

10     A      Yes.

11     Q      How close are they -- you obviously moved your

12  hand away when you fired; right?

13     A      Oh, absolutely.

14     Q      So you pulled his shirt up and held it there

15  for a while, and then you got your hand out of the way so

16  you don't shoot yourself?

17     A      Yes.

18     Q      And then you have the darts then in Jordn's

19  bare skin.  And then you use -- can you show us how you

20  use the Taser to connect Jordn's thigh -- this is the same

21  thigh you kicked; right?

22     A      No, this is the opposite thigh.

23     Q      So you are actually going across your body?

24     A      Yeah, I went across his body.

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

239

1      Q    So are you behind Jordn at this point or just

2  leaning over?

3      A    I'm just leaning.

4      Q    So can you kind of show us what you did, then?

5      A    The darts are deployed in his back.  He's still

6  got the wires, and the cartridge is still on the Taser

7  device itself.

8           So all you do is -- you can actually just take

9  that Taser and take -- and just push it down, you know,

10  just drive it into somebody's leg or whatever body part

11  you choose.  And then that acts as a connection, also.

12  It's almost like a third dart in the sense of -- without

13  any puncture wounds.

14      Q    Right.  It takes that three-inch spread that

15  you had to a very large spread; right?

16      A    Yes.

17      Q    Which is ideal for creating that neuromuscular

18  contraction; right?

19      A    Correct.

20      Q    And you apply the Taser itself to his bare

21  thigh; right?  Because he's got shorts on?

22      A    Yes.

23      Q    I'm trying to get an idea, because you're

24  standing -- you're on his opposite side.  You're on his

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

242

1  you fire the darts and then make the connection to the

2  thigh, like that; right?

3       A    Yeah, whatever the time is to go from here to

4  there.

5       Q    And that here to there was you moving your hand

6  three feet or so?

7       A    Correct.

8       Q    And you don't know what amount of time elapsed

9  in between; right?

10       A    No.

11       Q    It was one movement, right, boom, boom?

12       A    Yeah.

13       Q    How did Jordn's body -- now, let me ask you.

14  Let me take a step back.

15            You shoot the darts into his back, and you make

16  the connection.  He's still in a prone position; right?

17       A    Yes.

18       Q    How does Jordn's body react to the application

19  of the electrical-conducted weapon?

20       A    He went into full NMI.

21       Q    What does that mean to a lay person?

22       A    Neuromuscular incapacitation.

23       Q    What does that mean to a lay person?

24       A    It means that it worked.

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

1    Q    What we talked about earlier, that body seizing

2    up?

3    A    Yeah, he seized up.  And that allowed us to get

4    him under control or get him in cuffs at that point.

5    Q    As soon as you do that, do you get him in cuffs

6    or do you call EMS first?

7    A    Officer Holsopple is getting him in cuffs.  And

8    at the same time, then I get on my radio and advise that

9    we have a Taser deployment, that we need a 29, which is

10   our code for an ambulance.

11   Q    This is the first time anyone, as far as you

12   are aware, has contacted an ambulance or requested an

13   ambulance?

14   A    Yes.

15   Q    And when you requested the ambulance, you did

16   not call the fire department directly; right?

17   A    No.

18   Q    You went through dispatch?

19   A    Yes.

20   Q    And how long did that take to make that call?

21   A    I -- I don't know.  I don't know what the

22   process is at dispatch.

23   Q    I mean, you -- like how long did it take you to

24   tell dispatch we need an ambulance?

244

1      A    Just a few seconds.  Just enough to be able to

2  get to my mic, key it, and say the words.

3      Q    And then you knew that -- through that dispatch

4  would make the arrangements to get the fire department and

5  ambulance there?

6      A    Yes.

7      Q    You write:  "The suspect raised up.  His arms

8  swung out, and Officer Holsopple was able to secure his

9  other wrist in the cuff."

10         That's his right wrist, then; right?

11     A    Yes.

12     Q    "Right after the Taser shut off, and he was

13  cuffed, he was still fighting, kicking and squirming

14  around.  This was when Sergeant Denise Moore was also on

15  scene.  He was still out of control, trying to turn on his

16  side."

17     A    Yes.

18     Q    Was Sergeant Moore on scene when you used the

19  Taser the first time?

20     A    No.

21     Q    You say, "Right after the Taser shut off and he

22  was cuffed, he was still fighting, kicking, and squirming

23  around."

24     A    Yes.  Right after the cycle, he was still

245

```
 1    combative.  He continued right where he left off.
 2         Q    And now both hands are handcuffed behind his
 3    back?
 4         A    That is correct.
 5         Q    He's still in prone position; right?
 6         A    Yes.
 7         Q    Are you back down on your side, on your knees,
 8    on Jordn's left side?
 9         A    Yeah.  I'm still in the same spot that I was.
10    I had never moved yet.
11         Q    And is Officer Holsopple still in the same
12    spot?
13         A    Yes.
14         Q    And you say he's fighting, kicking, and
15    squirming around.  What's he doing?
16         A    Yeah, he's still doing the same thing.  He's
17    still trying to rear up.  He's kind of moving his head
18    back and forth, side-to-side, similar to the same
19    movements he did when he bit me.
20              And like I said, he was still kicking both his
21    feet and then just trying -- since now he was cuffed, he
22    was just trying to turn -- roll over side-to-side, and
23    then he was still yelling and just banging his head back
24    and forth.
```

246

1          He had started banging his head more on the

2   ground at this point.

3          Q     Where are your hands -- let me ask you:  Do you

4   put the Taser back?

5          A     No.  I still have the Taser in my hand.

6          Q     So it's in your right hand?

7          A     Yes.

8          Q     What are you doing with the Taser in your right

9   hand at this point?

10         A     It's just -- I'm just holding it at this point.

11         Q     Is it, you know -- is the plastic material

12   touching Jordn's body anywhere?

13         A     No.

14         Q     How are you holding it?

15         A     Just up like this (indicating).

16         Q     And where is your left hand?

17         A     It's still just sitting on top -- or on his

18   back.

19         Q     By his handcuffs, or where at?

20         A     Yeah, just mid, lower back.

21         Q     Where are Officer Holsopple's hands?

22         A     I think he's more up towards his shoulders.

23         Q     You say more towards his shoulders.  More in

24   the middle of his back, then, like between his shoulder

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

247

1    blades?

2         A    Yeah, but still on the side.  He was still on

3    the side.  He was still on that right side of Jordn.

4         Q    You say Jordn is squirming around.  He's trying

5    to get on his side, you say?

6         A    Yeah.  He's just rolling back, side-to-side,

7    yelling.

8         Q    So he's trying to get himself out of prone

9    position?

10         A    I don't know what he's trying to do.  He's

11    acting the same as he's been acting.

12         Q    Let me take that back.

13              His body movements are rocking side-to-side,

14    which would get him out of prone position; right?  His

15    body is trying to roll over?

16         A    He's trying to do something, yes.

17         Q    What you're seeing is his body --

18         A    Yeah, rolling side-to-side.

19         Q    He's in prone position, and his body is moving

20    away from prone position; right?

21         A    He's going side-to-side.

22         Q    And you and Officer Holsopple are keeping him

23    in prone position; right?

24         A    Yeah.  We are just trying to still gain

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

1    compliance of him.

2        Q    But my question is:  You guys are -- with the

3    pressure you're applying to him to keep him from moving --

4        A    Yes.

5        Q    -- you're keeping him in prone position?

6        A    Yes.

7        Q    And you have to press down with some force in

8    order to do that?

9        A    Yes.

10       Q    And it says, "This was when Sergeant Denise

11   Moore was also on scene."

12            Can you tell me how long between the first time

13   you used the electrical-conducted weapon on Jordn Miller,

14   while he was in prone position, did Sergeant Moore arrive?

15       A    I don't know.  She came up from behind me, so I

16   really -- I was focused and tunnel-visioned right on

17   Jordn, and she came up behind me, so I don't know exactly

18   when she arrived on scene.

19       Q    Sergeant Moore is now the third officer on

20   scene?

21       A    Yes.

22       Q    When officer -- were there any other officers

23   on scene?

24       A    Not at that time.

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

249

1      Q    Until Jordn became unresponsive, were there any

2   other officers who came on scene aside from you,

3   Holsopple, and Moore?

4      A    No.

5      Q    And Sergeant Moore is the on-scene supervisor

6   at this point?

7      A    Yes.

8      Q    So when Jordn is fighting, kicking and

9   squirming during this period, he's in prone position,

10  hands restrained behind his back?

11     A    Yes, sir.

12     Q    He can't bite anyone at this point; true?

13     A    He still could if we got our leg up there.

14     Q    He was not -- based on where you were

15  positioned, Holsopple was positioned, Sergeant Moore was

16  positioned, he wasn't able to bite anybody?

17     A    That's hard to answer, because I don't know

18  what he's capable of.  I already saw what he was capable

19  of.  Could he still do it at that point?  I don't know.

20     Q    Before you tasered him, I asked you about him

21  biting and him attempting to bite you again, before you

22  tasered him.

23          Had he attempted to bite you again before

24  Officer Moore comes back?

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

253

1      A    I can't stop him from banging his head on the

2   ground.  I used the Taser to get him under control.

3   That's the only method we had that was going to work for

4   this situation.  That was the best method.

5      Q    What was a safer position for Jordn to be in;

6   on his side or face down?

7      A    Ideally, if he could be sitting up, that would

8   be the best.

9      Q    Why?

10     A    Well, then there's no issues.  That means he's

11  calmed down.  It means we have control of him.  It means

12  that he would not be in a prone position.  But that's in

13  an ideal situation.

14     Q    I'm just asking you from a safety perspective,

15  as an officer whose job it is to help somebody, what's a

16  safer position for Jordn to be in; on his side or in a

17  prone position?

18         MR. BECK:  Objection.

19         Go ahead.

20     A    Again, it depends on his manners.  The safest

21  position is sitting up.  That's my opinion.

22   BY MR. HILL:

23     Q    You talked earlier about the risks of

24  positional restraint asphyxia.  Those risks decrease when

1  a person is on his side; true?  We agreed to that earlier?

2       A    Yes.

3       Q    Those risks of positional restraint asphyxia

4  decrease when a person is sitting up as opposed to prone

5  position; true?

6       A    That is true.

7       Q    In terms of positional restraint asphyxia, the

8  safer position would be for Jordn to be on his side or

9  sitting upright as opposed to in a prone position; true?

10           MR. BECK:  Objection.

11           Go ahead.

12       A    In any case, yes.

13   BY MR. HILL:

14       Q    Now, at this point are the probes still in

15  Jordn's back?

16       A    Yes.

17       Q    The probe -- what do you call them, lines,

18  connectors?  What are the wires?

19       A    Just wires.

20       Q    The wires have not broken; correct?

21       A    No.

22       Q    And while Jordn is handcuffed in prone

23  position, and as a third officer is on scene, you use the

24  electrical-conducted weapon again; true?

**Officer Robert Scherer - Vol. 1 - March 14, 2017**

255

1      A    Yes.

2      Q    How do you use the electrical-conducted weapon

3  the second time?

4      A    Same as the first.  I just try to hit on his

5  calf to try to make a larger connection.

6          I left it on there for about two to three

7  seconds, and I saw that it then had zero effects.  And I

8  actually removed it from his calf at that point and just

9  held it up in the air, because my brain couldn't focus to

10 tell me just to shut the switch off.  So I actually let it

11 cycle out while it was up in the air because I knew this

12 was not working anymore.

13         And then once that five-second cycle was done,

14 you know, I actually took the Taser cartridge off, threw

15 it, and threw my Taser off to the side of the ground.  I

16 couldn't even get it into the --

17         MR. HILL:  I'm going to pause for a quick

18 second, okay?

19             (Discussion held off the record.)

20         MR. HILL:  Officer, we're going to adjourn for

21 the day.  So we'll see you back at ten a.m. in the

22 morning, okay?  It's about 3:30.

23         THE WITNESS:  Yes, sir.

24                     - - -

260

1                           CERTIFICATE

2   State of Ohio      :

3   County of Franklin:

4

5           I, Whitney Layne, Notary Public in and for the

6   State of Ohio, duly commissioned and qualified, certify

7   that the within named ROBERT SCHERER was by me duly sworn

8   to testify to the whole truth in the cause aforesaid; that

9   the testimony was taken down by me in stenotype in the

10  presence of said witness; afterwards transcribed upon a

11  computer; that the foregoing is a true and correct

12  transcript of the testimony given by said witness taken at

13  the time and place in the foregoing caption specified.

14

15          IN WITNESS WHEREOF, I have set my hand and

16  affixed my seal of office at Dublin, Ohio, on this 21st

17  day of March, 2017.

18

19

20                          Whitney Layne, Notary Public

21                          In and for the State of Ohio

22  My Commission expires May 4, 2020

23

24