**EXHIBIT**

**10**

exhibitsticker.com

# In The Matter Of:

*Haydn Zeis, Administrator of the Estate of Jordn Miller v. Springfield Township, Ohio, et al.*

---

*Officer Robert Scherer*

*Vol. 2*

*March 15, 2017*

---

*Layne & Associates*

*6723 Cooperstone Drive*

*Dublin, Ohio  43017*

*(614) 309-1669*

*WhitneyLayne@att.net*



Original File 03-15-2017 Scherer2 Final.txt

**Min-U-Script® with Word Index**

1

1        IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF OHIO
2                   EASTERN DIVISION

3

4   Haydn Zeis, Administrator of
    the Estate of Jordn Miller,
5        Plaintiff,

6        vs.                      Case No. 5:16-CV-02331-JRA

7   Springfield Township, Ohio,
    et al.,
8        Defendants

9

                              - - -

10

11

        PART 2 VIDEO DEPOSITION OF OFFICER ROBERT SCHERER
12   the Defendant herein, called by the Plaintiff under the
     applicable Rules of Civil Procedure, taken before me,
13   Whitney Layne, a Notary Public for the State of Ohio, at
     the Springfield Township Police Department, 2465 Canfield
14   Road, Akron, Ohio 44312 on March 15, 2017 at 10:00 a.m.

15

16

17

18

19

20                   LAYNE & ASSOCIATES
                   6723 COOPERSTONE DRIVE
21                    DUBLIN, OHIO  43017

22

23

24

2

1   APPEARANCES

2

3        MICHAEL HILL, ESQUIRE
         EADIE HILL TRIAL LAWYERS
4        3100 East 45th Street
         Suite 218
5        Cleveland, Ohio  44127
              on behalf of the Plaintiff

6

7        GREGORY BECK, ESQUIRE
         MEL LUTE, ESQUIRE
8        BAKER DUBLIKAR BECK WILEY & MATHEWS
         400 South Main Street
9        North Canton, Ohio  44720
              on behalf of the Defendants

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

3

1                                    March 15, 2017
                                     Wednesday Session
2                                    10:00 a.m.

3
                                   - - -
4
                              STIPULATIONS
5
        It is stipulated by and among counsel for the
6    respective parties that the deposition of ROBERT SCHERER,
     the Defendant herein, called by the Plaintiff under the
7    applicable Rules of Civil Procedure, may be taken at this
     time by the notary Whitney Layne; that said deposition may
8    be reduced to writing in stenotypy by the notary, whose
     notes thereafter may be transcribed out of the presence of
9    the witness; and that the proof of the official character
     and qualification of the notary is waived.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**Officer Robert Scherer - Vol. 2 - March 15, 2017**

6

1    at least?

2         A    No, sir.

3         Q    Your memory is it was not warm, not cold?

4         A    Yeah.  I know it was sunny, but it did not --

5    it was not that warm to me.

6         Q    I have a couple follow-up questions about the

7    time period where Jordn is in the Jeep before you and

8    Officer Holsopple pulled him from the Jeep, okay?

9         A    Okay.

10        Q    I just want to confirm a couple of things.

11             While Jordn was in the Jeep, he never tried to

12   kick you; correct?

13        A    Correct.

14        Q    While Jordn was in the Jeep, he never tried to

15   kick anyone as far as you're aware?

16        A    As far as I'm aware, yes.

17        Q    You never saw Jordn try to spit on anyone while

18   he was in the Jeep; true?

19        A    True.

20        Q    You never observed Jordn try to spit at you

21   while he was in the Jeep; true?

22        A    True.

23        Q    Jordn never tried to bite you while he was in

24   the Jeep; true?

**Officer Robert Scherer - Vol. 2 - March 15, 2017**

7

1      A      True.

2      Q      You never saw Jordn try to bite anyone while he

3  was in the Jeep; true?

4      A      True.

5      Q      At the time you were standing outside the Jeep,

6  you didn't believe that Jordn had tried to bite anyone;

7  true?

8      A      No.  Yeah, true.

9      Q      While Jordn was in the Jeep and the door was

10  closed, he couldn't reach anyone; true?

11      A      True.

12      Q      Jordn was contained in the Jeep; true?

13      A      Yes.

14      Q      Did Jordn ever acknowledge your presence while

15  he was in the Jeep?

16      A      I'm not sure what he acknowledged.

17      Q      I mean, did he ever look at you?

18      A      He looked at us, but I don't know if he

19  acknowledged us.  I don't know what he was thinking.

20      Q      I know he never -- he never responded in a way

21  that was rationally consistent with your speech while he

22  was in the Jeep; true?

23      A      True.

24      Q      Yesterday we discussed what you consider to be

Officer Robert Scherer - Vol. 2 - March 15, 2017

8

1   some warning signs of a condition some people call excited
2   delirium; correct?
3        A    Yes.
4        Q    And some of those warning signs included
5   displays consistent with active mental illness; true?
6        A    True.
7        Q    Those warning signs include delusions or
8   hallucinations; true?
9        A    Yes.
10       Q    Those warning signs included disorientation;
11  true?
12       A    Yes.
13       Q    Those warning signs included disorganized or
14  incoherent speech; true?
15       A    Yes.
16       Q    Those warning signs included shouting or
17  yelling; true?
18       A    They can, yes.
19       Q    Those warning signs included strange or bizarre
20  behavior; true?
21            MR. BECK:  I don't want to be going through all
22  of this again, but --
23   BY MR. HILL:
24       Q    Those warning signs included agitation; true?

**Officer Robert Scherer - Vol. 2 - March 15, 2017**

9

1    A    It can, yes.

2    Q    Those warning signs included disrobing; true?

3    A    They can, yes.

4    Q    While Jordn was in the Jeep, all of these

5    warning signs I just described had either been reported to

6    you or you had directly observed them; true?

7    A    Some of them, they had, yes.

8    Q    There were also some signs of excited delirium

9    that you talked about yesterday that I want to make

10   sure -- I want to find out whether or not Jordn had these

11   or not.

12        You talked about a fear of glass as being a

13   sign or a warning sign of excited delirium; correct?

14   A    Yes.

15   Q    At any time did Jordn display any fear of glass

16   or anything that you saw?

17   A    No.

18   Q    You talked about an elevated internal

19   temperature as a sign of excited delirium; correct?

20   A    Yes.

21   Q    Did you request that anyone, either EMS or

22   physicians, take a rectal temperature of Jordn Miller to

23   identify what his internal temperature was?

24        MR. BECK:  Objection.

**Officer Robert Scherer - Vol. 2 - March 15, 2017**

11

1    extreme strength.

2        Q    You and Officer Holsopple were able to get

3    Jordn out of the car?

4        A    Yes.

5        Q    You were able to get him on the ground in a

6    prone position; correct?

7        A    Yes.

8        Q    He never got out of a prone position; correct?

9        A    No.

10        Q    Correct?

11        A    Correct.

12        Q    Jordn remained in a prone position until he

13    became unresponsive; correct?

14        A    He remained there until we got him into

15    control.

16        Q    He remained in a prone position until he became

17    unresponsive; true?

18        A    Which we believe he was in control of that,

19    yes.

20        Q    You answered, yes, he was in a prone position

21    from every point, from the time you put him on the ground,

22    out of the car, until he became unresponsive?

23        A    Yes.

24        Q    You kicked Jordn while he was in a prone

**Officer Robert Scherer - Vol. 2 - March 15, 2017**

12

1    position?

2        A    Yes.

3        Q    You used an electrical-conducted weapon on

4    Jordn while he was in a prone position?

5        A    Yes.

6        Q    You handcuffed Jordn while he was in a prone

7    position?

8        A    Yes.

9        Q    You used a electrical-conducted weapon a second

10   time while Jordn was in a prone position and handcuffed?

11       A    Yes.

12       Q    Jordn never lifted himself off the ground with

13   you on his back or anything like that?

14       A    No, we weren't laying on him.

15       Q    That's not my question.

16            He never stood up out of the prone position,

17   you were on his back or fighting him or anything like

18   that; right?

19       A    He attempted to lift up, but we would not let

20   him.

21       Q    Where we left off yesterday was you describing

22   the second application of the electrical-conducted weapon;

23   correct?  Is that what you remember?

24       A    I believe so.

**Officer Robert Scherer - Vol. 2 - March 15, 2017**

17

```
 1              How long -- go ahead and read along.
 2       A    (Reviewing document.)
 3       Q    How long after the application -- let me step
 4   back a second.
 5              When you used the Taser on Jordn the second
 6   time, is Officer Holsopple holding -- hold on.
 7              So you have your foot on Jordn's left leg;
 8   correct?
 9       A    Yes.
10       Q    What part of his leg?
11       A    It would have just been his -- probably his
12   calf.
13       Q    Do you remember?
14       A    No.
15       Q    Are you standing or kneeling?
16       A    I believe I was still stand -- or kneeling at
17   that point.
18       Q    So what leg would you have on Jordn's -- what
19   foot would you have on Jordn's left leg?
20       A    It would probably have been my right foot.
21       Q    So your left knee is on the ground, your right
22   foot is on Jordn's left leg, pushing him down on the
23   ground to keep him from moving his leg?
24       A    Yes.
```

**Officer Robert Scherer - Vol. 2 - March 15, 2017**

18

1        Q     And then Officer Holsopple was on his knees

2   beside Jordn, so he's still on Jordn's right side?

3        A     Yes.

4        Q     Across from you?

5        A     Yes.

6        Q     And Officer Holsopple was holding one hand that

7   was cuffed, so he's holding Jordn's hand that's behind

8   Jordn's back?

9        A     Well, he was completely handcuffed at this

10  point, so --

11       Q     Well, he's handcuffed behind his back?

12       A     Yes.

13       Q     So one of Officer Holsopple's hands is pushing

14  into -- on Jordn's back at the cuff area?

15       A     I would assume, yes.

16       Q     And his other hand was then holding down

17  Jordn's right leg, pushing -- holding -- pushing his right

18  leg into the ground to keep it from moving?

19       A     Yes.

20       Q     And then Sergeant Moore, when she approaches,

21  she puts her right foot into Jordn's left shoulder blade

22  to keep Jordn from arcing, from moving his head or neck

23  off the ground?

24       A     Correct.

**Officer Robert Scherer - Vol. 2 - March 15, 2017**

19

1      Q     So she's pushing down with some force on his
2  back?
3      A     I would assume.  I don't know how much force
4  she was using.
5      Q     But enough force to keep him from moving.
6  That's something he had been trying to do; correct?
7      A     Yes.
8      Q     She's keeping him from doing that, so she's
9  keeping his chest flush on the ground?
10          MR. BECK:  Objection.
11     A     She's keeping -- trying to gain control of him
12  also, yes.
13   BY MR. HILL:
14     Q     But I mean what his body is doing, his face --
15     A     Yes, we are trying to prevent him from causing
16  harm to us or himself.
17     Q     And you're successful at keeping his chest and
18  diaphragm and everything on the ground in a prone
19  position; correct?
20     A     Yes.
21     Q     And he's not able to lift his head or neck;
22  correct?
23     A     Not at that point.
24     Q     And it says:  "That position of you three

**Officer Robert Scherer - Vol. 2 - March 15, 2017**

20

1  officers doing that lasts for several minutes."  Correct?

2      A    That's what it says, yes.

3      Q    That's what it says because the three of you

4  wrote it; right?

5      A    Yes.

6      Q    And this set of events where the three of you

7  are holding Jordn down in this prone position, where he's

8  handcuffed, this is the period after you tasered Jordn

9  while he was in handcuffs; correct?

10      A    This is after the second tasing.

11      Q    And while the three of you were holding Jordn

12  down like this for several minutes, was Jordn trying to

13  squirm around still and move?

14      A    Yes, he was still very, very combative and

15  actively fighting with us.

16      Q    When you say fighting, his hands were cuffed,

17  so he wasn't using his hands to fight; correct?

18      A    Correct.

19      Q    His legs were being held down by you and

20  Officer Holsopple; correct?

21      A    We were trying to hold him down, yes.

22      Q    And you were successful at holding him down?

23      A    To a point, yes.

24      Q    And his body, his chest area was held down.

**Officer Robert Scherer - Vol. 2 - March 15, 2017**

22

1      A    I understand it's all possibilities that can

2   happen.

3      Q    And after several minutes of being in this

4   position with you on one side holding Jordn down, Officer

5   Holsopple holding Jordn down on the other side of you, and

6   Sergeant Moore holding Jordn down with her foot on his

7   upper back, he becomes unresponsive; correct?

8      A    Yes.

9      Q    You notice he's no longer breathing?

10      A    He's no longer fighting.

11      Q    You write:  "When he stopped trying to get up,

12   officers started rubbing his back, asking if he's okay,

13   trying to get a response from him.  When he wasn't

14   responding, officers rolled him over on his back."

15   Correct?

16      A    Yes.

17      Q    So when you say he stopped trying to get up, in

18   your documentation, the report you wrote that night, is

19   that what you're saying now as fighting, trying to get up?

20      A    Yes.

21      Q    Are those the same things?

22      A    Yes, those are the same meanings.  We actually

23   believed that we had gained compliance at that point, he

24   had just given up and submitted that -- that the fight was

Case: 5:16-cv-02331-JRA  Doc #: 30-10  Filed:  07/17/17  16 of 27.  PageID #: 2526

Officer Robert Scherer - Vol. 2 - March 15, 2017

1    over.

2         Q     And is that what had been going on, a fight or

3    a battle, until then?

4         A     Yes.

5         Q     You say:  "Officers started rubbing his back."

6               Who was rubbing Jordn's back?

7         A     It might have been Officer Holsopple.  I don't

8    recall specifically.

9         Q     It wasn't you?

10        A     No.

11        **Q     Jordn is still in a prone position at this**

12   **point when you're rubbing his back?**

13        **A     Yes.**

14        Q     How long do the officers continue to rub

15   Jordn's back?

16        A     It's minute seconds.  It's just enough -- as

17   soon as we didn't get -- he didn't answer us, that's when

18   we immediately rolled him over.

19        Q     Was his body limp at this point?

20        A     We rolled him on his side.  It was kind of --

21   it was hard to tell if he was limp.  I wouldn't say limp,

22   but --

23        Q     How about when he's still face down, but he's

24   -- you realize -- you realize something is wrong, right,

Layne & Associates
(614) 309-1669

**Officer Robert Scherer - Vol. 2 - March 15, 2017**

1      Q    But I mean during the time period where it's

2   you, Sergeant Moore and Holsopple, you can't see his face.

3   He's facing the ground?

4      A    Yes.

5      Q    Is it safe to assume that that's the time

6   period that the gravel and debris was getting in his

7   mouth?

8      A    I would say during that entire altercation,

9   yes.

10     Q    Did you remove that debris from his mouth?

11     A    No.

12     Q    Did anyone remove that debris from his mouth?

13     A    I can't speak on behalf of what the EMS did.

14     Q    No, no.  I'm sorry.  You're right.

15          Did you observe any of your fellow officers

16   remove debris from his mouth?

17     A    No.

18     Q    So at this point, before EMS gets there, he's

19   on his side, he's not responding, and he's got debris,

20   gravel debris from the gravel on his face and his mouth;

21   fair?

22     A    Yes.

23     Q    You first noticed the debris, then, after Jordn

24   stopped responding; correct?

**Officer Robert Scherer - Vol. 2 - March 15, 2017**

35

1    A    I don't believe they ran lights and sirens.

2    Q    Where did the -- this is a fire truck?

3    A    Ambulance.

4    Q    Where did the ambulance park?

5    A    Right at the end of the driveway.

6    Q    None of the officers gave any CPR; correct?

7    A    It wasn't needed until --

8    Q    My question --

9    A    No.

10   Q    So officer -- I'm sorry.  Your captain or chief

11   at the time, Chief Smith, created a report in this case

12   regarding the events that took place.  Are you aware of

13   that?

14   A    I am not aware of it.

15   Q    At the time, was Chief Smith the main policy

16   decision maker?

17   A    Yes.

18   Q    Here at the force?

19   A    Yes.

20   Q    I'm going to hand you what's been marked as

21   Exhibit 11 for today.

22        (Exhibit Number 11 was introduced.)

23   BY MR. HILL:

24   Q    And if you will look, if you go to page -- I'm

**Officer Robert Scherer - Vol. 2 - March 15, 2017**

48

1   numbers?

2        A    Yes.  But, however, that is Sergeant Moore's

3   writing.

4             The serial number is typed in there.  I'm

5   sorry.  The -- the Taser serial number is typed in there.

6   The cartridge serial number was tagged in there by 101,

7   and Sergeant Moore wrote that.

8        Q    There's a time and date listed on Page 2 at the

9   very top.  And the time is 15:14 hours; correct?

10       A    Yes.

11       Q    Where did you get that information when you put

12  that in?  That's pretty specific.

13       A    That would only come from the call, time of

14  call, is what that means.

15       Q    So that's not the time that you used the Taser?

16       A    No.

17       Q    Now, you also have a height and weight listed;

18  correct?

19       A    Yes.

20       Q    You have the weight of 151 pounds; right?

21       A    Yes.

22       Q    Where did you get that information?

23       A    That would just have been off his DMV, license

24  information.

**Officer Robert Scherer - Vol. 2 - March 15, 2017**

52

1   you did not remember that?

2        A     I couldn't recall that at that time, no.

3        Q     But now, a year and a half later, you do?

4              MR. BECK:  Objection.

5              Go ahead.

6        A     When you have time to reflect on things

7   throughout the year and a half, yes, there are certain

8   things that do come back to your memory.

9              This was written immediately after a very

10  stressful situation.  So trying to document and remember

11  every single incident immediately after that incident is

12  very difficult for the brain to process.

13             Also, during this report time is when I also

14  received a call from the hospital advising that Mr. Miller

15  was hepatitis C and that I was going to have to come in

16  for treatment, and that also distracted my brain quite a

17  bit.

18    BY MR. HILL:

19       Q     There's a note at the bottom of page 3 that you

20  wrote; correct?

21       A     Yes.

22       Q     And this would have been something you wrote

23  close to the time of the events; correct?

24       A     Yes.

**Officer Robert Scherer - Vol. 2 - March 15, 2017**

53

1    Q    And when you say the suspect was believed,

2    that's what you believed at the time?

3    A    Yes.

4    Q    At the time you were interacting with him?

5    A    Yes.

6    Q    So you say, "The suspect was believed to be in

7    full excited delirium state."  Correct?

8         MR. BECK:  Objection.

9         Go ahead.

10   A    Yes.

11   BY MR. HILL:

12   Q    Do you remember speaking to Chief Smith the

13   night or the day of September 8th, 2015, after you

14   returned to the station?

15   A    I -- yeah, I remember general conversation, not

16   specifics.

17   Q    I think you told me earlier that all -- the

18   force that you used, beginning from the time of pulling

19   Jordn out of the car until he became unresponsive, was to

20   help Jordn; is that fair?

21   A    I have to gain compliance and get him under

22   control before I can help him, yes.

23   Q    So your motivation in using the force that you

24   did was to help Jordn?

57

```
 1                    (Exhibit Number 3 was introduced.)
 2     BY MR. HILL:
 3          Q    If you could take a look at that.
 4          A    (Reviewing document.)
 5          Q    Have you had a chance to review that?
 6          A    Yeah.
 7          Q    Is this a document you're familiar with?
 8          A    Yes.
 9          Q    What's marked as Exhibit 3 is an Excited
10     Delirium Directive; is that correct?
11          A    Yes, sir.
12          Q    And this is a directive here at the Springfield
13     Township police department?
14          A    Yes, sir.
15          Q    And the document is dated March 16th, 2009?
16          A    Yes.
17          Q    And this is the same directive that was in
18     place as of September 8th, 2015, here at Springfield
19     Township?
20          A    Yes.
21          Q    And is this directive still in place today?
22          A    I believe it is, yes.
23          Q    At least as of March 16th, 2009, Springfield
24     Township officers understood that excited delirium was a
```

**Officer Robert Scherer - Vol. 2 - March 15, 2017**

58

1    significant enough problem that officers need to be

2    trained on how to respond to it; true?

3        A    Yes.

4        Q    This is, excited delirium, a common enough

5    incident that it was likely enough to occur that officers

6    needed to be trained on it; fair?

7        A    We don't have many, but it is -- like I said

8    earlier, it's a worldwide problem that some believe, some

9    don't.

10        Q    You've taught on excited delirium; correct?

11        A    Yes.

12        Q    You believed in it enough to teach on it to

13    your fellow officers; fair?

14        A    Yes.

15        Q    Same with respect to the directive.  It was

16    understood here at the department; correct?

17        A    Yes.

18        Q    And my understanding is that you actually

19    participated in drafting some of the language in this

20    document?

21        A    Yes.

22        Q    Did you draft the entire document?

23        A    I don't know if I drafted the entire thing.  I

24    know we worked on it and then we gave it to the attorneys.

**Officer Robert Scherer - Vol. 2 - March 15, 2017**

59

1    So I don't know if they changed some language or anything

2    like that.

3         Q    You and Chief Smith worked on it together?

4         A    Yes.

5         Q    Do you approve of the language in it?

6         A    Yes.

7         Q    You gave it to the chief -- to the attorneys

8    for Springfield Township?

9              MR. BECK:  Objection.

10        A    Yeah, the legal --

11    BY MR. HILL:

12        Q    I don't want to know the discussions.  But it

13    came back from the attorneys, and at that point it was the

14    directive here for Springfield Township?

15             MR. BECK:  Wait a minute.  He's not going to

16    answer that question.

17             MR. HILL:  Whether it went to him, I don't

18    think is privileged.

19             MR. BECK:  Well, you can ask him if he knows

20    whether that happened or not.

21    BY MR. HILL:

22        Q    I don't want to put words in your mouth.  I

23    thought you just testified that you thought it went to the

24    attorneys?

**Officer Robert Scherer - Vol. 2 - March 15, 2017**

60

1      A    I believe it did go to the attorneys, but I

2   never took it to them personally.

3      Q    That's fine.

4          It comes back at some point and it becomes the

5   directive for how to respond to excited delirium here at

6   Springfield Township; correct?

7      A    Yes.

8      Q    After it came back, you still approved of the

9   language in it; correct?

10     A    I wouldn't have had a choice, but yes.

11     Q    You don't have a choice, because that's the

12  policy here; right?

13     A    Yes.

14     Q    It states at the top, under directive:  "Any

15  officer who encounters a person who exhibits any warning

16  signs of excited delirium shall immediately summon EMS and

17  have them respond to a nearby staging area."  Correct?

18     A    Yes.

19     Q    We've already discussed all the warning signs

20  for excited delirium; right?

21     A    Yes.

22     Q    Why is it important for an officer, who

23  encounters any warning signs of excited delirium, to call

24  for an ambulance immediately?

**Officer Robert Scherer - Vol. 2 - March 15, 2017**

61

1      A      You want to try to get EMS in the area so that
2   they can respond, just help the response, basically, try
3   to make sure that the -- you can get any medical treatment
4   there a little bit quicker.
5      Q      Because excited delirium is a life-threatening
6   medical condition?
7      A      It could be.
8      Q      In the second paragraph, it states:  "It will
9   be our directive not to leave the subject laying in a
10  face-down prone position."  Correct?
11     A      Yes.
12     Q      And that's what you taught your fellow officers
13  here at Springfield Township; true?
14     A      Yes.
15     Q      You talked earlier about a post incident review
16  or a debriefing; right?
17     A      Yes.
18     Q      Who conducted that post incident review?
19     A      It was a pastor who was trained to do police
20  debriefing and fire and EMS debriefings.  It's a
21  counseling center.
22     Q      So this post incident debriefing that we're
23  talking about right now, was this more of a counseling
24  session for the police officers in terms of what they were

104

1                            CERTIFICATE

2    State of Ohio      :

3    County of Franklin:

4

5         I, Whitney Layne, Notary Public in and for the

6    State of Ohio, duly commissioned and qualified, certify

7    that the within named ROBERT SCHERER was by me duly sworn

8    to testify to the whole truth in the cause aforesaid; that

9    the testimony was taken down by me in stenotype in the

10   presence of said witness; afterwards transcribed upon a

11   computer; that the foregoing is a true and correct

12   transcript of the testimony given by said witness taken at

13   the time and place in the foregoing caption specified.

14

15        IN WITNESS WHEREOF, I have set my hand and

16   affixed my seal of office at Dublin, Ohio, on this 21st

17   day of March, 2017.

18

19

20                         Whitney Layne, Notary Public

21                         In and for the State of Ohio

22   My Commission expires May 4, 2020

23

24