EXHIBIT

11

# In The Matter Of:

*Haydn Zeis, Administrator of the Estate of Jordn Miller v. Springfield Township, Ohio, et al.*

*Officer Joseph Holsopple*
*Vol. 1*
*March 15, 2017*

*Layne & Associates*
*6723 Cooperstone Drive*
*Dublin, Ohio 43017*
*(614) 309-1669*
*WhitneyLayne@att.net*



Layne & Associates
Reporters Without Borders

Original File 03-15-2017 Holsopple Final.txt
**Min-U-Script® with Word Index**

```
                                                                    1

1            IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF OHIO
2                       EASTERN DIVISION

3

4   Haydn Zeis, Administrator of
    the Estate of Jordn Miller,
5       Plaintiff,

6       vs.                        Case No. 5:16-CV-02331-JRA

7   Springfield Township, Ohio,
    et al.,
8       Defendants

9
                              - - -
10

11
       PART 1 VIDEO DEPOSITION OF OFFICER JOSEPH HOLSOPPLE
12  the Defendant herein, called by the Plaintiff under the
    applicable Rules of Civil Procedure, taken before me,
13  Whitney Layne, a Notary Public for the State of Ohio, at
    the Springfield Township Police Department, 2465 Canfield
14  Road, Akron, Ohio 44312 on March 15, 2017 at 12:30 p.m.

15

16

17

18

19

20                      LAYNE & ASSOCIATES
                       6723 COOPERSTONE DRIVE
21                       DUBLIN, OHIO  43017

22

23

24
```

```
                                                           2

 1   APPEARANCES

 2

 3       MICHAEL HILL, ESQUIRE
         EADIE HILL TRIAL LAWYERS
 4       3100 East 45th Street
         Suite 218
 5       Cleveland, Ohio  44127
              on behalf of the Plaintiff
 6

 7       GREGORY BECK, ESQUIRE
         MEL LUTE, ESQUIRE
 8       BAKER DUBLIKAR BECK WILEY & MATHEWS
         400 South Main Street
 9       North Canton, Ohio  44720
              on behalf of the Defendants
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

3

1                        March 15, 2017
                         Wednesday Session
2                        12:30 p.m.

3
                              - - -
4
                          STIPULATIONS
5
        It is stipulated by and among counsel for the
6    respective parties that the deposition of JOSEPH
     HOLSOPPLE, the Defendant herein, called by the Plaintiff
7    under the applicable Rules of Civil Procedure, may be
     taken at this time by the notary Whitney Layne; that said
8    deposition may be reduced to writing in stenotypy by the
     notary, whose notes thereafter may be transcribed out of
9    the presence of the witness; and that the proof of the
     official character and qualification of the notary is
10   waived.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1  part of the investigation.  I think I went to the autopsy
2  on that, but that was it.
3      Q    Did you go to the autopsy in this case, Jordn
4  Miller?
5      A    No, sir.
6      Q    Did you ever speak to anyone from the medical
7  examiner's office in this case?
8      A    I think I might have -- no, no, that wasn't the
9  medical examiner.  I asked somebody if they had heard if
10 he passed away.  I think it was Jason Grom from the
11 medical examiner's office.  He was out on the scene for
12 something else, and I said, "Did you hear if Mr. Miller
13 had passed," and he told me yes.  That was the extent of
14 it.
15     Q    Did you ever speak to anyone from the Summit
16 County prosecutor's office about Jordn Miller?
17     A    No.
18     Q    Or this incident?
19     A    Not that I'm aware of.
20     Q    The Holcomb matter, this report of a man
21 disrobing, was he in a field?  Is that what you said?
22     A    In a field or in a shed or near a shed, in a
23 horse -- I know there was a horse barn close by.
24     Q    And that report of disrobing, that's a sign or

21

1  a warning sign of a condition -- some people call it
2  excited delirium?
3      A    Yes.
4      Q    Have you heard that?
5      A    Yes.
6      Q    Do you agree with that?
7      A    Yes, sir.
8      Q    On September 8th, 2015, were you wearing body
9  armor?
10     A    No, sir.
11     Q    How tall are you?
12     A    5'11.
13     Q    How much do you weigh?
14     A    260, 265, depending on what I had for lunch.
15     Q    Do you work out at all, lift weights?
16     A    I really haven't been in the gym in a long
17 time.  I do some pushup and situps at home.
18     Q    How about back in 2014, 2015?  Were you working
19 out?
20     A    Same.
21     Q    Did you have a Taser --
22     A    Yes.
23     Q    -- in September of 2015?
24     A    Uh-huh, yes.

1  Q    And is it your recollection that that training
2  ended like 2008, 2009, something along those lines?
3  A    I don't recall.
4  Q    Did it seem to end about the time that Chief
5  Smith, John Smith, became the chief here?
6  A    I would -- I think so, yes.
7  Q    I want to -- I'm going to read you some signs,
8  some warning signs -- strike that.
9       I spoke with Officer Scherer at length about
10 the warning signs, some of the warning signs of excited
11 delirium.  Okay?
12 A    Yes, sir.
13 Q    And I'm going to read some that he agreed to as
14 being warning signs of excited delirium.  I want to ask if
15 you agree to that, okay?
16 A    Yes.
17 Q    He agreed mentally ill symptoms or symptoms of
18 a mental illness are warning signs of excited delirium.
19 Do you agree?
20      MR. LUTE:  Objection.
21      Go ahead.
22 A    I guess they could be.
23 BY MR. HILL:
24 Q    Delusions or hallucinations are signs -- strike

1  that.
2          Delusions or hallucinations are signs that
3  police officers should consider, potentially, due to
4  excited delirium; true?
5          MR. LUTE:  Objection.
6          You may answer if you know.
7      A   Yes.
8  BY MR. HILL:
9      Q   Disorientation is a sign or symptom that police
10 officers should consider might be due to excited delirium;
11 true?
12     A   Yes, sir.
13     Q   Disorganized or incoherent speech are symptoms
14 or characteristics that police officers should consider
15 might be warning signs of excited delirium?
16     A   Yes.
17     Q   Shouting or yelling for no apparent reason are
18 activities that police officers should consider warning
19 signs of excited delirium; true?
20     A   Yes, sir.
21     Q   Agitation for no apparent reason is a warning
22 sign of excited delirium; true?
23         MR. LUTE:  Objection.
24         Go ahead.

1   A   Yes, sir.
2   BY MR. HILL:
3   Q   A report that a person has disrobed or is
4   disrobing for no apparent reason is a warning sign of
5   excited delirium; true?
6   A   Yes.
7   Q   A person's flailing their body parts and moving
8   for no apparent reason is a warning sign of excited
9   delirium; true?
10   A   Yes.
11       MR. LUTE:   Objection.
12       Go ahead.
13       THE WITNESS:   Oh.
14   A   Yes.
15   BY MR. HILL:
16   Q   Any other warning signs of excited delirium
17   that you're aware of that I didn't touch on?
18   A   It sounds like you got all the ones that are
19   pertinent.
20   Q   The big ones; right?
21   A   The ones I can think of.
22   Q   When deciding whether to use force on a member
23   of the public, police officers should consider the medical
24   condition of that person; correct?

1    Q    So a police officer should take all steps
2  possible to decrease the stress of such a person; true?
3         MR. LUTE:  Objection.
4         You may answer.
5    A    Yes.
6  BY MR. HILL:
7    Q    When a police officer uses force, that can
8  increase the physiological stress response of such a
9  person; true?
10   A    Yes.
11   Q    Increased stress, physiological stress, can
12 cause serious injury or even death; true?
13   A    Yes.
14   Q    Cause the heart to fail?
15        MR. LUTE:  Objection.
16        You may answer if you know.
17   A    I would assume.  It can stop the breathing.
18 BY MR. HILL:
19   Q    Stop breathing, right.
20        Positional restraint asphyxia occurs when a
21 person's body position interferes with breathing; true?
22   A    Yes.
23   Q    This can be caused by a restriction on the
24 chest's ability to expand; true?

1    A    I assume, yes.
2    Q    It can be caused when the position of the head
3  obstructs the airway; true?
4    A    Yes.
5    Q    It can be caused when anything is in the face
6  or near the face or mouth obstructs the airway; true?
7         MR. LUTE:  Objection.
8         You may answer.
9    A    Yes.
10  BY MR. HILL:
11    Q    Positional restraint asphyxia is a life-
12  threatening medical condition; true?
13    A    Say that again.
14    Q    Positional restraint asphyxia is a life-
15  threatening medical condition; true?
16    A    Yes.
17    Q    Positional restraint asphyxia can cause death;
18  true?
19    A    Yes.
20    Q    When a person asphyxiates, they've stopped
21  breathing; true?
22    A    Yes.
23    Q    When restraining an individual, officers must
24  be sure to -- must make sure that nothing is obstructing

```
 1   the person's breathing or airway; true?
 2           MR. LUTE:  Objection.
 3           Go ahead.
 4       A   Say it again.
 5    BY MR. HILL:
 6       Q   When restraining an individual, police officers
 7   must be sure that nothing is obstructing the person's
 8   breathing; true?
 9           MR. LUTE:  Objection.
10           Go ahead.
11       A   Yes.
12    BY MR. HILL:
13       Q   And police officers have to be aware of the
14   risk of positional restraint asphyxia whenever they're
15   restraining a member of the public or a suspect; true?
16       A   Yes.
17       Q   Risk factors for positional restraint asphyxia
18   include having the person in a face-down prone position;
19   true?
20       A   Yes.
21       Q   When a person is engaged in a struggle, it
22   increases the risk of positional restraint asphyxia; true?
23       A   Yes.
24       Q   And that's because more oxygen is being devoted
```

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

81

1  asphyxia than members of the general public?
2         MR. LUTE:  Objection.
3         You may answer if you know.
4     A   Yes.
5  BY MR. HILL:
6     Q   People who are under the influence of drugs are
7  at a higher risk of positional restraint asphyxia; true?
8     A   Yes.
9     Q   People who are experiencing a condition
10 sometimes described or called excited delirium are at a
11 higher risk for positional restraint asphyxia; true?
12    A   Yes.
13    Q   Persons in a medical crisis are at a higher
14 risk of positional restraint asphyxia; true?
15        MR. LUTE:  Objection.
16        You may answer if you know.
17    A   Yes.
18 BY MR. HILL:
19    Q   Anything that causes the muscles in the body to
20 contract rapidly or hard increases the risk of positional
21 restraint asphyxia; true?
22        MR. LUTE:  Objection.
23        You may answer if you know.
24    A   I don't know.

Officer Joseph Holsopple - Vol. 1 - March 15, 2017

82

1  BY MR. HILL:
2      Q    The application of a conducted electrical
3  weapon increases the risk of positional restraint
4  asphyxia; true?
5           MR. LUTE:  Objection.
6           You may answer.
7      A    True.
8  BY MR. HILL:
9      Q    People exposed to repeated applications of a
10 electrical-conducted weapon are at an even higher risk for
11 positional restraint asphyxia; true?
12          MR. LUTE:  Objection.
13          You may answer.
14     A    Yes.
15 BY MR. HILL:
16     Q    Those are all risk factors that compound upon
17 one another; true?
18          MR. LUTE:  Objection.
19          You may answer if you know that.
20     A    I don't know if one heightens the other one,
21 no, but they are things to look for.
22 BY MR. HILL:
23     Q    Excited delirium is a life-threatening medical
24 condition?

147

1  underneath him?
2      A    Just like -- well, after he bit Bubba, it was
3  up more by his face.  But at first it was more laying down
4  and hitting, like under the chest part of his body.
5      Q    Almost -- the way you're demonstrating is like
6  if you were going to give yourself the Heimlich maneuver?
7      A    Yeah, close to that.
8      Q    And when you say Bubba was on top of him,
9  that's at the beginning of the -- Jordn being on the
10 ground?
11     A    Yeah.  I don't even know if he laid down on top
12 of -- I don't think he did.  I think he was just -- I
13 don't think he -- I don't remember him laying, because --
14 I don't remember Bubba being -- laying down on top of him
15 at all.  I only remember him on his -- standing or
16 kneeling beside, you know -- beside him, or on his knees
17 with him.  But I don't remember him on top of him.
18     Q    I only say -- you said that Bubba landed on top
19 of him earlier, okay?
20     A    I said Bubba went down after him, I think.  But
21 I don't --
22     Q    I don't want to put words in your mouth.
23     A    Right.
24     Q    And we have a statement we can rely on.

164

1                        CERTIFICATE
2  State of Ohio     :
3  County of Franklin:
4
5          I, Whitney Layne, Notary Public in and for the
6  State of Ohio, duly commissioned and qualified, certify
7  that the within named JOSEPH HOLSOPPLE was by me duly
8  sworn to testify to the whole truth in the cause
9  aforesaid; that the testimony was taken down by me in
10 stenotype in the presence of said witness; afterwards
11 transcribed upon a computer; that the foregoing is a true
12 and correct transcript of the testimony given by said
13 witness taken at the time and place in the foregoing
14 caption specified.
15
16         IN WITNESS WHEREOF, I have set my hand and
17 affixed my seal of office at Dublin, Ohio, on this 23rd
18 day of March, 2017.
19
20                                *[Signature: Whitney Layne]*
21                         Whitney Layne, Notary Public
22                         In and for the State of Ohio
23 My Commission expires May 4, 2020
24