EXHIBIT
13
exhibitsticker.com

```
              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF OHIO
                       EASTERN DIVISION


   HAYDN ZEIS, Administrator of the Estate of
   JORDN MILLER,

             Plaintiff,

         vs.              CASE NO. 5:16-cv-02331-JRA
                          JUDGE ADAMS

   SPRINGFIELD TWP., OHIO, et al.,

             Defendants.


                           - - - -


         Deposition of SHAWN DEWOLF, taken as if
    upon cross-examination before Lisa M. Wright, a
   Notary Public within and for the State of Ohio, at
   the Springfield Township Police Department 2465,
   Canfield Road, Akron, Ohio, at 10:00 a.m. on
   Wednesday, May 31, 2017, pursuant to notice and/or
   stipulations of counsel, on behalf of the Plaintiff
   in this cause.


                           - - - -


              WARE REPORTING SERVICE, LLC
                 21860 CROSSBEAM LANE
                ROCKY RIVER, OHIO 44116
             216.533.7606   FAX 440.333.0745
```

```
 1      APPEARANCES:

 2       Michael A. Hill, Esq
         Eadie Hill
 3       3100 East 45th Street, Suite 218
         Cleveland, Ohio 44127
 4       216-777-8856
         Michael.hill@eadiehill.com
 5
             On behalf of the Plaintiff;
 6
         Gregory A. Beck, Esq.
 7       Baker, Dublikar, Beck, Wiley & Matthews
         400 South Main Street
 8       North Canton, Ohio  44720
         330-470-7780
 9       Beck@bakerfirm.com

10           On behalf of the Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

EXHIBIT INDEX

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 20 | RUN REPORT | 9 |
| EXHIBIT 3 | EXCITED DELIRIUM PROTOCOL | 10 |
| EXHIBIT 18 | NINE PHOTOS | 48 |
| EXHIBIT 21 | AKRON CITY HOSPITAL CALL SHEET | 96 |
| EXHIBIT 22 | AKRON CITY HOSPITAL HOSPITAL RECORDS | 103 |

1  So, yes, sometimes we don't have that
2  information. Actually, probably most of the time
3  we don't have that information of what is making
4  him, him or her, act that way. We just see that
5  they're acting that way, and it doesn't fit how
6  they normally do per bystanders or family, or if
7  anybody knows who this person -- like they dealt
8  with them before.
9  Q. So if you see a person, or you get a report that a
10 person is acting in a manner that fits this
11 agitated behavior profile and they're not calming
12 down, one of the options then is to medicate this
13 person with a sedative so that they don't continue
14 to struggle, wrestle, do things like that; is that
15 fair?
16 A. Yes.
17 Q. Okay. You talked about sedative, a sedative
18 medication that you have available?
19 A. Yes.
20 Q. What medication do you have available at
21 Springfield Township for this, for calming a person
22 with this kind of agitated state?
23 A. We have ketamine, k-e-t-a-m-i-n-e.
24 Q. And ketamine is really, kind of has become kind of
25 the gold standard drug for responding to excited

1   delirium, fair?
2   A. It is, yes.
3   Q. And ketamine, if I understand it, is actually an
4       anesthetic?
5   A. Yes, it has those properties.
6   Q. Okay.
7   A. They do use it in animals for surgical procedures
8       when it's neutering or spraying they do.
9   Q. Okay. And tell me what is the -- how do you
10      administer ketamine? Is it intramuscular
11      injection?
12  A. Yes.
13  Q. And for intramuscular injection do you just try to
14      get into a large piece of tissue?
15  A. The bigger the better. But the more appropriate
16      place is probably going to be a shoulder just
17      because of access.
18  Q. Okay. And can you give me an idea -- we don't have
19      this on video, but just an idea of kind of like the
20      needle, how big it is, what it looks like?
21  A. The syringe is, I don't know, three inches or so.
22      The needle is about an inch and a half.
23  Q. Okay. And then you say you put it in a shoulder.
24      Is it the back of the shoulder?
25  A. The deltoid here.

```
 1         specific like that?
 2    A.   Nothing specific as far as their location.
 3    Q.   Okay.  Just that there were three officers near his
 4         body?
 5    A.   I'm not even positive if there, what the count was.
 6    Q.   Okay.
 7    A.   I don't know that.
 8    Q.   Okay.  Do you remember anything about Jordn's
 9         position, supine, prone, on his side?
10    A.   Face down and handcuffed.
11    Q.   Okay.
12    A.   So that would be with the arms, you know,
13         handcuffed behind him.
14    Q.   Right.  And then when you arrived, did you or one
15         of your colleagues roll Jordn over onto his back or
16         side?
17    A.   Yes.
18    Q.   Did you have to remove, someone have to remove, the
19         handcuffs first?
20    A.   We did remove the cuffs, yeah.  Between us rolling
21         him over and then the officers unlocking the cuffs,
22         yes.
23    Q.   Okay.
24    A.   And that is indicated on my report.
25    Q.   And then in terms of removing the sweatshirt,
```

```
1   A.  Yes.
2   Q.  Okay.  Under, just to the right of that, you have
3       call info?
4   A.  Call information.
5   Q.  Do you see that?
6   A.  Yes.
7   Q.  Right in the middle top?
8   A.  Yes.
9   Q.  And you have called for, and the called for is the
10      reason that the fire department, the ambulance, is
11      being notified, right?
12  A.  Yes.
13  Q.  And here the reason you're being called is for, it
14      says, Tased patient, correct?
15  A.  Yes.
16  Q.  And that's because the reason that you were
17      actually called by the police to go to this
18      location is in response to one of the officers
19      Tasing this individual, correct?
20  A.  That is my understanding.
21  Q.  You were not heading in that direction when the
22      Tasing happened, correct?
23  A.  No.
24  Q.  So where it says also, also under call info, law
25      enforcement present, it says three?
```

1        Tased patient, that's the only person that I --
2        yes.
3    Q.  I mean, I'm talking about the initial 9-1-1 call or
4        dispatch --
5    A.  No.
6    Q.  -- for the scene originally.
7    A.  No.
8    Q.  Okay.  When you arrived and Jordn was on the ground,
9        as you described him, do you remember the officers
10       doing anything?  CPR or anything?
11   A.  They were not doing CPR because we started CPR
12       after we confirmed that he definitely did not have
13       a pulse.  Then we worked on getting, obviously with
14        the officers' help because they had the key, to
15       remove the cuffs and then get him get him ready to
16       get into the back of the squad by putting him on
17       our backboard so we could get him up off the ground
18       and so forth.
19   Q.  So let me go back to something we talked about
20       earlier, which was this Golden Corral.
21   A.  Yes.
22   Q.  When you gave that person ketamine, what do you
23       do -- how do you get them out of there afterward?
24   A.  How do you get them?  Well --
25   Q.  Do you put them on a backboard?

```
 1           arrival -- so it's U/A of EMS patient noticed by
 2           STPD to be apneic, which is not breathing, and
 3           pulseless.  Immediate CPR.  Cuffs removed and ACLS
 4           in progress throughout the transport.  And that's
 5           further documented down below.
 6      Q.   So it says, upon arrival of EMS patient noticed by
 7           STPD, Springfield Township Police Department, to be
 8           apneic and pulseless?
 9      A.   That's correlating with what I said that they said
10           when we got out of the squad that, hey, we just --
11           yeah.
12      Q.   And were they indicating to you, if you know, that
13            that's when he became pulseless and without any
14           kind of breath?
15      A.   I believe they were indicating that it just
16           happened.
17      Q.   Okay.  You stated patient Tased by Springfield
18           Township Police Department presenting in violent
19           agitated condition, correct?
20      A.   Yes.
21      Q.   I'm assuming this is information you're getting
22           from the police officers on scene?
23      A.   Yes.
24      Q.   Do you know who told you that information?
25      A.   Not specifically.  My assumption would be Officer
```

```
 1   A.   Yes.
 2   Q.   And when he was placed in handcuffs he could
 3        breathe and had a pulse?
 4   A.   Yes.
 5   Q.   Were there -- were you informed by anyone that
 6        Jordn was Tased after he was in handcuffs?
 7   A.   I was not, no.
 8   Q.   Is that the first time you heard that?
 9   A.   That he might have --
10   Q.   That he was Tased.
11   A.   The first time that he was Tased after he was
12        cuffed?
13   Q.   Yes.  Is this the first time you've heard that,
14        today, that he was Tased after he was in handcuffs?
15             MR. BECK:  Objection.  Go ahead.  You
16        can answer.
17   A.   Yes, I believe that that is the first time that
18        I've heard that.
19   Q.   Okay.  You said immediate CPR, cuffs removed, ACLS
20        in progress throughout transport?
21   A.   Yes.
22   Q.   CPR.  Who was doing chest compressions, and was
23        there some kind of rotating back and forth?
24   A.   I'm not sure who started the chest compressions.
25        I'm assuming my partner, since I was the lead
```

1  have to click on, and it may have been overlooked.
2  Because on my report I don't indicate that he had a
3  pulse at any time with us.
4  Q. That's what I was wondering.
5  A. Yes.
6  Q. So I guess to make sure, I don't know that I
7     totally understand it, based on the documentation
8     you've seen, your handwritten notes, your memory,
9     did Jordn regain a pulse at some point while
10    transferring him to Akron City?
11 A. No.
12 Q. Okay.
13 A. Not when he was with me.
14 Q. Okay. And at what point was he not with you?
15 A. When we gave him to the ER.
16 Q. So from the time you got to Jordn in the driveway
17    until the time you dropped him off in the ER, you
18    never were able to get a pulse?
19 A. Correct.
20 Q. Okay. I want to go to, I believe it would be, the
21    fourth page. I'm sorry. Yes. The fourth page of
22    Exhibit 20. It's a supplemental report.
23 A. Okay.
24 Q. And it says cardiac arrest type, yes, after EMS.
25    Do you see that?

1   A.   I do see that, yes.
2   Q.   Does that mean that he went into cardiac arrest
3        after you had arrived on scene?
4   A.   You know, that's a good question. ==I know that he==
5        ==was unresponsive with no pulse and apneic when we==
6        ==got there, and he never regained any of that for==
7        ==the time I had him.==
8   Q.   Okay. Is this kind of maybe one of those -- I
9        don't really understand the system, so maybe this
10       is one of those pull-downs that got a little bit
11       confusing?
12   A.   Yes. The unfortunate thing is because we haven't
13       gone to an electronic reporting right off the
14       get-go, we start on paper, have to come back --
15   Q.   You guys don't have like a Toughbook --
16   A.   Not yet. We're working in that direction. But we
17       have to come back and enter it in, and there are so
18       many field that unfortunately there are some that
19       just may not completely match on here, which I know
20       sounds horrible.
21   Q.   No. Because like underneath that it says cardiac
22       arrest witnessed, and it says no.
23   A.   Correct.
24   Q.   Should that be yes?
25   A.   Well, when I think cardiac arrest witnessed, I think

C E R T I F I C A T E

State of Ohio,       )
                     ) SS:
County of Cuyahoga.  )

    I, Lisa M. Wright, a Notary Public in and for the state of Ohio, do hereby certify that the within-named witness, SHAWN DEWOLF, was by me first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given was by me reduced to stenotypy in the presence of said witness, afterwards transcribed by means of computer-aided transcription, and that the foregoing is a true and correct transcript of the testimony so given as aforesaid.

    I do further certify that this deposition was taken at the time and place as specified in the foregoing caption, and that I am not a relative, counsel, or attorney of either party, that I am not, nor is the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28 (D), or otherwise interested in the outcome of this action.

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Cleveland, Ohio, on this day, June 19, 2017.

*Lisa M. Wright*
_____
Lisa M. Wright, Ware Reporting Service, LLC
21860 Crossbeam Lane, Rocky River, OH  44116
My commission expires September 14, 2020.