**EXHIBIT**

14

exhibitsticker.com

# In The Matter Of:

*Haydn Zeis, Administrator of the Estate of Jordn Miller v. Springfield Township, Ohio, et al.*

---

*Sergeant Tera Denise Moore*
*March 20, 2017*

---

*Layne & Associates*
*6723 Cooperstone Drive*
*Dublin, Ohio  43017*
*(614) 309-1669*
*WhitneyLayne@att.net*



Original File 03-20-2017 TMoore Final.txt
Min-U-Script® with Word Index

1        IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF OHIO
2                  EASTERN DIVISION

3

4  Haydn Zeis, Administrator of
   the Estate of Jordn Miller,
5      Plaintiff,

6
       vs.
7                       Case No. 5:16-CV-02331-JRA

8  Springfield Township, Ohio,
   et al.,
9      Defendants

10
                        - - -
11

12

13   VIDEO DEPOSITION OF SERGEANT TERA DENISE MOORE
   the Defendant herein, called by the Plaintiff
   under the applicable Rules of Civil Procedure,
14  taken before me, Whitney Layne, a Notary Public
   for the State of Ohio, at the Springfield Township
15  Police Department, 2465 Canfield Road, Akron, Ohio
   44312 on March 20, 2017 at 1:00 p.m.
16

17

18

19

20

21
                  LAYNE & ASSOCIATES
22               6723 COOPERSTONE DRIVE
                  DUBLIN, OHIO  43017
23

24

1  APPEARANCES

2

3      MICHAEL HILL, ESQUIRE
       EADIE HILL TRIAL LAWYERS
4      3100 East 45th Street
       Suite 218
5      Cleveland, Ohio  44127
            on behalf of the Plaintiff
6

7      MEL LUTE, ESQUIRE
       BAKER DUBLIKAR BECK WILEY & MATHEWS
8      400 South Main Street
       North Canton, Ohio  44720
9           on behalf of the Defendants

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                          March 20, 2017
Monday Session
2                          1:00 p.m.

3

4                        - - -

                  STIPULATIONS
5

6      It is stipulated by and among counsel for the
respective parties that the deposition of TERA
7  DENISE MOORE, the Defendant herein, called by the
Plaintiff under the applicable Rules of Civil
8  Procedure, may be taken at this time by the notary
Whitney Layne; that said deposition may be reduced
9  to writing in stenotypy by the notary, whose notes
thereafter may be transcribed out of the presence
10 of the witness; and that the proof of the official
character and qualification of the notary is
11 waived.

12

13

14

15

16

17

18

19

20

21

22

23

24

1    police officer responding to a scene, you're not

2    capable of making any kind of a medical diagnosis?

3        A    No.

4        Q    So in terms of a police officer

5    responding to the scene, and a person exhibits

6    behavior consistent with excited delirium, is it

7    your job to get that person to a medical

8    professional as soon as possible?

9              MR. LUTE:  Objection.

10             You may answer.

11       A    Once we get there, if we believe that

12   it's an excited delirium situation with drugs

13   involved, yes.

14    BY MR. HILL:

15       Q    You keep saying "with drugs involved."

16       A    Right.

17       Q    Excited delirium is an emergency;

18   correct?

19       A    Yes.

20             MR. LUTE:  Objection.

21             You may answer.

22       A    Yes.

23    BY MR. HILL:

24       Q    So what's safest for the person

1    where a person exhibits at least one sign of

2    excited delirium, it could be excited delirium, or

3    it could just be a mental health issue?

4        A    Yes, you have to determine what you

5    believe, yeah.

6        Q    And what -- in order to determine or

7    make these determinations as a police officer,

8    you've got to identify the available information;

9    correct?

10       A    Yes.

11       Q    And you've got to utilize the available

12   resources; correct?

13       A    Yes, when necessary.

14       Q    And in a situation where a person may

15   have excited delirium, it is necessary; correct?

16       A    Yes.

17       Q    And in terms of the available

18   information, it could include people who know this

19   person; correct?

20       A    Yes.

21       Q    It could be calling dispatch to get

22   additional information; correct?

23       A    Yes.

24       Q    It could be contacting family members if

1    you know where they are; correct?

2          A    Yes.

3          Q    It could be contacting other witnesses

4    who may have information about this person's

5    behavior; true?

6          A    If you have time.

7          Q    It could be making firsthand

8    observations about this individual in front of

9    you; correct?

10         A    Yes.

11         Q    Certain individuals who may be on drugs

12   exhibit signs that are pretty apparent that

13   they're on drugs; correct?

14         A    Sometimes.  But like I said, it's a fine

15   line.  Mental illness presents as excited delirium

16   and vice versa.

17         Q    So as a police officer, do you wait --

18   let's take a step back.

19              If you have a person who exhibits signs

20   of excited delirium, do you, Sergeant Moore, as a

21   police officer, wait to contact EMS or other

22   medical providers until you have information that

23   confirms that this person has used drugs recently?

24              MR. LUTE:  Objection.

1          You may answer.

2     A     That's kind of contradictive.  But if I

3  get to a call where I believe somebody has excited

4  delirium, of course I'm immediately calling EMS.

5   BY MR. HILL:

6     Q     Even if you don't know if they've taken

7  drugs?

8     A     If I believe it's excited delirium, I

9  believe they've taken drugs.

10    Q     How would -- have there ever been any

11 circumstances where you've arrived on a scene

12 where you believe a person had excited delirium

13 but weren't given information about drug use?

14          MR. LUTE:  Objection.

15          You may answer.

16    A     We can suspect that they've taken drugs,

17 but you never really know for sure.  But if you

18 can get the medical emergency there and close and

19 get them settled down enough, then they can be

20 evaluated.  But if I believe something is excited

21 delirium and they possibly have taken drugs

22 because it's no behavior I've ever known before or

23 seen before, then yeah, I would have EMS come

24 right away.

1    bigger back then.

2         Q    So this event you're referring to

3    occurred between five and ten years ago?

4         A    Yes.  Excited delirium doesn't exhibit

5    much anymore.

6         Q    I'm just asking about the dates.

7              And in that situation, just based on the

8    individual's behavior, it was pretty obvious to

9    you that he had been using drugs?

10        A    I suspected that he had been using

11   drugs.

12        Q    And when you suspected he was using

13   drugs, did you contact EMS?

14        A    Yes.

15        Q    And is that because, based on his

16   behavior, that triggered the excited delirium

17   policy that you have here at the station?

18        A    Yes.

19        Q    What happened with that individual?  Did

20   he survive?  Did he die?

21             MR. LUTE:  Objection.

22             Go ahead.

23        A    We finally got him cuffed, but I can't

24   remember if we took him down or if the squad took

1    Q    But my question is:  The reason you
2  called EMS, was that because you suspected excited
3  delirium?
4         A    It was a possibility, yeah.
5         Q    And what happened to this individual?
6         A    They always -- any time a situation like
7  that happens, they get transported, one way or the
8  other, to the hospital.  And again, I don't
9  remember if it was the squad with an officer
10  inside or us with him handcuffed.
11         Q    Did this individual on Albrecht, did he
12  survive?
13         A    Yes.
14         Q    Do you still see him occasionally?
15         A    No.
16         Q    And you don't know what treatment he got
17  at the hospital, do you?
18         A    No.
19         Q    Do you need to take your phone for any
20  reason --
21         A    No.  I'm sorry.  Actually, I had it on
22  silent.  I don't know how it even rang.
23         Q    Any other occasions where you've
24  responded to a scene and you were dealing with a

1    sure.

2         Q    Did it involve weapons?

3         A    I don't know if there were hostages.  I

4    think there was one that involved a weapon.

5         Q    It doesn't sound like you're in a

6    position to describe what happened.

7         A    I don't remember them.  That was very --

8    20 years ago.

9         Q    So just before we move on, as we sit

10   here, can you remember the details or even the

11   general substance of any occasions where you were

12   acting as a hostage negotiator?

13        A    Other than being called out to a

14   barricade and possible hostage, no, no details.

15        Q    Police officers must use the least

16   amount of force needed under the circumstances;

17   true?

18        A    Yes.

19        Q    Once a person is restrained, police

20   officers are no longer permitted to use force on

21   that individual; true?

22        A    No.

23             MR. LUTE:  Objection.

24             Go ahead.

1      A    If they are trying to kick officers, if

2   they're trying to get away from you, if they're

3   trying to hurt the public, if they're banging

4   their head on the ground and hurting themselves.

5   Those are examples.

6      Q    Can an officer then use a Taser on a

7   restrained person because he's banging his head on

8   the ground?

9      A    If he's hurting himself and we need to

10  immobilize him, yes.

11     Q    And then what would be the purpose of

12  tasering a restrained individual who is -- who has

13  banged his head on the ground?

14     A    I wouldn't want him to get a concussion

15  or knock himself out or kill himself.  And people

16  have the force to do that.

17     Q    So under that circumstance, the Taser of

18  a restrained person, who is handcuffed, would be

19  to help that person?  Is that your understanding?

20     A    And be a way to control him so he

21  wouldn't hurt himself anymore.

22     Q    In your experience here at Springfield

23  Township, on how many occasions have you seen

24  officers use a Taser on a person who is restrained

1    in handcuffs?

2              MR. LUTE:  Objection.

3              You may answer.

4         A    Multiple times.

5     BY MR. HILL:

6         Q    Can you give me -- when you say

7    "multiple," is it more than five, more than ten,

8    more than 20?

9              MR. LUTE:  Objection.

10             You may answer if you know.

11        A    I don't know exactly.  I would say

12   around ten.  Maybe more.

13    BY MR. HILL:

14        Q    Have you, during the course of your

15   employment here at Springfield Township, used an

16   electrical conducted weapon or a Taser on a person

17   who was restrained in handcuffs?

18             MR. LUTE:  Objection.

19             Go ahead.

20        A    I don't remember.  I would have to look

21   at the use of force reports.

22    BY MR. HILL:

23        Q    As a supervisor here at Springfield

24   Township, sometimes you sign off on the uses of

1    A    Yes.

2    Q    Have you ever testified as an expert in

3  the use of force or police procedures?

4    A    No.

5    Q    Have you ever been retained as a

6  consultant on the use of force or police

7  procedures?

8    A    No.

9    Q    Do you consider yourself to be an expert

10  in the use of force or police procedures?

11    A    No.

12    Q    Have you ever been asked by any

13  department to provide training or consulting to

14  police officers on the use of force?

15    A    No.

16    Q    Have you ever been retained or asked to

17  train officers from any police department on

18  police procedures or tactics?

19    A    No.

20    Q    Do you consider yourself, as part of

21  your job here as a supervisor, to be familiar or

22  well versed in the policies, practices and customs

23  of Springfield Township Police Department?

24    A    Yes.

1      Q      Force means any violence, compulsion or

2   constraints physically exerted by any means upon

3   or against a person or thing; true?

4      A      I would say.  I don't know what the

5   Webster's dictionary says, but that sounds about

6   right.

7      Q      That's the definition in Springfield

8   Township's use of force policy, okay?

9      A      Okay.

10     Q      You don't disagree with that definition?

11     A      No.

12     Q      Force, then, would include a police

13  officer's decision to physically grab and move a

14  person from one location to another; true?

15     A      That would be force.

16     Q      Force includes a police officer's

17  decision to physically restrain a person; true?

18     A      Yes.

19     Q      That includes a police officer's

20  decision to restrain a person and prevent them

21  from moving from one area to another; correct?

22     A      Yes.

23     Q      That includes restraining a person and

24  holding them in a specific position; true?

1      A      Yes.

2      Q      That includes an officer's decision to

3  restrain a person and prevent them from rolling

4  over or turning; true?

5      A      Yes.

6      Q      Force would include holding a person on

7  the ground; true?

8      A      Yes.

9      Q      Force would include kicking a person;

10  true?

11      A      Yes.

12      Q      Force would include striking a person

13  with your forearm; true?

14      A      Yes.

15      Q      Force would include using an electrical

16  conducted weapon; true?

17      A      Yes.

18      Q      When deciding whether to use force on a

19  member of the public, police officers should

20  consider the mental capacity of the subject at the

21  time; true?

22          MR. LUTE:  Objection.

23          You may answer.

24      A      Everything is -- every situation, like I

1              MR. HILL:  I'll rephrase it.

2    BY MR. HILL:

3         Q      In terms of your decision-making as to

4    whether to use an electrical conducted weapon on a

5    member of the public, does a person's mental

6    capacity factor in in any way?

7              MR. LUTE:  Objection.

8              Go ahead.

9         A      I use whatever force necessary, and we

10   use any force necessary that we can to put them

11   under control.

12             If it's grabbing them by the arm, then

13   that's the force we use.  If it's putting them to

14   the ground, then that's the force we use.  If

15   it's, you know, running after them and tackling

16   them, then that's the use of force.  If nothing is

17   working, we escalate, and eventually it might get

18   to an electrical device.  So every situation is

19   different.

20   BY MR. HILL:

21        Q      And my question, though, is:  Is there a

22   difference in your approach or response in the

23   amount of force you use or whether to use force

24   based on whether that person has a diminished

1    mental capacity or not?

2          A     It's not my job to determine whether

3    they do or not.  And even if it's my opinion that

4    they may or may not, I still have to do whatever

5    force is necessary to keep them under control.

6          Q     That's all I'm asking.

7          A     Okay.

8          Q     Is whether or not your decision to use

9    force is not influenced by whether they have a

10   diminished mental capacity or not.  That's my only

11   question.

12         A     Yes.

13         Q     When you say yes, you're agreeing that

14   the person's mental capacity is not a factor in

15   your decision to use force; fair?

16         A     If I have to use the force, then yes, I

17   will use it, if it's necessary.

18         Q     And I just want to make sure I'm getting

19   an answer to my question.

20         A     I mean, you know, you're going a couple

21   different ways.  I mean, if you want to rephrase,

22   you can.  I'm not sure exactly what you're looking

23   for, I guess.

24         Q     As a police officer here at Springfield

1    Township, do you use the same amount of force

2    regardless of whether the person is suffering from

3    a diminished mental capacity?

4        A    If I have to use the force, then I'll

5    use the force, yes.

6        Q    Does your decision to escalate force, is

7    that the same regardless of whether the person has

8    a diminished mental capacity and/or a normal

9    mental capacity?

10                MR. LUTE:   Objection.

11                Go ahead.

12        A    If it's necessary, yes.   It doesn't

13    matter what they have.

14    BY MR. HILL:

15        Q    In terms of your decision to use force,

16    you would use the same amount of force under the

17    same circumstances regardless of whether the

18    person has a diminished mental capacity; true?

19        A    If I believe that they do, yes.

20                Oh, my goodness.   Sorry.

21        Q    Do you need to get that?

22        A    No.

23        Q    Some individuals with diminished mental

24    capacity may not be able to follow a police

1    officer's commands; true?

2        A    Yes.

3        Q    Some individuals with a diminished

4    mental capacity may act in ways inconsistent with

5    police officers's commands; true?

6        A    That and injured people and -- a lot of

7    people have a problem with our commands.

8        Q    And for a drunk person, that actually

9    may be they're so intoxicated they actually have,

10   temporarily, diminished mental capacity; true?

11       A    At the time, you could say.

12       Q    Some individuals with diminished mental

13   capacities may not understand that they're

14   interacting with the police; true?

15       A    It's not for me to say.  I suppose it's

16   possible.

17       Q    Is it anything you've ever considered as

18   a police officer?

19       A    I think everybody considers that

20   possibility.

21       Q    Including reasonable police officers?

22       A    Yes.

23       Q    Some individuals with diminished mental

24   capacity --

1      A    I am sorry.

2      Q    Let me know when you're ready.

3      A    I'm going to turn this thing off,

4 because I think it's just the Apple watch that's

5 the problem.  And it won't bug me.  I'm sorry

6 about that.  I've never turned it off before so --

7 I'm good.

8      Q    Some individuals with diminished mental

9 capacity may not understand the roles that police

10 officers play in a particular situation; true?

11     A    I don't know what they think.

12     Q    Is that something that you have to

13 consider when re --

14     A    It's possible, yes.

15     Q    So it's something that a reasonable

16 officer should consider when responding to members

17 of the public; true?

18     A    Yes.

19     Q    And for example, there are members of

20 our community who may have diminished mental

21 capacities; true?

22     A    Yes.

23     Q    And those could include individuals with

24 cognitive deficits or mental retardation?

1      A    Yes.

2      Q    They could include members of our

3  elderly community who may have dementia or

4  Alzheimer's?

5      A    Yes.

6      Q    It may include very young children, for

7  example?

8      A    Yes.

9      Q    It may include individuals with certain

10  medical conditions like diabetes or other

11  conditions that can cause mental changes?

12      A    Yes.

13      Q    It may be individuals who have problems

14  with medication; correct?

15      A    Yes, but they're not mental illnesses.

16  They're situational.  Somebody with diabetes

17  doesn't have a mental illness.

18      Q    Sure.  But temporarily, they may have a

19  diminished mental capacity --

20      A    Cognitive difficulties.

21      Q    -- because of high or low sugar?

22      A    Well, that's what causes, yeah, for them

23  to act out, would be aggressive, sometimes.

24      Q    And that's -- so that's a great example.

1          So some people who have issues with
2     their glucose levels, because of diabetes, may be
3     delirious or aggressive under the circumstances
4     from no fault of their own; true?
5          A     Correct.  And they're not mentally ill,
6     yeah.  They have diabetes.
7          Q     Sure.  And at that moment, when they're
8     acting or behaving in that way, they may not
9     understand that they are acting in that way;
10    correct?
11         A     Yes.
12         Q     And in that situation, where officers
13    find themselves, they have to take into
14    consideration that this person's behavior may be
15    the result of a medical condition; true?
16         A     Yes.
17         Q     Because using force against that person
18    may not get them to change their behavior, because
19    they don't understand why they're doing it; true?
20              MR. LUTE:  Objection.
21              You may answer if you know.
22         A     You have to use force no matter what
23    cognitive or mental status they're in, if you have
24    to get them medical attention.

1    BY MR. HILL:

2        Q    So in terms of responding to an

3    individual who has -- who is in the throes of a

4    medical crisis because of diabetes, glucose

5    irregularities, would you alter your response in

6    any way?

7        A    No, if I need to control them.  It

8    happens a lot.

9        Q    And that would include using force

10   against that individual?

11       A    Yes.

12       Q    That would include using a Taser against

13   that individual?

14       A    Yes, if necessary.

15       Q    Would that include using strikes of the

16   forearm against that individual?

17       A    It depends.

18       Q    It's one of the options you consider?

19       A    Uh-huh.

20       Q    Yes?

21       A    Yes.

22       Q    There would be no restriction on that

23   just because the person's behavior is caused by

24   their diabetes?

1    BY MR. HILL:

2        Q    So in terms of responding to an

3    individual who has -- who is in the throes of a

4    medical crisis because of diabetes, glucose

5    irregularities, would you alter your response in

6    any way?

7        A    No, if I need to control them.  It

8    happens a lot.

9        Q    And that would include using force

10   against that individual?

11       A    Yes.

12       Q    That would include using a Taser against

13   that individual?

14       A    Yes, if necessary.

15       Q    Would that include using strikes of the

16   forearm against that individual?

17       A    It depends.

18       Q    It's one of the options you consider?

19       A    Uh-huh.

20       Q    Yes?

21       A    Yes.

22       Q    There would be no restriction on that

23   just because the person's behavior is caused by

24   their diabetes?

1      A      No.

2      Q      That would go really for any use of

3   force; correct?

4      A      Yes.

5      Q      Would that be true of other conditions

6   I've described as well, like Alzheimer's or

7   dementia?

8      A      If you have to get them medical

9   attention, you have to control them, so yes.

10      Q      And for an individual whose behavior is

11   being caused by Alzheimer's or dementia, will you

12   also use a Taser against such a person?

13      A      If you have to.

14      Q      Would you also use a forearm strike

15   against such a person?

16            MR. LUTE:   Objection.

17      A      If you have to.

18   BY MR. HILL:

19      Q      Would you also kick such a person?

20            MR. LUTE:   Objection.

21            Go ahead.

22      A      If you have to.

23   BY MR. HILL:

24      Q      And those are things that you would do,

1      A      No.

2      Q      That would go really for any use of

3  force; correct?

4      A      Yes.

5      Q      Would that be true of other conditions

6  I've described as well, like Alzheimer's or

7  dementia?

8      A      If you have to get them medical

9  attention, you have to control them, so yes.

10      Q      And for an individual whose behavior is

11  being caused by Alzheimer's or dementia, will you

12  also use a Taser against such a person?

13      A      If you have to.

14      Q      Would you also use a forearm strike

15  against such a person?

16          MR. LUTE:   Objection.

17      A      If you have to.

18  BY MR. HILL:

19      Q      Would you also kick such a person?

20          MR. LUTE:   Objection.

21          Go ahead.

22      A      If you have to.

23  BY MR. HILL:

24      Q      And those are things that you would do,

1  kicking, striking or tasering, in an effort to get

2  that person medical attention potentially?

3      A    To put them under control to get them

4  medical attention, yes, and keep them from hurting

5  people and themselves.

6      Q    And nothing about your response and the

7  use of force would be influenced by that person's

8  actions being caused by Alzheimer's or dementia;

9  true?

10      A    I would take into consideration if I

11  believed that was the case or if a wife told me,

12  "oh, my husband is suffering from dementia."  But

13  it would not make a difference in the way that I

14  have to control them or the use of force I use.

15      Q    And I just want to make sure I'm clear.

16          In terms of training here at Springfield

17  Township, you've never received any training

18  instructing you to change your response or the

19  amount of force you use based on the fact that a

20  person's actions are being caused by a medical

21  condition; is that true?

22      A    Use of force is use of force.  You have

23  to do that regardless of, like you said, whether

24  you're white, black, Asian, economic status,

1   whatever it is and whatever the situation.  If you

2   have to put them under control, you have to do

3   what you have to do.

4       Q   Should officers attempt to refrain from

5   using force when a person's actions are likely

6   being caused by a diminished mental capacity?

7         MR. LUTE:  Objection.

8         Go ahead.

9       A   My answer is still the same.  If they

10  have to use force, they have to whether they want

11  to or not.

12  BY MR. HILL:

13      Q   In terms of interacting with a member of

14  the public who has a diminished mental capacity,

15  is the approach by officers and when to use force

16  the same regardless of their mental capacity?

17        MR. LUTE:  Objection.

18        Go ahead.

19      A   Yes, it's the same.  These are all the

20  same questions.

21  BY MR. HILL:

22     Q   Police officers must never punish a

23  person for being in a diminished mental state;

24  true?

1      A     True.

2      Q     Police officers must never use force as

3    a punitive measure; true?

4      A     True.

5      Q     When addressing a member of the public

6    with a diminished mental capacity, a police

7    officer must never make that person less safe;

8    true?

9            MR. LUTE:  Objection.

10           You may answer if you know.

11     A     You never want to hurt anybody or them

12   to hurt anybody.

13    BY MR. HILL:

14     Q     And when addressing a member of the

15   public with a diminished mental capacity, police

16   officers must take every step possible to avoid

17   making them less safe; true?

18     A     Yes.

19     Q     Law enforcement officers are often

20   called upon to help mentally ill people; true?

21     A     Yes.

22     Q     In lots of different scenarios; true?

23     A     Yes.

24     Q     And some of those scenarios may be

1    people in a public setting; true?

2         A    Yes.

3         Q    Or a person running around naked in the

4    street, like an example you gave me earlier; true?

5         A    Yes.

6         Q    It may be a person who is in their home;

7    true?

8         A    Yes.

9         Q    May be a person who is in a car; true?

10        A    Yes.

11        Q    And people who are mentally ill may be

12   experiencing confusion; correct?

13        A    Yes.

14        Q    They may act strangely; correct?

15        A    Yes.

16        Q    They may be agitated; correct?

17        A    Yes.

18        Q    They may not understand the role of

19   police officers; true?

20        A    Yes.

21        Q    They may not be able to follow verbal

22   commands of police officers; true?

23        A    Yes.

24        Q    Do you believe that law enforcement

1    officers should do everything in their power to

2    protect the safety of mentally ill people in need

3    of help?

4              MR. LUTE:  Objection.

5              You may answer.

6      A    Yes.

7    BY MR. HILL:

8      Q    Because these are members of our

9    community and in need of help, like any others?

10     A    Yes.

11     Q    When engaging members of the public who

12   are suffering a mental health crisis, police

13   officers should attempt to engage in de-escalation

14   tactics; true?

15             MR. LUTE:  Objection.

16             Go ahead.

17     A    Yes.

18   BY MR. HILL:

19     Q    And what are some examples of

20   de-escalation tactics that police officers can use

21   when engaging a member of our community in the

22   throes of a mental health crisis?

23             MR. LUTE:  Objection.

24             Go ahead.

1    that's a use of force; correct?

2         A    No.  I mean, if you have to arrest

3    somebody, you can -- you have to grab their arm

4    and put their hands behind their back.  That's not

5    use of force.  That's handcuffing somebody.

6         Q    If an officer physically grabs somebody

7    and pulls them to the ground, is that a use of

8    force?

9         A    Yes.

10        Q    Officers should always attempt to

11   de-escalate situations, not escalate them; true?

12        A    Yes.

13        Q    Officers should never be the first

14   aggressor; true?

15        A    Yes.

16        Q    Should an officer's use of force only be

17   in response to a member of the public's

18   threatening behavior?

19        A    Yeah, that would be the point of

20   excessive force.

21        Q    Did you ever go to any training on any

22   de-escalation tactics here at Springfield

23   Township?

24        A    De-escalating training was covered in

1      A    Well, of course I would want someone to
2  tell me if they have been under drugs or for it to
3  say methamphetamine across their forehead or
4  something to that effect.  But if I have no idea,
5  but I suspect, I'm still going to use the same
6  amount of force as necessary.
7      Q    Positional restraint asphyxia occurs
8  when a person's body interferes with breathing;
9  true?
10     A    Yes.
11     Q    This can be caused by a restriction of
12 the chest's ability to expand; true?
13     A    Yes.
14     Q    It can be caused by any kind of pressure
15 on the diaphragm; true?
16     A    Yes.
17     Q    It can be caused when a person's -- the
18 position of a person's head obstructs the airway
19 or breathing; true?
20     A    Yes.
21     Q    It can be caused when anything is in the
22 mouth and it obstructs the airway; true?
23     A    I don't know.
24          MR. LUTE:  Objection.

1        Go ahead.

2     A    I don't know.

3  BY MR. HILL:

4     Q    Ever been taught that?

5     A    Positional asphyxia is, you know, a

6  breathing issue.  I guess if they were choking on

7  something -- I don't think that's positional, so I

8  don't know exactly where that question is going.

9     Q    Positional restraint asphyxia is a

10  life-threatening medical condition; true?

11     A    It could be.

12     Q    It is; isn't it?

13     A    Well, there's positional asphyxia and

14  some people don't die, so it could be.

15     Q    Asphyxia is the inability to breathe;

16  true?

17     A    Yes, for a second or for five minutes.

18     Q    Any time a person's breathing is

19  restricted, that's life threatening; correct?

20        MR. LUTE:  Objection.

21        You can answer if you know.

22     A    It could be.

23  BY MR. HILL:

24     Q    Positional restraint asphyxia can cause

1   death; true?

2       A    It can.

3       Q    That's something that's well known by

4   police officers; true?

5       A    Yes.

6       Q    You knew about that before September

7   8th, 2015?

8       A    Of course.

9       Q    Positional restraint asphyxia can cause

10  the heart to beat improperly; true?

11      A    That, I don't know.

12      Q    When restraining an individual, police

13  officers must actively assess the person to make

14  sure they're restrained in a safe manner; true?

15      A    As much as possible.

16      Q    When restraining an individual, officers

17  must be sure to make -- be sure to assess the

18  person to make sure -- strike that.

19          Officers have to be aware of the risk of

20  positional restraint asphyxia any time they

21  restrain a member of the public; true?

22      A    Repeat that question.

23      Q    Sure.  Police officers have to be aware

24  of the risk of positional restraint asphyxia

1   death; true?

2        A    It can.

3        Q    That's something that's well known by

4   police officers; true?

5        A    Yes.

6        Q    You knew about that before September

7   8th, 2015?

8        A    Of course.

9        Q    Positional restraint asphyxia can cause

10  the heart to beat improperly; true?

11       A    That, I don't know.

12       Q    When restraining an individual, police

13  officers must actively assess the person to make

14  sure they're restrained in a safe manner; true?

15       A    As much as possible.

16       Q    When restraining an individual, officers

17  must be sure to make -- be sure to assess the

18  person to make sure -- strike that.

19            Officers have to be aware of the risk of

20  positional restraint asphyxia any time they

21  restrain a member of the public; true?

22       A    Repeat that question.

23       Q    Sure.  Police officers have to be aware

24  of the risk of positional restraint asphyxia

1    whenever they restrain a member of the public;

2    true?

3         A    Yes.

4         Q    There are risk factors for positional

5    restraint asphyxia; true?

6         A    Yep.  Yes.

7         Q    Being in a prone position is a risk

8    factor for positional restraint asphyxia; true?

9         A    It's possible.

10        Q    Anything that causes a struggle while in

11   a prone position increases the risk of positional

12   restraint asphyxia; true?

13        A    It could.

14        Q    And that's because when a person

15   struggles, it causes the muscles to need more

16   oxygen devoted to them?

17        A    Yes.

18        Q    And you knew that as of September 8th,

19   2015; correct?

20        A    Yes.

21        Q    Anything that causes the heart to race

22   can increase the risk of positional restraint

23   asphyxia; true?

24        A    I would assume.

1  delirium need medical attention, yes.

2      Q      People in a state of excited delirium or

3  what people call excited delirium need medical

4  attention as soon as possible because they need

5  medical treatment; true?

6      A      Yes.

7      Q      Police are often the first individuals

8  contacted when a person is having a medical

9  emergency that some people call excited delirium;

10  true?

11      A      Based on we get calls for it, yes.

12      Q      Police officers may be the first person

13  to arrive on a scene for a person who may be

14  demonstrating signs of excited delirium; true?

15      A      Yes.

16      Q      Being in a state of excited delirium is

17  not a crime; true?

18      A      True.

19      Q      And that's because it's a medical

20  condition; true?

21          MR. LUTE:  Objection.

22          Go ahead.

23      A      If we know that's the case, yes.  I

24  mean, we could mistake it for disorderly conduct

1      A    Like I said before, I don't know how

2  much stress is on the body.

3   BY MR. HILL:

4      Q    So in such a circumstance, where a

5  person is in a state of excited delirium, should

6  police officers do everything they can to reduce

7  the amount of stress on the body?

8           MR. LUTE:  Objection.

9           Go ahead.

10     A    If I believe they're in a state of

11  excited delirium, I'm going to get the medical

12  experts there as soon as possible.

13   BY MR. HILL:

14     Q    Warning signs of excited delirium

15  include psychomotor agitation; true?

16     A    Yes.

17     Q    They include disorientation?

18     A    Yes.

19     Q    They include bizarre behavior?

20     A    Yes.

21     Q    They include speech disturbances, like

22  incoherent speech?

23     A    Yes.

24     Q    Hallucinations can be a warning sign of

1    has been tasered is excessive.  My question was --

2         A    My opinion.

3         Q    -- are people who have been exposed to

4    repeated applications of a Taser or an electrical

5    conducted weapon at a higher risk for positional

6    restraint asphyxia?

7              MR. LUTE:  Objection.

8              You may answer if you know the answer to

9    that question.

10        A    I do not know the answer to that

11   question.  I told you 30 times might be excessive.

12    BY MR. HILL:

13        Q    Excited delirium is a life-threatening

14   medical condition; true?

15             MR. LUTE:  Objection.

16             Go ahead.

17        A    Yes.

18    BY MR. HILL:

19        Q    People in a state of excited delirium

20   need emergency medical attention as soon as

21   possible; true?

22        A    When we know, yes.

23        Q    Pardon?

24        A    When you know, yes.

1    excited delirium?

2         A    Yes.

3         Q    Confusion can be a warning sign of

4    excited delirium?

5         A    Yes.

6         Q    Sometimes the removal of clothing --

7    well, we already talked about that, didn't we?

8         A    Yeah.

9         Q    We don't need to go back over that.

10            You were aware of these warning signs of

11   excited delirium we just discussed as of September

12   2015; true?

13            MR. LUTE:   Objection.

14            Go ahead.

15        A    Yes, I've been trained on that for many

16   years.

17   BY MR. HILL:

18        Q    Are there certain populations who are

19   considered to be at high risk for -- or higher

20   risk for serious injuries or even death from

21   electrical conducted weapons?

22        A    Not to my knowledge.

23        Q    Positional restraint asphyxia may

24   exacerbate the condition of an individual who has

1  received an electrical conducted weapon

2  application; is that true?

3        A    Yes.

4        Q    And why is that?

5        A    Well, if they fall face first and

6  they're on their belly for an extended period of

7  time, that could be a problem, if, you know,

8  they're not still trying to fight you.

9        Q    People can -- well, take a step back.

10            Is it your understanding that just

11  because a person can still struggle or move

12  they're not at risk for positional restraint

13  asphyxia?

14       A    It's my understanding that I still have

15  to do what is necessary so that they don't hurt

16  themselves or other people or us.

17       Q    No.  My question is:  A person can be

18  able to struggle or squirm around but be at risk

19  for positional restraint asphyxia; true?

20            MR. LUTE:  Objection.

21            You may answer.

22       A    I would feel like if they're struggling

23  they can still breathe or they wouldn't be moving.

24   BY MR. HILL:

1    Q    And then you would file that?

2    A    Yes.

3    Q    So there would be a copy?

4    A    Yes.

5    Q    When you got -- when you heard this call

6    come through dispatch, did you communicate at all

7    with any of your fellow officers, Officer

8    Holsopple or Scherer?

9    A    I went 2510, which means I was on my way

10   to assist them, to the Milo White call.  So at

11   time it was just on Milo White still, and I was

12   heading towards that direction.

13   Q    Did you give your location?

14   A    Probably not.

15   Q    Did you know the location at that time

16   of either officers Holsopple or Scherer when you

17   gave the 2510?

18   A    Where they were coming from, you mean?

19   No.

20   Q    There was no communication -- well, take

21   a step back.

22        Before you got to 1019 Abington, where

23   Jordn Miller eventually was, there was no plan

24   being communicated between either you, Officer

1  Scherer and Officer Holsopple over the radio in

2  terms of how to approach the scene; is that fair?

3      A     That's fair, yes.

4      Q     Did you activate your lights at any time

5  when responding to either 909 Milo White Drive or

6  1019 Abington?

7      A     I don't remember if I had my lights

8  activated or not.

9      Q     If you did, it would have activated the

10 dash cam; correct?

11     A     It would have.

12     Q     And have you ever -- and are you

13 required to save dash cam information?

14     A     I'm sure the Sunshine Laws say how long

15 you're required to keep it, but I don't know what

16 those laws are.  I don't deal with the dash cam

17 video.

18     Q     How about in an event like this, where

19 Jordn Miller is eventually hospitalized after

20 interacting with the police?

21            Would you have saved any dash cam video?

22            MR. LUTE:  Objection.

23            You may answer.

24     A     I don't know if there was any dash cam

1      Q      Have you had any Taser uses or

2  electrical conducted weapon uses?

3      A      Yes.

4      Q      Since you've had the body camera?

5      A      Since the body camera?  I don't remember

6  if it's since the body camera.  I don't believe

7  so.

8      Q      And I'm going to ask you a question that

9  I've asked everybody, okay, as police officers.

10  How tall are you?

11      A      Oh, five four and a half.

12      Q      How much do you weigh?

13      A      Oh, no, you didn't.

14         MR. LUTE:  That's why he prefaced it the

15  way he did.

16   BY MR. HILL:

17      Q      That's right.  I have got to be careful.

18      A      Do you know what?  When I go to the

19  doctor -- and I just went last week, as I told

20  you -- I turn around, and I literally face the

21  opposite direction.  So the last time I checked --

22      Q      Let's do it this way.  Nothing about how

23  much you weigh now.  How much did you weigh back

24  on September 8th, 2015?

1  consented to you signing for them; correct?

2     A    Yes.

3     Q    And with respect to -- and did you sign

4  this document?

5     A    Yes.

6     Q    So all the writing, where it says

7  Sergeant Moore, Officer Scherer, Officer

8  Holsopple, that's all your handwriting?

9     A    Yes.

10    Q    How about with the date, where it says

11 "9-8-15" handwritten.  Is that you or Smith?

12    A    That's Smith.

13    Q    And did you write Smith's name, too, or

14 did he write that?

15    A    That's his handwriting.

16    Q    After you arrived at 1019 Abington, had

17 you developed in your mind a plan as to what to do

18 when you got there?

19    A    Well, it was all evolving on my way, so

20 there was no way to -- to initiate any kind of

21 plan.  He was on the move, so --

22    Q    Even with respect to initiating a plan,

23 had you formulated one in your mind?

24    A    Well, I was going to where the call was,

1   where he was last seen.  So I was on my way to 909
2   Milo White initially.
3        Q    And did you have a plan as to what to do
4   when you got there?
5        A    Put him under control.  He was having a
6   psychiatric break.
7            MR. LUTE:  This is probably a good time
8   to stop.
9                (Recess taken.)
10   BY MR. HILL:
11        Q    Before we went on a break a moment ago,
12   I asked you whether or not you had formulated any
13   plan in terms of your response to 909 Milo White.
14   And your answer was you understood that he was
15   having a psychiatric break.  Is that fair?
16        A    Yes.
17        Q    In terms of responding to Jordn Miller's
18   psychiatric break at 909 Milo White, did you have
19   in your mind a plan as to what to do when you got
20   there?
21        A    I mean, I always -- any call that would
22   come out like that, if that's all the information
23   that we have, I mean, in my head I'm thinking,
24   okay, we just need to help this guy and we need to

1    A    There was no way to know where he was.
2  We were just looking for him.
3    Q    I mean, in terms of --
4    A    That was the plan, in my head, at least,
5  is we need to find this guy.  So it was just
6  whoever came upon him first.
7    Q    And was there any thought in your mind
8  about, over the radio, discussing with Officer
9  Scherer or Officer Holsopple what to do when you
10  found him?
11    A    No.
12    Q    How long of a drive -- I know you don't
13  know exactly where you were at.  But in looking at
14  any documents, do you know how long it took
15  between the initial call for Jordn Miller's
16  psychiatric break and your arriving at 1019
17  Abington?
18    A    Not without the dispatch records.  A
19  couple minutes.
20    Q    And during that entire time period, did
21  you communicate by phone or by radio with Officer
22  Holsopple in any way?
23    A    I don't remember.
24    Q    There's no memory of you doing so as you

1  contain him so he's not dangerous, he's not

2  hurting himself.  So those things are always going

3  through my mind.

4       Q     When you say "contain him," what do you

5  mean?

6       A     So he's not running around and out of

7  control.

8       Q     When you were responding or initially

9  responding, you didn't coordinate in any way with

10 your colleagues, Officer Holsopple or Officer

11 Scherer; is that fair?

12      A     Yes.

13      Q     Did you understand that Officer

14 Holsopple and Officer Scherer were also going to

15 the scene?

16      A     Yes.

17      Q     So you knew that there would be three

18 officers arriving at some point?

19      A     Yes.

20      Q     But in terms of who would do what or --

21 I'm sorry.  That wasn't clear.

22            In terms of what officers would be

23 responsible for doing what at the scene, you guys

24 hadn't had a -- hadn't discussed that?

1  on Milo White.

2      Q      During this few-minute drive, from the

3  time that the initial call comes in and you're

4  heading originally to 909 and then to 1019

5  Abington, did you request any additional

6  information from dispatch; for example, anymore

7  information about this person you were responding

8  to?

9      A      There was quite a bit of information

10  that already came in from his mother, what ended

11  up being his mother, about the psychiatric break

12  and that he needed hospitalized and, you know,

13  those kinds of things.  And it was a constant

14  barrage of radio traffic.  And I can't even

15  remember if I called 99, which was emergency

16  traffic, or not.

17      Q      What was emergency traffic?

18      A      99.  And I don't know if there would

19  have even been time, because it just happened so

20  fast.

21          So by the time they were out on

22  Abington, a couple minutes later I was able to get

23  there.  So there was a lot of traffic.  There was

24  the dispatch traffic, and then, you know, more

1   people were calling in saying he was trying to

2   steal the Jeep on Abington.  And then there was

3   somebody down the road from 1019 Abington that

4   also said he tried to get in that vehicle.  So

5   there was a lot of traffic coming from dispatch.

6           By the time there was a break in

7   traffic, they were already calling out that there

8   was a Taser deployment and start the FD.  And then

9   I got there after that.

10      Q    The information -- you said there was a

11  lot of information already provided by Jordn's

12  mother about him, including his psychotic break

13  and the need for hospitalization?

14      A    Yes.

15      Q    That's all the information you had while

16  you were driving there?

17      A    Yes.

18      Q    So you didn't need to follow up to get

19  additional information about that?

20      A    Yes.  As far as I'm concerned, that's

21  the truth.

22      Q    And that was, you know -- so you

23  understood that you were responding to somebody

24  with a psychiatric break whose family thought

1    needed hospitalization?

2         A    Yes.

3         Q    And during this few-minute drive,

4    however long it was -- but we know it was a couple

5    of minutes; correct?

6         A    Yes.

7         Q    While you were in the car?

8         A    Yes.

9         Q    You said when there was a break in

10   traffic.  You meant radio traffic?

11        A    Yes.

12        Q    When there was a break in radio traffic,

13   that's when Officer Scherer aired that there was a

14   Taser deployment?

15        A    Yes.

16        Q    You didn't -- I understand that you came

17   to the scene of 1019 Abington after a fairly

18   significant portion of the event actually took

19   place; correct?

20        A    Yes.

21        Q    So in terms of Jordn's behavior before

22   he got in the Jeep, you did not see Jordn; is that

23   fair?

24        A    No.  Yes, I did not.

1    Q    In terms of anything Jordn did before he
2  got in the Jeep, your information was limited to
3  anything that was aired over dispatch?
4    A    Yes.
5    Q    You did not see Jordn at any time he was
6  in the Jeep; correct?
7    A    No.
8    Q    You didn't know, when you arrived at
9  1019 Abington, what Jordn's condition was while he
10  was in the Jeep, other than a guy in a psychiatric
11  break who needs hospitalization?
12    A    Well, when the second call had came in,
13  about he's trying to steal a Jeep, that
14  information, that radio traffic.
15    Q    But in terms of what Jordn looked like
16  in the Jeep, you didn't see him?
17    A    No, I didn't see him in the Jeep.
18    Q    How he was moving his arms in the Jeep,
19  you didn't see that?
20    A    I was not there.
21    Q    What he was actually doing in the Jeep,
22  you didn't see any of that?
23    A    I didn't see it.
24    Q    You did not hear Jordn say anything

1    before you arrived at 1019 Abington?

2         A    Before I arrived?

3         Q    Uh-huh.

4         A    No.

5         Q    Before you arrived, you didn't know

6    anything about whether Jordn had bitten anybody;

7    true?

8         A    No.

9         Q    True?  Do you agree with what I said?

10        A    Yes.

11        Q    You did not observe Officer Scherer or

12   Officer Holsopple remove Jordn from the Jeep at

13   any point?

14        A    No.

15        Q    You did not see Officer Scherer kick

16   Jordn; correct?

17        A    No.

18        Q    You did not see Officer Holsopple strike

19   Jordn with his forearm; correct?

20        A    No.

21        Q    You did not observe Officer Holsopple or

22   Officer Scherer's efforts to restrain Jordn at any

23   time before handcuffs were used or applied?

24        A    No.

1    Q    Correct?

2    A    Yes, that's correct.

3    Q    You did not observe any kind of

4 interaction between Jordn and any homeowner or

5 other person at 1019 Abington before you arrived?

6    A    No.

7    Q    You were not -- before you arrived, you

8 were not given any information about Officer

9 Scherer's interactions with Jordn other than the

10 fact that Officer Scherer had used a Taser;

11 correct?

12    A    Correct.

13    Q    And with respect to Officer Holsopple,

14 at the time you arrived at 1019 Abington, you had

15 not received any information about Officer

16 Holsopple's interaction with Jordn; correct?

17    A    No.

18    Q    Correct?

19    A    Correct.

20    Q    Between the time Officer Scherer arrived

21 at 1019 Abington and his first use of the

22 electrical conducted weapon, had you received any

23 information from any source about what Jordn was

24 doing while the officers were on scene?

1    A    Okay.  It could be ten pages long.  I

2  mean, I tend to get long-winded, but I put the

3  basics.  It might have been ten pages if it was

4  just all my information.  But I was typing it

5  because I type the fastest.  And they told me what

6  happened when they got there.  And then I wrote

7  what happened when I got there.  And it was just a

8  basic scenario of what happened.

9   BY MR. HILL:

10    Q    So do you have any idea with any degree

11  of accuracy when you would have learned from an

12  unknown source that Jordn tried to stab somebody?

13    A    I don't know the times of anything.  It

14  all went by and quickly.

15    Q    Did you tell Chief Smith at any time

16  that you had knowledge that Jordn tried to stab

17  anybody?

18            MR. LUTE:  Objection.

19            You may answer.

20    A    No, we never had that conversation.

21   BY MR. HILL:

22    Q    Why not?

23            MR. LUTE:  Objection.

24            Go ahead.

1    Q    So I'm trying to make sure I understand

2 this.

3         You did not ever have any conversations

4 with Chief Holsopple about the fact --

5    A    Officer Holsopple.

6    Q    I'm sorry.  You did not have any

7 conversations at any time with Chief Smith about

8 the fact that you remember getting information

9 before you interacted with Jordn that he had

10 attempted to stab someone with a screwdriver?

11   A    I don't recall any details with Chief

12 Smith, other than the basics of the situation.

13   Q    Before today -- well, strike that.

14        Have you ever written in any documents

15 that you created at any time that Jordn ever tried

16 to stab someone?

17        MR. LUTE:  Objection.

18        You may answer.

19   A    Not to my knowledge.

20 BY MR. HILL:

21   Q    Before today, had you ever discussed

22 with anyone that you claimed to have known at the

23 time you got to 1019 Abington or while you were at

24 1019 Abington that Jordn had attempted to stab

1    someone with a screwdriver?

2         A    I wasn't --

3              MR. LUTE:  Objection.

4              You may answer.

5         A    I wasn't there when this alleged trying

6    to stab happened.  And he didn't stab anybody.  So

7    I went with the offense that he was committing,

8    and I wasn't concerned about that because he

9    didn't make contact with anybody.  That wouldn't

10   have been a priority of mine.

11    BY MR. HILL:

12        Q    Did you use force at any time against

13   Jordn because you thought he had tried to stab

14   someone?

15        A    I was not there during that situation.

16        Q    But my question is:  At any time that

17   you engaged in Jordn, did you use force because

18   you thought he had tried to stab someone?

19        A    No.

20        Q    That was not one of the things factoring

21   into your decision to use force?

22        A    No.

23        Q    Okay.  Did you ever speak to anyone at

24   1019 Abington to find -- on September 8th, 2015,

1   -- they were a ways back from Jordn at that point?

2        A    They were far enough back where they

3   weren't interfering with the officers, I just know

4   that much.

5        Q    And they didn't appear to you to be in

6   any kind of physical injury running around?

7        A    No.

8        Q    So anything you might have heard about

9   somebody being stabbed, by the time you got there

10  and you saw these people, you realized that

11  couldn't be the case?

12       A    It was a tried --

13            MR. LUTE:  Objection.

14            Go ahead.

15            THE WITNESS:  I'm sorry.

16       A    It was a tried.  It wasn't he stabbed

17  somebody, so that was not on the forefront of my

18  brain, no.

19   BY MR. HILL:

20       Q    And when you saw these people, I think

21  you said they seemed to be -- their behavior

22  seemed to be controlled?

23       A    They were controlled.

24       Q    They weren't within -- you said they

1    of the hoodie.

2         Q    And can you hold up that photograph?

3         A    You can see the hoodie in this one.

4         Q    I'm going to zoom in.  Can you move it a

5    little bit?  And is the hoodie behind the Jeep?

6         A    There's a part behind the Jeep and a

7    part to the side of the Jeep.

8         Q    Which part of the hoodie is where Jordn

9    was located?

10        A    He was in that general vicinity.

11        Q    But you said there's two different parts

12   of the hoodie.  One is behind the Jeep, and one is

13   to the side of the Jeep; correct?

14        A    Yes.

15        Q    So he wasn't in two places; right?

16        A    I just said he's in that general

17   vicinity.  Whether he was in the back of the Jeep

18   or the side of the Jeep, I can't tell you.  He was

19   near the Jeep, and I remember cutting the hoodie

20   -- the hoodie being cut off.

21        Q    Did you cut the hoodie off?

22        A    I don't remember who cut the hoodie off.

23   I think it may have been scissors from the EMS

24   squad.  You would have to ask them.  I was too

1  busy trying to arouse him, so --

2      Q     Where was Jordn's head with respect to

3  the location of the Jeep?  Does that make sense?

4  That might have been very unclear.

5      A     I still don't know which direction he

6  was facing, so --

7      Q     Was Jordn's head closer to the Jeep or

8  were his feet closer to the Jeep?

9      A     Like I said, I do not know.  He was

10  bucking around, and he was all over the place.  I

11  don't know which direction at what time he was

12  located.

13      Q     So you saw Jordn moving around the

14  driveway?

15      A     He was bucking up and kicking and moving

16  around.  He was all over the place.

17      Q     How far did Jordn's body travel while

18  you were in the driveway?

19      A     He was -- at that time, he was just able

20  to buck up and kick and try to bite.

21      Q     But my question is:  You said he was

22  moving all over the driveway.  From the time you

23  got there until the time he became unresponsive,

24  how far did Jordn's body move across the driveway?

1    Q    So when you got there, he said, "I was
2  bitten"?
3    A    No.  Holsopple said, "He just bit Bubba
4  in the leg."
5    Q    So how much earlier did that happen?
6    A    How much earlier did what happen?
7    Q    The bite.
8    A    It happened before I got out of the car
9  and was coming up the driveway.
10    Q    So as you pull in, did you see the bite
11  take place?
12    A    No.
13    Q    As you pull in, did you see Officer
14  Scherer kick Jordn?
15    A    No.
16    Q    As you pull in, did you see Officer
17  Holsopple strike Jordn in the back of the head?
18    A    I already told you no.
19    Q    So at what point -- so let me say.
20          When you pull in and you start jogging
21  up the driveway, are you looking at Officer
22  Scherer's back or his side?
23    A    I have no idea what I'm looking at, at
24  that point.  I'm looking at Jordn Miller to see

1  what I can do to help them control him.

2       Q     Same question with Officer Holsopple.

3  As you're coming up the driveway, are you looking

4  at Officer Holsopple's back or his side or his

5  front?

6       A     I cannot tell you.  I don't think I'm

7  looking at anybody's butt, but I mean, you know,

8  they were there and trying to control him, and I

9  wasn't paying attention to my officers and their

10  fronts or sides or which side they're on.  I'm

11  paying attention to what I can do to get control

12  and help them get control of Jordn Miller, which

13  was on the left side towards his shoulder area, is

14  where I was standing.  So wherever they tell you

15  where they were standing is where they were

16  standing.

17       Q     Where were their hands?

18       A     I wasn't paying attention to where their

19  hands were.  We were -- had hands on him, trying

20  to keep him from kicking, trying to keep him from

21  biting.

22       Q     I'm asking about their hands.

23       A     I cannot testify to where their hands

24  were.

1     Q    Can you testify to where their hands

2  were at any point?

3     A    No.  I mean, I just know that somebody

4  was trying to control his legs.  Somebody was

5  trying to control the middle section of his body.

6  I was trying to control his head and not get

7  bitten at the same time and shoulder area so he

8  couldn't buck up to try and reach to bite us

9  anymore.  But I don't know what they were doing

10  exactly.

11     Q    That was my only question, is:  Do you

12  know where their hands were at any point when you

13  were at 1019 Abington?

14     A    We were all hands-on, trying to keep him

15  down from getting injured and from injuring us.

16  That's all I know.  I know what I did.  I don't

17  have a specific idea of, oh, well, Officer

18  Holsopple was holding his right calf or anything

19  like that.

20     Q    But you remember Officer Scherer and

21  Officer Holsopple at least trying to keep Jordn on

22  the ground?

23     A    We were all trying to.

24     Q    So you're using force to keep Jordn on

1     Q    But that's not my question.  Do you

2  remember my question?

3     A    What is it you're looking for?

4     Q    Did you ever -- you, Officer Scherer,

5  Officer Holsopple try to physically get Jordn --

6     A    I never tried --

7     Q    Let me finish the question.

8     A    You already asked it.

9     MR. LUTE:  Just wait for the question.

10     Go ahead.  Probably start it again.

11  BY MR. HILL:

12     Q    Did you, Officer Scherer, Officer

13  Holsopple, ever try to transition physically Jordn

14  out of a prone position?

15     A    Not once I got there.  I did not do

16  that.

17     Q    That's all I want you --

18     A    That's all I'm trying to say, yes.  I

19  was trying to explain what I meant by him getting

20  up.

21     Q    Okay.

22     A    Okay.

23     Q    You don't know what was happening in

24  terms of Jordn's position before you got there;

1  correct?

2       A     His position?

3       Q     How he was being restrained?

4       A     I could see when I was coming up the

5  driveway.  Before I got there, of course I would

6  not know.

7       Q     So I only want to ask -- I only want you

8  to talk about what you know, okay?  All right?

9       A     Okay.  What do you want to know?

10       Q     So when I'm asking you questions about

11  did you or Officer Holsopple or Officer Scherer

12  ever try to transition Jordn out of a prone

13  position, I'm asking about while you were there,

14  okay?  Just so we're clear.

15       A     Okay.

16       Q     While you were there, did you see

17  Officer Scherer or Officer Holsopple ever try to

18  transition Jordn out of a prone position?

19       A     Not to my knowledge.

20       Q     You never physically tried to assist

21  Jordn out of a prone position; fair?

22       A     I don't recall trying to pull him up off

23  the ground.  We were trying not to get close like

24  that.

1      Q     And I don't even mean -- and

2  transitioning him out of a prone position could

3  mean sitting him up; correct?

4      A     Yes, it could.

5      Q     It could mean rolling him on his side;

6  correct?

7      A     It could.

8      Q     It could mean standing him up; correct?

9      A     Yes.

10     Q     And at least while you were present,

11 none of those were attempted; correct?

12     A     No, they were not.

13     Q     When you said earlier you tried to get

14 Jordn to stand up, those were verbal commands you

15 were giving to Jordn?

16     A     Yes.

17     Q     This is after Jordn had been tasered?

18     A     Yes.

19     Q     What verbal commands were you giving

20 Jordn?

21     A     I can't tell you word for word, but my

22 common thing is, "Come on, buddy.  We need you to

23 stand up.  We need you to get up.  You need to

24 just roll on over onto your side and get on your

1  nonsense.  I couldn't even tell you what he was

2  saying or trying to say.  But he was able to make

3  noise.  That's all I can tell you.

4   BY MR. HILL:

5       Q    What kind of noise?

6       A    That's all I can tell you.  I heard

7  noise.  Just nonsense.

8       Q    What kind of noise?  Can you describe

9  it?

10      A    I do not know.  Just loud noises, you

11  know, maybe even a "get off" here and there or

12  whatever, but nothing that made any sense

13  whatsoever.

14      Q    "Get off" makes sense, doesn't it?

15      A    Well, he didn't want arrested.  And at

16  that time, that's what he thought, he was under

17  arrest, in our minds, like everybody else.

18      Q    Is that what you were thinking at the

19  time?

20      A    Yes.  After he was trying to steal a

21  Jeep, I automatically thought he didn't want to

22  get arrested for that.

23      Q    Is that what you thought you were

24  dealing with at the time, a guy who was actively

1  resisting because he didn't want to go to jail?

2      A    Well, I didn't know if it was mental and

3  then he was trying to steal a Jeep on top of that.

4  I didn't know if it was just mental and he was

5  just in the Jeep.  I didn't know what was going on

6  in his head.  I could only tell you what I was

7  there for, and he was trying to steal a Jeep.

8      Q    You said -- I'm just trying to follow

9  up.

10         You said he maybe said "get off," and

11  then you said he didn't want to go to jail.

12      A    That's generally when people tell us,

13  "Get off me, man," you know, "get off me.  Get

14  away from me."  They say that all the time.

15      Q    And was he saying those things?

16      A    He may have said something like "off,"

17  or "get off" or he was verbally trying to

18  communicate.  Some things didn't make sense.  I

19  don't remember exactly what he said at all, but he

20  was making noise.

21      Q    As you sit here today, do you think you

22  remember Jordn saying something like "get off"?

23         MR. LUTE:  Objection.

24         You may answer.

1       A       It's -- it's in my head that he did, but
2   I don't know exactly what he was saying.  I don't
3   think he knew what he was saying.  So I can't tell
4   you for sure.  It was something to that effect,
5   but I can't tell you exactly what he said.
6   BY MR. HILL:
7       Q       Do you remember hearing any -- any
8   statements or words from Jordn that you could
9   understand?
10      A       Other than whatever it was that he said
11  to that effect, no, I didn't understand anything
12  he was saying or trying to say when I was there.
13      Q       So it was a lot of -- a lot of
14  incomprehensible noise, fair, coming from Jordn?
15      A       It was yelling noise, mostly.
16      Q       And then you heard him say something
17  like "get off," "get off me"?
18      A       Something to that effect.
19      Q       And when during your interaction with
20  Jordn did you hear him say "get off me"?
21      A       When he was trying to bite us.
22      Q       So where were you at when he was saying
23  "get off me"?
24      A       I never moved from his left shoulder

1    area.

2         Q    And you're talking about where your foot

3    was?

4         A    Yes, where my body was.

5         Q    And my understanding is Jordn was in

6    a -- handcuffed behind his back, on his stomach,

7    and you were standing towards where like the crown

8    of his head would be?

9         A    Yeah, like shoulder area.

10        Q    Were you straddling Jordn?

11        A    No.

12        Q    You have one foot on Jordn's shoulder

13   blade?

14        A    On his left shoulder blade when he bucks

15   up only.  When he would go back down, I didn't

16   have anything on him.

17        Q    So you would put your foot on him when

18   he started to buck up?

19        A    Yes.

20        Q    And you would use that foot to push him

21   back down?

22        A    Yes.  Well, to make sure that he didn't

23   get his head turned enough to bite anybody.

24        Q    Right.  But physically, you would be

1    pushing his body down?

2         A    It was pushing it down, yes.

3         Q    And that would continue until he fell

4    into these periods where he wasn't re -- where he

5    was kind of limp for a moment, for a few seconds?

6         A    It only happened a couple times by the

7    time I got there and by the time he went

8    unresponsive.

9         Q    So your left foot would be on, is it

10   Jordn's right shoulder?

11        A    It would have been my right foot on his

12   left shoulder.

13        Q    Your right foot on his left shoulder.

14   And you describe it in your report as his shoulder

15   blade?

16        A    General area, yeah.

17        Q    And is that like your scapula area?

18   Where would that be?

19        A    Well, right here (indicating), I guess.

20        Q    Like upper back?

21        A    Yeah.  I mean, your shoulder.

22        Q    I just want to make sure that -- can you

23   -- we're on video, so we can actually see.

24        A    I just pointed to it.  Right here

1    (indicating).

2         Q     Okay.

3         A     That's where you come up.  So if you

4    want somebody to go back down so they can't turn

5    their head, you push down right here (indicating).

6         Q     And where was your heel?

7         A     I could draw it, if you want, but --

8         Q     Was your heel on his back?

9         A     No.  Like my toes were on -- right here

10   (indicating).  And so I'm sideways, so that I can

11   move out of the way if he makes affirmative action

12   towards me to bite me.  So if this is his shoulder

13   blade, my toes are right here.  The rest of my

14   foot is right here.  And I wear a size seven shoe,

15   so --

16        Q     So when Jordn would go to raise his

17   shoulders off the ground, you would pick your foot

18   up, put it on his shoulder, and push him back

19   down?

20        A     Right.  And then take my foot back off.

21        Q     And how long would this struggle

22   continue before you took your foot off?

23        A     Oh, well, as soon as his shoulder was

24   back down on the ground, I took my foot off.  And

1  comprised in this investigator's note.  They told

2  me what they experienced when they were there.  I

3  discussed in there what I experienced when I was

4  there.  They said he had superhuman strength when

5  they had to extract him and they had to get him on

6  the ground and get him handcuffed and control him.

7  So if you want to talk about the superhuman

8  strength, you can talk to them.

9      Q    I did.

10     A    Okay.

11     Q    But you signed off on their report, so I

12  want to talk to you about it, okay?

13     A    I believe my officers, so it was the

14  three of us.

15     Q    My question is:  The phrase that you

16  used, superhuman strength, does that apply to the

17  period that you were on scene?

18     A    Not any more than anybody else he was

19  trying to bite.

20     Q    That's not my question.  The terminology

21  the three of you agreed to, superhuman strength,

22  did that apply to the period that you were on the

23  scene and interacting with Jordn where your foot

24  was on his shoulder?

1        A      Not that time.  Not when I was there.

2        Q      So is it your understanding that the

3   reference "superhuman strength" that's in Exhibit

4   12 applies to the time period before it was all

5   three officers restraining Jordn?

6        A      That's applied, yes, before I was there.

7        Q      I spoke to Officer Scherer about Jordn

8   moving his head while you were there.  I'm sorry.

9   I spoke to Officer Holsopple about that.

10              Officer Holsopple saw Jordn move his

11   head -- try to move his head from side-to-side but

12   never saw Jordn move his teeth to try to bite

13   somebody.

14              Is your testimony different than that?

15       A      Yes.

16       Q      Okay.  So I want you to tell me what --

17   you're telling me that Jordn was actively trying

18   to bite someone?

19       A      He had his mouth open.  I knew he

20   already bit somebody.  In my mind, he was trying

21   to bite somebody else again.

22       Q      I want to ask, though, what you saw.

23       A      I can't say --

24       Q      I'm asking what you saw Jordn do.

1      A    I'm explaining to you.  In my opinion,

2  he was trying to bite again.  He had his mouth

3  open and was coming towards where our legs were.

4  And to me, that would be him trying to bite again.

5          What he was trying to do in his head, I

6  don't know.  But that was my fear, and that's what

7  I was trying to prevent from happening.

8      Q    You said he was coming to where our legs

9  were; correct?

10      A    Yes.

11      Q    Whose legs?

12      A    Like I said, I don't know which position

13  we're in.  We're looking at him.  I'm focusing on

14  Jordn Miller.  I'm not focusing on which body is

15  where.  I just see legs, and there are officers's

16  legs in polyester pants, and his mouth is next to

17  them.  And I'm just making sure his mouth isn't

18  going to connect to a leg again.

19      Q    When you say he was coming to where

20  their legs are, what did you mean just now, if you

21  don't know where their legs were at?

22      A    I know where my legs are, and I can see

23  polyester pants.

24          Do I know which position the officers

1  questions.

2      Q    So as you approached and you hear the

3  Taser cycling, you're the supervisor on the scene

4  at that point; correct?

5      A    Yeah, I'm getting up there.

6      Q    I mean, you are Officer Scherer and

7  Officer Holsopple's supervisor; true?

8      A    Yes.

9      Q    And at that point, when you hear the

10  Taser going off, do you implicitly authorize the

11  use of the Taser?

12          MR. LUTE:  Objection.

13          You may answer.

14      A    No.

15  BY MR. HILL:

16      Q    Are you comfortable with the Taser being

17  used at that point?

18      A    If they felt that it was necessary, yes.

19      Q    Did you ask anyone why the Taser was

20  being used a second time?

21      A    I wasn't even around anybody.  I was

22  coming up.  I wasn't even next to anybody when it

23  was going off.

24      Q    My question is:  You get out of the car.

1  couldn't move his head.

2      Q      So where were you keeping your foot in

3  between him bucking up?

4      A      On the ground to stand.

5      Q      So you're telling me that you put the

6  foot on him, and then you put it on the ground

7  next to him?

8      A      That's correct.

9      Q      And then when he would buck up, how high

10  would you have to pick your foot up to put it on

11  Jordn's back?

12      A      A couple inches.  He is laying on the

13  ground. Like this, like this, like this, like

14  this.  (Indicating.)

15      Q      So you were putting it up about that far

16  (indicating)?

17      A      Well, that's about shoulder height.

18  Whatever shoulder height is on the ground and him

19  bucking up and then me putting his shoulder back

20  down on the ground.

21      Q      What I'm asking you is:  You said he

22  bucked up, and you had to put your shoulder on his

23  back.  How high did you have to put your foot to

24  get it on his back?

1  there and trying to roll around, and they were

2  containing that part of him, I would assume,

3  because I wasn't.  I was handling the head

4  movements.  To me, that was a couple minutes all

5  together, the struggle.

6      Q    So for everything except during this

7  couple minutes where you're involved, there's only

8  two occasions that last a couple seconds where

9  he's lying still; correct?

10      A    Where I have to push his shoulder down.

11      Q    We talked earlier -- it says:  "The

12  suspect would lay there for a few seconds but then

13  would continue to fight and struggle to get up."

14  Correct?

15      A    That's exactly right.

16      Q    You said that happened twice?

17      A    To me, my incident.

18          Are you asking me about the continuous

19  struggle that was a couple minutes or my incident

20  with the shoulder?  I don't understand.  You just

21  need to clarify that.  Am I being confusing?  I

22  don't know if I'm being confusing.

23      Q    There were only two occasions, then,

24  where Jordn lifted his shoulders off the ground

1    while you were there; correct?

2          A    Yes.

3          Q    And that only lasted a second or two

4    before you pushed Jordn's shoulders down on the

5    ground; correct?

6          A    Yes.

7          Q    Aside from that, Jordn's shoulders and

8    torso area were on the ground; correct?

9          A    His head moved, his feet were moving,

10   but his shoulders were down.

11              MR. HILL:  Let's change the tape, okay?

12              THE WITNESS:  Okay.

13         (Discussion held off the record.)

14    BY MR. HILL:

15         Q    Ready?

16         A    Yes.

17         Q    Okay.  We lost the tape.  The tape ended

18   as you were giving -- giving your last answer.

19   But I think we agreed that for the entire --

20   entire few minutes that you were there were Jordn,

21   there were only a few seconds where Jordn's chest

22   or torso were not on the ground; true?

23         A    Yes, a couple of times.

24         Q    And those few occasions where Jordn's

1  chest or shoulders lifted off the ground, you were

2  able to use your foot to push him back on the

3  ground relatively quickly?

4      A    Yes.

5      Q    And as you sit here, it's your

6  understanding or memory that that happened only

7  two or three times?

8      A    Yes.

9      Q    In terms of you moving around the area,

10  were you able to stand relatively in the same

11  position?

12      A    Yeah.  I just moved my closest leg.

13      Q    And your closest leg, is that the one

14  you were using to push Jordn down?

15      A    Yes.

16      Q    You didn't have to skirt your body

17  around Jordn one way or another?

18      A    No.

19      Q    And when Jordn lifted his shoulders up

20  off the ground, you were able to subdue him with

21  your foot pretty quickly?

22      A    Yes.

23      Q    And then at some point during this

24  process, Jordn stopped moving at all; correct?

1          A      Yes.

2          Q      And it says -- just tell me where you

3    were at, where you were located.  Was it still in

4    the same position?

5          A      Yes.

6          Q      When Jordn stopped responding at all?

7          A      Yes.

8          Q      So how long was it that Jordn went back

9    to the ground and stopped moving at all before one

10   of the officers, or perhaps you, recognized that

11   there was a problem with Jordn?

12         A      I'm so sorry.  It's been a long day.

13                This entire struggle, like I said

14   earlier, it lasted a couple minutes.  And then

15   when he wasn't -- you know, I had to do that a

16   couple times myself.  Then when I noticed his legs

17   weren't moving, too, when I didn't have to push

18   down his shoulder blade, then I started getting

19   worried when he was wasn't making any more noise.

20   So right away, I'm like, "Hey, are you okay,"

21   rubbing his back kind of thing, and he then wasn't

22   moving anymore.

23                So then we rolled him over, and I could

24   see his chest rising and falling.  I think Bubba

1      Q    Was the shirt lifted up at any point to

2   expose the probes?

3      A    I don't remember.

4      Q    And how long did you remain behind Jordn

5   where you were rubbing his back, asking are you

6   okay?

7      A    Just for a second.  When I realized he

8   wasn't moving or saying anything, we rolled him

9   over.

10      Q    Did his body appear lifeless at that

11   point?

12      A    Yes.

13      Q    Limp?

14      A    Limp.

15      Q    You said he stopped making any noise.

16   What noise was he making before he stopped?

17      A    All those noises that I explained

18   earlier.  When he no longer moved and no longer

19   was making those noises is when I said, "Hey,

20   buddy, are you okay," and rubbed his shoulders.

21      Q    And then do you remember which side

22   Jordn was rolled onto, his right or his left?

23      A    I don't remember.

24      Q    And this is the first time that any

1    Springfield officer attempted to roll Jordn out of

2    a prone position; correct?

3          A     When I was there.

4          Q     First time -- from the time that you

5    arrived, the first attempt to transition Jordn out

6    of a prone position was after you recognized he

7    was unresponsive; fair?

8          A     Yes.

9          Q     It states:  "Officers could tell the

10    suspect had debris in his mouth and in fear of

11    choking rolled him on his side."  Correct?

12          A     Yes.

13          Q     Now, Officer Holsopple testified that he

14    was the individual that recognized the debris in

15    Jordn's mouth.  Is that consistent with your

16    memory?

17          A     From what I can remember.

18          Q     From where you were standing, could you

19    see any debris or see Jordn's mouth?

20          A     I could see his mouth.  I couldn't see

21    the debris, because -- until we rolled him over.

22    And then there was just kind of dirt on his lips.

23          Q     While you were -- when Jordn became

24    unresponsive, where was your foot?

1     A     Same spot on the ground.

2     Q     Not on Jordn's back?

3     A     No.

4     Q     When it says, "Officers could tell that

5   the suspect had debris in his mouth," did you

6   actually get down and look at his mouth to check

7   for debris, or was that Officer Holsopple?

8     A     Officer Holsopple did that.

9     Q     Officer Holsopple already testified

10  about the debris that he saw in Jordn's mouth.

11        Based on your memory of the positions of

12  the officers, of the three of you, who do you

13  think would know best as to what was in Jordn's

14  mouth?

15     A     Officer Holsopple.  I remember him

16  saying that.

17     Q     Do you remember what he said about the

18  debris in his mouth?

19     A     Not exactly.

20     Q     Do you remember him saying anything

21  about any substance in his mouth, rocks or

22  anything like that?

23     A     No.

24     Q     Officer Holsopple said that no one

1    attempted to remove any debris from Jordn's mouth.

2    Is that consistent with your memory?

3        A    Yes.

4        Q    The first time anyone noticed or voiced

5    any concern -- well, let's take a step back.

6             Was it Officer Holsopple who said

7    something first about Jordn having debris in his

8    mouth?

9        A    I don't remember.

10       Q    You did not sustain any physical

11   injuries from your encounter with Jordn Miller;

12   correct?

13       A    No.

14       Q    Correct?

15       A    Correct.

16       Q    Jordn never scratched you or anything?

17       A    No.

18       Q    Because you didn't see Jordn until there

19   was already -- or until he was already in prone

20   restraint and had been tasered and things of that

21   nature, you can't say what injuries he had while

22   he was in the automobile; is that fair?

23       A    Yes.

24       Q    And you're not going to be able to state

1   in that -- in the house at the time or not.  I was

2   talking to Ms. Tomblin.

3        Q    Some of the other reports of witnesses

4   tend to go back to the scene where Jordn was.

5   Some of the other witnesses stated that Jordn was,

6   quote, foaming at the mouth.  Did you ever notice

7   anything like that?

8        A    No.

9        Q    Have you ever seen a person who was

10  conscious foaming at the mouth?

11       A    Conscious?

12       Q    Uh-huh.

13       A    I've seen a lot of things.  I mean,

14  there's -- you know, people get the white stringy

15  stuff and the stuff in the corners of their mouth.

16  That could be considered foaming.  I've seen them

17  drool.  So foaming?  It just depends on what they

18  were talking about.  I don't know.

19       Q    One of the officers testified that when

20  Jordn was rolled over to his side, on his side

21  after he became unresponsive, his eyes were rolled

22  back into his head.  Is that consistent with your

23  memory?

24       A    I do remember that in the investigative

1    report, yes, that someone said something about his

2    eyes being rolled back into his head.

3         Q    Is that consistent with your memory when

4    Jordn was rolled over?

5         A    Yes.

6         Q    You said that Jordn -- when you radio --

7    well, how long after you rolled Jordn over do you

8    radio the fire department to step it up?

9              MR. LUTE:  Objection.

10             Go ahead.

11        A    Right away.  As soon as I noticed he

12   wasn't responding, in fact, I told them to step it

13   up.

14    BY MR. HILL:

15        Q    And the reason you gave for EMS or the

16   fire department to step it up is because, quote,

17   "Jordn was barely breathing"?

18        A    His chest was still rising and falling,

19   but he wasn't responding to anything we were

20   saying.

21        Q    Do you remember saying anything about

22   Jordn barely breathing to EMS?

23        A    Yes.  By the time they got there, then,

24   his pulse had slowed and he was barely breathing,

1    by the time then the squad got there.

2         Q    Do you remember saying anything over the

3    radio to EMS to step it up because Jordn was

4    barely breathing?

5         A    Yes, unresponsive, something of that

6    nature.

7         Q    And when you said "barely breathing,"

8    what did you mean?

9         A    That he's not responding.  And in my

10   experience, when somebody goes limp, I mean,

11   they're on a downhill slide.

12        Q    And I'm just --

13        A    He wasn't agitated and breathing heavy

14   like he was before and mad or aggravated.  He went

15   limp.

16        Q    When you say he was breathing heavy

17   before, you're talking about the time period where

18   you were observing Jordn while he was handcuffed,

19   but still conscious?

20        A    Yeah, the fighting part.

21        Q    How was he breathing heavy during this

22   interaction with the police while you were there?

23        A    Just like anybody would if they were

24   struggling with somebody else.  They're, you know,

1  breathing heavy and trying to get away, and you

2  can hear them breathing.

3      Q     How could you hear him breathing?

4      A     With my ears.

5      Q     What did it sound like?

6      A     Breathing.  Fast breathing.  Agitated

7  breathing.  Breathing when we have to physically

8  control somebody.

9      Q     You could hear his breathing while you

10 were standing up straight?

11     A     When he would be struggling, I could

12 hear him.

13     Q     You said it was fast breathing.

14     A     It was out-of-breath breathing where

15 you're fighting.

16     Q     Like huffing?

17     A     Not Huffing, just fast breathing.  Mad.

18     Q     Well, I just want to know what it

19 sounded like, not his motivation.  But can you --

20     A     Well, it wasn't like he was struggling

21 for breath.  He was just breathing fast because of

22 the struggling and the kicking and the movements.

23     Q     I'm just trying to find out -- later on,

24 when we look back at the transcript or watch the

1     Q    And when you say "kicking," are you

2  talking about his knee being on the ground and his

3  calf and foot coming up?

4     A    Yeah, and trying to turn sideways and

5  kick sideways, too.

6     Q    And was he still making these same

7  noises while he was struggling on the ground

8  throughout this period?

9     A    Yes.

10     Q    And it was during this period that you

11  think you heard Jordn say something like "get

12  off"?

13     A    Something to that effect.

14     Q    And that's the only intelligible word

15  you heard Jordn say; correct?

16     A    Pretty much, yeah.

17     Q    When you say "pretty much," there's

18  nothing else that you --

19     A    Not that I can remember, no.

20     Q    Have we discussed all of your

21  conversations with Chief John Smith regarding the

22  events on September 8th, 2015?

23          MR. LUTE:  Objection.

24          Go ahead.

1    charged with resisting?

2         A    Whenever the policy or directive came

3    out is when that started, and I can't remember

4    when that happened.

5         Q    What policy or directive?

6         A    The Taser policy and/or directives that

7    may have been put up.  At one point, I remember

8    specifically being given something that said if

9    you tase somebody, they need to be charged with

10   resisting or obstructing.

11        Q    And that's still the directive here as

12   far as you know?

13        A    Yes.

14        Q    And my understanding is that no charges

15   were ever actually brought against Jordn?

16        A    Correct.

17        Q    Did you ever attempt to have charges

18   officially brought against Jordn?

19        A    No, I didn't do any of the

20   investigation.

21        Q    What did you do with this incident

22   report after it was concluded?

23        A    After I checked it?

24        Q    Uh-huh.

1                    CERTIFICATE

2    State of Ohio      :

3    County of Franklin:

4           I, Whitney Layne, Notary Public in and for the

5    State of Ohio, duly commissioned and qualified, certify

6    that the within-named TERA DENISE MOORE was by me duly

7    sworn to testify to the whole truth in the cause

8    aforesaid; that the testimony was taken down by me in

9    stenotype in the presence of said witness; afterwards

10   transcribed upon a computer; that the foregoing is a true

11   and correct transcript of the testimony given by said

12   witness taken at the time and place in the foregoing

13   caption specified.

14          IN WITNESS WHEREOF, I have set my hand and

15   affixed my seal of office at Dublin, Ohio, on this 3rd day

16   of April, 2017.

17

18

19                   _____

20                        Whitney Layne

21                        Notary Public - State of Ohio

22   My Commission Expires:  May 4, 2020.

23                        - - -

24