UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| HAYDN ZEIS, Administrator of the Estate of Jordn Lukas Miller, Deceased | ) ) ) | CASE NO. 5:16CV2331 |
| Plaintiff, | ) ) ) | JUDGE JOHN R. ADAMS |
| vs. | ) ) | |
| SPRINGFIELD TOWNSHIP, OHIO, et al. | ) ) ) ) | **DECLARATION OF RACHEL PORTMAN** |
| Defendants. | ) | |

Pursuant to 28 U.S.C.§ 1746, I, Rachel Portman, hereby declare, under penalty of perjury, as follows based upon my personal knowledge:

1. I am an adult over the age of 18 years.

2. I have no known disability that would prevent me from hearing, seeing, or recalling the events of September 8, 2015.

3. On September 8, 2015, I was at 1020 Abington Drive, Akron, Ohio 44312 and observed Jordn Miller interact with Springfield Township Police Officers at 1019 Abington Drive, Akron, Ohio 44312.

4. 1020 Abington Drive is directly across the street from 1019 Abington.

5. During the entire time that police officers from Springfield Township interacted with Jordn Miller at 1019 Abington, I was on the front porch at 1020 Abington Drive. An accurate photo of my vantage point is attached as Exhibit A.

6. My vision was unobstructed, and I was able to clearly see and hear the Springfield Township police officer's interaction with Jordn Miller.

1

7. Before the police arrived, I heard a person speaking loudly in the street coming from my left. The street was Abington Drive. This person was later identified as Jordn Miller.

8. Jordn was walking with his shoulders slumped forward and neck lowered. He appeared disoriented and confused like he did not know where he was or what he was doing.

9. Jordn's speech sounded mostly like nonsense, but I was able to make out the name "Kayla."

10. Jordn yelled the name "Kayla" for what appeared to be no reason. There was no one in the area where he was yelling.

11. Jordn turned and began walking toward 1019 Abington Drive. He was walking with his head and shoulders slumped over and continued to mumble incoherently.

12. Jordn was wearing a camouflage sweatshirt, shorts, and no shoes.

13. I don't remember the exact temperature that day, but it was an extremely hot day, and it was bizarre for a person to be wearing a sweatshirt in this weather. Jordn was inappropriately dressed.

14. Jordn appeared disoriented and incoherent, but did not appear threatening or dangerous. At no time did I believe that Jordn was threatening or dangerous.

15. Based on his behavior, it was obvious that Jordn was on drugs or mentally ill or both.

16. As Jordn was mumbling things that made no sense, he walked to a blue Jeep that was parked in the driveway of 1019 Abington, opened the driver's side door, and got inside.

17. The Jeep was parked. The Jeep's engine was not running. The Jeep's engine was not started until long after the incident with Jordn and the Springfield Township police was over.

18. There is a door on the side of the home at 1019 Abington that is only a few feet from the Jeep's passenger side.

19. After Jordn got in the Jeep, the door on the side of 1019 Abington opened, several people exited the house, and those people walked to the Jeep.

20. Chester Clark, the elderly owner of the Jeep who lives at 1019 Abington Drive, was one of the people who exited the home. Chester walked to the driver's side of the Jeep.

21. One of Jordn's arms was sticking out of the Jeep's driver's side window.

22. Chester Clark, the elderly owner of the Jeep, easily grabbed Jordn's arm and held it against the Jeep's driver's side door with little effort. Jordn was contained in the vehicle.

23. Another male who had exited the home entered the passenger side of the Jeep on several occasions while Chester Clark, the elderly man, continued to hold Jordn.

24. Chester Clark, the elderly man easily held Jordn, and it did not appear that Jordn was capable of overpowering the old man. Jordn looked physically weak.

25. At this point, two Springfield Township police cars arrived and parked in the street on Abington.

26. Their police cars were not parked in the driveway and did not interfere with my ability to see or hear Jordn in any way.

27. Two male police officers from Springfield Township walked up the driveway, and approached the driver's side of the Jeep.

3

28. The homeowners that were standing around the vehicle moved away from the vehicle as the officers approached, and Jordn remained in the vehicle.

29. Jordn did not attempt to exit the vehicle and no part of Jordn's body came out of the vehicle while the police officers were standing at the driver's side door.

30. Both male officers stood at the driver's side of the Jeep for a period of time, and Jordn's body remained in the Jeep.

31. The male officers then opened the Jeep's driver's side door and grabbed Jordn and began forcefully ripping him from the Jeep.

32. While the male officers were at the side of the Jeep, no part of Jordn's body was outside of the vehicle until the officers pulled Jordn out of the vehicle and threw him on the ground.

33. The officers threw Jordn face first onto the gravel driveway. Jordn landed on his stomach and was face down on the driveway.

34. When Jordn's body hit the ground, I heard a loud "thud" noise, which was caused by the impact of Jordn's body on the ground.

35. One of the officers simultaneously landed on top of Jordn's body as Jordn's face and stomach hit the ground. I heard Jordn moan and it looked like the wind had been knocked out of him.

36. The other officer, who was larger, immediately went to Jordn where he began forcefully pressing on Jordn's back with his hands and knees.

37. Jordn remained in a face-down position from the moment the officers pulled him from the vehicle and through him to the ground until the paramedics arrived and rolled him onto his back.

38. No police officer ever attempted to roll Jordn over onto his back or do anything to get him off of his stomach and face.

39. Once Jordn was on the ground, both male officers pressed their hands and knees forcefully into Jordn's back while Jordn was lying face down in the driveway next to the Jeep.

40. Both male officers continued to use force against Jordn by pressing on his body with their hands, knees, and bodyweight.

41. Jordn moaned and made sounds of distress while the officers were present and pressing on him. I thought at the time that these sounded like the sounds of a dying person.

42. I could hear Jordn moaning as the officers pressed their hands and knees into Jordn's back.

43. Jordn's head and shoulders were not rising off the ground. Jordn's legs were not kicking up and down. The male officers were holding Jordn's body on the ground.

44. The smaller officer stood and took a few steps backward away from Jordn. That officer looked down at Jordn. Jordn's face and mouth were on the gravel driveway. The larger officer then jumped on Jordn hitting Jordn in the back of the neck with his forearm. That officer laid on Jordn's back and his forearm was still pressing into Jordn's neck. The officer who was standing kicked Jordn with his right leg.

45. One of the officers then lifted Jordn's shirt from his waist area up into his back. The other officer shot a Taser into Jordn's back and then placed the Taser handle on Jordn's leg. Jordn moaned and screamed when the officer shot him and his body jerked up. This was the first time I saw Jordn's legs move off the ground. The other officer continued to hold Jordn down with his hand and knees.

5

46. When the officer shot the Taser into Jordn's back, Jordn was lying face down and was barely moving.

47. Jordn was lying face down and was not moving much or resisting when the officer shot the Taser into Jordn's back. Jordn did not appear to be resisting anything when the officer shot him in the back with the Taser.

48. After the Taser was shot in Jordn's back, the officers immediately handcuffed Jordn's hands behind Jordn's back and he remained face down.

49. After Jordn's hands were cuffed behind his back and he was facedown, both male officers continued to put their weight on Jordn's back with their hands, knees, and bodyweight.

50. Jordn continued to moan and make what sounded like sounds of distress and pain.

51. The same officer who fired the Taser into Jordn's back put the Taser on Jordn's leg a second time, and Jordn screamed again.

52. When the officer put the Taser on Jordn's leg, Jordn's legs were on the ground, he was not moving much, and both male officers were still pressing on Jordn's body and back with their hands and knees.

53. At this point a female officer arrived.

54. After the female officer arrived, both male officers continued to put their body weight on Jordn's back with their hands, knees, and body and Jordn was not physically resisting. Jordn continued to make sounds of distress as the officers were on top of him.

55. The female officer walked to Jordn and pressed her foot into Jordn's upper back. She kept it there until after he was completely limp.

6

56. Both male officers continued to press on Jordn's back with their hands, knees, and body weight while the female officer was present. While the officers were on top of him, Jordn looked like a dying man who was making sounds of distress.

57. The three officers laughed and joked at 1019 Abington before the paramedics arrived.

58. Jordn's body went limp while the officers were on top of Jordn pressing on his back with their hands, knees, bodyweight, and foot. After Jordn's body was completely limp, the officers got off of Jordn and walked approximately 10-15 feet away. They stood until the paramedics arrived.

59. No officer attempted to give Jordn CPR or ever attempted to roll Jordn onto his back.

60. The paramedics arrived and parked in the street. Their vehicles did not obstruct my view of Jordn.

61. When the paramedics arrived, Jordn was face down in the same position he had been since the officers threw him from the Jeep. His hands were still cuffed behind his back.

62. The paramedics rolled Jordn onto his back and began giving CPR. Jordn was placed on a backboard and put in the ambulance.

63. I was at 1020 Abington Drive when a Springfield Township Officer arrived and asked what happened. I told the officer that "I believe it wasn't right what the officers did" and indicated that I thought the amount of force that was used was excessive. I was never contacted again or asked to give a statement after that.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this 15th day of August 2017.

7

s/ *Rachel Portman*     8-15-17

Case: 5:16-cv-02331-JRA Doc #: 37-16 Filed: 08/23/17 9 of 9. PageID #: 2951



EXHIBIT 16-A