**EXHIBIT**

**18**

exhibitsticker.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| HAYDN ZEIS, Administrator of the Estate of Jordn Lukas Miller, Deceased | ) ) ) | CASE NO. 5:16CV2331 |
| Plaintiff, | ) ) | JUDGE JOHN R. ADAMS |
| vs. | ) ) | |
| SPRINGFIELD TOWNSHIP, OHIO, et al. | ) ) | |
| Defendants. | ) | |

## PRELIMINARY EXPERT REPORT AND AFFIDAVIT OF ROY R. BEDARD

### I.   INTRODUCTION

My name is Roy R. Bedard. I reside in Tallahassee, Florida, where I am a full-time Professional Law Enforcement, Civilian and Corrections Trainer. I am the owner and president of RRB Systems International, a police and public safety product and training corporation headquartered in Tallahassee, FL that conducts law enforcement, corrections and public safety training throughout the world. I am a listed subject matter expert in Use of Force by the Florida Department of Law Enforcement. I have been previously qualified as an expert in police procedures, police use of force, combat stress and self-defense. I have been retained by Plaintiff's counsel to provide expert analysis in the case of Haydn Zeis, Administrator of the Estate of Jordn Lukas Miller, Deceased vs. Springfield Township, Ohio, et al.

### II.   QUALIFICATIONS AND BACKGROUND

I am a certified law enforcement officer since 1987. I have taught a variety of professional courses over the last thirty years including classes in police and corrections procedures, police management and civil liability throughout the US and abroad. I have taught civilian self-defense courses at the Florida State University for the Center for Participant Education and Florida

1

Institute of Martial Arts. I have taught advanced defensive tactics to academies, corrections and law enforcement agencies throughout Florida and many other parts of the nation.  I have provided training and policy development to the Federal Law Enforcement Training Center and Federal Bureau of Prisons. I have developed police tactics training courses and hold patents, trademarks and copyrights on a variety of police equipment and law enforcement training. I have produced films and television shows which are used in colleges and law enforcement academies across the state and nation.  These films address the areas of use of force; police procedure, non-lethal uses of force; and issues involving Civil and Criminal liability.

I received a Bachelor's degree from the Florida State University in Criminology and Criminal Justice in 1999. I have a Master's degree from the Florida State University in Educational Psychology (Sport and Performance). I am currently a Ph.D. student at the Florida State University completing coursework in Sport and Performance Psychology and developing my dissertation that focuses on human performance in uncertain environments. For the past thirty years, I have served as a full-time police officer, police trainer and reserve officer. I began at the Florida State University as a patrol officer and participated in most of my police career as a field-training officer. I have been active with the Tallahassee Police Department since 1990 and retired in December of 2015. I retain my Florida police standards.

I am an adjunct trainer at the Florida Public Safety Institute in Havana, Florida since 1987. I provide training services for basic, advanced and specialized law enforcement and corrections officials.

I am certified as a police officer and police instructor by Florida's Criminal Justice Standards and Training Commission (CJSTC). I serve as a task force member to the Use of Force and Defensive Tactics Development Committee for police and corrections officers of the State of Florida at the Florida Department of Law Enforcement in Tallahassee, Florida.

I have previously appeared as an expert witness in a variety of civil and criminal cases, having been qualified in both state and federal courts as an expert in use of force, police procedures self-

2

defense and combat stress. My experience and publications are described more fully in the curriculum vitae, prepared by me and attached to this report.

## III.    ANALYSIS PROTOCOL

To prepare for this review I have analyzed the documents and data currently available to me from discovery materials. I have listed the items that I have reviewed in the following section. The materials I have reviewed are of the type typically relied upon by consultants and experts when conducting analyses and forming opinions regarding issues of use of force, police procedures, defensive tactics and questions of human performance. These documents have provided me enough relevant data to develop my preliminary opinions to a reasonable degree of professional certainty.

In addition to the documents germane to this case I rely upon my training, experience and advanced education in the field of use of force, defensive tactics and human performance, consultations with peers, review of professional articles, peer reviewed literature, legal and court opinions, and independent research that I have conducted over years of training and teaching in these specific areas.

Terminology: Opinions that I present in this report may use terminology that overlaps with other accepted legal terms or standards. Use of specific legal terminology is not intended to draw legal conclusions or to subvert the function of the court or to inappropriately influence triers-of-the-fact. The use of certain terms is common in my field of expertise and I use them often as I lecture and train law enforcement or civilian audiences. They form the basis of my understanding of the subject matter and are commonly used by other consultants, experts and law enforcement officials in the field.

Truth, Veracity and Bias: My analysis is not intended to assign credibility to any of the evidence or witness statements or to presume that any one version of events is more truthful than any other. The information I draw from various documents and sources may be deemed unreliable if contrary evidence demonstrates it to be untrue or untrustworthy. Where practical, I rely on undisputed facts

3

and I attempt to indicate disputed facts when appropriate. If facts or evidence directly contradict statements offered as evidence I attempt to point out contradictions and provide them context. Any assumption of truth is undertaken solely for the purpose of analysis and rendering an opinion. It is understood that the test of veracity and truth of the available evidence lies with trier-of-fact.

Nature and Status of Opinions: Any reference by me to documents reviewed is not intended to be all-inclusive of my foundation or basis of opinion. I reserve the right to supplement this report if necessary if new information becomes available. I make these opinions to a reasonable degree of professional certainty based upon my knowledge, experience, training, skill and the materials reviewed below. Each opinion is susceptible to further development as I continue to research, investigate or review new information presented to me.

## IV.    MATERIALS PROVIDED FOR REVIEW:

1.    Death Certificate of Jordn Miller
2.    Springfield Township Police Department M26 & X26 TASER use report
3.    Springfield Township Police Department M26 & X26 TASER use report: S. James Gilbert
4.    Springfield Township Police Department policy 1214.00: Use of Deadly Force and Weapons Requalification
5.    Springfield Township Ohio Uniform Incident Report #15-2772
6.    Springfield Township Investigative Notes by Moore, Scherer, Holsopple
7.    Springfield Township Investigative Notes by Lombardi
8.    Springfield Township Police Property Receipt
9.    Weather data, Akron Ohio, September 2015
10.   Images of Jordn Miller in hospital
11.   Images of Scene
12.   Advanced TASER report
13.   TASER download data
14.   Chief Smith's Report
15.   Directive: Excited Delirium, Chief John Smith, 03/16/09
16.   Policies and Procedures for the use of TASER X26 & M26 1214b.0
17.   Springfield Township Witness Statements
18.   Use of Force Report: Officer Scherer
19.   Milo White Audio Files from Springfield Township PD/911
      • 01-Unknown Artist _ Phone 1.wav
      • 02-Unknown Artist _ Phone 2.wav
      • 03-Unknown Artist _ Radio 1.wav

4

- 05-Unknown Artist _ Radio 3.wav
- 06-Unknown Artist _ Radio 4 .wav
- 07-Unknown Artist _ Radio 5.wav
- 08-Unknown Artist _ Radio 6 .wav
- 09-Unknown Artist _ Radio 7 .wav
- 10-Unknown Artist _ Radio 8 .wav
- 11-Unknown Artist _ Radio 9 .wav
- 12-Unknown Artist _ Radio 10.wav
- 13-Unknown Artist _ Radio 11.wav
- 14-Unknown Artist _ Radio 12.wav
- 15-Unknown Artist _ Radio 13.wav
- 16-Unknown Artist _ Radio 14.wav
- 17-Unknown Artist _ Radio 15.wav
- 18-Unknown Artist _ Radio 16.wav
- 19-Unknown Artist _ Radio 17.wav
- 20-Unknown Artist _ Radio 18.wav
- 21-Unknown Artist _ Radio 19.wav
- 22-Unknown Artist _ Radio 20.wav
- 23-Unknown Artist _ Radio 21.wav
- 25-Unknown Artist _ Radio 23.wav
- 26-Unknown Artist _ Radio 24.wav
- 27-Unknown Artist _ Radio 25.wav
- 28-Unknown Artist _ Radio 26.wav
- 29-Unknown Artist _ Radio 27.wav
- 30-Unknown Artist _ Radio 28.wav
- 32-Unknown Artist _ Radio 30.wav
- 36-Unknown Artist _ Radio 34.wav
- 37-Unknown Artist _ Radio 35.wav
- 38-Unknown Artist _ Radio 36.wav
- 39-Unknown Artist _ Radio 37.wav
- 41-Unknown Artist _ Radio 39.wav
- 43-Unknown Artist_ Radio 41.wav
- 44-Unknown Artist _ Radio 42.wav
- 46-Unknown Artist _ Radio 44.wav
- 48-Unknown Artist _ Radio 46.wav
- 49-Unknown Artist _ Radio 47.wav
- 50-Unknown Artist _ Radio 48.wav
- 53-Unknown Artist _ Radio 51.wav
- 54-Unknown Artist _ Radio 52.wav
- 55-Unknown Artist _ Radio 53.wav

20.    Abington Photographs
21.    Jordn Miller Photographs at Hospital
22.    Autopsy Photographs

23. Funeral Collage Photographs
24. Report of Autopsy
25. Deposition Transcripts
    a. Officer Robert Scherer
    b. Officer Joseph Holsopple
    c. Sergeant Denise Moore
    d. Chief John Smith
    e. Paramedic Shawn DeWolfe
25. Declaration of Rachel Portman

In addition to these case-specific items, I have also reviewed select texts and treatises in specific areas of police procedures and use of force:

1. American Psychiatric Association. (2013). *Diagnostic and Statistical Manual of Mental Disorders* (5th ed.). Arlington, VA: American Psychiatric Publishing.
2. Chan, T. E., Vilke, G. M., Neuman, T., & Clausen, J. (1997, November). *Restraint Position and Positional Asphyxia*. Annals of Emergency Medicine, 30(5), 578-586.
3. Howard, R.S., Holmes, P.A., & Koutroumanidis, M.A. (2011) *Hypoxic Ischemic Brain Injury*. Practical Neurology (11), 4-18.
4. DiMaio, T.G., & DiMaio, V.J. (2005). *Excited Delirium Syndrome: Cause of Death and Prevention*, Boca Raton, FL, USA: CRC Press
5. Dawes, D. M., Ho, J. D., Reardon, R. F., Sweeney, J. D., & Miner, J. (2010). *The physiologic effects of multiple simultaneous electronic control device discharges*. West J Emerg Med(11), 49-56.
6. Karch, S. (2008). *Pathology of drug abuse* (4th ed.). Boca Raton, FL: CRC Press.
7. Jauchem, J. (2010). *Deaths in Custody: Are Some Due to Electronic Control Devices (including TASER)*. J. Forensic Leg. Med (17), 1-7
8. Laposata, E. (1993). *Positional asphyxia during law enforcement transport*. American Journal of Forensic Medicine and Pathology, 14(86).
9. Neuman, T. (n.d.). *Effects of Positional Restraint on Oxygen Saturation and Heart Rate Following Exercise* (Vol. 90). Am, J. of Forensic medical Pathology.
10. Reay, D. T. (1988). *Effects of positional restraint on Oxygen Saturation and Heart rate following exercise* (Vol. 16). Am. J. Forensic M. Pathology.
11. Ross, D. (1998). *Factors associated with excited delirium deaths in police custody*. Modern Pathology, 11, 1127-1137.
12. Shkrum, M. J., & Ramsay, D. A. (2007). Chapter 3. *Forensic science and medicine: forensic pathology of trauma: common problems for the pathologist. In Asphyxia.* Totowa, NJ: Humana Press .
13. Wetli, C. (2005). *The history of excited delirium: characteristics, causes, and proposed mechanics for sudden death*. In Encyclopedia of Forensic and Legal Medicine. UK: Elseiver.
14.

In addition to these materials, the following court decisions are relevant:

1. *Graham v. Connor*, 490 U.S. 386 (1989)
2. *Tennessee v. Garner*, 471 U.S. 1 (1985)
3. *Champion v. Outlook*, 380 F.3d 893 (6th Cir. 2004)
4. *Martin v. City of Broadview Heights*, 712 F.3d 951 (6th Cir. 2013)
5. *Adams v. Metiva*, 31 F.3d 375 (6th Cir. 1999)
6. *Vineyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002)
7. *Simpson v. Hines*, 903 F.2d 400 (5th Cir. 1990)
8. *Johnson v. City of Cincinnati*, 39 F.Supp.2d 1013 (S.D. 1990)
9. *Pirolozzi v. Stanbro*, 2008 U.S. Dist. LEXIS 36054 (N.D. Ohio 2008)
10. *McCue v. City of Bangor*, 2016 WL 5349730 (1st Cir. 2016)
11. *Krecham v. County of Riverside*, 723 F.3d 1104 (9th Cir. 2013)
12. *Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003)
13. *Cruz v. City of Laramie*, 239 F. 3d 1183 (10th Cir. 2001)
14. *Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003)
15. *Gutierrez v. City of San Antonio*, 139 F.3d 441 (5th Cir. 1998)
16. *Abston v. City of Merced*, 506 Fed.Appx. 650 (9th Cir. 2013)
17. *Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008)
18. *Richman v. Sheahan*, 512 F.3d 876 (7th Cir. 2008)
19. *Howe v. Town of North Andover*, 854 F.Supp.2d 131 (D. Mass. 2012)
20. *Hopper v. Montgomery Cnty.*, No. 3:14-cv-158, 2017 U.S. Dist. LEXIS 16334, at *8 (S.D. Ohio Feb. 6, 2017),

## V.   PRELIMINARY REPORT

After a preliminary review of all of the documents I have received, I, being a recognized expert in police use of force and police procedures proffer that the following opinions. All of my opinions are expressed to a reasonable degree of law enforcement certainty based upon my education, training and experience.

## 1.  SUMMARY OF EVENTS

The facts that I have relied upon are contextualized to address specific salient issues of police procedures. I understand that there are additional facts beyond what are set forth below, and I reserve the right to rely on those facts during my testimony. The facts set forth below are not to the exclusion of any other facts in the record and are included for context only.

### A.    Call for Service and Miller's Appearance

On September 8, 2015 at 3:12pm the Springfield Township Police received a 911 emergency call from Wendy Tomblin at 909 Milo White Dr. in Springfield Township, OH. to report that her son Jordn Miller was suffering a "*psychotic break*" and that he was "*running around the driveway naked*". She asked that the police get someone there. Tomblin informed the call taker that Miller was 24 years old and "*mentally ill*." Yelling could be heard in the background. Tomblin remained somewhat calm and composed as she spoke. She was heard telling Amanda Weatherholt to calm down and that Miller would be ok. Tomblin further reported that Miller was *"bi-polar, and had Attention Deficit Disorder (ADD) and Obsessive-Compulsive Disorder (OCD)"*. Tomblin told the 911 call taker that Miller was not violent and that he did not possess any weapons. She said that this behavior had been on-going for a couple days and that he had a "*couple breaks but this was the worst*." Tomblin stated, "*I don't want them (the police) to hurt him*", to which the call taker immediately said, "*No. We're gonna get him some help*." Tomblin stayed on the phone with the call taker and gave a description of the clothes that Miller was wearing.

At 3:13pm, the Springfield Township Police Dispatcher notified officers in the field to be enroute to 901 Milo White Dr.: "*...a 23-year-old male, running around nude in the driveway,  no weapons, no one's injured, he's just having a 53.*"[1]  At 3:16pm the dispatcher notified officers that the subject took off but was now wearing clothes. The dispatcher gave the clothing description to the officers.

An eyewitness—Rachel Portman—observed the encounter from the front porch across the street. Portman observed Jordn approaching from the up the street appearing "disoriented," "confused," and "incoherent" but also appearing non-threatening and non-dangerous. He was mumbling nonsense, and it appeared to her that he was mentally ill or on drugs or both. Miller was wearing a sweatshirt, shorts, and no shoes. Before officers arrived at 1019 Abington Road, witnesses observed Miller acting in a manner consistent with what was reported by Tomblin, namely that Miller appeared delusional, incoherent, and of diminished mental capacity.

---

[1] A "53" refers to a call concerning a person's mental health status.

8

Jordn approached a blue Jeep that was parked in the driveway of 1019 Abington and entered through the driver's side door.  The Jeep was parked and not running.

At 3:19 pm, Sharon Cole notified the Springfield Township Police that a guy had gotten into her car at 1019 Abington Rd. When the call taker asked about the subject's clothing she immediately recognized the description to match Miller's. The call taker told the caller, "*Leave him alone. He's got some mental problems, that's why we are looking for him.*" At 3:20pm, the dispatcher informed the officers in the field, "*the male apparently jumped into a neighbor's car at 1019 Abington, in the driveway.*"

While searching, the officers were informed by dispatch that Miller was inside a parked car located at 1019 Abington Rd., one street from Miller's home. When the officers arrived at 1019 Abington, Jordn was contained in the Jeep.

The officers parked their vehicles on the street and approached on foot by walking up the driveway. When the officers arrived at 1019 Abington, Chester Clark, III approached the officers and met them at the end of the driveway. Clarke reportedly told the officers, "he's trying to steal our jeep." Officer Scherer observed people surrounding the Jeep holding the doors shut. The officers instructed the people to move away from the Jeep, which they did. Officers Scherer and Holsopple stood outside the driver side of the Jeep observing Miller.

### B.    Miller's Condition While In the Jeep

Officers Scherer and Holsopple admit that they understood that they were responding to a medical and mental health call for a person who required their assistance. This is consistent with the report they received of Miller's behavior and the "53" call that was made for a mental health incident. Both Scherer and Holsopple testified that they had previously responded to mental health calls for circumstances where a member of the community needed psychiatric assistance or evaluation, and they considered this function to be part of their duties as police officers.

9

Both Scherer and Holsopple testified that based on their own observations of Miller before they physically engaged him, he was displaying features of a mental health crisis and also what they considered to be warning signs of a phenomenon sometimes referred to as "excited delirium syndrome" or ExDS. Both officers testified that they believed that ExDS is a life threatening medical emergency.

Officer Scherer testified that when he was interacting with Miller the only suspicion he had was that Jordn was a person in a mental health crisis who needed assistance. The officers knew prior to their arrival that the person they would be interacting with—Jordn Miller—was in the "throes of a mental health crisis," and "had a mental disability of some sort."

At deposition, the officers agreed that based on the information they received, they understood that the person they would be confronting might be scared and confused, might not understand the police's role, needed medical help, had disrobed and was running around the neighborhood naked, and was somebody who might be delusional and hallucinating

When the officers approached the Jeep and stood near the driver's side door, Miller's entire body was contained in the Jeep. Officers did not observe Miller make any threatening gestures toward them or anyone else. Miller was not capable of striking anyone while he was in the Jeep and the officers were present  According to the officers, Miller uttered "spontaneous nonsense," never made any sense, and did not appear to understand what was going on around him.

While Miller was inside the Jeep, officers observed Miller engage in behaviors consistent with an obvious mental illness and also consistent with the phenomenon referred to as "excited delirium." The officers were able to observe Miller's hands. Miller was not holding any items in his hands.  Although Miller was seated in the car, according to the testimony of the officers, the officers had not observed Jordn do anything in furtherance of stealing the Jeep.

Springfield Township Police Department had an "excited delirium" policy. It states:

10

ANY OFFICER WHO ENCOUNTERS A PERSON WHO EXHIBITS ANY WARNING SIGNS OF "EXCITED DELIRIUM", SHALL IMMEDIATELY SUMMON EMS AND HAVE THEM RESPOND TO A NEARBY STAGING AREA, SUMMON FOR ADDITIONAL POLICE BACKUP, MAKE ANY AND ALL ATTEMPTS TO TAKE CONTROL OF THE SUBJECT FOR MEDICAL ASSESSMENT.

WE UNDERSTAND THAT THE SUBJECT MAY HAVE EXTREME STRENGTH AND ENDURANCE AND WILL NEED TO BE RESTRAINED. IT WILL BE OUR DIRECTIVE NOT TO LEAVE THE SUBJECT LAYING IN A "FACE DOWN PRONE POSITION"

Officer Scherer testified that this policy was created because the phenomenon of ExDS was becoming more widely known in the law enforcement field. Scherer was the primary drafter of the directive, and it was endorsed by then Chief John Smith.

### C.      The Officers' Extracting Miller from the Jeep

Although Scherer and Holsopple were aware of this policy, recognized that ExDS as a medical emergency that required immediate medical attention and treatment, and subjectively recognized that Miller had showed many of what they believed to be warning signs of ExDS, they chose not to summon EMS. Instead, the officers chose to physically extract Miller from the Jeep. The officers testified that Miller was not attempting to exit the Jeep, and had they desired to do so, they had both the time and opportunity to summon EMS.

The officers made the decision to physically extract Miller from the Jeep knowing that he would no longer be contained and that they would then have to use additional physical force against Miller to secure him. The officers opened the door and both officers reached into the Jeep, grabbed Miller and began pulling him out of the vehicle. Miller continued to have his hand on the steering wheel to remain in the vehicle. Defendants broke Jordn's grasp and threw him on his stomach in a facedown prone position on the driveway.

### D.      Confrontation with Miller in the Driveway

Outside the vehicle, Holsopple was on Miller's right side. Scherer was positioned on Miller's left side. Miller was in a face down prone position.  According to the officers at deposition, Miller attempted to roll from side-to-side to get out of face down prone position. Scherer and Holsopple openly admitted at deposition that they put their hands on Miller's back and compressed his body

11

to the ground in an effort to prevent him from arching his back or moving.  The officers admit that they were using force to keep Jordn in a face-down prone position.

These admissions of using weight and force to keep Miller in a prone position are consistent with the written statements that were prepared by Scherer, Holsopple, and Moore on the evening of September 8, 2015.

According to the officers at deposition, Miller never got out of prone position.  Miller became unresponsive while still in prone position.  At deposition, the officers described that while they were initially struggling with Miller in the driveway and using compressive force on Miller, his right arm was underneath his diaphragm.  Scherer testified that this arm was under Miller's diaphragm and Holsopple agreed that it was in the position one would use to implement the Heimlich maneuver.  This is important because it is the same positioning one would use to expel air from the body.

According to Officer Scherer's investigative note: "*While attempting to handcuff the suspect he continued to fight with us. He then bit me in the left calf, still fighting and was very uncontrollable. I deployed my Taser to the mid back at close range, then placed the Taser to his right calf to complete a circuit. Officers did gain compliance and was able to handcuff him during the 5-sec cycle. The suspect continued to fight thrashing around and was given a second cycle that did not gain any compliance.  Officers continued to wrestle with the suspect just trying to keep him still and hold him down so not to injure himself. The suspect did calm down and we noticed that he appeared to have a medical problem at this time. We rolled the suspect over, felt for a palse [sic] which was strong and fast, and his chest was rising and falling. We advised dispatch that we needed EHS and to advise to step it up.  He continued to feel for a palse [sic] and waited for EMS. As EHS arrived the suspect lost his palse [sic]*.*

At deposition, Scherer clarified that while the officers were compressing Miller's body into the ground to keep him in prone position, Jordn bit the front of Scherer's calf. Miller raised his head 6-7 inches off the ground to do so.

Scherer stood and backed away from Miller. Miller's face fell back to the gravel driveway.  Miller could no longer  bite anyone based on proximity, according to Scherer and Holsopple. Holsopple continued to hold Miller's body to the ground. One of Miller's arms was cuffed behind his back.

Scherer kicked Miller in the side with his right leg. A t  the same time Scherer kicked Miller, Holsopple forearmed Miller neck near the base of his skull. Scherer testified that when he kicked Miller (and by extension when Holsopple forearmed Miller's neck/skull), it was "clear he's not going to bite me again."[2]

Scherer drew his Taser. Holsopple lifted Miller's shirt exposing his back. Scherer fired the Taser  into Jordn's back with both probes connecting with a 3-inch spread. Scherer increases the spread by connecting the Taser to Miller's leg.

The barbs struck Miller in the middle of his back leaving an approximately 3" tattoo. Scherer then used the TASER is drive stun mode by applying it to Miller's thigh. For the first time, Scherer notified the fire department to be in route. Holsopple handcuffed both of Jordn's hands behind his back. It was only after Scherer used the Taser that any officer from Springfield Township called EMS.

Scherer testified that when he used the ECD, he believed Miller was  not  mentally capable  of  following  officer  commands  and was suffering a mental health crisis.

Sgt. Denise Moore was the on-scene supervisor. After arrival, Sgt. Moore came on the radio saying, *"902 come over here. We might need help getting him into the car."* An officer then said, "*We have one in custody with a TASER deployment*". This call was immediately followed with a time stamp of 3:21[3] demonstrating the immediacy at which the officers pulled Miller from the vehicle, placed him on the ground and TASERed him. At 3:26 Sgt. Moore requested that the fire

---

[2] Scherer Vol.I 224:12-16

[3] See wav file #13.

department "*step it up*" because Miller "*lost consciousness, was unresponsiveness, (and was) barely breathing*".

While Jordn was handcuffed in prone position and as Sergeant Denise Moore was arriving on scene, Scherer used his Taser a second time on Jordn's calf. The officers testified that Jordn was prone, with his hands behind his back, and officers were pressing on his him when the Taser was used a second time.

The officers openly admitted at deposition that they continued to apply and compressive force pressure to Miller's back after he was restrained in handcuffs.

Together, after the second Taser was deployed, Scherer, Holsopple, and Moore physically kept Jordn's body, including his diaphragm, torso, head, neck, and legs on the ground.

This is consistent with signed Investigative Note that Defendants Scherer, Holsopple, and Moore jointly created, reviewed, and signed on the night of the encounter. While he was in a facedown prone position, *"Sgt. Moore had her right foot on his left shoulder blade to keep him from arching up. . .He continued to struggle and try to get up for several minutes. When he stopped trying to get up, Officers started rubbing his back asking if he's okay trying to get a response from him.*

After becoming unresponsive, officers rolled Miller onto his back and conducted a *"sternum rub, [sic]"* a noxious technique by which the nerves proximal to the sternum are stimulated to cause a reaction.

14

After intentionally placing their weight on Miller's back. Miller became unresponsive. Miller lapsed into unconsciousness and never regained it. Miller was taken to Akron City Hospital where he died two days later.

At deposition, Officer Holsopple testified that he knew that Miller had rocks, gravel, and debris from the driveway in his mouth but chose not to remove it even after None of the officers removed the debris from Miller's mouth or gave CPR to Miller.

Paramedic DeWolfe testified that Miller was still handcuffed behind his back in a face down prone position when paramedics arrived.

### E.    Sworn Statement of Rachel Portman

Rachel Portman was an eyewitness to the events on September 8, 2015 who gave a signed declaration. I include portions of her statement because it reflects upon Miller's interaction with law enforcement on September 8, 2015. Where Portman's statement contradicts or is at odds with the testimony or the statements of the defendants, it is for the trier of fact to decide which account to believe.

Portman was positioned on a porch at 1020 Abington, which is directly across the street from 1019 Abington where Miller's confrontation with police occurred.

Before the police arrived, her attention was drawn to Miller who was approaching up the street to her left and speaking incoherently. Miller loudly yelled the name "Kayla," but it was apparent that there was no one in the area where Miller was speaking. Miller was walking with his head and shoulders slumped over. As he walked, he continued to mumble incoherently.

To Portman, Miller appeared disoriented and incoherent. However, she did perceive Miller as threatening or dangerous. Based on her observations, it was apparent to Portman that Miller was either mentally ill or on drugs or both.

As Miller mumbled incoherently, Miller approached a Jeep that was parked in the driveway of 1019 Abington. Miller entered through the driver's side door. Several people exited the home of 1019 Abington. An elderly man who had exited the home walked to the driver's side of the Jeep where Jordn's hand was sticking out of the window. The man held Miller's hand to the driver's side door with what Portman describes as "little effort."

The officers arrived, and after standing at the driver's side of the Jeep observing Jordn, Officers Scherer and Holsopple opened the door, grabbed Jordn and began forcefully ripping him from the Jeep.

Miller landed on his stomach in a face-down prone position. According to Portman, Miller's body made a loud "thud" noise when his body hit the ground. One of the officer's landed on Jordn as Jordn face and stomach hit the ground. Miller let out a moan or similar noise as the officer landed on top of him.

Portman describes that the officers pressed their hands, knees, and body weight into Miler's back and body both before and after he was handcuffed. According to Portman, throughout this process, Miller was made multiple sounds of "distress" and offered little resistance.

Portman recalls that at the time the ECD was fired into Miller's back, he was not resisting the officers. At the moment he was struck with the Taser, his body jerked up and he was handcuffed. When the Taser was subsequently applied to Miller's leg, Miller screamed.

As a female officer [Sgt. Moore] arrived, the male officers continued to put their body weight on Miller with their hands, knees, and body despite that Miller was not resisting. The female officer pressed her foot into Miller's upper back as the male officers continued to apply pressure to Miller's body until he became unresponsive.

16

## 2. TRAINING, POLICIES, PRACTICES AND CUSTOMES AT SPRINGFIELD TOWNNSHIP POLICE DEPARTMENT

During their depositions, Scherer, Holsopple, and Moore described training they received regarding issues that commonly occur for police officers in the field including uses of force, de-escalation and intervention tactics, interacting with members of the public who are suffering medical and mental health crises and those who are under the influence of drugs, and uses of force on restrained individuals, individuals who have a diminished mental capacity, and individuals in an agitated mental state.

These officers basic understanding of police practices and uses of force are notably absent. According to their testimony, these misunderstandings stem directly from a lack of training or affirmative mistraining at the department level. Furthermore, their deposition testimony makes clear that their affirmative misconduct by police officers concerning uses of force, de-escalation and intervention tactics, interacting with members of the public who are suffering medical and mental health crises and those who are under the influence of drugs, and uses of force on restrained individuals, individuals who have a diminished mental capacity, and individuals in an agitated mental state are accepted practices.

A sample of the officers' testimony is below:

Q    Do you receive any kind of training here at the department as to how to approach and interact with members 10 of the community who have diminished mental capacities?

A    I have not.

……..

Q    If training was offered here at the department on interacting with people who have a diminished mental capacity, you would have gladly received that training; correct?

A    Yes.

(Dep. Vol. I. 61:8-11; 64:4-10)

17

Q. The extent of your training, with respect to how to interact with members of the public who may be mentally ill, would simply be some overlap with your excited delirium training; true?

A. Yes.

Q There's never been any kind of specific course here at Springfield Township or anywhere else where you've gone through training about this is how a police officer should approach a situation involving a mental health crisis; true?

A True.

Q And again, the same question, but I think I know the answer. If training, specific training was offered here at Springfield Township involving how do police officers in our community approach and respond to members of the public who are suffering a mental health crisis, you would have undertaken that training if it was offered; true?

A True.

(Scherer Dep. Vol. I. 66:7-67:3)

Q Have you ever received any training on de-escalation tactics as a police officer?

A I don't believe so.

Q Have you received any training on what signs or symptoms to look for, to identify whether a person's behavior is being caused by a mental illness?

A No.

Q Have you ever been engaged in a process where a person is being involuntarily committed to a psychiatric institution? Sometimes they call it being pink slipped. Other states may call it the Baker Act. Do you know what I'm referring to?

A Yes, I know.

Q Have you ever been involved as an officer in one of those situations, assisting a mentally ill person to a hospital setting for an involuntary commitment?

A Yes.

Q Can you tell me -- have you received any  training on that?

A No.

18

(Scherer Dep. Vol. I. 68:11-69:7)

Q      Have you ever undergone any training about coordinating with EMS in terms of setting up a staging area or anything along those lines when responding to a mental health crisis?

A      Training, no.

(Scherer Dep. Vol. I. 73:19-23)

Q      And likewise, there has never been any kind of training here saying in a mental health crisis situation this is the plan or protocol that officers must follow; true?

A      True.

Q      Likewise, in terms of the decision to use force when handling an individual in a mental health crisis, that is just a matter of whatever happens at the scene; correct?

A      Yes.

Q      Do you ever consult any mental health professionals when dealing with a mental health call -- or a mental call, as you call it?

A      No.

(Scherer Dep. Vol. I. 79:6-19)

Q      Have you received any training with regard to using force on individuals or members of the public who may be in a medical crisis?

A      No.

Q      And if I understand it, the response from police officers here at Springfield Township, including yourself, would be the same, in terms of using force, regardless of whether a person was medically compromised or mentally compromised because it would all -- or absolutely normal, because it would all be based on reacting to that individual's behavior; is that true?

A That is…That is true.

(Scherer Dep. Vol. I. 86:7-24)

Scherer further testified that he had not received any training concerning the risks of positional asphyxia since approximately 2006 or 2007. (Scherer Dep. Vol. I. 101:21-102:9) Similarly, other

19

than being briefly mentioned in the Taser training, there is no training on excited delirium or the written policy that is in effect. (Scherer Dep. Vol. I. 104:2-7)

Q    And other than the excited delirium training, you're not aware of any specific training regarding prone restraint; correct?

A    Correct.

Q    And the last time that training would have been 3 given, as far as you know, would have been you giving it seven or eight years ago, give or take; correct?

A    At least, yes.

Q    Before it was discontinued by Chief Smith?

A    Yes.

Q    Is there anything in Springfield Township's policies banning prone restraint?

A    Not that I'm aware of.

(Scherer Dep. Vol. I. 105:22-106:10)

Q    So it's consistent with the training and the policy here at Springfield Township to use a Taser to gain compliance on people suffering from the medical condition excited delirium; true?

A    It is.

Q    And is that still the case?

A    Yes.

(Scherer Dep. Vol. I. 128:9-15)

Q    I just want to make sure I understand it. You're teaching your fellow officers that you've got to look for the warning signs of excited delirium; correct?

A    Yes.

Q    Because you're not going to get a diagnosis in the field; correct?

A    Yes.

20

Q    Based on the warning signs that are apparent to the officer, either by firsthand observation or information provided, they have to determine is this a warning sign of excited delirium; true?

A    Yes.

Q    And my question is: So when those warning signs are present, a police officer at Springfield Township may use a Taser on a person with excited delirium who is in prone restraint in order to gain compliance?

A    Yes, they may.

Q    And that's also true if that same person is in prone position, there are warning signs present of excited delirium and they're handcuffed in prone position, true, if you have to gain compliance?

A    Yes.

Q    And a Taser can be used for that?

A    Yes.

Q    And repeated applications, up to three, can be used for that in Springfield Township?

A    Yeah.

Q    That was a yes; right?

A    Yes.

(Scherer Dep. Vol. I. 129:2-130:7)

Q    From a department policy perspective, there is no greater limitation on using a Taser against people in a mental crisis, mental health crisis, under the influence of stimulant drugs, or in the throes of excited delirium any more than there is a member of the general population?

A    That is correct.

(Scherer Dep. Vol. I. 136:23-137:4)

Q    You can use three cycles of the Taser and still be in policy; correct?

A    Yes.

21

Q But sometimes here at the department you have to cycle the Taser more than three times, depending on the suspect?

A That is true.

Q All of which could be within policy here?

A That is true.

Q And all of that could be within policy regardless of whether the person is handcuffed or not; true?

A That is true.

Q And all of that can be within policy here regardless of whether the person is mentally ill; true?

A That is true.

Q And all of that can be within policy here regardless of whether or not the suspect is in the throes of a mental health crisis; true?

A That's true.

Q And all of that, the three cycles in handcuffs, could be consistent with policy here if the person was in the throes of a medical crisis; true?

A It's all true. It's all possible. Everything -- it's all possible.

Q I guess what I'm saying is there's no policy banning that here, that type of force here at Springfield Township?

A No.

(Scherer Dep. Vol. II. 98:22-100:9)

Q Do you have any -- have you received any specific training here at Springfield Township in terms of how to approach and handle a person in a mental health crisis?

A Just experience.

Q I mean, but training?

A No, sir.

Q    Is any training offered at Springfield Township on how to interact or approach a person in the throes of a mental health crisis?

A    Not that I'm aware of.

Q    How about with respect to a person who may be under the influence of drugs? Is there any training that is offered by Springfield Township in terms of how to interact with a person who may be acting strangely or bizarrely because they're on drugs?

A    No, sir, not that I'm aware of.

Q    And have you received any training on how to interact with members of the public who may be under the influence of drugs?

A    Not that I recall.

(Holsopple Dep. Vol.I 52:12-53:18)

Q    And I think you've answered my question, is that your approach to a suspected criminal act and detaining or restraining that person is going to be the same regardless of whether they're in the throes of a mental health crisis or not; is that a fair characterization of your testimony?

A    Correct.

(Holsopple Dep. Vol.I 60:11-17)

Holsopple testified that he did undergo crisis intervention training approximately 14 years ago, but has received no training in interacting with a member of the public in the throes of a mental health crisis since that time. (Holsopple Dep. Vol.I 64:12-65:6)

Q    The training that you received on excited delirium, was that given to you by Officer Scherer?

A    Yes, that was the last one.

Q    That would have been like -- were you getting that annually when Officer Scherer was running the program?

A    Yes.

Q    And is it your recollection that that training ended like 2008, 2009, something along those lines?

A    I don't recall.

Q    Did it seem to end about the time that Chief Smith, John Smith, became the chief here?

23

A      I would -- I think so, yes.

(Holsopple Dep. Vol.I 67:18-68:6)

In terms of using a Taser on a person in a mental or medical crisis, Holsopple testified that there is no manual or policy that would help him navigate when to use a Taser and when not to use a Taser. (Holsopple Dep. Vol.I 52:8-11)

Q      You said it's -- I just want to understand what the policy is here. Can you identify any policy as to when a police officer needs to contact EMS for a mental health crisis outside of a physical injury or a medication overdose on someone else's medication?

A      Other than the excited delirium, no policy, because it's subjective.

(Moore Dep. 37:13-22)

Q      Have you ever looked to see whether or not these types of policies in responding to a mental health crisis exist?

A      It's not my job, so no.

Q      So when you said that there's no way to have a policy, that's just your -- that's just your opinion as you sit here today?

A      Like I said, yes.

(Moore Dep. 39:4-14)

Q      Has anyone here at the department ever come to you to discuss creating a policy potentially for how to respond to people in a mental health crisis?

A      Not that I recall.

(Moore Dep. 39:23-40:5)

Q      So your excited delirium training that you're receiving on the policy here at Springfield Township would be included within any Taser training; fair?

A      Yes, usually.

Q      There's no separate class or course on how to respond to excited delirium that's being offered in Springfield Township?

A      Currently?

24

Q        As of September 8th, 2015.

A        Not that I'm aware of.

Q        How about currently?

A        No.

(Moore Dep. 39:23-40:5)

Q        And in terms of the -- in terms of training, have you received any training about how to respond to members of our community who may be under the influence of drugs other than the excited delirium policy?

A        Not that I'm aware of.

(Moore Dep. 106:15-20)

Q        In your experience here at Springfield Township, on how many occasions have you seen officers use a Taser on a person who is restrained in handcuffs?

A        Multiple times.

(Moore Dep. 70:22-71:4)

Q.       In terms of training here at Springfield Township, you've never received any training instructing you to change your response or the amount of force you use based on the fact that a person's actions are being caused by a medical condition; is that true?

A        Use of force is use of force. You have to do that regardless of, like you said, whether you're white, black, Asian, economic status, whatever it is and whatever the situation. If you have to put them under control, you have to do what you have to do.

Q        Should officers attempt to refrain from using force when a person's actions are likely being caused by a diminished mental capacity?

A        My answer is still the same. If they have to use force, they have to whether they want to or not.

Q        In terms of interacting with a member of the public who has a diminished mental capacity, is the approach by officers and when to use force the same regardless of their mental capacity?

A        Yes, it's the same. These are all the same questions.

(Moore Dep. 92:16-93:20)

Q        Just so we're clear, I didn't ask you about at what point the number of times a person has been tasered is excessive. My question was –

25

A        My opinion.

Q        -- are people who have been exposed to repeated applications of a Taser or an electrical conducted weapon at a higher risk for positional restraint asphyxia?

A        I do not know the answer to that question. I told you 30 times might be excessive.

(Moore Dep. 127:23-128:11)

### 3.  ASSESSMENT OF MILLER'S CONDITION AND RESPONSE

Though law enforcement officers are not trained to be psychologists, they are expected to learn how to manage the mentally ill when field intervention becomes necessary. Both recruit level and in-service training programs are expected to provide officers with the skills needed to manage a varying and unpredictable general population.

I know of no program which promotes or finds it acceptable to challenge and further agitate delusional subjects. This tactic is not routinely taught in law enforcement and it reasonably should not be practiced. It is a well-known principle of police work to consistently use calming and reassuring language when managing those suffering from a mental health crises precisely because authoritative and demanding language is considered counter-productive to the goal of achieving a peaceful resolution. Delusional subjects are rarely frightened by officer's angry words and rarely cower in fear at an officer's show of force. The officers that arrived on scene had now become more fully aware of Jordn Miller's delusional state of mind and agitated disposition. They could see him firsthand talking nonsensically and flailing about inside the vehicle. Officer Holsopple had dealt with Miller in a previous incident. During that episode Miller had sat in the cruiser crying and upset. Holsopple reported that he talked with him until he calmed down.

Officer Scherer later noted in his TASER report, "*Note: The suspect was believed to be in a full excited delirium state and full of unknown narcotics according to his mother. The suspect sustained side effects from being in this state.*" Chief Smith wrote in his report, "*both Officers Holsopple and Scherer are well aware and have been trained in the condition, components and*

26

*possible outcomes of Excited Delirium.*" Chief Smith went on to say, "*Officer Scherer was not only trained in what to look for, he also was previously the lead Taser instructor for several years for our department. In fact, he suggested the wording of the directive I wrote in 2009 to add to our policy in regards to encountering persons exhibiting signs of "excited delirium." He also taught "excited delirium" during Taser training to Officer Holsopple and Sgt. Moore, so I was confident they all knew what to look for, and how to react.*

Officer Scherer's apparent deep knowledge of ExDS begs the question of why the officers chose the course of action so inconsistent with recommended procedures for managing the mentally ill.

Rather than beginning a calming dialog or allowing Miller to calm himself, the officers immediately engaged him in a physical contest of strength. At the moment officers decided to extract Miller from the Jeep he presented no immediate threat to them or others in the community.

Forcibly removing him from the confines of the vehicle lessened the officers control over him and required them to escalate their force tactics to regain control. The struggle with Miller that included hard blows, wrestling and Tasering on two separate occasions was a direct and proximate cause of the officer's premature decision to take him into custody.

With mental episodes, so long as the victim doesn't present an immediate danger to anyone, officers are taught to remain patient and calm so as not to further agitate the delusional mind. It was clear to the officers that Miller was exhibiting signs of excited delirium. Miller needed a medical intervention and he needed it quickly. Within minutes of the officers arriving on the scene, Miller was handcuffed, face down on the ground, unresponsive and in respiratory distress. The officers did not allow Miller any time to calm down nor had they summoned EMS to immediately begin lifesaving procedures.

In circumstances such as these, the recommended best practice is to de-escalate the ExDS by preventing the need to struggle or to rapidly terminate the physiological effects of an ongoing struggle (DiMaio & DiMaio, 2005). This medical strategy encourages law enforcement officers to

27

avoid struggling with the individual if there is not an immediate danger and so long as the individual is contained. Restraint is used as a last resort. *"It is not possible to predict when an episode of excited delirium will result in death. What we do know is that such details occur in association with a violent struggle. The struggle is usually when medical or law enforcement personnel attempt to retrain an individual in order to prevent the individual from harming himself or herself or others after all therapeutic measures to diffuse the aggressive and violent behavior have failed. Death typically occurs minutes after the struggle ceases."* (DiMaio & DiMaio, 2005, pg. 97)

The department was made aware of ExDs years prior and had taken some preemptive caution against the mishandling of a potential event. A directive was written by Scherer and issued 03/16/09 by Chief John Smith to all officers is that they "*should make any and all attempts to take control of the subject for medical assessment.*" This directive was issued following the death of another individual in Springfield Township custody under circumstances similar to Miller's.

Had the officers followed the excited delirium policy and immediately contacted EMS, Shawn DeWolfe, the lead Springfield Township paramedic on duty on September 8, 2015, testified that they can administer the medication ketamine, which is the "gold standard drug" for quickly treating excited delirium, mental crises, and other agitated states. "The goal of sedation is to not prolong restraint." The paramedics testified that ketamine achieves rapid calming of the subject to eliminate physiologic stress, which is why it is important to sedate the person as soon as possible. Ketamine has a "very limited risk" and is "quick acting." Indeed, the paramedics testified that if a person is acting erratic and won't calm down with reasonable attempts, ketamine is the safest option for everybody involved.

Ketamine is given via an intramuscular injection into any muscle. The Springfield Township paramedics who responded had ketamine in their ambulance on September 8, 2015. Springfield Township paramedics testified that they have successfully administered ketamine to agitated individuals displaying signs and symptoms nearly identical to what Jordn Miller exhibited on September 8, 2015, including "[f]lailing his arms," cannot be calmed down by bystanders, saying

things that don't make sense, and to individuals with a diminished mental capacity.  In that instance, EMS coordinated with the people who were present and immediately converged to give the injection without any struggle. The ketamine worked by almost immediately subduing the person who was safely transported to the hospital.

This is consistent with the recommended practice of reducing the period of struggle so that EMS could immediately administer a sedative medication to greatly increase the ExDS sufferers chances of survival.

Furthermore, the officers openly admit that they were responding to what was admittedly a mental health crisis and they believed that Miller's behavior were the direct result of a mental health crisis. The same logic that applies to ExDS applies to circumstances of a mental health crisis and any reasonable police officer would know this.

Unfortunately, this order of operations was not carried out. Responding officers dragged Jordn Miller from the car, struggled with him for some period of time to get him handcuffed, struggled still more to hold him down, and all of this before EMS was called for the first time. The delayed response by EMS was likely a contributing factor to Miller's eventual demise.

## 4.  EXCITED DELIRIUM

### A.    Law Enforcement's Understanding of Excited Delirium

Occasionally, medical situations present as law enforcement calls for service. Indeed, the most famous Supreme Court cases for establishing criteria for proper use of force.[4] and departmental liability for failure to train[5] both involved medical emergencies.

It is believed in the law enforcement community that when a person experiences ExDS their physical effort becomes unbridled, making them appear to have super-human strength. The

---

[4] *Graham v. Connor*, 490 U.S. 386 (1989
[5] *City of Canton, Ohio v Harris*, 489 U.S. 378, 388 (1989)

energy costs of this behavior can rapidly lead to complete exhaustion, cardiac arrest and death. For this reason, wrestling and the use of TASER are only advised when absolutely necessary. The necessity of such interventions is typically reserved for circumstances when officers are protecting the innocent lives of others.

Scherer wrote in his Advanced TASER report: "*Note: The suspect was believed to be in a full excited delirium state and full of unknown narcotics according to his mother. The suspect sustained side effects from being in this state.*" During his deposition, Scherer testified that he believed Miller was in this state at the time he was interacting with Miller.[6]

According to the Chief's report, he was told that Miller's breathing began to shallow after he was in police custody but before EMS had arrived on the scene. He wrote, *"officers upon observing the condition change turned the suspect on his side, then his back to make sure his airway was not obstructed. He stated officers performed a sternum rub while waiting for EMS to arrive and take over."*

'Excited Delirium' is not considered a medically valid diagnosis. It is not a diagnostic term formally recognized in the diagnostic schemes of the American Psychiatric Association (APA) or the World Health Organization (WHO). This term is not specifically found in the DSM-V. However, the term has been accepted by the National Association of Medical Examiners and the American College of Emergency Physicians who argued in a 2009 white paper that excited delirium is a composite of codes found in the International Classification of Diseases, Ninth Revision (ICD-9). They argue that excited delirium syndrome is composed of four specific criteria that include i) delirium with agitation, ii) respiratory arrest, iii) hyperthermia and iv) death (Jauchem, 2010).

The controversy surrounding a proper diagnosis of excited delirium remains, but law enforcement officers are trained to recognize certain signs and symptoms that may be consistent with past incidents of sudden in custody death. Among these behaviors are paranoia, disorientation, dissociation, hyper-aggression, tachycardia, hallucination, diaphoresis,

---

[6] Scherer Dep. Vol.II 52:19-53:10,

incoherent speech or shouting, seemingly superhuman strength or endurance, hyperthermia, profuse sweating, and nudity- the result of peeling away layers of clothing due to the signature symptom of extremely high body temperature.

On 03/16/2009, Chief John Smith issued a directive with the subject line "Excited Delirium." The directive order that: *"Any officer who encounters a person who exhibits any warning signs of "excited delirium", shall immediately summon EMS and have them respond to a nearby staging area, summon for additional police backup, make any and all attempts to take control of the subject for medical assessment.*

*We understand that the subject may have extreme strength and endurance and will need to be restrained. It will be Our directive not to leave the subject laying in a "face down prone position". We will assist ems as directed and understand we may need to send officers with them to the hospital. It will be our directive under no circumstance will we transport a subject who is exhibiting any of the signs of "excited delirium" either to our police station, hospital, or mental health facility Only EMS personnel will transport subject. We understand that we will follow these steps with only the reasonable amount of force necessary for the health and welfare of our officers, the public, and the subject."*

All of the officers involved—Scherer, Holsopple, and Moore—testified that they understood ExDS to be a life-threatening medical emergency requiring immediate medical attention and treatment.

### B.    Managing Episodes of ExDS

The preferred method of managing a manic psychotic episode is to not threaten the subject, to continue with calming language, to give space so long as his location remained innocuous to the community, all the while waiting for back-up and medical personnel to arrive (DiMaio & DiMaio, 2005).

The courts have often spoken to the practice of law enforcement officers creating exigencies through the use of poor tactics. Though officers may perform discretionary functions, they may not create a more dangerous situation by their actions than the one that had previously existed. With the officers admitted knowledge of ExDS, they knew or should have known that physically engaging Miller without adequate medical support would likely exacerbate the physiologic affects that Miller was suffering. Indeed, the officers testified that anything that increases the physiological stress response of a person, which includes engaging the person in a struggle, exerted pressure on the person's body while restrained, striking or kicking the individual, and applications of a Taser all increase the cardiac and respiratory demands on a person resulting in an increased likelihood of cardiac arrest.

The reasonableness standard of the 4th Amendment requires that police tactics be reasonable and that officers consider the totality of the circumstances before, during and after any governmental intervention. The balancing test of the Fourth Amendment requires that officers measure *the need* to use force against the Constitutional rights of the citizen who is subject to the use of force. In the officers' view, Jordn Miller appeared to be suffering from an episode of mental distress. They were trained to recognize and did believe that Miller was showing symptoms of ExDS the moment they arrived on the scene. Though Miller had created a community spectacle, he was not in the act of committing a violent crime that required immediate apprehension.

However, the expectation that officers will stand their ground must be tempered with proper training protocols and decision-making criteria. Officers are expected to adjust their tactics to accommodate situations on a case-by-case basis by doing what is necessary to bring situations to their safest and most peaceful conclusions. Though mental illness and episodes of psychotic breaks sometimes masquerade as criminal events, officers are trained to understand that they often actually represent medical emergencies that require different interventions. The officers that responded to Jordn Miller claimed to know that he was likely suffering from an acute mental health crisis and/or ExDS episode. They purport to be trained in managing ExDS events yet their actions were not consistent with recommended guidelines for law enforcement first responders.

The data shows that forcing a struggle an ExDS victim and/or a person in an acute mental health crisis raises the calculable odds significantly that the individual will die. According to DiMaio and DiMaio the recommended procedures must take into account the following guidelines:

1. Identify symptoms and signs of ExDS.

2. Physical intervention should be a last resort.

3. Attempt to create a safe environment.

4. If two officers are present

    a. Only one officer should make contact with the ExDS subject while maintaining a safe distance.

    b. The second officer should be attending to environmental control by removing potentially hazardous objects, removing bystanders, and reducing stimulation.

5. Individuals in acute psychosis are not experiencing reality. Responders should make simple demands in a non-challenging manner.

6. Communicate willingness to help. "You seem upset," "We can help," "I'm here to help you," "You are safe"

7. Offer positive feedback in a positive manner.

8. Remain patient as you help them to calm down and regain control.

9. Make slow, non-threatening movements.

10. Try to identify someone who may have good rapport with the ExDS subject.

11. "If a struggle with a violent individual can be avoided, death from ExDS is avoided." [pg. 104]

If physical restraint is absolutely unavoidable then officers are encouraged to use overwhelming force in the form of several officers (5-6) to end the struggle quickly. This is the same tactic that has been used in mental institutions since the turn of the century when Bell's Mania was first formally documented.

33

The majority of cases of ExDS individuals who have died have occurred from several minutes to one hour after a struggle. A major concern of initiating a struggle with an ExDS victim is inducing a heart attack. There have not been any recorded cases of any ExDS subject surviving after experiencing cardiac arrest, even when emergency personnel were present and advanced life support was started. It is speculated that cardiopulmonary arrest due to ExDS is irreversible. The common wisdom is to lower the risks to a cardiovascular event by avoiding restraint and struggle.

### C.      Effects of Electronic Control Device (ECD) on ExDs

The officers attempted to subdue Miller after he was both partially and fully handcuffed with the use of the TASER. According to the officers, *"Officer Holsopple again tried to get his arm, however it was now right next to his face, and that would have been impossible without also getting bit. Officer Scherer then informed Officer Holsopple that he was going to deploy the Taser, at which time, Officer Holsopple moved away a little bit to the side to get ahold of his arm. Officers lifted up his shirt then Officer Scherer deployed the Taser. The darts struck him in the middle of the back and were about three inches apart from each other. Officer Scherer also put the Taser on his right thigh as a drive stun maneuver to make a good connection"*

After Miller had been properly handcuffed the officers reported, *"he was still out of control, trying to turn on his side. He was again given verbal commands to stop fighting and to stop resisting and he didn't so after he raised up again. Officer Scherer cycled the Taser again, but this time, it had no effect."*

The ECD (also called a conducted electronic weapon (CEW)) is designed to cause involuntary muscular contractions. ECDs have been implicated in some in-custody deaths. The most popular ECD is the TASER, manufactured by TASER International in Scottsdale Arizona. The TASER is a neuro-muscular inhibiter that causes an involuntary contraction of effected muscles electrical cycle through the use of projectile barbs which when fired at a target, are expected to lodge in the clothing or skin of a person to complete an electric circuit. For a full five seconds, 50,000 volts of low amperage current courses through the target ordinarily overriding the body's

natural neural mechanisms, forcing the muscles to contract. Most often, standing persons so affected will topple and fall as they lose total ambulatory control. Sheer meanness and madness are not enough, generally, to overcome the effective use of a Taser. Though a shock from a Taser hurts, it is not the pain that causes it to be so extraordinarily effective. It operates at a different level than most police equipment whose applications are limited to pain and mechanical compliance. The Taser works because it interrupts the body's natural neural/muscular functioning. It is one of the few police tools that works nearly all of the time on nearly everyone. Both anecdotal and empirical research support this conclusion; resulting in Taser being one of the most commonly used forms of self-defense. However, the use of the ECD comes with certain risks, particularly in controlling individuals in compromised populations.

The use of a Taser for subduing subjects suspected of suffering from ExDS is widely debated and controversial. Taser International has argued in the past that its flagship brand may be the only way to subdue an individual quickly enough to administer medical attention. However, in light of increasing lawsuits, Taser International has recently cautioned officers about using the Taser on subjects suspected of suffering from ExDS.

Some researchers suggest that the Taser can compromise respiration. Studies on animals bear this out (Dawes, Ho, Reardon, Sweeney, & Miner, 2010) but the findings have not been replicated in human trials. Tests on human subjects regarding the Tasers effects on respiration are confounded by important variables that are limited in research studies. In particular, human trials have only been conducted on healthy individuals in clinically controlled environments. Because it is unclear whether ECDs will affect breathing and perhaps bring about cardiac episodes in vulnerable populations, Amnesty International (2004), Police Executive Research Forum (PERF) (2005), and the National Institute of Justice (2011) all cite concerns about deploying them on identified ExDS candidates. These organizations hope that police policy will err on the side of caution until more can be known about how the effects of Taser may further complicate already compromised individuals.

TASER International has recently recognized the potential contribution that CEWs may have on ExDS and provides the following warning: *"Some individuals may be particularly susceptible to the effects of CEW use. These susceptible individuals include the elderly, those with heart conditions, asthma or other pulmonary conditions, and people suffering from excited delirium, profound agitation, severe exhaustion, drug intoxication or chronic drug abuse, and/or over-exertion from physical struggle. In a physiologically or metabolically compromised person, any physiologic or metabolic change may cause or contribute to sudden death."*

### 4.    POSITIONAL, POSTURAL, OR RESRAINT ASPHYXIA

For years, law enforcement agencies have prohibited officers from placing a person in face-down prone restraint and further prohibit officers from exerting compressive force on the bodies of subjects while they are restrained in a face-down prone position. Recognizing the dangers of injuries caused by improper positioning or restraint, courts throughout the country have ruled that exerting compressive force on a person who is in prone restraint is objectively unreasonable. These legal opinions, as well as medical research, have influenced the practices of police departments across the country. Police departments throughout the country have instituted policies to assure that a subject's airway remains uncompromised and their postural position allows for the full expression of the individuals breathing apparatus. In turn, any reasonable officer should know to avoid exerting compressive force on a person who is restrained.

Restraint deaths have been the focus of much research. From 1985-2008 a total of 75 publications (found in a database search of MedLine and ProMed) addressed sudden death in custody in which the manner of restraint was the primary issue assessed. Positional asphyxia is a form of postural asphyxia, whereby a person's ability to breath is compromised by external forces that act upon the human body. This can be a result of odd positioning, for instance placing a prisoner in a folded-up position in the back of a police car, or stacking weight on the subject's back to prevent the expression of the individual's breathing apparatus. The theory of restraint death liability in civil law is that the law enforcement officer's actions during or after an arrest may violate accepted standards of care for the proper handling and/or transport of prisoners. Indeed,

36

custody denotes a full responsibility by government officials for the safety and welfare of the prisoner/arrestee.

The practice of placing an officer(s) body weight on the back of an agitated subject who is handcuffed and recovering from a severe struggle is against the industry practice and violates a fundamental standard of care in police work. Respiration is dependent on a "bellows" mechanism via the action of the abdominal wall, diaphragm, intercostal muscles, and accessory muscles of respiration (Shkrum & Ramsay, 2007). Preventing this mechanism from fully expressing can result in incomplete air exchange up to and including complete asphyxiation. Positional restraint asphyxia occurs when a person's body position interferes with breathing either by compressing the chest, obstructing the airway, or causing difficulty breathing.

Defendants Scherer, Holsopple, and Moore were all aware of the life-threatening dangers of exerting compressive force on a subject restraining someone in a prone position as of September 8, 2015. Prone position means lying face down on your stomach. These defendants agreed that positional restraint asphyxia is a life threatening medical condition that can cause cardiac arrest and death.

The officers agreed that when engaging subjects, officers must always be mindful of the risks of positional asphyxia. The officers further acknowledged that face-down prone restraint is a risk factor for positional asphyxia, and, therefore, officers must reposition subjects out of prone restraint as soon as possible. As the officers acknowledged, getting person out of face-down prone restraint decreases the risks of positional asphyxia by alleviating pressure from the chest or diaphragm. Additionally, compressive force on the subjects body is to be avoided.

The officers further claimed to understand that adding stress to an already compromised individual is dangerous and can cause heart dysrhythmia, cardiac arrest, difficulty breathing, and sudden death. Thus, when deciding to use force or what degree of force to use, officers must consider whether the body is showing signs of physiologic stress. These agreements are all consistent with reasonable police practices.

37

The officers also testified to knowing that being under the influence of drugs, in an acute mental health crisis, suffering from "excited delirium," or being exposed to an ECD all increase the physiological stress response of the body thereby increasing the body's oxygen demands and further risking physical compromise. The officers further agrees that engaging a person in a struggle increases the physiological stress level by increasing agitation and triggering the body's fight or flight mechanism and increasing the risk of positional restraint asphyxia. The officers candidly admitted at deposition that the safest position for Miller would be one that did not involve prone restraint.

Despite the risks of positional asphyxia known to the officers, once Miller was extracted from the Jeep, he remained in prone position until he after he was unresponsive and EMS arrived to roll him over. While Miller was prone, Scherer kicked Jordn, Holsopple forearmed Miller into the back of his head, Scherer used an ECD multiple times, the officers used their body weight and hands to hold Miller in a face-down prone position after he was handcuffed.

Holsopple further admitted that he knew that Miller had debris, "gravel," and a "rock or two" from the driveway in his mouth but chose not to remove it. None of the officers removed the debris from Miller's mouth. No officer gave CPR to Miller. Miller was still handcuffed behind his back in face-down prone restraint when EMS arrived. It was EMS who ultimately rolled Miller onto his back.

In their Investigative Note, the officers reported that, "*Officer Scherer had his foot on his (Miller's) left leg to try to keep him from kicking us. Officer Holsopple was on his knees beside him, on the ground, and the officer was holding one hand that was cuffed and his other hand was holding down his right leg also prevent him from kicking. Sgt. Moore had her right foot on his (Miller's) left shoulder blade to keep him from arching up and turning his head to bite anyone.*"

By their own admissions, the officers did violate their own policy as well as generally accepted police practices. The directive by Chief Smith (2009) clearly states, *"any officer who encounters a person who exhibits any warning signs of "excited delirium" shall immediately summon EMS and have them respond to a nearby staging area, summon for additional police backup, make any and all attempts to take control of the subject for medical assessment."* The point has previously

been made that the officers did not immediately summon EMS upon recognizing the signs of ExDS and they did not have them respond to a staging area as required. In fact, EMS were not called until after the first Taser deployment. *"Officers lifted up his shirt then Officer Scherer deployed the Taser. The darts struck him in the middle of the back and were about three inches apart from each other. Officer Scherer also put the Taser on his right thigh as a drive stun maneuver to make a good connection. At this time, Officer Scherer advised dispatch that there was a Taser deployment and to send the fire department."*

It appears from the Use of Force report that EMS was called because of the Taser deployment. The officers confirmed this fact in his deposition. Accordingly, EMS was called for an ECD deployment as a matter of course rather than out of concern for the wellbeing of Miller, who the officers recognized as being in the throes of mental health crisis and displaying numerous warning signs of ExDS. With respect to positional asphyxia, the directive further states, *"it will be our directive not to leave the subject laying in a "face down prone position."* The officers candidly admit that after they had Miller in handcuffs that left him face down until his breathing began to shallow. Paramedic DeWolfe confirmed in his deposition that Miller was still in face-down prone restraint and cuffed behind his back when EMS arrived.

The officer's arrest procedures are  proximate to the medical distress that Miller suffered immediately following his struggle and restraint. The directive by the Springfield Township Chief of Police was put in place to remove the specter of positional asphyxia and it is clear that the protocols and the accepted standard of care for the care and custody of a potential ExDS individual were not adhered to.

## VI.    SUMMARY OF OPINIONS

1.      Officers of the Springfield Township Police Department were called by the Plaintiff to assist in a medical emergency involving Jordn Miller' mental health crisis.

2.      The responding officers were informed and believed that Miller was suffering some type of a psychotic break evidenced by his unusual, erratic, and nonsensical behavior.

3.      The officers understood that Miller was under a diminished mental capacity that prohibited his ability to understood his surroundings and to properly follow commands.

4.      Jordn Miller's mother was familiar with Millers baseline behaviors. She gave Springfield Township Police Department call taker sufficient information to cause a reasonably well- trained communications officer to recognize tell-tale signs of a potential case of excited delirium.

5.      Officer Scherer and Officer Holsopple were both trained to recognize signs and symptoms of excited delirium. Officer Scherer was an agency instructor in the signs, symptoms and response to ExDS. His advanced training and knowledge should reasonably anticipate a higher standard of care than reported.

6.      Upon arrival, Scherer and Holsopple did admittedly recognize that Miller was exhibiting signs and symptoms consistent with excited delirium yet they failed to act on the accepted protocols prescribed to manage this syndrome.

7.      Upon arrival, the officers found Miller confined inside of a vehicle. Four citizens were holding the doors shut to keep him inside. The officers were correct to remove the citizens from the vehicle for their safety and decrease the stressful nature of the situation.

40

8.     Rather than calling for EMS and waiting for them to arrive in a staging area before initiating a struggle, the officers immediately entered the vehicle and attempted to seize Miller by a show and use of force. This degree of force was unnecessary, unwarranted, and excessive under the circumstances and inconsistent with generally accepted police practices.

9.     The officers made no attempt to calm Miller while he was contained in the Jeep and offered no direct physical threat. This was a violation of the accepted standard of care for individuals potentially suffering from ExDS and/or a mental health crisis.

10.    The officers attempted to forcibly extract Miller from the vehicle and in doing so increased the known life-threatening features associated with ExDS and/or a psychotic break caused by other means.

11.    Proximate to the vehicle extraction, a significant struggle ensued. Miller was eventually overpowered with strikes, body weight and TASERS. Violence of this type exacerbates the stress in delusional, agitated individuals.

12.    Officer Scherer used his TASER twice on Miller after he was partially and fully handcuffed. The TASER was unnecessarily used as a control technique rather than for personal defense. TASERs are known to increase the body's physiological stress response increasing the oxygenation demands leading to serious injury or death for a medically and/or mentally compromised individual presenting as Jordn Miller did on September 8, 2015.

13.    The officers restrained Miller in a face-down prone position after being handcuffed. This was in violation of a Springfield Township Police directive issued by the Chief of Police in 2009 and in violation of well-accepted industry standards.

14.    To prevent Miller from getting up or transitioning out of a face-down prone position, officers applied body weight to his prone position, which is well-known in the industry to compromise the breathing apparatus and prohibited by industry standards.

15.    The officers failed to use accepted intervention techniques commonly recommended for managing psychotic episodes and persons in need of emergency medical help.

16.    Officers knew or should have known that if Miller was delusional, it was unlikely that he could recognize the law enforcement officers as officials. Based upon the officers' reports Miller did not possess the mental capacity to understand their authority. Voluntarily engaging him in a physical confrontation was likely to result in an unnecessary protracted struggle with predictably grim results.

17.    The amount of force used by Scherer, Holsopple, and Moore given the totality of the circumstances based upon the information they possessed at the moment violated industry standards and was excessive and unreasonable.

18.    If the officers involved had followed accepted police practices, the confrontation and injuries involved more likely than not would have been avoided.

19.    Springfield Township Police Department failed to properly train its police officers, including Scherer, Holsopple and Moore on appropriate intervention techniques for mentally ill, emotionally disturbed, or agitated members of the community.

20.    Springfield Township Police Department failed to properly train its police officers, including Scherer, Holsopple, and Moore on appropriate uses of force on restrained individuals.

42

21. Springfield Township Police Department failed to properly train its police officers, including Scherer, Holsopple, and Moore on appropriately positioning and restraining members of the public.

22. Springfield Township Police Department failed to properly train its police officers, including Scherer, Holsopple, and Moore on appropriate uses of force on medically compromised individuals.

23. Springfield Township Police Department developed insufficient policies, practices, and informal customs regarding the uses of force against medically and mentally compromised individuals such that it was likely that officers from the department would engage in the type and degree of excessive and unreasonable force exhibited against Jordn Miller on September 8, 2015.

These are my findings based on the relevant evidence submitted to me. As additional information is made available and as new facts may be uncovered during the discovery process, my professional opinions may change to reflect the newfound information; however, the opinions expressed herewith are current and are based upon the information reviewed and my experience as of this date.

FEE STRUCTURE AND RECOLLECTED CASES:

I have testified in trials and deposition both in State and Federal Court. My rate of compensation is a flat fee of $3000.00 for the case review and the submission of a report. Depositions are compensated at a flat rate of $1500.00 for a regular deposition. Trial appearance is compensated at a rate of $1800.00 per Reasonable reimbursement for travel and meals is not included in these rates.

VII.    PUBLICATIONS

- How to choose a Reality Fighting Instructor, Black Belt Magazine; Nov 2009, Co-author
- Florida FDLE CJSTC Video Production for Defensive Tactics: Set Director
- The Eddie Griffin Show: Television Pilot, Consulting Producer, Police Technical Advisor, Police segment with Tampa Police Department, VH1, Pilot
- Female Forces: Television Series (13 Episodes), Consulting Producer, Police Technical Advisor, The BIOGRAPHY Channel
- Rookies – Tampa: Television Series (8 episodes), A&E
- Operation Wild Season 1: Television series, Consulting Producer, Police Technical Advisor Boutique TV, Planet Green (DISCOVERY CHANNEL), Six episodes
- Operation Wild Season 2: Television series, Consulting Producer, Boutique TV, Planet Green (DISCOVERY CHANNEL), Ten episodes
- Unleashed; Broward County K-9 (6 episodes); Television Series, Consulting Producer, Police Technical Advisor, Thinkfactory Media, TLC
- World's Wildest Police Videos (13 episodes): Television Series, Field Segment Producer, Pilgrim Productions, SPIKE TV
- Landmark Use of Force Cases: Interactive DVD, Writer and on camera host. Summer 2007
- FDLE CJSTC BRC CMSII: (Basic Recruit Curriculum, State of Florida) 2008
- FDLE CJSTC BRC CMS: (Basic Recruit Curriculum, State of Florida) 1999
- *Meeting the Demands of the Contemporary Ground Encounter*: The Law Enforcement Trainer, Volume 12 number 7; Jan/Feb 1998
- *Using the Tools of Persuasion*: The Law Enforcement Trainer; Volume 20, number 2, Apr/May 2005
- *Center Mass Shooting to Kill*: The Law Enforcement Trainer; Volume 20, number 4, Nov/Dec 2005
- Exploring Criminal Justice: contributing author, college level textbook, 2006 by McGraw-Hill.
- *Manuals published by RRB Systems, International and used by law enforcement, corrections, military and security agencies and personnel in various parts of the world.*
- The Rapid Rotation Baton Basic Training Manuals; 1996
- The Rapid Rotation Baton Basic-Experienced Training Manual
- The Rapid Rotation Baton Intermediate Training Manual
- The Rapid Rotation Baton Advanced Training Manual
- The Rapid Rotation Baton Instructor Training Manual (Translations in Spanish, German and Korean)
- The Rapid Cuff: Training Manual (Instructor) 1998(Translations in Spanish and German)
- GROUNDFIGHT!: Training Manual (Instructor) 2000
- Oleo-Resin Capsicum (OCI) Training Manual (Instructor) 2000
- Pepper Ball: *(Instructor Course, SA-200, SA-10 Armorer's Manual) 2002*
- Defensive Tactics Instructor (DTI): *(Instructor Manual) 1996*
- PROTECTORS Occupational Fitness (Instructor Manual) 2008

- Vascular Neck Restraint Instructor Manual 2009

## VIII.    PRIOR TESTIMONY

The following are cases in which I have offered opinions in court:

1.    **Criminal - Grand Jury Presentment for the Prosecutor Georgia:**

   *In the matter of Isaiah Goar* (for the Prosecution)

   **Recognized Expertise:**

   - Official use of Deadly Force by Police
   - Police Procedures

2.    **Civil – Trial:**

   *William Hamilton v. Warden LaJoie, et al* (For the Plaintiff) Civil Action no. 3:07cv148(jba) United States District Court, District of Connecticut

   **Recognized Expertise:**

   - Corrections procedures
   - Defensive tactics
   - Use of force
   - Use of aerosol spray
   - Security Video recording equipment

3.    **Criminal –Trial:**

   *State v. Jan Patrick Squire* (For the Defendant) Case no. 2009-CF-010629, Twelfth Judicial Circuit in and for Sarasota, County, FL

   **Recognized Expertise:**

   - Police Use of Force

4.    **Criminal – Hearing, Stand your Ground Immunity**

   *State of Florida v. Alan Wayne Rice* (For the Defendant) Case No. 09-0059CF, Fourteenth Judicial Circuit of Florida

**Recognized Expertise:**

- Self Defense
- Combat Stress

5.    **Criminal- Trial:**

*State of Kansas v Scott Michael Weigel* (For the Defendant) Case No.13-CR-2, District Court of Lincoln County Kansas

**Recognized Expertise:**

- Clutch Reflex
- 

6.    **Criminal – Hearing, Stand Your Ground Immunity**

*State of Florida v Augustine Wylie* (For the Defendant) Case No. 06-CF-019669, Twentieth Judicial Circuit of Florida

**Recognized Expertise:**

- Self Defense
- Combat Stress

7.    **Civil – Trial:**

*Derrick Dupont v. County of Jasper, et al* (For the Plaintiff) Case No: 2008-CP-27-529, State of South Carolina in the Court of Common Pleas, County of Jasper

**Recognized Expertise:**

- Police procedures
- Use of Force
- Defensive Tactics

8.    **Civil – Trial:**

*Roeber v Makowiecki et al* (For the Defendant) Case No.8:2007cv00954, Florida Middle District Court

46

*Trial 09/23/08*

**Recognized Expertise:**

- Corrections procedures
- Use of Force
- Defensive Tactics

9.    **Civil – Trial**

*Javier Pita v City of North Miami Beach, Fl*., et al. (For the Plaintiff), Case No.:13-23682-CIV-MOOR, United States District Court, Southern District of Florida

*Trial 01/14/15*

**Recognized Expertise:**

- Police procedures
- Defensive Tactics
- Use of Force

FURTHER AFFIANT SAYETH NOT.

Signature: _____ Print Name: Roy R. Bedard

STATE OF FLORIDA
County of LEON

Sworn to and subscribed before me this 22ND day of August, 2017, by Roy Bedard who is personally known to me. NOTARY SEAL:



Notary Public - State of Florida

Print Name: Bettsy Hawe Mitchell

Commission No: 170662

BETTSY HOWE MITCHELL
Commission # FF 170662
Expires October 22, 2018
Bonded Thru Troy Fain Insurance 800-385-7019